**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RUBY FREEMAN | |
| and | Civil Action No. 21-3354 (BAH) |
| WANDREA MOSS, | |
|           Plaintiffs, | Chief Judge Beryl A. Howell |
|     v. | |
| RUDOLPH W. GIULIANI, | |
|           Defendant. | |

**MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND................................................................................................. 4

   I.     THE ACTIONABLE STATEMENTS ARE OF AND CONCERNING PLAINTIFFS... 14

      A.    Statement 1 Identifies Both Plaintiffs By Name. ....................................................... 15

      B.    Defendant Giuliani Concedes That Statements 2, 3, And 6 Explicitly Name Ms. Freeman................................................................................................................................. 16

      C.    All Of The Actionable Statements Refer to Ms. Freeman and Ms. Moss By Description.......................................................................................................................... 16

      D.    Although Not Required, Plaintiffs Sufficiently Allege That They Were Harassed Because of Defendant Giuliani's Statements........................................................................ 19

   II.     THE ACTIONABLE STATEMENTS ARE NOT PROTECTED OPINION.............. 20

   III.    THE STATEMENTS IN THE GIULIANI STRATEGIC PLAN ARE ACTIONABLE. ....................................................................................................................... 27

      A.    The Statements In The Giuliani Strategic Plan Are Not Time-Barred....................... 27

      B.    The Complaint Plausibly Alleges That Defendant Giuliani Is Responsible For The Giuliani Strategic Plan. ...................................................................................................... 30

   IV.    STATEMENT SIX IS ACTIONABLE BECAUSE THE COMPLAINT PLAUSIBLY ALLEGES THAT GIULIANI CAUSED ITS PUBLICATION. ............................................... 31

      A.    Giuliani Is Liable For Defamatory Content That He Caused To Be Published. ........ 31

      B.    The Complaint Pleads Sufficient Facts To Demonstrate The Foreseeability Of President Trump's Republication. ........................................................................................ 32

   V.     THE COURT NEED NOT CONSIDER AND, IF IT DOES, SHOULD REJECT THE MOTION'S ARGUMENTS AS TO ACTUAL MALICE. ...................................................... 33

      A.    The Complaint Sufficiently Pleads That Ms. Freeman Is Not A Limited Public Figure................................................................................................................................... 34

      B.    The Complaint Sufficiently Pleads Actual Malice As To The Three Criminal History Statements........................................................................................................................... 38

   VI.    THE COMPLAINT SUFFICIENTLY PLEADS CONSPIRACY. ............................... 40

   VII.   THE COMPLAINT SUFFICIENTLY PLEADS IIED.................................................. 43

CONCLUSION.................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta Orellana v. CropLife Int'l,*
    711 F.Supp.2d 81 (D.D.C. 2010) ............................................................41

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..............................................................................34

*Azzam v. Rightway Dev. Inc.,*
    789 F.Supp.2d 110 (D.D.C. 2011) ..........................................................45

*Bancroft Glob. Dev. v. United States,*
    330 F.Supp.3d 82 (D.D.C. 2018) ............................................................13

*Bayatfshar v. ARINC, Inc.,*
    961 F.Supp.2d 206 (D.D.C. 2013) .....................................................23, 24

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................5, 13, 34

*Bethel v. Rodriguez,*
    No. CV 20-1940 (RC), 2021 WL 1340961 (D.D.C. Apr. 9, 2021) .............13

*Blankenship v. Napolitano,*
    451 F.Supp.3d 596 (S.D. W. Va. 2020), *on reconsideration in part sub nom,*
    *Blankenship v. Fox News Network, LLC,* 510 F.Supp.3d 356 (S.D. W. Va.
    2020) ....................................................................................................40

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.,*
    757 F.3d 1125 (10th Cir. 2014) ..............................................................25

*Browning v. Clinton,*
    292 F.3d 235 (D.C. Cir. 2002)...........................................................18, 19

*Carroll v. TheStreet.com, Inc.,*
    No. 11-CV-81173, 2012 WL 13134547 (S.D. Fla. May 25, 2012).............40

*Caudle v. Thomason,*
    942 F.Supp. 635 (D.D.C. 1996) ........................................................16, 32

*Chandler v. Berlin,*
    998 F.3d 965 (D.C. Cir. 2021) ..........................................................30, 32

*Clyburn v. News World Commc'ns, Inc.,*
    705 F.Supp. 635 (D.D.C. 1989)..............................................................38

*Coclough v. Akal Sec., Inc.,*
   303 F.Supp.3d 123 (D.D.C. 2018) ...................................................................27, 29

*Competitive Enter. Inst. v. Mann,*
   150 A.3d 1213 (D.C. 2016) ...........................................................................20, 23, 24

*Couch v. Verizon Commc'ns, Inc.,*
   No. 20-2151 (RJL), 2021 U.S. Dist. LEXIS 188637 (D.D.C. Sept. 30, 2021).......................44

*Croixland Props. Ltd. P'ship v. Corcoran,*
   174 F.3d 213 (D.C. Cir. 1999)....................................................................14, 15, 16, 20

*Cunningham v. United Nat'l Bank of Wash.,*
   710 F.Supp. 861 (D.D.C. 1989) ...............................................................................14

*Dameron v. Washington Magazine, Inc.,*
   779 F.2d 736 (D.C. Cir. 1985) ............................................................................37, 38

*Doe v. Roman Cath. Diocese of Greensburg,*
   No. CV 20-1750 (EGS), 2022 WL 203455 (D.D.C. Jan. 24, 2022).........................................43

*Drejza v. Vaccaro,*
   650 A.2d 1308 (D.C. 1994) ...................................................................................44

*Elias v. Rolling Stone LLC,*
   872 F.3d 97 (2d Cir. 2017)...................................................................................15

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC,*
   194 F.Supp.3d 263 (S.D.N.Y. 2016).....................................................................20, 26

*Fetler v. Houghton Mifflin Co.,*
   364 F.2d 650 (2d. Cir. 1966)................................................................................15

*Firestone v. Firestone,*
   76 F.3d 1205 (D.C. Cir. 1996) ...............................................................................29

*Fridman v. Bean LLC,*
   No. CV 17-2041 (RJL), 2019 WL 231751 (D.D.C. Jan. 15, 2019).....................................34, 35

*Fridman v. Orbis Bus. Intel. Ltd.,*
   229 A.3d 494 (D.C. 2020), *cert. denied*, 141 S. Ct. 1074 (2021)...............................35, 36, 37

*Gertz v. Robert Welch, Inc.,*
   418 U.S. 323 (1974).........................................................................................36

*Gonzalez Ramos v. ADR Vantage, Inc.,*
   Case No. 18-cv-1690 (APM), 2021 WL 4462611 (D.D.C. Sept. 29, 2021)..............................29

*Gross v. New York Times Co.,*
  82 N.Y.2d 146 (1993) .................................................................................26

*Gullaksen v. United Air Lines,*
  68 F.Supp.3d 66 (D.D.C. 2014) ...................................................................5

*Haynes v. Alfred A. Knopf, Inc.,*
  8 F.3d 1222 (7th Cir. 1993) .........................................................................23

*Hughes v. Rhodes,*
  141 S.E.2d 841 (Ga. Ct. App. 1965) ...........................................................32

*Hutchinson v. Proxmire,*
  443 U.S. 111 (1979) .....................................................................................36

*Jankovic v. Int'l Crisis Grp.,*
  494 F.3d 1080 (D.C. Cir. 2007) ..................................................................28

*Jenoff v. Hearst Corp.,*
  644 F.2d 1004 (4th Cir. 1981) .....................................................................36

*Kassel v. Gannett Co.,*
  875 F.2d 935 (1st Cir. 1989) .......................................................................36

*Lagayan v. Odeh,*
  199 F.Supp.3d 21 (D.D.C. 2016) ................................................................42

*LaRue v. Johnson,*
  Civ A. No. 16-00504, 2018 WL 1967128 (D.D.C. Feb. 22, 2018), *report and
  recommendation adopted*, No. CV 16-504 (EGS), 2018 WL 2561036 (D.D.C.
  Apr. 4, 2018) ...............................................................................................45

*Linguex, Inc. v. Murphy,*
  No. CIV. A. 93-1903, 1994 WL 289357 (D.D.C. June 21, 1994) ...............30

*Mar-Jac Poultry, Inc. v. Katz,*
  773 F.Supp.2d 103 (D.D.C. 2011) ..............................................................17

*McFadden v. Wash. Metro. Area Transit Auth.,*
  949 F.Supp.2d 214 (D.D.C. 2013) ..............................................................30

*McFadden v. Wash. Metro. Area Transit Auth.,*
  No. CV 14-1115 (RBW), 2016 WL 10672014, . (D.D.C. Apr. 5, 2016) ...............44

*McMullen v. Synchrony Bank,*
  164 F.Supp.3d 77 (D.D.C. 2016) .........................................................40, 43

*Milkovich v. Lorain Journal Co.,*
  497 U.S. 1 (1990)..............................................................................................*passim*

*MiMedx Grp., Inc. v. DBW Partners LLC,*
  No. CV 17-1925 (JDB), 2018 WL 4681005 (D.D.C. Sept. 28, 2018)..............................34, 35

*Mullin v. Washington Free Wkly., Inc.,*
  785 A.2d 296 (D.C. 2001) ......................................................................................28

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964)..............................................................................................38

*Nyambal v. Alliedbarton Sec. Servs., LLC,*
  344 F.Supp.3d 183 (D.D.C. 2018) ..........................................................................30

*Ollman v. Evans,*
  750 F.2d 970 (D.C. Cir. 1984) ...........................................................................20, 25

*Oparaugo v. Watts,*
  884 A.2d 63 (D.C. 2005) ........................................................................................32

*Pannell v. Prot. Strategies, Inc.,*
  No. CV 21-602 (EGS), 2022 WL 522993 (D.D.C. Feb. 22, 2022) .................................13

*United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.,*
  No. CV 15-750 (RC), 2020 WL 686009 (D.D.C. Feb. 11, 2020) .................................42, 43

*Peay v. Curtis Pub. Co.,*
  78 F.Supp. 305 (D.D.C. 1948) ................................................................................17

*Peck v. Tribune Co.,*
  214 U.S. 185 (1909)..............................................................................................17

*Polsby v. Spruill,*
  No. Civ. 96-1641(TFH), 1997 WL 680550 (D.D.C. Aug. 1, 1997) ................................19

*Porous Media Corp. v. Pall Corp.,*
  173 F.3d 1109 (8th Cir. 1999) ................................................................................36

*Ramos v. ADR Vantage, Inc.,*
  No. 18-cv-01690, 2018 WL 6680531 (D.D.C. Dec. 19, 2018) .................................16, 41

*Richards v. Mileski,*
  662 F.2d 65 (D.C. Cir. 1981)...................................................................................27

*S. Air Transp., Inc. v. Am. Broad. Cos., Inc.,*
  877 F.2d 1010 (D.C. Cir. 1989) ..............................................................................19

*Serv. Parking Corp. v. Wash. Times Co.,*
   92 F.2d 502 (D.C. Cir. 1937) ................................................................18

*St. Amant v. Thompson,*
   390 U.S. 727 (1968) ................................................................39, 40

*Tavoulareas v. Piro,*
   759 F.2d 90 (D.C. Cir. 1985) ................................................................32

*Thompson v. Trump,*
   No. 21-CV-00400, 2022 WL 503384 (D.D.C. Feb. 18, 2022) ................41

*US Dominion, Inc. v. Byrne,*
   No. 1:21-CV-02131 (CJN), 2022 WL 1165935 (D.D.C. Apr. 20, 2022) ...................... *passim*

*US Dominion, Inc. v. Powell,*
   554 F.Supp.3d 42 (D.D.C. 2021) ................................................................ *passim*

*Van Buskirk v. Cable News Network, Inc.,*
   284 F.3d 977 (9th Cir. 2002) ................................................................25

*Vasquez v. Whole Foods Mkt. Inc.,*
   302 F.Supp.3d 36 (D.D.C. 2018) ................................................................ *passim*

*Waldbaum v. Fairchild Publ'ns, Inc.,*
   627 F.2d 1287 (D.C. Cir. 1980) ................................................................35

*Weyrich v. New Republic, Inc.,*
   235 F.3d 617 (D.C. Cir. 2001) ................................................................21, 23

*White v. Fraternal Ord. of Police,*
   707 F.Supp. 579 (D.D.C. 1989) ................................................................16

*Wilbanks v. Wolk,*
   121 Cal. App. 4th 883, 17 Cal. Rptr. 3d 497 (2004) ................................................................26

*Wisey's #£1 LLC v. Nimellis Pizzeria LLC,*
   952 F.Supp.2d 184 (D.D.C. 2013) ................................................................44

*Wolston v. Reader's Digest Ass'n,*
   443 U.S. 157 (1979) ................................................................37

*Zimmerman v. Al Jazeera Am., LLC,*
   246 F.Supp.3d 257 (D.D.C. 2017) ................................................................31

**Other Authorities**

Fed. R. Civ. P. 26(1) ................................................................30

Restatement (Second) of Torts § 564 cmt. b (1977).................................................................15

Restatement (Second) of Torts § 576(b)–(c) (1977)...............................................................32

Plaintiffs Ruby Freeman and Wandrea ArShaye ("Shaye") Moss (collectively, "Plaintiffs") respectfully submit this Opposition to Defendant Rudolph Giuliani's Motion to Dismiss (Dkt. 26 ("Motion" or "MTD")) the Plaintiffs' First Amended Complaint (Dkt. 22 ("Complaint")).[1]

## INTRODUCTION

This is not a complicated case. It involves clear and legally cognizable claims that Defendant Giuliani defamed Ms. Freeman and Ms. Moss by repeatedly and baselessly accusing them of having engaged in crimes while working as election workers for Fulton County, Georgia on election night in 2020. Defendant Giuliani made those accusations without evidence in early December 2020, and continued to repeat them to anyone who would listen long after most senior Republican elections officials in the State of Georgia had emphatically and publicly demonstrated why his claims were nonsense. Defendant Giuliani persisted in repeating these false factual allegations about Ms. Freeman and Ms. Moss for more than a year even though he understood that they had no factual basis—or, as Defendant Giuliani confessed in a separate state but similar context, "We've got lots of theories, we just don't have the evidence."[2] Defamation law protects those who do nothing more than offer their theories and opinions on matters of the day, but that protection wanes when advocates make up (and repeat) false facts about others in the hope of advancing their theory du jour.

