# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RUBY FREEMAN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>RUDOLPH W. GIULIANI,<br><br>Defendant. | Civil Action No. 21-3354 (BAH)<br><br>Chief Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

After the polls closed across the country on November 3, 2020—the first Presidential election in U.S. history to be conducted in the midst of a deadly global pandemic—the results in some states were immediately called, with either former Vice President Biden or then-President Trump declared the obvious winner. In other states, including Georgia, the margins of victory were substantially closer, and voters and candidates went to bed that night not knowing who had won. As days passed, local and state election officials diligently conducted the counting of absentee ballots and manual recounts, but the void of clear results became filled with increasingly outlandish paranoia from those claiming the election was being "stolen."

Defendant Rudolph Giuliani—a current media personality and former politician once dubbed "America's mayor"—propagated and pushed that false narrative. Caught in the crossfire of Giuliani's campaign to undermine the legitimacy of the 2020 election were plaintiffs Ruby

Freeman and Wandrea ArShaye ("Shaye") Moss (collectively, "plaintiffs"). Freeman was a temporary election worker with the Fulton County Registration and Elections Department in Fulton County, Georgia during the 2020 general election, while Moss worked on Fulton County's absentee ballot operation. After Giuliani made a litany of statements and accusations against plaintiffs concerning their activities as election workers, Freeman and Moss initiated the instant lawsuit in December 2021, against Giuliani, and others, for defamation, intentional infliction of emotional distress, and civil conspiracy.[1]

Giuliani now moves, under Federal Rule of Civil Procedure 12(b)(6), to dismiss all three counts in the Amended Complaint for failure to state a claim. *See* Defendant's Motion to Dismiss ("Def.'s Mot."), ECF No. 26. For the reasons set forth below, Giuliani's motion to dismiss is denied.

## I.    BACKGROUND

The relevant factual and procedural background is summarized below.

### A.    Factual Background

In the state of Georgia, which would emerge as one of the fierce battlegrounds of the 2020 election, the polls "opened" in the 2020 presidential election on September 15, 2020, when "local officials began mailing out absentee ballots" to voters across the state. Am. Compl. ¶¶ 28–29, ECF No. 22. Under the Georgia state rules governing elections, these voters were permitted to submit their ballots by mail "until Election Day on November 3, 2020," *id.* ¶ 29, necessarily

---

[1]    The original complaint also named as defendants Herring Networks, Inc. (d/b/a One America News Network), Charles Herring, Robert Herring, and Chanel Rion (together, the "OAN Defendants"). After reaching a settlement agreement with the OAN defendants, those defendants were voluntarily dismissed with prejudice, *see* Order (May 11, 2022), and plaintiffs filed, on May 10, 2022, the operative amended complaint solely against Giuliani, *see* Am. Compl., ECF No. 22.

resulting in some ballots not being received by election officials until after that date.  Together with those who voted during the early voting period, between October 12, 2020, and October 30, 2020, and those who voted on election day, approximately five million Georgians cast their votes in 2020, leading Georgia Secretary of State Brad Raffensperger to announce the State was "having a successful election." *Id.* ¶ 29.  After the polls closed on November 3, however, the results of the presidential election at the state-wide level were initially too close to call.  It was not until November 13—ten days later—that major news outlets including NBC, ABC, CBS, and CNN would call the state for then-Vice President Biden, with Fox News and the Associated Press following on November 19.  *Id.* ¶ 33.

To "confirm[] Biden had won Georgia's election," election officials in each county "carried out a risk-limiting audit" from November 11 through 19, "which included a full manual tally of all votes cast." Am. Compl. ¶ 34.  In each county across the state, election workers "examined 41,881 batches, hand-sorting and counting each ballot" in what "was the largest hand count of ballots across United States history." *Id.*  At the end of the hand count, in no county across the state was the variation in the margin of victory for Biden—between the initial result and the hand count— greater than 0.73 percent. *Id.*  The results confirmed that "[t]he correct winner was reported," *id.*, and on November 20—well before the Thanksgiving holiday—Secretary of State Raffensperger "certified Biden's victory" and Governor Brian Kemp certified the state's election results. *Id.* ¶ 35.  As was his right, "Trump requested a recount, which was conducted using scanners that read and tallied the votes," a process that, again, confirmed that Biden had won the state.  The results were "recertified" on December 7, 2020. *Id.* ¶ 36.  Put simply, the legal mechanisms in place to challenge and review the election process in Georgia were vigorously invoked, diligently

performed and plainly worked to assure the accuracy of the vote counting and validity of the results.

As election workers across the state worked long hours carefully ensuring the accuracy of the election, the Trump Campaign and its allies, including Giuliani, engaged in a media offensive that at best questioned, and at worse condemned, their work. *See id.* ¶¶ 4–5. On December 3, plaintiffs—who had been counting absentee ballots and participating in the recount in Fulton County at the State Farm Arena—were drawn into this offensive, when "Trump Campaign surrogates testified before the Georgia Senate, alleging that fraud and misconduct had occurred during Georgia's November 2020 election." *Id.* ¶ 37. In support of their allegations, "a lawyer assisting the Trump Campaign played snippets," *id.*, of a "State Farm Arena security camera video showing grainy images of two women," later identified as plaintiffs, "counting ballots." *Id.* ¶ 6. The Trump Campaign witnesses alleged that after "Republican observers had been asked to leave the arena[,] in contravention of Georgia law," the women in the video clip and "other election workers [had] produced and counted 18,000 hidden, fraudulent ballots." *Id.* ¶ 38. The witness "referred to 'suitcases of ballots [stored] under a table, under a tablecloth'" and stated that one of the women in the video clip (the "Edited Video") "had the name Ruby across her shirt somewhere," but did not otherwise identify the women by name. *Id.* The same day, the Trump Campaign repeated the same allegations on Twitter, sharing the Edited Video "and tweet[ing] that it showed 'suitcases filled with ballots pulled from under a table AFTER supervisors told poll workers to leave room and 4 people stayed behind to keep counting votes.'" *Id.* ¶ 39 (capitalization in original). Giuliani shared the Trump Campaign tweet "repeatedly . . . on his own Twitter account" on December 3 and 4, repeating the same caption. *Id.*; *see also* Fig., *id.* at 13.

