# EXHIBIT 1

Page 1

1

2          IN THE UNITED STATES DISTRICT COURT

3             FOR THE DISTRICT OF COLUMBIA

4    ------------------------------x

5    RUBY FREEMAN and

6    WANDREA MOSS,

7                   Plaintiffs,

8          v.                  Civil Action No.

9                              21-3354 (BAH)

10   RUDOLPH W. GIULIANI,

11                  Defendant.

12   ------------------------------x

13

14         DEPOSITION OF RUDOLPH W. GIULIANI

15                  March 1, 2023

16

17

18

19   Reported by:

20   MARY F. BOWMAN, RPR, CRR

21   JOB NO. 5786854

22

23

24

25

Page 2

```
1
2
3
4
5              March 1, 2023
6              9:30 a.m.
7
8
9        Deposition of RUDOLPH W. GIULIANI,
10  held at Willkie, Farr & Gallagher, LLP, 787
11  Seventh Avenue, New York, New York, before
12  Mary F. Bowman, a Registered Professional
13  Reporter, Certified Realtime Reporter, and
14  Notary Public of the States of New Jersey
15  and New York.
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1
2              APPEARANCES:
3
4  CAMARA & SIBLEY
5  Attorneys for Defendant
6      1108 Lavaca Street,  Suite 110263
7      Austin, TX 78701
8  BY:  JOE SIBLEY, ESQ.
9      -and-
10 DAVIDOFF HUTCHER & CITRON LLP
11     605 Third Avenue
12     New York, New York   10158
13 BY:  ROBERT J. COSTELLO, ESQ.
14
15
16
17
18 Also Present:
19     Deverell Write, Legal Videographer
20
21
22
23
24
25
```

Page 3

```
1
2              APPEARANCES:
3
4  WILLKIE FARR & GALLAGHER, LLP
5  Attorneys for Plaintiffs
6      1875 K Street, NW
7      Washington DC  20006
8  BY:  MICHAEL J. GOTTLIEB, ESQ.
9      M. ANNIE HOUGHTON-LARSEN, ESQ.
10     MAGGIE MacCURDY, ESQ.
11     MERYL GOVERSKI, ESQ. (Via Zoom)
12     JOHN KNOBLETT, ESQ.  (Via Zoom)
13     -and-
14 DUBOSE MILLER LLC
15     75 14th Street NE, Suite 2110
16     Atlanta, Georgia 30309
17 BY:  VON A. DUBOSE, ESQ. (Via Zoom)
18     -and-
19 UNITED TO PROTECT DEMOCRACY, INC.
20     82 Nassau Street, #601
21     New York, NY 10038
22 BY:  JOHN LANGFORD, ESQ. (Via Zoom)
23
24
25
```

Page 5

```
1              Giuliani
2        THE VIDEOGRAPHER:  We are on the
3  record at 9:36 a.m. on March 1, 2023.
4        Please note that the microphones
5  are sensitive and may pick up whispers
6  and private conversations.  Audio and
7  video recording will continue to take
8  place unless all parties agree to go
9  off the record.
10       This is media unit 1 of the
11 video-recorded deposition of Rudolph
12 Giuliani.  This the taken by counsel
13 for the plaintiff in the matter of Ruby
14 Freeman, et al., versus Rudolph W.
15 Giuliani.
16       This case is pending in the
17 United States District Court for the
18 District of Columbia.  We're at the
19 offices the Willkie Farr & Gallagher
20 located at 787 Seventh Avenue.
21       My name is Deverell Write from
22 Veritext Legal Solutions.  The court
23 reporter is Mary Bowman from Veritext
24 Legal Solutions.
25       At this time, will counsel please
```

2 (Pages 2 - 5)

# Excerpted

Giuliani

1
2     Then I put them aside and
3  starting -- really starting a while back,
4  when I thought we were going to have it
5  earlier, I read through everything.  Then
6  it got delayed twice, and then I read
7  through it in the last couple of days,
8  getting prepared for this.
9     Q.   Okay.  When you say it got
10 delayed twice, you are referring to --
11    A.   Because of my issues, yeah.
12    Q.   Okay.
13        In preparing for your deposition,
14 other than your attorneys that are sitting
15 here with you today, did you talk to
16 anyone, any third-party, about any of the
17 issues in this case?
18    A.   I talked to Bernie Kerik.  A
19 while back, I may have talked to Christina.
20 Probably some others that I can't remember.
21        I'm sure I talked -- talked to
22 people about it casually, also.  People
23 would ask you about a case, someone would
24 ask about this case or some other case or
25 how's it going, that sort of --

Giuliani

1
2     Q.   Let me just follow up on a couple
3  of those folks.  Okay?
4        Bernie Kerik, when was the last
5  time you spoke with Mr. Kerik -- not -- let
6  me rephrase.
7        When was the last time you spoke
8  with Mr. Kerik about any of the issues in
9  this case?
10    A.   About, I think, a day ago.
11    Q.   And what did you all talk about?
12    A.   I asked him to -- I asked him --
13 I asked him to find something -- I asked
14 him to take another look to see if he had
15 any papers in his files that would be
16 relevant to this.  Because we don't have
17 very much paper on this.
18        He assured me the back -- we
19 hadn't talked in a long time about this,
20 and he said, I -- I don't -- I don't think
21 so, but I'll look again.
22    Q.   Anything else you all talked
23 about besides --
24    A.   He took me through an incident
25 involving one of the plaintiffs and the FBI

Giuliani

1
2  that he was aware of --
3     Q.   Okay.  One of the plaintiffs --
4     A.   -- and he never talked to me
5  about it, actually.  We had never talked to
6  me about it except back when it happened.
7     Q.   Okay.  So when you say, "One of
8  the plaintiffs," are you referring to one
9  of the plaintiffs in this case?
10    A.   Yeah.  I think it's Ruby Freeman.
11    Q.   When you say an incident with the
12 FBI, what do you mean?
13    A.   It was some kind of a report that
14 she was arrested or questioned.  It was
15 very hysterical, claimed that she had done
16 very bad things and then recanted that.
17        And I had seen reports of that a
18 long time ago, never checked them out.
19 Bernie had sent me the reports a long time
20 ago, never checked them out.  And I asked
21 him had he ever checked them out, and he
22 said he did to some extent but he would do
23 it more thoroughly.
24    Q.   Okay.
25        And you have had a long

Giuliani

1
2  relationship with Mr. Kerik?
3     A.   I have.
4     Q.   Goes back several decades?
5     A.   To 1993.
6     Q.   When you say Mr. Kerik sent you
7  information about these issues, how does he
8  send you information?
9     A.   Well, I should modify that to
10 gave me information.  So here is how he
11 gives me information.
12        Tells it to me in person, on the
13 phone, or he will text me.  Rarely does he
14 email.  I'm trying to think I have an email
15 from Bernie.  Maybe.
16        So there would be -- he would be
17 do it in person.  He might give me a piece
18 of paper.  He might text something.  Or he
19 might call me on the telephone.
20        He was formerly an operative in
21 the Middle East before he was a police
22 officer doing intelligence-type work, so he
23 is very guarded in his -- it's hard to get
24 anything out of him.
25    Q.   Is he a skilled investigator?

4 (Pages 10 - 13)

# Excerpted

Page 94

Giuliani

1
2        And the President fired his legal
3   team and said, I want you to go -- largely
4   because he had been -- he had been promised
5   that there would be all these
6   preparations -- let me go back just a
7   little.
8        During the campaign, summer
9   probably, there was a very big article, I
10  think the biggest one being in the Los
11  Angeles Times, of the tremendous legal team
12  that Democrats were putting together and
13  that they had 1,000 or 2,000 lawyers that
14  they had prepared draft complaints and
15  draft papers in numerous jurisdictions.
16  They were going to challenge everywhere
17  humanly possible, and they weren't going to
18  concede no matter what.
19       It was buttressed by Hillary
20  Clinton's statement to Biden saying, "Under
21  no circumstances concede the election, no
22  matter what the vote is on election night."
23       So this created -- so this --
24  now, whether that's true or not, and I
25  think it was true, if it wasn't true, that

Page 95

Giuliani

1
2   would constitute one of those fakes, right?
3   That created great consternation in the
4   Trump team.  Do we have that?
5        I had no idea.  I was not part of
6   the -- I had been at campaign headquarters
7   three times at that point.  I was in my own
8   law office and consumed with the -- every
9   once in a while, I talked to them as
10  friends.
11       I kind of vaguely knew who his
12  lawyers were on the team, and I didn't
13  think an awful lot of them, to think they
14  were the high-powered lawyers -- when I
15  read the names of the Democratic lawyers, I
16  said, Wow, this is not good, it will be
17  minor league, major league.
18       But I put aside -- and then one
19  of my companions -- because this may have
20  been about the time the hard drive started.
21  But I remember who it was.  Bannon, Steve
22  Bannon said -- he said, you know, I've been
23  at that campaign headquarters a couple of
24  times.  I don't think they're prepared for
25  a damn thing.  Why don't you ask him to

Page 96

Giuliani

1
2   find out.
3        So at some point when I was
4   meeting with him, I just said,
5   Mr. President, you should check out the --
6   he came back and said, Oh, we are very well
7   prepared.  We have got all of this, came
8   back with a big long thing.
9        So he referred back to that that
10  day and said, Go over there and see what
11  they have.
12       And when I went over there, they
13  didn't have anything.  They hadn't prepared
14  anything.  They weren't prepared for
15  anything.  They had some lawyers here and
16  there, complete chaos.
17  Q.   This is the day after the
18  election?
19  A.   Day or two days after.
20       So we basically had to get rid of
21  most of them and start from scratch, which
22  left us ten days behind our adversaries,
23  and they were critical ten days.
24  Q.   And the team that was then
25  assembled was --

