# EXHIBIT 2

Page 1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3   - - - - - - - - - - - - - - -x

        RUBY FREEMAN, et al.,        :

4                                    :

            Plaintiffs,              :

5                                    :

        v.                           :   Civil Action No.

6                                    :   21-3354 (BAH)

        RUDOLPH W. GIULIANI,         :

7                                    :

            Defendant.               :

8   - - - - - - - - - - - - - - -x

9

10

11

12                      - - -

13              Monday, March 20, 2023

14                      - - -

15

16

17

18

19   Videotaped deposition of BERNARD KERIK, beginning at

20   10:51 a.m., before Christina S. Hotsko, RPR, CRR,

21   when were present on behalf of the respective

22   parties:

Page 2

```
1        A P P E A R A N C E S  (Via Zoom)
2   On behalf of Plaintiffs:
       M. ANNIE HOUGHTON-LARSEN, ESQUIRE
3   Willkie Farr & Gallagher, LLP
       787 Seventh Avenue
4   New York, New York 10019-6099
       (212) 728-8000
5   mhoughton-larsen@willkie.com
6   MICHAEL GOTTLIEB, ESQUIRE
       MAGGIE MacCURDY, ESQUIRE
7   Willkie Farr & Gallagher, LLP
       1875 K Street, Northwest
8   Washington, D.C. 20006-1238
       (202) 303-1000
9   mgottlieb@willkie.com
10
    On behalf of Witness:
11  TIMOTHY C. PARLATORE, ESQUIRE
       Parlatore Law Group
12  One World Trade Center, Suite 8500
       New York, New York 10007
13     (212) 603-9918
       timothy.parlatore@parlatorelawgroup.com
14
15  Also Present:
       Glen Fortner, Video Technician
16
17
18
19
20
21
22
```

Page 4

KERIK DEPOSITION EXHIBITS:                    PAGE

| 2  | Exhibit 11 | Video Clip | 140 |
| 3  | Exhibit 12 | Video Clip | 142 |
| 4  | Exhibit 13 | Video Clip | 147 |
| 5  | Exhibit 14 | Video Clip | 148 |
| 6  | Exhibit 15 | Video Clip | 153 |
| 7  | Exhibit 16 | Kerik Tweet, 10 December 2020 | 159 |
| 8  | Exhibit 17 | Kerik Tweet, 13 December 2020 | 160 |
| 9  | Exhibit 18 | Kerik Tweet, 14 December 2020 | 162 |
| 10 | Exhibit 19 | Kerik Tweet, 27 December 2020 | 163 |
| 11 | Exhibit 20 | Barnett Tweet, 28 December 2020 | 167 |
| 12 | Exhibit 21 | Kerik Tweet, 30 December 2020 | 170 |
| 13 | Exhibit 22 | Kerik Tweet, 30 December 2020 | 172 |
| 14 | Exhibit 23 | Video Clip, State Farm Arena | 174 |
|    |            | Election Day Security Footage |  |
| 15 |            |  |  |
|    | Exhibit 24 | Video Clip, State Farm Arena | 176 |
| 16 |            | Election Day Security Footage |  |
| 17 | Exhibit 25 | Declaration of Frances Watson | 177 |
| 18 | Exhibit 26 | Seven Hills Strategies, State | 184 |
|    |            | Election Board Report, 13 |  |
| 19 |            | November 2020, Unabridged Notes |  |
|    |            | Detailing Everything Witnessed |  |
| 20 |            | Nov 2 - Nov 7, 2020 |  |

21
22      *  (Exhibits attached to transcript.)

Page 3

1        C O N T E N T S
2   EXAMINATION BY:                         PAGE

    Counsel for Plaintiffs               07
3   Counsel for the Witness              206
4
    FURTHER EXAMINATION BY:              PAGE
5   Counsel for Plaintiffs               210
    Counsel for the Witness              211
6
7
    KERIK DEPOSITION EXHIBITS:           PAGE
8
    Exhibit 1   Interview of Bernard Kerik    45
9               13 January 2022
10  Exhibit 2   Parlatore Law Group Letter, 31   50
                December 2021
11
    Exhibit 3   E-mail Chain            59
12              Giuliani Team Strategic
                Communications Plan
13
    Exhibit 4   Strategic Communications Plan,  63
14              Giuliani Presidential Legal
                Defense Team
15
    Exhibit 5   Kerik Tweet, 11 December 2020   122
16
    Exhibit 6   E-mail Chain            124
17              Giuliani Team Strategic
                Communications Plan
18
    Exhibit 7   E-mail Chain            128
19
    Exhibit 8   Kerik Tweet, 3 December 2020    132
20
21  Exhibit 9   Kerik Tweet, 4 December 2020    134
22  Exhibit 10  Kerik Tweet, 6 December 2020    137

Page 5

1        P R O C E E D I N G S

2        VIDEO TECHNICIAN:  Good morning.  We are

3   going on the record at 10:51 on March 20th, 2023.

4        Please note that the microphones are

5   sensitive and may pick up whispering and private

6   conversations.

7        Please mute your phones at this time.

8        Audio and video recording will continue

9   to take place unless all parties agree to go off

10  the record.

11       This is media unit 1 of the

12  video-recorded deposition of Bernard Kerik in the

13  matter of Ruby Freeman, et al. v. Rudolph

14  Giuliani.  The location of the deposition is

15  Willkie Farr.

16       My name is Glen Fortner representing

17  Veritext, and I am the videographer.  The court

18  reporter is Christina Hotsko from the firm

19  Veritext.

20       I am not related to any party in this

21  action, nor am I financially interested in the

22  outcome.

