# EXHIBIT 13



RECEIVED
Dec 30 2022 12:54pm
Board on Professional Responsibility

**Date:** December 15, 2022

**Case:** In Re: Rudolph W. Giuliani



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

```
            DISTRICT OF COLUMBIA COURT OF APPEALS

            BOARD ON PROFESSIONAL RESPONSIBILITY

                   AD HOC HEARING COMMITTEE

- - - - - - - - - - - - - - - - - X

In the Matter of,              Board Docket No.

RUDOLPH GIULIANI,              22-BD-027

          Respondent.          Disciplinary Docket No.

A Temporarily Suspended Member    2020-D253

of the Bar of the District of     Vol. 5

Columbia Court of Appeals.        :

Bar Number: 237255                :

- - - - - - - - - - - - - - - - - X

                      Thursday, December 15, 2022


               CONTINUED VIRTUAL HEARING OF

                     RUDOLPH GIULIANI
```

Reported by

   Kim M. Brantley, C.S.R.

Page 1152

In Re: Rudolph W. Giuliani
December 15, 2022

Page 1153

1  Continued virtual hearing, taken via Zoom,
2  commencing at 9:01 a.m., before the Ad Hoc Hearing
3  Committee, and before Kim M. Brantley, a Court
4  Reporter and Notary Public in and for the District
5  of Columbia, when were present on behalf of the
6  respective parties:

Page 1154

1  APPEARANCES:
2      Ad Hoc Hearing Committee:
3      ROBERT C. BERNIUS, ESQUIRE
4      Chair
5      MS. CAROLYN HAYNESWORTH-MURRELL
6      Public Member
7      JAY BROZOST, ESQUIRE
8      Attorney Member
9
10     On behalf of the DC Attorney Disciplinary
11     System:
12     HAMILTON P. FOX, III, ESQUIRE
13     Disciplinary Counsel
14     JASON HORRELL, ESQUIRE
15     Assistant Disciplinary Counsel
16     515 Fifth Street NW, Ste. A-117
17     Washington, DC 20001
18     (202) 638-1501

Page 1155

1  APPEARANCES CONTINUED:
2     On behalf of Respondent:
3     HON. JOHN M. LEVENTHAL, (RET.) ESQUIRE
4     HON. BARRY KAMINS, (RET.) ESQUIRE
5     AIDALA, BERTUNA & KAMINS, PC
6     546 Fifth Avenue - Sixth Floor
7     New York, New York 10036
8     (212) 486-0011  E-mail
9     Email: judgeleventhal@aidalalaw.com
10 ALSO PRESENT:
11     AZADEH MATINPOUR, Paralegal
12     DC Disciplinary Counsel
13
14     ALEXANDRA DeBENEDICTIS, ESQUIRE
15     Aidala Bertuna & Kamins, PC
16
17     JIM PHALEN, ESQUIRE
18     MEGHAN BORRAZAS, Staff
19     Office of the Executive Attorney

Page 1156

1           I N D E X
2  CONTINUED RESPONDENT'S CASE:
3  WITNESS:         REDIRECT:     RECROSS:
4  Rudolph Giuliani    1163, 1194    1188
5
6  RESPONDENT'S CASE ON MITIGATION:
7  WITNESSES:       DIRECT:       CROSS:
8  Rudolph Giuliani    1213
9  Robert Costello     1221
10
11 ARGUMENT ON SANCTIONS:            PAGE:
12 By Mr. Fox              1228, 1248
13 By Mr. Leventhal        1239, 1250

2 (Pages 1153 to 1156)

**Excerpted**

Page 1173

1  when interviewing -- interviewing them?
2      A.  Well, yeah, they sort of focused me on
3  what I had been hearing as I said coming there,
4  and I had already had a conversation with Ken
5  Starr, I believe, about the idea of a consolidated
6  lawsuit.  So I thought that my value here from my
7  little team was not going to be to help Hicks with
8  what he -- he was doing.  Because I had already
9  been told by a number of people coming up there
10 what a good lawyer Hicks was and that we could
11 really trust him to put this thing together.
12     Q.  So what issue did you focus on?
13     A.  The failure to -- the -- what I would
14 call systemic, massive failure to observe.
15     Q.  And did -- did that issue fit in with
16 any legal issue you were working on?
17     A.  Sure.  It fit in -- first of all it was
18 similar to the information or evidence I was
19 getting from four or five other jurisdictions,
20 almost to a T.  In fact at times it was confusing,
21 and it's confusing in my memory to separate them.
22 I -- I can get Michigan and what something said to

