# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
RUBY FREEMAN, et al.,            )  Civil Action
               Plaintiffs,       )  No. 21-3354
vs.                              )
                                 )
RUDOLPH GIULIANI,                )  May 19, 2023
                                 )  11:07 a.m.
               Defendant.        )  Washington, D.C.
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**

<u>**APPEARANCES**</u>:

FOR PLAINTIFFS:     MERYL CONANT GOVERNSKI
                    MICHAEL GOTTLIEB
                    Willkie Farr & Gallagher LLP
                    1875 K Street, Suite 100
                    Washington, DC 20006
                    (202) 303-1016
                    Email: mgovernski@willkie.com

                    JOHN LANGFORD
                    Protect Democracy
                    555 W. 5th Street
                    Los Angeles, CA 90013
                    (919) 619-9819
                    Email: john.langford@protectdemocracy.org

FOR DEFENSE:        JOSEPH D. SIBLEY, IV
                    Camara & Sibley LLP
                    1108 Lavaca Street
                    Suite 110263
                    Austin, TX 78701
                    (713) 966-6789
                    Email: sibley@camarasibley.com

Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter
                    Washington, D.C.  20001


Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

# Excerpted

1    my reading of this, and correct me if I'm wrong, you

2    essentially concede that all of the data being held by

3    Trustpoint has not been searched fully for responsive

4    records in this case.

5            MR. SIBLEY:  The answer is, yes, Your Honor, that

6    is true.  And I never -- if I did, it was inadvertent.

7            There was never an agreement that we would only

8    search for emails, that was kind of the starter.

9            And just so the Court is aware, I was not aware of

10   the archiving of this data until after the conference that

11   we had with Her Honor the first time.  So then we found

12   out -- and apparently this was done, sort of, without

13   notice, it was just kind of -- it just kind of happened.  I

14   mean, it's in the archives.

15           But if we had known that, I certainly would have

16   tried to take measures to do those searches before that

17   occurred.  But the current status is I believe they're

18   trying to work out a payment plan where we can search that

19   data again.

20           THE COURT:  And when will that reach resolution?

21           I mean, discovery closes on Monday.

22           Typically, when discovery closes, I think not only

23   have all of the discovery requests been delivered to

24   opposing parties, but also that the responses have been

25   received before the close of discovery.

1        I entered an order yesterday at the plaintiffs'

2    request to say, you know, are we going to get records after

3    the close of discovery, even though it puts the plaintiffs

4    at a disadvantage because, when they get it after the close

5    of discovery, they have to ask Court permission to do any

6    follow up.  And I get that.

7        I clarified yesterday in my order that, yes, you

8    can still get responsive records and discovery after the

9    close of discovery in this case because of the mess that

10   discovery appears to me to be, with the Trustpoint dataset

11   being just one of the issues.

12       When is that going to be resolved, if you know?

13       MR. SIBLEY:  I do not know the answer to that

14   question, Your Honor.

15       THE COURT:  Do you want to confer with -- or,

16   Mr. Giuliani, do you know when it will be resolved?

17       THE DEFENDANT:  I have to ask Mr. Costello.  I

18   don't know if we know that, Your Honor.

19       THE COURT:  All right.  Well, not only do we not

20   know when it will be resolved, we don't know if it will be

21   resolved.  And so we might have to find alternative ways to

22   access the Trustpoint data, either by transferring the

23   Trustpoint data from Trustpoint to another vendor, by going

24   back to the original electronic devices with professional

25   forensic help to basically do additional forensic imaging

1   and uploading onto an eDiscovery vendor platform to search

2   for responsive records.

3          So, you know, those are all -- those are -- it's

4   all fairly troubling that this is happening on a Friday

5   before the close of discovery.

6          I think you would agree with that also,

7   Mr. Sibley.

8          MR. SIBLEY:  Yes, Your Honor.

9          And in response to some of the things that have

10  been discussed with the Court already, Mr. Giuliani is

11  willing to allow whoever their forensic person is to assess

12  those electronic devices that were seized.  And if something

13  can be done with those -- I mean, I am not sure that it will

14  get back all of the data that's at Trustpoint because I do

15  believe there is probably some damage there to the devices,

16  but I don't know that.  I am not an expert.

17         So I'm happy to let that person look at those

18  devices.  He is not objecting to that.

19         I think, as the Court pointed out earlier --

20         THE COURT:  Well, you know, if the plaintiffs do

21  that, they're going to want to shift those costs to

22  Mr. Giuliani.

23         MR. SIBLEY:  Understood.

24         And that's -- I mean, the Court pointed out

25  earlier, it's kind of an issue if he's claiming inability to

1    pay to get the Trustpoint data.  It's not clear how much

2    this might cost to do, so...

3           THE COURT:  Well, I think you don't have

4    particularly sympathetic ears on the part of the plaintiffs

5    right now for the claim of poverty by Mr. Giuliani, that he

6    can't afford to make up the arrears to have access to the

7    data; he can't get professional vendor help; he's relying on

8    his own manual searches rather than using professional help.

9           So I think you would agree that the plan, first,

10   perhaps to get more sympathetic ears from the plaintiffs, is

11   if Mr. Giuliani responds to the request for production in 40

12   and 41 so that they can take -- make an assessment of that

13   financial situation themselves.

14          MR. SIBLEY:  Your Honor, if the Court orders that

15   overruling the objections, that's -- obviously, the Court

16   has the discretion to do that.

17          But as -- one of those requests is the entire file

18   of a proceeding with his ex-wife over a divorce case.  So I

19   am not sure that that is necessarily going to get that

20   specific information.

21          I think Mr. Giuliani is okay with --

22          THE COURT:  But is it the entire -- I mean, I

23   did -- I will tell you, Mr. Sibley, I did look at the

24   request for matters related to his ex-wife's lawsuit with

25   some scrutiny because this is not -- you know, this is not a

1    lawsuit to go into his personal life at all.  And so -- but

2    I think the request related to his divorce settlement was a

3    little bit more refined than that.  It was the filings in a

4    particular docket, which is public, I would think, and all

5    filings related to the enforcement of the terms of the

6    settlement agreement.

7            So I think, including but not limited to the

8    lawsuit filed in the Supreme Court of the State of New York

9    in and around August 2022.

10           I mean, I think that -- to the extent that he has

11   financial obligations under a settlement agreement with his

12   ex-wife, I think that would be pertinent in evaluating his

13   financial net worth.

14           If he has promised, for example, particular

15   property -- real property that may be in his name but he

16   owes it to somebody else, that would be pertinent and

17   actually support his claim of poverty here.

18           You know, all of this is related to a publicly

19   docketed lawsuit.  So I didn't see that they were asking for

20   anything particularly private.

21           MR. SIBLEY:  I thought it was public, too,

22   Your Honor, but apparently in this Court --

23           THE COURT:  Say that again.

24           MR. SIBLEY:  I thought it was also public.  But

25   apparently -- because that was the first response is, if you

1    guys -- it's like asking us for something you can get on

2    PACER, right?  I mean, so apparently it's not.  So...

3           But what I was going to suggest to the Court --

4    obviously, whatever the Court orders we will do.  But it

5    seems like maybe a statement of net worth with assets and

6    liabilities; and liabilities would include any payments or

7    properties that might be, you know, owed to the ex-wife.

8           THE COURT:  They're entitled to see the underlying

9    documentation rather than just take Mr. Giuliani's word for

10   it.  Don't you think?

11          MR. SIBLEY:  Well, I think if the Court were to

12   overrule the objections and order punitive damage discovery

13   now, I suppose that would be correct.

