```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
RUBY FREEMAN, et al.,               )  Civil Action
                 Plaintiffs,        )  No. 21-3354
vs.                                 )
                                    )
RUDOLPH GIULIANI,                   )  May 19, 2023
                                    )  11:07 a.m.
                 Defendant.         )  Washington, D.C.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**

<u>**APPEARANCES**</u>:

```
FOR PLAINTIFFS:      MERYL CONANT GOVERNSKI
                     MICHAEL GOTTLIEB
                     Willkie Farr & Gallagher LLP
                     1875 K Street, Suite 100
                     Washington, DC 20006
                     (202) 303-1016
                     Email: mgovernski@willkie.com

                     JOHN LANGFORD
                     Protect Democracy
                     555 W. 5th Street
                     Los Angeles, CA 90013
                     (919) 619-9819
                     Email: john.langford@protectdemocracy.org

FOR DEFENSE:         JOSEPH D. SIBLEY, IV
                     Camara & Sibley LLP
                     1108 Lavaca Street
                     Suite 110263
                     Austin, TX 78701
                     (713) 966-6789
                     Email: sibley@camarasibley.com

Court Reporter:      Elizabeth Saint-Loth, RPR, FCRR
                     Official Court Reporter
                     Washington, D.C.  20001
```

```
               Proceedings reported by machine shorthand.
          Transcript produced by computer-aided transcription.
```

```
 1                        P R O C E E D I N G

 2              THE COURTROOM DEPUTY:  Matter before the Court,

 3     Civil Action No. 21-3354, Ruby Freeman, et al. versus

 4     Rudolph Giuliani.

 5              Counsel, please come forward and state your names

 6     for the record, starting with the plaintiff.

 7              MS. GOVERNSKI:  Meryl Governski, Your Honor, from

 8     Willkie Farr & Gallagher, on behalf of the plaintiffs.

 9              THE COURT:  And who else is seated with you at

10     counsel table?

11              I don't need all three of you to come up.  But if

12     you could just introduce everybody who is there, let me

13     know.

14              MS. GOVERNSKI:  Of course, Your Honor.

15              My colleague Michael Gottlieb, from Willkie Farr &

16     Gallagher, and co-counsel John Langford from Protect

17     Democracy.

18              THE COURT:  Langford, Gottlieb.

19              And you are Ms. Kwon?

20              MS. GOVERNSKI:  No.  I'm Meryl Governski.

21              THE COURT:  Governski.  Okay.  Sorry.

22              I have a list of, I don't know, eight names there.

23     I just want to make sure I know who is in front of me.

24              MS. GOVERNSKI:  Understood.

25              THE COURT:  Yes.
```

```
 1              MR. SIBLEY:  Good morning, Your Honor.

 2      Joe Sibley for defendant Rudolph Giuliani.

 3              THE COURT:  Yes.  And good morning.

 4              All right.  So we're here for a discovery dispute,

 5      never any federal judge's favorite way to spend time.

 6              I had great hopes that, after our last discovery

 7      hearing, everybody would go off, be friendly, and work all

 8      of this out.  But it seems as if disputes are continuing,

 9      requiring some judicial intervention.

10              As a backdrop, I went back and looked at the

11      docket.  I am very mindful that discovery in this case was

12      supposed to close back in November of 2022.  It's now

13      scheduled to close this Monday.

14              And I also appreciate, from looking at the

15      extensive number of email traffic that has been supplied to

16      the Court between the parties, that the plaintiffs have been

17      expressing their dissatisfaction with discovery responses

18      now for nearly a year.

19              So in broad strokes, I see, from the motion to

20      compel by the plaintiffs, that there are some basic

21      fundamental questions that the plaintiffs have raised about

22      discovery compliance in this case, including Mr. Giuliani's

23      efforts to do the most basic of duties under the Rules of

24      Civil Procedure, which is preserve relevant or responsive

25      records to this case in all the various locations where that
```

1    data may be located, also to search for and produce

2    responsive discovery, and specific questions about his

3    responses to Interrogatory Nos. 11 and 12; and then,

4    finally, what sanctions, if any, are triggered by these

5    complaints and the responses.  So in order to fully

6    appreciate all of this, I am going to have to dig down into

7    some details here.

8            So I am going to start -- of course, since it's

9    plaintiffs' motion, I will start with the plaintiffs.

10           Ms. Governski, are you handling this matter?

11           Come on up.

12           I am going to start with the proposed order.

13           What is the relief the plaintiffs are asking for

14   here, which is docketed at ECF 44-16?

15           MS. GOVERNSKI:  Yes, Your Honor.

16           THE COURT:  And I know you have described the

17   relief you are asking for as quite narrow.  And, in fact,

18   you're -- despite dissatisfaction with the plaintiffs'

19   understanding in the defendant's description of what's been

20   preserved, you are not asking for any spoliation sanctions

21   at all?

22           MS. GOVERNSKI:  Not at this point.

23           THE COURT:  And you're -- the only monetary relief

24   you are asking for from Mr. Giuliani is the cost of filing

25   the motion to compel?

1              MS. GOVERNSKI:  At this point, that's right,

2     Your Honor.

3              THE COURT:  All right.  As a substantive matter,

4     you are seeking to have Mr. Giuliani -- and I am sort of

5     paraphrasing -- collect, search, and produce all materials

6     responsive to all of plaintiffs' requests for production,

7     RFPs, in all locations, with the assistance of a

8     professional vendor and the inclusion of a privilege log.

9              So let me just talk about that first part of

10    what -- of the relief you are asking for.

11             Why do you think he needs a professional vendor?

12             MS. GOVERNSKI:  Well, as Your Honor noted, we have

13    been at this for a year.  We have been requesting details

14    about exactly what defendant Giuliani has done or has not

15    done through his counsel through extensive correspondence

16    and extensive meet and confers.

17             He has had more than a year to attempt to search,

18    collect, and produce materials, and he has failed to do so.

19    And we believe the point has come for him to engage

20    professional help.

21             In addition, during his deposition --

22             THE COURT:  He does have professional counsel.

23             MS. GOVERNSKI:  Correct.  Who, Your Honor --

24    during his deposition he testified he had not turned over

25    his devices to his counsel.

1            THE COURT:  When you say "he," you are referring

2    to Mr. Giuliani?

3            MS. GOVERNSKI:  Yes, Your Honor.

4            Mr. Giuliani said he had not turned over his

5    devices to his counsel.

6            His counsel indicated during, I believe, the

7    March 21st hearing that he had not -- had not personally

8    engaged in the search, that it's Defendant Giuliani's own

9    search, which, as Your Honor has noted, is incomprehensible

10   from -- from what brief details we have.

11           Additionally, during his deposition, Mr. Giuliani

12   stated that it would be possible to potentially access the

13   devices if he had the assistance of counsel -- I mean,

14   pardon me -- of a professional vendor, but that he did not

15   seek any substance.  So we think the time has come to take

16   him up on that suggestion that he engage a professional

17   vendor.

18           And in addition, Your Honor, Defendant Giuliani

19   has focused, almost exclusively, on Trustpoint and his

20   post-2021 devices.  The problem with that is that he does

21   not deny that he has possession of all of the devices that

22   the DOJ seized in April of 2021 and that they were returned

23   by that summer.  Some of them were returned, our

24   understanding, before we even served discovery.

25           We went out and talked to our own forensics expert

1    and said -- I should also note that there's been back and

2    forth about what exactly is going on with these devices,

3    claims.  Yes, we're searching them.  I searched them, but

4    they were wiped.  They're now inoperable.  I couldn't get

5    files.

6         We just don't know what the status is of these

7    devices.  We have a vendor.  Our vendor can take a look at

8    them or Mr. Giuliani can engage his own vendor to take a

9    look at them so we can really understand what is going on

10   with these devices.

11        And then, Your Honor, the second part is it's

12   really quite simple to do takeouts of his cloud accounts.

13   He has email accounts with Gmail, with Apple, with

14   ProtonMail.  Presumably, these are all free, commercially

15   available email services that a qualified vendor can very

16   easily log in using his credentials, download the data, and

17   perform a comprehensive search.

18        And the other -- the last point I will note,

19   Your Honor, is Mr. Giuliani has talked repeatedly about he

20   doesn't remember doing this or he doesn't remember doing

21   that.  He also testified during his deposition that his

22   recall is not 100 percent with respect to the data.  He

23   couldn't even remember if he had produced or looked for data

24   specific to this case, as opposed to the various additional

25   litigation relating to the post election 2020 claims.

1          Our own discovery, which we have painstakingly

2     tried to receive from third parties illustrates that there

3     are responsive materials.  There are responsive text

4     messages.  There are responsive messages on social media.

5     There are responsive messages in email that he has not

6     produced.

7          THE COURT:  Okay.  So I anticipate having seen

8     some of this in the opposition to the motion to compel

9     that -- where Mr. Giuliani says that it would cost $320,000

10    to access the archive Trustpoint data.  And I would expect

11    that he might also claim cost issues with retaining a

12    professional vendor to do what is now the norm in any civil

13    case to collect, preserve, and search data in an organized

14    fashion.

15         But given this resistance on the basis of cost, do

16    you think a first step, before moving to this first full

17    paragraph of your proposed order, would be to obtain

18    financial records from Mr. Giuliani since he has raised his

19    inability to pay, and then set up a process whereby those

20    financial records, which are in the RFPs, Nos. 40 and 41,

21    are produced to plaintiffs?  Plaintiffs get an assessment,

22    is his claim of poverty accurate or not?  Get an assessment;

23    get Mr. Giuliani's response to whatever that assessment is.

24    And then we can take it from there for whether -- you know,

25    use of a computer forensic expert is something within his

1     ability to pay or accessing the Trustpoint archive data,

2     which seems like it would hold the bulk of information that

3     might be responsive since some responsive documents have

4     already been found there, but the search was not within the

5     appropriate date range nor across all file types.

6              So would that be, as a procedural step, a way to

7     approach at least the first part of the proposed order?

8              MS. GOVERNSKI:  That makes sense to us,

9     Your Honor.  We do believe that that is, at a minimum, the

10    first step that -- that should occur here.  Because claims

11    of undue burden and attempts to cost shift, you need actual

12    evidence of the need and the financial inability to comply

13    with the basic rules of discovery.

14             I also would proffer, though, that cost shifting

15    doesn't even -- isn't even triggered until it's

16    inaccessible.  And we don't know that it's inaccessible,

17    Your Honor, because, first of all, Trustpoint was --

18             THE COURT:  Yes.  This but this is like -- this is

19    the step before making a determination, whether it's

20    accessible or inaccessible, because he's saying he can't

21    even afford the first step of a professional vendor or to

22    access the Trustpoint dataset to make that determination.

23             MS. GOVERNSKI:  Well, I would proffer, Your Honor,

24    that the Trustpoint is a little bit of a red herring, as is

25    the $350,000.

1            THE COURT:  320, I think, is what he said.

2            MS. GOVERNSKI:  Excuse me.  Thank you.

3            He has indicated that part of that cost is that he

4    is in arrears.  It's unclear exactly what portion of that is

5    to make up for whatever archiving costs existed before and

6    what costs -- what amount of that actually it would cost to

7    do what we need to do.

8            I will say that we went ahead and asked our vendor

9    what it would cost if we were to start with the devices.  I

10   believe we estimated not all of them because there were 18

11   devices seized.  We are not saying that we need --

12           THE COURT:  It was 19.

13           MS. GOVERNSKI:  19.

14           We don't need all of them.  But our estimate was

15   far more reasonable.  I think it was the range of 8500 to 15

16   or 16,000.  So I think probably a first step in tandem, with

17   whether Mr. Giuliani is unable to actually pay anything

18   towards his discovery obligations, is also to look at other

19   vendors who may be able to start with the devices and leave

20   Trustpoint out of it, which has been our point and what we

21   have been stressing for over a year.

22           THE COURT:  All right.  So I have read through the

23   various emails, but I haven't tried to count it up, that the

24   defense has produced privilege logs to the plaintiffs.

25           And so in this first paragraph of the proposed

1    order it asked for a privilege log.  And I am just

2    wondering:  Is that going to be redundant to the privilege

3    logs you have already received --

4              MS. GOVERNSKI:  So, Your Honor --

5              THE COURT:  -- and could you explain that?

6              MS. GOVERNSKI:  Of course.

7              The only privilege log that we received was with

8    respect to the Dominion documents.

9              As Your Honor knows, very early we received a

10   little bit over 1,000 documents which were what Mr. Giuliani

11   produced in response to the Dominion RFPs.  I believe that

12   those RFPs were noticed and the search occurred before we

13   even noticed our RFPs -- before we even served our RFPs.

14             I also will note that that collection occurred

15   after the seizure of Mr. Giuliani's devices.  So the

16   Dominion docs, the collection from which that set was

17   derived, are paper files that happened to be in his

18   apartment; they are materials that his counsel collected in

19   connection with his D.C. and New York Bar grievances; and

20   they are some third-party documents from Christianne Allen

21   and Christina Bobb.

22             By the way, productions from both of those two

23   third-party witnesses have resulted in documents that were

24   not included in the Dominion batch.

25             THE COURT:  Yes.  I am going to call those the

1    missing documents.  I have a number of questions about

2    those, but we will get to that later.

3            MS. GOVERNSKI:  Thank you.

4            So my understanding of the privilege log is that

5    that was created from -- it was a collective effort amongst

6    various individuals who were responding and producing

7    documents in response to litigation relating to the post

8    2020 election efforts.  So it wasn't solely

9    Defendant Giuliani's privilege log, it was a privilege log

10   across individuals of the Trump campaign and other

11   individuals who claim to be in a common interest.

12           So we received -- so this is my understanding from

13   much back and forth with Mr. Sibley; that he produced these

14   Dominion docs, he also produced a privilege log with them.

15           We went back to him and said, are all of these

16   documents even responsive to our request?  Can you give us a

17   narrowed privilege log?  So then he gave us a narrowed

18   privilege log from that Dominion document privilege log.

19   That is the only privilege log that we have in the case.

20           So his search of Trustpoint, which original search

21   was 50,000 documents, narrowed to 400, narrowed to under 200

22   that were actually produced -- 50 of which were blank.  So

23   we have in total from Trustpoint, I don't know, 120-ish

24   documents, we have no privilege log associated with

25   Trustpoint.

1        We also have no privilege --

2        THE COURT:  Okay.  Now I understand.

3        I knew that there was more than one privilege log.

4   But what you are saying is it's, like, there was an

5   overarching privilege log and then a subset of the single

6   privilege log all related to the Dominion production, but

7   nothing related to Trustpoint, nothing related to any of the

8   manual searches that Mr. Giuliani did himself, nothing

9   related to any other production that's been made.

10       MS. GOVERNSKI:  That's my understanding,

11  Your Honor.

12       THE COURT:  Okay.  Now I understand.  Okay.

13       And so then the next part, and I am going to go

14  back to some of these issues.

15       The next part of the proposed order asked for

16  Mr. Giuliani to file a declaration subject to penalty of

17  perjury detailing all of his efforts to preserve, collect,

18  search potentially responsive data and locations, a complete

19  list of all of those locations, and data that he used to

20  communicate about any material that might be responsive in

21  this case, including specific email accounts, text messages,

22  applications of social media, et cetera.

23       What the specific data is on the Trustpoint

24  database -- and, by that, I presume you mean what were the

25  specific electronic devices seized by the FBI on April 27th,

1    2021, that was then dumped in the Trustpoint dataset?

2          Is that what you mean?

3          MS. GOVERNSKI:  I think it goes beyond devices,

4    Your Honor.  I think it includes what specific email

5    accounts were captured.

6          We now know that Defendant Giuliani had at least

7    five different emails, potentially more.  Some may predate

8    that seizure, so it may be three or four before that

9    seizure.  We don't know what emails are captured in that.

10   We don't know what messaging applications are captured in

11   that.  We don't know what text messages are captured in

12   that.

13         In Mr. Sibley's filing with the Court from

14   March 24th, he did indicate that there were text messages

15   and messaging applications in Trustpoint which -- but those

16   weren't produced.  So whatever happened to them, the fact

17   that they exist in there is irrelevant to their discovery

18   obligations because they haven't searched for them or

19   produced them.

20         THE COURT:  Well, I think you -- I think

21   Mr. Sibley has been clear that he only searched for email.

22         MS. GOVERNSKI:  Exactly.  But we don't know what

23   emails, Your Honor.

24         THE COURT:  Right.  And for -- but you don't know

25   from which email accounts --

1          MS. GOVERNSKI:  Exactly.

2          THE COURT:  -- were searched?

3          MS. GOVERNSKI:  He had a Gmail account that he has

4     testified was -- he used for 90 percent of his

5     communications.  He also had an iCloud account that we know

6     he used for communications prior to the seizure.  He also

7     had work accounts, Giuliani Partners; potentially Giuliani

8     Communications, it's unclear.  And there is a @me email

9     account, it's not clear if that was pre or post seizure.

10    And then there is this Proton account which I believe is

11    post seizure.

12          In other words, we don't know what emails are even

13    in there.

14          THE COURT:  Okay.

15          MS. GOVERNSKI:  And one other thing -- just going

16    back to Trustpoint.  You know, we don't even know the exact

17    reason those devices were seized, if they were even seized

18    in connection to anything related to post election 2020.

19          So, you know, regardless of what repositories are

20    actually in Trustpoint, we're not entirely clear if even

21    what is in there would capture the universe.

22          I understand that they have made representations

23    to that effect, but it's not entirely clear to us or we

24    don't have the evidentiary -- you know, separate evidentiary

25    support about what content is actually in there.

1          THE COURT:  Okay.  So the response in the

2     opposition to this request for this declaration with all of

3     this detail is that Mr. Giuliani has now sat for a

4     deposition with the plaintiffs.  He's submitted the March

5     24, 2023, report in response to this Court's order.  He has

6     submitted his -- another declaration that was submitted as

7     an attachment to the opposition to the plaintiffs' motion to

8     compel.

9          So from, I guess, the defendant's perspective,

10    what is it about all of those instances where he has talked

11    about what he did in discovery in this case that still falls

12    short of detailing his preservation efforts, locations of

13    all sources of data, and searches he has already conducted.

14         MS. GOVERNSKI:  Well, I very much appreciate the

15    question --

16         THE COURT:  Specifically, let's start with the

17    deposition because the response has been they had an

18    opportunity to talk to him about that.

19         Did you or did you not take that opportunity?

20         MS. GOVERNSKI:  We did, Your Honor.

21         My colleague, Mr. Gottlieb, asked Mr. Giuliani

22    during his deposition -- and I would refer the Court to

23    Docket 44-9, which is excerpts of the deposition, pages 290

24    to 292.

25         Specifically, Mr. Gottlieb asked whether he -- he

1   said:

2           "Mr. Giuliani, do I understand correctly that the

3   steps that have been taken to preserve and produce documents

4   in this case are steps that have been taken by a third-party

5   provider?

6           "ANSWER:  Yes."

7           And he goes on to clarify that that third-party

8   provider was Trustpoint.

9           And then Mr. Gottlieb asked:

10          "Apart from what Trustpoint has done, do I

11  understand correctly that you have not yourself gone back

12  through devices or accounts to search for documents?"

13          And then he says:

14          "Sure I have.  But it hasn't helped because what

15  they gave back to me seems to be wiped, so I couldn't get

16  anything off of it."

17          So we're understanding from his deposition, Your

18  Honor, that his sole method of preservation was through

19  Trustpoint.  And if that is the case --

20          THE COURT:  Which means it was totally dependent

21  on what the FBI seized.

22          MS. GOVERNSKI:  Correct.

23          THE COURT:  Because that is the only data on

24  the -- on Trustpoint's archived servers.

25          MS. GOVERNSKI:  That's right, Your Honor.

1          So if that is the case -- if Mr. Giuliani can

2     certify here today that the only effort he has taken to

3     preserve in this case is whatever Trustpoint, a third party,

4     happened to do, then we would say that that portion of our

5     motion is moot, and we would probably move for

6     preservation-related sanctions.

7          If that is not the full extent of his preservation

8     efforts, then he should tell us that.  We have been asking

9     for him to tell us that for a year.  Even Mr. Giuliani's

10    counsel on December 12th, 2022, said:  "I am not aware of

11    his preservation efforts."

12         At the hearing on March 21st, the transcript

13    cites -- at 11, 3 to 4, the Court asks:  "Has Mr. Giuliani

14    locked down -- put a litigation hold on -- all of his

15    records given the pendency of this litigation?"

16         And Mr. Sibley wrote [sic]:  "Well, Your Honor, I

17    think the answer is yes.  I don't know."

18         And then he wrote [sic]:  "I think the concern is

19    he needs to certify" that he has -- "that that has, in fact,

20    not occurred."

21         So we would agree with Mr. Sibley that that is

22    what should happen, that he should certify as to what

23    exactly he has done.

24         And also, by the way, something that is quite

25    perplexing to me, Your Honor, is how Mr. Giuliani can claim

1    he doesn't have access to some accounts, and he doesn't

2    know -- he can't access his work accounts, he maybe -- he

3    can't access some accounts in the cloud, but yet he can

4    guarantee that they haven't been deleted and they have been

5    preserved.  It just doesn't -- it doesn't ring true.

6           And so we believe that we are expected -- entitled

7    to really understand what he has done.

8           THE COURT:  All right.  The next part of the

9    proposed order is that Mr. Giuliani's supplemented responses

10   to Interrogatories 11 and 12 to provide complete answers;

11   and you put a deadline of within five days.

12          And having looked at the opposition -- the

13   opposition filed in response to the motion to compel says

14   that the defendant would provide updated responses within

15   seven days of filing the opposition.  I quote:  Giuliani

16   will supplement these interrogatories within seven days.  So

17   I'm hoping this issue is moot.

18          Has he supplemented his answers to Interrogatories

19   11 and 12?  So is that a moot issue?

20          MS. GOVERNSKI:  He has supplemented, that is a

21   moot issue.

22          I will say that I still -- we still do not feel

23   that they are complete enough, but that is off the Court's

24   docket.

25          Can I just bring up one point though about the

1    interrogatories, Your Honor?  I just want to preview

2    something that may be coming down the pike.

3          There are three different interrogatories that

4    asked for metrics related to the reach of Mr. Giuliani's

5    statements on social media, the viewing metrics on Twitter

6    and on Common Sense.

7          His interrogatory responses -- or his RFP

8    responses to that said:  I will produce, and then a rog

9    response said he couldn't produce.  And so we held those in

10   abeyance while we wait for the 30(b)(6) depositions that we

11   are eagerly looking forward to hearing from

12   Defendant Giuliani's counsel as to who will serve as the

13   corporate rep.

14         But those are -- there is one live rog as to that

15   where we have not received a satisfactory answer.  We have

16   not moved the Court with respect to that rog because it's

17   not ripe.  But I just -- while we're talking about rogs, I

18   wanted to flag that for Your Honor.

19         THE COURT:  Okay.  Well, at least one thing is off

20   my plate, which is good to hear.

21         One of the next things in the proposed order, now

22   that we can strike off Interrogatories 11 and 12, is that

23   the plaintiffs are requesting that Mr. Giuliani be precluded

24   from relying on any evidence not provided in his initial

25   disclosures or interrogatory responses.  I was just curious

1        about that phrasing because people always supplement.

2                  So do you mean to say that he is precluded from

3        relying on any evidence not provided either in initial or

4        supplemental written disclosures or interrogatory responses?

5                  MS. GOVERNSKI:  Well, Your Honor, one of the

6        challenges is discovery is closing on Monday.  So if he were

7        to supplement his interrogatories or supplement his initial

8        disclosures with some additional third party or some

9        additional previously undisclosed basis for his statements

10       or any of his answers to the rogs, that that would

11       essentially preclude us from being able to depose or do any

12       fact discovery into those claims.

13                 THE COURT:  Although, I think you seem well able

14       to ask for permission to conduct a deposition or something

15       after the close of discovery with a specific good cause

16       showing -- that would be a good cause showing, I would

17       think.

18                 I would think it would also be unopposed as some

19       of these discovery efforts the plaintiffs have undertaken

20       have been with the cooperation of the defense.  So I don't

21       accept that as a reason not to alter the wording in the

22       proposed order, but I just wanted to make sure that that was

23       intentional on the plaintiffs' part.

24                 MS. GOVERNSKI:  You know, one of the issues,

25       Your Honor, is this constant attempt to try to figure out

1     what exactly the story is because of the ever-changing

2     narrative that we have over the past year of trying to -- to

3     get as much as we can get from third parties.

4              I think it would make sense for Your Honor to hold

5     that part of the protective order perhaps in abeyance.  But

6     I do think that we will want to reserve the right to seek

7     that relief depending upon what transpires after today.

8              THE COURT:  All right.  So that was going to be my

9     next question, is why isn't this provision premature --

10              MS. GOVERNSKI:  It could be.

11              THE COURT:  -- in terms of relief?

12              All right.  Now, one of the things you also

13     propose in your order, in addition to Mr. Giuliani paying

14     plaintiffs' attorney's fees for the cost of the motion,

15     subject to a future filing detailing the same, that the

16     Court issue any additional relief deemed to be appropriate.

17              And I sort of puzzled over that.  I must say I do

18     resist reading between the lines because I might be

19     misunderstanding.

20              Do you have something in mind for this additional

21     relief?  What are you asking obliquely for me to exercise my

22     inherent power to do, if anything?

23              MS. GOVERNSKI:  Well, for instance, one of those

24     would be to, you know, force a forensic accounting of his

25     devices, which we already -- is part and parcel of the

1    first -- first request.

2         We think Rule 37 allows for sanctions if

3    Your Honor thinks that in -- in your discretion that

4    Mr. Giuliani's conduct -- you know, for instance, Rule 37

5    permits -- I'm sorry -- I keep hearing --

6         THE COURT:  You just have to block it out.

7         MS. GOVERNSKI:  Thank you, Your Honor.

8         I think Rule 37, you know, permits discretion,

9    especially if the Court were to find that Defendant Giuliani

10   did not comply with the March 21st order.

11        THE COURT:  Okay.  Well, let me just be totally

12   clear.  I'm not -- I don't typically impose Rule 37

13   sanctions that haven't been requested by a party who is

14   closer to the dispute and what's going on.

15        So no obliqueness here.  If you want some relief,

16   you have got to just come out and ask for it.  Just so you

17   know for future reference.

18        MS. GOVERNSKI:  Okay.  Your Honor, if I can just

19   make one quick point to that.

20        THE COURT:  Yes.

21        MS. GOVERNSKI:  I think part of the challenge is

22   that we don't have the information that we need because of

23   how difficult it's been to get a straight answer from

24   Defendant Giuliani, especially with respect to preservation

25   efforts.  So your -- this is very much appreciated.  And we

1    will make sure, in the future, to be much more specific with

2    our Rule 37 request for relief.

3            I do anticipate that, if the behavior doesn't

4    change, we will be filing a Rule 37 motion which has much

5    more detail for what we're looking for.

6            THE COURT:  Okay.  So the defendant's report to

7    the Court on March 24th, 2023, identified a number --

8    three -- document locations, and I quote:  That is still

9    needing to be searched, and promised that Mr. Giuliani had

10   also been provided with new search terms by plaintiffs, and

11   that he will search all of the listed document locations

12   using both the original keyword search term list, plus the

13   new ones.

14           So I must say I did take that as very good news

15   after reading that March 24th report from defendant.

16           How many documents were produced to plaintiffs as

17   a result of this promise to search with new search terms all

18   three locations that the defendant conceded, as of

19   March 24th, 2023, still needed to be searched.

20           MS. GOVERNSKI:  One.

21           THE COURT:  Okay.  And what was that one document?

22           MS. GOVERNSKI:  It was a single communication with

23   Sidney Powell via Twitter.

24           And I should note also, in terms of the new search

25   terms -- so that was in respect to the third and fourth set,

1    Your Honor, of RFPs.  They were very narrow.  The third set

2    asks for his phone records and the fourth set asks for

3    financial related statements.

4         And I think it's important for us to raise those

5    with the Court because he has -- he actually, in his

6    responses, in objection, said he would produce his phone

7    records.  And then, in an email to us in March, said he

8    couldn't -- he doesn't have them, and so we'll have to

9    subpoena AT&T.

10        So we are in the process of subpoenaing AT&T.  But

11   we think that Defendant Giuliani is legally obligated to try

12   to access these directly from AT&T, as opposed -- as opposed

13   to insisting that we do so, especially because AT&T is a

14   large corporation.  It's a large bureaucracy.  And we don't

15   think that we should have to be in a position to file a

16   motion to compel to get phone records that he could ask them

17   for.

18        We also think, with respect to the third set of

19   RFPs, which ask for financial related information, that --

20   Your Honor already noted that we are entitled to those

21   because of his self -- his now professed inability to

22   perform the most basic discovery obligations.  But we think

23   that we are entitled to them for purposes of the case as

24   well, including motive with respect to actual malice,

25   circumstantial component of actual malice, and also for

 1    punitives.

 2           Mr. Sibley has repeatedly claimed that we have a

 3    burden to establish a prima facie case before we get that

 4    discovery, but that is not the majority rule and it's not

 5    the rule of this District.  So we believe we're entitled to

 6    those records.

 7           By the way, the last RFP asked for access to

 8    his --

 9           THE COURT:  How will his financial records reveal

10    his actual malice?

11           MS. GOVERNSKI:  So, of course, motive is a piece

12    of -- one of the pieces of circumstantial evidence that can

13    go towards -- you know, in and of itself is not sufficient,

14    but it can be one piece of circumstantial evidence that goes

15    to actual malice.

16           In fact, I just this morning was looking at the

17    case which -- I am going to butcher the name,

18    *T-A-V-O-U-L-A-R-E-A-S v. Piro*, 759 F.2d 90.  And that case

19    specifically talks about various motives as a basis for

20    finding actual motive, including to increase the reach of

21    viewership.

22           So that directly goes to the RFP for his metrics,

23    why we need his metrics, and including for our damages

24    calculation.  But of course financial motives also is

25    supported by the reasoning of that case because if he was

1    defaming our clients, and part of the reason was to increase

2    his own bank accounts -- that that would certainly be

3    probative of actual malice.  And of course it's directly

4    relevant to punitives, which we're entitled to now.

5           But I also -- the one other point, Your Honor, is

6    that these documents, the viewing metrics which would be

7    responsive to RFPs -- I will have the exact numbers for you

8    in a moment -- RFPs 19, 34, and 35, the phone records which

9    we request in RFP 39, and the financial records that we

10   request in RFPs 40 and 41, there is no basis to think that

11   those would even be in Trustpoint.

12          So it's unclear to us whether he's actually even

13   looked for those or made any efforts to secure those.

14          And especially with his viewing metrics.  I mean,

15   he is the sole owner and founder of Giuliani Communications

16   and Giuliani Partners so, ostensibly, they would have

17   information about the reach of his podcast, you know, his

18   contracts with advertisers.  All of the things that we're

19   asking for he hasn't even claimed they're not in his

20   possession, custody, or control.

21          So we think he, you know -- at a minimum, leaving

22   all of the Trustpoint and the emails aside -- he hasn't even

23   done the most basic search for those documents to those

24   requests.

25          THE COURT:  Okay.  Let me make sure we're all on

1 the same page in terms of when Mr. Giuliani's duty for

2 preservation was triggered.  When would the plaintiffs say

3 that duty was triggered, on the filing of the complaint or

4 some other time?

5    MS. GOVERNSKI:  So of course, at a minimum, it's

6 when we filed the complaint, which was in December of 2021.

7    But I would argue -- you know, of course they have

8 taken the position that the production of the Dominion

9 documents are sufficient for their discovery obligations,

10 and so he must have been on notice of those Election 2020

11 disputes.

12    I believe -- I mean, it would be great to ask and

13 confirm with Defendant Giuliani, Your Honor, but I believe

14 there was a cease and desist or reports of a cease and

15 desist from Smartmatic back in December of 2020.

16    So certainly if you are applying a broader view

17 that he seems to be applying, that the full landscape of

18 2020 -- post 2020 election efforts would include our case,

19 which we would argue it is, that he was under a duty to

20 preserve that far back, which, by the way, is before the

21 actionable statements in our claim were made -- or right

22 around the same time.

23    THE COURT:  All right.  Now, with respect to the

24 manual searches that Mr. Giuliani conducted, what precisely

25 was the data that he did a manual search on?

1            For text messages and social media, is that

2    basically the two different areas of potential responsive

3    data that he did the manual searches on?

4            MS. GOVERNSKI:  I wish I could tell you for sure,

5    but here is what I have gleaned.

6            So my understanding is he searched his devices,

7    his current devices.  We don't know what number of devices

8    that is.  Presumably, it's at least one phone.  We know he

9    had one phone post seizure.  And then maybe a -- I don't

10   know if it's an iPad or a computer, that would be -- it

11   would be helpful to understand that.

12           When he says he searched devices, it's unclear

13   what that means.  I actually tried this week to go on my

14   phone -- you know, you can scroll and there is just a search

15   bar, and you can type.  I typed in my husband's name and,

16   you know, it's just a -- a list of things.  But if you want

17   to actually search, you have to go into the applications

18   themselves.

19           It lists -- like my husband's name pulled up three

20   text messages.  But to actually search text messages I had

21   to go into the text messages application.

22           It is not clear from his response if he did that

23   or if he just did the search on his device.  I don't know

24   the answer to that, it would be helpful to know.

25           It seems like he didn't do that because then he

1    separately searched some social media; we don't know what

2    social media.  The only resulting production was from

3    Twitter, even though subsequent productions from Christina

4    Bobb has indicated that he used Instagram at his Instagram

5    handle, and that was not produced.  So it's unclear if he

6    searched Instagram or if he didn't search it.  We don't

7    know.

8              THE COURT:  Okay.  So, I mean, the objection and

9    the opposition is that plaintiffs do not explain why a

10   manual search is not sufficient to comply with the Court's

11   orders or the federal rules.

12             So I just want to make it clear that the

13   plaintiffs' position is that -- is not that no manual search

14   is ever sufficient, as I take it.  Plaintiffs' objection is

15   you just don't know how these manual searches were

16   conducted.

17             Do I have that right?

18             MS. GOVERNSKI:  So I think that that is right, we

19   don't know how these searches were conducted.

20             We are not saying a manual search is never, ever

21   appropriate.  But, at this point, I think it's important to

22   note the only manual search that he's claiming to have done

23   is his post 2020 devices.  So, at a minimum, we need some

24   searching of the pre-2020 devices.

25             He also seems to, by his own admission in his

