# EXHIBIT 2

```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
RUBY FREEMAN, et al.,                )  Civil Action
                 Plaintiffs,         )  No. 21-3354
vs.                                  )
                                     )
RUDOLPH GIULIANI,                    )  May 19, 2023
                                     )  11:07 a.m.
                 Defendant.          )  Washington, D.C.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**

<u>**APPEARANCES**</u>:

```
FOR PLAINTIFFS:      MERYL CONANT GOVERNSKI
                     MICHAEL GOTTLIEB
                     Willkie Farr & Gallagher LLP
                     1875 K Street, Suite 100
                     Washington, DC 20006
                     (202) 303-1016
                     Email: mgovernski@willkie.com

                     JOHN LANGFORD
                     Protect Democracy
                     555 W. 5th Street
                     Los Angeles, CA 90013
                     (919) 619-9819
                     Email: john.langford@protectdemocracy.org

FOR DEFENSE:         JOSEPH D. SIBLEY, IV
                     Camara & Sibley LLP
                     1108 Lavaca Street
                     Suite 110263
                     Austin, TX 78701
                     (713) 966-6789
                     Email: sibley@camarasibley.com

Court Reporter:      Elizabeth Saint-Loth, RPR, FCRR
                     Official Court Reporter
                     Washington, D.C.  20001
```

```
            Proceedings reported by machine shorthand.
       Transcript produced by computer-aided transcription.
```

# Excerpted

1        Our own discovery, which we have painstakingly

2   tried to receive from third parties illustrates that there

3   are responsive materials.  There are responsive text

4   messages.  There are responsive messages on social media.

5   There are responsive messages in email that he has not

6   produced.

7        THE COURT:  Okay.  So I anticipate having seen

8   some of this in the opposition to the motion to compel

9   that -- where Mr. Giuliani says that it would cost $320,000

10  to access the archive Trustpoint data.  And I would expect

11  that he might also claim cost issues with retaining a

12  professional vendor to do what is now the norm in any civil

13  case to collect, preserve, and search data in an organized

14  fashion.

15       But given this resistance on the basis of cost, do

16  you think a first step, before moving to this first full

17  paragraph of your proposed order, would be to obtain

18  financial records from Mr. Giuliani since he has raised his

19  inability to pay, and then set up a process whereby those

20  financial records, which are in the RFPs, Nos. 40 and 41,

21  are produced to plaintiffs?  Plaintiffs get an assessment,

22  is his claim of poverty accurate or not?  Get an assessment;

23  get Mr. Giuliani's response to whatever that assessment is.

24  And then we can take it from there for whether -- you know,

25  use of a computer forensic expert is something within his

1    ability to pay or accessing the Trustpoint archive data,

2    which seems like it would hold the bulk of information that

3    might be responsive since some responsive documents have

4    already been found there, but the search was not within the

5    appropriate date range nor across all file types.

6             So would that be, as a procedural step, a way to

7    approach at least the first part of the proposed order?

8             MS. GOVERNSKI:  That makes sense to us,

9    Your Honor.  We do believe that that is, at a minimum, the

10   first step that -- that should occur here.  Because claims

11   of undue burden and attempts to cost shift, you need actual

12   evidence of the need and the financial inability to comply

13   with the basic rules of discovery.

14            I also would proffer, though, that cost shifting

15   doesn't even -- isn't even triggered until it's

16   inaccessible.  And we don't know that it's inaccessible,

17   Your Honor, because, first of all, Trustpoint was --

18            THE COURT:  Yes.  This but this is like -- this is

19   the step before making a determination, whether it's

20   accessible or inaccessible, because he's saying he can't

21   even afford the first step of a professional vendor or to

22   access the Trustpoint dataset to make that determination.

23            MS. GOVERNSKI:  Well, I would proffer, Your Honor,

24   that the Trustpoint is a little bit of a red herring, as is

25   the $350,000.

1    THE COURT:  320, I think, is what he said.

2    MS. GOVERNSKI:  Excuse me.  Thank you.

3    He has indicated that part of that cost is that he

4    is in arrears.  It's unclear exactly what portion of that is

5    to make up for whatever archiving costs existed before and

6    what costs -- what amount of that actually it would cost to

7    do what we need to do.

8    I will say that we went ahead and asked our vendor

9    what it would cost if we were to start with the devices.  I

10   believe we estimated not all of them because there were 18

11   devices seized.  We are not saying that we need --

12   THE COURT:  It was 19.

13   MS. GOVERNSKI:  19.

14   We don't need all of them.  But our estimate was

15   far more reasonable.  I think it was the range of 8500 to 15

16   or 16,000.  So I think probably a first step in tandem, with

17   whether Mr. Giuliani is unable to actually pay anything

18   towards his discovery obligations, is also to look at other

19   vendors who may be able to start with the devices and leave

20   Trustpoint out of it, which has been our point and what we

21   have been stressing for over a year.

22   THE COURT:  All right.  So I have read through the

23   various emails, but I haven't tried to count it up, that the

24   defense has produced privilege logs to the plaintiffs.

25   And so in this first paragraph of the proposed

1    order it asked for a privilege log.  And I am just

2    wondering:  Is that going to be redundant to the privilege

3    logs you have already received --

4                 MS. GOVERNSKI:  So, Your Honor --

5                 THE COURT:  -- and could you explain that?

6                 MS. GOVERNSKI:  Of course.

7           The only privilege log that we received was with

8    respect to the Dominion documents.

9           As Your Honor knows, very early we received a

10   little bit over 1,000 documents which were what Mr. Giuliani

11   produced in response to the Dominion RFPs.  I believe that

12   those RFPs were noticed and the search occurred before we

13   even noticed our RFPs -- before we even served our RFPs.

14          I also will note that that collection occurred

15   after the seizure of Mr. Giuliani's devices.  So the

16   Dominion docs, the collection from which that set was

17   derived, are paper files that happened to be in his

18   apartment; they are materials that his counsel collected in

19   connection with his D.C. and New York Bar grievances; and

20   they are some third-party documents from Christianne Allen

21   and Christina Bobb.

22          By the way, productions from both of those two

23   third-party witnesses have resulted in documents that were

24   not included in the Dominion batch.

25                 THE COURT:  Yes.  I am going to call those the

1      missing documents.  I have a number of questions about

2      those, but we will get to that later.

3                MS. GOVERNSKI:  Thank you.

4           So my understanding of the privilege log is that

5      that was created from -- it was a collective effort amongst

6      various individuals who were responding and producing

7      documents in response to litigation relating to the post

8      2020 election efforts.  So it wasn't solely

9      Defendant Giuliani's privilege log, it was a privilege log

10     across individuals of the Trump campaign and other

11     individuals who claim to be in a common interest.

12          So we received -- so this is my understanding from

13     much back and forth with Mr. Sibley; that he produced these

14     Dominion docs, he also produced a privilege log with them.

15          We went back to him and said, are all of these

16     documents even responsive to our request?  Can you give us a

17     narrowed privilege log?  So then he gave us a narrowed

18     privilege log from that Dominion document privilege log.

19     That is the only privilege log that we have in the case.

20          So his search of Trustpoint, which original search

21     was 50,000 documents, narrowed to 400, narrowed to under 200

22     that were actually produced -- 50 of which were blank.  So

23     we have in total from Trustpoint, I don't know, 120-ish

24     documents, we have no privilege log associated with

25     Trustpoint.

1           We also have no privilege --

2           THE COURT:  Okay.  Now I understand.

3           I knew that there was more than one privilege log.

4    But what you are saying is it's, like, there was an

5    overarching privilege log and then a subset of the single

6    privilege log all related to the Dominion production, but

7    nothing related to Trustpoint, nothing related to any of the

8    manual searches that Mr. Giuliani did himself, nothing

9    related to any other production that's been made.

10          MS. GOVERNSKI:  That's my understanding,

11   Your Honor.

12          THE COURT:  Okay.  Now I understand.  Okay.

13          And so then the next part, and I am going to go

14   back to some of these issues.

15          The next part of the proposed order asked for

16   Mr. Giuliani to file a declaration subject to penalty of

17   perjury detailing all of his efforts to preserve, collect,

18   search potentially responsive data and locations, a complete

19   list of all of those locations, and data that he used to

20   communicate about any material that might be responsive in

21   this case, including specific email accounts, text messages,

22   applications of social media, et cetera.

23          What the specific data is on the Trustpoint

24   database -- and, by that, I presume you mean what were the

25   specific electronic devices seized by the FBI on April 27th,

