# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Civil Action No. 21-3354 (BAH)

RUBY FREEMAN, et al.,

      Plaintiffs,

vs.

RUDOLPH W. GIULIANI,

      Defendant.
_____/

                    401 East Las Olas Boulevard
                    Fort Lauderdale, Florida
                    May 16, 2023
                    12:32 p.m. - 4:23 p.m.

VIDEO DEPOSITION OF CHRISTINA BOBB

   Taken before SUZANNE VITALE, R.P.R., F.P.R.
and Notary Public for the State of Florida at Large,
pursuant to Notice of Taking Deposition filed in the
above cause.

```
 1  APPEARANCES:
 2
    On behalf of Plaintiffs:
 3
    LAURO & SINGER
 4  400 North Tampa Street
    15th Floor
 5  Tampa, Florida 33602
    BY:  GREG SINGER, ESQ.
 6  BY:  JOHN LAURO, ESQ. (viz Zoom)
    BY:  FILZAH PAVALON, ESQ. (via Zoom)
 7       gsinger@laurosinger.com
 8
    On behalf of Defendant:
 9
    UNITED TO PROTECT DEMOCRACY
10  555 West 5th Street
    35th Floor
11  Los Angeles, California 90013
    BY:  CHRISTINE KWON, ESQ.
12       christine.kwon@protectdemocracy.org
13   and
14  WILLKIE FARR & GALLAGHER, LLP
    1875 K Street, Northwest
15  Washington, DC 20006-1238
    BY:  MAGGIE MACCURDY
16       mmacurdy@willkie.com
17   and
18  WILLKIE FARR & GALLAGHER, LLP
    787 Seventh Avenue,
19  New York, New York 10019
    BY:  MERYL GOVERNSKI, ESQ.
20       mgovernski@willkie.com
21
22  ALSO PRESENT:
         Sara Stout (Videographer)
23       Suzanne Vitale (Court Stenographer)
24
25
```

# Excerpted

1     A.    Maria's son.
2     Q.    Did he have a role on the Giuliani legal
3  team?
4     A.    Yes.  He would help Maria out and he did,
5  like, the technical, like printing and like -- I
6  mean, I don't want to diminish his role, but I think
7  of him as a printer.  Like if we needed something
8  printed, he would print it and help you do that.
9     Q.    He assisted Ms. Ryan with the admin work
10 she did?
11    A.    Correct.
12    Q.    Do you know who John Eastman is?
13    A.    Yes.
14    Q.    Did he have a role on the Giuliani legal
15 team?
16    A.    Yes.  He obviously was an expert brought
17 in for consultation and he consulted with the mayor.
18    Q.    An expert?
19    A.    Yes, he's a constitutional law scholar.
20    Q.    What was your relationship with
21 Mr. Eastman?
22    A.    I did not know him.  I got to know him a
23 little bit at that time, but certainly he was
24 working directly with Rudy.  He did not need to go
25 through me.

1      Q.    Did you communicate with Mr. Eastman
2   often?
3      A.    Not often but occasionally.
4      Q.    What about did you communicate with
5   Mr. Eastman?
6      A.    Whatever -- I mean, I don't have a
7   specific recollection.  But if we were working on
8   something or if -- I was probably just there if he
9   needed something, but I didn't have extensive
10  communication with him.
11     Q.    Do you know who Ray Smith is?
12     A.    Yes.  He was local counsel in Georgia.
13     Q.    So was he on the Giuliani legal team?
14     A.    I would say he was local counsel.  I mean,
15  it depends on how you're defining the Rudy Giuliani
16  legal team.
17           I define the Rudy Giuliani legal team as
18  the people who were at the RNC headquarters.  The
19  people you're talking about are obviously -- yes,
20  they're part of the legal team but I wouldn't
21  necessarily put them under the umbrella.  But, you
22  know, it depends on how you're defining it all.
23     Q.    Ray Smith was local counsel in Georgia.
24           Who was part of the Georgia Giuliani legal
25  team?

1       A.    I don't know.  I didn't work on Georgia.
2       Q.    To clarify, when I ask you about the
3  Giuliani legal team, I'm asking how you use the term
4  in your book referring back to page 6.
5       A.    Yeah, in the book -- I describe it in the
6  book and I go through -- the book is talking about
7  the events at the RNC office.  And that's how I'm
8  referring to it in the book.  I talk about the RNC
9  headquarters and the discussions at the RNC
10 headquarters.  But that's a very narrow portion of
11 three pages of the book, so it certainly can be
12 defined more than one way.
13      Q.    You testified that if you needed to reach
14 Mr. Giuliani directly, you could.
15      A.    Uh-huh.
16      Q.    Did you serve as an intermediary for
17 communications to Mr. Giuliani?
18      A.    Sometimes.  Mostly via e-mail.  People
19 sent me stuff, a law that they wanted to get to him.
20 Because I was in D.C. so that's why I have e-mails
21 from Ray Smith even though I didn't work on Georgia.
22 I was physically in D.C. and could get him physical
23 copies.
24      Q.    Because you were physically in D.C. and
25 could get him physical copies of e-mails is why you

