# EXHIBIT 6

Page 1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - -x

     RUBY FREEMAN, et al.,          :

4                                   :

        Plaintiffs,                 :

5                                   :

        v.                          :   Civil Action No.

6                                   :   21-3354 (BAH)

     RUDOLPH W. GIULIANI,           :

7                                   :

        Defendant.                  :

8    - - - - - - - - - - - - - - - -x

9

10

11

12                    - - -

13             Monday, March 20, 2023

14                    - - -

15

16

17

18

19   Videotaped deposition of BERNARD KERIK, beginning at

20   10:51 a.m., before Christina S. Hotsko, RPR, CRR,

21   when were present on behalf of the respective

22   parties:

Page 2

1          A P P E A R A N C E S   (Via Zoom)
2    On behalf of Plaintiffs:
         M. ANNIE HOUGHTON-LARSEN, ESQUIRE
3        Willkie Farr & Gallagher, LLP
         787 Seventh Avenue
4        New York, New York 10019-6099
         (212) 728-8000
5        mhoughton-larsen@willkie.com
6        MICHAEL GOTTLIEB, ESQUIRE
         MAGGIE MacCURDY, ESQUIRE
7        Willkie Farr & Gallagher, LLP
         1875 K Street, Northwest
8        Washington, D.C. 20006-1238
         (202) 303-1000
9        mgottlieb@willkie.com
10

     On behalf of Witness:
11       TIMOTHY C. PARLATORE, ESQUIRE
         Parlatore Law Group
12       One World Trade Center, Suite 8500
         New York, New York 10007
13       (212) 603-9918
         timothy.parlatore@parlatorelawgroup.com
14
15   Also Present:
         Glen Fortner, Video Technician
16
17
18
19
20
21
22

# Excerpted

1   He said, are you guys good?  You know, he was very

2   nice, very cordial.  And he came up to me and

3   he -- he walked up to me, and he went like this.

4   He went, you got your vest on?  I said, yes, sir.

5   He says, good.  He says, you got to wear a vest.

6   And he says, you know what?  Guys, go

7   downstairs -- there was a coffee shop in, like --

8   in the Tower.  He said, go downstairs and grab

9   some coffee and tell them I sent you downstairs.

10          And -- looking back, it's funny now

11   because everybody was shit scared; they're, like,

12   I ain't going down there, no way.

13          That's the first time I ever saw him.

14   And that had to be, like, 1987, maybe or

15   something.  So -- and then I got to meet him

16   several times after, so I've known him a long

17   time.

18          So back to your question, I was a big

19   supporter of his for the election.  I was in

20   Washington, D.C. the night of the election, on

21   November 3rd.  I stayed in D.C. until the 4th.

22   And, you know -- I don't remember exactly.  I

Page 38

1   either left the night of the 4th or the morning of

2   the 5th.  I went home.  And just about the time I

3   walked in the door, Mayor Giuliani called me, said

4   that he had spoken with the president and that he

5   wanted me to come back and assist him; he was

6   going to be looking at the investig- -- at the

7   election.

8           And I packed up some clothes, I got back

9   in my truck, and I drove back to D.C.

