# EXHIBIT 2

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - -x

     RUBY FREEMAN, et al.,          :

4                                   :

        Plaintiffs,                 :

5                                   :

        v.                          :   Civil Action No.

6                                   :   21-3354 (BAH)

     RUDOLPH W. GIULIANI,           :

7                                   :

        Defendant.                  :

8    - - - - - - - - - - - - - - - -x

9

10

11

12                      - - -

13              Monday, March 20, 2023

14                      - - -

15

16

17

18

19   Videotaped deposition of BERNARD KERIK, beginning at

20   10:51 a.m., before Christina S. Hotsko, RPR, CRR,

21   when were present on behalf of the respective

22   parties:

Page 2

```
 1              A P P E A R A N C E S   (Via Zoom)
 2   On behalf of Plaintiffs:
        M. ANNIE HOUGHTON-LARSEN, ESQUIRE
 3      Willkie Farr & Gallagher, LLP
        787 Seventh Avenue
 4      New York, New York 10019-6099
        (212) 728-8000
 5      mhoughton-larsen@willkie.com
 6      MICHAEL GOTTLIEB, ESQUIRE
        MAGGIE MacCURDY, ESQUIRE
 7      Willkie Farr & Gallagher, LLP
        1875 K Street, Northwest
 8      Washington, D.C. 20006-1238
        (202) 303-1000
 9      mgottlieb@willkie.com
10
     On behalf of Witness:
11      TIMOTHY C. PARLATORE, ESQUIRE
        Parlatore Law Group
12      One World Trade Center, Suite 8500
        New York, New York 10007
13      (212) 603-9918
        timothy.parlatore@parlatorelawgroup.com
14
15   Also Present:
        Glen Fortner, Video Technician
16
17
18
19
20
21
22
```

# Excerpted

Page 37

1   He said, are you guys good?  You know, he was very

2   nice, very cordial.  And he came up to me and

3   he -- he walked up to me, and he went like this.

4   He went, you got your vest on?  I said, yes, sir.

5   He says, good.  He says, you got to wear a vest.

6   And he says, you know what?  Guys, go

7   downstairs -- there was a coffee shop in, like --

8   in the Tower.  He said, go downstairs and grab

9   some coffee and tell them I sent you downstairs.

10          And -- looking back, it's funny now

11  because everybody was shit scared; they're, like,

12  I ain't going down there, no way.

13          That's the first time I ever saw him.

14  And that had to be, like, 1987, maybe or

15  something.  So -- and then I got to meet him

16  several times after, so I've known him a long

17  time.

18          So back to your question, I was a big

19  supporter of his for the election.  I was in

20  Washington, D.C. the night of the election, on

21  November 3rd.  I stayed in D.C. until the 4th.

22  And, you know -- I don't remember exactly.  I

Page 38

1    either left the night of the 4th or the morning of

2    the 5th.  I went home.  And just about the time I

3    walked in the door, Mayor Giuliani called me, said

4    that he had spoken with the president and that he

5    wanted me to come back and assist him; he was

6    going to be looking at the investig- -- at the

7    election.

8            And I packed up some clothes, I got back

9    in my truck, and I drove back to D.C.

10       Q.  And so when you say, Mayor Giuliani

11   called me and said that he had spoken with the

12   president and he wanted me to come back, was that

13   Mayor Giuliani wanted you to come back or

14   President Trump wanted you to come back?

15       A.  No, the mayor.

16       Q.  The mayor wanted you to come back.

17           Why do you think he reached out to you?

18       A.  He probably knew I could be helpful.

19       Q.  Okay.  In what way?

20       A.  Look, I've worked with him and for him

21   for a long time, whether it's investigative work,

22   whether it's consulting work, you know, I've --

```
                                             Page 39
 1   you know, and we're friends on top of it.  You
 2   know, he probably thought I could help.
 3        Q.   You guys are still friends, yeah?
 4        A.   Yeah.
 5        Q.   How is he as a boss?
 6        A.   He's usually great.
 7        Q.   Is he hands on?
 8        A.   Yeah.
 9        Q.   Yeah.
10        A.   Very hands on.
11        Q.   Very hands on.  Okay.
12             So Mayor Giuliani called you around the
13   5th and -- to ask you to assist.  You said yes,
14   came back down?
15             What then became -- or what was your
16   role.  Right?  Like, you come down, you get to
17   wherever you all are working, and then you're,
18   like, okay, what am I doing now?  How --
19        A.   I think I got there in -- I want to say
20   it was the 5th.  So I got there in the morning,
21   spoke to him when I arrived.  We were -- he was
22   staying at the Mandarin Oriental Hotel.  And I
```

