# EXHIBIT 3

Page 1

1                    UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF COLUMBIA

2

3              Civil Action No. 21-3354 (BAH)

4    RUBY FREEMAN, et al.,

5                    Plaintiffs,

6    vs.

7    RUDOLPH W. GIULIANI,

8

                    Defendant.

9    _____/

10                            401 East Las Olas Boulevard

                              Fort Lauderdale, Florida

11                            May 16, 2023

                              12:32 p.m. - 4:23 p.m.

12

13

14           VIDEO DEPOSITION OF CHRISTINA BOBB

15

16       Taken before SUZANNE VITALE, R.P.R., F.P.R.

17    and Notary Public for the State of Florida at Large,

18    pursuant to Notice of Taking Deposition filed in the

19    above cause.

20

21

22

23

24

25

Page 2

```
 1   APPEARANCES:
 2
     On behalf of Plaintiffs:
 3
     LAURO & SINGER
 4   400 North Tampa Street
     15th Floor
 5   Tampa, Florida 33602
     BY:  GREG SINGER, ESQ.
 6   BY:  JOHN LAURO, ESQ. (viz Zoom)
     BY:  FILZAH PAVALON, ESQ. (via Zoom)
 7        gsinger@laurosinger.com
 8
     On behalf of Defendant:
 9
     UNITED TO PROTECT DEMOCRACY
10   555 West 5th Street
     35th Floor
11   Los Angeles, California 90013
     BY:  CHRISTINE KWON, ESQ.
12        christine.kwon@protectdemocracy.org
13    and
14   WILLKIE FARR & GALLAGHER, LLP
     1875 K Street, Northwest
15   Washington, DC 20006-1238
     BY:  MAGGIE MACCURDY
16        mmacurdy@willkie.com
17    and
18   WILLKIE FARR & GALLAGHER, LLP
     787 Seventh Avenue,
19   New York, New York 10019
     BY:  MERYL GOVERNSKI, ESQ.
20        mgovernski@willkie.com
21
22   ALSO PRESENT:
          Sara Stout (Videographer)
23        Suzanne Vitale (Court Stenographer)
24
25
```

# Excerpted

1    A.   I don't think so.  Not that I specifically

2  remember.

3         Again, just the D.C. bar.  I don't know if

4  you consider that official capacity, but I testified

5  at the hearing.  I don't even remember when that

6  hearing was but that might have been in '22.

7    Q.   My question was whether you worked

8  together with Mr. Giuliani in any capacity, official

9  or otherwise?

10   A.   No.  I'm trying to answer your question.

11   Q.   I'd like to direct your attention to

12 page 6 of your book, to the section with the heading

13 "Rudy Giuliani's Legal Team."

14        Do you see that?

15   A.   Yes.

16   Q.   So that section begins, "In the days after

17 the election, as questions continued to go

18 unanswered, I was put in touch with Rudy Giuliani.

19 And by mid-November 2020, I had volunteered to help

20 Rudy's legal team investigate and challenge the

21 results of the 2020 election.  I was asked to focus

22 on coordinating the litigation efforts in Arizona,

23 Michigan and New Mexico."

24        Did I read that correctly?

25   A.   Yes.

```
                                            Page 17
 1        Q.    Who put you in touch with Mr. Giuliani?
 2        A.    Chanel Rion.
 3        Q.    Who is Chanel Rion?
 4        A.    A reporter for America News.
 5        Q.    When was that?
 6        A.    Mid-November 2020.
 7        Q.    So after the election?
 8        A.    Yes.
 9        Q.    Where were you physically located on
10   election day 2020?
11        A.    Like during the election?
12        Q.    On election day 2020.
13        A.    Well, I didn't sit in one location during
14   the day.  So during the election, I was on the front
15   lawn of the White House.
16        Q.    In D.C.?
17        A.    In Washington, D.C., yes.  That's where it
18   is.
19        Q.    You used the term "volunteered."
20        A.    Yes.
21        Q.    What do you mean by that?
22        A.    I was unpaid.
23        Q.    You were receiving no financial
24   compensation for your volunteer effort with
25   Mr. Giuliani?
```

Page 18

1      A.    Yes.

2      Q.    For how many hours a week did you

3    typically volunteer when you were volunteering with

4    Mr. Giuliani?

5      A.    It depended on the week.  If I didn't have

6    COVID, it was more.  When I did have COVID, it was

7    very, very little.  So -- and I also had another

8    job.  So I would say anywhere from a couple of hours

9    to, I don't know, 20 hours.  It was part time.  I

10   considered myself a part-time volunteer.

11     Q.    I'm sorry you had COVID during this time.

12           When you didn't have COVID, is it accurate

13   to say you were volunteering about 20 hours a week?

