```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
     - - - - - - - - - - - - - - - x
 3   RUBY FREEMAN, et al.,
                                      Civil Action No. 21-3354
 4              Plaintiffs,           Monday, December 11, 2023
     vs.                              1:35 p.m.
 5
     RUDY GIULIANI,
 6
                Defendant.
 7   - - - - - - - - - - - - - - - x

 8   _____

 9         TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
            HELD BEFORE THE HONORABLE BERYL A. HOWELL
10                 UNITED STATES DISTRICT JUDGE

11   _____

12   APPEARANCES:

13   FOR PLAINTIFFS:     MICHAEL GOTTLIEB, ESQ.
                         MERYL CONANT GOVERNSKI, ESQ.
14                       ANNIE HOUGHTON-LARSEN, ESQ.
                         WILLKIE FARR & GALLAGHER LLP
15                       1875 K Street, Suite 100
                         Washington, DC 20006
16                       (202) 303-1016
                         Email: mgovernski@willkie.com
17
                         VON A. DuBOSE, ESQ.
18                       DUBOSE MILLER
                         75 14th Street NE
19                       Atlanta, GA 30309
                         (404) 720-8111
20                       Email:  miller@dubosemiller.com

21                       JOHN LANGFORD, ESQ.
                         PROTECT DEMOCRACY
22                       555 W. 5th Street
                         Los Angeles, CA 90013
23                       (919) 619-9819
                         Email: john.langford@protectdemocracy.org
24
25               (Continued on Next Page)
```

```
1      APPEARANCES (CONTINUED):

2      FOR DEFENSE:    JOSEPH D. SIBLEY, IV, ESQ.
                       CAMARA & SIBLEY LLP
3                      1108 Lavaca Street
                       Suite 110263
4                      Austin, TX 78701
                       (713) 966-6789
5                      Email: sibley@camarasibley.com

6      ALSO PRESENT: Ruby Freeman
                     Wandrea Moss
7

8      Court Reporter:           Lisa A. Moreira, RDR, CRR
                                 Official Court Reporter
9                                U.S. Courthouse, Room 6718
                                 333 Constitution Avenue, NW
10                               Washington, DC  20001
                                 (202) 354-3187
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2

3    WITNESS                                          PAGE

     REGINA SCOTT
4         (By Mr. DuBose)............................... 69
          (By Mr. Sibley)...............................100
5         (By Mr. DuBose)...............................130

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                   P R O C E E D I N G S
 2          THE COURT:  All right.  Ladies and gentlemen, I
 3  hope you've had a pleasant lunch, but now that you've been
 4  selected and sworn, I'm going to give you some preliminary
 5  instructions that will guide you as to how this trial will
 6  work and about some of the legal rules that are important in
 7  the trial.
 8          These remarks are not a substitute for the
 9  instructions I will give you at the end of the trial before
10  you start your deliberations.  These are preliminary
11  instructions, and they're just intended to give you a sense
12  for what's going to be going on in the courtroom and what
13  your responsibilities as jurors will be.
14          Now, you each found on your chairs when you came
15  back a notebook with a pen inside a plastic bag.  That's
16  because I permit jurors to take notes during trial, if they
17  want to, and to have their notes with them during
18  deliberations.
19          None of you is required to take notes.  Indeed,
20  you should not take notes if you think that note-taking
21  might distract you from listening to the evidence and
22  watching the depositions or distract your attention in any
23  way from looking at the witnesses.
24          On the other hand, if you think that taking notes
25  might better focus your attention on the witnesses and the
```

1    evidence or might better help you to remember what went on

2    during the trial, you should feel free to take notes.

3            I leave the decision of whether or not to take

4    notes up to each juror individually because it's my

5    experience that different people have different ways of most

6    effectively recalling and remembering what they've seen or

7    heard.

8            And so some of us do it better just by listening

9    and observing; some of us do it better by taking some notes.

10   If your notebook is more of a hindrance than a help during

11   the trial, just put it under your chair and forget about it.

12           You should remember that your notes are only an

13   aid to help your memory.  They are not evidence, and they

14   should not replace your own memory of the evidence.

15           Those jurors who do not take notes should rely on

16   their own memory of the evidence and should not be

17   influenced by another juror's notes.  The notes are only for

18   the note-taker's personal use in refreshing his or her

19   memory of the evidence.

20           Now, whenever there's a recess during the course

21   of the trial, just leave your notebooks and the pens in the

22   envelope on your seats.  They will be left there during

23   short recesses.  And also, when we take an overnight recess,

24   Mr. Coates will collect them and keep them in secure

25   storage.  No one, including myself, will ever look at your

1    notes.

2            You will not be able to take your notebooks home

3    with you overnight or at the end of the trial.  I'm

4    sometimes asked about that.  No, you may not.

5            At the end of the trial, after you have finished

6    your deliberations, returned to the courtroom, and delivered

7    your verdict, your notebooks will be collected and your

8    notes torn out and destroyed.  Again, neither I nor anyone

9    else will look at any notes that you have taken during the

10   course of the trial.

11           Now, there are no alternates in this case.  This

12   means that all of you are regular jurors and all of you will

13   deliberate in this matter, so it is important that all of

14   you give this case your most serious attention.

15           Now, during the trial you're going to hear me use

16   a few terms that you may not have heard before.  Let me

17   briefly explain some of the most common terms to you.

18           The party who sues is called the plaintiff.  When

19   I refer to the plaintiffs, I am talking about the plaintiffs

20   Ruby Freeman and Shaye Moss.

21           The party being sued is called the defendant.  In

22   this action, when I speak of the defendant, I am referring

23   to Rudolph Giuliani.

24           When I refer to counsel, that's just another way

25   of saying "lawyer."

 1          And the plaintiffs' attorneys are Michael

 2    Gottlieb, Meryl Governski, John Langford, Von DuBose, and

 3    Annie Houghton-Larson.

 4          And the defendant's attorney is Joseph Sibley.

 5          When I sustain an objection that a lawyer has made

 6    to testimony or evidence, I am excluding that evidence from

 7    this trial for a good reason.  When you have heard that I

 8    have overruled an objection, I am permitting that evidence

 9    to be admitted and for your consideration.

10          When I say "admitted into evidence" or "received

11    into evidence," I mean that this particular statement or

12    exhibit may be considered by you in making the decisions you

13    must make at the end of the trial.

14          In the event the plaintiffs and the defendant

15    stipulate -- that is, agree to certain facts -- you should

16    consider any stipulation of fact to be undisputed evidence.

17          Now I will briefly describe or state again what

18    this case is about before discussing some of the procedures

19    we will use and some of the rules of law that will be

20    important.

21          This is a civil case.  Plaintiffs Ruby Freeman and

22    Wandrea or Shaye -- she calls herself Shaye -- Moss claim

23    that Defendant Rudolph W. Giuliani defamed them,

24    intentionally inflicted emotional distress on them, and

25    engaged in a conspiracy with others to do the same.

1          Plaintiffs served as election workers at the State

2     Farm Arena in Fulton County, Georgia, during the 2020

3     presidential election.

4          Mr. Giuliani is the former mayor of New York City,

5     an attorney who has practiced law for decades, and a current

6     media personality with his own radio shows and podcasts.

7     Mr. Giuliani headed the Trump campaign legal team during

8     former president Donald J. Trump's unsuccessful bid for re-

9     election in 2020 and was part of the campaign to undermine

10    the legitimacy of that election in battleground states like

11    Georgia.

12         Mr. Giuliani publicly and falsely accused

13    plaintiffs of committing various acts of election fraud,

14    including illegally excluding poll watchers under false

15    pretenses, sneaking in and hiding illegal ballots in

16    suitcases under tables, illegally counting ballots multiple

17    times, and passing a USB drive with the intent of changing

18    the vote count in the voting tabulation devices.

19         Ms. Freeman and Ms. Moss allege that

20    Mr. Giuliani's actions have caused them to suffer and

21    continue to suffer extensive emotional and reputational

22    harm, including because Mr. Giuliani's actions made them

23    targets for profane and vile threats.

24         The Court has already determined that Mr. Giuliani

25    is liable for defamation per se, intentional infliction of

1   emotional distress, and civil conspiracy, and that

2   Ms. Freeman and Ms. Moss are entitled to receive

3   compensation, including in the form of punitive damages, for

4   Mr. Giuliani's willful conduct.

5          The only issue remaining in this trial is for

6   the jury, you all, to determine any amount of damages

7   Mr. Giuliani owes to plaintiffs for the damage caused by his

8   conduct.

9          This is a somewhat unusual case because, unlike

10  many other jury trials, in this case certain matters have

11  already been decided.  I'm going to explain what has already

12  been decided in this case and what you, the jury, will have

13  to decide.

14         You are not being asked to and you must not

15  reconsider any of the issues that have already been decided

16  in this case.  Before I give you instructions about what has

17  been decided, I will tell you the reason.

18         In a federal civil action like this case, parties

19  are entitled to the disclosure of all relevant, non-

20  privileged evidence in the other party's possession or

21  control during a process called discovery.  That evidence

22  can include relevant documents and electronically stored

23  information such as defendant's computer files, emails, text

24  messages, online chats, social media accounts, and call

25  logs.

1    Since each party is entitled to obtain the other

2    side's records, all parties to a lawsuit must preserve their

3    records.  The federal rules require parties to preserve and

4    produce the records so that there will be a level playing

5    field when plaintiffs try to prove their claims and

6    defendants try to prove any defenses to those claims.

7    In this case, the Court found that Mr. Giuliani

8    willfully refused to comply with his discovery obligations,

9    including by failing to preserve all relevant records and

10   failing to provide plaintiffs with all relevant records.

11   Those records include relevant communications and documents

12   whether stored in a filing cabinet or on a computer or

13   phone.

14   The Court also found that Mr. Giuliani's willful

15   refusal to comply with his discovery obligations caused the

16   plaintiffs prejudice, which means that it harmed their

17   ability to prove their claims.

18   To address the unfairness to the plaintiffs caused

19   by Mr. Giuliani's misconduct in complying with the rules for

20   fair discovery in a federal civil action, the Court has

21   issued certain orders that Mr. Giuliani is liable to

22   plaintiffs on their three claims against him without the

23   plaintiffs having to produce any more evidence than they

24   already have given his failure to produce relevant records.

25   Also under these orders certain facts must be

1    assumed in this case.  As I will explain again at the end of

2    the trial, this means that you will be required to assume

3    certain facts in calculating the amount, if any, of awards

4    of compensatory and punitive damages.

5            I will first explain plaintiffs' three claims for

6    which Mr. Giuliani is liable and then instruct you on the

7    facts that must be assumed in this case as you make your

8    determination of any damages owed by Mr. Giuliani to

9    plaintiffs.

10           It has already been established in this case that

11   Mr. Giuliani is liable to plaintiffs for defamation,

12   intentional infliction of emotional distress, and civil

13   conspiracy.  It has also been decided that Mr. Giuliani's

14   conduct was willful, and that, as a result, plaintiffs are

15   also entitled to punitive damages.

16           I will explain what each of those terms means in a

17   moment.  For now, I want to emphasize that you are not being

18   asked to and must not reconsider any of these matters;

19   instead, your only role is to determine any amount of money

20   damages that Mr. Giuliani owes to plaintiffs in the form of

21   compensatory and punitive damages.  In making that

22   determination, you must decide the issues presented to you

23   based on the instructions you receive now and at the end of

24   the case based on the evidence that you have heard and the

25   instructions you have received.

1        So that you understand what has already been

2    decided, I will now describe the elements of each of

3    plaintiffs' claims.  The elements describe the necessary

4    conditions for a legally valid claim.  These are the

5    elements of each of plaintiffs' three claims that have

6    already been decided.

7        It already has been decided that Mr. Giuliani is

8    liable to plaintiffs for defamation.  That means that you

9    must accept, for purposes of this trial, that Mr. Giuliani

10   defamed Ms. Freeman and Ms. Moss by publishing certain false

11   and defamatory statements about them, that Mr. Giuliani

12   published these statements with actual malice, that

13   Mr. Giuliani had no legal right to do so, and that these

14   defamatory statements caused harm to Ms. Freeman and

15   Ms. Moss.  These statements are what you will hear referred

16   to today as the actionable statements.

17       The conclusion that Mr. Giuliani published his

18   statements about Ms. Freeman and Ms. Moss means that he

19   personally communicated statements about Ms. Freeman and

20   Ms. Moss to third parties or that he caused other people to

21   communicate the actionable statements to third parties.  The

22   conclusion of the actionable statements were false means

23   that they were not true.

24       In this case the Court has already decided that

25   the actionable statements were defamatory.  A defamatory

1    statement is one that would tend to injure plaintiffs in

2    their trade, profession, or community standing or lower them

3    in the estimation of the community.  In particular, the

4    Court has concluded that the actionable statements falsely

5    accused Ms. Freeman and Ms. Moss of committing crimes.  This

6    is a serious type of defamation known as defamation per se.

7         When a defendant commits defamation per se, the

8    defendants need not prove that they were actually injured by

9    the statements; instead, the law presumes that plaintiffs

10   were injured.  In this case you may presume that the

11   actionable statements injured Ms. Freeman and Ms. Moss in

12   their trade, profession, and community standing, and lowered

13   them in the estimation of the community.

14        The conclusion that Mr. Giuliani made the

15   actionable statements without privilege to a third party

16   means that he did not have a separate legal right to make

17   them.

18        The conclusion that Mr. Giuliani published the

19   actionable statements with actual malice means that

20   Mr. Giuliani knew his statements about Ms. Freeman and

21   Ms. Moss were false, or he recklessly disregarded whether

22   they were true at the time that he published those

23   statements.  In other words, the Court has found that

24   Mr. Giuliani acted at least with a high degree of awareness

25   that the statements were probably false.

 1           The Court's finding that Mr. Giuliani caused harm

 2     to Ms. Freeman and Ms. Moss means that they suffered harm as

 3     a result of the defamation.

 4           The Court has also found Mr. Giuliani liable for

 5     intentional infliction of emotional distress.  That means

 6     that you are to accept, for purposes of this trial, that

 7     Mr. Giuliani intentionally inflicted emotional distress on

 8     plaintiffs by engaging in extreme and outrageous conduct

 9     that intentionally or recklessly caused Ms. Freeman and

10     Ms. Moss to suffer severe emotional distress.

11           The Court has also found that Mr. Giuliani engaged

12     in a civil conspiracy to commit the torts of defamation and

13     intentional infliction of emotional distress on or before

14     December 3, 2020, with Donald J. Trump, the Trump 2020

15     presidential campaign's legal team headed by Mr. Giuliani,

16     the One America News network -- called for short OAN -- OAN

17     reporters, and others.  That means that Mr. Giuliani agreed

18     with his co-conspirators to commit defamation and

19     intentional infliction of emotional distress and took

20     certain acts in furtherance of that agreement.

21           As a result of this finding, Mr. Giuliani is

22     liable in this case not just for the harm caused by his own

23     actions, but also for the harm caused by the actions that

24     his co-conspirators took in furtherance of the same

25     conspiracy.

1          Now, to address the unfairness to the plaintiffs

2     caused by Mr. Giuliani's willful failure to comply with his

3     discovery obligations, the Court has issued certain orders

4     about what facts must be assumed in this case, including

5     about damages.  And I will explain this again at the end of

6     the trial in final instructions that you will have in

7     writing, so if you don't want to try and jot all this down,

8     just listen carefully.

9          You will be required to assume certain facts in

10    calculating any awards of compensatory and punitive damages.

11         You must assume that Mr. Giuliani received

12    substantial financial benefits from his defamation of

13    Ms. Freeman and Ms. Moss.

14         You must assume that Mr. Giuliani was

15    intentionally trying to hide evidence about his financial

16    assets for the purpose of artificially deflating his net

17    worth.

18         You must assume that Mr. Giuliani was

19    intentionally trying to hide evidence about the viewership

20    of his video podcast and his social media reach for the

21    purpose of artificially deflating the reach of his

22    defamatory statements.

23         You must assume that Mr. Giuliani was

24    intentionally trying to hide evidence about the finances of

25    his businesses, Giuliani Communications LLC and Giuliani

1    Partners LLC, for the purpose of shielding his assets from

2    discovery and artificially deflating his net worth.

3         And you must assume Mr. Giuliani's businesses,

4    Giuliani Communications LLC and Giuliani Partners LLC,

5    continue to generate advertising revenue and other income

6    from their operations.

7         Now, as I have explained, your duty in this case

8    is limited to determining any amount of money damages to

9    award plaintiffs.  The amount of money awarded to a party in

10   a civil suit like this one is called damages.  The Court has

11   already determined that plaintiffs are entitled to an award

12   of two forms of damages, compensatory and punitive.

13        Compensatory damages are the amount of money that

14   will fairly and reasonably compensate plaintiffs for the

15   harm they have suffered.  As I will explain in greater

16   detail, in this case that harm is not limited to physical

17   and economic harm, but also may include things like

18   reputational harm, emotional harm, and mental harm.

19        Punitive damages are damages awarded to a

20   plaintiff above and beyond the amount of compensatory

21   damages.  Punitive damages are not intended to compensate a

22   plaintiff for the harm that the plaintiff has suffered.

23   Rather, the law permits a jury in a civil case to award a

24   plaintiff punitive damages against a defendant as a

25   punishment for outrageous conduct and to deter others from

1    engaging in similar conduct in the future.

2            I will instruct you in more detail later on the

3    legal standards for how to determine the amount of damages

4    owed.  For now I'm just going to give you some general

5    instructions.

6            As to the defamation claim, plaintiffs are

7    presumed to be harmed as a result of the defamatory

8    actionable statements, and thus they are not required to

9    present evidence of the harm they have suffered for you to

10   award damages to compensate them for that harm.  You are

11   entitled to consider any such evidence of harm, if it is

12   presented.

13           Plaintiffs' burden in presenting such evidence is

14   only to provide a reasonable basis from which you can

15   estimate the harm to the reputations from the defamatory

16   actionable statements.  While you may not engage in

17   speculation or guesswork, you are entitled to approximate

18   plaintiffs' damages based upon the evidence they present.

19           Furthermore, if you decide that the evidence does

20   not fully capture the harm that plaintiffs suffered as a

21   result of the damage to their reputations, you may award an

22   additional amount that using your good judgment and common

23   sense you decide is necessary to compensate them fully for

24   the harm caused to their reputations by the defamatory

25   actionable statements.

1          As to plaintiffs' intentional infliction of
2    emotional distress claim, plaintiffs must show by a
3    preponderance of the evidence that they suffered damages in
4    the form of emotional distress.  If you conclude that
5    plaintiffs have shown by a preponderance of the evidence
6    that plaintiffs suffered damages in the form of emotional
7    distress, plaintiffs' burden is then only to provide a
8    reasonable basis from which you can estimate their damages.
9    There is no exact standard or mathematical formula for
10   deciding the compensatory damages to be awarded for this
11   type of harm, nor is the testimony of any witness required
12   about the amount of compensation.
13          While you may not engage in speculation or
14   guesswork, you are entitled to approximate plaintiffs'
15   damages based upon the evidence they have presented.  To
16   decide the amount that would fairly and reasonably
17   compensate plaintiffs for emotional distress, you should
18   consider the facts of this case in the light of your
19   experience and common sense.
20          To establish a fact by preponderance of the
21   evidence is to prove that it is more likely so than not so.
22   In other words, a preponderance of the evidence means that
23   the evidence produces in your mind the belief that the thing
24   in question is more likely true than not true.
25          The fact that plaintiffs have filed a lawsuit

against Mr. Giuliani does not mean that plaintiffs' evidence is entitled to greater weight than any evidence the defendant may put before you.  If, after considering all of the evidence, the evidence favoring the plaintiffs' side of an issue is more convincing to you and causes you to believe that the probability of truth favors the plaintiffs on that issue, then the plaintiffs will have succeeded in carrying the burden of proof on that issue.

The term "preponderance of the evidence" does not mean that the proof must produce absolute or mathematical certainty.  For example, it does not mean proof beyond a reasonable doubt as is required in criminal cases.  For those of you who have sat as a juror in a criminal case, you will have heard of proof beyond a reasonable doubt.  That requirement does not apply in a civil case; and, therefore, you should put it out of your mind.

Whether there is a preponderance of the evidence depends on the quality, not the quantity, of evidence.  In other words, merely having a greater number of witnesses or documents bearing on a certain version of the facts does not necessarily constitute a preponderance of the evidence.  If you believe the evidence is evenly balanced on an issue that the plaintiffs had to prove, then the plaintiffs have not carried the burden of proof, and your finding on that issue must be for the defendant.

1          As to the final claim of civil conspiracy, the

2     Court has already determined that Mr. Giuliani acted as part

3     of a civil conspiracy to commit the torts of defamation and

4     intentional infliction of emotional distress on or about

5     December 3, 2020, with Donald J. Trump, the Trump 2020

6     presidential campaign's legal team headed by Mr. Giuliani,

7     the One America News network, OAN, and OAN reporters and

8     others.  That means, for purposes of determining damages in

9     this case, that it has already been decided that

10    Mr. Giuliani is liable for the harm caused not just by his

11    own actions, but also for the harm caused by the actions of

12    his co-conspirators taken in furtherance of the conspiracy.

13          Now I'm going to tell you about the parts of the

14    trial.

15          The trial begins with each side having a chance to

16    make opening statements.  The opening statements of the

17    lawyers are not evidence, and they're only supposed to be a

18    general statement of what the lawyers expect the evidence to

19    be.  They are intended to help you understand the evidence

20    which will be introduced.

21          After the opening statements, plaintiffs'

22    attorneys will present their witnesses in support of its

23    claim.  This is called direct examination.

24          When plaintiffs' counsel is finished, defense

25    counsel may ask questions of each witness put on by the

1    plaintiffs.  That is called cross-examination.

2            And after cross-examination is finished,

3    plaintiffs' counsel will have an opportunity to do a

4    redirect examination.

5            After the plaintiffs present their evidence, the

6    defendant may call witnesses to the stand and ask questions

7    on direct examination, and plaintiffs' attorneys may cross-

8    examine those witnesses.  And, again, the defense counsel

9    will have an opportunity for redirect examination after that

10   cross-examination is done.

11           During the testimony of witnesses you may

12   sometimes hear a lawyer ask a question which contains an

13   assertion of fact inside of the question.  For example:  The

14   car was going 90 miles an hour, wasn't it, Mr. Witness?

15   Please remember that no matter how sure or confident the

16   lawyer sounds when stating the question, the assertion of

17   fact by the lawyer in the question is not evidence.  Only

18   what the witness says in the answer is evidence.

19           So if the witness answers no, then there is no

20   evidence the car was going 90 miles an hour even though the

21   lawyer quite confidently said so.  There's only evidence to

22   that effect if the witness answers yes.

23           Now, during the course of this trial you may also

24   hear reference to deposition testimony.  A deposition is the

25   testimony of a person taken before trial.  Depositions are

1   used by parties in litigation to conduct discovery and to

2   preserve testimony for future use in the case, including at

3   trial.

4           At a deposition, the witness is placed under oath,

5   swears to tell the truth, and lawyers for each side may ask

6   questions.  The court reporter is present and records the

7   questions and answers.

8           During the trial you may view certain deposition

9   testimony presented by video.  You should give deposition

10  testimony the same fair and impartial consideration you give

11  any other testimony.  You should not give more weight or

12  less weight to deposition testimony just because the witness

13  does not testify in person or live here in the courtroom.

14          Now, after all the evidence has been presented,

15  the lawyers for plaintiffs and the defendant will have an

16  opportunity to make closing arguments in support of their

17  case.  The lawyers' closing arguments, just like their

18  opening statements, are not evidence in the case; they're

19  only intended to help you understand the evidence.

20          Finally, at the end of all of the evidence and the

21  arguments for both sides, I will give you your final

22  instructions on the law that you are to apply in your

23  deliberations, and then you will retire to consider your

24  verdict.  Your verdict must be unanimous.

25          Now I want to speak to you briefly about my job

1    and what your job is; that is, the functions of the judge

2    and the functions of the jury.

3          My responsibilities are to conduct this trial in

4    an orderly, fair, and efficient manner; to rule on legal

5    questions that come up during the trial; and to instruct you

6    about the law that applies in this case.

7          It is your sworn duty as jurors to accept and

8    apply the law as I state it to you.  Your job, ladies and

9    gentlemen, is to determine the facts.  You and only you are

10   the judges of the facts.  You determine the weight, the

11   effect, and the value of the evidence, as well as the

12   credibility or believability of the witnesses.  You must

13   consider and weigh the testimony of all witnesses who appear

14   before you and must decide the extent to which you believe

15   any witness.

16         You must pay careful attention to the testimony of

17   all the witnesses because you will not have transcripts or

18   summaries of the testimony available to you during your

19   deliberations.  You will have to rely on your memory and on

20   your notes, if you choose to take any.  It is your job to

21   resolve any conflicts in the testimony which may occur

22   during the trial and to decide where the truth lies, so

23   please pay careful attention.

24         You may consider only the evidence properly

25   admitted in this case.  That evidence includes the sworn

testimony of witnesses, exhibits admitted into evidence, and
facts stipulated to and agreed to by counsel.  You may
consider any facts to which all counsel have agreed or
stipulated to to be undisputed evidence and also the facts
that I will instruct you about as guiding your
determinations in this case.

You may also draw from the facts you find to be
proved such reasonable inferences as seem justified in light
of your experience.  Inferences are deductions or
conclusions that reason and common sense lead you to draw
from facts established by the evidence in the case.

As I have explained and will repeat to you before
your deliberations, there are certain inferences that you
must make in this case.  You must accept as true all the
factual matters already decided in this case as I have
explained to you in these instructions.  You must also
assume certain facts for purposes of the case, and I will
repeat those for you in the final instructions so you will
have them fresh during your deliberations.

Certain things are not evidence and must not be
considered by you, and this is a short list of three things
that are not evidence.

As I mentioned, statements, arguments, questions,
and objections by lawyers are not evidence.  Testimony that
the Court has excluded or told you to disregard is not

1    evidence and must not be considered.  And anything you may

2    have seen or heard outside the courtroom is not evidence and

3    must be disregarded.  You are to decide this case solely on

4    the evidence presented here in the courtroom.

5            During the trial, if the Court or a lawyer makes

6    statements or asks a question that refers to evidence you

7    remember differently, you should rely on your own memory of

8    the evidence during your deliberations.  It is your

9    recollection of the evidence that controls.

10           The lawyers in this case may object from time to

11   time when the other side asks a question, makes an argument,

12   or offers evidence that the lawyer believes is not properly

13   admissible.  You must not hold such objections against the

14   lawyer who makes them or the party the lawyer represents.

15   Indeed, it is the lawyers' job and responsibility to object

16   to evidence which he or she believes is not properly

17   admissible under the rules of evidence.

18           If I sustain an objection asked by a lawyer, you

19   should forget about the question because the question is not

20   evidence; and you must not guess or speculate what the

21   answer to the question might have been.  If a question is

22   asked and answered and I then rule that the answer should be

23   stricken from the record, you must forget about both the

24   question and the answer that was stricken.  You should

25   follow this same rule if it happens that any of the exhibits

1    are stricken.

2            If I overrule an objection to a question, you may

3    consider the answer and treat the answer like any other.  It

4    is still up to you to decide how much weight, if any, the

5    answer is entitled to.

6            Now, during this trial I may rule on motions or

7    objections by the lawyers, make comments to lawyers,

8    question witnesses, and instruct you on the law.  You should

9    not take any of my statements or actions as any indication

10   of my opinion about how you should decide this case in terms

11   of damages.  If you think that somehow I have expressed or

12   even hinted at any opinion as to how you should make your

13   decision about damages, you should disregard it.  The

14   verdict in this case is your sole and exclusive

15   responsibility.

16           Now, to ensure fairness, you must follow certain

17   rules about your conduct as jurors.

18           First, you are not permitted to discuss this case

19   with anyone until this case is submitted to you for your

20   decision at the end of my final instructions.  This means

21   that until the case is submitted to you, you may not talk

22   about it, even with your fellow jurors.  This is because we

23   don't want you making decisions until you've heard all of

24   the evidence and the instructions of law.

25           After I submit the case to you, you may discuss it

1   only when I instruct you to do so and only in the jury room

2   and only in the presence of all of your fellow jurors.  It

3   is important you keep an open mind and not decide any issue

4   in the case until after I submit the entire case to you with

5   my final instructions.

6           In addition, you may not talk about this case with

7   anybody else.  It should go without saying that you may not

8   write about the case electronically, through any blog

9   posting or other communication, including social networking

10  sites such as Facebook or Twitter/X until you have submitted

11  your verdict and the case is over.  This is because you must

12  decide the case based on the instructions I give you and

13  what happens in the courtroom and not on what someone else

14  may have said or told you outside the courtroom.

15          I am sure that when you go home tonight or when

16  you call work to let them know you've been selected for a

17  jury, you may be asked what kind of case you're sitting on.

18  You may respond that you've been selected as a juror in a

19  civil case, but nothing else.  Between now and when you are

20  discharged from jury duty, you must not provide to or

21  receive from anyone, including friends, co-workers and

22  family members, any information about your jury service.

23          As I said, you may tell them that you've been

24  selected to serve as a juror on a civil case, and you may

25  tell them how long you anticipate the case will last.  You

1    must not give any information about the case itself or the

2    people involved in the case because undoubtedly, if you do

3    that, the person you're speaking to may want to share his or

4    her own opinions about this case or the people involved, and

5    you must not hear that person's opinions, views, or

6    information because all those opinions, views, and

7    information may be wrong and have nothing to do with the

8    evidence that you're going to hear in this case.

9         You must also warn people not to try to say

10   anything to you or write to you about your jury service in

11   this case.  This includes face to face or by phone, text, or

12   email or through social media.  In this age of electronic

13   communications, I want to stress you must not use electronic

14   devices or computers to talk about this case, including

15   Tweeting, texting, blogging, emailing, posting information

16   on a website or chat room, or any other means at all.

17        Do not send or accept messages, including email or

18   text messages, about your jury service.  You must not

19   disclose your thoughts about your jury service or ask for

20   advice on how to decide this case.

21        When the case is over, you may discuss any part of

22   it with anyone you wish; but until then, you may not do so.

23        Second, although it is a natural human tendency to

24   talk with people with whom you may come into contact, you

25   must not talk to any of the parties or their attorneys or

1    any witnesses in this case during the time you serve on this

2    jury.  If you encounter people connected with the case

3    outside the courtroom, you should avoid having any

4    conversation with them, overhearing their conversation, or

5    having any contact with them at all.

6            For example, if you find yourself in a courthouse

7    corridor, elevator, or any other location where the case is

8    being discussed by attorneys, parties, witnesses, or anyone

9    else, you should immediately leave the area to avoid hearing

10   such discussions.

11           If you see any of the attorneys or witnesses

12   involved in the case or parties and they turn and walk away

13   from you, they are not being rude.  They're merely following

14   the same instruction not to have any contact with the jurors

15   in this case.

16           If you do happen to hear a discussion about the

17   case, you should report that to me as soon as possible just

18   by letting Mr. Coates know.

19           Third, it is unlikely, but if someone tries to

20   talk to you about this case, you should refuse to engage in

21   any conversation about the case and immediately let me know

22   by telling Mr. Coates.  Do not tell the other jurors.  Just

23   let me know, and I will discuss it with you privately.

24           Fourth, there may be reports in the newspaper or

25   on the radio, Internet, or television concerning this case

1    while the trial is going on.  If there should be such media

2    coverage in this case, you may be tempted to read, listen

3    to, or watch it.  You must not do so.  You must not read,

4    listen to, or watch such reports because you must decide

5    this case solely on the evidence presented in this

6    courtroom.

7            If you are exposed to any press coverage about

8    this case, you must tell me about it immediately by

9    informing Mr. Coates.  Again, you should not tell any of

10   your fellow jurors or anyone else.  I will speak to you

11   about it privately.

12           Fifth, because you must decide this case based

13   only on what occurs in the courtroom, you may not conduct

14   any independent investigation of the law or the facts in

15   this case or consult with anybody about the case.  That

16   means you may not conduct any research in books, newspapers,

17   or through Google searches about anybody involved in the

18   case or what happened in this case.

19           In this electronic age that also means you cannot

20   conduct any kind of research or ask somebody for research.

21   Research includes something even as simple or seemingly

22   harmless as using the Internet to look up a legal term.

23           I want to explain the reasons why you should not

24   conduct your own research or investigation.

25           All parties have a right to have the case decided

1    only on evidence and legal rules that they know about and

2    that they have a chance to respond to.  Relying on

3    information you get outside this courtroom is unfair because

4    the parties would not have a chance to refute it, to correct

5    it, or to explain it.

6           Unfortunately, information we get over the

7    Internet or from other sources, including media sources, may

8    be incomplete or misleading or just plain wrong.  It is up

9    to you to decide whether to credit any evidence presented in

10   court, and only the evidence presented in court may be

11   considered by you.  If evidence or legal information has not

12   been presented in court, you cannot rely on it.  Moreover,

13   if any of you do your own research about the facts or the

14   law, this may result in different jurors basing their

15   decisions on different information.  Each juror must make

16   his or her decision based on the same evidence and under the

17   same rules.

18          Finally, ladies and gentlemen, do not make up your

19   mind during the trial about what your final decision will

20   be.  Keep an open mind.  Do not decide any issue in the case

21   until after I submit the entire case to you with my final

22   instructions.  Then you and your fellow jurors may discuss

23   the case during deliberations and reach your decision.

24          Your job is to decide this case without prejudice,

25   without fear, without sympathy, without favor, and based

1    only on a fair consideration of the evidence presented in

2    this courtroom.  It is for that reason you must completely

3    disregard any press, television, or radio reports that you

4    may read, see, or hear about this matter.  If any such

5    reports come to your attention, it is your sworn duty to put

6    it aside and direct your attention elsewhere.

7            Now, at the beginning of the jury selection

8    process you were introduced to the parties in person, and

9    other witnesses were identified to you only by their name

10   being said.  I want to emphasize that if at any time during

11   the trial you suddenly think you recognize or might know a

12   witness or someone referred to in the testimony or evidence,

13   you should not tell any other members of the jury.  Just let

14   Mr. Coates know, and I will speak to you privately about it.

15           Now, the schedule we're going to follow during the

16   trial is that we will try to start promptly at 9:15 a.m. in

17   the morning.  We'll take a short midmorning break and a

18   lunch break from about 12:30 to 1:30 p.m., and then take a

19   midafternoon break and end around 5:00.

20           You will spend most of your time during the trial

21   either in the courtroom or in the jury room.  I urge you not

22   to leave your valuables in the jury room, your purses, your

23   wallets, or anything of value.  Keep your valuables with

24   you.

25           So thank you very much for your attention, and

1    we're now going to proceed with opening statements starting

2    with plaintiffs' opening statement.

3              Do you want a lapel mic?  Would that be easier

4    than holding it?

5              MR. DuBOSE:  This is probably easier.

6              THE COURT:  Okay.  Fine, your preference.

7              MR. DuBOSE:  What's in a name?  Power, purpose,

8    pride.  I represent the plaintiffs in this case, Ruby

9    Freeman and Shaye Moss.

10             My name is Von DuBose.  I got my name from my

11   father:  Willie Lavon DuBose.  Thank goodness they spared me

12   the Willie.  We don't have any Willie's here, do we?

13             Okay.  But if they had named me Willie Lavon

14   DuBose, Jr., or the second, I would have been very proud to

15   be Willie Lavon DuBose, Jr.

16             Why?  Because names are important.  It's one of

17   the first thing a child learns.  It's their name.  Names are

18   important.  Names are significant.  They often connect us to

19   our family.  They sometimes connect us to our homeland.

20   They're descriptive.  They often define us.  They're

21   important personally.  They're important in business.

22   They're often our personal brands in business.

23             Names are how people find us.  Names are how

24   people identify us.  The great golfer Ben Hogan said, "Your

25   name is the most important thing you own.  Don't ever do

1    anything to disgrace or cheapen it."

2          But what happens if someone else disgraces or

3    cheapens that name?

4          Ladies and gentlemen, that's what this case is

5    about.  It's about names that have been disgraced and

6    cheapened.  Two names in particular:  Ruby Freeman and Shaye

7    Moss.

8          This case isn't about their names in the abstract.

9    It's about what their names mean today versus before

10   Mr. Giuliani engaged in the conduct at issue in this case.

11         This case is about how Mr. Giuliani and his co-

12   conspirators took these folks' good name and made their

13   names as a call to action for millions and millions of

14   people who did not want to accept the results of the 2020

15   presidential election.  You will hear how Mr. Giuliani and

16   his co-conspirators stole the lives of Ms. Freeman and

17   Ms. Moss by destroying their names.

18         Now, you may be asking yourselves:  How do you

19   destroy a name?  What was the result of this call to action

20   I'm speaking of?  What does that look like, to destroy a

21   name?  What does that sound like?  Emotionally, what does it

22   feel like?

23         Let's start with evidence of what it sounds like.

24         And before we get to that evidence, I just want to

25   take a second to thank you, each of you, for assisting us in

1    this case and serving as jurors.  As the judge said, it's an

2    important civic duty, and we really appreciate your time and

3    attention.

4            Now, back to what this evidence sounds like.  I'll

5    warn you what you're about to hear is graphic.

6            (Audio played)

7            MR. DuBOSE:  Those are just a few of the hundreds

8    and hundreds of messages that Ms. Freeman and Ms. Moss

9    started receiving on December 3, 2020.  We will get back to

10   them in a moment, but let's start with how we ended up here.

11           In the aftermath of the 2020 presidential

12   election, Mr. Giuliani set about concocting a scheme to

13   ensure that President Trump would stay in power even though

14   he lost the election.

15           Of course, Mr. Giuliani is well known throughout

16   the country and even the world.  He had access to a massive

17   national audience via various podcasts and platforms that he

18   owns, operates, and makes money from.

19           Mr. Giuliani spearheaded a team of lawyers and

20   investigators, some of whom you see here (indicating) and

21   who you will hear deposition testimony from during this

22   trial.  Their scheme was to stop the certification of the

23   2020 election and to change the outcome in several states

24   that Trump expected to win but didn't, like Georgia.

25           The evidence will show that Ms. Moss helped count

1    votes in Georgia in the 2020 presidential election, just as

2    she had at every election since 2012.

3         The evidence will show that Shaye started working

4    for the Department of Registration and Elections in Fulton

5    County, Georgia.  She actually worked her way up from the

6    mailroom to elections supervisor.  It was the only job she

7    ever had, and the only job she ever wanted.

8         The right to vote is sacred.  It was a privilege

9    to help ensure the right to vote and to have everybody's

10   vote count.

11        Despite the global pandemic, Shaye's mom, Ruby

12   Freeman, signed up to serve as a temporary worker in that

13   election as well.

14        Both Ms. Freeman and Ms. Moss reported to the

15   State Farm Arena in Fulton County on November 3, 2020.  They

16   reported before the sun came up and spent every hour of that

17   day and some into the next helping to count absentee

18   ballots.

19        Now, besides the stress of a busy and very long

20   day, November 3rd was unremarkable.  They showed up, they

21   worked hard, and they went home.

22        And within a few days news outlets projected Joe

23   Biden the winner of the 2020 presidential election in

24   Georgia.  The Secretary of State of Georgia, Brad

25   Raffensperger, ordered a hand recount of every ballot in the

1     state on November 11, 2020; and he joined Georgia Governor

2     Brian Kemp in certifying Georgia's election for president on

3     November 20th.

4              But Mr. Giuliani and his co-conspirators were

5     determined not to accept these results.  Instead, they chose

6     to scapegoat Ms. Freeman and Ms. Moss as the reason

7     President Trump lost the state of Georgia.  They used their

8     names as a cornerstone of a call to action.

9              Beginning on December 3, 2020, Mr. Giuliani and

10    his team started telling an audience of millions that

11    surveillance video footage from State Farm Arena of ordinary

12    ballot processing was evidence of these two women stealing

13    an entire election.

14             What we see here is a snapshot of the State Farm

15    Arena video.  You also see here circled in red Ms. Freeman

16    and Ms. Moss.

17             Now, beginning on December 3, 2020, Mr. Giuliani,

18    like in the Tweet you see here, and his team started telling

19    an audience of millions that video footage of ordinary

20    ballot processing of State Farm Arena was evidence of

21    election fraud.

22             (Audio played)

23             MR. DuBOSE:  As you will hear in more detail

24    shortly, none of that -- none of that -- was true.  But the

25    millions of people who heard the lies didn't wait for

 1   confirmation.

 2           So what happened?  Strangers called, emailed,

 3   texted, and messaged Ms. Freeman, Ms. Moss, and even

 4   Ms. Moss's then-14-year-old son acting on what Mr. Giuliani

 5   told them; that Ms. Freeman and Ms. Moss were criminals who

 6   had stolen the election from President Trump; that Ruby and

 7   Shaye were traitors to our country.  And the response from

 8   those Mr. Giuliani called to action was swift, it was

 9   racist, and it was vicious.

10           They said that Ruby and Shaye deserved to hang

11   from trees for treason, hang from the United States Capitol,

12   close enough so people could hear their necks snap; that

13   Ruby and Shaye belonged in jail or dead or taken out to the

14   street in trash bags.

15           One message told Ms. Freeman they knew where she

16   slept at night.  Another said, "Hey nigger, we're coming to

17   get you."

18           One stranger told Ms. Moss on the phone -- told

19   her son on the phone that he should hang alongside his

20   mother.  Hundreds and hundreds of messages, too many to read

21   them all.

22           Now, Georgia officials publicly investigated

23   Mr. Giuliani's claims and found that there was no evidence

24   that Ms. Freeman or Ms. Moss deviated from any process.

25   There was no evidence to suggest fraud.

1          You will hear from two of the official state

2     investigators who reached those conclusions.  You will hear

3     that they found that Ms. Freeman and Ms. Moss did not kick

4     out the media or any observers.  You will hear from one of

5     those observers, too, who will tell you that she was not

6     kicked out, she simply left on her own, and would have said

7     as much to Mr. Giuliani, if he had only asked.

8          That Ms. Freeman and Ms. Moss did not hide or

9     smuggle any mystery ballots or make up a story about a water

10    main break; that Ms. Freeman and Ms. Moss did not scan or

11    count fraudulent ballots; that they did not pass around USB

12    or flash drives to manipulate voting machines.

13          In fact, the evidence will show that what

14    Ms. Freeman passed to Ms. Moss was a ginger mint.  A ginger

15    mint.  A small piece of candy from mother to daughter.

16          And what you will not see in this case is any

17    video that shows my clients passing around a USB drive or

18    inserting one into any voting machines.  You won't see it

19    because it doesn't exist.  And Georgia officials said as

20    much publicly beginning the day after Mr. Giuliani and his

21    team started using the State Farm Arena video to claim

22    fraud.

23          (Audio played)

24          MR. DUBOSE:  That was Gabriel Sterling, the

25    Georgia Secretary of State employee who was in charge of the

1   election when on December 4th he confirmed the videos showed

2   normal ballot processing.

3        And here he is, Mr. Sterling, just a few days

4   later.

5        (Audio played)

6        MR. DUBOSE:  You will see that two of the members

7   of Mr. Giuliani's team who were deposed during discovery in

8   this case will not answer any of our questions about their

9   statements or about the State Farm video.  Instead, they

10  asserted their Fifth Amendment right against self-

11  incrimination 309 times in one instance and 448 times in the

12  other instance.  And this is all in one deposition.

13        In the days after December 4, 2020, words turned

14  to actions.  Ms. Freeman will tell you how strange people

15  began to show up at her house pounding on her door, ringing

16  her doorbell.  Strange people also showed up to the house of

17  Ms. Freeman's mother -- that's Ms. Moss's grandmother --

18  looking for Ms. Freeman and Ms. Moss saying they were there

19  to make a citizen's arrest.

20        The threats and the harassment started to wane a

21  bit around the Christmas holidays in 2020, and there was

22  some hope that the worst had passed.  But Mr. Giuliani's

23  plan was just heating up.

24        You will hear testimony about a blueprint called

25  the Strategic Communications Plan of the Giuliani

1    Presidential Legal Defense Team.   The plan's express purpose

2    was to create public pressure to disregard the results of

3    the election by spotlighting so-called fraudulent vote

4    counts in key states, states like Georgia.

5             The Giuliani Strategic Plan used Ms. Freeman's and

6    Ms. Moss's names as a call to action.   It contemplated

7    specifically targeting them by name.   It contemplated using

8    the State Farm video to claim Ms. Freeman and Ms. Moss stole

9    the election by excluding observers and stuffing ballots.

10            The Giuliani Strategic Plan would label

11   Ms. Freeman a criminal under arrest even while acknowledging

12   that there was no evidence that Ms. Freeman was under

13   arrest.

14            You will hear that Mr. Giuliani and his co-

15   conspirators worked on the plan for weeks and ultimately

16   emailed and presented it to the president's chief of staff

17   in late December of 2020.   Mr. Giuliani, President Trump,

18   and the Trump campaign turned the plan into a call to

19   action.

20            (Audio played)

21            MR. DuBOSE:   Now, let's talk about what has

22   already happened in this case.   The Court has already found

23   those post December 3, 2020, statements constitute

24   defamation as a matter of law.   That means that Mr. Giuliani

25   published false and defamatory statements -- also known as

1    lies -- about Ms. Freeman and Ms. Moss, and those statements

2    caused them harm.

3          The Court has already found that Mr. Giuliani

4    intentionally inflicted emotional distress on Ms. Freeman

5    and Ms. Moss by engaging in extreme and outrageous conduct.

6          And the Court has already found that Mr. Giuliani

7    engaged in a civil conspiracy, a civil conspiracy to commit

8    defamation and intentional infliction of emotional distress.

9    That means that Mr. Giuliani is liable not only for the

10   harms his own actions caused, but also for the actions his

11   co-conspirators took in furtherance of their conspiracy.

12         These findings of liability make this case

13   somewhat unusual.  This trial is unusual because the Court

14   has already made these findings of liability.  You won't see

15   us up here trying to prove that each of the statements we're

16   here about are false.

17         As the judge has informed you, your job here is

18   not to determine whether Mr. Giuliani engaged in wrongful

19   conduct or whether that conduct caused injury to our

20   clients.  The Court has already decided that to be the case.

21         As the Court explained, your only job is to

22   determine any amount of monetary damages Ms. Freeman and

23   Ms. Moss should receive.

24         You will hear directly from Ms. Freeman and

25   Ms. Moss over the course of this week.  They will explain as

1    best they can what it's like to have their life hijacked in

2    an instant through no fault of their own and all for

3    political motives.

4         You will hear from Ms. Moss, and she will explain

5    that when the threats started, she didn't even know what

6    "treason" meant.  She had to ask a friend whether that meant

7    that people could exact vigilante justice against you.  She

8    started to have nightmares, nightmares of her son finding

9    her hanging from a tree alongside her mom.

10        She will explain why she felt compelled to leave

11   the job she loved, and the only one she had ever known,

12   because she knew she would never be allowed to touch another

13   ballot.  Ms. Moss will explain the humiliation she felt when

14   she tried to find another job, including going to interview

15   at a Chick-fil-A, only to have the interviewer pull up an

16   article online accusing her of committing election fraud.

17        "Is this you?"

18        She put her head down and walked out in shame.

19        And you'll hear from Ms. Freeman.  You will hear

20   how strange people beat on her door at all times of the

21   night; how on January 5, 2020, the day before the Capitol

22   insurrection here in Washington, a pack of strangers

23   carrying flags and yelling through bullhorns gathered

24   outside of her house.

25        But she wasn't there.  She wasn't there because

1    earlier that day the FBI told her it wasn't safe at her

2    house, and she should leave.  She should leave her home

3    until at least January 20th, the time of the presidential

4    inauguration.

5          You'll hear how Ms. Freeman was alone without

6    anywhere to turn, anyone to go to.  The multiple security

7    cameras and the security system that she set up at her home

8    could not restore her sense of security.  So she put the

9    home she lived in for more than 20 years and the home she

10   never wanted to leave, the neighborhood she never wanted to

11   leave, she put her home on the market and left and went to a

12   place where no one can trace her name.

13         And speaking of her name, she now lives in fear of

14   hearing it.  She's had to change the name of her business.

15   You will hear how she took such pride in being known as Lady

16   Ruby.  She's no longer Lady Ruby because she's scared to use

17   that name.

18         Now, at the end of this case we're going to come

19   back to you and ask you to award damages.  Now I'm going to

20   turn the podium to my colleague, Mike Gottlieb, who will

21   discuss the types of damages you can award Ms. Freeman and

22   Ms. Moss and the factors to consider when awarding those

23   damages.

24         Thank you.

25         MR. GOTTLIEB:  Good afternoon, ladies and

1    gentlemen.  My name is Mike Gottlieb, and, with Mr. DuBose

2    and our other colleagues here at counsel's table, we have

3    the privilege of representing Ruby Freeman and Shaye Moss.

4            Mr. DuBose has previewed some of the evidence that

5    you'll hear in the case, and what I'd like to do is spend a

6    shorter amount of time talking with you about the damages

7    and how we'd like you to apply the evidence that you'll hear

8    to the damages findings that you'll make in this case.  And

9    I'd suggest to you that your job here this week is at the

10   same time simple and challenging.

11           It's simple because the evidence that you will

12   hear of the harm that our clients have suffered is

13   overwhelming.  You've just heard some of it, and you'll hear

14   some more.

15           But your job is challenging because we're going to

16   ask you to attach numbers to harms that are inherently

17   difficult to quantify in dollars and cents.  How much is

18   someone's reputation worth?  What about peace of mind,

19   dignity, safety, or the right to pursue the career you want

20   or the life you want?

21           We can't decide those questions for you, but we

22   can and will help guide your path with evidence.

23           We'll ask you to award two types of damages in

24   this case:  compensatory and punitives.  The Court has

25   instructed you on each of these and will instruct you again,

1    but we want to spend a few minutes setting the scene for the

2    evidence that you'll hear.

3            The concept of compensatory damages is simple.

4    They're designed to provide fair and just compensation to

5    Ms. Freeman and Ms. Moss for the harm they've suffered.

6            Now, you may hear us throughout this trial talking

7    about emotional distress damages, reputational damages,

8    defamation damages, actual damages.  Whenever we say any of

9    those things, we're talking about compensatory damages;

10   they'd just be different kinds of compensatory damages.

11           Punitive damages are the second type, and they're

12   different.  As you've heard already, they're designed to

13   punish outrageous conduct and to deter others from engaging

14   in that kind of conduct.

15           Now, as the Court will instruct you, there's no

16   mathematical formula that you're required to follow for any

17   of these kinds of damages awards.  We aren't required to

18   calculate out the damages with numerical precision down to

19   the last dollars and cents, and that's especially true in

20   this case.

21           As the Court has instructed you, the statements

22   Mr. Giuliani has made about our clients are so harmful and

23   so damaging that the law allows you to presume damage.

24   Certain kinds of false accusations, like falsely calling

25   someone a criminal, are serious enough that the law assumes

1    that that harms a person's reputation, and that's certainly

2    the case here.

3              But we won't ask you to just rely on that

4    presumption.  We will show you evidence that gives you a

5    reasonable basis to estimate the harm to Ms. Freeman and

6    Ms. Moss's reputations.

7              As Mr. DuBose has explained, you will hear from

8    Ms. Freeman and Ms. Moss at the beginning and end of our

9    case.  They will tell you about the campaign of defamation

10   and the emotional terror that they experienced.  You will

11   hear about what was stolen from them, their choices about

12   where to live and where to work, their feelings of happiness

13   and security, and the safety and innocence of their

14   families.  That testimony, I submit, will guide your

15   emotional harm and damages award.

16             You will also hear about the volume of threats and

17   derogatory comments that were made against our clients.

18   You're about to hear testimony from Ms. Regina Scott, a

19   long-time career law enforcement professional who works at a

20   company called Jensen Hughes.  Ms. Scott and her colleagues

21   monitor online statements to mitigate threats.  They've done

22   so for Ms. Freeman and Ms. Moss.  And Ms. Scott will testify

23   about what they found.

24             Ms. Scott will testify about how our clients have

25   faced an overwhelming volume of negative and threatening

1    online criticism starting in early December of 2020.  After

2    December 3rd of 2020, vile, racist, hateful comments

3    rocketed across the Internet; and fuelled by Mr. Giuliani

4    and his co-conspirators, those comments have never stopped.

5           Ms. Scott's testimony will show you how for a

6    staggering number of Americans the names "Ruby Freeman" and

7    "Shaye Moss" have become synonymous with crime, cheating,

8    and fraud.

9           You've also already heard that the harm our

10   clients suffered was no accident.  As early as December 4,

11   2020, Mr. Giuliani fired up his microphone and headset and

12   said that our clients' homes should be visited, their

13   offices should be searched, and they should be arrested.

14   The Giuliani Team Strategic Plan laid out in writing how

15   Mr. Giuliani and his co-conspirators intended to destroy

16   Ms. Freeman and Ms. Moss's reputations.  The plan's talking

17   points branded our clients as criminals and detailed how to

18   promote that brand, the criminal brand, through presidential

19   Tweets, campaign ads, and like-minded influencers on social

20   media.  They targeted Ruby and Shaye, falsely accused them

21   of midnight crimes, and spread those lies around the world.

22          The plan succeeded because it had at its disposal

23   the most powerful amplifier on earth, the social media

24   accounts of Donald J. Trump.  In a January 2, 2021, phone

25   call that you've heard a clip from already, to Georgia

1     Secretary of State Brad Raffensperger that was circulated

2     around the world, President Trump bragged about how Ruby

3     Freeman's reputation was devastated, parroted the strategic

4     plan's lies about Ruby and Shaye, and turned "Where's Ruby?"

5     into an Internet meme, the kind of thing you could put on a

6     T-shirt or a coffee cup.

7             Plaintiffs will offer testimony from the only

8     expert witness in this case, Dr. Ashlee Humphreys.  She's a

9     PhD who teaches and writes about the spread of information

10    across social media and traditional media platforms.  She

11    has expertise in how and why information spreads online.

12    She also knows how people and companies fight back.

13            Dr. Humphreys has quantified the reach of the

14    statements that Mr. Giuliani and his co-conspirators made

15    about Ms. Freeman and Ms. Moss.  You will hear how she

16    estimated the reach of these statements through what she

17    calls an impressions model.  And you'll see how that model

18    allows her to trace Mr. Giuliani's false accusations, words

19    like "known vote scammer," across traditional and social

20    media and estimate the number of impressions that occur as a

21    result.

22            Dr. Humphreys will show you how Rudy Giuliani and

23    Donald Trump saturated the Internet with lies about

24    Ms. Freeman and Ms. Moss to the tune of hundreds of millions

25    of views.  Dr. Humphreys has quantified 52 statements by

1      Mr. Giuliani, Mr. Trump, and the Trump campaign classified

2      as the emotional harm statements.  These were published

3      between December 3rd and December 22nd of 2020.  Those

4      statements by themselves generated between 111 and 249

5      million impressions.

6              She has also quantified the 16 statements

7      classified as the defamation statements or the actionable

8      statements in this case which started on December 23, 2020.

9      Those had between 35 million and 56.7 million receptive

10     impressions, a concept that she will explain further in her

11     testimony.

12             Dr. Humphreys will also offer an impact

13     assessment.  That assessment analyzes online search data and

14     social media commentary about Ms. Freeman and Ms. Moss by

15     looking at tools like Google Trends starting after

16     Mr. Giuliani and his co-conspirators started spreading the

17     claims that the plaintiffs had engaged in election fraud.

18             Dr. Humphreys will share her findings that

19     negative and violent commentary about Ms. Freeman and

20     Ms. Moss began early in December of 2020, hasn't stopped,

21     and had significant, lasting, and ongoing negative impact on

22     their reputations.

23             Based on these models, Dr. Humphreys will offer

24     you a damages model that is tailored to the statements that

25     the Court has found constitute defamation in this case.

1          Building on her impressions model, Dr. Humphreys

2     has calculated in dollars and cents a way to measure the

3     reputational harm that Ms. Freeman and Ms. Moss suffered.

4     You'll hear that one way to measure reputational harm is to

5     estimate a cost to repair the damage.

6          If an arsonist burned down your home, you'd want

7     to know how much would it cost to rebuild it.  It's similar

8     for reputation.  Unfortunately it's way easier to tear down

9     a reputation than it is to build it back up, but repair is

10    possible.  It can be done.  It's accomplished by finding

11    trusted messengers, better known these days as influencers,

12    who can offer positive statements to the audience that were

13    prone to believe the defamatory messages or the negative

14    messages.  And the way to do that, it turns out, is to

15    design a Strategic Communications Plan.

16         You'll hear more about Dr. Humphreys'

17    methodologies and calculations in her testimony.  For now

18    know that Dr. Humphreys will testify that the cost to repair

19    the damage done to Ms. Freeman and Ms. Moss's reputation

20    likely ranges between $17 and $47 million for the defamatory

21    statements in this case alone.  She will give you principles

22    to help you decide what number within that range is most

23    appropriate.

24         We will ask you to award reputational damages to

25    Ms. Freeman and Ms. Moss based on Dr. Humphreys' estimated

1    cost to repair their reputations.  We will ask you to add to

2    that number the more than $1 million of expenses and costs

3    Ms. Freeman and Ms. Moss have suffered for things like lost

4    wages, Ms. Freeman's forced relocation to a new home,

5    security expenses, and more.

6          We expect you'll find that this evidence in total

7    warrants an award of compensatory damages for harm to

8    reputation and reputation alone in the tens of millions of

9    dollars.

10          Now, as you've heard, this is an unusual case.

11   The Court has explained that certain decisions have been

12   made already.  Some of those include adverse inferences or

13   findings that you'll need to follow.

14          As you'll hear, you can consider factors like

15   Mr. Giuliani's net worth when you're making your damages

16   decisions.  But you won't hear much evidence about that in

17   this trial, and that's because, as the Court has instructed

18   you, Mr. Giuliani refused to comply with his discovery

19   obligations, and you must therefore presume that he

20   intentionally tried to hide evidence about his financial

21   assets to deflate his net worth.

22          You also must consider other things that

23   Mr. Giuliani hid, like the information that would have

24   confirmed the reach of his podcasts, radio shows, and other

25   platforms, advertising revenue.  Please keep these

 1    inferences in mind as you listen to the evidence that you

 2    hear this week.

 3            So where does that leave us?

 4            At the close of evidence, we'll ask you to award

 5    compensatory and punitive damages.  For reputational damages

 6    Dr. Humphreys will offer a conservative estimate to quantify

 7    our clients' reputational harm.  And we'll ask you to add

 8    that number to the out-of-pocket expenses that you'll hear

 9    that our clients have incurred.  That number, we will submit

10    to you, will be in the tens of millions of dollars, and with

11    good reason.

12            The value of our reputations is not defined by our

13    income brackets, and here, where reputation has been

14    shattered and that harm endures, the damages should be

15    substantial.

16            How about emotional harm?  We know that emotional

17    harm by its very nature is difficult to quantify, and

18    ultimately it will be up to you to make a decision as to

19    what is fair and just based on the evidence.

20            You'll hear from Ms. Freeman and Ms. Moss about

21    their mental pain and suffering, the loss of livelihoods,

22    homes, senses of security.

23            You'll hear from Ms. Scott and Dr. Humphreys about

24    the nature, the volume, and the reach of the statements and

25    threats.

 1          And we submit that together this evidence will

 2     give you a yardstick for measuring the scope of the insult,

 3     the humiliation, and the embarrassment that our clients were

 4     made to suffer.

 5          We submit that Ms. Freeman's and Ms. Moss's

 6     emotional harm is extraordinary; and if you listen to how

 7     they have suffered through the perpetual nightmare that

 8     started in November 2020, you will find your way to a just

 9     and fair award.

10          Last, we will ask you to award punitive damages.

11     For that, we will ask that you sit with the gravity of what

12     Mr. Giuliani and his co-conspirators did.  We will ask you

13     to think about how needless, how cruel it is for powerful

14     figures like Mr. Giuliani to target election workers, to

15     brand volunteers and civil servants as fraudsters and

16     criminals, without evidence, knowing that millions of people

17     will believe and act upon those lies; in fact, intending for

18     millions of people to believe and act upon those lies.

19          The next Ruby Freeman and Shaye Moss might be

20     election workers, but they could just as easily be police

21     officers, school board members, librarians, teachers.

22          So we ask you as you hear the evidence over the

23     course of the next few days, when you think about punitive

24     damages, consider a verdict that will send a message, and

25     that message is this:  In the United States of America,

1    behavior like Rudy Giuliani's is not the inevitable result

2    of politics.  It is not acceptable, and it will not be

3    tolerated.

4              Thank you.

5              THE COURT:  Mr. Sibley.

6              MR. SIBLEY:  May it please the Court.  This is a

7    little bit of a strange case because I'm going to stand here

8    and have to tell you that my client did something wrong.

9    Her Honor has already ruled that, and so your function here

10   is going to be to determine to what extent were the

11   plaintiffs damaged.

12             And there's really no question that these

13   plaintiffs were harmed.  They're good people.  No question

14   about that.  They didn't deserve what happened to them.

15             But what happened to them was something that

16   happened because of a controversy that involved a lot of

17   people.  It wasn't just Rudy Giuliani.  And we think what

18   the evidence will show -- no question they were harmed, but

19   there's not going to be a lot of evidence of linking

20   Mr. Giuliani to the harm that they're complaining of because

21   of the breadth of people involved that are far beyond this

22   alleged conspiracy or the conspiracy that the Court will

23   instruct you on.  And it is the plaintiffs' burden in this

24   trial to prove how much damage that Mr. Giuliani caused to

25   them and intended to cause to them as opposed to other

1   persons.

2          And I want you to remember a term that I think the

3   Court is going to talk to you about, may have already talked

4   to you about, certainly will when you get to the final jury

5   charge, which is the term "proximate cause."  And what that

6   really means is "but for."  In other words, if it hadn't

7   been for what Mr. Giuliani did, would the events in

8   question, would the harm that the plaintiffs have suffered

9   have occurred.

10          And make no mistake about it, you're going to see

11   a lot of evidence of harm.  In fact, you've already seen a

12   lot of it.  But not much evidence that Mr. Giuliani was the

13   cause.  For example, you saw those horrible calls.  Not one

14   of those calls, not one of those correspondences mentioned

15   anything about Mr. Giuliani.  These were from a lot of

16   random people who had seen this, as the plaintiffs' own

17   slides indicate, all over the Internet.

18          And so there's no evidence that Mr. Giuliani

19   intend -- certainly did not intend for those types of things

20   to occur.  He never promoted violence against these women.

21   He never -- there was never any racist statements made about

22   these women.  This was something that other people did

23   independent of Mr. Giuliani.

24          And I want you to pay attention to that evidence

25   in this trial of proximate cause, because it's not about the

1    presentation of counsel.  It's not about theatrics or

2    emotion.  It's not about the skill of this very fine group

3    of lawyers.  It's not how many witnesses that they have.

4    But it's what can actually be attributed proximate-cause-

5    wise to Mr. Giuliani.

6              There's no guilt by association here.  He can't be

7    judged because of his political beliefs or, you know,

8    whatever he thought about the election.

9              What can we say Mr. Giuliani -- what harm can we

10   say that he caused the plaintiffs?  This is important

11   because the amount of damages they're claiming is truly

12   incredible.

13             A lot of you probably have followed or may have

14   followed the Johnny Depp trial.  That was a pretty big

15   defamation trial.  And the amount of damages they're going

16   to ask for are far in excess of what Johnny Depp was awarded

17   at his trial.  And we're going to hear from some witnesses

18   they have about why they have that number, and I think you

19   need to ask yourself how plausible is that figure.

20             THE COURT:  Mr. Sibley, let's stick to this case,

21   not other cases.

22             MR. SIBLEY:  Yes, Your Honor.

23             And I'm not saying that movie stars are more

24   important than these women.  In fact, I would make the

25   argument that they're more important than any Hollywood

1    celebrity because, as has been pointed out, they're serving

2    an important function in our democracy by being election

3    workers, and their reputations and good name are just as

4    important.  But at some level you have to tie the amount of

5    damages they're claiming to something, and we don't think

6    that they're going to be able to show you that the amount of

7    damages they're asking for can be rightly attributable to

8    any reasonable basis.

9         I'm going to tell you something now.  I've never

10   said this before in a trial as a defendant, but I'm going to

11   say it now because we have to.

12        At the end of this, in closing argument before you

13   go back and decide what you're going to do here, I'm going

14   to ask you to award an amount of damages against my client

15   because the Court has already ruled he is liable for

16   damages.  How much those damages are are where you come in.

17   And I'm going to give you a number, and I want you to pay

18   attention to the evidence of proximate cause in this case.

19   What is the weight of the evidence with respect to what

20   Mr. Giuliani did and how his conduct harmed the plaintiffs

21   and whether it would have happened anyway if Mr. Giuliani

22   had never been involved in any of this.

23        And I'm going to give you a number, and I think

24   it's going to be fair and proportionate to the harm that the

25   plaintiffs suffered that Mr. Giuliani was responsible for

1     and intended.  But I want you to see all of the evidence

2     before we -- before you decide on that.

3            This isn't a criminal case, but the principles

4     here are very much the same, and that is the punishment

5     really should fit the crime.  And what the plaintiffs'

6     counsel are asking for here in this case is really the civil

7     equivalent of the death penalty, because if you award the

8     amount of damages they're asking for, it will be the end of

9     Mr. Giuliani.

10           And you're going to get to meet him throughout --

11    during this trial.  And you're going to hear from a lot of

12    witnesses.  And I want you to come back with an award at the

13    end -- and keep in mind the evidence -- that's fair,

14    appropriate, and just.

15           We're going to ask you to do justice solely based

16    on what the plaintiffs are able to show you here at trial.

17    And, again, it's their burden, not ours.

18           Thank you.

19           THE COURT:  All right.  Why don't we take a short

20    ten-minute break before plaintiffs call their first witness.

21           (Jury exits courtroom)

22           THE COURT:  Yes?

23           MR. DuBOSE:  Brief housekeeping matter.

24           THE COURT:  Yes.

25           MR. DUBOSE:  So we -- there was some discussion at

1    the pretrial conference about batch-admitting a certain

2    amount of documents.  I have a number of them.  And we can

3    do it however you like, prior to the jury coming back or

4    now.

5              THE COURT:  We can do it now, if you like.

6              Mr. Sibley, are you ready to do it now?

7              MR. SIBLEY:  I'm sorry, Your Honor.  I was

8    conferring with my client.  I didn't hear Mr. DuBose.

9              THE COURT:  It's the batch admission of exhibits.

10   Is this for the first witness?

11             MR. DuBOSE:  We can do it witness by witness.  I

12   have plenty of them.  So we can go through a large batch, or

13   whatever your preference is, Judge?

14             THE COURT:  Why don't we do it witness by witness.

15             MR. DuBOSE:  Okay.  We also have some that pertain

16   to the open as well.

17             THE COURT:  To what?

18             MR. DuBOSE:  To the open as well.

19             THE COURT:  Okay.  Have you both agreed to this

20   list?

21             MR. SIBLEY:  I --

22             THE COURT:  Do you want a second, Mr. Sibley, to

23   look at it?

24             MR. SIBLEY:  We have it in an email, I'm assuming.

25             THE COURT:  Okay.  We're going to take our ten-

1    minute break now.  You all get, I'd say, eight minutes.  So

2    then we'll come back before the jury comes back and we can

3    do it then.

4            (Recess taken)

5            THE COURT:  Okay.  Are we ready now to admit a

6    batch of exhibits?

7            MR. GOTTLIEB:  Your Honor, before we do that, I

8    just have one issue I'd like to raise.  I didn't want to

9    object during Mr. Sibley's opening, but there is one issue

10   where he was in an argument about "proximate cause" where he

11   was straying into what I believe was a matter already

12   decided in the Court's December 7th order, Docket No. 119.

13           We understand the only causation issue left in the

14   case to be the one described by the *Greyhound* Second Circuit

15   decision of whether the injuries established in the

16   complaint or whether the damages that we calculate naturally

17   flow from the injuries in the complaint, not whether the

18   injuries in the complaint flow from Mr. Giuliani.  So with

19   respect to future witnesses, we'd like -- and we will make

20   objections to the extent that Mr. Sibley is trying to elicit

21   testimony around that liability/proximate cause

22   determination issue.

23           THE COURT:  Yes, you're continuing to make that

24   argument.

25           MR. SIBLEY:  I don't know that that's true, Your

1    Honor.  I believe that the argument is, yes, there is a

2    proximate causation -- he has proximately caused some

3    damages.  The question is to what extent.

4          And I don't see anything, unless I'm missing

5    something.  But we can make arguments, for example, that

6    other people who are outside the conspiracy caused damages

7    instead of Mr. Giuliani.  I'm not sure how that violates any

8    of the Court's orders.

9          THE COURT:  So are you saying that all those

10    people who made those phone calls repeating exactly what

11    they heard from Mr. Giuliani and his --

12          MR. SIBLEY:  How do we know that?

13          THE COURT:  -- other people, unless you track them

14    down and ask them the question:  Did you hear this directly

15    from Mr. Giuliani?  And absent that kind of proof of

16    causation, he can't be held liable for it for defamation?

17          MR. SIBLEY:  I actually think that's correct.  I

18    think if you have stories all over the Internet about

19    particular individuals, and you get responses from people,

20    it's impossible to be able to trace how the person who made

21    the horrible phone calls we heard, whether --

22          THE COURT:  But I think that is precisely what the

23    expert witness is going to be testifying about, about

24    tracking it to him.

25          MR. SIBLEY:  And that's what I'm -- that's my

1    issue, is I'm not sure that that's true, but we'll see.

2              THE COURT:  All right.  Let's go back to the batch

3    exhibits, please.

4              MR. SIBLEY:  Your Honor, further to the end of

5    things we've discussed before, I would -- you know, I'm not

6    sure.  I've never been in a situation like this.  I'm not

7    sure -- I don't really want to have to object, for example,

8    when they try to introduce evidence of things that Her Honor

9    has already ruled on.  I would prefer to just -- if the

10   Court can just give me running objections on the pretrial

11   objections that we had about the scope of the conspiracy,

12   pleadings, and things like that.

13             I mean, Her Honor has already ruled.  I'd prefer

14   not to have to object to those things during trial.

15             THE COURT:  I think once you've made your motions

16   and it's been ruled on, those are objections that continue

17   through the rest of the case.

18             MR. SIBLEY:  Understood, Your Honor.

19             THE COURT:  The jury's ready to come in, so let's

20   move along.

21             MR. DuBOSE:  Sure.  Would you rather I just read

22   the exhibits into the record, and then we'll, of course,

23   present all of these --

24             THE COURT:  Okay.  Why don't you just say -- is it

25   PTX 1 through 20?  How are you going to do it?

1          MR. DuBOSE:  Sure.  I'll start with Plaintiffs'

2    Exhibit 1 through Plaintiffs' Exhibit 25; Plaintiffs'

3    Exhibit 28 through 49; Plaintiffs' Exhibit 179; Plaintiffs'

4    Exhibit 187 through 202.

5          And I'm just going to say the exhibit.  These are

6    all plaintiffs.

7          Exhibit 205, Exhibit 209 through 210.

8          THE COURT:  So it's 205 through 210?

9          MR. DuBOSE:  So, no, we don't have '6, '7, and '8.

10          THE COURT:  Okay.  205.

11          MR. DuBOSE:  And then 209 and 210.

12          THE COURT:  Yes.

13          MR. DuBOSE:  Okay.  214, 216, 223, 225, 248

14    through 253, 335 through 338, 471, 512 through 513, 521 and

15    522, 542 and 543, 546, 559, 568, 569, 588.

16          We also have 54, 56, 128, 144 and 145, 147, 150

17    and 151, 165A, 234, 236 and 237, 239, 243, 254.

18          THE COURT:  2...?

19          MR. DuBOSE:  '54.

20          THE COURT:  Okay.

21          MR. DuBOSE:  264 and 265.

22          THE COURT:  264 through '65.

23          MR. DuBOSE:  269, 275, 278, 291, 301, 307, 312,

24    345, 381, 426, 428, 466, 554, 575.

25          And this last stretch pertains to the first

```
 1    witness:  428, 452 and 453, 456, 459 through 465.

 2              THE COURT:  4 -- okay, so 456 through 459, or 459

 3    through something else?

 4              MR. DuBOSE:  Correct, so it's 456 on its own.

 5              THE COURT:  Okay.

 6              MR. DuBOSE:  And then 459 through 465.

 7              THE COURT:  Okay.

 8              MR. DuBOSE:  467 and 468, 470 and 471, 477, 479,

 9    482 and 483, 485 through 487, 521 and 523, and 559.

10              I've got one more.  I've just got to confirm that

11    I said 269.

12              THE COURT:  Yes.

13              MR. DuBOSE:  Okay.  And the Court's preference as

14    to when these come up in examinations, do you want us to

15    confirm with you that what we're about to show the witness

16    has already been admitted --

17              THE COURT:  Yes.

18              MR. DuBOSE:  -- before --

19              THE COURT:  That is Mr. Coates's view or cue that

20    he can publish it to the jury.

21              MR. DuBOSE:  Okay.  So I'll confirm with --

22              THE COURT:  Right.

23              MR. DuBOSE:  We'll confirm with the Court first

24    and then --

25              THE COURT:  And, Mr. Sibley, with respect to all
```

1    these admitted exhibits, I understand there's no objection

2    from defense to their admission.

3              MR. SIBLEY:  No, Your Honor.

4              THE COURT:  Okay.  Because if you are going to say

5    you were going to object based on some other previously

6    filed motion or something, I'd want you to, you know,

7    identify for the record, since you've made no secret that

8    you're going to appeal all the rulings in the case, which

9    ones you're particularly objecting to and why so the D.C.

10   Circuit has some ability to evaluate it.

11             MR. SIBLEY:  Well, I thought we just established

12   that -- I mean, the issue here is what identifies the

13   actionable conduct from which damages can flow.  That was

14   really the issue.

15             THE COURT:  Okay.  So you're going to have to

16   raise your objection -- you are going to have to raise an

17   objection just so the record is absolutely clear and I

18   understand what the nature of the objection is so that I can

19   know what I'm ruling on.

20             MR. SIBLEY:  Okay.  Thank you, Your Honor.

21             THE COURT:  As opposed to just silence and then

22   giving you carte blanche to raise, you know, post hoc

23   objections once you think of them down the line instead of

24   having anything...

25             So I'm going to ask you again:  With respect to

1    the exhibits that have just been listed -- which you all

2    know about what they are, but I don't really; I'm presuming

3    you all are much more familiar with them -- you don't have

4    any objection to their admission?

5            MR. SIBLEY:  I don't have any objection to their

6    admission based on the Court's orders that the Court has

7    already ruled on issues such as who is in the conspiracy,

8    what kind of claims they can make as a result of the

9    conspiracy, what actionable statements, what actionable

10   conduct the Court -- the order the Court issued --

11           THE COURT:  Okay.  So I'm going to want you to go

12   through each of these exhibits and identify for me by

13   tomorrow morning which you actually have a foundation to

14   object on based on any rulings or not.  I'm just going to

15   need to know.  The record's going to have to be clear --

16           MR. SIBLEY:  Understood.

17           THE COURT:  -- as to what you're raising an

18   objection to.

19           MR. SIBLEY:  That's fine.  I can do that.

20           THE COURT:  Okay.

21           MR. SIBLEY:  I would just ask --

22           THE COURT:  And why.  Okay?

23           MR. SIBLEY:  That's fine.

24           (To Mr. DuBose) If you can just email me that list

25   so that I can have it.

```
 1              THE COURT:  All right.  Are we now ready to bring

 2       the jury in, Plaintiffs?

 3              MR. GOTTLIEB:  Yes, Your Honor.

 4              THE COURT:  Yes.  Okay.  Let's bring the jury in.

 5              (Jury enters courtroom)

 6              THE COURT:  So I do try and keep us on a schedule,

 7       but we were taking up some matters that I think will let the

 8       evidence come in more smoothly and save us time in the end,

 9       which is why we're slightly delayed after the break.

10              All right.  Are the plaintiffs ready to call their

11       next witness?

12              MR. DuBOSE:  Yes.

13              THE COURT:  And who is that?

14              MR. DUBOSE:  The plaintiffs call Regina Scott.

15              THE COURT:  And good afternoon, Ms. Scott.

16              THE WITNESS:  Good afternoon, Judge.

17              THE COURT:  If you could just stand, face the

18       jury, raise your right hand.

19              (Witness sworn)

20              THE COURT:  You may proceed.

21              MR. DuBOSE:  Thank you.

22                        REGINA SCOTT, Sworn

23                        DIRECT EXAMINATION

24       BY MR. DuBOSE:

25       Q.  Good afternoon, Ms. Scott.
```

1    A.   Good afternoon.

2    Q.   Could you please state your name for the record.

3    A.   Regina Scott.

4    Q.   Okay.  And can you let the jury know what your

5    relationship is to this case?

6    A.   I am a senior consultant and team leader at Jensen

7    Hughes responsible for investigations, open source analysis,

8    and threat violence risk management.

9    Q.   Okay.  I'm going to return to your employer, Jensen

10   Hughes, in just a second.  But first can you briefly

11   describe your professional background for the jury?

12   A.   I spent 30 years as a Chicago police officer.  I spent

13   the majority of that time working as a detective in various

14   investigative capacities, including a homicide detective,

15   long-term investigations within gang intelligence, and I

16   retired as a sergeant.

17   Q.   Okay.  Now, back to Jensen Hughes.  Can you tell us

18   about Jensen Hughes?

19   A.   We're a full-service security risk and consulting firm

20   where we offer end-to-end coverage by way of a whole-of-

21   enterprise approach to security and risk management.  We

22   have various teams that work kind of arm in arm.  We have an

23   investigative practice.  We have an open source analysis

24   team as well as a threat violence and risk management team.

25               On the other side of the house, we have our

1    security risk management that handles executive-level

2    protection, including security, as well as security

3    assessments, emergency preparedness, and workplace violence

4    prevention awareness training.

5    Q.  Does Jensen Hughes provide any services to Ms. Freeman

6    and Ms. Moss?

7    A.  Yes.

8    Q.  What types of services has Jensen Hughes provided for

9    Ms. Freeman and Ms. Moss?

10   A.  Threat and reputational monitoring as well as physical

11   security.

12   Q.  Okay.  And are you involved in providing those services?

13   A.  Yes.

14   Q.  And what do you do?

15   A.  I am a team leader responsible for investigations in

16   open source where I oversee the work on this project.

17   Q.  Okay.  Now I'm going to work with you on Plaintiffs'

18   Exhibit 456.

19           MR. DUBOSE:  And before we work, we're going to

20   confirm that 456 we have on our admitted list?

21           THE COURT:  456?

22           MR. DuBOSE:  456, yes, Judge.

23           THE COURT:  Yes.  It's been admitted.

24           MR. DuBOSE:  All right.

25   Q.  Okay.  Plaintiffs' Exhibit 456, Ms. Scott, do you know

1    what this is?

2    A.  Yes.

3    Q.  What is it?

4    A.  This is an example of a metadata sheet that is provided

5    by a vendor, and it includes specific information unique to

6    users:  date, time, and posters.

7    Q.  You mentioned metadata.

8    A.  Yes.

9    Q.  What is that?

10            MR. SIBLEY:  Objection, Your Honor; calls for

11   expert testimony.  This witness has not been disclosed as an

12   expert.

13            THE COURT:  Why don't you establish a foundation

14   for asking her what metadata is.

15            MR. DuBOSE:  Sure.

16   Q.  All right.  Ms. Scott, can you tell us how you know what

17   metadata is?

18   A.  I know what it is as I have examined and had an

19   opportunity to dig into it.  Based on what we do at Jensen

20   Hughes, it provides a back look of the data.  It's just data

21   about data.

22   Q.  Okay.  And at various times over your career, even with

23   the Chicago Police Department, did you have experience with

24   metadata?

25   A.  Yes.

 1                    MR. SIBLEY:  Your Honor, I would re-urge the

 2          objection because, as Mr. DuBose has now elicited, this

 3          witness is testifying based on specialized knowledge which

 4          would make this expert testimony, and this witness has not

 5          been disclosed as an expert.

 6                    THE COURT:  No.  He wanted to know how she knew

 7          about what metadata was.

 8                    MR. SIBLEY:  Well, she's been --

 9                    THE COURT:  It's not making her an expert.  Your

10          objection's overruled.

11                    MR. SIBLEY:  Okay.

12                    THE COURT:  (To the witness) You've seen metadata

13          before both as a Chicago police officer and in your work at

14          Jensen Hughes?

15                    THE WITNESS:  Yes.

16                    THE COURT:  And do you use it quite regularly?

17                    THE WITNESS:  Yes.

18                    THE COURT:  Proceed.

19                    MR. DuBOSE:  Okay.

20          BY MR. DuBOSE:

21          Q.  Does Jensen Hughes preserve all the source materials it

22          collects?

23          A.  Yes, that's correct.

24          Q.  So moving back to 456, do you know when Ms. Freeman and

25          Ms. Moss is first mentioned on this spreadsheet?

```
 1              MR. SIBLEY:  Your Honor, again, I think we need to

 2     lay foundation.  Did the witness create this spreadsheet?

 3     What's her relationship to the spreadsheet?

 4              MR. DuBOSE:  I can do it, sure.

 5              THE COURT:  That's appropriate.

 6              MR. DuBOSE:  Sure.

 7     Q.  Ms. Scott, is this spreadsheet a document that's kept in

 8     the normal course of business for Jensen Hughes?

 9     A.  It is client-specific.

10     Q.  Yes.  But is this a document that Jensen Hughes keeps in

11     its records in the normal course of business?

12     A.  Yes.

13     Q.  Okay.  And is this a document that was generated at the

14     direction of a third party by Jensen Hughes?

15     A.  Correct.

16              MR. SIBLEY:  So that would establish it as

17     potentially a business record of Jensen Hughes.  But what

18     does this witness, other than custodian, have to say about

19     the document based on her personal knowledge?  So I would

20     object based on personal knowledge of the document.

21              MR. DuBOSE:  She's testifying that this is a

22     document -- and if he allows me to get through my

23     examination a little bit, we will establish that this is a

24     document upon which her analysis of what was going on with

25     Ms. Freeman and Ms. Moss --
```

1          THE COURT:  And I thought you had -- I thought,

2     Mr. Sibley, when we were doing the batch admission of

3     documents, that you had agreed to the admission of this

4     document.  So I'm a little surprised that you're

5     backpedaling right now and now saying that you don't want

6     this admitted, this document.

7          MR. SIBLEY:  So this is a document that's

8     actually, I believe, relied on by Dr. Humphreys, who is

9     their other expert.  So my understanding is this is just

10    background material that their expert relied on.

11         But what I'm trying to figure out now --

12         THE COURT:  Okay.  Let's get on the phone here.

13         (The following is a bench conference

14          held outside the hearing of the jury)

15         THE COURT:  Okay.  I'm a little surprised given

16    the fact that I thought we did this.  Mr. Sibley, can you

17    hear me?

18         Okay.  We're going to use the old way.  Okay.

19    Step forward.  This is where the microphone is.

20         All right.  So okay.  So aren't you about to talk

21    about what this document is?

22         MR. DuBOSE:  Absolutely.

23         THE COURT:  Did she prepare this document?

24         MR. DuBOSE:  No.  So this was -- this is created

25    by a third-party vendor, and so it's created a level down

1   from where she is within that function.  But it is a part of

2   what she uses to generate the reports to the clients.

3           THE COURT:  So why don't you just start and just

4   say what's been her role in connection with these

5   plaintiffs, and as part of that, does she direct others to

6   create any materials for her and what is the nature of those

7   materials.

8           MR. DuBOSE:  Sure.

9           THE COURT:  And based on those -- you know, does

10  she review those materials and any kind of threat

11  assessment.

12          MR. DuBOSE:  Sure, absolutely.

13          THE COURT:  And as part of that, did she -- you

14  know, did she recognize this Exhibit, PTX 456, and is that

15  an exhibit that she regularly uses in performing services

16  for her client, and what would it be.

17          I have no idea what this document is myself.

18          MR. DuBOSE:  If we had understood there were

19  objections, we probably would have built the examination a

20  little differently.

21          THE COURT:  You know, the whole federal rule thing

22  and evidence it's really also helpful to expect to inform a

23  jury about what it is they're looking at and why it's

24  important.

25          And so Mr. Sibley's not asking questions that are,

1    you know -- they're totally normal, and I don't know the

2    answer to those questions.

3            So he's going to establish a more thorough

4    foundation for what this document is.  And then what's your

5    objection?

6            MR. SIBLEY:  Well, Your Honor, let me flag this

7    for you.  Mr. Gottlieb said in opening, and it's in their

8    disclosures, there was only one expert that they designated.

9    That's Dr. Humphreys.

10           My problem with this is I'm not sure how this

11   witness can talk about methodologies, about how this company

12   creates these things.  I mean, that's clearly specialized

13   knowledge.

14           I mean, this is not a street vendor truck you can

15   just go get an alert -- a threat alert report on.  I mean,

16   they're doing expert work.  And if she's testifying based on

17   that, then this is a problem because she wasn't disclosed as

18   anything other than knowledge of plaintiffs' damages.

19           THE COURT:  She's not giving an opinion about

20   this.  She's talking about this.

21           You know, so your objection's overruled on that.

22           Okay.  Are we ready to get back to business?

23           MR. DUBOSE:  Sure.

24           THE COURT:  Okay, then.

25           (This is the end of the bench conference)

```
 1              THE COURT:  Please proceed, Mr. DuBose.
 2              MR. DuBOSE:  Thank you.
 3    BY MR. DuBOSE:
 4    Q.  So, Ms. Scott, we're going to talk a little bit more
 5    about 456 and the manner in which documents like Plaintiffs'
 6    Exhibit 456 are generated.  Okay?  All right.  So let's take
 7    a couple of steps back.
 8              So Exhibit 456 is a spreadsheet.  Can you explain
 9    how exhibits like 456 are generated in the work that you do
10    in Jensen Hughes and how that is used by you in your
11    capacity at Jensen Hughes to generate reports for
12    Ms. Freeman and Ms. Moss?
13    A.  Sure.  This information is pulled from the database that
14    we use.
15    Q.  And who pulls it?
16    A.  The vendor, third-party vendor.
17    Q.  Okay.
18    A.  And it's not something that's front-facing in the
19    interface, and so it's pulled from the back that provides
20    those unique identifiers that we spoke of.
21    Q.  Okay.  And I think we have that.  Let's talk about the
22    process a little bit.
23    A.  Okay.
24    Q.  Okay.  So you have a third-party vendor --
25    A.  That's correct.
```

1    Q.  -- who pulls this information.

2            And can you walk us through how that third-party

3    vendor then communicates or transfers this information to

4    Jensen Hughes for use in what you do?

5    A.  The information is subsequently relayed to us or

6    provided in an Excel spreadsheet from the vendor, and it

7    allows us an opportunity then to dig in for mentions or

8    posts within that sheet.  We're able to use that and compare

9    it to the information that we're seeing in our manual

10   analysis portion as well.

11   Q.  Okay.  So moving back to 456, do you know when the first

12   time Ms. Freeman and Ms. Moss is mentioned in this

13   spreadsheet?

14   A.  Yes.

15   Q.  When is that?

16   A.  December 3, 2020.

17   Q.  What line is that?

18   A.  Line 5.

19   Q.  Is it correct that there are no mentions of either

20   Ms. Freeman or Ms. Moss before December 3, 2020?

21   A.  That's correct.

22   Q.  Now, which types of statements did you begin to see on

23   December 3, 2020?

24   A.  We began to see statements associated with the State

25   Farm Arena double-counting of ballots, videotape, video

1    footage, things of that nature.

2    Q.  And when you say "the State Farm Arena," are you

3    referencing the videotape from State Farm Arena?

4    A.  That's correct.

5    Q.  Let's look at Line 7.  Line 7 there says, "We got them

6    Mother F-ers on tape."  Does that reference -- "on tape" --

7    have any meaning to you?

8    A.  Yes.

9    Q.  And what is that?

10   A.  I understand that to mean that they are alleging --

11          MR. SIBLEY:  Objection, Your Honor.  That's

12   speculation.  This witness did not author this statement, so

13   how would she have an understanding of what it means?

14          THE COURT:  How would you have an understanding of

15   what that means --

16          THE WITNESS:  I would have --

17          THE COURT:  -- or who it's referring to?

18          THE WITNESS:  I would have an understanding of

19   what that means based on the work that we do and based on

20   the fact that all of the other posts, as they are lined out,

21   and they're speaking about by name within this post.  So I

22   understood that to mean Ms. Freeman and Ms. Moss.

23          THE COURT:  Based on the context of the entire

24   post?

25          THE WITNESS:  That's correct.

```
 1              THE COURT:  All right.  Overruled.

 2              Proceed.

 3    BY MR. DuBOSE:

 4    Q.  Now I want to direct your attention to Line 12.  Can you

 5    read the first sentence in Column C aloud, please?

 6    A.  "Video footage from Georgia shows that poll workers were

 7    told to stop counting and leave, while 4 people stayed

 8    behind to continue counting ballots in private."

 9    Q.  Okay.  And here again, placing that term "video footage"

10    in context, do you have any idea what video footage is being

11    referenced there?

12              MR. SIBLEY:  Same objection, Your Honor.  He's

13    asking if she has any idea.  It's speculation.

14              MR. DuBOSE:  It was the same question.

15              THE COURT:  Well, she can explain why it is --

16              MR. DUBOSE:  Sure.

17              THE COURT:  -- she thinks she understands what

18    video footage is being referred to.

19    A.  So as part of the post, it talks about CCTV video in

20    Georgia.  And from the other work and what we're seeing here

21    specifically speaking in this post about Georgia and poll

22    workers, I would understand that to mean State Farm Arena.

23    Q.  Okay.  And can you read the second sentence, please?

24    A.  "Can I be the first to say that Ruby Freeman didn't kill

25    herself?"
```

1    Q.  These statements, are these consistent with the type of

2    content that you started to see around December 3, 2020?

3    A.  That's correct.

4    Q.  Do you know if the number of statements like this

5    increased after December 3, 2020?

6    A.  Yes.

7    Q.  Okay.  Looking at the left side of the spreadsheet,

8    you'll see some statements that started on December 4, 2020.

9    Do you see that?

10   A.  Yes.

11   Q.  Do you know how many December 4th statements there are

12   in this spreadsheet?

13   A.  Yes.

14   Q.  How many?

15   A.  More than 1,700.

16   Q.  How about December 5th?  Do you know how many December

17   5th statements are in this spreadsheet?

18   A.  Yes.

19   Q.  And what is that number?

20   A.  More than 1,100.

21   Q.  And what is the purpose of collecting these types of

22   messages about Ms. Freeman and Ms. Moss?

23   A.  So as part of what we're monitoring for, we're

24   monitoring for direct or indirect threats or anything that

25   is reputationally damaging that could potentially lead to

1   violence, and so it's important to capture that information.

2   Q.  Okay.  I want to work with you now on Plaintiffs'

3   Exhibit 428.

4           THE COURT:  Before you leave this Plaintiffs'

5   Exhibit 456.

6           MR. DuBOSE:  Sure.

7           THE COURT:  So does this Plaintiffs' Exhibit 456

8   reflect the results of essentially an Internet search for

9   the plaintiffs' names?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.

12          THE WITNESS:  Not just Internet -- I'm sorry, Your

13  Honor -- but other forms as well.  So anything within social

14  media or any other news or information of that.

15          THE COURT:  All right.  So is it fair to say that

16  all -- every item listed on here mentioned one of the

17  plaintiffs by name, or does it also capture text or

18  substance that doesn't reference the plaintiffs by name?

19          THE WITNESS:  Yes, there is some in there that may

20  not reference them by name.

21          THE COURT:  Okay.

22  Q.  Would you explain how you understand -- if they don't

23  reference Ms. Freeman and Ms. Moss by name, how you

24  understand those statements to be pertaining to them?

25  A.  So we start with an initial keyword search, which is

1    client-specific, key terms or phrases that we use.  And we

2    build out based on what we see within the environment.

3              So things that we would start to see associated

4    with Ms. Freeman and Ms. Moss, that becomes a secondary list

5    of terms that we then are looking for.

6              MR. DuBOSE:  Okay.  I'd like to confirm that

7    Plaintiffs' Exhibit 428 has been admitted?

8              THE COURT:  It has been.

9              MR. DuBOSE:  Okay.

10   Q.  Ms. Scott, I'm showing you what's been marked for this

11   trial as Plaintiffs' Exhibit 428.  Have you seen this

12   document before?

13   A.  Yes.

14   Q.  What is it?

15   A.  This is a comprehensive report from our findings.  This

16   one --

17             MR. SIBLEY:  Objection, Your Honor; lack of

18   foundation.  This witness is neither -- is not an author of

19   the document.  On the very last page it has someone's name

20   listed who is not her.

21             MR. DuBOSE:  I can lay a foundation for it, of

22   course.  There was no objection to it at the time we

23   admitted it, but now there's an objection, so --

24             THE COURT:  Surprise.

25             MR. DuBOSE:  Sure, surprise.

```
 1               I can proceed any way you'd like, Judge.
 2               THE COURT:  Lay a foundation for it --
 3               MR. DuBOSE:  Sure.
 4               THE COURT:  -- now that there's an objection.
 5               MR. DuBOSE:  Sure.
 6       BY MR. DuBOSE:
 7       Q.  All right.  So Plaintiffs' Exhibit 428, do you recognize
 8       this document?
 9       A.  I do.
10       Q.  What is it?
11       A.  This is a comprehensive threat intelligence and
12       monitoring report for a specified period of time.  This
13       report runs November 21, 2021, through May 1st of 2023.
14               MR. SIBLEY:  Your Honor, it's the same objection.
15       How does she know what it is?  That was -- that's the basis
16       of the objection.  What's her knowledge of it?
17               MR. DuBOSE:  That's the next question.  If I could
18       get through a few questions, I can establish a foundation
19       quite easily.
20               THE COURT:  Well, it's not his job to make your
21       job easy.
22               MR. DuBOSE:  That's right.
23               THE COURT:  So proceed.
24               MR. DuBOSE:  Sure.
25       Q.  All right.  So is this a document you generated
```

1    yourself?

2    A.  No.

3    Q.  Okay.  Take a look at the last page.  There's a name

4    there.

5              (Pause)

6    Q.  Okay.  So right here you see it says, "Authors and

7    Contributors"?

8    A.  Yes.

9    Q.  All right.  What is Bostrom?

10   A.  I'm sorry?

11   Q.  What is Bostrom?  It says, "Bostrom oversaw the

12   construction of this report."

13   A.  That is the direct team manager for open source

14   analysis.

15   Q.  And the next sentence says, "Members of the threat and

16   violence risk management practice were responsible for the

17   monitoring, data collection, primary analysis, and core

18   research."

19              Are you a member of the threat and violence risk

20   management practice at Jensen Hughes?

21   A.  I am.

22   Q.  Okay.  And were you, in fact, involved in generating

23   this report?

24   A.  I had oversight over the report, yes.

25   Q.  Okay.  So people under your direct supervision generated

1    this report?

2    A.  That's correct.

3    Q.  And they generated this report at your direction?

4    A.  Yes.

5    Q.  And this report is a business record that's kept in the

6    normal case -- in the normal course of business at Jensen

7    Hughes?

8    A.  Yes.

9    Q.  All right.

10             THE COURT:  Although he hasn't raised a hearsay

11   objection, so...

12             But go ahead.

13             MR. DuBOSE:  I'm not sure how much I need to do.

14   I keep looking back at him.

15             So assuming we have no more objections, back to

16   428.

17   Q.  I want to focus your attention on the key findings

18   aspect of this report.

19             Can you please explain the first key finding in

20   the report?

21   A.  We identified the mentions for Ms. Freeman and Ms. Moss;

22   and, again, that would be from November 21st of '21 through

23   May 1st of 2023.

24   Q.  Okay.  And can you tell me how many mentions of

25   Ms. Freeman and Ms. Moss occurred over the time period you

1    just referenced?

2    A.  More than 710,000.

3    Q.  Does that mean 710,000 express mentions of their names?

4    A.  Yes.

5    Q.  And a second ago you talked about mentions that may not

6    state the name specifically.  This 710,000 that's denoted

7    here, does that include mentions that do not directly

8    include their names?

9    A.  It does not.

10   Q.  So you talked about primary search words and additional

11   keywords.  What types of keywords did Jensen Hughes use to

12   service Ms. Freeman and Ms. Moss when monitoring online

13   activity about them?

14   A.  So originally, when we started, our starting point for

15   the keywords was the monitor list as provided by the client.

16   Q.  Okay.  And are there any specific words that Jensen

17   Hughes used to monitor Ms. Freeman and Ms. Moss?

18   A.  Yes.

19   Q.  What types of words?

20   A.  So that would, again, be what we see in that online

21   environment.  So that secondary list of key terms, "treason,

22   "voter fraud," "arrested," the things that we would see

23   associated with their names would become then part of that

24   list that would grow on the other side.

25   Q.  Okay.  Let's move to Page 452.  This chart refers to

1    Twitter.  How many mentions were identified on Twitter

2    during this time period?

3    A.  Over 657,000.

4    Q.  And do you know what percentage of mentions is

5    represented by the Twitter mentions?

6    A.  More than 90 percent.

7    Q.  Okay.  Let's move to Page 5, titled "Additional

8    Insights."  And here we see several multicolored graphs.

9    Can you please explain what these graphs depict.

10   A.  So these graphs depict -- again, from the vendor -- they

11   are metrics related to sentiment.  The graph is showing --

12   and you can see in red -- negative sentiment is in red;

13   positive sentiment is listed in green; and neutral is a

14   shade of gray.

15   Q.  Okay.  And what does it mean for the sentiment to be

16   negative?

17   A.  When a sentiment is negative, it is harmful or

18   threatening, reputationally damaging.  That is what the

19   database picks up on for that sentiment.

20   Q.  Okay.  And looking at these graphs, do they depict

21   sentiment trends in any way?

22   A.  Yes.

23   Q.  How so?

24   A.  Well, they depict largely negative sentiment trends.

25   Q.  Okay.  So that second graph that we see here, does that

1    provide a percentage negative rate?

2    A.  It does.  Largely negative at 58 percent.

3    Q.  Okay.  Let's move to the next tab, Page 53.

4           Can you please tell me what this page reflects.

5    A.  This is an actual page that illustrates the actual

6    screen captures that the analysts are seeing in the

7    environment.  And this one is dated from April 17, 2023.

8    Q.  Okay.  And do you see content from the user Bratt, B-R-

9    A-T-T, reflected about three posts down?

10   A.  Yes.

11   Q.  And apologizing for the nature of this content we'll be

12   discussing, it's offensive, but can you please read this

13   aloud?

14   A.  "I will be able to die happily if I ever see Ruby

15   convicted of treason.  I would love to see her executed but

16   understand she would be useful to sing like a canary."

17   Q.  Please turn to Page 285.  Can you please describe this

18   page for the jury.

19   A.  So, again, it's another example of actual screen

20   captures as they were observed in the environment.  This one

21   is dated January 12, 2023, from Truth Social.

22   Q.  And turning to Page 1053, the date here is December 3,

23   2021.  And it says, "We identified additional threatening

24   commentaries."  Do you see that?

25   A.  Yes.

1    Q.  Do you see the screenshots that are listed there?

2    A.  I do.

3    Q.  Can you please read the first four screenshots aloud?

4    A.  "Fuck the Courts.  Just let the Days of the Rope start."

5            "I can see a car accident in her future."

6            "Fucking kill these traitors, they get no rights."

7            "Those two shouldn't have even been breathing

8    after what they did."

9    Q.  Going back to a question you got earlier in this

10   examination, how do you know those comments were about Ruby

11   and Shaye?

12   A.  It is the totality of all the information that is

13   contained.

14   Q.  Let's look at the bottom one here.  Can you read that

15   one aloud, please.

16   A.  "Form a grand jury.  Indict and press charges.  Provide

17   the recorded video evidence.  Convict and execute,

18   accordingly."

19           MR. DuBOSE:  Let's turn to Page 1096.

20   Q.  Can you please read the top statement on this page.

21   A.  "They Need to Hang for Treason."

22   Q.  Okay.  Ms. Scott, are the posts that we just discussed

23   characteristic of other posts about Ms. Freeman and Ms. Moss

24   that you saw during this time period?

25   A.  That's correct.

1    Q.  Do you know how many pages in this report discusses

2    mentions like those we just worked through?

3    A.  Yes.

4    Q.  How many pages?

5    A.  There are well over a thousand pages with multiple

6    mentions per page.

7              THE COURT:  So Plaintiffs' Exhibit 428 is over a

8    thousand pages long?

9              MR. DuBOSE:  Yes, Your Honor.

10             THE COURT:  Okay.

11             MR. DuBOSE:  So confirming now that Plaintiffs'

12   Exhibit 466 has been admitted?

13             THE COURTROOM DEPUTY:  Yes.

14             MR. DuBOSE:  Yes.

15             THE COURT:  466?

16             MR. DuBOSE:  Yes, okay.

17             THE COURT:  Yes, it has been.

18   Q.  Ms. Scott, I'm showing you what's been marked for this

19   trial as Plaintiffs' Exhibit 466.  Have you seen this

20   document before?

21   A.  Yes.

22   Q.  What is it?

23   A.  This is another comprehensive threat intelligence and

24   monitoring report.

25   Q.  Was this report seen here at 466 generated in the same

1    way that the prior report that you testified about was

2    generated?

3    A.  That's correct.

4    Q.  What's the time period covered for this report?

5    A.  This report goes from May 1, 2023, through August 18th

6    of 2023.

7    Q.  And how many mentions of Ms. Freeman and Ms. Moss does

8    this report reflect?

9    A.  More than 318,000.

10   Q.  More than 318,000 in just a little over three months?

11   A.  That's correct.

12   Q.  Let's move to Page 4.  Can you tell us the sentiment

13   trends for this report.

14   A.  Again, largely negative at about 67 percent.

15   Q.  Let's move to Page 14.  Can you read some of the text on

16   the upper right-hand side of the page, the top post and the

17   second from the bottom?

18   A.  "All riggers should be hanged."

19           "Ruby Freeman and her daughter Wandrea are

20   riggers."

21           MR. DuBOSE:  Let's go to Page 24, focusing in on

22   the upper left-hand side.

23   Q.  Can you please read that text aloud.

24   A.  "Where is GA Ruby Freeman?  Find this criminal subpoena

25   her for trial!!"

```
1              MR. DuBOSE:  Page 175.
2    Q.  Did some of the mentions of Ms. Freeman and Ms. Moss
3    include user-generated images?
4    A.  That's correct.
5    Q.  Do you see an example of this on the bottom page?
6    A.  Yes.
7    Q.  And what is this graphic?
8    A.  It's a user-generated image.  It sort of looks like a
9    wanted poster or something from the old west, a bounty
10   poster, something of that nature.
11   Q.  Can you read the text on this image aloud, please.
12   A.  "Wanted For Election Rigging.  Ruby Freeman.  No Account
13   Elections Stealing Scoundrel, Been Known to Count Fake
14   Ballots in the Dead of Night.
15           "Last seen in Atlanta, Georgia."
16   Q.  The post that we've just discussed in this report, are
17   they characteristic of the other posts about Ms. Freeman and
18   Ms. Moss that you've seen during this time period?
19   A.  That's correct.
20           MR. DuBOSE:  I'd like to confirm now that
21   Plaintiffs' Exhibit 554 has been admitted before publishing?
22           THE COURT:  It has been.
23           MR. DuBOSE:  Thank you.
24   Q.  Let's now discuss what's been marked as Plaintiffs'
25   Exhibit 554.
```

1           Ms. Scott, do you recognize this document?

2    A.  I do.

3    Q.  What is it?

4    A.  It's another threat intelligence and monitoring

5    comprehensive report.

6    Q.  And how many mentions of Ms. Freeman and Ms. Moss does

7    this report reflect?

8    A.  More than 320,000.

9    Q.  Let me just back up for a second.  Was this report

10   generated in the same manner that the other two reports that

11   you testified about today were generated?

12   A.  That's correct.

13   Q.  So that's over 320,000 mentions in a little over three

14   months?

15   A.  Yes.  The report goes from August 18, 2023, through

16   November 22nd of 2023.

17   Q.  Okay.  And at the bottom of Page 3 we see sentiment

18   trends again, right?

19   A.  Yes.

20   Q.  What are the sentiment trends for this report?

21   A.  Again, largely negative at about 65 percent.

22   Q.  Ms. Scott, are you aware of whether Mr. Giuliani has

23   made statements about Ms. Freeman and Ms. Moss?

24   A.  Yes.

25           THE COURT:  Did you say this month?

```
 1                    MR. DuBOSE:  I'm sorry?

 2                    THE COURT:  Did you say this month?

 3                    MR. DuBOSE:  No.  No, I did not.

 4                    THE COURT:  What did you say?

 5                    MR. DuBOSE:  I said:  Are you aware of whether

 6       Mr. Giuliani has made statements about Ms. Freeman and

 7       Ms. Moss?

 8                    THE COURT:  Oh, Ms. Moss.  Okay.

 9                    MR. DuBOSE:  I apologize, Your Honor.  My voice is

10       cracking a little bit.

11       Q.  Are you aware of whether any of these statements were

12       made after this lawsuit was filed in December of 2021?

13       A.  Yes.

14       Q.  Where have those statements been made?

15       A.  The statements were made on a nightly show, America's

16       Mayor, which is Mr. Giuliani's show, as well as a few other

17       shows where Mr. Giuliani was a guest.

18                    MR. DuBOSE:  I'd like to confirm now that

19       Plaintiffs' Exhibit 463 has been admitted?

20                    THE COURTROOM DEPUTY:  Yes.

21                    THE COURT:  463?

22                    MR. DuBOSE:  463, yes, Your Honor.

23                    THE COURT:  It has been, yes.

24                    MR. DuBOSE:  Thank you.

25                    All right.  I am going to play an excerpt of
```

1    Plaintiffs 463 timestamped from 3:15 through 3:38.

2              THE COURT:  And what's the date of this exhibit?

3              MR. DuBOSE:  And the date is August 15, 2023.

4              (Video played)

5    Q.  Ms. Scott, have you seen this video before?

6    A.  Yes.

7    Q.  Do you have an understanding of what it is?

8    A.  Yes.

9    Q.  What is it?

10   A.  It's a snippet from Mr. Giuliani's America's Mayor Live,

11   his nightly show.

12   Q.  Okay.  And we already established that this was August

13   15th of 2023.

14             Mr. Giuliani referenced two women in this clip.

15   Did you hear that?

16   A.  Yes.

17   Q.  Okay.  Did you have an understanding of what he is

18   referring to?

19   A.  Yes.

20   Q.  Ms. Scott, do you know whether any of these statements

21   by Mr. Giuliani have been direct mentions of Ms. Freeman and

22   Ms. Moss?

23   A.  Yes.

24   Q.  Do you know how many times Mr. Giuliani has referenced

25   these individuals since you've started this work?

 1    A.  Yes.

 2    Q.  How many times?

 3    A.  It's been a total of 20 times of either direct mentions

 4    and/or references.

 5    Q.  Okay.  And what's the time frame that you're referencing

 6    for these 20 mentions?

 7    A.  So July 11th of '23 through December 4th, which was the

 8    last mention, of this year.

 9    Q.  December 4th as in a little over a week ago?

10    A.  Yes, sir.

11         THE COURT:  So the 20 times that you're saying

12    that Mr. Giuliani mentioned directly the plaintiffs by name,

13    is that 20 times since 2020 or is this just for the period

14    July 11, '23, through December 4, '23?  I want to make sure

15    I understand you correctly.

16         THE WITNESS:  So there's 20 total, which include

17    direct and indirect mentions, and it's been since we started

18    at Jensen Hughes looking at this material from July 11th of

19    '23 through last Monday, which was the last mention,

20    December 4, 2023.

21    Q.  And Ms. Scott, be clear what you mean when you say "this

22    material."

23    A.  Just specifically speaking about the America's Mayor

24    Live nightly show as well as other shows where Mr. Giuliani

25    may have been a guest.

1   Q.  Okay.  So these are statements made by Mr. Giuliani

2   directly; is that correct?

3   A.  Yes.

4   Q.  Which is different from many of the other statements

5   that you've been going through earlier in the examination.

6   This is Mr. Giuliani specifically; is that correct?

7   A.  That's correct.

8   Q.  Ms. Scott, how many clients does Jensen Hughes do this

9   type of work for?

10  A.  Maybe about 30 or so.  It's labor-intensive work.  No

11  more than about that.

12  Q.  Okay.  Is that 30 in the entire existence of Jensen

13  Hughes, or is that 30 at any given time that we may find

14  Jensen Hughes?

15  A.  At any given time.

16  Q.  Is this case typical among the types of cases that

17  Jensen Hughes handles?

18  A.  No, not at all.

19  Q.  Why is that?

20  A.  Well, the type of -- you know, when we say negative

21  sentiment, what that means.  So the type of violent and

22  racist and graphic material, that's on a level that we're

23  not -- that we don't see at all in our work, in the work

24  that we are doing.

25          But the second part of that is you have that type

1    of content, and then you have the volume of that type of

2    content.  In a lot of what we see, there are people who are

3    posting, whether social media influencers or they're posting

4    to get likes.

5            The difference is that Ms. Freeman and Ms. Moss

6    are being posted about.  And so when you combine the type of

7    content along with the volume of content, it's

8    unprecedented.

9            MR. DuBOSE:  No further questions.

10           THE COURT:  Mr. Sibley.

11                      CROSS-EXAMINATION

12   BY MR. SIBLEY:

13   Q.  Good afternoon.

14   A.  Good afternoon.

15   Q.  I want to talk to you about the methodology that your

16   company goes through when you create these threat assessment

17   reports that we've been looking at.  Okay?

18   A.  Okay.

19   Q.  I want to try to give like an example so I can get an

20   understanding.  But sometimes when you do like a background

21   check on someone, you go to a site.  I've used a site called

22   Intelius.  Have you heard of that?

23   A.  I have.

24   Q.  Okay.  And so you'll put someone's name --

25           THE COURT:  I'm sorry, and how do you spell that?

```
 1              MR. SIBLEY:  I believe it's I-N-T-E-L-I-U-S,
 2    but -- there may be two Ls, but...
 3              THE COURT:  Okay.
 4    Q.  You just kind of put in some information, someone's
 5    name, maybe date of birth, and it just sort of generates an
 6    automated report.  Is that -- do you have experience with
 7    Intelius?
 8    A.  I don't have any experience with that database, no.
 9    Q.  Okay.  But are you aware that there are databases or
10    services you can go to on the Internet and just do like a
11    background check on someone?  Are you aware of that?
12    A.  I am.
13    Q.  Okay.  And that's kind of automated where you put in the
14    information and you get a report almost like CARFAX or
15    something, right?
16    A.  It can be.
17    Q.  Okay.  But what your company does is something beyond --
18    it's not an automated thing where you just go to
19    jensenhughes.com and put in some information and get all
20    these reports, right?
21    A.  That's correct.
22    Q.  Okay.  Tell me kind of the methodology and what goes in
23    to generating the kind of -- you know, we've seen some very
24    large documents.  Tell us how you go about doing that.
25    A.  Specific to the threat monitoring report?
```

1    Q.  Let's start with that.

2    A.  Okay.  So those reports, the starting point is always

3    the client need.  What is it that the client is concerned

4    about?  What issues are they looking for?  Whether it's

5    threat or violence, risk-based or reputational, or a

6    combination of both.  We build out from there.

7            So we have to identify those concerns, which would

8    be key terms or phrases as identified by the client, and

9    then we begin our process.

10   Q.  By the way, when were you first contacted about working

11   on this case?

12   A.  November of 2021 Jensen Hughes was retained.

13   Q.  Okay.  And how were you -- were you contacted, I

14   suppose, by counsel?

15   A.  I don't know what the original form of contact was.

16   Q.  Okay.  Do you have any history of working with any of

17   the counsel involved in this case?

18   A.  Yes.

19   Q.  Okay.  On what other matters?

20   A.  I'm sorry?

21   Q.  What other matters have you worked on with counsel in

22   this case?

23   A.  Well, we have a series of matters that we're working on.

24   Q.  Okay.  What are those?

25   A.  I don't have them all directly by name.

1     Q.  Well, you can't think of any of them right now?  You

2     said you only have 30 matters.  You can't think of any of

3     the matters that you're working on with plaintiffs' counsel?

4     A.  We have several projects.  I don't know if we're able to

5     provide that information in open court.

6          MR. SIBLEY:  Well, I mean, I'm asking -- I think

7     it's relevant, Your Honor.

8          THE COURT:  Well, there's no objection being

9     raised.

10         MR. DuBOSE:  Objection, Your Honor.  This is

11    obviously sensitive information.  This is obviously a

12    subject matter that there are security concerns for folks

13    who may be receiving these services.  So we would like an

14    opportunity to maybe confer with Mr. Sibley on what it is

15    he's trying to get at here.

16         MR. SIBLEY:  Maybe if I can ask a couple of other

17    questions around that and then we can maybe come back to it,

18    I guess, if necessary.

19         THE COURT:  Okay.  I'm going to sustain the

20    objection for right now until I understand why it's all

21    relevant.

22    Q.  Okay.  Are you being paid for your services in this

23    case?

24    A.  I'm not being paid for my testimony, no.

25    Q.  Is your firm being paid for its services with all these

1    reports that we've seen generated?

2    A.  Yes.

3    Q.  Okay.  How much has your firm been paid for the work

4    done on this case?

5    A.  I don't know.

6    Q.  Okay.  Are you being paid for the work -- is your firm

7    being paid for your work done on the other cases that you're

8    working on with plaintiffs' counsel?

9    A.  Yes.

10   Q.  Okay.  Do you know -- is it -- how many matters?  Do you

11   remember?

12   A.  About, I believe, six.

13   Q.  Okay.  Is that including this one or not including this

14   one?

15   A.  Including this one.

16   Q.  Okay.  So that's about -- I'm not a mathematician, but

17   it sounds like about 20 percent of your work is from

18   plaintiffs' counsel; is that right?  Current work.

19   A.  That could be about right.

20   Q.  Okay.

21            MR. SIBLEY:  Your Honor, I would like to ask the

22   question again because I think it's relevant to the -- it's

23   relevant to the bias of the witness whose firm is being paid

24   for generating documents that are being used in this case.

25            THE COURT:  Okay.  Let's see if you can use

1    your -- rather than having a speaking objection, why don't

2    you use your machine; see if we can get the walkie-talkies

3    working.

4                    (The following is a bench conference

5                     held outside the hearing of the jury)

6                    THE COURT:  Mr. Sibley, can you hear me?  Can you

7    hear me, Mr. Sibley?

8                    All right.  So come on up.  Mr. Sibley, could you

9    step forward.  I can't hear you on that.

10                   I'm sorry, I really -- I don't understand --

11   although the objection has been raised that it's

12   confidential, but I have --

13                   MR. SIBLEY:  And relevance, Your Honor.

14                   THE COURT:  I don't understand what the relevance

15   is of other clients.  You established that she gets work

16   from some of these plaintiffs' lawyers.  We've got three

17   different firms here.  What's the relevance?

18                   MR. SIBLEY:  So the other expert they have has a

19   large dossier of sort of anti-Trump cases, which is fine,

20   but when it's a substantial percentage of her cases I think

21   that's goes toward an issue of the bias of the witness,

22   especially when it's someone who's testifying.

23                   THE COURT:  Keep your voice down.

24                   MR. SIBLEY:  I think this is an expert, and I'm

25   going -- we're going to explore that a little bit more.  I

1       think that she's an unauthorized expert.  But if that had

2       been the case, then they would have had to disclose the

3       compensation, other matters, things like that.

4              I think it goes to the bias of the witness.  She

5       was evasive, Your Honor.  When I asked her the question, she

6       said she didn't remember, after she said there's only 30

7       matters.  I think it's -- I think I'm entitled to probe

8       that.  I mean, confidentiality -- we have a lot of

9       confidential stuff in this case, and we have a

10      confidentiality order.

11             THE COURT:  Yes, but that's very different from

12      asking about what private clients may have security concerns

13      that they hired the security risk assessment person for.

14             MR. SIBLEY:  It may be.  How about --

15             THE COURT:  I actually understand why it's

16      confidential.  Why don't you establish that she does other

17      work for them, and to the extent you want to establish bias,

18      I think you've sort of shown --

19             MR. SIBLEY:  Can I ask --

20             THE COURT:  -- she wants to do a good job here --

21             MR. SIBLEY:  One question I want to ask.

22             THE COURT:  -- because she has other clients and

23      gets 20 percent of her work from this firm.

24             So you've established that fully.

25             MR. SIBLEY:  Can I just ask --

```
 1              THE COURT:  As to whether or not she's an expert,
 2    I disagree with you.  She's not an expert.  She's testifying
 3    as a fact witness about what she is seeing, and as a fact
 4    witness, not an expert witness.
 5              So as to the relevance of the specific names, I
 6    don't see that.  The objection is overruled.
 7              MR. SIBLEY:  Can I ask one question?
 8              THE COURT:  About -- well, the objection on
 9    relevance is sustained.  To the extent you think you're
10    entitled to it, I think that's overruled.
11              So what is your next --
12              MR. SIBLEY:  Just one question.  If she has been
13    disclosed as a witness in those matters, I'm not sure how
14    that would be confidential.  So can I ask her if she's
15    offered testimony or -- I mean, how is that confidential if
16    it's public?
17              MR. DUBOSE:  There's so many assumptions here,
18    Judge.  It assumes that --
19              THE COURT:  He can ask if she's testified --
20              MR. DUBOSE:  -- there's an active lawsuit.  They
21    may not have an active lawsuit.
22              THE COURT:  Then she would say no.
23              MR. DuBOSE:  But it gets back to the same concern
24    that you started getting into, the confidential pieces and
25    things that are sensitive.
```

 1              THE COURT:  If she's been named as a witness, it's

 2      no longer confidential.  It's a lawsuit.  Okay.  So you can

 3      ask that.

 4              (This is the end of the bench conference)

 5              THE COURT:  Okay.  Mr. Sibley.

 6      BY MR. SIBLEY:

 7      Q.  Okay.  Ms. Scott, with respect to the other matters that

 8      we were discussing, have you -- has your firm or -- you or

 9      your firm provided any testimony in those cases?

10      A.  No, sir.

11      Q.  Have you issued any reports or anything like that that

12      have been used in those cases that you're aware of?

13      A.  I don't understand the question.

14      Q.  Are there active lawsuits pending on those matters?  Do

15      you know whether there are?

16      A.  I believe so, yes.

17      Q.  And your firm has not been disclosed as a witness in

18      those cases as far as you know?

19      A.  Not as far as I'm aware.

20      Q.  Okay.

21              All right.  Let's go back to talking about how you

22      all generate these reports.

23              Okay.  So, first of all, the client comes to you

24      and says, "Here's my issue.  I've got social media

25      concerns," or whatever it is.  And then you all go into

1    action, right?

2    A.  Yes.

3    Q.  Okay.  Now, tell me the process of how this plays out,

4    because it sounds like you have a lot of people involved in

5    the process?

6    A.  The process as far as how we use the tools?  Who's doing

7    the work?

8    Q.  Yes, ma'am.

9    A.  Sure.

10          So after we get the initial list -- again, that's

11   the starting point -- we utilize a series of open source

12   analysis tools.  As you can imagine, there's a lot of

13   information, and so the tools allow us an opportunity to

14   scrape what's in the environment.  Not only what's on social

15   media, but all platforms within the Internet and dark web,

16   websites, anything that is available and open publicly.

17   That information is reduced from the databases.

18          And then the second component of that that we do

19   is we provide the realtime analysis, and so it's digging in

20   to those posts and that material and understanding and

21   observing what's in the environment.

22          So it's two-pronged.

23   Q.  Okay.  Do you have different types of persons at the

24   firm who perform different functions, I suppose?

25   A.  That's correct.

1    Q.  Okay.  So who does that initial function of sort of the

2    data-gathering?  Who does that function?  What are they

3    called?

4    A.  The open source analysts.

5    Q.  Okay.  Are those the people that generated that giant

6    spreadsheet that we saw earlier?

7    A.  No.

8    Q.  Okay.  Who generates that?

9    A.  So that was requested from our third-party vendor, and

10   the vendor generated the spreadsheet.

11   Q.  Oh, I see.  You all requested it from a third party?

12   A.  Yes.

13   Q.  I see.  Do you know who was the vendor?

14   A.  The vendor was Ontic.

15   Q.  Can you spell that?

16   A.  O-N-T-I-C.

17   Q.  What is Ontic?

18   A.  Ontic is a database.  It's an open source analysis tool,

19   and it's one of the tools that we use.

20   Q.  Okay.  So you go to Ontic, and you get a spreadsheet

21   that sort of pools all of this information off of, I guess,

22   the Internet, social media, things like that, right?

23   A.  Well, it's what works in the background.

24          We use the tool, but this is what's showing in the

25   back.  It's not part of the regular user interface.  So it's

1    the information, but it's the back end of the information.

2    Q.   Okay.  And then what do you all do when you all get --

3    I'm going to ask specific to this case, I guess.

4            When you got that information from Ontic, I

5    believe you said there was some manual analysis that went

6    into it, right?

7    A.   Yes.

8    Q.   And that's -- I believe you said it was labor-intensive,

9    right?

10   A.   That's correct.

11   Q.   How long did it take you to come up -- from the time you

12   got -- well, let me ask it this way:

13           How long did it take you to get that spreadsheet

14   from Ontic?

15   A.   I don't know.

16   Q.   Well, if you were engaged in November 2021, do you know

17   the date of the spreadsheet that we saw earlier that we were

18   discussing?

19   A.   I know the date that the spreadsheet covers.  Is that

20   what you're asking me?

21   Q.   Well, let me ask you two questions.

22           One question is:  What dates does the spreadsheet

23   cover?

24           The second question is:  What date was the

25   spreadsheet generated?

```
 1                    MR. DuBOSE:  Objection.  If we could ask one

 2    question at a time.  It may be compound.

 3                    THE COURT:  I think that's true, and I want to be

 4    absolutely specific so the record's clear about what

 5    spreadsheet we're talking about because we've had a number

 6    of exhibits introduced during this witness and certain

 7    reports.

 8                    So are you talking, Mr. Sibley, about Plaintiffs'

 9    Exhibit 456?

10                    MR. SIBLEY:  I believe that's correct, Your Honor.

11    Will you let me --

12                    THE COURT:  I don't want to put words in your

13    mouth, but let's be precise.

14                    MR. SIBLEY:  My weight-lifting exercise today were

15    those thousand-page exhibits.

16                    THE COURT:  I'll say.

17                    MR. SIBLEY:  Yes, Your Honor, it is 456.

18                    THE COURT:  Okay.

19    Q.  Okay.  So with respect to Exhibit 456, what's the

20    date range of that spreadsheet again?  I think you told

21    Mr. DuBose.

22    A.  November of 2020 through June of 2021.

23    Q.  Okay.  And do you know the date that this spreadsheet

24    was given to your firm or was generated by Ontic?

25    A.  I don't recall.
```

1          MR. DuBOSE:  Objection; compound.

2          THE COURT:  I think you don't recall as to either

3     date in that compound question?

4          THE WITNESS:  No, I don't recall.

5     Q.  Okay.  Well, let me get the specific exhibit so we can

6     talk about it here.

7          Exhibit 428, do you want to take a peek at that?

8          Do you have it open, ma'am?

9     A.  I do.

10    Q.  Okay.  It looks like the date on that is May 2023.  Do

11    you see that?

12    A.  Yes.

13    Q.  Is it your understanding that that document was

14    generated on or about May of 2023?

15    A.  That's correct.

16    Q.  Okay.  All right.  So let's go back to the process.

17         From the time that you got the Exhibit 456

18    information from Ontic, how long did it take you to generate

19    Exhibit 428, if you recall?

20    A.  I don't recall the specific amount of time.  I do know

21    that it was extremely labor-intensive due to the amount of

22    content.

23    Q.  What do you all charge as far as fees?  I mean, is it

24    like hourly or -- how do you charge fees?

25    A.  In general?

1   Q.  For this case how did you charge fees?

2   A.  This is part of an existing master service agreement

3   that we have.

4   Q.  With who?

5   A.  With the client.

6   Q.  Which client is it?  Who is the client?

7   A.  Here, Protect Democracy.

8   Q.  Oh, Protect Democracy.  Okay.

9            Okay.  And so how is that billed out?  Is it

10  hourly?  How is it billed?

11  A.  It's billed based on time spent.

12  Q.  Okay.  What's your rate, for example?  What's your

13  hourly rate?

14  A.  It depends.

15  Q.  For this case.

16  A.  I don't know what my hourly rate is for this case.

17  Q.  You don't know what it is under the master services

18  agreement?

19  A.  No, I don't.

20  Q.  Okay.  Well, let's get back to talking about the labor-

21  intensive exercise of going from the Ontic massive

22  spreadsheet to what we see in Exhibit 428.  Okay?

23  A.  (No verbal response)

24  Q.  Yes, ma'am?

25  A.  Yes.

```
 1    Q.  Can you tell us.  Tell us the process; who's involved
 2    and how it works.
 3    A.  So, again, the information that is initially pulled from
 4    the spreadsheet and the analysts are then able to pull that
 5    information and manually look into the environment to see
 6    what they're seeing.  So that affords them the opportunity
 7    to not only have the spreadsheet, which is generated through
 8    a vendor, but they're also digging into each post.
 9    Q.  Wow.  Really?  So they actually literally go into the
10    spreadsheet and go into each and every post?
11    A.  Each negatively coded sentiment post.
12    Q.  I see.  And that's most of them, according to what you
13    said earlier.  Right?
14    A.  It's what we used to assess for threat, yes.
15    Q.  Well, that must have been labor-intensive based on the
16    size of the spreadsheet, I suppose, right?
17    A.  It was labor-intensive, yes.
18    Q.  Do you all keep billing records, like a log of the time
19    you spend on matters?
20    A.  Yes.
21    Q.  Okay.  Now, the people who go and then manually look at
22    these posts, what kind of people are they?  What's their job
23    title, I guess?
24    A.  Analysts.
25    Q.  Okay.  Do they have any kind of specialized training?
```

1    How do you hire analysts, I guess?

2    A.   So we have a variety of different types of analysts.

3    Our open source analysts.  It depends on the candidate.  It

4    depends on what environment they're coming from.

5         But we do look to assess for a set of baseline

6    skills.

7    Q.   Okay.  Well, let's talk about specific to this case.

8    What kind of analysts worked on going through and looking

9    man -- manually looking at all of these posts?

10   A.   I don't understand your question.

11   Q.   So you said the people who go through and look at the

12   posts, you said it depends.  You use different types of

13   analysts for different types of things, right?

14   A.   (No verbal response)

15   Q.   Yes.

16   A.   That's correct.

17   Q.   Okay.  So I'm asking, what types of analysts and what

18   kind of qualifications did the analysts have for the work

19   that was done on Exhibit 428?

20   A.   So the type of analysts are open source analysts.

21   That's the type.

22   Q.   Okay.  Do they have college degrees?

23   A.   Yes.

24   Q.   Okay.  What are their degrees in?

25              MR. DuBOSE:  Objection.

1    Q.  Do you know?

2          THE COURT:  Mr. Sibley, are you looking for

3    resumes for the people who are the open source analysts at

4    Jensen Hughes?

5          MR. SIBLEY:  No, I'm not.  I'm just wanting to

6    establish, Your Honor, that this is a document created by a

7    compilation of undisclosed experts that can't be explained

8    without someone with specialized knowledge, and that's my

9    reason for this line of questioning.

10          THE COURT:  And your objection is what?

11          MR. DuBOSE:  Relevance.  I think we're far afield

12    here when we're talking about these --

13          THE COURT:  Well, he'd rather spend his time

14    talking about the resumes of people who found this online

15    and on social media rather than the substance, so overruled.

16    Q.  Can you tell us what type of -- type of education and

17    what type of degrees the analysts that worked on Exhibit 428

18    have?

19    A.  I can't recall specific degrees.  I can tell you they

20    have an extensive background in doing this work.

21    Q.  Okay.  So you don't know if they're even qualified to do

22    the work in Exhibit 428.  Is that what you're saying?

23    A.  That's not what I'm saying.

24    Q.  Okay.  Then how do you know they're qualified if you

25    don't even know what their degrees were in?

1    A.  I supervise their work.

2    Q.  You supervise -- you went and looked at every one of the

3    posts in this -- in Exhibit 456?  Every one of the posts in

4    the spreadsheet?

5    A.  I have not.

6              MR. DuBOSE:  Objection.

7              THE COURT:  It's getting argumentative.

8              And that is not what she testified to, Mr. Sibley.

9    You're taking that out of context.

10             MR. SIBLEY:  Okay.

11             THE COURT:  And that's not what she said.

12   Q.  Tell me what the supervisory services involve.  How did

13   you supervise them?

14   A.  I have multiple standing meetings with all of the teams

15   involved, including our open source analysis team.  I also

16   meet with their managers multiple times a week in standing

17   meetings.

18             Additionally, as needed, we identify any issues,

19   needs, or concerns, and that's fluid.  This type of work

20   requires a lot of touch.

21   Q.  Okay.  How many analysts do you all have?

22   A.  Right now we have four open source analysts.

23   Q.  That's it?

24   A.  Specific to open source, we have four.

25   Q.  And were those four the ones that worked on this matter?

1    A.  Some of the team, yes.

2    Q.  Were there others that are no longer with the company?

3    A.  Yes.

4    Q.  Okay.  And you don't remember -- even though it was only

5    a few, you can't tell me what their qualifications or

6    education were?

7    A.  I can't tell you their specific degrees, no.

8    Q.  Okay.  But you would agree with me that they were

9    specialists in what they do, right?

10   A.  I would agree with you.

11   Q.  And you're a specialist in what you do, aren't you?

12   A.  I would agree with you.

13   Q.  Okay.  And if someone comes to you and says, "Jensen

14   Hughes, I need your help on this particular security

15   matter," you would hold yourself out as an expert in this

16   field, wouldn't you?

17            MR. DuBOSE:  Objection; relevance.

18            THE COURT:  Well, I'm going to overrule it.  Being

19   an expert in a field doesn't mean that somebody is

20   testifying as an expert under Federal Rule of Evidence 702.

21            So I don't know -- Mr. Sibley, so I don't know

22   precisely where you're going with that, but the witness can

23   answer the question of whether she views herself as an

24   expert, having served in the Chicago police force for 20-

25   plus years and retired as a sergeant and now has been

1    working here, whether she feels like she has some skill set

2    that gives her some expertise to do what she's doing.

3              So you may answer that.

4    A.  Yes.

5    Q.  Okay.  And besides the analysts that you mentioned, the

6    open source analysts, who else was involved in creating

7    Exhibit 428?

8    A.  We have two senior investigators who are also working on

9    the project.

10   Q.  Okay.  And what do they do?

11   A.  Specifically their job is to listen to and notate all of

12   the America's Mayor nightly shows as well as any other shows

13   that Mr. Giuliani would have either authored or been a guest

14   on.

15   Q.  I see.  So for this case that was their job, right?

16   A.  That's correct.

17   Q.  Okay.  Got it.

18             And are they -- would you consider them experts in

19   what they do in their investigative services?

20   A.  I would.

21   Q.  Okay.  And so this Exhibit 428 is the product of you,

22   the analysts, and the investigators creating this document,

23   Exhibit 428, right?

24   A.  Yes.

25   Q.  Okay.  And without the expertise of all of those people,

1    this document would not have been possible, would it?

2    A.  That's correct.

3    Q.  If you don't have the qualifications, skills, or

4    training, you can't create Exhibit 428.  Am I right?

5    A.  Yes.

6    Q.  Okay.  And with the process -- without having to go

7    through all of the other threat intelligence and monitoring

8    reports that we talked about, is the process that we just

9    discussed with Exhibit 428, is it applicable to the other

10   intelligence and monitoring reports that you discussed with

11   Mr. DuBose?

12   A.  Yes.

13   Q.  Okay.

14           MR. SIBLEY:  Your Honor, at this time, I think I

15   know what your ruling's going to be, but I would re-urge --

16           THE COURT:  Why don't you step on up.

17           (The following is a bench conference

18            held outside the hearing of the jury)

19           MR. SIBLEY:  I think I know what you're going to

20   rule on it, but I have to -- I have to re-urge the

21   objection.  I think she's established that that is -- this

22   entire document is an expert report in disguise.  It's an

23   undisclosed expert report in disguise.

24           THE COURT:  Because people who have a college

25   degree and have a competency in reading comprehension --

```
 1                    MR. SIBLEY:  Your Honor --

 2                    THE COURT:  -- are able to read this?

 3                    MR. SIBLEY:  Your Honor, that's not fair.  The

 4      people -- she's saying it requires specialty.  People are

 5      gone through and making calls.  That's why I was very clear

 6      about it.

 7                    This is like an Intelius report where you put

 8      someone's in and it generates -- it's not CARFAX.  They

 9      spent labor-intensive effort, months.

10                    THE COURT:  She's offering no opinion here

11      whatsoever based on expertise.  She's collected facts and

12      she has some skill set at an office and knows how to collect

13      these facts and present them to the jury in reports.  That

14      is not offering expert opinion.

15                    Do you want to say something?

16                    MR. DuBOSE:  Sure.  Let's start with the point

17      that these reports were not generated for this litigation as

18      they would be for an expert witness in this case.

19                    To your point, Your Honor, under our last sidebar

20      these are -- she's a fact witness, and she's talking about

21      documents that were generated to ensure the safety of

22      Ms. Freeman and Ms. Moss and also track the threats.  That's

23      it.

24                    THE COURT:  So to the extent -- what precisely are

25      you asking for, Mr. Sibley?  Are you asking for these
```

1    reports to be -- having been admitted, which we all thought

2    was with your consent, do you want them struck --

3              MR. SIBLEY:  I'm going to --

4              THE COURT:  -- because they're expert reports?

5    What precisely are you asking for?

6              MR. SIBLEY:  So now that it has been revealed what

7    the nature of the document is -- and by the way, the reason

8    why we agreed to the admission is because Dr. Humphreys

9    relies on these reports, these documents, and says this is

10   data that was pulled.

11             So we weren't sure what this was.  We weren't sure

12   what they did.  We didn't have any information on this

13   person other than she was going to testify about damages.  I

14   thought looking at this firm that maybe she was going to

15   say, "Hey, I staked out their house, and I saw people" --

16   you know, I mean, there was a lot of fact witness

17   testimony --

18             THE COURT:  How long has Mr. Sibley had all these

19   reports?

20             MR. SIBLEY:  September.

21             MR. DuBOSE:  A long time.  It could have been

22   handled --

23             MR. SIBLEY:  It was after the schedule was

24   imposed.  It was after the default.

25             MR. DuBOSE:  After the default.

1          THE COURT:  Okay.  Well, to the extent that you

2     are seeking to exclude -- having had these admitted with

3     your consent, to the extent, Mr. Sibley, you are seeking to

4     have them struck as exhibits, which is a little bit belated

5     since they've already been testified to, your objection is

6     overruled because they are not expert reports.  They are

7     collations of data that they have done, and this witness has

8     not been opining about anything.

9          All right.  Thank you.  You may go back to your

10     desks.

11          (This is the end of the bench conference).

12     BY MR. SIBLEY:

13     Q.  All right.  Ms. Scott, you talked a lot about all of

14     those -- I mean, Exhibit 456 has a lot of posts that you say

15     increased in number around December 3rd of 2020, correct?

16     A.  That's correct.

17     Q.  Okay.  Is there anything in that spreadsheet that would

18     let us know how the persons who made those posts, to the

19     extent they were about the plaintiffs, how they -- how they

20     learned this information that they were discussing about the

21     plaintiffs?

22          Like do you know what the source of their -- of

23     that knowledge was of those persons?

24     A.  No, I don't.

25     Q.  Okay.  So basically what that spreadsheet shows is that

124

1    there's a timing correlation between December 3rd and a

2    radical increase in the number of posts, online posts, about

3    Ms. Freeman and Ms. Moss, correct?

4    A.  Yes.

5    Q.  But you can't necessarily identify the origin of why

6    those posts generated [sic] radically in number on December

7    3, 2020, at least from this spreadsheet, correct?

8    A.  Are you asking the origin of the spike for the 3rd of

9    December?

10   Q.  Yes, ma'am.

11   A.  No.

12   Q.  Okay.  In fact, do you know who the first person was to

13   publish this video that we've seen now of the plaintiffs

14   with the -- in the -- what's the name of the county in

15   Atlanta?  I forget.  Fulton County.  The Braves play in

16   Fulton County Stadium.  I should know that.

17          But do you know who the first person to post that

18   video and claim that there was some kind of election fraud,

19   do you have any knowledge of that?  In your research and

20   investigation, did you determine that?

21   A.  I don't know.

22   Q.  Okay.  Did you review any documents in preparation for

23   your testimony today?

24   A.  Yes.

25   Q.  Okay.  What documents did you review?

1    A.   The documents that are contained here within these

2    binders.

3    Q.   Okay.  So you just reviewed the exhibits that Mr. DuBose

4    published to you, correct?

5    A.   And the daily monitoring reports that went into the

6    comprehensive reports, yes.

7    Q.   Okay.  Any other documents other than those?

8    A.   Documents?

9    Q.   Yes, ma'am.  Any written piece -- any written

10   instrument, did you review that in preparation for your

11   testimony other than the documents we just discussed?

12   A.   Other than what we just discussed, no.

13   Q.   Okay.  Because I was wondering how you had kind of on

14   the tip of your tongue all those numbers that Mr. DuBose was

15   asking you about.  And I'm assuming you went through prior

16   to your testimony and counted these up and had the numbers

17   ready, right?

18   A.   Yes.

19   Q.   Okay.  Do you know how many of the posts that are in

20   Exhibit 456 -- let's just say Exhibit 456.  Do you know how

21   many of those posts reference Rudy Giuliani?

22   A.   I don't.

23   Q.   Okay.  Do you know how many of the posts that are

24   referenced in Exhibit 428 reference Rudy Giuliani?

25   A.   I don't.

```
1    Q.  Do you know how many of the posts in any of the threat
2    intelligence and monitoring reports that we've looked at
3    reference Rudy Giuliani?
4    A.  No, I don't.
5    Q.  Is it fair to say that most of the posts that are
6    included in Jensen Hughes materials do not reference the
7    plaintiffs by name?
8    A.  Quantify "most."
9    Q.  More than 50 percent.
10   A.  There's a large amount -- I don't know the percent --
11   that reference them by name.
12   Q.  Okay.  Did you break up the number of posts that you
13   assessed in your work between Ms. Moss and Ms. Freeman, or
14   did you just kind of lump them both together?
15   A.  They're part of the same project.
16   Q.  Okay.  So you don't have it sort of bifurcated out where
17   it says this many for Ms. Moss or this many for Ms. Freeman,
18   anything like that?
19   A.  Not for the general work, but we do for the nightly
20   show, any other shows that Mr. Giuliani would have been a
21   guest on.
22   Q.  I see.  So just the ones -- just for what Mr. Giuliani
23   said that you were monitoring, right?
24   A.  I'm sorry?
25   Q.  So it was just for what Mr. Giuliani said that you were
```

1   monitoring, correct?

2           That's the only work that you did to break up

3   Ms. Moss and Ms. Freeman separately as opposed to lumping

4   them together.  Am I right?

5   A.  Well, that was less content, but yes.

6   Q.  Okay.  And just to be clear, you haven't seen any -- I

7   mean, I asked you the question earlier.  I was going to ask

8   again.

9           Are there any materials from Jensen Hughes that

10  you're aware of that would point to Mr. Giuliani as being

11  responsible for many of these horrible racist and

12  threatening remarks that were directed at Ms. Moss and

13  Ms. Freeman?

14          MR. DuBOSE:  Objection.

15          THE COURT:  Overruled.

16  A.  Not specifically identified.

17  Q.  Okay.  Do you know how many people in general were

18  posting about Ms. Moss and Ms. Freeman back in the

19  December -- November and December 2020 time frame?

20  A.  Thousands.

21  Q.  Okay.  It was all over the Internet, wasn't it, at that

22  time?

23  A.  Among other places, yes.

24  Q.  Social media and the Internet, right?

25  A.  Yes.

1    Q.  And even on some network news shows, right?

2    A.  Yes.  Open source, yes.

3    Q.  Do you know what news networks covered the allegations

4    that Ms. Moss and Ms. Freeman had done something wrong with

5    respect to the election?

6    A.  I don't.

7    Q.  Okay.  Do you know whether there was a change in

8    activity -- well, let me strike that.

9         Do you know when this lawsuit was filed?

10   A.  I don't recall off the top of my head, no.

11   Q.  Okay.  Would it surprise you to learn that the lawsuit

12   was filed in December of 2021?

13   A.  Would it surprise me?

14   Q.  Yes, ma'am.

15   A.  I'm not surprised.

16   Q.  Okay.

17   A.  I mean, I don't understand where you're going with that

18   question.  I don't know what you mean.

19   Q.  Sure.  Well, what I was going to ask you is in doing

20   your work -- let's just assume that this lawsuit was filed

21   shortly after your firm was retained in November 2021.

22   Let's just assume it was filed in December of 2021.

23        Did you do any work to figure out whether the

24   number of mentions of Ms. Freeman or Ms. Moss arose because

25   of the media coverage that ensued after this lawsuit was

1   filed?

2   A.  No, it is not solely related to that.  There was

3   negative sentiment prior to the filing of the lawsuit.

4   Q.  Sure.  But I'm asking if you did work to see whether

5   there was a spike.  Maybe it had gone down since December

6   2020, and then once this lawsuit was filed with all of the

7   media coverage, if it went back up in December of 2021?

8   A.  Precipitating events can rise discussion.

9   Q.  Sure.  But you didn't do the work to assess that, did

10  you?

11  A.  I'd have to go back and look at the report to see if

12  that spike is specifically mentioned, but we do cover spikes

13  in activity.

14  Q.  Okay.

15          MR. SIBLEY:  All right.  I pass the witness, Your

16  Honor.

17          THE COURT:  All right.  Redirect?

18                  REDIRECT EXAMINATION

19  BY MR. DuBOSE:

20  Q.  Mr. Sibley just asked you a question about whether news

21  events may cause a spike in coverage.  If a news event

22  causes increased mentions, is there any mechanism within

23  your review that will account for a news event which may not

24  be negative versus positive?  How would you account for an

25  event that may be neutral in some sense like a news event or

 1     something else?

 2              MR. SIBLEY:  I would object to that as being

 3     compound actually, Your Honor.

 4              THE COURT:  And could you rephrase that question,

 5     please.

 6              MR. DuBOSE:  Sure.

 7              THE COURT:  I'm not sure I understood that

 8     question myself.

 9              MR. DuBOSE:  Sure.

10     Q.  So Mr. Sibley just asked you about whether or not you

11     monitored any potential spikes after a news event.  Is there

12     anything about the way that you analyze these mentions that

13     would account for something like a news event?

14     A.  Yes.

15     Q.  And what is that?

16     A.  And so within the report we notate when there is a rise

17     in mentions as part of sentiment, and so the increased

18     activity would also be listed for a particular event.

19     Q.  Okay.  And the increase in activity, is there a

20     characterization of negative versus positive in that

21     increase?

22     A.  That's correct.

23     Q.  Okay.  And how would -- in the context of negative

24     versus positive, how would a news event typically show up as

25     trending in sentiment?

1    A.  It would depend on what the news event was about.

2    Q.  Okay.  Typically Jensen Hughes takes on matters like

3    Ms. Freeman and Ms. Moss.  Does Jensen Hughes typically take

4    on matters from individuals who do not have a fear for their

5    safety?

6    A.  That's usually one of the primary keys, but also

7    reputational that could potentially lead to violence as

8    well.

9    Q.  Okay.  And let me focus you on Ms. Freeman's and

10   Ms. Moss's situation.  The retention of Jensen Hughes, do

11   you have any idea of what the primary objective was in

12   retaining Jensen Hughes?

13   A.  Yes.

14   Q.  What's that?

15   A.  So threat monitoring and also reputational to see if

16   there would be any continued conversation as it was related

17   to potential violence.

18          The violence was I think the primary catalyst for

19   the monitoring, and reputational as well.  Both.

20   Q.  Okay.  And the threat monitoring, does that have

21   anything to do with ensuring safety for Ms. Freeman and

22   Ms. Moss?

23   A.  Yes.

24   Q.  All right.  And the last thing I'll ask you is you had a

25   few questions about how much Jensen Hughes was being paid

1    potentially and how much you may have been paid.  Do you

2    recall those questions from Mr. Sibley?

3    A.  Yes.

4    Q.  Ms. Scott, notwithstanding the amount of money you may

5    be paid, would you come and testify untruthfully based on

6    money being paid to you?

7    A.  No.

8              MR. DuBOSE:  That's all I have.

9              THE COURT:  All right.  Ms. Scott, you're excused.

10             MR. SIBLEY:  Your Honor, a brief recross, if I --

11             THE COURT:  We don't do recrosses.  We go direct,

12    cross, redirect.  That's it.  Witness excused.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  Okay.  Ladies and gentlemen, it's five

15    of 5:00 so I'm going to excuse you before we start another

16    witness.

17             Remember my cautions to you during your

18    preliminary instructions.  When people want to know what did

19    you do today, say you were selected to serve on a jury in a

20    civil case.  It should last this week, possibly into next.

21             When people say, "What it's about?," please do not

22    tell them what it's about.  You can say you were instructed

23    by the judge -- I can be the bad guy here -- instructed by

24    the judge not to talk about this case and not to talk about

25    what it is because people might feel like they know

1    something when they don't, because you have to decide this

2    case based on what you hear in the courtroom.

3              So with that, please have a pleasant evening.

4              Let me just tell you, we're going to start

5    tomorrow morning -- I hope to have you all in your seats by

6    9:15.  I invite you all to come early.  We provide coffee.

7    We provide snacks.  I know this is not your -- fruit, so

8    it's not just sweets.

9              I know this is not your normal commute so leave a

10   little extra time, get here early, read the newspaper here.

11   Do not talk about the case amongst yourselves while you're

12   all sitting there having your coffee.  Talk about other

13   things.  But I invite you to come early.

14             I think we put food out at around 8:00ish, so come

15   early, because we can't start without you.

16             So thank you.  With that, have a pleasant evening.

17             (Jury exits courtroom)

18             THE COURT:  All right.  You're all excused.  See

19   you tomorrow morning.  If you have preliminary matters,

20   please bring it up at 9:00.

21             MR. SIBLEY:  Your Honor, I have a question.  The

22   breakout rooms, they lock automatically, I guess, when we

23   leave.

24             THE COURT:  Do they?  You're telling me something,

25   Mr. Sibley, I don't know.

1        MR. SIBLEY:  Well, I can ask --

2        THE COURT:  Why don't you ask Mr. Coates.  He

3   keeps charge of the rooms.

4            (Whereupon the hearing was

5            adjourned at 4:57 p.m.)

6

7        **CERTIFICATE OF OFFICIAL COURT REPORTER**

8

9        I, LISA A. MOREIRA, RDR, CRR, do hereby

10   certify that the above and foregoing constitutes a true and

11   accurate transcript of my stenographic notes and is a full,

12   true and complete transcript of the proceedings to the best

13   of my ability.

14      Dated this 11th day of December, 2023.

15

16

17                              /s/Lisa A. Moreira, RDR, CRR
                               Official Court Reporter
18                              United States Courthouse
                               Room 6718
19                              333 Constitution Avenue, NW
                               Washington, DC 20001

20

21

22

23

24

25

# $

**$17** [1] - 51:20
**$47** [1] - 51:20

# '

**'21** [1] - 86:22
**'23** [4] - 97:7, 97:14, 97:19
**'54** [1] - 64:19
**'65** [1] - 64:22
**'8** [1] - 64:9

# /

**/s/Lisa** [1] - 134:16

# 1

**1** [4] - 52:2, 63:25, 64:2, 92:5
**1,100** [1] - 81:20
**1,700** [1] - 81:15
**100** [1] - 1:14
**1053** [1] - 89:22
**1096** [1] - 90:19
**11** [3] - 1:4, 37:1, 97:14
**110263** [1] - 2:3
**1108** [1] - 2:3
**111** [1] - 50:4
**119** [1] - 61:12
**11th** [3] - 97:7, 97:18, 134:14
**12** [2] - 80:4, 89:21
**128** [1] - 64:16
**12:30** [1] - 32:18
**14** [1] - 92:15
**144** [1] - 64:16
**145** [1] - 64:16
**147** [1] - 64:16
**14th** [1] - 1:18
**15** [1] - 96:3
**150** [1] - 64:16
**151** [1] - 64:17
**15th** [1] - 96:13
**16** [1] - 50:6
**165A** [1] - 64:17
**17** [1] - 89:7
**175** [1] - 93:1
**179** [1] - 64:3
**18** [1] - 94:15
**187** [1] - 64:4
**1875** [1] - 1:14
**18th** [1] - 92:5
**1:30** [1] - 32:18
**1:35** [1] - 1:4
**1st** [2] - 84:13, 86:23

# 2

**2** [1] - 48:24
**2..** [1] - 64:18
**20** [10] - 44:9, 63:25, 97:3, 97:6, 97:11, 97:13, 97:16, 103:17, 105:23, 118:24
**20001** [2] - 2:10, 134:19
**20006** [1] - 1:15
**2012** [1] - 36:2
**202** [3] - 1:15, 2:10, 64:4
**2020** [40] - 8:2, 8:9, 14:14, 20:5, 34:14, 35:9, 35:11, 35:23, 36:1, 36:15, 36:23, 37:1, 37:9, 37:17, 40:13, 40:21, 41:17, 41:23, 43:21, 48:1, 48:2, 48:11, 50:3, 50:8, 50:20, 54:8, 78:16, 78:20, 78:23, 81:2, 81:5, 81:8, 97:13, 111:22, 123:15, 124:7, 127:19, 129:6
**2021** [11] - 48:24, 84:13, 89:23, 95:12, 101:12, 110:16, 111:22, 128:12, 128:21, 128:22, 129:7
**2023** [15] - 1:4, 84:13, 86:23, 89:7, 89:21, 92:5, 92:6, 94:15, 94:16, 96:3, 96:13, 97:20, 112:10, 112:14, 134:14
**205** [3] - 64:7, 64:8, 64:10
**209** [2] - 64:7, 64:11
**20th** [2] - 37:3, 44:3
**21** [1] - 84:13
**21-3354** [1] - 1:3
**210** [3] - 64:7, 64:8, 64:11
**214** [1] - 64:13
**216** [1] - 64:13
**21st** [1] - 86:22
**223** [1] - 64:13
**225** [1] - 64:13
**22nd** [2] - 50:3, 94:16
**23** [1] - 50:8
**234** [1] - 64:17
**236** [1] - 64:17
**237** [1] - 64:17
**239** [1] - 64:17
**24** [1] - 92:21
**243** [1] - 64:17
**248** [1] - 64:13
**249** [1] - 50:4
**25** [1] - 64:2
**253** [1] - 64:14
**254** [1] - 64:17
**264** [2] - 64:21, 64:22
**265** [1] - 64:21
**269** [2] - 64:23, 65:11
**275** [1] - 64:23
**278** [1] - 64:23
**28** [1] - 64:3
**285** [1] - 89:17
**291** [1] - 64:23

# 3

**3** [15] - 14:14, 20:5, 35:9, 36:15, 37:9, 37:17, 41:23, 78:16, 78:20, 78:23, 81:2, 81:5, 89:22, 94:17, 124:7
**30** [6] - 69:12, 98:10, 98:12, 98:13, 102:2, 105:6
**301** [1] - 64:23
**303-1016** [1] - 1:15
**30309** [1] - 1:18
**307** [1] - 64:23
**309** [1] - 40:11
**312** [1] - 64:23
**318,000** [2] - 92:9, 92:10
**320,000** [2] - 94:8, 94:13
**333** [2] - 2:9, 134:18
**335** [1] - 64:14
**338** [1] - 64:14
**345** [1] - 64:24
**35** [1] - 50:9
**354-3187** [1] - 2:10
**381** [1] - 64:24
**3:15** [1] - 96:1
**3:38** [1] - 96:1
**3rd** [6] - 36:20, 48:2, 50:3, 123:15, 124:1, 124:8

# 4

**4** [8] - 40:13, 48:10, 65:2, 80:7, 81:8, 92:12, 97:14, 97:20
**404** [1] - 1:19
**426** [1] - 64:24
**428** [20] - 64:24, 65:1, 82:3, 83:7, 83:11, 84:7, 86:16, 91:7,

112:7, 112:19, 113:22, 115:19, 116:17, 116:22, 119:7, 119:21, 119:23, 120:4, 120:9, 125:24
**448** [1] - 40:11
**452** [2] - 65:1, 87:25
**453** [1] - 65:1
**456** [25] - 65:1, 65:2, 65:4, 70:18, 70:20, 70:21, 70:22, 70:25, 72:24, 75:14, 77:5, 77:6, 77:8, 77:9, 78:11, 82:5, 82:7, 111:9, 111:17, 111:19, 112:17, 117:3, 123:14, 125:20
**459** [4] - 65:1, 65:2, 65:6
**463** [4] - 95:19, 95:21, 95:22, 96:1
**465** [2] - 65:1, 65:6
**466** [5] - 64:24, 91:12, 91:15, 91:19, 91:25
**467** [1] - 65:8
**468** [1] - 65:8
**470** [1] - 65:8
**471** [2] - 64:14, 65:8
**477** [1] - 65:8
**479** [1] - 65:8
**482** [1] - 65:9
**483** [1] - 65:9
**485** [1] - 65:9
**487** [1] - 65:9
**49** [1] - 64:3
**4:57** [1] - 134:5
**4th** [4] - 40:1, 81:11, 97:7, 97:9

# 5

**5** [3] - 43:21, 78:18, 88:7
**50** [1] - 126:9
**512** [1] - 64:14
**513** [1] - 64:14
**52** [1] - 49:25
**521** [2] - 64:14, 65:9
**522** [1] - 64:15
**523** [1] - 65:9
**53** [1] - 89:3
**54** [1] - 64:16
**542** [1] - 64:15
**543** [1] - 64:15
**546** [1] - 64:15
**554** [3] - 64:24, 93:21, 93:25
**555** [1] - 1:21

**559** [2] - 64:15, 65:9
**56** [1] - 64:16
**56.7** [1] - 50:9
**568** [1] - 64:15
**569** [1] - 64:15
**575** [1] - 64:24
**58** [1] - 89:2
**588** [1] - 64:15
**5:00** [2] - 32:19, 132:15
**5th** [3] - 1:21, 81:16, 81:17

# 6

**6** [1] - 64:9
**619-9819** [1] - 1:22
**65** [1] - 94:21
**657,000** [1] - 88:3
**67** [1] - 92:14
**6718** [2] - 2:9, 134:18
**69** [1] - 3:4

# 7

**7** [3] - 64:9, 79:5
**702** [1] - 118:20
**710,000** [3] - 87:2, 87:3, 87:6
**713** [1] - 2:4
**720-8111** [1] - 1:19
**75** [1] - 1:18
**78701** [1] - 2:4
**7th** [1] - 61:12

# 8

**8:00ish** [1] - 133:14

# 9

**90** [3] - 21:14, 21:20, 88:6
**90013** [1] - 1:22
**919** [1] - 1:22
**966-6789** [1] - 2:4
**9:00** [1] - 133:20
**9:15** [2] - 32:16, 133:6

# A

**a.m** [1] - 32:16
**ability** [3] - 10:17, 66:10, 134:13
**able** [9] - 6:2, 58:6, 59:16, 62:20, 78:8, 89:14, 102:4, 114:4, 121:2
**absent** [1] - 62:15
**absentee** [1] - 36:17
**absolute** [1] - 19:10

**absolutely** [4] - 66:17, 74:22, 75:12, 111:4
**abstract** [1] - 34:8
**accept** [7] - 12:9, 14:6, 23:7, 24:14, 28:17, 34:14, 37:5
**acceptable** [1] - 55:2
**access** [1] - 35:16
**accident** [2] - 48:10, 90:5
**accomplished** [1] - 51:10
**according** [1] - 114:12
**accordingly** [1] - 90:18
**Account** [1] - 93:12
**account** [3] - 129:23, 129:24, 130:13
**accounts** [2] - 9:24, 48:24
**accurate** [1] - 134:11
**accusations** [2] - 46:24, 49:18
**accused** [3] - 8:12, 13:5, 48:20
**accusing** [1] - 43:16
**acknowledging** [1] - 41:11
**act** [2] - 54:17, 54:18
**acted** [2] - 13:24, 20:2
**acting** [1] - 38:4
**Action** [1] - 1:3
**action** [10] - 6:22, 9:18, 10:20, 34:13, 34:19, 37:8, 38:8, 41:6, 41:19, 108:1
**actionable** [15] - 12:16, 12:21, 12:22, 12:25, 13:4, 13:11, 13:15, 13:19, 17:8, 17:16, 17:25, 50:7, 66:13, 67:9
**actions** [10] - 8:20, 8:22, 14:23, 20:11, 26:9, 40:14, 42:10
**active** [3] - 106:20, 106:21, 107:14
**activity** [5] - 87:13, 128:8, 129:13, 130:18, 130:19
**acts** [2] - 8:13, 14:20
**actual** [6] - 12:12, 13:19, 46:8, 89:5, 89:19
**add** [2] - 52:1, 53:7
**addition** [1] - 27:6
**Additional** [1] - 88:7
**additional** [3] - 17:22, 87:10, 89:23
**additionally** [1] -

117:18
**address** [2] - 10:18, 15:1
**adjourned** [1] - 134:5
**admissible** [2] - 25:13, 25:17
**admission** [7] - 60:9, 66:2, 67:4, 67:6, 74:2, 74:3, 122:8
**admit** [1] - 61:5
**admitted** [16] - 7:9, 7:10, 23:25, 24:1, 65:16, 66:1, 70:20, 70:23, 74:6, 83:7, 83:23, 91:12, 93:21, 95:19, 122:1, 123:2
**admitting** [1] - 60:1
**ads** [1] - 48:19
**adverse** [1] - 52:12
**advertising** [2] - 16:5, 52:25
**advice** [1] - 28:20
**affords** [1] - 114:6
**afield** [1] - 116:11
**aftermath** [1] - 35:11
**AFTERNOON** [1] - 1:9
**afternoon** [7] - 44:25, 68:15, 68:16, 68:25, 69:1, 99:13, 99:14
**age** [2] - 28:12, 30:19
**ago** [2] - 87:5, 97:9
**agree** [4] - 7:15, 118:8, 118:10, 118:12
**agreed** [6] - 14:17, 24:2, 24:3, 60:19, 74:3, 122:8
**agreement** [3] - 14:20, 113:2, 113:18
**ahead** [1] - 86:12
**aid** [1] - 5:13
**al** [1] - 1:3
**alert** [2] - 76:15
**allegations** [1] - 128:3
**allege** [1] - 8:19
**alleged** [1] - 55:22
**alleging** [1] - 79:10
**allow** [1] - 108:13
**allowed** [1] - 43:12
**allows** [4] - 46:23, 49:18, 73:22, 78:7
**almost** [1] - 100:14
**alone** [3] - 44:5, 51:21, 52:8
**alongside** [2] - 38:19, 43:9
**aloud** [6] - 80:5, 89:13, 90:3, 90:15, 92:23, 93:11
**ALSO** [1] - 2:6
**alternates** [1] - 6:11

**Amendment** [1] - 40:10
**America** [3] - 14:16, 20:7, 54:25
**America's** [4] - 95:15, 96:10, 97:23, 119:12
**Americans** [1] - 48:6
**amount** [24] - 9:6, 11:3, 11:19, 16:8, 16:9, 16:13, 16:20, 17:3, 17:22, 18:12, 18:16, 42:22, 45:6, 57:11, 57:15, 58:4, 58:6, 58:14, 59:8, 60:2, 112:20, 112:21, 126:10, 132:4
**amplifier** [1] - 48:23
**analysis** [11] - 69:7, 69:23, 73:24, 78:10, 85:14, 85:17, 108:12, 108:19, 109:18, 110:5, 117:15
**analysts** [20] - 89:6, 109:4, 114:4, 114:24, 115:1, 115:2, 115:3, 115:8, 115:13, 115:17, 115:18, 115:20, 116:3, 116:17, 117:21, 117:22, 119:5, 119:6, 119:22
**analyze** [1] - 130:12
**analyzes** [1] - 50:13
**Angeles** [1] - 1:22
**ANNIE** [1] - 1:13
**Annie** [1] - 7:3
**answer** [11] - 21:18, 25:21, 25:22, 25:24, 26:3, 26:5, 40:8, 76:2, 118:23, 119:3
**answered** [1] - 25:22
**answers** [3] - 21:19, 21:22, 22:7
**anti** [1] - 104:19
**anti-Trump** [1] - 104:19
**anticipate** [1] - 27:25
**anything..** [1] - 66:24
**anyway** [1] - 58:21
**apologize** [1] - 95:9
**apologizing** [1] - 89:11
**appeal** [1] - 66:8
**appear** [1] - 23:13
**APPEARANCES** [2] - 1:11, 2:1
**applicable** [1] - 120:9
**applies** [1] - 23:6

**apply** [4] - 19:15, 22:22, 23:8, 45:7
**appreciate** [1] - 35:2
**approach** [1] - 69:21
**appropriate** [3] - 51:23, 59:14, 73:5
**approximate** [2] - 17:17, 18:14
**April** [1] - 89:7
**area** [1] - 29:9
**Arena** [10] - 8:2, 36:15, 37:11, 37:15, 37:20, 39:21, 78:25, 79:2, 79:3, 80:22
**argument** [6] - 25:11, 57:25, 58:12, 61:10, 61:24, 62:1
**argumentative** [1] - 117:7
**arguments** [5] - 22:16, 22:17, 22:21, 24:23, 62:5
**arm** [1] - 69:22
**arose** [1] - 128:24
**arrest** [3] - 40:19, 41:11, 41:13
**arrested** [2] - 48:13, 87:22
**arsonist** [1] - 51:6
**article** [1] - 43:16
**artificially** [3] - 15:16, 15:21, 16:2
**Ashlee** [1] - 49:8
**aside** [1] - 32:6
**aspect** [1] - 86:18
**asserted** [1] - 40:10
**assertion** [2] - 21:13, 21:16
**assess** [3] - 114:14, 115:5, 129:9
**assessed** [1] - 126:13
**assessment** [5] - 50:13, 75:11, 99:16, 105:13
**assessments** [1] - 70:3
**assets** [3] - 15:16, 16:1, 52:21
**assisting** [1] - 34:25
**associated** [3] - 78:24, 83:3, 87:23
**association** [1] - 57:6
**assume** [10] - 11:2, 15:9, 15:11, 15:14, 15:18, 15:23, 16:3, 24:17, 128:20, 128:22
**assumed** [3] - 11:1, 11:7, 15:4
**assumes** [2] - 46:25,

106:18
**assuming** [3] - 60:24, 86:15, 125:15
**assumptions** [1] - 106:17
**Atlanta** [3] - 1:18, 93:15, 124:15
**ATT** [1] - 89:9
**attach** [1] - 45:16
**attention** [13] - 4:22, 4:25, 6:14, 23:16, 23:23, 32:5, 32:6, 32:25, 35:3, 56:24, 58:18, 80:4, 86:17
**attorney** [2] - 7:4, 8:5
**attorneys** [6] - 7:1, 20:22, 21:7, 28:25, 29:8, 29:11
**attributable** [1] - 58:7
**attributed** [1] - 57:4
**audience** [4] - 35:17, 37:10, 37:19, 51:12
**audio** [5] - 35:6, 37:22, 39:23, 40:5, 41:20
**August** [4] - 92:5, 94:15, 96:3, 96:12
**Austin** [1] - 2:4
**author** [2] - 79:12, 83:18
**authored** [1] - 119:13
**authors** [1] - 85:6
**automated** [3] - 100:6, 100:13, 100:18
**automatically** [1] - 133:22
**available** [2] - 23:18, 108:16
**Avenue** [2] - 2:9, 134:18
**avoid** [2] - 29:3, 29:9
**award** [17] - 16:9, 16:11, 16:23, 17:10, 17:21, 44:19, 44:21, 45:23, 47:15, 51:24, 52:7, 53:4, 54:9, 54:10, 58:14, 59:7, 59:12
**awarded** [4] - 16:9, 16:19, 18:10, 57:16
**awarding** [1] - 44:22
**awards** [3] - 11:3, 15:10, 46:17
**aware** [9] - 94:22, 95:5, 95:11, 100:9, 100:11, 107:12, 107:19, 127:10
**awareness** [2] - 13:24, 70:4

# B

**background** [6] - 69:11, 74:10, 99:20, 100:11, 109:23, 116:20
**backpedaling** [1] - 74:5
**bad** [1] - 132:23
**bag** [1] - 4:15
**bags** [1] - 38:14
**balanced** [1] - 19:22
**ballot** [5] - 36:25, 37:12, 37:20, 40:2, 43:13
**Ballots** [1] - 93:14
**ballots** [8] - 8:15, 8:16, 36:18, 39:9, 39:11, 41:9, 78:25, 80:8
**based** [31] - 11:23, 11:24, 17:18, 18:15, 27:12, 30:12, 31:16, 31:25, 50:23, 51:25, 53:19, 59:15, 66:5, 67:6, 67:14, 71:19, 72:3, 73:19, 73:20, 75:9, 76:16, 79:19, 79:23, 83:2, 101:5, 113:11, 114:15, 121:11, 132:5, 133:2
**baseline** [1] - 115:5
**basing** [1] - 31:14
**basis** [5] - 17:14, 18:8, 47:5, 58:8, 84:15
**batch** [6] - 60:1, 60:9, 60:12, 61:6, 63:2, 74:2
**batch-admitting** [1] - 60:1
**battleground** [1] - 8:10
**bearing** [1] - 19:20
**beat** [1] - 43:20
**become** [2] - 48:7, 87:23
**becomes** [1] - 83:4
**BEFORE** [1] - 1:9
**began** [3] - 40:15, 50:20, 78:24
**begin** [2] - 78:22, 101:9
**beginning** [5] - 32:7, 37:9, 37:17, 39:20, 47:8
**begins** [1] - 20:15
**behavior** [1] - 55:1
**behind** [1] - 80:8
**belated** [1] - 123:4
**belief** [1] - 18:23
**beliefs** [1] - 57:7

**believability** [1] - 23:12
**believes** [2] - 25:12, 25:16
**belonged** [1] - 38:13
**Ben** [1] - 33:24
**bench** [6] - 74:13, 76:25, 104:4, 107:4, 120:17, 123:11
**benefits** [1] - 15:12
**BERYL** [1] - 1:9
**best** [2] - 43:1, 134:12
**better** [5] - 4:25, 5:1, 5:8, 5:9, 51:11
**between** [7] - 27:19, 50:3, 50:4, 50:9, 51:20, 124:1, 126:13
**beyond** [5] - 16:20, 19:11, 19:14, 55:21, 100:17
**bias** [4] - 103:23, 104:21, 105:4, 105:17
**bid** [1] - 8:8
**Biden** [1] - 36:23
**bifurcated** [1] - 126:16
**big** [1] - 57:14
**billed** [3] - 113:9, 113:10, 113:11
**billing** [1] - 114:18
**binders** [1] - 125:2
**birth** [1] - 100:5
**bit** [8] - 40:21, 55:7, 73:23, 77:4, 77:22, 95:10, 104:25, 123:4
**blanche** [1] - 66:22
**blog** [1] - 27:8
**blogging** [1] - 28:15
**blueprint** [1] - 40:24
**board** [1] - 54:21
**books** [1] - 30:16
**Bostrom** [2] - 85:9, 85:11
**bottom** [4] - 90:14, 92:17, 93:5, 94:17
**bounty** [1] - 93:9
**BR** [1] - 89:8
**brackets** [1] - 53:13
**Brad** [2] - 36:24, 49:1
**bragged** [1] - 49:2
**brand** [3] - 48:18, 54:15
**branded** [1] - 48:17
**brands** [1] - 33:22
**bratt** [1] - 89:8
**braves** [1] - 124:15
**breadth** [1] - 55:21
**break** [9] - 32:17, 32:18, 32:19, 39:10,

59:20, 61:1, 68:9, 126:12, 127:2
**breakout** [1] - 133:22
**breathing** [1] - 90:7
**Brian** [1] - 37:2
**brief** [2] - 59:23, 132:10
**briefly** [4] - 6:17, 7:17, 22:25, 69:10
**bring** [3] - 68:1, 68:4, 133:20
**build** [3] - 51:9, 83:2, 101:6
**building** [1] - 51:1
**built** [1] - 75:19
**bullhorns** [1] - 43:23
**burden** [6] - 17:13, 18:7, 19:8, 19:24, 55:23, 59:17
**burned** [1] - 51:6
**business** [9] - 33:21, 33:22, 44:14, 73:8, 73:11, 73:17, 76:22, 86:5, 86:6
**businesses** [2] - 15:25, 16:3
**busy** [1] - 36:19
**but..** [1] - 100:2
**BY** [9] - 68:24, 72:20, 77:3, 80:3, 84:6, 99:12, 107:6, 123:12, 129:19

# C

**CA** [1] - 1:22
**cabinet** [1] - 10:12
**calculate** [2] - 46:18, 61:16
**calculated** [1] - 51:2
**calculating** [2] - 11:3, 15:10
**calculations** [1] - 51:17
**CAMARA** [1] - 2:2
**cameras** [1] - 44:7
**campaign** [6] - 8:7, 8:9, 41:18, 47:9, 48:19, 50:1
**campaign's** [2] - 14:15, 20:6
**canary** [1] - 89:16
**candidate** [1] - 115:3
**candy** [1] - 39:15
**cannot** [2] - 30:19, 31:12
**capacities** [1] - 69:14
**capacity** [1] - 77:11
**Capitol** [2] - 38:11, 43:21

**capture** [3] - 17:20, 82:1, 82:17
**captures** [2] - 89:6, 89:20
**car** [3] - 21:14, 21:20, 90:5
**career** [3] - 45:19, 47:19, 71:22
**careful** [2] - 23:16, 23:23
**carefully** [1] - 15:8
**CARFAX** [2] - 100:14, 121:8
**carried** [1] - 19:24
**carrying** [2] - 19:7, 43:23
**carte** [1] - 66:22
**case** [136] - 6:11, 6:14, 7:18, 7:21, 9:9, 9:10, 9:12, 9:16, 9:18, 10:7, 11:1, 11:7, 11:10, 11:24, 12:24, 13:10, 14:22, 15:4, 16:7, 16:16, 16:23, 18:18, 19:13, 19:15, 20:9, 22:2, 22:17, 22:18, 23:6, 23:25, 24:6, 24:11, 24:14, 24:15, 24:17, 25:3, 25:10, 26:10, 26:14, 26:18, 26:19, 26:21, 26:25, 27:4, 27:6, 27:8, 27:11, 27:12, 27:17, 27:19, 27:24, 27:25, 28:1, 28:2, 28:4, 28:8, 28:11, 28:14, 28:20, 28:21, 29:1, 29:2, 29:7, 29:12, 29:15, 29:17, 29:20, 29:21, 29:25, 30:2, 30:5, 30:8, 30:12, 30:15, 30:18, 30:25, 31:20, 31:21, 31:23, 31:24, 33:8, 34:4, 34:8, 34:10, 34:11, 35:1, 39:16, 40:8, 41:22, 42:12, 42:20, 44:18, 45:5, 45:8, 45:24, 46:20, 47:2, 47:9, 49:8, 50:8, 50:25, 51:21, 52:10, 55:7, 57:20, 58:18, 59:3, 59:6, 61:14, 63:17, 66:8, 69:5, 86:6, 98:16, 101:11, 101:17, 101:22, 102:23, 103:4, 103:24, 105:2, 105:9, 110:3, 113:1, 113:15,

113:16, 115:7, 119:15, 121:18, 132:20, 132:24, 133:2, 133:11
**cases** [9] - 19:12, 57:21, 98:16, 103:7, 104:19, 104:20, 107:9, 107:12, 107:18
**catalyst** [1] - 131:18
**causation** [2] - 61:13, 62:2, 62:16
**caused** [20] - 8:20, 9:7, 10:15, 10:18, 12:14, 12:20, 14:1, 14:9, 14:22, 14:23, 15:2, 17:24, 20:10, 20:11, 42:2, 42:10, 42:19, 55:24, 57:10, 62:2, 62:6
**causes** [2] - 19:5, 129:22
**cautions** [1] - 132:17
**CCTV** [1] - 80:19
**celebrity** [1] - 58:1
**cents** [3] - 45:17, 46:19, 51:2
**certain** [17] - 7:15, 9:10, 10:21, 10:25, 11:3, 12:10, 14:20, 15:3, 15:9, 19:20, 22:8, 24:13, 24:17, 24:20, 26:16, 46:24, 52:11, 60:1, 111:6
**certainly** [3] - 47:1, 56:4, 56:19
**certainty** [1] - 19:11
**CERTIFICATE** [1] - 134:7
**certification** [1] - 35:22
**certify** [1] - 134:10
**certifying** [1] - 37:2
**chair** [1] - 5:11
**chairs** [1] - 4:14
**challenging** [2] - 45:10, 45:15
**chance** [3] - 20:15, 31:2, 31:4
**change** [3] - 35:23, 44:14, 128:7
**changing** [1] - 8:17
**characteristic** [2] - 90:23, 93:17
**characterization** [1] - 130:20
**charge** [6] - 39:25, 56:5, 112:23, 112:24, 113:1, 134:3
**charges** [1] - 90:16

**chart** [1] - 87:25
**chat** [1] - 28:16
**chats** [1] - 9:24
**cheapen** [1] - 34:1
**cheapened** [1] - 34:6
**cheapens** [1] - 34:3
**cheating** [1] - 48:7
**check** [2] - 99:21, 100:11
**Chicago** [4] - 69:12, 71:23, 72:13, 118:24
**Chick** [1] - 43:15
**Chick-fil-A** [1] - 43:15
**chief** [1] - 41:16
**child** [1] - 33:17
**choices** [1] - 47:11
**choose** [1] - 23:20
**chose** [1] - 37:5
**Christmas** [1] - 40:21
**circled** [1] - 37:15
**Circuit** [2] - 61:14, 66:10
**circulated** [1] - 49:1
**citizen's** [1] - 40:19
**City** [1] - 8:4
**civic** [1] - 35:2
**civil** [18] - 7:21, 9:1, 9:18, 10:20, 11:12, 14:12, 16:10, 16:23, 19:15, 20:1, 20:3, 27:19, 27:24, 42:7, 54:15, 59:6, 132:20
**Civil** [1] - 1:3
**claim** [9] - 7:22, 12:4, 17:6, 18:2, 20:1, 20:23, 39:21, 41:8, 124:18
**claiming** [2] - 57:11, 58:5
**claims** [10] - 10:5, 10:6, 10:17, 10:22, 11:5, 12:3, 12:5, 38:23, 50:17, 67:8
**classified** [2] - 50:1, 50:7
**clear** [6] - 66:17, 67:15, 97:21, 111:4, 121:5, 127:6
**clearly** [1] - 76:12
**client** [14] - 55:8, 58:14, 60:8, 73:9, 75:16, 83:1, 87:15, 101:3, 101:8, 107:23, 113:5, 113:6
**client-specific** [2] - 73:9, 83:1
**clients** [15] - 39:17, 42:20, 45:12, 46:22, 47:17, 47:24, 48:10, 48:17, 53:9, 54:3,

75:2, 98:8, 104:15, 105:12, 105:22
**clients'** [2] - 48:12, 53:7
**clip** [2] - 48:25, 96:14
**close** [2] - 38:12, 53:4
**closing** [3] - 22:16, 22:17, 58:12
**co** [14] - 14:18, 14:24, 20:12, 27:21, 34:11, 34:16, 37:4, 41:14, 42:11, 48:4, 48:15, 49:14, 50:16, 54:12
**co-conspirators** [11] - 14:18, 14:24, 20:12, 34:16, 37:4, 42:11, 48:4, 48:15, 49:14, 50:16, 54:12
**co-workers** [1] - 27:21
**Coates** [6] - 5:24, 29:18, 29:22, 30:9, 32:14, 134:2
**Coates's** [1] - 65:19
**coded** [1] - 114:11
**coffee** [3] - 49:6, 133:6, 133:12
**collations** [1] - 123:7
**colleague** [1] - 44:20
**colleagues** [2] - 45:2, 47:20
**collect** [2] - 5:24, 121:12
**collected** [2] - 6:7, 121:11
**collecting** [1] - 81:21
**collection** [1] - 85:17
**collects** [1] - 72:22
**college** [2] - 115:22, 120:24
**COLUMBIA** [1] - 1:1
**Column** [1] - 80:5
**combination** [1] - 101:6
**combine** [1] - 99:6
**coming** [3] - 38:16, 60:3, 115:4
**commentaries** [1] - 89:24
**commentary** [2] - 50:14, 50:19
**comments** [5] - 26:7, 47:17, 48:2, 48:4, 90:10
**commit** [4] - 14:12, 14:18, 20:3, 42:7
**commits** [1] - 13:7
**committing** [3] - 8:13, 13:5, 43:16
**common** [4] - 6:17, 17:22, 18:19, 24:10

**communicate** [1] - 12:21
**communicated** [1] - 12:19
**communicates** [1] - 78:3
**communication** [1] - 27:9
**Communications** [4] - 15:25, 16:4, 40:25, 51:15
**communications** [2] - 10:11, 28:13
**community** [4] - 13:2, 13:3, 13:12, 13:13
**commute** [1] - 133:9
**companies** [1] - 49:12
**company** [5] - 47:20, 76:11, 99:16, 100:17, 118:2
**compare** [1] - 78:8
**compelled** [1] - 43:10
**compensate** [5] - 16:14, 16:21, 17:10, 17:23, 18:17
**compensation** [4] - 9:3, 18:12, 46:4, 105:3
**compensatory** [13] - 11:4, 11:21, 15:10, 16:12, 16:13, 16:20, 18:10, 45:24, 46:3, 46:9, 46:10, 52:7, 53:5
**competency** [1] - 120:25
**compilation** [1] - 116:7
**complaining** [1] - 55:20
**complaint** [3] - 61:16, 61:17, 61:18
**complete** [1] - 134:12
**completely** [1] - 32:2
**comply** [4] - 10:8, 10:15, 15:2, 52:18
**complying** [1] - 10:19
**component** [1] - 108:18
**compound** [4] - 111:2, 112:1, 112:3, 130:3
**comprehension** [1] - 120:25
**comprehensive** [5] - 83:15, 84:11, 91:23, 94:5, 125:16
**computer** [2] - 9:23, 10:12
**computers** [1] - 28:14
**CONANT** [1] - 1:13

**concept** [2] - 46:3, 50:10
**concern** [1] - 106:23
**concerned** [1] - 101:3
**concerning** [1] - 29:25
**concerns** [5] - 101:7, 102:12, 105:12, 107:25, 117:19
**conclude** [1] - 18:4
**concluded** [1] - 13:4
**conclusion** [4] - 12:17, 12:22, 13:14, 13:18
**conclusions** [2] - 24:10, 39:2
**concocting** [1] - 35:12
**conditions** [1] - 12:4
**conduct** [22] - 9:4, 9:8, 11:14, 14:8, 16:25, 17:1, 22:1, 23:3, 26:17, 30:13, 30:16, 30:20, 30:24, 34:10, 42:5, 42:19, 46:13, 46:14, 58:20, 66:13, 67:10
**confer** [1] - 102:14
**conference** [6] - 60:1, 74:13, 76:25, 104:4, 107:4, 120:17
**conference)** [1] - 123:11
**conferring** [1] - 60:8
**confident** [1] - 21:15
**confidential** [7] - 104:12, 105:9, 105:16, 106:14, 106:15, 106:24, 107:2
**confidentiality** [2] - 105:8, 105:10
**confidently** [1] - 21:21
**confirm** [8] - 65:10, 65:15, 65:21, 65:23, 70:20, 83:6, 93:20, 95:18
**confirmation** [1] - 38:1
**confirmed** [2] - 40:1, 52:24
**confirming** [1] - 91:11
**conflicts** [1] - 23:21
**connect** [2] - 33:18, 33:19
**connected** [1] - 29:2
**connection** [1] - 75:4
**consent** [2] - 122:2, 123:3
**conservative** [1] - 53:6
**consider** [13] - 7:16, 17:11, 18:18, 22:23, 23:13, 23:24, 24:3,

26:3, 44:22, 52:14, 52:22, 54:24, 119:18
**consideration** [3] - 7:9, 22:10, 32:1
**considered** [4] - 7:12, 24:21, 25:1, 31:11
**considering** [1] - 19:3
**consistent** [1] - 81:1
**conspiracy** [17] - 7:25, 9:1, 11:13, 14:12, 14:25, 20:1, 20:3, 20:12, 42:7, 42:11, 55:22, 62:6, 63:11, 67:7, 67:9
**conspirators** [13] - 14:18, 14:24, 20:12, 34:12, 34:16, 37:4, 41:15, 42:11, 48:4, 48:15, 49:14, 50:16, 54:12
**constitute** [3] - 19:21, 41:23, 50:25
**constitutes** [1] - 134:10
**Constitution** [2] - 2:9, 134:18
**construction** [1] - 85:12
**consult** [1] - 30:15
**consultant** [1] - 69:6
**consulting** [1] - 69:19
**contact** [4] - 28:24, 29:5, 29:14, 101:15
**contacted** [2] - 101:10, 101:13
**contained** [2] - 90:13, 125:1
**contains** [1] - 21:12
**contemplated** [2] - 41:6, 41:7
**content** [9] - 81:2, 89:8, 89:11, 99:1, 99:2, 99:7, 112:22, 127:5
**context** [4] - 79:23, 80:10, 117:9, 130:23
**continue** [4] - 8:21, 16:5, 63:16, 80:8
**continued** [1] - 1:24, 131:16
**CONTINUED** [1] - 2:1
**continuing** [1] - 61:23
**Contributors** [1] - 85:7
**control** [1] - 9:21
**controls** [1] - 25:9
**controversy** [1] - 55:16
**conversation** [4] - 29:4, 29:21, 131:16
**convict** [1] - 90:17

**convicted** [1] - 89:15
**convincing** [1] - 19:5
**core** [1] - 85:17
**cornerstone** [1] - 37:8
**correct** [36] - 31:4,
62:17, 65:4, 72:23,
73:15, 77:25, 78:19,
78:21, 79:4, 79:25,
81:3, 86:2, 90:25,
92:3, 92:11, 93:4,
93:19, 94:12, 98:2,
98:6, 98:7, 100:21,
108:25, 110:10,
111:10, 112:15,
115:16, 119:16,
120:2, 123:15,
123:16, 124:3,
124:7, 125:4, 127:1,
130:22
**correctly** [1] - 97:15
**correlation** [1] - 124:1
**correspondences** [1]
- 56:14
**corridor** [1] - 29:7
**cost** [4] - 51:5, 51:7,
51:18, 52:1
**costs** [1] - 52:2
**counsel** [15] - 6:24,
20:24, 20:25, 21:3,
21:8, 24:2, 24:3,
57:1, 59:6, 101:14,
101:17, 101:21,
102:3, 103:8, 103:18
**counsel's** [1] - 45:2
**count** [5] - 8:18, 35:25,
36:10, 36:17, 39:11
**Count** [1] - 93:13
**counted** [1] - 125:16
**counting** [4] - 8:16,
78:25, 80:7, 80:8
**country** [2] - 35:16,
38:7
**counts** [1] - 41:4
**County** [5] - 8:2, 36:5,
36:15, 124:15,
124:16
**county** [1] - 124:14
**couple** [2] - 77:7,
102:16
**course** [11] - 5:20,
6:10, 21:23, 35:15,
42:25, 54:23, 63:22,
73:8, 73:11, 83:22,
86:6
**COURT** [152] - 1:1, 4:2,
33:6, 55:5, 57:20,
59:19, 59:22, 59:24,
60:5, 60:9, 60:14,
60:17, 60:19, 60:22,
60:25, 61:5, 61:23,

62:9, 62:13, 62:22,
63:2, 63:15, 63:19,
63:24, 64:8, 64:10,
64:12, 64:18, 64:20,
64:22, 65:2, 65:5,
65:7, 65:12, 65:17,
65:19, 65:22, 65:25,
66:4, 66:15, 66:21,
67:11, 67:17, 67:20,
67:22, 68:1, 68:4,
68:6, 68:13, 68:15,
68:17, 68:20, 70:21,
70:23, 71:13, 72:6,
72:9, 72:12, 72:16,
72:18, 73:5, 74:1,
74:12, 74:15, 74:23,
75:3, 75:9, 75:13,
75:21, 76:19, 76:24,
77:1, 79:14, 79:17,
79:23, 80:1, 80:15,
80:17, 82:4, 82:7,
82:11, 82:15, 82:21,
83:8, 83:24, 84:2,
84:4, 84:20, 84:23,
86:10, 91:7, 91:10,
91:15, 91:17, 93:22,
94:25, 95:2, 95:4,
95:8, 95:21, 95:23,
96:2, 97:11, 99:10,
99:25, 100:3, 102:8,
102:19, 103:25,
104:6, 104:14,
104:23, 105:11,
105:15, 105:20,
105:22, 106:1,
106:8, 106:19,
106:22, 107:1,
107:5, 111:3,
111:12, 111:16,
111:18, 112:2,
116:2, 116:10,
116:13, 117:7,
117:11, 118:18,
120:16, 120:24,
121:2, 121:10,
121:24, 122:4,
122:18, 123:1,
127:15, 129:17,
130:4, 130:7, 132:9,
132:11, 132:14,
133:18, 133:24,
134:2, 134:7
**court** [6] - 12:24, 22:6,
31:10, 31:12, 102:5
**Court** [37] - 2:8, 2:8,
8:24, 10:7, 10:14,
10:20, 13:4, 13:23,
14:4, 14:11, 15:3,
16:10, 20:2, 24:25,
25:5, 41:22, 42:3,
42:6, 42:13, 42:20,

42:21, 45:24, 46:15,
46:21, 50:25, 52:11,
52:17, 55:6, 55:22,
56:3, 58:15, 63:10,
65:23, 67:6, 67:10,
134:17
**court's** [1] - 61:12
**Court's** [4] - 14:1,
62:8, 65:13, 67:6
**courthouse** [1] - 29:6
**Courthouse** [2] - 2:9,
134:17
**COURTROOM** [2] -
91:13, 95:20
**courtroom** [17] - 4:12,
6:6, 22:13, 25:2,
25:4, 27:13, 27:14,
29:3, 30:6, 30:13,
31:3, 32:2, 32:21,
59:21, 68:5, 133:2,
133:17
**Courts** [1] - 90:4
**cover** [2] - 110:23,
129:12
**coverage** [6] - 30:2,
30:7, 69:20, 128:25,
129:7, 129:21
**covered** [2] - 92:4,
128:3
**covers** [1] - 110:19
**cracking** [1] - 95:10
**create** [5] - 41:2, 73:2,
75:6, 99:16, 120:4
**created** [3] - 74:24,
74:25, 116:6
**creates** [1] - 76:12
**creating** [2] - 119:6,
119:22
**credibility** [1] - 23:12
**credit** [1] - 31:9
**crime** [2] - 48:7, 59:5
**crimes** [2] - 13:5,
48:21
**criminal** [7] - 19:12,
19:13, 41:11, 46:25,
48:18, 59:3, 92:24
**criminals** [3] - 38:5,
48:17, 54:16
**criticism** [1] - 48:1
**cross** [5] - 21:1, 21:2,
21:7, 21:10, 132:12
**CROSS** [1] - 99:11
**cross-examination** [3]
- 21:1, 21:2, 21:10
**CROSS-
EXAMINATION** [1] -
99:11
**CRR** [3] - 2:8, 134:9,
134:16
**cruel** [1] - 54:13

**cue** [1] - 65:19
**cup** [1] - 49:6
**current** [2] - 8:5,
103:18
**custodian** [1] - 73:18

# D

**D.C** [1] - 66:9
**daily** [1] - 125:5
**damage** [6] - 9:7,
17:21, 46:23, 51:5,
51:19, 55:24
**damaged** [1] - 55:11
**damages** [70] - 9:3,
9:6, 11:4, 11:8,
11:15, 11:20, 11:21,
15:5, 15:10, 16:8,
16:10, 16:12, 16:13,
16:19, 16:21, 16:24,
17:3, 17:10, 17:18,
18:3, 18:6, 18:8,
18:10, 18:15, 20:8,
26:11, 26:13, 42:22,
44:19, 44:21, 44:23,
45:6, 45:8, 45:23,
46:3, 46:7, 46:8,
46:9, 46:10, 46:11,
46:17, 46:18, 47:15,
50:24, 51:24, 52:7,
52:15, 53:5, 53:14,
54:10, 54:24, 57:11,
57:15, 58:5, 58:7,
58:14, 58:16, 59:8,
61:16, 62:3, 62:6,
66:13, 76:18, 122:13
**damaging** [3] - 46:23,
81:25, 88:18
**dark** [1] - 108:15
**data** [8] - 50:13, 71:20,
71:21, 85:17, 109:2,
122:10, 123:7
**data-gathering** [1] -
109:2
**database** [4] - 77:13,
88:19, 100:8, 109:18
**databases** [2] - 100:9,
108:17
**date** [12] - 71:6, 89:22,
96:2, 96:3, 100:5,
110:17, 110:19,
110:24, 111:20,
111:23, 112:3,
112:10
**Dated** [1] - 134:14
**dated** [2] - 89:7, 89:21
**dates** [1] - 110:22
**daughter** [2] - 39:15,
92:19
**days** [5] - 36:22, 40:3,

40:13, 51:11, 54:23
**Days** [1] - 90:4
**DC** [3] - 1:15, 2:10,
134:19
**Dead** [1] - 93:14
**dead** [1] - 38:13
**death** [1] - 59:7
**decades** [1] - 8:5
**December** [44] - 1:4,
14:14, 20:5, 35:9,
37:9, 37:17, 40:1,
40:13, 41:17, 41:23,
48:1, 48:2, 48:10,
50:3, 50:8, 50:20,
61:12, 78:16, 78:20,
78:23, 81:2, 81:5,
81:8, 81:11, 81:16,
89:22, 95:12, 97:7,
97:9, 97:14, 97:20,
123:15, 124:1,
124:6, 124:9,
127:19, 128:12,
128:22, 129:5,
129:7, 134:14
**decide** [23] - 9:13,
11:22, 17:19, 17:23,
18:16, 23:14, 23:22,
25:3, 26:4, 26:10,
27:3, 27:12, 28:20,
30:4, 30:12, 31:9,
31:20, 31:24, 45:21,
51:22, 58:13, 59:2,
133:1
**decided** [14] - 9:11,
9:12, 9:15, 9:17,
11:13, 12:2, 12:6,
12:7, 12:24, 20:9,
24:15, 30:25, 42:20,
61:12
**deciding** [1] - 18:10
**decision** [8] - 5:3,
26:13, 26:20, 31:16,
31:19, 31:23, 53:18,
61:15
**decisions** [5] - 7:12,
26:23, 31:15, 52:11,
52:16
**deductions** [1] - 24:9
**defamation** [20] - 8:25,
11:11, 12:8, 13:6,
13:7, 14:3, 14:12,
14:18, 15:12, 17:6,
20:3, 41:24, 42:8,
46:8, 47:9, 50:7,
50:25, 57:15, 62:16
**defamatory** [11] -
12:11, 12:14, 12:25,
15:22, 17:7, 17:15,
17:24, 41:25, 51:13,
51:20

**defamed** [2] - 7:23, 12:10
**default** [2] - 122:24, 122:25
**Defendant** [2] - 1:6, 7:23
**defendant** [10] - 6:21, 6:22, 7:14, 13:7, 16:24, 19:3, 19:25, 21:6, 22:15, 58:10
**defendant's** [2] - 7:4, 9:23
**defendants** [2] - 10:6, 13:8
**Defense** [1] - 41:1
**defense** [3] - 20:24, 21:8, 66:2
**DEFENSE** [1] - 2:2
**defenses** [1] - 10:6
**define** [1] - 33:20
**defined** [1] - 53:12
**deflate** [1] - 52:21
**deflating** [3] - 15:16, 15:21, 16:2
**degree** [2] - 13:24, 120:25
**degrees** [6] - 115:22, 115:24, 116:17, 116:19, 116:25, 118:7
**delayed** [1] - 68:9
**deliberate** [1] - 6:13
**deliberations** [9] - 4:10, 4:18, 6:6, 22:23, 23:19, 24:13, 24:19, 25:8, 31:23
**delivered** [1] - 6:6
**Democracy** [2] - 113:7, 113:8
**democracy** [1] - 58:2
**DEMOCRACY** [1] - 1:21
**denoted** [1] - 87:6
**department** [2] - 36:4, 71:23
**depict** [4] - 88:9, 88:10, 88:20, 88:24
**deposed** [1] - 40:7
**deposition** [8] - 21:24, 22:4, 22:8, 22:9, 22:12, 35:21, 40:12
**depositions** [2] - 4:22, 21:25
**Depp** [2] - 57:14, 57:16
**DEPUTY** [2] - 91:13, 95:20
**derogatory** [1] - 47:17
**describe** [5] - 7:17, 12:2, 12:3, 69:11,

89:17
**described** [1] - 61:14
**descriptive** [1] - 33:20
**deserve** [1] - 55:14
**deserved** [1] - 38:10
**design** [1] - 51:15
**designated** [1] - 76:8
**designed** [2] - 46:4, 46:12
**desks** [1] - 123:10
**despite** [1] - 36:11
**destroy** [3] - 34:19, 34:20, 48:15
**destroyed** [1] - 6:8
**destroying** [1] - 34:17
**detail** [3] - 16:16, 17:2, 37:23
**detailed** [1] - 48:17
**detective** [2] - 69:13, 69:14
**deter** [1] - 16:25, 46:13
**determination** [3] - 11:8, 11:22, 61:22
**determinations** [1] - 24:6
**determine** [9] - 9:6, 11:19, 17:3, 23:9, 23:10, 42:18, 42:22, 55:10, 124:20
**determined** [4] - 8:24, 16:11, 20:2, 37:5
**determining** [2] - 16:8, 20:8
**devastated** [1] - 49:3
**deviated** [1] - 38:24
**devices** [2] - 8:18, 28:14
**die** [1] - 89:14
**difference** [1] - 99:5
**different** [14] - 5:5, 31:14, 31:15, 46:10, 46:12, 98:4, 104:17, 105:11, 108:23, 108:24, 115:2, 115:12, 115:13
**differently** [2] - 25:7, 75:20
**difficult** [2] - 45:17, 53:17
**dig** [2] - 71:19, 78:7
**digging** [2] - 108:19, 114:8
**dignity** [1] - 45:19
**DIRECT** [1] - 68:23
**direct** [12] - 20:23, 21:7, 32:6, 75:5, 80:4, 81:24, 85:13, 85:25, 96:21, 97:3, 97:17, 132:11
**directed** [1] - 127:12

**direction** [2] - 73:14, 86:3
**directly** [6] - 42:24, 62:14, 87:7, 97:12, 98:2, 101:25
**disagree** [1] - 106:2
**discharged** [1] - 27:20
**disclose** [2] - 28:19, 105:2
**disclosed** [5] - 71:11, 72:5, 76:17, 106:13, 107:17
**disclosure** [1] - 9:19
**disclosures** [1] - 76:8
**discovery** [9] - 9:21, 10:8, 10:15, 10:20, 15:3, 16:2, 22:1, 40:7, 52:18
**discuss** [7] - 26:18, 26:25, 28:21, 29:23, 31:22, 44:21, 93:24
**discussed** [8] - 29:8, 63:5, 90:22, 93:16, 120:9, 120:10, 125:11, 125:12
**discusses** [1] - 91:1
**discussing** [5] - 7:18, 89:12, 107:8, 110:18, 123:20
**discussion** [3] - 29:16, 59:25, 129:8
**discussions** [1] - 29:10
**disgrace** [1] - 34:1
**disgraced** [1] - 34:5
**disgraces** [1] - 34:2
**disguise** [2] - 120:22, 120:23
**disposal** [1] - 48:22
**disregard** [4] - 24:25, 26:13, 32:3, 41:2
**disregarded** [2] - 13:21, 25:3
**distract** [2] - 4:21, 4:22
**distress** [16] - 7:24, 9:1, 11:12, 14:5, 14:7, 14:10, 14:13, 14:19, 18:2, 18:4, 18:7, 18:17, 20:4, 42:4, 42:8, 46:7
**DISTRICT** [3] - 1:1, 1:1, 1:10
**Docket** [1] - 61:12
**document** [26] - 73:7, 73:10, 73:13, 73:19, 73:20, 73:22, 73:24, 74:4, 74:6, 74:7, 74:21, 74:23, 75:17, 76:4, 83:12, 83:19,

84:8, 84:25, 91:20, 94:1, 112:13, 116:6, 119:22, 120:1, 120:22, 122:7
**documents** [16] - 9:22, 10:11, 19:20, 60:2, 74:3, 77:5, 100:24, 103:24, 121:21, 122:9, 124:22, 124:25, 125:1, 125:7, 125:8, 125:11
**dollars** [5] - 45:17, 46:19, 51:2, 52:9, 53:10
**Donald** [5] - 8:8, 14:14, 20:5, 48:24, 49:23
**done** [9] - 21:10, 47:21, 51:10, 51:19, 103:4, 103:7, 115:19, 123:7, 128:4
**door** [2] - 40:15, 43:20
**doorbell** [1] - 40:16
**dossier** [1] - 104:19
**double** [1] - 78:25
**double-counting** [1] - 78:25
**doubt** [2] - 19:12, 19:14
**down** [11] - 15:7, 43:18, 46:18, 51:6, 51:8, 62:14, 66:23, 74:25, 89:9, 104:23, 129:5
**Dr** [16] - 49:8, 49:13, 49:22, 49:25, 50:12, 50:18, 50:23, 51:1, 51:16, 51:18, 51:25, 53:6, 53:23, 74:8, 76:9, 122:8
**draw** [2] - 24:7, 24:10
**drive** [2] - 8:17, 39:17
**drives** [1] - 39:12
**DuBose** [106] - 1:17, 7:2, 33:5, 33:7, 33:10, 33:11, 33:14, 33:15, 35:7, 37:23, 41:21, 45:1, 45:4, 47:7, 59:23, 60:8, 60:11, 60:15, 60:18, 63:21, 64:1, 64:9, 64:11, 64:13, 64:19, 64:21, 64:23, 65:4, 65:6, 65:8, 65:13, 65:18, 65:21, 65:23, 67:24, 68:12, 68:21, 68:24, 70:22, 70:24, 71:15, 72:2, 72:19, 72:20, 73:4, 73:6, 73:21, 74:22, 74:24,

75:8, 75:12, 75:18, 77:1, 77:2, 77:3, 80:14, 82:6, 83:6, 83:9, 83:21, 83:25, 84:3, 84:5, 84:6, 84:17, 84:22, 84:24, 86:13, 90:19, 91:9, 91:11, 91:14, 91:16, 92:21, 93:1, 93:20, 93:23, 95:1, 95:3, 95:5, 95:9, 95:18, 95:22, 95:24, 96:3, 99:9, 102:10, 106:23, 111:1, 111:21, 112:1, 115:25, 116:11, 117:6, 118:17, 120:11, 121:16, 122:21, 122:25, 125:3, 125:14, 127:14, 129:19, 130:6, 130:9, 132:8
**duBOSE** [1] - 80:3
**DUBOSE** [10] - 1:17, 39:24, 40:6, 59:25, 68:14, 70:19, 76:23, 80:16, 106:17, 106:20
**DuBose)..................**
**..................** [1] - 3:4
**DuBose)..................**
**..................130** [1] - 3:5
**due** [1] - 112:21
**during** [37] - 4:16, 4:17, 5:2, 5:10, 5:20, 5:22, 6:9, 6:15, 8:2, 8:7, 9:21, 21:11, 21:23, 22:8, 23:5, 23:18, 23:22, 24:19, 25:5, 25:8, 26:6, 29:1, 31:19, 31:23, 32:10, 32:15, 32:20, 35:21, 40:7, 59:11, 61:9, 63:14, 88:2, 90:24, 93:18, 111:6, 132:17
**duty** [5] - 16:7, 23:7, 27:20, 32:5, 35:2

---

**E**

**early** [7] - 48:1, 48:10, 50:20, 133:6, 133:10, 133:13, 133:15
**earth** [1] - 48:23
**easier** [3] - 33:3, 33:5, 51:8
**easily** [2] - 54:20, 84:19

**easy** [1] - 84:21
**economic** [1] - 16:17
**education** [2] - 116:16, 118:6
**effect** [2] - 21:22, 23:11
**effectively** [1] - 5:6
**efficient** [1] - 23:4
**effort** [1] - 121:9
**eight** [1] - 61:1
**either** [5] - 32:21, 78:19, 97:3, 112:2, 119:13
**Election** [1] - 93:12
**election** [28] - 8:1, 8:3, 8:9, 8:10, 8:13, 34:15, 35:12, 35:14, 35:23, 36:1, 36:2, 36:13, 36:23, 37:2, 37:13, 37:21, 38:6, 40:1, 41:3, 41:9, 43:16, 50:17, 54:14, 54:20, 57:8, 58:2, 124:18, 128:5
**elections** [2] - 36:4, 36:6
**Elections** [1] - 93:13
**electronic** [3] - 28:12, 28:13, 30:19
**electronically** [2] - 9:22, 27:8
**elements** [3] - 12:2, 12:3, 12:5
**elevator** [1] - 29:7
**elicit** [1] - 61:20
**elicited** [1] - 72:2
**elsewhere** [1] - 32:6
**email** [4] - 28:12, 28:17, 60:24, 67:24
**Email** [4] - 1:16, 1:19, 1:23, 2:5
**emailed** [2] - 38:2, 41:16
**emailing** [1] - 28:15
**emails** [1] - 9:23
**embarrassment** [1] - 54:3
**emergency** [1] - 70:3
**emotion** [1] - 57:2
**emotional** [24] - 7:24, 8:21, 9:1, 11:12, 14:5, 14:7, 14:10, 14:13, 14:19, 16:18, 18:2, 18:4, 18:6, 18:17, 20:4, 42:4, 42:8, 46:7, 47:10, 47:15, 50:2, 53:16, 54:6
**emotionally** [1] - 34:21

**emphasize** [2] - 11:17, 32:10
**employee** [1] - 39:25
**employer** [1] - 69:9
**encounter** [1] - 29:2
**end** [23] - 4:9, 6:3, 6:5, 7:13, 11:1, 11:23, 15:5, 22:20, 26:20, 32:19, 44:18, 47:8, 58:12, 59:8, 59:13, 63:4, 68:8, 69:20, 76:25, 107:4, 110:1, 123:11
**end-to-end** [1] - 69:20
**ended** [1] - 35:10
**endures** [1] - 53:14
**enforcement** [1] - 47:19
**engage** [3] - 17:16, 18:13, 29:20
**engaged** [7] - 7:25, 14:11, 34:10, 42:7, 42:18, 50:17, 110:16
**engaging** [4] - 14:8, 17:1, 42:5, 46:13
**ensued** [1] - 128:25
**ensure** [4] - 26:16, 35:13, 36:9, 121:21
**ensuring** [1] - 131:21
**enterprise** [1] - 69:21
**enters** [1] - 68:5
**entire** [6] - 27:4, 31:21, 37:13, 79:23, 98:12, 120:22
**entitled** [12] - 9:2, 9:19, 10:1, 11:15, 16:11, 17:11, 17:17, 18:14, 19:2, 26:5, 105:7, 106:10
**envelope** [1] - 5:22
**environment** [8] - 83:2, 87:21, 89:7, 89:20, 108:14, 108:21, 114:5, 115:4
**equivalent** [1] - 59:7
**ers** [1] - 79:6
**especially** [2] - 46:19, 104:22
**ESQ** [6] - 1:12, 1:13, 1:13, 1:17, 1:20, 2:2
**essentially** [1] - 82:8
**establish** [9] - 18:20, 71:13, 73:16, 73:23, 76:3, 84:18, 105:16, 105:17, 116:6
**established** [8] - 11:10, 24:11, 61:15, 66:11, 96:12, 104:15, 105:24, 120:21

**estimate** [6] - 17:15, 18:8, 47:5, 49:20, 51:5, 53:6
**estimated** [2] - 49:16, 51:25
**estimation** [2] - 13:3, 13:13
**et** [1] - 1:3
**evaluate** [1] - 66:10
**evasive** [1] - 105:5
**evening** [2] - 133:3, 133:16
**evenly** [1] - 19:22
**event** [10] - 7:14, 129:21, 129:23, 129:25, 130:11, 130:13, 130:18, 130:24, 131:1
**events** [3] - 56:7, 129:8, 129:21
**evidence** [121] - 4:21, 5:1, 5:13, 5:14, 5:16, 5:19, 7:6, 7:8, 7:10, 7:11, 7:16, 9:20, 9:21, 10:23, 11:24, 15:15, 15:19, 15:24, 17:9, 17:11, 17:13, 17:18, 17:19, 18:3, 18:5, 18:15, 18:21, 18:22, 18:23, 19:1, 19:2, 19:4, 19:9, 19:17, 19:18, 19:21, 19:22, 20:17, 20:18, 20:19, 21:5, 21:17, 21:18, 21:20, 21:21, 22:14, 22:18, 22:19, 22:20, 23:11, 23:24, 23:25, 24:1, 24:4, 24:11, 24:20, 24:22, 24:24, 25:1, 25:2, 25:4, 25:6, 25:8, 25:9, 25:12, 25:16, 25:17, 25:20, 26:24, 28:8, 30:5, 31:1, 31:9, 31:10, 31:11, 31:16, 32:1, 32:12, 34:23, 34:24, 35:4, 35:25, 36:3, 37:12, 37:20, 38:23, 38:25, 39:13, 41:12, 45:4, 45:7, 45:11, 45:22, 46:2, 47:4, 52:6, 52:16, 52:20, 53:1, 53:4, 53:19, 54:1, 54:16, 54:22, 55:18, 55:19, 56:11, 56:12, 56:18, 56:24, 58:18, 58:19, 59:1, 59:13, 63:8, 68:8, 75:22, 90:17, 118:20

**exact** [2] - 18:9, 43:7
**exactly** [1] - 62:10
**examination** [11] - 20:23, 21:1, 21:2, 21:4, 21:7, 21:9, 21:10, 73:23, 75:19, 90:10, 98:5
**EXAMINATION** [3] - 68:23, 99:11, 129:18
**examinations** [1] - 65:14
**examine** [1] - 21:8
**examined** [1] - 71:18
**example** [9] - 19:11, 21:13, 29:6, 56:13, 62:5, 63:7, 71:4, 89:19, 93:5, 99:19, 113:12
**Excel** [1] - 78:6
**excerpt** [1] - 95:25
**excess** [1] - 57:16
**exclude** [1] - 123:2
**excluded** [1] - 24:25
**excluding** [3] - 7:6, 8:14, 41:9
**exclusive** [1] - 26:14
**excuse** [1] - 132:15
**excused** [3] - 132:9, 132:12, 133:18
**execute** [1] - 90:17
**executed** [1] - 89:15
**executive** [1] - 70:1
**executive-level** [1] - 70:1
**exercise** [2] - 111:14, 113:21
**exhibit** [6] - 7:12, 64:5, 75:14, 75:15, 96:2, 112:5
**Exhibit** [42] - 64:2, 64:3, 64:4, 64:7, 70:18, 70:25, 77:6, 77:8, 82:3, 82:5, 82:7, 83:7, 83:11, 84:7, 91:7, 91:12, 91:19, 93:21, 93:25, 95:19, 111:9, 111:19, 112:7, 112:17, 112:19, 113:22, 115:19, 116:17, 116:22, 117:3, 119:7, 119:21, 119:23, 120:4, 120:9, 123:14, 125:20, 125:24
**exhibits** [14] - 24:1, 25:25, 60:9, 61:6, 63:3, 63:22, 66:1, 67:1, 67:12, 77:9,

111:6, 111:15, 123:4, 125:3
**exist** [1] - 39:19
**existence** [1] - 98:12
**existing** [1] - 113:2
**exits** [2] - 59:21, 133:17
**expect** [3] - 20:18, 52:6, 75:22
**expected** [1] - 35:24
**expenses** [3] - 52:2, 52:5, 53:8
**experience** [6] - 5:5, 18:19, 24:9, 71:23, 100:6, 100:8
**experienced** [1] - 47:10
**expert** [27] - 49:8, 62:23, 71:11, 71:12, 72:4, 72:5, 72:9, 74:9, 74:10, 76:8, 76:16, 104:18, 104:24, 105:1, 106:1, 106:2, 106:4, 118:15, 118:19, 118:20, 118:24, 120:22, 120:23, 121:14, 121:18, 122:4, 123:6
**expertise** [4] - 49:11, 119:2, 119:25, 121:11
**experts** [2] - 116:7, 119:18
**explain** [19] - 6:17, 9:11, 11:1, 11:5, 11:16, 15:5, 16:15, 30:23, 31:5, 42:25, 43:4, 43:10, 43:13, 50:10, 77:8, 80:15, 82:22, 86:19, 88:9
**explained** [7] - 16:7, 24:12, 24:16, 42:21, 47:7, 52:11, 116:7
**explore** [1] - 104:25
**exposed** [1] - 30:7
**express** [2] - 41:1, 87:3
**expressed** [1] - 26:11
**extensive** [2] - 8:21, 116:20
**extent** [10] - 23:14, 55:10, 61:20, 62:3, 105:17, 106:9, 121:24, 123:1, 123:3, 123:19
**extra** [1] - 133:10
**extraordinary** [1] - 54:6
**extreme** [2] - 14:8,

42:5
**extremely** [1] - 112:21

# F

**F-ers** [1] - 79:6
**face** [3] - 28:11, 68:17
**Facebook** [1] - 27:10
**faced** [1] - 47:25
**facing** [1] - 77:18
**fact** [17] - 7:16, 18:20,
18:25, 21:13, 21:17,
39:13, 54:17, 56:11,
57:24, 74:16, 79:20,
85:22, 106:3,
121:20, 122:16,
124:12
**factors** [2] - 44:22,
52:14
**facts** [20] - 7:15, 10:25,
11:3, 11:7, 15:4,
15:9, 18:18, 19:20,
23:9, 23:10, 24:2,
24:3, 24:4, 24:7,
24:11, 24:17, 30:14,
31:13, 121:11,
121:13
**factual** [1] - 24:15
**failing** [2] - 10:9, 10:10
**failure** [2] - 10:24, 15:2
**fair** [12] - 10:20, 22:10,
23:4, 32:1, 46:4,
53:19, 54:9, 58:24,
59:13, 82:15, 121:3,
126:5
**fairly** [2] - 16:14, 18:16
**fairness** [1] - 26:16
**Fake** [1] - 93:13
**false** [9] - 8:14, 12:10,
12:22, 13:21, 13:25,
41:25, 42:16, 46:24,
49:18
**falsely** [4] - 8:12, 13:4,
46:24, 48:20
**familiar** [1] - 67:3
**families** [1] - 47:14
**family** [2] - 27:22,
33:19
**far** [7] - 55:21, 57:16,
107:18, 107:19,
108:6, 112:23,
116:11
**Farm** [12] - 8:2, 36:15,
37:11, 37:14, 37:20,
39:21, 40:9, 41:8,
78:25, 79:2, 79:3,
80:22
**FARR** [1] - 1:14
**father** [1] - 33:11
**fault** [1] - 43:2

**favor** [1] - 31:25
**favoring** [1] - 19:4
**favors** [1] - 19:6
**FBI** [1] - 44:1
**fear** [3] - 31:25, 44:13,
131:4
**federal** [5] - 9:18, 10:3,
10:20, 75:21, 118:20
**feelings** [1] - 47:12
**fees** [3] - 112:23,
112:24, 113:1
**fellow** [4] - 26:22,
27:2, 30:10, 31:22
**felt** [2] - 43:10, 43:13
**few** [10] - 6:16, 35:7,
36:22, 40:3, 46:1,
54:23, 84:18, 95:16,
118:5, 131:25
**field** [3] - 10:5, 118:16,
118:19
**fifth** [1] - 30:12
**Fifth** [1] - 40:10
**fight** [1] - 49:12
**figure** [3] - 57:19,
74:11, 128:23
**figures** [1] - 54:14
**fil** [1] - 43:15
**filed** [9] - 18:25, 66:6,
95:12, 128:9,
128:12, 128:20,
128:22, 129:1, 129:6
**files** [1] - 9:23
**filing** [2] - 10:12, 129:3
**final** [9] - 15:6, 20:1,
22:21, 24:18, 26:20,
27:5, 31:19, 31:21,
56:4
**finally** [2] - 22:20,
31:18
**finances** [1] - 15:24
**financial** [3] - 15:12,
15:15, 52:20
**findings** [7] - 42:12,
42:14, 45:8, 50:18,
52:13, 83:15, 86:17
**fine** [5] - 33:6, 57:2,
67:19, 67:23, 104:19
**finished** [3] - 6:5,
20:24, 21:2
**fired** [1] - 48:11
**firm** [13] - 69:19,
102:25, 103:3,
103:6, 103:23,
105:23, 107:8,
107:9, 107:17,
108:24, 111:24,
122:14, 128:21
**firms** [1] - 104:17
**first** [18] - 11:5, 26:18,
33:17, 59:20, 60:10,

64:25, 65:23, 69:10,
72:25, 78:11, 80:5,
80:24, 86:19, 90:3,
101:10, 107:23,
124:12, 124:17
**fit** [1] - 59:5
**five** [1] - 132:14
**flag** [1] - 76:6
**flags** [1] - 43:23
**flash** [1] - 39:12
**flow** [3] - 61:17, 61:18,
66:13
**fluid** [1] - 117:19
**focus** [3] - 4:25, 86:17,
131:9
**focusing** [1] - 92:21
**folks** [1] - 102:12
**folks'** [1] - 34:12
**follow** [5] - 25:25,
26:16, 32:15, 46:16,
52:13
**followed** [2] - 57:13,
57:14
**following** [4] - 29:13,
74:13, 104:4, 120:17
**food** [1] - 133:14
**footage** [7] - 37:11,
37:19, 79:1, 80:6,
80:9, 80:10, 80:18
**FOR** [3] - 1:1, 1:12, 2:2
**force** [1] - 118:24
**forced** [1] - 52:4
**foregoing** [1] - 134:10
**forget** [4] - 5:11,
25:19, 25:23, 124:15
**form** [6] - 9:3, 11:20,
18:4, 18:6, 90:16,
101:15
**former** [2] - 8:4, 8:8
**forms** [2] - 16:12,
82:13
**formula** [2] - 18:9,
46:16
**forward** [2] - 74:19,
104:9
**foundation** [8] - 67:13,
71:13, 73:2, 76:4,
83:18, 83:21, 84:2,
84:18
**four** [4] - 90:3, 117:22,
117:24, 117:25
**fourth** [1] - 29:24
**frame** [2] - 97:5,
127:19
**fraud** [9] - 8:13, 37:21,
38:25, 39:22, 43:16,
48:8, 50:17, 87:22,
124:18
**fraudsters** [1] - 54:15
**fraudulent** [2] - 39:11,

41:3
**free** [1] - 5:2
**Freeman** [99] - 2:6,
6:20, 7:21, 8:19, 9:2,
12:10, 12:14, 12:18,
12:19, 13:5, 13:11,
13:20, 14:2, 14:9,
15:13, 33:9, 34:6,
34:16, 35:8, 36:12,
36:14, 37:6, 37:15,
38:3, 38:5, 38:15,
38:24, 39:3, 39:8,
39:10, 39:14, 40:14,
40:18, 41:8, 41:11,
41:12, 42:1, 42:4,
42:22, 42:24, 43:19,
44:5, 44:21, 45:3,
46:5, 47:5, 47:8,
47:22, 48:6, 48:16,
49:15, 49:24, 50:14,
50:19, 51:3, 51:19,
51:25, 52:3, 53:20,
54:19, 70:5, 70:9,
72:24, 73:25, 77:12,
78:12, 78:20, 79:22,
80:24, 81:22, 82:23,
83:4, 86:21, 86:25,
87:12, 87:17, 90:23,
92:7, 92:19, 92:24,
93:2, 93:12, 93:17,
94:6, 94:23, 95:6,
96:21, 99:5, 121:22,
124:3, 126:13,
126:17, 127:3,
127:13, 127:18,
128:4, 128:24,
131:3, 131:21
**FREEMAN** [1] - 1:3
**Freeman's** [6] - 40:17,
41:5, 49:3, 52:4,
54:5, 131:9
**fresh** [1] - 24:19
**friend** [1] - 43:6
**friends** [1] - 27:21
**front** [1] - 77:18
**front-facing** [1] -
77:18
**fruit** [1] - 133:7
**fuck** [1] - 90:4
**fucking** [1] - 90:6
**fuelled** [1] - 48:3
**full** [2] - 69:19, 134:11
**full-service** [1] - 69:19
**fully** [3] - 17:20, 17:23,
105:24
**Fulton** [5] - 8:2, 36:4,
36:15, 124:15,
124:16
**function** [5] - 55:9,
58:2, 75:1, 109:1,

109:2
**functions** [3] - 23:1,
23:2, 108:24
**furtherance** [4] -
14:20, 14:24, 20:12,
42:11
**furthermore** [1] -
17:19
**future** [4] - 17:1, 22:2,
61:19, 90:5

# G

**GA** [2] - 1:18, 92:24
**Gabriel** [1] - 39:24
**GALLAGHER** [1] -
1:14
**gang** [1] - 69:15
**gathered** [1] - 43:23
**gathering** [1] - 109:2
**general** [5] - 17:4,
20:18, 112:25,
126:19, 127:17
**generate** [5] - 16:5,
75:2, 77:11, 107:22,
112:18
**generated** [23] - 50:4,
73:13, 77:6, 77:9,
84:25, 85:25, 86:3,
91:25, 92:2, 93:3,
93:8, 94:10, 94:11,
103:1, 109:5,
109:10, 110:25,
111:24, 112:14,
114:7, 121:17,
121:21, 124:6
**generates** [3] - 100:5,
109:8, 121:8
**generating** [3] - 85:22,
100:23, 103:24
**gentlemen** [6] - 4:2,
23:9, 31:18, 34:4,
45:1, 132:14
**Georgia** [18] - 8:2,
8:11, 35:24, 36:1,
36:5, 36:24, 37:1,
37:7, 38:22, 39:19,
39:25, 41:4, 48:25,
80:6, 80:20, 80:21,
93:15
**Georgia's** [1] - 37:2
**giant** [1] - 109:5
**ginger** [2] - 39:14
**Giuliani** [113] - 6:23,
7:23, 8:4, 8:7, 8:12,
8:24, 9:7, 10:7,
10:21, 11:6, 11:8,
11:11, 11:20, 12:7,
12:9, 12:11, 12:13,
12:17, 13:14, 13:18,

13:20, 13:24, 14:1,
14:4, 14:7, 14:11,
14:15, 14:17, 14:21,
15:11, 15:14, 15:18,
15:23, 15:25, 16:4,
19:1, 20:2, 20:6,
20:10, 34:10, 34:11,
34:15, 35:12, 35:15,
35:19, 37:4, 37:9,
37:17, 38:4, 38:8,
39:7, 39:20, 40:25,
41:5, 41:10, 41:14,
41:17, 41:24, 42:3,
42:6, 42:9, 42:18,
46:22, 48:3, 48:11,
48:14, 48:15, 49:14,
49:22, 50:1, 50:16,
52:18, 52:23, 54:12,
54:14, 55:17, 55:20,
55:24, 56:7, 56:12,
56:15, 56:18, 56:23,
57:5, 57:9, 58:20,
58:21, 58:25, 59:9,
61:18, 62:7, 62:11,
62:15, 94:22, 95:6,
95:17, 96:14, 96:21,
96:24, 97:12, 97:24,
98:1, 98:6, 119:13,
125:21, 125:24,
126:3, 126:20,
126:22, 126:25,
127:10
**GIULIANI** [1] - 1:5
**Giuliani's** [16] - 8:20,
8:22, 9:4, 10:14,
10:19, 11:13, 15:2,
16:3, 38:23, 40:7,
40:22, 49:18, 52:15,
55:1, 95:16, 96:10
**given** [5] - 10:24,
74:15, 98:13, 98:15,
111:24
**global** [1] - 36:11
**golfer** [1] - 33:24
**goodness** [1] - 33:11
**Google** [2] - 30:17,
50:15
**GOTTLIEB** [4] - 1:12,
44:25, 61:7, 68:3
**Gottlieb** [4] - 7:2,
44:20, 45:1, 76:7
**governor** [1] - 37:1
**Governski** [1] - 7:2
**GOVERNSKI** [1] - 1:13
**grand** [1] - 90:16
**grandmother** [1] -
40:17
**graph** [2] - 88:11,
88:25
**graphic** [3] - 35:5,

93:7, 98:22
**graphs** [4] - 88:8,
88:9, 88:10, 88:20
**gravity** [1] - 54:11
**gray** [1] - 88:14
**great** [1] - 33:24
**greater** [3] - 16:15,
19:2, 19:19
**green** [1] - 88:13
**Greyhound** [1] - 61:14
**group** [1] - 57:2
**grow** [1] - 87:24
**guess** [7] - 25:20,
102:18, 109:21,
110:3, 114:23,
115:1, 133:22
**guesswork** [2] - 17:17,
18:14
**guest** [4] - 95:17,
97:25, 119:13,
126:21
**guide** [3] - 4:5, 45:22,
47:14
**guiding** [1] - 24:5
**guilt** [1] - 57:6
**guy** [1] - 132:23

---

## H

**hand** [5] - 4:24, 36:25,
68:18, 92:16, 92:22
**handled** [1] - 122:22
**handles** [2] - 70:1,
98:17
**hang** [3] - 38:10,
38:11, 38:19
**Hang** [1] - 90:21
**hanged** [1] - 92:18
**hanging** [1] - 43:9
**happily** [1] - 89:14
**happiness** [1] - 47:12
**harassment** [1] -
40:20
**hard** [1] - 36:21
**harm** [42] - 8:22,
12:14, 14:1, 14:2,
14:22, 14:23, 16:15,
16:16, 16:17, 16:18,
16:22, 17:9, 17:10,
17:11, 17:15, 17:20,
17:24, 18:11, 20:10,
20:11, 42:2, 45:12,
46:5, 47:5, 47:15,
48:9, 50:2, 51:3,
51:4, 52:7, 53:7,
53:14, 53:16, 53:17,
54:6, 55:20, 56:8,
56:11, 57:9, 58:24
**harmed** [5] - 10:16,
17:7, 55:13, 55:18,

58:20
**harmful** [2] - 46:22,
88:17
**harmless** [1] - 30:22
**harms** [3] - 42:10,
45:16, 47:1
**hateful** [1] - 48:2
**head** [2] - 43:18,
128:10
**headed** [3] - 8:7,
14:15, 20:6
**headset** [1] - 48:11
**hear** [54] - 6:15, 12:15,
21:12, 21:24, 28:5,
28:8, 29:16, 32:4,
34:15, 35:5, 35:21,
37:23, 38:12, 39:1,
39:2, 39:4, 40:24,
41:14, 42:24, 43:4,
43:19, 44:5, 44:15,
45:5, 45:7, 45:12,
45:13, 46:2, 46:6,
47:7, 47:11, 47:16,
47:18, 49:15, 51:4,
51:16, 52:14, 52:16,
53:2, 53:8, 53:20,
53:23, 54:22, 57:17,
59:11, 60:8, 62:14,
74:17, 96:15, 104:6,
104:7, 104:9, 133:2
**heard** [16] - 5:7, 6:16,
7:7, 11:24, 19:14,
25:2, 26:23, 37:25,
45:13, 46:12, 48:9,
48:25, 52:10, 62:11,
62:21, 99:22
**hearing** [6] - 29:9,
44:14, 74:14, 104:5,
120:18, 134:4
**hearsay** [1] - 86:10
**heating** [1] - 40:23
**HELD** [1] - 1:9
**held** [4] - 62:16, 74:14,
104:5, 120:18
**help** [9] - 5:1, 5:10,
5:13, 20:19, 22:19,
36:9, 45:22, 51:22,
118:14
**helped** [1] - 35:25
**helpful** [1] - 75:22
**helping** [1] - 36:17
**hereby** [1] - 134:9
**herself** [1] - 7:22,
80:25, 118:23
**hid** [1] - 52:23
**hide** [5] - 15:15, 15:19,
15:24, 39:8, 52:20
**hiding** [1] - 8:15
**high** [1] - 13:24
**hijacked** [1] - 43:1

**hindrance** [1] - 5:10
**hinted** [1] - 26:12
**hire** [1] - 115:1
**hired** [1] - 105:13
**history** [1] - 101:16
**hoc** [1] - 66:22
**Hogan** [1] - 33:24
**hold** [2] - 25:13,
118:15
**holding** [1] - 33:4
**holidays** [1] - 40:21
**Hollywood** [1] - 57:25
**home** [10] - 6:2, 27:15,
36:21, 44:2, 44:7,
44:9, 44:11, 51:6,
52:4
**homeland** [1] - 33:19
**homes** [2] - 48:12,
53:22
**homicide** [1] - 69:14
**honor** [1] - 55:9
**Honor** [40] - 57:22,
60:7, 61:7, 62:1,
63:4, 63:8, 63:13,
63:18, 66:3, 66:20,
68:3, 71:10, 72:1,
73:1, 76:6, 79:11,
80:12, 82:13, 83:17,
84:14, 91:9, 95:9,
95:22, 102:7,
102:10, 103:21,
104:13, 105:5,
111:10, 111:17,
116:6, 120:14,
121:1, 121:3,
121:19, 129:16,
130:3, 132:10,
132:13, 133:21
**HONORABLE** [1] - 1:9
**hope** [3] - 4:3, 40:22,
133:5
**horrible** [3] - 56:13,
62:21, 127:11
**Houghton** [1] - 7:3
**HOUGHTON** [1] - 1:13
**HOUGHTON-
LARSEN** [1] - 1:13
**Houghton-Larson** [1]
- 7:3
**hour** [3] - 21:14,
21:20, 36:16
**hourly** [4] - 112:24,
113:10, 113:13,
113:16
**house** [6] - 40:15,
40:16, 43:24, 44:2,
69:25, 122:15
**housekeeping** [1] -
59:23
**HOWELL** [1] - 1:9

**Hughes** [36] - 47:20,
69:7, 69:10, 69:17,
69:18, 70:5, 70:8,
71:20, 72:14, 72:21,
73:8, 73:10, 73:14,
73:17, 77:10, 77:11,
78:4, 85:20, 86:7,
87:11, 87:17, 97:18,
98:8, 98:13, 98:14,
98:17, 101:12,
116:4, 118:14,
126:6, 127:9, 131:2,
131:3, 131:10,
131:12, 131:25
**human** [1] - 28:23
**humiliation** [2] -
43:13, 54:3
**Humphreys** [14] -
49:8, 49:13, 49:22,
49:25, 50:12, 50:18,
50:23, 51:1, 51:18,
53:6, 53:23, 74:8,
76:9, 122:8
**Humphreys'** [2] -
51:16, 51:25
**hundreds** [5] - 35:7,
35:8, 38:20, 49:24

---

## I

**idea** [4] - 75:17, 80:10,
80:13, 131:11
**identified** [6] - 32:9,
86:21, 88:1, 89:23,
101:8, 127:16
**identifiers** [1] - 77:20
**identifies** [1] - 66:12
**identify** [6] - 33:24,
66:7, 67:12, 101:7,
117:18, 124:5
**illegal** [1] - 8:15
**illegally** [2] - 8:14,
8:16
**illustrates** [1] - 89:5
**image** [2] - 93:8, 93:11
**images** [1] - 93:3
**imagine** [1] - 108:12
**immediately** [2] - 29:9,
29:21, 30:8
**impact** [2] - 50:12,
50:21
**impartial** [1] - 22:10
**important** [17] - 4:6,
6:13, 7:20, 27:3,
33:16, 33:18, 33:21,
33:25, 35:2, 57:10,
57:24, 57:25, 58:2,
58:4, 75:24, 82:1
**imposed** [1] - 122:24
**impossible** [1] - 62:20

**impressions** [5] - 49:17, 49:20, 50:5, 50:10, 51:1
**IN** [1] - 1:1
**inauguration** [1] - 44:4
**include** [8] - 9:22, 10:11, 16:17, 52:12, 87:7, 87:8, 93:3, 97:16
**included** [1] - 126:6
**includes** [4] - 23:25, 28:11, 30:21, 71:5
**including** [19] - 5:25, 8:14, 8:22, 9:3, 10:9, 15:4, 22:2, 27:9, 27:21, 28:14, 28:17, 31:7, 43:14, 69:14, 70:2, 103:13, 103:15, 117:15
**income** [2] - 16:5, 53:13
**incomplete** [1] - 31:8
**increase** [2] - 124:2, 130:19, 130:21
**increased** [4] - 81:5, 123:15, 129:22, 130:17
**incredible** [1] - 57:12
**incrimination** [1] - 40:11
**incurred** [1] - 53:9
**indeed** [2] - 4:19, 25:15
**independent** [2] - 30:14, 56:23
**indicate** [1] - 56:17
**indicating** [1] - 35:20
**indication** [1] - 26:9
**indict** [1] - 90:16
**indirect** [2] - 81:24, 97:17
**individually** [1] - 5:4
**individuals** [3] - 62:19, 96:25, 131:4
**inevitable** [1] - 55:1
**inferences** [5] - 24:8, 24:9, 24:13, 52:12, 53:1
**inflicted** [3] - 7:24, 14:7, 42:4
**infliction** [8] - 8:25, 11:12, 14:5, 14:13, 14:19, 18:1, 20:4, 42:8
**influenced** [1] - 5:17
**influencers** [3] - 48:19, 51:11, 99:3
**inform** [1] - 75:22
**information** [38] - 9:23, 27:22, 28:1,

28:6, 28:7, 28:15, 31:3, 31:6, 31:11, 31:15, 49:9, 49:11, 52:23, 71:5, 77:13, 78:1, 78:3, 78:5, 78:9, 82:1, 82:14, 90:12, 100:4, 100:14, 100:19, 102:5, 102:11, 108:13, 108:17, 109:21, 110:1, 110:4, 112:18, 114:3, 114:5, 122:12, 123:20
**informed** [1] - 42:17
**informing** [1] - 30:9
**inherently** [1] - 45:16
**initial** [3] - 82:25, 108:10, 109:1
**injure** [1] - 13:1
**injured** [2] - 13:8, 13:10, 13:11
**injuries** [2] - 61:15, 61:17, 61:18
**injury** [1] - 42:19
**innocence** [1] - 47:13
**inserting** [1] - 39:18
**inside** [2] - 4:15, 21:13
**Insights** [1] - 88:8
**instance** [2] - 40:11, 40:12
**instant** [1] - 43:2
**instead** [6] - 11:19, 13:9, 37:5, 40:9, 62:7, 66:23
**instruct** [9] - 11:6, 17:2, 23:5, 24:5, 26:8, 27:1, 45:25, 46:15, 55:23
**instructed** [5] - 45:25, 46:21, 52:17, 132:22, 132:23
**instruction** [1] - 29:14
**instructions** [17] - 4:5, 4:9, 4:11, 9:16, 11:23, 11:25, 15:6, 17:5, 22:22, 24:16, 24:18, 26:20, 26:24, 27:5, 27:12, 31:22, 132:18
**instrument** [1] - 125:10
**insult** [1] - 54:2
**insurrection** [1] - 43:22
**Intelius** [3] - 99:22, 100:7, 121:7
**INTELIUS** [1] - 100:1
**intelligence** [7] - 69:15, 84:11, 91:23,

94:4, 120:7, 120:10, 126:2
**intend** [2] - 56:19
**intended** [7] - 4:11, 16:21, 20:19, 22:19, 48:15, 55:25, 59:1
**intending** [1] - 54:17
**intensive** [7] - 98:10, 110:8, 112:21, 113:21, 114:15, 114:17, 121:9
**intent** [1] - 8:17
**intentional** [8] - 8:25, 11:12, 14:5, 14:13, 14:19, 18:1, 20:4, 42:8
**intentionally** [8] - 7:24, 14:7, 14:9, 15:15, 15:19, 15:24, 42:4, 52:20
**interface** [1] - 77:19, 109:25
**Internet** [15] - 29:25, 30:22, 31:7, 48:3, 49:5, 49:23, 56:17, 62:18, 82:8, 82:12, 100:10, 108:15, 109:22, 127:21, 127:24
**interview** [1] - 43:14
**interviewer** [1] - 43:15
**introduce** [1] - 63:8
**introduced** [3] - 20:20, 32:8, 111:6
**investigated** [1] - 38:22
**investigation** [3] - 30:14, 30:24, 124:20
**investigations** [3] - 69:7, 69:15, 70:15
**investigative** [3] - 69:14, 69:23, 119:19
**investigators** [4] - 35:20, 39:2, 119:8, 119:22
**invite** [2] - 133:6, 133:13
**involve** [1] - 117:12
**involved** [14] - 28:2, 28:4, 29:12, 30:17, 55:16, 55:21, 58:22, 70:12, 85:22, 101:17, 108:4, 114:1, 117:15, 119:6
**issue** [18] - 9:5, 19:5, 19:7, 19:8, 19:22, 19:24, 27:3, 31:20, 34:10, 61:8, 61:9, 61:13, 61:22, 63:1, 66:12, 66:14,

104:21, 107:24
**issued** [4] - 10:21, 15:3, 67:10, 107:11
**issues** [5] - 9:15, 11:22, 67:7, 101:4, 117:18
**item** [1] - 82:16
**itself** [1] - 28:1
**IV** [1] - 2:2

**J**

**jail** [1] - 38:13
**January** [4] - 43:21, 44:3, 48:24, 89:21
**Jensen** [36] - 47:20, 69:6, 69:9, 69:17, 69:18, 70:5, 70:8, 71:19, 72:14, 72:21, 73:8, 73:10, 73:14, 73:17, 77:10, 77:11, 78:4, 85:20, 86:6, 87:11, 87:16, 97:18, 98:8, 98:12, 98:14, 98:17, 101:12, 116:4, 118:13, 126:6, 127:9, 131:2, 131:3, 131:10, 131:12, 131:25
**jensenhughes.com** [1] - 100:19
**job** [20] - 22:25, 23:1, 23:8, 23:20, 25:15, 31:24, 36:6, 36:7, 42:17, 42:21, 43:11, 43:14, 45:9, 45:15, 84:20, 84:21, 105:20, 114:22, 119:11, 119:15
**Joe** [1] - 36:22
**JOHN** [1] - 1:20
**John** [1] - 7:2
**john.langford@ protectdemocracy. org** [1] - 1:23
**Johnny** [2] - 57:14, 57:16
**joined** [1] - 37:1
**Joseph** [1] - 7:4
**JOSEPH** [1] - 2:2
**jot** [1] - 15:7
**Jr** [2] - 33:14, 33:15
**judge** [5] - 23:1, 35:1, 42:17, 132:23, 132:24
**JUDGE** [1] - 1:10
**Judge** [5] - 60:13, 68:16, 70:22, 84:1, 106:18
**judged** [1] - 57:7

**judges** [1] - 23:10
**judgment** [1] - 17:22
**July** [3] - 97:7, 97:14, 97:18
**June** [1] - 111:22
**juror** [5] - 5:4, 19:13, 27:18, 27:24, 31:15
**juror's** [1] - 5:17
**jurors** [14] - 4:13, 4:16, 5:15, 6:12, 23:7, 26:17, 26:22, 27:2, 29:14, 29:22, 30:10, 31:14, 31:22, 35:1
**jury** [37] - 9:6, 9:10, 9:12, 16:23, 23:2, 27:1, 27:17, 27:20, 27:22, 28:10, 28:18, 28:19, 29:2, 32:7, 32:13, 32:21, 32:22, 56:4, 59:21, 60:3, 61:2, 65:20, 68:2, 68:4, 68:5, 68:18, 69:4, 69:11, 74:14, 75:23, 89:18, 90:16, 104:5, 120:18, 121:13, 132:19, 133:17
**JURY** [1] - 1:9
**jury's** [1] - 63:19
**justice** [2] - 43:7, 59:15
**justified** [1] - 24:8

**K**

**keep** [10] - 5:24, 27:3, 31:20, 32:23, 52:25, 59:13, 68:6, 86:14, 104:23, 114:18
**keeps** [2] - 73:10, 134:3
**Kemp** [1] - 37:2
**kept** [2] - 73:7, 86:5
**key** [6] - 41:4, 83:1, 86:17, 86:19, 87:21, 101:8
**keys** [1] - 131:6
**keyword** [1] - 82:25
**keywords** [3] - 87:11, 87:15
**kick** [1] - 39:3
**kicked** [1] - 39:6
**kill** [2] - 80:24, 90:6
**kind** [19] - 27:17, 30:20, 46:14, 49:5, 62:15, 67:8, 69:22, 75:10, 100:4, 100:22, 100:23, 114:22, 114:25, 115:8,

115:18, 124:18, 125:13, 126:14
**kinds** [3] - 46:10, 46:17, 46:24
**knowing** [1] - 54:16
**knowledge** [9] - 72:3, 73:19, 73:20, 76:13, 76:18, 84:16, 116:8, 123:23, 124:19
**known** [7] - 13:6, 35:15, 41:25, 43:11, 44:15, 49:19, 51:11
**Known** [1] - 93:13
**knows** [2] - 49:12, 121:12

## L

**label** [1] - 41:10
**labor** [7] - 98:10, 110:8, 112:21, 113:20, 114:15, 114:17, 121:9
**labor-intensive** [6] - 98:10, 110:8, 112:21, 114:15, 114:17, 121:9
**lack** [1] - 83:17
**ladies** [6] - 4:2, 23:8, 31:18, 34:4, 44:25, 132:14
**Lady** [2] - 44:15, 44:16
**laid** [1] - 48:14
**LANGFORD** [1] - 1:20
**Langford** [1] - 7:2
**lapel** [1] - 33:3
**large** [4] - 60:12, 100:24, 104:19, 126:10
**largely** [4] - 88:24, 89:2, 92:14, 94:21
**LARSEN** [1] - 1:13
**Larson** [1] - 7:3
**last** [13] - 27:25, 46:19, 54:10, 64:25, 83:19, 85:3, 93:15, 97:8, 97:19, 121:19, 131:24, 132:20
**lasting** [1] - 50:21
**late** [1] - 41:17
**Lavaca** [1] - 2:3
**Lavon** [3] - 33:11, 33:13, 33:15
**law** [15] - 7:19, 8:5, 13:9, 16:23, 22:22, 23:6, 23:8, 26:8, 26:24, 30:14, 31:14, 41:24, 46:23, 46:25, 47:19
**lawsuit** [12] - 10:2,

18:25, 95:12, 106:20, 106:21, 107:2, 128:9, 128:11, 128:20, 128:25, 129:3, 129:6
**lawsuits** [1] - 107:14
**lawyer** [11] - 6:25, 7:5, 21:12, 21:16, 21:17, 21:21, 25:5, 25:12, 25:14, 25:18
**lawyers** [1] - 20:17, 20:18, 22:5, 22:15, 24:24, 25:10, 26:7, 35:19, 57:3, 104:16
**lawyers'** [2] - 22:17, 25:15
**lay** [3] - 73:2, 83:21, 84:2
**lead** [3] - 24:10, 81:25, 131:7
**leader** [2] - 69:6, 70:15
**learn** [1] - 128:11
**learned** [1] - 123:20
**learns** [1] - 33:17
**least** [3] - 13:24, 44:3, 124:7
**leave** [14] - 5:3, 5:21, 29:9, 32:22, 43:10, 44:2, 44:10, 44:11, 53:3, 80:7, 82:4, 133:9, 133:23
**left** [6] - 5:22, 39:6, 44:11, 61:13, 81:7, 92:22
**left-hand** [1] - 92:22
**legal** [11] - 4:6, 8:7, 12:13, 13:16, 14:15, 17:3, 20:6, 23:4, 30:22, 31:1, 31:11
**Legal** [1] - 41:1
**legally** [1] - 12:4
**legitimacy** [1] - 8:10
**less** [2] - 22:12, 127:5
**letting** [1] - 29:18
**level** [5] - 10:4, 58:4, 70:1, 74:25, 98:22
**liability** [2] - 42:12, 42:14
**liability/proximate** [1] - 61:21
**liable** [11] - 8:25, 10:21, 11:6, 11:11, 12:8, 14:4, 14:22, 20:10, 42:9, 58:15, 62:16
**librarians** [1] - 54:21
**lies** [8] - 23:22, 37:25, 42:1, 48:21, 49:4, 49:23, 54:17, 54:18
**life** [2] - 43:1, 45:20

**lifting** [1] - 111:14
**light** [2] - 18:18, 24:8
**like-minded** [1] - 48:19
**likely** [3] - 18:21, 18:24, 51:20
**limited** [2] - 16:8, 16:16
**line** [2] - 66:23, 78:17, 116:9
**Line** [4] - 78:18, 79:5, 80:4
**lined** [1] - 79:20
**linking** [1] - 55:19
**Lisa** [1] - 2:8
**LISA** [1] - 134:9
**list** [9] - 24:21, 60:20, 67:24, 70:20, 83:4, 87:15, 87:21, 87:24, 108:10
**listed** [6] - 67:1, 82:16, 83:20, 88:13, 90:1, 130:18
**listen** [6] - 15:8, 30:2, 30:4, 53:1, 54:6, 119:11
**listening** [2] - 4:21, 5:8
**literally** [1] - 114:9
**litigation** [2] - 22:1, 121:17
**Live** [2] - 96:10, 97:24
**live** [2] - 22:13, 47:12
**lived** [1] - 44:9
**livelihoods** [1] - 53:21
**lives** [2] - 34:16, 44:13
**LLC** [4] - 15:25, 16:1, 16:4
**LLP** [2] - 1:14, 2:2
**location** [1] - 29:7
**lock** [1] - 133:22
**log** [1] - 114:18
**logs** [1] - 9:25
**long-term** [1] - 69:15
**long-time** [1] - 47:19
**look** [14] - 5:25, 6:9, 30:22, 34:20, 60:23, 71:20, 79:5, 85:3, 90:14, 114:5, 114:21, 115:5, 115:11, 129:11
**looked** [2] - 117:2, 126:2
**looking** [5] - 4:23, 40:18, 50:15, 75:23, 81:7, 83:5, 86:14, 88:20, 97:18, 99:17, 101:4, 115:8, 115:9, 116:2, 122:14
**looks** [2] - 93:8,

112:10
**Los** [1] - 1:22
**loss** [1] - 53:21
**lost** [3] - 35:14, 37:7, 52:3
**love** [1] - 89:15
**loved** [1] - 43:11
**lower** [1] - 13:2
**lowered** [1] - 13:12
**Ls** [1] - 100:2
**lump** [1] - 126:14
**lumping** [1] - 127:3
**lunch** [2] - 4:3, 32:18

## M

**ma'am** [6] - 108:8, 112:8, 113:24, 124:10, 125:9, 128:14
**machine** [1] - 104:2
**machines** [2] - 39:12, 39:18
**mailroom** [1] - 36:6
**main** [1] - 39:10
**majority** [1] - 69:13
**malice** [2] - 12:12, 13:19
**man** [1] - 115:9
**management** [6] - 69:8, 69:21, 69:24, 70:1, 85:16, 85:20
**manager** [1] - 85:13
**managers** [1] - 117:16
**manipulate** [1] - 39:12
**manner** [3] - 23:4, 77:5, 94:10
**manual** [2] - 78:9, 110:5
**manually** [3] - 114:5, 114:21, 115:9
**marked** [3] - 83:10, 91:18, 93:24
**market** [1] - 44:11
**massive** [2] - 35:16, 113:21
**master** [2] - 113:2, 113:17
**material** [5] - 74:10, 97:18, 97:22, 98:22, 108:20
**materials** [6] - 72:21, 75:6, 75:7, 75:10, 126:6, 127:9
**mathematical** [3] - 18:9, 19:10, 46:16
**mathematician** [1] - 103:16
**matter** [9] - 6:13, 21:15, 32:4, 41:24,

59:23, 61:11, 102:12, 117:25, 118:15
**matters** [19] - 9:10, 11:18, 24:15, 68:7, 101:19, 101:21, 101:23, 102:2, 102:3, 103:10, 105:3, 105:7, 106:13, 107:7, 107:14, 114:19, 131:2, 131:4, 133:19
**Mayor** [2] - 96:10, 97:23
**mayor** [3] - 8:4, 95:16, 119:12
**mean** [26] - 7:11, 19:1, 19:10, 19:11, 34:9, 63:13, 66:12, 76:12, 76:14, 76:15, 79:10, 79:22, 80:22, 87:3, 88:15, 97:21, 102:6, 105:8, 106:15, 112:23, 118:19, 122:16, 123:14, 127:7, 128:17, 128:18
**meaning** [1] - 79:7
**means** [25] - 6:12, 10:16, 11:2, 11:16, 12:8, 12:18, 12:22, 13:16, 13:19, 14:2, 14:5, 14:17, 18:22, 20:8, 26:20, 28:16, 30:16, 30:19, 41:24, 42:9, 56:6, 79:13, 79:15, 79:19, 98:21
**meant** [2] - 43:6
**measure** [2] - 51:2, 51:4
**measuring** [1] - 54:2
**mechanism** [1] - 129:22
**media** [22] - 8:6, 9:24, 15:20, 28:12, 30:1, 31:7, 39:4, 48:20, 48:23, 49:10, 49:20, 50:14, 82:14, 99:3, 107:24, 108:15, 109:22, 116:15, 127:24, 128:25, 129:7
**meet** [2] - 59:10, 117:16
**meetings** [2] - 117:14, 117:17
**member** [1] - 85:19
**members** [5] - 27:22, 32:13, 40:6, 54:21, 85:15

146

**meme** [1] - 49:5
**memory** [6] - 5:13, 5:14, 5:16, 5:19, 23:19, 25:7
**mental** [2] - 16:18, 53:21
**mention** [2] - 97:8, 97:19
**mentioned** [9] - 24:23, 56:14, 71:7, 72:25, 78:12, 82:16, 97:12, 119:5, 129:12
**mentions** [24] - 78:7, 78:19, 86:21, 86:24, 87:3, 87:5, 87:7, 88:1, 88:4, 88:5, 91:2, 91:6, 92:7, 93:2, 94:6, 94:13, 96:21, 97:3, 97:6, 97:17, 128:24, 129:22, 130:12, 130:17
**merely** [2] - 19:19, 29:13
**Meryl** [1] - 7:2
**MERYL** [1] - 1:13
**message** [3] - 38:15, 54:24, 54:25
**messaged** [1] - 38:3
**messages** [8] - 9:24, 28:17, 28:18, 35:8, 38:20, 51:13, 51:14, 81:22
**messengers** [1] - 51:11
**metadata** [7] - 71:4, 71:7, 71:14, 71:17, 71:24, 72:7, 72:12
**methodologies** [2] - 51:17, 76:11
**methodology** [2] - 99:15, 100:22
**metrics** [1] - 88:11
**mgovernski@willkie. com** [1] - 1:16
**mic** [1] - 33:3
**Michael** [1] - 7:1
**MICHAEL** [1] - 1:12
**microphone** [2] - 48:11, 74:19
**midafternoon** [1] - 32:19
**midmorning** [1] - 32:17
**midnight** [1] - 48:21
**might** [7] - 4:21, 4:25, 5:1, 25:21, 32:11, 54:19, 132:25
**Mike** [2] - 44:20, 45:1
**miles** [2] - 21:14,

21:20
**MILLER** [1] - 1:17
**miller@dubosemiller .com** [1] - 1:19
**million** [5] - 50:5, 50:9, 51:20, 52:2
**millions** [10] - 34:13, 37:10, 37:19, 37:25, 49:24, 52:8, 53:10, 54:16, 54:18
**mind** [8] - 18:23, 19:16, 27:3, 31:19, 31:20, 45:18, 53:1, 59:13
**minded** [1] - 48:19
**mint** [2] - 39:14, 39:15
**minute** [2] - 59:20, 61:1
**minutes** [2] - 46:1, 61:1
**misconduct** [1] - 10:19
**misleading** [1] - 31:8
**missing** [1] - 62:4
**mistake** [1] - 56:10
**mitigate** [1] - 47:21
**model** [4] - 49:17, 50:24, 51:1
**models** [1] - 50:23
**mom** [2] - 36:11, 43:9
**moment** [2] - 11:17, 35:10
**Monday** [2] - 1:4, 97:19
**monetary** [1] - 42:22
**money** [7] - 11:19, 16:8, 16:9, 16:13, 35:18, 132:4, 132:6
**monitor** [3] - 47:21, 87:15, 87:17
**monitored** [1] - 130:11
**monitoring** [18] - 70:10, 81:23, 81:24, 84:12, 85:17, 87:12, 91:24, 94:4, 100:25, 120:7, 120:10, 125:5, 126:2, 126:23, 127:1, 131:15, 131:19, 131:20
**month** [2] - 94:25, 95:2
**months** [3] - 92:10, 94:14, 121:9
**MOREIRA** [1] - 134:9
**Moreira** [2] - 2:8, 134:16
**moreover** [1] - 31:12
**morning** [4] - 32:17, 67:13, 133:5, 133:19

**Moss** [90] - 2:6, 6:20, 7:22, 8:19, 9:2, 12:10, 12:15, 12:18, 12:20, 13:5, 13:11, 13:21, 14:2, 14:10, 15:13, 33:9, 34:7, 34:17, 35:8, 35:25, 36:14, 37:6, 37:16, 38:3, 38:5, 38:18, 38:24, 39:3, 39:8, 39:10, 39:14, 40:18, 41:8, 42:1, 42:5, 42:23, 42:25, 43:4, 43:13, 44:22, 45:3, 46:5, 47:8, 47:22, 48:7, 49:15, 49:24, 50:14, 50:20, 51:3, 51:25, 52:3, 53:20, 54:19, 70:6, 70:9, 72:25, 73:25, 77:12, 78:12, 78:20, 79:22, 81:22, 82:23, 83:4, 86:21, 86:25, 87:12, 87:17, 90:23, 92:7, 93:2, 93:18, 94:6, 94:23, 95:7, 95:8, 96:22, 99:5, 121:22, 124:3, 126:13, 126:17, 127:3, 127:12, 127:18, 128:4, 128:24, 131:3, 131:22
**Moss's** [8] - 38:4, 40:17, 41:6, 47:6, 48:16, 51:19, 54:5, 131:10
**most** [10] - 5:5, 6:14, 6:17, 32:20, 33:25, 48:23, 51:22, 114:12, 126:5, 126:8
**Mother** [1] - 79:6
**mother** [3] - 38:20, 39:15, 40:17
**motion** [1] - 66:6
**motions** [2] - 26:6, 63:15
**motives** [1] - 43:3
**mouth** [1] - 111:13
**move** [6] - 63:20, 87:25, 88:7, 89:3, 92:12, 92:15
**movie** [1] - 57:23
**moving** [2] - 72:24, 78:11
**MR** [167] - 33:5, 33:7, 35:7, 37:23, 39:24, 40:6, 41:21, 44:25, 55:6, 57:22, 59:23, 59:25, 60:7, 60:11, 60:15, 60:18, 60:21,

60:24, 61:7, 61:25, 62:12, 62:17, 62:25, 63:4, 63:18, 63:21, 64:1, 64:9, 64:11, 64:13, 64:19, 64:21, 64:23, 65:4, 65:6, 65:8, 65:13, 65:18, 65:21, 65:23, 66:3, 66:11, 66:20, 67:5, 67:16, 67:19, 67:21, 67:23, 68:3, 68:12, 68:14, 68:21, 68:24, 70:19, 70:22, 70:24, 71:10, 71:15, 72:1, 72:8, 72:11, 72:19, 72:20, 73:1, 73:4, 73:6, 73:16, 73:21, 74:7, 74:22, 74:24, 75:8, 75:12, 75:18, 76:6, 76:23, 77:2, 77:3, 79:11, 80:3, 80:12, 80:14, 80:16, 82:6, 83:6, 83:9, 83:17, 83:21, 83:25, 84:3, 84:5, 84:6, 84:14, 84:17, 84:22, 84:24, 86:13, 90:19, 91:9, 91:11, 91:14, 91:16, 92:21, 93:1, 93:20, 93:23, 95:1, 95:3, 95:5, 95:9, 95:18, 95:22, 95:24, 96:3, 99:9, 99:12, 100:1, 102:6, 102:10, 102:16, 103:21, 104:13, 104:18, 104:24, 105:14, 105:19, 105:21, 105:25, 106:7, 106:12, 106:17, 106:20, 106:23, 107:6, 111:1, 111:10, 111:14, 111:17, 112:1, 115:25, 116:5, 116:11, 117:6, 117:10, 118:17, 120:14, 120:19, 121:1, 121:3, 121:16, 122:3, 122:6, 122:20, 122:21, 122:23, 122:25, 123:12, 127:14, 129:15, 129:19, 130:2, 130:6, 130:9, 132:8, 132:10, 133:21, 134:1
**multicolored** [1] - 88:8
**multiple** [5] - 8:16, 44:6, 91:5, 117:14,

117:16
**must** [49] - 7:13, 9:14, 10:2, 10:25, 11:7, 11:18, 11:22, 12:9, 15:4, 15:11, 15:14, 15:18, 15:23, 16:3, 18:2, 19:10, 19:25, 22:24, 23:12, 23:14, 23:16, 24:14, 24:16, 24:20, 25:1, 25:3, 25:13, 25:20, 25:23, 26:16, 27:11, 27:20, 28:1, 28:5, 28:9, 28:13, 28:18, 28:25, 30:3, 30:4, 30:8, 30:12, 31:15, 32:2, 52:19, 52:22, 114:15
**mystery** [1] - 39:9

**N**

**name** [33] - 32:9, 33:7, 33:10, 33:17, 33:25, 34:3, 34:12, 34:19, 34:21, 41:7, 44:12, 44:13, 44:14, 44:17, 45:1, 58:3, 69:2, 79:21, 82:17, 82:18, 82:20, 82:23, 83:19, 85:3, 87:6, 97:12, 99:24, 100:5, 101:25, 124:14, 126:7, 126:11
**named** [2] - 33:13, 107:1
**names** [19] - 33:16, 33:17, 33:18, 33:23, 34:5, 34:6, 34:8, 34:9, 34:13, 34:17, 37:8, 41:6, 48:6, 82:9, 87:3, 87:8, 87:23, 106:5
**national** [1] - 35:17
**natural** [1] - 28:23
**naturally** [1] - 61:16
**nature** [8] - 53:17, 53:24, 66:18, 75:6, 79:1, 89:11, 93:10, 122:7
**NE** [1] - 1:18
**necessarily** [2] - 19:21, 124:5
**necessary** [3] - 12:3, 17:23, 102:18
**necks** [1] - 38:12
**Need** [1] - 90:21
**need** [6] - 13:8, 52:13, 57:19, 67:15, 73:1, 86:13, 101:3, 118:14
**needed** [1] - 117:18
**needless** [1] - 54:13

**needs** [1] - 117:19
**negative** [17] - 47:25, 50:19, 50:21, 51:13, 88:12, 88:16, 88:17, 88:24, 89:1, 89:2, 92:14, 94:21, 98:20, 129:3, 129:24, 130:20, 130:23
**negatively** [1] - 114:11
**neighborhood** [1] - 44:10
**net** [4] - 15:16, 16:2, 52:15, 52:21
**network** [3] - 14:16, 20:7, 128:1
**networking** [1] - 27:9
**networks** [1] - 128:3
**neutral** [2] - 88:13, 129:25
**never** [10] - 43:12, 44:10, 48:4, 56:20, 56:21, 58:9, 58:22, 63:6
**new** [1] - 52:4
**New** [1] - 8:4
**news** [12] - 36:22, 82:14, 128:1, 128:3, 129:20, 129:21, 129:23, 129:25, 130:11, 130:13, 130:24, 131:1
**News** [2] - 14:16, 20:7
**newspaper** [2] - 29:24, 133:10
**newspapers** [1] - 30:16
**next** [9] - 36:17, 54:19, 54:23, 68:11, 84:17, 85:15, 89:3, 106:11, 132:20
**Next** [1] - 1:24
**nigger** [1] - 38:16
**Night** [1] - 93:14
**night** [2] - 38:16, 43:21
**nightly** [5] - 95:15, 96:11, 97:24, 119:12, 126:19
**nightmare** [1] - 54:7
**nightmares** [2] - 43:8
**non** [1] - 9:19
**none** [3] - 4:19, 37:24
**normal** [7] - 40:2, 73:8, 73:11, 76:1, 86:6, 133:9
**notate** [2] - 119:11, 130:16
**note** [2] - 4:20, 5:18
**note-taker's** [1] - 5:18
**note-taking** [1] - 4:20
**notebook** [2] - 4:15,

---

5:10
**notebooks** [3] - 5:21, 6:2, 6:7
**notes** [17] - 4:16, 4:17, 4:19, 4:20, 4:24, 5:2, 5:4, 5:9, 5:12, 5:15, 5:17, 6:1, 6:8, 6:9, 23:20, 134:11
**nothing** [2] - 27:19, 28:7
**notwithstanding** [1] - 132:4
**November** [13] - 36:15, 36:20, 37:1, 37:3, 54:8, 84:13, 86:22, 94:16, 101:12, 110:16, 111:22, 127:19, 128:21
**number** [19] - 19:19, 48:6, 49:20, 51:22, 52:2, 53:8, 53:9, 57:18, 58:17, 58:23, 60:2, 81:4, 81:19, 111:5, 123:15, 124:2, 124:6, 126:12, 128:24
**numbers** [2] - 45:16, 125:14, 125:16
**numerical** [1] - 46:18
**NW** [2] - 2:9, 134:18

## O

**O-N-T-I-C** [1] - 109:16
**OAN** [4] - 14:16, 20:7
**oath** [1] - 22:4
**object** [9] - 25:10, 25:15, 61:9, 63:7, 63:14, 66:5, 67:14, 73:20, 130:2
**objecting** [1] - 66:9
**objection** [39] - 7:5, 7:8, 25:18, 26:2, 66:1, 66:16, 66:17, 66:18, 67:4, 67:5, 67:18, 71:10, 72:2, 76:5, 79:11, 80:12, 83:17, 83:22, 83:23, 84:4, 84:14, 84:16, 86:11, 102:8, 102:10, 102:20, 104:1, 104:11, 106:6, 106:8, 111:1, 112:1, 115:25, 116:10, 117:6, 118:17, 120:21, 123:5, 127:14
**objection's** [2] - 72:10, 76:21
**objections** [10] -

---

24:24, 25:13, 26:7, 61:20, 63:10, 63:11, 63:16, 66:23, 75:19, 86:15
**objective** [1] - 131:11
**obligations** [4] - 10:8, 10:15, 15:3, 52:19
**observed** [1] - 89:20
**observers** [3] - 39:4, 39:5, 41:9
**observing** [2] - 5:9, 108:21
**obtain** [1] - 10:1
**obviously** [2] - 102:11
**occur** [3] - 23:21, 49:20, 56:20
**occurred** [2] - 56:9, 86:25
**occurs** [1] - 30:13
**OF** [3] - 1:1, 1:9, 134:7
**offensive** [1] - 89:12
**offer** [6] - 49:7, 50:12, 50:23, 51:12, 53:6, 69:20
**offered** [1] - 106:15
**offering** [2] - 121:10, 121:14
**offers** [1] - 25:12
**office** [1] - 121:12
**officer** [2] - 69:12, 72:13
**officers** [1] - 54:21
**offices** [1] - 48:13
**official** [2] - 39:1, 134:17
**OFFICIAL** [1] - 134:7
**Official** [1] - 2:8
**officials** [2] - 38:22, 39:19
**often** [3] - 33:18, 33:20, 33:22
**old** [2] - 74:18, 93:9
**once** [3] - 63:15, 66:23, 129:6
**one** [38] - 5:25, 13:1, 16:10, 33:16, 38:15, 38:18, 39:4, 39:18, 40:11, 40:12, 43:11, 44:12, 51:4, 56:13, 56:14, 61:8, 61:9, 61:14, 65:10, 76:8, 82:16, 83:16, 89:7, 89:20, 90:14, 90:15, 103:13, 103:14, 103:15, 105:21, 106:7, 106:12, 109:19, 110:22, 111:1, 117:2, 117:3, 131:6
**One** [2] - 14:16, 20:7

---

**ones** [3] - 66:9, 117:25, 126:22
**ongoing** [1] - 50:21
**online** [10] - 9:24, 43:16, 47:21, 48:1, 49:11, 50:13, 87:12, 87:20, 116:14, 124:2
**Ontic** [9] - 109:14, 109:17, 109:18, 109:20, 110:4, 110:14, 111:24, 112:18, 113:21
**open** [22] - 27:3, 31:20, 60:16, 60:18, 69:7, 69:23, 70:16, 85:13, 102:5, 108:11, 108:16, 109:4, 109:18, 112:8, 115:3, 115:20, 116:3, 117:15, 117:22, 117:24, 119:6, 128:2
**opening** [8] - 20:16, 20:21, 22:18, 33:1, 33:2, 61:9, 76:7
**operates** [1] - 35:18
**operations** [1] - 16:6
**opining** [1] - 123:8
**opinion** [5] - 26:10, 26:12, 76:19, 121:10, 121:14
**opinions** [3] - 28:4, 28:5, 28:6
**opportunity** [8] - 21:3, 21:9, 22:16, 71:19, 78:7, 102:14, 108:13, 114:6
**opposed** [3] - 55:25, 66:21, 127:3
**order** [3] - 61:12, 67:10, 105:10
**ordered** [1] - 36:25
**orderly** [1] - 23:4
**orders** [5] - 10:21, 10:25, 15:3, 62:8, 67:6
**ordinary** [2] - 37:11, 37:19
**origin** [2] - 124:5, 124:8
**original** [1] - 101:15
**originally** [1] - 87:14
**out-of-pocket** [1] - 53:8
**outcome** [1] - 35:23
**outlets** [1] - 36:22
**outrageous** [4] - 14:8, 16:25, 42:5, 46:13
**outside** [3] - 25:2, 27:14, 29:3, 31:3,

---

43:24, 62:6, 74:14, 104:5, 120:18
**overhearing** [1] - 29:4
**overnight** [2] - 5:23, 6:3
**overrule** [2] - 26:2, 118:18
**overruled** [9] - 7:8, 72:10, 76:21, 80:1, 106:6, 106:10, 116:15, 123:6, 127:15
**oversaw** [1] - 85:11
**oversee** [1] - 70:16
**oversight** [1] - 85:24
**overwhelming** [2] - 45:13, 47:25
**owed** [2] - 11:8, 17:4
**owes** [2] - 9:7, 11:20
**own** [15] - 5:14, 5:16, 8:6, 14:22, 20:11, 25:7, 28:4, 30:24, 31:13, 33:25, 39:6, 42:10, 43:2, 56:16, 65:4
**owns** [1] - 35:18

## P

**p.m** [3] - 1:4, 32:18, 134:5
**pack** [1] - 43:22
**PAGE** [1] - 3:2
**Page** [12] - 1:24, 87:25, 88:7, 89:3, 89:17, 89:22, 90:19, 92:12, 92:15, 92:21, 93:1, 94:17
**page** [10] - 83:19, 85:3, 89:4, 89:5, 89:18, 90:20, 91:6, 92:16, 93:5, 111:15
**pages** [4] - 91:1, 91:4, 91:5, 91:8
**paid** [11] - 102:22, 102:24, 102:25, 103:3, 103:6, 103:7, 103:23, 131:25, 132:1, 132:5, 132:6
**pain** [1] - 53:21
**pandemic** [1] - 36:11
**parroted** [1] - 49:3
**part** [14] - 8:9, 20:2, 28:21, 75:1, 75:5, 75:13, 80:19, 81:23, 87:23, 98:25, 109:25, 113:2, 126:15, 130:17
**particular** [6] - 7:11, 13:3, 34:6, 62:19,

118:14, 130:18
**particularly** [1] - 66:9
**parties** [12] - 9:18,
10:2, 10:3, 12:20,
12:21, 22:1, 28:25,
29:8, 29:12, 30:25,
31:4, 32:8
**Partners** [2] - 16:1,
16:4
**parts** [1] - 20:13
**party** [13] - 6:18, 6:21,
10:1, 13:15, 16:9,
25:14, 73:14, 74:25,
77:16, 77:24, 78:2,
109:9, 109:11
**party's** [1] - 9:20
**pass** [2] - 39:11,
129:15
**passed** [2] - 39:14,
40:22
**passing** [2] - 8:17,
39:17
**path** [1] - 45:22
**Pause** [1] - 85:5
**pay** [4] - 23:16, 23:23,
56:24, 58:17
**peace** [1] - 45:18
**peek** [1] - 112:7
**pen** [1] - 4:15
**penalty** [1] - 59:7
**pending** [1] - 107:14
**pens** [1] - 5:21
**people** [47] - 5:5,
12:20, 28:2, 28:4,
28:9, 28:24, 29:2,
33:23, 33:24, 34:14,
37:25, 38:12, 40:14,
40:16, 43:7, 43:20,
49:12, 54:16, 54:18,
55:13, 55:17, 55:21,
56:16, 56:22, 62:6,
62:10, 62:13, 62:19,
80:7, 85:25, 99:2,
108:4, 109:5,
114:21, 114:22,
115:11, 116:3,
116:14, 119:25,
120:24, 121:4,
122:15, 127:17,
132:18, 132:21,
132:25
**per** [4] - 8:25, 13:6,
13:7, 91:6
**percent** [8] - 88:6,
89:2, 92:14, 94:21,
103:17, 105:23,
126:9, 126:10
**percentage** [3] - 88:4,
89:1, 104:20
**perform** [1] - 108:24

**performing** [1] - 75:15
**period** [7] - 84:12,
86:25, 88:2, 90:24,
92:4, 93:18, 97:13
**permit** [1] - 4:16
**permits** [1] - 16:23
**permitted** [1] - 26:18
**permitting** [1] - 7:8
**perpetual** [1] - 54:7
**person** [9] - 21:25,
22:13, 28:3, 32:8,
62:20, 105:13,
122:13, 124:12,
124:17
**person's** [2] - 28:5,
47:1
**personal** [4] - 5:18,
33:22, 73:19, 73:20
**personality** [1] - 8:6
**personally** [2] - 12:19,
33:21
**persons** [4] - 56:1,
108:23, 123:18,
123:23
**pertain** [1] - 60:15
**pertaining** [1] - 82:24
**pertains** [1] - 64:25
**PhD** [1] - 49:9
**phone** [8] - 10:13,
28:11, 38:18, 38:19,
48:24, 62:10, 62:21,
74:12
**phrases** [2] - 83:1,
101:8
**physical** [2] - 16:16,
70:10
**picks** [1] - 88:19
**piece** [2] - 39:15,
125:9
**pieces** [1] - 106:24
**place** [1] - 44:12
**placed** [1] - 22:4
**places** [1] - 127:23
**placing** [1] - 80:9
**plain** [1] - 31:8
**plaintiff** [5] - 6:18,
16:20, 16:22, 16:24
**Plaintiffs** [2] - 1:4,
68:2
**plaintiffs** [62] - 6:19,
7:14, 7:21, 8:1, 8:13,
9:7, 10:5, 10:10,
10:16, 10:18, 10:22,
10:23, 11:9, 11:11,
11:14, 11:20, 12:8,
13:1, 13:9, 14:8,
15:1, 16:9, 16:11,
16:14, 17:6, 17:20,
18:2, 18:5, 18:6,
18:17, 18:25, 19:6,

19:7, 19:23, 21:1,
21:5, 22:15, 33:8,
49:7, 50:17, 55:11,
55:13, 56:8, 57:10,
58:20, 58:25, 59:16,
59:20, 64:6, 68:10,
68:14, 75:5, 82:17,
82:18, 96:1, 97:12,
123:19, 123:21,
124:13, 126:7
**PLAINTIFFS** [1] - 1:12
**Plaintiffs'** [21] - 64:1,
64:2, 64:3, 70:17,
70:25, 77:5, 82:2,
82:4, 82:7, 83:7,
83:11, 84:7, 91:7,
91:11, 91:19, 93:21,
93:24, 95:19, 111:8
**plaintiffs'** [25] - 7:1,
11:5, 12:3, 12:5,
17:13, 17:18, 18:1,
18:7, 18:14, 19:1,
19:4, 20:21, 20:24,
21:3, 21:7, 33:2,
55:23, 56:16, 59:5,
76:18, 82:9, 102:3,
103:8, 103:18,
104:16
**plan** [4] - 40:23, 41:15,
41:18, 48:22
**Plan** [5] - 40:25, 41:5,
41:10, 48:14, 51:15
**plan's** [3] - 41:1,
48:16, 49:4
**plastic** [1] - 4:15
**platforms** [4] - 35:17,
49:10, 52:25, 108:15
**plausible** [1] - 57:19
**play** [2] - 95:25,
124:15
**played** [6] - 35:6,
37:22, 39:23, 40:5,
41:20, 96:4
**playing** [1] - 10:4
**plays** [1] - 108:3
**pleadings** [1] - 63:12
**pleasant** [3] - 4:3,
133:3, 133:16
**plenty** [1] - 60:12
**plus** [1] - 118:25
**pocket** [1] - 53:8
**podcast** [1] - 15:20
**podcasts** [3] - 8:6,
35:17, 52:24
**podium** [1] - 44:20
**point** [6] - 87:14,
101:2, 108:11,
121:16, 121:19,
127:10
**pointed** [1] - 58:1

**points** [1] - 48:17
**police** [5] - 54:20,
69:12, 71:23, 72:13,
118:24
**political** [2] - 43:3,
57:7
**politics** [1] - 55:2
**poll** [3] - 8:14, 80:6,
80:21
**pools** [1] - 109:21
**portion** [1] - 78:10
**positive** [5] - 51:12,
88:13, 129:24,
130:20, 130:24
**possession** [1] - 9:20
**possible** [2] - 29:17,
51:10, 120:1
**possibly** [1] - 132:20
**post** [12] - 41:23,
66:22, 79:21, 79:24,
80:19, 80:21, 92:16,
93:16, 114:8,
114:10, 114:11,
124:17
**posted** [1] - 99:6
**poster** [2] - 93:9,
93:10
**posters** [1] - 71:6
**posting** [5] - 27:9,
28:15, 99:3, 127:18
**posts** [23] - 78:8,
79:20, 89:9, 90:22,
90:23, 93:17,
108:20, 114:22,
115:9, 115:12,
117:3, 123:14,
123:18, 124:2,
124:6, 125:19,
125:21, 125:23,
126:1, 126:5, 126:12
**potential** [2] - 130:11,
131:17
**potentially** [4] - 73:17,
81:25, 131:7, 132:1
**pounding** [1] - 40:15
**power** [2] - 33:7, 35:13
**powerful** [2] - 48:23,
54:13
**practice** [3] - 69:23,
85:16, 85:20
**practiced** [1] - 8:5
**precipitating** [1] -
129:8
**precise** [1] - 111:13
**precisely** [4] - 62:22,
118:22, 121:24,
122:5
**precision** [1] - 46:18
**prefer** [2] - 63:9, 63:13
**preference** [1] - 33:6,

60:13, 65:13
**prejudice** [2] - 10:16,
31:24
**preliminary** [4] - 4:4,
4:10, 132:18, 133:19
**preparation** [2] -
124:22, 125:10
**prepare** [1] - 74:23
**preparedness** [1] -
70:3
**preponderance** [7] -
18:3, 18:5, 18:20,
18:22, 19:9, 19:17,
19:21
**presence** [1] - 27:2
**PRESENT** [1] - 2:6
**present** [7] - 17:9,
17:18, 20:22, 21:5,
22:6, 63:23, 121:13
**presentation** [1] - 57:1
**presented** [12] - 11:22,
17:12, 18:15, 22:9,
22:14, 25:4, 30:5,
31:9, 31:10, 31:12,
32:1, 41:16
**presenting** [1] - 17:13
**preserve** [5] - 10:2,
10:3, 10:9, 22:2,
72:21
**president** [2] - 8:8,
37:2
**President** [5] - 35:13,
37:7, 38:6, 41:17,
49:2
**president's** [1] - 41:16
**presidential** [9] - 8:3,
14:15, 20:6, 34:15,
35:11, 36:1, 36:23,
44:3, 48:18
**Presidential** [1] - 41:1
**press** [3] - 30:7, 32:3,
90:16
**pressure** [1] - 41:2
**presume** [3] - 13:10,
46:23, 52:19
**presumed** [1] - 17:7
**presumes** [1] - 13:9
**presuming** [1] - 67:2
**presumption** [1] - 47:4
**pretenses** [1] - 8:15
**pretrial** [2] - 60:1,
63:10
**pretty** [1] - 57:14
**prevention** [1] - 70:4
**previewed** [1] - 45:4
**previously** [1] - 66:5
**pride** [2] - 33:8, 44:15
**primary** [5] - 85:17,
87:10, 131:6,
131:11, 131:18

149

**principles** [2] - 51:21, 59:3
**private** [2] - 80:8, 105:12
**privately** [3] - 29:23, 30:11, 32:14
**privilege** [3] - 13:15, 36:8, 45:3
**privileged** [1] - 9:20
**probability** [1] - 19:6
**probe** [1] - 105:7
**problem** [2] - 76:10, 76:17
**procedures** [1] - 7:18
**proceed** [7] - 33:1, 68:20, 72:18, 77:1, 80:2, 84:1, 84:23
**proceedings** [1] - 134:12
**process** [12] - 9:21, 32:8, 38:24, 77:22, 101:9, 108:3, 108:5, 108:6, 112:16, 114:1, 120:6, 120:8
**processing** [3] - 37:12, 37:20, 40:2
**produce** [4] - 10:4, 10:23, 10:24, 19:10
**produces** [1] - 18:23
**product** [1] - 119:21
**profane** [1] - 8:23
**profession** [2] - 13:2, 13:12
**professional** [2] - 47:19, 69:11
**project** [3] - 70:16, 119:9, 126:15
**projected** [1] - 36:22
**projects** [1] - 102:4
**promote** [1] - 48:18
**promoted** [1] - 56:20
**promptly** [1] - 32:16
**prone** [1] - 51:13
**pronged** [1] - 108:22
**proof** [6] - 19:8, 19:10, 19:11, 19:14, 19:24, 62:15
**properly** [2] - 23:24, 25:12, 25:16
**proportionate** [1] - 58:24
**PROTECT** [1] - 1:21
**Protect** [2] - 113:7, 113:8
**protection** [1] - 70:2
**proud** [1] - 33:14
**prove** [8] - 10:5, 10:6, 10:17, 13:8, 18:21, 19:23, 42:15, 55:24
**proved** [1] - 24:8

**provide** [12] - 10:10, 17:14, 18:7, 27:20, 46:4, 70:5, 89:1, 90:16, 102:5, 108:19, 133:6, 133:7
**provided** [5] - 70:8, 71:4, 78:6, 87:15, 107:9
**provides** [2] - 71:20, 77:19
**providing** [1] - 70:12
**proximate** [6] - 56:5, 56:25, 57:4, 58:18, 61:10, 62:2
**proximate-cause** [1] - 57:4
**proximately** [1] - 62:2
**PTX** [2] - 63:25, 75:14
**public** [2] - 41:2, 106:16
**publicly** [4] - 8:12, 38:22, 39:20, 108:16
**publish** [2] - 65:20, 124:13
**published** [7] - 12:12, 12:17, 13:18, 13:22, 41:25, 50:2, 125:4
**publishing** [2] - 12:10, 93:21
**pull** [2] - 43:15, 114:4
**pulled** [4] - 77:13, 77:19, 114:3, 122:10
**pulls** [2] - 77:15, 78:1
**punish** [1] - 46:13
**punishment** [2] - 16:25, 59:4
**punitive** [13] - 9:3, 11:4, 11:15, 11:21, 15:10, 16:12, 16:19, 16:21, 16:24, 46:11, 53:5, 54:10, 54:23
**punitives** [1] - 45:24
**purpose** [6] - 15:16, 15:21, 16:1, 33:7, 41:1, 81:21
**purposes** [4] - 12:9, 14:6, 20:8, 24:17
**purses** [1] - 32:22
**pursue** [1] - 45:19
**put** [16] - 5:11, 19:3, 19:16, 20:25, 32:5, 43:18, 44:8, 44:11, 49:5, 99:24, 100:4, 100:13, 100:19, 111:12, 121:7, 133:14

### Q

**qualifications** [3] -

115:18, 118:5, 120:3
**qualified** [2] - 116:21, 116:24
**quality** [1] - 19:18
**quantified** [3] - 49:13, 49:25, 50:6
**quantify** [4] - 45:17, 53:6, 53:17, 126:8
**quantity** [1] - 19:18
**questioning** [1] - 116:9
**questions** [16] - 20:25, 21:6, 22:6, 22:7, 23:5, 24:23, 40:8, 45:21, 75:25, 76:2, 84:18, 99:9, 102:17, 110:21, 131:25, 132:2
**quite** [3] - 21:21, 72:16, 84:19

### R

**racist** [5] - 38:9, 48:2, 56:21, 98:22, 127:11
**radical** [1] - 124:2
**radically** [1] - 124:6
**radio** [4] - 8:6, 29:25, 32:3, 52:24
**Raffensperger** [2] - 36:25, 49:1
**raise** [5] - 61:8, 66:16, 66:22, 68:18
**raised** [3] - 86:10, 102:9, 104:11
**raising** [1] - 67:17
**random** [1] - 56:16
**range** [2] - 51:22, 111:20
**ranges** [1] - 51:20
**rate** [4] - 89:1, 113:12, 113:13, 113:16
**rather** [5] - 16:23, 63:21, 104:1, 116:13, 116:15
**RDR** [3] - 2:8, 134:9, 134:16
**re** [4] - 8:8, 72:1, 120:15, 120:20
**re-urge** [2] - 72:1, 120:15, 120:20
**reach** [7] - 15:20, 15:21, 31:23, 49:13, 49:16, 52:24, 53:24
**reached** [1] - 39:2
**read** [16] - 30:2, 30:3, 32:4, 38:20, 63:21, 80:5, 80:23, 89:12, 90:3, 90:14, 90:20, 92:15, 92:23, 93:11,

121:2, 133:10
**reading** [1] - 120:25
**ready** [7] - 60:6, 61:5, 63:19, 68:1, 68:10, 76:22, 125:17
**really** [11] - 35:2, 55:12, 56:6, 59:5, 59:6, 63:7, 66:14, 67:2, 75:22, 104:10, 114:9
**realtime** [1] - 108:19
**reason** [8] - 7:7, 9:17, 24:10, 32:2, 37:6, 53:11, 116:9, 122:7
**reasonable** [7] - 17:14, 18:8, 19:12, 19:14, 24:8, 47:5, 58:8
**reasonably** [2] - 16:14, 18:16
**reasons** [1] - 30:23
**rebuild** [1] - 51:7
**recalling** [1] - 5:6
**receive** [4] - 9:2, 11:23, 27:21, 42:23
**received** [3] - 7:10, 11:25, 15:11
**receiving** [2] - 35:9, 102:13
**receptive** [1] - 50:9
**Recess** [1] - 61:4
**recess** [2] - 5:20, 5:23
**recesses** [1] - 5:23
**recklessly** [2] - 13:21, 14:9
**recognize** [4] - 32:11, 75:14, 84:7, 94:1
**recollection** [1] - 25:9
**reconsider** [2] - 9:15, 11:18
**record** [7] - 25:23, 63:22, 66:7, 66:17, 69:2, 73:17, 86:5
**record's** [2] - 67:15, 111:4
**recorded** [1] - 90:17
**records** [10] - 10:2, 10:3, 10:4, 10:9, 10:10, 10:11, 10:24, 22:6, 73:11, 114:18
**recount** [1] - 36:25
**recross** [1] - 132:10
**recrosses** [1] - 132:11
**red** [3] - 37:15, 88:12
**redirect** [4] - 21:4, 21:9, 129:17, 132:12
**REDIRECT** [1] - 129:18
**reduced** [1] - 108:17
**refer** [2] - 6:19, 6:24

**reference** [10] - 21:24, 79:6, 82:18, 82:20, 82:23, 125:21, 125:24, 126:3, 126:6, 126:11
**referenced** [5] - 80:11, 87:1, 96:14, 96:24, 125:24
**references** [1] - 97:4
**referencing** [2] - 79:3, 97:5
**referred** [3] - 12:15, 32:12, 80:18
**referring** [3] - 6:22, 79:17, 96:18
**refers** [2] - 25:6, 87:25
**reflect** [3] - 82:8, 92:8, 94:7
**reflected** [1] - 89:9
**reflects** [1] - 89:4
**refreshing** [1] - 5:18
**refusal** [1] - 10:15
**refuse** [1] - 29:20
**refused** [2] - 10:8, 52:18
**refute** [1] - 31:4
**REGINA** [2] - 3:3, 68:22
**Regina** [3] - 47:18, 68:14, 69:3
**registration** [1] - 36:4
**regular** [2] - 6:12, 109:25
**regularly** [2] - 72:16, 75:15
**related** [3] - 88:11, 129:2, 131:16
**relationship** [2] - 69:5, 73:3
**relayed** [1] - 78:5
**relevance** [7] - 104:13, 104:14, 104:17, 106:5, 106:9, 116:11, 118:17
**relevant** [10] - 9:19, 9:22, 10:9, 10:10, 10:11, 10:24, 102:7, 102:21, 103:22, 103:23
**relied** [2] - 74:8, 74:10
**relies** [1] - 122:9
**relocation** [1] - 52:4
**rely** [5] - 5:15, 23:19, 25:7, 31:12, 47:3
**relying** [1] - 31:2
**remaining** [1] - 9:5
**remarks** [2] - 4:8, 127:12
**remember** [9] - 5:1, 5:12, 21:15, 25:7,

56:2, 103:11, 105:6,
118:4, 132:17
**remembering** [1] - 5:6
**repair** [4] - 51:5, 51:9,
51:18, 52:1
**repeat** [2] - 24:12,
24:18
**repeating** [1] - 62:10
**rephrase** [1] - 130:4
**replace** [1] - 5:14
**report** [35] - 29:17,
76:15, 83:15, 84:12,
84:13, 85:12, 85:23,
85:24, 86:1, 86:3,
86:5, 86:18, 86:20,
91:1, 91:24, 91:25,
92:1, 92:4, 92:5,
92:8, 92:13, 93:16,
94:5, 94:7, 94:9,
94:15, 94:20, 100:6,
100:14, 100:25,
120:22, 120:23,
121:7, 129:11,
130:16
**reported** [2] - 36:14,
36:16
**REPORTER** [1] -
134:7
**reporter** [1] - 22:6
**Reporter** [3] - 2:8, 2:8,
134:17
**reporters** [2] - 14:17,
20:7
**reports** [26] - 29:24,
30:4, 32:3, 32:5,
75:2, 77:11, 94:10,
99:17, 100:20,
101:2, 103:1,
107:11, 107:22,
111:7, 120:8,
120:10, 121:13,
121:17, 122:1,
122:4, 122:9,
122:19, 123:6,
125:5, 125:6, 126:2
**represent** [1] - 33:8
**represented** [1] - 88:5
**representing** [1] - 45:3
**represents** [1] - 25:14
**reputation** [9] - 45:18,
47:1, 49:3, 51:8,
51:9, 51:19, 52:8,
53:13
**reputational** [13] -
8:21, 16:18, 46:7,
51:3, 51:4, 51:24,
53:5, 53:7, 70:10,
101:5, 131:7,
131:15, 131:19
**reputationally** [2] -

81:25, 88:18
**reputations** [9] -
17:15, 17:21, 17:24,
47:6, 48:16, 50:22,
52:1, 53:12, 58:3
**requested** [2] - 109:9,
109:11
**require** [1] - 10:3
**required** [8] - 4:19,
11:2, 15:9, 17:8,
18:11, 19:12, 46:16,
46:17
**requirement** [1] -
19:15
**requires** [2] - 117:20,
121:4
**research** [8] - 30:16,
30:20, 30:21, 30:24,
31:13, 85:18, 124:19
**resolve** [1] - 23:21
**respect** [7] - 58:19,
61:19, 65:25, 66:25,
107:7, 111:19, 128:5
**respond** [2] - 27:18,
31:2
**response** [3] - 38:7,
113:23, 115:14
**responses** [1] - 62:19
**responsibilities** [2] -
4:13, 23:3
**responsibility** [2] -
25:15, 26:15
**responsible** [5] -
58:25, 69:7, 70:15,
85:16, 127:11
**rest** [1] - 63:17
**restore** [1] - 44:8
**result** [10] - 11:14,
14:3, 14:21, 17:7,
17:21, 31:14, 34:19,
49:21, 55:1, 67:8
**results** [4] - 34:14,
37:5, 41:2, 82:8
**resumes** [2] - 116:3,
116:14
**retained** [2] - 101:12,
128:21
**retaining** [1] - 131:12
**retention** [1] - 131:10
**retire** [1] - 22:23
**retired** [2] - 69:16,
118:25
**return** [1] - 69:9
**returned** [1] - 6:6
**revealed** [1] - 122:6
**revenue** [2] - 16:5,
52:25
**review** [5] - 75:10,
124:22, 124:25,
125:10, 129:23

**reviewed** [1] - 125:3
**riggers** [2] - 92:18,
92:20
**Rigging** [1] - 93:12
**right-hand** [1] - 92:16
**rightly** [1] - 58:7
**rights** [1] - 90:6
**ringing** [1] - 40:15
**rise** [2] - 129:8, 130:16
**risk** [9] - 69:8, 69:19,
69:21, 69:24, 70:1,
85:16, 85:19, 101:5,
105:13
**risk-based** [1] - 101:5
**rocketed** [1] - 48:3
**role** [2] - 11:19, 75:4
**room** [4] - 27:1, 28:16,
32:21, 32:22
**Room** [2] - 2:9, 134:18
**rooms** [2] - 133:22,
134:3
**Rope** [1] - 90:4
**Ruby** [24] - 2:6, 6:20,
7:21, 33:8, 34:6,
36:11, 38:6, 38:10,
38:13, 44:16, 45:3,
48:6, 48:20, 49:2,
49:4, 54:19, 80:24,
89:14, 90:10, 92:19,
92:24, 93:12
**RUBY** [1] - 1:3
**rude** [1] - 29:13
**Rudolph** [2] - 6:23,
7:23
**Rudy** [6] - 49:22, 55:1,
55:17, 125:21,
125:24, 126:3
**RUDY** [1] - 1:5
**rule** [6] - 23:4, 25:22,
25:25, 26:6, 75:21,
120:20
**Rule** [1] - 118:20
**ruled** [6] - 55:9, 58:15,
63:9, 63:13, 63:16,
67:7
**rules** [8] - 4:6, 7:19,
10:3, 10:19, 25:17,
26:17, 31:1, 31:17
**ruling** [1] - 66:19
**ruling's** [1] - 120:15
**rulings** [2] - 66:8,
67:14
**running** [1] - 63:10
**runs** [1] - 84:13

---

**S**

**sacred** [1] - 36:8
**safe** [1] - 44:1
**safety** [5] - 45:19,

47:13, 121:21,
131:5, 131:21
**sat** [1] - 19:13
**saturated** [1] - 49:23
**save** [1] - 68:8
**saw** [5] - 56:13, 90:24,
109:6, 110:17,
122:15
**scammer** [1] - 49:19
**scan** [1] - 39:10
**scapegoat** [1] - 37:6
**scared** [1] - 44:16
**scene** [1] - 46:1
**schedule** [3] - 32:15,
68:6, 122:23
**scheme** [2] - 35:12,
35:22
**school** [1] - 54:21
**scope** [2] - 54:2, 63:11
**SCOTT** [2] - 3:3, 68:22
**Scott** [26] - 47:18,
47:20, 47:22, 47:24,
53:23, 68:14, 68:15,
68:25, 69:3, 70:25,
71:16, 73:7, 77:4,
83:10, 90:22, 91:18,
94:1, 94:22, 96:5,
96:20, 97:21, 98:8,
107:7, 123:13,
132:4, 132:9
**Scott's** [1] - 48:5
**Scoundrel** [1] - 93:13
**scrape** [1] - 108:14
**screen** [2] - 89:6,
89:19
**screenshots** [2] -
90:1, 90:3
**se** [3] - 8:25, 13:6,
13:7
**search** [4] - 50:13,
82:8, 82:25, 87:10
**searched** [1] - 48:13
**searches** [1] - 30:17
**seats** [2] - 5:22, 133:5
**Second** [1] - 61:14
**second** [14] - 28:23,
33:14, 34:25, 46:11,
60:22, 69:10, 80:23,
87:5, 88:25, 92:17,
94:9, 98:25, 108:18,
110:24
**secondary** [2] - 83:4,
87:21
**secret** [1] - 66:7
**Secretary** [3] - 36:24,
39:25, 49:1
**secure** [1] - 5:24
**security** [16] - 44:6,
44:7, 44:8, 47:13,
52:5, 53:22, 69:19,

69:21, 70:1, 70:2,
70:11, 102:12,
105:12, 105:13,
118:14
**see** [53] - 29:11, 32:4,
35:20, 37:14, 37:15,
37:18, 39:16, 39:18,
40:6, 42:14, 49:17,
56:10, 59:1, 62:4,
63:1, 78:22, 78:24,
81:2, 81:8, 81:9,
83:2, 83:3, 85:6,
87:20, 87:22, 88:8,
88:12, 88:25, 89:8,
89:14, 89:15, 89:24,
90:1, 90:5, 93:5,
94:17, 98:23, 99:2,
103:25, 104:2,
106:6, 109:11,
109:13, 112:11,
113:22, 114:5,
114:12, 119:15,
126:22, 129:4,
129:11, 131:15,
133:18
**seeing** [5] - 78:9,
80:20, 89:6, 106:3,
114:6
**seeking** [2] - 123:2,
123:3
**seem** [1] - 24:8
**seemingly** [1] - 30:21
**selected** [5] - 4:4,
27:16, 27:18, 27:24,
132:19
**selection** [1] - 32:7
**self** [1] - 40:10
**send** [2] - 28:17, 54:24
**senior** [2] - 69:6, 119:8
**sense** [6] - 4:11,
17:23, 18:19, 24:10,
44:8, 129:25
**senses** [1] - 53:22
**sensitive** [2] - 102:11,
106:25
**sentence** [3] - 80:5,
80:23, 85:15
**sentiment** [16] - 88:11,
88:12, 88:13, 88:15,
88:17, 88:19, 88:21,
88:24, 92:12, 94:17,
94:20, 98:21,
114:11, 129:3,
130:17, 130:25
**separate** [1] - 13:16
**separately** [1] - 127:3
**September** [1] -
122:20
**sergeant** [2] - 69:16,
118:25

**series** [2] - 101:23, 108:11
**serious** [3] - 6:14, 13:6, 46:25
**servants** [1] - 54:15
**serve** [4] - 27:24, 29:1, 36:12, 132:19
**served** [2] - 8:1, 118:24
**service** [7] - 27:22, 28:10, 28:18, 28:19, 69:19, 87:12, 113:2
**services** [11] - 70:5, 70:8, 70:12, 75:15, 100:10, 102:13, 102:22, 102:25, 113:17, 117:12, 119:19
**serving** [2] - 35:1, 58:1
**SESSION** [1] - 1:9
**set** [5] - 35:12, 44:7, 115:5, 119:1, 121:12
**setting** [1] - 46:1
**several** [3] - 35:23, 88:8, 102:4
**severe** [1] - 14:10
**shade** [1] - 88:14
**shame** [1] - 43:18
**share** [2] - 28:3, 50:18
**shattered** [1] - 53:14
**Shaye** [5] - 6:20, 7:22, 33:9, 34:6, 36:3, 38:7, 38:10, 38:13, 45:3, 48:7, 48:20, 49:4, 54:19, 90:11
**Shaye's** [1] - 36:11
**sheet** [2] - 71:4, 78:8
**shielding** [1] - 16:1
**shirt** [1] - 49:6
**short** [5] - 5:23, 14:16, 24:21, 32:17, 59:19
**shorter** [1] - 45:6
**shortly** [2] - 37:24, 128:21
**show** [18] - 18:2, 35:25, 36:3, 39:13, 40:15, 47:4, 48:5, 49:22, 55:18, 58:6, 59:16, 65:15, 95:15, 95:16, 96:11, 97:24, 126:20, 130:24
**showed** [3] - 36:20, 40:1, 40:16
**showing** [4] - 83:10, 88:11, 91:18, 109:24
**shown** [2] - 18:5, 105:18
**shows** [11] - 8:6, 39:17, 52:24, 80:6,

95:17, 97:24, 119:12, 123:25, 126:20, 128:1
**SIBLEY** [67] - 2:2, 2:2, 55:6, 57:22, 60:7, 60:21, 60:24, 61:25, 62:12, 62:17, 62:25, 63:4, 63:18, 66:3, 66:11, 66:20, 67:5, 67:16, 67:19, 67:21, 67:23, 71:10, 72:1, 72:8, 72:11, 73:1, 73:16, 74:7, 76:6, 79:11, 80:12, 83:17, 84:14, 99:12, 100:1, 102:6, 102:16, 103:21, 104:13, 104:18, 104:24, 105:14, 105:19, 105:21, 105:25, 106:7, 106:12, 107:6, 111:10, 111:14, 111:17, 116:5, 117:10, 120:14, 120:19, 121:1, 121:3, 122:3, 122:6, 122:20, 122:23, 123:12, 129:15, 130:2, 132:10, 133:21, 134:1
**Sibley** [26] - 7:4, 55:5, 57:20, 60:6, 60:22, 61:20, 65:25, 74:2, 74:16, 99:10, 102:14, 104:6, 104:7, 104:8, 107:5, 111:8, 116:2, 117:8, 118:21, 121:25, 122:18, 123:3, 129:20, 130:10, 132:2, 133:25
**Sibley's** [2] - 61:9, 75:25
**Sibley)** .....................
............**100** [1] - 3:4
**sibley@
camarasibley.
com**
[1] - 2:5
**sic** [1] - 124:6
**side** [9] - 19:4, 20:15, 22:5, 25:11, 69:25, 81:7, 87:24, 92:16, 92:22
**side's** [1] - 10:2
**sidebar** [1] - 121:19
**sides** [1] - 22:21
**signed** [1] - 36:12
**significant** [2] - 33:18, 50:21

**silence** [1] - 66:21
**similar** [2] - 17:1, 51:7
**simple** [4] - 30:21, 45:10, 45:11, 46:3
**simply** [1] - 39:6
**sing** [1] - 89:16
**sit** [1] - 54:11
**site** [2] - 99:21
**sites** [1] - 27:10
**sitting** [2] - 27:17, 133:12
**situation** [2] - 63:6, 131:10
**six** [1] - 103:12
**size** [1] - 114:16
**skill** [3] - 57:2, 119:1, 121:12
**skills** [2] - 115:6, 120:3
**slept** [1] - 38:16
**slides** [1] - 56:17
**slightly** [1] - 68:9
**small** [1] - 39:15
**smoothly** [1] - 68:8
**smuggle** [1] - 39:9
**snacks** [1] - 133:7
**snap** [1] - 38:12
**snapshot** [1] - 37:14
**sneaking** [1] - 8:15
**snippet** [1] - 96:10
**so-called** [1] - 41:3
**so..** [1] - 86:11
**social** [16] - 9:24, 15:20, 27:9, 28:12, 48:19, 48:23, 49:10, 49:19, 50:14, 82:13, 99:3, 107:24, 108:14, 109:22, 116:15, 127:24
**Social** [1] - 89:21
**sole** [1] - 26:14
**solely** [4] - 25:3, 30:5, 59:15, 129:2
**someone** [10] - 27:13, 29:19, 32:12, 34:2, 46:25, 99:21, 100:11, 104:22, 116:8, 118:13
**sometimes** [6] - 6:4, 21:12, 33:19, 99:20
**somewhat** [2] - 9:9, 42:13
**son** [3] - 38:4, 38:19, 43:8
**soon** [1] - 29:17
**sorry** [8] - 60:7, 82:12, 85:10, 95:1, 99:25, 101:20, 104:10, 126:24
**sort** [7] - 93:8, 100:5,

104:19, 105:18, 109:1, 109:21, 126:16
**sound** [1] - 34:21
**sounds** [5] - 21:16, 34:23, 35:4, 103:17, 108:4
**source** [17] - 69:7, 69:23, 70:16, 72:21, 85:13, 108:11, 109:4, 109:18, 115:3, 115:20, 116:3, 117:15, 117:22, 117:24, 119:6, 123:22, 128:2
**sources** [2] - 31:7
**spared** [1] - 33:11
**speaking** [7] - 28:3, 34:20, 44:13, 79:21, 80:21, 97:23, 104:1
**spearheaded** [1] - 35:19
**specialist** [1] - 118:11
**specialists** [1] - 118:9
**specialized** [4] - 72:3, 76:12, 114:25, 116:8
**specialty** [1] - 121:4
**specific** [14] - 71:5, 73:9, 83:1, 87:16, 100:25, 106:5, 110:3, 111:4, 112:5, 112:20, 115:7, 116:19, 117:24, 118:7
**specifically** [8] - 41:7, 80:21, 87:6, 97:23, 98:6, 119:11, 127:16, 129:12
**specified** [1] - 84:12
**speculate** [1] - 25:20
**speculation** [4] - 17:17, 18:13, 79:12, 80:13
**spell** [2] - 99:25, 109:15
**spend** [5] - 32:20, 45:5, 46:1, 114:19, 116:13
**spent** [5] - 36:16, 69:12, 113:11, 121:9
**spike** [4] - 124:8, 129:5, 129:12, 129:21
**spikes** [2] - 129:12, 130:11
**spotlighting** [1] - 41:3
**spread** [2] - 48:21, 49:9
**spreading** [1] - 50:16
**spreads** [1] - 49:11

**spreadsheet** [30] - 72:25, 73:2, 73:3, 73:7, 77:8, 78:6, 78:13, 81:7, 81:12, 81:17, 109:6, 109:10, 109:20, 110:13, 110:17, 110:19, 110:22, 110:25, 111:5, 111:20, 111:23, 113:22, 114:4, 114:7, 114:10, 114:16, 117:4, 123:17, 123:25, 124:7
**stadium** [1] - 124:16
**staff** [1] - 41:16
**staggering** [1] - 48:6
**staked** [1] - 122:15
**stand** [3] - 21:6, 55:7, 68:17
**standard** [1] - 18:9
**standards** [1] - 17:3
**standing** [4] - 13:2, 13:12, 117:14, 117:16
**stars** [1] - 57:23
**start** [14] - 4:10, 32:16, 34:23, 35:10, 64:1, 75:3, 82:25, 83:3, 90:4, 101:1, 121:16, 132:15, 133:4, 133:15
**started** [17] - 35:9, 36:3, 37:10, 37:18, 39:21, 40:20, 43:5, 43:8, 50:8, 50:16, 54:8, 81:2, 81:8, 87:14, 96:25, 97:17, 106:24
**starting** [6] - 33:1, 48:1, 50:15, 87:14, 101:2, 108:11
**state** [7] - 7:17, 23:8, 37:1, 37:7, 39:1, 69:2, 87:6
**State** [15] - 8:1, 36:15, 36:24, 37:11, 37:14, 37:20, 39:21, 39:25, 40:9, 41:8, 49:1, 78:24, 79:2, 79:3, 80:22
**statement** [6] - 7:11, 13:1, 20:18, 33:2, 79:12, 90:20
**statements** [67] - 12:11, 12:12, 12:14, 12:15, 12:16, 12:18, 12:19, 12:21, 12:22, 12:25, 13:4, 13:9,

13:11, 13:15, 13:19, 13:20, 13:23, 13:25, 15:22, 17:8, 17:16, 17:25, 20:16, 20:21, 22:18, 24:23, 25:6, 26:9, 33:1, 40:9, 41:23, 41:25, 42:1, 42:15, 46:21, 47:21, 49:14, 49:16, 49:25, 50:2, 50:4, 50:6, 50:7, 50:8, 50:24, 51:12, 51:21, 53:24, 56:21, 67:9, 78:22, 78:24, 81:1, 81:4, 81:8, 81:11, 81:17, 82:24, 94:23, 95:6, 95:11, 95:14, 95:15, 96:20, 98:1, 98:4
**States** [3] - 38:11, 54:25, 134:17
**STATES** [2] - 1:1, 1:10
**states** [4] - 8:10, 35:23, 41:4
**stating** [1] - 21:16
**stay** [1] - 35:13
**stayed** [1] - 80:7
**Stealing** [1] - 93:13
**stealing** [1] - 37:12
**stenographic** [1] - 134:11
**step** [3] - 74:19, 104:9, 120:16
**steps** [1] - 77:7
**sterling** [1] - 39:24, 40:3
**stick** [1] - 57:20
**still** [1] - 26:4
**stipulate** [1] - 7:15
**stipulated** [2] - 24:2, 24:4
**stipulation** [1] - 7:16
**stole** [2] - 34:16, 41:8
**stolen** [2] - 38:6, 47:11
**stop** [2] - 35:22, 80:7
**stopped** [2] - 48:4, 50:20
**storage** [1] - 5:25
**stored** [2] - 9:22, 10:12
**stories** [1] - 62:18
**story** [1] - 39:9
**strange** [4] - 40:14, 40:16, 43:20, 55:7
**stranger** [1] - 38:18
**strangers** [2] - 38:2, 43:22
**strategic** [1] - 49:3
**Strategic** [5] - 40:25, 41:5, 41:10, 48:14, 51:15

**straying** [1] - 61:11
**Street** [4] - 1:14, 1:18, 1:21, 2:3
**street** [2] - 38:14, 76:14
**stress** [2] - 28:13, 36:19
**stretch** [1] - 64:25
**stricken** [3] - 25:23, 25:24, 26:1
**strike** [1] - 128:8
**struck** [2] - 122:2, 123:4
**stuff** [1] - 105:9
**stuffing** [1] - 41:9
**subject** [1] - 102:12
**submit** [7] - 26:25, 27:4, 31:21, 47:14, 53:9, 54:1, 54:5
**submitted** [3] - 26:19, 26:21, 27:10
**subpoena** [1] - 92:24
**subsequently** [1] - 78:5
**substance** [2] - 82:18, 116:15
**substantial** [3] - 15:12, 53:15, 104:20
**substitute** [1] - 4:8
**succeeded** [2] - 19:7, 48:22
**suddenly** [1] - 32:11
**sued** [1] - 6:21
**sues** [1] - 6:18
**suffer** [4] - 8:20, 8:21, 14:10, 54:4
**suffered** [15] - 14:2, 16:15, 16:22, 17:9, 17:20, 18:3, 18:6, 45:12, 46:5, 48:10, 51:3, 52:3, 54:7, 56:8, 58:25
**suffering** [1] - 53:21
**suggest** [2] - 38:25, 45:9
**suit** [1] - 16:10
**suitcases** [1] - 8:16
**Suite** [2] - 1:14, 2:3
**summaries** [1] - 23:18
**sun** [1] - 36:16
**supervise** [3] - 117:1, 117:2, 117:13
**supervision** [1] - 85:25
**supervisor** [1] - 36:6
**supervisory** [1] - 117:12
**support** [2] - 20:22, 22:16
**suppose** [3] - 101:14,

108:24, 114:16
**supposed** [1] - 20:17
**surprise** [4] - 83:24, 83:25, 128:11, 128:13
**surprised** [3] - 74:4, 74:15, 128:15
**surveillance** [1] - 37:11
**sustain** [3] - 7:5, 25:18, 102:19
**sustained** [1] - 106:9
**swears** [1] - 22:5
**sweets** [1] - 133:8
**swift** [1] - 38:8
**sworn** [5] - 4:4, 23:7, 23:25, 32:5, 68:19
**Sworn** [1] - 68:22
**sympathy** [1] - 31:25
**synonymous** [1] - 48:7
**system** [1] - 44:7

**T**

**T-shirt** [1] - 49:6
**tab** [1] - 89:3
**table** [1] - 45:2
**tables** [1] - 8:16
**tabulation** [1] - 8:18
**tailored** [1] - 50:24
**taker's** [1] - 5:18
**talkies** [1] - 104:2
**talks** [1] - 80:19
**tape** [1] - 79:6
**target** [1] - 54:14
**targeted** [1] - 48:20
**targeting** [1] - 41:7
**targets** [1] - 8:23
**teachers** [1] - 54:21
**teaches** [1] - 49:9
**team** [15] - 8:7, 14:15, 20:6, 35:19, 37:10, 37:18, 39:21, 40:7, 69:6, 69:24, 70:15, 85:13, 117:15, 118:1
**Team** [2] - 41:1, 48:14
**teams** [2] - 69:22, 117:14
**tear** [1] - 51:8
**television** [2] - 29:25, 32:3
**temporary** [1] - 36:12
**tempted** [1] - 30:2
**ten** [2] - 59:20, 60:25
**ten-minute** [1] - 59:20
**tend** [1] - 13:1
**tendency** [1] - 28:23
**tens** [2] - 52:8, 53:10
**term** [6] - 19:9, 30:22,

56:2, 56:5, 69:15, 80:9
**terms** [8] - 6:16, 6:17, 11:16, 26:10, 83:1, 83:5, 87:21, 101:8
**terror** [1] - 47:10
**testified** [5] - 92:1, 94:11, 106:19, 117:8, 123:5
**testify** [6] - 22:13, 47:22, 47:24, 51:18, 122:13, 132:5
**testifying** [7] - 62:23, 72:3, 73:21, 76:16, 104:22, 106:2, 118:20
**testimony** [35] - 7:6, 18:11, 21:11, 21:24, 21:25, 22:2, 22:9, 22:10, 22:11, 22:12, 23:13, 23:16, 23:18, 23:21, 24:1, 24:24, 32:12, 35:21, 40:24, 47:14, 47:18, 48:5, 49:7, 50:11, 51:17, 61:21, 71:11, 72:4, 102:24, 106:15, 107:9, 122:17, 124:23, 125:11, 125:16
**text** [7] - 9:23, 28:11, 28:18, 82:17, 92:15, 92:23, 93:11
**texted** [1] - 38:3
**texting** [1] - 28:15
**THE** [167] - 1:1, 1:1, 1:9, 4:2, 33:6, 55:5, 57:20, 59:19, 59:22, 59:24, 60:5, 60:9, 60:14, 60:17, 60:19, 60:22, 60:25, 61:5, 61:23, 62:9, 62:13, 62:22, 63:2, 63:15, 63:19, 63:24, 64:8, 64:10, 64:12, 64:18, 64:20, 64:22, 65:2, 65:5, 65:7, 65:12, 65:17, 65:19, 65:22, 65:25, 66:4, 66:15, 66:21, 67:11, 67:17, 67:20, 67:22, 68:1, 68:4, 68:6, 68:13, 68:15, 68:16, 68:17, 68:20, 70:21, 70:23, 71:13, 72:6, 72:9, 72:12, 72:15, 72:16, 72:17, 72:18, 73:5, 74:1, 74:12, 74:15, 74:23, 75:3, 75:9, 75:13, 75:21, 76:19,

76:24, 77:1, 79:14, 79:16, 79:17, 79:18, 79:23, 79:25, 80:1, 80:15, 80:17, 82:4, 82:7, 82:10, 82:11, 82:12, 82:15, 82:19, 82:21, 83:8, 83:24, 84:2, 84:4, 84:20, 84:23, 86:10, 91:7, 91:10, 91:13, 91:15, 91:17, 93:22, 94:25, 95:2, 95:4, 95:8, 95:20, 95:21, 95:23, 96:2, 97:11, 97:16, 99:10, 99:25, 100:3, 102:8, 102:19, 103:25, 104:6, 104:14, 104:23, 105:11, 105:15, 105:20, 105:22, 106:1, 106:8, 106:19, 106:22, 107:1, 107:5, 111:3, 111:12, 111:16, 111:18, 112:2, 112:4, 116:2, 116:10, 116:13, 117:7, 117:11, 118:18, 120:16, 120:24, 121:2, 121:10, 121:24, 122:4, 122:18, 123:1, 127:15, 129:17, 130:4, 130:7, 132:9, 132:11, 132:13, 132:14, 133:18, 133:24, 134:2
**theatrics** [1] - 57:1
**themselves** [1] - 50:4
**then-14-year-old** [1] - 38:4
**therefore** [2] - 19:15, 52:19
**they've** [4] - 5:6, 46:5, 47:21, 123:5
**thinks** [1] - 80:17
**third** [11] - 12:20, 12:21, 13:15, 29:19, 73:14, 74:25, 77:16, 77:24, 78:2, 109:9, 109:11
**third-party** [5] - 74:25, 77:16, 77:24, 78:2, 109:9
**thorough** [1] - 76:3
**thoughts** [1] - 28:19
**thousand** [3] - 91:5, 91:8, 111:15
**thousand-page** [1] -

111:15
**thousands** [1] - 127:20
**threat** [18] - 69:8, 69:24, 70:10, 75:10, 76:15, 84:11, 85:15, 85:19, 91:23, 94:4, 99:16, 100:25, 101:5, 114:14, 120:7, 126:1, 131:15, 131:20
**threatening** [4] - 47:25, 88:18, 89:23, 127:12
**threats** [8] - 8:23, 40:20, 43:5, 47:16, 47:21, 53:25, 81:24, 121:22
**three** [8] - 10:22, 11:5, 12:5, 24:21, 89:9, 92:10, 94:13, 104:16
**throughout** [3] - 35:15, 46:6, 59:10
**tie** [1] - 58:4
**timestamped** [1] - 96:1
**timing** [1] - 124:1
**tip** [1] - 125:17
**title** [1] - 114:23
**titled** [1] - 88:7
**today** [6] - 12:16, 34:9, 94:11, 111:14, 124:23, 132:19
**together** [3] - 54:1, 126:14, 127:4
**tolerated** [1] - 55:3
**tomorrow** [3] - 67:13, 133:5, 133:19
**tongue** [1] - 125:14
**tonight** [1] - 27:15
**took** [5] - 14:19, 14:24, 34:12, 42:11, 44:15
**tool** [2] - 109:18, 109:24
**tools** [5] - 50:15, 108:6, 108:12, 108:13, 109:19
**top** [3] - 90:20, 92:16, 128:10
**torn** [1] - 6:8
**torts** [2] - 14:12, 20:3
**total** [3] - 52:6, 97:3, 97:16
**totality** [1] - 90:12
**totally** [1] - 76:1
**touch** [2] - 43:12, 117:20
**toward** [1] - 104:21
**trace** [3] - 44:12, 49:18, 62:20

**track** [2] - 62:13, 121:22
**tracking** [1] - 62:24
**trade** [2] - 13:2, 13:12
**traditional** [2] - 49:10, 49:19
**training** [3] - 70:4, 114:25, 120:4
**traitors** [2] - 38:7, 90:6
**transcript** [2] - 134:11, 134:12
**TRANSCRIPT** [1] - 1:9
**transcripts** [1] - 23:17
**transfers** [1] - 78:3
**trash** [1] - 38:14
**Treason** [1] - 90:21
**treason** [4] - 38:11, 43:6, 87:21, 89:15
**treat** [1] - 26:3
**tree** [1] - 43:9
**trees** [1] - 38:11
**trending** [1] - 130:25
**trends** [5] - 88:21, 88:24, 92:13, 94:18, 94:20
**Trends** [1] - 50:15
**trial** [50] - 4:5, 4:7, 4:9, 4:16, 5:2, 5:11, 5:21, 6:3, 6:5, 6:10, 6:15, 7:7, 7:13, 9:5, 11:2, 12:9, 14:6, 15:6, 20:14, 20:15, 21:23, 21:25, 22:3, 22:8, 23:3, 23:5, 23:22, 25:5, 26:6, 30:1, 31:19, 32:11, 32:16, 32:20, 35:22, 42:13, 46:6, 52:17, 55:24, 56:25, 57:14, 57:15, 57:17, 58:10, 59:11, 59:16, 63:14, 83:11, 91:19, 92:25
**TRIAL** [1] - 1:9
**trials** [1] - 9:10
**tried** [2] - 43:14, 52:20
**tries** [1] - 29:19
**truck** [1] - 76:14
**true** [12] - 12:23, 13:22, 18:24, 24:14, 37:24, 46:19, 61:25, 63:1, 111:3, 134:10, 134:12
**truly** [1] - 57:11
**Trump** [17] - 8:7, 14:14, 20:5, 35:13, 35:24, 37:7, 38:6, 41:17, 41:18, 48:24, 49:2, 49:23, 50:1, 104:19
**Trump's** [1] - 8:8

**trusted** [1] - 51:11
**Truth** [1] - 89:21
**truth** [3] - 19:6, 22:5, 23:22
**try** [8] - 10:5, 10:6, 15:7, 28:9, 32:16, 63:8, 68:6, 99:19
**trying** [7] - 15:15, 15:19, 15:24, 42:15, 61:20, 74:11, 102:15
**tune** [1] - 49:24
**turn** [5] - 29:12, 44:6, 44:20, 89:17, 90:19
**turned** [3] - 40:13, 41:18, 49:4
**turning** [1] - 89:22
**turns** [1] - 51:14
**Tweet** [1] - 37:18
**Tweeting** [1] - 28:15
**Tweets** [1] - 48:19
**Twitter** [3] - 88:1, 88:5
**Twitter/X** [1] - 27:10
**two** [13] - 16:12, 34:6, 37:12, 39:1, 40:6, 45:23, 90:7, 94:10, 96:14, 100:2, 108:22, 110:21, 119:8
**two-pronged** [1] - 108:22
**TX** [1] - 2:4
**type** [16] - 13:6, 18:11, 46:11, 81:1, 98:9, 98:20, 98:21, 98:25, 99:1, 99:6, 115:20, 115:21, 116:16, 116:17, 117:19
**types** [14] - 44:21, 45:23, 56:19, 70:8, 78:22, 81:21, 87:11, 87:19, 98:16, 108:23, 115:2, 115:12, 115:13, 115:17
**typical** [1] - 98:16
**typically** [3] - 130:24, 131:2, 131:3

## U

**U.S** [1] - 2:9
**ultimately** [2] - 41:15, 53:18
**unanimous** [1] - 22:24
**unauthorized** [1] - 105:1
**under** [13] - 5:11, 8:14, 8:16, 10:25, 22:4, 25:17, 31:16, 41:11, 41:12, 85:25,

113:17, 118:20, 121:19
**undermine** [1] - 8:9
**understood** [5] - 63:18, 67:16, 75:18, 79:22, 130:7
**undisclosed** [2] - 116:7, 120:23
**undisputed** [2] - 7:16, 24:4
**undoubtedly** [1] - 28:2
**unfair** [1] - 31:3
**unfairness** [2] - 10:18, 15:1
**unfortunately** [2] - 31:6, 51:8
**unique** [2] - 71:5, 77:20
**UNITED** [2] - 1:1, 1:10
**United** [3] - 38:11, 54:25, 134:17
**unless** [2] - 62:4, 62:13
**unlike** [1] - 9:9
**unlikely** [1] - 29:19
**unprecedented** [1] - 99:8
**unremarkable** [1] - 36:20
**unsuccessful** [1] - 8:8
**untruthfully** [1] - 132:5
**unusual** [4] - 9:9, 42:13, 52:10
**up** [34] - 5:4, 23:5, 26:4, 30:22, 31:8, 31:18, 35:10, 36:5, 36:12, 36:16, 36:20, 39:9, 40:15, 40:16, 40:23, 42:15, 43:15, 44:7, 48:11, 51:9, 53:18, 65:14, 68:7, 88:19, 94:9, 104:8, 110:11, 120:16, 125:16, 126:12, 127:2, 129:7, 130:24, 133:20
**upper** [2] - 92:16, 92:22
**urge** [4] - 32:21, 72:1, 120:15, 120:20
**USB** [3] - 8:17, 39:11, 39:17
**useful** [1] - 89:16
**user** [4] - 89:8, 93:3, 93:8, 109:25
**user-generated** [2] - 93:3, 93:8
**users** [1] - 71:6
**uses** [2] - 75:2, 75:15

**utilize** [1] - 108:11

## V

**valid** [1] - 12:4
**valuables** [2] - 32:22, 32:23
**value** [3] - 23:11, 32:23, 53:12
**variety** [1] - 115:2
**various** [5] - 8:13, 35:17, 69:13, 69:22, 71:22
**vendor** [14] - 71:5, 74:25, 76:14, 77:16, 77:24, 78:3, 78:6, 88:10, 109:9, 109:10, 109:13, 109:14, 114:8
**verbal** [2] - 113:23, 115:14
**verdict** [6] - 6:7, 22:24, 26:14, 27:11, 54:24
**version** [1] - 19:20
**versus** [4] - 34:9, 129:24, 130:20, 130:24
**via** [1] - 35:17
**vicious** [1] - 38:9
**video** [15] - 15:20, 22:9, 37:11, 37:15, 37:19, 39:17, 39:21, 40:9, 41:8, 78:25, 80:6, 80:9, 80:10, 80:18, 80:19, 90:17, 96:5, 124:13, 124:18
**Video** [1] - 96:4
**videos** [1] - 40:1
**videotape** [2] - 78:25, 79:3
**view** [2] - 22:8, 65:19
**viewership** [1] - 15:19
**views** [4] - 28:5, 28:6, 49:25, 118:23
**vigilante** [1] - 43:7
**vile** [2] - 8:23, 48:2
**violates** [1] - 62:7
**violence** [11] - 56:20, 69:8, 69:24, 70:3, 82:1, 85:16, 85:19, 101:5, 131:7, 131:17, 131:18
**violent** [2] - 50:19, 98:21
**visited** [1] - 48:12
**voice** [2] - 95:9, 104:23
**volume** [5] - 47:16, 47:25, 53:24, 99:1, 99:7

**volunteers** [1] - 54:15
**Von** [2] - 7:2, 33:10
**VON** [1] - 1:17
**vote** [6] - 8:18, 36:8, 36:9, 36:10, 41:3, 49:19
**voter** [1] - 87:22
**votes** [1] - 36:1
**voting** [3] - 8:18, 39:12, 39:18
**vs** [1] - 1:4

## W

**wages** [1] - 52:4
**wait** [1] - 37:25
**walk** [2] - 29:12, 78:2
**walked** [1] - 43:18
**walkie** [1] - 104:2
**walkie-talkies** [1] - 104:2
**wallets** [1] - 32:23
**Wandrea** [3] - 2:6, 7:22, 92:19
**wane** [1] - 40:20
**wants** [1] - 105:20
**warn** [2] - 28:9, 35:5
**warrants** [1] - 52:7
**Washington** [4] - 1:15, 2:10, 43:22, 134:19
**watch** [2] - 30:3, 30:4
**watchers** [1] - 8:14
**watching** [1] - 4:22
**water** [1] - 39:9
**ways** [1] - 5:5
**web** [1] - 108:15
**website** [1] - 28:16
**websites** [1] - 108:16
**week** [6] - 42:25, 45:9, 53:2, 97:9, 117:16, 132:20
**weeks** [1] - 41:15
**weigh** [1] - 23:13
**weight** [7] - 19:2, 22:11, 22:12, 23:10, 26:4, 58:19, 111:14
**weight-lifting** [1] - 111:14
**west** [1] - 93:9
**whatsoever** [1] - 121:11
**whole** [2] - 69:20, 75:21
**whole-of** [1] - 69:20
**willful** [4] - 9:4, 10:14, 11:14, 15:2
**willfully** [1] - 10:8
**Willie** [4] - 33:11, 33:12, 33:13, 33:15
**Willie's** [1] - 33:12

**WILLKIE** [1] - 1:14
**win** [1] - 35:24
**winner** [1] - 36:23
**wise** [1] - 57:5
**wish** [1] - 28:22
**WITNESS** [13] - 3:2, 68:16, 72:15, 72:17, 79:16, 79:18, 79:25, 82:10, 82:12, 82:19, 97:16, 112:4, 132:13
**witness** [49] - 18:11, 20:25, 21:14, 21:18, 21:19, 21:22, 22:4, 22:12, 23:15, 32:12, 49:8, 59:20, 60:10, 60:11, 60:14, 62:23, 65:1, 65:15, 68:11, 68:19, 71:11, 72:3, 72:4, 72:12, 73:2, 73:18, 76:11, 79:12, 83:18, 103:23, 104:21, 105:4, 106:3, 106:4, 106:13, 107:1, 107:17, 111:6, 118:22, 121:18, 121:20, 122:16, 123:7, 129:15, 132:12, 132:16
**witnesses** [20] - 4:23, 4:25, 19:19, 20:22, 21:6, 21:8, 21:11, 23:12, 23:13, 23:17, 24:1, 26:8, 29:1, 29:8, 29:11, 32:9, 57:3, 57:17, 59:12, 61:19
**women** [5] - 37:12, 56:20, 56:22, 57:24, 96:14
**wondering** [1] - 125:13
**words** [10] - 13:23, 18:22, 19:19, 40:13, 49:18, 56:6, 87:10, 87:16, 87:19, 111:12
**worker** [1] - 36:12
**workers** [7] - 8:1, 27:21, 54:14, 54:20, 58:3, 80:6, 80:22
**workplace** [1] - 70:3
**works** [3] - 47:19, 109:23, 114:2
**world** [3] - 35:16, 48:21, 49:2
**worst** [1] - 40:22
**worth** [5] - 15:17, 16:2, 45:18, 52:15, 52:21
**wow** [1] - 114:9
**write** [2] - 27:8, 28:10

**writes** [1] - 49:9
**writing** [2] - 15:7, 48:14
**written** [2] - 125:9
**wrongful** [1] - 42:18

## Y

**yardstick** [1] - 54:2
**year** [1] - 97:8
**years** [3] - 44:9, 69:12, 118:25
**yelling** [1] - 43:23
**York** [1] - 8:4
**yourself** [4] - 29:6, 57:19, 85:1, 118:15
**yourselves** [2] - 34:18, 133:11