Defendant Giuliani defamed Ms. Freeman and Ms. Moss because he was unwilling to accept that his candidate of choice, former President Donald J. Trump, lost the 2020 presidential election, including the State of Georgia. To fight that result, Defendant Giuliani orchestrated a

---

[1] All references to "Complaint" refer to the Amended Complaint (Dkt. 22) unless otherwise noted.
[2] *Here's every word from the fourth Jan. 6 Committee hearing on its investigation*, NPR (June 21, 2022), https://www.npr.org/2022/06/21/1105848096/jan-6-committee-hearing-transcript (testimony of Rusty Bowers, the Speaker of the Arizona House of Representatives, before the Congressional Select Committee to Investigate the January 6th Attack on the U.S. Capitol).

plan to identify scapegoats who could be blamed for purported election fraud. Ms. Freeman and Ms. Moss became the two principal scapegoats in Georgia. Plaintiffs were convenient targets not because of anything they actually did, but instead because Defendant Giuliani simply insisted, without evidence, that a video showing Plaintiffs engaged in ordinary, appropriate, and lawful counting of absentee ballots in State Farm Arena on election night was in fact a "smoking gun" of criminal wrongdoing. He made these claims despite their inherent implausibility, including because by the time he made these claims, the State of Georgia had already confirmed the result of the election via a comprehensive hand recount of all ballots.

Unbothered and unconstrained by the truth, Defendant Giuliani launched a defamatory campaign that falsely accused both Plaintiffs, of engaging in voter fraud, including but not limited to: hiding illegal ballots in suitcases; concocting a plan to kick Republican election observers out in order to count the illegal ballots; counting ballots for President Biden multiple times; and passing around a flash drive to hack the election machines. Each of these statements is and was false, but the "evidence" was unimportant to Defendant Giuliani. He had his theory, which he spoon-fed to President Trump and Trump's surrogates, followers, and allies in the media. As a result, and as seemingly intended, Defendant Giuliani's lies about Plaintiffs spread rapidly and widely, and they have caused harm that persists to this day.

Defendant Giuliani's Motion does not assert that his statements were true. Nor does he challenge that the Complaint sufficiently pleads his knowledge that the majority of the statements at issue were false when he published them. Instead, Defendant Giuliani asks this Court to make legal conclusions unsupported by and contrary to law, factual findings inappropriate for this stage, and factual inferences that are unreasonable and implausible.

*First*, the Complaint sufficiently alleges that Defendant Giuliani's statements are "of and concerning" Plaintiffs because the statements either identify Plaintiffs by name, are accompanied by a video depicting them, or describe Plaintiffs in a way the law clearly recognizes as sufficient to establish identification. *Infra* § I.  *Second*, for several reasons, Defendant Giuliani is wrong as a matter of law that his statements accusing Ms. Freeman and Ms. Moss of engaging in criminal acts are opinions, not facts.  *Infra* § II.  *Third*, the statements contained in the Giuliani Strategic Plan are not time-barred, *infra* § III(A), and it would be inappropriate and implausible for this Court to infer that Defendant did not bear responsibility for the communications plan that *bears his name, infra* § III(B).  *Fourth*, the Complaint sufficiently alleges that Defendant Giuliani caused (and is therefore liable for) the publication of the statements about Plaintiffs by former President Trump on a call with Georgia's Secretary of State.  *Infra* § IV.  *Fifth*, while Defendant Giuliani concedes that the Complaint sufficiently pleads actual malice as to a majority of the statements, the Court need not reach the limited statements about Ms. Freeman that the Motion challenges on those grounds because the Complaint sufficiently alleges that she is a private figure.  *Infra* § V(A).  Even were that not the case, the Complaint pleads factual allegations sufficient to establish actual malice as to all the statements.  *Infra* § V(B).  *Finally*, the Motion provides no basis in law for dismissal of the Complaint's claims of conspiracy, *infra* § VI, and intentional infliction of emotional distress, *infra* § VII.  Plaintiffs respectfully submit that the Court should deny the Motion in its entirety.

## FACTUAL BACKGROUND

On November 3, 2020, Plaintiffs reported to State Farm Arena in Fulton County, Georgia to serve as nonpartisan election workers in the 2020 presidential election. ¶¶19–20, 30–32.[3]  Ms. Moss was an employee with the Fulton County Department of Registration and Elections and Ms. Freeman, to support her daughter, signed up as a temporary election worker for the Georgia 2020 general election, including on Election Day on November 3, 2020. ¶¶19–20.  As soon as it became clear that his candidate of choice was likely to lose—and before the results of the election had even been ascertained—Defendant Giuliani launched a campaign to dispute and undermine the election. He formulated and then executed a plan to deceive the American people into believing that the election was "stolen," a plan that soon thereafter targeted Ms. Freeman and Ms. Moss as unwitting scapegoats.  ¶¶140–62.  Over a matter of weeks, Defendant Giuliani's plan deployed fantastical and fabricated allegations to transform these two ordinary and unknown election workers into infamous pariahs and, tragically, the targets of a violent and racist mob.  ¶¶57–101.

Defendant Giuliani bears substantial and outsized responsibility for smearing Ms. Freeman and Ms. Moss.  ¶¶4–5.  On December 3, 2020, Trump Campaign surrogates, including Defendant Giuliani, were the first to broadcast security camera video from the State Farm Arena on Election Day showing grainy images of then unidentified Ms. Freeman and Ms. Moss engaged in nothing more than the ordinary process of ballot opening and tabulation (the "Trump Edited Video").  ¶¶6, 37–38.  Defendant Giuliani republished the Trump Edited Video on his Twitter account that afternoon, and, throughout early December, repeatedly published claims that Plaintiffs and other election workers had smuggled into State Farm Arena and illegally counted tens of thousands of fraudulent ballots.  ¶¶6, 69, 71–72.

---

[3] All citations to paragraphs refer to the Amended Complaint unless otherwise noted.  Plaintiffs adopt all defined terms as used in the Amended Complaint unless otherwise noted.

The day after Defendant Giuliani began using the Trump Edited Video to perpetuate lies about Fulton County and the Plaintiffs, Georgia officials announced that they had reviewed the entirety of the security camera video and concluded that there had been no fraud or misconduct in the November 3 vote count at State Farm Arena and that the security camera video showed "normal ballot processing."   ¶¶40–41.   Georgia elections officials gave multiple interviews and press conferences in early December 2020, refuting any claims of voter fraud, including the specific claims about Plaintiffs.  ¶¶44, 49–50.  *Two* hand recounts verifying the final results of the election were completed, the first on November 19, 2020, and the second on December 7, 2020, further underscoring that there was no truth to Defendant Giuliani's outrageous allegations.  ¶¶7, 34–36, 49, 52.  These factual refutations of the lies about Ms. Freeman and Ms. Moss, along with independent fact checks and the reported results of two recounts, were shared on Twitter and other social media platforms, and widely reported.  ¶¶42–43, 45, 48, 51–52, 54–55.

Nonetheless, sometime before December 27, Giuliani crafted and launched the Giuliani Strategic Plan with a stated goal of inspiring "citizens to call upon legislators and Members of Congress to disregard the fraudulent vote count and certify the duly-elected President Trump" by engaging in a nationwide communications plan.  Dkt. 26-3;[4] ¶¶9–10, 58, 61.  The Giuliani Strategic Plan identified Ms. Freeman and Ms. Moss *by name*, specifically by referring to the Trump Edited "Video of Ruby and Shay [*sic*] at midnight" at which time the document alleges there was a "200,000 vote bump" as a result of "a lie to get the Republican observers and media to leave at

---

[4] Defendant Giuliani appears to agree that the Court may take judicial notice of the Strategic Plan, particularly as it is attached to Giuliani's motion to dismiss at Docket Entry 26-3.  *Gullaksen v. United Air Lines*, 68 F.Supp.3d 66, 70 (D.D.C. 2014) ("In ruling on a 12(b)(6) motion, a court may consider facts alleged in the complaint, documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim.").  *See generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.13 (2007).

10:30 p.m." Dkt. 26-3 at 10; ¶¶62. In what it dubs "Suitcase Gate," the Giuliani Strategic Plan refers to the Trump Edited Video showing "'ballot stuffing' when 'suitcases' (container type) filled with ballots (approximately 6,000 in each container) were rolled out from under [a] table at GA arena and placed in tabulation machines" by "poll workers who remained AFTER all Poll Watchers (GOP and the like), press, and all third parties were required to leave the premises[.]" Dkt. 26-3 at 21; ¶63. The Giuliani Strategic Plan also stated that "Ruby Freeman is seen surreptitiously & illegally handing off hard-drives ON CAMERA" and that "Ruby Freeman (woman in purple shirt on video), now under arrest and providing evidence against GA SOS Stacey Abrams and DNC on advanced coordinated effort to commit voter / election fraud [*need confirmation of arrest and evidence*]." Dkt. 26-3 at 21 (emphasis in original); ¶¶60, 63.

From December 2020 and continuing even after Plaintiffs filed this lawsuit, Defendant Giuliani executed the Giuliani Strategic Plan by repeating the same defamatory lies about Plaintiffs across multiple platforms. Defendant Giuliani published or caused to be published nearly 50 Actionable Statements between December 23, 2020, and January 2022. *See* ¶¶57–101; *see supra* Actionable Statements Chart.

On January 2, 2021, then President Trump republished several of the false claims included in the Giuliani Strategic Plan on a phone call with Georgia Secretary of State Brad Raffensperger and others, when he asked Mr. Raffensperger to "find 11,780 votes" to flip the Georgia election result in his favor. ¶¶78, 80–84.

Defendant Giuliani attempts to recast the Actionable Statements by labeling each defamatory publication as a single defamatory statement (i.e., the Giuliani Strategic Plan as "Statement 1" and a December 23, 2020 Episode of *Giuliani's Common Sense* podcast as "Statement 2") even though each publication includes multiple actionable statements. For clarity,

Plaintiffs adopt the Motion's classification of the Actionable Statements without conceding that they each represent only a single statement and the below chart ("Actionable Statements Chart") lists the multiple, separate statements contained within each of the categories in the Motion.[5]

| Instance of Defamation | MTD No. | Actionable Statements |
|---|---|---|
| **Giuliani Strategic Plan** | 1 | • "Election Official Ruby Freeman is seen surreptitiously & illegally handing off hard-drives ON CAMERA in the Georgia counting facility." ¶60 (MTD Ex. A at 4). |
| | | • *YOU CANNOT LET AMERICA ITSELF BE STOLEN BY CRIMINALS – YOU MUST TAKE A STAND AND YOU MUST TAKE IT TODAY.*" ¶61 (MTD Ex. A at 6). |
| | | • "Video of Ruby and Shay at midnight . . . That is the time of the 200,000 vote bump . . . No Watermain Break – a lie to get the Republican observers and media to leave at 10:30pm" ¶62 (MTD Ex. A at 10). |
| | | • "'**Suitcase Gate**' - Video of 'ballot stuffing' when 'suitcases' (container type) filled with ballots (approximately 6,000 in each container) were rolled out from under table at GA arena and placed in tabulation machines (one batch repeatedly tabulated at least 3 times) by [X number] of poll workers who remained AFTER all Poll Watchers (GOP and the like), press and all third parties were required to leave the premises per announcement at or about [___ AM] until [___ AM] in violation of election laws enacted by GA state legislature." ¶63 (MTD Ex. A at 21). |
| | | • "Ruby Freeman (woman in purple shirt on video), now under arrest and providing evidence against GA SOS Stacey Abrams and DNC on advanced coordinated effort to commit voter / election fraud [*need confirmation of arrest and evidence*]." *Id.* |

---

[5] Plaintiffs include this chart to assist the Court's resolution of the Motion, but in doing so do not intend to waive the right to rely upon other statements omitted from the Actionable Statement Chart if properly pleaded in the Complaint. Plaintiffs reserve the right to pursue additional statements as actionable as they arise throughout the case, including as a result of discovery.