Georgia state election officials and the Georgia Bureau of Investigation immediately investigated, and promptly debunked, the claims regarding the Edited Video. *Id.* ¶¶ 40–41. After "review[ing] the security videotape in its entirety" and "interview[ing] all witnesses who were present at the time of the alleged misconduct," officials "found no evidence whatsoever to substantiate any of the claims," and in the early morning hours of December 4, Georgia's state-wide "Voting Implementation Manager" tweeted, "The 90 second video of election worker at the State Farm arena, purporting to show fraud was watched in its entirety (hours) by @GaSecofState investigators.  Shows normal ballot processing.  Here is the fact check on it." *Id.*  The tweet linked to "a fact-check published by Lead Stories, a fact-checking website that identifies false or misleading stories," which demonstrated that the Edited Video "did not show suitcases full of ballots being pulled from under a table, and that poll watchers were not told to leave," but rather that "the containers in the video contained ballots that were processed for counting earlier in the night." *Id.* ¶ 42.  Moreover, the fact-check explained "that the vote count data and voter verifications negated the claim that thousands of fraudulent ballots had been introduced into the count, and that it was not illegal for election workers to count ballots in the observers' absence." *Id.*  Georgia Public Broadcasting also published an article reporting that the Edited Video merely "showed a normal tabulation process, which both state and county officials had verified," and further explained "that no observers had been asked to leave, but Republican monitors and the press did leave when some election employees stopped their work for the night." *Id.* ¶ 43; *see also id.* ¶ 45 (explaining that an article published by PolitiFact, a nonprofit website that checks the accuracy of claims made by elected officials and others, corroborated the conclusions of Georgia Public Broadcasting).

Despite the repeated debunking of the Trump Campaign's claims of voter fraud in the election in Georgia by state officials and private organizations, Giuliani persisted in pushing those very claims—and began taking direct aim at plaintiffs in the process.  That began in December 2020, when Giuliani orchestrated and implemented a strategic plan "to educate the public on the fraud numbers, and inspire citizens to call upon legislators and Members of Congress to disregard the fraudulent vote count and certify the duly elected President Trump." *Id.* ¶¶ 57, 58; *see also* "Strategic Communications Plan[,] Giuliani Presidential Legal Defense Team" (the "Strategic Plan" or "Plan") at 2, ECF 26-3.  A section of the Plan was dedicated to exposing the alleged voter fraud schemes in Georgia.  *See* Am. Compl. ¶¶ 62, 63.  Freeman was named in the Plan as being "under arrest" and part of "coordinated effort to commit voter/election fraud." *Id.* ¶ 63.  Giuliani specifically accused Freeman and the other workers in the Edited Video of "ballot stuffing" by rolling out "suitcases" filled with ballots when "press and all third parties were required to leave the premises"—an event the Strategic Plan calls "Suitcase Gate." *Id.*  On December 23, 2020, Giuliani, on his podcast, named Freeman as someone with "a history of fraud participation," and claimed that she, with the help of other election workers, counted the same ballots "eight times," "cheating" in manner that "look[ed] like a bank heist." *Id.* ¶¶ 66, 67.  On December 25, 2020, Giuliani, again on his podcast, accused "Ms. Freeman and her crew" of attempting to scan ballots multiple times, likening them to "crooks spr[i]ng[ing] into action." *Id.* ¶ 69.

On December 30, 2020, Giuliani, on his podcast, played the Edited Video, *id.* ¶ 71, describing the content as follows:

> During that videotape, that we can all see right in front of our eyes, we can see them stealing the votes.  We can see them throwing out the people.  We can see them counting it four and five times.  We also have the statistics during that period of time, 120,000 votes for Biden, couple hundred votes for Trump, no observers, makes it totally illegal.  That alone changes the election. . . . For a hundred years,

this film will show that the, the 2020 presidential election, there was an attempt to steal it.

*Id.* ¶ 71; *see also id.* ¶ 74 (Giuliani explaining that Freeman and the other election workers in the Edited Video "make sure there's no one around, they make sure the doors are locked so nobody else can come in, and then at a certain point they look around again, and they go under a table covered by a black, like a black blanket, and they start pulling out ballots"). This podcast episode remains on Giuliani's website, and he further disseminated the episode on social media. *Id.* ¶ 76.

On January 2, 2021, then-President Trump called Georgia Secretary of State Brad Raffensperger—a call that Giuliani allegedly encouraged Trump to make after republishing his claims about plaintiffs. *Id.* ¶¶ 80, 81. Trump stated Freeman's name "no less than 19 times," calling Freeman "a vote scammer, a professional vote scammer and hustler," "known scammer," "known political operative," and "ballotteer[.]" *Id.* Echoing the Strategic Plan's description of "Suitcase Gate," Trump, on his phone call with Secretary Raffensperger, alleged that plaintiffs and others "stuffed" ballot boxes with fake ballots hidden in suitcases and sometimes tabulating ballots multiple times. *Id.* In response, Secretary Raffensperger, Georgia Secretary of State, stated, "You're talking about the State Farm video. And I think it's extremely unfortunate that Rudy Giuliani or his people, they sliced and diced that video and took it out of context." *Id.* ¶ 82.