Page 97

Giuliani

1
2   A.   Was myself --
3   Q.   Let me just finish my question.
4        I'll ask you about who was on it,
5   but the team that was assembled at that
6   point in time, is that the team that
7   Ms. Bobb is referring to as the "Giuliani
8   legal team"?
9   A.   Correct.
10  Q.   Now you can tell me, who was on
11  this team?
12  A.   It was myself, Jenna Ellis,
13  Victoria Toensing, Joe diGenova, Boris
14  Epshteyn, originally.
15       We added Christina after about
16  two weeks, and we added -- oh, my goodness,
17  of course, her name will escape me.
18       Come on, guys, help me.  The
19  wicked witch of the east.
20  Q.   It's -- really, in this forum,
21  I'm interested in what you remember.
22  A.   Oh, I remember who it is, I just
23  can't remember the name.  I block it out.
24  Q.   We can come back to it.
25  A.   On purpose.  Everybody knows who

25 (Pages 94 - 97)

Page 98

Giuliani

1  it is.
2      Q.   We can come back to it.
3          Anyone else aside apart from
4  this --
5      A.   Sidney.
6      Q.   Sidney?
7      A.   It was Sidney.
8      Q.   Sidney who?
9          MR. COSTELLO:  How could you
10  forget that.
11     Q.   Are you referring to Sidney
12  Powell?
13     A.   Sidney Powell, yeah.
14     Q.   Sidney Powell was part of the
15  team then?
16     A.   Yeah, she was part of the team.
17     Q.   Did this team meet anywhere or
18  was it --
19     A.   Yeah, yeah.  We had the campaign
20  office as our headquarters, and we met
21  there.  And then, after a while, the
22  campaign headquarters sort of dried up and
23  they were just doing, like, billing things
24  and very dispirited, so we went and got

Page 99

Giuliani

1  rooms at the Mandarin Oriental Hotel where
2  we could be more private, also, a little
3  bit away from the press.
4          And we moved our operation to the
5  Mandarin Oriental, and then because of
6  Covid reasons around Christmastime, we
7  moved it to the Willets Hotel.
8      Q.   So for this Giuliani legal team,
9  the client was former President Trump in
10  his personal capacity, is that correct?
11     A.   Correct.
12     Q.   Not the campaign?
13     A.   Well, the campaign -- the
14  Republican -- the campaign was also part --
15  I was running the campaign.
16     Q.   Okay.  Was there an engagement
17  letter for any of the clients that this
18  team represented?
19     A.   I'm not sure.  I didn't pay
20  attention to that.
21     Q.   Any that you can recall seeing or
22  signing as you sit here today?
23     A.   No, but that doesn't mean I
24  didn't.

Page 100

Giuliani

1      Q.   I understand.
2          There may have been but you can't
3  recall?
4      A.   Yeah, I have a faint recollection
5  that there were a couple of things written
6  up about the inter-reaction but I don't
7  recall it.
8      Q.   I'm just trying to understand who
9  the clients were.
10     A.   I understand.  It was done like
11  that (indicating.)
12     Q.   So it may have been that there --
13  Republican National Committee was a client?
14     A.   Yeah, because in some of the
15  cases, we were representing both, Donald
16  Trump and the Republican National
17  Committee.
18         But Donald Trump as Donald Trump,
19  not Donald Trump as President of the United
20  States, who would be represented by White
21  House counsel in that case.
22     Q.   Understood.
23         Donald Trump as candidate for
24  office?

Page 101

Giuliani

1      A.   Correct.  As candidate, he has to
2  have a private lawyer.
3      Q.   Understood.
4      A.   As President, he has legal
5  counsel.
6      Q.   And when you say the cases, you
7  are referring to litigation that had been
8  filed or --
9      A.   Some of which had been filed,
10  some of which would be filed, some of which
11  was on appeal, had already been lost.
12         Everything that remained.
13     Q.   Okay.
14         And so we started this discussion
15  after the break talking about different
16  hats, and what we have just been talking
17  about is litigation.
18         And so in filings in litigations
19  and court submissions and hearings before
20  judges, am I correct that that would be
21  wearing the litigation legal hat?
22     A.   Sure, sure.  The litigation,
23  the -- yeah.
24     Q.   But at the same time, you were

26 (Pages 98 - 101)

# Excerpted

Page 122

1                    Giuliani
2     Q.   Do you know about when that
3  occurred?  Was it in December of 2020,
4  November --
5     A.   I don't.
6     Q.   Okay.
7          Do you believe that that happened
8  in the year 2020, so before we got to 2021?
9     A.   Yeah.
10     Q.   Okay.
11          So at some point in 2020, you
12  watched a large amount of footage from
13  State Farm?
14     A.   Yeah, a lot of it is just very
15  boring and very -- just normal counting of
16  votes.
17     Q.   And it was available to you in
18  your -- you had it available to you in your
19  office, the full video feed from State Farm
20  Arena that night?
21     A.   Somebody may have brought it and
22  played it for me.  I seem to recall that.
23     Q.   Do you recall who brought it to
24  you?
25          Because there was -- if we go

Page 123

1                    Giuliani
2  sort of back in time --
3          MR. COSTELLO:  He just shook his
4  head.  He didn't give an answer.
5     A.   I don't recall.
6          And there is a slight possibility
7  it happened in Atlanta while I was there.
8     Q.   In Atlanta when you were
9  testifying before the Georgia legislature?
10     A.   Yeah, I was there a couple of
11  times.
12     Q.   At least two times you --
13     A.   I testified -- I thought I
14  testified twice and I was there three times
15  or maybe I testified three times.
16     Q.   And one of those times was with
17  Jackie Pick, is that right?
18     A.   Yes.  Well, that -- that would
19  have been before I had actually seen the
20  video.
21     Q.   Okay.  So there is the first day
22  of testimony before the Georgia legislature
23  with Jackie Pick when the video was played
24  for the first time, is that right?
25          And if I understood --

Page 124

1                    Giuliani
2          MR. SIBLEY:  Rudy, you got to
3  answer --
4     A.   The answer is yes.
5     Q.   And I understand you previously
6  testified that you had not reviewed the
7  video prior to when you saw it in the room
8  that day?
9     A.   The first time I saw the video
10  was when it was played in the hearing
11  chamber.
12     Q.   And then at some point in time
13  after that, you came back and testified
14  again before the Georgia legislature?
15     A.   By that time, I had reviewed the
16  whole -- or as much of it as I could.
17     Q.   So by the time you came back to
18  testify again, you believe you had watched
19  some large amount --
20     A.   Yeah, I think I had watched on
21  and off about eight hours of it.
22     Q.   Great.  We will come back to
23  that.
24          Let me show you one more of the
25  statements.  We will mark Exhibit 9.

Page 125

1                    Giuliani
2          (Exhibit 9, statement dated June
3  14, 2022, marked for identification, as
4  of this date.)
5          MS. HOUGHTON-LARSEN:  And that's
6  Binder 2, Tab 61.
7     Q.   So the court reporter is handing
8  you what's been marked as Exhibit 9.  This
9  is a transcript of a show from One America
10  News distributed on Rumble, June 14, 2021,
11  Uncovering the Crime of the Century with
12  Rudy Giuliani, and it looks like the
13  reporter for this was Natalie Harp.
14          Do you have a recollection of
15  this?
16     A.   Yeah, I have a vague -- I mean,
17  I've been interviewed by Natalie many, many
18  times, so it is hard to focus on a
19  particular time.
20          But if you don't mind, could I
21  take a short break to use the men's room?
22     Q.   That would be fine.
23     A.   It will be quick.
24          THE VIDEOGRAPHER:  The time on
25  the video monitor is 12:03 p.m.

32 (Pages 122 - 125)

# Excerpted

Giuliani

1
2     A.   I don't remember which ones
3  were -- I don't remember which ones were
4  direct statements and which ones were
5  hearsay statements given to me by others.
6  I would have to look at them all to refresh
7  my recollection about that.
8     Q.   But I assume you would agree
9  based on a conversation we had earlier
10  about the importance of being in a room to
11  know what's happened there that the people
12  who were in the room would be very
13  important witnesses, is that right?
14     A.   Being in the room?
15     Q.   If you are concerned with the
16  events of what has occurred in a room on a
17  particular location --
18     A.   Sure.
19     Q.   -- you would want to know what
20  the people who were in the room said about
21  what happened on that occasion, is that
22  right?
23     A.   Sure.
24     Q.   So let me mark an exhibit.  And
25  Exhibit 11, and this is Tab --

Giuliani

1
2         MS. HOUGHTON-LARSEN:  Eighteen.
3     Q.   Got it.  So this is Volume 1,
4  Tab 18.
5         (Exhibit 11, petitioner notice of
6     filing of Exhibit 12 to verified
7     petition, marked for identification, as
8     of this date.)
9     Q.   Sir, the court reporter has
10  handed what has been marked as Exhibit 11.
11  And Exhibit 11 is an affidavit of an
12  individual named Mitchell Harrison, who was
13  a Republican party field organizer in
14  Georgia.  And this has been filed in Fulton
15  County, Georgia in a case called "Trump v.
16  Raffensperger" in 2020.
17         Sir, are you familiar with that
18  litigation, Trump v. Raffensperger?
19     A.   Vaguely.
20     Q.   Would this have been one of the
21  cases you would have been --
22     A.   No, I don't think I was involved
23  in that case.  I don't think so.
24     Q.   Have you ever reviewed this
25  affidavit or any affidavit of Mr. Harrison?