2 (Pages 2 - 5)

# Excerpted

1       MS. HOUGHTON-LARSEN:  Understood.  Taking
2 down a long interview can be difficult, obviously.
3 BY MS. HOUGHTON-LARSEN:
4       Q.  So you understand you're under oath
5 today?
6       A.  Yes.
7       Q.  Okay.  And you understand that your
8 testimony today carries the same weight as if you
9 were before a judge or a jury?
10      A.  Yes.
11      Q.  Any reason you might not be able to give
12 accurate testimony today?
13      A.  No.
14      Q.  Okay.  There's no reason that your memory
15 might be less sharp than usual today?
16      A.  No.
17      Q.  Okay.  And I understand you've been
18 through this before but, you know, it's always
19 good to set down a few ground rules.  As you know,
20 everything is being transcribed by our court
21 reporter here.  For her benefit, if you could
22 please answer my questions verbally with a yes or

1 no rather than a head nod or an uh-huh, huh-uh,
2 that will make it easier.
3       Do you understand?
4       A.  Yes.
5       Q.  Okay.  And also for the court reporter --
6 and I will do my best as well -- let's please try
7 not to talk over each other.  So if you could
8 please allow me to finish my questions, and I'll
9 try to allow you to finish your answers.
10      A.  Understood.
11      Q.  Thank you.
12      If my question is unclear, if you could
13 please let me know.
14      A.  Okay.
15      Q.  Okay?  And if you don't ask me to clarify
16 my question, I'm going to assume that you
17 understand my question; is that fair?
18      A.  Yes.
19      Q.  Okay.  And I will plan for us to take
20 regular breaks.  But if you need a break, please
21 let me know.
22      MS. HOUGHTON-LARSEN:  Mr. Parlatore, if

1 you need a break.
2 BY MS. HOUGHTON-LARSEN:
3       Q.  And as long as a question isn't pending,
4 of course we can take one.
5       A.  Okay.
6       Q.  And throughout the deposition, I expect
7 that Mr. Parlatore may raise certain objections to
8 my questions.  Unless he objects to my question on
9 the basis of privilege and directs you not to
10 answer, you must answer my question.
11      Do you understand that?
12      A.  Yes.
13      Q.  Okay.
14      MR. PARLATORE:  Or.  There are additional
15 reasons, but go ahead.  I mean, that's not the
16 only reason to -- if the questioning becomes, you
17 know, abusive or harassing, then that's another
18 basis.
19      MS. HOUGHTON-LARSEN:  I don't expect that
20 to be the case.
21 BY MS. HOUGHTON-LARSEN:
22      Q.  And how did you prepare for this

1 deposition, Mr. Kerik?
2       A.  Basically just looked over some notes
3 that I have.
4       Q.  Okay.  What notes did you look at?
5       A.  I have a file, a file that has a bunch of
6 material from the election of 2020 --
7       Q.  Okay.
8       A.  -- that I briefly looked at over the last
9 few days.
10      Q.  Okay.  And when you say you have a file,
11 is that a physical file or is it a computer file?
12      A.  No.  It's an electronic file.
13      Q.  It's an electronic file.  And are
14 those -- you said notes.
15      Are those notes that you have prepared
16 sort of since the 2020 election or were they
17 prepared in that post -- immediate post-2020
18 election time period?
19      A.  They're documents that were collected
20 throughout the investigation, subsequent to the
21 investigation.
22      Q.  Okay.

4 (Pages 10 - 13)

Page 14

1    A. And a number of reports that I and others
2 collected in the aftermath of the investigation.
3    Q. Okay.
4    A. Or the election.
5    Q. Did reviewing any of those documents
6 refresh your recollection?
7    A. To an extent, yes.
8    Q. Okay. Can you say specifically which
9 documents refreshed your recollection?
10    A. Not really.
11    Q. Okay. Did you speak with anyone besides
12 your attorney in preparing for this deposition?
13    A. No.
14    Q. You didn't speak to Mr. Giuliani before
15 this -- about this deposition?
16    A. No.
17    Q. Okay. So you said you reviewed notes.
18 Did you take any notes in preparing for your
19 deposition?
20    A. No.
21    Q. Okay. So I just want to start, you know,
22 by having you talk me through your professional

Page 15

1 background briefly.
2    How did you start your career?
3    A. I started my career in 1974. I joined
4 the United States Army. I was a military police
5 officer and a military police dog handler.
6    Q. Oh.
7    A. I was -- I was stationed in Fort Bragg,
8 North Carolina, and Korea.
9    I got out of the military in 1977, went
10 to work for a state/federal task force
11 investigating illegal cigarette transportation
12 into a seven-state jurisdiction. I did that for
13 about ten months. And then I left the United
14 States and went to work for the royal family of
15 Saudi Arabia. And I lived and worked in Saudi
16 Arabia from 1978 to June of 1980.
17    I returned to the United States, and I
18 was a cop in North Carolina for the Cumberland
19 County Sheriff's Department. Transferred to the
20 Passaic County Sheriff's Department in New Jersey,
21 where I was a correction officer. And then I was
22 recruited to go back to work in Saudi Arabia, and

Page 16

1 I spent another year and a half to two years there
2 living in the kingdom at that time.
3    I returned in 1984, returned to the
4 Passaic County Sheriff's Department, where I
5 ultimately became the warden of the Passaic County
6 Jail.
7    In December of 1985 and in July of 1986,
8 I joined the New York City Police Department. My
9 patrol time was spent in Brooklyn, Manhattan. I
10 was in uniform, plain clothes. I was in an
11 anti-crime unit in Times Square.
12    And then I was transferred to the
13 narcotics division in Harlem, Spanish Harlem in
14 Washington Heights. While there, I was also
15 assigned -- subsequently assigned to the major
16 case unit. And from that -- from there I was
17 later transferred to the New York Drug Enforcement
18 Task Force, which was a state -- local, state, and
19 federal task force working for the DEA. I was an
20 undercover in that capacity over the next four,
21 four-and-a-half years.
22    I was transferred to the intelligence

Page 17

1 division, and I was assigned to the mayor's
2 protective detail in the New York City Police
3 Department's intelligence division.
4    And then in May of 1994, I believe, Mayor
5 Giuliani sent me to Rikers Island as a result of
6 my corrections background in New Jersey. I went
7 initially as the executive assistant and chief of
8 staff to the commissioner. Six months later, I
9 was appointed first deputy commissioner.
10 Two-and-a-half years later, I was appointed
11 commissioner and took over the entire department
12 of 13,000 uniformed and civilian staff.
13    And then, in August of 2000, I became the
14 New York City Police Commissioner. And I was the
15 police commissioner until January 1st, 2002. I
16 retired from the NYPD then.
17    In May of -- no. In April of 2003, I was
18 requested by President Bush to take over the
19 Ministry of Interior of Iraq. I did so. Took
20 over as the Minister of Interior until they
21 replaced the actual post-Saddam interior minister.
22 And that was in September of '03.