Page 1174

1  me in Philadelphia, confused.  So it was hitting
2  me that this was all very, very good material if
3  we were going to do an eventual consolidation, and
4  I wanted that preserved as best I could.
5      I was assuming that Hicks, Kearns,
6  Hicks' assistant and Kearns' assistant were
7  handling the Philadelphia part actively, because I
8  had been told they were very good.  I also had
9  assured myself -- hadn't met her yet -- but that
10 we had a very good attorney in Pittsburgh.
11 Because during the course of that short time I was
12 there, we had their meeting in charge, we had
13 already run into some pretty bad attorneys.
14     Q.  Now did you also make any decisions on
15 rejecting information that you were receiving?
16     A.  Well, there was one man who was all
17 over me, very impressive man who had a very, very
18 long, long story of what had happened to him,
19 which I wouldn't even bother you with, a quite
20 credible, long story of what had happened to him,
21 and it was so good that I said to him, you know,
22 we -- "I can't really follow this now, but come

Page 1175

1  over to the campaign headquarters" -- which he
2  knew -- "and maybe I can have five minutes alone
3  with you".
4      So then this would be a good point
5  to -- to say, you know, we were finished at -- at
6  the convention center and we decided that we would
7  go to the -- that we would go to the campaign
8  headquarters, gather all the information we had.
9  That means myself and my team that I told you
10 about.
11     At that point, Eric Trump, Jr. had
12 shown up and he had information that he had been
13 gathering all day.  Corey had other people in
14 other parts of the state that he had either come
15 into the campaign headquarters or calling in.
16     So we were going to all meet at the
17 campaign headquarters and see what's the sum and
18 substance of the evidence he had at that point.
19     Q.  All right.  In the -- in the next few
20 days going forward, did you make decisions about
21 rejecting any of the information that --
22     A.  Yeah, yeah.  I told you that, toward

Page 1176

1  the end --
2      Q.  Other than the person you were talking
3  about before.  Were there other people --
4      A.  No, I rejected -- I rejected -- I don't
5  know, it's hard to say how many.  That's -- that
6  one I rejected because, it was a great story and
7  I -- I gave it to Dr. Ryan, and she didn't want to
8  bother Bernie with it, because Bernie was
9  overwhelmed, so she did her own background check.
10 She said, "You're going to have a tough time with
11 this guy" --
12     Q.  Other than -- other than --
13     A.  He's got a record as long as your arm.
14     Q.  Other than that individual, were there
15 other individuals whom you --
16     A.  Yeah, we had a person that claimed to
17 be an observer that we could prove wasn't there.
18 We had a person claiming to be a -- a -- a
19 republican observer who was a democrat -- who was
20 a democrat observer who either was trying to set
21 us up or was bitter because he had been fired by
22 the democrats.

Page 1177

1  So I'd say, I don't know, I -- I can
2  distinctly remember throwing out 15 that you could
3  attribute to Philadelphia. I could be a little
4  wrong, because at the same time I wasn't reviewing
5  them just to -- I was reviewing, you know,
6  Minneapolis with Philadelphia with Atlanta.
7      Q. Well, let's stick -- let's stick to
8  Pennsylvania.
9      A. But I guess the point that I'd like to
10 make for the panel is that it would be unfair if
11 you think we just took every piece of crap that we
12 got. We threw a lot of stuff out.
13     Q. So is it fair to say that you were
14 vetting the information that was -- you personally
15 were vetting much of the information that was
16 coming in?
17     A. Yeah, I was assuming it was being
18 vetted and asking on the way up to me. So
19 sometimes I'd be a little surprised that such a --
20 such a bad one would get that far up.
21     Q. All right. Now, when you testified
22 last week, you did not mention these personal