14          I guess what I am trying to zero in on is his

15   current inability to pay.  I am not sure that it needs to go

16   quite that far, but if the Court -- obviously, the Court has

17   discretion here to do that.  So...

18          THE COURT:  All right.  Well, if there are

19   particular matters that are particularly private in this

20   information, then -- I mean, I think you can seek a

21   protective order or have a conversation with, you know, the

22   plaintiffs about that in particular.

23          MR. SIBLEY:  I believe we have a protective order

24   in place already.

25          THE COURT:  I am going to order it --

```
1            MR. SIBLEY:  Okay.
2            THE COURT:  -- responses to 40 and 41, just so you
3   are not kept on the edge of your seat.  That's going to be
4   part of my order.
5            I mean, with respect to the point you just raised,
6   which you did raise in your briefing, in objecting to
7   producing the financial records until plaintiffs have made
8   out a prima facie case of their defamation case or -- or
9   whether -- or summary judgment, I think you also mentioned
10  in your briefing, and you cite from D'Onofrio v. SFX Sports
11  Group, which is a D.D.C. case from 2008.
12           I have to say I was really puzzled by that
13  citation because that case expressly states, quote:  A
14  majority of the federal courts have permitted pretrial
15  discovery of financial information of the defendant without
16  requiring plaintiffs to establish a prima facie case.
17           So I actually think that the majority view holds
18  here, and I am -- I am going to order that.
19           Let's go back to Trustpoint.
20           One of the things you haven't detailed in the
21  Trustpoint data is -- or in the March 24, 2023, status
22  report to the Court is precisely what the sources of the
23  data were that are part of the Trustpoint dataset.
24           Your report helpfully describes, you know, the
25  different types of file types that are available for
```

1    searching on Trustpoint and, generally, we know that the

2    data sources were electronic devices seized on April 27th,

3    2021, by the FBI from Mr. Giuliani's person, residence, and

4    office.

5            But what you haven't provided is specifically what

6    those devices were, which would be clear from the search

7    warrant returned -- and I am sure Mr. Costello has that --

8    and, you know, whether everything in the Trustpoint dataset

9    was actually all user -- all user created generated data on

10   any of those devices without any exclusion, meaning they

11   took a forensic image of the electronic devices, they took

12   that entire dataset.  They dumped it in Trustpoint, which is

13   why you got so many operating files, which is what it sounds

14   like to me.  But you haven't really confirmed that in order

15   to also confirm for the emails what emails stored on those

16   electronic devices actually derive from which accounts.

17           MR. SIBLEY:  As much as I was able to confirm what

18   the data was as far as where it came from, Mr. Costello

19   confirmed for me -- and there was actually some

20   correspondence with the Department of Justice -- that this

21   was a capture of everything that was on those devices that

22   they could get which, as Your Honor mentioned -- that's why

23   there were the background files, and things like that.

24           I was not -- I did not understand -- and I

25   apologize if the Court wanted me to list specifically the

1       devices that were part of that.  I think I have sent a list

2       of those to plaintiffs previously, at least some of those

3       devices.

4               We certainly can provide a list -- I think we do

5       have a list we can provide that indicates the serial

6       numbers, I believe, of the devices.

7               THE COURT:  Whether they were MacBooks, iPhones,

8       laptops, et cetera.

9               MR. SIBLEY:  Sure.  I think --

10              THE COURT:  All right.  Well, I think it would be

11      good to know.

12              The Plaintiffs' counsel even said right here:  We

13      don't know what other devices may have been used prior to

14      the seizure that may not have been seized.  And I think that

15      certification has to make clear -- I think the FBI is

16      usually pretty thorough.  I think they probably took every

17      single one of Mr. Giuliani's devices that he ever touched

18      that they were -- that they could find.

19              Is that right, Mr. Giuliani?

20              THE DEFENDANT:  Would you like me to help with

21      that?

22              THE COURT:  Sure.  That's why you're here,

23      Mr. Giuliani.

24              THE DEFENDANT:  The FBI took --

25              THE COURT:  Mr. Giuliani, could you turn your mic

1    on?

2              THE DEFENDANT:  I'm sorry.  I don't mean to

3    interrupt.  I just want to help.

4              THE COURT:  And, Mr. Giuliani, your helper wants

5    to give you some water, which you are welcome to have.

6              THE DEFENDANT:  I don't mean to interrupt.  I just

7    want to see if I can shorten it and help you.

8              The FBI took every electronic device in my

9    apartment and in my law office.  I am not sure there were

10   any in my law office at that time.  If there were, they were

11   probably small ones and not relevant and didn't produce very

12   much.  The main ones were in my house because it was

13   pandemic, and I was working out of my home.

14             They also took -- and, therefore, it is a little

15   confusing.  Some of those devices are not mine.  They took

16   every device.

17             So they took a colleague's device.  They took my

18   ex-wife's computer, right, which has nothing to do with

19   this, which actually she hadn't used in four years.  So it

20   was exhaustive.

21             Plus, the FBI had been monitoring my iCloud since

22   approximately -- I may have the dates slightly off so don't

23   hold me to it exactly, but it would have been -- it would

24   have been April of 2008 -- no.  Wrong.

25             It would have been 20- -- sometime in 2017.  Late

1    2017 until around the time they searched my apartment.  They

2    got an order to monitor -- to take my iCloud records and

3    then to monitor it consistently thereafter.

4         So they really had already almost all of the

5    information that was on the devices because as I said, I

6    think in the deposition, 90 to 95 percent of my

7    communication is done on Apple, and it's backed up by the

8    iCloud.

9         So when they took -- and most of the devices they

10   took, if not all, were Apple devices that related to me.

11        So when they took all my devices, they were really

12   checking, is there anything else they could pick up that

13   they had not picked up from the iCloud.  So it's pretty --

14   nothing is ever 100 percent exhaustive.  But having done

15   this work at one time in my life, this was about as

16   exhaustive as you would get.  That was -- that, as far as I

17   know, was all transferred to Trustpoint.

18        The FBI has its own copy that is preserved.

19   Exactly if we could get access to that, I don't know, but it

20   is preserved by the FBI.  And Trustpoint has assured us that

21   they are going to preserve it in hopes that we can work

22   things out.

23        And there might be a way -- if we could talk

24   informally, there might be a way to -- if we tailored the

25   request to Trustpoint and wasn't:  We want to see everything

1    you have.  If we were to tailor a request with them that was

2    logical and made sense, we might be able to pay them a

3    limited amount.  I am not saying we could, but it would

4    suggest to me it would be practical because they make some

5    money on this.

6              THE COURT:  Well, I have two questions for you,

7    Mr. Giuliani.

8              THE DEFENDANT:  We could pay them a limited amount

9    for a search of specific things, but not -- I don't mean to

10   be critical, but they made gigantic requests, Your Honor.

11             THE COURT:  Okay.  I am going to interrupt you for

12   a second, Mr. Giuliani.

13             I am going to ask your client one question because

14   he may know the answer to this more than you, Mr. Sibley.

15             MR. SIBLEY:  Yes, Your Honor.

16             THE COURT:  You say that the FBI was monitoring

17   your iCloud account.  Was the result of that monitoring by

18   the FBI also uploaded to the Trustpoint account or do you

19   not know that?

20             THE DEFENDANT:  I think I know the answer to that,

21   but I am not sure and I would have to check with my counsel,

22   Bob Costello.

23             The answer is I think it was, but I am not -- but

24   don't hold me to it.  It may not have been.