```
1    deposition, not be -- he doesn't -- he said in his
2    deposition that he thinks he could use some help.  So I
3    think by his own admission maybe he can't on his own do a
4    manual search.
5              THE COURT:  Okay.  In his declaration he says that
6    for the manual searches that he used the search terms
7    provided by the plaintiffs to conduct the search, which I
8    did manually.  He says that in paragraph 2 of his
9    declaration.
10             So how many keywords did plaintiffs provide for
11   him to do a keyword search of?
12             MS. GOVERNSKI:  I apologize, Your Honor, I don't
13   have that list in front of me.  I would be happy to --
14             THE COURT:  Is it less than ten or more than ten?
15             MS. GOVERNSKI:  No.  Definitely more than ten,
16   Your Honor.  But I would also note that --
17             THE COURT:  More than 50 or less than 50?
18             MS. GOVERNSKI:  I think it was probably around
19   somewhere in that ballpark because it was to all of the
20   first and second RFPs, which are the bulk of our entire
21   RFPs.
22             But I will also note that -- what just dawned on
23   me is, you know, our search terms were calibrated for the
24   way that we typically handle search terms, which are using
25   Boolean terms and within.  And so I don't even know if
```

1    it's -- if even a responsive document, if you searched your

2    device, would come up with those search terms.  Those were

3    obviously designed for a professional vendor to use.

4           So I am not sure whether those search terms

5    would actually pull up responsive materials on a manual

6    search on a device.

7           THE COURT:  Okay.  Well, that was actually part of

8    my questions, too, because, I mean, when a professional

9    vendor is used, there is fuzzy logic that's used that picks

10   up misspellings by the user of the dataset being searched.

11          Do you have any idea whether the manual searches

12   being done by Mr. Giuliani used any kind of fuzzy logic to

13   pick up misspellings?

14          MS. GOVERNSKI:  I have no idea, Your Honor.

15          THE COURT:  Okay.

16          MS. GOVERNSKI:  One other point, Your Honor, if I

17   may.  You know, we provided the search terms kind of as a

18   courtesy but also as part of the ordinary course of how we

19   conduct discovery in all of our cases, where we usually work

20   collaboratively and they provide a hit term report; and we

21   go back and forth and we try to narrow, and we figure out

22   false hits.  So that did not happen with Trustpoint.  You

23   know, he said:  Here are the search terms, 50,000 emails,

24   400 hits, I am going to randomly produce less than 200.

25          But separate from that, Your Honor, that doesn't

1    supplant the obligation to go in where he likely has

2    relevant information and pull it irrespective if it hits on

3    a search time.  So I am not clear if that happened either.

4              THE COURT:  All right.  Now, the plaintiffs -- I

5    am going to turn to the missing documents for a second

6    because the plaintiffs have identified these six documents,

7    if my count is correct, that -- and I take it that the

8    plaintiffs view each of these six documents as responsive

9    documents to RFPs; is that right?

10             MS. GOVERNSKI:  That's right.  And I should note,

11   Your Honor, that these are just illustrative.  We have

12   others.  We just didn't -- you already have enough on your

13   docket from us.

14             THE COURT:  Okay.  So, I mean, among the six

15   documents is an Instagram direct message on August 17, 2022,

16   between Christina Bobb and Mr. Giuliani.

17             I just wanted to be clear about this because, as I

18   understand it, the parties agreed-upon time frame for

19   responsive documents ends on January 21, 2022; is that

20   right?

21             MS. GOVERNSKI:  So I think that we agreed -- I

22   need to check the exact date.  That sounds right, Your

23   Honor.

24             THE COURT:  So that Instagram direct message

25   wouldn't necessarily have been produced to you because it

```
 1    wasn't within your agreed-upon time frame?

 2              MS. GOVERNSKI:  So let me clarify one point, Your

 3    Honor.  So Exhibit 1 which was 56-2, and Exhibit 3, 56-4 --

 4    you can see everything is redacted in these.

 5              Ms. Bobb produced these in response to an RFP that

 6    said:  Documents sufficient to show aliases and methods of

 7    communication with Defendant Giuliani regarding post 2020

 8    election efforts.

 9              So I would not say on its face that this

10    particular chain is what is responsive.  It's that she

11    produced this as a document to show that she communicated

12    with Mr. Giuliani via Instagram about his post 2020 election

13    efforts.

14              THE COURT:  All right.  So that one wasn't

15    produced to show:  Here is a missing responsive document.

16    That was produced to show:  See they communicated over

17    Instagram -- direct messaging application features on

18    Instagram?

19              MS. GOVERNSKI:  That's right.

20              And I should note my colleague -- so the January

21    2020 cutoff date was for Trustpoint, and it wasn't

22    necessarily for all of our RFPs because, as we know,

23    Defendant Giuliani's statements about our clients continued

24    post January 2021.

25              And I also --
```

1            THE COURT:  Well, in the complaint I thought that

2      the last statement referring to the plaintiffs was

3      specifically on January 12, 2022.

4            MS. GOVERNSKI:  Right, 2022.

5            THE COURT:  So that's why, as I understood, in

6      trying to make sense of this time frame, that --

7            MS. GOVERNSKI:  Understood.

8            THE COURT:  -- for discovery that I thought the

9      parties had agreed upon, that the end date for discovery,

10     whether it was Trustpoint -- I thought it was across the

11     board but you-all understand your agreements better than I.

12     That's why it was a time frame ending on January 21, 2022, a

13     few days after the last alleged defamatory statement.

14           MS. GOVERNSKI:  Understood.  Let me consult with

15     my colleagues, and if -- about that.

16           THE COURT:  Okay.  All right.  So --

17           MS. GOVERNSKI:  But, Your Honor, one more piece --

18     I'm sorry.  If I may, about 56-2 and 56-3.

19           THE COURT:  Yes.  Go ahead.

20           MS. GOVERNSKI:  So these are text messages from

21     December 5th and December 4th, and we have others including

22     December --

23           THE COURT:  No.  I know.  All the rest of them

24     fall within the agreed-upon date range.  I get that.

25           MS. GOVERNSKI:  Right.  But my other point that I

1    wanted to make, Your Honor, is that Defendant Giuliani, in

2    his declaration, said he doesn't recall ever discussing

3    our -- our client's via text.

4            THE COURT:  Yeah.  I know.  And I picked up that

5    there are, in fact, responsive texts.  I saw that.

6            He didn't say he never did, he just said he

7    couldn't recall.  So all that does is warrant a thorough

8    search, not to rely on his recollection.

9            So with respect to the phone records, is

10   Mr. Giuliani giving you any particular consent form or

11   anything, or do you even need that to get to his subscriber

12   records from -- related to his phone?

13           MS. GOVERNSKI:  So he -- so the first time that we

14   learned -- so he did not -- he said in his RNOs that he

15   would produce these.  So the first time we learned that he

16   wouldn't was right before we filed our motion to compel.

17           We went ahead and got a subpoena out right away.

18   And then, in his declaration, he said he does not object to

19   the subpoena.  I think to the extent that -- we would be

20   happy to explore with him a waiver whereby AT&T would give

21   us the records with his waiver, although it's unclear why we

22   need to be involved in that or why he can't just go to AT&T

23   and do that himself.

24           THE COURT:  All right.  With respect to the

25   Trustpoint search, I appreciate the frustration with the

1    limits of the search that was conducted of Trustpoint in

2    that it was not -- it was not the full time frame agreed for

3    the parties, it was a shortened time frame.

4         And it was only emails of which email account -- I

5    guess you don't know particularly, although, you have gotten

6    126 emails produced to you.  So you can see -- are they all

7    from one single email account or multiple?

8         MS. GOVERNSKI:  I believe I have that, if Your

9    Honor can give me one quick second.

10        So we know that there are -- there were 26 from

11   rudolphgiuliani@icloud.com; and there were 85 from rhhelen,

12   and that appears to be the only two.

13        THE COURT:  All right.  To the extent that there

14   were other email accounts, you don't know whether they're

15   not in the dataset or whether the search of email was

16   extensive enough to cover all of the email accounts that

17   might be on the dataset.

18        MS. GOVERNSKI:  We don't know that.

19        And I would also note, Your Honor, that we do have

20   some emails from rudolph.giuliani@giulianipartners.com, from

21   press@giulianipartners.com, from

22   mariaryan@giulianipartners.com [sic], which I don't believe

23   we have any of those from Trustpoint.  Other than -- yeah.

24   I don't know if we have any -- my records don't indicate

25   that we do.

1           THE COURT:  Because I thought that the 126 emails

2      that were ultimately produced were from the Trustpoint

3      search conducted by Mr. Giuliani's counsel.

4           MS. GOVERNSKI:  Oh, I'm sorry, Your Honor.

5           When I referenced the others, it's what we have

6      received from other third parties or what we have received

7      from --

8           THE COURT:  I see.

9           MS. GOVERNSKI:  Yeah.

10           THE COURT:  Okay.  Now, there is this sort of

11     varied dispute where defense counsel says that he only

12     searched Trustpoint for emails because he thought that was

13     agreed to with the plaintiffs.

14           Do you know where he may have gotten that idea?

15           MS. GOVERNSKI:  Yeah.  So I think he acknowledged

16     it at the hearing on March 21st, actually, on the

17     transcript -- 16, 21 to 22 -- when he said, "I think we had

18     just agreed, look, let's look for email files first, and

19     let's go from there."

20           That is consistent with our understanding.  We

21     were pretty desperate to start getting some documents so we

22     said start with the emails, but that certainly was not

23     intended to be the sole -- our sole expectation.

24           THE COURT:  Okay.  So the last set of questions

25     that I have for you, which I am also going to pose to

1   Mr. Sibley -- so this is a heads up for you, Mr. Sibley.

2          Have the plaintiffs sent any kind of preservation

3   letter to Trustpoint?  Because if Mr. Giuliani is in arrears

4   with Trustpoint -- they have archived the data; they have

5   taken it off whatever platform they use for active searches.

6   I don't know what the contract is that Mr. Giuliani has with

7   Trustpoint and how long Trustpoint has agreed to hold on to

8   that data.

9          Have you -- if all of the devices that produced

10  the data that is now held by Trustpoint turn out to, in

11  fact, be inoperable or inaccessible, as Mr. Giuliani has

12  reported, I am sure you are a little bit concerned what

13  Trustpoint is going to do with that huge dataset of the

14  seized electronic devices from Mr. Giuliani's person,

15  residence, and office in April of 2021.

16         So have you alerted Trustpoint in any way that

17  they should preserve that data?

18         MS. GOVERNSKI:  Not that I am aware of.  We will

19  do that if -- I know my team on the phone, they're probably

20  drafting that as we speak.  Thank you for bringing that up.

21  We will, Your Honor.

22         I will note that we only first learned about this

23  Trustpoint archiving in his opposition to our motion.  And

24  we have been very frantic trying to timely comply with the

25  close of discovery, but we will get that out.

1          That's a great point.  Thank you.

2          THE COURT:  All right.  And have you asked to see

3    the terms of the contract with Trustpoint or made any effort

4    to communicate with Trustpoint about Trustpoint's

5    willingness to either transfer the data to your own vendor

6    so that you can access it under certain terms or allow you,

7    at some limited rate, to do your own searches?

8          Have you had any communications with Trustpoint

9    about that?

10          MS. GOVERNSKI:  Not that I know of, but we will do

11    so immediately.

12          THE COURT:  I am not encouraging you one way or

13    the other.

14          MS. GOVERNSKI:  Yes.  But --

15          THE COURT:  I am just wondering how long an

16    eDiscovery vendor is just going to hold onto data that

17    they're not being paid to hold onto.

18          MS. GOVERNSKI:  I would appreciate knowing the

19    answer to that question from Defendant Giuliani because we

20    do believe, based on the D.C. definition of legal

21    possession, custody or control, that he has an obligation to

22    do that, to make sure that those materials are being

23    preserved.

24          THE COURT:  Right.  Well, those are -- as I said,

25    those are questions I am going to ask Mr. Sibley.

```
1              All right.  I think that's it.

2              Is there anything else you wanted to talk to me

3    about?

4              MS. GOVERNSKI:  No.  I just want to thank you for

5    your thoroughness and for reviewing the many, many filings

6    relating to this, and the extensive exhibits.

7              THE COURT:  I can't say I am happy about it as I

8    started this hearing.  No judge, with lots of busy

9    substantive matters, is happy to get a discovery dispute.

10             All right.

11             MS. GOVERNSKI:  Thank you.

12             THE COURT:  I will now turn to the defense.

13             MR. SIBLEY:  Your Honor, may my client get a

14   brief -- can we take a brief bathroom break of five minutes?

15             THE COURT:  Yes.  Of course.  Thank you for

16   bringing that to my attention.

17             We will take a break for ten minutes.

18             MR. SIBLEY:  Thank you, Your Honor.

19             (Whereupon, a recess was taken.)

20             THE COURT:  Mr. Sibley, come on up.

21             So why don't I just pick up where I left off in

22   talking about this whole Trustpoint database issue.

23             Has Mr. Giuliani or you, on his behalf, sent a

24   letter to Trustpoint telling them to preserve that data

25   because it's responsive -- contains potentially responsive
```

1    information in this litigation?

2           MR. SIBLEY:  We actually just confirmed at the

3    break that it's being -- it's being held.  And the

4    government also actually has the same dataset, so the

5    documents are being preserved.

6           But to answer this specific question, Your Honor,

7    I did not send a notice to Trustpoint One about that.  And,

8    in fact -- it may have been done by other counsel in other

9    cases, but we did disclose Trustpoint as a vendor quite a

10   while ago.

11          But to answer Your Honor's question -- I am being

12   told yes, so apparently it was done.  So...

13          THE DEFENDANT:  Yes.

14          THE COURT:  The answer is -- Mr. Giuliani, I'm --

15   Mr. Giuliani wants to speak.

16          So, Mr. Giuliani, you are saying yes.  Could

17   you --

18          THE DEFENDANT:  The answer is it's preserved.

19   It's also preserved by the government and by Trustpoint.

20          And Robert Costello, who is my lawyer in the

21   criminal case, secured that at the time that we had the

22   dispute over the payment, which we're trying to resolve.

23          THE COURT:  Could you update us on the --

24   Mr. Sibley, on the status of the arrears and what it's going

25   to take to be able to do a complete search because based on

1    my reading of this, and correct me if I'm wrong, you

2    essentially concede that all of the data being held by

3    Trustpoint has not been searched fully for responsive

4    records in this case.

5              MR. SIBLEY:  The answer is, yes, Your Honor, that

6    is true.  And I never -- if I did, it was inadvertent.

7              There was never an agreement that we would only

8    search for emails, that was kind of the starter.

9              And just so the Court is aware, I was not aware of

10   the archiving of this data until after the conference that

11   we had with Her Honor the first time.  So then we found

12   out -- and apparently this was done, sort of, without

13   notice, it was just kind of -- it just kind of happened.  I

14   mean, it's in the archives.

15             But if we had known that, I certainly would have

16   tried to take measures to do those searches before that

17   occurred.  But the current status is I believe they're

18   trying to work out a payment plan where we can search that

19   data again.

20             THE COURT:  And when will that reach resolution?

21             I mean, discovery closes on Monday.

22             Typically, when discovery closes, I think not only

23   have all of the discovery requests been delivered to

24   opposing parties, but also that the responses have been

25   received before the close of discovery.

```
1            I entered an order yesterday at the plaintiffs'

2    request to say, you know, are we going to get records after

3    the close of discovery, even though it puts the plaintiffs

4    at a disadvantage because, when they get it after the close

5    of discovery, they have to ask Court permission to do any

6    follow up.  And I get that.

7            I clarified yesterday in my order that, yes, you

8    can still get responsive records and discovery after the

9    close of discovery in this case because of the mess that

10   discovery appears to me to be, with the Trustpoint dataset

11   being just one of the issues.

12           When is that going to be resolved, if you know?

13           MR. SIBLEY:  I do not know the answer to that

14   question, Your Honor.

15           THE COURT:  Do you want to confer with -- or,

16   Mr. Giuliani, do you know when it will be resolved?

17           THE DEFENDANT:  I have to ask Mr. Costello.  I

18   don't know if we know that, Your Honor.