```
1     2021, that was then dumped in the Trustpoint dataset?

2                  Is that what you mean?

3                  MS. GOVERNSKI:  I think it goes beyond devices,

4     Your Honor.  I think it includes what specific email

5     accounts were captured.

6                  We now know that Defendant Giuliani had at least

7     five different emails, potentially more.  Some may predate

8     that seizure, so it may be three or four before that

9     seizure.  We don't know what emails are captured in that.

10    We don't know what messaging applications are captured in

11    that.  We don't know what text messages are captured in

12    that.

13                 In Mr. Sibley's filing with the Court from

14    March 24th, he did indicate that there were text messages

15    and messaging applications in Trustpoint which -- but those

16    weren't produced.  So whatever happened to them, the fact

17    that they exist in there is irrelevant to their discovery

18    obligations because they haven't searched for them or

19    produced them.

20                 THE COURT:  Well, I think you -- I think

21    Mr. Sibley has been clear that he only searched for email.

22                 MS. GOVERNSKI:  Exactly.  But we don't know what

23    emails, Your Honor.

24                 THE COURT:  Right.  And for -- but you don't know

25    from which email accounts --
```

```
1                MS. GOVERNSKI:  Exactly.

2                THE COURT:  -- were searched?

3                MS. GOVERNSKI:  He had a Gmail account that he has

4     testified was -- he used for 90 percent of his

5     communications.  He also had an iCloud account that we know

6     he used for communications prior to the seizure.  He also

7     had work accounts, Giuliani Partners; potentially Giuliani

8     Communications, it's unclear.  And there is a @me email

9     account, it's not clear if that was pre or post seizure.

10    And then there is this Proton account which I believe is

11    post seizure.

12                In other words, we don't know what emails are even

13    in there.

14                THE COURT:  Okay.

15                MS. GOVERNSKI:  And one other thing -- just going

16    back to Trustpoint.  You know, we don't even know the exact

17    reason those devices were seized, if they were even seized

18    in connection to anything related to post election 2020.

19                So, you know, regardless of what repositories are

20    actually in Trustpoint, we're not entirely clear if even

21    what is in there would capture the universe.