1  served as an intermediary for communications to
2  Mr. Giuliani?
3       A.   That's what you're saying.  That's not
4  what I'm saying.
5            I'm saying I was physically present in
6  Washington, D.C.  Ray Smith was not.  So if Ray
7  Smith wanted to know if Rudy had seen a complaint or
8  whatever, he would send it to me and I would send it
9  to the mayor.  And if I was with the mayor, then Ray
10 Smith would know that the mayor had seen it.  So
11 people would send me -- my understanding is that's
12 why Ray Smith was sending me all of these e-mails,
13 was because he wanted to make sure that the mayor
14 saw them and I was physically there.  He was not.
15 He was in Georgia.
16      Q.   When you say Mr. Smith would send things
17 to you for you to send to Mr. Giuliani, through what
18 means?
19      A.   E-mail.  That's why you have the e-mails
20 from Ray Smith.  So I could say, Mr. Mayor, Ray
21 Smith has sent you an e-mail with the complaint in
22 it.  Have you seen it?  Because he knows that I
23 would do that.
24      Q.   Couldn't Mr. Smith e-mail Mr. Giuliani
25 directly?

1    A.   He could.  But Rudy is getting like 10,000
2    e-mails a day.  He wanted to make sure that I would
3    point it out to Rudy and say, hey, there is an
4    e-mail in your inbox with a complaint or something,
5    whatever the document is.
6    Q.   Did you serve as an intermediary for
7    communications to other Giuliani team members?
8    A.   I don't know -- I don't know what you're
9    referring to.
10   Q.   Would people go through you to communicate
11   to other Giuliani team members?
12   A.   Possibly.  I know Ray Smith did a lot.
13   I'm trying to think off the top of my head.
14        I mean, I don't know.  Like, I was not
15   designated, like, the intermediary but I was very
16   reliable and I would respond and people wanted to
17   know -- wanted to get a response to know -- even if
18   the answer was no, he hasn't looked at it, they
19   wanted to know.  And I'm responsive, so that's why I
20   got all of the e-mails that I received even though I
21   didn't work on Georgia.
22   Q.   We're turning to page 6 of your book.
23        When you write that your role was focused
24   on coordinating the litigation efforts in Arizona,
25   Michigan and New Mexico, what do you mean by

1  "coordinating"?
2      A.   I worked with the local counsel there and
3  relayed what the intent was for litigation.  I was
4  kind of like in-house counsel communicating with
5  local counsel.
6      Q.   So you were communicating with local
7  counsel in those states.
8           What else did you do in coordinating?
9           MR. SINGER:  I'm going to object to this.
10      It's outside the scope of the Court's order.
11      Her activities in states other than Georgia
12      don't pertain to the allegations in other
13      states.
14           MS. KWON:  Are you directing Ms. Bobb not
15      to answer?
16           MR. SINGER:  Yes, you don't need to answer
17      that.
18  BY MS. KWON:
19      Q.   Will you be following your counsel's
20  instruction?
21      A.   Yes.
22      Q.   You previously testified before the House
23  Select Committee to investigate the January 6th
24  attack on the United States Capitol?
25      A.   Yes.

Page 43

1    Q.   You testified before that committee on
2    April 21, 2022?
3    A.   I mean, I don't know the exact date but
4    that's probably right.
5    Q.   You testified truthfully before that
6    committee?
7    A.   Yes.
8    Q.   Are you aware that your testimony was
9    transcribed?
10   A.   Yes.
11   Q.   Are you aware that because you were
12   speaking with the congressional committee, you could
13   have been subject to consequences under the Federal
14   Perjury Statute 18 U.S. Code Section 1001 if you had
15   lied?
16   A.   Yes.
17   Q.   Have you reviewed that transcript?
18   A.   No.
19   Q.   Do you have any reason to doubt that the
20   transcript accurately reflects your testimony?
21   A.   I didn't review it.  I don't know.  I
22   didn't lie.  But if you want to ask me a specific
23   question about it, I can tell you.
24        MS. KWON:  Let's get Tab 38, which we will
25   mark as Exhibit 2.

1             (Thereupon, the referred-to document was
2     marked for Identification as Plaintiff's Exhibit 2.)
3     BY MS. KWON:
4         Q.   The court reporter is handing you what has
5     been marked as Exhibit 2, which is a transcript
6     of -- a printout of the transcript of your interview
7     with the January 6th committee.  I'll represent to
8     you that this is a document that was certified by
9     the government publishing office, and I will suggest
10    we take a break so you have time to review it.
11        A.   You're asking me to read --
12             MR. LAURO:  You want her to review the
13        entire transcript?
14             MS. KWON:  To review it for accuracy.
15             MR. LAURO:  She's not going to review the
16        entire transcript.  We'll postpone the
17        deposition if you want to do that.
18             If you want to direct her to a particular
19        question or a particular issue, that's fine.
20        But the entire transcript is not relevant to
21        this deposition.
22    BY MS. KWON:
23        Q.   Let's stay on the record and I will direct
24    you to specific portions of the transcript and you
25    can assess them.

# Excerpted

Page 159

## CERTIFICATE

STATE OF FLORIDA )
COUNTY OF BROWARD )

I, SUZANNE VITALE, R.P.R., F.P.R., do hereby certify that I was authorized to and did stenographically report the foregoing deposition of CHRISTINA BOBB; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 22nd day of May, 2023.

*Suzanne Vitale*

SUZANNE VITALE, R.P.R., F.P.R.
My Commission No. DD179981
Expires: 5/24/2024