10      Q.   And so when you say, Mayor Giuliani

11  called me and said that he had spoken with the

12  president and he wanted me to come back, was that

13  Mayor Giuliani wanted you to come back or

14  President Trump wanted you to come back?

15      A.   No, the mayor.

16      Q.   The mayor wanted you to come back.

17           Why do you think he reached out to you?

18      A.   He probably knew I could be helpful.

19      Q.   Okay.  In what way?

20      A.   Look, I've worked with him and for him

21  for a long time, whether it's investigative work,

22  whether it's consulting work, you know, I've --

```
 1   you know, and we're friends on top of it.  You

 2   know, he probably thought I could help.

 3        Q.   You guys are still friends, yeah?

 4        A.   Yeah.

 5        Q.   How is he as a boss?

 6        A.   He's usually great.

 7        Q.   Is he hands on?

 8        A.   Yeah.

 9        Q.   Yeah.

10        A.   Very hands on.

11        Q.   Very hands on.  Okay.

12             So Mayor Giuliani called you around the

13   5th and -- to ask you to assist.  You said yes,

14   came back down?

15             What then became -- or what was your

16   role.  Right?  Like, you come down, you get to

17   wherever you all are working, and then you're,

18   like, okay, what am I doing now?  How --

19        A.   I think I got there in -- I want to say

20   it was the 5th.  So I got there in the morning,

21   spoke to him when I arrived.  We were -- he was

22   staying at the Mandarin Oriental Hotel.  And I
```

Page 40

```
 1   checked in.  I either saw him or spoke to him, and
 2   he was going to the campaign headquarters.  And I
 3   told him I would meet him over there.  And that's
 4   where they were going to work out of, campaign
 5   headquarters.  So that's where I went.
 6        Q.  Where were the campaign headquarters at
 7   that time?
 8        A.  Arlington, Virginia.  The Arlington
 9   Tower.
10        Q.  Okay.  And for most of your time doing
11   this investigation, were you working there in
12   Arlington or were you working at the Mandarin?
13   Or...
14        A.  No.  First it was Arlington Tower.  Then
15   -- I forget who, somebody got COVID, and they
16   threw us out of the campaign headquarters and said
17   nobody can come in here.  Somebody in the campaign
18   got COVID.  It was right before Andrew Giuliani
19   got COVID.  It was sometime before that.
20             And then we left the Tower, we left the
21   campaign headquarters, and we started working out
22   of the hotel.  And the hotel was the Mandarin.
```

```
                                           Page 41

  1        Q.   The Mandarin?  And you said you either

  2   spoke to Mr. Giuliani in person or -- you either

  3   met -- saw Mr. Giuliani or spoke to him.

  4             That would have been on the phone or --

  5   how did you guys normally communicate?

  6        A.   On the phone.

  7        Q.   On the phone.  Okay.

  8             Are you a big texter?

  9        A.   Not too much.  And not with him.

 10        Q.   Not with him?

 11        A.   Yeah.

 12        Q.   Because -- because he's not a big texter?

 13        A.   No.  Because if I text him, it will take

 14   six years for him to get back to him.

 15        Q.   I see.  What about --

 16        A.   It's easier if I call him.

 17        Q.   Fair enough.

 18             And what about e-mail?  How is he on

 19   e-mail?

 20        A.   No.  Forget it.

 21        Q.   No.  Okay.  You've got to call.

 22             Okay.  So you're working wherever you're
```

# Excerpted

Page 44

```
 1            MR. PARLATORE:  I don't know where you're
 2    going with this.  But to the extent that you want
 3    to start getting into what was he -- what were
 4    they doing in anticipation of litigation as
 5    opposed to, in those instances, there were very
 6    specific questions that were asked that he was
 7    able to answer.  To the extent you're trying to go
 8    more broad and, you know, go on more of a fishing
 9    expedition, the answer is no.
10            MS. HOUGHTON-LARSEN:  Well, certainly
11    that's not my intention.
12            MR. PARLATORE:  Okay.
13            MS. HOUGHTON-LARSEN:  Is Mr. Sibley on
14    the line?
15            MS. MacCURDY:  No.
16            MS. HOUGHTON-LARSEN:  Okay.
17    BY MS. HOUGHTON-LARSEN:
18       Q.  So let's go to your January 6th
19    testimony.  I think that will be easier.
20            MS. HOUGHTON-LARSEN:  So can I just have
21    tab 26, please?
22            If we could just mark this as Exhibit 1,
```

Page 45

1   please.   This is going to be a little unwieldy --

2   I'm sorry -- for you to look through.   Didn't have

3   a stapler big enough.

4          (Kerik Deposition Exhibit 1 marked for

5          identification and attached to the

6          transcript.)