# Excerpted

Page 65

```
1              And I think that's what I was talking
2    about.
3        Q.   Okay.  So this is reflecting your opinion
4    that you felt strongly about this, right?
5        A.   In this e-mail, yeah.
6        Q.   Okay.  And am I correct -- I mean, the
7    mayor also had sent this, as you say, to Mark
8    Meadows the previous evening.
9              Is it fair to say he also felt strongly
10   about this, as far as you understood?
11       A.   I would say.  Yeah.
12       Q.   Okay.
13       A.   Or I would have never sent it.
14       Q.   So tell me what you mean by that.
15       A.   You know, the mayor is in charge.
16       Q.   Right.
17       A.   It's the mayor's legal team.  If the
18   mayor is concerned or he has concerns or he wants
19   something done, you know, I would do it.  If he
20   didn't want it, if he wasn't concerned, or he
21   said, you know, this isn't of interest to me, I
22   wouldn't do it.
```

                                                    Page 66

1          Q.   Okay.  So do you think -- I mean -- and I
2     don't want to get into anything too specific and
3     so --
4          A.   Right.
5          Q.   But would it have been the case for this
6     e-mail -- like, do you have a recollection of
7     checking with Mr. Giuliani before sending this?
8          A.   Right now?
9          Q.   Yes.
10         A.   No.
11         Q.   Would that have been your regular
12    practice?
13         A.   Normally.
14         Q.   Normally?
15         A.   Yes.
16         Q.   Okay.  So he would have been aware that
17    you were doing this?
18         A.   Yes.
19         Q.   Okay.
20         A.   Normally.  Not -- I can't say he was
21    aware, but under normal conditions, yes.
22         Q.   But he was obviously aware -- or I

# Excerpted

Page 92

```
 1   name.  There was a young guy that worked -- he
 2   worked for, like, a state senator, but he took a
 3   leave or something.  I don't know who -- he got
 4   COVID.  Although I don't know if he was involved
 5   in this.  Like that -- you know, one of them.
 6        Q.  Okay.  This might help you.  Can we
 7   please turn to page 6.
 8            Okay.  So about two-thirds down the page
 9   it says, "Key team members.  Rudy Giuliani."
10            And then, "BK."  I'm assuming that's you.
11        A.  That's probably me.
12        Q.  Okay.  "KF."  Do you know who that is?
13        A.  Katherine Friess.
14        Q.  And then, "Media advisors.  SB."  Who do
15   you think that is?
16        A.  No idea.  Well, I went through this
17   before.
18            THE WITNESS:  Who did I do this with?
19   J6?
20            MR. PARLATORE:  Probably.
21            THE WITNESS:  Yeah.  Boris Epshteyn would
22   have been the BE.  SB, I have no idea what that
```

```
                                            Page 93
 1    is.

 2    BY MS. HOUGHTON-LARSEN:

 3         Q.  Okay.

 4         A.  Serrano's public relations team.

 5             Research team.  CR.  Off the top of my

 6    head...

 7    BY MS. HOUGHTON-LARSEN:

 8         Q.  Sorry for the memory test.

 9         A.  Yeah, I don't know.

10         Q.  What about SP?

11         A.  Don't know.

12         Q.  Do you think it was Sidney Powell?

13         A.  What's the date here?  Is there a date on

14    this thing?

15         Q.  The date says, "Timeline, December 27th -

16    January 6th."  And this is, remember, attached to

17    the e-mail that you sent on December 28th.

18         A.  Oh, December 28th I sent this?  It could

19    have been Sidney Powell, but she was -- you know,

20    the mayor dismissed her, you know, away from --

21    you know, we created distance between us and her,

22    and I don't know when that was.  So I don't know.
```

```
                                        Page 94
1    It could have been, if that was before he told her
2    she was no longer connected to the team.
3         Q.  Understood.
4              Do you have a sense of who -- or do you
5    remember or know who TF was referring to?
6         A.  No.
7         Q.  No.  And what about PW?
8         A.  Phil Waldron.
9         Q.  Okay.  And what's the Peter Navarro team?
10        A.  Peter Navarro worked for the President.
11   And there were some people in his office, I think
12   a guy and a girl from his office, and I don't
13   remember their names.
14        Q.  Okay.
15        A.  But it was somebody from his office
16   maybe.
17        Q.  Okay.
18        A.  There were -- there was a lot of data, a
19   lot of stuff that they were collecting and
20   forwarding to us.  If somebody called -- I guess
21   if somebody called the White House and gave them
22   stuff to look at, or complaints or allegations,
```