14     A.    Depending on the day.  Yes, I mean, that

15   was a chaotic time and I also had another job, but I

16   would spend as much time as I could helping him.

17     Q.    In the passage on page 6 of your book that

18   we just reviewed, you reference "Rudy's legal team."

19     A.    Okay.

20     Q.    What do you --

21     A.    Well, just to be clear, it's not quoted in

22   the book.  You are quoting it.

23     Q.    Correct.

24     A.    But in the book, it's unquoted.

25     Q.    Understood.

Page 19

1          What do you mean by "Rudy's legal team"?

2      A.   The group of people that had come together

3  to help Rudy after the election.

4      Q.   When you were volunteering on the Giuliani

5  legal team, did you have an understanding of who or

6  what was Mr. Giuliani's client?

7      A.   President Trump or the Trump campaign.  I

8  think my NDA was with the Trump campaign.

9      Q.   Your testimony is that you understood

10  Mr. Giuliani's client when you were volunteering

11  with the Giuliani team was either the Trump campaign

12  or President Trump?

13      A.   President Trump and the Trump campaign.

14  President Trump is part of the Trump campaign.  So

15  he certainly was the client and then it extended to

16  the campaign.

17      Q.   President Trump in his personal capacity?

18      A.   In his capacity as a candidate, yes.

19      Q.   You just testified that in 2022 you were

20  helping Mr. Giuliani with his D.C. bar disciplinary

21  hearing.

22          Were you serving on Mr. Giuliani's legal

23  team during that bar grievance process?

24      A.   No, the legal team was over after

25  January 6, 2021.

# Excerpted

Page 22

```
 1   at OAN and on the Giuliani legal team?
 2        A.   What do you mean by "crossover"?
 3        Q.   Was there any overlap between your roles
 4   at OAN and on the Giuliani legal team?
 5        A.   I would probably need a specific example.
 6   What I was doing with the Giuliani legal team
 7   certainly came out in my reporting.  I mean, I had
 8   the legal team on my television show.  So to that
 9   extent, yes.  But the actual legal work that I did
10   was kept separate, so...
11        Q.   You write in your book that you
12   volunteered to help the Giuliani legal team
13   investigate and challenge the results of the 2020
14   election.
15             Were you doing any work for OAN on efforts
16   to investigate and challenge the results of the 2020
17   election?
18        A.   Yes.
19        Q.   After you stopped volunteering on the
20   Giuliani legal team, you went back to OAN full time?
21        A.   I never left OAN full time but, yes, I
22   continued working for OAN.
23        Q.   Who comprised the Giuliani legal team?
24        A.   I don't know all of them but the ones that
25   I know, I would say Jenna Ellis, Boris Epshteyn were
```

```
                                              Page 23
 1   from the campaign legal team.  Katherine Friess,
 2   Bernie Kerik who was the lead investigator.  There
 3   were a few others that I don't necessarily remember
 4   their names that were working on other states.
 5   Those are the people I can think of off the top of
 6   my head.
 7        Q.   Let's start with Jenna Ellis, what was her
 8   role?
 9        A.   She did a lot of the TV appearances.  She
10   was -- she was like his main sidekick, if you want
11   to call it that.  She attended all the hearings with
12   him.  She was kind of the main second person.
13        Q.   Second person to?
14        A.   To Rudy.
15        Q.   What was your relationship with Jenna
16   Ellis?
17        A.   Well, I just met her when I started
18   volunteering, so I didn't know her but I got to know
19   her through that process.  So...
20        Q.   Did you communicate with Jenna Ellis
21   often?
22        A.   When?
23        Q.   When you were volunteering on the Giuliani
24   legal team.
25        A.   I don't -- I mean, often -- we
```

# Excerpted

```
                                            Page 31
 1        Q.    You can't recall their last names?
 2        A.    Right.  I didn't work closely with them.
 3   There were other -- there were other people.
 4        Q.    Do you know who Phil Waldron is?
 5        A.    Yes, I know Phil.
 6        Q.    Was he on the Giuliani legal team?
 7        A.    Yeah.  Well, yeah, he was one of the
 8   investigators.
 9        Q.    So his role was as an investigator?
10        A.    Investigator, and then he did the
11   technology -- like he was the tech expert at the
12   hearings and stuff, so yeah.
13             And then Phil had a team of people that
14   did all the tech stuff.  I wasn't really involved in
15   the like the tech part of stuff.  But, yes, Phil
16   also had a team of people.
17        Q.    Did you communicate with Mr. Waldron
18   often?
19        A.    Sporadically, I would say.  If there
20   was -- I definitely communicated with Phil Waldron
21   but I wasn't -- like I wasn't doing the technology
22   piece so it wasn't like a heavy part of what I was
23   working on.  But, yes, there were periods of time
24   where we communicated.
25        Q.    More than once a week?
```

1        A.    Yes, more than once a week.

2        Q.    Would you say several times a week?

3        A.    It would depend.  Like it would be a day.

4    Like we might communicate a bunch one day and then

5    not for the rest of the week, or maybe a couple of

6    times a couple of days, you know.