| Instance of Defamation | MTD No. | Actionable Statements |
|---|---|---|
| **12/23/2020, Episode of Giuliani's Common Sense** | 2 | • ". . . [T]he observers are being thrown out of the room. A phony excuse of a water main break was used. They still were thrown out of the room, didn't want to leave. Once they were all left and a last check was done around the hall, the workers for Atlanta—for Fulton County—the five or six, one of whom has a history of voter fraud participation, Ruby Freeman, uh, they scurry under these desks." ¶66. |
| | | • "[I]t's quite clear no matter who they're doing it for, they're cheating. It looks like a bank heist." *Id.* |
| **12/25/2020, Episode of Giuliani's Common Sense** | 3 | • "Ruby Freeman and her crew getting everybody out of the center, creating a false story . . . ." ¶69. |
| | | • "They get everybody out. They wait, they wait, they wait. They check, they check, they check, like they're gonna do a heist, and all of a sudden the crooks sprang into action." *Id.* |
| **12/30/2020, Rudy Giuliani Interview by OAN's Chanel Rion** | 4 | • "During that videotape, that we can all see right in front of our eyes, we can see them stealing the votes. We can see them throwing out the people. We can see them counting it four and five times." ¶71. |
| | | • "120,000 votes for Biden, couple hundred votes for Trump, no observers, makes it totally illegal." ¶71. |
| | | • "For a hundred years, this film will show that the, the 2020 presidential election, there was an attempt to steal it." ¶71. |
| | | • "I see, I can see the fraud, it's in front of my eyes. What am I supposed to do, close my eyes and make believe that in Fulton County, Georgia, when they closed the doors, and they got rid of the public, and they started triple counting ballots and it ends up being 120,000 for, for Biden and 3,000 for Trump? They weren't cheating?" ¶72. |
| **12/30/2020, Episode of Giuliani's Common Sense** | 5 | • [The Trump Edited Video] "proves that Georgia was stolen by, uh, Joe Biden and by the Democrats. That one video proves it." ¶74. |
| | | • "[T]he first thing that the election workers do . . . is they, um, move out the observers. . . . [T]hey make sure there's no one around, they make sure the doors are locked so nobody else can come in, and then at a certain point they look around again, and they go under a table covered by a black, like a black blanket, and they start pulling out ballots." ¶74. |

| Instance of Defamation | MTD No. | Actionable Statements |
|---|---|---|
| | | • "[The videotape is] just this one piece of evidence.  So don't tell me there wasn't fraud in this election.  And don't tell me I can't use the word 'fraud' . . ." ¶75. |
| **1/2/2021, Telephone Call Between Incumbent Candidate Trump and Georgia Secretary of State** | 6 | • "We had at least 18,000 that's on tape – we had them counted very painstakingly – 18,000 voters having to do with Ruby Freeman. She's a vote scammer, a professional vote scammer and hustler, Ruby Freeman." ¶80. |
| | | • "[T]hey said very clearly and it's been reported that they said there was a major water main break." ¶80. |
| | | • "Those votes were put there a number of hours before. The table was put there – I think it was – Brad, you would know. It was probably eight hours or seven hours before, and then it was stuffed with votes." ¶80. |
| | | • "But it had slow motion and it was magnified many times over, and the minimum it was was 18,000 ballots, all for Biden." ¶80. |
| | | • "[W]e're so far ahead of these numbers, even the phony ballots of Ruby Freeman – known scammer." |
| | | • "But the minimum number is 18,000 on the Ruby Freeman night where she ran back in there when everybody was gone and stuffed – she stuffed the ballot boxes. Let's face it, Brad. I mean, they did it in slow-motion replay magnified, right? She stuffed the ballot boxes. They were stuffed like nobody's ever seen them stuffed before." ¶81. |
| | | • "She stuffed the ballot – each ballot went three times. They were showing here's ballot number one, here it is a second, third time, next ballot." ¶81. |
| | | • "We have a new tape that we're going to release. It's devastating." ¶81. |
| | | • "You know, they put them in three times." ¶83. |
| | | • "And the minimum – there were 18,000 ballots but they used them three times. So that's, you know, a lot of votes. And that one event – and they were all to Biden, by the way; that's the other thing we didn't say. You know, Ruby Freeman, one thing I forgot to say which was the most important. Do you know that every single ballot she did went to Biden? You know that, right? Do you know that, by the way, Brad? Every single ballot that she did through the machines at early – early in the morning went to Biden. Did you know that, Ryan?" ¶84. |

| Instance of Defamation | MTD No. | Actionable Statements |
|---|---|---|
| | | • "No, they were 100 percent for Biden. One hundred percent. There wasn't a Trump vote in the whole group." ¶84. |
| | | • "We're way over that number, and just if you took just Ruby Freeman we're over that number by five or six times when you multiply it out times three, and every single ballot went to Biden." ¶84. |
| **1/6/2021, Insurrection** | 7 | • "In Fulton County, Republican poll watchers were ejected, in some cases, physically from the room under the false pretense of a pipe burst. Water main burst, everybody leave. Which we now know was a total lie." ¶88. |
| | | • "Then election officials pull boxes, Democrats, and suitcases of ballots out from under a table. You all saw it on television, totally fraudulent. And illegally scanned them for nearly two hours, totally unsupervised. Tens of thousands of votes. This act coincided with a mysterious vote dump of up to 100,000 votes for Joe Biden, almost none for Trump. Oh, that sounds fair. That was at 1:34 AM." ¶88. |
| **1/18/2021, Episode of OAN's In Focus with Stephanie Hamill** | 8 | • "I get banned from any of the big tech things when I say that not only was there voter fraud, I have evidence of it, I've seen it, I have a motion picture of it. I can show you the voter fraud in living color. It was done in Fulton County, Georgia, it was well over 30,000 ballots were stolen. They were attributed to Biden instead of Trump." ¶89. |
| **6/14/2021, Episode of OAN's The Real Story with Natalie Harp** | 9 | • "But for sure there was fraud, you can't say there wasn't fraud. . . . The law of Georgia is that the ballots have to be counted in public. They deliberately threw people out and counted the ballots in private, and there's videotape of it." ¶90. |
| | | • "They committed the crimes on video. You can see them do it. They lied about it. Then you can see these same people handing off flash drives to each other." *Id.* |
| | | • "I think Georgia is, uh, in terms of proof, the clearest proof." ¶91. |
| | | • "[B]ut, uh, in terms of proof, Georgia has every kind of proof you could possibly imagine." ¶91. |

| Instance of Defamation | MTD No. | Actionable Statements |
|---|---|---|
| | | • "[Y]ou can see them throw the people out. And the law specifically says you can't count in private, so they threw the people out. They used this phony excuse that there was going to be some kind of a water main break. It was not. There was no water main break, and then after the people were out—and you can just watch the way they're doing it. I mean, I've watched bank robberies. I mean, this, this looked like a bank robbery. They were doing it surreptitiously. And, uh, handing 'em off, and doing it quickly, and occasionally you can see them multiple count a vote. Now you take the two women who ran that, there are other tapes of them earlier in the day, handing off—handing off small, hard drives and flash drives, those flash drives were used to put in the machines—the machines that supposedly weren't, uh, accessible by internet, all of which were accessible by internet. So these women have gotten away scot-free." ¶91. |
| | | • "You see them unceremoniously ushered out. And then you see the woman check out the whole place to make sure there's nobody there and that's when they get the ballots from under the table, and that's when they start counting the ballots under the table." ¶91. |
| | | • "Another thing your listeners should understand, Natalie, is they did this in crooked Democratic cities. Not everywhere. This was a very, very well planned, executed, fraud." ¶92. |
| 7/23/2021, Episode of The Real Story with Natalie Harp | 10 | • "How about the videotape that I have where they're shoving the thing into the machine three and four times so they can be recounted by the same two women that earlier in the day were passing around hard drives or flash drives that supposedly can't be used in Dominion machines, but can." ¶94. |
| | | • "I have the truth." ¶94. |
| 12/10/2021, Episode of OAN's The Real Story with Natalie Harp | 11 | • "[T]hat videotape is about as clear evidence of stealing votes as I've ever seen." ¶96. |
| | | • "[Y]ou've got a tape in, in, in Georgia that's crystal clear, it looks like a, it looks like a bank robbery, my goodness." ¶96. |
| | | • "There's no doubt that people stole votes in that election for Biden, and the numbers are—I would say—way beyond what was necessary to switch the vote in about four states." ¶96. |

| Instance of Defamation | MTD No. | Actionable Statements |
|---|---|---|
| **1/12/2022, Episode of Giuliani's Common Sense** | 12 | • "So you remember, remember the, the very famous video of the whole day of the, there was a, uh, the arena had a, had a, had a security camera that was unknown to the participants. So several days, if not weeks, after the election the, the, uh, company came forward with tapes of this very suspicious activity where the people were thrown out of the arena, the observers." ¶99. |
| | | • "They then for about 15 minutes cased the place and made sure everyone was gone. Then they opened up this big blanket and under all the whole, all these ballots and then with no one observing in violation of the law they very seriously tried to count all these votes." ¶99. |
| | | • "[W]e are trying to rely on, relying on people who have lied in the past." ¶100. |
| | | • "[I]t looks like ballots were thrown away during that process and it looks like ballots were counted three or four times." ¶100. |

The impact of Defendant Giuliani's defamatory campaign was immediate and devastating. As a result of the defamation, Ms. Freeman has endured relentless harassment, including "Christmas cards" mailed to her address that read, "Ruby please report to the FBI and tell them you committed voter fraud. If not you will be sorry;" and "You deserve to go to jail, you worthless piece of shit whore." ¶143. Upon consultation with law enforcement, Ms. Freeman changed her phone number and email address, installed nearly a dozen pieces of security equipment to safeguard her home, and temporarily relocated from her home after the FBI determined she would not be safe in her home from January 6, 2021 through Inauguration Day. ¶¶140, 144, 146. A crowd surrounded Ms. Freeman's home on or around January 5, 2021. ¶145. Ms. Freeman was forced to shutter her business, pop-up clothing boutique LaRuby's Unique Treasures, because she was unable to safely attend public events or market online without harassment. ¶147. Ms. Freeman continues to receive threatening communications and fears for her safety when in public, and has lost friends as a result of being falsely accused of crimes. ¶¶148–50.

Ms. Moss has endured similar harassment and experienced negative consequences personally and professionally. For months, Ms. Moss received harassing phone calls, including one to a cell phone that her 14-year-old son was using during which the caller said that he "should hang alongside [his] nigger momma." ¶151. Strangers sent messages accusing Ms. Moss of treason, insisting that she deserved to die, and twice showed up at her grandmother's house and attempted to push through the front door to attempt a "citizens' arrest." ¶¶153, 155. This harassment followed Ms. Moss to work at the Fulton County Department of Registration and Elections where protestors gathered outside of the office calling for Ms. Moss to be fired. ¶157. Due to fear and anxiety, Ms. Moss has largely retreated from social life and has experienced negative health impacts. ¶¶160–61.

## LEGAL STANDARD

When considering a motion to dismiss, a court "presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor." *Bancroft Glob. Dev. v. United States*, 330 F.Supp.3d 82, 90 (D.D.C. 2018); *see also Pannell v. Prot. Strategies, Inc.*, No. CV 21-602 (EGS), 2022 WL 522993, at *2 (D.D.C. Feb. 22, 2022).[6] Construing a plaintiff's factual allegations as true, a complaint must only plead "facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A defamation claim will survive a motion to dismiss where the complaint pleads "the substance of the alleged defamatory statement, the individuals to whom the statement was made, the name of the speaker, and the date of the alleged statement." *Bethel v. Rodriguez*, No. CV 20-1940 (RC), 2021 WL 1340961, at *8 (D.D.C. Apr.

---

[6] The Motion states that Defendant Giuliani "does not believe that there is a material difference in the elements of defamation between D.C. and Georgia and, therefore, does not believe the Court needs to engage in a conflict of laws analysis at this stage." MTD at 8 n.2. Accordingly, Plaintiffs cite D.C. law for purposes of this Opposition without conceding the accuracy of Defendant Giuliani's position or waiving any right to assert that a choice of law analysis is appropriate.

9, 2021) (quotation marks omitted) (quoting *Crowley v. North Am. Telecomm. Ass'n*, 691 A.2d 1169, 1172 (D.C. Cir. 1997)).