Over the next year, Giuliani amplified the false claim that Freeman and Moss were involved in an election fraud scheme on One America News Network ("OAN") and his own podcast. On January 18, 2021, Giuliani appeared on OAN to claim plaintiffs were involved in a voter fraud scheme. *Id.* ¶ 89. On June 14, 2021, Giuliani claimed on OAN that plaintiffs "committed the crimes on video. You can see them do it. They lied about it. Then you can see these same people handing off flash drives to each other." *Id.* ¶ 90. On July 23, 2021, Giuliani again brought up plaintiffs' purported election fraud efforts on OAN, stating, "How about the

videotape that I have where they're shoving the thing into the machine three and four times so they can be recounted by the same two women that earlier in the day were passing around hard drives or flash drives that supposedly can't be used in Dominion machines, but can." *Id.* ¶ 94.   On December 10, 2021, he explained at an appearance on OAN, "The situation in Georgia, uh, that videotape is about as clear evidence of stealing votes as I've ever seen." *Id.* ¶ 96.   On January 12, 2022, Giuliani stated on his podcast, "They then for about 15 minutes cased the place and made sure everyone was gone.   Then they opened up this big blanket and under all the whole, all these ballots and then with no one observing in violation of the law they very seriously tried to count all these votes." *Id.* ¶ 99.

The accusations levied against plaintiffs had consequences.   Plaintiffs claim they have experienced online, personal, and professional consequences directly resulting from Giuliani's statements and conduct.   *See id.* ¶¶ 140–57.   Strangers camped out near Freeman's home in Georgia, harassing her and her neighbors.   *Id.* ¶ 141.   "Christmas cards were mailed to Ms. Freeman's address with messages like, 'Ruby please report to the FBI and tell them you committed voter fraud.   If not[,] you will be sorry,' and 'You deserve to go to jail, you worthless piece of shit whore.'" *Id.* ¶ 143.   Protesters targeted her home on January 5 and January 6, 2021, though Freeman had fled her home at the recommendation of the Federal Bureau of Investigation.   *Id.* ¶¶ 144–45.   Pizza delivery orders were ordered to her home that her family never ordered, which is a common tactic of online harassment called "doxx[ing]." *Id.* ¶ 142.   Local police received more than twenty harassing phone calls while monitoring Freeman's phone and, eventually, she had to change her email and phone numbers.   *Id.* ¶ 140.   Freeman has experienced strangers harassing her in public and has lost friendships, *id.* ¶¶ 148–49, plus she has had to cease her online business because of prolonged harassment on social media and public events, *id.* ¶ 147.

Like Freeman, Moss alleges being targeted for similar harassment due to Giuliani's conduct.  Moss' family received threatening phone calls for months, including her 14-year old son who used her old cell phone.  *Id.* ¶ 151.  One caller stated that Moss' son "should hang alongside [his] nigger momma."  *Id.*  Moss received constant messages on her social media account accusing her of "treason" and threatening violence.  *Id.*  Moss' grandmother's home was twice attacked by strangers attempting a "citizens' arrest."  *Id.* ¶ 155.  Due to Giuliani's allegations, strangers have protested Moss at her workplace and left her "feeling fearful[.]"  *Id.* ¶ 157–59.  Moss enjoyed her job before Giuliani's actions, but she eventually left because her "workplace became a toxic environment."  *Id.* ¶ 159.  Moss must order groceries online because she now fears for her life in public.  *Id.* ¶ 160.  Like Freeman, Moss has retreated from public and social life because of continued violent threats and harassment.  *Id.* ¶¶ 160–62.

### B.     Procedural Background

On December 23, 2021, plaintiffs filed the instant lawsuit, naming Giuliani as a defendant, *see* Compl. ¶ 23, ECF No. 1, as well as the OAN Defendants, *id.* ¶ 22.  After all defendants appeared, the parties jointly sought to consolidate the deadlines for defendants to answer the Complaint, *see* Unopposed Def.'s Mem. Extension of Time to Respond to Compl. and Consolidate Deadlines, ECF No. 11, which the Court agreed to extend until March 25, 2022, *see* Min. Order (Jan. 27, 2022).

Before any answer was filed, on March 21, 2022, plaintiffs and the OAN Defendants requested an additional extension to allow them to engage in mediation for a period of 30 days.  *See* Unopposed Def.'s Mem. Extension of Time to Respond to Compl. ("Def.'s Mem. for Mediation") at 1, ECF No. 12, which request was granted, *see* Min. Order (Mar. 22, 2022).  After successfully completing mediation and entering a settlement agreement, on May 10, 2022,

plaintiffs moved to dismiss the complaint with prejudice "against the OAN Defendants only" and for entry of "final judgment as to the OAN Defendants only." Pls.' Def.'s Mem. Voluntary Dismissal & Entry of J. with Respect to Defs. Herring Networks, Inc., Charles Herring, Robert Herring, and Chanel Rion Only at 1, ECF No. 21. This motion was granted and the OAN Defendants are no longer parties to this action. *See* Min. Order (May 11, 2022).

Giuliani "declined to participate in mediation" and, instead, answered the complaint on March 25, 2022. *See* Giuliani Answer, ECF No. 13. [2] After plaintiffs and Giuliani filed their Joint Meet and Confer Report, the Court issued a scheduling order to govern further proceedings, *see* Min. Order (Apr. 26, 2022), pursuant to which plaintiffs filed, on May 10, 2022, the operative sixty-page Amended Complaint. *See* Am. Compl. In their amended pleading, plaintiffs bring three claims, against Giuliani as the only named defendant, for (1) defamation or defamation *per se*, *id.* ¶¶ 164–77; (2) intentional infliction of emotional distress, *id.* ¶¶ 179–86; and (3) civil conspiracy for all alleged torts, *id.* ¶¶ 188–91. As relief, plaintiffs seek nominal, compensative, and punitive damages; attorneys' fees and costs; pre- and post- judgment interest "at the highest lawful rates;" "[d]eclaratory relief stating that the statements authored and published by Defendant and those attributable to Defendant . . . were and are false;" and an injunction requiring defendant "to remove his false and defamatory statements about Plaintiffs from any website and/or social media accounts under [his] control." *Id.* at 59, Prayer for Relief.