Giuliani

1
2     A.   Could I read it and then I can
3  refresh my recollection?
4     Q.   Of course.
5     A.   I recall this, yes.
6     Q.   Do you recall having read this
7  before?
8     A.   I don't remember the context in
9  which I've either read it or been told
10  about it.
11     Q.   Okay.  Do you see the date on
12  this sworn affidavit from Mr. Harrison is
13  November 9, 2020?
14     A.   No, I didn't, but there it is,
15  yup.
16     Q.   Okay.  So this is very close in
17  time to the events of election, is that
18  right?
19     A.   Right.
20     Q.   It's within one week of it, is
21  that correct?
22     A.   That is.
23     Q.   Do you see a mention anywhere in
24  this affidavit of Mr. Harrison saying that
25  they had been told to leave because of a

Giuliani

1
2  water main break?
3     A.   I don't.
4     Q.   Do you see in paragraph 10,
5  Mr. Harrison discusses that after
6  concluding that Regina Walker would not --
7  Waller would not give us this information
8  on the number process versus the ones still
9  left to be processed, we along with the Fox
10  News crew the State Farm Arena shortly
11  after 10:30 p.m.
12         Do you see that?
13     A.   I see that.
14     Q.   Do you see any reference in this
15  paragraph of being instructed to leave?
16         MR. COSTELLO:  Could I have that
17     last question read back?
18         (Record read.)
19         MR. COSTELLO:  In this paragraph.
20         MR. GOTTLIEB:  That is the
21     question.
22     A.   Well, I see paragraph 8,
23  "Sometime after 10 o'clock, the counting
24  activity slowed.  Shortly thereafter, a
25  younger lady with a long braided but blond

Page 142

Giuliani

1  Giuliani
2  hair yelled out to all of them they should
3  stop working and come back.  Thereafter,
4  all but four election employees left State
5  Farm leaving just the blond-haired lady,
6  who Michelle and I assumed was the
7  supervisor, two older ladies and Regina
8  Waller at the location.  The lady appeared
9  through the night, and Michelle and I
10  believed her to be the supervisor."
11  Q.  Do you understand those
12  references to a blond-haired lady in
13  paragraph 8 to be one of my clients?
14  A.  I can't say that, if that is what
15  he meant, but what I am saying is,
16  basically, he was told that they were going
17  to stop counting.
18  Q.  Yes, sir, but my question is, do
19  you see any reference --
20  A.  I don't, I don't --
21  Q.  -- in that paragraph --
22  A.  -- but that isn't the only reason
23  that they were thrown out.  That was one
24  of.
25  Q.  Mr. Giuliani, my question simply

Page 143

1  is, do you see --
2  A.  No, I told you, I don't see it
3  here, but that doesn't --
4  Q.  And do you see --
5  A.  -- that doesn't explain the fact
6  that they were told that the counting would
7  stop, which turned out to be a lie.  And
8  the counting didn't -- the counting didn't
9  stop and proceeded illegally.
10  Q.  Mr. Giuliani, I understand that's
11  your view, and we will have a conversation
12  about that.
13  My question now is simply
14  focusing on your allegation that my clients
15  threw observers out of State Farm Arena on
16  the night of November 3rd, and my question
17  to you is if you see any indication in this
18  affidavit that my clients instructed
19  Mr. Mitchell -- or Mr. Harrison or his
20  colleagues to leave State Farm Arena?
21  A.  "The blond-haired lady yelled out
22  to all of them they should stop working and
23  come back tomorrow."
24
25  It seems to me that's telling

Page 144

1  Giuliani
2  them to leave.
3  Q.  You believe --
4  A.  Stop working.  Come back
5  tomorrow.
6  Q.  You believe that that reference
7  is an instruction to the observers to stop
8  working, not the counters?
9  A.  It's an instruction to everybody
10  to stop working and to go home.
11  Q.  And yet --
12  A.  But what turned out is the
13  workers --
14  Q.  Mr. Giuliani, you'll --
15  A.  -- stayed and counted illegally.
16  MR. COSTELLO:  Let him finish his
17  answer, please.
18  Q.  That paragraph is a reference to
19  shortly after 10 o'clock p.m., is that
20  right?
21  A.  Yeah.  That's when it stopped,
22  yeah.
23  Q.  And this --
24  A.  I would say that statement fits
25  easily the description that they were

Page 145

1  Giuliani
2  thrown out, yelled at -- yelled out to all
3  of them they should stop working and come
4  back tomorrow.
5  Q.  Mr. Giuliani --
6  A.  That was untrue.
7  Q.  -- they did not leave until after
8  10:30 p.m., is that correct?
9  A.  It doesn't matter when they left.
10  They were told to leave, and I'm not sure
11  that timing is absolutely correct.
12  Q.  Well, in paragraph 10,
13  Mr. Harrison says, "We left State Farm
14  Arena shortly after 10:30 p.m."
15  A.  Yeah, I'm not sure that that's
16  absolutely correct.
17  But in any event, he was told to
18  leave.
19  Q.  That is, your view is that
20  paragraph 8 -- as I understand it, your
21  view is that Mr. Harrison is saying in a
22  sworn affidavit in paragraph 8 that he and
23  his colleagues and the observers were told
24  to leave?
25  A.  No.  He is saying that everybody

37 (Pages 142 - 145)

Page 146

Giuliani

1  was told to leave.  Which turned out to be
2  worse because that turned out not to be the
3  truth until -- they got rid of the people
4  they wanted to get rid of.  They kept the
5  people they wanted to keep, and then they
6  proceeded to count irrespective of the law
7  of Georgia.
8      Q.   Mr. Giuliani, nonetheless, if
9  that is your interpretation of
10  Mr. Harrison's statement, he and his
11  colleagues remained for another half hour,
12  is that --
13     A.   Trying to get information that
14  they didn't get.
15     Q.   Mr. Giuliani, did you ever talk
16  to Mr. Harrison about what he may have
17  meant in this affidavit?
18     A.   I wasn't -- no, I don't think so
19  because I wasn't involved in this case.
20     Q.   Okay.  Did it ever occur to you
21  to talk to the eyewitnesses who were
22  present at State Farm?
23     A.   Not based on this.  This seemed
24  to me to be sufficient to make it clear

Page 147

Giuliani

1  that they were yelled at, they were told to
2  stop working, to come back tomorrow.
3         It turned out to be a completely
4  phony excuse.  But whether the phony excuse
5  was the water main break or this person
6  saying they are going to stop counting but
7  lying about that, doesn't seem to matter
8  very much to me.  I wasn't pursuing this
9  case.  But it seems to me that's equally as
10  despicable.
11     Q.   Mr. Giuliani, you agree that word
12  choice is important, correct?
13     A.   Yeah.
14     Q.   Particularly in a sworn affidavit
15  to the court?
16     A.   Um-hm.
17     Q.   You see on this page where you
18  are saying that you believe Mr. -- I
19  keep -- I keep transposing Mitchell and
20  Harrison.
21         Where Mr. Harrison is talking
22  about what happened that night, sometimes
23  he uses the word "they" and sometimes he
24  uses the word "we."

Page 148

Giuliani

1      Do you see that?
2      A.   Right.
3      Q.   In paragraph 8, does he say (as
4  read):  The blond-haired -- the lady with
5  the long braided but blond hair yelled out
6  to us, we should stop working?
7      A.   No.  I don't say that he did.
8      Q.   Is it maybe a reasonable
9  assumption that that's because the
10  observers did not work for the Georgia
11  election officials?
12     A.   I don't see what that would have
13  to do with it.  The people who are working
14  are the election officials.
15     Q.   We can agree that this paragraph
16  does not say that the lady with the long
17  braided but blond hair yelled out to all of
18  us, we should stop working, correct?
19     A.   No.  But it could easily be
20  interpreted as referring to the people who
21  are doing the main work, who were the
22  people counting the ballots, that's the way
23  I would read it.
24     Q.   You would read it as the people

Page 149

Giuliani

1  doing the work and counting the ballots?
2      A.   The other people are observing.
3      Q.   Great.  So we can --
4      A.   The work being done there is not
5  observing.  The work being done there is
6  counting ballots.
7         The woman yells out, Stop
8  working, counting the ballots, not stop
9  observing.  That would be absurd --
10     Q.   Okay.
11     A.   -- and then, Come back tomorrow.
12     Q.   I think we understand each other
13  now.
14     A.   And that ended up in the
15  situation with the -- maybe a different
16  ruse being used that the water main break
17  was intended to accomplish, which is to get
18  out the observers and then have a nice,
19  private place, contrary to Georgia law, so
20  you could count the ballots that were
21  hidden under what looked like to me a
22  casket.
23     Q.   Okay.  I think we understand each
24  other.

38 (Pages 146 - 149)

Page 150

Giuliani

1
2    A.   I mean, I've done a lot of cases
3  that -- that's about as clear to me as you
4  can get.
5        Could I have a little more water?
6  Q.   Sure.
7        We will mark another exhibit.
8        MR. COSTELLO:  Mr. Gottlieb, how
9  long do you want to go?  It's 12:36.
10       We don't have any problem if you
11 want to go later.
12       MR. GOTTLIEB:  I have about
13 probably two more exhibits to finish
14 this line of questioning.
15       THE WITNESS:  I'm okay.  If you
16 are worried about me.
17       MR. GOTTLIEB:  We will close that
18 out and then we'll take our lunch
19 break.
20       THE WITNESS:  Worry about me
21 until I faint.
22       (Exhibit 12, petitioner notice of
23 filing of Exhibit 13 to verified
24 petition, marked for identification, as
25 of this date.)

Page 151

Giuliani

1
2    Q.   Mr. Giuliani, you have been
3  handed what has been marked as Exhibit 13,
4  and this is Tab --
5    A.   You are making me do more reading
6  than I had to do to prepare for myself.
7    Q.   Sorry, Exhibit 12.
8        MR. COSTELLO:  What volume is
9  this?
10       MS. HOUGHTON-LARSEN:  Volume 1,
11 Tab 16.
12   Q.   So, Mr. Giuliani, the --
13 Exhibit 11 was the affidavit of Mitchell
14 Harrison.  Exhibit 12 is an affidavit from
15 another Republican election observer who
16 was present at State Farm Arena on election
17 night, and that is a woman named Michelle
18 Branton.
19       Does that name ring a bell to
20 you?
21   A.   It does vaguely but I -- if I
22 read this --
23   Q.   Why don't you take a moment --
24   A.   -- if I read this, I might be
25 able to place it better.