5 (Pages 14 - 17)

**Excerpted**

Page 34

1    A.  At times.
2    Q.  Yeah?  Okay.
3       You said that a lot of your work sort of
4   since being released from prison has been in
5   criminal justice.
6       Am I right, do you also have a firm of
7   your own where you do sort of security work?
8    A.  I do.  I did.  I mean, I technically
9   still do.  But my security work is not -- you
10  know, it's not like a security company.  You know,
11  I get calls.  You know, people will call me up and
12  they want -- you know, they want domestic
13  investigators or they want -- I don't know.  You
14  know, there's a bunch of stuff that I just won't
15  do.
16   Q.  That you won't do?
17   A.  I won't do.  You know --
18   Q.  Because?
19   A.  I'm not interested.
20   Q.  Okay.
21   A.  And there's other stuff that, you know,
22  I'm interested in.  You know, there's -- and

Page 35

1   these -- some of that stuff involves legal issues.
2   For example, I've been an advisor to families that
3   have been involved in legal battles with the
4   government, and I've gotten involved with those
5   cases, if you will, to help those families.  But
6   those are things that, you know, to me are
7   important or I took some interest in.  And I took
8   on those challenges.
9    Q.  So fair to say that one of the types of
10  work or one of the things that you were interested
11  in was investigating the 2020 election?
12   A.  Was I interested?  I became interested.
13  Yes.
14   Q.  Okay.  Talk to me about that.
15   A.  I was a supporter of President Trump.
16  I've known -- I've known him since, I don't know,
17  probably the same time I've known the mayor.  I've
18  known him a long time.
19   Q.  I don't mean to interrupt you.  How did
20  you know him?
21   A.  From New York City, being at different
22  events, being in the position I was in.  I came to

Page 36

1   know him.  And I can't even tell you when the
2   first time is.  It's a long time ago.
3    Q.  Okay.
4    A.  I think the first time I ever saw Donald
5   Trump, actually had contact with him, he shook my
6   hand.  I was actually a cop and I was in plain
7   clothes.  I was in an anti-crime unit in Midtown
8   South.  And they sent us -- actually, I think it
9   was Michael Jackson.  Michael Jackson was going
10  shopping on a Sunday -- this is true.  Michael
11  Jackson was going shopping on a Sunday.  They were
12  opening -- what's that kids' -- what's that toy
13  store on --
14   Q.  FAO Schwarz.
15   A.  FAO Schwarz.  I think it was Michael
16  Jackson.  They were opening FAO Schwarz, and they
17  sent a bunch of plain clothes guys up for this
18  detail.  And we were in front of the Towers.  And
19  Trump came out of the building and saw us out
20  there and came over and said, hey, guys, what's
21  going on?  You know, we said, we're here for
22  this -- you know, we have a job across the street.

Page 37

1   He said, are you guys good?  You know, he was very
2   nice, very cordial.  And he came up to me and
3   he -- he walked up to me, and he went like this.
4   He went, you got your vest on?  I said, yes, sir.
5   He says, good.  He says, you got to wear a vest.
6   And he says, you know what?  Guys, go
7   downstairs -- there was a coffee shop in, like --
8   in the Tower.  He said, go downstairs and grab
9   some coffee and tell them I sent you downstairs.
10      And -- looking back, it's funny now
11  because everybody was shit scared; they're, like,
12  I ain't going down there, no way.
13      That's the first time I ever saw him.
14  And that had to be, like, 1987, maybe or
15  something.  So -- and then I got to meet him
16  several times after, so I've known him a long
17  time.
18      So back to your question, I was a big
19  supporter of his for the election.  I was in
20  Washington, D.C. the night of the election, on
21  November 3rd.  I stayed in D.C. until the 4th.
22  And, you know -- I don't remember exactly.  I

10 (Pages 34 - 37)

Page 38

1 either left the night of the 4th or the morning of
2 the 5th.  I went home.  And just about the time I
3 walked in the door, Mayor Giuliani called me, said
4 that he had spoken with the president and that he
5 wanted me to come back and assist him; he was
6 going to be looking at the investig- -- at the
7 election.
8      And I packed up some clothes, I got back
9 in my truck, and I drove back to D.C.
10     Q.  And so when you say, Mayor Giuliani
11 called me and said that he had spoken with the
12 president and he wanted me to come back, was that
13 Mayor Giuliani wanted you to come back or
14 President Trump wanted you to come back?
15     A.  No, the mayor.
16     Q.  The mayor wanted you to come back.
17       Why do you think he reached out to you?
18     A.  He probably knew I could be helpful.
19     Q.  Okay.  In what way?
20     A.  Look, I've worked with him and for him
21 for a long time, whether it's investigative work,
22 whether it's consulting work, you know, I've --

Page 39

1 you know, and we're friends on top of it.  You
2 know, he probably thought I could help.
3     Q.  You guys are still friends, yeah?
4     A.  Yeah.
5     Q.  How is he as a boss?
6     A.  He's usually great.
7     Q.  Is he hands on?
8     A.  Yeah.
9     Q.  Yeah.
10     A.  Very hands on.
11     Q.  Very hands on.  Okay.
12       So Mayor Giuliani called you around the
13 5th and -- to ask you to assist.  You said yes,
14 came back down?
15       What then became -- or what was your
16 role.  Right?  Like, you come down, you get to
17 wherever you all are working, and then you're,
18 like, okay, what am I doing now?  How --
19     A.  I think I got there in -- I want to say
20 it was the 5th.  So I got there in the morning,
21 spoke to him when I arrived.  We were -- he was
22 staying at the Mandarin Oriental Hotel.  And I