Page 1178

1  interviews, correct, that you conducted?
2      A. I don't -- no, I don't believe I did.
3      Q. And -- and was there a reason why you
4  didn't?
5      A. Didn't come up. And I -- I -- I mean,
6  there was only a certain amount of time you have.
7  I didn't know how relevant they would be. I
8  thought -- I mean, my thinking was we had so many
9  affidavits that I submitted. I think I testified
10 I read them all. And I thought that would satisfy
11 the -- the -- the court that I had more than
12 sufficient factual basis for the allegation --
13     Q. The panel, the panel?
14     A. Sorry, the panel. I mean, I -- I
15 read -- I did read through the affidavits, all of
16 them, twice, before I testified, and it seemed to
17 me we had supplied, almost in duplicate,
18 triplicate, whatever, an enormous amount of
19 support for the allegations that we had made, and
20 that that wasn't going to be an issue of personal
21 vetting. But when that came up, I felt sort of
22 unfair because -- I felt it wouldn't be fair if

Page 1179

1  they thought I didn't -- I didn't do some personal
2  vetting, because I always do in my lawsuits, even
3  if I can only do just a little bit.
4      I used to train my lawyers that you got
5  to -- you've gotta go -- you've gotta go to the
6  bank to observe the bank robbery if you want to
7  try a bank robbery, because there could be a
8  pillar of the way that nobody remembers. And
9  then, you got to get your hands dirty, and you got
10 to talk to the people you're relying on. It gives
11 you things that you otherwise wouldn't get.
12     I didn't -- I didn't want them to think
13 that, because this was truncated, I didn't do
14 that. It -- it kind of worked out that I was able
15 to do it, because I could do it for a different
16 purpose here, which is that overall lawsuit, but
17 it got me into -- I'm looking at this --
18     Q. Now -- now -- now you mentioned --
19     A. I think about 15 of these people, who
20 then again I got to -- and I'm also trying hard,
21 and I will confess, I may have confused one or
22 two, because some of these people came back up

Page 1180

1  again when we did the Gettysburgh hearing.
2      Q. Now you mentioned a few people by the
3  name of Mr. Kweder and Mr. Mercer.
4      Do you recall any other names of
5  individuals who you personally spoke to?
6      A. Yeah, I spent a -- I spent a lot of
7  time with -- with -- with Katherine.
8      Q. Do you remember her last name?
9      A. Of course I do. Katherine -- I can't
10 remember her last name.
11     Q. Are any other --
12     A. Katherine -- Katherine was in charge of
13 Pittsburgh for us. Katherine had, from the very
14 beginning -- now I remember -- it was a great
15 reluctance to testify but an extraordinary amount
16 of information and -- and -- and even -- even at
17 the point of the argument, the oral argument that
18 I made on the chance that we were going to have a
19 hearing, that Judge Brann would give us a hearing,
20 I was reserving my right to use every amount of
21 skill that I had, and I was waiting mafia people,
22 that's everybody to get her -- to get her to

In Re: Rudolph W. Giuliani
December 15, 2022

Page 1257

1  MR. GIULIANI: And I am personally
2  offended by it and I -- I don't know what has
3  happened to the defensive lawyers who take on
4  unpopular causes, because that is exactly what I
5  did, and I have more than a basis for three
6  quarters of the cases that come into your purview
7  for bringing this case. It just happens to be
8  that my side of it is politically incorrect.
9  MR. KAMINS: Thank you. All right.
10  Thank you, Mr. Chair.
11  CHAIRMAN BERNIUS: Thank you. Unless
12  there's anything else, we're adjourned.
13  MR. KAMINS: Thank you.
14  (Whereupon at 11:19 a.m. the hearing
15  concluded.)

1  CERTIFICATE OF NOTARY PUBLIC
2  I, KIM M. BRANTLEY, C.S.R., the officer
3  before whom the foregoing hearing was taken, do
4  hereby, certify that the proceedings were taken by
5  me in stenotype and thereafter reduced to
6  typewriting under my direction; that said hearing
7  is a true record of the proceedings; that I am
8  neither counsel for, related to, nor employed by
9  any of the parties to the action in which this
10  hearing was taken; and, further, that I am not a
11  relative or employee of any counsel or attorney
12  employed by the parties hereto, nor financially or
13  otherwise interested in the outcome of this
14  action.
15
16  _____
      KIM M. BRANTLEY, C.S.R.
17  Notary Public in and for
    the District of Columbia
18
19
20
21  My commission expires: October 31, 2024
22

28 (Pages 1257 to 1258)