25             THE COURT:  Okay.  Now back to you, Mr. Sibley.

1          Thank you, Mr. Giuliani, for those clarifications.

2          What -- the response that Mr. Giuliani just gave

3     me demonstrates that just giving me the file types of

4     information held in the Trustpoint dataset is insufficient.

5     You need to find out what the data sources are of that data,

6     if it includes the entire iCloud account that was being

7     monitored, according to Mr. Giuliani, by the FBI.  I think

8     that would give some assurance to the plaintiffs that might

9     be more complete in that that iCloud account, at a minimum,

10    is preserved.

11         So I think you -- it's incumbent upon you to find

12    out from Mr. Costello, or from Trustpoint itself, what the

13    data sources are by machine identification, type of machine,

14    serial number -- to make sure we all know what we're talking

15    about -- and any other data sources that went into that

16    dataset.  That is number one.

17         I think Mr. Giuliani raises a very good point,

18    which is that the agreed-upon date range for the Trustpoint

19    dataset, as I understand it, was September 1, 2020, through

20    January 21, 2022.

21         So that if -- rather than the possibly terabytes

22    of data that are in the Trustpoint dataset, which might be a

23    lot to put into an active discovery platform for searching,

24    can be more targeted and only user-generated data from that

25    date range can be unarchived for searching that might make

1  it cheaper than $320,000, which is the amount I understand

2  that Trustpoint is asking to -- asking for to upload all of

3  their dataset.

4       So I think that is something that you can also --

5  it would be helpful for you to pursue.

6       MR. SIBLEY:  I just sent the list of devices while

7  you had the exchange with Mr. Giuliani, so that's been

8  provided to plaintiffs, Your Honor.

9       The iCloud question -- my understanding was that

10  they did have everything in Trustpoint, but it seems like

11  there may be some -- we need to -- I understand, Your Honor.

12       THE COURT:  You need to find out the specific data

13  sources.

14       All right.  I just want to do the same thing that

15  I did with the plaintiffs, which is go through the proposed

16  order to find out what precisely are all of the objections

17  and make sure I am understanding the objections to the terms

18  of the proposed order which, as I said, is described by

19  plaintiffs as narrow.  And I think, in some ways, the

20  plaintiffs' description as it being a narrow relief order is

21  accurate.

22       The proposed order asks that I direct Mr. Giuliani

23  to collect, search, and produce all materials responsive to

24  all of plaintiffs' requests for production in all locations,

25  whether in Trustpoint or not, including a privilege log

1    specifically tailored to the searches Mr. Giuliani

2    performed, specifically for materials responsive to

3    plaintiffs' request for production with the assistance of a

4    professional vendor.

5              So with respect to that component of the proposed

6    order, my understanding is that the defense objects to the

7    professional vendor, essentially, for the same reason that

8    they would object to having to search all of the materials

9    on Trustpoint, and that's a financial issue.

10             Do I understand that correctly, or am I missing

11   something?

12             MR. SIBLEY:  That portion of it is a financial

13   issue at this point, Your Honor.

14             THE COURT:  Okay.  Then, with respect to including

15   a privilege log, do you agree -- are all of the plaintiffs

16   correct that the only privilege log that's been produced is

17   with respect to the Dominion document set and not

18   Trustpoint, not the manual searches that were done by

19   Mr. Giuliani, and not anything else?

20             MR. SIBLEY:  That is incorrect because we

21   actually -- the privilege log that was done as part of the

22   Dominion production.  They asked for all of those documents,

23   so that was part of the request:  Produce everything you

24   produced for January 6, Dominion -- that was the privilege

25   log for that set.

1          We also produced a more narrow privilege log out

2      of that privilege log that targeted, sort of, the issues in

3      this case.

4          We then produced a third privilege log because,

5      when we got the Trustpoint documents -- when we reviewed

6      those documents, some of those documents were privileged but

7      they weren't Mr. Giuliani's privilege, they were the Trump

8      campaign's privilege.  So we sent those to the Trump

9      campaign and the Trump campaign issued another privilege log

10     which we produced to them.

11         I am sure Ms. Governski probably just had

12     forgotten about that, that was during our -- after the

13     hearing that we had with Her Honor last time.

14         What I did is I took the Trustpoint documents that

15     were privileged vis-à-vis the Trump campaign, because that

16     was Mr. Giuliani's client, and sent it to the Trump campaign

17     because I did not want to be involved in making privilege

18     calls on that.

19         Now, there are documents that are privilege

20     documents like communications between me and Mr. Giuliani.

21     Have those been logged?  No.  But that was part of the

22     objection, which is that I have never had to log privilege

23     communications with my client on the case that the requests

24     have been served in.  Right?  That's not something we

25     normally do.

```
 1              Outside of documents created for this litigation
 2    with counsel, I believe everything has been logged that we
 3    have claimed privilege on.
 4              THE COURT:  I think Mr. Giuliani wants to speak to
 5    you for a second.
 6              THE DEFENDANT:  Can I ask Joe a question?
 7              THE COURT:  Of course.
 8              (Whereupon, counsel and defendant confer.)
 9              MR. SIBLEY:  Your Honor, Mr. Giuliani reports that
10    there may be another privilege log for the criminal matter,
11    the investigation.  I was not aware of that.  But if --
12    we'll confirm that.  If there is such a log, apparently that
13    would be -- apparently what happened was the DOJ had these
14    documents.  They were sent to Judge Jones, the Special
15    Master.  There were privilege assertions made by
16    Mr. Costello, and that privilege log was then -- the special
17    matter --
18              THE DEFENDANT:  Trump privilege.
19              MR. SIBLEY:  The Special Master made rulings based
20    on that.  It sounds like we should get that document as well
21    and provide that to the plaintiffs because that may also
22    provide -- based on the descriptions, that may provide
23    insight as to whether there are documents relevant to this
24    case that were --
25              THE COURT:  Okay.  So let me just -- let me just
```

# Excerpted

1    thing.

2         I do have a question, though, Your Honor, about

3    the privilege log.  Is the Court going to require us to log

4    privileged communications between myself and Mr. Giuliani?

5    Normally, you only have to log privileged communications

6    that were not created as a result of the instant litigation.

7    So I am a little -- I just want to clarify.

8         THE COURT:  Well, I didn't think that that

9    question would come up here because I had understood the

10   time frame to end January 21, 2022, which was months before

11   this litigation began and you started representing

12   Mr. Giuliani in this case.

13        I think that that is something you can consult

14   with plaintiffs about because that shouldn't be an issue if

15   that is the time frame that they have clarified today is

16   only applied to the Trustpoint documents and not the other

17   documents.

18        I am going to leave -- I don't want to get

19   involved in the parties' discussion about what the

20   applicable time frame is.  I just don't know enough about

21   the case to be able to do that.  You-all are the ones

22   sitting through all of the discovery, not me.

23        MR. SIBLEY:  I understand, Your Honor.

24        THE COURT:  So I am actually not going to answer

25   that question, essentially make a ruling, when I just -- I

1    really think that you -- the parties need to talk about

2    that.  And if it does need my intervention, I want it teed

3    up appropriately with the arguments on all sides and facts

4    so I know what I am ruling on.

5        Okay.  So then let's go to the next paragraph of

6    the proposed order which asked that Mr. Giuliani file a

7    declaration subject to penalty of perjury that details to

8    the Court efforts taken to preserve, collect, and search

9    potentially responsive data and locations that may contain

10   responsive materials, complete lists of all such locations

11   and data that Mr. Giuliani used to communicate about any

12   materials responsive to any of plaintiffs' RFPs.  The

13   specific data located in the Trustpoint database which we

14   have already discussed, and, clearly, there is a need for

15   that; and what searches, if any, have occurred of both the

16   locations and data that Mr. Giuliani used to communicate

17   about any materials responsive to the plaintiffs' RFPs and

18   the specific data on the Trustpoint database.