19           THE COURT:  All right.  Well, not only do we not

20   know when it will be resolved, we don't know if it will be

21   resolved.  And so we might have to find alternative ways to

22   access the Trustpoint data, either by transferring the

23   Trustpoint data from Trustpoint to another vendor, by going

24   back to the original electronic devices with professional

25   forensic help to basically do additional forensic imaging
```

1    and uploading onto an eDiscovery vendor platform to search

2    for responsive records.

3              So, you know, those are all -- those are -- it's

4    all fairly troubling that this is happening on a Friday

5    before the close of discovery.

6              I think you would agree with that also,

7    Mr. Sibley.

8              MR. SIBLEY:  Yes, Your Honor.

9              And in response to some of the things that have

10   been discussed with the Court already, Mr. Giuliani is

11   willing to allow whoever their forensic person is to assess

12   those electronic devices that were seized.  And if something

13   can be done with those -- I mean, I am not sure that it will

14   get back all of the data that's at Trustpoint because I do

15   believe there is probably some damage there to the devices,

16   but I don't know that.  I am not an expert.

17             So I'm happy to let that person look at those

18   devices.  He is not objecting to that.

19             I think, as the Court pointed out earlier --

20             THE COURT:  Well, you know, if the plaintiffs do

21   that, they're going to want to shift those costs to

22   Mr. Giuliani.

23             MR. SIBLEY:  Understood.

24             And that's -- I mean, the Court pointed out

25   earlier, it's kind of an issue if he's claiming inability to

1    pay to get the Trustpoint data.  It's not clear how much

2    this might cost to do, so...

3            THE COURT:  Well, I think you don't have

4    particularly sympathetic ears on the part of the plaintiffs

5    right now for the claim of poverty by Mr. Giuliani, that he

6    can't afford to make up the arrears to have access to the

7    data; he can't get professional vendor help; he's relying on

8    his own manual searches rather than using professional help.

9            So I think you would agree that the plan, first,

10   perhaps to get more sympathetic ears from the plaintiffs, is

11   if Mr. Giuliani responds to the request for production in 40

12   and 41 so that they can take -- make an assessment of that

13   financial situation themselves.

14           MR. SIBLEY:  Your Honor, if the Court orders that

15   overruling the objections, that's -- obviously, the Court

16   has the discretion to do that.

17           But as -- one of those requests is the entire file

18   of a proceeding with his ex-wife over a divorce case.  So I

19   am not sure that that is necessarily going to get that

20   specific information.

21           I think Mr. Giuliani is okay with --

22           THE COURT:  But is it the entire -- I mean, I

23   did -- I will tell you, Mr. Sibley, I did look at the

24   request for matters related to his ex-wife's lawsuit with

25   some scrutiny because this is not -- you know, this is not a

1    lawsuit to go into his personal life at all.  And so -- but

2    I think the request related to his divorce settlement was a

3    little bit more refined than that.  It was the filings in a

4    particular docket, which is public, I would think, and all

5    filings related to the enforcement of the terms of the

6    settlement agreement.

7            So I think, including but not limited to the

8    lawsuit filed in the Supreme Court of the State of New York

9    in and around August 2022.

10           I mean, I think that -- to the extent that he has

11   financial obligations under a settlement agreement with his

12   ex-wife, I think that would be pertinent in evaluating his

13   financial net worth.

14           If he has promised, for example, particular

15   property -- real property that may be in his name but he

16   owes it to somebody else, that would be pertinent and

17   actually support his claim of poverty here.

18           You know, all of this is related to a publicly

19   docketed lawsuit.  So I didn't see that they were asking for

20   anything particularly private.

21           MR. SIBLEY:  I thought it was public, too,

22   Your Honor, but apparently in this Court --

23           THE COURT:  Say that again.

24           MR. SIBLEY:  I thought it was also public.  But

25   apparently -- because that was the first response is, if you

1    guys -- it's like asking us for something you can get on

2    PACER, right?  I mean, so apparently it's not.  So...

3           But what I was going to suggest to the Court --

4    obviously, whatever the Court orders we will do.  But it

5    seems like maybe a statement of net worth with assets and

6    liabilities; and liabilities would include any payments or

7    properties that might be, you know, owed to the ex-wife.

8           THE COURT:  They're entitled to see the underlying

9    documentation rather than just take Mr. Giuliani's word for

10   it.  Don't you think?

11          MR. SIBLEY:  Well, I think if the Court were to

12   overrule the objections and order punitive damage discovery

13   now, I suppose that would be correct.

14          I guess what I am trying to zero in on is his

15   current inability to pay.  I am not sure that it needs to go

16   quite that far, but if the Court -- obviously, the Court has

17   discretion here to do that.  So...

18          THE COURT:  All right.  Well, if there are

19   particular matters that are particularly private in this

20   information, then -- I mean, I think you can seek a

21   protective order or have a conversation with, you know, the

22   plaintiffs about that in particular.

23          MR. SIBLEY:  I believe we have a protective order

24   in place already.

25          THE COURT:  I am going to order it --

 1              MR. SIBLEY:  Okay.

 2              THE COURT:  -- responses to 40 and 41, just so you

 3     are not kept on the edge of your seat.  That's going to be

 4     part of my order.

 5              I mean, with respect to the point you just raised,

 6     which you did raise in your briefing, in objecting to

 7     producing the financial records until plaintiffs have made

 8     out a prima facie case of their defamation case or -- or

 9     whether -- or summary judgment, I think you also mentioned

10     in your briefing, and you cite from D'Onofrio v. SFX Sports

11     Group, which is a D.D.C. case from 2008.

12              I have to say I was really puzzled by that

13     citation because that case expressly states, quote:  A

14     majority of the federal courts have permitted pretrial

15     discovery of financial information of the defendant without

16     requiring plaintiffs to establish a prima facie case.

17              So I actually think that the majority view holds

18     here, and I am -- I am going to order that.

19              Let's go back to Trustpoint.

20              One of the things you haven't detailed in the

21     Trustpoint data is -- or in the March 24, 2023, status

22     report to the Court is precisely what the sources of the

23     data were that are part of the Trustpoint dataset.

24              Your report helpfully describes, you know, the

25     different types of file types that are available for

1    searching on Trustpoint and, generally, we know that the

2    data sources were electronic devices seized on April 27th,

3    2021, by the FBI from Mr. Giuliani's person, residence, and

4    office.

5          But what you haven't provided is specifically what

6    those devices were, which would be clear from the search

7    warrant returned -- and I am sure Mr. Costello has that --

8    and, you know, whether everything in the Trustpoint dataset

9    was actually all user -- all user created generated data on

10   any of those devices without any exclusion, meaning they

11   took a forensic image of the electronic devices, they took

12   that entire dataset.  They dumped it in Trustpoint, which is

13   why you got so many operating files, which is what it sounds

14   like to me.  But you haven't really confirmed that in order

15   to also confirm for the emails what emails stored on those

16   electronic devices actually derive from which accounts.

17        MR. SIBLEY:  As much as I was able to confirm what

18   the data was as far as where it came from, Mr. Costello

19   confirmed for me -- and there was actually some

20   correspondence with the Department of Justice -- that this

21   was a capture of everything that was on those devices that

22   they could get which, as Your Honor mentioned -- that's why

23   there were the background files, and things like that.

24        I was not -- I did not understand -- and I

25   apologize if the Court wanted me to list specifically the

1    devices that were part of that.  I think I have sent a list

2    of those to plaintiffs previously, at least some of those

3    devices.

4              We certainly can provide a list -- I think we do

5    have a list we can provide that indicates the serial

6    numbers, I believe, of the devices.

7              THE COURT:  Whether they were MacBooks, iPhones,

8    laptops, et cetera.

9              MR. SIBLEY:  Sure.  I think --

10             THE COURT:  All right.  Well, I think it would be

11   good to know.

12             The Plaintiffs' counsel even said right here:  We

13   don't know what other devices may have been used prior to

14   the seizure that may not have been seized.  And I think that

15   certification has to make clear -- I think the FBI is

16   usually pretty thorough.  I think they probably took every

17   single one of Mr. Giuliani's devices that he ever touched

18   that they were -- that they could find.

19             Is that right, Mr. Giuliani?

20             THE DEFENDANT:  Would you like me to help with

21   that?

22             THE COURT:  Sure.  That's why you're here,

23   Mr. Giuliani.

24             THE DEFENDANT:  The FBI took --

25             THE COURT:  Mr. Giuliani, could you turn your mic

1    on?

2              THE DEFENDANT:  I'm sorry.  I don't mean to

3    interrupt.  I just want to help.

4              THE COURT:  And, Mr. Giuliani, your helper wants

5    to give you some water, which you are welcome to have.

6              THE DEFENDANT:  I don't mean to interrupt.  I just

7    want to see if I can shorten it and help you.

8              The FBI took every electronic device in my

9    apartment and in my law office.  I am not sure there were

10   any in my law office at that time.  If there were, they were

11   probably small ones and not relevant and didn't produce very

12   much.  The main ones were in my house because it was

13   pandemic, and I was working out of my home.

14             They also took -- and, therefore, it is a little

15   confusing.  Some of those devices are not mine.  They took

16   every device.

17             So they took a colleague's device.  They took my

18   ex-wife's computer, right, which has nothing to do with

19   this, which actually she hadn't used in four years.  So it

20   was exhaustive.

21             Plus, the FBI had been monitoring my iCloud since

22   approximately -- I may have the dates slightly off so don't

23   hold me to it exactly, but it would have been -- it would

24   have been April of 2008 -- no.  Wrong.

25             It would have been 20- -- sometime in 2017.  Late

1      2017 until around the time they searched my apartment.  They

2      got an order to monitor -- to take my iCloud records and

3      then to monitor it consistently thereafter.

4           So they really had already almost all of the

5      information that was on the devices because as I said, I

6      think in the deposition, 90 to 95 percent of my

7      communication is done on Apple, and it's backed up by the

8      iCloud.

9           So when they took -- and most of the devices they

10     took, if not all, were Apple devices that related to me.

11          So when they took all my devices, they were really

12     checking, is there anything else they could pick up that

13     they had not picked up from the iCloud.  So it's pretty --

14     nothing is ever 100 percent exhaustive.  But having done

15     this work at one time in my life, this was about as

16     exhaustive as you would get.  That was -- that, as far as I

17     know, was all transferred to Trustpoint.

18          The FBI has its own copy that is preserved.

19     Exactly if we could get access to that, I don't know, but it

20     is preserved by the FBI.  And Trustpoint has assured us that

21     they are going to preserve it in hopes that we can work

22     things out.

23          And there might be a way -- if we could talk

24     informally, there might be a way to -- if we tailored the

25     request to Trustpoint and wasn't:  We want to see everything

1    you have.  If we were to tailor a request with them that was

2    logical and made sense, we might be able to pay them a

3    limited amount.  I am not saying we could, but it would

4    suggest to me it would be practical because they make some

5    money on this.

6            THE COURT:  Well, I have two questions for you,

7    Mr. Giuliani.

8            THE DEFENDANT:  We could pay them a limited amount

9    for a search of specific things, but not -- I don't mean to

10   be critical, but they made gigantic requests, Your Honor.

11           THE COURT:  Okay.  I am going to interrupt you for

12   a second, Mr. Giuliani.

13           I am going to ask your client one question because

14   he may know the answer to this more than you, Mr. Sibley.

15           MR. SIBLEY:  Yes, Your Honor.

16           THE COURT:  You say that the FBI was monitoring

17   your iCloud account.  Was the result of that monitoring by

18   the FBI also uploaded to the Trustpoint account or do you

19   not know that?

20           THE DEFENDANT:  I think I know the answer to that,

21   but I am not sure and I would have to check with my counsel,

22   Bob Costello.

23           The answer is I think it was, but I am not -- but

24   don't hold me to it.  It may not have been.

25           THE COURT:  Okay.  Now back to you, Mr. Sibley.

 1          Thank you, Mr. Giuliani, for those clarifications.

 2          What -- the response that Mr. Giuliani just gave

 3     me demonstrates that just giving me the file types of

 4     information held in the Trustpoint dataset is insufficient.

 5     You need to find out what the data sources are of that data,

 6     if it includes the entire iCloud account that was being

 7     monitored, according to Mr. Giuliani, by the FBI.  I think

 8     that would give some assurance to the plaintiffs that might

 9     be more complete in that that iCloud account, at a minimum,

10     is preserved.

11          So I think you -- it's incumbent upon you to find

12     out from Mr. Costello, or from Trustpoint itself, what the

13     data sources are by machine identification, type of machine,

14     serial number -- to make sure we all know what we're talking

15     about -- and any other data sources that went into that

16     dataset.  That is number one.

17          I think Mr. Giuliani raises a very good point,

18     which is that the agreed-upon date range for the Trustpoint

19     dataset, as I understand it, was September 1, 2020, through

20     January 21, 2022.

21          So that if -- rather than the possibly terabytes

22     of data that are in the Trustpoint dataset, which might be a

23     lot to put into an active discovery platform for searching,

24     can be more targeted and only user-generated data from that

25     date range can be unarchived for searching that might make

1     it cheaper than $320,000, which is the amount I understand

2     that Trustpoint is asking to -- asking for to upload all of

3     their dataset.

4             So I think that is something that you can also --

5     it would be helpful for you to pursue.

6             MR. SIBLEY:  I just sent the list of devices while

7     you had the exchange with Mr. Giuliani, so that's been

8     provided to plaintiffs, Your Honor.

9             The iCloud question -- my understanding was that

10    they did have everything in Trustpoint, but it seems like

11    there may be some -- we need to -- I understand, Your Honor.

12            THE COURT:  You need to find out the specific data

13    sources.

14            All right.  I just want to do the same thing that

15    I did with the plaintiffs, which is go through the proposed

16    order to find out what precisely are all of the objections

17    and make sure I am understanding the objections to the terms

18    of the proposed order which, as I said, is described by

19    plaintiffs as narrow.  And I think, in some ways, the

20    plaintiffs' description as it being a narrow relief order is

21    accurate.

22            The proposed order asks that I direct Mr. Giuliani

23    to collect, search, and produce all materials responsive to

24    all of plaintiffs' requests for production in all locations,

25    whether in Trustpoint or not, including a privilege log

 1    specifically tailored to the searches Mr. Giuliani

 2    performed, specifically for materials responsive to

 3    plaintiffs' request for production with the assistance of a

 4    professional vendor.

 5            So with respect to that component of the proposed

 6    order, my understanding is that the defense objects to the

 7    professional vendor, essentially, for the same reason that

 8    they would object to having to search all of the materials

 9    on Trustpoint, and that's a financial issue.

10            Do I understand that correctly, or am I missing

11    something?

12            MR. SIBLEY:  That portion of it is a financial

13    issue at this point, Your Honor.

14            THE COURT:  Okay.  Then, with respect to including

15    a privilege log, do you agree -- are all of the plaintiffs

16    correct that the only privilege log that's been produced is

17    with respect to the Dominion document set and not

18    Trustpoint, not the manual searches that were done by

19    Mr. Giuliani, and not anything else?

20            MR. SIBLEY:  That is incorrect because we

21    actually -- the privilege log that was done as part of the

22    Dominion production.  They asked for all of those documents,

23    so that was part of the request:  Produce everything you

24    produced for January 6, Dominion -- that was the privilege

25    log for that set.

1          We also produced a more narrow privilege log out

2     of that privilege log that targeted, sort of, the issues in

3     this case.

4          We then produced a third privilege log because,

5     when we got the Trustpoint documents -- when we reviewed

6     those documents, some of those documents were privileged but

7     they weren't Mr. Giuliani's privilege, they were the Trump

8     campaign's privilege.  So we sent those to the Trump

9     campaign and the Trump campaign issued another privilege log

10    which we produced to them.

11         I am sure Ms. Governski probably just had

12    forgotten about that, that was during our -- after the

13    hearing that we had with Her Honor last time.

14         What I did is I took the Trustpoint documents that

15    were privileged vis-à-vis the Trump campaign, because that

16    was Mr. Giuliani's client, and sent it to the Trump campaign

17    because I did not want to be involved in making privilege

18    calls on that.

19         Now, there are documents that are privilege

20    documents like communications between me and Mr. Giuliani.

21    Have those been logged?  No.  But that was part of the

22    objection, which is that I have never had to log privilege

23    communications with my client on the case that the requests

24    have been served in.  Right?  That's not something we

25    normally do.

1          Outside of documents created for this litigation

2     with counsel, I believe everything has been logged that we

3     have claimed privilege on.

4          THE COURT:  I think Mr. Giuliani wants to speak to

5     you for a second.

6          THE DEFENDANT:  Can I ask Joe a question?

7          THE COURT:  Of course.

8          (Whereupon, counsel and defendant confer.)

9          MR. SIBLEY:  Your Honor, Mr. Giuliani reports that

10    there may be another privilege log for the criminal matter,

11    the investigation.  I was not aware of that.  But if --

12    we'll confirm that.  If there is such a log, apparently that

13    would be -- apparently what happened was the DOJ had these

14    documents.  They were sent to Judge Jones, the Special

15    Master.  There were privilege assertions made by

16    Mr. Costello, and that privilege log was then -- the special

17    matter --

18          THE DEFENDANT:  Trump privilege.

19          MR. SIBLEY:  The Special Master made rulings based

20    on that.  It sounds like we should get that document as well

21    and provide that to the plaintiffs because that may also

22    provide -- based on the descriptions, that may provide

23    insight as to whether there are documents relevant to this

24    case that were --

25          THE COURT:  Okay.  So let me just -- let me just

1    talk about -- okay.

2            I think it would be appropriate for you to do one

3    single privilege log for each dataset, each production

4    that's been made in any future production.

5            We need one privilege log that everybody

6    understands what we're talking about, because you have

7    succeeded in confusing me a little bit about which privilege

8    log has been produced and whose privileges are being

9    asserted.  Clearly, Mr. Giuliani has his own privilege to

10   assert but his clients also have privilege to assert.

11           Just so I am clear, Mr. Giuliani doesn't -- he

12   certainly doesn't represent either the former -- President

13   Trump or the campaign in any of its iterations now?

14               THE DEFENDANT:  Right.  Yes.  I do not.

15               MR. SIBLEY:  He does not.

16               THE COURT:  Okay.  And for this time frame of

17   September 1, 2020, through January 21, 2022 --

18               THE DEFENDANT:  What was the earlier date, Your

19   Honor?

20               THE COURT:  September 1, 2020.

21           Did Mr. Giuliani have an attorney-client privilege

22   with the former President and with the campaign at that

23   time?

24           He is nodding yes.

25           Is that correct, Mr. Giuliani?

1           THE DEFENDANT:  Your Honor, again, I have to check

2      the records to be exactly correct about the date.

3           September 1, 2020, I still represented the

4      President personally.  Then, shortly thereafter, I

5      represented the President in another matter and also the

6      campaign.  And that lasted until -- there I am a little

7      unsure.  Somewhere into 2021, maybe February, maybe March.

8      I would have to go check.

9           THE COURT:  I think the date was February 16th,

10      2021, when Jason Miller issued a statement that you were no

11      longer representing Mr. Trump.

12           THE DEFENDANT:  That would have been it, right.

13      It would have definitely been in existence on September 1,

14      2020.

15           THE COURT:  All right.  So with respect to

16      privilege, I just want to make sure because -- that the

17      privilege is only being asserted for

18      attorney-client-privileged work and not political consulting

19      and not PR work.

20           Are you making sure about that, Mr. Sibley?

21           MR. SIBLEY:  I haven't seen many communications

22      beyond that time frame Her Honor mentioned except for

23      communications where -- for example, Christina Bobb.  There

24      might be a communication where he reaches out to her or

25      someone from his office reaches out to her to find out

 1    information that pertains to the litigation, right?

 2          So even if you are not representing a client

 3    anymore, if there is litigation that arose over

 4    representation, there can still be a privilege even if --

 5    not representing in those matters.  But anything -- I mean,

 6    there were emails that were from, like, the Republican

 7    National Convention and some lawyers were copied on it.  We

 8    have produced all of those.

 9          THE COURT:  Okay.  Well, I just want to be sure

10    that you understand the law in this Circuit.  The Circuit

11    has made it clear in *In re Lindsey* -- all the way back to

12    1998 -- that it's only legal advice that's subject to the

13    privilege, not a lawyer's advice on political, strategic, or

14    policy issues; that would not be shielded from disclosure by

15    the attorney-client privilege.

16          So for Mr. Giuliani, who may have worn multiple

17    hats when he was doing work for the Trump campaign back in

18    2020 -- I hope you're scrutinizing any assertion of

19    privilege to be very clear that there is not an overt

20    assertion and nondisclosure of responsive records.

21          MR. SIBLEY:  We will rereview that Your Honor.

22    But I will tell you that actually -- I understand Her

23    Honor -- that is the law.

24          We actually did not claim privilege on some of the

25    meetings that Mr. Giuliani had with staff members and things

1    like that before these Georgia hearings because, after

2    looking at it, this was not in anticipation of litigation

3    but in anticipation of presenting at a hearing which would

4    not be privileged.  So we withdrew privilege assertions on

5    that basis.

6              THE COURT:  Okay.  That's reassuring.

7              Okay.  So putting aside -- let's go back to the

8    proposed order.

9              With respect to the first paragraph, I think you

10   are going to need to do a clear unified privilege log for

11   each particular production or data source that -- Trustpoint

12   being one data source for things for which you claim

13   privilege so that we all understand what's being privileged

14   here but -- what there is an assertion of privilege over.

15             But is there anything other than cost that is

16   particularly objectionable in the first paragraph of that

17   proposed order?

18             MR. SIBLEY:  Not with respect to searching those

19   repositories.

20             THE COURT:  Right.

21             MR. SIBLEY:  I mean, I suppose we can make an --

22   the problem is that there are so many different litigations

23   that if this were the only case maybe we could say it's

24   overly broad, but we have already had to collect the

25   documents for so many cases that it's really a search term

1          thing.

2                    I do have a question, though, Your Honor, about

3          the privilege log.  Is the Court going to require us to log

4          privileged communications between myself and Mr. Giuliani?

5          Normally, you only have to log privileged communications

6          that were not created as a result of the instant litigation.

7          So I am a little -- I just want to clarify.

8                    THE COURT:  Well, I didn't think that that

9          question would come up here because I had understood the

10         time frame to end January 21, 2022, which was months before

11         this litigation began and you started representing

12         Mr. Giuliani in this case.

13                   I think that that is something you can consult

14         with plaintiffs about because that shouldn't be an issue if

15         that is the time frame that they have clarified today is

16         only applied to the Trustpoint documents and not the other

17         documents.

18                   I am going to leave -- I don't want to get

19         involved in the parties' discussion about what the

20         applicable time frame is.  I just don't know enough about

21         the case to be able to do that.  You-all are the ones