22                I understand that they have made representations

23    to that effect, but it's not entirely clear to us or we

24    don't have the evidentiary -- you know, separate evidentiary

25    support about what content is actually in there.
```

1          THE COURT:  Okay.  So the response in the

2    opposition to this request for this declaration with all of

3    this detail is that Mr. Giuliani has now sat for a

4    deposition with the plaintiffs.  He's submitted the March

5    24, 2023, report in response to this Court's order.  He has

6    submitted his -- another declaration that was submitted as

7    an attachment to the opposition to the plaintiffs' motion to

8    compel.

9          So from, I guess, the defendant's perspective,

10   what is it about all of those instances where he has talked

11   about what he did in discovery in this case that still falls

12   short of detailing his preservation efforts, locations of

13   all sources of data, and searches he has already conducted.

14         MS. GOVERNSKI:  Well, I very much appreciate the

15   question --

16         THE COURT:  Specifically, let's start with the

17   deposition because the response has been they had an

18   opportunity to talk to him about that.

19         Did you or did you not take that opportunity?

20         MS. GOVERNSKI:  We did, Your Honor.

21         My colleague, Mr. Gottlieb, asked Mr. Giuliani

22   during his deposition -- and I would refer the Court to

23   Docket 44-9, which is excerpts of the deposition, pages 290

24   to 292.

25         Specifically, Mr. Gottlieb asked whether he -- he

# Excerpted

1    searching on Trustpoint and, generally, we know that the

2    data sources were electronic devices seized on April 27th,

3    2021, by the FBI from Mr. Giuliani's person, residence, and

4    office.

5        But what you haven't provided is specifically what

6    those devices were, which would be clear from the search

7    warrant returned -- and I am sure Mr. Costello has that --

8    and, you know, whether everything in the Trustpoint dataset

9    was actually all user -- all user created generated data on

10   any of those devices without any exclusion, meaning they

11   took a forensic image of the electronic devices, they took

12   that entire dataset.  They dumped it in Trustpoint, which is

13   why you got so many operating files, which is what it sounds

14   like to me.  But you haven't really confirmed that in order

15   to also confirm for the emails what emails stored on those

16   electronic devices actually derive from which accounts.

17       MR. SIBLEY:  As much as I was able to confirm what

18   the data was as far as where it came from, Mr. Costello

19   confirmed for me -- and there was actually some

20   correspondence with the Department of Justice -- that this

21   was a capture of everything that was on those devices that

22   they could get which, as Your Honor mentioned -- that's why

23   there were the background files, and things like that.

24       I was not -- I did not understand -- and I

25   apologize if the Court wanted me to list specifically the

1    devices that were part of that.  I think I have sent a list

2    of those to plaintiffs previously, at least some of those

3    devices.

4           We certainly can provide a list -- I think we do

5    have a list we can provide that indicates the serial

6    numbers, I believe, of the devices.

7           THE COURT:  Whether they were MacBooks, iPhones,

8    laptops, et cetera.

9           MR. SIBLEY:  Sure.  I think --

10          THE COURT:  All right.  Well, I think it would be

11   good to know.

12          The Plaintiffs' counsel even said right here:  We

13   don't know what other devices may have been used prior to

14   the seizure that may not have been seized.  And I think that

15   certification has to make clear -- I think the FBI is

16   usually pretty thorough.  I think they probably took every

17   single one of Mr. Giuliani's devices that he ever touched

18   that they were -- that they could find.

19          Is that right, Mr. Giuliani?

20          THE DEFENDANT:  Would you like me to help with

21   that?

22          THE COURT:  Sure.  That's why you're here,

23   Mr. Giuliani.

24          THE DEFENDANT:  The FBI took --

25          THE COURT:  Mr. Giuliani, could you turn your mic

```
1    on?

2                 THE DEFENDANT:  I'm sorry.  I don't mean to

3    interrupt.  I just want to help.

4                 THE COURT:  And, Mr. Giuliani, your helper wants

5    to give you some water, which you are welcome to have.

6                 THE DEFENDANT:  I don't mean to interrupt.  I just

7    want to see if I can shorten it and help you.

8          The FBI took every electronic device in my

9    apartment and in my law office.  I am not sure there were

10   any in my law office at that time.  If there were, they were

11   probably small ones and not relevant and didn't produce very

12   much.  The main ones were in my house because it was

13   pandemic, and I was working out of my home.

14               They also took -- and, therefore, it is a little

15   confusing.  Some of those devices are not mine.  They took

16   every device.

17               So they took a colleague's device.  They took my

18   ex-wife's computer, right, which has nothing to do with

19   this, which actually she hadn't used in four years.  So it

20   was exhaustive.

21               Plus, the FBI had been monitoring my iCloud since

22   approximately -- I may have the dates slightly off so don't

23   hold me to it exactly, but it would have been -- it would

24   have been April of 2008 -- no.  Wrong.