7   BY MS. HOUGHTON-LARSEN:

8       Q.   So do you recognize this document?

9       A.   No.

10      Q.   Okay.   Do you see on the first page it

11  says the interview -- it's an interview of Bernard

12  Kerik on Thursday, January 13th, 2022?

13      A.   I see it.

14      Q.   Okay.   So if we could just turn to

15  page 12, please.   And I don't know how familiar

16  you are with reviewing transcripts, but there are

17  these line markers on the left-hand side, so I'll

18  refer to the page and the line.

19          So I'm starting at page 12.   Let's do

20  line 16.

21          So the questioner says, "Okay.   Perfect.

22  And we are pulling up -- it's Exhibit 1, which is

1   the letter that I'm referencing, so I'm not just

2   reading into a void here.  And I believe on page 2

3   it says, quote, Mr. Kerik was tasked with

4   investigating and gathering credible, verifiable,

5   and admissible evidence as part of a potential

6   litigation.  And in this role he compiled a

7   significant amount of information regarding the

8   elections in the States of Arizona, Georgia,

9   Wisconsin, Michigan, and Pennsylvania.

10  Understanding -- this is my question now.

11  Understanding that it may be more than that, not

12  just those states, do you agree with the statement

13  that Mr. Parlatore made?"

14          Then this is your answer, line 25:  "Yes.

15  I think -- I think my role, our role, my specific

16  role, was not only to investigate the election for

17  possible litigation, it was also to provide the

18  legislature -- legislators and electors in the

19  various states, the six swing states, information

20  that they may or may not be aware of.  So I think

21  there was a dual purpose, but primarily, it

22  started out for litigation.  Yes."

1          Do you see that?

2      A.   Yes.

3      Q.   Okay.  And you agree with that, that

4   accurately reflects what you were doing?

5      A.   Pretty much.  Yeah.

6      Q.   Okay.  So you were -- you and

7   Mr. Giuliani were investigating the election in

8   these six states, right?

9      A.   And anything else that came up.

10      Q.   And anything else that came up.

11      A.   Right.

12      Q.   How -- when you say anything else that

13   came up, was that -- anything -- like,

14   Mr. Giuliani would maybe -- would direct you to

15   that?  Or how would something else come up?

16      A.   No.  Basically the information that came

17   to us came from a hundred different sources.  It

18   could have come from the campaign.  It could have

19   come from somebody in the White House.  It could

20   have come from a state legislator.  It could have

21   come from a state campaign office.  Could have

22   come from civilians.  Could have come from outside

                                                                Page 48

1   attorneys that we had no contact -- we didn't know

2   who they were.

3           So we had -- we had tons of information

4   that was coming to us.  When I say the six states,

5   those are the -- primarily the six swing states.

6   But there were times that, you know, somebody

7   would call and say, you know --

8           MR. PARLATORE:  No, don't give examples.

9           THE WITNESS:  Okay.

10          MS. HOUGHTON-LARSEN:  You're directing

11  him not to answer?

12          MR. PARLATORE:  I am.

13          MS. HOUGHTON-LARSEN:  And on what basis?

14          MR. PARLATORE:  Work product.

15          MS. HOUGHTON-LARSEN:  Okay.

16          MR. PARLATORE:  You've read -- you've

17  read a portion of the transcript which is based on

18  a letter related to work product specifically.

19  Okay?  That was -- you know, if you go back and

20  read the actual letter, it talks about how they

21  were trying to get to work product things, the

22  things that are in anticipation of litigation.

1          So -- you have a very specific claim

2    here.  You know, trying to go around it to go into

3    other things is not appropriate, especially when

4    it's privileged.  So you need to move on.

5          MS. HOUGHTON-LARSEN:  Thank you very

6    much.  This is my deposition, and I'll ask the

7    questions I'd like to ask.

8          MR. PARLATORE:  I know.  But since you're

9    trying to get into work product privileged things,

10    I'm explaining it to you.

11          MS. HOUGHTON-LARSEN:  I'm certainly not

12    trying to get into work product privilege --

13          MR. PARLATORE:  Good.  Then --

14          MS. HOUGHTON-LARSEN:  -- but I

15    appreciate --

16          MR. PARLATORE:  Then let's move to

17    non-privileged issue.