# Excerpted

```
                                        Page 95
```

1    they would send it to us.

2        Q.  And would they send it to you?  Or who

3    would they send it to you?

4        A.  It could be anybody on the team.

5        Q.  Okay.

6        A.  Most likely the lawyers.

7        Q.  Most likely the lawyers.  Okay.

8            And I think -- I know you testified about

9    this at the January 6th.  I'm happy to direct you

10   to the testimony if you prefer.

11           But you said there were continual

12   discussions for about six weeks about this

13   strategic communications plan; is that correct?

14       A.  Yeah.  I mean, not specifically about the

15   plan itself, but it was -- you know, all this

16   stuff, the allegations within here, that's what

17   the plan was about.

18       Q.  Right.

19       A.  So that was the continual discussions.  I

20   don't think we had a continual discussion about

21   the plan.

22       Q.  So correct me if I'm misstating, but you

Page 96

1    would say that there were continual discussions

2    about getting the evidence and the allegations

3    that you were receiving and that you knew about in

4    front of the various state legislatures?

5         A.  Yes.

6         Q.  Okay.  And how were those discussions

7    taking place?  Were you having meetings?

8         A.  We had meetings if it was necessary.  If

9    somebody wanted -- somebody had something to see

10   the mayor and, you know, give him something, there

11   would be a meeting with the people that would have

12   to be involved.  Right?

13            But we basically lived out of two suites,

14   you know, in the Mandarin or -- first we were in

15   the Mandarin.  Then the mayor and I got COVID and

16   they kicked us out of the Mandarin, and we went to

17   the -- we went to the Willard.  And even in the

18   Willard, we ran the investigative element of this

19   out of our suites.  We had a conference room plus

20   our suites.  So we were in constant -- we were in

21   meetings all day long.

22        Q.  I see.

1    A.   Everybody was working out of those rooms.

2    Q.   I see.  So was the mayor also working

3    there -- out of there with you all?

4    A.   Yeah.

5    Q.   Okay.  I think you said if somebody had

6    something to see the mayor -- to show the mayor, I

7    think is what you said, you know, give him

8    something, there would be a meeting with the

9    people that would have to be involved.

10   A.   Right.

11   Q.   Okay.  Do you have a memory of whether

12   they were formal meetings or discussions that you

13   all were having because you were just in close

14   proximity about this plan to get evidence to the

15   legislatures?

16   A.   No.

17   Q.   No.

18   A.   It wasn't -- you know, it's not like we

19   came into a conference room like this --

20   Q.   Right.

21   A.   -- and there was a camera and there was

22   recorders and all that -- no, none of that.

Page 98

1    Some -- you know, and I'll give you an example,

2    because her name already came up.  Sidney Powell

3    wanted to see the mayor about something she heard

4    or she found or whatever the case may be.  She

5    called me, wanted to see the mayor.  I set it up.

6    She came.  She sat in the suite with him.  A

7    couple of us sat around and she told him whatever.

8         Q.  Got it.  And she called you because you

9    were -- you sort of made -- you were the buffer,

10   right, between --

11        A.  Right.  Right.

12        Q.  -- with the mayor.

13             Do you have a sense of, over the

14   course -- you're going to be -- you're going to

15   smile at me at this question.

16        A.  Okay.

17        Q.  Do you have a sense of, over the course

18   of that sort of six weeks or so, how many times

19   you were discussing the plan to get information to

20   these state legislatures?