7        Q.    Do you know who Christianne Allen is?

8        A.    Christianne, yes.  She was Rudy's

9    assistant.  Sorry, I don't know her formal title.

10   But I think that's the role she served.

11       Q.    Thank you for the correction.

12             Is Christianne Allen someone who was a

13   part of the Giuliani legal team?

14       A.    Yes.

15       Q.    What was your relationship with Ms. Allen?

16       A.    Same as everyone else.  I didn't know her

17   before but I got to know her through the process.

18       Q.    Did you communicate with her often?

19       A.    Not as often as the others, but

20   occasionally, yes.

21       Q.    Do you know who Mirna Tarraf is?

22       A.    Yes.  She was also part of the legal team.

23   She was -- I think she was originally on the

24   campaign and was one of the holdovers onto the Rudy

25   team, I think.  Yeah, she also worked kind of like a

                                            Page 33

1   paralegal role.  I don't know what she actually was,

2   but I would think of her as a paralegal.

3        Q.   What was your relationship with

4   Ms. Tarraf?

5        A.   Same.  I did not know her beforehand.  Got

6   to know her in the process.

7        Q.   Did you communicate with Ms. Tarraf often?

8        A.   Probably a couple of times a week.  It

9   depended on the week.  There was so much happening,

10  it's hard to give a precise amount.  But -- but,

11  yes, I would say yes.

12       Q.   Did you communicate with Ms. Tarraf often?

13       A.   I just said I would say yes.

14       Q.   What about did you communicate with

15  Ms. Tarraf?

16       A.   Whatever we were working on at the time.

17  Whatever Rudy needed or -- I mean, I don't have a

18  specific recollection of what we talked about.

19       Q.   Did you communicate anything through

20  Ms. Tarraf to Mr. Giuliani?

21       A.   Same answer as the others.  I never needed

22  to go through anybody.  But yes, there were probably

23  times where she would take information that I gave

24  her and give to Rudy.

25       Q.   Just to clarify, I'm asking not if you

```
                                             Page 34
 1   needed to but if you ever did.
 2        A.   Well, no, I understand that.  But to say I
 3   went through someone implies that I am trying to get
 4   something to Rudy and I'm going through them, and
 5   that's not the case.
 6             My point is if I'm communicating with
 7   Mirna, it's because I'm communicating with Mirna,
 8   not because I intend for Mirna to give my
 9   information to Rudy.  She may have done that, but
10   that's my only point.
11             Unless he specifically asked her for
12   something, like get this from Christina, which is I
13   think is what happened with the timeline, then, yes,
14   I did that.  But unless it was a specific instance
15   like that, it was never my intent.
16        Q.   Do you know who Maria Ryan is?
17        A.   Yes.  She -- I would say she also filled
18   an admin role.
19        Q.   On the Giuliani legal team?
20        A.   Yes.
21        Q.   What was your relationship with Ms. Ryan?
22        A.   Same.  I did not know her beforehand.  I
23   met her in the process.
24        Q.   Did you communicate with Ms. Ryan often?
25        A.   No.
```

# Excerpted

Page 37

```
 1        A.    Maria's son.
 2        Q.    Did he have a role on the Giuliani legal
 3   team?
 4        A.    Yes.  He would help Maria out and he did,
 5   like, the technical, like printing and like -- I
 6   mean, I don't want to diminish his role, but I think
 7   of him as a printer.  Like if we needed something
 8   printed, he would print it and help you do that.
 9        Q.    He assisted Ms. Ryan with the admin work
10   she did?
11        A.    Correct.
12        Q.    Do you know who John Eastman is?
13        A.    Yes.
14        Q.    Did he have a role on the Giuliani legal
15   team?
16        A.    Yes.  He obviously was an expert brought
17   in for consultation and he consulted with the mayor.
18        Q.    An expert?
19        A.    Yes, he's a constitutional law scholar.
20        Q.    What was your relationship with
21   Mr. Eastman?
22        A.    I did not know him.  I got to know him a
23   little bit at that time, but certainly he was
24   working directly with Rudy.  He did not need to go
25   through me.
```

1      Q.    Did you communicate with Mr. Eastman

2   often?