## ARGUMENT

### I.     THE ACTIONABLE STATEMENTS ARE OF AND CONCERNING PLAINTIFFS.

The Complaint sufficiently alleges that all of the Actionable Statements are "of and concerning" Plaintiffs.[7]  To meet their burden at this stage, Plaintiffs need only allege facts from which a person who is "acquainted with" Ms. Freeman and/or Ms. Moss could conclude that the statements referred to them.  *Vasquez v. Whole Foods Mkt. Inc.*, 302 F.Supp.3d 36, 67 (D.D.C. 2018) (declining motion to dismiss because plaintiffs sufficiently pleaded that it was "plausible that persons acquainted with them would recognize" statements were "of and concerning" them); *see also US Dominion, Inc. v. Byrne*, No. 1:21-CV-02131 (CJN), 2022 WL 1165935, at *4 (D.D.C. Apr. 20, 2022); *Cunningham v. United Nat'l Bank of Wash.*, 710 F.Supp. 861, 863 (D.D.C. 1989) (holding at summary judgment stage that of and concerning standard "met by the fact that the statements were specific enough so that *some* readers could precisely identify the person mentioned") (emphasis in the original).  "[I]t suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed."  *Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 216 (D.C. Cir. 1999).  The same principle applies when a defamatory statement is directed towards a group, as long as "a reasonable listener could conclude the statement referred to each member or 'solely or

---

[7] Defendant Giuliani argues that several of the Statements are not "of and concerning" Plaintiffs (MTD at 10–12) (as to Ms. Freeman, Statements 4, 5, 6, 7, 8, 9, 10, 11 and 12; as to Ms. Moss, All Statements), while at the same time arguing that these very same Statements are simply his "opinions and subjective interpretations" of what is displayed in the Trump Edited Video.  MTD at 14–18 (All Statements).  Giuliani cannot have it both ways.  If, as Giuliani asserts, all the Statements merely reflect his opinion of the Trump Edited Video, then—by his own admission— all of the Statements must also incorporate the Video itself.  This admission logically results in the conclusion that all of the Statements are "of and concerning" Ms. Freeman and Ms. Moss.

especially'" to Plaintiffs.   *Vasquez*, 302 F.Supp.3d at 64 (citation omitted).[8]   The Complaint

satisfies this standard as to all of the Actionable Statements.

A.   <u>Statement 1 Identifies Both Plaintiffs By Name</u>.

Statement 1 is "of and concerning" Plaintiffs because it specifically names Plaintiffs.  *See*,

*e.g.*, *US Dominion, Inc. v. Byrne*, 2022 WL 1165935, at *4.  Defendant Giuliani concedes, as he

must, that the Giuliani Strategic Plan expressly refers to Ms. Freeman by her name.  MTD at 12;

¶59–64.  Defendant Giuliani is demonstrably wrong that Ms. "Moss was never named in any of

the Statements."  MTD at 10–11.  The portion of the Giuliani Strategic Plan on "VOTER FRAUD

HIGHLIGHTS FOR 2020 US ELECTION" that was "Presented by the Giuliani Team" states

under the Georgia header:

- *Video of Ruby and **Shay** at midnight*
    - *That is the time of the 200,000 vote bump*
        - *Similar interruptions at same time in other states*
    - *No Watermain Break – a lie to get the Republican observers and media to leave at 10:30pm*

Dkt. 26-3 at 9–10 (emphasis added); ¶62.[9]  The Court should hold that the "of and concerning"

standard is met as to both Plaintiffs for the Actionable Statements contained in the Strategic Plan.

Furthermore, because the Strategic Plan served as the basis for Defendant Giuliani's defamatory

campaign, ¶¶9–12, 57–65, it is reasonable to infer that all of the Actionable Statements were "of

and concerning" Plaintiffs, and the Court "need not parse" the remaining statements.  *US*

---

[8] *See also Elias v. Rolling Stone LLC*, 872 F.3d 97, 104–05 (2d Cir. 2017) (holding at motion to dismiss "stage of the litigation, Plaintiffs need only plead sufficient facts to make it plausible— not probable or even reasonably likely—that a reader familiar" with plaintiff would identify the plaintiff) (citations omitted); *Fetler v. Houghton Mifflin Co.*, 364 F.2d 650, 651 (2d. Cir. 1966) ("It is not necessary that all the world should understand the libel; it is sufficient if those who knew the plaintiff can make out that he is the person meant."); Restatement (Second) of Torts § 564 cmt. b (1977) ("It is not necessary that everyone recognize the [plaintiff] as the person intended; it is enough that any recipient of the communication reasonably so understands it.").

[9] Defendant Giuliani's misspelling of Ms. Moss's name is of no moment.  *See Croixland*, 174 F.3d at 216 ("misnaming" does not insulate a defendant).

*Dominion, Inc. v. Byrne*, 2022 WL 1165935 at *4 n.4 (finding complaint satisfied "of and concerning" requirement where some of the alleged defamatory statements mention or reference plaintiff).

B.   Defendant Giuliani Concedes That Statements 2, 3, And 6 Explicitly Name Ms. Freeman.

There is no dispute that Statements 2, 3, and 6 expressly refer to Ms. Freeman by name. MTD at 12; ¶¶66, 69, 77–86.   There are  no grounds to dismiss those statements based on Defendant Giuliani's "of and concerning" argument as to Ms. Freeman.

C.   All Of The Actionable Statements Refer to Ms. Freeman and Ms. Moss By Description.

All of the Actionable Statements are "of and concerning" Ms. Freeman and Ms. Moss because they refer to them by description.   Contrary to Defendant Giuliani's representation, MTD at 10–12, "it is well established that a plaintiff need not be expressly named for a communication to be 'of and concerning'" her.   *White v. Fraternal Ord. of Police*, 707 F.Supp. 579, 594 n.23 (D.D.C. 1989) (citations omitted); *see also Ramos v. ADR Vantage, Inc.*, No. 18-cv-01690, 2018 WL 6680531, at *1 (D.D.C. Dec. 19, 2018); *Croixland*, 174 F.3d at 216–18.   The "of and concerning" element is sufficiently demonstrated where, as here, all of the Actionable Statements either were accompanied by the playing of or an explicit reference to a video that a reasonable viewer familiar with Plaintiffs would know featured them.   *Vasquez*, 302 F.Supp.3d at 64–65 (declining motion to dismiss because plaintiffs' former coworkers likely "would have known about their terminations" and would have "reasonabl[y] believed" statements about terminations referred to plaintiffs); *Caudle v. Thomason*, 942 F.Supp. 635, 638 (D.D.C. 1996) (denying motion to dismiss because while statements about company did not "explicitly refer" to the plaintiff, a "listener would reasonably believe that the statements referred to him" because he was President

and CEO); *Peay v. Curtis Pub. Co.*, 78 F.Supp. 305, 306 (D.D.C. 1948) ("It is not necessary that the plaintiff's name be mentioned in the text.  The publication of a photograph or portrait of the plaintiff as part of the libelous material may be such an identification."); *Peck v. Tribune Co*., 214 U.S. 185, 188–89 (1909) (holding "of and concerning" met by "the insertion of the plaintiff's picture" in proximity to the defamatory content).

Defendant Giuliani published Statements 4, 5, and 9 contemporaneously with playing the Trump Edited Video—a video that features only a handful of individuals, and primarily Plaintiffs. *See* ¶¶6, 19–20, 28–32, 59–64, 66, 69, 71–72, 74, 80–84, 88, 89, 90–100. [10]  A viewer who knows or is familiar with Ms. Moss and Ms. Freeman would know they were featured in the Trump Edited Video, especially when coupled with the knowledge that Ms. Moss works for Fulton County Department of Registration and Elections and that she and Ms. Freeman served as election workers there on Election Day in 2020.  Statements 4, 5, and 9 are of and concerning Plaintiffs as a matter of law.  *See supra*; *see also Mar-Jac Poultry, Inc. v. Katz*, 773 F.Supp.2d 103, 118–19 (D.D.C. 2011) (at motion for summary judgment finding genuine issue of material fact as to whether statements were "of and concerning" plaintiff where plaintiff's name was displayed in video but not spoken).

For those Actionable Statements unaccompanied by the Trump Edited Video (Statements 1–3, 6–8, 10–12), their content and context still render them "of and concerning" the Plaintiffs.

---

[10] During the December 30, 2020 OAN broadcast when Defendant Giuliani published Statement 4, the Trump Edited Video ran *three separate times*, including while Defendant Giuliani made some of the Actionable Statements.  ¶¶71–72.  The Trump Edited Video played while Defendant Giuliani made the defamatory comments contained in Statement 5 and a freeze frame of the video was shown during the Podcast that included a red circle around Ms. Freeman's image.  ¶74.  The Trump Edited Video played twice during Statement 9, including when Defendant Giuliani stated: "They deliberately threw people out and counted the ballots in private, and there's a videotape of it."; "They committed the crimes on video."; and "Then you can see these same people handing off flash drives to each other."  ¶90.

All of those statements make explicit reference to the Trump Edited Video and refer to the individuals featured on the tape as election workers counting ballots in Fulton County on Election Day. (¶¶59–64, 66, 69, 71–72, 74, 80–84, 88, 89, 90–92, 94, 96, 99). Virtually all of these Statements (1–3, 6–7, 10, 12) include descriptions specifically detailing the supposed activities of Ms. Freeman and Ms. Moss—such as describing the "two women" who "were passing around hard drives or flash drives," ¶¶90–92, 94, and workers "pulling" or "taking ballots" out from under a desk and "counting" ballots, ¶¶6, 66, 69, 74, 88, 99–100. Statements 3 and 6 refer to Ms. Freeman's "crew" and her "daughter." ¶¶69, 80. It is reasonable to infer that a person acquainted with Ms. Moss and Ms. Freeman would reasonably conclude that statements were about them. *See Vasquez*, 302 F.Supp.3d at 66–67 (finding plaintiffs had pled small-group theory defamation because "[W]here a statement defames all members of a small group, the reference to the individual plaintiff reasonably follows from the statement") (quotation omitted);[11] *Serv. Parking Corp. v. Wash. Times Co.*, 92 F.2d 502, 504 (D.C. Cir. 1937) ("Where the words reflect on each and every member of a certain number or class, each or all can sue.") (quotation omitted).[12]

---

[11] In *Vasquez*, a grocery store claimed that statements falsely accusing former store managers of "manipulating a store bonus program" were not "of and concerning" the plaintiffs because the statements did "not specify the store locations" nor the type of "store managers" and did not otherwise provide "sufficiently identifiable subjects of the statements." *Id.* at 42–44, 64. The Court denied the motion to dismiss, stating that plaintiffs had "pleaded sufficient factual matter to make it plausible that persons acquainted with them" would understand the statements were "of and concerning" them. *Id.* at 67–68.

[12] The Motion acknowledges that a member of a group can sue for defamation where "the group's size or other circumstances are such that a reasonable listener could conclude the statement referred to each member or 'solely or especially' to the plaintiff." MTD at 10. Defendant Giuliani's reliance on *Browning* is unavailing. There, the Court dismissed plaintiff's defamation claims, not because she was unable to prove that she was a member of a group of "witnesses" referred to by the defendant, but because the court determined that the language used to describe the group amounted to "non-actionable hyperbole." *Browning v. Clinton*, 292 F.3d 235, 247–48 (D.C. Cir. 2002) (internal quotation marks omitted). The court noted, without deciding, that "a listener who *knew* [the court] filing contained the [plaintiff's] affidavit might well believe" that defendant's

Defendant Giuliani's explicit direction in *all* of the statements that his listeners and viewers "review the video for themselves," MTD at 15–17, necessitates the inference that a reasonable listener would understand the statements referred to the individuals on that video, and therefore were "of and concerning Plaintiffs" for the reasons discussed above.  *See Polsby v. Spruill*, No. Civ. 96-1641(TFH), 1997 WL 680550, at *8 (D.D.C. Aug. 1, 1997) (when analyzing the of and concerning element, courts must "review the words or statements in their context, not merely on their face" (citing *Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994)); *Vasquez*, 302 F.Supp.3d at 64 (whether "a plaintiff within a group is identifiable need not rest on the face of the statement alone" and "can rely upon extrinsic evidence to show that listeners understood the statements to pertain to the plaintiff"); *see also US Dominion, Inc. v. Byrne*, 2022 WL 1165935, at *4; *cf. S. Air Transp., Inc. v. Am. Broad. Cos., Inc.*, 877 F.2d 1010, 1015 (D.C. Cir. 1989) ("Only by considering the text in conjunction with the accompanying visual images can one understand" the defamatory impact of a story "as it is the juxtaposition of audio and visual elements that conveys the meaning intended.").[13]

D.   Although Not Required, Plaintiffs Sufficiently Allege That They Were Harassed Because of Defendant Giuliani's Statements.

Defendant Giuliani implies, without citing any law, that the "of and concerning" element requires allegations that, if true, would demonstrate causation.  MTD 11–12.  No such requirement exists as any elements in a claim for defamation *per se*, as another Court in this district explained to Defendant Giuliani when rejecting his motion to dismiss a separate case alleging defamation

---

reference to "'witnesses' pertained to each witness, including" plaintiff."  *Id.* at 247 (emphasis in the original).

[13] The Court can deny the Motion without reaching the statements that refer to but do not play the Trump Edited Video because when plaintiffs bring defamation claims for multiple statements— some of which expressly name plaintiffs and some of which do not—it is ultimately left to the jury to determine whether a reasonable person would believe that the non-express statements referred to plaintiffs.  *See US Dominion, Inc. v. Byrne*, 2022 WL 1165935, at *4, n.4.

*per se*.  *See US Dominion, Inc. v. Powell*, 554 F.Supp.3d 42, 74 (D.D.C. 2021) (holding in defamation *per se* case that plaintiff need not plead evidence of causation).  Plaintiffs need not prove—at the motion to dismiss stage or otherwise—that Defendant Giuliani's defamatory statements were the cause of Plaintiffs' damages in order to satisfy that a reasonable listener would conclude that he was referring to Plaintiffs.  *See Croixland*, 174 F.3d at 216 (laying out standard for "of and concerning" which does not include any causation requirement).  Nevertheless, Plaintiffs have sufficiently pled that Defendant Giuliani "is directly responsible for the reputational harm that Ms. Freeman and Ms. Moss experienced" and "directly contributed to [their] receiving . . . an onslaught of extremely violent and graphic threats and dangerous harassment."  ¶¶136, 139.