On June 6, 2022, Giuliani filed the pending motion to dismiss the Amended Complaint for failure to state a claim against him, under Federal Rule of Civil Procedure 12(b)(6). *See* Def.'s

---

[2]    Giuliani filed the Answer after the denial of his motion to extend the deadline to respond to the Complaint by two months "in order to maintain a consolidated briefing schedule among the parties while Plaintiffs and the OAN Defendants pursue formal settlement discussions," Def.'s Mem. for Mediation at 2, due to "insufficient cause to justify such a substantial extension of time to respond to the Complaint beyond that afforded to Giuliani by the Federal Rules," Min. Order (Mar. 22, 2022).

Mem. at 1.  Plaintiffs opposed Giuliani's motion, *see* Memorandum in Opposition to Defendant's Motion to Dismiss ("Pls.' Opp'n"), ECF No. 27, and Giuliani filed no reply.  The requisite time for Giuliani to do so has now passed, *see* D.D.C. Local Civil Rule 7(d) (providing seven days for reply), and thus the motion is now ripe for resolution.

## II.   LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "[a] plaintiff need not make 'detailed factual allegations,'" but the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *VoteVets Action Fund v. McDonough*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  Consequently, "a complaint survives a motion to dismiss even 'if there are two alternative explanations, one advanced by [the] defendant and the other advanced by the plaintiff, both of which are plausible.'" *VoteVets Action Fund*, 992 F.3d at 1104 (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015)).

In deciding a motion under Rule 12(b)(6), the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555; *see also Atchley, v. AstraZeneca UK Limited, et al.*, 22 F.4th 204, 210–11 (D.C. Cir. 2022).  Courts do not, however, "assume the truth of legal conclusions, nor do [they] 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir.

2015) (alteration in original) (citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

## III.   DISCUSSION

Giuliani seeks complete dismissal of this lawsuit, claiming that plaintiffs have failed to state a claim on all three counts in their Amended Complaint. For the reasons set forth below, Giuliani is wrong. Plaintiffs have stated a claim as to each of the three counts, and Giuliani's arguments to the contrary are unpersuasive.

The parties' arguments regarding each of the three counts in the Amended Complaint are discussed below *seriatim*.

### A.   Defamation Claim (Count 1)

To succeed on a claim for defamation under D.C. law, a plaintiff must prove: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement [met the requisite standard]; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005) (quoting *Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1173 n.2 (D.C. 1997)).

Giuliani challenges the sufficiency of plaintiffs' defamation claim as to all four elements. First, he says that any allegedly defamatory statements made in the Strategic Plan cannot support the defamation claim because the Plan's publication on December 17, 2020, more than a year before the filing of the instant action, renders the claim time-barred, and because plaintiffs purportedly fail plausibly to allege that Giuliani authored or wrote the Plan. Def.'s Mem. at 10. Second, he argues that none of the statements that plaintiffs cite mention or refer to Moss by name,

so she cannot plead an element of her defamation claim—that a reasonable listener would understand that Giuliani's statements concerned her.  *Id.* at 10–11.  He similarly claims that several other statements that cited in the Amended Complaint do not refer to Freeman by name, so a reasonable listener would not understand those as specifically referring to her either.  *Id.* at 12. Third, he argues that, all else aside, the thrust of the alleged defamatory statements were protected opinion.  *Id.* at 14–18.  Fourth, Giuliani says that because Freeman is "clearly a limited purpose public figure," she was required to and failed to plead actual malice with respect to his statements regarding Freeman's criminal history of voter fraud participation.

None of Giuliani's arguments withstand scrutiny.  Starting with Giuliani's arguments concerning the Strategic Plan, he is wrong that dismissal of the defamation claim is appropriate due to the limitations period. The statute of limitations for defamation claims is one year under D.C. law.  D.C. Code § 12-301(4).  The critical date for statute-of-limitation purposes is when the defaming document or statement was published or transmitted to a third party.  *See Mullin v. Washington Free Wkly., Inc.*, 785 A.2d 296, 298 (D.C. 2001) (quotation marks omitted) ("Defamation occurs on publication, and the statute of limitations runs from the date of publication.").  The law is well-settled that because "'statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred.'"  *Coclough v. Akal Sec., Inc.*, 303 F. Supp. 3d 123, 135 (D.D.C. 2018) (quoting *Bregman v. Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014)); *see also Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) ("[C]ourts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint.").  With respect to showing that the defendant plausibly authored the defamatory statement, the plaintiff need only allege facts that plausibly show that the defendant had "*some* degree of authority and *some* degree of responsibility

over the information it conveyed." *See Nyambal v. AlliedBarton Sec. Servs., LLC*, 344 F. Supp. 3d 183, 191 (D.D.C. 2018) (emphasis added); *see also Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 271 (D.D.C. 2017) ("'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