Page 152

Giuliani

1
2    Q.   Why don't you take a moment to
3  read the affidavit.
4    A.   You have to appreciate that this
5  is one case out of eight others and there
6  are over a thousand affidavits.
7        So they do get a little
8  confusing, sometimes the states get
9  confused.
10       MR. COSTELLO:  You're not
11 representing that this is one of the
12 eight cases challenging the election,
13 right?
14       This is a different case brought
15 by President Trump in his capacity
16 against Raffensperger.
17       MR. GOTTLIEB:  I'm not
18 representing anything about this case.
19 Except for what the caption is and the
20 court --
21       MR. COSTELLO:  Got it.  Thank
22 you.
23   A.   I mean, I should have made more
24 of how far away this stupid thing was from
25 the counting.  You couldn't say anything.

Page 153

Giuliani

1
2        MR. COSTELLO:  Rudy, please, just
3  read it.
4        What was the number of the
5  previous one, 20?
6        MS. HOUGHTON-LARSEN:  The
7  previous tab?  18.
8    A.   Okay.  I still can't place her.
9  I kind of generally remember her.  But it
10 kind of fits in with about five other
11 people.
12   Q.   Do you have a -- well, so first
13 of all, this is an affidavit of Michelle
14 Branton that is sworn on the 8th of
15 November 2020, and it has been filed in
16 that same litigation, Trump v.
17 Raffensperger.
18   A.   Correct.
19   Q.   Do you have any recollection of
20 ever reviewing this affidavit or the
21 contents of it?
22   A.   I have a recollection of the
23 facts here.  Whether I saw it in an
24 affidavit or somebody told them to me, I
25 don't know.

39 (Pages 150 - 153)

Giuliani

1
2     I mean, not all the facts but the
3  key -- the key facts.
4     Q.   So Ms. Branton was at State Farm
5  on election night along with Mr. Harrison
6  according to this affidavit, is that right?
7     A.   That's right.
8     Q.   And she was a Republican
9  observer, is that right?
10    A.   She was a Republican observer
11 that I should note spent all her time and
12 did not observe nothing.  Was not able to
13 observe anything.
14    Q.   And do you see in paragraph 7,
15 there is a reference to a woman across the
16 room where the scanners were located,
17 yelled at everyone to stop working and
18 return the next day at 8:30 a.m.?
19    A.   Correct.
20    Q.   And that's the same thing we were
21 just discussing from the affidavit of
22 Mr. Harrison, the same --
23    A.   I would assume that's right.  Two
24 people could have done it, too, but, I mean
25 we will assume that it was one person that

Giuliani

1
2  did it.
3     Q.   And you see after that that
4  Ms. Branton stayed for some period of time
5  in State Farm Arena and performed some
6  additional activities, is that right?
7     A.   Yeah.  I mean, that's what
8  appears on the tape as well.  They leave
9  sort of ad seriatim.  They don't leave all
10 at once, they leave a few at a time.
11    Q.   Right.  So Ms. Branton, along
12 with what looks like the Fox News crew
13 that's referenced in paragraph 9, remained
14 in the room for some period of time, is
15 that right?
16    A.   A woman across the room -- tell
17 everyone to stop working and return the
18 next day.  The lady had appeared through
19 the night.  Mitchell and I believed her to
20 be the supervisor.
21       And then after the supervisor
22 gave her instruction, all the staff workers
23 left, except the supervisor described and
24 another much older lady that had a shirt on
25 that said "Ruby" on it, and that one other

Giuliani

1
2  lady that I cannot recall her appearance
3  and Regina Waller -- so at the time that
4  work stopped at about 10:30, I recall those
5  four employees remaining.
6        At this time, we along with the
7  Fox crew were the only persons as I recall
8  left in the room, other than, I guess, what
9  she described.  We had been instructed by
10 Brandon Moe (phonetic) to obtain the number
11 of ballots processed and the number that
12 was still remaining to be processed.  I
13 guess to check to see if they were going to
14 count any overnight.
15       We attempted to obtain the
16 information three separate times, and she
17 wouldn't give it to us, basically.  She
18 also appeared to be calling someone asking
19 them for advice on how to respond to our
20 request.  You can obtain it on the website.
21    Q.   So the chronology that is
22 described here by Ms. Branton is a woman
23 gives an instruction to the election
24 workers to stop working.
25       Ms. Branton then attempts to

Giuliani

1
2  obtain -- is staying after that
3  instruction, attempts to obtain some
4  additional information --
5     A.   Well, apparently, she decides to
6  leave, but she has to get information
7  before she leaves.  That information is
8  information that you would get upon exit,
9  right?
10       How many have been counted, let's
11 freeze it, then why do you want that
12 information, so that you can pick up are
13 they screwing around with me and are they
14 going to count ballots overnight.  That's
15 why she is asking for that document.
16    Q.   That's your interpretation of why
17 she is asking?
18    A.   I can't imagine why else.
19    Q.   Mr. Giuliani, do you see any
20 reference in this affidavit to being told
21 that there was a water main break?
22    A.   I don't.  But I see the same
23 scheme that is just as pernicious, which is
24 to make it as -- make it appears as if you
25 are going to stop counting, get the people

Page 158

Giuliani

1   out and then go ahead and count.
2
3       Q.   I understand that, Mr. Giuliani.
4       A.   What does it matter if it was a
5   water main break or it was a lie?
6       Q.   Well, I thought that you said
7   that words matter --
8       A.   Words are important --
9       Q.   -- tremendously.
10      A.   Tremendously important, but the
11  intent of the words and the effect of the
12  words are the most important.
13           Did you do it with a gun or a
14  knife?  Well, maybe people thought you did
15  it with a gun but you actually did it with
16  a knife.
17      Q.   I understand, Mr. Giuliani.
18           So do you see any reference in
19  Ms. Branton --
20      A.   I do not see a reference --
21      Q.   Please let me finish my question,
22  sir.
23      A.   -- to a water main break.
24      Q.   Please let me finish my question
25  sir.

Page 159

Giuliani

1
2           Do you see any reference in
3   Ms. Branton's affidavit to being forced out
4   of State Farm Arena or being told that they
5   must leave?
6       A.   Well, it depends on how strong
7   that statement is.
8           She was told -- she was told to
9   leave.  And in due course, she and
10  everybody else left.
11          She wanted some information that
12  would seem to me to be very relevant to
13  whether this was on the up and up and was
14  denied that information.
15      Q.   Mr. Giuliani, I thought we agreed
16  in looking at the last affidavit that the
17  instruction to stop working was the
18  instruction to the election officials.
19      A.   No, we didn't.
20      Q.   You understood it to be an
21  instruction to the election officials.
22      A.   Well, yes, yes, but, I mean, she
23  wanted everybody out of there.
24      Q.   Because, of course, the observers
25  do not work for the Georgia state election

Page 160

Giuliani

1   officials, right?
2
3       A.   Yes, yes.  Well, she is telling
4   them that they are not going to be working,
5   so, therefore, come back tomorrow.
6       Q.   Sir, I understand that you think
7   there may be a different aspect of the
8   scheme.  I'm simply just trying to focus on
9   the precise factual allegation that you
10  alleged that my clients instructed or
11  forced the observers to leave State Farm
12  Arena.  I'm trying to drill down on that
13  precise allegation --
14           MR. SIBLEY:  Objection, form.
15      A.   So you are -- the people there
16  executed this by creating a false scenario
17  that the counting was going to stop and,
18  therefore, there was no reason to remain
19  there, and they actually gave a false time
20  when it was going to start again, at 8:30
21  the next morning, and then they waited out
22  everybody leaving, which was short half
23  hour.
24      Q.   Okay.  So based on these
25  affidavits --

Page 161

Giuliani

1
2       A.   So they used a subterfuge, a
3   ruse, a fraud to get the people out.
4       Q.   And we will come to that.
5           But for present purposes, can we
6   agree, based on these eyewitness
7   statements, that one thing my clients did
8   not do is physically force all of the
9   election observers to leave State Farm
10  Arena?
11      A.   I don't think I said she
12  physically did it.
13      Q.   Let's remove the word
14  "physically."
15           Can we agree that my clients did
16  not force the observers to leave State Farm
17  Arena?
18      A.   I wouldn't agree with that.
19           I would say the tactics that were
20  used are tantamount to creating a situation
21  where it would be useless to remain there.
22      Q.   Okay.
23      A.   So that by --
24      Q.   Useless to remain --
25      A.   Particularly -- particularly by

41 (Pages 158 - 161)

Page 162

Giuliani

1
2 giving them a completely false statement as
3 to what was happening, of course it was
4 intended to force them out.
5    Q.   Okay.  You would agree though
6 that my clients --
7    A.   It wasn't force like beating them
8 over the head with a stick, but it was
9 manipulating them.
10    Q.   You would agree, based on these
11 affidavits, certainly that my clients did
12 not escort the observers out of State Farm
13 Arena?
14    A.   It doesn't say who or if anyone
15 escorted them, that's correct.
16       But, I mean, I don't know, I --
17    Q.   In fact --
18    A.   We will have to look at the
19 video --
20    Q.   -- both of the affidavits say
21 that we left, correct?
22    A.   Well, they were the last to
23 leave.
24    Q.   You would think, would you not,
25 that these two individuals in their

Page 163

Giuliani

1
2 affidavits, if they had been escorted out
3 or forcibly removed from State Farm Arena
4 would say that, would you not?
5    A.   I think they would say if they
6 were forcibly removed.  I don't know if
7 they would say if they were escorted, and
8 at the time -- remember, at the time that
9 this is being said to them, they have no
10 reason to believe they are being lied to.
11    Q.   Correct.
12    A.   They don't find that out until
13 later.
14    Q.   I understand that is your
15 position.  But these are affidavits
16 submitted in support of litigation alleging
17 election fraud, am I right?
18    A.   Yeah.
19    Q.   And so is there any reason you
20 can think of why if these eyewitnesses have
21 been forcibly removed from State Farm
22 Arena --
23    A.   I didn't say they were forcibly
24 removed.
25    Q.   Is there any reason that you