Page 40

1 checked in.  I either saw him or spoke to him, and
2 he was going to the campaign headquarters.  And I
3 told him I would meet him over there.  And that's
4 where they were going to work out of, campaign
5 headquarters.  So that's where I went.
6     Q.  Where were the campaign headquarters at
7 that time?
8     A.  Arlington, Virginia.  The Arlington
9 Tower.
10     Q.  Okay.  And for most of your time doing
11 this investigation, were you working there in
12 Arlington or were you working at the Mandarin?
13 Or...
14     A.  No.  First it was Arlington Tower.  Then
15 -- I forget who, somebody got COVID, and they
16 threw us out of the campaign headquarters and said
17 nobody can come in here.  Somebody in the campaign
18 got COVID.  It was right before Andrew Giuliani
19 got COVID.  It was sometime before that.
20       And then we left the Tower, we left the
21 campaign headquarters, and we started working out
22 of the hotel.  And the hotel was the Mandarin.

Page 41

1     Q.  The Mandarin?  And you said you either
2 spoke to Mr. Giuliani in person or -- you either
3 met -- saw Mr. Giuliani or spoke to him.
4       That would have been on the phone or --
5 how did you guys normally communicate?
6     A.  On the phone.
7     Q.  On the phone.  Okay.
8       Are you a big texter?
9     A.  Not too much.  And not with him.
10     Q.  Not with him?
11     A.  Yeah.
12     Q.  Because -- because he's not a big texter?
13     A.  No.  Because if I text him, it will take
14 six years for him to get back to him.
15     Q.  I see.  What about --
16     A.  It's easier if I call him.
17     Q.  Fair enough.
18       And what about e-mail?  How is he on
19 e-mail?
20     A.  No.  Forget it.
21     Q.  No.  Okay.  You've got to call.
22       Okay.  So you're working wherever you're

11 (Pages 38 - 41)

Page 42

1 working, whether it's Mandarin Oriental or
2 campaign headquarters. And what -- what did you
3 understand -- like, what were you -- what was sort
4 of the brief? What were you doing?
5          MR. PARLATORE: Objection. Now, to the
6 extent that we're going to now get into what --
7 the work that he was doing in anticipation of
8 litigation, you know, related to election stuff,
9 that's, you know, work product privilege. So...
10          MS. HOUGHTON-LARSEN: Are you objecting
11 to him answering that question?
12          MR. PARLATORE: I am, yeah. If you guys
13 want to talk specifically about -- my
14 understanding is that Mr. Giuliani's counsel is --
15 you know, is saying that the Ruby Freeman-specific
16 piece was not in anticipation of litigation, so we
17 can ask that. But if you want to talk about
18 general, you know, election integrity
19 investigations in anticipation of litigation,
20 that's work product, so I'm objecting.
21          MS. HOUGHTON-LARSEN: And you're
22 directing him not to answer?

Page 43

1          MR. PARLATORE: I am.
2          MS. HOUGHTON-LARSEN: And what's the
3 basis of that? It's -- you're saying it's
4 attorney work product?
5          MR. PARLATORE: Did you not hear what I
6 was just saying?
7          MS. HOUGHTON-LARSEN: I'm just trying to
8 clarify.
9          MR. PARLATORE: To the extent that they
10 are doing investigations in anticipation of
11 litigation, that is work product.
12          MS. HOUGHTON-LARSEN: Okay.
13          MR. PARLATORE: So it's not something
14 that you can ask about here.
15          MS. HOUGHTON-LARSEN: Got that. I think
16 he's already testified to generally what the
17 investigation team was doing during his
18 January 6th interview, during his D.C. bar
19 testimony last year.
20          Is there a reason that you're objecting
21 to here but he was allowed to testify about it in
22 those instances?

Page 44

1          MR. PARLATORE: I don't know where you're
2 going with this. But to the extent that you want
3 to start getting into what was he -- what were
4 they doing in anticipation of litigation as
5 opposed to, in those instances, there were very
6 specific questions that were asked that he was
7 able to answer. To the extent you're trying to go
8 more broad and, you know, go on more of a fishing
9 expedition, the answer is no.
10          MS. HOUGHTON-LARSEN: Well, certainly
11 that's not my intention.
12          MR. PARLATORE: Okay.
13          MS. HOUGHTON-LARSEN: Is Mr. Sibley on
14 the line?
15          MS. MacCURDY: No.
16          MS. HOUGHTON-LARSEN: Okay.
17 BY MS. HOUGHTON-LARSEN:
18     Q. So let's go to your January 6th
19 testimony. I think that will be easier.
20          MS. HOUGHTON-LARSEN: So can I just have
21 tab 26, please?
22          If we could just mark this as Exhibit 1,

Page 45

1 please. This is going to be a little unwieldy --
2 I'm sorry -- for you to look through. Didn't have
3 a stapler big enough.
4          (Kerik Deposition Exhibit 1 marked for
5             identification and attached to the
6             transcript.)
7 BY MS. HOUGHTON-LARSEN:
8     Q. So do you recognize this document?
9     A. No.
10     Q. Okay. Do you see on the first page it
11 says the interview -- it's an interview of Bernard
12 Kerik on Thursday, January 13th, 2022?
13     A. I see it.
14     Q. Okay. So if we could just turn to
15 page 12, please. And I don't know how familiar
16 you are with reviewing transcripts, but there are
17 these line markers on the left-hand side, so I'll
18 refer to the page and the line.
19          So I'm starting at page 12. Let's do
20 line 16.
21          So the questioner says, "Okay. Perfect.
22 And we are pulling up -- it's Exhibit 1, which is

12 (Pages 42 - 45)

Page 46

1 the letter that I'm referencing, so I'm not just
2 reading into a void here. And I believe on page 2
3 it says, quote, Mr. Kerik was tasked with
4 investigating and gathering credible, verifiable,
5 and admissible evidence as part of a potential
6 litigation. And in this role he compiled a
7 significant amount of information regarding the
8 elections in the States of Arizona, Georgia,
9 Wisconsin, Michigan, and Pennsylvania.
10 Understanding -- this is my question now.
11 Understanding that it may be more than that, not
12 just those states, do you agree with the statement
13 that Mr. Parlatore made?"
14       Then this is your answer, line 25: "Yes.
15 I think -- I think my role, our role, my specific
16 role, was not only to investigate the election for
17 possible litigation, it was also to provide the
18 legislature -- legislators and electors in the
19 various states, the six swing states, information
20 that they may or may not be aware of. So I think
21 there was a dual purpose, but primarily, it
22 started out for litigation. Yes."