19       What is objectionable about that requested relief?

20       MR. SIBLEY:  Well, I don't know that it's

21   objectionable, Your Honor, but I do want to be clear about

22   something.

23       Mr. Giuliani has stated -- I can't remember if

24   it's interrogatories or requests for admissions, but he has

25   not deleted any documents.  So all of the documents --

1          THE COURT:  But not deleting documents is not the

2     same as preserving the information in a manner that can be

3     retrieved and searched.

4          MR. SIBLEY:  I understand that, Your Honor.

5     Normally, that situation arises where you have, like, an

6     auto-delete, sort of, policy at a company, or something like

7     that.

8          THE COURT:  Exactly.

9          MR. SIBLEY:  And I think what he is saying is

10    that's not the case with me, nothing gets deleted as a

11    matter of course.  I believe he has said that.  But I don't

12    think --

13         THE COURT:  What if the phone he is using dies or

14    is inoperable?

15         He has said that all of the machines he used prior

16    to April 2021 are inoperable, can't be accessed.  That can

17    happen with any machine.  So that's why you preserve that

18    data in a manner that doesn't make it disappear.

19         MR. SIBLEY:  I understand that, Your Honor.

20    But --

21         THE DEFENDANT:  It's on the cloud.

22         MR. SIBLEY:  -- I think what he has said that all

23    of that data --

24         THE COURT:  I can only speak to one person at a

25    time, Mr. Giuliani.  You are well familiar with --

```
1              THE DEFENDANT:  I know, Your Honor.  It's
2     frustrating.
3              THE COURT:  -- with the plight of court reporters
4     who can only take down one person speaking at a time.
5              THE DEFENDANT:  I'm sorry.  I apologize, Your
6     Honor.  I apologize.
7              THE COURT:  So, Mr. Sibley, do you want to talk to
8     your client because he's anxious to say something, or do you
9     want me just to have him say what he wishes to say?
10             MR. SIBLEY:  I will let him speak, Your Honor.
11             But the data was taken by the DOJ.  He lost the
12     ability to do any preservation as of April 2021.  This case
13     wasn't filed until January or, I think, maybe, December
14     2021.  I can't remember.
15             Whatever that data was, I mean, I think what he
16     was saying in deposition is, look, it was preserved because
17     it was taken by the government.  And it's there.  I think
18     that was what he meant to say, but I will let him speak.
19             THE COURT:  Mr. Giuliani, is that what you wanted
20     to say?
21             THE DEFENDANT:  That and -- Your Honor, that's
22     correct.  The data -- I had not deleted or changed or
23     done -- first of all, I have about 20 preservation orders,
24     much of which overlaps with theirs -- not completely, but
25     almost completely.  So I started, you know, preserving from
```

1  way before their case.  And then the FBI took everything, so

2  they preserved it.

3          And then I back up everything on iCloud regularly

4  so it's preserved that way as well.  And at least I have

5  done nothing knowingly -- understand, I have been doing this

6  for 50 years; I understand the obligations.

7          There is nothing I would like to hide.  I would

8  like you to see everything.  It's just the enormity of their

9  request, in my experience, is way beyond what is necessary

10  in this case.  That may also be true because I am

11  inundated -- they have 1 case, I have 20.  And some of the

12  other requests are even bigger than theirs.  If there is

13  anything missing here, it's inadvertent.  It is not for want

14  of trying to preserve everything.

15          THE COURT:  All right.  Well, having detail about

16  that in a certification --

17          THE DEFENDANT:  But I am happy to write out

18  something, if it helps --

19          THE COURT:  Excellent.

20          THE DEFENDANT:  If it helps for me to make it in a

21  more detailed statement of what I just said or answer their

22  questions -- however they want it, I will do the best I can

23  to assure them that I have done everything I can to preserve

24  it.

25          Do I understand everything with this technology?

1    Of course not; I don't.  A lot of it is confusing to me, but

2    I have preserved everything.

3              THE COURT:  All right.  So I don't see anything

4    particularly objectionable about that provision.

5              The part of the proposed order dealing with

6    Interrogatories 11 and 12 is moot.

7              And then the next part of the order asking that

8    Mr. Giuliani be precluded from relying on any evidence not

9    provided in his initial disclosures or interrogatory

10   responses -- which I would never order because I think

11   people have a right to supplement and amend.

12             But with -- is there any reason why Mr. Giuliani

13   should not be precluded from relying on any evidence not

14   provided in his initial or supplemented written disclosures

15   or interrogatory responses?

16             MR. SIBLEY:  I just think that's unripe, Your

17   Honor, because we have more discovery that needs to be

18   taken.  At the appropriate time, if that attempt is made,

19   then the Court will weigh all of the factors that the Court

20   weighs at that point and you will make that call then.

21             I just think it's premature.

22             THE COURT:  So you think it's premature as well?

23             MR. SIBLEY:  Yes.

24             THE COURT:  All right.  And then the provision

25   that Mr. Giuliani paid plaintiffs' attorneys fees for the

1    cost of the motion to compel subject to any future filing

2    detailing the same.

3         You understand that -- when the plaintiffs make a

4    motion to compel for failure to fully comply with discovery

5    obligations the Friday before the Monday close of fact

6    discovery and I have a whole dataset, clearly, that hasn't

7    been thoroughly searched no matter what the excuses are --

8    the motion to compel seems almost inevitable.

9         But would you agree that the rule, essentially,

10    requires payment of attorney's fees for filing?  I mean,

11    Rule 37(a)(5)(A) appears fairly mandatory.

12         MR. SIBLEY:  Well, Your Honor, I think if there is

13    good cause and justification; for example, for the payment

14    of -- if it's not -- I don't know that we -- we didn't

15    really oppose the motion to compel to search that data.  We

16    just couldn't do it.

17         The thing about the preservation of documents, I

18    mean, that's not -- there was no discovery request that was

19    made on that that we didn't answer.  That's just something

20    they wanted in response to the motion to compel.  So, I

21    mean, that's not really -- I don't think that's really

22    appropriate.

23         I am not sure what else -- I mean, I suppose we

24    could have went back and done some things differently, paid

25    Trustpoint's bills to where this didn't happen, but I don't

# Excerpted

1      mean, do you know how many keywords there are?

2              Plaintiffs' counsel said it was around 50.  I was

3      expecting there might be around 450.  But 50, that's not

4      very many to run across datasets of computers, devices used

5      for communications, social media, email accounts, documents?

6      That's just basic discovery.  That is not excessive

7      discovery.

8              So why is there anything excessive about those

9      requests that make the requested discovery not proportional?

10             THE DEFENDANT:  Your Honor.

11             THE COURT:  Mr. Sibley.

12             MR. SIBLEY:  What I am saying, Your Honor, is that

13     when we have -- and it's exhibited by the Dominion

14     production as well.  Almost all of the communications were

15     emails.  We have searched for the emails during the relevant

16     time frames with the search terms.

17             What they're wanting to do is to go in and look at

18     a little sliver of, potentially, text messages, and things

19     like that, that might have some mention of the plaintiffs or

20     something like that.  That's what I am saying

21     is disproportionate.

22             THE COURT:  Mr. Sibley, I have read the complaint

23     in this case.  I had to deal with Mr. Giuliani's motion to

24     dismiss, so I have become much more familiar with the case.