22         sitting through all of the discovery, not me.

23                   MR. SIBLEY:  I understand, Your Honor.

24                   THE COURT:  So I am actually not going to answer

25         that question, essentially make a ruling, when I just -- I

1    really think that you -- the parties need to talk about

2    that.  And if it does need my intervention, I want it teed

3    up appropriately with the arguments on all sides and facts

4    so I know what I am ruling on.

5           Okay.  So then let's go to the next paragraph of

6    the proposed order which asked that Mr. Giuliani file a

7    declaration subject to penalty of perjury that details to

8    the Court efforts taken to preserve, collect, and search

9    potentially responsive data and locations that may contain

10   responsive materials, complete lists of all such locations

11   and data that Mr. Giuliani used to communicate about any

12   materials responsive to any of plaintiffs' RFPs.  The

13   specific data located in the Trustpoint database which we

14   have already discussed, and, clearly, there is a need for

15   that; and what searches, if any, have occurred of both the

16   locations and data that Mr. Giuliani used to communicate

17   about any materials responsive to the plaintiffs' RFPs and

18   the specific data on the Trustpoint database.

19          What is objectionable about that requested relief?

20          MR. SIBLEY:  Well, I don't know that it's

21   objectionable, Your Honor, but I do want to be clear about

22   something.

23          Mr. Giuliani has stated -- I can't remember if

24   it's interrogatories or requests for admissions, but he has

25   not deleted any documents.  So all of the documents --

1          THE COURT:  But not deleting documents is not the

2     same as preserving the information in a manner that can be

3     retrieved and searched.

4          MR. SIBLEY:  I understand that, Your Honor.

5     Normally, that situation arises where you have, like, an

6     auto-delete, sort of, policy at a company, or something like

7     that.

8          THE COURT:  Exactly.

9          MR. SIBLEY:  And I think what he is saying is

10    that's not the case with me, nothing gets deleted as a

11    matter of course.  I believe he has said that.  But I don't

12    think --

13         THE COURT:  What if the phone he is using dies or

14    is inoperable?

15         He has said that all of the machines he used prior

16    to April 2021 are inoperable, can't be accessed.  That can

17    happen with any machine.  So that's why you preserve that

18    data in a manner that doesn't make it disappear.

19         MR. SIBLEY:  I understand that, Your Honor.

20    But --

21         THE DEFENDANT:  It's on the cloud.

22         MR. SIBLEY:  -- I think what he has said that all

23    of that data --

24         THE COURT:  I can only speak to one person at a

25    time, Mr. Giuliani.  You are well familiar with --

1          THE DEFENDANT:  I know, Your Honor.  It's

2     frustrating.

3          THE COURT:  -- with the plight of court reporters

4     who can only take down one person speaking at a time.

5          THE DEFENDANT:  I'm sorry.  I apologize, Your

6     Honor.  I apologize.

7          THE COURT:  So, Mr. Sibley, do you want to talk to

8     your client because he's anxious to say something, or do you

9     want me just to have him say what he wishes to say?

10          MR. SIBLEY:  I will let him speak, Your Honor.

11          But the data was taken by the DOJ.  He lost the

12     ability to do any preservation as of April 2021.  This case

13     wasn't filed until January or, I think, maybe, December

14     2021.  I can't remember.

15          Whatever that data was, I mean, I think what he

16     was saying in deposition is, look, it was preserved because

17     it was taken by the government.  And it's there.  I think

18     that was what he meant to say, but I will let him speak.

19          THE COURT:  Mr. Giuliani, is that what you wanted

20     to say?

21          THE DEFENDANT:  That and -- Your Honor, that's

22     correct.  The data -- I had not deleted or changed or

23     done -- first of all, I have about 20 preservation orders,

24     much of which overlaps with theirs -- not completely, but

25     almost completely.  So I started, you know, preserving from

1    way before their case.  And then the FBI took everything, so

2    they preserved it.

3             And then I back up everything on iCloud regularly

4    so it's preserved that way as well.  And at least I have

5    done nothing knowingly -- understand, I have been doing this

6    for 50 years; I understand the obligations.

7             There is nothing I would like to hide.  I would

8    like you to see everything.  It's just the enormity of their

9    request, in my experience, is way beyond what is necessary

10   in this case.  That may also be true because I am

11   inundated -- they have 1 case, I have 20.  And some of the

12   other requests are even bigger than theirs.  If there is

13   anything missing here, it's inadvertent.  It is not for want

14   of trying to preserve everything.

15             THE COURT:  All right.  Well, having detail about

16   that in a certification --

17             THE DEFENDANT:  But I am happy to write out

18   something, if it helps --

19             THE COURT:  Excellent.

20             THE DEFENDANT:  If it helps for me to make it in a

21   more detailed statement of what I just said or answer their

22   questions -- however they want it, I will do the best I can

23   to assure them that I have done everything I can to preserve

24   it.

25             Do I understand everything with this technology?

1    Of course not; I don't.  A lot of it is confusing to me, but

2    I have preserved everything.

3               THE COURT:  All right.  So I don't see anything

4    particularly objectionable about that provision.

5               The part of the proposed order dealing with

6    Interrogatories 11 and 12 is moot.

7               And then the next part of the order asking that

8    Mr. Giuliani be precluded from relying on any evidence not

9    provided in his initial disclosures or interrogatory

10   responses -- which I would never order because I think

11   people have a right to supplement and amend.

12              But with -- is there any reason why Mr. Giuliani

13   should not be precluded from relying on any evidence not

14   provided in his initial or supplemented written disclosures

15   or interrogatory responses?

16              MR. SIBLEY:  I just think that's unripe, Your

17   Honor, because we have more discovery that needs to be

18   taken.  At the appropriate time, if that attempt is made,

19   then the Court will weigh all of the factors that the Court

20   weighs at that point and you will make that call then.

21              I just think it's premature.

22              THE COURT:  So you think it's premature as well?

23              MR. SIBLEY:  Yes.

24              THE COURT:  All right.  And then the provision

25   that Mr. Giuliani paid plaintiffs' attorneys fees for the

1    cost of the motion to compel subject to any future filing

2    detailing the same.

3         You understand that -- when the plaintiffs make a

4    motion to compel for failure to fully comply with discovery

5    obligations the Friday before the Monday close of fact

6    discovery and I have a whole dataset, clearly, that hasn't

7    been thoroughly searched no matter what the excuses are --

8    the motion to compel seems almost inevitable.

9         But would you agree that the rule, essentially,

10   requires payment of attorney's fees for filing?  I mean,

11   Rule 37(a)(5)(A) appears fairly mandatory.

12        MR. SIBLEY:  Well, Your Honor, I think if there is

13   good cause and justification; for example, for the payment

14   of -- if it's not -- I don't know that we -- we didn't

15   really oppose the motion to compel to search that data.  We

16   just couldn't do it.

17        The thing about the preservation of documents, I

18   mean, that's not -- there was no discovery request that was

19   made on that that we didn't answer.  That's just something

20   they wanted in response to the motion to compel.  So, I

21   mean, that's not really -- I don't think that's really

22   appropriate.

23        I am not sure what else -- I mean, I suppose we

24   could have went back and done some things differently, paid

25   Trustpoint's bills to where this didn't happen, but I don't

1   think that's really a discovery abuse issue which would

2   justify attorney's fees for -- I am just not sure what they

3   are getting from this motion to compel that we could have

4   done anything about other than paying Trustpoint's fees so

5   we could search those documents.

6        I am not sure what else we have done to inhibit or

7   disrupt or impede discovery efforts.  They may not be

8   satisfied with everything they have gotten, but they have

9   subpoenaed dozens of people and we haven't objected to it.

10       We haven't even taken the plaintiffs' deposition

11  because we felt like that would be unnecessary given this --

12  that is really the issue, Your Honor; what are the needs of

13  the case?  This is a defamation case.

14       We know what was said.  We know that it was

15  defamatory as far as, like, it has defamatory meaning.

16  Whether it's actually defamation, that's a separate

17  question; was it opinion?

18       There are different issues but, really, ultimately

19  the fact issues here can only really --

20       THE COURT:  You think the plaintiffs don't need

21  any more discovery than what they have got explicated in

22  their complaint?

23       MR. SIBLEY:  I think that the only thing they're

24  going to find, if they're going to find anything -- which I

25  don't think they're going to find this -- is some sort of

1    admission where Mr. Giuliani says:  I am entertaining

2    serious doubts about the truth of this statement, see

3    *Milkovich*, and I am going to make it anyway.  I don't think

4    they're going to find that.

5         But they have everything else they would need

6    circumstantially to say:  Well, you know, he should have

7    known this was false; he should have had doubts.  I just

8    don't know what else they're going to find from all of this

9    dragnet of discovery on that issue because --

10        THE COURT:  And that is the entire purpose of

11   discovery, isn't it?

12        MR. SIBLEY:  What's that, Your Honor?

13        THE COURT:  To find any evidence to address any

14   defense that Mr. Giuliani would present that he truly

15   believed that the plaintiffs were in accord with the

16   descriptions that are allegedly defamatory in that he really

17   did think that there was election fraud in Fulton County,

18   Georgia.  That is the whole purpose of discovery.

19        MR. SIBLEY:  It is, Your Honor.

20        But what I'm saying is the needs of the case.  I

21   mean, there have to be limits as to -- I mean, you know,

22   discovery has its limits, right?

23        Is it a fishing expedition?

24        THE COURT:  Do you think that it is a fishing

25   expedition when you have a limited number of keywords -- I

1     mean, do you know how many keywords there are?

2              Plaintiffs' counsel said it was around 50.  I was

3     expecting there might be around 450.  But 50, that's not

4     very many to run across datasets of computers, devices used

5     for communications, social media, email accounts, documents?

6     That's just basic discovery.  That is not excessive

7     discovery.

8              So why is there anything excessive about those

9     requests that make the requested discovery not proportional?

10             THE DEFENDANT:  Your Honor.

11             THE COURT:  Mr. Sibley.

12             MR. SIBLEY:  What I am saying, Your Honor, is that

13    when we have -- and it's exhibited by the Dominion

14    production as well.  Almost all of the communications were

15    emails.  We have searched for the emails during the relevant

16    time frames with the search terms.

17             What they're wanting to do is to go in and look at

18    a little sliver of, potentially, text messages, and things

19    like that, that might have some mention of the plaintiffs or

20    something like that.  That's what I am saying

21    is disproportionate.

22             THE COURT:  Mr. Sibley, I have read the complaint

23    in this case.  I had to deal with Mr. Giuliani's motion to

24    dismiss, so I have become much more familiar with the case.

25    I know this is not just about emails.

 1              There was a strategic plan that -- according to

 2      the complaint -- mentioned these two plaintiffs by name.

 3      There are documents.  There may be drafts of that.

 4              It's broader than email, isn't it?

 5              MR. SIBLEY:  But that document was in an email and

 6      it was not created by Mr. Giuliani.

 7              THE COURT:  That's what you say.  Aren't they

 8      allowed to test that?

 9              MR. SIBLEY:  They would be, Your Honor, but that

10      was sent via email as well.  I think the email would even

11      get those documents.  They, in fact, did get documents, I

12      think, from third parties pertaining to that.

13              This is -- I am not saying that they're not

14      entitled to it, Your Honor.  I am saying that --

15              THE COURT:  Exactly.  They are entitled to it.

16              Your client really wants to speak.

17              THE DEFENDANT:  I do, Your Honor.

18              First of all --

19              THE COURT:  Mr. Sibley, do you want to talk to

20      your client before he speaks or shall I just give him the

21      floor?

22              MR. SIBLEY:  I will let him speak, Your Honor.

23              THE COURT:  Mr. Giuliani.

24              THE DEFENDANT:  Your Honor, I have conducted hours

25      and hours of search for them, produced an enormous number of

1    documents for them.

2            I sat through a deposition for them and answered

3    every question that they asked me.  Maybe we took a

4    privilege; I am not sure we even did take privilege on

5    anything.

6            I ran every name they gave me.  I have to go back

7    and look.  It was a lot more than 40 keywords, Your Honor.

8    I don't know the exact number so I am not going to give it

9    to you.  It seemed to me very, very burdensome, but I ran

10   every single one.  It was the third time I did it for them,

11   the third time.

12           This is punishment by process, Your Honor.  That's

13   what going on here.

14           THE COURT:  Say that again.

15           THE DEFENDANT:  Punishment by process.

16           THE COURT:  Punishment by process.

17           THE DEFENDANT:  Yes.  I mean, this is --

18           THE COURT:  That's a bit of alliteration,

19   Mr. Giuliani.

20           THE DEFENDANT:  Well, no.  It's the person being

21   punished, I get it.  I get what they're doing.

22           This is the kind of -- this is the kind of -- I

23   did defamation cases for a living for *The Washington Post*,

24   believe it or not, a long time ago, for *The Wall Street*

25   *Journal*; I know the kind of discovery you do in a defamation

1    case.  This is massive discovery by a Wall Street law firm

2    being imposed on us.

3          They have more than enough information to go to

4    trial.  If we made some mistakes -- if we made some

5    mistakes -- and we did, largely because we have got 20 cases

6    going on.  And while I'm dealing with their demands, I am

7    dealing with the demands from five other cases.  They

8    overlap, and it gets confusing.  It was inadvertent and a

9    mistake.

10         I think it would be really unfair to impose costs

11   on us, because we have acted in good faith.  We have tried

12   very, very hard to comply with them.  If we haven't

13   succeeded, it's not for lack of trying.  I really think it's

14   unfair for them to impose costs on us because they could

15   have made this a lot simpler than they have made it.

16         Also, you have to recognize how complicated this

17   is.  My documents were taken from me.  So the search that I

18   could have done -- I could have done a 500-word search if I

19   had all -- by the way, the number of -- the number of

20   devices I have to search are pretty simple.  It's really,

21   basically, one phone and one iPad and then a few others here

22   and there.  But I didn't have it to do it.

23         When I got it back, for some reason that had not

24   been explained to me by the FBI -- a lot of it was deleted.

25   A lot of it is not there.

1          I am happy to -- if they would like their expert,

2    before you decide this, to come and look and see if he can

3    find what the FBI took out, fine.  I have no reason to

4    believe it would even be relevant to their case.

5          The reason I feel offended by this is I spent

6    hours and hours and hours.  I can't distinguish their case

7    from the other cases, but I know I have tried very, very

8    hard to comply with what they want.  I ran those keywords,

9    it seemed to me, three different times.  And I gave back

10   what I had.

11         The one document you are talking about you will

12   see is not in my database, it was in somebody else's

13   database.  And as soon as we discovered it, we produced it.

14   We're talking about the document that went to the -- that

15   came through Ms. Frees [sic] or Mr. Kerik -- that was a

16   document that I didn't have.  I wasn't hiding it.

17         THE COURT:  You are talking about among the

18   missing documents?

19         THE DEFENDANT:  Yes.  It was one that I had very

20   little to do with initially, and it's also one that wasn't

21   in my database.

22         MR. SIBLEY:  I believe he's talking about the --

23         THE COURT:  It's one that -- among the six missing

24   documents that the plaintiffs have identified that would be

25   responsive and on which you are a recipient or a cc that

1    were not produced by you, it could have been inadvertence;

2    it could have been you could have deleted them before you

3    were under a preservation order in this lawsuit.  There are

4    any number of reasons.  But I think you can imagine that,

5    with those six missing documents, the plaintiffs are

6    concerned that there may be other responsive records being

7    missed.

8              THE DEFENDANT:  I understand their concern about

9    that.  But in my experience, six missing documents in the

10   number of documents we're talking here is almost regularly

11   the case.  It is very, very rare that you do a discovery in

12   anything but the simplest of cases and you produce every

13   document.

14             None of us are perfect.  Not being perfect doesn't

15   mean you are deleting things.  I don't delete things.

16             THE COURT:  Let me go back to the manual search.

17   Manual searches, in this day and age, with the volume of

18   electronic data is a bit nerve-racking.

19             You didn't supervise Mr. Giuliani when he was

20   doing those manual searches, is that right?  He did it all

21   by himself.

22             MR. SIBLEY:  Yes, Your Honor.

23             THE COURT:  And you don't know precisely what

24   process he used to perform the manual search in terms of

25   keeping track of which keyword he was searching or not?

1          MR. SIBLEY:  He -- as a lawyer, Your Honor, I am

2     confident he would be able to understand how to search for

3     these terms.

4          THE COURT:  And you don't know whether he went

5     application by application by application to conduct the

6     search so that if, on his phone or on his computer, he had

7     an email application, different email accounts to access

8     emails, whether he had Excel spreadsheets, whether he had

9     PDF, whether he had Word -- you don't know whether he went

10    application by application down the line with each keyword?

11         MR. SIBLEY:  Your Honor, I understand that he

12    searched his social media accounts and his messaging

13    services because --

14         THE COURT:  Only those?

15         MR. SIBLEY:  On the new phone.

16         THE COURT:  Okay.

17         MR. SIBLEY:  On the new phone.  Because the new

18    phone -- it's outside of the time frame, right?  So that's

19    why we said any communications about this case would have

20    been like our communications.

21         What really were at issue were -- he needed to go

22    in and look at his social media messaging.  I believe what

23    he said in his declaration was, I went into every social

24    media account and looked for these messages.  So...

25         THE COURT:  And he ran each keyword individually

1     at one time?

2              MR. SIBLEY:  I would have to let him explain it,

3     Your Honor.

4              THE COURT:  You don't know that?

5              MR. SIBLEY:  I don't.

6              THE COURT:  Do you know how he saved the search

7     results for potentially responsive records that got a

8     keyword hit that he then reviewed to ensure that they were

9     or were not responsive?

10             Do you know how he did that in the manual

11    searches?

12             MR. SIBLEY:  I don't.  However, Your Honor, I

13    think there was such paucity of communications on these

14    social media platforms because he just doesn't use it very

15    often -- I am not sure that that would have been something

16    that he would have felt the need to do.

17             THE COURT:  So, to the best of your knowledge, he

18    didn't collect all the potentially responsive records that

19    got a keyword hit, segregate them for review perhaps with

20    your counsel, for whether they were responsive and

21    producible -- you don't think he did that process?

22             MR. SIBLEY:  My understanding is the only document

23    that was not -- and this was searching the new phone because

24    he has testified that he can't access the old phones -- but

25    searching the new phone -- the only thing he found was that

 1    one communication on his social media with Sidney Powell.

 2              THE COURT:  And -- I'm sorry.

 3              The plaintiffs have also said that they provided

 4    the search terms using Boolean search terminology, Boolean

 5    logic, so that it was basically not a single keyword but it

 6    could have been a phrase to do the search.

 7              Did he search for the main keyword or did he just

 8    put in the search with the full phrase?

 9              If so, that would be very confusing for some of

10    these applications or even on social media to search that

11    way.

12              MR. SIBLEY:  I understand that, Your Honor.  The

13    answer is I don't know.

14              But here is what I do know --

15              THE COURT:  Okay.  That's enough "I don't knows."

16              MR. SIBLEY:  Okay.

17              THE COURT:  That means this manual search, to my

18    mind, is unverifiable.  And that's why, typically, you

19    download the social media account contents, you put it into

20    a form on a platform that can be searched so that you can

21    ensure that the search is complete and thorough.

22              These manual searches, as I pointed out the last

23    time we were here, are very nerve-racking, not verifiable.

24    Not particularly trustworthy, despite all of the good faith

25    and due diligence that Mr. Giuliani might bring to the task.

1              MR. SIBLEY:  May I add something to that, Your

2      Honor?

3              THE COURT:  Yes.

4              MR. SIBLEY:  I also -- aside from the search

5      terms, I also requested that he find any communications that

6      pertained to any allegation of election fraud or the kind of

7      issues that would have been pertinent to this case.

8              So it wasn't -- I asked that he look not just from

9      the search terms, but anything -- I am not even sure the

10     Sidney Powell communication, quite frankly, came from the

11     search terms.  It may have been just -- well, this is about

12     the election, and I asked him to produce those documents.

13             I do want to point out for the Court that we

14     didn't just rely on the search terms.  I did have him look

15     at more generic, so...

16             THE DEFENDANT:  Your Honor.

17             THE COURT:  Why is it that you haven't just

18     downloaded the contents of those social media accounts and

19     done this in a proper way?  Is that a cost issue?

20             MR. SIBLEY:  Well, I mean, this is the first time

21     that I have -- my understanding is that there are so

22     few comm- -- this is about communications, not just, like,

23     postings -- right? -- because I believe all of the postings

24     they have -- I mean, some of that is part of their claims.

25             But as far as the communications messaging on

1   social media platforms, my understanding is there is just so

2   few that it wouldn't be -- you wouldn't need to engage a

3   professional to do it.

4            THE COURT:  But didn't he also use a manual search

5   technique such as it is to not only search social media

6   accounts but also his email accounts?

7            MR. SIBLEY:  It would have been the new email

8   account that he got after the seizure.

9            So that's -- what he said was, yes, there were

10  things that popped up, but they were all, like, our

11  attorney-client privilege communications about this case.

12  Right?  Because that --

13           THE COURT:  So he never actually went back to his

14  rhelen [sic] account?  I mean, he has a lot of email

15  accounts.

16           So he never went back to --

17           THE DEFENDANT:  That's not true.  That's not true.

18           THE COURT:  -- the rhelen account --

19           THE DEFENDANT:  Yes.

20           THE COURT:  -- the rudygiuliani@me account --

21           THE DEFENDANT:  I did.

22           THE COURT:  -- rudolphgiuliani@icloud account, all

23  of those that may have existed, you know, during the time

24  frame, as I understand it, that was agreed upon --

25           THE DEFENDANT:  Your Honor, I did.

 1              THE COURT:  Excuse me, Mr. Giuliani.

 2              THE DEFENDANT:  Counsel has stated a

 3    misimpression --

 4              (Overlapping speakers.)

 5              THE COURT:  Excuse me, Mr. Giuliani.

 6              -- to check?

 7              Because if those are not in the Trustpoint

 8    account, the only thing on Trustpoint might be what was

 9    saved onto his electronic devices; and there might be more,

10    actually, in those accounts held by the service provider

11    that he would have access to.

12              So you are saying he actually never went back and

13    searched those?

14              MR. SIBLEY:  That's not what I am saying, Your

15    Honor.

16              Part of the answer to that question would be the

17    iCloud issue that I think the Court raised earlier, because

18    some of that may have been in there as a result of the

19    iCloud.  That's something we need to get to the bottom of.

20    I believe he did -- to the extent he still has access -- and

21    if I may let him speak on it.

22              THE DEFENDANT:  Your Honor, I did what you asked

23    me to do.  All of these things were not mentioned during the

24    conference, that I should do it 14 different ways.

25              I did it the way I did it every other search.  I

1     have done many of these in many of these cases.  And I don't

2     remember this one exactly, but I can tell you my practice.

3          I took the keyword and I put it into the -- we're

4     talking about social media.  I put it into the -- I put it

5     into the social media, and I searched for it.  In this case

6     I came up with a few, not many.

7          In other cases -- meaning other cases -- I have

8     come up with a lot.

9          THE COURT:  And you used the key word as