25               It would have been 20- -- sometime in 2017.  Late
```

1    2017 until around the time they searched my apartment.  They

2    got an order to monitor -- to take my iCloud records and

3    then to monitor it consistently thereafter.

4         So they really had already almost all of the

5    information that was on the devices because as I said, I

6    think in the deposition, 90 to 95 percent of my

7    communication is done on Apple, and it's backed up by the

8    iCloud.

9         So when they took -- and most of the devices they

10   took, if not all, were Apple devices that related to me.

11        So when they took all my devices, they were really

12   checking, is there anything else they could pick up that

13   they had not picked up from the iCloud.  So it's pretty --

14   nothing is ever 100 percent exhaustive.  But having done

15   this work at one time in my life, this was about as

16   exhaustive as you would get.  That was -- that, as far as I

17   know, was all transferred to Trustpoint.

18        The FBI has its own copy that is preserved.

19   Exactly if we could get access to that, I don't know, but it

20   is preserved by the FBI.  And Trustpoint has assured us that

21   they are going to preserve it in hopes that we can work

22   things out.

23        And there might be a way -- if we could talk

24   informally, there might be a way to -- if we tailored the

25   request to Trustpoint and wasn't:  We want to see everything

1   you have.  If we were to tailor a request with them that was

2   logical and made sense, we might be able to pay them a

3   limited amount.  I am not saying we could, but it would

4   suggest to me it would be practical because they make some

5   money on this.

6           THE COURT:  Well, I have two questions for you,

7   Mr. Giuliani.

8           THE DEFENDANT:  We could pay them a limited amount

9   for a search of specific things, but not -- I don't mean to

10  be critical, but they made gigantic requests, Your Honor.

11          THE COURT:  Okay.  I am going to interrupt you for

12  a second, Mr. Giuliani.

13          I am going to ask your client one question because

14  he may know the answer to this more than you, Mr. Sibley.

15          MR. SIBLEY:  Yes, Your Honor.

16          THE COURT:  You say that the FBI was monitoring

17  your iCloud account.  Was the result of that monitoring by

18  the FBI also uploaded to the Trustpoint account or do you

19  not know that?

20          THE DEFENDANT:  I think I know the answer to that,

21  but I am not sure and I would have to check with my counsel,

22  Bob Costello.

23          The answer is I think it was, but I am not -- but

24  don't hold me to it.  It may not have been.

25          THE COURT:  Okay.  Now back to you, Mr. Sibley.

1                    Thank you, Mr. Giuliani, for those clarifications.

2                    What -- the response that Mr. Giuliani just gave

3        me demonstrates that just giving me the file types of

4        information held in the Trustpoint dataset is insufficient.

5        You need to find out what the data sources are of that data,

6        if it includes the entire iCloud account that was being

7        monitored, according to Mr. Giuliani, by the FBI.  I think

8        that would give some assurance to the plaintiffs that might

9        be more complete in that that iCloud account, at a minimum,

10       is preserved.

11                   So I think you -- it's incumbent upon you to find

12       out from Mr. Costello, or from Trustpoint itself, what the

13       data sources are by machine identification, type of machine,

14       serial number -- to make sure we all know what we're talking

15       about -- and any other data sources that went into that

16       dataset.  That is number one.

17                   I think Mr. Giuliani raises a very good point,

18       which is that the agreed-upon date range for the Trustpoint

19       dataset, as I understand it, was September 1, 2020, through

20       January 21, 2022.

21                   So that if -- rather than the possibly terabytes

22       of data that are in the Trustpoint dataset, which might be a

23       lot to put into an active discovery platform for searching,

24       can be more targeted and only user-generated data from that

25       date range can be unarchived for searching that might make

1    it cheaper than $320,000, which is the amount I understand

2    that Trustpoint is asking to -- asking for to upload all of

3    their dataset.

4             So I think that is something that you can also --

5    it would be helpful for you to pursue.

6             MR. SIBLEY:  I just sent the list of devices while

7    you had the exchange with Mr. Giuliani, so that's been

8    provided to plaintiffs, Your Honor.

9             The iCloud question -- my understanding was that

10   they did have everything in Trustpoint, but it seems like

11   there may be some -- we need to -- I understand, Your Honor.

12            THE COURT:  You need to find out the specific data

13   sources.

14            All right.  I just want to do the same thing that

15   I did with the plaintiffs, which is go through the proposed

16   order to find out what precisely are all of the objections

17   and make sure I am understanding the objections to the terms

18   of the proposed order which, as I said, is described by

19   plaintiffs as narrow.  And I think, in some ways, the

20   plaintiffs' description as it being a narrow relief order is

21   accurate.

22            The proposed order asks that I direct Mr. Giuliani

23   to collect, search, and produce all materials responsive to

24   all of plaintiffs' requests for production in all locations,

25   whether in Trustpoint or not, including a privilege log

# Excerpted

1     like that before these Georgia hearings because, after

2     looking at it, this was not in anticipation of litigation

3     but in anticipation of presenting at a hearing which would

4     not be privileged.  So we withdrew privilege assertions on

5     that basis.

6                 THE COURT:  Okay.  That's reassuring.

7                 Okay.  So putting aside -- let's go back to the

8     proposed order.

9                 With respect to the first paragraph, I think you

10    are going to need to do a clear unified privilege log for

11    each particular production or data source that -- Trustpoint

12    being one data source for things for which you claim

13    privilege so that we all understand what's being privileged

14    here but -- what there is an assertion of privilege over.

15                But is there anything other than cost that is

16    particularly objectionable in the first paragraph of that

17    proposed order?

18                MR. SIBLEY:  Not with respect to searching those

19    repositories.

20                THE COURT:  Right.

21                MR. SIBLEY:  I mean, I suppose we can make an --

22    the problem is that there are so many different litigations

23    that if this were the only case maybe we could say it's