18          MS. HOUGHTON-LARSEN:  As I said, this is

19    my deposition, and I'll be asking the questions I

20    like, which are going to be completely appropriate

21    and not probing into anything --

22          MR. PARLATORE:  So far --

```
                                             Page 50

 1            MS. HOUGHTON-LARSEN:  -- work product.

 2            MR. PARLATORE:  -- you've already gone

 3    into some work product stuff, so I anticipate

 4    you'll probably continue to probe into that.

 5            MS. HOUGHTON-LARSEN:  Let's go to that

 6    letter.  Shall we?

 7            What tab is that, Maggie?

 8            We'll mark this as Exhibit 2, please.

 9            (Kerik Deposition Exhibit 2 marked for

10            identification and attached to the

11            transcript.)

12    BY MS. HOUGHTON-LARSEN:

13        Q.  Okay.  Do you recognize this?

14        A.  I think so.

15        Q.  Okay.  Do you see that this is on

16    Mr. Parlatore's letterhead.  It's dated

17    December 31st, 2021, and it's directed to the

18    January 6 Commission.

19        A.  Right.

20        Q.  Okay.  So you're welcome to review it if

21    you want, but I'm just going to direct us to the

22    second page.
```

```
                                            Page 51

 1        A.   Okay.

 2        Q.   So on the second page, it's the middle

 3   paragraph, I guess.  It starts, "Mr. Kerik was

 4   hired."

 5             Do you see that?

 6        A.   Yes.

 7        Q.   Okay.  It says, "Mr. Kerik was hired by

 8   former President Donald Trump's legal team to act

 9   as an investigator tasked to look into claims of

10   election fraud."

11             Okay.  That's right, right?

12        A.   Right.

13        Q.   Okay.  Just while we're on it, did you --

14   did you have a contract or anything?

15        A.   No.

16        Q.   You didn't.  Were you getting paid for

17   your work?

18        A.   No.

19        Q.   Okay.  Next sentence reads, "In this

20   role, Mr. Kerik received, reviewed, and processed

21   claims of fraud from around the country."

22             Okay.  So when you say received, that's,
```

# Excerpted

Page 63

1          (Kerik Deposition Exhibit 4 marked for

2          identification and attached to the

3          transcript.)

4          THE WITNESS:  Okay.

5   BY MS. HOUGHTON-LARSEN:

6      Q.  Okay.  So this is the attachment,

7   Exhibit 4.  Feel free to review that, but I'll

8   direct you to particular points.

9      A.  Okay.

10     Q.  And this e-mail and this attachment are

11  things that both you and Mr. Giuliani have

12  testified about previously, or given an interview

13  about previously, so I think we should be -- we

14  should be good --

15     A.  Okay.

16     Q.  -- from the attorney work product

17  concerns.

18          Okay.  So just going back, you say, "We

19  need to pull the trigger today to have the impact

20  that's needed in the states we're targeting."

21          So what did you mean by that?

22     A.  I think what I was talking about at the

Page 64

1    time was to force the legislators to do their job.

2        Q.   Okay.

3        A.   From my perspective -- and now, I'm --

4    I'm going to say this, I don't remember

5    specifically what I was talking about at the time.

6    But given this and the plan, one problem we had

7    was that we were finding evidence of fraud,

8    improprieties, things of that nature.  We were

9    going to the legislators.  We were providing it to

10   them or -- which was even worse -- they were

11   providing us -- they were telling us, you know,

12   there is -- you know, we found this or we heard of

13   that or we're looking at this.