21        A.  Not that we had a meeting about that.

22        Q.  Not that you had a meeting.

```
                                        Page 99
 1        A.   But we discussed it every day.

 2        Q.   Every day.

 3        A.   Every day.

 4        Q.   Right.

 5        A.   I mean, it was -- you know, that was --

 6   every day.

 7        Q.   Right.

 8        A.   And -- and I think the piece that's sort

 9   of -- we haven't discussed is the fact that, in

10   the middle of the investigative stuff that we were

11   doing and collecting all this data, we were then

12   going out and doing the hearings, the public

13   hearings, trying to get the legislators to

14   understand what we were finding at the time.  So

15   you had all this stuff going on, but also we were

16   traveling to do those hearings.

17        Q.   Was there someone on the team who you

18   recall leading the effort to reach out to state

19   legislatures?

20        A.   Most likely -- not specifically.  But the

21   mayor was responsible for the legal team.  And,

22   you know, he wanted -- he wanted everything and
```

```
 1   anything we could find with regard to possible

 2   litigation and anything and everything we could

 3   find that the legislators should be aware of so

 4   they could make a decision whether they should or

 5   should not certify a state vote.

 6          Q.  Okay.  Okay.  We'll go through the plan

 7   for a couple of minutes and then we'll break for

 8   lunch.

 9          A.  Okay.

10          Q.  As long as you're still okay.

11               All right.  So at the bottom of page 1 --

12   I just want to go through a couple of these

13   specific things.

14               At the bottom of page 1 it says,

15   "Fraudulent ballots" -- indentation -- "Fulton

16   County, Georgia.  Video of suitcases of fraudulent

17   ballots."

18               Is that the video that we were discussing

19   earlier of my clients?

20          A.  Yeah, I would think so.

21          Q.  Okay.  If we can turn to page 3.  Under

22   the bullet "Election officials' illegal actions,"
```

**Excerpted**

1   together when he saw the video was in that

2   hearing.  And I think there was a -- there was a

3   point in time that somebody was showing us the

4   video or going through the video with us up at the

5   hotel.

6        Q.  And --

7        A.  Don't ask me who that was, because I

8   don't have a clue.

9        Q.  Mr. Kerik, I've got to.

10       Do you have a recollection --

11       A.  No.  I don't -- I don't remember -- I

12   don't remember who was there.

13            MR. PARLATORE:  I won't make the asked

14   and answered objection.  Answered before asked.

15            MS. HOUGHTON-LARSEN:  Pardon me.

16   BY MS. HOUGHTON-LARSEN:

17       Q.  So just to be clear, you recall seeing

18   the video that Jacki Pick showed during the

19   December 3rd hearing --

20       A.  Right.

21       Q.  -- and Mr. Giuliani was also there,

22   right?

1       A.  Right.

2       Q.  And then you also think that you and

3   Mr. Giuliani were shown that same video that

4   Ms. Pick showed at State Farm Arena?

5       A.  Right.

6       Q.  And that was at the hotel.  Was that the

7   Mandarin Oriental?

8       A.  I don't know which one it was.

9       Q.  So -- but it was either the Mandarin

10  Oriental or the Willard?

11      A.  Yes.

12      Q.  And do you recall who was showing it to

13  you?

14      A.  No.

15      Q.  Do you recall around when that would have

16  been?

17      A.  No.  I can almost see us sitting at the

18  table and him looking through it.  But you know

19  what?  We looked at tons of videos, especially

20  after January 6th.  You know, we were videoed out.

21  So I can't say.

22      Q.  And I do -- you testified earlier, I

# Excerpted

Page 212

```
 1                     C E R T I F I C A T E

 2             I do hereby certify that the aforesaid

 3     testimony was taken before me, pursuant to notice, at

 4     the time and place indicated; that said deponent was

 5     by me duly sworn to tell the truth, the whole truth,

 6     and nothing but the truth; that the testimony of said

 7     witness was taken by me in stenotypy and thereafter

 8     reduced to typewriting under my direction; that said

 9     statement is a true record of the proceedings; that I

10     am neither counsel for, related to, nor employed by

11     any of the parties to the action in which this

12     statement was taken; and, further, that I am not a

13     relative or employee of any counsel or attorney

14     employed by the parties hereto, nor financially or

15     otherwise interested in the outcome of this action.

16

17

18

19

20

21

22                     CHRISTINA S. HOTSKO, RPR, CRR
```