3      A.    Not often but occasionally.

4      Q.    What about did you communicate with

5   Mr. Eastman?

6      A.    Whatever -- I mean, I don't have a

7   specific recollection.  But if we were working on

8   something or if -- I was probably just there if he

9   needed something, but I didn't have extensive

10  communication with him.

11     Q.    Do you know who Ray Smith is?

12     A.    Yes.  He was local counsel in Georgia.

13     Q.    So was he on the Giuliani legal team?

14     A.    I would say he was local counsel.  I mean,

15  it depends on how you're defining the Rudy Giuliani

16  legal team.

17           I define the Rudy Giuliani legal team as

18  the people who were at the RNC headquarters.  The

19  people you're talking about are obviously -- yes,

20  they're part of the legal team but I wouldn't

21  necessarily put them under the umbrella.  But, you

22  know, it depends on how you're defining it all.

23     Q.    Ray Smith was local counsel in Georgia.

24           Who was part of the Georgia Giuliani legal

25  team?

Page 39

1         A.    I don't know.  I didn't work on Georgia.

2         Q.    To clarify, when I ask you about the

3    Giuliani legal team, I'm asking how you use the term

4    in your book referring back to page 6.

5         A.    Yeah, in the book -- I describe it in the

6    book and I go through -- the book is talking about

7    the events at the RNC office.  And that's how I'm

8    referring to it in the book.  I talk about the RNC

9    headquarters and the discussions at the RNC

10   headquarters.  But that's a very narrow portion of

11   three pages of the book, so it certainly can be

12   defined more than one way.

13        Q.    You testified that if you needed to reach

14   Mr. Giuliani directly, you could.

15        A.    Uh-huh.

16        Q.    Did you serve as an intermediary for

17   communications to Mr. Giuliani?

18        A.    Sometimes.  Mostly via e-mail.  People

19   sent me stuff, a law that they wanted to get to him.

20   Because I was in D.C. so that's why I have e-mails

21   from Ray Smith even though I didn't work on Georgia.

22   I was physically in D.C. and could get him physical

23   copies.

24        Q.    Because you were physically in D.C. and

25   could get him physical copies of e-mails is why you

```
                                          Page 40
```

 1    served as an intermediary for communications to

 2    Mr. Giuliani?

 3         A.   That's what you're saying.  That's not

 4    what I'm saying.

 5              I'm saying I was physically present in

 6    Washington, D.C.  Ray Smith was not.  So if Ray

 7    Smith wanted to know if Rudy had seen a complaint or

 8    whatever, he would send it to me and I would send it

 9    to the mayor.  And if I was with the mayor, then Ray

10    Smith would know that the mayor had seen it.  So

11    people would send me -- my understanding is that's

12    why Ray Smith was sending me all of these e-mails,

13    was because he wanted to make sure that the mayor

14    saw them and I was physically there.  He was not.

15    He was in Georgia.

16         Q.   When you say Mr. Smith would send things

17    to you for you to send to Mr. Giuliani, through what

18    means?

19         A.   E-mail.  That's why you have the e-mails

20    from Ray Smith.  So I could say, Mr. Mayor, Ray

21    Smith has sent you an e-mail with the complaint in

22    it.  Have you seen it?  Because he knows that I

23    would do that.

24         Q.   Couldn't Mr. Smith e-mail Mr. Giuliani

25    directly?

# Excerpted

Page 158

1

2                        CERTIFICATE OF OATH

3

4    STATE OF FLORIDA    )

5    COUNTY OF BROWARD   )

6

7              I, the undersigned authority, certify

8        that CHRISTINA BOBB personally appeared before

9        me, and was duly sworn.

10             WITNESS my hand and official seal this

11       22nd day of May, 2023.

12

13                        *Suzanne Vitale*

14

15             SUZANNE VITALE, R.P.R., F.P.R.

               Notary Public, State of Florida

16             My Commission No. DD179981

               Expires: 5/24/2024

17

18

19

20

21

22

23

24

25

Page 159

1

2                    CERTIFICATE

3

4   STATE OF FLORIDA   )

5   COUNTY OF BROWARD  )

6

7            I, SUZANNE VITALE, R.P.R., F.P.R., do

8       hereby certify that I was authorized to and did

9       stenographically report the foregoing deposition

10      of CHRISTINA BOBB; that a review of the

11      transcript was requested; and that the transcript

12      is a true record of my stenographic notes.

13            I FURTHER CERTIFY that I am not a

14      relative, employee, attorney, or counsel of any

15      of the parties, nor am I a relative or employee

16      of any of the parties' attorney or counsel

17      connected with the action, nor am I financially

18      interested in the action.

19            Dated this 22nd day of May, 2023.

20

21

22      SUZANNE VITALE, R.P.R., F.P.R.

        My Commission No. DD179981

        Expires: 5/24/2024

23

24

25