## II.    THE ACTIONABLE STATEMENTS ARE NOT PROTECTED OPINION.

Defendant Giuliani argues that "*all* of the defamatory import of the Statements are essentially" his "opinions and subjective interpretations" of the Trump Edited Video, but this argument does not hold up to legal scrutiny.  MTD at 14.  The Actionable Statements are not Giuliani's "opinions" because they accuse Plaintiffs of criminal acts (which are capable of being proven true), *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20–21 (1990), imply "provably false fact[s], or rely upon stated facts that are provably false," *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1241, 1244 (D.C. 2016), and the basis of his defamatory publications—the Trump Edited Video—is "incomplete," *Milkovich*, 497 U.S. at 19.  Even accepting the Statements were his opinions (which they are not), Giuliani finds no refuge in the opinion doctrine because he consistently implied he possessed "knowledge of damaging, undisclosed facts," *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984), and held himself out as an expert with views based on a legitimate "investigation," *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F.Supp.3d 263, 286 (S.D.N.Y. 2016).  Dismissing a defamation claim on the grounds that the statements are protected opinion is only appropriate if "no reasonable person could conclude" the

statements express or imply a verifiably false fact. *US Dominion, Inc. v. Powell*, 554 F.Supp.3d at 57; *id* at 58 ("The question, then, is whether a reasonable juror could conclude that [Plaintiff]'s statements expressed or implied a verifiably false fact about [Defendant]") (citing *Milkovich*, 497 U.S. at 20–21). Plaintiffs easily carry their burden at this stage.

*First*, the Actionable Statements are not opinion because they accuse Plaintiffs of engaging in specific criminal acts, which by definition must be capable of being proven true in a court of law. *Compare Milkovich*, 497 U.S. at 20–21 (holding statements implying individual "perjured himself in a judicial proceeding" contained "provably false factual connotation") and *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624–25 (D.C. Cir. 2001) (citing cases holding that accusations that an individual committed crimes of blackmail or treason would imply a verifiably false fact, and thus present an actionable statement), *with*, *e.g.*, ¶60 ("Ruby Freeman is seen surreptitiously & illegally handing off hard-drives"); ¶66 ("[O]bservers are being thrown out of the room. A phony excuse of a water main break was used."); *id.*("There's a video recording in Fulton County, Georgia, of what is obviously, without any doubt, the theft of votes."); ¶69 ("Ruby Freeman and her crew getting everybody out of the center, creating a false story that there was a—that there was a water main break"); ¶72 ("[T]hey got rid of the public, and they started triple counting ballots[.]"); ¶91 ("Now you take the two women who ran that, there are other tapes of them earlier in the day, handing off—handing off small, hard drives and flash drives, those flash drives were used to put in the machines[.]"); ¶92 ("Then they opened up this big blanket and under all the whole, all these ballots and then with no one observing in violation of the law they very seriously tried to count all these votes."). The Court need not engage in any further analysis to determine that the Actionable Statements communicate facts, not opinion.

21

Defendant Giuliani does not expressly argue that the statements accusing Plaintiffs of engaging in criminal acts are capable of a defamatory meaning, but rather asserts that "*all* of the defamatory import of the Statements are *essentially* Giuliani's opinions and subjective interpretations of a publicly disclosed and available video" and are, therefore, protected because viewers can see the video for themselves.  MTD at 14 (first emphasis in original, second emphasis added); *see also id.* at 15 ("clearly Giuliani's subjective views/conjectures").   This reductive argument ignores that Giuliani's publications are replete with straightforward statements of verifiably false facts—including the existence of "other tapes" showing the "handing off" of "hard drives and flash drives," that Plaintiffs were responsible for "creat[ing] a false story" of a "water main break," and more.  *See supra.*  Thus, the Court can reject Giuliani's  argument entirely because the opinion doctrine is inapplicable where, as here, a defendant publishes statements containing a "provably false factual connotation." *Milkovich*, 497 U.S. at 20; *see also US Dominion, Inc. v. Byrne*, 2022 WL 1165935, at *4 (acknowledging that in a case alleging a series of lies, a plaintiff survives a motion to dismiss as long as some of the statements alleged are statements expressing or implying facts alleged to be false).

Defendant Giuliani's sporadic use of words like "it looks like" and "you can see"—which he charts in two pages of his Motion—does not change the fact that the Actionable Statements are statements of fact.  *Milkovich*, 497 U.S. at 18–19 ("Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'" ).  Even if such self-serving labels carried weight, Defendant Giuliani's own characterizations of his Actionable Statements as "truth" and "proven" would bar his claim of privilege.  *See, e.g.*, MTD at 3 ("There's a video recording in Fulton County, Georgia, of **what is obviously, without any doubt,** the theft of votes.");

*id.* at 4 ("[T]he Fulton County vote counting [videotape], which in and of itself proves that Georgia was stolen by, uh, Joe Biden and by the Democrats. ***That one video proves it.***"); *id.* at 6 ("I know we've lost the spin war, but we haven't lost the truth war. ***I have the truth.***") (emphases added).

Defendant Giuliani also claims his statements about "Plaintiffs' state of mind and motivations for telling observers to leave, water, leakers, etc." are not actionable because "a number of courts have recognized that a person's motivations" are not verifiable.[14]  MTD at 17–18.  Defendant Giuliani's argument ignores that the defamatory meaning of his statements—accusing Plaintiffs of engaging in various overt acts as part of a conspiracy to commit election fraud—is provable as true.  *See Weyrich*, 235 F.3d at 624–26.  The law does not exempt from liability statements just because they relate to a plaintiff's state of mind.  *Competitive Enter.*, 150 A.3d at 1242 (finding actionable "personal attacks on an individual's honesty and integrity" and accusation that plaintiff engaged in "deceit to manufacture the results he desired"); *Bayatfshar*, 961 F.Supp.2d at 217 (finding statement that plaintiff "seemed to 'ha[ve] his own agenda'" capable of being proven false); *Weyrich*, 235 F.3d at 626 (anecdotes suggesting plaintiff was emotionally volatile, mentally unsound, and unfit for his profession "survive[d] the verifiability screen").

*Second*, Defendant Giuliani cannot rely upon the opinion doctrine because the law does not protect statements that "imply a provably false fact, or rely upon stated facts that are provably false."  *Competitive Enter. Inst.*, 150 A.3d at 1241, 1244 ("[T]he First Amendment gives no

---

[14] The Motion cites a handful of out-of-circuit cases to support the argument that because "Plaintiffs' state of mind and motivations" are unknown, then "any of Giuliani's speculations regarding them are protected opinion and non-actionable."  MTD at 17–18.  However, none of these cases relates to or supports exempting from liability statements that accuse Plaintiffs of engaging in a criminal conspiracy to steal an election.  Those authorities are irrelevant where, as here, the Actionable Statements accuse Plaintiffs of conspiring to commit criminal acts and use specific factual allegations (such as, for example, clearing out observers in order to count illegal ballots in secret).  *See, e.g.*, *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993).

protection to an assertion 'sufficiently factual to be susceptible of being proved true or false' *even if* the assertion is expressed by implication in 'a statement of opinion'") (emphasis in the original) (citations omitted).  "Even if the speaker states the facts upon which he bases his opinion, ***if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.***"  *Milkovich*, 497 U.S. at 18–19 (emphasis added); *Bayatfshar v. ARINC, Inc.*, 961 F.Supp.2d 206, 216–17 (D.D.C. 2013) ("Even if a statement is one of opinion, it is still actionable 'if it has an explicit or implicit factual foundation,' as this makes it 'objectively verifiable'") (quoting *Washington v. Smith*, 80 F.3d 555, 556 (D.C. Cir. 1996)).  Like Defendant Giuliani, the defendant in *Competitive Enterprise* attempted to argue as opinion statements that disclosed the emails on which the "opinions" were based, arguing that "the reader will understand that the statement reflects the writer's view, based on an interpretation of the facts disclosed, such that the reader remains 'free to draw his or her own conclusion based upon those facts.'"  *Competitive Enter.*, 150 A.3d at 1245 (quoting *Moldea I*, 15 F.3d 1137, 1145 (D.C. Cir. 1994)).  The court found the argument "unavailing" because a reasonable viewer would see the statements as "asserting as a fact" that the emails showed plaintiff having "engaged in deceptive data manipulation and academic and scientific misconduct" when that had "actually has been proved to be false by four separate investigations."  *Competitive Enter.*, 150 A.3d at 1245–46.

Just as in *Competitive Enterprise*, here a reasonable viewer would interpret Defendant Giuliani "as asserting as fact" that Plaintiffs engaged in election fraud, even though multiple state officers and investigations had previously and definitively concluded otherwise.  *See* ¶¶40–56.  Because the "factual foundation" of his statements (i.e., the Trump Edited Video) does not show what Defendant Giuliani claimed it showed, he cannot shield his "assessment" as opinion.  *See US Dominion, Inc., v. Powell*, 554 F.Supp.3d at 58–59 (holding statements that electronic voting

machine maker "flipped," "weighted," and "injected" votes during the 2020 election were not the speaker's "own interpretation" of the underlying facts where the evidence cited was "either false or provide[d] no factual basis" to support her assessment).  Providing viewers with the alleged basis for the Actionable Statements does not provide Defendant Giuliani with any protection because his "assessment" is provable as false.

*Third*, the primary disclosed fact on which all of Giuliani's defamatory publications are based is, at a minimum, "incomplete."  *Milkovich*, 497 U.S. at 19; *accord Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1139–40 (10th Cir. 2014) (reversing grant of dismissal where plaintiff alleged undisclosed and unedited footage would disprove edited footage); *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 984–85 (9th Cir. 2002) (citing *Milkovich* for proposition that broadcaster's omission of known facts would lead to defamation liability where disclosed facts leave viewer with false impression).  The Trump Edited Video that Defendant Giuliani repeatedly published and relies on (and likely helped create) is a small clip from hours of surveillance footage.  *See* ¶¶41, 44, 115.  As Georgia authorities and the New York court that suspended Giuliani's legal license have made clear, viewing the footage in full (as Giuliani claims to have done, ¶41) itself disproves Giuliani's claims.  ¶¶41, 44, 115.  But Giuliani never published the full footage, despite it being readily accessible online.  ¶¶54 & nn.39–40.

*Fourth*, and even if everything above were not the case, Defendant Giuliani cannot avail himself of the opinion doctrine because, in his statements, he repeatedly implies that he "possesses knowledge of damaging, undisclosed facts."  *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984).  Doing so effectively waives any application of the opinion doctrine, because such a representation leaves the reasonable reader, listener, or viewer unable to examine the basis for the alleged statement.  *See US Dominion, Inc. v. Powell*, 554 F.Supp.3d at 59 (finding statement that speaker

had undisclosed "evidence from [the] mouth of the guy who founded" plaintiff-company "admit[ting that] he can change a million votes, no problem at all" adequately pleaded as actionable, defamatory statement).  Among other implied undisclosed facts, Defendant Giuliani suggests that Ms. Freeman has a "history of voter fraud" (she does not); that there are "other tapes" not shown that corroborate his assertions (there are not); that "Ruby Freeman and her crew" were responsible for "creating a false story" that there was a water main break to dodge the observers (they were not); that Plaintiffs were multiplying "Biden" votes in particular, that all of their votes or the vast majority of the votes they tallied that night went to Trump, and that they stole votes from Trump (none of that is true); that it would have been illegal to tally votes outside the presence of observers (not so); and that Plaintiffs illegally handed off hard drives or flash drives (they did not).  ¶¶60, 66, 69, 71–72, 84, 88–89, 91, 94.

Further bolstering this point, throughout his defamatory campaign, Giuliani held himself out to be an expert offering an informed view based on a legitimate investigation.  *See Enigma Software*, 194 F.Supp.3d  at 286 (rejecting opinion defense where defendant claimed to be a subject matter expert); *Gross v. New York Times Co.*, 82 N.Y.2d 146, 156 (NY 1993) (rejecting opinion defense for statements made after "what purported to be a thorough investigation"); *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 904, 17 Cal. Rptr. 3d 497, 511 (2004) ("An accusation that, if made by a layperson, might constitute opinion may be understood as being based on fact if made by someone with specialized knowledge of the industry.").  On December 30, 2020, for example, Giuliani suggested that his statements about the Trump Edited Video were based on "evidence that shows that the Biden people stole the election" and "evidence that shows that Trump actually had more votes."  ¶71.  He further suggested that "[w]e also have the statistics during that period of time, 120,000 votes for Biden, couple hundred for Trump," *id.*, and that the video is "just one piece

26

of evidence," ¶75.  Similarly on June 14, 2021, Giuliani said, "[I]n terms of proof, Georgia has

every kind of proof you could possibly imagine."  ¶91.  He also held himself out as a legal expert,

repeatedly opining on Georgia Law.  *See e.g.*, ¶90 ("The law of Georgia is that the ballots have to

be counted in public."); ¶91 ("[T]he law specifically says you can't count in private, so they threw

the people out."); ¶99 ("[T]hen with no one observing in violation of the law they very seriously

tried to count all these votes.").  Coupled with Giuliani's proximity to the ongoing legal challenges

and his repeated implication that his "opinions" were based on undisclosed facts, Giuliani's

decision to hold himself out as an expert offering thoughts based on evidence and statistics

undermines any opinion defense.  At a minimum, Plaintiffs have alleged sufficient facts from

which a reasonable juror could conclude that Giuliani was offering not opinions, but statements

that expressed or implied verifiably false facts.