First, Giuliani's statute-of-limitations argument fails because plaintiffs have plausibly shown that the Strategic Plan was published within a year of when they filed their complaint. Although Giuliani is correct that the statute of limitations for defamation claims is one year under D.C. law, plaintiffs have plausibly stated that publication occurred *after* December 23, 2020— exactly one year before plaintiffs filed this action.  For starters, the only evidence that Giuliani provides to show that the Strategic Plan was published prior to December 23, 2020 is a citation to a footnote in the Amended Complaint, which notes December 17, 2020 as the Plan's publication date.  Def.'s Mem. at 10; *see* Am. Compl. ¶ 57, n.42 ("Giuliani Presidential Legal Defense Team, Strategic Communications Plan (Dec. 17, 2020), available at https://perma.cc/VP2S-CJMR."). Plaintiffs, however, explain that the reference to December 17 reflects a scrivener's error, and they meant to identify the publication date as December *27*, 2020.  Pl.'s Opp'n at 37 (emphasis in original).  Indeed, the Plan itself identifies the "TIMELINE" for execution as between "Dec. 27th – Jan 6th," and also notes that the Trump Campaign has "10 Days to Execute This Plan & Certify President Trump!," ECF 26-3 at 2 (emphasis in original), with the end-date of the "10 Days" presumably being the certification by Congress of the electoral college vote on January 6, 2021. Consistent with this timeline, the Strategic Plan could have plausibly been published on or right before December 27, 2020, giving the Plan's followers ten days to accomplish its goals on January 6, 2021.  The statements outlined in the Strategic Plan are thus, at least, plausibly timely.

Giuliani's weak effort to distance himself from authorship of the Strategic Plan also falls flat.  Given that the title of the Strategic Plan specifies Giuliani *by name*, *see id.* at 2 (emphasis added) ("STRATEGIC COMMUNICATIONS PLAN **GIULIANI** PRESIDENTIAL LEGAL DEFENSE TEAM"),  that this document identifies "Rudy Giuliani" as the first person under "Key Team Members," *see id.* at 7, and that Giuliani's conduct after its publication shows he was integrally involved in "launch[ing]," "orchestrat[ing]," and "execut[ing]" the Plan, *see* Amend. Compl. ¶¶ 9, 57, 136; *see also id.* ¶¶10–12, 58–64, 134, 137, 190, plaintiffs have done more than enough plausibly to allege that Giuliani bears at least "some degree of authority and some degree of responsibility" over authoring the Plan.  *See Nyambal*, 344 F. Supp. 3d at 191.

Next up is Giuliani's claim that purportedly defamatory statements, which do not mention Freeman and Moss by name, should be dismissed because no reasonable listener would plausibly read them as concerning Freeman and Moss, respectively.  Giuliani fails to cite, address or distinguish the holding of *Croixland Properties Limited Partnership v. Corcoran*, where the D.C. Circuit explained that a plaintiff can satisfy the first element of defamation—that the defendant made a false and defamatory statement "of and concerning" the plaintiff—without specifically identifying the plaintiff by name.  174 F.3d 213, 216 (D.C. Cir. 1999) ("[I]t suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description[.]").  "When a statement refers to a group, a member of that group may claim defamation if the group's size or other circumstances are such that a reasonable listener could conclude the statement referred to each member or 'solely or especially' to the plaintiff." *Browning v. Clinton*, 292 F.3d 235, 247 (D.C. Cir. 2002) (citing Restatement (Second) of Torts § 564A (1977)).

Plaintiffs have plausibly alleged that Giuliani's statements "of and concern[]" them.  For one thing, the Strategic Plan references both Freeman and Moss by name. Plan, ECF No. 26-3 at 9–10 ("Video of *Ruby* and *Shay* at midnight," using plaintiffs' first names) (emphasis added). Plaintiffs further allege that the rest of Giuliani's alleged defamatory statements are connected to the Strategic Plan and thus a reasonable listener could connect the dots and conclude that Giuliani's statements are "of and concerning" plaintiffs.  *See Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 64 (D.D.C. 2018) (noting that a "plaintiff can rely upon extrinsic evidence to show that listeners understood the statements to pertain to the plaintiff").

Even putting aside the Strategic Plan, the defamatory statements that Giuliani challenges at least plausibly refer to plaintiffs by description.  According to plaintiffs, three of the defamatory statements were contemporaneously published with the Edited Video featuring a handful of Georgia election workers, two of whom are Freeman and Moss.  *See* Amend. Compl. ¶¶ 59–64, 66, 69, 71–72, 74, 80–84, 88, 89, 90–100.  For those statements not published with the Edited Video, a reasonable listener could, based on the surrounding context, plausibly infer that the statements are "of and concerning" Freeman and Moss.  Not only do these statements all explicitly reference the Edited Video and the individuals on the Video as election workers counting ballots in Fulton County, *see id.*, but nearly all the statements, except for what the parties refer to as "Statement 8,"[3] describe the purported activities of the entire group of Fulton County election

---

[3]     Statement 8 was made by Giuliani during an OAN interview on January 18, 2021, as follows:

> I mean, they pretty much censored it while it was going on, so they would love to turn the page on it.  I mean, I get banned from any of the big tech things when I say that not only was there voter fraud, I have evidence of it, I've seen it, I have a motion picture of it.  I can show you the voter fraud in living color.  It was done in Fulton County, Georgia, it was well over 30,000 ballots were stolen. They were attributed to Biden instead of Trump.  Had they been caught and held to account for it, Trump would have won Georgia.

Amend. Compl. ¶ 89.  A reasonable listener could read this message as referencing the Edited Video and the actions of election workers in Fulton County, which workers include Freeman and Moss.

workers or contain words that could be reasonably read to reference Freeman and Moss specifically. *See id.* ¶¶ 90–92, 94 (describing "two women . . . passing around hard drives or flash drives"); ¶¶ 6, 66, 69, 74, 88, 99–100 (explaining that workers were "pulling" or "taking ballots" out from under a desk and "counting" ballots", and that ballots were also "thrown away during that process" while others were "counted three or four times"); ¶¶ 69, 80 (referencing "Freeman and her crew" and Freeman's "daughter").  Considering that these allegations use characteristics or other language to describe Freeman and Moss, plaintiffs have provided more than enough to survive dismissal.  Bluntly put, Giuliani's suggestion that the defamatory statements must single out plaintiffs by name lacks legal support.  *See White v. Fraternal Ord. of Police*, 707 F. Supp. 579, 594 n.23 (D.D.C. 1989) ("[I]t is well established that a plaintiff need not be expressly named for a communication to be 'of and concerning' [her.]"); *see also Caudle v. Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1996) (denying motion to dismiss because even though the statements referenced the company in general and did not "explicitly refer" to the plaintiff, a "listener would reasonably believe that the statements referred to [the plaintiff]" because he was President and CEO of the company); *Peay v. Curtis Pub. Co.*, 78 F. Supp. 305, 306 (D.D.C. 1948) ("It is not necessary that the plaintiff's name be mentioned in the text.  The publication of a photograph or portrait of the plaintiff as part of the libelous material may be such an identification.").