Page 164

Giuliani

1
2 could think of --
3    A.   If they were forcibly removed, I
4 imagine they would say it, sure.
5    Q.   Okay.
6    A.   I would.
7    Q.   And if they had been instructed
8 themselves, observers, get out, do you
9 think that they would say that, too?
10       MR. SIBLEY:  Objection, form.
11    A.   I think that's a matter of
12 interpretation.  I could interpret this as
13 being effectively instructed to get out
14 because it's useless to remain.
15    Q.   Okay.  Let's mark another
16 exhibit.
17       This is Exhibit 13.
18    A.   Based on a lie.
19       MS. HOUGHTON-LARSEN:  Volume 1,
20 Tab 6.
21       (Exhibit 13, document entitled
22 "State Election Board Report, November
23 13, 2020, Unabridged Notes Detailing
24 Everything Witnessed November 2 through
25 November 7, 2020," marked for

Page 165

Giuliani

1
2 identification, as of this date.)
3    Q.   Mayor Giuliani, you've been
4 handed what has been marked as Exhibit 13.
5 And this document is entitled "State
6 Election Board Report, November 13, 2020,
7 Unabridged Notes Detailing Everything
8 Witnessed November 2 through November 7,
9 2020."
10       Have you ever seen this document
11 before?
12    A.   Gee, that's a good question.
13 I've seen -- here's what strikes me.  I've
14 seen this Seven Hills logo before.
15    Q.   Do you recall --
16    A.   But beyond that, this does not
17 ring -- this doesn't -- what's the right
18 words -- jog my recollection.
19    Q.   Do you recall recently doing a
20 podcast with John Solomon?
21    A.   Yeah, yeah.  I recently did two,
22 but yeah.
23    Q.   Do you recall on one of those
24 podcasts with John Solomon, there was a
25 discussion about the notes of a Georgia

42 (Pages 162 - 165)

# Excerpted

Page 198

Giuliani

1  Giuliani
2  talked on a number of podcasts about how
3  somewhere around 100,000 or more votes were
4  added for Biden in kind of the middle of
5  the night on Election Day or the night
6  after Election Day.
7      Is it your contention or theory
8  that these USB drives related to that dump
9  or addition of votes late in the night that
10  day?
11     A.   I don't remember.  I don't
12  remember if I said 100,000 with regard to
13  Georgia or some other state.
14     Q.   Okay.  I mean, if I -- without
15  going through a bunch of statements, if I
16  represent to you --
17     A.   If you say I said it --
18     Q.   -- if I represent to you that you
19  said somewhere between 100,000 and 138,000
20  at various times --
21     A.   Yeah, I would say -- I'm not
22  going to debate -- I'm not going to debate
23  it.
24     Q.   So as you sit here today, is it
25  your belief that large number of votes --

Page 199

1  Giuliani
2  large numbers of votes were added for then
3  Vice President Biden, former Vice President
4  Biden in the night after Election Day that
5  were the result of these USB drives?
6      A.   Oh, I don't know that, that
7  that -- I don't know if that came before or
8  after.
9      Remember, the night of the
10  election, Trump was ahead by 2-and-a-half
11  percent about and -- or maybe 3-and-a-half,
12  I don't remember.  So I don't know if those
13  votes had already been counted in that
14  3-and-a-half percent lead or these votes
15  were tossed in later.
16     Q.   I just want to try to nail down
17  your understanding of this.
18     So why don't we look at -- I
19  think we have introduced this one already,
20  right?
21     This is Volume 2, Tab 55.  We
22  will mark another exhibit.  Just make sure
23  I understand.
24     We will mark this as Exhibit 15.
25     (Exhibit 15, transcript of "I

Page 200

1  Giuliani
2  Can't Say This on National Television"
3  marked for identification, as of this
4  date.)
5      Q.   So you've been handed what has
6  been marked as Exhibit 15, which is a
7  transcript of your Common Sense episode 98,
8  I Can't Say This on National Television,
9  dated December 30, 2020.
10     MR. COSTELLO:  Can you give me
11  the volume, please?
12     MS. HOUGHTON-LARSEN:  Volume 2,
13  Tab 55.
14     MR. COSTELLO:  55.  Thank you.
15     Q.   And if you turn to page 8 of this
16  transcript and start down on line 12, and
17  you are talking about your analysis of the
18  voter theft in Georgia, and you say, "We
19  tracked the time that this took place.  How
20  many votes were counted during this period
21  officially and the votes counted during
22  this period of time were about 120,000 and
23  almost all of them were for Biden."
24     Is this the period of time when
25  you have alleged that the observers were

Page 201

1  Giuliani
2  wrongfully excluded from State Farm Arena?
3      A.   I believe so.  I'd have to look
4  at -- this is based on a report from Walton
5  where he did a run.
6      Q.   Sorry, you said "Walton."  Is
7  that Waldron?
8      A.   W-A-L-T-O-N, Phil Walton.
9      Q.   Phil Waldron, W-A-L --
10     MR. COSTELLO:  D-R-O-N.
11     Q.   -- D-R-O-N?
12     A.   Yeah.
13     This is based on a -- what Phil
14  tried to do is take a look at, during this
15  period, how many votes were counted and
16  what was the breakdown, and he had a couple
17  of different scenarios, and this was one of
18  them.
19     Q.   Okay.
20     A.   But in each case, it was a
21  significantly large number of Biden votes
22  and a ridiculously small number of Trump
23  votes, like 70,000 to 3,000, or something
24  like that.
25     This was one of two or three

51 (Pages 198 - 201)

# Excerpted

Page 238

Giuliani

1
2      A.   Only after the fact.
3      Q.   Okay.  Let's mark this as the
4  next exhibit, Exhibit 19.  This is
5  Volume 1, Tab 12.
6          (Exhibit 19, document entitled,
7      "Strategic Communications Plan of the
8      Giuliani Presidential Legal Defense
9      Team," marked for identification, as of
10     this date.)
11     Q.   Do you -- as you sit here today
12  and you looked at what has been marked as
13  Exhibit 19, do you recognize this document?
14     A.   I should clarify how I recognize
15  it though.
16     Q.   Please do.
17     A.   I recognize it as something given
18  to me after this litigation began.
19     Q.   Okay.
20     A.   I hadn't seen this before.
21     Q.   So, Mr. Giuliani, you produced
22  this document to us in this litigation.  So
23  how did you receive it?
24     A.   I believe, I believe --
25          MR. SIBLEY:  Object to form.

Page 239

Giuliani

1
2      A.   -- I didn't originally produce
3  this document to you.  But I think when I
4  asked Bernie Kerik for his documents, I got
5  this document and then I produced it to
6  you.
7      Q.   Okay.
8      A.   In other words, this was in
9  Bernie's possession, not mine.
10     Q.   Bernie Kerik would know how this
11  document came about and what was done with
12  it?
13     A.   Pretty much, yeah.
14     Q.   You would trust his explanation
15  of how this document came about and what
16  was done with it?
17     A.   Yeah, I mean, having seen it now,
18  I know a little bit about how it came
19  about, but I'm telling you the document
20  itself, I didn't see at the time, don't
21  believe I originally submitted it to you,
22  and then Bernie gave it to us and we gave
23  it to you.
24     Q.   Okay.
25          You, I think, testified before

Page 240

Giuliani

1
2  the January 6 Commission.
3          Do you recall doing that?
4      A.   Pardon me?
5      Q.   You testified before the January
6  6 Commission in Congress, is that correct?
7      A.   Right.
8      Q.   And I think, in that testimony,
9  you talked about this document, is that
10  right?
11     A.   I -- yes, I did.
12     Q.   And you testified truthfully
13  before the January 6 Commission?
14     A.   I did.
15     Q.   Did you tell the January 6
16  Commission with respect to this document
17  that you were familiar with the
18  communications plan that was going to be --
19     A.   I was.
20     Q.   -- presented to the White House?
21     A.   Right.
22     Q.   And that you -- you actually, I
23  believe, had a view about this
24  communications plan, right?
25     A.   I was opposed to it.

Page 241

Giuliani

1
2      Q.   So you were familiar with this
3  communications plan before this litigation,
4  is that right?
5          MR. SIBLEY:  Objection to form.
6      A.   Yes.  I wasn't saying I wasn't, I
7  just had never seen the document before.
8      Q.   So that's what I want to
9  understand.
10     A.   Okay.  I was familiar -- I was
11  familiar with various aspects of this.  I
12  was familiar with what they wanted to do.
13  I thought what they wanted to do was a
14  mistake.  I knew it wouldn't be agreed to.
15          I thought it was too late for a
16  public relations plan.  I thought the
17  company involved in it was just trying to
18  make money.  And they wanted to go ahead
19  with it, and I said, Well, okay, go ahead
20  with it.
21          They may have offered this to me
22  before they went to -- and I said, But I'm
23  not going to go to the White House, you can
24  go yourself.
25          They may have presented this to

61 (Pages 238 - 241)

Page 242

Giuliani

1  me beforehand to look at, and I said, Why
2  am I going to bother looking at it?  How
3  many times can I tell you, I don't think
4  it's a good idea.
5      Q.   What company was the
6  communications company that you --
7      A.   I don't remember.  If we look in
8  here, we probably can find it.
9      And they are not bad people, but
10  it just seemed like a waste of money.
11      Q.   If you turn four pages into this
12  document -- and I apologize, there are no
13  page numbers, but this is how it was given
14  to us -- you will see at the top of the
15  page I'm trying to get to in blue writing
16  something that says, "Supporting documents,
17  voter fraud highlights for 2020 U.S.
18  election."
19      A.   What page?  Is it the fourth
20  page?
21      Q.   I'm sorry --
22      MR. COSTELLO:  I think that's the
23  wrong page.
24      Q.   This would be the 8th page,

Page 243

Giuliani

1  because it's double -- printed
2  double-sided.
3      A.   What does it say on the top?
4      Q.   "Supporting documents."
5      MR. COSTELLO:  Supporting
6  documents.
7      Q.   In blue print.
8      A.   Oh, yeah, I see it.
9      Q.   I think this is -- I apologize,
10  it's not the fourth page.  It's the eighth
11  page.
12      And it says, "Voter fraud
13  highlights for 2020 U.S. election presented
14  by the Giuliani team."
15      Do you see that?
16      A.   I do.
17      Q.   And you see that page we are
18  looking at says "Arizona" on the top.  The
19  next page over, if you look at it, it says
20  "Georgia."
21      Do you see that?
22      A.   I do.
23      Q.   And there are a number of sort of
24  bullet points, statistics about Georgia