Page 47

1       Do you see that?
2    A. Yes.
3    Q. Okay. And you agree with that, that
4 accurately reflects what you were doing?
5    A. Pretty much. Yeah.
6    Q. Okay. So you were -- you and
7 Mr. Giuliani were investigating the election in
8 these six states, right?
9    A. And anything else that came up.
10   Q. And anything else that came up.
11   A. Right.
12   Q. How -- when you say anything else that
13 came up, was that -- anything -- like,
14 Mr. Giuliani would maybe -- would direct you to
15 that? Or how would something else come up?
16   A. No. Basically the information that came
17 to us came from a hundred different sources. It
18 could have come from the campaign. It could have
19 come from somebody in the White House. It could
20 have come from a state legislator. It could have
21 come from a state campaign office. Could have
22 come from civilians. Could have come from outside

Page 48

1 attorneys that we had no contact -- we didn't know
2 who they were.
3       So we had -- we had tons of information
4 that was coming to us. When I say the six states,
5 those are the -- primarily the six swing states.
6 But there were times that, you know, somebody
7 would call and say, you know --
8       MR. PARLATORE: No, don't give examples.
9       THE WITNESS: Okay.
10      MS. HOUGHTON-LARSEN: You're directing
11 him not to answer?
12      MR. PARLATORE: I am.
13      MS. HOUGHTON-LARSEN: And on what basis?
14      MR. PARLATORE: Work product.
15      MS. HOUGHTON-LARSEN: Okay.
16      MR. PARLATORE: You've read -- you've
17 read a portion of the transcript which is based on
18 a letter related to work product specifically.
19 Okay? That was -- you know, if you go back and
20 read the actual letter, it talks about how they
21 were trying to get to work product things, the
22 things that are in anticipation of litigation.

Page 49

1       So -- you have a very specific claim
2 here. You know, trying to go around it to go into
3 other things is not appropriate, especially when
4 it's privileged. So you need to move on.
5       MS. HOUGHTON-LARSEN: Thank you very
6 much. This is my deposition, and I'll ask the
7 questions I'd like to ask.
8       MR. PARLATORE: I know. But since you're
9 trying to get into work product privileged things,
10 I'm explaining it to you.
11      MS. HOUGHTON-LARSEN: I'm certainly not
12 trying to get into work product privilege --
13      MR. PARLATORE: Good. Then --
14      MS. HOUGHTON-LARSEN: -- but I
15 appreciate --
16      MR. PARLATORE: Then let's move to
17 non-privileged issue.
18      MS. HOUGHTON-LARSEN: As I said, this is
19 my deposition, and I'll be asking the questions I
20 like, which are going to be completely appropriate
21 and not probing into anything --
22      MR. PARLATORE: So far --

13 (Pages 46 - 49)

Page 50

1    MS. HOUGHTON-LARSEN: -- work product.
2    MR. PARLATORE: -- you've already gone
3 into some work product stuff, so I anticipate
4 you'll probably continue to probe into that.
5    MS. HOUGHTON-LARSEN: Let's go to that
6 letter. Shall we?
7    What tab is that, Maggie?
8    We'll mark this as Exhibit 2, please.
9    (Kerik Deposition Exhibit 2 marked for
10    identification and attached to the
11    transcript.)
12 BY MS. HOUGHTON-LARSEN:
13    Q. Okay. Do you recognize this?
14    A. I think so.
15    Q. Okay. Do you see that this is on
16 Mr. Parlatore's letterhead. It's dated
17 December 31st, 2021, and it's directed to the
18 January 6 Commission.
19    A. Right.
20    Q. Okay. So you're welcome to review it if
21 you want, but I'm just going to direct us to the
22 second page.

Page 51

1    A. Okay.
2    Q. So on the second page, it's the middle
3 paragraph, I guess. It starts, "Mr. Kerik was
4 hired."
5    Do you see that?
6    A. Yes.
7    Q. Okay. It says, "Mr. Kerik was hired by
8 former President Donald Trump's legal team to act
9 as an investigator tasked to look into claims of
10 election fraud."
11    Okay. That's right, right?
12    A. Right.
13    Q. Okay. Just while we're on it, did you --
14 did you have a contract or anything?
15    A. No.
16    Q. You didn't. Were you getting paid for
17 your work?
18    A. No.
19    Q. Okay. Next sentence reads, "In this
20 role, Mr. Kerik received, reviewed, and processed
21 claims of fraud from around the country."
22    Okay. So when you say received, that's,

Page 52

1 like, kind of what we were just talking about a
2 minute ago, right? You said you were -- there
3 were, like, hundreds of sources or, you know, you
4 were getting information from all of these
5 different --
6    A. Right.
7    Q. -- entities or people.
8    Okay. And when you say you were
9 receiving them, were they being -- was there,
10 like, one e-mail address that everyone was using?
11 Or, like, how did that --
12    MR. PARLATORE: Objection.
13 BY MS. HOUGHTON-LARSEN:
14    Q. -- work?
15    MR. PARLATORE: Don't answer that. Work
16 product privilege.
17    MS. HOUGHTON-LARSEN: An e-mail address
18 is work product privilege?
19    MR. PARLATORE: You're asking about their
20 process. You can move on.
21 BY MS. HOUGHTON-LARSEN:
22    Q. So you say -- so the next thing is that

Page 53

1 you were reviewing these claims.
2    And that was you, personally, reviewing
3 them?
4    MR. PARLATORE: Objection. Work product.
5 Going into what their process is.
6    MS. HOUGHTON-LARSEN: I'm pretty much I'm
7 just clarifying literally what is written here,
8 Mr. Kerik reviewed --
9    MR. PARLATORE: If you don't understand
10 what that means, then, you know, that's not our
11 issue. This is a letter outlining why getting
12 into the specifics is, in fact, work product. If
13 you had read the whole letter, you'd know that.
14 So trying to, you know, "clarify" by going deeper
15 into the work product stuff, you know, doesn't
16 help you here. So move on.
17 BY MS. HOUGHTON-LARSEN:
18    Q. And so, again, to be clear, my question
19 is --
20    MR. PARLATORE: Objectionable.
21 Therefore, you need to move on to the next one.
22    MS. HOUGHTON-LARSEN: Sorry, can I just

14 (Pages 50 - 53)

Page 54

1 finish my question?