25     I know this is not just about emails.

```
1              There was a strategic plan that -- according to
2        the complaint -- mentioned these two plaintiffs by name.
3        There are documents.  There may be drafts of that.
4              It's broader than email, isn't it?
5              MR. SIBLEY:  But that document was in an email and
6        it was not created by Mr. Giuliani.
7              THE COURT:  That's what you say.  Aren't they
8        allowed to test that?
9              MR. SIBLEY:  They would be, Your Honor, but that
10       was sent via email as well.  I think the email would even
11       get those documents.  They, in fact, did get documents, I
12       think, from third parties pertaining to that.
13             This is -- I am not saying that they're not
14       entitled to it, Your Honor.  I am saying that --
15             THE COURT:  Exactly.  They are entitled to it.
16             Your client really wants to speak.
17             THE DEFENDANT:  I do, Your Honor.
18             First of all --
19             THE COURT:  Mr. Sibley, do you want to talk to
20       your client before he speaks or shall I just give him the
21       floor?
22             MR. SIBLEY:  I will let him speak, Your Honor.
23             THE COURT:  Mr. Giuliani.
24             THE DEFENDANT:  Your Honor, I have conducted hours
25       and hours of search for them, produced an enormous number of
```

1    documents for them.

2            I sat through a deposition for them and answered

3    every question that they asked me.  Maybe we took a

4    privilege; I am not sure we even did take privilege on

5    anything.

6            I ran every name they gave me.  I have to go back

7    and look.  It was a lot more than 40 keywords, Your Honor.

8    I don't know the exact number so I am not going to give it

9    to you.  It seemed to me very, very burdensome, but I ran

10   every single one.  It was the third time I did it for them,

11   the third time.

12           This is punishment by process, Your Honor.  That's

13   what going on here.

14           THE COURT:  Say that again.

15           THE DEFENDANT:  Punishment by process.

16           THE COURT:  Punishment by process.

17           THE DEFENDANT:  Yes.  I mean, this is --

18           THE COURT:  That's a bit of alliteration,

19   Mr. Giuliani.

20           THE DEFENDANT:  Well, no.  It's the person being

21   punished, I get it.  I get what they're doing.

22           This is the kind of -- this is the kind of -- I

23   did defamation cases for a living for *The Washington Post*,

24   believe it or not, a long time ago, for *The Wall Street*

25   *Journal*; I know the kind of discovery you do in a defamation

1    case.  This is massive discovery by a Wall Street law firm

2    being imposed on us.

3            They have more than enough information to go to

4    trial.  If we made some mistakes -- if we made some

5    mistakes -- and we did, largely because we have got 20 cases

6    going on.  And while I'm dealing with their demands, I am

7    dealing with the demands from five other cases.  They

8    overlap, and it gets confusing.  It was inadvertent and a

9    mistake.

10           I think it would be really unfair to impose costs

11   on us, because we have acted in good faith.  We have tried

12   very, very hard to comply with them.  If we haven't

13   succeeded, it's not for lack of trying.  I really think it's

14   unfair for them to impose costs on us because they could

15   have made this a lot simpler than they have made it.

16           Also, you have to recognize how complicated this

17   is.  My documents were taken from me.  So the search that I

18   could have done -- I could have done a 500-word search if I

19   had all -- by the way, the number of -- the number of

20   devices I have to search are pretty simple.  It's really,

21   basically, one phone and one iPad and then a few others here

22   and there.  But I didn't have it to do it.

23           When I got it back, for some reason that had not

24   been explained to me by the FBI -- a lot of it was deleted.

25   A lot of it is not there.

1          I am happy to -- if they would like their expert,

2     before you decide this, to come and look and see if he can

3     find what the FBI took out, fine.  I have no reason to

4     believe it would even be relevant to their case.

5          The reason I feel offended by this is I spent

6     hours and hours and hours.  I can't distinguish their case

7     from the other cases, but I know I have tried very, very

8     hard to comply with what they want.  I ran those keywords,

9     it seemed to me, three different times.  And I gave back

10    what I had.

11         The one document you are talking about you will

12    see is not in my database, it was in somebody else's

13    database.  And as soon as we discovered it, we produced it.

14    We're talking about the document that went to the -- that

15    came through Ms. Frees [sic] or Mr. Kerik -- that was a

16    document that I didn't have.  I wasn't hiding it.

17         THE COURT:  You are talking about among the

18    missing documents?

19         THE DEFENDANT:  Yes.  It was one that I had very

20    little to do with initially, and it's also one that wasn't

21    in my database.

22         MR. SIBLEY:  I believe he's talking about the --

23         THE COURT:  It's one that -- among the six missing

24    documents that the plaintiffs have identified that would be

25    responsive and on which you are a recipient or a cc that

1    were not produced by you, it could have been inadvertence;

2    it could have been you could have deleted them before you

3    were under a preservation order in this lawsuit.  There are

4    any number of reasons.  But I think you can imagine that,

5    with those six missing documents, the plaintiffs are

6    concerned that there may be other responsive records being

7    missed.

8              THE DEFENDANT:  I understand their concern about

9    that.  But in my experience, six missing documents in the

10   number of documents we're talking here is almost regularly

11   the case.  It is very, very rare that you do a discovery in

12   anything but the simplest of cases and you produce every

13   document.

14             None of us are perfect.  Not being perfect doesn't

15   mean you are deleting things.  I don't delete things.

16             THE COURT:  Let me go back to the manual search.

17   Manual searches, in this day and age, with the volume of

18   electronic data is a bit nerve-racking.

19             You didn't supervise Mr. Giuliani when he was

20   doing those manual searches, is that right?  He did it all

21   by himself.

22             MR. SIBLEY:  Yes, Your Honor.

23             THE COURT:  And you don't know precisely what

24   process he used to perform the manual search in terms of

25   keeping track of which keyword he was searching or not?

1      MR. SIBLEY:  He -- as a lawyer, Your Honor, I am

2  confident he would be able to understand how to search for

3  these terms.

4      THE COURT:  And you don't know whether he went

5  application by application by application to conduct the

6  search so that if, on his phone or on his computer, he had

7  an email application, different email accounts to access

8  emails, whether he had Excel spreadsheets, whether he had

9  PDF, whether he had Word -- you don't know whether he went

10  application by application down the line with each keyword?

11      MR. SIBLEY:  Your Honor, I understand that he

12  searched his social media accounts and his messaging

13  services because --

14      THE COURT:  Only those?

15      MR. SIBLEY:  On the new phone.

16      THE COURT:  Okay.

17      MR. SIBLEY:  On the new phone.  Because the new

18  phone -- it's outside of the time frame, right?  So that's

19  why we said any communications about this case would have

20  been like our communications.

21      What really were at issue were -- he needed to go

22  in and look at his social media messaging.  I believe what

23  he said in his declaration was, I went into every social

24  media account and looked for these messages.  So...

25      THE COURT:  And he ran each keyword individually

1    at one time?

2            MR. SIBLEY:  I would have to let him explain it,

3    Your Honor.

4            THE COURT:  You don't know that?

5            MR. SIBLEY:  I don't.

6            THE COURT:  Do you know how he saved the search

7    results for potentially responsive records that got a

8    keyword hit that he then reviewed to ensure that they were

9    or were not responsive?

10           Do you know how he did that in the manual

11   searches?

12           MR. SIBLEY:  I don't.  However, Your Honor, I

13   think there was such paucity of communications on these

14   social media platforms because he just doesn't use it very

15   often -- I am not sure that that would have been something

16   that he would have felt the need to do.