10    specifically provided by the plaintiffs?

11         THE DEFENDANT:  Yes, Your Honor.  Exactly.  And

12    sometimes I ran it a few different ways if I came up with

13    nothing because I knew there would be suspicion if I came up

14    with nothing.  I ran it two or three different ways.

15         The simple fact is there wasn't as much about this

16    case in the social media as there were some others.  Some

17    others had been very fruitful.

18         I also went back to rhelen, and all of those other

19    emails, some of which were actually never used.  They

20    existed but they had, maybe, five uses or six uses, and most

21    of them didn't fit into this time period.  I am not even

22    sure any of them -- it may be rhelen had a few.

23         But most of the other ones were prior emails that

24    were long gone before we get to September of 2020.  But I

25    went back and checked them to make sure that that was the --

1    at least every one that I had.  So don't -- don't -- please

2    don't assume that I didn't do it when I did do it.

3             THE COURT:  And what about WhatsApp, Telegram, and

4    Signal messaging applications?

5             THE DEFENDANT:  Well, I checked both of those.  In

6    fact, I rechecked them today because Joe asked me about

7    that --

8             THE COURT:  It's not "both."  It's three;

9    WhatsApp, Telegram, and Signal.

10            THE DEFENDANT:  Okay.  Telegram I checked.  I have

11   some communications on Telegram.  I don't know that there

12   were any of theirs.  But I don't have many communications on

13   Telegram.  Very few on Signal.

14            I checked WhatsApp fully.  And during this period

15   there were very few communications on WhatsApp; none of

16   them, I don't believe, related to this case.  Those three

17   are not three that I use myself.

18            Other people call me on those.  It's not -- I

19   don't know if I am expressing myself correctly.  I don't use

20   those to initiate calls.  I have them because people that

21   communicate with me use them.

22            So, yes, I did check them.  I am not sure there

23   was anything about them in this time period about their

24   case.  But I checked them, yes, Your Honor.  And I rechecked

25   them.

1          THE COURT:  All right.  And have you preserved any

2     of the data that's on those applications in Mr. Giuliani's

3     accounts for any of those messaging applications and email

4     accounts so that you could double-check and verify that it's

5     thorough, complete, and the keyword searches have been

6     appropriately done?

7          MR. SIBLEY:  Well, I have not preserved it, Your

8     Honor, but I believe he has said that he has, so --

9          THE COURT:  Well, he just says he doesn't delete

10    stuff from there.  Is that the same as preservation in your

11    view?

12         MR. SIBLEY:  If there is a potential for deletion

13    to occur by sort of natural -- the way it's set up, I

14    suppose you would need to go in and change that to where it

15    didn't auto delete.  But I don't believe that anything -- he

16    said he doesn't delete things; he doesn't have it set up

17    that way.

18         I can certainly go in and look at what he has

19    looked at.  We have found -- I mean, there are

20    communications that are there from the time frame.  I don't

21    think there's been an auto deletion that occurred where

22    everything was wiped out at that time frame.  He certainly

23    hasn't done that.

24         THE COURT:  All right.  Well, among the missing

25    documents are two text messages between Mr. Giuliani and

1    Christina Bobb on December 4 and December 5, 2020, and those

2    were not produced by Mr. Giuliani.  So this does raise some

3    question -- both about the correctness of Mr. Giuliani's

4    recollection, which he didn't believe he had ever used text

5    messages with respect to the matters at issue in this case;

6    and it does raise questions about the thoroughness of

7    searches of text messages and the manner in which this is

8    being done without notes being kept, without clarity on how

9    the manual searches were being done.

10         You can appreciate why the plaintiffs are somewhat

11   concerned about all of the responsive records even from

12   texts being properly identified, collected, and produced.

13         Let me turn to the phone records.

14         I think your view is:  If he doesn't have his

15   phone bill sitting around his apartment within his

16   possession, he doesn't have possession or control of his

17   phone records, and it's just fine for him to tell the

18   plaintiffs to go to AT&T directly.

19         Is that, basically, Mr. Giuliani's position?

20         MR. SIBLEY:  Well, initially, I believe he had the

21   phone records but he didn't have copies of the phone

22   records, that's why we didn't object to it.  We said sure,

23   we'll produce it.  He didn't have them.  And I am not sure

24   that he --

25         THE COURT:  What do you mean he had them and then

1    he didn't have them?

2              MR. SIBLEY:  He never had them.

3              I thought that he had the records, which is why we

4    said sure, we'll produce the documents.  I wasn't going to

5    object to it, it's not objectionable.

6              But it turned out he didn't have the phone

7    records.  I mean, most of us don't keep our phone records.

8    And I looked into -- I don't keep my phone records, but it's

9    all online.

10             THE COURT:  Exactly.  It's all online.

11             So why can't he go to his AT&T account and

12   download all of the phone records that he needs in order to

13   produce to the plaintiffs?

14             And doesn't it look a little bit like a backhanded

15   way of dealing with the discovery request simply to say:

16   You go get it yourself?

17             MR. SIBLEY:  If I can explain, Your Honor.

18             I don't believe that the records they're wanting,

19   that have calls and things like that -- I am not sure he can

20   get those from his online account.  It might be -- you know,

21   he has the bill for the number, he pays the amount.

22             But what they're wanting is detailed logs of when

23   text messages were sent, not the substance, things like

24   that.  I am not sure he can get access to that, which is why

25   he says --

1      THE COURT:  Well, how can you stand before me

2   today and say he can't do it if you don't know for sure he

3   can't do that?

4      MR. SIBLEY:  Well, I believe we had -- not to

5   reveal attorney-client communications, Your Honor, but I did

6   request that these records be obtained.  And I don't believe

7   that he was able to get the records that had the information

8   that they wanted because I believe it's phone records

9   sufficient -- I am trying to remember -- phone records

10  sufficient to demonstrate calls between this time.  And I

11  just don't -- I don't think it has that.

12      That's why we said:  Look, whatever you need from

13  us, we'll sign something.  We don't have an objection to you

14  getting them.  It's just not something that we -- I am not

15  sure how we would get that, actually, Your Honor.

16      THE COURT:  It's usually much easier for the

17  accountholder to get any documentation from a provider

18  rather than going through a subpoena process, wouldn't you

19  agree?

20      MR. SIBLEY:  Yes.  But then, if that happens, Your

21  Honor, we have the problem of:  Well, how do we know you

22  gave us everything?

23      They have subpoenaed -- they have sent dozens of

24  subpoenas.  So I thought the better way --

25      THE COURT:  But that isn't that easy to deal with,

1    saying:  This is the request we made; this is what we got

2    back from AT&T.  If you want more, you are going to have to

3    explain it.  This is my understanding of your request, and

4    this is what we got.

5          Really, the phone records are something that you

6    should get to produce.

7          MR. SIBLEY:  I will instruct the client to get

8    whatever he can get from the carrier and produce those

9    documents, Your Honor.

10         THE COURT:  All right.  Is there anything else you

11   want to tell me about?

12         MR. SIBLEY:  I don't believe so, Your Honor.

13         THE COURT:  Let me just raise one other issue with

14   you.

15         That is, you do ask or -- you do cite the *Zubulake*

16   series of cases from the Southern District of New York in

17   calling the archived Trustpoint data "inaccessible" and make

18   the point, given the $320,000 arrears bill for Trustpoint --

19   that if the plaintiffs want this data because it's now

20   "inaccessible," as I understand the defense argument in the

21   opposition brief, then the plaintiffs have to do some cost

22   shifting and help pay for that.

23         I just wanted to give you an opportunity to

24   explain that more because I went back -- I had not read

25   *Zubulake* in a long time.  But I went back to see how

1      inaccessible data was defined.

2              Judge Scheindlin had identified five categories of

3      data:  One, active online data; two, near line data; three,

4      offline storage, archives; four, backup tapes; five, erased,

5      fragmented or damaged data; and then went on to hold that

6      only the first -- only the latter two categories were

7      inaccessible.

8              The first three categories that I quote are

9      typically identified as accessible for which the responding

10     party has the duty to collect, search, preserve, and

11     produce.

12             So how would -- you cited *Zubulake* for the

13     inaccessible data point.  So how, in your reading of

14     *Zubulake*, would the archived Trustpoint data even become

15     inaccessible?

16             MR. SIBLEY:  I think it would be more along the

17     lines of a backup tape, right?  Because this is not --

18             THE COURT:  I think it's offline storage,

19     archives; that's Category No. 3, not "inaccessible," because

20     it doesn't really require any forensic expertise to get

21     access to it.

22             MR. SIBLEY:  Well, these are not our -- it's not

23     like he has the archives in his files -- though, right? --

24     Your Honor?

25             This is a third-party vendor that we can only get

1    access to files from -- I mean, it does require -- I mean,

2    there were expert requirements involved in this because they

3    had to extract the data, they have to host the data.  I am

4    not sure that that would be apposite to our situation.

5         I can understand a situation where a company has

6    archived data and they have free access to it; we don't.

7         THE COURT:  Well, in my reading of the *Zubulake*

8    cases on which you relied, it's not my view that this data

9    at Trustpoint is inaccessible that would warrant a cost

10   shifting here.  I hope you are promptly able to work out the

11   situation with Trustpoint.

12        If there is nothing further that you would like to

13   say, I am going to give the plaintiffs an opportunity for

14   reply.

15        MR. SIBLEY:  Thank you, Your Honor.

16        MS. GOVERNSKI:  Thank you, Your Honor.

17        I have a few points to raise, but first I should

18   ask if there is anything in particular that you would like

19   to ask or if you'd like me to just go through my list very

20   quickly.

21        THE COURT:  Just go through your list.

22        MS. GOVERNSKI:  Okay.  First of all, there's been

23   a lot of talk today about devices and Trustpoint.  But we

24   have learned something new, which is all of this is on the

25   cloud.

1          Defendant Giuliani has said he -- 95 to 99 percent

2     of his communications are on the cloud.  So he, today, via

3     counsel or personally, has not explained why he cannot

4     download what is on the cloud or have a professional vendor

5     download what is on the cloud and conduct a search the way

6     the majority of discovery is run in cases.

7          So I think there is a lot of focus and diversions

8     to Trustpoint and to devices when the cloud is there and

9     should be a very, really, low-cost way to do this -- I

10    suspect -- perhaps a vendor time to download.  But we would

11    be happy to have our vendor let us know what the cost would

12    be to log into his Gmail, to log into his various email

13    accounts, and to perform a takeout, which we do in our

14    litigation quite frequently.

15         THE COURT:  I am going to interrupt you for just

16    one second.

17         MS. GOVERNSKI:  Sure.

18         THE COURT:  Mr. Sibley, you hear the offer to

19    actually preserve the data on the cloud in the normal

20    typical manner offered by plaintiffs to do that for you.

21    Would you be willing to have their vendor do that for you?

22         MR. SIBLEY:  Your Honor, the answer is yes,

23    provided that there is no privilege waiver if the vendor

24    accesses privileged data.  But I believe that there are

25    problems with him accessing the cloud; I believe he's

1    testified to that.

2           So I don't think that it's the case that the cloud

3    has everything that they're looking for on it.  I am not

4    sure where that came from, but he has had problems accessing

5    the cloud with respect to the data that was in the time

6    frame that the FBI did the seizure, which would be the

7    relevant time frame for this case.

8           But to answer the Court's question, the answer is

9    no.  There is no objection to assistance with preservation

10   to the extent they think that is something that needs to

11   occur, although I am not sure how much of that can be

12   accessed.

13          THE DEFENDANT:  Can I add to it, Your Honor, to

14   supplement what Mr. Sibley said?

15          THE COURT:  Mr. Giuliani, you are irrepressible.

16   Proceed.

17          THE DEFENDANT:  Your Honor, when I do the search,

18   I attempt to also check it out against the cloud.  I mean, I

19   download.  I make sure everything is downloaded.

20          And here is the problem with the cloud.  When we

21   go back to the period of time -- material that was seized by

22   the FBI, that I don't have access to on the cloud.  They

23   have it, but I don't have access to it.  I can't get that

24   from my devices.  The FBI has that.

25          THE COURT:  So it's not a matter of you having --

1    it's not a matter of you not being able to access your

2    different email accounts because, for example, you have lost

3    your password.  But once you do access the accounts you are

4    not seeing data there; is that what you are saying?

5              THE DEFENDANT:  Yes, for certain periods of time.

6              Currently?  Fine.  I can go back for the last year

7    and a half, and I can get everything on the cloud.  It's all

8    there.

9              But if I go back to a certain period of time, I

10   would have to go look at exactly where it is.  It is frozen.

11   I can't get it through our -- the stuff that's on

12   rhelen0528 -- I shouldn't give my whole one, I guess -- I

13   can't get.  The FBI still has that.  I can't figure out --

14   they give us no reason why they don't release it.

15             They gave me a letter saying the case is over.

16   They gave me a letter saying there was no indication of

17   crime, but I can't get access to that.

18             Did they destroy it?  I don't know.

19             THE COURT:  Well, I don't think the FBI is in the

20   business of preserving data for subjects of an

21   investigation and then, as a favor, turn it over --

22             THE DEFENDANT:  We can agree to disagree.

23             THE COURT:  -- I just don't think they're in that

24   business.  It doesn't surprise me, Mr. Giuliani.

25             You of all people should know that that's not --

 1     it's not unusual that they would not --

 2              THE DEFENDANT:  No, it's not usual --

 3              THE COURT:  -- cede to your request?

 4              THE DEFENDANT:  -- but they do -- it's also not

 5     impossible for them -- they also do do it.  It's a question

 6     of how compelling the request is.

 7              And, finally, I really don't know what they did

 8     with it.  I don't know exactly what they did with it.

 9              THE COURT:  All right.  But I think -- I wanted to

10     interrupt you because I think that you have an agreement

11     from the defendant that he would agree to have your vendor

12     preserve this information, and then you can proceed from

13     there in terms of working out a protocol for searching that

14     would protect privileged information.

15              MS. GOVERNSKI:  Yes.

16              THE COURT:  I am not going to get any more

17     involved in that discussion than what I just said.

18              MS. GOVERNSKI:  But Your Honor -- let's focus on

19     this rhhelen [sic] account, okay?

20              He is now saying he -- he doesn't know if it's in

21     Trustpoint -- right? -- I think we have established that.

22     We don't know if the cloud that they took was in Trustpoint.

23     We also don't know if the cloud includes, for instance, the

24     rhhelen.  And yet now he's also saying, when he accesses it,

25     these records are not there.  So we don't know if they have

1    been preserved from what he has been saying, and it sounds

2    like he doesn't know if they have been preserved.  And so it

3    seems like all we're getting here is his post-2021 devices

4    which -- and whatever is in the cloud from post 2021.

5            Now, there may be some responsive materials in

6    there, but this doesn't solve the larger problem which is

7    all of these communications in Signal, WhatsApp, Telegram,

8    his various Gmail accounts -- we don't know if they have

9    been preserved.  We don't know if they're in Trustpoint, and

10   he doesn't have access to them.

11           While we would be happy to get a cost estimate

12   from our vendor and have our vendor log into his accounts

13   and download them the proper way -- if they're not there,

14   then we're not downloading much of anything.  So I think

15   some of the -- the Court is seeing firsthand some of our

16   challenges with trying to get clear answers.  It's as clear

17   as mud.

18           If the Court would include in the order that he

19   should give us his login access and information for his

20   various email accounts for Telegram, for ProtonMail -- would

21   pass over the devices to us -- we would be happy to get an

22   estimate on that, and then work with him.

23           Of course, our position is he should have to bear

24   the cost.  But we would be happy to meet and confer and come

25   to Your Honor if we can't reach resolution on that.  We

1     think that we have more questions than answers after today.

2          It would be helpful to know, though -- we did

3     receive an inventory of the devices from Mr. Sibley, but we

4     don't know what those devices are in terms of:  Are they the

5     2000 -- the device of his wife from 2000 or is it the iPhone

6     he was actually using.  So it would be helpful if we could

7     understand exactly which devices are the ones that would

8     have materials from this time period so then we can go to

9     our vendor and provide a more tailored estimate.  But I

10    would note our current estimate to -- I believe, to

11    forensically image six to eight devices was less than

12    $10,000.

13         Very quickly -- because the Court has been more

14    than patient today -- the search terms that we provided are

15    actually filed on the docket, Docket No. 36-1.  I actually

16    was over -- I overstated the number.  There were 33 Boolean

17    search terms that covers the first and second sets.

18         I should note that -- I would direct the Court to

19    the first exhibit of our motion to compel which lists the

20    responses and objections.  And Defendant Giuliani barely

21    objected to any of our RFPs, including on overbreadth.  So

22    the claims here about how we're asking for the universe and

23    looking for a fishing expedition is belied by his own

24    responses and objections and actual terms at Docket 36-1.

25         Three more very quick clarifications.

1          The time period, Your Honor, that we agreed to, to

2     April 2021 -- for purposes of Trustpoint, we think it

3     should -- I'm sorry, for January 2002 [sic], we think it

4     actually should go through present for post Trustpoint; and

5     here is why.  We know, for instance, Christina Bobb recently

6     published a book that Defendant Giuliani provided a blurb

7     for and that that book specifically talks about the State

8     Farm arena fraud.  We think it's artificially limiting

9     potentially responsive materials if we cut it off in January

10    2022.  We have reason to believe there was continued ongoing

11    conversations.

12         I know Your Honor did not want to engage in this

13    specific time period; we can talk about it with them.  But I

14    just wanted to circle back pursuant to your question.

15         Also, Mr. Sibley referenced not needing to do a

16    log of communications with counsel.  We would agree for

17    communications between Mr. Giuliani and Mr. Sibley.  But,

18    for instance, we just received a privilege document from

19    Ms. Bobb where she is on a communication that Mr. Sibley is

20    on.  She is saying she can't produce it because Mr. Sibley

21    has said that that communication is privileged; that hasn't

22    been logged on any privilege log we have.

23         And so it seems like there are communications that

24    Mr. Sibley is on but that other third parties are on too,

25    and we would think that those should be logged because we

1    need to understand what kind of umbrella of privilege

2    they're trying to assert, which is abundantly clear

3    considering the privilege conundrum we have with all of

4    these different privilege logs.

5              I apologize to the Court if it is true that there

6    is a third privilege log.  I do not recall seeing a third

7    privilege log.  And if there is one, I do not recall it

8    being described as a privilege log vis-à-vis Trustpoint, as

9    opposed to another privilege log from the Trump campaign of

10   this universe of Dominion documents.  I will go back and

11   look.

12             But the point still remains that, as Your Honor

13   suggested, we need a clear privilege log that makes clear

14   whose privilege he is asserting and what documents they're

15   from, what repository they're from.

16             THE COURT:  Okay.  Before you move on, hold that

17   thought.

18             MS. GOVERNSKI:  Sure.

19             THE COURT:  I am going to interrupt you for one

20   second.

21             Mr. Sibley, you would agree that if there is a

22   communication with you and Mr. Giuliani and a third

23   person -- whether it's Christina Bobb or somebody else --

24   that that's a questionable privilege because third-party

25   participation would break a privilege.

1          So you would agree that that should be part of a

2     log at a minimum?

3          MR. SIBLEY:  Well, I suppose Christina Bobb is one

4     thing, she was counsel for the Trump campaign and worked

5     under him.  So if there is communications among us about

6     things that might have been done -- and there is a lot of

7     litigation -- I suppose that can be logged.

8          But we also have communications -- he had

9     mentioned Mr. Costello, there are other lawyers.  I mean,

10    that seems -- why would we need -- if everyone who is on the

11    communication is counsel for him -- Christina Bobb is not

12    counsel for him, those are not third parties in that sense.

13         THE COURT:  So for clarification of the privilege

14    log, you do not have to log communications that you

15    personally are having with Mr. Giuliani alone or with other

16    personal counsel to Mr. Giuliani.

17         But if there are other persons involved, like

18    Christina Bobb -- or any other third person who is not a

19    personal attorney to Mr. Giuliani, you need to log that so

20    that it can be tested if plaintiffs decide they want to

21    challenge the assertion of privilege over that or at least

22    have a discussion with you about why you are asserting

23    privilege.

24         MR. SIBLEY:  I understand the distinction, Your

25    Honor.

1            THE COURT:  Thank you.

2            MS. GOVERNSKI:  And my last point, Your Honor,

3      subject to any other questions you have, is that, in our

4      view, the rules are pretty clear that costs and fees are not

5      discretionary under Rule 37.  At a minimum, Your Honor has

6      indicated that she would move to compel the

7      financial-related records and the AT&T records but, really,

8      I think any time the motion to compel is granted, the rules

9      are mandatory.

10           THE COURT:  All right.

11           MS. GOVERNSKI:  Thank you, Your Honor.

12           THE COURT:  Okay.  I am going to issue a limited

13     ruling today.  I am going to grant the plaintiffs' motion to

14     compel in part today, and I am going to reserve ruling in

15     part.

16           Let me explain the part I am going to grant.

17           Mr. Giuliani must file a declaration subject to

18     penalty of perjury requiring him to detail to the Court by

19     May 30, 2023, all efforts taken to preserve, collect, and

20     search potentially responsive data and locations that may

21     contain responsive materials to all of plaintiffs' requests

22     for production.

23           As part of that, I also want a complete list of

24     all such locations and data that Mr. Giuliani used to

25     communicate about any materials responsive to any of

1   plaintiffs' requests for production including but not

2   limited to specific email accounts, text messaging

3   applications, messaging applications, social media, devices,

4   hardware, and the form of the communication.

5         Also, the specific data located in the Trustpoint

6   database which may contain but, in a submission to the Court

7   in a declaration, the list of the source devices or source

8   iCloud accounts that went into make up the Trustpoint

9   dataset.

10         Also, in the declaration, clarification of what

11   searches, if any, that have occurred to both those

12   Categories B and C.

13         I am going to reserve ruling on the requested

14   relief in the first paragraph of the proposed order that the

15   Defendant Giuliani must collect, search, and produce all

16   materials responsive to all of plaintiffs' requests for

17   productions in all locations, whether in Trustpoint or not,

18   including a privilege log specifically tailored to the

19   searches Defendant Giuliani performed specifically for

20   materials responsive to plaintiffs' requests for production

21   with the assistance of a professional vendor and bear all

22   related costs.  Because in order to evaluate the objection

23   to financial costs of the financial vendor and accessing the

24   Trustpoint dataset, Mr. Giuliani is directed to respond to

25   the request for production in Nos. 40 and 41 which relates

1    to the requests for all of his financial and net worth

2    information.

3            Plaintiffs are directed to submit a report to the

4    Court -- well, Mr. Giuliani is directed to produce to the

5    plaintiffs by May 30th, 2023, a full response to requests

6    for production Nos. 40 and 41.

7            In terms of the process we're going to follow

8    thereafter, I am going direct the plaintiffs to submit a

9    report to the Court by June 16th, 2023, with an assessment

10   of Mr. Giuliani's ability to bear the cost of further

11   searches, with any response by Mr. Giuliani to that

12   assessment by June 30th, 2023.

13           Now, if before May 30, 2023, when Mr. Giuliani is