24    overly broad, but we have already had to collect the

25    documents for so many cases that it's really a search term

1      thing.

2            I do have a question, though, Your Honor, about

3      the privilege log.  Is the Court going to require us to log

4      privileged communications between myself and Mr. Giuliani?

5      Normally, you only have to log privileged communications

6      that were not created as a result of the instant litigation.

7      So I am a little -- I just want to clarify.

8            THE COURT:  Well, I didn't think that that

9      question would come up here because I had understood the

10     time frame to end January 21, 2022, which was months before

11     this litigation began and you started representing

12     Mr. Giuliani in this case.

13            I think that that is something you can consult

14     with plaintiffs about because that shouldn't be an issue if

15     that is the time frame that they have clarified today is

16     only applied to the Trustpoint documents and not the other

17     documents.

18            I am going to leave -- I don't want to get

19     involved in the parties' discussion about what the

20     applicable time frame is.  I just don't know enough about

21     the case to be able to do that.  You-all are the ones

22     sitting through all of the discovery, not me.

23            MR. SIBLEY:  I understand, Your Honor.

24            THE COURT:  So I am actually not going to answer

25     that question, essentially make a ruling, when I just -- I

1    really think that you -- the parties need to talk about

2    that.  And if it does need my intervention, I want it teed

3    up appropriately with the arguments on all sides and facts

4    so I know what I am ruling on.

5           Okay.  So then let's go to the next paragraph of

6    the proposed order which asked that Mr. Giuliani file a

7    declaration subject to penalty of perjury that details to

8    the Court efforts taken to preserve, collect, and search

9    potentially responsive data and locations that may contain

10   responsive materials, complete lists of all such locations

11   and data that Mr. Giuliani used to communicate about any

12   materials responsive to any of plaintiffs' RFPs.  The

13   specific data located in the Trustpoint database which we

14   have already discussed, and, clearly, there is a need for

15   that; and what searches, if any, have occurred of both the

16   locations and data that Mr. Giuliani used to communicate

17   about any materials responsive to the plaintiffs' RFPs and

18   the specific data on the Trustpoint database.

19          What is objectionable about that requested relief?

20          MR. SIBLEY:  Well, I don't know that it's

21   objectionable, Your Honor, but I do want to be clear about

22   something.

23          Mr. Giuliani has stated -- I can't remember if

24   it's interrogatories or requests for admissions, but he has

25   not deleted any documents.  So all of the documents --

1            THE COURT:  But not deleting documents is not the

2       same as preserving the information in a manner that can be

3       retrieved and searched.

4            MR. SIBLEY:  I understand that, Your Honor.

5       Normally, that situation arises where you have, like, an

6       auto-delete, sort of, policy at a company, or something like

7       that.

8            THE COURT:  Exactly.

9            MR. SIBLEY:  And I think what he is saying is

10      that's not the case with me, nothing gets deleted as a

11      matter of course.  I believe he has said that.  But I don't

12      think --

13           THE COURT:  What if the phone he is using dies or

14      is inoperable?

15           He has said that all of the machines he used prior

16      to April 2021 are inoperable, can't be accessed.  That can

17      happen with any machine.  So that's why you preserve that

18      data in a manner that doesn't make it disappear.

19           MR. SIBLEY:  I understand that, Your Honor.

20      But --

21           THE DEFENDANT:  It's on the cloud.

22           MR. SIBLEY:  -- I think what he has said that all

23      of that data --

24           THE COURT:  I can only speak to one person at a

25      time, Mr. Giuliani.  You are well familiar with --

1          THE DEFENDANT:  I know, Your Honor.  It's

2     frustrating.

3          THE COURT:  -- with the plight of court reporters

4     who can only take down one person speaking at a time.

5          THE DEFENDANT:  I'm sorry.  I apologize, Your

6     Honor.  I apologize.

7          THE COURT:  So, Mr. Sibley, do you want to talk to

8     your client because he's anxious to say something, or do you

9     want me just to have him say what he wishes to say?

10          MR. SIBLEY:  I will let him speak, Your Honor.

11          But the data was taken by the DOJ.  He lost the

12     ability to do any preservation as of April 2021.  This case

13     wasn't filed until January or, I think, maybe, December

14     2021.  I can't remember.

15          Whatever that data was, I mean, I think what he

16     was saying in deposition is, look, it was preserved because

17     it was taken by the government.  And it's there.  I think

18     that was what he meant to say, but I will let him speak.

19          THE COURT:  Mr. Giuliani, is that what you wanted

20     to say?

21          THE DEFENDANT:  That and -- Your Honor, that's

22     correct.  The data -- I had not deleted or changed or

23     done -- first of all, I have about 20 preservation orders,

24     much of which overlaps with theirs -- not completely, but

25     almost completely.  So I started, you know, preserving from

1    way before their case.  And then the FBI took everything, so

2    they preserved it.

3             And then I back up everything on iCloud regularly

4    so it's preserved that way as well.  And at least I have

5    done nothing knowingly -- understand, I have been doing this

6    for 50 years; I understand the obligations.

7             There is nothing I would like to hide.  I would

8    like you to see everything.  It's just the enormity of their

9    request, in my experience, is way beyond what is necessary

10   in this case.  That may also be true because I am

11   inundated -- they have 1 case, I have 20.  And some of the

12   other requests are even bigger than theirs.  If there is

13   anything missing here, it's inadvertent.  It is not for want

14   of trying to preserve everything.

15            THE COURT:  All right.  Well, having detail about

16   that in a certification --

17            THE DEFENDANT:  But I am happy to write out

18   something, if it helps --

19            THE COURT:  Excellent.

20            THE DEFENDANT:  If it helps for me to make it in a

21   more detailed statement of what I just said or answer their

22   questions -- however they want it, I will do the best I can

23   to assure them that I have done everything I can to preserve

24   it.

25            Do I understand everything with this technology?