14           But our concern was you're going to be

15   involved in the certification or allow the

16   certification of a state vote that you, yourself,

17   know should not happen based on the things that we

18   were collecting.  Based on the things that we were

19   reviewing, you know, we wanted to -- we wanted to

20   push them and educate them as to what we were

21   finding to make sure that they pretty much did

22   their job.

```
                                            Page 65

 1            And I think that's what I was talking

 2   about.

 3        Q.  Okay.  So this is reflecting your opinion

 4   that you felt strongly about this, right?

 5        A.  In this e-mail, yeah.

 6        Q.  Okay.  And am I correct -- I mean, the

 7   mayor also had sent this, as you say, to Mark

 8   Meadows the previous evening.

 9            Is it fair to say he also felt strongly

10   about this, as far as you understood?

11        A.  I would say.  Yeah.

12        Q.  Okay.

13        A.  Or I would have never sent it.

14        Q.  So tell me what you mean by that.

15        A.  You know, the mayor is in charge.

16        Q.  Right.

17        A.  It's the mayor's legal team.  If the

18   mayor is concerned or he has concerns or he wants

19   something done, you know, I would do it.  If he

20   didn't want it, if he wasn't concerned, or he

21   said, you know, this isn't of interest to me, I

22   wouldn't do it.
```

```
                                          Page 66
```

 1      Q.  Okay.  So do you think -- I mean -- and I

 2   don't want to get into anything too specific and

 3   so --

 4      A.  Right.

 5      Q.  But would it have been the case for this

 6   e-mail -- like, do you have a recollection of

 7   checking with Mr. Giuliani before sending this?

 8      A.  Right now?

 9      Q.  Yes.

10      A.  No.

11      Q.  Would that have been your regular

12   practice?

13      A.  Normally.

14      Q.  Normally?

15      A.  Yes.

16      Q.  Okay.  So he would have been aware that

17   you were doing this?

18      A.  Yes.

19      Q.  Okay.

20      A.  Normally.  Not -- I can't say he was

21   aware, but under normal conditions, yes.

22      Q.  But he was obviously aware -- or I

Page 67

1    shouldn't say obviously.  Strike that.

2         A.   Right.

3         Q.   He was aware of the Giuliani team's

4    strategic communications plan --

5         A.   Right.

6         Q.   Right.  That people were working on it?

7         A.   Right.

8         Q.   Right.  Okay.  And I am going to skip the

9    next two paragraphs, but you read them.

10            And then in the last paragraph you say,

11   "We can do all the investigations we want later,

12   but if the President plans on winning, it's the

13   legislators that have to be moved, and this will

14   do just that," right?

15        A.   Right.

16        Q.   And what do you mean by "we can do all

17   the investigations we want later"?

18        A.   Well, the problem is -- and this is -- I

19   think this is -- you know, I think for maybe law

20   firms like yours, I think the press -- I think,

21   you know, the critics of the "big lie" thing, as

22   the J6 committee puts it, I think nobody realizes

**Excerpted**

```
                                              Page 93
 1    is.
 2    BY MS. HOUGHTON-LARSEN:
 3         Q.  Okay.
 4         A.  Serrano's public relations team.
 5             Research team.  CR.  Off the top of my
 6    head...
 7    BY MS. HOUGHTON-LARSEN:
 8         Q.  Sorry for the memory test.
 9         A.  Yeah, I don't know.
10         Q.  What about SP?
11         A.  Don't know.
12         Q.  Do you think it was Sidney Powell?
13         A.  What's the date here?  Is there a date on
14    this thing?
15         Q.  The date says, "Timeline, December 27th -
16    January 6th."  And this is, remember, attached to
17    the e-mail that you sent on December 28th.
18         A.  Oh, December 28th I sent this?  It could
19    have been Sidney Powell, but she was -- you know,
20    the mayor dismissed her, you know, away from --
21    you know, we created distance between us and her,
22    and I don't know when that was.  So I don't know.
```