## III.   THE   STATEMENTS   IN   THE   GIULIANI   STRATEGIC   PLAN   ARE ACTIONABLE.

### A.   The Statements In The Giuliani Strategic Plan Are Not Time-Barred.

> i.   *The Court should not dismiss the statements contained in the Giuliani Strategic Plan because they are not conclusively time-barred.*

Contrary to Defendant Giuliani's assertion, there is no basis for this Court to determine

that the claims as to the statements contained in the Giuliani Strategic Plan are time-barred.  This

Court has recognized that "courts should hesitate to dismiss a complaint on statute of limitations

grounds based solely on the face of the complaint" and "because statute of limitations issues often

depend on contested questions of fact, dismissal is appropriate ***only if*** the complaint on its face is

conclusively time-barred."  *Coclough v. Akal Sec., Inc.*, 303 F.Supp.3d 123, 135 (D.D.C. 2018)

(Howell, J.) (quoting *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) and *Bregman v.

Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014)) (emphasis added); *accord Richards v. Mileski*, 662

F.2d 65, 73 (D.C. Cir. 1981) (finding error in dismissal based on statute of limitations because

there is an "inherent problem in using a motion to dismiss for purposes of raising a statute of limitations defense" because "it is more likely that the plaintiff can raise factual setoffs to such an affirmative defense").

Dismissal of the Complaint as to the statements in the Giuliani Strategic Plan is not appropriate because they are not "conclusively time-barred" as the law requires. Contrary to Giuliani's assertion, MTD at 10, the date on which the Giuliani Strategic Plan was drafted is utterly irrelevant to the statute of limitations analysis; what matters for purposes of a defamation claim is not when a document was drafted, but rather when that the document was published, i.e., transmitted to a third party. *See Mullin v. Washington Free Wkly., Inc.*, 785 A.2d 296, 298 (D.C. 2001) ("Defamation occurs on publication, and the statute of limitations runs from the date of publication."); *see also Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1087 (D.C. Cir. 2007) ("[F]or purposes of the statute of limitations in defamation claims, a book, magazine, or newspaper has one publication date, the date on which it is first generally available to the public."). The publication date or dates is a question of fact that remains unknown to Plaintiffs.[15] The document itself is undated, and its content indicates that it likely was published around December 27, 2020 (i.e., within a year of the December 23, 2021 filing of the original Complaint). For example, the Plan identifies the "TIMELINE" for execution as between "Dec. 27th – Jan 6th" and, consistent with that timeline, notes directly beneath the title and authority: "We Have **10** Days To Execute This Plan & Certify President Trump!" Dkt. 26-3 at 2 (emphasis in original). There is nothing on the face of the document itself that suggests that the Strategic Plan predates or was published before December 23, 2020, such that it falls outside of the one-year statute of limitations.

---

[15] Given the breadth of the campaign to overturn the 2020 election, it is plausible—even likely— that the Giuliani Strategic Plan was published numerous times (perhaps hundreds or even thousands of times) to third parties over the last 19 months.

In any event, Defendant Giuliani offers no evidence supporting the assertion that the Strategic Plan dates to December 17, 2020, and relies only on a footnote citation in the Complaint, which includes the date December 17, 2020 in parentheses. MTD at 10. The Complaint does not allege a publication date for the Strategic Plan, and the citation with the December 17, 2020 date reflects a scrivener's error. *Compare* ¶¶ 9, 57–64 (identifying the publication date as "[a]round December 2020"), *with* ¶¶ 9 n.2, 57 n.42. Plaintiffs intended the "Dec. **1**7, 2020" to be "Dec. **2**7, 2020," as Plaintiffs believe it to be the most likely date of publication for the reasons above. Indeed, December 17, 2020 (as a date of drafting or publication) does not comport with common sense because the Giuliani Strategic Plan specifically references events that occurred *after* that date. *See* Dkt. 26, at 19 (citing worst fraud incidents by state "as of 12/19/2020"); *id.* (citation to Twitter post "as of 12/18/20"). The Court should reject Defendant Giuliani's arguments for dismissal based on the statute of limitations because the claims premised on the Strategic Plan are not "conclusively time-barred" on the face of the Complaint. *Coclough*, 303 F.Supp.3d at 135.[16]

  ii.  *The Giuliani Strategic Plan is not time-barred pursuant to the Discovery Rule.*

Even if it were true that the Giuliani Strategic Plan had been published prior to December 23, 2020, Plaintiffs' claims would not be time-barred. Under "the Discovery Rule," a defamation claim only accrues once "a plaintiff knew or should have known through the exercise of reasonable diligence of: (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Gonzalez Ramos v. ADR Vantage, Inc.*, Case No. 18-cv-1690 (APM), 2021 WL

---

[16] Should the Court be inclined to credit Defendant Giuliani's argument, Plaintiffs respectfully request leave to file a second amended complaint to correct their scrivener's error. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (noting that with respect to a statute of limitations defense, "dismissal *with prejudice* is warranted only when a trial court 'determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency'") (quoting *Jarrell v. U.S. Postal Serv.,* 753 F.2d 1088, 1091 (D.C. Cir. 1985)).

4462611, at *7 (D.D.C. Sept. 29, 2021); *Chandler v. Berlin*, 998 F.3d 965, 971–72 (D.C. Cir. 2021); *McFadden v. Wash. Metro. Area Transit Auth.*, 949 F.Supp.2d 214, 221 (D.D.C. 2013); *Linguex, Inc. v. Murphy*, No. CIV. A. 93-1903, 1994 WL 289357, at *1 (D.D.C. June 21, 1994). The Complaint alleges—and Giuliani does not contest—that the existence of the Giuliani Strategic Plan did not become public until January 2022, only after being disclosed pursuant to a subpoena. *See* MTD at 2; ¶57.  Defendant Giuliani does not, and cannot, contend Plaintiffs discovered the statements contained within the Giuliani Strategic Plan prior to January 2022.  *See McFadden*, 949 F.Supp.2d at 218, 222 (holding defamation claim began to accrue in June 2011, the date on which plaintiff reviewed transcripts of March 2011 grievance hearing).

B.   The Complaint Plausibly Alleges That Defendant Giuliani Is Responsible For The Giuliani Strategic Plan.

Defendant Giuliani asks this Court to dismiss the statements contained in the Giuliani Strategic Plan based on the contention that there are "no plausible allegations in the Complaint that Giuliani even made the Statement, was otherwise responsible for its contents, or published it to a third party."  MTD at 10.  As to publication, the Complaint sufficiently pleads facts from which it is reasonable for the Court to infer that the Giuliani Strategic Plan was published to a third party, including that third party, Bernard Kerik, produced the document to the Congressional Select Committee to Investigate the January 6th Attack on the United States Capitol.  ¶57 n.43.[17] And the *only* plausible inference based on the facts in the Complaint is that Defendant Giuliani bore "some degree of authority and some degree of responsibility" for creating, publishing, and executing the Strategic Plan.  *Nyambal v. Alliedbarton Sec. Servs., LLC*, 344 F.Supp.3d 183, 191

---

[17] Furthermore, the scope of the publication of the Giuliani Strategic Plan is a fact within Defendant Giuliani's control, and Plaintiffs are entitled to discovery on the questions of to whom and when he sent it.  Fed. R. Civ. P. 26(1) (allowing discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case").

(D.D.C. 2018) (reversing grant of motion to dismiss because "[w]ithout the benefit of discovery, the [c]ourt ha[d] no information" as to defendant's authority to publish and plaintiff's allegations made it "at least plausible" that such authority existed); *see also Zimmerman v. Al Jazeera Am., LLC*, 246 F.Supp.3d 257, 271 (D.D.C. 2017) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The title of the Giuliani Strategic Plan is "STRATEGIC COMMUNICATIONS PLAN *GIULIANI PRESIDENTIAL LEGAL DEFENSE TEAM*" and identifies "Rudy Giuliani" as the first individual listed under "Key Team Members."  Dkt. 26-3 at 2, 7 (emphasis added); ¶9 n.2.  The "Giuliani Team" is identified as the author of a section labeled "Supporting Documents: Voter Fraud Highlights for 2020 US Election," which contains false statements about Ms. Freeman and Ms. Moss and identifies them by name.  Dkt. 26-3 at 9–12.

Not only does the face of the Giuliani Strategic Plan support an inference that he was responsible for its creation, Defendant Giuliani's subsequent conduct effectuating the strategy (including to defame Plaintiffs) also demonstrates facts sufficient for the Court to determine that he "launched," "orchestrated," and "executed" the Strategic Plan.  ¶¶9, 57, 136; *see also id.* ¶¶10–12, 58–64, 134, 137, 190.  On these facts, it is implausible to accept Defendant Giuliani's suggestion that he was not responsible for a plan bearing his own name.  Plaintiffs have sufficiently alleged that Defendant Giuliani both caused the creation of and published the Strategic Plan to third parties.

## IV.   STATEMENT SIX IS ACTIONABLE BECAUSE THE COMPLAINT PLAUSIBLY ALLEGES THAT GIULIANI CAUSED ITS PUBLICATION.

### A.   Giuliani Is Liable For Defamatory Content That He Caused To Be Published.

Giuliani asserts, without citation, that there are no "legal legs" to hold him liable for former President Trump's republication of Defendant Giuliani's lies about Plaintiffs on January 2, 2021. MTD at 12–14.  To the contrary, defamation law establishes that the "maker of a defamatory statement may be held accountable for its republication if such republication was reasonably foreseeable." *Chandler v. Berlin*, 998 F.3d 965, 976 (D.C. Cir. 2021) (alterations and quotation omitted); *Oparaugo v. Watts*, 884 A.2d 63, 73 (D.C. 2005) (citing *Tavoulareas v. Piro*, 759 F.2d 90, 136 (D.C. Cir. 1985)); *accord, Hughes v. Rhodes*, 141 S.E.2d 841, 845 (Ga. Ct. App. 1965); *see also* Restatement (Second) of Torts § 576(b)–(c) (1977) (holding publisher of a defamatory statement may be held liable for republication if it intended such republication).  In *Tavoulareas*, for example, the D.C. Circuit concluded that a physician could be held liable for defaming a Chief Executive Officer by serving as a source for a *Washington Post* story accusing the CEO of misusing his position to help prop up his son's career.  759 F.2d at 98.  Citing the general rule, the court concluded that "it was reasonably foreseeable that as reporters they might republish the statements in a news story," and it explained that the law does not require the original source to have "knowingly participated" in the republication.  *Id.* at 98, 136 n.56; *see also Caudle*, 942 F.Supp. at 639 (finding sufficient to allege that a defendant "knew, or in the exercise of reasonable care should have known, that such republication would occur").

B. <u>The Complaint Pleads Sufficient Facts To Demonstrate The Foreseeability Of President Trump's Republication.</u>

As the Complaint details, Defendant Giuliani played *the* central role in spreading the lies about Ms. Freeman and Ms. Moss, including being among the first of Mr. Trump's surrogates to broadcast the Trump Edited Video as a claim of purported election fraud and to promote that lie on social media.  ¶¶37–39.  Sometime on or before December 27, 2020,  Defendant Giuliani crafted the Giuliani Strategic Plan—which identified Ms. Freeman and Ms. Moss by name and repeated

the lies about them—with a stated goal of using a nationwide communications strategy in order to ensure then President Trump's reelection.  ¶¶57–60, 62–63.  Not only was it foreseeable that other individuals would repeat the lies about Plaintiffs, *it was the stated goal and intention of the Giuliani Strategic Plan itself.*  ¶58.

At some point during this period, Defendant Giuliani began to lead the "war room" for former President Trump from the Willard Hotel in the District of Columbia.  ¶87.  The Complaint alleges that Defendant Giuliani "published defamatory claims about Plaintiffs directly to Donald Trump, members of the Trump Campaign, and other individuals in Washington, D.C. prior to January 2, 2021."  ¶77.  It was reasonably foreseeable that former President Trump would, as he did, repeat Defendant Giuliani's lies about Plaintiffs, including during the phone call with Secretary Raffensperger.  ¶¶80–84.  On these facts, the Complaint sufficiently alleges that "Mr. Trump was re-publishing comments made to him by Defendant Giuliani, and Defendant Giuliani encouraged Trump to make the call."  ¶79.  Those republications were the result of a deliberate plan hatched by Defendant Giuliani for which he may be held liable.  Separately, and for the reasons discussed in Section VI, Defendant Giuliani also may be liable under a conspiracy theory.