Giuliani's third prong of attack on plaintiffs' defamation claim is that all his challenged statements are protected opinion.  Although, generally, opinions are not actionable because they are protected by the First Amendment, "even a *per se* opinion is actionable if it can reasonably be understood as implying provable facts."  *Moldea v. New York Times Co.*, 15 F.3d 1137, 1144 (D.C. Cir. 1994) (quotation marks omitted).  Statements that are "capable of bearing implied defamatory meanings," must be examined to assess whether they express opinions "protected by the First

Amendment as non-verifiable statements [that] did not imply provable facts," with this assessment posing "a question of law for the court to determine as a threshold matter." *Id.*  The D.C. Circuit has provided guidance on how a protected opinion can bear a defamatory implication, explaining that "[j]ust as a speaker is not immunized from liability simply by prefacing otherwise defamatory statements with the words 'In my opinion . . . ,' defamatory assessments based on incorrect 'facts' stated by the speaker are also actionable.  Thus, the statement 'In my opinion Jones is a liar because he cheats on his taxes' could be libelous if the allegation of cheating were untrue." *Id.*; *see also Weyrich v. New Republic, Inc.*, 235 F.3d 617, 625 (D.C. Cir. 2001) (collecting cases illustrating this point).

Giuliani's alleged statements accuse plaintiffs of criminal activity—which can be proven to be true or false in court— and, consequently, he cannot seek refuge under the opinion doctrine for the same reasons articulated in *Moldea v. New York Times Company*.  Even if Giuliani made clear that his statements were his own subjective views, those statements still included accusations of election fraud that can be verified as true or false.  *See, e.g.*, Am. Compl. ¶ 60 ("Ruby Freeman is seen surreptitiously & illegally handing off hard-drives"); ¶ 66 ("There's a video recording in Fulton County, Georgia, of what is obviously, without any doubt, the theft of votes. . . . [O]bservers are being thrown out of the room. A phony excuse of a water main break was used."); ¶ 69 ("Ruby Freeman and her crew getting everybody out of the center, creating a false story that there was a— that there was a water main break"); ¶ 72 ("[T]hey got rid of the public, and they started triple counting ballots[.]"); ¶ 91 ("Now you take the two women who ran that, there are other tapes of them earlier in the day, handing off—handing off small, hard drives and flash drives, those flash drives were used to put in the machines[.]"); ¶ 99 ("Then they opened up this big blanket and under all the whole, all these ballots and then with no one observing in violation of the law they very

seriously tried to count all these votes."). The fact that Giuliani directs listeners to view the Edited Video for themselves is beside the point. If Giuliani falsely characterized plaintiffs' actions in the Edited Video, his statements are still actionable because they imply verifiably false facts.

Last up is Giuliani's assertion that, because "Freeman is clearly a limited purpose public figure[,]" Def.'s Mem. at 18, her claims as to Giuliani's statements regarding Freeman's criminal history must be dismissed because she purportedly failed to plead any allegations that Giuliani's statements were made with actual malice. Freeman responds that (1) she sufficiently pleads that she is a private figure; (2) even if she is a limited purpose public figure, she adequately pleads allegations to show that Giuliani acted with actual malice when he made those purportedly defamatory statements. Pl.'s Opp'n at 34–40.

The Supreme Court has held that a person can become "a public figure for a limited range of issues" by "inject[ing] himself or [ ] draw[ing] [himself] into a particular public controversy[.]" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). If a plaintiff is a limited public figure for certain issues, the plaintiff can "prevail in a defamation suit [with respect to those issues] only by proving the defendant's 'actual malice' [with respect to the defamatory statements]." *Clyburn v. News World Commc'ns*, 903 F.2d 29, 31 (D.C. Cir. 1990) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)). A private figure, however, need only allege that the defendant negligently published the defamatory statement under D.C. law. *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 87 (D.C. 1980) ("Therefore, the basic standard of care in the District of Columbia for media defamation of private individuals, so far as actual damages are involved, becomes translated by *Gertz* [*v. Robert Welch, Inc.*] from strict liability to its next most proximate standard of care that of negligence.").

Although whether Freeman is a private figure or a limited-purpose public figure is a relevant issue, Freeman has done all she must to do at this stage: allege that she is a private figure. The pleading burden on plaintiffs would be too onerous if they were required not only to anticipate whether a defendant would raise a limited-public-figure defense, but, on top of that, also to find and elicit facts before discovery that shed light on the defendant's state of mind to prove actual malice.  For these reasons, a plaintiff does not have an "obligation to anticipate in its complaint the need to plead facts to defend against defendants' assertions that [she] is a public figure." *MiMedx Grp., Inc. v. DBW Partners LLC*, No. CV 17-1925 (JDB), 2018 WL 4681005, at *6 (D.D.C. Sept. 28, 2018); *see also Fridman v. Bean LLC*, No. CV 17-2041 (RJL), 2019 WL 231751, at *4 (D.D.C. Jan. 15, 2019) (cleaned up) ("[W]here a plaintiff has not alleged facts establishing public figure status and may be able to produce a factual basis for a finding that the plaintiff should be considered a private figure with regard to the allegedly defamatory statements, there is no basis for imposing on the plaintiff an obligation to anticipate in the complaint the need to plead facts to defend against defendants' assertion that the plaintiff is a public figure.").