Page 244

Giuliani

1  that you see here.
2      Is this page or these bullet
3  points familiar to you?
4      A.   I've seen -- honestly, not
5  specifically.  Generically.  I've seen many
6  of these bullet point pages with shifting
7  numbers, changing numbers, different
8  experts.
9      Q.   Okay.
10      A.   To say that I saw this exact one
11  that they connected to this document, I
12  can't tell you that.
13      Q.   All right.
14      A.   Some of it -- some of it looks
15  familiar.  Some of it looks unfamiliar.
16      Q.   Okay.
17      If you turn -- and, I again
18  apologize, there are no page numbers here,
19  but turn one, two, three, four, five, six
20  pieces of paper in, until you get to very,
21  very small print --
22      MR. COSTELLO:  In further?
23      Q.   Yeah, in further in the
24  document --

Page 245

Giuliani

1      A.   Further?
2      Q.   -- until you see small print,
3  they look like footnotes.
4      A.   Yeah, the little blue things.
5  Yeah, okay.
6      Q.   And do you see at the bottom of
7  this page -- just make sure we are on the
8  same place -- "Georgia 1, suitcase gate"?
9      Let's find that together.
10      MR. COSTELLO:  That's the next
11  page.  At the bottom.
12      A.   I see Arizona.
13      Q.   So turn one more page.
14      MR. COSTELLO:  The numbers are 6,
15  7, 8, 9, 10.
16      A.   Now I see Georgia, suitcase gate.
17      MR. COSTELLO:  That's it.
18      Q.   So this says, "Georgia 1,
19  suitcase gate," and then if you look a
20  few -- I guess it's really one sentence in
21  there, it says, "Ruby Freeman, woman in
22  purple shirt on video, now under arrest and
23  providing evidence against Georgia
24  Secretary of State Stacey Abrams and

62 (Pages 242 - 245)

Giuliani
1
2    DNC" --
3        A.   I don't know what that's based
4    on.  I mean, I've heard that rumor, but I
5    had never had any proof of that.
6        Q.   And you can see there --
7        A.   No, I didn't see that that was
8    submitted as part of this.
9            But I've heard -- I've heard
10   rumors that she was arrested and she was
11   going to turn state's evidence and that she
12   didn't.
13       Q.   Okay.  You know now as you sit
14   here today that this arrest did not happen,
15   right?
16       A.   I don't know that, no.
17       Q.   You don't know that?
18       A.   I don't know -- if that -- if an
19   incident like I just described to you
20   happened or not.
21           I know that I heard about it.  I
22   know -- I didn't know about it to the
23   extent or had confidence in it enough that
24   I would have put it in the report, I
25   wouldn't.  But I still don't know if

Giuliani
1
2    something like that did happen or didn't
3    happen.
4        Q.   Okay.
5            Your motion to dismiss cites a
6    Snopes article from December 18, 2020.
7            Are you familiar -- that speak to
8    this issue?
9        A.   Who?
10       Q.   An article from Snopes?
11           Do you know what Snopes is?
12       A.   No.
13       Q.   You talked about Snopes in your
14   podcast about misinformation on social
15   media as a cite that sometimes debunks
16   rumors and debunks --
17       A.   All right.  Okay.
18       Q.   And I just will show you
19   Volume 2, Tab 47, we will mark as the next
20   exhibit.
21           (Exhibit 20, article from Snopes,
22       marked for identification, as of this
23       date.)
24       Q.   So you have been handed what has
25   been marked as Exhibit 20, which is an

Giuliani
1
2    article from Snopes.com dated December 18,
3    2020, entitled "Ruby Freeman was not
4    arrested by the FBI."  And this is, again,
5    an article that is cited in your motion to
6    dismiss.
7            And if you look at page 4 --
8    sorry.  I apologize, not page 4.  If you
9    look at page 2, this article that you have
10   cited says, third paragraph down, "There
11   was no truth to this rumor that FBI did not
12   arrest Ruby Freeman for election fraud and
13   this person was not suspected outside of
14   conspiracy-minded circles of any illegal
15   activity related to the 2020 election."
16           Do you see that?
17       A.   Right.
18       Q.   Do you see that there is a
19   description of how this viral message --
20   there is a viral message that started this
21   rumor that were part of Twitter threads?
22           MR. COSTELLO:  Talking about the
23       next paragraph, right?
24           MR. GOTTLIEB:  Yes.
25       A.   Okay.

Giuliani
1
2        Q.   So this article that you cited
3    references Facebook posts and Twitter posts
4    that began a viral theory that Ruby Freeman
5    had been arrested.
6            Are you aware of any other source
7    of information, apart from the ones
8    mentioned in this article, that
9    substantiate an allegation that Ruby
10   Freeman had been arrested?
11       A.   Do I know any more sources for
12   this allegation?
13       Q.   Correct.
14       A.   No.
15       Q.   Did you ever do anything to
16   investigate whether or not Ruby Freeman had
17   been arrested and was providing testimony
18   about Stacey Abrams and the DNC?
19       A.   I asked Bernie Kerik to look into
20   it.
21       Q.   Did he?
22       A.   I only did that a few days ago.
23       Q.   So you asked Bernie Kerik a few
24   days ago to look into whether Ms. Freeman
25   had been arrested?

# Excerpted

Giuliani

1
2     the video monitor is 3:17 p.m.  We are
3     off the record.  This is the end of
4     media 3.
5          (Recess.)
6          THE VIDEOGRAPHER:  We are back on
7     the record.  The time on the video
8     monitor is 3:31 p.m.  This is media
9     unit 4.
10 BY MR. GOTTLIEB:
11    Q.    Mayor Giuliani, I'm going to hand
12    you two documents.  They were produced to
13    us sequentially.  And we will mark them as
14    Exhibits 21 and 22.
15         (Exhibit 21, document, Bates
16         stamped 076PR - 1890_001, marked for
17         identification, as of this date.)
18         (Exhibit 22, document, Bates
19         stamped 076PR - 1891_001, marked for
20         identification, as of this date.)
21         MS. HOUGHTON-LARSEN:  Tabs 51 and
22         52 in Binder 2.
23    Q.    These documents have Bates
24    numbers on them, unlike many of the ones
25    we've been looking at.

Giuliani

1
2          These document have Bates
3     numbers.  Exhibit 21 has the Bates number
4     076PR many zeros 1890 ending in 001.
5          Exhibit 22 has 076PR many zeros
6     1891 ending in 001 also.  And that document
7     goes a number of pages through 0021 as the
8     Bates number on the last page.
9          These documents were produced to
10    us in this litigation.
11         Do you recognize Exhibit 21 as an
12    email from Mr. Kerik to Mark Meadows?
13    A.    That's what it looks like, sure.
14    Sure, sure.
15    Q.    And Mark Meadows as of
16    December 28, 2020 was the Chief of Staff of
17    the White House?
18    A.    Yes, he was.
19    Q.    Okay.
20         And you've already testified
21    today that you think highly of Mr. Kerik,
22    find him trustworthy and credible, is that
23    right?
24    A.    I do.
25    Q.    And somebody who you believe

Giuliani

1
2     would be careful in representations that he
3     would make to the White House Chief of
4     Staff?
5     A.    I would think so.
6     Q.    And particularly given that you
7     testified Mr. Kerik doesn't use email all
8     that often?
9     A.    Yeah, he's very reliable.
10    Q.    An email sent to the White House
11    Chief of Staff is one that goes into the
12    White House archives, is that right?
13    A.    Um-hm.
14    Q.    And so in this email, Mr. Kerik
15    has sent to Mr. Meadows on December 28,
16    2020, can you see that there is an
17    attachment on this email?
18         It's in the header of the email.
19    There is something that says "attachments"?
20    A.    I'm sorry, I don't see the
21    attachment.
22    Q.    Okay.  I'm just asking in the
23    header of the email, there is a "From," a
24    "Sent," a "To," a "Subject" and an
25    "Attachments."

Giuliani

1
2          Do you see those?
3          MR. COSTELLO:  The fourth line
4     down, fifth line down.
5     A.    One, two, three, four.  Is that
6     what all those numbers mean?
7          I don't see attachment --
8     external --
9          MR. COSTELLO:  No, two more lines
10    underneath that.
11    A.    Giuliani Team Strategic --
12         MR. COSTELLO:  That's the
13    attachment.
14    A.    Are you saying he attached this
15    to this?
16    Q.    Yes.
17         And I'm just saying the subject
18    line and the attachments line here say the
19    same thing, right?  "Giuliani Team
20    Strategic Communications Plan Version 1"?
21    A.    Got it.
22    Q.    Do you see how in the title of
23    the attachment, or the title of Exhibit 22,
24    is the strategic communications plan, a
25    version of which we looked at in

Page 258

Giuliani

1        Giuliani
2    Exhibit 19, is that right?
3        A.   Yes, sir.
4        Q.   Do you see Mr. Kerik has written
5    to Mr. Meadows saying, "Dear Mark, I know
6    the Mayor sent this to you last evening but
7    just wanted to emphasize the importance of
8    timing"?
9        A.   I do.
10       Q.   Was Mr. Kerik, safe to say,
11   referring to you when he refers to the
12   "Mayor"?
13       A.   Um-hm.
14       Q.   So he is saying, at least, that
15   you sent this to Mr. Meadows last evening,
16   which would have been December 27?
17       A.   Yeah.  But he was wrong.
18          My communication on this mostly
19   was with Katherine Friess, and it may be
20   that this is too ships passing in the
21   night, but Bernie -- Bernie may have
22   assumed that I did, but he certainly didn't
23   know that I did.
24          And we have talked about it since
25   then, so...