2     MR. PARLATORE: Sure.

3 BY MS. HOUGHTON-LARSEN:

4     Q. My question was, Mr. Kerik, were you

5 personally reviewing the claims of fraud that the

6 team was receiving?

7     MS. HOUGHTON-LARSEN: And you have

8 objected?

9     MR. PARLATORE: Yes, I have.

10     MS. HOUGHTON-LARSEN: And directed him

11 not to answer?

12     MR. PARLATORE: I have.

13     MS. HOUGHTON-LARSEN: And the objection

14 is based on?

15     MR. PARLATORE: Work product.

16     MS. HOUGHTON-LARSEN: Okay.

17     MR. PARLATORE: You're asking about what

18 the internal process of the legal team is. It's

19 improper.

20     I know that you don't like that, which is

21 why you're smirking, but that's the problem with

22 this, is when you want to get into the specifics

Page 55

1 of what an investigative team did as part of a

2 legal team in anticipation of litigation, you're

3 going to run into privilege issues.

4     If you have specific questions related to

5 your case, he's here to answer those. But to the

6 extent that you want to go outside that to get

7 into what their process was on other things, it's

8 objectionable. So...

9     MS. HOUGHTON-LARSEN: I want to be very

10 clear. I really am not trying to get into work

11 product.

12     MR. PARLATORE: Okay.

13     MS. HOUGHTON-LARSEN: And so I will do my

14 best to ask questions in a way that are not

15 probing into work product.

16 BY MS. HOUGHTON-LARSEN:

17     Q. Okay. So going back to what we were

18 talking about a little bit before, Mr. Kerik, your

19 interview testimony before January 6 referenced

20 the six swing states, right? And you said that as

21 well?

22     A. Yes.

Page 56

1     Q. Okay. And Georgia was one of those

2 states?

3     A. Yes.

4     Q. Okay. Who else was working with you on

5 the team?

6     MR. PARLATORE: Objection. Are you

7 trying to get into the identities of all the other

8 investigators as part of a legal team working in

9 anticipation of litigation?

10     MS. HOUGHTON-LARSEN: I'm asking who was

11 on the team investigating --

12     MR. PARLATORE: Okay.

13     MS. HOUGHTON-LARSEN: Yes.

14     MR. PARLATORE: So you're asking the

15 identities of the other investigators on the team

16 working in anticipation of litigation, including

17 any additional, you know, contractors that they

18 may have hired as part of that?

19     MS. HOUGHTON-LARSEN: My question is

20 slightly more broad. I'm not just interested in

21 investigators. I'm interested in anyone who was

22 working on the team.

Page 57

1     MR. PARLATORE: Okay. If you want to ask

2 something specific that would not be

3 objectionable, you can go ahead. But this one,

4 I'm directing him not to answer, work product.

5     MS. HOUGHTON-LARSEN: Okay.

6 BY MS. HOUGHTON-LARSEN:

7     Q. Okay. So in addition to you on the team,

8 was Phil Waldron on the team working on these

9 issues with Mr. Giuliani?

10     A. Yes.

11     Q. Okay. And what did you understand his

12 role to be?

13     MR. PARLATORE: Was he working on it in

14 anticipation of litigation? Because, if so, the

15 answer to that is "objection."

16     MS. HOUGHTON-LARSEN: And you're

17 directing him not to answer?

18     MR. PARLATORE: I am.

19     MS. HOUGHTON-LARSEN: And the basis of

20 that is?

21     MR. PARLATORE: Work product.

22     MS. HOUGHTON-LARSEN: Okay.

15 (Pages 54 - 57)

# Excerpted

Page 62

1    Q.  Okay.  So your next sentence is, "We need
2 to pull the trigger today to have the impact
3 that's needed in the states that we're targeting."
4    A.  Right.
5    Q.  What did you mean by that?
6    A.  It had to have something to do with the
7 plan itself.  Do you have a copy of the plan?
8    Q.  I do.  Would you like to see it?
9    A.  Please.
10    Q.  Okay.  So --
11    MR. PARLATORE:  Do you want to read the
12 whole e-mail, too?  Because that might --
13    THE WITNESS:  Yeah.  That -- I'll do that
14 while you --
15    MR. PARLATORE:  Some of these questions,
16 the answer to it is two sentences forward.
17    THE WITNESS:  Okay.
18    MS. HOUGHTON-LARSEN:  Let's get it while
19 he's reading.
20    This is Exhibit 4.
21
22

Page 63

1    (Kerik Deposition Exhibit 4 marked for
2    identification and attached to the
3    transcript.)
4    THE WITNESS:  Okay.
5 BY MS. HOUGHTON-LARSEN:
6    Q.  Okay.  So this is the attachment,
7 Exhibit 4.  Feel free to review that, but I'll
8 direct you to particular points.
9    A.  Okay.
10    Q.  And this e-mail and this attachment are
11 things that both you and Mr. Giuliani have
12 testified about previously, or given an interview
13 about previously, so I think we should be -- we
14 should be good --
15    A.  Okay.
16    Q.  -- from the attorney work product
17 concerns.
18    Okay.  So just going back, you say, "We
19 need to pull the trigger today to have the impact
20 that's needed in the states we're targeting."
21    So what did you mean by that?
22    A.  I think what I was talking about at the

Page 64

1 time was to force the legislators to do their job.
2    Q.  Okay.
3    A.  From my perspective -- and now, I'm --
4 I'm going to say this, I don't remember
5 specifically what I was talking about at the time.
6 But given this and the plan, one problem we had
7 was that we were finding evidence of fraud,
8 improprieties, things of that nature.  We were
9 going to the legislators.  We were providing it to
10 them or -- which was even worse -- they were
11 providing us -- they were telling us, you know,
12 there is -- you know, we found this or we heard of
13 that or we're looking at this.
14    But our concern was you're going to be
15 involved in the certification or allow the
16 certification of a state vote that you, yourself,
17 know should not happen based on the things that we
18 were collecting.  Based on the things that we were
19 reviewing, you know, we wanted to -- we wanted to
20 push them and educate them as to what we were
21 finding to make sure that they pretty much did
22 their job.