17           THE COURT:  So, to the best of your knowledge, he

18   didn't collect all the potentially responsive records that

19   got a keyword hit, segregate them for review perhaps with

20   your counsel, for whether they were responsive and

21   producible -- you don't think he did that process?

22           MR. SIBLEY:  My understanding is the only document

23   that was not -- and this was searching the new phone because

24   he has testified that he can't access the old phones -- but

25   searching the new phone -- the only thing he found was that

1    one communication on his social media with Sidney Powell.

2             THE COURT:  And -- I'm sorry.

3             The plaintiffs have also said that they provided

4    the search terms using Boolean search terminology, Boolean

5    logic, so that it was basically not a single keyword but it

6    could have been a phrase to do the search.

7             Did he search for the main keyword or did he just

8    put in the search with the full phrase?

9             If so, that would be very confusing for some of

10   these applications or even on social media to search that

11   way.

12            MR. SIBLEY:  I understand that, Your Honor.  The

13   answer is I don't know.

14            But here is what I do know --

15            THE COURT:  Okay.  That's enough "I don't knows."

16            MR. SIBLEY:  Okay.

17            THE COURT:  That means this manual search, to my

18   mind, is unverifiable.  And that's why, typically, you

19   download the social media account contents, you put it into

20   a form on a platform that can be searched so that you can

21   ensure that the search is complete and thorough.

22            These manual searches, as I pointed out the last

23   time we were here, are very nerve-racking, not verifiable.

24   Not particularly trustworthy, despite all of the good faith

25   and due diligence that Mr. Giuliani might bring to the task.

1          MR. SIBLEY:  May I add something to that, Your

2     Honor?

3          THE COURT:  Yes.

4          MR. SIBLEY:  I also -- aside from the search

5     terms, I also requested that he find any communications that

6     pertained to any allegation of election fraud or the kind of

7     issues that would have been pertinent to this case.

8          So it wasn't -- I asked that he look not just from

9     the search terms, but anything -- I am not even sure the

10    Sidney Powell communication, quite frankly, came from the

11    search terms.  It may have been just -- well, this is about

12    the election, and I asked him to produce those documents.

13         I do want to point out for the Court that we

14    didn't just rely on the search terms.  I did have him look

15    at more generic, so...

16         THE DEFENDANT:  Your Honor.

17         THE COURT:  Why is it that you haven't just

18    downloaded the contents of those social media accounts and

19    done this in a proper way?  Is that a cost issue?

20         MR. SIBLEY:  Well, I mean, this is the first time

21    that I have -- my understanding is that there are so

22    few comm- -- this is about communications, not just, like,

23    postings -- right? -- because I believe all of the postings

24    they have -- I mean, some of that is part of their claims.

25         But as far as the communications messaging on

1    social media platforms, my understanding is there is just so

2    few that it wouldn't be -- you wouldn't need to engage a

3    professional to do it.

4              THE COURT:  But didn't he also use a manual search

5    technique such as it is to not only search social media

6    accounts but also his email accounts?

7              MR. SIBLEY:  It would have been the new email

8    account that he got after the seizure.

9              So that's -- what he said was, yes, there were

10   things that popped up, but they were all, like, our

11   attorney-client privilege communications about this case.

12   Right?  Because that --

13             THE COURT:  So he never actually went back to his

14   rhelen [sic] account?  I mean, he has a lot of email

15   accounts.

16             So he never went back to --

17             THE DEFENDANT:  That's not true.  That's not true.

18             THE COURT:  -- the rhelen account --

19             THE DEFENDANT:  Yes.

20             THE COURT:  -- the rudygiuliani@me account --

21             THE DEFENDANT:  I did.

22             THE COURT:  -- rudolphgiuliani@icloud account, all

23   of those that may have existed, you know, during the time

24   frame, as I understand it, that was agreed upon --

25             THE DEFENDANT:  Your Honor, I did.

```
1              THE COURT:  Excuse me, Mr. Giuliani.

2              THE DEFENDANT:  Counsel has stated a

3      misimpression --

4              (Overlapping speakers.)

5              THE COURT:  Excuse me, Mr. Giuliani.

6              -- to check?

7              Because if those are not in the Trustpoint

8      account, the only thing on Trustpoint might be what was

9      saved onto his electronic devices; and there might be more,

10     actually, in those accounts held by the service provider

11     that he would have access to.

12             So you are saying he actually never went back and

13     searched those?

14             MR. SIBLEY:  That's not what I am saying, Your

15     Honor.

16             Part of the answer to that question would be the

17     iCloud issue that I think the Court raised earlier, because

18     some of that may have been in there as a result of the

19     iCloud.  That's something we need to get to the bottom of.

20     I believe he did -- to the extent he still has access -- and

21     if I may let him speak on it.

22             THE DEFENDANT:  Your Honor, I did what you asked

23     me to do.  All of these things were not mentioned during the

24     conference, that I should do it 14 different ways.

25             I did it the way I did it every other search.  I
```

1    have done many of these in many of these cases.  And I don't

2    remember this one exactly, but I can tell you my practice.

3            I took the keyword and I put it into the -- we're

4    talking about social media.  I put it into the -- I put it

5    into the social media, and I searched for it.  In this case

6    I came up with a few, not many.

7            In other cases -- meaning other cases -- I have

8    come up with a lot.

9            THE COURT:  And you used the key word as

10   specifically provided by the plaintiffs?

11           THE DEFENDANT:  Yes, Your Honor.  Exactly.  And

12   sometimes I ran it a few different ways if I came up with

13   nothing because I knew there would be suspicion if I came up

14   with nothing.  I ran it two or three different ways.

15           The simple fact is there wasn't as much about this

16   case in the social media as there were some others.  Some

17   others had been very fruitful.

18           I also went back to rhelen, and all of those other

19   emails, some of which were actually never used.  They

20   existed but they had, maybe, five uses or six uses, and most

21   of them didn't fit into this time period.  I am not even

22   sure any of them -- it may be rhelen had a few.

23           But most of the other ones were prior emails that

24   were long gone before we get to September of 2020.  But I

25   went back and checked them to make sure that that was the --

1   at least every one that I had.  So don't -- don't -- please

2   don't assume that I didn't do it when I did do it.

3              THE COURT:  And what about WhatsApp, Telegram, and

4   Signal messaging applications?

5              THE DEFENDANT:  Well, I checked both of those.  In

6   fact, I rechecked them today because Joe asked me about

7   that --

8              THE COURT:  It's not "both."  It's three;

9   WhatsApp, Telegram, and Signal.

10              THE DEFENDANT:  Okay.  Telegram I checked.  I have

11   some communications on Telegram.  I don't know that there

12   were any of theirs.  But I don't have many communications on

13   Telegram.  Very few on Signal.

14              I checked WhatsApp fully.  And during this period

15   there were very few communications on WhatsApp; none of

16   them, I don't believe, related to this case.  Those three

17   are not three that I use myself.

18              Other people call me on those.  It's not -- I

19   don't know if I am expressing myself correctly.  I don't use

20   those to initiate calls.  I have them because people that

21   communicate with me use them.

22              So, yes, I did check them.  I am not sure there

23   was anything about them in this time period about their

24   case.  But I checked them, yes, Your Honor.  And I rechecked

25   them.

1          THE COURT:  All right.  And have you preserved any

2     of the data that's on those applications in Mr. Giuliani's

3     accounts for any of those messaging applications and email

4     accounts so that you could double-check and verify that it's

5     thorough, complete, and the keyword searches have been

6     appropriately done?