14   required to provide the responses to RFPs Nos. 40 and 41 to

15   the plaintiffs -- if you are able to work out all of the

16   arrears with Trustpoint and able to perform full and

17   complete searches on the Trustpoint dataset, you can ask

18   me -- you can come back to me to ask me about -- to

19   reconsider the RFP -- responses to RFPs Nos. 40 and 41, but

20   I don't have great hopes for that since that's been a

21   situation that's been, I guess, outstanding for some time.

22   And we'll proceed from there in this murky mess.

23           Is there anything further from plaintiffs today?

24           I am going to be issuing this in a written order.

25           Is there anything further from the plaintiffs

1     today?

2             MS. GOVERNSKI:  Just one very -- I am very sorry

3     to keep us here.

4             The current schedule has expert discovery ending,

5     I believe, on June 16th.  I think given where we are we

6     would confer with defendant and probably file a motion to

7     extend that out.

8             THE COURT:  I am here every day.

9             MS. GOVERNSKI:  Thank you, Your Honor.

10            THE COURT:  Anything further from the defense?

11            MR. SIBLEY:  No, Your Honor.  And we would not

12    oppose any reasonable request for an extension.

13            THE COURT:  All right.  You are all excused.

14            THE DEFENDANT:  Thank you, Your Honor.

15            THE COURT:  Thank you, Mr. Giuliani.

16            (Whereupon, the proceeding concludes, 1:45 p.m.)
                            * * * * *
17                          **CERTIFICATE**

18            I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
      certify that the foregoing constitutes a true and accurate
19    transcript of my stenographic notes, and is a full, true,
      and complete transcript of the proceedings to the best of my
20    ability.

21            This certificate shall be considered null and void
      if the transcript is disassembled and/or photocopied in any
22    manner by any party without authorization of the signatory
      below.
23
              Dated this 24th day of May, 2023.
24
              /s/ Elizabeth Saint-Loth, RPR, FCRR
25            Official Court Reporter

1

## $

**$10,000** [1] - 99:12
**$320,000** [3] - 8:9,
  56:1, 91:18
**$350,000** [1] - 9:25

## /

**/s** [1] - 106:24

## 1

**1** [7] - 34:3, 55:19,
  60:17, 60:20, 61:3,
  61:13, 68:11
**1,000** [1] - 11:10
**100** [3] - 1:12, 7:22,
  53:14
**11** [6] - 4:3, 18:13,
  19:10, 19:19, 20:22,
  69:6
**110263** [1] - 1:19
**1108** [1] - 1:19
**11:07** [1] - 1:5
**12** [6] - 4:3, 19:10,
  19:19, 20:22, 35:3,
  69:6
**120-ish** [1] - 12:23
**126** [2] - 37:6, 38:1
**12th** [1] - 18:10
**14** [1] - 84:24
**15** [1] - 10:15
**16** [1] - 38:17
**16,000** [1] - 10:16
**16th** [3] - 61:9, 105:9,
  106:5
**17** [1] - 33:15
**18** [1] - 10:10
**1875** [1] - 1:12
**19** [4] - 1:5, 10:12,
  10:13, 27:8
**1998** [1] - 62:12
**1:45** [1] - 106:16

## 2

**2** [1] - 31:8
**20** [4] - 52:25, 67:23,
  68:11, 76:5
**200** [2] - 12:21, 32:24
**2000** [2] - 99:5
**20001** [1] - 1:23
**20006** [1] - 1:12
**2002** [1] - 100:3
**2008** [2] - 49:11, 52:24
**2017** [2] - 52:25, 53:1
**202** [1] - 1:13
**2020** [19] - 7:25, 12:8,
  15:18, 28:10, 28:15,

28:18, 30:23, 34:7,
  34:12, 34:21, 55:19,
  60:17, 60:20, 61:3,
  61:14, 62:18, 85:24,
  88:1
**2021** [13] - 6:22, 14:1,
  28:6, 34:24, 39:15,
  50:3, 61:7, 61:10,
  66:16, 67:12, 67:14,
  98:4, 100:2
**2022** [12] - 3:12, 18:10,
  33:15, 33:19, 35:3,
  35:4, 35:12, 47:9,
  55:20, 60:17, 64:10,
  100:10
**2023** [11] - 1:5, 16:5,
  24:7, 24:19, 49:21,
  103:19, 105:5,
  105:9, 105:12,
  105:13, 106:23
**21** [6] - 33:19, 35:12,
  38:17, 55:20, 60:17,
  64:10
**21-3354** [2] - 1:3, 2:3
**21st** [4] - 6:7, 18:12,
  23:10, 38:16
**22** [1] - 38:17
**24** [2] - 16:5, 49:21
**24th** [5] - 14:14, 24:7,
  24:15, 24:19, 106:23
**26** [1] - 37:10
**27th** [2] - 13:25, 50:2
**290** [1] - 16:23
**292** [1] - 16:24

## 3

**3** [3] - 18:13, 34:3,
  92:19
**30** [2] - 103:19, 105:13
**30(b)(6** [1] - 20:10
**303-1016** [1] - 1:13
**30th** [2] - 105:5,
  105:12
**320** [1] - 10:1
**33** [1] - 99:16
**34** [1] - 27:8
**35** [1] - 27:8
**36-1** [2] - 99:15, 99:24
**37** [7] - 23:2, 23:4,
  23:8, 23:12, 24:2,
  24:4, 103:5
**37(a)(5)(A** [1] - 70:11
**39** [1] - 27:9

## 4

**4** [2] - 18:13, 88:1
**40** [9] - 8:20, 27:10,
  46:11, 49:2, 75:7,

104:25, 105:6,
  105:14, 105:19
**400** [2] - 12:21, 32:24
**41** [8] - 8:20, 27:10,
  46:12, 49:2, 104:25,
  105:6, 105:14,
  105:19
**44-16** [1] - 4:14
**44-9** [1] - 16:23
**450** [1] - 73:3
**4th** [1] - 35:21

## 5

**5** [1] - 88:1
**50** [6] - 12:22, 31:17,
  68:6, 73:2, 73:3
**50,000** [2] - 12:21,
  32:23
**500-word** [1] - 76:18
**555** [1] - 1:15
**56-2** [2] - 34:3, 35:18
**56-3** [1] - 35:18
**56-4** [1] - 34:3
**5th** [2] - 1:15, 35:21

## 6

**6** [1] - 57:24
**619-9819** [1] - 1:16

## 7

**713** [1] - 1:20
**759** [1] - 26:18
**78701** [1] - 1:20

## 8

**85** [1] - 37:11
**8500** [1] - 10:15

## 9

**90** [3] - 15:4, 26:18,
  53:6
**90013** [1] - 1:16
**919** [1] - 1:16
**95** [2] - 53:6, 94:1
**966-6789** [1] - 1:20
**99** [1] - 94:1

## A

**a.m** [1] - 1:5
**abeyance** [2] - 20:10,
  22:5
**ability** [4] - 9:1, 67:12,
  105:10, 106:20
**able** [13] - 10:19,

21:11, 21:13, 42:25,
  50:17, 54:2, 64:21,
  79:2, 90:7, 93:10,
  96:1, 105:15, 105:16
**abundantly** [1] - 101:2
**abuse** [1] - 71:1
**accept** [1] - 21:21
**access** [27] - 6:12,
  8:10, 9:22, 19:1,
  19:2, 19:3, 25:12,
  26:7, 40:6, 44:22,
  46:6, 53:19, 79:7,
  80:24, 84:11, 84:20,
  89:24, 92:21, 93:1,
  93:6, 95:22, 95:23,
  96:1, 96:3, 96:17,
  98:10, 98:19
**accessed** [2] - 66:16,
  95:12
**accesses** [2] - 94:24,
  97:24
**accessible** [2] - 9:20,
  92:9
**accessing** [4] - 9:1,
  94:25, 95:4, 104:23
**accord** [1] - 72:15
**according** [2] - 55:7,
  74:1
**account** [21] - 15:3,
  15:5, 15:9, 15:10,
  37:4, 37:7, 54:17,
  54:18, 55:6, 55:9,
  79:24, 81:19, 83:8,
  83:14, 83:18, 83:20,
  83:22, 84:8, 89:11,
  89:20, 97:19
**accountholder** [1] -
  90:17
**accounting** [1] - 22:24
**accounts** [32] - 7:12,
  7:13, 13:21, 14:5,
  14:25, 15:7, 17:12,
  19:1, 19:2, 19:3,
  27:2, 37:14, 37:16,
  50:16, 73:5, 79:7,
  79:12, 82:18, 83:6,
  83:15, 84:10, 87:3,
  87:4, 94:13, 96:2,
  96:3, 98:8, 98:12,
  98:20, 104:2, 104:8
**accurate** [3] - 8:22,
  56:21, 106:18
**acknowledged** [1] -
  38:15
**acted** [1] - 76:11
**Action** [2] - 1:3, 2:3
**actionable** [1] - 28:21
**active** [3] - 39:5,
  55:23, 92:3
**actual** [8] - 9:11,

25:24, 25:25, 26:10,
  26:15, 26:20, 27:3,
  99:24
**add** [2] - 82:1, 95:13
**addition** [3] - 5:21,
  6:18, 22:13
**additional** [6] - 7:24,
  21:8, 21:9, 22:16,
  22:20, 44:25
**additionally** [1] - 6:11
**address** [1] - 72:13
**admission** [3] - 30:25,
  31:3, 72:1
**admissions** [1] -
  65:24
**advertisers** [1] - 27:18
**advice** [2] - 62:12,
  62:13
**afford** [2] - 9:21, 46:6
**age** [1] - 78:17
**ago** [2] - 42:10, 75:24
**agree** [11] - 18:21,
  45:6, 46:9, 57:15,
  70:9, 90:19, 96:22,
  97:11, 100:16,
  101:21, 102:1
**agreed** [12] - 33:18,
  33:21, 34:1, 35:9,
  35:24, 37:2, 38:13,
  38:18, 39:7, 55:18,
  83:24, 100:1
**agreed-upon** [4] -
  33:18, 34:1, 35:24,
  55:18
**agreement** [4] - 43:7,
  47:6, 47:11, 97:10
**agreements** [1] -
  35:11
**ahead** [3] - 10:8,
  35:19, 36:17
**aided** [1] - 1:25
**al** [2] - 1:3, 2:3
**alerted** [2] - 39:16
**aliases** [1] - 34:6
**allegation** [1] - 82:6
**alleged** [1] - 35:13
**allegedly** [1] - 72:16
**Allen** [1] - 11:20
**alliteration** [1] - 75:18
**allow** [2] - 40:6, 45:11
**allowed** [1] - 74:8
**allows** [1] - 23:2
**almost** [6] - 6:19,
  53:4, 67:25, 70:8,
  73:14, 78:10
**alone** [1] - 102:15
**alter** [1] - 21:21
**alternative** [1] - 44:21
**amend** [1] - 69:11
**amount** [5] - 10:6,

54:3, 54:8, 56:1,
89:21
**Angeles** [1] - 1:16
**ANSWER** [1] - 17:6
**answer** [22] - 18:17,
20:15, 23:23, 29:24,
40:19, 42:6, 42:11,
42:14, 42:18, 43:5,
44:13, 54:14, 54:20,
54:23, 64:24, 68:21,
70:19, 81:13, 84:16,
94:22, 95:8
**answered** [1] - 75:2
**answers** [5] - 19:10,
19:18, 21:10, 98:16,
99:1
**anticipate** [2] - 8:7,
24:3
**anticipation** [2] - 63:2,
63:3
**anxious** [1] - 67:8
**anyway** [1] - 72:3
**apart** [1] - 17:10
**apartment** [4] - 11:18,
52:9, 53:1, 88:15
**apologize** [5] - 31:12,
50:25, 67:5, 67:6,
101:5
**APPEARANCES** [1] -
1:9
**Apple** [3] - 7:13, 53:7,
53:10
**applicable** [1] - 64:20
**application** [8] -
29:21, 34:17, 79:5,
79:7, 79:10
**applications** [10] -
13:22, 14:10, 14:15,
29:17, 81:10, 86:4,
87:2, 87:3, 104:3
**applied** [1] - 64:16
**applying** [2] - 28:16,
28:17
**apposite** [1] - 93:4
**appreciate** [6] - 3:14,
4:6, 16:14, 36:25,
40:18, 88:10
**appreciated** [1] -
23:25
**approach** [1] - 9:7
**appropriate** [6] - 9:5,
22:16, 30:21, 60:2,
69:18, 70:22
**appropriately** [2] -
65:3, 87:6
**April** [8] - 6:22, 13:25,
39:15, 50:2, 52:24,
66:16, 67:12, 100:2
**archive** [2] - 8:10, 9:1
**archived** [5] - 17:24,

39:4, 91:17, 92:14,
93:6
**archives** [4] - 43:14,
92:4, 92:19, 92:23
**archiving** [3] - 10:5,
39:23, 43:10
**areas** [1] - 29:2
**arena** [1] - 100:8
**argue** [2] - 28:7, 28:19
**argument** [1] - 91:20
**arguments** [1] - 65:3
**arises** [1] - 66:5
**arose** [1] - 62:3
**arrears** [6] - 10:4,
39:3, 42:24, 46:6,
91:18, 105:16
**artificially** [1] - 100:8
**aside** [3] - 27:22, 63:7,
82:4
**assert** [3] - 60:10,
101:2
**asserted** [2] - 60:9,
61:17
**asserting** [2] - 101:14,
102:22
**assertion** [4] - 62:18,
62:20, 63:14, 102:21
**assertions** [2] - 59:15,
63:4
**assess** [1] - 45:11
**assessment** [6] - 8:21,
8:22, 8:23, 46:12,
105:9, 105:12
**assets** [1] - 48:5
**assistance** [5] - 5:7,
6:13, 57:3, 95:9,
104:21
**associated** [1] - 12:24
**assume** [1] - 86:2
**assurance** [1] - 55:8
**assure** [1] - 68:23
**assured** [1] - 53:20
**AT&T** [10] - 25:9,
25:10, 25:12, 25:13,
36:20, 36:22, 88:18,
89:11, 91:2, 103:7
**attachment** [1] - 16:7
**attempt** [4] - 5:17,
21:25, 69:18, 95:18
**attempts** [1] - 9:11
**attention** [1] - 41:16
**attorney** [6] - 60:21,
61:18, 62:15, 83:11,
90:5, 102:19
**attorney's** [3] - 22:14,
70:10, 71:2
**attorney-client** [4] -
60:21, 62:15, 83:11,
90:5
**attorney-client-**

**privileged** [1] - 61:18
**attorneys** [1] - 69:25
**August** [2] - 33:15,
47:9
**Austin** [1] - 1:20
**authorization** [1] -
106:22
**auto** [3] - 66:6, 87:15,
87:21
**auto-delete** [1] - 66:6
**available** [2] - 7:15,
49:25
**aware** [5] - 18:10,
39:18, 43:9, 59:11

**B**

**backdrop** [1] - 3:10
**backed** [1] - 53:7
**background** [1] -
50:23
**backhanded** [1] -
89:14
**backup** [2] - 92:4,
92:17
**ballpark** [1] - 31:19
**bank** [1] - 27:2
**bar** [1] - 29:15
**Bar** [1] - 11:19
**barely** [1] - 99:20
**based** [4] - 40:20,
42:25, 59:19, 59:22
**basic** [6] - 3:20, 3:23,
9:13, 25:22, 27:23,
73:6
**basis** [5] - 8:15, 21:9,
26:19, 27:10, 63:5
**batch** [1] - 11:24
**bathroom** [1] - 41:14
**bear** [3] - 98:23,
104:21, 105:10
**become** [2] - 73:24,
92:14
**BEFORE** [1] - 1:8
**began** [1] - 64:11
**behalf** [2] - 2:8, 41:23
**behavior** [1] - 24:3
**belied** [1] - 99:23
**below** [1] - 106:22
**BERYL** [1] - 1:8
**best** [3] - 68:22, 80:17,
106:19
**better** [2] - 35:11,
90:24
**between** [8] - 3:16,
22:18, 33:16, 58:20,
64:4, 87:25, 90:10,
100:17
**beyond** [3] - 14:3,
61:22, 68:9

**bigger** [1] - 68:12
**bill** [3] - 88:15, 89:21,
91:18
**bills** [1] - 70:25
**bit** [8] - 9:24, 11:10,
39:12, 47:3, 60:7,
75:18, 78:18, 89:14
**blank** [1] - 12:22
**block** [1] - 23:6
**blurb** [1] - 100:6
**board** [1] - 35:11
**Bob** [1] - 54:22
**Bobb** [12] - 11:21,
30:4, 33:16, 34:5,
61:23, 88:1, 100:5,
100:19, 101:23,
102:3, 102:11,
102:18
**book** [2] - 100:6,
100:7
**Boolean** [4] - 31:25,
81:4, 99:16
**bottom** [1] - 84:19
**break** [4] - 41:14,
41:17, 42:3, 101:25
**brief** [6] - 6:10, 41:14,
91:21
**briefing** [2] - 49:6,
49:10
**bring** [2] - 19:25,
81:25
**bringing** [2] - 39:20,
41:16
**broad** [2] - 3:19, 63:24
**broader** [2] - 28:16,
74:4
**bulk** [2] - 9:2, 31:20
**burden** [2] - 9:11, 26:3
**burdensome** [1] -
75:9
**bureaucracy** [1] -
25:14
**business** [2] - 96:20,
96:24
**busy** [1] - 41:8
**butcher** [1] - 26:17

**C**

**CA** [1] - 1:16
**calculation** [1] - 26:24
**calibrated** [1] - 31:23
**Camara** [1] - 1:18
**campaign** [11] - 12:10,
58:9, 58:15, 58:16,
60:13, 60:22, 61:6,
62:17, 101:9, 102:4
**campaign's** [1] - 58:8
**cannot** [1] - 94:3
**capture** [2] - 15:21,

50:21
**captured** [4] - 14:5,
14:9, 14:10, 14:11
**carrier** [1] - 91:8
**case** [58] - 3:11, 3:22,
3:25, 7:24, 8:13,
12:19, 13:21, 16:11,
17:4, 17:19, 18:1,
18:3, 25:23, 26:3,
26:17, 26:18, 26:25,
28:18, 42:21, 43:4,
44:9, 46:18, 49:8,
49:11, 49:13, 49:16,
58:3, 58:23, 59:24,
63:23, 64:12, 64:21,
66:10, 67:12, 68:1,
68:10, 68:11, 71:13,
72:20, 73:23, 73:24,
76:1, 77:4, 77:6,
78:11, 79:19, 82:7,
83:11, 85:5, 85:16,
86:16, 86:24, 88:5,
95:2, 95:7, 96:15
**cases** [14] - 32:19,
42:9, 63:25, 75:23,
76:5, 76:7, 77:7,
78:12, 85:1, 85:7,
91:16, 93:8, 94:6
**categories** [3] - 92:2,
92:6, 92:8
**Categories** [1] -
104:12
**Category** [1] - 92:19
**cc** [1] - 77:25
**cease** [2] - 28:14
**cede** [1] - 97:3
**certain** [3] - 40:6,
96:5, 96:9
**certainly** [8] - 27:2,
28:16, 38:22, 43:15,
51:4, 60:12, 87:18,
87:22
**certificate** [1] - 106:21
**CERTIFICATE** [1] -
106:17
**certification** [2] -
51:15, 68:16
**certify** [4] - 18:2,
18:19, 18:22, 106:18
**cetera** [2] - 13:22, 51:8
**chain** [1] - 34:10
**challenge** [2] - 23:21,
102:21
**challenges** [2] - 21:6,
98:16
**change** [2] - 24:4,
87:14
**changed** [1] - 67:22
**changing** [1] - 22:1
**cheaper** [1] - 56:1

**check** [8] - 33:22, 54:21, 61:1, 61:8, 84:6, 86:22, 87:4, 95:18
**checked** [5] - 85:25, 86:5, 86:10, 86:14, 86:24
**checking** [1] - 53:12
**Christianne** [1] - 11:20
**Christina** [10] - 11:21, 30:3, 33:16, 61:23, 88:1, 100:5, 101:23, 102:3, 102:11, 102:18
**circle** [1] - 100:14
**Circuit** [2] - 62:10
**circumstantial** [3] - 25:25, 26:12, 26:14
**circumstantially** [1] - 72:6
**citation** [1] - 49:13
**cite** [2] - 49:10, 91:15
**cited** [1] - 92:12
**cites** [1] - 18:13
**Civil** [3] - 1:3, 2:3, 3:24
**civil** [1] - 8:12
**claim** [9] - 8:11, 8:22, 12:11, 18:25, 28:21, 46:5, 47:17, 62:24, 63:12
**claimed** [3] - 26:2, 27:19, 59:3
**claiming** [2] - 30:22, 45:25
**claims** [6] - 7:3, 7:25, 9:10, 21:12, 82:24, 99:22
**clarification** [2] - 102:13, 104:10
**clarifications** [2] - 55:1, 99:25
**clarified** [2] - 44:7, 64:15
**clarify** [3] - 17:7, 34:2, 64:7
**clarity** [1] - 88:8
**clear** [23] - 14:21, 15:9, 15:20, 15:23, 23:12, 29:22, 30:12, 33:3, 33:17, 46:1, 50:6, 51:15, 60:11, 62:11, 62:19, 63:10, 65:21, 98:16, 101:2, 101:13, 103:4
**clearly** [3] - 60:9, 65:14, 70:6
**client** [14] - 41:13, 54:13, 58:16, 58:23,

60:21, 61:18, 62:2, 62:15, 67:8, 74:16, 74:20, 83:11, 90:5, 91:7
**client's** [1] - 36:3
**clients** [3] - 27:1, 34:23, 60:10
**close** [10] - 3:12, 3:13, 21:15, 39:25, 43:25, 44:3, 44:4, 44:9, 45:5, 70:5
**closer** [1] - 23:14
**closes** [2] - 43:21, 43:22
**closing** [1] - 21:6
**cloud** [19] - 7:12, 19:3, 66:21, 93:25, 94:2, 94:4, 94:5, 94:8, 94:19, 94:25, 95:2, 95:5, 95:18, 95:20, 95:22, 96:7, 97:22, 97:23, 98:4
**co** [1] - 2:16
**co-counsel** [1] - 2:16
**collaboratively** [1] - 32:20
**colleague** [3] - 2:15, 16:21, 34:20
**colleague's** [1] - 52:17
**colleagues** [1] - 35:15
**collect** [11] - 5:5, 5:18, 8:13, 13:17, 56:23, 63:24, 65:8, 80:18, 92:10, 103:19, 104:15
**collected** [2] - 11:18, 88:12
**collection** [2] - 11:14, 11:16
**collective** [1] - 12:5
**COLUMBIA** [1] - 1:1
**coming** [1] - 20:2
**comm** [1] - 82:22
**commercially** [1] - 7:14
**common** [1] - 12:11
**Common** [1] - 20:6
**communicate** [6] - 13:20, 40:4, 65:11, 65:16, 86:21, 103:25
**communicated** [2] - 34:11, 34:16
**communication** [11] - 24:22, 34:7, 53:7, 61:24, 81:1, 82:10, 100:19, 100:21, 101:22, 102:11, 104:4
**communications** [31] - 15:5, 15:6, 40:8,

58:20, 58:23, 61:21, 61:23, 64:4, 64:5, 73:5, 73:14, 79:19, 79:20, 80:13, 82:5, 82:22, 82:25, 83:11, 86:11, 86:12, 86:15, 87:20, 90:5, 94:2, 98:7, 100:16, 100:17, 100:23, 102:5, 102:8, 102:14
**Communications** [2] - 15:8, 27:15
**company** [2] - 66:6, 93:5
**compel** [17] - 3:20, 4:25, 8:8, 16:8, 19:13, 25:16, 36:16, 70:1, 70:4, 70:8, 70:15, 70:20, 71:3, 99:19, 103:6, 103:8, 103:14
**compelling** [1] - 97:6
**complaint** [6] - 28:3, 28:6, 35:1, 71:22, 73:22, 74:2
**complaints** [1] - 4:5
**complete** [11] - 13:18, 19:10, 19:23, 42:25, 55:9, 65:10, 81:21, 87:5, 103:23, 105:17, 106:19
**completely** [2] - 67:24, 67:25
**compliance** [1] - 3:22
**complicated** [1] - 76:16
**comply** [7] - 9:12, 23:10, 30:10, 39:24, 70:4, 76:12, 77:8
**component** [2] - 25:25, 57:5
**comprehensive** [1] - 7:17
**computer** [5] - 1:25, 8:25, 29:10, 52:18, 79:6
**computer-aided** [1] - 1:25
**computers** [1] - 73:4
**CONANT** [1] - 1:10
**concede** [1] - 43:2
**conceded** [1] - 24:18
**concern** [2] - 18:18, 78:8
**concerned** [3] - 39:12, 78:6, 88:11
**concludes** [1] - 106:16
**conduct** [6] - 21:14, 23:4, 31:7, 32:19,

79:5, 94:5
**conducted** [7] - 16:13, 28:24, 30:16, 30:19, 37:1, 38:3, 74:24
**confer** [4] - 44:15, 59:8, 98:24, 106:6
**conference** [2] - 43:10, 84:24
**confers** [1] - 5:16
**confident** [1] - 79:2
**confirm** [4] - 28:13, 50:15, 50:17, 59:12
**confirmed** [3] - 42:2, 50:14, 50:19
**confusing** [5] - 52:15, 60:7, 69:1, 76:8, 81:9
**connection** [2] - 11:19, 15:18
**consent** [1] - 36:10
**considered** [1] - 106:21
**considering** [1] - 101:3
**consistent** [1] - 38:20
**consistently** [1] - 53:3
**constant** [1] - 21:25
**constitutes** [1] - 106:18
**consult** [2] - 35:14, 64:13
**consulting** [1] - 61:18
**contain** [2] - 65:9, 103:21, 104:6
**contains** [1] - 41:25
**content** [1] - 15:25
**contents** [2] - 81:19, 82:18
**continued** [2] - 34:23, 100:10
**continuing** [1] - 3:8
**contract** [2] - 39:6, 40:3
**contracts** [1] - 27:18
**control** [3] - 27:20, 40:21, 88:16
**conundrum** [1] - 101:3
**Convention** [1] - 62:7
**conversation** [1] - 48:21
**conversations** [1] - 100:11
**cooperation** [1] - 21:20
**copied** [1] - 62:7
**copies** [1] - 88:21
**copy** [1] - 53:18
**corporate** [1] - 20:13
**corporation** [1] -

25:14
**Correct** [1] - 17:22
**correct** [8] - 5:23, 33:7, 43:1, 48:13, 57:16, 60:25, 61:2, 67:22
**correctly** [4] - 17:2, 17:11, 57:10, 86:19
**correctness** [1] - 88:3
**correspondence** [2] - 5:15, 50:20
**cost** [21] - 4:24, 8:9, 8:11, 8:15, 9:11, 9:14, 10:3, 10:6, 10:9, 22:14, 46:2, 63:15, 70:1, 82:19, 91:21, 93:9, 94:9, 94:11, 98:11, 98:24, 105:10
**Costello** [8] - 42:20, 44:17, 50:7, 50:18, 54:22, 55:12, 59:16, 102:9
**costs** [8] - 10:5, 10:6, 45:21, 76:10, 76:14, 103:4, 104:22, 104:23
**Counsel** [1] - 84:2
**counsel** [27] - 2:5, 2:10, 2:16, 5:15, 5:22, 5:25, 6:5, 6:6, 6:13, 11:18, 18:10, 20:12, 38:3, 38:11, 42:8, 51:12, 54:21, 59:2, 59:8, 73:2, 80:20, 94:3, 100:16, 102:4, 102:11, 102:12, 102:16
**count** [2] - 10:23, 33:7
**County** [1] - 72:17
**course** [14] - 2:14, 4:8, 11:6, 26:11, 26:24, 27:3, 28:5, 28:7, 32:18, 41:15, 59:7, 66:11, 69:1, 98:23
**COURT** [192] - 1:1, 1:8, 2:9, 2:18, 2:21, 2:25, 3:3, 4:16, 4:23, 5:3, 5:22, 6:1, 8:7, 9:18, 10:1, 10:12, 10:22, 11:5, 11:25, 13:2, 13:12, 14:20, 14:24, 15:2, 15:14, 16:1, 16:16, 17:20, 17:23, 19:8, 20:19, 21:13, 22:8, 22:11, 23:6, 23:11, 23:20, 24:6, 24:21, 26:9, 27:25, 28:23, 30:8, 31:5, 31:14, 31:17,

4

32:7, 32:15, 33:4, 33:14, 33:24, 34:14, 35:1, 35:5, 35:8, 35:16, 35:19, 35:23, 36:4, 36:24, 37:13, 38:1, 38:8, 38:10, 38:24, 40:2, 40:12, 40:15, 40:24, 41:7, 41:12, 41:15, 41:20, 42:14, 42:23, 43:20, 44:15, 44:19, 45:20, 46:3, 46:22, 47:23, 48:8, 48:18, 48:25, 49:2, 51:7, 51:10, 51:22, 51:25, 52:4, 54:6, 54:11, 54:16, 54:25, 56:12, 57:14, 59:4, 59:7, 59:25, 60:16, 60:20, 61:9, 61:15, 62:9, 63:6, 63:20, 64:8, 64:24, 66:1, 66:8, 66:13, 66:24, 67:3, 67:7, 67:19, 68:15, 68:19, 69:3, 69:22, 69:24, 71:20, 72:10, 72:13, 72:24, 73:11, 73:22, 74:7, 74:15, 74:19, 74:23, 75:14, 75:16, 75:18, 77:17, 77:23, 78:16, 78:23, 79:4, 79:14, 79:16, 79:25, 80:4, 80:6, 80:17, 81:2, 81:15, 81:17, 82:3, 82:17, 83:4, 83:13, 83:18, 83:20, 83:22, 84:1, 84:5, 85:9, 86:3, 86:8, 87:1, 87:9, 87:24, 88:25, 89:10, 90:1, 90:16, 90:25, 91:10, 91:13, 92:18, 93:7, 93:21, 94:15, 94:18, 95:15, 95:25, 96:19, 96:23, 97:3, 97:9, 97:16, 101:16, 101:19, 102:13, 103:1, 103:10, 103:12, 106:8, 106:10, 106:13, 106:15
**court** [1] - 67:3
**Court** [44] - 1:22, 1:22, 2:2, 3:16, 14:13, 16:22, 18:13, 20:16, 22:16, 23:9, 24:7, 25:5, 43:9, 44:5, 45:10, 45:19, 45:24, 46:14, 46:15, 47:8, 47:22, 48:3, 48:4, 48:11, 48:16, 49:22,

50:25, 64:3, 65:8, 69:19, 82:13, 84:17, 98:15, 98:18, 99:13, 99:18, 101:5, 103:18, 104:6, 105:4, 105:9, 106:25
**Court's** [4] - 16:5, 19:23, 30:10, 95:8
**courtesy** [1] - 32:18
**COURTROOM** [1] - 2:2
**courts** [1] - 49:14
**cover** [1] - 37:16
**covers** [1] - 99:17
**created** [5] - 12:5, 50:9, 59:1, 64:6, 74:6
**credentials** [1] - 7:16
**crime** - 96:17
**criminal** [2] - 42:21, 59:10
**critical** [1] - 54:10
**curious** [1] - 20:25
**current** [5] - 29:7, 43:17, 48:15, 99:10, 106:4
**custody** [2] - 27:20, 40:21
**cut** [1] - 100:9
**cutoff** [1] - 34:21

# D

**D'Onofrio** [1] - 49:10
**D.C** [4] - 1:6, 1:23, 11:19, 40:20
**D.D.C** [1] - 49:11
**damage** [2] - 45:15, 48:12
**damaged** [1] - 92:5
**damages** [1] - 26:23
**data** [77] - 4:1, 7:16, 7:22, 7:23, 8:10, 8:13, 9:1, 13:18, 13:19, 13:23, 16:13, 17:23, 28:25, 29:3, 39:4, 39:8, 39:10, 39:17, 40:5, 40:16, 41:24, 43:2, 43:10, 43:19, 44:22, 44:23, 45:14, 46:1, 46:7, 49:21, 49:23, 50:2, 50:9, 50:18, 55:5, 55:13, 55:15, 55:22, 55:24, 56:12, 63:11, 63:12, 65:9, 65:11, 65:13, 65:16, 65:18, 66:18, 66:23, 67:11, 67:15, 67:22, 70:15, 78:18, 87:2, 91:17,

91:19, 92:1, 92:3, 92:5, 92:13, 92:14, 93:3, 93:6, 93:8, 94:19, 94:24, 95:5, 96:4, 96:20, 103:20, 103:24, 104:5
**database** [8] - 13:24, 41:22, 65:13, 65:18, 77:12, 77:13, 77:21, 104:6
**dataset** [21] - 9:22, 14:1, 32:10, 37:15, 37:17, 39:13, 42:4, 44:10, 49:23, 50:8, 50:12, 55:4, 55:16, 55:19, 55:22, 56:3, 60:3, 70:6, 104:9, 104:24, 105:17
**datasets** [1] - 73:4
**date** [10] - 9:5, 33:22, 34:21, 35:9, 35:24, 55:18, 55:25, 60:18, 61:2, 61:9
**Dated** [1] - 106:23
**dates** [1] - 52:22
**dawned** [1] - 31:22
**days** [4] - 19:11, 19:15, 19:16, 35:13
**DC** [1] - 1:12
**deadline** [1] - 19:11
**deal** [2] - 73:23, 90:25
**dealing** [4] - 69:5, 76:6, 76:7, 89:15
**December** [9] - 18:10, 28:6, 28:15, 35:21, 35:22, 67:13, 88:1
**decide** [2] - 77:2, 102:20
**declaration** [12] - 13:16, 16:2, 16:6, 31:5, 31:9, 36:2, 36:18, 65:7, 79:23, 103:17, 104:7, 104:10
**deemed** [1] - 22:16
**defamation** [5] - 49:8, 71:13, 71:16, 75:23, 75:25
**defamatory** [4] - 35:13, 71:15, 72:16
**defaming** [1] - 27:1
**DEFENDANT** [46] - 42:13, 42:18, 44:17, 51:20, 51:24, 52:2, 52:6, 54:8, 54:20, 59:6, 59:18, 60:14, 60:18, 61:1, 61:12, 66:21, 67:1, 67:5, 67:21, 68:17, 68:20, 73:10, 74:17, 74:24,

75:15, 75:17, 75:20, 77:19, 78:8, 82:16, 83:17, 83:19, 83:21, 83:25, 84:2, 84:22, 85:11, 86:5, 86:10, 95:13, 95:17, 96:5, 96:22, 97:2, 97:4, 106:14
**Defendant** [19] - 1:6, 6:8, 6:18, 12:9, 14:6, 20:12, 23:9, 23:24, 25:11, 28:13, 34:7, 34:23, 36:1, 40:19, 94:1, 99:20, 100:6, 104:15, 104:19
**defendant** [9] - 3:2, 5:14, 19:14, 24:15, 24:18, 49:15, 59:8, 97:11, 106:6
**defendant's** [3] - 4:19, 16:9, 24:6
**defense** [8] - 10:24, 21:20, 38:11, 41:12, 57:6, 72:14, 91:20, 106:10
**DEFENSE** [1] - 1:18
**defined** [1] - 92:1
**definitely** [2] - 31:15, 61:13
**definition** [1] - 40:20
**delete** [5] - 66:6, 78:15, 87:9, 87:15, 87:16
**deleted** [6] - 19:4, 65:25, 66:10, 67:22, 76:24, 78:2
**deleting** [2] - 66:1, 78:15
**deletion** [1] - 87:12, 87:21
**delivered** [1] - 43:23
**demands** [2] - 76:6, 76:7
**Democracy** [2] - 1:15, 2:17
**demonstrate** [1] - 90:10
**demonstrates** [1] - 55:3
**deny** [1] - 6:21
**Department** [1] - 50:20
**dependent** [1] - 17:20
**depose** [1] - 21:11
**deposition** [16] - 5:21, 5:24, 6:11, 7:21, 16:4, 16:17, 16:22, 16:23, 17:17, 21:14, 31:1, 31:2, 53:6, 67:16, 71:10, 75:2

**depositions** [1] - 20:10
**DEPUTY** [1] - 2:2
**derive** [1] - 50:16
**derived** [1] - 11:17
**described** [3] - 4:16, 56:18, 101:8
**describes** [1] - 49:24
**description** [2] - 4:19, 56:20
**descriptions** [2] - 59:22, 72:16
**designed** [1] - 32:3
**desist** [2] - 28:14, 28:15
**desperate** [1] - 38:21
**despite** [2] - 4:18, 81:24
**destroy** [1] - 96:18
**detail** [4] - 16:3, 24:5, 68:15, 103:18
**detailed** [3] - 49:20, 68:21, 89:22
**detailing** [4] - 13:17, 16:12, 22:15, 70:2
**details** [4] - 4:7, 5:13, 6:10, 65:7
**determination** [2] - 9:19, 9:22
**device** [7] - 29:23, 32:2, 32:6, 52:8, 52:16, 52:17, 99:5
**devices** [60] - 5:25, 6:5, 6:13, 6:20, 6:21, 7:2, 7:7, 7:10, 10:9, 10:11, 10:19, 11:15, 13:25, 14:3, 15:17, 17:12, 22:25, 29:6, 29:7, 29:12, 30:23, 30:24, 39:9, 39:14, 44:24, 45:12, 45:15, 45:18, 50:2, 50:6, 50:10, 50:11, 50:16, 50:21, 51:1, 51:3, 51:6, 51:13, 51:17, 52:15, 53:5, 53:9, 53:10, 53:11, 56:6, 73:4, 76:20, 84:9, 93:23, 94:8, 95:24, 98:3, 98:21, 99:3, 99:4, 99:7, 99:11, 104:3, 104:7
**dies** [1] - 66:13
**different** [13] - 14:7, 20:3, 29:2, 49:25, 63:22, 71:18, 77:9, 79:7, 84:24, 85:12, 85:14, 96:2, 101:4
**differently** [1] - 70:24
**difficult** [1] - 23:23

**dig** [1] - 4:6
**diligence** [1] - 81:25
**direct** [6] - 33:15, 33:24, 34:17, 56:22, 99:18, 105:8
**directed** [3] - 104:24, 105:3, 105:4
**directly** [4] - 25:12, 26:22, 27:3, 88:18
**disadvantage** [1] - 44:4
**disagree** [1] - 96:22
**disappear** [1] - 66:18
**disassembled** [1] - 106:21
**disclose** [1] - 42:9
**disclosure** [1] - 62:14
**disclosures** [5] - 20:25, 21:4, 21:8, 69:9, 69:14
**discovered** [1] - 77:13
**discovery** [58] - 3:4, 3:6, 3:11, 3:17, 3:22, 4:2, 6:24, 8:1, 9:13, 10:18, 14:17, 16:11, 21:6, 21:12, 21:15, 21:19, 25:22, 26:4, 28:9, 32:19, 35:8, 35:9, 39:25, 41:9, 43:21, 43:22, 43:23, 43:25, 44:3, 44:5, 44:8, 44:9, 44:10, 45:5, 48:12, 49:15, 55:23, 64:22, 69:17, 70:4, 70:6, 70:18, 71:1, 71:7, 71:21, 72:9, 72:11, 72:18, 72:22, 73:6, 73:7, 73:9, 75:25, 76:1, 78:11, 89:15, 94:6, 106:4
**discretion** [4] - 23:3, 23:8, 46:16, 48:17
**discretionary** [1] - 103:5
**discussed** [2] - 45:10, 65:14
**discussing** [1] - 36:2
**discussion** [3] - 64:19, 97:17, 102:22
**dismiss** [1] - 73:24
**disproportionate** [1] - 73:21
**dispute** [5] - 3:4, 23:14, 38:11, 41:9, 42:22
**disputes** [2] - 3:8, 28:11
**disrupt** [1] - 71:7
**dissatisfaction** [2] -

3:17, 4:18
**distinction** [1] - 102:24
**distinguish** [1] - 77:6
**District** [2] - 26:5, 91:16
**DISTRICT** [3] - 1:1, 1:1, 1:8
**diversions** [1] - 94:7
**divorce** [2] - 46:18, 47:2
**docket** [5] - 3:11, 19:24, 33:13, 47:4, 99:15
**Docket** [3] - 16:23, 99:15, 99:24
**docketed** [2] - 4:14, 47:19
**docs** [2] - 11:16, 12:14
**document** [16] - 12:18, 24:8, 24:11, 24:21, 32:1, 34:11, 34:15, 57:17, 59:20, 74:5, 77:11, 77:14, 77:16, 78:13, 80:22, 100:18
**documentation** [2] - 48:9, 90:17
**documents** [60] - 9:3, 11:8, 11:10, 11:20, 11:23, 12:1, 12:7, 12:16, 12:21, 12:24, 17:3, 17:12, 24:16, 27:6, 27:23, 28:9, 33:5, 33:6, 33:8, 33:9, 33:15, 33:19, 34:6, 38:21, 42:5, 57:22, 58:5, 58:6, 58:14, 58:19, 58:20, 59:1, 59:14, 59:23, 63:25, 64:16, 64:17, 65:25, 66:1, 70:17, 71:5, 73:5, 74:3, 74:11, 75:1, 76:17, 77:18, 77:24, 78:5, 78:9, 78:10, 82:12, 87:25, 89:4, 91:9, 101:10, 101:14
**DOJ** [3] - 6:22, 59:13, 67:11
**Dominion** [13] - 11:8, 11:11, 11:16, 11:24, 12:14, 12:18, 13:6, 28:8, 57:17, 57:22, 57:24, 73:13, 101:10
**done** [31] - 5:14, 5:15, 17:10, 18:23, 19:7, 27:23, 30:22, 32:12, 42:8, 42:12, 43:12, 45:13, 53:7, 53:14,

57:18, 57:21, 67:23, 68:5, 68:23, 70:24, 71:4, 71:6, 76:18, 82:19, 85:1, 87:6, 87:23, 88:8, 88:9, 102:6