1    Of course not; I don't.  A lot of it is confusing to me, but

2    I have preserved everything.

3            THE COURT:  All right.  So I don't see anything

4    particularly objectionable about that provision.

5            The part of the proposed order dealing with

6    Interrogatories 11 and 12 is moot.

7            And then the next part of the order asking that

8    Mr. Giuliani be precluded from relying on any evidence not

9    provided in his initial disclosures or interrogatory

10   responses -- which I would never order because I think

11   people have a right to supplement and amend.

12           But with -- is there any reason why Mr. Giuliani

13   should not be precluded from relying on any evidence not

14   provided in his initial or supplemented written disclosures

15   or interrogatory responses?

16           MR. SIBLEY:  I just think that's unripe, Your

17   Honor, because we have more discovery that needs to be

18   taken.  At the appropriate time, if that attempt is made,

19   then the Court will weigh all of the factors that the Court

20   weighs at that point and you will make that call then.

21           I just think it's premature.

22           THE COURT:  So you think it's premature as well?

23           MR. SIBLEY:  Yes.

24           THE COURT:  All right.  And then the provision

25   that Mr. Giuliani paid plaintiffs' attorneys fees for the

1     cost of the motion to compel subject to any future filing

2     detailing the same.

3              You understand that -- when the plaintiffs make a

4     motion to compel for failure to fully comply with discovery

5     obligations the Friday before the Monday close of fact

6     discovery and I have a whole dataset, clearly, that hasn't

7     been thoroughly searched no matter what the excuses are --

8     the motion to compel seems almost inevitable.

9              But would you agree that the rule, essentially,

10    requires payment of attorney's fees for filing?  I mean,

11    Rule 37(a)(5)(A) appears fairly mandatory.

12             MR. SIBLEY:  Well, Your Honor, I think if there is

13    good cause and justification; for example, for the payment

14    of -- if it's not -- I don't know that we -- we didn't

15    really oppose the motion to compel to search that data.  We

16    just couldn't do it.

17             The thing about the preservation of documents, I

18    mean, that's not -- there was no discovery request that was

19    made on that that we didn't answer.  That's just something

20    they wanted in response to the motion to compel.  So, I

21    mean, that's not really -- I don't think that's really

22    appropriate.

23             I am not sure what else -- I mean, I suppose we

24    could have went back and done some things differently, paid

25    Trustpoint's bills to where this didn't happen, but I don't

# Excerpted

1    have done many of these in many of these cases.  And I don't

2    remember this one exactly, but I can tell you my practice.

3              I took the keyword and I put it into the -- we're

4    talking about social media.  I put it into the -- I put it

5    into the social media, and I searched for it.  In this case

6    I came up with a few, not many.

7              In other cases -- meaning other cases -- I have

8    come up with a lot.

9              THE COURT:  And you used the key word as

10   specifically provided by the plaintiffs?

11             THE DEFENDANT:  Yes, Your Honor.  Exactly.  And

12   sometimes I ran it a few different ways if I came up with

13   nothing because I knew there would be suspicion if I came up

14   with nothing.  I ran it two or three different ways.

15             The simple fact is there wasn't as much about this

16   case in the social media as there were some others.  Some

17   others had been very fruitful.

18             I also went back to rhelen, and all of those other

19   emails, some of which were actually never used.  They

20   existed but they had, maybe, five uses or six uses, and most

21   of them didn't fit into this time period.  I am not even

22   sure any of them -- it may be rhelen had a few.

23             But most of the other ones were prior emails that

24   were long gone before we get to September of 2020.  But I

25   went back and checked them to make sure that that was the --

1    at least every one that I had.  So don't -- don't -- please

2    don't assume that I didn't do it when I did do it.

3              THE COURT:  And what about WhatsApp, Telegram, and

4    Signal messaging applications?

5              THE DEFENDANT:  Well, I checked both of those.  In

6    fact, I rechecked them today because Joe asked me about

7    that --

8              THE COURT:  It's not "both."  It's three;

9    WhatsApp, Telegram, and Signal.

10             THE DEFENDANT:  Okay.  Telegram I checked.  I have

11   some communications on Telegram.  I don't know that there

12   were any of theirs.  But I don't have many communications on

13   Telegram.  Very few on Signal.

14             I checked WhatsApp fully.  And during this period

15   there were very few communications on WhatsApp; none of

16   them, I don't believe, related to this case.  Those three

17   are not three that I use myself.

18             Other people call me on those.  It's not -- I

19   don't know if I am expressing myself correctly.  I don't use

20   those to initiate calls.  I have them because people that

21   communicate with me use them.

22             So, yes, I did check them.  I am not sure there

23   was anything about them in this time period about their

24   case.  But I checked them, yes, Your Honor.  And I rechecked

25   them.

1          THE COURT:  All right.  And have you preserved any

2     of the data that's on those applications in Mr. Giuliani's

3     accounts for any of those messaging applications and email

4     accounts so that you could double-check and verify that it's

5     thorough, complete, and the keyword searches have been

6     appropriately done?

7          MR. SIBLEY:  Well, I have not preserved it, Your

8     Honor, but I believe he has said that he has, so --

9          THE COURT:  Well, he just says he doesn't delete

10    stuff from there.  Is that the same as preservation in your

11    view?

12         MR. SIBLEY:  If there is a potential for deletion

13    to occur by sort of natural -- the way it's set up, I

14    suppose you would need to go in and change that to where it

15    didn't auto delete.  But I don't believe that anything -- he

16    said he doesn't delete things; he doesn't have it set up

17    that way.

18         I can certainly go in and look at what he has

19    looked at.  We have found -- I mean, there are

20    communications that are there from the time frame.  I don't

21    think there's been an auto deletion that occurred where

22    everything was wiped out at that time frame.  He certainly

23    hasn't done that.

24         THE COURT:  All right.  Well, among the missing

25    documents are two text messages between Mr. Giuliani and