Page 94

```
 1    It could have been, if that was before he told her
 2    she was no longer connected to the team.
 3         Q.  Understood.
 4             Do you have a sense of who -- or do you
 5    remember or know who TF was referring to?
 6         A.  No.
 7         Q.  No.  And what about PW?
 8         A.  Phil Waldron.
 9         Q.  Okay.  And what's the Peter Navarro team?
10         A.  Peter Navarro worked for the President.
11    And there were some people in his office, I think
12    a guy and a girl from his office, and I don't
13    remember their names.
14         Q.  Okay.
15         A.  But it was somebody from his office
16    maybe.
17         Q.  Okay.
18         A.  There were -- there was a lot of data, a
19    lot of stuff that they were collecting and
20    forwarding to us.  If somebody called -- I guess
21    if somebody called the White House and gave them
22    stuff to look at, or complaints or allegations,
```

Page 95

1    they would send it to us.

2         Q.   And would they send it to you?  Or who

3    would they send it to you?

4         A.   It could be anybody on the team.

5         Q.   Okay.

6         A.   Most likely the lawyers.

7         Q.   Most likely the lawyers.  Okay.

8              And I think -- I know you testified about

9    this at the January 6th.  I'm happy to direct you

10   to the testimony if you prefer.

11             But you said there were continual

12   discussions for about six weeks about this

13   strategic communications plan; is that correct?

14        A.   Yeah.  I mean, not specifically about the

15   plan itself, but it was -- you know, all this

16   stuff, the allegations within here, that's what

17   the plan was about.

18        Q.   Right.

19        A.   So that was the continual discussions.  I

20   don't think we had a continual discussion about

21   the plan.

22        Q.   So correct me if I'm misstating, but you

Page 96

1   would say that there were continual discussions

2   about getting the evidence and the allegations

3   that you were receiving and that you knew about in

4   front of the various state legislatures?

5       A.  Yes.

6       Q.  Okay.  And how were those discussions

7   taking place?  Were you having meetings?

8       A.  We had meetings if it was necessary.  If

9   somebody wanted -- somebody had something to see

10  the mayor and, you know, give him something, there

11  would be a meeting with the people that would have

12  to be involved.  Right?

13          But we basically lived out of two suites,

14  you know, in the Mandarin or -- first we were in

15  the Mandarin.  Then the mayor and I got COVID and

16  they kicked us out of the Mandarin, and we went to

17  the -- we went to the Willard.  And even in the

18  Willard, we ran the investigative element of this

19  out of our suites.  We had a conference room plus

20  our suites.  So we were in constant -- we were in

21  meetings all day long.

22      Q.  I see.

```
                                          Page 97
```

1      A.   Everybody was working out of those rooms.

2      Q.   I see.  So was the mayor also working

3   there -- out of there with you all?

4      A.   Yeah.

5      Q.   Okay.  I think you said if somebody had

6   something to see the mayor -- to show the mayor, I

7   think is what you said, you know, give him

8   something, there would be a meeting with the

9   people that would have to be involved.

10      A.   Right.

11      Q.   Okay.  Do you have a memory of whether

12   they were formal meetings or discussions that you

13   all were having because you were just in close

14   proximity about this plan to get evidence to the

15   legislatures?

16      A.   No.

17      Q.   No.

18      A.   It wasn't -- you know, it's not like we

19   came into a conference room like this --

20      Q.   Right.

21      A.   -- and there was a camera and there was

22   recorders and all that -- no, none of that.

# Excerpted

Page 212

1                   C E R T I F I C A T E

2              I do hereby certify that the aforesaid

3    testimony was taken before me, pursuant to notice, at

4    the time and place indicated; that said deponent was

5    by me duly sworn to tell the truth, the whole truth,

6    and nothing but the truth; that the testimony of said

7    witness was taken by me in stenotypy and thereafter

8    reduced to typewriting under my direction; that said

9    statement is a true record of the proceedings; that I

10   am neither counsel for, related to, nor employed by

11   any of the parties to the action in which this

12   statement was taken; and, further, that I am not a

13   relative or employee of any counsel or attorney

14   employed by the parties hereto, nor financially or

15   otherwise interested in the outcome of this action.

16

17

18

19

20

21

22                          CHRISTINA S. HOTSKO, RPR, CRR