## V.   THE COURT NEED NOT CONSIDER AND, IF IT DOES, SHOULD REJECT THE MOTION'S ARGUMENTS AS TO ACTUAL MALICE.

This Court should reject Defendant Giuliani's argument that Ms. Freeman is "clearly a limited purpose public figure" and must, therefore, plead actual malice as to the statements (falsely) claiming that she has an "alleged criminal history."  MTD at 18–19.  Importantly, the Motion argues that the Complaint fails to plead actual malice as to only three statements that it claims accuse Ms. Freeman of having a criminal history: that Ms. Freeman (1) was "under arrest" for being part of a "coordinated effort to commit voter/election fraud," ¶63; (2) has "a history of voter fraud participation," ¶66; and (3) is a "professional vote scammer and hustler" and a "known

scammer," ¶¶80–81 (collectively, "Criminal History Statements").[18]  But even as to these three statements, the Court need not consider Defendant Giuliani's argument as to actual malice because the Complaint sufficiently pleads that Ms. Freeman is a private figure.  *Infra* § V(A).  As to Ms. Moss, Defendant does not contest the Complaint's allegations that Ms. Moss is a private figure, and even if this Court were to conclude that Ms. Moss is a limited public figure, it nonetheless should reject Defendant Giuliani's argument because the Complaint sufficiently pleads actual malice as to the three Criminal History Statements.  *Infra* § V(B).

A.    The Complaint Sufficiently Pleads That Ms. Freeman Is Not A Limited Public Figure.

   i.    *Ms. Freeman need only allege that she is a private figure, which the Complaint does.*

The Complaint sufficiently alleges that Ms. Freeman is a private figure.  ¶164; s*ee generally Iqbal*, 556 U.S. at 662; *Twombly*, 550 U.S. 544; *MiMedx Grp., Inc. v. DBW Partners LLC*, No. CV 17-1925 (JDB), 2018 WL 4681005, at *6 (D.D.C. Sept. 28, 2018) (denying motion to dismiss claim for defamation because plaintiff pleaded it was a private figure and there was no "obligation to anticipate in its complaint the need to plead facts to defend against defendants' assertions that it is a public figure").  A defamation plaintiff need not plead "a factual basis for a finding that [it] should be considered a private figure" because whether a defamation plaintiff is a public or limited public figure is an affirmative defense.  *Fridman v. Bean LLC*, No. CV 17-2041 (RJL), 2019 WL 231751, at *4 (D.D.C. Jan. 15, 2019) ("[W]here a plaintiff has not alleged facts establishing public figure status and 'may be able to produce a factual basis for a finding that the plaintiff should be considered a private figure with regard to the' allegedly defamatory statements,

---

[18] The Motion suggests that Statements 1, 2, and 6 relate to an "alleged criminal history of voter fraud participation," but ignores that there are additional statements contained within the categories he labels as "Statements 1, 2, and 6" that do not relate to an alleged criminal history.  MTD at 19.

'*there is no basis for imposing on the plaintiff an obligation to anticipate in the complaint the need to plead facts to defend against defendants' assertion that the plaintiff is a public figure.*'")

(brackets omitted) (emphasis added) (quoting *MiMedx*, 2018 WL 4681005, at *6).[19]   The Court

need not engage in any further analysis to reject Defendant Giuliani's argument that the Complaint

should be dismissed because it fails to plead actual malice.

> ii.    *If the Court engages in an analysis about Ms. Freeman's status, the Complaint sufficiently alleges the elements required to find she is a private figure.*

If the Court considers the substance of Defendant Giuliani's arguments as to Ms.

Freeman's status, there are sufficient allegations in the Complaint to determine that Ms. Freeman

is a private figure.[20]   Defendant Giuliani asserts that Ms. Freeman is a limited public figure because

she "chose to work as [an] election worker" and, therefore, was a central figure in the "public

controversy over the propriety of vote counting in Fulton County, Georgia."   MTD at 18.

Accepting *arguendo* that the relevant controversy is the "propriety of vote counting in Fulton

County" as Defendant Giuliani describes,[21] *he* is responsible for creating and injecting Ms.

---

[19]   The   District   of   Columbia   Court   of   Appeals   found   the   reasoning   of "*Fridman* and *MiMedx* inapplicable to a special motion to dismiss," which is *not* at issue in this case, and in doing so has distinguished a Rule 12(b)(6) motion, which *is* at issue here and which poses "no requirement that a plaintiff offer any evidence to defeat" in the latter type of motion. *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 506–07 (D.C. 2020), *cert. denied*, 141 S. Ct. 1074 (2021).

[20]   When considering whether a defamation plaintiff is a limited-purpose public figure, courts analyze: (1) whether there was a preexisting controversy; (2) plaintiff's role in that controversy; and (3) whether the actionable statements are germane to that controversy. *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296–98 (D.C. Cir. 1980); *Fridman v. Orbis*, 229 A.3d at 505. Plaintiffs dispute that Defendant Giuliani has properly articulated any of those elements as a matter of fact but accept his factual assertions for the limited purpose of showing his argument fails to demonstrate that Ms. Freeman is a public figure as a matter of law.

[21]   Giuliani defines the controversy too broadly.   Plaintiffs reviewed *absentee ballots* at a *single location* in Fulton County—the State Farm Arena.   ¶¶30–31.   The relevant controversy was about the counting of absentee ballots at State Farm Arena, not about the "propriety of vote counting in Fulton County, Georgia" more generally, as Defendant asserts.   MTD at 18; *see Waldbaum*, 627 F.2d at 1297 n.27 (explaining that "a narrow controversy may be a phase of another, broader one,

---

Freeman into that "controversy" by publishing allegations of impropriety against Ms. Freeman based upon nothing more than grainy snippets of video footage of Plaintiffs beginning on December 3, 2020.  ¶¶6, 37–39, 116.  Defendant Giuliani is legally barred from using a public controversy he created and into which he thrust Ms. Freeman to bootstrap his public figure argument.  *See Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure."); *Fridman v. Orbis*, 229 A.3d at 505 (noting that "the controversy to which the defamation relates" must be "subject of public discussion prior to the defamation"); *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1120 (8th Cir. 1999) (finding plaintiff not a public figure because it attracted notoriety only as a result of the defendant's allegedly false and misleading public statements, "creat[ing] a controversy that did not otherwise exist"); *Kassel v. Gannett Co.*, 875 F.2d 935, 941 (1st Cir. 1989) (holding defendants' attempt to characterize a government employee as a public figure "is bootstrapping of the most flagrant sort" since it was the allegedly defamatory publication at issue that brought him into the public eye and he had had no special access to the media beforehand); *Jenoff v. Hearst Corp.*, 644 F.2d 1004, 1007 (4th Cir. 1981) (finding plaintiff not a public figure because "he [had] assumed no prominence in any public controversy, except as a result of the [allegedly defamatory] charges leveled against him").

Even if Defendant Giuliani did not create the controversy he claims this case is about (which he did), Ms. Freeman did not "thrust" herself into it simply by signing up to be an election worker.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974) ("[T]hose classed as public

---

and a person playing a major role in the 'subcontroversy' may have little influence on the larger questions or on other subcontroversies," and that "[i]n such an instance, the plaintiff would be a public figure if the defamation pertains to the subcontroversy in which [s]he is involved but would remain a private person for the overall controversy and its other phases").

figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.  In either event, they invite attention and comment.").  There was no "controversy" about the "propriety of vote counting in Fulton County" during the presidential election at the time Ms. Freeman signed up to serve as an election worker in advance of that election.  *Compare, e.g.*, ¶32 (Ms. Freeman "signed up to be a temporary worker for the November 2020 election"), *with* ¶¶37–39 (Dec. 3, 2020, allegations by Defendant Giuliani and other surrogates of fraud).  Moreover, even were there a preexisting controversy, Ms. Freeman still would not be a limited-purpose public figure because she never "purposely tr[ied] to influence the outcome or could realistically have been expected, because of h[er] position in the controversy, to have an impact on its resolution." *Fridman v. Orbis*, 229 A.3d at 505, 508–09 (finding organization became a limited-purpose public figure by publishing "hundreds of pages of news articles" on controversy in the decade prior).  A private individual "is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 167 (1979).  Plaintiffs are aware of no law, and Defendant Giuliani cites none, for the proposition that anyone who enlists as a temporary election worker becomes a limited public figure for any alleged "controversy" that may later arise regarding that election.

Defendant Giuliani's reliance on *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736 (D.C. Cir. 1985), is misplaced.  MTD at 18.  Emphasizing "the limited scope" of its holding in that case, the Court of Appeals for the District of Columbia held that the plaintiff was an involuntary public figure only because eight years *prior* to publication he had become a notorious figure at the center of the airplane crash to which the subsequent defamatory statements related. *Dameron*, 779 F.2d at 737–38, 43.  The Court in that case and courts in subsequent cases have stressed that the

"circumstances in which an involuntary public figure is created will, we are confident, continue to be few and far between." *Id.* at 743; *Clyburn v. News World Commc'ns, Inc.*, 705 F.Supp. 635, 640–41 (D.D.C. 1989) (finding involuntary public figure where plaintiff had "purposely attempted to influence the outcome" of a public inquiry, including by making (false) statements to the *Washington Post* and the Federal Drug Enforcement Agency, before the publication of the alleged defamation). The Court in *Dameron* noted that the plaintiff was the rare involuntary public figure because he had the "misfortune to have a tragedy occur on his watch," *Dameron*, 779 F.2d at 741, whereas here, no tragedy or event of large import occurred with plaintiffs at its center except for the controversy concocted by Defendant. Even based on Defendant Giuliani's version of events, Ms. Freeman cannot be characterized as anything more than a private individual—one of many temporary election workers in Fulton County—who he thrust into the public eye solely as part of the defamatory campaign that forms the basis of this lawsuit.

> B. <u>The Complaint Sufficiently Pleads Actual Malice As To The Three Criminal History Statements</u>.

In any event, the Court need not resolve Ms. Freeman's status because Plaintiffs have sufficiently alleged that Defendant acted with actual malice. A defendant acts with "actual malice" when publishing a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). "Because 'proof of actual malice calls a defendant's state of mind into question,' this element 'does not readily lend itself to summary disposition.'" *US Dominion, Inc. v. Byrne*, 2022 WL 1165935, at *5 (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979)). A defendant acts with reckless disregard for the truth where "the defendant in fact entertained serious doubts as to the truth of his publication," where there "are obvious reasons to doubt the veracity" of a source, or "where a story

is fabricated by the defendant" or "the product of his imagination."  *St. Amant v. Thompson*, 390

U.S. 727, 731–32 (1968).

Defendant Giuliani claims that the Complaint fails to allege that his statements accusing

Ms. Freeman of having a history of committing voter fraud were false.  MTD at 19.  Defendant

Giuliani defeats his own argument by confirming that the Strategic Plan (which the Motion

categorizes as "Statement 1") "raised the question of verification for the sources" of so-called

"reports" about Ms. Freeman's alleged criminal history.  MTD at 19; ¶63; Dkt. 26-3 at 21.[22]

Specifically, the Giuliani Strategic Plan states: "Ruby Freeman (woman in purple shirt on video),

now under arrest and providing evidence against GA SOS Stacey Abrams and DNC on advanced

coordinated effort to commit voter / election fraud [***need confirmation of arrest and evidence***]."

¶63; Dkt. 26-3 at 21 (bolding added).  That statement expressly concedes doubt regarding the

veracity of the relevant accusations about Ms. Freeman, but nonetheless Defendant Giuliani

accused Ms. Freeman publicly on December 23, 2020 of having "a history of voter fraud

participation," ¶66, and causing the publication of a statement on January 2, 2021, calling her a

"professional vote scammer" and "known scammer," ¶¶80–81.  This more than meets the standard

for pleading actual malice.[23]  Giuliani appears to have "fabricated" these claims out of thin air, and

---

[22] The Motion refers to a Snopes.com article to substantiate that "(apparently false) allegations that [Ms. Freeman] had been arrested/had a criminal record regarding voting fraud that pre-date any of the public Statements Giuliani made regarding Freeman."  MTD at 12; Ex. A.  That article was dated December 18, 2020, and states that there is "no truth to the rumor" that Ms. Freeman was arrested by the FBI and explicitly names Defendant Giuliani for his role in having "started sharing a video that showed an election worker they identified as Freeman removing ballots from a suitcase."  *Id*.  The article concluded that Ms. Freeman "was not arrested by the FBI and she is not suspected (outside of conspiracy-minded circles) of any wrongdoing related to the 2020 election."  *Id*.  In other words, by December 18, 2020, the Snopes.com article to which the Motion refers confirmed that the related statement in the Giuliani Strategic Plan and the other statements advanced by Defendant Giuliani were false.

[23] While the Court should find the Complaint sufficiently pleads actual malice to all of the Actionable Statements, to the extent it credits Defendant Giuliani's argument, it would only be

his Statements are akin to publications based wholly on an "unverified anonymous phone call." *St. Amant*, 390 U.S. at 732.   Accordingly (and contrary to Defendant Giuliani's assertion), Plaintiffs alleged that Defendant published his claims that Ms. Freeman had a history of engaging in fraud with actual malice.   ¶169.[24]

## VI.   THE COMPLAINT SUFFICIENTLY PLEADS CONSPIRACY.

The Complaint sufficiently pleads the elements required to establish a *prima facie* case of civil conspiracy to commit defamation, defamation *per se*, and intentional infliction of emotional distress ("IIED").   The elements of civil conspiracy are: "(1) an agreement between two or more persons (2) to participate in an unlawful act, and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement pursuant to, and in furtherance of, the common scheme."   *McMullen v. Synchrony Bank*, 164 F.Supp.3d 77, 96–97 (D.D.C. 2016); *see generally Blankenship v. Napolitano*, 451 F.Supp.3d 596, 629 (S.D. W. Va. 2020), *on reconsideration in part sub nom*, *Blankenship v. Fox News Network, LLC*, 510 F.Supp.3d 356 (S.D. W. Va. 2020) (finding plaintiff sufficiently pled that defendants conspired to defame him on news broadcasts and defeat his candidacy for the West Virginia Republican primary to survive a motion to dismiss); *Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2012 WL 13134547, at *7 (S.D. Fla. May 25, 2012) (denying motion to dismiss civil conspiracy claim).