Even assuming that Freeman were required affirmatively to plead she was not a limited-purpose public figure, *and* assuming, *arguendo*, that Freeman was a limited-purpose public figure (an issue this Court does not decide), Giuliani must still then show that Freeman did not plead sufficient facts to show he made statements regarding her purported criminal history with actual malice.  Freeman has sufficiently pled those facts, so Giuliani's argument goes nowhere.

A defendant acts with "actual malice" when publishing a statement "with knowledge that it was false or with reckless disregard of whether it was false or not."  *New York Times Co.*, 376 U.S. at 280.  "A defendant has acted recklessly if the defendant in fact entertained serious doubts as to the truth of his publication or acted with a high degree of awareness of probable falsity."

*Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016) (cleaned up) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).  The inquiry is ultimately subjective—"it is not enough to show that defendant should have known better; instead, the plaintiff must offer evidence that the defendant in fact harbored subjective doubt." *Jankovic*, 822 F.3d at 589.  Although this question goes to the defendant's state of mind, "proof may take the form of circumstantial evidence, such as the existence of 'obvious reasons to doubt the veracity of the informant or the accuracy of his reports' or the inherent improbability of the reports." *Clyburn*, 903 F.2d at 33 (quoting *St. Amant*, 390 U.S. at 732).  For example, the plaintiff can provide evidence that "it was highly probable that the story was '(1) fabricated; (2) so inherently improbable that only a reckless person would have put [it] in circulation; or (3) based wholly on an unverified anonymous . . . source that [defendant] had obvious reason to doubt.'" *Lohrenz v. Donnelly*, 350 F.3d 1272, 1283 (D.C. Cir. 2003).

Freeman's actual-malice argument is as follows.  First, the Strategic Plan expressly concedes that whether Freeman was arrested for voter or election fraud needed to be confirmed. Strategic Plan at 21 (emphasis added) ("Ruby Freeman (woman in purple shirt on video), now under arrest and providing evidence against GA SOS Stacey Abrams and DNC on advanced coordinated effort to commit voter / election fraud [*need confirmation of arrest and evidence*].").  On top of this, Giuliani concedes that public reporting had shown that there was no truth to the allegation that Freeman "had been arrested/had a criminal record regarding voting fraud" before Giuliani made his statements regarding Freeman.  Def.'s Mot. at 47 (discussing an article by Snopes.com reporting that Freeman was not arrested for committing crimes related to election fraud in Georgia); *see also* Dan Evon, *Ruby Freeman Was Not Arrested by the FBI*, Snopes.com (Dec. 18, 2020), https://www.snopes.com/fact-check/ruby-freeman-arrested-by-fbi/.  Despite that

lack of confirmation, on December 23, 2020—four days before when the plaintiffs allege the Strategic Plan was likely published—Giuliani publicly accused Freeman of having "a history of voter fraud participation." Am. Compl. ¶ 66. Plaintiffs also allege that Giuliani caused the publication of Trump's statement on January 2, 2021, when he called Freeman a "professional vote scammer" and "known scammer[.]" *Id.* ¶¶ 80–81. [4]

Freeman has plausibly alleged Giuliani made statements about her criminal activity/history with actual malice. When taken together, these allegations at least plausibly suggest that Giuliani fabricated Freeman's arrest and criminal record out of whole cloth: Giuliani accused Freeman of election fraud before the Strategic Plan was allegedly published, even though the Strategic Plan (which Giuliani was at least plausibly an author) noted that the Trump Campaign still needed evidence that she was arrested for that very criminal activity. *Cf. Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 284 (D.D.C. 2017) (denying defendants' motion to dismiss on actual malice grounds in a defamation case because plaintiffs alleged that defendants "failed to uncover a single reported piece of evidence corroborating [the sole source's] outlandish claims"). When viewing the Amended Complaint's factual allegations in the light most favorable to the plaintiffs, this evidence is enough to suggest that Giuliani recklessly accused Freeman of being arrested for election fraud.

For these reasons, plaintiffs have pled a plausible defamation claim under D.C. law.

## B.   Intentional Infliction of Emotional Distress Claim (Count 2)

Giuliani argues that plaintiffs' claim for intentional infliction of emotional distress ("IIED") must be dismissed as duplicative of their defamation claim. Def.'s Mem. at 18–19. He

---

[4]   Giuliani says that he cannot be held responsible for Trump's allegedly defamatory statements, but because plaintiffs have sufficiently pled their civil conspiracy claim, *see infra*, Part III.C, these statements may be used against Giuliani, at least at this stage.

is wrong because IIED is a separate and distinct tort from defamation.  Under D.C. law, a plaintiff alleging intentional infliction of emotional distress "must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or and recklessly (3) causes the plaintiff [to suffer] severe emotional distress."  *Doe v. Bernabei & Wachtel, PLLC*, 116 A.3d 1262, 1269 (D.C. 2015) (quoting *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013) (alterations in original).  These elements significantly differ from those for a defamation claim.  *See, supra,* Part III.A.  The D.C. Court of Appeals has also treated the two torts differently.  *See, e.g.*, *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1261 (D.C. 2016), as amended (Dec. 13, 2018) (discussing IIED and defamation as separate torts).  Plaintiffs' IIED claim stands as pled.

## C.      Civil Conspiracy Claim (Count 3)

With respect to plaintiffs' civil conspiracy claim, Giuliani argues that civil conspiracy has been inadequately pleaded, and Giuliani cannot therefore be vicariously liable for any third-party statements cited in the Amended Complaint.  Def.'s Mem. at 13–14.  In support, he argues that plaintiffs have not shown the particularization of an agreement between Giuliani and the alleged co-conspirators or the "who, what, where, and when" of an agreement.  Def's Mot. at 13–14.