Page 259

1        Giuliani
2        Q.   And so in talking about it since
3    then --
4        A.   He -- he knows that I remained
5    opposed to it.
6          I've been opposed to it
7    throughout.  And the question at the very
8    end was, would we take a chance in doing
9    it?  And I decided no.
10         I guess he wasn't there when I
11   did.
12       Q.   Right.  So -- I'm sorry,
13   Mr. Giuliani.
14       A.   I think this is a matter of
15   confusion rather than what you might make
16   of it, which is that he was misrepresenting
17   my position.
18       Q.   And I think you've made very
19   clear in your January 6 testimony and here
20   today that you were opposed to this
21   strategic communications plan.
22       A.   Right.
23       Q.   So that's not really my question.
24         My question is, you were -- you
25   have testified that Mr. Kerik was wrong

Page 260

1        Giuliani
2    that you sent this plan along to the White
3    House or to Mr. Meadows?
4        A.   Correct.  I didn't -- I didn't --
5    I certainly didn't send it.
6          Now -- and Bernie wouldn't have
7    been the one to do it either.  Would
8    somebody else played a game with it and
9    made it look like it was sent from my
10   office?  That's possible.
11         But Mark knew my position on this
12   independently.  So he knew that I thought
13   it wasn't worth spending the 5 to 8 million
14   dollars.
15       Q.   I believe you testified before
16   the January 6 Commission that you were
17   aware that some members of the team or this
18   communications firm wanted to make a
19   presentation of this plan to the White
20   House, is that right?
21       A.   Right.  I let them do it.
22       Q.   And you let them do it, is that
23   right?
24       A.   Yeah.
25       Q.   So you were aware ahead of time

Page 261

1        Giuliani
2    that they would make the presentation, you
3    were opposed to it, but you also didn't
4    stand in the way of it being presented?
5        A.   100 percent, and I knew it was
6    going to happen, but sometimes people don't
7    listen.
8        Q.   And you were 100 percent certain
9    as you sit here today that you didn't send
10   this along but say, for example, to
11   Mr. Meadows, I'm opposed to this, but I'm
12   sending it to you because these other
13   people want to present it to the President?
14       A.   I don't -- I doubt it.  I doubt
15   it.  I mean, it's always possible I
16   forgot -- no, I don't think so.
17       Q.   Okay.
18         Are you aware that the same day
19   that Mr. Kerik sent this email to
20   Mr. Meadows, he tweeted out some of the
21   content of this document, the strategic
22   communications plan?
23       A.   I don't -- I'm not sure if I am.
24   It sounds kind of familiar but not -- no,
25   I'm not aware of it, no.

66 (Pages 258 - 261)

Page 262

Giuliani

1
2    Q.   Let's mark Exhibit 23.
3        MS. HOUGHTON-LARSEN:  That's
4    Tab 53 in Binder 2.
5        (Exhibit 23, Tweets from Bernie
6    Kerik, marked for identification, as of
7    this date.)
8    Q.   So, Mayor Giuliani, I've handed
9    you what has been marked as Exhibit 23.
10   And this is a tweet -- the bottom part of
11   the screen is -- of the exhibit on the
12   first page is a tweet that Mr. Kerik has
13   sent out, and if you flip to the next page,
14   you can see the date and the time at the
15   bottom of the content of the tweet, which
16   is listed at --
17   A.   This looks like the summary page
18   from their memo.
19   Q.   Just so we have a clear record,
20   the time and date on the bottom of the
21   tweet says 3:57 p.m. on December 28, 2020.
22       Do you see that on the second
23   page, sir?
24   A.   I do.
25   Q.   And if we take now Exhibit 22,

Page 263

Giuliani

1
2    which is the version 1, Giuliani team
3    strategic communications plan, and if we
4    open it back up to the page that says
5    "Georgia" on the top, which is --
6    A.   The same as that, right?
7    Q.   Well, that's what I wanted to ask
8    you.
9    A.   It looks the same.
10   Q.   It looks like this is ten pages
11   into that document.  It looks like
12   Mr. Kerik has tweeted out the content from
13   the strategic communications plan on the
14   same day as he sent it to Mr. Meadows, is
15   that right?
16   A.   Well, actually, what he-- this is
17   not so much the communications plan as it
18   is the state of the case or of the evidence
19   in Georgia according to them.
20       I wouldn't say it's -- well, I
21   guess it's part of the communications plan
22   to put that out.
23   Q.   This was a page of the supporting
24   documents --
25   A.   Yeah, yeah, yeah.

Page 264

Giuliani

1
2    Q.   -- that were attached to the
3    communications plan, is that right?
4    A.   Yeah.
5        I guess the idea was, try to get
6    this around to everybody.  I guess.
7    Q.   You see in there references to
8    Ruby and Shaye by name?
9    A.   I do.
10   Q.   And you see it says, "There is
11   video of Ruby and Shaye at midnight.  That
12   is the time of the 200,000 vote bump"?
13   A.   I see that, yes.
14   Q.   And you see there is a bullet
15   that says, "No water main break, a lie to
16   get the Republican observers and media to
17   leave at 10:30 p.m."?
18   A.   I see that.
19   Q.   Do you see -- these are the same
20   bullet points that you see in the
21   supporting documents to the strategic
22   communications plan, is that right?
23   A.   Yes.
24   Q.   Did you discuss this tweet with
25   Mr. Kerik?

Page 265

Giuliani

1
2    A.   I didn't.
3    Q.   Were you aware until this moment
4    that he had sent this tweet?
5    A.   Pretty much, yeah.  I mean, I
6    don't remember -- I don't remember going
7    over this before.  Certainly not at the
8    time.
9    Q.   Sorry, sir.  My question was -- I
10   asked a bad question.  Let me try it again.
11       Is this moment the first moment
12   you have become aware of --
13   A.   I'm not sure if it's the first
14   moment.  The first might have been when we
15   dealt with this with the January 6
16   committee, that that was the first moment I
17   became aware of it.
18   Q.   Mr. Kerik gave some testimony to
19   the January 6 Commission in which he said
20   that there were discussions around this
21   plan going on for about six weeks.
22       Are you familiar with him --
23   well, let me just ask you, is that
24   accurate?
25   A.   I can't say that it's not.  I

67 (Pages 262 - 265)

Page 266

Giuliani

1    wasn't part of six weeks of discussions
2    about this.  But they could have.
3        Q.   Okay.  Are you familiar with
4    about how long or roughly how long the team
5    of people who were interested in this plan
6    were working on it?
7        A.   I would have thought more like
8    three or four.  But, again, that would be a
9    bit of a guess.
10       Q.   Three or four weeks?
11       A.   It would come to me in conclusory
12   form, not -- I mean, I don't know when they
13   began debating it.
14       Q.   If you look six pages into the
15   strategic communications plan, there's just
16   one thing I want to ask you about.
17       A.   The plan?
18       Q.   Yes, sir.
19           You will see at the bottom, I
20   think it is page 6, again -- yup, it is the
21   sixth page of the document.
22           MR. COSTELLO:  What's it say at
23   the top?
24       A.   Okay.
25

Page 267

Giuliani

1        Q.   Well, I'm sorry, there is a Bates
2    number on this page.
3        A.   "Over vote in Michigan by
4    township"?
5        Q.   We have a Bates number.  It ends
6    in 006.
7        A.   So what's --
8        Q.   If you see on the upper left-hand
9    corner, it will say "006" at the end.
10           We actually had a page number on
11   this one.
12       A.   Okay.
13       Q.   So you see they have referenced
14   content, and they say, "Giuliani team voter
15   fraud numbers, see supporting document
16   below for detail."
17           Do you see that?
18       A.   I do.
19       Q.   And we just talked about a
20   document that says "supporting documents"
21   on it?
22       A.   Uh-huh.
23       Q.   And then you see there is a list
24   of key team members.
25

Page 268

Giuliani

1        Do you see that there?
2        A.   Key team members, got it.
3        Q.   I'm wondering if you know who
4    some of these initials reference.
5            So it says, "Rudy Giuliani's
6    strategic communications plan" --
7        A.   Bernie Kerik, Katherine Friess.
8        Q.   So "BK" is Bernie Kerik --
9        A.   Those were the two that were
10   most, you know, in favor of this,
11   particularly Katherine.
12       Q.   "PK" is Bernie Kerik.  "KF" is
13   Katherine Friess.
14           Then it says, "Media advisors, SB
15   and BE?
16       A.   I assume they were part of the
17   Serrano public relations team.
18       Q.   Do you know who those people are,
19   SB and BE?
20       A.   No.
21       Q.   Then you see the Serrano public
22   relations team.
23           Who the Serrano public relations
24   team?
25

Page 269

Giuliani

1        A.   It was the public relations team
2    that wanted to do this for 5 to 8 million
3    dollars.
4        Q.   And who runs the Serrano
5    public --
6        A.   Mark Serrano.
7        Q.   Anybody else work with Mark
8    Serrano?
9        A.   Not that I -- yes, but not that I
10   would know.
11       Q.   No names you can remember?
12       A.   Right.  I mean, I know them but I
13   don't know them.
14       Q.   Okay.  So Mark Serrano was the --
15   and Serrano public relations was the firm
16   that wanted --
17       A.   Yeah, I don't want to malign them
18   or anything, but it just seemed to me that
19   this was too little, too late.
20           Without getting into the details
21   of it, some of which are also wrong, but
22   you didn't have to get to that.  This is
23   too little, too late.
24       Q.   Did you tell Mr. Kerik that at

68 (Pages 266 - 269)

Giuliani

1   Giuliani
2   the time, by the way?
3       A.   I probably told that more to
4   Katherine because Bernie -- Bernie was
5   really doing more important things than
6   this at the time.  My communications would
7   have been more with Katherine about this.
8       I didn't really Peter Navarro's
9   team was involved in this.  We worked very
10  closely with Peter's team, and I never
11  discussed this with Peter.  So I don't know
12  if they weren't being bootstrapped, too.
13      Q.   And research team references "CR"
14  and "SP."
15      Do you know who those people are?
16      A.   Like in many organizations, there
17  was a split in my organization between this
18  group with Katherine and her people and
19  then the group with Jenna Ellis and
20  Christina Bobb and they had two different
21  ways of looking at things.
22      And they didn't basically -- and
23  I was sort of in the middle of it.  They
24  didn't communicate that well with each
25  other.