Page 65

1    And I think that's what I was talking
2 about.
3    Q.  Okay.  So this is reflecting your opinion
4 that you felt strongly about this, right?
5    A.  In this e-mail, yeah.
6    Q.  Okay.  And am I correct -- I mean, the
7 mayor also had sent this, as you say, to Mark
8 Meadows the previous evening.
9    Is it fair to say he also felt strongly
10 about this, as far as you understood?
11    A.  I would say.  Yeah.
12    Q.  Okay.
13    A.  Or I would have never sent it.
14    Q.  So tell me what you mean by that.
15    A.  You know, the mayor is in charge.
16    Q.  Right.
17    A.  It's the mayor's legal team.  If the
18 mayor is concerned or he has concerns or he wants
19 something done, you know, I would do it.  If he
20 didn't want it, if he wasn't concerned, or he
21 said, you know, this isn't of interest to me, I
22 wouldn't do it.

17 (Pages 62 - 65)

# Excerpted

Page 78

1 my question is, do you recognize this document
2 that says, "Georgia," with a bunch of bullet
3 points independently?
4     A. Do I recognize it?  Not necessarily that
5 it goes to this document, but I do recognize it.
6 Yes.
7     Q. Okay.  It almost looks to me -- and you
8 can tell me if you agree.  It almost looks to
9 me -- right -- so if we flip back to page 8, it
10 says, "Supporting documents.  Voter fraud
11 highlights for 2020 U.S. election."
12       So it almost looks like this is a
13 separate document that's been sort of attached to
14 the back of the plan; is that right?
15     A. Well, I can't say.  But normally what
16 would happen in a situation like this, as I said
17 earlier, you've got -- we've got five, six
18 different people, maybe, working on -- you know,
19 these two people are working on Georgia, this guy
20 is working on Arizona, this guy is working on
21 Pennsylvania, two people, whatever.
22       We would sort of have them do the same

Page 79

1 sort of format so the mayor would have bullet
2 points to recognize where there were problems and
3 what those problems were.  And that's what this
4 looks like.
5     Q. I see.  So almost like a state-specific
6 living document that could sort of update the
7 team --
8     A. Right.  And --
9     Q. -- to say, you know, here's what he have.
10     A. -- that's exactly what would happen.
11 This document may look like it had five bullet
12 points, you know, today --
13     Q. Okay.
14     A. -- may have seven tomorrow, nine the next
15 day, whatever.  As they come in -- and some would
16 be reduced; some would be taken out.  If we
17 confirmed something, we'd pull it off.
18     Q. If you confirmed something --
19     A. That it was something -- that it
20 shouldn't have been there, for example.
21     Q. I see.  So if you confirmed that an
22 allegation here was not correct, you would remove

Page 80

1 it?
2     A. Right.
3     Q. And how did you determine if something
4 should be put on here?  Did you first have to
5 determine if it was definitively true?
6     A. Somebody would come to us and say, look,
7 here's what I found.
8     Q. Okay.
9     A. Right?  Or I saw it.  Or the mayor found
10 it.  Or whatever.
11     Q. Okay.  I guess I'm just -- and I'm not
12 being clear with my question, so I apologize.
13       Was it -- was what came to this document,
14 were these allegations of fraud or were these
15 conclusive determinations of fraud?
16     A. Everything initially was allegations.
17     Q. Sure.
18     A. We didn't -- you know, the -- our ability
19 to give a conclusive answer within, I don't know,
20 six weeks wasn't happening, right?  Which is why
21 there was such a push for the legislators to do
22 their job.

Page 81

1       You know, in Georgia, for example, you
2 know, the mayor tried to get the -- I forget what
3 he was -- the head of the senate or somebody, you
4 know, call the GBI and tell them to look at A, B,
5 C.  You know, we -- we see it, we have it.  Do
6 their job.  Go do their job.
7       So that was the purpose of the plan
8 itself.
9     Q. And so you made it sound like these could
10 have been being updated every day, every couple of
11 days.
12       Were they sort of being circulated to the
13 team as they were being updated?
14     A. Could be.
15     Q. Okay.
16     A. Could be.
17     Q. And were you contributing to the Georgia
18 living document?
19     A. Could be.  I mean, if something come
20 across my -- you know, came in my view, you know,
21 I'd have somebody take a look at it or go check
22 this or call this guy or whatever.

21 (Pages 78 - 81)

**Excerpted**

Page 90

1  there -- because I think everybody left, or
2  something, but there was one -- there was one
3  person or two people that stayed behind, and I
4  think they're the ones that told somebody -- I
5  don't know who they told -- I think -- I think
6  that's where that came from.
7      Q.  Okay.  And just to be clear, if there was
8  somebody who -- they weren't speaking to you,
9  these --
10     A.  No.
11     Q.  -- witnesses who were at State Farm Arena
12  that night.
13     A.  Not me personally, and I don't know if
14  anybody -- any of our people talked to them
15  personally.
16     Q.  Okay.  Did you think it would -- would
17  you think it would be important to talk to them
18  personally, to understand what they were saying?
19     A.  It could.  Yeah.
20     Q.  Okay.  So do you know who drafted this
21  document, this overall document?
22     A.  No.  No.