7          MR. SIBLEY:  Well, I have not preserved it, Your

8     Honor, but I believe he has said that he has, so --

9          THE COURT:  Well, he just says he doesn't delete

10    stuff from there.  Is that the same as preservation in your

11    view?

12         MR. SIBLEY:  If there is a potential for deletion

13    to occur by sort of natural -- the way it's set up, I

14    suppose you would need to go in and change that to where it

15    didn't auto delete.  But I don't believe that anything -- he

16    said he doesn't delete things; he doesn't have it set up

17    that way.

18         I can certainly go in and look at what he has

19    looked at.  We have found -- I mean, there are

20    communications that are there from the time frame.  I don't

21    think there's been an auto deletion that occurred where

22    everything was wiped out at that time frame.  He certainly

23    hasn't done that.

24         THE COURT:  All right.  Well, among the missing

25    documents are two text messages between Mr. Giuliani and

1    Christina Bobb on December 4 and December 5, 2020, and those

2    were not produced by Mr. Giuliani.  So this does raise some

3    question -- both about the correctness of Mr. Giuliani's

4    recollection, which he didn't believe he had ever used text

5    messages with respect to the matters at issue in this case;

6    and it does raise questions about the thoroughness of

7    searches of text messages and the manner in which this is

8    being done without notes being kept, without clarity on how

9    the manual searches were being done.

10          You can appreciate why the plaintiffs are somewhat

11   concerned about all of the responsive records even from

12   texts being properly identified, collected, and produced.

13          Let me turn to the phone records.

14          I think your view is:  If he doesn't have his

15   phone bill sitting around his apartment within his

16   possession, he doesn't have possession or control of his

17   phone records, and it's just fine for him to tell the

18   plaintiffs to go to AT&T directly.

19          Is that, basically, Mr. Giuliani's position?

20          MR. SIBLEY:  Well, initially, I believe he had the

21   phone records but he didn't have copies of the phone

22   records, that's why we didn't object to it.  We said sure,

23   we'll produce it.  He didn't have them.  And I am not sure

24   that he --

25          THE COURT:  What do you mean he had them and then

1    he didn't have them?

2               MR. SIBLEY:  He never had them.

3               I thought that he had the records, which is why we

4    said sure, we'll produce the documents.  I wasn't going to

5    object to it, it's not objectionable.

6               But it turned out he didn't have the phone

7    records.  I mean, most of us don't keep our phone records.

8    And I looked into -- I don't keep my phone records, but it's

9    all online.

10              THE COURT:  Exactly.  It's all online.

11              So why can't he go to his AT&T account and

12   download all of the phone records that he needs in order to

13   produce to the plaintiffs?

14              And doesn't it look a little bit like a backhanded

15   way of dealing with the discovery request simply to say:

16   You go get it yourself?

17              MR. SIBLEY:  If I can explain, Your Honor.

18              I don't believe that the records they're wanting,

19   that have calls and things like that -- I am not sure he can

20   get those from his online account.  It might be -- you know,

21   he has the bill for the number, he pays the amount.

22              But what they're wanting is detailed logs of when

23   text messages were sent, not the substance, things like

24   that.  I am not sure he can get access to that, which is why

25   he says --

```
1            THE COURT:  Well, how can you stand before me

2    today and say he can't do it if you don't know for sure he

3    can't do that?

4            MR. SIBLEY:  Well, I believe we had -- not to

5    reveal attorney-client communications, Your Honor, but I did

6    request that these records be obtained.  And I don't believe

7    that he was able to get the records that had the information

8    that they wanted because I believe it's phone records

9    sufficient -- I am trying to remember -- phone records

10   sufficient to demonstrate calls between this time.  And I

11   just don't -- I don't think it has that.

12            That's why we said:  Look, whatever you need from

13   us, we'll sign something.  We don't have an objection to you

14   getting them.  It's just not something that we -- I am not

15   sure how we would get that, actually, Your Honor.

16            THE COURT:  It's usually much easier for the

17   accountholder to get any documentation from a provider

18   rather than going through a subpoena process, wouldn't you

19   agree?

20            MR. SIBLEY:  Yes.  But then, if that happens, Your

21   Honor, we have the problem of:  Well, how do we know you

22   gave us everything?

23            They have subpoenaed -- they have sent dozens of

24   subpoenas.  So I thought the better way --

25            THE COURT:  But that isn't that easy to deal with,
```

# Excerpted

 1    inaccessible data was defined.

 2              Judge Scheindlin had identified five categories of

 3    data:  One, active online data; two, near line data; three,

 4    offline storage, archives; four, backup tapes; five, erased,

 5    fragmented or damaged data; and then went on to hold that

 6    only the first -- only the latter two categories were

 7    inaccessible.

 8              The first three categories that I quote are

 9    typically identified as accessible for which the responding

10    party has the duty to collect, search, preserve, and

11    produce.

12              So how would -- you cited *Zubulake* for the

13    inaccessible data point.  So how, in your reading of

14    *Zubulake*, would the archived Trustpoint data even become

15    inaccessible?

16              MR. SIBLEY:  I think it would be more along the

17    lines of a backup tape, right?  Because this is not --

18              THE COURT:  I think it's offline storage,

19    archives; that's Category No. 3, not "inaccessible," because

20    it doesn't really require any forensic expertise to get

21    access to it.

22              MR. SIBLEY:  Well, these are not our -- it's not

23    like he has the archives in his files -- though, right? --

24    Your Honor?

25              This is a third-party vendor that we can only get

1    access to files from -- I mean, it does require -- I mean,

2    there were expert requirements involved in this because they

3    had to extract the data, they have to host the data.  I am

4    not sure that that would be apposite to our situation.

5            I can understand a situation where a company has

6    archived data and they have free access to it; we don't.

7            THE COURT:  Well, in my reading of the *Zubulake*

8    cases on which you relied, it's not my view that this data

9    at Trustpoint is inaccessible that would warrant a cost

10   shifting here.  I hope you are promptly able to work out the

11   situation with Trustpoint.

12           If there is nothing further that you would like to

13   say, I am going to give the plaintiffs an opportunity for

14   reply.

15           MR. SIBLEY:  Thank you, Your Honor.

16           MS. GOVERNSKI:  Thank you, Your Honor.

17           I have a few points to raise, but first I should

18   ask if there is anything in particular that you would like

19   to ask or if you'd like me to just go through my list very

20   quickly.

21           THE COURT:  Just go through your list.

22           MS. GOVERNSKI:  Okay.  First of all, there's been

23   a lot of talk today about devices and Trustpoint.  But we

24   have learned something new, which is all of this is on the

25   cloud.

```
 1              Defendant Giuliani has said he -- 95 to 99 percent
 2      of his communications are on the cloud.  So he, today, via
 3      counsel or personally, has not explained why he cannot
 4      download what is on the cloud or have a professional vendor
 5      download what is on the cloud and conduct a search the way
 6      the majority of discovery is run in cases.
 7              So I think there is a lot of focus and diversions
 8      to Trustpoint and to devices when the cloud is there and
 9      should be a very, really, low-cost way to do this -- I
10      suspect -- perhaps a vendor time to download.  But we would
11      be happy to have our vendor let us know what the cost would
12      be to log into his Gmail, to log into his various email
13      accounts, and to perform a takeout, which we do in our
14      litigation quite frequently.
15              THE COURT:  I am going to interrupt you for just
16      one second.
17              MS. GOVERNSKI:  Sure.
18              THE COURT:  Mr. Sibley, you hear the offer to
19      actually preserve the data on the cloud in the normal
20      typical manner offered by plaintiffs to do that for you.
21      Would you be willing to have their vendor do that for you?
22              MR. SIBLEY:  Your Honor, the answer is yes,
23      provided that there is no privilege waiver if the vendor
24      accesses privileged data.  But I believe that there are
25      problems with him accessing the cloud; I believe he's
```

1    testified to that.