**double** [1] - 87:4
**double-check** [1] - 87:4
**doubts** [2] - 72:2, 72:7
**down** [5] - 4:6, 18:14, 20:2, 67:4, 79:10
**download** [8] - 7:16, 81:19, 89:12, 94:4, 94:5, 94:10, 95:19, 98:13
**downloaded** [2] - 82:18, 95:19
**downloading** [1] - 98:14
**dozens** [2] - 71:9, 90:23
**drafting** [1] - 39:20
**drafts** [1] - 74:3
**dragnet** [1] - 72:9
**due** [1] - 81:25
**dumped** [2] - 14:1, 50:12
**during** [11] - 5:21, 5:24, 6:6, 6:11, 7:21, 16:22, 58:12, 73:15, 83:23, 84:23, 86:14
**duties** [1] - 3:23
**duty** [4] - 28:1, 28:3, 28:19, 92:10

**E**

**eagerly** [1] - 20:11
**early** [1] - 11:9
**ears** [2] - 46:4, 46:10
**easier** [1] - 90:16
**easily** [1] - 7:16
**easy** [1] - 90:25
**ECF** [1] - 4:14
**edge** [1] - 49:3
**eDiscovery** [2] - 40:16, 45:1
**effect** [1] - 15:23
**effort** [3] - 12:5, 18:2, 40:3
**efforts** [15] - 3:23, 12:8, 13:17, 16:12, 18:8, 18:11, 21:19, 23:25, 27:13, 28:18, 34:8, 34:13, 65:8, 71:7, 103:19
**eight** [2] - 2:22, 99:11
**either** [5] - 21:3, 33:3, 40:5, 44:22, 60:12

**election** [9] - 7:25, 12:8, 15:18, 28:18, 34:8, 34:12, 72:17, 82:6, 82:12
**Election** [1] - 28:10
**electronic** [13] - 13:25, 39:14, 44:24, 45:12, 50:2, 50:11, 50:16, 52:8, 78:18, 84:9
**ELIZABETH** [1] - 106:18
**Elizabeth** [2] - 1:22, 106:24
**Email** [3] - 1:13, 1:17, 1:21
**email** [31] - 3:15, 7:13, 7:15, 8:5, 13:21, 14:4, 14:21, 14:25, 15:8, 25:7, 37:4, 37:7, 37:14, 37:15, 37:16, 38:18, 73:5, 74:4, 74:5, 74:10, 79:7, 83:6, 83:7, 83:14, 87:3, 94:12, 96:2, 98:20, 104:2
**emails** [23] - 10:23, 14:7, 14:9, 14:23, 15:12, 27:22, 32:23, 37:4, 37:6, 37:20, 38:1, 38:12, 38:22, 43:8, 50:15, 62:6, 73:15, 73:25, 79:8, 85:19, 85:23
**encouraging** [1] - 40:12
**end** [2] - 35:9, 64:10
**ending** [2] - 35:12, 106:4
**ends** [1] - 33:19
**enforcement** [1] - 47:5
**engage** [5] - 5:19, 6:16, 7:8, 83:2, 100:12
**engaged** [1] - 6:8
**enormity** [1] - 68:8
**enormous** [1] - 74:25
**ensure** [2] - 80:8, 81:21
**entered** [1] - 44:1
**entertaining** [1] - 72:1
**entire** [6] - 31:20, 46:17, 46:22, 50:12, 55:6, 72:10
**entirely** [2] - 15:20, 15:23
**entitled** [8] - 19:6, 25:20, 25:23, 26:5, 27:4, 48:8, 74:14, 74:15
**erased** [1] - 92:4

**especially** [4] - 23:9, 23:24, 25:13, 27:14
**essentially** [5] - 21:11, 43:2, 57:7, 64:25, 70:9
**establish** [2] - 26:3, 49:16
**established** [1] - 97:21
**estimate** [5] - 10:14, 98:11, 98:22, 99:9, 99:10
**estimated** [4] - 1:3, 2:3, 13:22, 51:8
**evaluate** [1] - 104:22
**evaluating** [1] - 47:12
**ever-changing** [1] - 22:1
**evidence** [8] - 9:12, 20:24, 21:3, 26:12, 26:14, 69:8, 69:13, 72:13
**evidentiary** [2] - 15:24
**ex** [5] - 46:18, 46:24, 47:12, 48:7, 52:18
**ex-wife** [3] - 46:18, 47:12, 48:7
**ex-wife's** [2] - 46:24, 52:18
**exact** [4] - 15:16, 27:7, 33:22, 75:8
**exactly** [18] - 5:14, 7:2, 10:4, 14:22, 15:1, 18:23, 22:1, 52:23, 53:19, 61:2, 66:8, 74:15, 85:2, 85:11, 89:10, 96:10, 97:8, 99:7
**example** [4] - 47:14, 61:23, 70:13, 96:2
**Excel** [1] - 79:8
**excellent** [1] - 68:19
**except** [1] - 61:22
**excerpts** [1] - 16:23
**excessive** [2] - 73:6, 73:8
**exchange** [1] - 56:7
**exclusion** [1] - 50:10
**exclusively** [1] - 6:19
**excuse** [3] - 10:2, 84:1, 84:5
**excused** [1] - 106:13
**excuses** [1] - 70:7
**exercise** [1] - 22:21
**exhaustive** [3] - 52:20, 53:14, 53:16
**Exhibit** [1] - 34:3
**exhibit** [1] - 99:19
**exhibited** [1] - 73:13

6

**exhibits** [1] - 41:6
**exist** [1] - 14:17
**existed** [3] - 10:5, 83:23, 85:20
**existence** [1] - 61:13
**expect** [1] - 8:10
**expectation** [1] - 38:23
**expected** [1] - 19:6
**expecting** [1] - 73:3
**expedition** [3] - 72:23, 72:25, 99:23
**experience** [2] - 68:9, 78:9
**expert** [6] - 6:25, 8:25, 45:16, 77:1, 93:2, 106:4
**expertise** [1] - 92:20
**explain** [7] - 11:5, 30:9, 80:2, 89:17, 91:3, 91:24, 103:16
**explained** [2] - 76:24, 94:3
**explicated** [1] - 71:21
**explore** [1] - 36:20
**expressing** [2] - 3:17, 86:19
**expressly** [1] - 49:13
**extend** [1] - 106:7
**extension** [1] - 106:12
**extensive** [5] - 3:15, 5:15, 5:16, 37:16, 41:6
**extent** [6] - 18:7, 36:19, 37:13, 47:10, 84:20, 95:10
**extract** [1] - 93:3

## F

**F.2d** [1] - 26:18
**face** [1] - 34:9
**facie** [3] - 26:3, 49:8, 49:16
**fact** [13] - 4:17, 14:16, 18:19, 21:12, 26:16, 36:5, 39:11, 42:8, 70:5, 71:19, 74:11, 85:15, 86:6
**factors** [1] - 69:19
**facts** [1] - 65:3
**failed** [1] - 5:18
**failure** [1] - 70:4
**fairly** [2] - 45:4, 70:11
**faith** [2] - 76:11, 81:24
**fall** [1] - 35:24
**falls** [1] - 16:11
**false** [2] - 32:22, 72:7
**familiar** [2] - 66:25, 73:24

**far** [7] - 10:15, 28:20, 48:16, 50:18, 53:16, 71:15, 82:25
**Farm** [1] - 100:8
**Farr** [3] - 1:11, 2:8, 2:15
**fashion** [1] - 8:14
**favor** [1] - 96:21
**favorite** [1] - 3:5
**FBI** [20] - 13:25, 17:21, 50:3, 51:15, 51:24, 52:8, 52:21, 53:18, 53:20, 54:16, 54:18, 55:7, 68:1, 76:24, 77:3, 95:6, 95:22, 95:24, 96:13, 96:19
**FCRR** [3] - 1:22, 106:18, 106:24
**features** [1] - 34:17
**February** [2] - 61:7, 61:9
**federal** [3] - 3:5, 30:11, 49:14
**fees** [6] - 22:14, 69:25, 70:10, 71:2, 71:4, 103:4
**felt** [2] - 71:11, 80:16
**few** [10] - 35:13, 76:21, 82:22, 83:2, 85:6, 85:12, 85:22, 86:13, 86:15, 93:17
**figure** [3] - 21:25, 32:21, 96:13
**file** [9] - 9:5, 13:16, 25:15, 46:17, 49:25, 55:3, 65:6, 103:17, 106:6
**filed** [6] - 19:13, 28:6, 36:16, 47:8, 67:13, 99:15
**files** [7] - 7:5, 11:17, 38:18, 50:13, 50:23, 92:23, 93:1
**filing** [8] - 4:24, 14:13, 19:15, 22:15, 24:4, 28:3, 70:1, 70:10
**filings** [3] - 41:5, 47:3, 47:5
**finally** [2] - 4:4, 97:7
**financial** [19] - 8:18, 8:20, 9:12, 25:3, 25:19, 26:9, 26:24, 27:9, 46:13, 47:11, 47:13, 49:7, 49:15, 57:9, 57:12, 103:7, 104:23, 105:1
**financial-related** [1] - 103:7
**fine** [3] - 77:3, 88:17, 96:6

**firm** [1] - 76:1
**first** [31] - 5:9, 8:16, 9:7, 9:10, 9:17, 9:21, 10:16, 10:25, 23:1, 31:20, 36:13, 36:15, 38:18, 39:22, 43:11, 46:9, 47:25, 63:9, 63:16, 67:23, 74:18, 82:20, 92:6, 92:8, 93:17, 93:22, 99:17, 99:19, 104:14
**firsthand** [1] - 98:15
**fishing** [3] - 72:23, 72:24, 99:23
**fit** [1] - 85:21
**five** [7] - 14:7, 19:11, 41:14, 76:7, 85:20, 92:2, 92:4
**flag** [1] - 20:18
**floor** [1] - 74:21
**focus** [2] - 94:7, 97:18
**focused** [1] - 6:19
**follow** [2] - 44:6, 105:7
**FOR** [3] - 1:1, 1:10, 1:18
**force** [1] - 22:24
**foregoing** [1] - 106:18
**forensic** [7] - 8:25, 22:24, 44:25, 45:11, 50:11, 92:20
**forensically** [1] - 99:11
**forensics** [1] - 6:25
**forgotten** [1] - 58:12
**form** [3] - 36:10, 81:20, 104:4
**former** [2] - 60:12, 60:22
**forth** [3] - 7:2, 12:13, 32:21
**forward** [2] - 2:5, 20:11
**founder** [1] - 27:15
**four** [3] - 14:8, 52:19, 92:4
**fourth** [2] - 24:25, 25:2
**fragmented** [1] - 92:5
**frame** [17] - 33:18, 34:1, 35:6, 35:12, 37:2, 37:3, 60:16, 61:22, 64:10, 64:15, 64:20, 79:18, 83:24, 87:20, 87:22, 95:6, 95:7
**frames** [1] - 73:16
**frankly** [1] - 82:10
**frantic** [1] - 39:24
**fraud** [3] - 72:17, 82:6, 100:8
**free** [2] - 7:14, 93:6

**FREEMAN** [1] - 1:3
**Freeman** [1] - 2:3
**frees** [1] - 77:15
**frequently** [1] - 94:14
**Friday** [2] - 45:4, 70:5
**friendly** [1] - 3:7
**front** [2] - 2:23, 31:13
**frozen** [1] - 96:10
**fruitful** [1] - 85:17
**frustrating** [1] - 67:2
**frustration** [1] - 36:25
**full** [8] - 8:16, 18:7, 28:17, 37:2, 81:8, 105:5, 105:16, 106:19
**fully** [4] - 4:5, 43:3, 70:4, 86:14
**Fulton** [1] - 72:17
**fundamental** [1] - 3:21
**future** [5] - 22:15, 23:17, 24:1, 60:4, 70:1
**fuzzy** [2] - 32:9, 32:12

## G

**Gallagher** [3] - 1:11, 2:8, 2:16
**generally** [1] - 50:1
**generated** [2] - 50:9, 55:24
**generic** [1] - 82:15
**Georgia** [2] - 63:1, 72:18
**gigantic** [1] - 54:10
**GIULIANI** [1] - 1:5
**Giuliani** [121] - 2:4, 3:2, 4:24, 5:4, 5:14, 6:2, 6:4, 6:11, 6:18, 7:8, 7:19, 8:9, 8:18, 10:17, 11:10, 13:8, 13:16, 14:6, 15:7, 16:3, 16:21, 17:2, 18:1, 18:13, 18:25, 19:15, 20:23, 22:13, 23:9, 23:24, 24:9, 25:11, 27:15, 27:16, 28:13, 28:24, 32:12, 33:16, 34:7, 34:12, 36:1, 36:10, 39:3, 39:6, 39:11, 40:19, 41:23, 42:14, 42:15, 42:16, 44:16, 45:10, 45:22, 46:5, 46:11, 46:21, 51:19, 51:23, 51:25, 52:4, 54:7, 54:12, 55:1, 55:2, 55:7, 55:17, 56:7, 56:22, 57:1, 57:19, 58:20, 59:4, 59:9,

60:9, 60:11, 60:21, 60:25, 62:16, 62:25, 64:4, 64:12, 65:6, 65:11, 65:16, 65:23, 66:25, 67:19, 69:8, 69:12, 69:25, 72:1, 72:14, 74:6, 74:23, 75:19, 78:19, 81:25, 84:1, 84:5, 87:25, 88:2, 94:1, 95:15, 96:24, 99:20, 100:6, 100:17, 101:22, 102:15, 102:16, 102:19, 103:17, 103:24, 104:15, 104:19, 104:24, 105:4, 105:11, 105:13, 106:15
**Giuliani's** [24] - 3:22, 6:8, 8:23, 11:15, 12:9, 18:9, 19:9, 20:4, 20:12, 23:4, 28:1, 34:23, 38:3, 39:14, 48:9, 50:3, 51:17, 58:7, 58:16, 73:23, 87:2, 88:3, 88:19, 105:10
**given** [5] - 8:15, 18:15, 71:11, 91:18, 106:5
**gleaned** [1] - 29:5
**Gmail** [4] - 7:13, 15:3, 94:12, 98:8
**Gottlieb** [5] - 2:15, 2:18, 16:21, 16:25, 17:9
**GOTTLIEB** [1] - 1:11
**government** [3] - 42:4, 42:19, 67:17
**GOVERNSKI** [79] - 1:10, 2:7, 2:14, 2:20, 2:24, 4:15, 4:22, 5:1, 5:12, 5:23, 6:3, 9:8, 9:23, 10:2, 10:13, 11:4, 11:6, 12:3, 13:10, 14:3, 14:22, 15:1, 15:3, 15:15, 16:14, 16:20, 17:22, 17:25, 19:20, 21:5, 21:24, 22:10, 22:23, 23:7, 23:18, 23:21, 24:20, 24:22, 26:11, 28:5, 29:4, 30:18, 31:12, 31:15, 31:18, 32:14, 32:16, 33:10, 33:21, 34:2, 34:19, 35:4, 35:7, 35:14, 35:17, 35:20, 35:25, 36:13, 37:8, 37:18, 38:4, 38:9, 38:15, 39:18, 40:10, 40:14,

40:18, 41:4, 41:11, 93:16, 93:22, 94:17, 97:15, 97:18, 101:18, 103:2, 103:11, 106:2, 106:9
**Governski** [5] - 2:7, 2:20, 2:21, 4:10, 58:11
**grant** [2] - 103:13, 103:16
**granted** [1] - 103:8
**great** [4] - 3:6, 28:12, 40:1, 105:20
**grievances** [1] - 11:19
**Group** [1] - 49:11
**guarantee** [1] - 19:4
**guess** [5] - 16:9, 37:5, 48:14, 96:12, 105:21
**guys** [1] - 48:1

### H

**half** [1] - 96:7
**handle** [2] - 30:5, 31:24
**handling** [1] - 4:10
**happy** [11] - 31:13, 36:20, 41:7, 41:9, 45:17, 68:17, 77:1, 94:11, 98:11, 98:21, 98:24
**hard** [2] - 76:12, 77:8
**hardware** [1] - 104:4
**hats** [1] - 62:17
**heads** [1] - 39:1
**hear** [2] - 20:20, 94:18
**hearing** [9] - 3:7, 6:7, 18:12, 20:11, 23:5, 38:16, 41:8, 58:13, 63:3
**HEARING** [1] - 1:7
**hearings** [1] - 63:1
**held** [6] - 20:9, 39:10, 42:3, 43:2, 55:4, 84:10
**help** [9] - 5:20, 31:2, 44:25, 46:7, 46:8, 51:20, 52:3, 52:7, 91:22
**helped** [1] - 17:14
**helper** [1] - 52:4
**helpful** [5] - 29:11, 29:24, 56:5, 99:2, 99:6
**helpfully** [1] - 49:24
**helps** [2] - 68:18, 68:20
**hereby** [1] - 106:18
**herring** [1] - 9:24
**hide** [1] - 68:7

**hiding** [1] - 77:16
**himself** [3] - 13:8, 36:23, 78:21
**hit** [3] - 32:20, 80:8, 80:19
**hits** [3] - 32:22, 32:24, 33:2
**hold** [10] - 9:2, 18:14, 22:4, 39:7, 40:16, 40:17, 52:23, 54:24, 92:5, 101:16
**holds** [1] - 49:17
**home** [1] - 52:13
**Honor** [135] - 2:7, 2:14, 3:1, 4:15, 5:2, 5:12, 5:23, 6:3, 6:9, 6:18, 7:11, 7:19, 9:9, 9:17, 9:23, 11:4, 11:9, 13:11, 14:4, 14:23, 16:20, 17:18, 17:25, 18:16, 18:25, 20:1, 20:18, 21:5, 21:25, 22:4, 23:3, 23:7, 23:18, 25:1, 25:20, 27:5, 28:13, 31:12, 31:16, 32:14, 32:16, 32:25, 33:11, 33:23, 34:3, 35:17, 36:1, 37:9, 37:19, 38:4, 39:21, 41:13, 41:18, 42:6, 43:5, 43:11, 44:14, 44:18, 45:8, 46:14, 47:22, 50:22, 54:10, 54:15, 56:8, 56:11, 57:13, 58:13, 59:9, 60:19, 61:1, 61:22, 62:21, 62:23, 64:2, 64:23, 65:21, 66:4, 66:19, 67:1, 67:6, 67:10, 67:21, 69:17, 70:12, 71:12, 72:12, 72:19, 73:10, 73:12, 74:9, 74:14, 74:17, 74:22, 74:24, 75:7, 75:12, 78:22, 79:1, 79:11, 80:3, 80:12, 81:12, 82:2, 82:16, 83:25, 84:15, 84:22, 85:11, 86:24, 87:8, 89:17, 90:5, 90:15, 90:21, 91:9, 91:12, 92:24, 93:15, 93:16, 94:22, 95:13, 95:17, 97:18, 98:25, 100:1, 100:12, 101:12, 102:25, 103:2, 103:5, 103:11, 106:9, 106:11, 106:14

**Honor's** [1] - 42:11
**HONORABLE** [1] - 1:8
**hope** [2] - 62:18, 93:10
**hopes** [3] - 3:6, 53:21, 105:20
**hoping** [1] - 19:17
**host** [1] - 93:3
**hours** [5] - 74:24, 74:25, 77:6
**house** [1] - 52:12
**HOWELL** [1] - 1:8
**huge** [1] - 39:13
**husband's** [2] - 29:15, 29:19

### I

**iCloud** [13] - 15:5, 52:21, 53:2, 53:8, 53:13, 54:17, 55:6, 55:9, 56:9, 68:3, 84:17, 84:19, 104:8
**idea** [3] - 32:11, 32:14, 38:14
**identification** [1] - 55:13
**identified** [6] - 24:7, 33:6, 77:24, 88:12, 92:2, 92:9
**illustrates** [1] - 8:2
**illustrative** [1] - 33:11
**image** [2] - 50:11, 99:11
**imagine** [1] - 78:4
**imaging** [1] - 44:25
**immediately** [1] - 40:11
**impede** [1] - 71:7
**important** [2] - 25:4, 30:21
**impose** [3] - 23:12, 76:10, 76:14
**imposed** [1] - 76:2
**impossible** [1] - 97:5
**inability** [5] - 8:19, 9:12, 25:21, 45:25, 48:15
**inaccessible** [12] - 9:16, 9:20, 39:11, 91:17, 91:20, 92:1, 92:7, 92:13, 92:15, 92:19, 93:9
**inadvertence** [1] - 78:1
**inadvertent** [3] - 43:6, 68:13, 76:8
**include** [3] - 28:18, 48:6, 98:18
**included** [1] - 11:24

**includes** [3] - 14:4, 55:6, 97:23
**including** [12] - 3:22, 13:21, 25:24, 26:20, 26:23, 35:21, 47:7, 56:25, 57:14, 99:21, 104:1, 104:18
**inclusion** [1] - 5:8
**incomprehensible** [1] - 6:9
**incorrect** [1] - 57:20
**increase** [2] - 26:20, 27:1
**incumbent** [1] - 55:11
**indicate** [2] - 14:14, 37:24
**indicated** [4] - 6:6, 10:3, 30:4, 103:6
**indicates** [1] - 51:5
**indication** [1] - 96:16
**individually** [1] - 79:25
**individuals** [3] - 12:6, 12:10, 12:11
**inevitable** [1] - 70:8
**informally** [1] - 53:24
**information** [19] - 9:2, 23:22, 25:19, 27:17, 33:2, 42:1, 46:20, 48:20, 49:15, 53:5, 55:4, 62:1, 66:2, 76:3, 90:7, 97:12, 97:14, 98:19, 105:2
**inherent** [1] - 22:22
**inhibit** [1] - 71:6
**initial** [5] - 20:24, 21:3, 21:7, 69:9, 69:14
**initiate** [1] - 86:20
**inoperable** [4] - 7:4, 39:11, 66:14, 66:16
**insight** [1] - 59:23
**insisting** [1] - 25:13
**Instagram** [8] - 30:4, 30:6, 33:15, 33:24, 34:12, 34:17, 34:18
**instance** [5] - 22:23, 23:4, 97:23, 100:5, 100:18
**instances** [1] - 16:10
**instant** [1] - 64:6
**instruct** [1] - 91:7
**insufficient** [1] - 55:4
**intended** [1] - 38:23
**intentional** [1] - 21:23
**interest** [1] - 12:11
**Interrogatories** [4] - 19:10, 19:18, 20:22, 69:6
**interrogatories** [5] - 19:16, 20:1, 20:3,

21:7, 65:24
**Interrogatory** [1] - 4:3
**interrogatory** [5] - 20:7, 20:25, 21:4, 69:9, 69:15
**interrupt** [6] - 52:3, 52:6, 54:11, 94:15, 97:10, 101:19
**intervention** [2] - 3:9, 65:2
**introduce** [1] - 2:12
**inundated** [1] - 68:11
**inventory** [1] - 99:3
**investigation** [2] - 59:11, 96:21
**involved** [6] - 36:22, 58:17, 64:19, 93:2, 97:17, 102:17
**iPad** [2] - 29:10, 76:21
**iPhone** [1] - 99:5
**iPhones** [1] - 99:5
**irrelevant** [1] - 14:17
**irrepressible** [1] - 95:15
**irrespective** [1] - 33:2
**issue** [18] - 19:17, 19:19, 19:21, 22:16, 41:22, 45:25, 57:9, 57:13, 64:14, 71:1, 71:12, 72:9, 79:21, 82:19, 84:17, 88:5, 91:13, 103:12
**issued** [2] - 58:9, 61:10
**issues** [9] - 8:11, 13:14, 21:24, 44:11, 58:2, 62:14, 71:18, 71:19, 82:7
**issuing** [1] - 105:24
**iterations** [1] - 60:13
**itself** [2] - 26:13, 55:12
**IV** [1] - 1:18

### J

**January** [12] - 33:19, 34:20, 34:24, 35:3, 35:12, 55:20, 57:24, 60:17, 64:10, 67:13, 100:3, 100:9
**Jason** [1] - 61:10
**Joe** [3] - 3:2, 59:6, 86:6
**JOHN** [1] - 1:14
**John** [1] - 2:16
**john.langford@ protectdemocracy. org** [1] - 1:17
**Jones** [1] - 59:14
**JOSEPH** [1] - 1:18

Journal [1] - 75:25
judge [1] - 41:8
JUDGE [1] - 1:8
Judge [2] - 59:14, 92:2
judge's [1] - 3:5
judgment [1] - 49:9
judicial [1] - 3:9
June [3] - 105:9, 105:12, 106:5
Justice [1] - 50:20
justification [1] - 70:13
justify [1] - 71:2

**K**

keep [4] - 23:5, 89:7, 89:8, 106:3
keeping [1] - 78:25
kept [2] - 49:3, 88:8
Kerik [1] - 77:15
key [1] - 85:9
keyword [11] - 24:12, 31:11, 78:25, 79:10, 79:25, 80:8, 80:19, 81:5, 81:7, 85:3, 87:5
keywords [5] - 31:10, 72:25, 73:1, 75:7, 77:8
kind [12] - 32:12, 32:17, 39:2, 43:8, 43:13, 45:25, 75:22, 75:25, 82:6, 101:1
knowing [1] - 40:18
knowingly [1] - 68:5
knowledge [1] - 80:17
known [2] - 43:15, 72:7
knows [2] - 11:9, 81:15
Kwon [1] - 2:19

**L**

lack [1] - 76:13
landscape [1] - 28:17
LANGFORD [1] - 1:14
Langford [2] - 2:16, 2:18
laptops [1] - 51:8
large [2] - 25:14
largely [1] - 76:5
larger [1] - 98:6
last [10] - 3:6, 7:18, 26:7, 35:2, 35:13, 38:24, 58:13, 81:22, 96:6, 103:2
lasted [1] - 61:6

late [1] - 52:25
latter [1] - 92:6
Lavaca [1] - 1:19
law [5] - 52:9, 52:10, 62:10, 62:23, 76:1
lawsuit [1] - 46:24, 47:1, 47:8, 47:19, 78:3
lawyer [2] - 42:20, 79:1
lawyer's [1] - 62:13
lawyers [2] - 62:7, 102:9
learned [4] - 36:14, 36:15, 39:22, 93:24
least [8] - 9:7, 14:6, 20:19, 29:8, 51:2, 68:4, 86:1, 102:21
leave [2] - 10:19, 64:18
leaving [1] - 27:21
left [1] - 41:21
legal [2] - 40:20, 62:12
legally [1] - 25:11
less [4] - 31:14, 31:17, 32:24, 99:11
letter [4] - 39:3, 41:24, 96:15, 96:16
liabilities [1] - 48:6
life [2] - 47:1, 53:15
likely [1] - 33:1
limited [7] - 40:7, 47:7, 54:3, 54:8, 72:25, 103:12, 104:2
limiting [1] - 100:8
limits [3] - 37:1, 72:21, 72:22
Lindsey [1] - 62:11
line [2] - 79:10, 92:3
lines [2] - 22:18, 92:17
list [14] - 2:22, 13:19, 24:12, 29:16, 31:13, 50:25, 51:1, 51:4, 51:5, 56:6, 93:19, 93:21, 103:23, 104:7
listed [1] - 24:11
lists [3] - 29:19, 65:10, 99:19
litigation [13] - 7:25, 12:7, 18:14, 18:15, 42:1, 59:1, 62:1, 62:3, 63:2, 64:6, 64:11, 94:14, 102:7
litigations [1] - 63:22
live [1] - 20:14
living [1] - 75:23
LLP [2] - 1:11, 1:18
located [3] - 4:1, 65:13, 104:5
locations [15] - 3:25,

5:7, 13:18, 13:19, 16:12, 24:8, 24:11, 24:18, 56:24, 65:9, 65:10, 65:16, 103:20, 103:24, 104:17
locked [1] - 18:14
log [51] - 5:8, 7:16, 11:1, 11:7, 12:4, 12:9, 12:14, 12:17, 12:18, 12:19, 12:24, 13:3, 13:5, 13:6, 56:25, 57:15, 57:16, 57:21, 57:25, 58:1, 58:2, 58:4, 58:9, 58:22, 59:10, 59:12, 59:16, 60:3, 60:5, 60:8, 63:10, 64:3, 64:5, 94:12, 98:12, 100:16, 100:22, 101:6, 101:7, 101:8, 101:9, 101:13, 102:2, 102:14, 102:19, 104:18
logged [5] - 58:21, 59:2, 100:22, 100:25, 102:7
logic [3] - 32:9, 32:12, 81:5
logical [1] - 54:2
login [1] - 98:19
logs [4] - 10:24, 11:3, 89:22, 101:4
look [19] - 7:7, 7:9, 10:18, 38:18, 45:17, 46:23, 67:16, 73:17, 75:7, 77:2, 79:22, 82:8, 82:14, 87:18, 89:14, 90:12, 96:10, 101:11
looked [7] - 3:10, 7:23, 19:12, 27:13, 79:24, 87:19, 89:8
looking [7] - 3:14, 20:11, 24:5, 26:16, 63:2, 95:3, 99:23
Los [1] - 1:16
lost [2] - 67:11, 96:2
LOTH [1] - 106:18
Loth [2] - 1:22, 106:24
low [1] - 94:9
low-cost [1] - 94:9

**M**

MacBooks [1] - 51:7
machine [4] - 1:24, 55:13, 66:17
machines [1] - 66:15
main [2] - 52:12, 81:7

majority [4] - 26:4, 49:14, 49:17, 94:6
malice [5] - 25:24, 25:25, 26:10, 26:15, 27:3
mandatory [2] - 70:11, 103:9
manner [2] - 66:2, 66:18, 88:7, 94:20, 106:22
manual [24] - 13:8, 28:24, 28:25, 29:3, 30:10, 30:13, 30:15, 30:20, 30:22, 31:4, 31:6, 32:5, 32:11, 46:8, 57:18, 78:16, 78:17, 78:20, 78:24, 80:10, 81:17, 81:22, 83:4, 88:9
manually [1] - 31:8
March [12] - 6:7, 14:14, 16:4, 18:12, 23:10, 24:7, 24:15, 24:19, 25:7, 38:16, 49:21, 61:7
mariaryan@
giulianipartners.
com [1] - 37:22
massive [1] - 76:1
Master [2] - 59:15, 59:19
material [2] - 13:20, 95:21
materials [19] - 5:5, 5:18, 8:3, 11:18, 32:5, 40:22, 56:23, 57:2, 57:8, 65:10, 65:12, 65:17, 98:5, 99:8, 100:9, 103:21, 103:25, 104:16, 104:20
matter [10] - 2:2, 4:10, 5:3, 59:10, 59:17, 61:5, 66:11, 70:7, 95:25, 96:1
matters [5] - 41:9, 46:24, 48:19, 62:5, 88:5
mean [43] - 6:13, 13:24, 14:2, 21:2, 27:14, 28:12, 30:8, 32:8, 33:14, 43:14, 43:21, 45:13, 45:24, 46:22, 47:10, 48:2, 48:20, 49:5, 52:2, 52:6, 54:9, 62:5, 63:21, 67:15, 70:10, 70:18, 70:21, 70:23, 72:21, 73:1, 75:17, 78:15, 82:20, 82:24,

83:14, 87:19, 88:25, 89:7, 93:1, 95:18, 102:9
meaning [3] - 50:10, 71:15, 85:7
means [3] - 17:20, 29:13, 81:17
meant [1] - 67:18
measures [1] - 43:16
media [21] - 8:4, 13:22, 20:5, 29:1, 30:1, 30:2, 73:5, 79:12, 79:22, 79:24, 80:14, 81:1, 81:10, 81:19, 82:18, 83:1, 83:5, 85:4, 85:5, 85:16, 104:3
meet [2] - 5:16, 98:24
meetings [1] - 62:25
members [1] - 62:25
mention [1] - 73:19
mentioned [6] - 49:9, 50:22, 61:22, 74:2, 84:23, 102:9
Meryl [2] - 2:7, 2:20
MERYL [1] - 1:10
mess [2] - 44:9, 105:22
message [2] - 33:15, 33:24
messages [17] - 8:4, 8:5, 13:21, 14:11, 14:14, 29:1, 29:20, 29:21, 35:20, 73:18, 79:24, 87:25, 88:5, 88:7, 89:23
messaging [10] - 14:10, 14:15, 34:17, 79:12, 79:22, 82:25, 86:4, 87:3, 104:2, 104:3
method [1] - 17:18
methods [1] - 34:6
metrics [6] - 20:4, 20:5, 26:22, 26:23, 27:6, 27:14
mgovernski@willkie
.com [1] - 1:13
mic [1] - 51:25
MICHAEL [1] - 1:11
Michael [1] - 2:15
might [22] - 8:11, 9:3, 13:20, 22:18, 37:17, 44:21, 46:2, 48:7, 53:23, 53:24, 54:2, 55:8, 55:22, 55:25, 61:24, 73:3, 73:19, 81:25, 84:8, 84:9, 89:20, 102:6
Milkovich [1] - 72:3

**Miller** [1] - 61:10
**mind** [2] - 22:20, 81:18
**mindful** [1] - 3:11
**mine** [1] - 52:15
**minimum** [7] - 9:9, 27:21, 28:5, 30:23, 55:9, 102:2, 103:5
**minutes** [2] - 41:14, 41:17
**misimpression** [1] - 84:3
**missed** [1] - 78:7
**missing** [10] - 12:1, 33:5, 34:15, 57:10, 68:13, 77:18, 77:23, 78:5, 78:9, 87:24
**misspellings** [2] - 32:10, 32:13
**mistake** [1] - 76:9
**mistakes** [2] - 76:4, 76:5
**misunderstanding** [1] - 22:19
**moment** [1] - 27:8
**Monday** [4] - 3:13, 21:6, 43:21, 70:5
**monetary** [1] - 4:23
**money** [1] - 54:5
**monitor** [2] - 53:2, 53:3
**monitored** [1] - 55:7
**monitoring** [1] - 52:21, 54:16, 54:17
**months** [1] - 64:10
**moot** [5] - 18:5, 19:17, 19:19, 19:21, 69:6
**morning** [3] - 3:1, 3:3, 26:16
**most** [7] - 3:23, 25:22, 27:23, 53:9, 85:20, 85:23, 89:7
**MOTION** [1] - 1:7
**motion** [23] - 3:19, 4:9, 4:25, 8:8, 16:7, 18:5, 19:13, 22:14, 24:4, 25:16, 36:16, 39:23, 70:1, 70:4, 70:8, 70:15, 70:20, 71:3, 73:23, 99:19, 103:8, 103:13, 106:6
**motive** [3] - 25:24, 26:11, 26:20
**motives** [2] - 26:19, 26:24
**move** [3] - 18:5, 101:16, 103:6
**moved** [1] - 20:16
**moving** [1] - 8:16
**MR** [77] - 3:1, 41:13,

41:18, 42:2, 43:5, 44:13, 45:8, 45:23, 46:14, 47:21, 47:24, 48:11, 48:23, 49:1, 50:17, 51:9, 54:15, 56:6, 57:12, 57:20, 59:9, 59:19, 60:15, 61:21, 62:21, 63:18, 63:21, 64:23, 65:20, 66:4, 66:9, 66:19, 66:22, 67:10, 69:16, 69:23, 70:12, 71:23, 72:12, 72:19, 73:12, 74:5, 74:9, 74:22, 77:22, 78:22, 79:1, 79:11, 79:15, 79:17, 80:2, 80:5, 80:12, 80:22, 81:12, 81:16, 82:1, 82:4, 82:20, 83:7, 84:14, 87:7, 87:12, 88:20, 89:2, 89:17, 90:4, 90:20, 91:7, 91:12, 92:16, 92:22, 93:15, 94:22, 102:3, 102:24, 106:11
**MS** [78] - 2:7, 2:14, 2:20, 2:24, 4:15, 4:22, 5:1, 5:12, 5:23, 6:3, 9:8, 9:23, 10:2, 10:13, 11:4, 11:6, 12:3, 13:10, 14:3, 14:22, 15:1, 15:3, 15:15, 16:14, 16:20, 17:22, 17:25, 19:20, 21:5, 21:24, 22:10, 22:23, 23:7, 23:18, 23:21, 24:20, 24:22, 26:11, 28:5, 29:4, 30:18, 31:12, 31:15, 31:18, 32:14, 32:16, 33:10, 33:21, 34:2, 34:19, 35:4, 35:7, 35:14, 35:17, 35:20, 35:25, 36:13, 37:8, 37:18, 38:4, 38:9, 38:15, 39:18, 40:10, 40:14, 40:18, 41:4, 41:11, 93:16, 93:22, 94:17, 97:15, 97:18, 101:18, 103:2, 103:11, 106:2, 106:9
**mud** [1] - 98:17
**multiple** [2] - 37:7, 62:16
**murky** [1] - 105:22
**must** [5] - 22:17, 24:14, 28:10, 103:17, 104:15

**N**

**name** [6] - 26:17, 29:15, 29:19, 47:15, 74:2, 75:6
**names** [2] - 2:5, 2:22
**narrative** [1] - 22:2
**narrow** [6] - 4:17, 25:1, 32:21, 56:19, 56:20, 58:1
**narrowed** [4] - 12:17, 12:21
**National** [1] - 62:7
**natural** [1] - 87:13
**near** [1] - 92:3
**nearly** [1] - 3:18
**necessarily** [3] - 33:25, 34:22, 46:19
**necessary** [1] - 68:9
**need** [31] - 2:11, 9:11, 9:12, 10:7, 10:11, 10:14, 23:22, 26:23, 30:23, 33:22, 36:11, 36:22, 55:5, 56:11, 56:12, 60:5, 63:10, 65:1, 65:2, 65:14, 71:20, 72:5, 80:16, 83:2, 84:19, 87:14, 90:12, 101:1, 101:13, 102:10, 102:19
**needed** [2] - 24:19, 79:21
**needing** [2] - 24:9, 100:15
**needs** [8] - 5:11, 18:19, 48:15, 69:17, 71:12, 72:20, 89:12, 95:10
**nerve** [2] - 78:18, 81:23
**nerve-racking** [2] - 78:18, 81:23
**net** [3] - 47:13, 48:5, 105:1
**never** [12] - 3:5, 30:20, 36:6, 43:6, 43:7, 58:22, 69:10, 83:13, 83:16, 84:12, 85:19, 89:2
**New** [3] - 11:19, 47:8, 91:16
**new** [11] - 24:10, 24:13, 24:17, 24:24, 79:15, 79:17, 80:23, 80:25, 83:7, 93:24
**news** [1] - 24:14
**next** [7] - 13:13, 13:15, 19:8, 20:21, 22:9, 65:5, 69:7

**nondisclosure** [1] - 62:20
**none** [2] - 78:14, 86:15
**norm** [1] - 8:12
**normal** [1] - 94:19
**normally** [3] - 58:25, 64:5, 66:5
**Nos** [6] - 4:3, 8:20, 104:25, 105:6, 105:14, 105:19
**note** [13] - 7:1, 7:18, 11:14, 24:24, 30:22, 31:16, 31:22, 33:10, 34:20, 37:19, 39:22, 99:10, 99:18
**noted** [5] - 5:12, 6:9, 25:20
**notes** [2] - 88:8, 106:19
**nothing** [11] - 13:7, 13:8, 52:18, 53:14, 66:10, 68:5, 68:7, 85:13, 85:14, 93:12
**notice** [3] - 28:10, 42:7, 43:13
**noticed** [2] - 11:12, 11:13
**November** [1] - 3:12
**null** [1] - 106:21
**number** [15] - 3:15, 12:1, 24:7, 29:7, 55:14, 55:16, 72:25, 74:25, 75:8, 76:19, 78:4, 78:10, 89:21, 99:16
**numbers** [2] - 27:7, 51:6

**O**

**object** [4] - 36:18, 57:8, 88:22, 89:5
**objected** [2] - 71:9, 99:21
**objecting** [2] - 45:18, 49:6
**objection** [7] - 25:6, 30:8, 30:14, 58:22, 90:13, 95:9, 104:22
**objectionable** [5] - 63:16, 65:19, 65:21, 69:4, 89:5
**objections** [6] - 46:15, 48:12, 56:16, 56:17, 99:20, 99:24
**objects** [1] - 57:6
**obligated** [1] - 25:11
**obligation** [2] - 33:1, 40:21

**obligations** [7] - 10:18, 14:18, 25:22, 28:9, 47:11, 68:6, 70:5
**obliquely** [1] - 22:21
**obliqueness** [1] - 23:15
**obtain** [1] - 8:17
**obtained** [1] - 90:6
**obviously** [4] - 32:3, 46:15, 48:4, 48:16
**occur** [3] - 9:10, 87:13, 95:11
**occurred** [7] - 11:12, 11:14, 18:20, 43:17, 65:15, 87:21, 104:11
**OF** [2] - 1:1, 1:7
**offended** [1] - 77:5
**offer** [1] - 94:18
**offered** [1] - 94:20
**office** [5] - 39:15, 50:4, 52:9, 52:10, 61:25
**Official** [1] - 1:22
**official** [1] - 106:25
**offline** [2] - 92:4, 92:18
**often** [1] - 80:15
**old** [1] - 80:24
**once** [1] - 96:3
**one** [56] - 13:3, 15:15, 19:25, 20:14, 20:19, 20:21, 21:5, 21:24, 22:12, 22:23, 23:19, 24:20, 24:21, 26:12, 26:14, 27:5, 29:8, 29:9, 32:16, 34:2, 34:14, 35:17, 37:7, 37:9, 40:12, 44:11, 46:17, 49:20, 51:17, 53:15, 54:13, 55:16, 60:2, 60:5, 63:12, 66:24, 67:4, 75:10, 76:21, 77:11, 77:19, 77:20, 77:23, 80:1, 81:1, 85:2, 86:1, 91:13, 92:3, 94:16, 96:12, 101:7, 101:19, 102:3, 106:2
**One** [1] - 42:7
**ones** [6] - 24:13, 52:11, 52:12, 64:21, 85:23, 99:7
**ongoing** [1] - 100:10
**online** [4] - 89:9, 89:10, 89:20, 92:3
**operating** [1] - 50:13
**opinion** [1] - 71:17
**opportunity** [4] - 16:18, 16:19, 91:23,

10

93:13
**oppose** [2] - 70:15, 106:12
**opposed** [4] - 7:24, 25:12, 101:9
**opposing** [1] - 43:24
**opposition** [9] - 8:8, 16:2, 16:7, 19:12, 19:13, 19:15, 30:9, 39:23, 91:21
**order** [40] - 4:5, 4:12, 8:17, 9:7, 11:1, 13:15, 16:5, 19:9, 20:21, 21:22, 22:5, 22:13, 23:10, 44:1, 44:7, 48:12, 48:21, 48:23, 48:25, 49:4, 49:18, 50:14, 53:2, 56:16, 56:18, 56:20, 56:22, 57:6, 63:8, 63:17, 65:6, 69:5, 69:7, 69:10, 78:3, 89:12, 98:18, 104:14, 104:22, 105:24
**orders** [4] - 30:11, 46:14, 48:4, 67:23
**ordinary** [1] - 32:18
**organized** [1] - 8:13
**original** [3] - 12:20, 24:12, 44:24
**ostensibly** [1] - 27:16
**outside** [2] - 59:1, 79:18
**outstanding** [1] - 105:21
**overarching** [1] - 13:5
**overbreadth** [1] - 99:21
**overlap** [1] - 76:8
**overlapping** [1] - 84:4
**overlaps** [1] - 67:24
**overly** [1] - 63:24
**overrule** [1] - 48:12
**overruling** [1] - 46:15
**overstated** [1] - 99:16
**overt** [1] - 62:19
**owed** [1] - 48:7
**owes** [1] - 47:16
**own** [14] - 6:8, 6:25, 7:8, 8:1, 27:2, 30:25, 31:3, 40:5, 40:7, 46:8, 53:18, 60:9, 99:23
**owner** [1] - 27:15

**P**

**p.m** [1] - 106:16
**PACER** [1] - 48:2

**page** [1] - 28:1
**pages** [1] - 16:23
**paid** [3] - 40:17, 69:25, 70:24
**painstakingly** [1] - 8:1
**pandemic** [1] - 52:13
**paper** [1] - 11:17
**paragraph** [7] - 8:17, 10:25, 31:8, 63:9, 63:16, 65:5, 104:14
**paraphrasing** [1] - 5:5
**parcel** [1] - 22:25
**pardon** [1] - 6:14
**part** [30] - 5:9, 7:11, 9:7, 10:3, 13:13, 13:15, 19:8, 21:23, 22:5, 22:25, 23:21, 27:1, 32:7, 32:18, 46:4, 49:4, 49:23, 51:1, 57:21, 57:23, 58:21, 69:5, 69:7, 82:24, 84:16, 102:1, 103:14, 103:15, 103:16, 103:23
**participation** [1] - 101:25
**particular** [8] - 34:10, 36:10, 47:4, 47:14, 48:19, 48:22, 63:11, 93:18
**particularly** [7] - 37:5, 46:4, 47:20, 48:19, 63:16, 69:4, 81:24
**parties** [12] - 3:16, 8:2, 22:3, 33:18, 35:9, 37:3, 38:6, 43:24, 65:1, 74:12, 100:24, 102:12
**parties'** [1] - 64:19
**Partners** [2] - 15:7, 27:16
**party** [11] - 11:20, 11:23, 17:4, 17:7, 18:3, 21:8, 23:13, 92:10, 92:25, 101:24, 106:22
**pass** [1] - 98:21
**password** [1] - 96:3
**past** [1] - 22:2
**patient** [1] - 99:14
**paucity** [1] - 80:13
**pay** [8] - 8:19, 9:1, 10:17, 46:1, 48:15, 54:2, 54:8, 91:22
**paying** [2] - 22:13, 71:4
**payment** [4] - 42:22, 43:18, 70:10, 70:13
**payments** [1] - 48:6
**pays** [1] - 89:21

**PDF** [1] - 79:9
**penalty** [3] - 13:16, 65:7, 103:18
**pendency** [1] - 18:15
**people** [6] - 21:1, 69:11, 71:9, 86:18, 86:20, 96:25
**percent** [5] - 7:22, 15:4, 53:6, 53:14, 94:1
**perfect** [2] - 78:14
**perform** [5] - 7:17, 25:22, 78:24, 94:13, 105:16
**performed** [2] - 57:2, 104:19
**perhaps** [4] - 22:5, 46:10, 80:19, 94:10
**period** [8] - 85:21, 86:14, 86:23, 95:21, 96:9, 99:8, 100:1, 100:13
**periods** [1] - 96:5
**perjury** [3] - 13:17, 65:7, 103:18
**permission** [2] - 21:14, 44:5
**permits** [2] - 23:5, 23:8
**permitted** [1] - 49:14
**perplexing** [1] - 18:25
**person** [9] - 39:14, 45:11, 45:17, 50:3, 66:24, 67:4, 75:20, 101:23, 102:18
**personal** [3] - 47:1, 102:16, 102:19
**personally** [4] - 6:7, 61:4, 94:3, 102:15
**persons** [1] - 102:17
**perspective** [1] - 16:9
**pertained** [1] - 82:6
**pertaining** [1] - 74:12
**pertains** [1] - 62:1
**pertinent** [3] - 47:12, 47:16, 82:7
**phone** [30] - 25:2, 25:6, 25:16, 27:8, 29:8, 29:9, 29:14, 36:9, 36:12, 39:19, 66:13, 76:21, 79:6, 79:15, 79:17, 79:18, 80:23, 80:25, 88:13, 88:15, 88:17, 88:21, 89:6, 89:7, 89:8, 89:12, 90:8, 90:9, 91:5
**phones** [1] - 80:24
**photocopied** [1] - 106:21

**phrase** [2] - 81:6, 81:8
**phrasing** [1] - 21:1
**pick** [3] - 32:13, 41:21, 53:12
**picked** [2] - 36:4, 53:13
**picks** [1] - 32:9
**piece** [3] - 26:11, 26:14, 35:17
**pieces** [1] - 26:12
**pike** [1] - 20:2
**Piro** [1] - 26:18
**place** [1] - 48:24
**plaintiff** [1] - 2:6
**Plaintiffs** [1] - 1:3
**plaintiffs** [62] - 2:8, 3:16, 3:20, 3:21, 4:9, 4:13, 8:21, 10:24, 16:4, 20:23, 21:19, 24:10, 24:16, 28:2, 30:9, 31:7, 31:10, 33:4, 33:6, 33:8, 35:2, 38:13, 39:2, 44:3, 45:20, 46:4, 46:10, 48:22, 49:7, 49:16, 51:2, 55:8, 56:8, 56:15, 56:19, 57:15, 59:21, 64:14, 70:3, 71:20, 72:15, 73:19, 74:2, 77:24, 78:5, 81:3, 85:10, 88:10, 88:18, 89:13, 91:19, 91:21, 93:13, 94:20, 102:20, 105:3, 105:5, 105:8, 105:15, 105:23, 105:25
**PLAINTIFFS** [1] - 1:10
**Plaintiffs'** [1] - 51:12
**plaintiffs'** [22] - 4:9, 4:18, 5:6, 16:7, 21:23, 22:14, 30:13, 30:14, 44:1, 56:20, 56:24, 57:3, 65:12, 65:17, 69:25, 71:10, 73:2, 103:13, 103:21, 104:1, 104:16, 104:20
**plan** [3] - 43:18, 46:9, 74:1
**plate** [1] - 20:20
**platform** [4] - 39:5, 45:1, 55:23, 81:20
**platforms** [2] - 80:14, 83:1
**plight** [1] - 67:3
**plus** [3] - 24:12, 52:21
**podcast** [1] - 27:17
**point** [22] - 4:22, 5:1, 5:19, 7:18, 10:20,

19:25, 23:19, 27:5, 30:21, 32:16, 34:2, 35:25, 40:1, 49:5, 55:17, 57:13, 69:20, 82:13, 91:18, 92:13, 101:12, 103:2