```
1    Christina Bobb on December 4 and December 5, 2020, and those
2    were not produced by Mr. Giuliani.  So this does raise some
3    question -- both about the correctness of Mr. Giuliani's
4    recollection, which he didn't believe he had ever used text
5    messages with respect to the matters at issue in this case;
6    and it does raise questions about the thoroughness of
7    searches of text messages and the manner in which this is
8    being done without notes being kept, without clarity on how
9    the manual searches were being done.
10             You can appreciate why the plaintiffs are somewhat
11   concerned about all of the responsive records even from
12   texts being properly identified, collected, and produced.
13             Let me turn to the phone records.
14             I think your view is:  If he doesn't have his
15   phone bill sitting around his apartment within his
16   possession, he doesn't have possession or control of his
17   phone records, and it's just fine for him to tell the
18   plaintiffs to go to AT&T directly.
19             Is that, basically, Mr. Giuliani's position?
20             MR. SIBLEY:  Well, initially, I believe he had the
21   phone records but he didn't have copies of the phone
22   records, that's why we didn't object to it.  We said sure,
23   we'll produce it.  He didn't have them.  And I am not sure
24   that he --
25             THE COURT:  What do you mean he had them and then
```

1     he didn't have them?

2             MR. SIBLEY:  He never had them.

3             I thought that he had the records, which is why we

4     said sure, we'll produce the documents.  I wasn't going to

5     object to it, it's not objectionable.

6             But it turned out he didn't have the phone

7     records.  I mean, most of us don't keep our phone records.

8     And I looked into -- I don't keep my phone records, but it's

9     all online.

10            THE COURT:  Exactly.  It's all online.

11            So why can't he go to his AT&T account and

12    download all of the phone records that he needs in order to

13    produce to the plaintiffs?

14            And doesn't it look a little bit like a backhanded

15    way of dealing with the discovery request simply to say:

16    You go get it yourself?

17            MR. SIBLEY:  If I can explain, Your Honor.

18            I don't believe that the records they're wanting,

19    that have calls and things like that -- I am not sure he can

20    get those from his online account.  It might be -- you know,

21    he has the bill for the number, he pays the amount.

22            But what they're wanting is detailed logs of when

23    text messages were sent, not the substance, things like

24    that.  I am not sure he can get access to that, which is why

25    he says --

# Excerpted

1    inaccessible data was defined.

2              Judge Scheindlin had identified five categories of

3    data:  One, active online data; two, near line data; three,

4    offline storage, archives; four, backup tapes; five, erased,

5    fragmented or damaged data; and then went on to hold that

6    only the first -- only the latter two categories were

7    inaccessible.

8              The first three categories that I quote are

9    typically identified as accessible for which the responding

10   party has the duty to collect, search, preserve, and

11   produce.

12             So how would -- you cited *Zubulake* for the

13   inaccessible data point.  So how, in your reading of

14   *Zubulake*, would the archived Trustpoint data even become

15   inaccessible?

16             MR. SIBLEY:  I think it would be more along the

17   lines of a backup tape, right?  Because this is not --

18             THE COURT:  I think it's offline storage,

19   archives; that's Category No. 3, not "inaccessible," because

20   it doesn't really require any forensic expertise to get

21   access to it.

22             MR. SIBLEY:  Well, these are not our -- it's not

23   like he has the archives in his files -- though, right? --

24   Your Honor?

25             This is a third-party vendor that we can only get

1    access to files from -- I mean, it does require -- I mean,

2    there were expert requirements involved in this because they

3    had to extract the data, they have to host the data.  I am

4    not sure that that would be apposite to our situation.

5            I can understand a situation where a company has

6    archived data and they have free access to it; we don't.

7            THE COURT:  Well, in my reading of the *Zubulake*

8    cases on which you relied, it's not my view that this data

9    at Trustpoint is inaccessible that would warrant a cost

10   shifting here.  I hope you are promptly able to work out the

11   situation with Trustpoint.

12           If there is nothing further that you would like to

13   say, I am going to give the plaintiffs an opportunity for

14   reply.

15           MR. SIBLEY:  Thank you, Your Honor.

16           MS. GOVERNSKI:  Thank you, Your Honor.

17           I have a few points to raise, but first I should

18   ask if there is anything in particular that you would like

19   to ask or if you'd like me to just go through my list very

20   quickly.

21           THE COURT:  Just go through your list.

22           MS. GOVERNSKI:  Okay.  First of all, there's been

23   a lot of talk today about devices and Trustpoint.  But we

24   have learned something new, which is all of this is on the

25   cloud.

1          Defendant Giuliani has said he -- 95 to 99 percent

2     of his communications are on the cloud.  So he, today, via

3     counsel or personally, has not explained why he cannot

4     download what is on the cloud or have a professional vendor

5     download what is on the cloud and conduct a search the way

6     the majority of discovery is run in cases.

7          So I think there is a lot of focus and diversions

8     to Trustpoint and to devices when the cloud is there and

9     should be a very, really, low-cost way to do this -- I

10    suspect -- perhaps a vendor time to download.  But we would

11    be happy to have our vendor let us know what the cost would

12    be to log into his Gmail, to log into his various email

13    accounts, and to perform a takeout, which we do in our

14    litigation quite frequently.

15          THE COURT:  I am going to interrupt you for just

16    one second.

17          MS. GOVERNSKI:  Sure.

18          THE COURT:  Mr. Sibley, you hear the offer to

19    actually preserve the data on the cloud in the normal

20    typical manner offered by plaintiffs to do that for you.

21    Would you be willing to have their vendor do that for you?

22          MR. SIBLEY:  Your Honor, the answer is yes,

23    provided that there is no privilege waiver if the vendor

24    accesses privileged data.  But I believe that there are

25    problems with him accessing the cloud; I believe he's

 1    testified to that.

 2              So I don't think that it's the case that the cloud

 3    has everything that they're looking for on it.  I am not

 4    sure where that came from, but he has had problems accessing

 5    the cloud with respect to the data that was in the time

 6    frame that the FBI did the seizure, which would be the

 7    relevant time frame for this case.

 8              But to answer the Court's question, the answer is

 9    no.  There is no objection to assistance with preservation

10    to the extent they think that is something that needs to

11    occur, although I am not sure how much of that can be

12    accessed.

13              THE DEFENDANT:  Can I add to it, Your Honor, to

14    supplement what Mr. Sibley said?

15              THE COURT:  Mr. Giuliani, you are irrepressible.

16    Proceed.

17              THE DEFENDANT:  Your Honor, when I do the search,

18    I attempt to also check it out against the cloud.  I mean, I

19    download.  I make sure everything is downloaded.

20              And here is the problem with the cloud.  When we

21    go back to the period of time -- material that was seized by

22    the FBI, that I don't have access to on the cloud.  They

23    have it, but I don't have access to it.  I can't get that

24    from my devices.  The FBI has that.

25              THE COURT:  So it's not a matter of you having --

1     it's not a matter of you not being able to access your

2     different email accounts because, for example, you have lost

3     your password.  But once you do access the accounts you are

4     not seeing data there; is that what you are saying?

5               THE DEFENDANT:  Yes, for certain periods of time.