---

relevant to the three Criminal History Statements and, even as to those, Plaintiffs would respectfully request the opportunity to amend to satisfy the pleading requirement for actual malice.
[24] Buttressing these allegations is the fact that Giuliani was a licensed attorney and a former U.S. Attorney well versed in criminal law.   ¶23.   He knew that a background check was readily attainable and must have harbored serious doubts about accusing Ms. Freeman of having a criminal record without obtaining such a background check.   *Cf. US Dominion Inc. v. Powell*, 554 F.Supp.3d at 61–62 (concluding that Sidney Powell acted with actual malice, in part, because she relied on experts whom an experienced litigator like herself would have known or should have known were unreliable).

Contrary to Defendant Giuliani's argument that Plaintiffs must plead "the particularization of an agreement between Giuliani and the alleged co-conspirators," MTD at 13, "[c]ourts in this circuit have recognized that a plaintiff need not allege that an express or formal agreement was entered into" and must only plead "enough factual matter (taken as true) to suggest that an agreement was made." *Ramos*,  2018 WL 6680531, at *3 (quotation marks omitted) (quoting *Twombly*, 550 U.S. at 556 and *United States ex rel. Tran v. Comput. Scis. Corp.*, 53 F.Supp.3d 104, 134 (D.D.C. 2014)).   In "'most civil conspiracy cases,' courts are required to 'infer an agreement from indirect evidence.'" *Ramos*, 2018 WL 6680531, at *3 (quoting *Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983)).[25]

Here, the allegations in the Complaint do more than demonstrate that an agreement existed to target Plaintiffs as part of an unlawful effort to overturn the 2020 presidential election.  As alleged in the Complaint, Defendant Giuliani launched a Strategic Plan sometime in December 2020 with a stated goal of overturning the 2020 election by engaging in a "[n]ationwide communications outreach campaign to educate the public on the fraud" in the election (which did not exist) in order to "inspire citizens to call upon legislators and Members of Congress to disregard the fraudulent vote count and certify the duly-elected President Trump." ¶58.  The messaging was central to telling "everyone" that "you cannot let America itself be stolen by criminals," such as (according to the Giuliani Strategic Plan) Ms. Freeman and Ms. Moss, who would be portrayed as

---

[25] Federal Rule of Civil Procedure 9(b) does not apply to Plaintiffs' claim of civil conspiracy because the cause of action does not sound in fraud or mistake. *Cf. Thompson v. Trump*, No. 21-CV-00400, 2022 WL 503384, at *29 (D.D.C. Feb. 18, 2022) (considering Section 1985(1) conspiracy claim and holding that Rule 9(b)'s heightened pleading standard applies only to the two instances identified in the Rule: "the circumstances constituting fraud or mistake . . . [n]either [of which] applies here"); *see also Acosta Orellana v. CropLife Int'l*, 711 F.Supp.2d 81, 113 n.37 (D.D.C. 2010) (reasoning that "[t]here is no heightened pleading requirement for civil conspiracy, nor is civil conspiracy exempt from the operation of Rule 8(a)") (quoting *Burnett v. Al Baraka Inv. and Dev. Corp.*, 274 F.Supp.2d 86 at 103, 110 (D.D.C. 2003)).

being part of a "coordinated effort to commit voter/election fraud." ¶¶61–63.[26]   The Giuliani Strategic Plan lists the "key team members" to execute the agreed-upon plan, including "Rudy Giuliani" and various individuals identified by category and/or initials (e.g., "Media Advisors – SB, BE" and "Identified Legislative Leaders.").  Dkt. 26-3 at 7–8.

The Complaint further alleges that Defendant Giuliani executed the plan, including by publishing defamatory claims about Plaintiffs directly to Donald Trump, members of the Trump Campaign, and others in the District of Columbia prior to January 2, 2021.  ¶77.  Accordingly, the Complaint contains more than "sufficient facts from which the court can plausibly infer that there existed an agreement" among Defendant Giuliani and others to publish false and defamatory statements about Plaintiffs.  *See Lagayan v. Odeh*, 199 F.Supp.3d 21, 31 (D.D.C. 2016).   For example, during the call former President Trump made to Secretary Raffensperger¸ Trump echoed the Giuliani Strategic Plan's description of "Suitcase Gate" in alleging that Plaintiffs and others "stuffed" ballot boxes with fake ballots hidden in suitcases, sometimes tabulating ballots three times, and calling Plaintiff Freeman a "vote scammer" and known political operative.  *Compare* MTD Ex. A at 21, *with* ¶¶80–81.  It is reasonable to infer from the above that Defendant Giuliani and the Trump Campaign were in communication, and given the overwhelming similarities between the Giuliani Strategic Plan and the January 2nd phone call, that the Statements in each were not "mere parallel conduct."  *Lagayan*, 199 F.Supp.3d at 30.

Defendant Giuliani relies on *United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc*., No. CV 15-750 (RC), 2020 WL 686009 (D.D.C. Feb. 11, 2020), which alleges a civil

---

[26] The Motion claims that the Giuliani Strategic Plan does "not indicate a plan to disseminate false information, but rather to 'educate the public,'" MTD at 13, which not only is an issue of fact improper for resolution at the motion to dismiss phase, but also ignores that the campaign had a specific purpose to overturn the 2020 election, not passive "education."

conspiracy based on an underlying tort that is sound in fraud (violation of the False Claims Act), *Id.* at *1, to argue that there was no "'who, what, where, when' of the supposed meeting of the minds." MTD at 14 (quoting *PCA Integrity*, 2020 WL 686009, at *30). Here, not only do the torts underlying Plaintiffs' civil conspiracy claim *not* sound in fraud, but the Complaint alleges sufficient detail about *who* participated in the conspiracy (including Defendant Giuliani, the individuals and groups listed in the Giuliani Strategic Plan, and other Trump surrogates), *when* (beginning in December 2020 and continuing), and *how* (to engage in a nationwide campaign to spread the claim of voter fraud, including to accuse Plaintiffs of being criminals).

Defendant Giuliani argues that Plaintiffs are required to identify his co-conspirators by name. MTD at 13–14. Not so. Where the co-conspirators can "reasonably be inferred," a plaintiff need not explicitly identify the names of alleged co-conspirators. *Doe v. Roman Cath. Diocese of Greensburg*, No. CV 20-1750 (EGS), 2022 WL 203455, at *19–20 (D.D.C. Jan. 24, 2022) (finding that the co-conspirators could reasonably be inferred from the complaint to be "Parish and Diocese instructors and agents" that plaintiffs' allegations were sufficiently pled); *see also McMullen*, 164 F.Supp.3d at 98 (recognizing that a plaintiff may not know exactly who conspired with whom without the benefit of discovery). Here, Defendant Giuliani's alleged co-conspirators can be reasonably inferred from the Complaint where Plaintiffs plead that the Strategic Plan identified individuals and groups, including "Freedom Caucus Members," "Peter Navarro Team," and Trump Surrogates. ¶64.

## VII. THE COMPLAINT SUFFICIENTLY PLEADS IIED.

Defendant Giuliani does not challenge that the Complaint sufficiently pleads the elements of IIED and instead argues only that Plaintiffs' IIED claim "rises or falls with their defamation claim." MTD at 19–20. If the Court denies the Motion as to the defamation claims (as it should), Defendant Giuliani provides no other basis for why this Court should dismiss Plaintiffs' IIED

claim.  But even if the Court were to dismiss all of the defamation claims, Defendant Giuliani's argument as to the IIED claim is wrong as a matter of law.

As other courts in this District have explained, "defamation and intentional infliction of emotional distress are separate and distinct torts."  *McFadden v. Washington Metro. Area Transit Auth.*, No. CV 14-1115 (RBW), 2016 WL 10672014, at *1 n.1. (D.D.C. Apr. 5, 2016); *Wisey's #£1 LLC v. Nimellis Pizzeria LLC*, 952 F.Supp.2d 184, 190 (D.D.C. 2013) (holding that the claims, including defamation and IIED, "do not legally overlap" because the former requires examining "the falseness and defamatory nature of alleged statements," while the IIED addresses whether that conduct "rose to the level of being extreme and outrageous" and caused "severe emotional distress").  The Complaint adequately pleads all three elements required to state a claim for intentional infliction of emotional distress: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994).[27]

Defendant Giuliani's decision to engage in an 18-month long national campaign to target Ms. Freeman and Ms. Moss by name and video as "criminals" who attempted to steal the election, in order to inspire his fellow Americans to "take a stand" and "call upon legislators and Members of Congress to disregard the fraudulent vote count and certify the duly-elected President Trump," ¶¶57–64, 66, 69–72, 74–84, 88–92, 94, 96, 98–100, can "plausibly be seen as outrageous enough

---

[27] Defendant Giuliani's IIED argument relies on only one case—*Couch v. Verizon Commc'ns, Inc.*, No. 20-2151 (RJL), 2021 U.S. Dist. LEXIS 188637 (D.D.C. Sept. 30, 2021)—in which another court in this District found that plaintiff failed to plead any "*factual* basis from which to infer that the statements were improbable, relying entirely on his own conclusory opinions[.]"  *Id.* (emphasis in original).  That case bears no resemblance to this one, including because Defendant Giuliani does not challenge that the Complaint sufficiently pleads actual malice as to the majority of the Actionable Statements, and the arguments that he does advance (such as based on the "of and concerning" or opinion doctrines) have no overlap with the elements of IIED.  Moreover, Plaintiffs specifically alleged that Defendant Giuliani engaged in IIED, with "actual malice."  ¶180.

to sustain a claim for IIED, thus satisfying the first element of the tort." *Azzam v. Rightway Dev. Inc.*, 789 F.Supp.2d 110, 118 (D.D.C. 2011) (Howell, J.) (finding the relevant "conduct . . . would shock an average member of the community"); *see LaRue v. Johnson*, Civ A. No. 16-00504 (EGS/RMM), 2018 WL 1967128, at *7–8 (D.D.C. Feb. 22, 2018), *report and recommendation adopted*, No. CV 16-504 (EGS), 2018 WL 2561036 (D.D.C. Apr. 4, 2018) (finding outrageousness where defendant accused plaintiff of "criminal conduct, unprofessionalism, and slander of those close to her"). The allegations relating to the Strategic Plan plausibly plead that Defendant Giuliani intentionally and recklessly chose to scapegoat Ms. Freeman and Ms. Moss, even were that not the case, the second element "'can be inferred from the outrageousness of the act,' especially at this early stage in the litigation when any direct evidence of intent or recklessness likely remains exclusively in the hands of the defendants." *Azzam*, 789 F.Supp.2d at 118–19 (cleaned up and citations omitted).

Finally, the Complaint details Plaintiffs' severe emotional distress as a result of Defendant Giuliani's actions. ¶¶140–62; *see LaRue*, 2018 WL 1967128, at *8 (finding plaintiff sufficiently pleaded a *prima facie* claim for IIED where complaint alleged plaintiff was in constant fear for her safety and depressed).

## CONCLUSION

For the reasons discussed herein, Plaintiffs respectfully request the Court dismiss Defendant Giuliani's Motion in its entirety.

Dated: June 27, 2022

**WILLKIE FARR & GALLAGHER LLP**
*/s/ Michael J. Gottlieb*
Michael J. Gottlieb (974960)
Meryl C. Governski (1023549)
1875 K Street NW
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000
mgottlieb@willkie.com
mgovernski@willkie.com

**UNITED TO PROTECT DEMOCRACY, INC.**
John Langford (admitted *pro hac vice*)
NY Bar No. 5348479
Rachel Goodman (admitted *pro hac vice*)
NY Bar No. 4879458
82 Nassau Street, #601
New York, NY 10038
Tel: (202) 579-4582
john.langford@protectdemocracy.org
rachel.goodman@protectdemocracy.org

**DUBOSE MILLER LLC**
Von A. DuBose (admitted *pro hac vice*)
GA Bar No. 231451
75 14th Street NE
Suite 2110
Atlanta, Georgia 30309
Tel: (404) 720-8111
dubose@dubosemiller.com

**KASTORF LAW LLC**
Kurt C. Kastorf (admitted *pro hac vice*)
GA Bar No. 315315
1387 Iverson Street NE
Suite #100
Atlanta, GA 30307
Tel: (404) 900-0330
kurt@kastorflaw.com

***Attorneys for Plaintiffs Ruby Freeman and Wandrea Moss***

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2022, this document was filed with the Clerk of the Court of the U.S. District Court for the District of Columbia by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel of record.

Dated: June 27, 2022

/s/ Michael J. Gottlieb
WILLKIE FARR & GALLAGHER LLP
Michael J. Gottlieb (974960)
1875 K Street NW
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000
mgottlieb@willkie.com