Giuliani mischaracterizes the type and nature of the evidence that plaintiffs must provide at the motion-to-dismiss stage.  In the District of Columbia, "[t]o establish a prima facie case of civil conspiracy, [the plaintiff] ha[s] to prove (1) an agreement between two or more persons (2) to participate in an unlawful act, and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement pursuant to, and in furtherance of, the common scheme."  *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000).  While "mere allegations that [the] [d]efendants agreed among themselves to defraud the plaintiff, without alleging facts that indicate they took steps to further the fraudulent scheme, will not defeat a motion to dismiss[,]" *McMullen v.*

*Synchrony Bank*, 164 F. Supp. 3d 77, 97 (D.D.C. 2016), "a plaintiff need not allege that an express

or formal agreement was entered into" to defeat a motion to dismiss.  *United States ex rel. Tran v.*

*Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 134 (D.D.C. 2014); *see also Ramos v. ADR Vantage,*

*Inc.*, No. 18-CV-01690 (APM), 2018 WL 6680531, at *3 (D.D.C. Dec. 19, 2018) (denying a

motion to dismiss a civil conspiracy claim when "the gist of Plaintiff's claim is that his co-workers

took the opportunity to spread lies and falsehoods about him through Defendant's workplace report

and that Defendant agreed to use the report for that malicious purpose").  In fact, the D.C. Circuit

has held that "in most civil conspiracy cases," courts must "infer an agreement from indirect

evidence."  *Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983) (explaining that "[t]he

circumstances of the wrongdoing generally dictate what evidence is relevant or available in

deciding whether an agreement exists," including "[f]actors like the relationship between the

parties' acts, the time and place of their execution, and the duration of the joint activity"). [5]

The Strategic Plan and other conduct provide ample circumstantial evidence of a civil

conspiracy between Giuliani and members of the Trump Campaign.[6]  The stated goal of the Plan

was to engage in a "[n]ationwide communications outreach campaign to educate the public on the

fraud" in the election to "inspire citizens to call upon legislators and Members of Congress to

disregard the fraudulent vote count and certify the duly-elected President Trump."  Am. Compl.

---

[5]       Giuliani's reliance on U*nited States ex rel. PCA Integrity Associates, LLP v. NCO Financial Systems,*
*Incorporated*, to suggest that plaintiffs needed to show more evidence of a conspiracy, is misplaced.  *See* No. CV 15-
750 (RC), 2020 WL 686009 (D.D.C. Feb. 11, 2020).  The plaintiff in that case alleged a conspiracy based on an
underlying tort that sounded in fraud—a violation of the False Claims Act—so the court applied Federal Rule of Civil
Procedure 9(b)'s heightened pleading standard.  *See id.* at *11 ("For FCA fraud actions, a heightened pleading standard
applies.").

[6]       To the extent that Giuliani argues that plaintiffs must identify *all* of the alleged co-conspirators by name in
the Amended Complaint, he is, again, wrong.  *See McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 98 (D.D.C.
2016) (recognizing that the plaintiff might need discovery to learn which individuals conspired against her and denying
the motion to dismiss civil conspiracy charge because she "alleged facts specific enough to allow the Court to draw
an inference of an agreement"); *cf. Bush v. Butler*, 521 F. Supp. 2d 63, 68–69 (D.D.C. 2007) (dismissing conspiracy
claim because the complaint "provid[ed] no description of the persons involved in the agreement, the nature of the
agreement, [or] what particular acts were taken to form the conspiracy").

¶ 58.  One of those acts was to accuse Freeman of "ballot stuffing" by rolling out "suitcases" filled with ballots when "press and all third parties were required to leave the premises"—an event the Strategic Plan calls "Suitcase Gate."  *Id.* ¶ 63.  The Plan lists Giuliani and others as "[k]ey [t]eam [m]embers," Strategic Plan at 7–8, which also suggests that the Plan was a coordinated action. Furthermore, Trump also employed the Strategic Plan's description of "Suitcase Gate" in his call with Secretary of State Raffensperger, when he alleged Freeman and others "stuffed" ballot boxes with fake ballots hidden in suitcases.  *Id.* ¶ 80–81.  A reasonable jury could accordingly infer that (1) Giuliani, Trump, and the "[k]ey [t]eam [m]embers" listed in the Strategic Plan (2) created a plan to sow doubt in the outcome of the 2020 election by (3) launching a misinformation campaign, which included accusing Freeman, Moss, and others of participating in schemes of electoral fraud, and (4) injuring plaintiffs in the process.[7]  Plaintiffs have pled a plausible civil conspiracy.

## IV.    CONCLUSION

For the reasons set forth above, Giuliani's motion to dismiss is denied and the entirety of plaintiffs' claims may advance to discovery.  An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: October 31, 2022

_____

BERYL A. HOWELL

Chief Judge

---

[7]    Giuliani defends the Strategic Plan as a plan to "'educate the public,'" Def.'s Mem. at 13 (quoting Strategic Plan at 1), rather than to disseminate false information.  Regardless of how Giuliani characterizes the goal of the Plan, plaintiffs allege that the Plan's goal was to overturn the 2020 presidential election, and they allege more than enough evidence in their Amended Complaint to infer that unlawful act was the Plan's underlying purpose.  *See, e.g.*, Amend. Compl. ¶ 9 (noting that the Strategic Plan "relied on the following call to action: 'YOU CANNOT LET AMERICA ITSELF BE STOLEN BY CRIMINALS – YOU MUST TAKE A STAND AND YOU MUST TAKE IT TODAY'").