1   Giuliani
2       Q.   So you don't know who "CR" and is
3   "SP" refers to?
4       A.   But I do know -- what I can tell
5   you very interesting, and that's why I
6   mentioned it, that none of these people are
7   really from the rest of our team.  This is
8   a whole new team they are trying to create.
9       Q.   How did you communicate at this
10  time with Ms. Friess, by the way?
11      A.   We were staying in the same
12  hotel.  She was at -- she was with me eight
13  hours a day, seven hours a day, six hours a
14  day, five, depending on where she was off
15  to without -- that would be true of all of
16  them.  We sort of all stayed in the hotel
17  and we met together -- we met together
18  every day.
19      It was called a "war room"
20  because they tried to -- they tried to
21  suggest that we had something to do with
22  the January 6, whatever, speech and rally,
23  and what our war room was about was
24  gathering evidence of voter fraud so that
25  the legislatures could develop a vote on

1   Giuliani
2   whether the election was -- election
3   results were accurate.
4       Because we thought our best last
5   chance was -- the one thing that you could
6   certainly say in these states, whether you
7   could say Trump won or not, that the vote
8   was inaccurate.  And we wanted to see if we
9   could get that -- that was our major --
10  that was our major function.  That was the
11  major function that Mark had for us.  It
12  wasn't that everybody on the team agreed
13  with that.
14      Q.   Just asking --
15      A.   That's what I agreed with.
16      Q.   Fair enough.
17      There is a reference there to
18  "influencer outreach by TF."
19      Do you know who that is, "TF"?
20      A.   Where is that?  I'm sorry.
21      Q.   Influencer outreach, TF?
22      A.   No, this is why -- this tells me
23  this was somewhat removed -- these -- I
24  mean, you should expect to see "CB" for
25  Christina Bobb or "CA" for Christianné

1   Giuliani
2   Allen or "BE" for Boris Epshteyn -- oh,
3   there you go, BE.  Maybe Boris was
4   involved.  I doubt it.
5       Q.   Do you know whether Cleta
6   Mitchell had any involvement with this
7   plan?
8       A.   I don't.
9       Cleta and -- Cleta and Katherine
10  were close but Cleta was also close to the
11  other people on my team.  She was the
12  source of a lot of information.
13      Q.   I'm going to ask you the same
14  questions.
15      Do you know if Christina Bobb was
16  involved in this?
17      A.   With this effort?
18      Q.   Yeah.
19      A.   No.  She would have been very
20  much opposed to it.
21      Q.   Jenna Ellis?
22      A.   Same thing.
23      Q.   Very much opposed?
24      A.   Yes.
25      Q.   Maria Ryan?

69 (Pages 270 - 273)

Page 274

Giuliani

2    A.   Probably opposed but more
3 neutral.
4    Q.   What was Christianné Allen's
5 role?
6    A.   Christianné Allen?
7    Q.   Yeah.
8    A.   She was one of my advisors.  She
9 was the chief of staff of my company before
10 I -- before I joined Trump, and so she came
11 in to help run things.
12    Q.   And she was working on
13 election-related issues with you?
14    A.   Correct.
15        Although at the time we are
16 talking about, she had Covid.  This period
17 right here, she would not be -- you
18 wouldn't see her name in a lot of this
19 stuff because she had Covid.  She had a
20 pretty bad case for about two-and-a-half
21 weeks.
22    Q.   One more thing I want to show
23 you.  I'll just ask you a question about.
24        If you flip ahead back to the
25 supporting documents, and the Georgia page

Page 275

Giuliani

2 that ends in 009 at the top left-hand
3 corner --
4    A.   Interesting, we just found these,
5 you know.  Here we spent that whole time.
6 Such smart lawyers.
7    Q.   And I want to --
8    A.   Nobody here has a sense of humor.
9    Q.   So --
10    A.   I can't go this long without
11 jokes.
12    Q.   Mr. Giuliani, if you can find
13 Exhibit 15?
14    A.   What?
15    Q.   If you can find Exhibit 15 in
16 your stack there?  We're going to keep out
17 the current document you're looking at,
18 which is Exhibit 22, and I want you to pull
19 out Exhibit 15.
20    A.   Is that kind of a test because of
21 my age?
22    Q.   No, sir.  Absolutely not.
23        MR. COSTELLO:  Which one is 15?
24        MS. HOUGHTON-LARSEN:  15 is
25 Tab 55, which is volume 2.

Page 276

Giuliani

2    A.   What am I looking for?
3    Q.   15.
4    A.   Here.  I got it.
5    Q.   So we previously marked
6 Exhibit 15, which a transcript of one of
7 your -- episode 93 of Common Sense, which
8 was on December 30, 2020 --
9        MR. COSTELLO:  98.  You said 93.
10    Q.   Episode 98.
11        MR. GOTTLIEB:  You are correct,
12 sir.  Thank you for correcting me.
13    Q.   If you could turn to page 10 of
14 that transcript.
15    A.   Page 10?
16    Q.   Yes, sir.
17    A.   Page 10.
18    Q.   Here is what I would like you to
19 do, and I assure you this is not a test.
20    A.   Okay.  I thought it was a
21 cognitive test, could be age
22 discrimination.
23    Q.   No, sir.  I would like you to
24 keep Exhibit 15, page 10 out, and I would
25 like you to have next to it Exhibit 22 with

Page 277

Giuliani

2 00 -- with 009.
3        Now, you've got Exhibit 22
4 sitting right in front of you, sir.
5    A.   Oh, it's the one with 009.
6    Q.   That's why I asked you to keep it
7 out.
8        So just have them sitting side by
9 side there.
10        And I guess what I want to ask
11 you, sir, is if you see, starting at line 3
12 there, in the transcript --
13    A.   On 009?
14        MR. COSTELLO:  No, the other one.
15    Q.   On Exhibit 15 --
16    A.   Got it.
17    Q.   -- you start with "2,560 felons
18 with uncomplete sentences were registered
19 to vote."
20        Do you see that?
21    A.   I do see that, right.
22    Q.   Do you see, now looking over at
23 page 009 of the strategic plan, the same
24 words, "2,560 felons" --
25    A.   Right.

70 (Pages 274 - 277)

Page 278

Giuliani

1
2     Q.    -- "with uncomplete sentences
3   registered to vote"?
4         And I acknowledge there are
5   differences between the two of these, but
6   I'm trying to identify the similarities.
7         If you move down to line 8 on
8   page 10 of the transcript, you see
9   66,200 --
10    A.    Underaged, yup, I see that.
11    Q.    Do you see that same language in
12  the strategic plan?
13    A.    I've got it.
14    Q.    And then if you go down to "2,423
15  unregistered people voted" on line 11 of
16  the transcript, do you see that line in the
17  strategic plan, page 009?
18    A.    I do.
19    Q.    And am I right that these aren't
20  just the same statistics, these are the
21  same words that are --
22    A.    Yeah, this was probably -- so
23  what you are looking at here with Georgia,
24  this is a sheet that was kept up to date
25  every week or two weeks as we gathered new

Page 279

Giuliani

1
2   evidence or changed evidence with regard to
3   states.  It was a summary sheet.
4     Q.    Okay.
5     A.    And everybody would rely on it.
6         This would be the same summary
7   sheet that Peter Navarro had.  I'm pretty
8   sure we sent this to the White House.  They
9   would keep them.
10        So when I went to do my podcast,
11  I probably just picked this up.  Not this,
12  (indicating), this (indicating.)
13    Q.    So we have a clear record here,
14  not the strategic --
15    A.    So we have a clear record, I
16  didn't pick up the strategic communication
17  plan --
18        MR. COSTELLO:  Exhibit what?
19    A.    -- but I picked up -- Exhibit 22.
20  But I probably picked up the enclosure in
21  there for Georgia, which is separate from
22  the plan and was available to everybody on
23  the Mayor's -- on the President's team.
24    Q.    Great.
25    A.    That was a joint enterprise of

Page 280

Giuliani

1
2   Navarro and my office.
3     Q.    So that part of the document, not
4   the plan, but the --
5     A.    Correct.
6     Q.    -- supporting documents --
7     A.    And so when Katherine did her
8   plan, that's what she used to plan that
9   everybody -- it would be something
10  everybody agreed on.
11    Q.    And all I'm trying to get at is,
12  the supporting documents part of this is a
13  document that you and your team were
14  working on and updating --
15    A.    Correct.
16    Q.    -- and sending around, I think
17  you said, Mr. Navarro's team --
18    A.    Correct.
19    Q.    -- and the White House, is that
20  right?
21    A.    Um-hm.
22    Q.    And so that is a document that
23  you were relying on in doing your podcasts
24  and in other advocacy you were doing
25  publicly at the time?

Page 281

Giuliani

1
2         MR. COSTELLO:  Was that a
3   question?  Because he didn't answer.
4     A.    What was it?  I'm sorry.  I'm not
5   hearing this.
6     Q.    This is a document you were
7   relying on as you were doing your podcast
8   and other public advocacy at the time?
9     A.    The Georgia breakdown.
10    Q.    The Georgia breakdown --
11    A.    Correct, the Georgia breakdown --
12    Q.    -- and supporting documents?
13    A.    -- which is independent, really,
14  of the document it was appended to.  It's a
15  separate document that was kept up to date
16  every couple of weeks and was available to
17  everybody on the team.
18    Q.    Okay.  Great.
19        I want to ask you about a
20  telephone call that President Trump had
21  with Georgia Secretary of State
22  Raffensperger on January 2, 2021.
23        This is a telephone call that's
24  been much talked about in the press and
25  discussed.  I assume you were familiar in

71 (Pages 278 - 281)

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.