Page 91

1      Q.  No.  Okay.  Do you have a sense -- or do
2  you know whether it was multiple people
3  contributing to it or one effort?
4      A.  It would have been multiple people.
5      Q.  Okay.  Were you one of those people who
6  was contributing to this communications plan?
7      A.  Verbally, yes.
8      Q.  Okay.
9      A.  I wouldn't be typing any of this stuff --
10     Q.  Okay.
11     A.  -- putting this in here.
12     Q.  Okay.  And so verbally, when you were
13  talking about this -- developing this strategic
14  communications plan, who were you speaking with?
15     A.  Different people on the team, attorneys
16  and otherwise.
17     Q.  Can you give me names specifically, to
18  the extent that you recall?
19     A.  It would have been Christina Bobb,
20  Katherine Friess, Boris Epshteyn.  There was
21  another attorney -- there was -- there was another
22  attorney, I don't know his name -- I forget his

Page 92

1  name.  There was a young guy that worked -- he
2  worked for, like, a state senator, but he took a
3  leave or something.  I don't know who -- he got
4  COVID.  Although I don't know if he was involved
5  in this.  Like that -- you know, one of them.
6      Q.  Okay.  This might help you.  Can we
7  please turn to page 6.
8      Okay.  So about two-thirds down the page
9  it says, "Key team members.  Rudy Giuliani."
10     And then, "BK."  I'm assuming that's you.
11     A.  That's probably me.
12     Q.  Okay.  "KF."  Do you know who that is?
13     A.  Katherine Friess.
14     Q.  And then, "Media advisors.  SB."  Who do
15  you think that is?
16     A.  No idea.  Well, I went through this
17  before.
18     THE WITNESS:  Who did I do this with?
19  J6?
20     MR. PARLATORE:  Probably.
21     THE WITNESS:  Yeah.  Boris Epshteyn would
22  have been the BE.  SB, I have no idea what that

Page 93

1  is.
2  BY MS. HOUGHTON-LARSEN:
3      Q.  Okay.
4      A.  Serrano's public relations team.
5      Research team.  CR.  Off the top of my
6  head...
7  BY MS. HOUGHTON-LARSEN:
8      Q.  Sorry for the memory test.
9      A.  Yeah, I don't know.
10     Q.  What about SP?
11     A.  Don't know.
12     Q.  Do you think it was Sidney Powell?
13     A.  What's the date here?  Is there a date on
14  this thing?
15     Q.  The date says, "Timeline, December 27th -
16  January 6th."  And this is, remember, attached to
17  the e-mail that you sent on December 28th.
18     A.  Oh, December 28th I sent this?  It could
19  have been Sidney Powell, but she was -- you know,
20  the mayor dismissed her, you know, away from --
21  you know, we created distance between us and her,
22  and I don't know when that was.  So I don't know.

# Excerpted

Page 98

1 Some -- you know, and I'll give you an example,
2 because her name already came up. Sidney Powell
3 wanted to see the mayor about something she heard
4 or she found or whatever the case may be. She
5 called me, wanted to see the mayor. I set it up.
6 She came. She sat in the suite with him. A
7 couple of us sat around and she told him whatever.
8     Q. Got it. And she called you because you
9 were -- you sort of made -- you were the buffer,
10 right, between --
11     A. Right. Right.
12     Q. -- with the mayor.
13        Do you have a sense of, over the
14 course -- you're going to be -- you're going to
15 smile at me at this question.
16     A. Okay.
17     Q. Do you have a sense of, over the course
18 of that sort of six weeks or so, how many times
19 you were discussing the plan to get information to
20 these state legislatures?
21     A. Not that we had a meeting about that.
22     Q. Not that you had a meeting.

Page 99

1     A. But we discussed it every day.
2     Q. Every day.
3     A. Every day.
4     Q. Right.
5     A. I mean, it was -- you know, that was --
6 every day.
7     Q. Right.
8     A. And -- and I think the piece that's sort
9 of -- we haven't discussed is the fact that, in
10 the middle of the investigative stuff that we were
11 doing and collecting all this data, we were then
12 going out and doing the hearings, the public
13 hearings, trying to get the legislators to
14 understand what we were finding at the time. So
15 you had all this stuff going on, but also we were
16 traveling to do those hearings.
17     Q. Was there someone on the team who you
18 recall leading the effort to reach out to state
19 legislatures?
20     A. Most likely -- not specifically. But the
21 mayor was responsible for the legal team. And,
22 you know, he wanted -- he wanted everything and

Page 100

1 anything we could find with regard to possible
2 litigation and anything and everything we could
3 find that the legislators should be aware of so
4 they could make a decision whether they should or
5 should not certify a state vote.
6     Q. Okay. Okay. We'll go through the plan
7 for a couple of minutes and then we'll break for
8 lunch.
9     A. Okay.
10     Q. As long as you're still okay.
11        All right. So at the bottom of page 1 --
12 I just want to go through a couple of these
13 specific things.
14        At the bottom of page 1 it says,
15 "Fraudulent ballots" -- indentation -- "Fulton
16 County, Georgia. Video of suitcases of fraudulent
17 ballots."
18        Is that the video that we were discussing
19 earlier of my clients?
20     A. Yeah, I would think so.
21     Q. Okay. If we can turn to page 3. Under
22 the bullet "Election officials' illegal actions,"

Page 101

1 about halfway down there it says, "Election
2 official Ruby Freeman is seen surreptitiously and
3 illegally handing off hard drives on camera in the
4 Georgia counting facility"; is that correct?
5     A. That's what it says. Yeah.
6     Q. Okay. And again, that's, as far as you
7 know, referring to that video that we were
8 discussing.
9     A. I think so. Yes.
10     Q. Okay.
11     A. I don't -- hold on. I don't know if it
12 pertains to that first video. Because there was
13 another video I saw -- although I think I saw that
14 later. I don't know. I'm not sure.
15        Where it says she was illegally handing
16 off hard drives on camera --
17     Q. I see. Because the first video that you
18 recall seeing was having to do with those big
19 containers of --
20     A. The big containers, pulling --
21     Q. -- ballots.
22     A. -- them out from under the thing.

26 (Pages 98 - 101)

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.