2              So I don't think that it's the case that the cloud

3    has everything that they're looking for on it.  I am not

4    sure where that came from, but he has had problems accessing

5    the cloud with respect to the data that was in the time

6    frame that the FBI did the seizure, which would be the

7    relevant time frame for this case.

8              But to answer the Court's question, the answer is

9    no.  There is no objection to assistance with preservation

10   to the extent they think that is something that needs to

11   occur, although I am not sure how much of that can be

12   accessed.

13             THE DEFENDANT:  Can I add to it, Your Honor, to

14   supplement what Mr. Sibley said?

15             THE COURT:  Mr. Giuliani, you are irrepressible.

16   Proceed.

17             THE DEFENDANT:  Your Honor, when I do the search,

18   I attempt to also check it out against the cloud.  I mean, I

19   download.  I make sure everything is downloaded.

20             And here is the problem with the cloud.  When we

21   go back to the period of time -- material that was seized by

22   the FBI, that I don't have access to on the cloud.  They

23   have it, but I don't have access to it.  I can't get that

24   from my devices.  The FBI has that.

25             THE COURT:  So it's not a matter of you having --

```
 1      it's not a matter of you not being able to access your
 2      different email accounts because, for example, you have lost
 3      your password.  But once you do access the accounts you are
 4      not seeing data there; is that what you are saying?
 5                  THE DEFENDANT:  Yes, for certain periods of time.
 6                  Currently?  Fine.  I can go back for the last year
 7      and a half, and I can get everything on the cloud.  It's all
 8      there.
 9                  But if I go back to a certain period of time, I
10      would have to go look at exactly where it is.  It is frozen.
11      I can't get it through our -- the stuff that's on
12      rhelen0528 -- I shouldn't give my whole one, I guess -- I
13      can't get.  The FBI still has that.  I can't figure out --
14      they give us no reason why they don't release it.
15                  They gave me a letter saying the case is over.
16      They gave me a letter saying there was no indication of
17      crime, but I can't get access to that.
18                  Did they destroy it?  I don't know.
19                  THE COURT:  Well, I don't think the FBI is in the
20      business of preserving data for subjects of an
21      investigation and then, as a favor, turn it over --
22                  THE DEFENDANT:  We can agree to disagree.
23                  THE COURT:  -- I just don't think they're in that
24      business.  It doesn't surprise me, Mr. Giuliani.
25                  You of all people should know that that's not --
```

1    it's not unusual that they would not --

2              THE DEFENDANT:  No, it's not usual --

3              THE COURT:  -- cede to your request?

4              THE DEFENDANT:  -- but they do -- it's also not

5    impossible for them -- they also do do it.  It's a question

6    of how compelling the request is.

7              And, finally, I really don't know what they did

8    with it.  I don't know exactly what they did with it.

9              THE COURT:  All right.  But I think -- I wanted to

10   interrupt you because I think that you have an agreement

11   from the defendant that he would agree to have your vendor

12   preserve this information, and then you can proceed from

13   there in terms of working out a protocol for searching that

14   would protect privileged information.

15             MS. GOVERNSKI:  Yes.

16             THE COURT:  I am not going to get any more

17   involved in that discussion than what I just said.

18             MS. GOVERNSKI:  But Your Honor -- let's focus on

19   this rhhelen [sic] account, okay?

20             He is now saying he -- he doesn't know if it's in

21   Trustpoint -- right? -- I think we have established that.

22   We don't know if the cloud that they took was in Trustpoint.

23   We also don't know if the cloud includes, for instance, the

24   rhhelen.  And yet now he's also saying, when he accesses it,

25   these records are not there.  So we don't know if they have

1    been preserved from what he has been saying, and it sounds

2    like he doesn't know if they have been preserved.  And so it

3    seems like all we're getting here is his post-2021 devices

4    which -- and whatever is in the cloud from post 2021.

5           Now, there may be some responsive materials in

6    there, but this doesn't solve the larger problem which is

7    all of these communications in Signal, WhatsApp, Telegram,

8    his various Gmail accounts -- we don't know if they have

9    been preserved.  We don't know if they're in Trustpoint, and

10   he doesn't have access to them.

11          While we would be happy to get a cost estimate

12   from our vendor and have our vendor log into his accounts

13   and download them the proper way -- if they're not there,

14   then we're not downloading much of anything.  So I think

15   some of the -- the Court is seeing firsthand some of our

16   challenges with trying to get clear answers.  It's as clear

17   as mud.

18          If the Court would include in the order that he

19   should give us his login access and information for his

20   various email accounts for Telegram, for ProtonMail -- would

21   pass over the devices to us -- we would be happy to get an

22   estimate on that, and then work with him.

23          Of course, our position is he should have to bear

24   the cost.  But we would be happy to meet and confer and come

25   to Your Honor if we can't reach resolution on that.  We

1    think that we have more questions than answers after today.

2           It would be helpful to know, though -- we did

3    receive an inventory of the devices from Mr. Sibley, but we

4    don't know what those devices are in terms of:  Are they the

5    2000 -- the device of his wife from 2000 or is it the iPhone

6    he was actually using.  So it would be helpful if we could

7    understand exactly which devices are the ones that would

8    have materials from this time period so then we can go to

9    our vendor and provide a more tailored estimate.  But I

10   would note our current estimate to -- I believe, to

11   forensically image six to eight devices was less than

12   $10,000.

13          Very quickly -- because the Court has been more

14   than patient today -- the search terms that we provided are

15   actually filed on the docket, Docket No. 36-1.  I actually

16   was over -- I overstated the number.  There were 33 Boolean

17   search terms that covers the first and second sets.

18          I should note that -- I would direct the Court to

19   the first exhibit of our motion to compel which lists the

20   responses and objections.  And Defendant Giuliani barely

21   objected to any of our RFPs, including on overbreadth.  So

22   the claims here about how we're asking for the universe and

23   looking for a fishing expedition is belied by his own

24   responses and objections and actual terms at Docket 36-1.

25          Three more very quick clarifications.

# Excerpted

```
1    today?

2             MS. GOVERNSKI:  Just one very -- I am very sorry

3    to keep us here.

4             The current schedule has expert discovery ending,

5    I believe, on June 16th.  I think given where we are we

6    would confer with defendant and probably file a motion to

7    extend that out.

8             THE COURT:  I am here every day.

9             MS. GOVERNSKI:  Thank you, Your Honor.

10            THE COURT:  Anything further from the defense?

11            MR. SIBLEY:  No, Your Honor.  And we would not

12   oppose any reasonable request for an extension.

13            THE COURT:  All right.  You are all excused.

14            THE DEFENDANT:  Thank you, Your Honor.

15            THE COURT:  Thank you, Mr. Giuliani.

16            (Whereupon, the proceeding concludes, 1:45 p.m.)
                              *  *  *  *  *
17                          CERTIFICATE

18            I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
19   transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
20   ability.

21            This certificate shall be considered null and void
     if the transcript is disassembled and/or photocopied in any
22   manner by any party without authorization of the signatory
     below.
23
          Dated this 24th day of May, 2023.
24
          /s/ Elizabeth Saint-Loth, RPR, FCRR
25        Official Court Reporter
```