**pointed** [3] - 45:19, 45:24, 81:22
**points** [1] - 93:17
**policy** [2] - 62:14, 66:6
**political** [2] - 61:18, 62:13
**popped** [1] - 83:10
**portion** [3] - 10:4, 18:4, 57:12
**pose** [1] - 38:25
**position** [5] - 25:15, 28:8, 30:13, 88:19, 98:23
**possession** [5] - 6:21, 27:20, 40:21, 88:16
**possible** [1] - 6:12
**possibly** [1] - 55:21
**post** [13] - 7:25, 12:7, 15:9, 15:11, 15:18, 28:18, 29:9, 30:23, 34:7, 34:12, 34:24, 98:4, 100:4
**Post** [1] - 75:23
**post-2021** [2] - 6:20, 98:3
**postings** [2] - 82:23
**potential** [2] - 29:2, 87:12
**potentially** [11] - 6:12, 13:18, 14:7, 15:7, 41:25, 65:9, 73:18, 80:7, 80:18, 100:9, 103:20
**poverty** [3] - 8:22, 46:5, 47:17
**Powell** [3] - 24:23, 81:1, 82:10
**power** [1] - 22:22
**PR** [1] - 61:19
**practical** [1] - 54:4
**practice** [1] - 85:2
**pre** [1] - 15:9
**pre-2020** [1] - 30:24
**precisely** [4] - 28:24, 49:22, 56:16, 78:23
**preclude** [1] - 21:11
**precluded** [4] - 20:23, 21:2, 69:8, 69:13
**predate** [1] - 14:7
**premature** [3] - 22:9, 69:21, 69:22
**present** [2] - 72:14, 100:4
**presenting** [1] - 63:3

**preservation** [14] - 16:12, 17:18, 18:6, 18:7, 18:11, 23:24, 28:2, 39:2, 67:12, 67:23, 70:17, 78:3, 87:10, 95:9

**preservation-related** [1] - 18:6

**preserve** [17] - 3:24, 8:13, 13:17, 17:3, 18:3, 28:20, 39:17, 41:24, 53:21, 65:8, 66:17, 68:14, 68:23, 92:10, 94:19, 97:12, 103:19

**preserved** [18] - 4:20, 19:5, 40:23, 42:5, 42:18, 42:19, 53:18, 53:20, 55:10, 67:16, 68:2, 68:4, 69:2, 87:1, 87:7, 98:1, 98:2, 98:9

**preserving** [3] - 66:2, 67:25, 96:20

**President** [4] - 60:12, 60:22, 61:4, 61:5

**press@ giulianipartners. com** [1] - 37:21

**presumably** [2] - 7:14, 29:8

**presume** [1] - 13:24

**pretrial** [1] - 49:14

**pretty** [5] - 38:21, 51:16, 53:13, 76:20, 103:4

**preview** [1] - 20:1

**previously** [2] - 21:9, 51:2

**prima** [3] - 26:3, 49:8, 49:16

**private** [2] - 47:20, 48:19

**privilege** [76] - 5:8, 10:24, 11:1, 11:2, 11:7, 12:4, 12:9, 12:14, 12:17, 12:18, 12:19, 12:24, 13:1, 13:3, 13:5, 13:6, 56:25, 57:15, 57:16, 57:21, 57:24, 58:1, 58:2, 58:4, 58:7, 58:8, 58:9, 58:17, 58:19, 58:22, 59:3, 59:10, 59:15, 59:16, 59:18, 60:3, 60:5, 60:7, 60:9, 60:10, 60:21, 61:16, 61:17, 62:4, 62:13, 62:15, 62:19, 62:24, 63:4,

63:10, 63:13, 63:14, 64:3, 75:4, 83:11, 94:23, 100:18, 100:22, 101:1, 101:3, 101:4, 101:6, 101:7, 101:8, 101:9, 101:13, 101:14, 101:24, 101:25, 102:13, 102:21, 102:23, 104:18

**privileged** [10] - 58:6, 58:15, 61:18, 63:4, 63:13, 64:4, 64:5, 94:24, 97:14, 100:21

**privileges** [1] - 60:8

**probative** [1] - 27:3

**problem** [5] - 6:20, 63:22, 90:21, 95:20, 98:6

**problems** [2] - 94:25, 95:4

**procedural** [1] - 9:6

**Procedure** [1] - 3:24

**proceed** [3] - 95:16, 97:12, 105:22

**proceeding** [2] - 46:18, 106:16

**proceedings** [1] - 106:19

**Proceedings** [1] - 1:24

**process** [9] - 8:19, 25:10, 75:12, 75:15, 75:16, 78:24, 80:21, 90:18, 105:7

**produce** [23] - 4:1, 5:5, 5:18, 17:3, 20:8, 20:9, 25:6, 32:24, 36:15, 52:11, 56:23, 57:23, 78:12, 82:12, 88:23, 89:4, 89:13, 91:6, 91:8, 92:11, 100:20, 104:15, 105:4

**producible** [1] - 80:21

**producing** [2] - 12:6, 49:7

**production** [18] - 5:6,

13:6, 13:9, 28:8, 30:2, 46:11, 56:24, 57:3, 57:22, 60:3, 60:4, 63:11, 73:14, 103:22, 104:1, 104:20, 104:25, 105:6

**productions** [3] - 11:22, 30:3, 104:17

**professed** [1] - 25:21

**professional** [12] - 5:8, 5:11, 5:20, 5:22, 6:14, 6:16, 8:12, 9:21, 32:3, 32:8, 44:24, 46:7, 46:8, 57:4, 57:7, 83:3, 94:4, 104:21

**proffer** [2] - 9:14, 9:23

**promise** [1] - 24:17

**promised** [2] - 24:9, 47:14

**promptly** [1] - 93:10

**proper** [2] - 82:19, 98:13

**properly** [1] - 88:12

**properties** [1] - 48:7

**property** [2] - 47:15

**proportional** [1] - 73:9

**propose** [1] - 22:13

**proposed** [17] - 4:12, 8:17, 9:7, 10:25, 13:15, 19:9, 20:21, 21:22, 56:15, 56:18, 56:22, 57:5, 63:8, 63:17, 65:6, 69:5, 104:14

**protect** [1] - 97:14

**Protect** [2] - 1:15, 2:16

**protective** [3] - 22:5, 48:21, 48:23

**protocol** [1] - 97:13

**Proton** [1] - 15:10

**ProtonMail** [2] - 7:14, 98:20

**provide** [11] - 19:10, 19:14, 31:10, 32:20, 51:4, 51:5, 59:21, 59:22, 99:9, 105:14

**provided** [14] - 20:24, 21:3, 24:10, 31:7, 32:17, 50:5, 56:8, 69:9, 69:14, 81:3, 85:10, 94:23, 99:14, 100:6

**provider** [4] - 17:5, 17:8, 84:10, 90:17

**provision** [3] - 22:9, 69:4, 69:24

**public** [3] - 47:4, 47:21, 47:24

**publicly** [1] - 47:18

**published** [1] - 100:6

**pull** [2] - 32:5, 33:2

**pulled** [1] - 29:19

**punished** [1] - 75:21

**punishment** [3] - 75:12, 75:15, 75:16

**punitive** [1] - 48:12

**punitives** [2] - 26:1, 27:4

**purpose** [2] - 72:10, 72:18

**purposes** [2] - 25:23, 100:2

**pursuant** [1] - 100:14

**pursue** [1] - 56:5

**put** [8] - 18:14, 19:11, 55:23, 81:8, 81:19, 85:3, 85:4

**puts** [1] - 44:3

**putting** [1] - 63:7

**puzzled** [2] - 22:17, 49:12

**Q**

**qualified** [1] - 7:15

**questionable** [1] - 101:24

**questions** [11] - 3:21, 4:2, 12:1, 32:8, 38:24, 40:25, 54:6, 68:22, 88:6, 99:1, 103:3

**quick** [3] - 23:19, 37:9, 99:25

**quickly** [2] - 93:20, 99:13

**quite** [7] - 4:17, 7:12, 18:24, 42:9, 48:16, 82:10, 94:14

**quote** [4] - 19:15, 24:8, 49:13, 92:8

**R**

**racking** [2] - 78:18, 81:23

**raise** [6] - 25:4, 49:6, 88:2, 88:6, 91:13, 93:17

**raised** [4] - 3:21, 8:18, 49:5, 84:17

**raises** [1] - 55:17

**ran** [6] - 75:6, 75:9, 77:8, 79:25, 85:12, 85:14

**randomly** [1] - 32:24

**range** [5] - 9:5, 10:15, 35:24, 55:18, 55:25

**rare** [1] - 78:11

**rate** [1] - 40:7

**rather** [4] - 46:8, 48:9, 55:21, 90:18

**re** [1] - 62:11

**reach** [5] - 20:4, 26:20, 27:17, 43:20, 98:25

**reaches** [2] - 61:24, 61:25

**read** [3] - 10:22, 73:22, 91:24

**reading** [5] - 22:18, 24:15, 43:1, 92:13, 93:7

**real** [1] - 47:15

**really** [27] - 7:9, 7:12, 19:7, 49:12, 50:14, 53:4, 53:11, 63:25, 65:1, 70:15, 70:21, 71:1, 71:12, 71:18, 71:19, 72:16, 74:16, 76:10, 76:13, 76:20, 79:21, 91:5, 92:20, 94:9, 97:7, 103:7

**reason** [10] - 15:17, 21:21, 27:1, 57:7, 69:12, 76:23, 77:3, 77:5, 96:14, 100:10

**reasonable** [2] - 10:15, 106:12

**reasoning** [1] - 26:25

**reasons** [1] - 78:4

**reassuring** [1] - 63:6

**receive** [2] - 8:2, 99:3

**received** [9] - 11:3, 11:7, 11:9, 12:12, 20:15, 38:6, 43:25, 100:18

**recently** [1] - 100:5

**recess** [1] - 41:19

**rechecked** [2] - 86:6, 86:24

**recipient** [1] - 77:25

**recognize** [1] - 76:16

**recollection** [2] - 36:8, 88:4

**reconsider** [1] - 105:19

**record** [1] - 2:6

**records** [45] - 3:25, 8:18, 8:20, 18:15, 25:2, 25:7, 25:16, 26:6, 26:9, 27:8, 27:9, 36:9, 36:12, 36:21, 37:24, 43:4, 44:2, 44:8, 45:2, 49:7, 53:2, 61:2, 62:20, 78:6, 80:7, 80:18, 88:11, 88:13,

88:17, 88:21, 88:22, 89:3, 89:7, 89:8, 89:12, 89:18, 90:6, 90:7, 90:8, 90:9, 91:5, 97:25, 103:7
**red** [1] - 9:24
**redacted** [1] - 34:4
**redundant** [1] - 11:2
**refer** [1] - 16:22
**reference** [1] - 23:17
**referenced** [2] - 38:5, 100:15
**referring** [2] - 6:1, 35:2
**refined** [1] - 47:3
**regarding** [1] - 34:7
**regardless** [1] - 15:19
**regularly** [2] - 68:3, 78:10
**related** [18] - 13:6, 13:7, 13:9, 15:18, 18:6, 20:4, 25:3, 25:19, 36:12, 46:24, 47:2, 47:5, 47:18, 53:10, 86:16, 103:7, 104:22
**relates** [1] - 104:25
**relating** [3] - 7:25, 12:7, 41:6
**release** [1] - 96:14
**relevant** [8] - 3:24, 27:4, 33:2, 52:11, 59:23, 73:15, 77:4, 95:7
**relied** [1] - 93:8
**relief** [13] - 4:13, 4:17, 4:23, 5:10, 22:7, 22:11, 22:16, 22:21, 23:15, 24:2, 56:20, 65:19, 104:14
**rely** [2] - 36:8, 82:14
**relying** [5] - 20:24, 21:3, 46:7, 69:8, 69:13
**remains** [1] - 101:12
**remember** [7] - 7:20, 7:23, 65:23, 67:14, 85:2, 90:9
**rep** [1] - 20:13
**repeatedly** [2] - 7:19, 26:2
**reply** [1] - 93:14
**report** [8] - 16:5, 24:6, 24:15, 32:20, 49:22, 49:24, 105:3, 105:9
**reported** [2] - 1:24, 39:12
**Reporter** [3] - 1:22, 1:22, 106:25
**reporters** [1] - 67:3

**reports** [2] - 28:14, 59:9
**repositories** [2] - 15:19, 63:19
**repository** [1] - 101:15
**represent** [1] - 60:12
**representation** [1] - 62:4
**representations** [1] - 15:22
**represented** [2] - 61:3, 61:5
**representing** [4] - 61:11, 62:2, 62:5, 64:11
**Republican** [1] - 62:6
**request** [24] - 12:16, 16:2, 23:1, 24:2, 27:9, 27:10, 44:2, 46:11, 46:24, 47:2, 53:25, 54:1, 57:3, 57:23, 68:9, 70:18, 89:15, 90:6, 91:1, 91:3, 97:3, 97:6, 104:25, 106:12
**requested** [5] - 23:13, 65:19, 73:9, 82:5, 104:13
**requesting** [2] - 5:13, 20:23
**requests** [16] - 5:6, 27:24, 43:23, 46:17, 54:10, 56:24, 58:23, 65:24, 68:12, 73:9, 103:21, 104:1, 104:16, 104:20, 105:1, 105:5
**require** [3] - 64:3, 92:20, 93:1
**required** [1] - 105:14
**requirements** [1] - 93:2
**requires** [1] - 70:10
**requiring** [3] - 3:9, 49:16, 103:18
**rereview** [1] - 62:21
**reserve** [3] - 22:6, 103:14, 104:13
**residence** [2] - 39:15, 50:3
**resist** [1] - 22:18
**resistance** [1] - 8:15
**resolution** [2] - 43:20, 98:25
**resolve** [1] - 42:22
**resolved** [4] - 44:12, 44:16, 44:20, 44:21
**respect** [19] - 7:22, 11:8, 20:16, 23:24, 24:25, 25:18, 25:24,

28:23, 36:9, 36:24, 49:5, 57:5, 57:14, 57:17, 61:15, 63:9, 63:18, 88:5, 95:5
**respond** [1] - 104:24
**responding** [2] - 12:6, 92:9
**responds** [1] - 46:11
**response** [16] - 8:23, 11:11, 12:7, 16:1, 16:5, 16:17, 19:13, 20:9, 29:22, 34:5, 45:9, 47:25, 55:2, 70:20, 105:5, 105:11
**responses** [18] - 3:17, 4:3, 4:5, 19:9, 19:14, 20:7, 20:8, 20:25, 21:4, 25:6, 43:24, 49:2, 69:10, 69:15, 99:20, 99:24, 105:14, 105:19
**responsive** [47] - 3:24, 4:2, 5:6, 8:3, 8:4, 8:5, 9:3, 12:16, 13:18, 13:20, 27:7, 29:2, 32:1, 32:5, 33:8, 33:19, 34:10, 34:15, 36:5, 41:25, 43:3, 44:8, 45:2, 56:23, 57:2, 62:20, 65:9, 65:10, 65:12, 65:17, 77:25, 78:6, 80:7, 80:9, 80:18, 80:20, 88:11, 98:5, 100:9, 103:20, 103:21, 103:25, 104:16, 104:20
**rest** [1] - 35:23
**result** [4] - 24:17, 54:17, 64:6, 84:18
**resulted** [1] - 11:23
**resulting** [1] - 30:2
**results** [1] - 80:7
**retaining** [1] - 8:11
**retrieved** [1] - 66:3
**returned** [3] - 6:22, 6:23, 50:7
**reveal** [2] - 26:9, 90:5
**review** [1] - 80:19
**reviewed** [2] - 58:5, 80:8
**reviewing** [1] - 41:5
**RFP** [6] - 20:7, 26:7, 26:22, 27:9, 34:5, 105:19
**RFPs** [20] - 5:7, 8:20, 11:11, 11:12, 11:13, 25:1, 25:19, 27:7, 27:8, 27:10, 31:20, 31:21, 33:9, 34:22,

65:12, 65:17, 99:21, 105:14, 105:19
**rhelen** [4] - 83:14, 83:18, 85:18, 85:22
**rhelen0528** [1] - 96:12
**rhhelen** [3] - 37:11, 97:19, 97:24
**ring** [1] - 19:5
**ripe** [1] - 20:17
**RNOs** [1] - 36:14
**Robert** [1] - 42:20
**rog** [3] - 20:8, 20:14, 20:16
**rogs** [2] - 20:17, 21:10
**RPR** [3] - 1:22, 106:18, 106:24
**RUBY** [1] - 1:3
**Ruby** [1] - 2:3
**RUDOLPH** [1] - 1:5
**Rudolph** [2] - 2:4, 3:2
**rudolph.giuliani@ giulianipartners. com** [1] - 37:20
**rudolphgiuliani@ icloud** [1] - 83:22
**rudolphgiuliani@ icloud.com** [1] - 37:11
**rudygiuliani@me** [1] - 83:20
**rule** [3] - 26:4, 26:5, 70:9
**Rule** [8] - 23:2, 23:4, 23:8, 23:12, 24:2, 24:4, 70:11, 103:5
**Rules** [1] - 3:23
**rules** [4] - 9:13, 30:11, 103:4, 103:8
**ruling** [5] - 64:25, 65:4, 103:13, 103:14, 104:13
**rulings** [1] - 59:19
**run** [2] - 73:4, 94:6

**S**

**SAINT** [1] - 106:18
**Saint** [1] - 1:22, 106:24
**SAINT-LOTH** [1] - 106:18
**Saint-Loth** [2] - 1:22, 106:24
**sanctions** [5] - 4:4, 4:20, 18:6, 23:2, 23:13
**sat** [2] - 16:3, 75:2
**satisfactory** [1] - 20:15
**satisfied** [1] - 71:8

**saved** [2] - 80:6, 84:9
**saw** [1] - 36:5
**schedule** [1] - 106:4
**scheduled** [1] - 3:13
**Scheindlin** [1] - 92:2
**scroll** [1] - 29:14
**scrutinizing** [1] - 62:18
**scrutiny** [1] - 46:25
**search** [91] - 4:1, 5:5, 5:17, 6:8, 6:9, 7:17, 8:13, 9:4, 11:12, 12:20, 13:18, 17:12, 24:10, 24:11, 24:12, 24:17, 24:24, 27:23, 28:25, 29:14, 29:17, 29:20, 29:23, 30:6, 30:10, 30:13, 30:20, 30:22, 31:4, 31:6, 31:7, 31:11, 31:23, 31:24, 32:2, 32:4, 32:6, 32:17, 32:23, 33:3, 36:8, 36:25, 37:1, 37:15, 38:3, 42:25, 43:8, 43:18, 45:1, 50:6, 54:9, 56:23, 57:8, 63:25, 65:8, 70:15, 71:5, 73:16, 74:25, 76:17, 76:18, 76:20, 78:16, 78:24, 79:2, 79:6, 80:6, 81:4, 81:6, 81:7, 81:8, 81:10, 81:17, 81:21, 82:4, 82:9, 82:11, 82:14, 83:4, 83:5, 84:25, 92:10, 94:5, 95:17, 99:14, 99:17, 103:20, 104:15
**searched** [22] - 7:3, 14:18, 14:21, 15:2, 24:9, 24:19, 29:6, 29:12, 30:1, 30:6, 32:1, 32:10, 38:12, 43:3, 53:1, 66:3, 70:7, 73:15, 79:12, 81:20, 84:13, 85:5
**searches** [26] - 13:8, 16:13, 28:24, 29:3, 30:15, 30:19, 31:6, 32:11, 39:5, 40:7, 43:16, 46:8, 57:1, 57:18, 65:15, 78:17, 78:20, 80:11, 81:22, 87:5, 88:7, 88:9, 104:11, 104:19, 105:11, 105:17
**searching** [10] - 7:3, 30:24, 50:1, 55:23, 55:25, 63:18, 78:25,

80:23, 80:25, 97:13
**seat** [1] - 49:3
**seated** [1] - 2:9
**second** [9] - 7:11,
31:20, 33:5, 37:9,
54:12, 59:5, 94:16,
99:17, 101:20
**secure** [1] - 27:13
**secured** [1] - 42:21
**see** [16] - 3:19, 34:4,
34:16, 37:6, 38:8,
40:2, 47:19, 48:8,
52:7, 53:25, 68:8,
69:3, 72:2, 77:2,
77:12, 91:25
**seeing** [3] - 96:4,
98:15, 101:6
**seek** [3] - 6:15, 22:6,
48:20
**seeking** [1] - 5:4
**seem** [1] - 21:13
**segregate** [1] - 80:19
**seized** [11] - 6:22,
10:11, 13:25, 15:17,
17:21, 39:14, 45:12,
50:2, 51:14, 95:21
**seizure** [10] - 11:15,
14:8, 14:9, 15:6,
15:9, 15:11, 29:9,
51:14, 83:8, 95:6
**self** [1] - 25:21
**send** [1] - 42:7
**Sense** [1] - 20:6
**sense** [5] - 9:8, 22:4,
35:6, 54:2, 102:12
**sent** [10] - 39:2, 41:23,
51:1, 56:6, 58:8,
58:16, 59:14, 74:10,
89:23, 90:23
**separate** [3] - 15:24,
32:25, 71:16
**separately** [1] - 30:1
**September** [6] - 55:19,
60:17, 60:20, 61:3,
61:13, 85:24
**serial** [2] - 51:5, 55:14
**series** [1] - 91:16
**serious** [1] - 72:2
**serve** [1] - 20:12
**served** [3] - 6:24,
11:13, 58:24
**servers** [1] - 17:24
**service** [1] - 84:10
**services** [2] - 7:15,
79:13
**set** [11] - 8:19, 11:16,
24:25, 25:1, 25:2,
25:18, 38:24, 57:17,
57:25, 87:13, 87:16
**sets** [1] - 99:17

**settlement** [3] - 47:2,
47:6, 47:11
**seven** [2] - 19:15,
19:16
**SFX** [1] - 49:10
**shall** [2] - 74:20,
106:21
**shielded** [1] - 62:14
**shift** [2] - 9:11, 45:21
**shifting** [3] - 9:14,
91:22, 93:10
**short** [1] - 16:12
**shorten** [1] - 52:7
**shortened** [1] - 37:3
**shorthand** [1] - 1:24
**shortly** [1] - 61:4
**show** [4] - 34:6, 34:11,
34:15, 34:16
**showing** [2] - 21:16
**SIBLEY** [78] - 1:18,
3:1, 41:13, 41:18,
42:2, 43:5, 44:13,
45:8, 45:23, 46:14,
47:21, 47:24, 48:11,
48:23, 49:1, 50:17,
51:9, 54:15, 56:6,
57:12, 57:20, 59:9,
59:19, 60:15, 61:21,
62:21, 63:18, 63:21,
64:23, 65:20, 66:4,
66:9, 66:19, 66:22,
67:10, 69:16, 69:23,
70:12, 71:23, 72:12,
72:19, 73:12, 74:5,
74:9, 74:22, 77:22,
78:22, 79:1, 79:11,
79:15, 79:17, 80:2,
80:5, 80:12, 80:22,
81:12, 81:16, 82:1,
82:4, 82:20, 83:7,
84:14, 87:7, 87:12,
88:20, 89:2, 89:17,
90:4, 90:20, 91:7,
91:12, 92:16, 92:22,
93:15, 94:22, 102:3,
102:24, 106:11
**Sibley** [30] - 1:18, 3:2,
12:13, 14:21, 18:16,
18:21, 26:2, 39:1,
40:25, 41:20, 42:24,
45:7, 46:23, 54:14,
54:25, 61:20, 67:7,
73:11, 73:22, 74:19,
94:18, 95:14, 99:3,
100:15, 100:17,
100:19, 100:20,
100:24, 101:21
**Sibley's** [1] - 14:13
sibley@
**camarasibley.com**

[1] - 1:21
**sic** [7] - 18:16, 18:18,
37:22, 77:15, 83:14,
97:19, 100:3
**sides** [1] - 65:3
**Sidney** [3] - 24:23,
81:1, 82:10
**sign** [1] - 90:13
**Signal** [4] - 86:4, 86:9,
86:13, 98:7
**signatory** [1] - 106:22
**simple** [3] - 7:12,
76:20, 85:15
**simpler** [1] - 76:15
**simplest** [1] - 78:12
**simply** [1] - 89:15
**single** [7] - 13:5,
24:22, 37:7, 51:17,
60:3, 75:10, 81:5
**sitting** [2] - 64:22,
88:15
**situation** [6] - 46:13,
66:5, 93:4, 93:5,
93:11, 105:21
**six** [8] - 33:6, 33:8,
33:14, 77:23, 78:5,
78:9, 85:20, 99:11
**slightly** [1] - 52:22
**sliver** [1] - 73:18
**small** [1] - 52:11
**so..** [6] - 42:12, 46:2,
48:2, 48:17, 79:24,
82:15
**social** [21] - 8:4,
13:22, 20:5, 29:1,
30:1, 30:2, 73:5,
79:12, 79:22, 79:23,
80:14, 81:1, 81:10,
81:19, 82:18, 83:1,
83:5, 85:4, 85:5,
85:16, 104:3
**sole** [4] - 17:18, 27:15,
38:23
**solely** [1] - 12:8
**solve** [1] - 98:6
**someone** [1] - 61:25
**sometime** [1] - 52:25
**sometimes** [1] - 85:12
**somewhat** [1] - 88:10
**somewhere** [2] -
31:19, 61:7
**soon** [1] - 77:13
**sorry** [9] - 2:21, 23:5,
35:18, 38:4, 52:2,
67:5, 81:2, 100:3,
106:2
**sort** [6] - 5:4, 22:17,
38:10, 43:12, 58:2,
66:6, 71:25, 87:13

**sounds** [4] - 33:22,
50:13, 59:20, 98:1
**source** [4] - 63:11,
63:12, 104:7
**sources** [7] - 16:13,
49:22, 50:2, 55:5,
55:13, 55:15, 56:13
**Southern** [1] - 91:16
**speakers** [1] - 84:4
**speaking** [1] - 67:4
**speaks** [1] - 74:20
**Special** [2] - 59:14,
59:19
**special** [1] - 59:16
**specific** [17] - 4:2,
7:24, 13:21, 13:23,
13:25, 14:4, 21:15,
24:1, 42:6, 46:20,
54:9, 56:12, 65:13,
65:18, 100:13,
104:2, 104:5
**specifically** [12] -
16:16, 16:25, 26:19,
35:3, 50:5, 50:25,
57:1, 57:2, 85:10,
100:7, 104:18,
104:19
**spend** [1] - 3:5
**spent** [1] - 77:5
**spoliation** [1] - 4:20
**Sports** [1] - 49:10
**spreadsheets** [1] -
79:8
**staff** [1] - 62:25
**stand** [1] - 90:1
**start** [8] - 4:8, 4:9,
4:12, 10:9, 10:19,
16:16, 38:21, 38:22
**started** [3] - 41:8,
64:11, 67:25
**starter** [1] - 43:8
**starting** [1] - 2:6
**State** [2] - 47:8, 100:7
**state** [1] - 2:5
**statement** [6] - 35:2,
35:13, 48:5, 61:10,
68:21, 72:2
**statements** [5] - 20:5,
21:9, 25:3, 28:21,
34:23
**STATES** [2] - 1:1, 1:8
**states** [1] - 49:13
**status** [4] - 7:6, 42:24,
43:17, 49:21
**stenographic** [1] -
106:19
**step** [6] - 8:16, 9:6,
9:10, 9:19, 9:21,
10:16
**steps** [2] - 17:3, 17:4

**still** [11] - 16:11,
19:22, 24:8, 24:19,
44:8, 61:3, 62:4,
84:20, 96:13, 101:12
**storage** [2] - 92:4,
92:18
**stored** [1] - 50:15
**story** [1] - 22:1
**straight** [1] - 23:23
**strategic** [2] - 62:13,
74:1
**Street** [5] - 1:12, 1:15,
1:19, 75:24, 76:1
**stressing** [1] - 10:21
**strike** [1] - 20:22
**strokes** [1] - 3:19
**stuff** [2] - 87:10, 96:11
**subject** [3] - 13:16,
22:15, 62:12, 65:7,
70:1, 103:3, 103:17
**subjects** [1] - 96:20
**submission** [1] -
104:6
**submit** [2] - 105:3,
105:8
**submitted** [3] - 16:4,
16:6
**subpoena** [4] - 25:9,
36:17, 36:19, 90:18
**subpoenaed** [2] -
71:9, 90:23
**subpoenaing** [1] -
25:10
**subpoenas** [1] - 90:24
**subscriber** [1] - 36:11
**subsequent** [1] - 30:3
**subset** [1] - 13:5
**substance** [2] - 6:15,
89:23
**substantive** [2] - 5:3,
41:9
**succeeded** [2] - 60:7,
76:13
**sufficient** [7] - 26:13,
28:9, 30:10, 30:14,
34:6, 90:9, 90:10
**suggest** [2] - 48:3,
54:4
**suggested** [1] -
101:13
**suggestion** [1] - 6:16
**Suite** [2] - 1:12, 1:19
**summary** [1] - 49:9
**summer** [1] - 6:23
**supervise** [1] - 78:19
**supplant** [1] - 33:1
**supplement** [6] -
19:16, 21:1, 21:7,
69:11, 95:14
**supplemental** [1] -

21:4
**supplemented** [4] - 19:9, 19:18, 19:20, 69:14
**supplied** [1] - 3:15
**support** [2] - 15:25, 47:17
**supported** [1] - 26:25
**suppose** [6] - 48:13, 63:21, 70:23, 87:14, 102:3, 102:7
**supposed** [1] - 3:12
**Supreme** [1] - 47:8
**surprise** [1] - 96:24
**suspect** [1] - 94:10
**suspicion** [1] - 85:13
**sympathetic** [2] - 46:4, 46:10

## T

**table** [1] - 2:10
**tailor** [1] - 54:1
**tailored** [4] - 53:24, 57:1, 99:9, 104:18
**takeout** [1] - 94:13
**takeouts** [1] - 7:12
**talks** [2] - 26:19, 100:7
**tandem** [1] - 10:16
**tape** [1] - 92:17
**tapes** [1] - 92:4
**targeted** [2] - 55:24, 58:2
**task** [1] - 81:25
**TAVOULAREAS** [1] - 26:18
**team** [1] - 39:19
**technique** [1] - 83:5
**technology** [1] - 68:25
**teed** [1] - 65:2
**Telegram** [7] - 86:3, 86:9, 86:10, 86:11, 86:13, 98:7, 98:20
**ten** [4] - 31:14, 31:15, 41:17
**terabytes** [1] - 55:21
**term** [3] - 24:12, 32:20, 63:25
**terminology** [1] - 81:4
**terms** [32] - 22:11, 24:10, 24:17, 24:24, 24:25, 28:1, 31:6, 31:23, 31:24, 31:25, 32:2, 32:4, 32:17, 32:23, 40:3, 40:6, 47:5, 56:17, 73:16, 78:24, 79:3, 81:4, 82:5, 82:9, 82:11, 82:14, 97:13, 99:4, 99:14, 99:17, 99:24,

105:7
**test** [1] - 74:8
**tested** [1] - 102:20
**testified** [5] - 5:24, 7:21, 15:4, 80:24, 95:1
**text** [16] - 8:3, 13:21, 14:11, 14:14, 29:1, 29:20, 29:21, 35:20, 36:3, 73:18, 87:25, 88:4, 88:7, 89:23, 104:2
**texts** [2] - 36:5, 88:12
**THE** [239] - 1:1, 1:8, 2:2, 2:9, 2:18, 2:21, 2:25, 3:3, 4:16, 4:23, 5:3, 5:22, 6:1, 8:7, 9:18, 10:1, 10:12, 10:22, 11:5, 11:25, 13:2, 13:12, 14:20, 14:24, 15:2, 15:14, 16:1, 16:16, 17:20, 17:23, 19:8, 20:19, 21:13, 22:8, 22:11, 23:6, 23:11, 23:20, 24:6, 24:21, 26:9, 27:25, 28:23, 30:8, 31:5, 31:14, 31:17, 32:7, 32:15, 33:4, 33:14, 33:24, 34:14, 35:1, 35:5, 35:8, 35:16, 35:19, 35:23, 36:4, 36:24, 37:13, 38:1, 38:8, 38:10, 38:24, 40:2, 40:12, 40:15, 40:24, 41:7, 41:12, 41:15, 41:20, 42:13, 42:14, 42:18, 42:23, 43:20, 44:15, 44:17, 44:19, 45:20, 46:3, 46:22, 47:23, 48:8, 48:18, 48:25, 49:2, 51:7, 51:10, 51:20, 51:22, 51:24, 51:25, 52:2, 52:4, 52:6, 54:6, 54:8, 54:11, 54:16, 54:20, 54:25, 56:12, 57:14, 59:4, 59:6, 59:7, 59:18, 59:25, 60:14, 60:16, 60:18, 60:20, 61:1, 61:9, 61:12, 61:15, 62:9, 63:6, 63:20, 64:8, 64:24, 66:1, 66:8, 66:13, 66:21, 66:24, 67:1, 67:3, 67:5, 67:7, 67:19, 67:21, 68:15, 68:17, 68:19, 68:20, 69:3, 69:22, 69:24,

71:20, 72:10, 72:13, 72:24, 73:10, 73:11, 73:22, 74:7, 74:15, 74:17, 74:19, 74:23, 74:24, 75:14, 75:15, 75:16, 75:17, 75:18, 75:20, 77:17, 77:19, 77:23, 78:8, 78:16, 78:23, 79:4, 79:14, 79:16, 79:25, 80:4, 80:6, 80:17, 81:2, 81:15, 81:17, 82:3, 82:16, 82:17, 83:4, 83:13, 83:17, 83:18, 83:19, 83:20, 83:21, 83:22, 83:25, 84:1, 84:2, 84:5, 84:22, 85:9, 85:11, 86:3, 86:5, 86:8, 86:10, 87:1, 87:9, 87:24, 88:25, 89:10, 90:1, 90:16, 90:25, 91:10, 91:13, 92:18, 93:7, 93:21, 94:15, 94:18, 95:13, 95:15, 95:17, 95:25, 96:5, 96:19, 96:22, 96:23, 97:2, 97:3, 97:4, 97:9, 97:16, 101:16, 101:19, 102:13, 103:1, 103:10, 103:12, 106:8, 106:10, 106:13, 106:14, 106:15
**theirs** [2] - 67:24, 68:12, 86:12
**themselves** [2] - 29:18, 46:13
**thereafter** [3] - 53:3, 61:4, 105:8
**therefore** [1] - 52:14
**thinks** [2] - 23:3, 31:2
**third** [24] - 8:2, 11:20, 11:23, 17:4, 17:7, 18:3, 21:8, 22:3, 24:25, 25:1, 25:18, 38:6, 58:4, 74:12, 75:10, 75:11, 92:25, 100:24, 101:6, 101:22, 101:24, 102:12, 102:18
**third-party** [6] - 11:20, 11:23, 17:4, 17:7, 92:25, 101:24
**thorough** [4] - 36:7, 51:16, 81:21, 87:5
**thoroughly** [1] - 70:7
**thoroughness** [2] - 41:5, 88:6
**three** [14] - 2:11, 14:8,

20:3, 24:8, 24:18, 29:19, 77:9, 85:14, 86:8, 86:16, 86:17, 92:3, 92:8, 99:25
**timely** [1] - 39:24
**today** [13] - 18:2, 22:7, 64:15, 86:6, 90:2, 93:23, 94:2, 99:1, 99:14, 103:13, 103:14, 105:23, 106:1
**took** [18] - 50:11, 51:16, 51:24, 52:8, 52:14, 52:15, 52:17, 53:9, 53:10, 53:11, 58:14, 68:1, 75:3, 77:3, 85:3, 97:22
**total** [1] - 12:23
**totally** [2] - 17:20, 23:11
**touched** [1] - 51:17
**towards** [2] - 10:18, 26:13
**track** [1] - 78:25
**traffic** [1] - 3:15
**Transcript** [1] - 1:25
**transcript** [5] - 18:12, 38:17, 106:19, 106:19, 106:21
**TRANSCRIPT** [1] - 1:7
**transcription** [1] - 1:25
**transfer** [1] - 40:5
**transferred** [1] - 53:17
**transferring** [1] - 44:22
**transpires** [1] - 22:7
**trial** [1] - 76:4
**tried** [6] - 8:2, 10:23, 29:13, 43:16, 76:11, 77:7
**triggered** [4] - 4:4, 9:15, 28:2, 28:3
**troubling** [1] - 45:4
**true** [8] - 19:5, 43:6, 68:10, 83:17, 101:5, 106:18, 106:19
**truly** [1] - 72:14
**Trump** [11] - 12:10, 58:7, 58:8, 58:9, 58:15, 58:16, 60:13, 61:11, 62:17, 101:9, 102:4
**trump** [1] - 59:18
**Trustpoint** [99] - 6:19, 8:10, 9:1, 9:17, 9:22, 9:24, 10:20, 12:20, 12:23, 12:25, 13:7, 13:23, 14:1, 14:15, 15:16, 15:20, 17:8,

17:10, 17:19, 18:3, 27:11, 27:22, 32:22, 34:21, 35:10, 36:25, 37:1, 37:23, 38:2, 38:12, 39:3, 39:4, 39:7, 39:10, 39:13, 39:16, 39:23, 40:3, 40:4, 40:8, 41:22, 41:24, 42:7, 42:9, 42:19, 43:3, 44:10, 44:22, 44:23, 45:14, 46:1, 49:19, 49:21, 49:23, 50:1, 50:8, 50:12, 53:17, 53:20, 53:25, 54:18, 55:4, 55:12, 55:18, 55:22, 56:2, 56:10, 56:25, 57:9, 57:18, 58:5, 58:14, 63:11, 64:16, 65:13, 65:18, 84:7, 84:8, 91:17, 91:18, 92:14, 93:9, 93:11, 93:23, 94:8, 97:21, 97:22, 98:9, 100:2, 100:4, 101:8, 104:5, 104:8, 104:17, 104:24, 105:16, 105:17
**Trustpoint's** [4] - 17:24, 40:4, 70:25, 71:4
**trustworthy** [1] - 81:24
**truth** [1] - 72:2
**try** [3] - 21:25, 25:11, 32:21
**trying** [11] - 22:2, 35:6, 39:24, 42:22, 43:18, 48:14, 68:14, 76:13, 90:9, 98:16, 101:2
**turn** [6] - 33:5, 39:10, 41:12, 51:25, 88:13, 96:21
**turned** [3] - 5:24, 6:4, 89:6
**Twitter** [3] - 20:5, 24:23, 30:3
**two** [9] - 11:22, 29:2, 37:12, 54:6, 74:2, 85:14, 87:25, 92:3, 92:6
**TX** [1] - 1:20
**type** [2] - 29:15, 55:13
**typed** [1] - 29:15
**types** [4] - 9:5, 49:25, 55:3
**typical** [1] - 94:20
**typically** [5] - 23:12, 31:24, 43:22, 81:18, 92:9

## U

**ultimately** [2] - 38:2, 71:18
**umbrella** [1] - 101:1
**unable** [1] - 10:17
**unarchived** [1] - 55:25
**unclear** [6] - 10:4, 15:8, 27:12, 29:12, 30:5, 36:21
**under** [8] - 3:23, 12:21, 28:19, 40:6, 47:11, 78:3, 102:5, 103:5
**underlying** [1] - 48:8
**understood** [6] - 2:24, 35:5, 35:7, 35:14, 45:23, 64:9
**undertaken** [1] - 21:19
**undisclosed** [1] - 21:9
**undue** [1] - 9:11
**unfair** [2] - 76:10, 76:14
**unified** [1] - 63:10
**UNITED** [2] - 1:1, 1:8
**universe** [3] - 15:21, 99:22, 101:10
**unnecessary** [1] - 71:11
**unopposed** [1] - 21:18
**unripe** [1] - 69:16
**unsure** [1] - 61:7
**unusual** [1] - 97:1
**unverifiable** [1] - 81:18
**up** [33] - 2:11, 4:11, 6:16, 8:19, 10:5, 10:23, 19:25, 29:19, 32:2, 32:5, 32:10, 32:13, 36:4, 39:1, 39:20, 41:20, 41:21, 44:6, 46:6, 53:7, 53:12, 53:13, 64:9, 65:3, 68:3, 83:10, 85:6, 85:8, 85:12, 85:13, 87:13, 87:16, 104:8
**update** [1] - 42:23
**updated** [1] - 19:14
**upload** [1] - 56:2
**uploaded** [1] - 54:18
**uploading** [1] - 45:1
**user** [4] - 32:10, 50:9, 55:24
**user-generated** [1] - 55:24
**uses** [2] - 85:20
**usual** [1] - 97:2

## V

**varied** [1] - 38:11
**various** [8] - 3:25, 7:24, 10:23, 12:6, 26:19, 94:12, 98:8, 98:20
**vendor** [33] - 5:8, 5:11, 6:14, 6:17, 7:7, 7:8, 7:15, 8:12, 9:21, 10:8, 32:3, 32:9, 40:5, 40:16, 42:9, 44:23, 45:1, 46:7, 57:4, 57:7, 92:25, 94:4, 94:10, 94:11, 94:21, 94:23, 97:11, 98:12, 99:9, 104:21, 104:23
**vendors** [1] - 10:19
**verifiable** [1] - 81:23
**verify** [1] - 87:4
**versus** [1] - 2:3
**via** [5] - 24:23, 34:12, 36:3, 74:10, 94:2
**view** [7] - 28:16, 33:8, 49:17, 87:11, 88:14, 93:8, 103:4
**viewership** [1] - 26:21
**viewing** [3] - 20:5, 27:6, 27:14
**vis-à-vis** [2] - 58:15, 101:8
**void** [1] - 106:21
**volume** [1] - 78:17
**vs** [1] - 1:4

## W

**wait** [1] - 20:10
**waiver** [3] - 36:20, 36:21, 94:23
**Wall** [2] - 75:24, 76:1
**wants** [4] - 42:15, 52:4, 59:4, 74:16
**warrant** [3] - 36:7, 50:7, 93:9
**Washington** [4] - 1:6, 1:12, 1:23, 75:23
**water** [1] - 52:5
**ways** [5] - 44:21, 56:19, 84:24, 85:12, 85:14
**week** [1] - 29:13
**weigh** [1] - 69:19
**weighs** [1] - 69:20
**welcome** [1] - 52:5
**WhatsApp** [5] - 86:3, 86:9, 86:14, 86:15, 98:7
**whereby** [2] - 8:19,

36:20
**whole** [4] - 41:22, 70:6, 72:18, 96:12
**wife** [4] - 46:18, 47:12, 48:7, 99:5
**wife's** [2] - 46:24, 52:18
**willing** [2] - 45:11, 94:21
**willingness** [1] - 40:5
**Willkie** [3] - 1:11, 2:8, 2:15
**wiped** [3] - 7:4, 17:15, 87:22
**wish** [1] - 29:4
**wishes** [1] - 67:9
**withdrew** [1] - 63:4
**witnesses** [1] - 11:23
**wondering** [2] - 11:2, 40:15
**Word** [1] - 79:9
**word** [2] - 48:9, 85:9
**wording** [1] - 21:21
**words** [1] - 15:12
**worn** [1] - 62:16
**worth** [3] - 47:13, 48:5, 105:1
**write** [1] - 68:17
**written** [3] - 21:4, 69:14, 105:24
**wrote** [2] - 18:16, 18:18

## Y

**year** [7] - 3:18, 5:13, 5:17, 10:21, 18:9, 22:2, 96:6
**years** [2] - 52:19, 68:6
**yesterday** [2] - 44:1, 44:7
**York** [3] - 11:19, 47:8, 91:16
**you-all** [2] - 35:11, 64:21
**yourself** [2] - 17:11, 89:16

## Z

**zero** [1] - 48:14
**Zubulake** [5] - 91:15, 91:25, 92:12, 92:14, 93:7