6               Currently?  Fine.  I can go back for the last year

7     and a half, and I can get everything on the cloud.  It's all

8     there.

9               But if I go back to a certain period of time, I

10    would have to go look at exactly where it is.  It is frozen.

11    I can't get it through our -- the stuff that's on

12    rhelen0528 -- I shouldn't give my whole one, I guess -- I

13    can't get.  The FBI still has that.  I can't figure out --

14    they give us no reason why they don't release it.

15              They gave me a letter saying the case is over.

16    They gave me a letter saying there was no indication of

17    crime, but I can't get access to that.

18              Did they destroy it?  I don't know.

19              THE COURT:  Well, I don't think the FBI is in the

20    business of preserving data for subjects of an

21    investigation and then, as a favor, turn it over --

22              THE DEFENDANT:  We can agree to disagree.

23              THE COURT:  -- I just don't think they're in that

24    business.  It doesn't surprise me, Mr. Giuliani.

25              You of all people should know that that's not --

1    it's not unusual that they would not --

2              THE DEFENDANT:  No, it's not usual --

3              THE COURT:  -- cede to your request?

4              THE DEFENDANT:  -- but they do -- it's also not

5    impossible for them -- they also do do it.  It's a question

6    of how compelling the request is.

7              And, finally, I really don't know what they did

8    with it.  I don't know exactly what they did with it.

9              THE COURT:  All right.  But I think -- I wanted to

10   interrupt you because I think that you have an agreement

11   from the defendant that he would agree to have your vendor

12   preserve this information, and then you can proceed from

13   there in terms of working out a protocol for searching that

14   would protect privileged information.

15             MS. GOVERNSKI:  Yes.

16             THE COURT:  I am not going to get any more

17   involved in that discussion than what I just said.

18             MS. GOVERNSKI:  But Your Honor -- let's focus on

19   this rhhelen [sic] account, okay?

20             He is now saying he -- he doesn't know if it's in

21   Trustpoint -- right? -- I think we have established that.

22   We don't know if the cloud that they took was in Trustpoint.

23   We also don't know if the cloud includes, for instance, the

24   rhhelen.  And yet now he's also saying, when he accesses it,

25   these records are not there.  So we don't know if they have

1    been preserved from what he has been saying, and it sounds

2    like he doesn't know if they have been preserved.  And so it

3    seems like all we're getting here is his post-2021 devices

4    which -- and whatever is in the cloud from post 2021.

5            Now, there may be some responsive materials in

6    there, but this doesn't solve the larger problem which is

7    all of these communications in Signal, WhatsApp, Telegram,

8    his various Gmail accounts -- we don't know if they have

9    been preserved.  We don't know if they're in Trustpoint, and

10   he doesn't have access to them.

11           While we would be happy to get a cost estimate

12   from our vendor and have our vendor log into his accounts

13   and download them the proper way -- if they're not there,

14   then we're not downloading much of anything.  So I think

15   some of the -- the Court is seeing firsthand some of our

16   challenges with trying to get clear answers.  It's as clear

17   as mud.

18           If the Court would include in the order that he

19   should give us his login access and information for his

20   various email accounts for Telegram, for ProtonMail -- would

21   pass over the devices to us -- we would be happy to get an

22   estimate on that, and then work with him.

23           Of course, our position is he should have to bear

24   the cost.  But we would be happy to meet and confer and come

25   to Your Honor if we can't reach resolution on that.  We

1      think that we have more questions than answers after today.

2           It would be helpful to know, though -- we did

3      receive an inventory of the devices from Mr. Sibley, but we

4      don't know what those devices are in terms of:  Are they the

5      2000 -- the device of his wife from 2000 or is it the iPhone

6      he was actually using.  So it would be helpful if we could

7      understand exactly which devices are the ones that would

8      have materials from this time period so then we can go to

9      our vendor and provide a more tailored estimate.  But I

10     would note our current estimate to -- I believe, to

11     forensically image six to eight devices was less than

12     $10,000.

13          Very quickly -- because the Court has been more

14     than patient today -- the search terms that we provided are

15     actually filed on the docket, Docket No. 36-1.  I actually

16     was over -- I overstated the number.  There were 33 Boolean

17     search terms that covers the first and second sets.

18          I should note that -- I would direct the Court to

19     the first exhibit of our motion to compel which lists the

20     responses and objections.  And Defendant Giuliani barely

21     objected to any of our RFPs, including on overbreadth.  So

22     the claims here about how we're asking for the universe and

23     looking for a fishing expedition is belied by his own

24     responses and objections and actual terms at Docket 36-1.

25          Three more very quick clarifications.

1          The time period, Your Honor, that we agreed to, to

2     April 2021 -- for purposes of Trustpoint, we think it

3     should -- I'm sorry, for January 2002 [sic], we think it

4     actually should go through present for post Trustpoint; and

5     here is why.  We know, for instance, Christina Bobb recently

6     published a book that Defendant Giuliani provided a blurb

7     for and that that book specifically talks about the State

8     Farm arena fraud.  We think it's artificially limiting

9     potentially responsive materials if we cut it off in January

10    2022.  We have reason to believe there was continued ongoing

11    conversations.

12         I know Your Honor did not want to engage in this

13    specific time period; we can talk about it with them.  But I

14    just wanted to circle back pursuant to your question.

15         Also, Mr. Sibley referenced not needing to do a

16    log of communications with counsel.  We would agree for

17    communications between Mr. Giuliani and Mr. Sibley.  But,

18    for instance, we just received a privilege document from

19    Ms. Bobb where she is on a communication that Mr. Sibley is

20    on.  She is saying she can't produce it because Mr. Sibley

21    has said that that communication is privileged; that hasn't

22    been logged on any privilege log we have.

23         And so it seems like there are communications that

24    Mr. Sibley is on but that other third parties are on too,

25    and we would think that those should be logged because we

# Excerpted

1   today?

2          MS. GOVERNSKI:  Just one very -- I am very sorry

3   to keep us here.

4          The current schedule has expert discovery ending,

5   I believe, on June 16th.  I think given where we are we

6   would confer with defendant and probably file a motion to

7   extend that out.

8          THE COURT:  I am here every day.

9          MS. GOVERNSKI:  Thank you, Your Honor.

10          THE COURT:  Anything further from the defense?

11          MR. SIBLEY:  No, Your Honor.  And we would not

12   oppose any reasonable request for an extension.

13          THE COURT:  All right.  You are all excused.

14          THE DEFENDANT:  Thank you, Your Honor.

15          THE COURT:  Thank you, Mr. Giuliani.

16          (Whereupon, the proceeding concludes, 1:45 p.m.)

                        * * * * *

17                      **CERTIFICATE**

18          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
    certify that the foregoing constitutes a true and accurate
19   transcript of my stenographic notes, and is a full, true,
    and complete transcript of the proceedings to the best of my
20   ability.

21          This certificate shall be considered null and void
    if the transcript is disassembled and/or photocopied in any
22   manner by any party without authorization of the signatory
    below.
23
        Dated this 24th day of May, 2023.
24
        /s/ Elizabeth Saint-Loth, RPR, FCRR
25      Official Court Reporter