```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
      - - - - - - - - - - - - - - - x
 3    RUBY FREEMAN, et al.,
                                         Civil Action No. 21-3354
 4                   Plaintiffs,         Monday, December 13, 2023
      vs.                                1:21 p.m.
 5
      RUDY GIULIANI,
 6
                     Defendant.
 7    - - - - - - - - - - - - - - - x

 8    _____

 9          TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
            HELD BEFORE THE HONORABLE BERYL A. HOWELL
10                  UNITED STATES DISTRICT JUDGE
      _____
11

12    APPEARANCES:

13    FOR PLAINTIFFS:      MICHAEL GOTTLIEB, ESQ.
                           MERYL CONANT GOVERNSKI, ESQ.
14                         ANNIE HOUGHTON-LARSEN, ESQ.
                           WILLKIE FARR & GALLAGHER LLP
15                         1875 K Street, Suite 100
                           Washington, DC 20006
16                         (202) 303-1016
                           Email: mgovernski@willkie.com

17                         VON A. DuBOSE, ESQ.
                           DUBOSE MILLER
18                         75 14th Street NE
                           Atlanta, GA 30309
19                         (404) 720-8111
                           Email:  miller@dubosemiller.com
20
                           JOHN LANGFORD, ESQ.
21                         PROTECT DEMOCRACY
                           555 W. 5th Street
22                         Los Angeles, CA 90013
                           (919) 619-9819
23                         Email: john.langford@protectdemocracy.org

24
           (Continued on Next Page)
25
```

```
1      APPEARANCES (CONTINUED):

2      FOR DEFENSE:       JOSEPH D. SIBLEY, IV, ESQ.
                          CAMARA & SIBLEY LLP
3                         1108 Lavaca Street
                          Suite 110263
4                         Austin, TX 78701
                          (713) 966-6789
5                         Email: sibley@camarasibley.com

6      ALSO PRESENT: Ruby Freeman
                     Wandrea Moss
7

8      Court Reporter:           Lisa A. Moreira, RDR, CRR
                                 Official Court Reporter
9                                U.S. Courthouse, Room 6718
                                 333 Constitution Avenue, NW
10                               Washington, DC  20001
                                 (202) 354-3187
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2
   WITNESS                                        PAGE
3
   ASHLEE HUMPHREYS, Ph.D.
4       (By Mr. Sibley)................................. 4
        (By Mr. Gottlieb)...............................74
5
   RUBY FREEMAN
6       (By Ms. Governski)..............................97

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2          THE COURT:  All right.  Are the parties ready to

3   bring the jury in?

4          MR. GOTTLIEB:  Yes, Your Honor.

5          THE COURT:  Okay.  Perfect.

6          (Jury enters courtroom)

7          THE COURT:  All right, Mr. Gottlieb.  Please

8   proceed.

9          Oh, it's cross-examination.  Mr. Sibley.  Sorry.

10                  CROSS-EXAMINATION

11  BY MR. SIBLEY:

12  Q.  Good afternoon, Dr. Humphreys.

13  A.  Good afternoon.

14  Q.  You would consider yourself a scientist, right?

15  A.  A social scientist, yes.

16  Q.  Right.  And one of the terms that I saw you use in your

17  report was "reasonable degree of certainty," right?

18  A.  I would need to see the exact passage, but it's possible

19  I wrote that.

20  Q.  Well, don't scientists generally come to conclusions

21  based on reasonable degrees of certainty?

22  A.  Yes, I suppose so.

23  Q.  Okay.  Well, how sure are you about the conclusions that

24  plaintiffs' counsel has shown to the jury today?

25  A.  I'm very sure.  I would be more sure if I had the actual

```
1    data from the accountholder.
2    Q.  Okay.  I don't know what that means, but let me ask you
3    this:  On July 28, 2023, you issued your first report in
4    this case, right?  Does that sound about right?
5    A.  That's correct.
6    Q.  And you have a damages range of between $14 million and
7    $41 million, right?
8    A.  Yes, that's correct.
9    Q.  Okay.  You issued a second report on October 6, 2023.
10   Do you recall that?
11   A.  Yes, I do.
12   Q.  And the damages range at that time, just about a couple
13   of months later, was $19 million to $74 million.  Right?
14            MR. GOTTLIEB:  Objection, Your Honor; misstates
15   the evidence.
16            MR. SIBLEY:  May I approach the witness, Your
17   Honor?
18            THE COURT:  Okay.  And what are you approaching
19   with?
20            MR. SIBLEY:  The second or the supplement to the
21   expert report.
22            THE COURT:  The second supplement, which was in
23   December?
24            MR. SIBLEY:  No, Your Honor.  The first
25   supplement, which was October.
```

 1          THE COURT:  And has this been marked just for

 2     identification, Mr. Sibley?

 3          MR. SIBLEY:  It has not been marked yet.  I want

 4     the witness to -- I'm asking if the witness recognizes the

 5     document.

 6          THE COURT:  I like everything that's being shown

 7     to a witness to be marked.  So do you want to make this

 8     Defense 1?

 9          MR. SIBLEY:  I guess we can make it Defendant's

10     Exhibit 1, Your Honor.

11          THE COURT:  Okay.

12          MR. SIBLEY:  I've got an exhibit sticker.

13          THE COURT:  Please apply it.

14          And ladies and gentlemen, things that are marked

15     for identification are not things admitted into evidence

16     that you will see during your deliberations.  If they're

17     marked for identification, they're just marked so we can

18     keep track of what's being used in court for the record.

19          (Witness reviews document)

20          THE COURT:  And your question, Mr. Sibley?

21          MR. SIBLEY:  My question is:  Does she recognize

22     the document?

23          THE WITNESS:  Yes, I do.

24     BY MR. SIBLEY:

25     Q.  Okay.  And was that a supplement to your report?

```
 1    A.  Yes.
 2    Q.  Okay.  And isn't it true that you had a damages range in
 3    that report of $74 million --
 4            MR. GOTTLIEB:  Objection, Your Honor.
 5    Q.  -- up to $74 million?
 6            MR. GOTTLIEB:  Objection, Your Honor.  It's vague
 7    as to --
 8            THE COURT:  I'm going to let the witness answer,
 9    if she can.
10            THE WITNESS:  I'm sorry.  Could you reask the
11    question?
12    Q.  Sure.  Isn't it true that you had sort of a maximum
13    damages range in that report of $74 million?
14    A.  For which statements are you referring to?
15    Q.  I'm just asking you if that's the range of damages --
16    the upper bound of damages in your report.  Yes or no?
17    A.  That is one number I've given here, but if you could be
18    more specific I think that would be helpful.
19    Q.  Does the number $74,061,145 appear in the supplement to
20    your report dated October 6, 2023?
21    A.  Yes.
22    Q.  Okay.  And then on December 1, 2023, you issued another
23    report, didn't you?
24    A.  That's correct.
25    Q.  Okay.  And you took into consideration more statements,
```

1    did you not?

2    A.  That's not correct.

3    Q.  Okay.  Were the statements you took in consideration in

4    the December 1st report different than the July 28th report?

5    A.  No.  They were the same statements.

6    Q.  Okay.  And so then it was $17 million -- between $17

7    million and $47 million, correct?

8    A.  Yes.

9    Q.  Okay.  All right.  So these numbers apparently

10   fluctuate, don't they?

11   A.  How do you mean, "fluctuate"?

12   Q.  Well, they're different in all three of your reports.

13   There were different numbers.  Why is that?

14   A.  There are different instances.

15   Q.  Okay.

16   A.  And so the numbers are different.

17   Q.  Okay.  But this is science, right?

18   A.  Correct.

19   Q.  Okay.  You said that -- you said something earlier that

20   caught my attention.  You said false statements travel

21   faster than true ones.  Is that true?

22   A.  Correct.  That's correct.

23   Q.  Who determines whether the statements are false?

24   A.  In this particular study, I believe they used a number

25   of fact-checking organizations.

1   Q.  Okay.  So you're relying on -- forget about this case

2   because it's already been established the statements are

3   false.  But in general -- because I'm going to your

4   underlying methodology, right?  So in general, false

5   statements travel faster than true ones, right?

6   A.  In this particular study, the false statements that they

7   studied and coded as false traveled faster than true

8   statements.

9   Q.  Okay.  In this particular case, you mean?

10  A.  In that study that I cited, they found that the false

11  statements in their data set traveled faster than the true

12  statements in their data set.

13  Q.  Okay.  So you're referring to a study?

14  A.  Correct.

15  Q.  Okay.  But someone has to make -- there's like a fact-

16   checker person that makes that determination, right?

17  A.  Yeah, I believe they relied on an organization that

18  classifies statements.

19  Q.  Okay.  But you know that today's misinformation might be

20  tomorrow's truth, right?

21  A.  How do you mean?

22  Q.  Well, like, for example, during COVID there was a theory

23  that the virus had escaped from a laboratory, and that was

24  deemed misinformation and people were banned from talking

25  about it on social media.  But today it's the generally

```
 1    accepted origin of the COVID virus.
 2              Are you familiar with that?
 3    A.  I'm familiar with the coronavirus and various theories
 4    for how it's spread.  Yes, I'm familiar with that.
 5    Q.  Okay.  Like, for example -- for example, the laptop, the
 6    Hunter Biden laptop, do you remember when that came out
 7    before the election, and there were claims that that was
 8    misinformation?  I mean, you're testifying about
 9    Mr. Giuliani, so you should know he got banned from certain
10    media channels because of that.
11              That turned out to be true as well, right?
12              MR. GOTTLIEB:  Objection, Your Honor; 403.
13              THE COURT:  I'm going to sustain the objection
14    because I don't know where you're going with that,
15    Mr. Sibley.
16              MR. SIBLEY:  Okay.
17    Q.  All right.  Well, let's look at your -- I'm going to
18    look at your list of cases that you gave me, okay, that
19    you've worked on.  Let's focus on the defamation cases.
20    Okay?
21              Lafferty v. Alex Jones, right?
22    A.  That's correct.
23    Q.  Have you issued an opinion in that case?
24    A.  I was a consulting expert for that case.
25    Q.  Okay.  Did you employ this impressions-based damages
```

1    model in that case?

2    A.  I did not produce a finalized report in that case.

3    Q.  Okay.  What were you asked to do in that case?

4    A.  I was asked to take a look at some statements and

5    provide an opinion about them to counsel prior to trial.

6    Q.  What kind of opinion?

7    A.  Just a consulting opinion.

8    Q.  Like were they true or false, or did they cause damage?

9    I mean, can you be more specific?

10              MR. GOTTLIEB:  Objection, Your Honor; the specific

11   advice is treading into what I imagine may be work product

12   privilege.

13              MR. SIBLEY:  It's listed on her disclosure.

14              THE COURT:  I'm sorry.  Listing a case on the

15   disclosure is not the same as delving into a consulting

16   expert's potentially privileged communications with

17   attorneys.

18              So you're not trying to do that, are you,

19   Mr. Sibley?

20              MR. SIBLEY:  I'm not.  I just -- I want to know in

21   general --

22              THE COURT:  Okay.  So why don't you rephrase the

23   question in a way that might elicit something that doesn't

24   delve into privileged communications.

25   Q.  Did you do any impressions-based work in the *Alex Jones*

1   case?

2   A.  I didn't produce a finalized report in that case.  It

3   was a little while ago, so no, I didn't complete my

4   analysis.

5   Q.  That's not what I asked you, ma'am.  I asked you if you

6   did impressions-based work in the case, not whether you

7   completed a report.

8   A.  I did some work that was of the same nature as the work

9   I performed here, yes.

10  Q.  Okay.  And I know you keep looking at the attorneys

11  every time you answer the questions.  You haven't been told

12  what to say here, have you?

13  A.  No, of course not.

14  Q.  Okay.  How about the *Feehan and Legendairy Milk v.*

15  *Duhaney and Milky Mama?*  What kind of case is that?

16  A.  That was also a social media defamation case.

17  Q.  Okay.  Who is -- did you represent the plaintiff, I

18  suppose?

19  A.  I did, yes.

20  Q.  Okay.  Who is Krystal Duhaney and Milky Mama, LLC?  What

21  kind of -- who is that?

22  A.  So that was -- both of those parties make supplements to

23  increase breast milk, and one company had defamed another

24  company over the effectiveness of this product.

25  Q.  Okay.  Did you issue a report in that case?

 1    A.   No.   I believe they settled.   I was -- I provided them

 2    with an estimate prior to the settlement.

 3    Q.   Impressions-based work again?

 4    A.   Correct.

 5    Q.   Okay.   And, again, that's a business, though, right?

 6    A.   That's correct.

 7    Q.   Okay.   And then you mentioned this earlier, but there

 8    were a couple of cases listed.   *E. Jean Carroll v. Donald*

 9    *Trump*, right?

10    A.   Correct.

11    Q.   Are there two cases?

12    A.   Yes, there are.

13    Q.   What are the nature of those cases?

14    A.   So one case has gone to judgment I believe in January,

15    and a jury awarded the plaintiff a certain amount of money.

16            And the next case is upcoming in January.

17    Q.   Okay.   Have you issued reports in both those cases?

18    A.   Yes, I have.

19    Q.   Okay.   Did you use the impressions-based model?

20    A.   Yes.

21    Q.   Okay.   And I guess the first one that went to judgment,

22    that's the one where I guess a jury received your report?

23    A.   Correct.

24    Q.   Okay.   What was the amount that your report asked for in

25    that case?

1   A.  You know, I don't recall offhand.  If I saw the report,

2   I would be able to assist you.

3   Q.  You don't remember how much money you asked for against

4   Donald Trump?

5   A.  I'm sorry, I don't.

6   Q.  Do you know how much the jury awarded?

7   A.  Roughly, yes, I do.

8   Q.  Well, what, roughly, was it?

9   A.  I believe their total award was maybe $8 million, but

10  only -- my part was a subset of that.

11  Q.  Okay.  And did you ask for that much, or was it less

12  than that?  Or more?

13  A.  You know, I don't recall.  If you provided me with my

14  report, I could give you more specific information.

15  Q.  Okay.  And what about the second Donald Trump case?

16  Have you done any work in that case?

17  A.  Yes, I have.

18  Q.  And what did you do?

19  A.  The same nature of the assignment in the first case.

20  Q.  You issued a report, right?

21  A.  Correct.

22  Q.  Do you know how much you are asking for in that case?

23  A.  No, I don't recall offhand.

24  Q.  Well, here's one that I think -- you haven't been in

25  trial until today, right?

1    A.  I'm sorry?

2    Q.  Have you been at the trial until today?  I just haven't

3    seen you in the gallery --

4    A.  At which?  At this trial?

5    Q.  Yes.

6    A.  No, I have not.

7    Q.  Well, here's one the jurors will recognize.  You're

8    involved in a case representing the plaintiffs against

9    Gateway Pundit, right?

10   A.  That's correct.

11   Q.  Okay.  And what work have you done in that case?

12   A.  I've done some preliminary work in the same nature as

13   this case and others that I --

14   Q.  Have you issued a report?

15   A.  I have not.

16   Q.  Okay.  Are you familiar with that case?

17   A.  I'm somewhat familiar.

18   Q.  Somewhat familiar.  How much time have you spent on that

19   case?

20   A.  You know, I'd have to consult my records.  I don't

21   recall exactly how many hours.

22   Q.  Okay.  You don't know how much you've been paid?

23   A.  No.

24   Q.  How much have you been paid on this case?

25   A.  You know, I'd have to consult my records.

1    Q.  Okay.  You don't have an estimate?

2    A.  As I testified, I'm paid $350 an hour.

3    Q.  You don't know, estimated, how many hours you've spent

4    on the case?

5    A.  I don't know offhand.  I'll have to consult my records.

6    Q.  And you don't know, estimated, how much you've been paid

7    on the case?

8    A.  Correct.

9    Q.  Okay.  So what is your understanding of *The Gateway*

10   *Pundit* lawsuit brought by the plaintiffs in this case?

11          MR. GOTTLIEB:  Objection, Your Honor; improper

12   scope for an expert.

13          MR. SIBLEY:  She's --

14          THE COURT:  Sustained.  You can ask her about her

15   work on that case, but what does she know about --

16   Q.  You're a retained expert on that case, are you not?

17   A.  That's correct.  I've been retained.

18   Q.  Okay.  And part of being a retained expert on the case

19   is reviewing things like the pleadings like you did in this

20   case, right?

21   A.  Correct.

22   Q.  All right.  Have you reviewed the complaint or the

23   petition in *The Gateway Pundit* case?

24   A.  I have reviewed the complaint, yes.

25          MR. SIBLEY:  May I approach, Your Honor?

1          THE COURT:  Yes.  Once again, could you just put a

2     sticker on that.

3          MR. SIBLEY:  I'm going to list it as Defendant's

4     Exhibit 2, Your Honor.

5     BY MR. SIBLEY:

6     Q.  Just take a moment, ma'am, and review that document.

7     Tell me if you recognize it.

8     A.  (Witness reviews document) Yes.  So it's been some time

9     since I looked at this document, but I do recognize it, yes.

10          MR. SIBLEY:  I'd like to move into evidence, Your

11     Honor, Defendant's Exhibit 2, *The Gateway Pundit* -- *Ms.*

12     *Freeman and Ms. Moss v.  The Gateway Pundit, et al.*

13          MR. GOTTLIEB:  No objection.

14          THE COURT:  All right.  Can I just talk to the

15     parties for a second.

16               (The following is a bench conference

17                held outside the hearing of the jury)

18          THE COURT:  I don't think the plaintiffs' own

19     complaint has been introduced into evidence in this case,

20     has it?

21          MR. GOTTLIEB:  It has not, Your Honor.

22          THE COURT:  Okay.  All right.

23          (This is the end of the bench conference)

24          THE COURT:  Okay.  Hearing no objection, Defense

25     Exhibit 2 will be admitted.

1    BY MR. SIBLEY:

2    Q.  And after looking at that again, would you agree with me

3    that the allegations against The Gateway Pundit are

4    substantially similar to the allegations in this case?

5            MR. GOTTLIEB:  Objection, Your Honor.  It's

6    calling for a legal conclusion of the substantial similarity

7    of allegations in a complaint.

8            THE COURT:  Overruled.  She can answer it.

9    A.  I'm sorry.  Can you just define what you mean by

10   "similar"?  How do you mean?

11   Q.  Well, it's based on allegations of election fraud, is it

12   not?

13   A.  I don't think the complaint is based on allegations of

14   voter fraud.

15   Q.  Okay.  The complaint is based on allegations of

16   defamation because The Gateway Pundit accused the plaintiffs

17   of election fraud, correct?

18   A.  Correct.  It's my understanding that it's a defamation

19   case.

20   Q.  All right.  And that lawsuit -- if you look at the date

21   on it, that lawsuit is actually dated -- let's look at the

22   last page -- December 2nd -- next-to-the-last page, December

23   2, 2021.  Does that sound right?

24   A.  Yes.

25   Q.  And this lawsuit -- well, let me just ask you.  Would it

1    surprise you to know that this lawsuit was filed December

2    3rd of 2021?

3    A.  No.

4    Q.  Well, you reviewed the complaint, right?

5    A.  Correct.

6    Q.  Okay.  Thank you.

7            Then we also see -- I'm not sure if this is a

8    misprint, but it looks like there's a case involving

9    Ms. Freeman and Ms. Moss against Mr. Giuliani in St. Louis.

10   Is that true?

11   A.  It's possible that's a typo.  I'm not sure what version

12   you're reading.

13   Q.  Okay.  All right.  So that was a surprise to us when we

14   saw it, so I just wanted to double-check.

15   A.  Sure.

16   Q.  And then I see a case involving Project Veritas?

17   A.  That's correct.

18   Q.  Are you representing the plaintiff in that case against

19   Project Veritas?

20   A.  Yes, I am.

21   Q.  And what's the nature of that case?

22   A.  So this is also a defamation case.  There was a -- I

23   believe a Republican Trump voter who was accused of fraud.

24   Q.  A Republican Trump voter who was accused of fraud.  What

25   does that mean?

```
 1    A.  Well, it's my understanding that the plaintiff, who I
 2    think is named Mr. Weisenbach, was accused of fraud in some
 3    way by the defendant, James O'Keefe or Project Veritas, and
 4    he is suing them for defamation.
 5    Q.  I see.  Well, you went to great labors to identify that
 6    Mr. Weisenbach is a Trump supporter, didn't you?
 7              MR. GOTTLIEB:  Objection, Your Honor;
 8    mischaracterizes testimony.
 9    Q.  I didn't ask you who he supported.  I just asked you
10    what the case is about.
11              THE COURT:  She said what she said.  It's
12    overruled.
13              MR. SIBLEY:  Okay.
14    Q.  And Project Veritas is a fairly well-known news
15    organization or -- I don't know what you would call them,
16    but they're associated with right-wing politics, aren't
17    they?
18    A.  It's my understanding that they are.  I was largely
19    unfamiliar with them prior to this case.
20    Q.  How about Rudy Giuliani?  Is he associated with right-
21    wing politics, based on your understanding?
22    A.  Yes.
23    Q.  How about Donald Trump?
24    A.  Yes.
25    Q.  Okay.  Why are all of your individual defamation
```

1   cases -- why do they all involve right-wing figures as

2   defendants where you're testifying about damages models for

3   the plaintiff?  Is there a reason for that?

4   A.  No.

5   Q.  Okay.

6              THE COURT:  But are you sure that Project Veritas

7   is a right-wing organization or even a news organization?

8   Are you sure about that?

9              THE WITNESS:  I'm not sure about that.

10             THE COURT:  All right.  I'm not sure about your

11  characterization either.

12             Go ahead, Mr. Sibley.

13             MR. SIBLEY:  Oh, I -- well, I would beg to differ

14  with the Court's conclusion on that, but, I mean, the

15  witness has spoken about it, and people can draw their own

16  conclusions.

17  Q.  Well, wait a minute.  Project Veritas is James O'Keefe,

18  right?

19  A.  It's my understanding that he is associated with them.

20  Q.  Yeah.

21  A.  Frankly, I don't know that much about the organization.

22  Q.  Well, isn't that the organization or isn't that the guy

23  that had, like, hidden cameras and talked to Planned

24  Parenthood and a big controversy about that?  They're, like,

25  an antiabortion group or something?

```
 1              MR. GOTTLIEB:  Objection, Your Honor; facts not

 2      anywhere in evidence.

 3              MR. SIBLEY:  I just asked her if she knew.  I

 4      mean, the Court is --

 5              THE COURT:  Well, he's asking her about this.

 6      It's really on a wide sphere of relevancy here.

 7              MR. SIBLEY:  I think it goes to the bias of the

 8      witness.

 9              THE COURT:  If you know, you can answer that.

10      A.  To be honest, I'm not familiar with his background.

11      Q.  Okay.  Of all the defamation cases that we've talked

12      about, the only one where you actually made it to testify at

13      trial is the Donald Trump case, right?

14      A.  That's correct.

15      Q.  Okay.  And you don't even remember what you said as far

16      as what you were asking for for damages, right?

17      A.  That's not correct.

18      Q.  How much did you ask for?

19      A.  I remember approximately how much, but I would need to

20      be refreshed.

21      Q.  Well, I'm asking you what you remember sitting here

22      today.

23              I mean, that's a pretty memorable trial, right?

24      It's Donald Trump.  How could you forget?

25      A.  As you've just enumerated, I have a few cases.
```

```
 1    Q.  Yes.

 2    A.  And I don't remember offhand.

 3    Q.  Okay.

 4            All right.  Let's talk about Jensen Hughes.  You

 5    talked about Jensen Hughes with Mr. Gottlieb earlier.  Do

 6    you recall that?

 7    A.  Yes.

 8    Q.  Okay.  Have you worked with Jensen Hughes on any other

 9    matters other than this?

10    A.  No.

11    Q.  Okay.  What have you -- have you talked to any of the

12    people at Jensen Hughes?

13    A.  No.

14    Q.  Did you correspond with anyone at Jensen Hughes?

15    A.  No.

16    Q.  How did you get the Jensen Hughes report?

17    A.  I was provided the report by counsel.

18    Q.  Okay.  Do you know what Jensen Hughes does?

19    A.  Roughly, yes.

20    Q.  What is your understanding of what Jensen Hughes does?

21    A.  So what I know is just the product that I was provided

22    with, which is a report that provides social media and other

23    online information related to some key search terms like

24    Ruby Freeman and Shaye Moss.

25    Q.  Okay.  Well, you weren't here, I guess, on Monday, but
```

1    some -- we heard from them.  And would it surprise you to

2    learn that the representative of Jensen Hughes talked about

3    the expertise of that organization and that they're experts

4    in what they do?  Would that surprise you?

5    A.  No.

6    Q.  Okay.  And you relied on the Jensen Hughes information

7    for your reports, correct?

8    A.  For my impact analysis, yes.

9    Q.  Okay.  For the impact analysis.

10   A.  Correct.

11   Q.  And that's determining how many impacts the statements

12   at issue had, correct?

13   A.  No, that's not correct.

14   Q.  Okay.  What is that?  How did it factor into your

15   reporting conclusions, I guess?  If you could explain.

16   A.  Right.  So in that middle analysis, the impact analysis,

17   I wanted to understand descriptively how the reputations of

18   Ms. Moss and Ms. Freeman had changed over time, and so I

19   consulted some data that they had collected.

20   Q.  Okay.  And you relied on that in your report, correct?

21   A.  Correct.

22   Q.  And what would have -- would your report change, for

23   example, if you never had seen the Jensen Hughes documents?

24   A.  How do you mean would it have changed?

25   Q.  Well, what if you didn't have Jensen Hughes -- the

1   documents you received from Jensen Hughes and you relied on?

2   Would that have changed your report, if you had never

3   received that information from Jensen Hughes?

4   A.  Not substantially, no.

5   Q.  Well, but it would have changed it, right?

6   A.  I can go into detail about the parts that would or would

7   not have been changed, if you'd like.

8   Q.  Well, you don't rely on things that are insignificant,

9   right?

10  A.  I mean, what do you mean by "insignificant"?

11  Q.  Well, you didn't read *The Great Gatsby* in connection

12  with your report, did you?

13  A.  No.

14  Q.  Okay.  Because that has nothing to do with your ultimate

15  opinion, right?

16  A.  Correct.

17  Q.  So obviously the Jensen Hughes documents had something

18  to do with your analysis, right?

19  A.  Yes.

20  Q.  Okay.  And so I want to know, if you didn't have the

21  Jensen Hughes materials, what information would you have not

22  had?  And would you have even been able to create your final

23  report?

24          MR. GOTTLIEB:  Objection; asked and answered and

25  compound.

```
 1              THE COURT:  Overruled.
 2   A.  Yes, I would have.
 3   Q.  Okay.  You said it wouldn't have substantially changed
 4   your conclusions, but it would have changed them, right?
 5   A.  It would have changed a little bit of the
 6   characterization of the social media commentary, but the
 7   impressions numbers and the damages numbers would remain
 8   exactly the same.
 9   Q.  It would have made it less reliable, though, wouldn't
10   it?
11   A.  No.
12   Q.  Okay.  So it just had no effect at all on your report
13   even though the document is a thousand pages long?  Yes?
14   A.  Yes.
15   Q.  So you just look through thousand-page documents that
16   have no effect on the reliability of your report?
17   A.  It contributed to some of my report, but not a
18   significant or substantial conclusion.
19   Q.  Okay.
20              All right.  I think what you said when you talked
21   to Mr. Gottlieb earlier is that you analyzed two sets of
22   statements.  There were the defamation statements, which
23   were after December 23rd, and then there were the emotional
24   harm statements, as you called them, from before -- well,
25   from December 3rd to December 23rd.  Am I right?
```

1    A.  Correct.

2    Q.  Okay.  When were you contacted about working on this

3    case?

4    A.  I don't recall.  I'd have to consult my records.

5    Q.  Okay.  Who contacted you about working on this case?

6    A.  I don't recall exactly.

7    Q.  Okay.  How were you contacted?

8    A.  I believe I was contacted by one of the plaintiffs'

9    attorneys.

10   Q.  Okay.  You can't give me a timeframe?  Like was it this

11   year?  Was it last year?

12   A.  These go on for a while.

13          It was perhaps -- you know, I don't recall, I'm

14   sorry.  I don't recall exactly.

15   Q.  Again, you keep looking at the attorneys.  I mean, is

16   there -- do you have any money riding on this, or are you

17   going to get paid something if the outcome is different?

18          I mean, what -- there's nothing like that, is

19   there?

20   A.  No.

21   Q.  You're just here to testify truthfully, right?

22   A.  Yes.

23   Q.  Okay.  And you have a PhD, right?

24   A.  Correct.

25   Q.  Okay.  I've just found scientists and, you know, people

1    that are like -- I'm not a scientist.  I was a philosophy

2    major.  I've just found that people that are -- you were a

3    philosophy major, too?

4    A.  Yes, I was.

5    Q.  Well, I'm glad one of us made it to a science field.

6             I've just found people that are scientifically

7    minded just to be very detail-oriented, so I guess I'm just

8    surprised that you don't remember a lot of these details.

9             THE COURT:  Is that a question, Mr. Sibley?

10            MR. GOTTLIEB:  Objection.  Is that a question?

11            MR. SIBLEY:  Well --

12            THE COURT:  This isn't a conversation.  So just

13   pose a question.

14            MR. SIBLEY:  Okay.  All right.

15   Q.  Did you have email correspondence with plaintiffs'

16   counsel?

17   A.  Yes.

18   Q.  How much email correspondence did you have?

19   A.  How do you mean, "how much"?

20   Q.  How many times did you have email exchanges?

21   A.  I can't give you the exact number.  I really don't know.

22   Q.  How often would you have communicated with them?

23   Weekly?  Monthly?

24   A.  I would say maybe every couple weeks.  It wasn't, in my

25   opinion, that often.

1  Q.  Okay.  Was most of your correspondence with plaintiffs'
2  counsel via email?
3  A.  I don't know what you mean by "most."  Probably not the
4  majority.
5  Q.  Okay.  What was the majority of the contact with
6  plaintiffs' counsel?
7  A.  I'd say it was likely a Zoom meeting.
8  Q.  Okay.  So you had Zoom meetings.
9  A.  Uh-huh.
10  Q.  Which wouldn't have left a paper trail after you had the
11  meeting, right?  Am I right?
12          There's no documentary evidence of that.  Am I
13  right?
14          MR. GOTTLIEB:  Objection; misstates facts.
15          MR. SIBLEY:  I think in the age of COVID we all
16  know what a Zoom is.
17          THE COURT:  I'm sorry.  There's so much buried in
18  that question, Mr. Sibley, that might be objectionable.
19          MR. SIBLEY:  I'll withdraw it.  I'll withdraw it.
20          THE COURT:  Thank you.
21  BY MR. SIBLEY:
22  Q.  Okay.  Other than the Zoom meetings and some email
23  correspondence, how else did you have contact with
24  plaintiffs' counsel?
25  A.  I mean, that's all -- I visited once last week.

1    Q.  Okay.  Any other meetings other than Zoom meetings with

2    plaintiffs' counsel?

3    A.  No, not that I recall.

4    Q.  Text messages?

5    A.  No, not until trial when we coordinated logistics.

6    Q.  Logistical stuff, right?

7    A.  Correct.

8    Q.  Because you mentioned in your report -- I think you

9    actually discussed this with Mr. Gottlieb -- that you made

10   calls on what to look at and draw your opinions on based on

11   the things that plaintiffs' counsel provided you, right?

12   A.  Sorry.  What do you mean by "calls"?

13   Q.  Well, you decided what opinions you were going to issue

14   based on the things that plaintiffs' counsel told you to

15   issue opinions on, right?

16   A.  That's not correct.

17   Q.  Okay.  Well, how did you know what to even testify about

18   with respect to this case unless plaintiffs' counsel told

19   you about it?

20   A.  It's based on my own work product in this case, my own

21   calculations.

22   Q.  But you received materials from plaintiffs' counsel,

23   right?

24   A.  I received a set of statements and in some cases some

25   instances of those statements to analyze.

 1    Q.  And that would have been via email, correct?

 2    A.  Most likely, or an email that had a link.

 3    Q.  I see.  Okay.

 4          Did you produce the email correspondence in

 5    connection with your expert disclosures?

 6          MR. GOTTLIEB:  Objection, Your Honor.  It's not

 7    something the defendants requested, so I'm not seeing the

 8    relevance.

 9          THE COURT:  Overruled.

10    A.  I was never asked to produce email personally.

11    Q.  Okay.  It's not -- there's no email correspondence

12    identified in your report as something that you relied on or

13    reviewed in connection with your report, is there?

14    A.  No.  There's no email correspondence.

15    Q.  Okay.  When you met with plaintiffs' counsel last -- you

16    said it was last week?

17    A.  Correct.

18    Q.  What did you all talk about?

19          MR. GOTTLIEB:  Objection, Your Honor.  It's

20    calling for work product.

21          MR. SIBLEY:  It's a testifying expert.

22          THE COURT:  Overruled.

23    A.  We were preparing for trial.

24    Q.  Okay.  So like rehearsing testimony and things like

25    that, right?

1    A.  We were discussing how to present -- best kind of

2    present the findings of my report to the jury and the Court.

3    Q.  Okay.  Were there any documents that you reviewed in

4    that meeting?

5    A.  How do you mean?  What kinds of documents?

6    Q.  I said "any documents."  Do you know what a document is?

7    A.  Yes.

8    Q.  Okay.  Did you review any documents in that meeting?

9    A.  Yes.

10   Q.  What documents did you review?

11   A.  We reviewed some slides that we all looked at that I

12   helped prepare.

13   Q.  Okay.  Were those the slides that you saw with

14   Mr. Gottlieb during your discussion with him?

15   A.  Correct.

16   Q.  Any other documents you reviewed?

17   A.  No.

18   Q.  Okay.  Did you review documents in preparation for your

19   testimony today?

20   A.  Yes.

21   Q.  What documents did you review?

22   A.  I reviewed my expert report, the first supplement, the

23   second supplement, a printout of my slides.

24   Q.  Okay.  So you reviewed the supplement to the report that

25   I showed you initially, but you couldn't remember the

1    numbers in the report.  Correct?

2    A.  That's correct.

3    Q.  Okay.

4           All right.  Have you had any meetings with the

5    plaintiffs, Ms. Moss and Ms. Freeman?

6    A.  No.

7    Q.  Have you had any communication with them at all?

8    A.  No.  We shared a room for lunch briefly just now.

9    Q.  I don't want to know about lunch conversations.

10   A.  Sure.

11   Q.  I'm just wondering if you maybe interviewed them in

12   connection with your work or anything like that.

13   A.  No.

14   Q.  Okay.

15          All right.  Let's go now to kind of the substance

16   of your work here, okay?  One of the things you said in your

17   report and you also told Mr. Gottlieb is that you did not

18   consider the statements that were outside of the sort of

19   universe of statements you identified in your reports, which

20   are the Giuliani statements and the conspiracy statements;

21   is that correct?

22   A.  Could you be more specific which ones you're referring

23   to?

24   Q.  Sure.  You said that you did not consider the

25   statements -- outside of the statements that you

1    specifically identify as the defamatory statements, you

2    didn't identify the effect of other statements outside of

3    that on the plaintiffs' reputation, correct?

4    A.   That's correct.

5    Q.   Okay.  Are you aware that in *The Gateway Pundit* case

6    that you've been retained as an expert on there were

7    statements made about the plaintiffs that were false

8    pertaining to election fraud?  You're aware of that, right?

9    A.   Yes, I am.

10   Q.   Are you aware that according to the plaintiffs' petition

11   in that case, The Gateway Pundit was actually the first news

12   organization to identify the plaintiffs by name?

13   A.   Yes, I am.

14   Q.   And they also provided the information on how to contact

15   the plaintiffs through I believe it was LinkedIn.

16   A.   I'm not familiar with that particular detail.

17   Q.   Okay.  Well, the document will speak for itself.

18   A.   Uh-huh.

19   Q.   And so as part of your work in *The Gateway Pundit* case,

20   you're going to look at the impact of the statements The

21   Gateway Pundit made about the plaintiffs and how that

22   impacted the reputation.  Am I right?

23   A.   Yes.

24   Q.   Okay.  And it will be the exact same analysis that you

25   used in this case, will it not?

1   A.   What do you mean by "the exact same analysis"?

2   Q.   Well, I don't want to go back through the slide show,

3   but you said you looked at the number of impressions, and

4   then you looked at the media through which those impressions

5   occurred and then how many times you have to sort of state

6   the correct information.

7          I mean, is that -- did you use the same

8   methodology that you used in this case in that case?

9   A.   The methodology will have similarities, yes.

10  Q.   And you haven't drawn a conclusion yet about how much

11  it's going to cost to fix what The Gateway Pundit did,

12  right?

13  A.   That's correct.

14  Q.   Okay.  But part of the -- part of the sort of

15  reeducation that your work goes to, if The Gateway Pundit is

16  paying for a campaign for the plaintiffs to have

17  advertisements or whatever it is you're talking about that

18  tell people the truth, how is that not also addressing the

19  false statements made by Mr. Giuliani or Mr. Trump or the

20  host of other people who have made false claims about the

21  plaintiffs?  Doesn't that also work to the plaintiffs'

22  benefit?

23  A.   I'm sorry.  Could you restate the question.

24  Q.   Sure.

25  A.   What was the question?

1   Q.  Let's imagine that The Gateway Pundit paid the

2   plaintiffs right now what you're saying would be the value

3   of -- based on your impressions model, they paid the

4   plaintiffs that money, and the plaintiffs underwent this

5   campaign to repair their reputation.

6           Wouldn't that also help with the damage done by

7   Mr. Giuliani or Mr. Trump or the many other people that have

8   made false claims about the plaintiffs?

9   A.  No.

10  Q.  It wouldn't?

11  A.  No.

12  Q.  So saying -- so if The Gateway Pundit says these women

13  did not commit election fraud, they were innocent, these

14  were false claims, that has no effect on what people think

15  about what Mr. Giuliani said about the plaintiffs?

16  A.  I'm sorry.  What's the question?

17  Q.  You want to -- basically your damages model is what's

18  the value that it would take to educate the public, inform

19  the public who believe -- still believes in the election

20  fraud, changing their minds or trying to change their minds.

21  That's basically in a nutshell what your damages model is,

22  right?

23  A.  That's not correct.

24          So my damages model is tied directly to the

25  statements and the impressions in this particular case.

1   Q.  I understand that's your damages model in this case.

2   I'm asking about your methodology, okay?

3           The point of the impressions model is for any

4   particular set of statements we look at the impressions, and

5   then we calculate how much it would cost to counter

6   information in those impressions, right?  Is that fair?

7   A.  Yes.

8   Q.  Okay.  Because I'm trying to understand it so the jury

9   understands it, and I think I understand what you're getting

10  at there.

11          So what I'm saying is that if The Gateway Pundit

12  did, for the statements it made about the plaintiffs -- and

13  it was the first publication to name the plaintiffs -- if

14  The Gateway Pundit did that, how would that not also help

15  change the minds of the people that believe what

16  Mr. Giuliani said?

17  A.  So in *The Gateway Pundit* case, if they were to run a

18  corrective campaign, it would repair the damage done by the

19  statements of The Gateway Pundit, just as in this case.

20  Q.  Okay.  So it would have no -- it's only -- I believe

21  Giuliani when he says there was election fraud by Ms. Moss

22  and Ms. Freeman, but I don't believe The Gateway Pundit.

23          Isn't that the same fact claim just made by

24  different people?

25  A.  Not necessarily, no.

```
1    Q.  Okay.  Have you ever heard of the flat-earth theory?

2    A.  Yes.

3    Q.  Okay.  There are some people out there that still

4    believe there's a flat earth.  Are you aware of that?

5    A.  Yes.

6    Q.  Some very, very good athletes I've heard talk about the

7    flat-earth theory.  It's rather strange.

8              It's also rather strange that in 2023 we have

9    people who believe in claims that have been pretty much

10   disproven.  Isn't that -- it's unfortunate, isn't it?

11   A.  Yes.

12   Q.  Okay.  And so no matter how much money or effort one

13   spends in trying to, quote-unquote, educate a certain

14   portion of the public, some people are just never going to

15   believe it, are they?

16   A.  Yes, that's correct.

17   Q.  Okay.  And have you assigned a percentage of --

18   because -- let me back up.

19             It's been about three years since the unfortunate

20   events that happened to Ms. Freeman and Ms. Moss, right?

21   A.  Correct.

22   Q.  And has there not been a massive campaign by the

23   government, by state officials, by news organizations to

24   tell everyone that what Ms. Freeman and Ms. Moss were

25   accused of -- that is, stealing votes on election night --
```

1    was false?  Has there not been such a campaign?

2              MR. GOTTLIEB:  Objection, Your Honor; misstates

3    facts, facts not in evidence, and prejudicial.

4              THE COURT:  I don't know how prejudicial it is,

5    and the jury's been instructed multiple times that questions

6    are not evidence.

7              So what does the witness know about that, if

8    anything?

9              Overruled.

10             Do you know anything about that?

11             THE WITNESS:  I mean, I can just say I've seen

12   evidence from social science that approximately one in three

13   people still believe that the election was fraudulent as of

14   June 2023.

15   BY MR. SIBLEY:

16   Q.  That's my point.  If they still believe it after --

17   well, the state of Georgia issued a report that said the

18   claims that have been made about Ms. Freeman and Ms. Moss

19   aren't true, right?  Are you aware of that?

20   A.  I'm not aware of the specifics.

21   Q.  You didn't look into -- okay.  So this is good.

22             So you didn't look into all of the counter

23   information vindicating Ms. Freeman and Ms. Moss stating

24   that it's not -- the things that were said about them

25   weren't true.  You didn't look into that, did you?

1    A.  How do you mean, "look into that"?

2    Q.  Well, did you look into how many positive news stories

3    there are about Ms. Freeman and Ms. Moss and about how they

4    were wrongfully accused of this?

5    A.  That wasn't relevant.  My assignment in this case was to

6    provide a measure of the harm done to Ms. Freeman and

7    Ms. Moss, and that wasn't relevant to my assignment.

8    Q.  Well, wait a minute.  You said we have to spend a

9    certain amount of money to try to change people's minds,

10   right?  That's going to fix their reputation, isn't it?

11   A.  I said that we'll have to spend a certain amount of

12   money to repair the reputation -- the harm done by the

13   statements of Mr. Giuliani in this case.

14   Q.  And part of that is spending money on different media

15   platforms to tell people the truth, isn't it?

16   A.  Correct.

17   Q.  Okay.  And so what I'm asking you is:  Have you looked

18   at how unsuccessful the campaigns by government agencies and

19   other media agencies have been thus far to dispel the belief

20   in people's minds that the election was stolen?  Have you

21   looked into that?

22   A.  To my knowledge, there's not been a broad Strategic

23   Communications Plan conducted on this account.

24   Q.  Did you look into it?  Yes or no?

25   A.  That was not part of my assignment.

1    Q.  Okay.  Well, wouldn't -- if you knew that no matter how

2    much money you spent you're not going to change people's

3    minds, wouldn't that have affected your conclusions?

4    A.  Sorry, what's the question?

5    Q.  Sure.  You said the purpose of spending the money is to

6    change people's minds.

7           If you know that's a fool's errand -- which means

8    it doesn't matter how much money you spend, no matter what

9    you tell them they're still not going to change their

10   minds -- wouldn't that have affected your conclusions?

11   A.  I don't believe that's a fool's errand in this case.

12           MR. SIBLEY:  Objection; not responsive.

13   Q.  Would it have changed your conclusions or not?

14   A.  I'm sorry, what's the question?

15           MR. SIBLEY:  Objection; nonresponsive.

16           THE COURT:  He's really asking me to strike that

17   answer because you picked out part of his question to

18   respond to and not the overall question.

19           So your motion to strike her answer is overruled

20   because you had a lot buried in your question, and she

21   responded to one aspect of it.

22           So you can ask your question more cleanly, and

23   perhaps you'll get an answer.

24           MR. SIBLEY:  Okay.  Can you read back the

25   question?  I'm sorry.  I lost my train of thought.

```
1              THE COURT:  I'm not going to read it back for you.

2      Just rephrase your question.

3      BY MR. SIBLEY:

4      Q.  All right.  Well, look, the bottom line is part of what

5      you're claiming here is that we need sort of a counter

6      information plan affirming the plaintiffs' innocence on

7      these claims.  Am I right?

8      A.  Yes.

9      Q.  Have you looked at the track record of success on any

10     such information plans in the past?

11     A.  Yes.  In my field, reputational repair is largely

12     effective.

13     Q.  Have you looked at -- with respect to the plaintiffs,

14     have you looked at how, say, a government-issued report

15     might have changed people's opinions about the plaintiffs?

16     Have you looked at that?

17     A.  No.

18     Q.  Okay.  If you knew -- let's suppose that you had done

19     the work and determined, look, it doesn't matter what we

20     tell these people, we're not going to change their minds,

21     would that change the conclusion in your opinion?

22     A.  No.

23     Q.  Okay.  So we're going to just spend money just for the

24     sake of it to try and educate people who will never change

25     their minds?
```

```
 1    A.  No.

 2    Q.  Well, if we can't change their minds, why are we

 3    spending the money to do it?

 4    A.  In my field, it's been documented that reputational

 5    repair campaigns are largely effective.

 6    Q.  But if you know it won't be effective already, why would

 7    you spend the money to do it?

 8    A.  I don't know that.

 9    Q.  I just asked you, ma'am --

10         THE COURT:  You had buried in your compound

11    question a belief that she is denying she had.

12         So rephrase your question.

13         MR. SIBLEY:  Okay.

14    Q.  You didn't look at -- you didn't look at the effects of

15    changing public opinion on the existing counter information

16    plans that have been in place since 2020 to dispel notions

17    that the election was stolen.  You didn't do that, did you?

18         MR. GOTTLIEB:  Objection to form.  It is

19    misleading again.

20         THE COURT:  Well, I think this witness is smart

21    enough to figure out where there are buried assumptions in

22    the question, which is what she has been responding to.  So

23    I'm going to overrule your objection.

24         I'll let her answer it to her best ability.

25    A.  Could you restate the question?
```

```
1    Q.  Sure.  I don't really remember it actually at this
2    point, but let's just move on.
3    A.  Okay.
4    Q.  I think the point's been made.
5            All right.
6            THE COURT:  Do you want me to reread your last
7    question?
8            MR. SIBLEY:  No.  It's okay.  Let me just get to
9    the next part of the examination.
10   Q.  All right.  Let's look at the specific statements that
11   you looked at.  Okay?  I think you have a binder in front of
12   you that is -- yes, it's Volume 1 of 2.
13   A.  Okay.
14   Q.  And just look at Exhibit -- Plaintiffs' Exhibit 1.
15           All right.  That's the first statement that you
16   examined as far as the defamatory statements, right?
17   A.  That's right.
18   Q.  And that's what we now know as the Giuliani Strategic
19   Communications Plan; is that right?
20   A.  Yes.
21   Q.  Do you see at the top there -- and I think you recognize
22   it in your report -- it says "Timeline:  December 27th
23   through January 6th."
24   A.  Yes.
25   Q.  Okay.  But you have some conspiracy -- you looked at
```

1    some conspiracy statements by the Trump campaign.  Do you

2    recall that?

3    A.  Yes.

4    Q.  Okay.  And those were from December 23, 2020, weren't

5    they?

6    A.  Yes.

7    Q.  Okay.  So it looks like the Strategic Communications

8    Plan is aiming to operate from December 27th to January 6th.

9    Am I right?

10   A.  That's what it says here, yes.

11   Q.  Okay.  So are you aware of any -- do you have any

12   knowledge that the Donald Trump campaign Tweets or

13   advertisements that happened on December 23rd, that those

14   were done in furtherance of the Giuliani Strategic

15   Communications Plan?

16   A.  No.

17   Q.  Okay.  And, again, the dates for the communication plan

18   appear to be December 27th through January 6th, right?

19   A.  Yes.  That's what it says here.

20   Q.  Presumably because they're -- they want to get out

21   information to affect what happened on January 6th, which

22   was the certification of President Biden, right?

23   A.  Yes, that's how I understand it.

24   Q.  All right.  Let's look at another page that you looked

25   at with Mr. Gottlieb.  I think it's the -- oh, it's the

1   very -- it's toward the very end.  It says SM Conservative

2   Influencers, and that's where you talked about the

3   importance of influencers and things like that.

4          Just let me know when you get there.

5          (Pause)

6   A.  Yes, I see it.

7   Q.  Okay.  I want you to look through those influencers

8   there, and let me know if you see The Gateway Pundit.

9   A.  (Witness reviews document) I don't see it.  It looks

10  like these are mostly individuals.

11  Q.  But you don't see it, do you?

12  A.  No.

13  Q.  Okay.  Turn to the next page, if you would.

14         All right.  Do you see how there's these -- it's

15  almost like an annotation where there's different footnotes

16  and things or different links, I guess?  Do you see that?

17  A.  I believe so.

18  Q.  Okay.  Look at the -- it says "Ten Worst Fraud

19  Incidents."  Do you see that?

20  A.  What state is this under?

21  Q.  It looks like Arizona.  Or actually Arizona and

22  Michigan.

23  A.  Okay.  I see --

24         THE COURT:  Mr. Sibley, you're welcome to use the

25  ELMO so we can all see what we're looking at, if you'd like.

1          MR. SIBLEY:  I'm sorry.  I thought we were going

2     to put up the document.

3          Can we see?

4          THE COURTROOM DEPUTY:  One moment.

5          THE COURT:  Then we can all see what you're

6     looking at.

7          MR. SIBLEY:  Okay.

8     BY MR. SIBLEY:

9     Q.  It looks like The Gateway Pundit is like a source for

10    the information, isn't it?

11    A.  Can you point to where you're referring?

12    Q.  Yes.  It's highlighted on the screen.

13         It looks like it's highlighted on the document

14    there.  It says Gateway Pundit, right?

15    A.  Yes, I see that.

16    Q.  Okay.  So would you agree with me that based on the

17    Strategic Communications Plan, The Gateway Pundit is not

18    listed as someone who is identified as an influencer to

19    spread the information but actually is a source of the

20    information, right?

21    A.  The Gateway Pundit is not on the list of influencers.

22    It is listed here under "Dead Voted."

23    Q.  How about under "Detroit Leaks"?

24    A.  Yes, I see that link.

25    Q.  How about under "Multiple Ballots With Same Signature"?

1    A.  Yes, I see that link.

2    Q.  Okay.  So what we do know is those members of the

3    Giuliani Strategic Communications Plan were reading and, to

4    some extent, relying on The Gateway Pundit, right?

5    A.  That's one of many sources in this document.

6    Q.  But The Gateway Pundit is one of them, right?

7    A.  The Gateway Pundit is a link in this document, yes.

8    Q.  Okay.

9         All right.  Let me get back to -- I forgot to ask

10   you this question, but have you -- are you aware of any

11   defamation -- situations where someone was defamed, and your

12   methodology, the reputational repair program, was employed.

13   Like is there any such evidence or can you point to any

14   example of that?

15   A.  I'm not aware of any cases like that.

16   Q.  So you're the only one who's ever, I guess, advanced

17   this theory of measure of reputational harm.  Am I right?

18   A.  There's been one judgment based on this methodology.

19   Q.  Yeah, but you're the only person calling themselves an

20   expert who's ever -- that you're aware of that's ever said

21   here's how you measure reputational harm, is this

22   impressions method.  Right?

23   A.  I don't know what other experts use.  I can't speak to

24   that.

25   Q.  Okay.  So you invented this, right?

```
 1   A.  I don't know what other experts do.  This is how I do

 2   it.

 3   Q.  But you didn't learn this from someone else.  You came

 4   up with the method, right?

 5   A.  This is the method I used and developed in this case,

 6   yes.

 7   Q.  Well, you made it actually for Trump, didn't you?

 8   A.  I did use this method in the E. Jean Carroll/Trump case

 9   as well, yes.

10   Q.  Okay.  That was the first time in history that it had

11   ever been used, wasn't it?

12   A.  I can't speak to that.  I don't know.

13   Q.  Well, you aren't aware of any examples, are you?

14   A.  Reputational repair campaigns such as this are very

15   common, so I'm not the first one to use a reputational

16   repair campaign.

17   Q.  But your methodology for measuring reputational harm

18   here -- the Donald Trump case is the first time in history

19   that you're aware of anyone using that.  Am I right?

20   A.  I don't know of all the cases in history.  I don't know

21   the details of many defamation cases.

22            So yes.  That I'm aware of, yes, sure.

23   Q.  Okay.  Well, what do you have experience with as far

24   as -- you say reputational repair campaigns are very

25   successful.  You've said that multiple times, haven't you?
```

1    A.  Correct.

2    Q.  Can you give us some examples of how they have been

3    successful?

4    A.  Sure.  So they're broadly used by companies and by

5    people.

6              One example is the fashion brand Dior.  So Dior

7    had a reputational crisis when one of their designers I

8    believe said some things that were anti-Semitic, and so they

9    engaged in a very extensive corrective campaign across

10   social media.  They hired influencers.  I believe they

11   signed Natalie Portman as one of these influencers and

12   executed that campaign.  It's largely regarded as

13   successful.

14   Q.  Okay.  That's a brand.  I guess I'm more focused on

15   like -- I mean, Ms. Moss and Ms. Freeman were just ordinary

16   people when this happened though.

17   A.  Uh-huh.

18   Q.  So do you have any examples of a defamation case

19   involving just ordinary folks who needed to repair their

20   reputations?

21   A.  Ordinary people, no.  But certainly people, yes.

22   Q.  Right.  Because the more prominent you are, the more

23   prominent your reputation is, the more important it is to

24   repair that reputation, right?

25   A.  No, I don't agree.

1    Q.   Okay.  Do you think the average person in America knows

2    who Ms. Moss and Ms. Freeman are?

3    A.   I don't have evidence one way or the other.

4    Q.   You didn't look into that, did you?

5    A.   I did not survey --

6    Q.   Okay.

7    A.   -- a representative sample of the American people.

8    Q.   You talk about trusted sources of information in your

9    report, don't you?

10   A.   Yes.

11   Q.   What -- I mean, who would you consider to be trusted

12   sources of information?

13   A.   It depends on the audience.  So a source that I trust

14   might be different than a source that you or anybody else

15   trusts.

16   Q.   Well, probably the people that believe the election was

17   stolen don't trust the same sources of information as you,

18   right?

19   A.   That's possible, yeah.

20   Q.   I mean, do you think the average person that thinks the

21   election was stolen and maybe says something like "Let's go

22   Brandon," do you think they watch CNN or Fox News?

23   A.   According to the data I have from Pew Research, they are

24   more likely to watch Fox News.

25   Q.   And, in fact, they'd probably be more likely to watch

```
1    something that's even considered more on the fringe like

2    maybe One America News, right?

3    A.  I think it depends on the person.

4    Q.  Do you know what One America News is?

5    A.  Roughly, yes.

6    Q.  Okay.  Well, were you aware that One America News was

7    sued in this lawsuit initially by Ms. Moss and Ms. Freeman?

8    A.  Yes.

9    Q.  And you should also be aware based on your work that

10   Mr. Giuliani made statements on One America News, right?

11   A.  Yes.  I recall one statement.

12   Q.  Do you have an awareness of whether there was an

13   agreement to resolve the case between Ms. Moss and

14   Ms. Freeman and One America News?

15           MR. GOTTLIEB:  Objection, Your Honor.  It's going

16   into prohibited territory.

17           THE COURT:  It's already come out.  Overruled.

18   A.  Yes, I'm aware there was some kind of agreement.

19   Q.  Okay.  How did you become aware of that?

20   A.  Maybe in initially reviewing the complaint I became

21   aware of it.

22   Q.  Okay.  Have you -- have you reviewed -- do you know

23   whether there's like an agreement resolving --

24           MR. GOTTLIEB:  Objection, Your Honor.  This is

25   improper.
```

```
 1                   MR. SIBLEY:  Let me ask the question --

 2                   THE COURT:  Let's just talk.

 3                   (The following is a bench conference

 4                    held outside the hearing of the jury)

 5                   THE COURT:  Okay.  So, Mr. Sibley, this was not

 6      supposed to be talked about at all.  It came out during

 7      Ms. Moss's testimony.  Because it came out, I'm going to let

 8      you talk about that a little bit, but like where are you

 9      going with this?

10                   MR. SIBLEY:  Let me tell you, Your Honor.  I just

11      want to ask her --

12                   THE COURT:  This was not supposed to come in at

13      all.

14                   MR. SIBLEY:  It wasn't, but I didn't -- it wasn't

15      like I did it.

16                   THE COURT:  No, I understand.  I appreciate that.

17                   MR. SIBLEY:  But I have to ask her the question

18      that if she -- if a payment had been made by, for example,

19      One America News, would that affect the number that she has

20      in her report?  Would it reduce the damages?

21                   MR. GOTTLIEB:  Your Honor, the question of offsets

22      is definitionally a legal question for the Court.

23                   THE COURT:  Absolutely, but that's -- so that is

24      sustained.

25                   (This is the end of the bench conference)
```

1    BY MR. SIBLEY:

2    Q.  All right.  Are you aware of -- do you know who someone

3    named Eric Coomer is?

4    A.  No, I don't.

5    Q.  All right.  Well, let me just ask you, in the Trump

6    case -- I'm sorry, what was the plaintiff's name in that

7    case?

8    A.  E. Jean Carroll.

9    Q.  I guess that's on appeal, so she hasn't been paid yet,

10   right, that you know of?

11   A.  I'm not familiar with what happened after the verdict.

12   Q.  Well, I guess here's what I'm getting at.  Have you ever

13   overseen the kind of campaigns that you're talking about

14   where we're going to fix someone's reputation by, I don't

15   know, putting advertisements up?  You know, "Ms. Moss and

16   Ms. Freeman were innocent" or something, I guess, on

17   Twitter.

18            Have you ever done anything like that?

19   A.  No.

20   Q.  So then how would you know about the success of that?

21   A.  So I teach that regularly in my class to students who go

22   on and do that throughout their career.

23   Q.  Okay.  But what personal knowledge or actually any

24   knowledge at all do you have of the success of a campaign to

25   repair a reputation of a private individual who is trying to

1     repair their reputation after being defamed?

2            Can you give me any examples of case studies

3     you've looked at?

4     A.  Of private individuals?

5     Q.  Yes, ma'am.

6     A.  No.

7     Q.  No.  Okay.  So we don't know what the success -- so

8     would you agree with me that companies and individuals are

9     different?

10    A.  In what way?

11    Q.  Well, I mean, companies usually advertise.  Individuals

12    usually don't.

13    A.  I don't agree with that, no.

14    Q.  You think individuals just put up a billboard that says

15    "Hi, I'm Joe.  Here's my number.  Send me a text if you want

16    to meet"?

17    A.  Prominent individuals regularly engage in public

18    relations.

19    Q.  I'm talking about advertisements.  Right?  You

20    understand what an advertisement is, right?

21    A.  Yes, I do.

22    Q.  All right.  Well, that's one of the things you listed in

23    your report, which is you're quantifying like taking out ads

24    on social media or other types of media, right?

25    A.  That's one element of the campaign, yes.

 1    Q.  Okay.  And how would -- I mean, I don't even understand

 2    how that would work.

 3    A.  Uh-huh.

 4    Q.  Like, if someone called John Doe a pedophile and put it

 5    on the Internet, is John Doe going to take out

 6    advertisements on, you know, Twitter or, I don't know,

 7    TikTok that says "I'm not a pedophile"?  Is that how that

 8    works?

 9    A.  So as I recommended in my reputational repair campaign,

10    the message should come from multiple trusted sources, such

11    as influencers.

12    Q.  You think people trust influencers?

13    A.  I know they do, according to research, yes.

14    Q.  Okay.  But you can't give me one example of a successful

15    reputational repair campaign by a private individual, can

16    you?

17    A.  No.

18    Q.  Okay.

19            All right.  Does -- I think you mentioned a little

20    bit about this earlier, but a retraction or an apology by

21    the defamer, does that help repair a plaintiff's reputation?

22    A.  Right.  As discussed previously, that can help.

23    Q.  Okay.  Did you do any -- are you aware that OAN took

24    down the statements about the plaintiffs?  Based on what

25    Ms. Moss told us yesterday, that apparently happened.

1    A.  I wasn't directly aware of that, no.

2    Q.  Okay.

3    A.  It doesn't surprise me.

4    Q.  Based on what we heard from Ms. Moss yesterday, not only

5    did OAN take down the statements, but OAN actually published

6    true information, some kind of information about the

7    plaintiffs that would I guess absolve them of any

8    responsibility for stealing the election.

9            Were you aware of that?

10   A.  I wasn't aware of that, but it doesn't surprise me.

11   Q.  Well, wouldn't it have been helpful for you to know how

12   successful -- the campaign that you want the jury to make

13   Mr. Giuliani pay for, wouldn't it have been helpful to know

14   how successful the OAN taking down the stories and

15   publishing, you know, some kind of apology or retraction

16   was?  Wouldn't that have been helpful to know how successful

17   that was?

18   A.  No.  My estimate of the damages in this case is related

19   directly to the statements by Mr. Giuliani.

20   Q.  But the statements were also on OAN.

21           MR. GOTTLIEB:  Objection; mischaracterizes.

22           THE COURT:  Overruled.

23           Is there a question?

24   BY MR. SIBLEY:

25   Q.  You're aware that the statements that OAN made -- they

1    were in the same lawsuit.  You're aware of that, right?

2    A.   Yes.

3    Q.   Okay.  The statements were -- sometimes Mr. Giuliani was

4    making the statements on OAN, wasn't he?

5    A.   So it's my understanding that --

6    Q.   Yes or no?

7    A.   Could you ask the question again?

8    Q.   Yes.  Some of the statements, the actionable defamatory

9    statements that you looked at, were made on OAN, weren't

10   they?

11   A.   That is correct.

12   Q.   So looking at OAN and what they did and taking down the

13   statements and making an apology, wouldn't that help you

14   have a better understanding of the likelihood of success of

15   a campaign to change the minds of the people who still

16   believe that Ms. Moss and Ms. Freeman stole the election?

17   A.   No.  It's a different set of statements, a different

18   source.

19   Q.   Okay.

20   A.   There are many reasons why that would not be helpful.

21   Q.   It's the same kind of audience, though, isn't it?

22   A.   I mean, what do you mean by "the same kind of audience"?

23   Q.   Like the same kind of people that listen to Giuliani

24   watch OAN, right?

25   A.   There may be overlap, yes.

1    Q.  You don't think there's a lot of overlap?

2    A.  Based on the scope of impressions that I estimated in my

3    first analysis, the OAN audience may be a subset of the

4    total, but I don't think it's the same.

5    Q.  You think OAN has a smaller audience than Giuliani?

6    A.  Not Giuliani specifically.  I'm talking about the range

7    of impressions that I estimated in this case.

8    Q.  The truth is you just didn't look at this issue, did

9    you?

10   A.  I'm sorry, what do you mean by "this issue"?

11   Q.  The issue of OAN retracting the statements made about

12   the plaintiffs.  You didn't look at the effect that that had

13   on their reputation, did you?

14   A.  Correct.  That's not relevant to my assignment.

15   Q.  You think that wasn't relevant to your assignment?

16            MR. GOTTLIEB:  Objection, Your Honor; asked and

17   answered.  He's badgering the witness at this point.

18            THE COURT:  Overruled.

19   BY MR. SIBLEY:

20   Q.  You determined it wasn't relevant, right?

21   A.  Yes.

22   Q.  Or you just did what the plaintiffs' attorneys told you

23   to do, right?

24   A.  That's not correct.  My assignment in this case was to

25   measure the impressions for a certain number of statements.

1    Q.  But you let the plaintiffs' lawyers define the scope of

2    the assignment, didn't you?

3    A.  No.

4    Q.  Okay.  You didn't get information from them to decide

5    what to look into?

6    A.  Yes.

7    Q.  Okay.

8          All right.  Have you looked at -- sometimes when,

9    you know, horrible things happen to people, it actually

10   gives them a platform to increase their reputation and their

11   sort of standing in the community, doesn't it?

12   A.  I mean, what do you mean by "increase reputation"?

13   Q.  Well, I'm going to give you an example.  Were you aware

14   that Ms. Moss and Ms. Freeman were given the Presidential

15   Citizens Medal by President Biden?

16   A.  Yes, I was aware of that.

17   Q.  Okay.  I mean, that's a pretty big deal, isn't it?

18   A.  To some people, yes.

19   Q.  Okay.  Well, did you look at the effect that that -- I

20   mean, that's something you can put on your resume.  I have

21   never met anyone that has a Presidential Citizens Medal --

22   have you? -- besides these ladies sitting right here?

23   A.  Not that I'm aware of.

24   Q.  Okay.  And I believe Ms. Moss actually received the John

25   F. Kennedy Profile in Courage Award, didn't she?

1    A.  I'm not aware of that particular award, but it doesn't

2    surprise me.

3    Q.  Well, John F. Kennedy was a pretty prominent president,

4    right?

5    A.  Yes.

6    Q.  Okay.  So those are things that -- and I'm not -- we're

7    not thanking Mr. Giuliani for that, but sometimes these kind

8    of things can elevate a person to, Wow, you know, look at

9    the courage that they have to stand strong in the face of

10   all of these false allegations.

11           Have you looked at -- have you done the work to

12   see how the reputation has increased based on that?

13   A.  What do you mean by their reputation increasing?

14   Q.  Their standing -- well, there's -- reputation is like a

15   scale, right?  You can have things that harm your reputation

16   or things that help your reputation, right?

17   A.  The way that I would put it is that you can be prominent

18   or not prominent, and then you can be prominent for certain

19   things.  So there are two different elements.

20   Q.  Well, would you say that Ms. Moss and Ms. Freeman --

21   after all of this fiasco that's happened over the last few

22   years, would you say that they now have a reputation as

23   being hardworking, honest women?

24   A.  Amongst which audience?

25   Q.  Well, amongst the general population.

1    A.  I mean, what do you mean by "the general population" in

2    this case?

3    Q.  You keep talking about this case and this audience,

4    right?

5            So is the whole goal of your theory of damages to

6    forcibly convert election deniers by some kind of

7    reeducation campaign?  Is that what this is about?

8    A.  No.

9    Q.  Okay.  Well, why are we going to waste our time with

10   flat-earth people?  Should we launch a campaign to force

11   flat-earth people to convert to round-earth beliefs?  Don't

12   you think that's kind of a waste of time?

13   A.  I don't offer an opinion on convincing flat-earth

14   people.

15   Q.  Okay.

16           All right.  Well, let's look at the -- let's look

17   back at the Giuliani Strategic Communications Plan.  Do you

18   know who that was disseminated to?

19   A.  I'm sorry, what?

20   Q.  Do you know who it was disseminated to?

21   A.  No, I don't.

22   Q.  Okay.  And let's talk about the call between former

23   President Trump and Secretary Raffensperger.  You reviewed

24   that, right?

25   A.  Yes, I did.

1    Q.  Okay.  Do you know how that phone call was reported and

2    how it kind of was released to the public?

3    A.  No, I don't.

4    Q.  Okay.  So you're not aware of any action by

5    Mr. Giuliani, for example, in disseminating that phone call,

6    are you?

7    A.  No, I'm not aware of the details of how that call became

8    public.

9    Q.  Okay.  Do you know the origin of the video, now-infamous

10   video, that Mr. Giuliani published where he accused the

11   plaintiffs of election fraud?

12   A.  No, I don't.

13   Q.  Okay.  Did you read Mr. Giuliani's deposition?

14   A.  No.

15   Q.  Not at all?

16   A.  I reviewed some selected portions of it.

17   Q.  Okay.  Because I thought you said -- I thought you said

18   something about how -- about the cost of the Strategic

19   Communications Plan.

20   A.  That's correct.

21   Q.  And did you get that from Mr. Giuliani's deposition?

22   A.  No, I don't believe so.

23   Q.  How did you learn that?

24   A.  I believe that was discussed when we were reviewing the

25   Strategic Communications Plan.

1    Q.   When we.  Who's "we"?

2    A.   When I was discussing the Strategic Communications Plan

3    with attorneys.

4    Q.   Okay.  So you got that information from attorneys?

5    A.   Correct.

6    Q.   Do you remember what portion of Mr. Giuliani's

7    deposition that you reviewed?

8    A.   No, I don't remember offhand.

9    Q.   Do you remember seeing him take the Fifth Amendment in

10   the deposition?

11   A.   No, actually I don't.

12   Q.   He likes to talk, doesn't he?

13   A.   I don't know.

14   Q.   Okay.

15        All right.  Let me ask you this:  Could you --

16   well, strike that.

17        Have you done the work to assess the harm,

18   reputational harm, of each of the statements individually?

19   A.   Yes.

20   Q.   Okay.  So you would just basically take the impressions

21   from each statement and then use your sort of formula to

22   come up with the -- I guess you actually did do that.

23   Mr. Gottlieb showed the spreadsheet, and I think you had a

24   line by line for each statement, right?

25   A.   That's right.

1    Q.  Okay.  That's right.

2           All right.  Do you have any -- I mean, I guess you

3    looked at some of the stuff from Jensen Hughes and, you

4    know, other things that we looked at.  But there was some

5    vitriolic, racist, violent statements that were directed at

6    the plaintiffs, were there not?

7    A.  Yes.

8    Q.  Okay.  But you don't have an opinion on whether those

9    statements were directed at the plaintiffs because of

10   Mr. Giuliani's conduct, do you?

11   A.  No, I don't have an opinion on that.

12   Q.  Okay.  Who was your understanding of the co-

13   conspirators, I guess, for purposes of the conspiracy

14   statements?  What was your understanding?

15   A.  So I evaluated statements by Mr. Giuliani, by Mr. Trump,

16   and the Trump campaign.

17   Q.  Okay.

18           MR. SIBLEY:  Your Honor, if I can -- if we can

19   take a very short restroom break, I think I'm almost done

20   with this witness.  I just need to look through my notes to

21   make sure.

22           THE COURT:  Sure, absolutely.  We'll take a ten-

23   minute break.

24           (Jury exits courtroom)

25           (Recess taken)

```
 1                 THE COURT:  Mr. Sibley, are you done?

 2                 MR. SIBLEY:  Almost, Your Honor.  Just a few

 3      minutes.

 4                 MR. GOTTLIEB:  I just wanted to raise one issue.

 5      Your Honor, I just conferred with Mr. Sibley.  We're going

 6      to make every effort to -- he tells me he's almost done with

 7      his cross.  We're trying to make every effort to get through

 8      this today.  But if we need to go slightly beyond 5:00, we

 9      would love to be able to finish our case today with our next

10      witness.

11                 THE COURT:  Okay.

12                 Mr. Sibley, are you ready?

13                 MR. SIBLEY:  Yes.

14                 (Jury enters courtroom)

15                 THE COURT:  All right.  Mr. Sibley, please

16      proceed.

17                 MR. SIBLEY:  Thank you, Your Honor.

18      BY MR. SIBLEY:

19      Q.  Just a few follow-up questions, Dr. Humphreys.

20                 I think you told Mr. Gottlieb that you had or are

21      working with plaintiffs' counsel on some other cases.  Is

22      that true?

23      A.  I have worked with plaintiffs' counsel on a previous

24      case.

25      Q.  What case was that?
```

1    A.   That was the case of I believe *Rich v. Butowsky*,

2    something like that.   It was a while ago.

3    Q.   Okay.   What kind of case was that?

4    A.   This was a case where -- I believe it was also a

5    defamation case on social media.

6    Q.   You represented the plaintiff?

7    A.   That's correct.   I worked with this counsel.

8    Q.   Who was the defendant?

9    A.   I don't know that much about them.   I think his name was

10   Ed Butowsky, and there might have been another defendant in

11   the case.

12   Q.   Okay.   Of course *The Gateway Pundit* case, I would assume

13   you're also working with plaintiffs' counsel, correct?

14   A.   No, I don't believe so.

15   Q.   Okay.   Well, would you look at -- well, I think -- I'm

16   trying to help you here, but would it surprise you to know

17   that Mr. Langford might be on that case?

18   A.   John Langford?

19   Q.   Yes.

20   A.   Oh, yes.   Okay, sure.

21   Q.   I'm not trying to trick you.

22   A.   Sure.   There is a team so...

23   Q.   Now, are you aware of whether or not the plaintiffs have

24   already spent any money or engaged in any efforts at this

25   counter information campaign that is part of your damages

1    model?

2    A.  I'm not aware of any money they've spent.

3    Q.  Do you know why they haven't done so?

4    A.  No.

5    Q.  Okay.  But this campaign is only going to be successful

6    if you actually spend the money and do it, right?

7    A.  Yes.

8    Q.  Sure.  If you don't -- I mean, if you don't actually pay

9    for the advertisements, they can't be done, right?

10   A.  Sure.

11   Q.  Okay.  And do you have an understanding of why they

12   haven't engaged in the campaign to launch advertisements to

13   clear their names?

14   A.  To my knowledge, there's not been a judgment in the case

15   or an award.

16   Q.  So they need the money to do it, right?

17   A.  Yes.  You would need money to run this campaign.

18   Q.  Do you have an understanding of whether they've received

19   money from any other sources that might fund such a

20   campaign?

21            MR. GOTTLIEB:  Objection, Your Honor.

22            THE COURT:  Overruled.  If she knows.

23   A.  No, I don't know.

24   Q.  Okay.  But hypothetically, if they had received that

25   money, you would have expected them to use that money to pay

1    for the campaign, right?

2    A.  No.

3    Q.  Okay.  Well, I thought their reputations are important

4    and need to be fixed.  Why wouldn't you use the money to fix

5    it?

6    A.  I believe the way they spend the money is up to them.

7    Q.  Okay.  One of the other things I forgot to ask you about

8    initially was you mention in your report that you did not

9    consider Mr. Giuliani's *nolo contendere* stipulation, right?

10   A.  I'm sorry, what was the thing you referred to?

11   Q.  *Nolo contendere.*

12   A.  What is that?

13   Q.  Well, it's in your report.  I assumed you know what it

14   was.

15   A.  I'm sorry, what's the --

16   Q.  Are you aware of some stipulation that was entered into

17   in this case where Mr. Giuliani did not contest liability?

18   A.  Oh, yes.  I am aware of that.

19   Q.  Okay.  And you don't think that Mr. Giuliani's no

20   contest of liability is helpful for the plaintiffs' campaign

21   to clear their name?

22   A.  No.

23   Q.  You don't think the fact that Her Honor has already

24   determined Mr. Giuliani to be liable and for the statements

25   having been false, you don't think that's helpful to the

```
 1    plaintiffs' reputational repair?

 2    A.  No.

 3    Q.  All right.  Are you aware -- do you have a familiarity

 4    generally with defamation -- defamation jury verdicts?  Any

 5    understanding or familiarity with it in general?

 6    A.  I mean, with what aspects?

 7    Q.  Well, I'm just saying, have you compared sort of what

 8    your numbers are here with other defamation cases to see if

 9    the bottom line matches up?

10    A.  Not extensively, no.

11    Q.  Okay.  So for all you know, your numbers are

12    substantially higher than the average defamation award in a

13    similarly situated case, right?

14              MR. GOTTLIEB:  Objection; 403.

15              THE COURT:  Overruled.  If she knows.

16    A.  I don't.  My numbers are based on the impressions in

17    this case.

18    Q.  Well, being an expert in defamation cases, did you

19    follow the Johnny Depp case?

20              MR. GOTTLIEB:  Objection; misstates.

21    A.  I am aware of the Johnny Depp case.

22              THE COURT:  Wait, wait, wait, wait, wait.

23              So your objection was "misstates."  Based on that

24    objection, it's overruled.

25              So you may answer.
```

1    A.  I am aware of that case.

2    Q.  Okay.  Do you know what the outcome of that case was?

3              MR. GOTTLIEB:  Objection; relevance, 403.

4              THE COURT:  Sustained.

5    BY MR. SIBLEY:

6    Q.  Isn't part of making sure your methodology is reliable

7    making sure that you have looked at -- surveyed other cases

8    involving defamation to see that you've got something that's

9    consistent with what other courts and other experts have

10   done?

11             MR. GOTTLIEB:  Objection.  Same objection.

12             THE COURT:  Sustained.

13   BY MR. SIBLEY:

14   Q.  Have any peers reviewed your work to determine whether

15   it's reliable?

16   A.  No.  It's not common for peers to review my work in

17   these types of cases.

18   Q.  The answer is no peer has reviewed the work that you've

19   done -- the methodology that you've employed in this case.

20   Am I right?

21   A.  My work is based on peer-reviewed methodologies.

22             MR. SIBLEY:  Objection; nonresponsive.

23             THE COURT:  Overruled.

24   Q.  Has there been any review by any of your peers or any

25   scholarly assessment of your methodology that was used in

1    this case?

2    A.  Yes.

3    Q.  Who?

4    A.  All of my methodologies are based on peer-reviewed

5    research.

6              MR. SIBLEY:  Objection; nonresponsive.

7              THE COURT:  Overruled.

8    BY MR. SIBLEY:

9    Q.  Even though you're the only one that you know of to ever

10   use this methodology, you don't think it's important that

11   someone has reviewed your work to determine whether it is

12   reliable; is that right?

13             MR. GOTTLIEB:  Objection; asked and answered.

14             THE COURT:  Overruled.

15   A.  I'm sorry, could you ask the question?

16   Q.  Even though you testified earlier that you're the only

17   one to ever use this methodology in a defamation case, you

18   don't think it's important that you have a peer review the

19   work to determine its reliability?  It's not important?

20   A.  All of my methodology is based on peer-reviewed work.

21             MR. SIBLEY:  Objection; nonresponsive.  I didn't

22   ask what her work was based on.  I asked if her work has, in

23   fact, been peer reviewed.

24             THE COURT:  Overruled.

25             MR. SIBLEY:  Okay.  All right.  I pass the

1     witness, Your Honor.

2                    Actually, Your Honor, I have a motion, if I may?

3                    (The following is a bench conference

4                     held outside the hearing of the jury)

5                    THE COURT:  Yes, Mr. Sibley?

6                    MR. SIBLEY:  I move to exclude the expert based on

7     702, 703, unreliable methodology, undisclosed foundations.

8     Under Rule 37, she's admitted that she had things that she

9     relied on that she didn't disclose, not to mention the

10    Jensen Hughes objection that you already overruled and the

11    fact that this is the only person to ever use this

12    methodology.  There's no evidence that anyone else has ever

13    used it or reviewed it, and it was a made-for-Trump damages

14    model.

15                   THE COURT:  Do the plaintiffs want to respond?

16                   MR. GOTTLIEB:  Nearly all of those -- actually,

17    all of those are answered in Dr. Humphreys's direct

18    testimony.

19                   The methodologies -- each piece of the damages

20    methodology that she is employing have been peer-reviewed,

21    including reliance on public data, the types of methods used

22    by experts in her field, including the measuring of

23    impressions and the taking account of impressions into the

24    calculation of damages based on standard industry cost

25    inputs that go into those calculations.  She has disclosed

1    the bases for her opinions.

2           Mr. Sibley had an opportunity to object to those

3    and to depose her and declined to do so.  The record is I

4    think pretty clear from her testimony that she applied

5    consistent methodologies across the three reports.

6           THE COURT:  The motion's denied.

7           (This is the end of the bench conference)

8                     REDIRECT EXAMINATION

9    BY MR. GOTTLIEB:

10   Q.  Good afternoon, Dr. Humphreys.

11   A.  Good afternoon.

12   Q.  It is afternoon now.

13   A.  Yes.

14   Q.  Dr. Humphreys, do you recall Mr. Sibley asked you if you

15   agreed with the following statement:  The more prominent you

16   are, the more important it is to repair your reputation?

17           Do you recall him asking you that?

18   A.  Yes.

19   Q.  Do you agree?

20   A.  No.

21   Q.  Does reputational harm impose costs on anyone who is

22   harmed?

23   A.  Yes.  We all have reputations, and they can all be

24   harmed.

25   Q.  And even with respect to those ordinary people

1    Mr. Sibley was referring to, can reputational harm be

2    damaging?

3    A.   Yes.

4    Q.   Can reputational harm cause people to incur costs that

5    they never anticipated incurring before?

6    A.   Yes.

7    Q.   Like security threats?

8    A.   Yes.

9    Q.   And health harms?

10   A.   Yes.

11   Q.   Emotional harms?

12   A.   Yes.

13   Q.   Do people with a great deal of resources and money have

14   something to draw upon when they face those costs?

15   A.   Yes.

16   Q.   What about these so-called ordinary people that

17   Mr. Sibley was referring to?

18   A.   I don't believe that most ordinary people have the money

19   to run this kind of campaign.

20   Q.   Dr. Humphreys, are you aware that Mr. Giuliani continues

21   to have his own spokesperson?

22   A.   What do you mean, "spokesperson"?

23   Q.   A spokesman, somebody that helps with him talking to the

24   press and with communications.

25   A.   I wasn't aware of that, no.

1    Q.  Are you aware that Mr. Giuliani gave a press conference

2    outside this court a couple of days ago?

3    A.  Yes, I am.

4    Q.  And --

5            MR. SIBLEY:  Objection, Your Honor; foundation and

6    assumes facts not in evidence.

7            THE COURT:  Sustained.  I don't know where this is

8    going with this expert.

9            MR. GOTTLIEB:  Let me try it this way.

10   BY MR. GOTTLIEB:

11   Q.  Are you aware that Defendant Giuliani has a show that he

12   continues to make statements on?

13   A.  Yes.

14   Q.  And that Mr. Giuliani talks about himself on those shows

15   sometimes?

16   A.  Yes.

17   Q.  And that Mr. Giuliani has continued to make statements

18   about the plaintiffs on those shows?

19   A.  Yes.

20   Q.  Is that strategic communication?

21   A.  It can be, yes.

22   Q.  By an individual?

23   A.  Yes.

24   Q.  And Mr. Giuliani makes statements attempting to improve

25   or defend his reputation on his own?

```
1    A.  Yes.
2              MR. SIBLEY:  Objection, Your Honor; calls for
3    speculation and foundation.
4              THE COURT:  Overruled.
5    BY MR. GOTTLIEB:
6    Q.  Have you ever heard or encountered an individual that
7    wrote a book after a major event or controversy that damaged
8    them?
9    A.  In general I'm aware of the practice.  I can't call to
10   mind a specific example right this second.
11   Q.  But there are people who will write books and go on book
12   tours?
13   A.  Yes.
14   Q.  And go out and give public speaking -- public speeches
15   to talk about something that's happened to them?
16   A.  Yes.
17   Q.  Are those versions of repair campaigns?
18   A.  Yes.
19   Q.  And they're done by individuals?
20   A.  Yes.
21   Q.  So it's not the case that only companies run repair
22   campaigns, right?
23   A.  Correct.
24   Q.  And are you aware of repair campaigns that have been run
25   in the past?
```

1              I know Mr. Sibley was asking you some questions,

2      and there was a long exchange.  But are you aware of any

3      time that you can think of an individual running a repair

4      campaign?

5      A.  Yes.

6      Q.  What comes to mind?

7      A.  So there are many examples.  One example is Martha

8      Stewart.  After her insider trading scandal in 2002 she ran

9      an extensive reputational repair campaign.

10     Q.  She did that as an individual?

11     A.  Yes.

12     Q.  Do you know if she had assistance from companies or

13     other people assisting her with that campaign?

14             MR. SIBLEY:  Object; foundation, Your Honor.  The

15     witness is not --

16             THE COURT:  Overruled.

17     Q.  If you know.

18     A.  Yes, she hired agencies to manage this process.

19     Q.  Okay.  So individuals that you are aware of have run

20     reputational repair campaigns?

21     A.  Correct.

22     Q.  And there are, I assume, many individuals that you can

23     think of that have run strategic communications campaigns?

24     A.  Correct.

25     Q.  Have you ever -- Mr. Sibley said no individual would

1    ever take out an ad or put up a billboard.  Have you ever --

2    you live in Chicago, right?

3    A.  Yes.

4    Q.  Have you ever been driving on the highway in Chicago and

5    seen a billboard on the side of the road for a solo

6    attorney?

7    A.  For an attorney, yes.

8              MR. SIBLEY:  Your Honor, objection; misstates the

9    question.  It wasn't a -- it misstates a prior question and

10   testimony.

11             THE COURT:  Overruled.

12   Q.  The point being, Dr. Humphreys, you've seen

13   advertisements or messages taken out by a single individual.

14   A.  Yes.

15   Q.  And that was designed to improve their brand or improve

16   their image?

17   A.  Yes.

18   Q.  In fact, isn't that quite common?

19   A.  Yes.

20   Q.  Do you remember Mr. Sibley asking you some questions

21   about the other cases in which you've served as an expert?

22   A.  Yes.

23   Q.  And he asked you about some cases that you and I talked

24   about in your direct exam, right?

25   A.  Yes.

1   Q.  Including cases that you disclosed in your expert

2   report, right?

3   A.  Yes.

4   Q.  And some of those are matters in which you've been

5   retained by Protect Democracy as an organization; is that

6   right?

7   A.  That's right.

8   Q.  Is the *Weisenbach* case one of the cases where you've

9   been retained by Protect Democracy?

10  A.  Yes.

11          MR. GOTTLIEB:  All right.  Your Honor, I'd like to

12  mark an exhibit.  I think this will be Plaintiffs' Exhibit

13  608.

14  BY MR. GOTTLIEB:

15  Q.  Dr. Humphreys, you've been handed a document that's been

16  marked as Plaintiffs' Exhibit 608.  Do you recognize this

17  document?

18  A.  Yes.

19  Q.  What is it?

20  A.  This is a complaint in the *Weisenbach v. Project Veritas*

21  case.

22  Q.  So this is the *Project Veritas* case that you were

23  talking about with Mr. Sibley in cross-examination?

24  A.  That's right.

25  Q.  You're currently serving as an expert in this case?

1    A.  Correct.

2              MR. GOTTLIEB:  Your Honor, I move the admission of

3    Plaintiffs' Exhibit 608.

4              MR. SIBLEY:  I object to the admission of this

5    exhibit, Your Honor, on the basis that --

6              THE COURT:  Why don't we talk about it then.

7              (The following is a bench conference

8               held outside the hearing of the jury)

9              THE COURT:  Yes?

10             MR. SIBLEY:  Okay.  They're now -- after they had

11   a break and she's been coached on what to say, they're going

12   to introduce the complaint, and she's going to try to

13   rehabilitate the testimony on that.  It's inappropriate.

14             THE COURT:  But you put in the complaint in a

15   totally different case, so why should I deny them the -- you

16   know, you put in *The Gateway*, whatever that group is called,

17   complaint, so they can pile us up with this other complaint

18   in which she's also serving as an expert.

19             I mean, what --

20             MR. SIBLEY:  That case is the same plaintiffs on

21   the same claims.  This isn't an entirely different -- she

22   feigned ignorance of the case.  She did it multiple times

23   when I asked her.  She did --

24             THE COURT:  On *Weisenbach* she did not feign

25   ignorance on this complaint.  She actually talked about this

 1    complaint.

 2              Why do you want this complaint in?

 3              MR. GOTTLIEB:  Your Honor, first of all, for the

 4    record, I resent the implication that she was coached over

 5    the break.

 6              THE COURT:  We don't have to waste time on that.

 7              MR. GOTTLIEB:  Second of all, the reason that

 8    we're introducing this is to show a single picture from the

 9    complaint of who the plaintiff is, which goes directly to

10    rebutting Mr. Sibley's allegation that this is a biased

11    witness who only takes cases opposed to Trump.

12              It is a picture of the plaintiff showing him

13    wearing a Trump sign over essentially a Trump mask.  I want

14    to show that picture.

15              THE COURT:  Why don't you instead ask her --

16    because she already knows he's a Trump supporter -- and just

17    say, you know:  Mr. Sibley asked you a bunch of questions

18    and said you only took cases, you know, that were against,

19    you know, Donald Trump.  So don't you also take cases that

20    have a supporter?  And she already knows that.

21              Why do you have to put in a complaint?

22              MR. GOTTLIEB:  If that's the Court's ruling, we'll

23    accept it, Your Honor.  But he's the one who started

24    introducing complaints from other matters.

25              THE COURT:  I think there are other ways to do

```
1    this without putting all this stuff about Project Veritas,

2    which is not a news organization.  And I think there are a

3    lot of very conservative Republicans who would have nothing

4    to do with Project Veritas.

5            MR. GOTTLIEB:  Okay, Your Honor.  I'll ask her the

6    question another way.

7            THE COURT:  Okay.  Good.

8            (This is the end of the bench conference)

9            THE COURT:  So you're withdrawing 608?

10           MR. GOTTLIEB:  We'll withdraw it, Your Honor.

11   BY MR. GOTTLIEB:

12   Q.  Dr. Humphreys, let's talk about the Weisenbach

13   complaint.

14           In the Weisenbach v. Project Veritas complaint

15   you're serving as an expert, correct?

16   A.  Correct.

17   Q.  Do you know if the plaintiff in that case at the time of

18   the events in question was registered to vote for any

19   political party?

20   A.  Yes.  In the complaint it says he was a registered

21   Republican.

22   Q.  And that is the party that you are supporting in the

23   case, right?

24   A.  That's right.

25   Q.  And who did that --
```

1          MR. SIBLEY:  Objection, Your Honor.

2          THE COURT:  Overruled.

3          MR. SIBLEY:  Leading and --

4          THE COURT:  Overruled.

5    BY MR. GOTTLIEB:

6    Q.  Are you aware of who the plaintiff in the *Weisenbach*

7    case voted for in the 2020 election?

8    A.  Yes.  He -- in the complaint, it says he voted for

9    Mr. Trump.

10   Q.  And he has raised defamation claims; is that right?

11   A.  That's right.

12   Q.  So when Mr. Sibley was asking you all these questions

13   insisting that you're only taking cases against Mr. Trump or

14   taking cases against Republicans, that certainly wouldn't

15   apply to this case, would it?

16          MR. SIBLEY:  Objection, Your Honor;

17   mischaracterizes the testimony.

18          THE COURT:  Overruled.

19   Q.  Did your political motivations impact your analyses or

20   conclusions in this case in any respect, Dr. Humphreys?

21   A.  No.

22   Q.  Have you ever turned down an expert engagement based on

23   your political beliefs?

24   A.  No.

25   Q.  Do you seek out engagements to serve any kind of a

```
 1   personal political agenda?

 2   A.  No.

 3   Q.  And do you seek out engagements because you only want to

 4   represent plaintiffs or defendants on one side or the other?

 5   A.  No.

 6   Q.  Do you recall ever having turned down an engagement in a

 7   case because it would have been for a defendant?

 8   A.  No.

 9   Q.  If a Republican sought to hire you as an expert in the

10   case, including a defamation case, would you represent them?

11   A.  Yes.  It would depend on the case and my caseload, but

12   yes.

13   Q.  Mr. Sibley asked you some questions about whether you

14   considered sort of the positive information that was out

15   there about Ms. Freeman and Ms. Moss.  Do you recall that?

16   A.  Yes, I do.

17   Q.  Does your impressions model account for the fact that

18   there may be positive information that has been circulated

19   about Ms. Freeman and Ms. Moss?

20   A.  In the impressions model, no, it does not.

21   Q.  What about the concept of receptive impressions?  Does

22   that account for whether there is positive information out

23   in the world?

24   A.  Receptive impressions account for people who are likely

25   to believe the statements of Mr. Trump.  So in that sense,
```

1    yes.

2    Q.  So the impressions that you're trying to correct are the

3    impressions of the people who are receptive to Rudy

4    Giuliani, Donald Trump, the Trump campaign?

5    A.  That's right.

6    Q.  So your damages model, which is based on the impressions

7    model, is it trying to correct or spend money on people who

8    would be inclined to take into account or give weight to our

9    clients having received a Presidential Medal of Freedom?

10   A.  No, it's not.

11   Q.  In fact, is it designed specifically to exclude that

12   audience and those people?

13   A.  Yes.

14   Q.  And is that because it's your conclusion that that

15   audience, the people that would receive -- be persuaded by

16   the receipt of the Presidential Medal of Freedom, our

17   clients' reputation hasn't been harmed with those

18   individuals, right?

19   A.  That's correct.  That does not.  It doesn't include

20   those people.

21   Q.  And I believe you testified on direct that reputational

22   harm can occur in different sort of sections of the

23   population; is that right?

24   A.  Yes.  A reputational harm can occur even if 30 percent

25   of the people believe the claim.

1    Q.  Is that why you were having some trouble answering

2    Mr. Sibley's questions about the general population or the

3    general public with respect to reputational harm?

4    A.  Yes.

5    Q.  Is it even accurate to think of reputational harm with

6    respect to the public at large?

7    A.  Not really.

8    Q.  You recall Mr. Sibley asked you right at the start of

9    the cross a series of questions about changing your analysis

10   in your different reports?

11   A.  Yes.

12   Q.  And he, I think, asked you the question that -- he asked

13   you the question whether the statements that you analyzed in

14   the December supplemental report were the same as the

15   statements you analyzed in the original July report.  Do you

16   recall those questions?

17   A.  Yes.

18   Q.  Is there a difference in your analysis between

19   statements and instances and impressions?

20   A.  Yes.

21   Q.  Can you explain to the jury again what the difference

22   between statements and instances is?

23   A.  Sure.  So the statements remain the same throughout the

24   case.  The third supplement was to quantify the impressions

25   of an additional set of instances of one particular

1   statement.

2   Q.  And so the statements in the December report I think you

3   said are the exact same 16 statements you analyzed in your

4   original July report?

5   A.  That's correct.

6   Q.  So what was the difference?

7   A.  So there were additional news articles and other

8   publications of the January 2nd call that I included in the

9   analysis.

10  Q.  And did anything about your methodology change at all?

11  A.  No.

12  Q.  It's just that -- was it just the inputs to the

13  methodology that changed?

14  A.  Correct.  There were an additional set of articles that

15  had the same statement.

16  Q.  Dr. Humphreys, do you still have Defendant's Exhibit 1

17  up in front of you?

18  A.  Yes.

19  Q.  Could you take a look at the table of -- sorry, so

20  everyone is clear, Defendant's Exhibit 1 was the October 6,

21  2023, first supplemental expert report that you had in this

22  case, right?

23  A.  Yes.

24  Q.  Do you recall Mr. Sibley asked you some questions about

25  how the damages range had changed in this report from your

1    initial report?

2    A.  Yes.

3    Q.  If you look at the table of contents on the first page

4    of Defendant's Exhibit 1, do you have an understanding as

5    you look at this of what was different about the damages

6    numbers you were estimating in this October report versus

7    the first report?

8    A.  Yes.  So in this report I provided an additional damages

9    number that was based on the emotional harm statements, I

10   believe.

11   Q.  So in this report, this October report, you provided an

12   estimate of a cost-to-repair campaign that would have

13   included the statements prior to December 23rd; is that

14   correct?

15   A.  That's correct.  It was an additional estimate.

16   Q.  Okay.  And that was an estimate that you added to the

17   estimate of the post-December 23 statements from your July

18   report.

19   A.  Correct.

20   Q.  Did you change anything about the estimate from the July

21   report about the post-December 23 statements?

22   A.  No.

23   Q.  And, in fact, you haven't even recommended to the jury

24   that they award damages for the cost to repair for the

25   emotional harm statements, have you?

```
 1    A.  Correct.

 2    Q.  So the only thing that's changed, if I understand your

 3    testimony, Dr. Humphreys, from your initial cost-to-repair

 4    campaign that you estimated in July and the one that you

 5    have recommended today is that you've got some additional

 6    instances of the January 2, 2021, Trump phone call; is that

 7    right?

 8    A.  Yes, that's correct.

 9    Q.  So the only change between what you originally put in

10    your report and what you have said to the jury today is that

11    you've found and analyzed some additional republications of

12    that January 2nd call and included those in your analysis?

13    A.  That's right.

14    Q.  Dr. Humphreys, do you recall Mr. Sibley asked you some

15    questions about Jensen Hughes?

16    A.  Yes.

17    Q.  And he asked you how your analysis would be different if

18    you didn't consider the Jensen Hughes threat information; is

19    that right?

20    A.  Correct.

21    Q.  What part in your reports and your analysis was the

22    Jensen Hughes information or data relevant to?

23    A.  It was relevant to the impact analysis.

24    Q.  Your impact assessment.  That second assessment in the

25    case, the second model in the case?
```

```
1    A.  That's right.  That's where I tried to understand the

2    nature of the reputational harm.

3    Q.  Have you recommended a damages award to the jury based

4    on your impact assessment in this case?

5    A.  No.

6    Q.  Is the Jensen Hughes data therefore relevant in any way

7    to the cost to repair campaign that you have measured and

8    recommended to the jury in this case?

9           MR. SIBLEY:  Objection, Your Honor; calls for a

10   legal conclusion.

11          THE COURT:  Overruled.

12   A.  No, it's not relevant.

13   Q.  Do you remember Mr. Sibley was asking you some questions

14   about the flat-earth theory?

15   A.  Yes, I do.

16   Q.  And, along with that, some questions about why you

17   didn't consider the government repair campaigns that have

18   been underway?

19   A.  Correct.

20   Q.  Are you aware of any government repair campaigns that

21   have been underway for the plaintiffs in this case?

22   A.  No, I'm not.

23   Q.  Is a government report or an investigative report from a

24   government agency the same thing as a strategic

25   communications plan?
```

```
1    A.  No.  It reaches a different audience.

2    Q.  Do strategic communications plans sometimes rely upon

3    government reports for their messaging?

4    A.  Yes, they can.

5    Q.  But those are different things, right?

6    A.  Yes.

7    Q.  And so -- withdrawn.

8              Mr. Sibley asked you some questions about The

9    Gateway Pundit case, a number of questions about The Gateway

10   Pundit case.  Do you recall that?

11   A.  Yes, I do.

12   Q.  Is there any evidence -- well, is there an award of

13   damages in The Gateway Pundit case?

14   A.  No.

15   Q.  So all the hypothetical questions Mr. Sibley was asking

16   you about potential awards in The Gateway Pundit case are

17   hypotheticals, right?

18   A.  Yes.

19   Q.  And if there's no award in that case, that would mean

20   plaintiffs never have any money.

21   A.  Correct.

22   Q.  Is your damages model tailored to general impressions

23   out in the world or specific impressions that you itemized?

24   A.  Specific impressions.

25   Q.  And how have you been sure about that in calculating --
```

1    the calculations that we did when we looked at that table,

2    how are you sure about the fact that you're only trying to

3    address the impressions that result from the actionable

4    statements in this case?

5    A.  So I based the damages purely on the defamation

6    statements in this case, and more particularly the receptive

7    impressions to the defamation statements.

8    Q.   All right.  I'm almost done, Dr. Humphreys.

9              Do you recall Mr. Sibley was asking you some

10   questions about the Strategic Communications Plan?

11   A.  Yes.

12   Q.  Okay.  And he was asking you about questions about how

13   you knew or understood how much a strategic communications

14   plan would have cost?

15   A.  Yes.

16             MR. GOTTLIEB:  Your Honor, I think Plaintiffs'

17   Exhibit 345 has already been received into evidence.  And if

18   so, may I publish?

19             THE COURT:  And just so we're all clear, since the

20   term "Strategic Communications Plan" has been bandied about,

21   when you're talking about it, you're talking about

22   Exhibit 1, correct?

23             MR. GOTTLIEB:  Correct, Your Honor.

24             THE COURT:  Okay.  And now you're talking about

25   345, and it has been admitted.

```
 1                    MR. GOTTLIEB:  May we publish?

 2                    THE COURT:  Yes.

 3      BY MR. GOTTLIEB:

 4      Q.  Dr. Humphreys, I'm showing you an exhibit that's already

 5      in evidence in this case, which is an email from Bernard

 6      Kerik to Mark Meadows regarding the Giuliani Team Strategic

 7      Communications Plan dated December 28, 2020.  Do you see

 8      that on your screen?

 9      A.  Yes, I do.

10      Q.  Do you see in the second paragraph where Mr. Kerik

11      states to Mr. Meadows that he's estimating that the campaign

12      is going to run between $5 million to $8 million?

13      A.  Yes.

14      Q.  Is that what you were thinking about when you testified

15      earlier that you recalled seeing something about the cost of

16      a campaign in about that range?

17      A.  Yes.

18      Q.  And Mr. Sibley, I think, highlighted that the Strategic

19      Communications Plan was only supposed to run about ten days;

20      is that right?

21      A.  Correct.

22      Q.  What conclusions have you drawn in this case based on

23      the cost of the Strategic Communications Plan from the fact

24      that there was a ten-day-long Strategic Communications Plan

25      that was designed to cost $5 million to $8 million?
```

1    A.  So a $5 million to $8 million plan run over ten days

2    would cost more than, let's say, a million dollars a week,

3    probably $2 million a week actually.

4           If you were to run this kind of campaign on the

5    scale needed in this case, it would cost -- let's say a

6    million times 52 weeks for a year, and that would be $52

7    million.

8           MR. GOTTLIEB:  Thank you, Dr. Humphreys.  No

9    further questions.

10          THE COURT:  Okay.  You're excused, Dr. Humphreys.

11          THE WITNESS:  Thank you.

12          THE COURT:  And the plaintiffs' next witness.

13          MS. GOVERNSKI:  Your Honor, the plaintiffs call

14   Ruby Freeman.

15          THE COURT:  Good afternoon, Ms. Freeman.

16          Mark, could you clear the things off the desk.

17          THE COURTROOM DEPUTY:  Sure, Your Honor.

18          THE COURT:  I don't want you to be crowded over

19   there, Ms. Freeman.

20          THE WITNESS:  Thank you.

21          (Witness sworn)

22          MS. GOVERNSKI:  Your Honor, before we begin, I'd

23   like to batch in certain documents that I intend to

24   reference during Ms. Freeman's exam.

25          THE COURT:  And, Ms. Freeman, I know that chair

 1   can go back really far, but you might have to lean forward.

 2   Pull the microphone over to you -- it's moveable -- so we

 3   can hear you when you start speaking.

 4            Okay.  Now, for the exhibits?

 5            MS. GOVERNSKI:  Your Honor, pursuant to the

 6   parties' stipulation and agreement and with the Court's

 7   permission, I move to admit the following exhibits to which

 8   Defendant Giuliani has not asserted any objections:  PTX 27,

 9   142 through 146, 149 through 150, 394, 404, 416 through 420,

10   423, 499, 502, 510, 570, and 571.

11            I would note, Your Honor, that 510, 570 and 5 --

12            THE COURT:  Slow down just one second.

13            MS. GOVERNSKI:  Yes, ma'am.

14            THE COURT:  Say that again.  510 and what?

15            MS. GOVERNSKI:  570 and 571.  And I would note

16   that 510, 570, and 571 are hard-copy exhibits.

17            THE COURT:  All right.  Mr. Sibley, do you need a

18   second to check on those numbers?

19            MR. SIBLEY:  It looks like it was what we

20   stipulated to last night.  I have no objection, Your Honor.

21            THE COURT:  All right.  Hearing no objection, all

22   those numbers will be admitted.

23            MS. GOVERNSKI:  Thank you, Your Honor.

24            I also would note that I intend to use the

25   following exhibits which have already been admitted:  PTX 1,

```
 1    11, 12, 165A, 237, and 575.

 2              THE COURT:  Okay.

 3              (Pause)

 4              THE COURT:  Oh, please proceed.  Sorry about that.

 5              MS. GOVERNSKI:  Thank you.

 6                      RUBY FREEMAN, Sworn

 7                      DIRECT EXAMINATION

 8    BY MR. GOVERNSKI:

 9    Q.  Good afternoon.

10    A.  Good afternoon.

11    Q.  Can you please state your name for the record.

12    A.  Ruby Freeman.

13    Q.  Ms. Freeman, would you please introduce yourself to the

14    jury.

15    A.  Good afternoon.  I am Lady Ruby.  I am a mother, a

16    grandmother.  I'm a daughter.  I'm a proud American citizen.

17    I am a Christian.  I have a traveling boutique by the name

18    of LaRuby's Unique Treasures.

19    Q.  Ms. Freeman, what does the name "Lady Ruby" mean to you?

20    A.  Lady Ruby was special.  It meant classy, unique.  I'm a

21    lady.

22    Q.  Do you still go by the name "Lady Ruby"?

23    A.  No, I don't.  I can't use my name anymore, so I'm no

24    longer Lady Ruby.

25              Sometimes I don't know who I am.
```

1    Q.  Ms. Freeman, what about your last name?  Can you tell us

2    any of the symbolism of your last name?

3    A.  I found out that "Freeman" was the name that the slaves

4    chose to keep instead of taking on a slave master name, so I

5    was always -- I liked that because it meant I was a free

6    person.  I'm a free man, Freeman.

7    Q.  Ms. Freeman, where did you grow up?

8    A.  I grew up in South Georgia; Douglas, Georgia.

9    Q.  And who raised you?

10   A.  I called her Mama, which was my grandmamma.  Yeah.  She

11   raised me.

12   Q.  What was Mama like?

13   A.  Mama was strict.  In the South, you know.  Mama worked

14   for a family ironing clothes.  She also worked in the

15   tobacco field.  She was very protective.  I was like her

16   youngest because my mom was in school, so she was Mama.

17   Q.  What did you do for fun as a child?

18   A.  Mama made candy for me.  She would make candy, and we

19   would color it different food colors, you know, and I would

20   take it to school and sell it.  And I would come home and

21   say, "Mama, everybody don't have a nickel.  Can we sell some

22   for a penny or three cents?" you know.

23          And she made doughnuts, canned biscuits, and she

24   had a pill bottle, and she would put the -- you know, make

25   the hole, you know, from the pill bottles.  And that was

1    like doughnuts now.

2              But I ate those.  I didn't sell any of those.

3    Q.  You mentioned candy.  I'm just wondering why the memory

4    of candy triggered a memory for you.

5    A.  Candy was always -- has always been a part of my life it

6    seems like, you know.  We had candy, and my mom grew up

7    later giving us candy in our stockings, and so then I always

8    took on to having, you know, candy, like a ginger mint,

9    candy.

10   Q.  You mentioned a ginger mint.  I'm holding up what has

11   been admitted as PTX 510.

12             Ms. Freeman, what is this?

13   A.  It's a ginger mint.

14   Q.  And what are ginger mints?

15   A.  Ginger mints is a -- it's a mint that has a ginger taste

16   to it, and I always use it -- especially in the pandemic,

17   you know, everybody coughs or sneezes.  It's like, you know,

18   "Get a ginger mint," because I felt like it was healthy and

19   it was something soothing.  And it was a ginger mint.

20   Q.  Ms. Freeman, I noticed ginger mints over at counsel

21   table.  You brought some here with you today?

22   A.  Oh, yeah, I brought ginger mints.  And I know that Your

23   Honor was coughing yesterday.  I wanted to give her one so

24   bad.

25             THE COURT:  I know I might need this one.

1    A.  You know, so ginger mints are what I give everybody.

2    And even in the boutique, I would put one in their bag when

3    they'd shop with me.  Just a ginger mint.

4    Q.  Ms. Freeman, if we could go back to your childhood a

5    little bit.

6         Could you tell me a little bit about school.

7    A.  Well, it was segregated.  It was first through twelfth

8    grade.  And I think around the sixth grade it became

9    integrated, so we moved from one school to another school.

10   And I was there for two years.

11        And then we went on to high school.  I was there

12   just for the ninth and tenth grade, and that was -- it was a

13   challenging year, but yeah.  I went there.

14   Q.  You mentioned that at some point you left your

15   segregated school to go to a school that was integrated; is

16   that right?

17   A.  Yes.

18   Q.  How was that transition for you?

19   A.  It was hard.  It was different, you know, because of

20   course we was with white students now.

21        And I remember one incidence.  It was -- it was a

22   set of twins, and they were white.  And I don't know what

23   brought it on, but they called me the N word, and I remember

24   that I never heard it like that.

25        You know, of course, we saw Martin Luther King

1   stuff, but I'd never been called that or really heard it

2   being used because we were Christians.  Mama didn't use

3   those words, so -- and I went home and I told Mama, and she

4   said, "Just stay away from them."

5   Q.  And is that a lesson that you've taken with you

6   throughout your life?

7   A.  Yes.  People that have the audacity to call you the N

8   word, you just don't associate with them at all.

9   Q.  And you mentioned high school.  Where did you finish

10   high -- or did you finish high school?

11   A.  I moved to Atlanta in the Metro Atlanta area, and I

12   finished high school, yes, in East Atlanta.

13   Q.  And what type of work did you do after you graduated

14   from high school?

15   A.  When I graduated from high school, I went to work for

16   this law firm.  And my assignment was to make sure the files

17   were signed before they took them out, you know.  So this

18   man came in and he got a file, and he was reading it and

19   just slowly walking out and reading.

20        And I was like, "Excuse me.  Can you sign the

21   book?"

22        And he was looking at me.  I said, "You have to

23   sign the book before you can take them out."

24        And he signed it, and he walked out.  And then

25   later I found out that he was Mr. Spalding of King &

1    Spalding law firm, so I was like, Well, he should have known

2    to sign for it.  He made the rules.

3    Q.  Would you have done anything different if you had known

4    who he was?

5    A.  No, because you go by the rules.  The rule is to sign

6    the book, so you sign the book.

7    Q.  Ms. Freeman, did there come a time when you started to

8    sell clothing?

9    A.  Yes.  I started selling clothing in 1987.  I was a

10   street vendor for Atlanta Fulton County Stadium at that

11   time, and it was the Atlanta Braves when we went from the

12   worst to the first, and I did the World Series and then I --

13   the next year I did the Olympics, and yeah.

14   Q.  Did you enjoy selling clothing?

15   A.  Yes, I enjoyed selling clothing.  I had unique -- I had

16   the official merchandise, so people bought -- they got used

17   to me.  They would come to the games, and they would look

18   for me.

19        And some of the baseball players and the batting

20   coaches, they would come and shop with me because they knew

21   I had the merchandise that they had inside the stadium, but

22   they were less expensive.  So I was known to have the good

23   stuff.

24   Q.  What did you like about selling clothing?

25   A.  I got to talk to people.  They would come from all over,

1    and sometimes the guys would come.

2            The woman might not want to go in the game, and

3    they would stay out with me, and they talked, and we talked,

4    and they would share some of their private moments with me.

5    And we would pray.  We would talk.  They just got to know

6    me.  They knew me as the person that they could sit with.

7            And I don't know if you've ever been in the

8    stadium, but there's only one restaurant there, and that

9    the Kentucky Fried Chicken.  And they would say, "Well, you

10   want us to watch your table while you go to the restaurant

11   to get something?"

12           So it was always special that they knew that they

13   was going to come to the game and they was going to watch my

14   stuff while I go to the restaurant.  It was just fun getting

15   to know the people.

16   Q.  And you mentioned that you started your own boutique.

17   Tell us a little bit about that.

18   A.  Yeah, so after the Olympics, and so now there is no

19   more -- it's not unique anymore because at that time nobody

20   was really selling Braves merchandise or Olympics

21   merchandise.  It was just -- but now everybody has it, so it

22   was like okay, that season is over.

23           And then later I started working selling clothes

24   and LaRuby's Unique Treasures, and I always had -- because I

25   remembered the stadium stuff.  So I had good-quality, unique

1    clothing.  I did a lot of -- most people call them trade

2    shows, but to me they was church conventions or people

3    that's in the limelight, you know, that wanted fashion.  So

4    I enjoyed that.

5    Q.  Did you have a brick and mortar?

6    A.  No.  That was my goal.  My goal was to have a brick and

7    mortar.

8         Yeah, but of course I can't do that now.  I can't

9    do the brick and mortar because I can't use my name anymore,

10   so I can't advertise Lady Ruby.  It's just -- yeah, so I

11   can't do that.

12   Q.  We'll get back to that.

13        Ms. Freeman, when did you have your daughter, the

14   fellow plaintiff in this case, Ms. Moss?

15   A.  Shaye was born in 1984.

16   Q.  And where did you live throughout Ms. Moss's childhood?

17   A.  We moved throughout the Metro Atlanta area, and then we

18   ended up in Cobb County, a known address in Powder Springs,

19   Georgia; 5201 Memorial Lane, Powder Springs, Georgia.

20   Q.  And you referenced Memorial Lane.  Was that your street?

21   A.  That was the street I lived on, 20 -- at 20, 22 years.

22   Q.  Can you tell us a little bit about that neighborhood.

23   A.  I lived in a nice neighborhood.  It was quiet.  It was

24   multiracial.  It was -- everybody minded their own business.

25   And because I was in the little area, about like a five-

1    house radius, I was the only single woman, so they watched

2    out for me.  At that time they knew I had the big 14-foot-

3    long truck, so they watched out for me.

4            I knew people in my neighborhood.  I got to know

5    the cleaners.  I had certain cleaners.  The grocery store.

6    You know, it was a good neighborhood.  I enjoyed it.

7    Q.  And you said you had lived there for how long?

8    A.  I moved there in 2000.

9    Q.  And at some point did your daughter, Ms. Moss, go to

10   college?

11   A.  Yes.  Shaye left and went to college in 2022, 2021.

12   Yes, she went on to college, and she graduated from college,

13   and she came home and blessed me with a grandson, yeah.

14   Q.  You said 2021?

15   A.  2001, sorry.

16   Q.  2001.  Thank you, just to clear our record.

17           And what did Ms. Moss do after college?

18   A.  She started working at the Fulton County voters

19   registration and election.

20   Q.  And you also -- did you have a history of working for

21   Fulton County?

22   A.  Yes.  I worked for Fulton County Police Department for

23   11 years, and then I went on to work for Fulton County 911

24   for eight years.

25   Q.  Ms. Freeman, did there come a time when you decided to

1    help Fulton County with the 2020 presidential election?

2    A.   Yes, I did.   2020, I think it was like October.

3    Q.   And why did you decide to do that?

4    A.   Well, when I worked at the police department and for

5    911, Fulton County was always special to me.   You know,

6    that's -- they were special.   I really enjoyed working with

7    them.

8            And so I would always say -- well, when it was

9    time for the election, I said, You know what?   When I worked

10   there before, I remember the secretary of state at that

11   time.   You know, they would always say that Fulton County

12   was -- well, it was a big county, the last one to get the

13   ballots and everything in, and it was just taking so long.

14           I said, You know what?   I can do this.   I'm going

15   to go and help.   You know, they mean something to me.   I'm

16   going to go and help Fulton County out.

17   Q.   How much, if any, role did politics have on your

18   decision to help Fulton County in the presidential election?

19   A.   Politics, no.   I mean, you know, you vote.   You

20   definitely had to vote because we finally earned the right

21   as blacks to vote, and then being a woman.   So you vote.

22           But politics, no.

23   Q.   You don't consider yourself a political person?

24   A.   No.

25   Q.   You mentioned that the job started in October of 2020?

1    A.   Yes.

2    Q.   Where did you work when you started October 2020?

3    A.   The Fulton County Government Center.

4    Q.   And while you were working at the Fulton County

5    Government Center in October 2020, did you ever check which

6    candidates were marked on the ballots?

7    A.   No.

8    Q.   Could you have?

9    A.   No.

10   Q.   Why not?

11   A.   The ballots were in the envelope.

12   Q.   So at the Government Center in Fulton County, the

13   ballots were sealed when you dealt with them?

14   A.   Yes.

15   Q.   And did there come a time when you started working at a

16   location other than the government counting center?

17   A.   Yes.  I went on to State Farm Arena.

18   Q.   And when was that?

19   A.   About a week -- a couple of days before the election.

20   Q.   And when you say "before the election," is that the --

21   A.   The 2020 election, I'm sorry.  It was in November.

22   Q.   November 3, 2020?

23   A.   Probably so, yes.

24   Q.   Ms. Freeman, when you were working at the State Farm

25   Arena in connection with the 2020 presidential election, did

1    you ever look at the ballots, how they were marked?

2    A.  No.

3    Q.  And, Ms. Freeman, did you work out of the State Farm

4    Arena on Election Day?

5    A.  Yes.

6    Q.  And you also worked at the Fulton County arena the days

7    up to Election Day?

8    A.  Yes.

9    Q.  How were the days up to the election and Election Day

10   different, if they were in any way?

11   A.  The only difference on Election Day, it was people

12   everywhere.  There were cameras.  There was reporters,

13   observers.  It was just a very busy day.

14   Q.  Was the work itself different?

15   A.  No.  I did the same thing.

16   Q.  Ms. Freeman, did anything particularly memorable happen

17   in November 2020 after Election Day?

18   A.  No.

19   Q.  Did there come a point in time when that changed?

20   A.  Yes.

21   Q.  When was that?

22   A.  December 3rd, that night, going into December 4th, early

23   morning.

24            MS. GOVERNSKI:  I'd like to pull up PTX 237, which

25   has been previously admitted.

```
 1              Permission to publish to the jury?

 2              THE COURT:  You may publish.

 3   BY MR. GOVERNSKI:

 4   Q.  Ms. Freeman, do you see what's on your screen?

 5   A.  Yes.

 6   Q.  It looks like this is a Tweet from Defendant Rudy

 7   Giuliani on December 3, 2020, at 2:49 p.m.?

 8   A.  Yes.

 9   Q.  Does Mr. Giuliani's Tweet on this day and at this time

10   have any significance to you?

11   A.  Yes.  That's when the first video came out, yes.

12   Q.  And, Ms. Freeman, what happened to you in your personal

13   life after this December 3, 2020, Tweet?

14   A.  After that, like I said, that morning of the 4th, I just

15   start getting phone calls, text messages, emails.  The phone

16   was just going crazy, just a lot.

17              MS. GOVERSKI:  I'd like to pull up on the screen

18   Exhibit 165A, which also has been previously admitted.  And

19   I would request permission to publish to the jury.

20              THE COURT:  Yes, you may publish.

21   Q.  Ms. Freeman, you can see it on your screen as well, if

22   that's helpful.

23   A.  Yes.

24   Q.  Do you recognize what this is?

25   A.  Yes.
```

1    Q.  What is this?

2    A.  This is an email dated December the 4th at 2:58 a.m.

3    Q.  And when you said that you started receiving various

4    communications into the evening, December 3rd into the 4th,

5    is this what you were referring to?

6    A.  Yes, ma'am.

7    Q.  If I could please ask you to turn the page to the

8    document with the Bates -- I'm sorry, 165A with the Bates

9    number that ends in 003.

10        You should see it on your screen as well,

11   Ms. Freeman.

12        And you'll see this is an email that you received

13   on December 4th at 3:14 a.m.; is that right?

14   A.  Yes.

15   Q.  Ms. Freeman, the top of this, the substance of this

16   email states:  Someone's Interested in LaRuby's Unique

17   Treasures?

18   A.  Yes.

19   Q.  What does LaRuby's Unique Treasures mean to you in the

20   context of this communication?

21   A.  This is the name of my boutique, so I just assumed it

22   was someone interested in buying merchandise.

23        MS. GOVERNSKI:  And if we can please pull up the

24   content of this message, which I'm not going to read in the

25   record given the profanity, and I apologize to the jury and

1    the Court for the language that we'll be seeing in the next

2    few moments.

3    BY MS. GOVERNSKI:

4    Q.  Ms. Freeman, when you read this message, did you believe

5    this individual was interested in LaRuby's Unique Treasures?

6    A.  No.

7    Q.  Ms. Freeman, before December 3rd or 4th, had you ever in

8    your life received a message like this before?

9    A.  No.

10   Q.  Before December 3rd or 4th, had you ever in your life

11   been called the words in this email?

12   A.  No.

13   Q.  Had you ever been called a criminal and a felon?

14   A.  No.

15   Q.  Had you ever been accused of treason?

16   A.  No.

17            MS. GOVERNSKI:  If we can please put up on the

18   screen the page from the same exhibit, PTX 165A, that ends

19   in 320.

20   Q.  Ms. Freeman, is this another message that you received

21   via LaRuby's Unique Treasures?

22   A.  Yes.

23   Q.  I'm also not going to read the full text to the jury,

24   but if we look at the first line, it says, "You are dead.

25   Your family and you are now criminals and traitors to the

 1     union.  BLM wants the cops to go away, good.  They are in

 2     the way of my ropes and your tree!"

 3              Do the phrases "ropes" and "tree" have any meaning

 4     to you?

 5     A.  Yes.  I took it as though they were going to hang me

 6     with their ropes on my trees.

 7              MS. GOVERNSKI:  And if we can look in the

 8     second-to-last sentence where it says, "Kill yourself now so

 9     we can save AMNO!" and then proceeds on to repeat various

10     profanities that I'll spare the Court.

11     Q.  Ms. Freeman, have you at any time used this type of

12     language with anyone?

13     A.  No.

14     Q.  And why not?

15     A.  That's just not a part of my character.  I don't say

16     stuff like that.

17     Q.  I'm going to look at one -- a few more, please.

18              MS. GOVERNSKI:  If we could turn to 379 of the

19     same exhibit.

20     Q.  Ms. Freeman, can you please tell the jury who this

21     communication was from and the email address that was used?

22     A.  It said from the Grand Wizard, kkk@protonmail.

23     Q.  What, if anything, do those terms mean to you?

24     A.  Grand Wizard, Ku Klux Klan, you know.  I thought, Wow,

25     I'm getting an email from -- whether it was true or not, I

1  saw that it said Grand Wizard, KKK.

2      You don't mess with the KKK.  That's like --

3  living in Georgia, it's like that's a side of town you

4  didn't go to and you didn't -- you know, so to get an email

5  from that was horrible.

6  Q.  And you see it says, "We are coming for you and your

7  family!  Ms. Ruby, safest place for you right now is in

8  prison.  Or you will swing from the trees."

9  A.  Yeah.

10  Q.  Ms. Freeman, I'm wondering if you had any reaction to

11  their use of your name, Ruby, in this message?

12  A.  So it's like, okay, you're calling me by my name, so how

13  you -- you got my name.

14  Q.  How do you think they got your name?

15  A.  Huh?

16  Q.  I'm sorry?

17  A.  What did you say?

18  Q.  I didn't mean to interrupt.

19  A.  No.  What did you say?

20  Q.  How do you think they got your name?

21  A.  From the business name from -- I had a -- I had a T-

22  shirt on that night.  I had one in every color because it's

23  my business, you know, Lady Ruby's.  So that was like my

24  uniform.  I had all the colors.  And so I had it on for

25  election night, you know, Lady Ruby, blinged out.

1              So they had my name.

2    Q.  And when you refer -- you were wearing a shirt on

3    election night when you were working at the State Farm

4    Arena?

5    A.  Yes.

6    Q.  And we had earlier talked about the State Farm Arena

7    video.

8    A.  Uh-huh.

9    Q.  Were you wearing the shirt in that video?

10   A.  Yes.

11             MS. GOVERNSKI:  If we could please turn to 395 in

12   the same exhibit, 165A.

13   Q.  Ms. Freeman, I'll direct your attention to the first

14   sentence, which states your full name.  "Ruby Freeman, I

15   hope the Federal Government hangs you and your daughter from

16   the Capitol dome.  I pray that I will be sitting close

17   enough to hear your necks snap!"

18             Do you recall your reaction to receiving this

19   message?

20   A.  Yes.  It was like you have my full name now, and you

21   want the federal government to hang me and my daughter from

22   the Capitol dome, and you hate us so bad that you want to

23   hear our necks snap.

24   Q.  Did you only receive messages like this to LaRuby's

25   Unique Treasures?

```
1    A.  No.  I received messages from all forms of social media,

2    personal email, text messages, voicemails.

3              I had LinkedIn, and they got so many that they

4    disconnected me from being on LinkedIn.

5              It was just everywhere.  I got letters in the mail

6    because they got my address.  Now they got -- you know, you

7    can put your name in and find out where you live, so now

8    they have my address.

9              THE COURT:  Ms. Freeman, could you just move that

10   microphone closer to you.  Thank you.

11              THE WITNESS:  Okay.

12   BY MS. GOVERNSKI:

13   Q.  Ms. Freeman, how many communications like the ones we've

14   talked about did you receive?

15   A.  Hundreds.  Hundreds.  I received so many on my phone

16   that at one time my phone crashed.  It just died.

17              MS. GOVERNSKI:  If we can go to 287, please.

18   Ms. Freeman, where do you receive these messages?

19   A.  This is on Instagram.

20   Q.  If I could please direct your attention to the comment

21   on 288 from -- that you see on the screen.  Would you mind

22   reading this comment to the jury starting with the words "Go

23   after"?

24   A.  It says, "Go after Ruby Freeman, the owner of

25   Ruby_Unique Treasures.  She's the lady in the purple shirt
```

1    from the video where she took ballots out of the suitcase.

2    Lock her up."

3    Q.  And the lady in the purple shirt?

4    A.  That was me.

5    Q.  That was you?

6             MS. GOVERNSKI:  We can go to Page 18, please.

7    Q.  Ms. Freeman, can you tell where you received this

8    message?

9    A.  Messenger, Facebook Messenger.

10   Q.  And if I can direct your attention to the second

11   sentence at the end, it says, "You better get on the phone

12   with Uncle Rudy Giuliani and cut a deal.  It might keep u

13   out of the big house."

14   A.  Yes.

15   Q.  Do you recall having an impression of the reference in

16   this email to the defendant in this case, Rudy Giuliani?

17   A.  Yes.  That was -- I went back to that -- the video, that

18   Tweet that was -- that Rudy Giuliani sent out to his

19   millions of followers about me at State Farm Arena, and it

20   was like, Get in touch with him.  Maybe he can keep you out

21   of prison.

22   Q.  And that's the Tweet that we looked at --

23   A.  Yes.

24   Q.  -- a few moments ago, PTX 237?

25   A.  I think that's the name of it, yes.

```
 1                  MS. GOVERNSKI:  If we can go, please, to Page 90
 2     of 279A.
 3                  Sorry.  Back up, Mr. Spalding.  Yes, right here.
 4     BY MS. GOVERNSKI:
 5     Q.  Ms. Freeman, can you please read the substance of this
 6     text message to the jury?
 7     A.  It says, "We know.
 8                  "Where.
 9                  "U.
10                  "Sleep."
11     Q.  And how did you receive this message?
12     A.  This came in through text message.
13     Q.  A text message to your personal phone?
14     A.  Yes, yes.
15                  MS. GOVERNSKI:  And if we can go to the next page,
16     Mr. Spalding, please.
17     Q.  Ms. Freeman, can you please read this -- was this a text
18     message also?
19     A.  Yes, this is a text message.
20     Q.  Can you please read to the jury the language starting
21     with "They are coming for you"?
22     A.  It says, "They are coming for you.  I'm not far behind.
23     I'm coming for you also.  Trash will be taken to the street
24     in bags."
25                  I'm sorry.
```

1    Q.  What, if any, meaning did you take from the last

2    sentence, "Trash will be taken to the street in bags"?

3    A.  I took it as though they were going to cut me up and put

4    me in the trash bags and take it out to my street.

5    Q.  And your street at that point was Memorial Lane?

6    A.  Yes.

7    Q.  And you talked about receiving letters to your home?

8    A.  Yes.

9              MS. GOVERNSKI:  Your Honor, I plan to use PTX 570

10   and 571, which are two of the physical exhibits that you

11   admitted.  I would ask permission to approach the witness.

12             THE COURT:  Yes, you may.

13   BY MS. GOVERNKSI:

14   Q.  Ms. Freeman, let's start with the top document that I

15   handed you.  Can you open that and explain to the jury what

16   it is?

17             MS. GOVERNSKI:  And, Mr. Spalding, we can take

18   this down from the screen.

19   A.  It was a letter, something like I got in the mail on

20   December the 7th, 2020.  It said, "LaRuby, you are one

21   ignorant cheaten lying fat ugly N word.  Black people don't

22   do like you did."

23             MS. GOVERNSKI:  Let's put 165A back on the screen,

24   which has just been admitted, and we have a scanned version

25   of this contained within that document.

```
 1                    If we can go to the -- right.
 2      BY MS. GOVERNSKI:
 3      Q.  Ms. Freeman, is this the document that you just read to
 4      the jury?
 5      A.  Yes.
 6      Q.  And this was sent to your personal residence?
 7      A.  Yes, 5201 Memorial Lane.
 8      Q.  Would you mind opening the next envelope and describing
 9      it to the jury.
10      A.  Yes.  This is another letter that I got on December 22nd
11      at my home address, 5201 Memorial Lane.
12      Q.  How would you describe it?
13      A.  When I saw it, it looked like a demonic monkey, and it
14      said "LaRuby's father."
15                    MS. GOVERNSKI:  And for clarity of the record, on
16      the screen right now we're seeing 165A at Page 2526.
17                    Mr. Spalding, can you go to the next page.
18      Q.  Ms. Freeman, is this the image that's on the second
19      document that is in front of you?
20      A.  Yes.
21      Q.  It's a little bit difficult to see on the screen.  Can
22      you try to describe --
23      A.  I had to really look at it because I didn't know what it
24      was, and then I realized -- I realized that it was roadkill
25      on the side of the street, on the curb, with a balloon
```

1    saying "Get Well Soon."

2            I took it as they were going to kill me like

3    roadkill and put me on the side of the street.

4    Q.  Can you try to explain to the jury what it felt like to

5    receive messages like this mailed to you at your home.

6    A.  I felt horrible.  I felt I was terrorized.  I was -- I

7    was scared.

8            Now I don't know.  You know, I'm just scared like

9    people are coming to kill me.  They got my address.  You

10   know, you saw they had my phone number.  They had my name.

11   I just -- I was always scared.

12   Q.  Ms. Freeman, you mentioned that you received voicemails

13   as well; is that right?

14   A.  Yes.  I got a lot of voicemails.

15           MS. GOVERNSKI:  We've already admitted PTX 149 and

16   150.  I would like permission to play PTX 150 for the jury.

17           THE COURT:  You may.

18           MS. GOVERNSKI:  And I warn that this will be

19   difficult to listen to.

20           (Audio played)

21   BY MS. GOVERNSKI:

22   Q.  Ms. Freeman, do you remember receiving this?

23   A.  Yes.

24   Q.  Can you explain your reaction?

25   A.  I thought it was horrible.  People calling me saying

```
1    stuff like this about me and my daughter.  I thought it was
2    just racist.  Scary.  Horrible.  Horrible part of my life.
3    Q.  And this wasn't the only voice message you received, was
4    it?
5    A.  No.  I received several.
6              MS. GOVERNSKI:  If we can please pull up PTX 142,
7    which has been admitted.
8              Permission to publish to the jury?
9              THE COURT:  It may be published.
10   Q.  Ms. Freeman, if you can look at your screen, what are we
11   looking at here?
12   A.  Voicemail.  There was three of them back to back.
13   Q.  So these are three back-to-back voicemails from December
14   6, 2020?
15   A.  Yes, from the same number, and person.
16   Q.  And it says at 13:53, so 1:53, 1:55, and 15:58; is that
17   right?
18   A.  Yes.
19   Q.  In the afternoon?
20   A.  Yes.
21             MS. GOVERNSKI:  I'd like to play these one by one.
22   And the same warning, that they'll be difficult to listen
23   to.
24             THE COURT:  And this is Exhibit 142, correct?
25             MS. GOVERNSKI:  Oh, Your Honor, thank you.
```

```
 1                    THE COURT:  Is it?

 2                    MS. GOVERNSKI:  This is 142.  The voicemails are

 3       separate exhibits.  They're 143, 144, and 145.

 4                    THE COURT:  Okay.  Mark, do you have 143?

 5                    THE COURTROOM DEPUTY:  Yes, I have them.  I have

 6       them, yes.

 7                    MS. GOVERNSKI:  Thank you, Your Honor.  Permission

 8       to play them?

 9                    THE COURT:  Yes, you may.

10                    MS. GOVERNSKI:  Let's start, Mr. Spalding, with

11       143.

12                    (Audio played)

13                    MS. GOVERNSKI:  And let's go to 144.

14                    (Audio played)

15                    MS. GOVERNSKI:  And 145, please.

16                    (Audio played)

17       BY MS. GOVERNSKI:

18       Q.  I'm sorry, Ms. Freeman.  Can you explain what it felt

19       like to receive these messages.

20       A.  It was horrible.  I couldn't believe, you know, I'm

21       getting all these messages, you know, all these voicemails,

22       because I wasn't answering the phone at this point.  And I

23       just -- a lot of racist people out there who just really

24       don't like me.

25                    And it started with this one person that just
```

1   started everything, and now seems like half the world is

2   against me, you know, because they think I did something.

3           I didn't do nothing.

4   Q.  Did you report these threats to the police?

5   A.  Yes, I did, on December 4th.  I went to the police

6   department, and I reported it.

7   Q.  What do you remember about that meeting?

8   A.  Well, the Fulton County Government Center is inside --

9   it's the city of Atlanta, but because Fulton County Police

10  Department is in there -- and I went to them.  I guess I

11  felt close to them because I had worked with Fulton County,

12  so I went there.

13          And we went in the back, and my phone just kept

14  ringing.  And I was telling the lieutenant that I was

15  receiving all these messages and -- you know, about working

16  with the elections.  And the phone just kept ringing and

17  ringing.

18          And she got my phone and she started answering it,

19  and, you know, she would say, "Who is this?"  You know,

20  "Talk to me."  You know, "Come and get me," you know,

21  because they were saying, "We're coming to get you."

22          And she made a police report, and she told me when

23  I got home that Cobb County is to make -- call the police

24  and make a report so they will have it.

25  Q.  Just so I understand your testimony, while you were

1    meeting with the police, your cell phone kept ringing with

2    people making those threats?

3    A.  Yes, because that was still -- that was on the 4th, so

4    the phone was still -- it was just ringing off -- just

5    ringing, ringing, ringing, you know, all day, all morning.

6    It started early that morning.  So it was just ringing

7    nonstop, just ringing.

8              And so she told me, you know -- after I left she

9    told me -- before I left she told me once I left out of

10   there, just turn the phone off.  You know, just turn it off.

11   And that's what I did.  I turned it off.

12   Q.  And did there come a time when you called the police for

13   help?

14   A.  Yes.  When I got home, I called the police.  They came

15   out, and they made a police report.

16             And then later, the next day I think it was, I

17   called the police out.

18   Q.  The next day being January 5th?

19   A.  December --

20   Q.  I mean -- I'm sorry -- December 5, 2020?

21   A.  December 5th, yes.  I called them because people start

22   coming to the house with bullhorns and -- you know, and --

23   you know, they was just coming to get me.

24   Q.  Ms. Freeman, just so I can make sure that the record is

25   clear since I messed up the date, you were saying you called

1    the police on December 5, 2020; is that right?

2    A.  I first called the police on December 4th when I came

3    home from the police department for Fulton County.

4    Q.  And then the next day?

5    A.  And then the next day, yeah, people started coming to

6    the house.

7           MS. GOVERNSKI:  Your Honor, I'd like to play PTX

8    423, which is the 911 call that's been admitted into

9    evidence.

10          THE COURT:  You may publish.

11          MS. GOVERNSKI:  Mr. Spalding, would you please

12   play PTX 423 from 1:49 to 2:36.

13          (Audio played)

14   BY MS. GOVERNSKI:

15   Q.  You were saying they're banging on the door; is that

16   right?

17   A.  Yes.

18   Q.  Do you remember how you felt at the moment when you were

19   calling police on this call?

20   A.  I was scared.  I was scared because now not only am I

21   getting phone calls and emails and stuff, now you're

22   actually coming to the house.

23          And I was just scared.  I was scared because I

24   didn't know -- you know, they're coming to kill me.  I was

25   just scared.  I was scared.

```
 1    Q.  On that call you used the word "terroristic threats."

 2    I'm just wondering why?

 3    A.  Because I was terrorized, so that was my best

 4    description.  I was terrorized.  I felt terrible.  It was

 5    just -- it was horrible.  It was just horrible.

 6    Q.  Did there come a time when things quieted down a little

 7    bit?

 8    A.  Yes.  It got quiet about the second week of December

 9    around about.  It got quiet.  And before Christmas.

10    Q.  Did things stay quiet?

11    A.  No.  It got -- it got crazy again around January the

12    4th; 3rd, 4th.

13            MS. GOVERNSKI:  Your Honor, I'd like to put PTX 1

14    on the screen, which has been admitted.

15            THE COURT:  Yes, it may be published.

16    BY MS. GOVERNSKI:

17    Q.  Ms. Freeman, do you recognize this document?

18    A.  Yes.

19    Q.  What is this?

20    A.  It's the Strategic Communications Plan, Giuliani

21    Presidential Legal Defense Team.  It was dated December --

22    the timeline was December 27th through January 6th.

23    Q.  And that's right around the time when you just --

24    A.  Yeah.

25    Q.  -- were stating that things got crazy again for you?
```

```
 1    A.  Yeah.

 2              MS. GOVERNSKI:  If we can please, Mr. Spalding, go

 3    to Page 20.

 4    Q.  And you can see at the bottom it says Georgia Suitcase

 5    Gate, Video of Ballot Stuffing?

 6    A.  Yes.

 7    Q.  Do you have any impression of the term "video" and the

 8    terms "ballot stuffing"?

 9    A.  It was the video that Giuliani had Tweeted out to his

10    millions of followers in that first video that we saw.

11    Q.  And when you refer to that first Tweet, you're talking

12    about that December 3rd Tweet that we mentioned earlier?

13    A.  Yes, yes.  Me with the purple shirt.

14              THE COURT:  I'm just going to step over here.

15              THE WITNESS:  Shoot.

16              THE COURT:  I want you to lean it over that way.

17              THE WITNESS:  Okay.  Is that better?  Okay.

18              MS. GOVERNSKI:  Thank you, Your Honor.

19    BY MS. GOVERNSKI:

20    Q.  Ms. Freeman, you see your name referenced there in the

21    third-to-last sentence?

22    A.  Yes.

23    Q.  It says "Ruby Freeman (woman in purple shirt on video)."

24    A.  Yes.

25    Q.  And the reference to "woman in purple shirt on video" is
```

1    to that shirt you described earlier to the jury?

2    A.  Yes.

3    Q.  And you see it says, "Ruby Freeman (woman in purple

4    shirt on video), now under arrest," and then at the end it

5    has brackets and in italics *need confirmation of arrest and*

6    *evidence*.

7               Do you see that?

8    A.  Yes.

9    Q.  Ms. Freeman, were you ever arrested in connection with

10   the 2020 presidential election?

11   A.  No.

12   Q.  Have you ever been arrested?

13   A.  No.

14   Q.  Is anything about this sentence true?

15   A.  No.

16   Q.  And what was your reaction to seeing your name in the

17   Giuliani Strategic Communications Plan?

18   A.  When I saw this, it took me back to when it first came

19   out that I had did something.  I always -- I felt that this

20   was a plan.  This was a plan from the beginning that if No.

21   45 didn't win, then they had already set this plan up, and

22   now that my name is on my -- on a shirt, they can fill me in

23   the spaces to this plan they already had put in order.  This

24   was what they were going to do.

25               So now they've got my name, and they put me.  They

```
1    filled in the blanks with my name and my business, because I
2    had a little -- you know, it was LaRuby's Unique Treasures,
3    so I'm the culprit.
4    Q.  What was that last word you said?
5    A.  Culprit.  That may not be the right word.
6    Q.  Ms. Freeman, when you refer to 45, who are you referring
7    to?
8    A.  Former president.
9    Q.  President --
10   A.  I don't even like to call his name, yeah.
11   Q.  Former President Trump?
12   A.  Yes.
13   Q.  Did there come a time in January that you learned about
14   former President Trump using your name?
15   A.  Yes, I did.
16   Q.  How so?
17   A.  I heard the conversation when he called
18   Mr. Raffensperger, Secretary of State for Fulton County,
19   City of Atlanta.
20   Q.  And he said that name on your call?
21   A.  Yes, several times.  I think they said over 18 times.
22   The conversation lasted over an hour with him talking about
23   me stealing the ballots.
24   Q.  That's former President Trump using your name, Ruby
25   Freeman, 18 times?
```

```
1    A.  Yes.

2              MS. GOVERNSKI:  Your Honor, we've already admitted

3    PTX 11, 12, and 575.  I'd like permission to play part of

4    PTX 11 to the jury.

5              THE COURT:  You may publish.

6              MS. GOVERNSKI:  Mr. Spalding, can you please play

7    PTX 111 at 4:04 to 4:22.

8              (Audio played)

9    BY MS. GOVERNSKI:

10   Q.  Ms. Freeman, how did it feel to hear the most powerful

11   person on earth say your name?

12   A.  I just felt like really?  Is this the former president

13   talking about me?  Me?  How mean.  How evil.

14              I just was devastated.  I just -- me?  I didn't do

15   nothing.  It just made me feel like he really don't care.

16   You all are just trying to execute your plan.  You don't

17   care that I'm a real person.  I'm just a real person, and I

18   didn't do anything.

19              MS. GOVERNSKI:  Mr. Spalding, let's play 21:12 to

20   21:47.

21              (Audio played)

22   BY MS. GOVERNSKI:

23   Q.  Ms. Freeman, do you have any reaction to hearing former

24   President Trump use the terms "ballot stuffing"?

25   A.  He didn't know what he was talking about really.  And we
```

1    were stuffing ballots in suitcases.

2              He had no clue what he was talking about.  He was

3    just trying to put a name with somebody stealing ballots,

4    which was totally a lie.

5    Q.  And is that the same language, "stuffing ballots," that

6    we just saw in the strategic plan?

7    A.  Yes.

8    Q.  And what is your reaction to hearing former President

9    Trump saying that the term "Where's Ruby?" was trending

10   online?

11   A.  No, I felt -- once again, I felt bad.  I felt horrible.

12   I'm getting all the death threats.  I'm getting all this

13   mail.  I'm just -- people talking about they're coming to

14   get me.

15             And by him saying "Where is she?" that, to me, was

16   like, Go get her.  Where is she?  She should be arrested by

17   now.  Like you're really telling them to find me and go get

18   me.  I should be arrested.

19             MS. GOVERNSKI:  Let's play, Mr. Spalding, 24:59 to

20   25:29.

21             (Audio played)

22   BY MS. GOVERNSKI:

23   Q.  Ms. Freeman, what was your reaction to hearing former

24   President Trump tell Mr. Raffensperger that your reputation

25   was devastated?

```
 1    A.  My reputation.  It, like, took my reputation.  It was...
 2              What I took out was also all over the Internet.
 3    You put me on blast.  You just messed up my reputation
 4    totally.
 5    Q.  You mentioned earlier that you were concerned with
 6    "Where's Ruby?" online, that people would take that as a cue
 7    to come find you?
 8    A.  Yes.
 9    Q.  And did they?
10    A.  Yeah.  They came.  Yeah, they came looking for me.
11    Q.  To your home?
12    A.  To my home.
13    Q.  When was that?
14    A.  When did they come to my home?  Different ones came to
15    my home around January the 4th.
16    Q.  Tell us about that.
17    A.  Hmm?
18    Q.  Tell us about that.
19    A.  I had people start coming to the home with bullhorns.
20    They were looking for me.  I was just scared, y'all.  It
21    was -- I could have never imagined that happening to anyone,
22    you know, and -- yeah.
23              They was coming to get me, you know, and I just
24    felt this all started with one Tweet.  It just all started
25    with that.
```

1          And now the -- No. 45, the campaign, and

2     Mr. Giuliani just messed me up, you know.  They just messed

3     up my name.  They messed up my business, you know, and they

4     had my daughter involved.

5          It was just -- it was horrible.  It was -- yeah.

6     Q.  Ms. Freeman, you testified that people came to your home

7     around January 4th; is that right?

8     A.  Yes.

9     Q.  About how many people?

10    A.  I don't know.  It was -- it was I would say over ten

11    people that had come to my home.

12    Q.  With bullhorns?

13    A.  Yes.

14    Q.  Were they carrying anything else?

15    A.  They came with bullhorns.  They came with flags.  And,

16    you know -- yeah, they were coming to get me.

17    Q.  And were you at your home?

18    A.  No.

19    Q.  Why not?

20    A.  I had just been advised that I needed to leave my home.

21          And I was like, "Where am I going?"  And I said,

22    "Well, when can I come back home?"

23          And they said, "Not until after the inauguration."

24    So I had to leave my home.

25    Q.  When you said you were advised and "they," who are you

```
1    referring to?

2    A.  The FBI.

3    Q.  And how long did you stay out of your home?

4    A.  Two months.

5    Q.  Beginning on what date?

6    A.  January the 5th.  Yes, January the 5th I left home.  A

7    girlfriend of mine, she and her husband let me stay at their

8    house.  I stayed there for two weeks.

9    Q.  And then where did you stay?

10   A.  And then I was at different Airbnbs.

11   Q.  Did that cost money?

12   A.  Yeah.

13          MS. GOVERNSKI:  Your Honor, the parties have

14   stipulated that Ms. Freeman incurred $6,699 related to the

15   temporary housing during the period between January 5, 2021,

16   and March 2021.  That stipulation is entered into the

17   exhibit that we have provided into evidence.

18   BY MS. GOVERNSKI:

19   Q.  Ms. Freeman, did you make any modifications to your home

20   on Memorial Lane during this period of time when you weren't

21   living there?

22   A.  Yes, I had -- I had to get security cameras and motion

23   sensors, yeah.

24   Q.  Had you ever in your more than 20 years living at

25   Memorial Lane considered getting security cameras?
```

```
1    A.  No.  No, I never thought about getting security cameras.

2    Q.  And did that cost money, Ms. Freeman?

3    A.  Yes, that cost money as well.

4    Q.  The installation and the monitoring?

5    A.  Yes.

6    Q.  Do you still live at Memorial Lane?

7    A.  No.

8    Q.  Why not?

9    A.  I had to move.  I moved out because my address is out

10   there, you know.  So I couldn't stay at home.

11            I was just too scared, and my neighbors were

12   having to watch out for me.  I couldn't -- I was scared to

13   come home at dark, you know.

14            Yeah, I was just scared, so I knew I had to move.

15   Q.  When did you move?

16   A.  I moved November the 6th, 2022.

17   Q.  And did you buy a new home?

18   A.  Yes, I had to buy a new home.

19   Q.  Did you install security cameras at your new home?

20   A.  I have installed new cameras, yes.

21   Q.  And did that cost money?

22   A.  Yes.

23            MS. GOVERNSKI:  Your Honor, the parties have

24   stipulated that Ms. Freeman incurred $4,635 in connection

25   with installing and maintaining security systems for her
```

1    former home at Memorial Lane and her current residence.

2    BY MS. GOVERNSKI:

3    Q.  Ms. Freeman, when did you list your home on Memorial

4    Lane?

5    A.  I didn't list my home until June 2023.

6    Q.  Why did you wait that long?

7    A.  I didn't know where I was going.  I didn't know where I

8    was going, and I had to borrow money from the equity to be

9    able to move and to get -- find somewhere to live, you know,

10   because I didn't have all the money, so...

11   Q.  So, Ms. Freeman, you took equity out of your home on

12   Memorial Lane?

13   A.  Yes.

14           MS. GOVERNSKI:  Your Honor, the parties have

15   stipulated that Ms. Freeman took out $129,000 -- I'm sorry,

16   $129,932 in equity from her home on Memorial Lane in October

17   2022.

18   BY MS. GOVERNSKI:

19   Q.  Ms. Freeman, did these events cause any complications

20   with you purchasing a new home?

21   A.  Yes.

22   Q.  How so?

23   A.  It was hard because I knew I couldn't have a home in my

24   name.  Utilities -- you know, nothing could be in my name,

25   so I had to -- I had to get a lawyer, a certain kind of

1   lawyer, to help me so I wouldn't have nothing in my name.

2   And it was just hard.

3          You know, every time I would pass by the cameras

4   in the house, you know, it was just -- even though I didn't

5   hear nothing, I would always catch myself looking in the

6   cameras to make sure nobody was around the house.  But,

7   yeah, I couldn't have it in my name.

8          And I would go with a bill, and I'd never had to

9   really have anything but the bill.  And I went this one

10  time, and the lady said I needed my ID.

11         And I was like, "No, I don't need my ID."

12         And they was like, "Yes, you do."

13         And it was horrible.  I just -- I tried to be

14  calm.  I tried to explain to the lady I've never had to do

15  it before.  And I can't get my name.

16         And I would leave, and I would go to a different

17  place because I know I didn't have to use my name.  I was

18  just oh, so scared.  I can't use my name no more.  And it's

19  so scary every time I go somewhere, if I have to use my

20  name -- yeah.

21  Q.  Ms. Freeman, do you introduce yourself to your new

22  neighbors?

23  A.  No.  You know, I go and take the trash out and they

24  would be like, you know, "Glad to see you in the

25  neighborhood."  They would tell me their name, and I felt

1   just so -- I was like -- I think one lady I didn't even

2   introduce myself because who am I?  What am I?  What is my

3   name today?  Who am I today?  What name am I going to use?

4          You know, they sent a welcome letter.  You know,

5   they have different stuff going on, karaoke, tennis, you

6   know, different stuff.  And it's like, well, I can't go

7   because I can't use my name so I can't participate in

8   nothing.

9          You know, so it's like, yeah, I have -- I have a

10  home, but I can't do nothing.  I can't -- I can't say who I

11  am.  You know, I'm used to going and meeting somebody, you

12  know, and I have this home store that I go to, and, you

13  know, you see people shopping and saying stuff, and it's

14  like I can't introduce myself no more.

15         You know, and so the home, it's like I miss my old

16  neighborhood because I was me.  I could introduce myself.

17         Now I just don't have -- you know, I don't have a

18  name really.

19  Q.  Ms. Freeman, I want to go back for a second to January

20  5, 2021, which you testified was the day that you left your

21  home, right?

22  A.  Yes.

23  Q.  And that's the day before January 6, 2021?

24  A.  Yes.

25  Q.  Does that date have any meaning to you?

1    A.  Yes.  January 6th was the day that they stormed the

2    Capitol.

3    Q.  So they came -- people came to your house --

4    A.  Before then, yes.  And I remember when I saw it on the

5    television, the January 6th, I remember thinking, you know,

6    that could have been me because of this person, all the

7    stuff going on with the Capitol.

8              And, you know, I felt so bad for the people.  No

9    one helping them.  You know, the ones that got killed and

10   stuff, I felt so bad for them.  I was like, you know, if the

11   FBI hadn't told me to leave, that could have been me because

12   they came to my house, you know.

13             I was just so -- I was just kind of -- I didn't

14   know -- I didn't know if I was mad, hurt, disappointed.  I

15   don't know.  I just was having a whole bunch of emotions.

16   Q.  And at that point you were staying at your friend's

17   home?

18   A.  Yes.

19   Q.  You had mentioned that you only stayed there for a few

20   weeks?

21   A.  Yes.  I got a phone call, and -- I had two phone calls

22   that day -- one day, and they had advised me that -- they'd

23   say whenever something happens they have to call and make a

24   note.  So they had advised me that my name was in this

25   person's wallet on the death list.  It was a list of people,

 1    and my name was on it.

 2           And so then I got a call from somebody else, and

 3    they was asking me about the people that came to my house,

 4    and my girlfriend's husband, I heard him.  He's like, you

 5    know, "It's getting too close to home now."

 6           So, you know, I was so -- I was just -- I just

 7    started packing.  I started packing myself.

 8           And she was like, "Where are you going?"

 9           And I was like, "I don't know."  I said, "I

10    don't know where I'm going, but I'm leaving because I don't

11    want -- I don't want your husband to feel like I'm putting

12    you all in jeopardy now, and your life is threatened because

13    of me being here."

14           And she was like, "Where are you going?"

15           I was like, "I don't know."  I said, "But if it

16    wasn't dark, I would leave now."

17           So that next morning I remember her fixing me a

18    big breakfast.  You know, I felt like a homeless person

19    because, you know, somebody going to feed you and then you

20    got to leave.

21           So she fed me, and then I just left, and I had all

22    my stuff in the car.  I couldn't go back home.  And I was

23    just mad.  I was just mad.

24    Q.  I want to break that apart a little, Ms. Freeman, just

25    so I can make sure the record is clear.

1          You said you received phone calls.  Who did you

2     receive phone calls from?

3     A.  The FBI called, and the other one was from Cobb County

4     Police Department.

5     Q.  And your impression of those calls was that you were on

6     a death list?

7     A.  Yes.  He said that they had arrested somebody, and when

8     they arrested them, that in their wallet or whatever on that

9     person my name was on this list, and there was a death list.

10    And I -- he said whenever anything happened he had to call

11    to let me know.

12          So, yeah.

13    Q.  And you left your friend's home after that?

14    A.  Yeah.

15    Q.  Because you testified you were -- well, can you explain

16    why that prompted you to leave your friend's home again.

17    A.  Because, you know, he was saying, you know, "It's

18    getting too close now.  This is beginning to affect us," you

19    know, with me being there.  And he just felt it was just so

20    ironic that in one day -- you know, nobody called me the

21    whole time, and then one day you had two people calling, and

22    he was not happy.

23          And I -- I didn't -- I couldn't stay there

24    knowing -- I'd rather just stay in my car and just be

25    homeless than to put that on somebody else.  So I just -- I

1    just left.

2    Q.  How did it feel in that moment when you were in your

3    car?

4    A.  Homeless.  Because I have a house, and I can't even go

5    there.  I don't have nowhere to go.  I'm just in my car out

6    on the street.

7              And then I just got -- I just got mad with the

8    people all over again.  This man that's done put out this

9    Tweet and done caused all of this -- all of this, all of

10   this, and I'm just emotional.  I'm just all over the place.

11             I wasn't going to stay with nobody else.  I don't

12   want to  be -- I just -- I don't want to put that on nobody,

13   so I would just -- so yeah, and I went to different Airbnbs.

14   Q.  Was there anyone for you to turn to?

15   A.  No.  No.  No.  No.  No.  Because people were saying

16   like -- you know, even with friends, you know, they were

17   afraid to be associated with me.

18             Yeah, they -- I talked with one lady.  She was a

19   vendor.  And I -- she was called the Shoe Lady.  She was

20   like, "Girl, we heard all this stuff talking about you."

21             I'm like, "Well, why nobody called?  Why did

22   nobody reach out to me?"

23             It's like, "We didn't know if your phone was

24   tapped.  We weren't going to be calling you."

25             So then I didn't have nobody.

1          And then, yeah, I -- I notified my church.  I was

2     trying to get in touch with them.  And finally they called.

3     And I was saying, you know, "Don't look it up now," because

4     you be on the phone and you can tell when somebody's looking

5     up something.

6          I was like, "No.  Wait until you get home with

7     Pastor Young.  Look it up."

8          And they never called me back.  They never called.

9     They never sent no letter.  It was around Christmas, so they

10    didn't -- I didn't get -- they didn't -- they just cut me

11    off.

12         But I had to realize that, you know, they had kind

13    of a big congregation, and they didn't want that on them,

14    you know.  You know, they just didn't want that on their

15    members.

16         I was just hurt.  I was like, Jesus, you know,

17    what is going on?  Why?  What am I to do?  Now that this is

18    happening with me, what am I doing?  What am I doing?

19         And yes, so I didn't know.  I couldn't turn to

20    Shaye because I knew what she was going through.  And my

21    mom, I wouldn't dare.  I wouldn't dare go to her.  I just

22    said, I'll deal with this by myself.

23         No, I didn't have nobody.  People were afraid to

24    be associated with me.

25    Q.  You mentioned Ms. Moss.  You were here yesterday when

1   she testified, right?

2   A.  Yup.

3   Q.  How did it feel to hear her tell her story?

4   A.  Once again, I was just -- to have to go through that,

5   you know, at a young age, just going through.  And I felt so

6   bad for her.  I felt so bad for her.  And even while she was

7   up here to hear people's remarks, you know, I was just --

8   you know, I am a Christian.  I'm like, Fix it, Jesus,

9   because I can't do nothing about this.  Fix it, Jesus.  And

10  to hear them talking and sniggering and stuff, I was just,

11  Okay.  I know you got this, God.  I know you got this.

12          So yeah, I felt bad for her because she really

13  loved her job, you know.  She loved her job.  She would

14  always be there, you know, regardless.  She would always be

15  there and leave my grandson at home to work all the time,

16  you know.  So I felt bad for her.

17  Q.  Ms. Freeman, you talked a little bit about how this all

18  is still impacting your life today.  I'm just wondering if

19  you can explain to the jury at all about how this -- the

20  issues -- the events we've discussed impacts you on a daily

21  basis.

22  A.  You know, I still have -- I'm on an emotional roller

23  coaster from one day to the next, you know.  You know, some

24  days I'm good, and then some days I'm not good.

25          When I heard the alarm was messed up, you know,

1    the -- from the cameras, and it was just beeping, beeping,

2    and I remember going to the -- just trying to find out what

3    it was.  It just kept beeping.

4            And then I went to the -- I called the police

5    because I'm like, What's going on?  Is somebody outside?

6    You know, it's -- you panic.  You have those moments.

7            Still if I'm in the car, I always wear a mask.  I

8    always wear a mask and/or sunglasses so -- because I

9    don't -- I'm afraid, you know.  I'm afraid of people, you

10   know.

11           And some days I'll just go along, and if it's a

12   really bad day, you know, I'll say, Jesus, you know, I don't

13   like your people today.  Not today.  Today's not good,

14   Jesus.  I don't like them today.

15           And, you know, I just talk, you know, and I

16   tell -- I say -- sometimes I say I'm glad I live alone

17   because I'll just go through the house screaming.  You know,

18   it's to keep my sanity.  It may not seem like I'm sane right

19   then, but I'll just go through the house screaming.  I'll

20   just release.  I'll release.

21           Yeah, I'm scared to not be able to do shows

22   anymore, and there's some shows -- like I'm supposed to be

23   doing a show now.  But some shows I do, if I'm the only one,

24   for whatever reason.

25           They had my name up because they know me as Lady

 1    Ruby, but they don't know -- everybody don't know what's

 2    going up, and they'll have my name up and little lanyards

 3    with bling around them, you know, to represent me.  They're

 4    my T-shirts that I don't wear anymore, but they don't know

 5    that.

 6              And I know this one event I did, and -- that

 7    event, and I was so excited because they had my name up, and

 8    I was just so excited.  And this man came up and said, Are

 9    you Lady Ruby:

10              And I'm always like, "Why?"

11              And he said, "Are you the Lady Ruby?"

12              And I walk away, and, you know, I go -- I travel

13    all over the United States to get the latest fashions, and I

14    had to stop going because you have to have your name on your

15    lanyard.

16              I can't go nowhere with my name because they -- so

17    it's like I don't have a life.  I don't have a life.  I

18    don't have a life.  I'm just out here trying to make it

19    happen.

20              But it's sad.  It's scary and it's sad.

21              Just a lot of different things happened that --

22    yeah.

23    Q.  Do you still operate LaRuby's Unique Treasures?

24    A.  No.  I had to change the name.  I had to change the

25    name, and because I changed the name nobody knows me no

1    more.  My brand is gone.  You know, I can't say -- I can't

2    advertise, and I can't do pop-up shops with my name.  I

3    can't -- different people that really know me, you know.

4             People that come from all over the United States

5    wherever I do shows, they will say -- people will get off

6    the elevator, and they'll say, "Oh" -- because you got your

7    name there, they will say, "Are you Lady Ruby?"

8             And I'm like, "Yeah."

9             It's like, "We were told that we didn't need to

10   bring the luggage," you know, and they would shop.

11            But now, you know, it's like that person is gone

12   no more.  I can't just advertise.  And when I do a show, I

13   can't -- you know, I can't do Facebook Live no more.  I

14   can't -- I can't market to other vendors because I'm the

15   prime vendor.  So I have mentees that I teach how to be

16   successful vendors, you know.  I can't do that no more.

17            You know, and people will say, "When are we going

18   back on the road again?"  And I'll just go by myself.  But I

19   go because I can't put nobody else, you know, in harm like

20   that.  So I don't have -- I don't have a name no more.

21            And a name is everything.  If you don't have

22   nothing else, you have your name.  That's the only thing you

23   have in life, is your name.  You know, everything else is

24   either bought or whatever.

25            So my life is just messed up.  It's just really

1   messed up all because of somebody putting me out there on

2   blast, just Tweeting my name out to their millions of

3   followers, and all of them hate me.  Like they just say it,

4   you know, yeah.

5   Q.  So are you Lady Ruby still?

6   A.  No.  I am Lady Ruby, but I can't advertise it, you know

7   what I'm saying?  I can't market it.  I can't do a show, and

8   I got -- I have shows and there I have -- they'll say, "Send

9   your logo, you know, so we can put on the big screen, you

10  know."  I'm the only one that don't have nothing up there

11  because I can't.  Because I don't know who's coming in the

12  hotel, who's coming in the conference center, who's going to

13  know.

14          And then I'm the only one in there with a mask

15  on.  You know, a lot of people don't wear masks anymore.

16  I'm walking around with a mask on because I can't be

17  recognized.

18          And then there are some shows I can't even do

19  because the ones that do know about it, you know, some of

20  them, they're afraid for me to be around, so I can't even do

21  shows.

22          It's -- I'm just -- I'm kind of lost, y'all,

23  you know.  I'm just kind of lost.  It's like, What am I

24  doing?

25          But I still know I have purpose.  I know I have

```
 1    purpose, and so it's going to be all right.

 2              MS. GOVERNSKI:  No further questions.

 3              THE COURT:  Mr. Sibley.

 4              MR. SIBLEY:  Ms. Freeman, it's nice to finally

 5    meet you.

 6              THE WITNESS:  Thank you.

 7              MR. SIBLEY:  I don't have any questions for you.

 8              THE COURT:  Any redirect?

 9              MS. GOVERNSKI:  No, Your Honor.  I just wanted to

10    read into the record a couple of additional stipulations

11    relating to Ms. Freeman.

12              The parties have stipulated that Ms. Freeman

13    incurred $24,946 in monthly mortgage payments on her former

14    home since relocating on November 6, 2022.

15              The parties have stipulated that Ms. Freeman

16    incurred $1,198 of utility payments on her former home since

17    relocating on November 6, 2022, through October 2023.

18              And the parties have stipulated that Ms. Freeman

19    incurred $3,500 in moving expenses.

20              THE COURT:  And is that on a document that is

21    admitted into evidence so that it will be presented to the

22    jury in case they didn't write down all those numbers very

23    quickly?

24              MS. GOVERNSKI:  Yes, Your Honor, it is.

25              THE COURT:  (To the jury) So if you missed some of
```

1    those numbers, it will be sent back with you during your

2    deliberations.

3                MS. GOVERNSKI:  PTX 588.

4                THE COURT:  Okay.

5                MS. GOVERNSKI:  Thank you, Ms. Freeman.

6                THE COURT:  Ms. Freeman, you're excused.  You may

7    leave the witness stand.

8                All right.  Let me just have a brief conversation

9    with counsel.

10               (The following is a bench conference

11                held outside the hearing of the jury)

12               THE COURT:  Okay.  So do the plaintiffs have any

13   other witnesses?

14               MR. GOTTLIEB:  No, Your Honor.

15               THE COURT:  So do you want to rest in front of the

16   jury?

17               MR. GOTTLIEB:  Yes.

18               THE COURT:  And then -- and then we'll start up

19   tomorrow morning with any defense case.

20               MR. SIBLEY:  Yes, Your Honor, and also directed

21   verdict, motions for directed verdict.  I'm just going to

22   make them orally.

23               THE COURT:  Yeah, but how is that going to work

24   since the claim -- there's this default judgment.  You're

25   going to get a defaulted judgment on the damages?  Is

1      that --

2                  MR. SIBLEY:  Well, again, as Her Honor has pointed

3      out, I don't -- I just want to make it for the record.

4                  THE COURT:  Okay.  Okay.

5                  MR. SIBLEY:  I don't know if it does any good or

6      not.

7                  THE COURT:  This is an unusual situation.  I

8      wasn't sure that the motions would be appropriate.

9                  But anyway, so this is what we're going to do.

10     I'm going to excuse the jury, and I think I'd like to have

11     the charging conference tomorrow.  So I'm going to give you

12     my circulation copy of the instructions and a copy of the

13     verdict form I think that I would propose to use.

14                 I'm going to ask the jury to come in starting at

15     10:00 tomorrow morning.  That will give us time to do the

16     charging conference in the morning.

17                 Is that amenable to the plaintiffs?

18                 MR. GOTTLIEB:  Yes, Your Honor.  That works for

19     us.

20                 THE COURT:  And Mr. Sibley?

21                 MR. SIBLEY:  Yes.  You still want us here at 9:00?

22                 THE COURT:  You can be here at 9:00, and hopefully

23     the charging conference will go quite quickly.  I'll tell

24     you about it when I excuse the jury.  But 10:00 for the

25     jury.  9:00 for everybody else.  Okay?

1          (This is the end of the bench conference)

2          THE COURT:  All right, ladies and gentlemen -- do

3    plaintiffs want to make their statement?

4          MR. GOTTLIEB:  Thank you, Your Honor.  The

5    plaintiffs rest.

6          THE COURT:  All right.  So we've now completed the

7    plaintiffs' case-in-chief, and tomorrow morning we're going

8    to turn to the defense case.

9          I'm going to excuse you now with the caution that

10   I make regularly not to discuss the case among yourselves or

11   with anybody else.  I'm going to ask that you come in

12   tomorrow at 10:00.

13         Of course, if you want to come in earlier, we have

14   the snacks and coffee you're welcome to, but I'm not going

15   to bring you in until 10:00.  We have a number of legal

16   issues we're going to take up in the morning, and I don't

17   want to waste your time.

18         So with that, you're excused.

19         (Jury exits courtroom)

20         THE COURT:  All right.  So, Counsel, I'm going to

21   give you the circulation draft of the jury instructions.  I

22   think I've incorporated all the sort of later filings,

23   supplemental filings, on jury instructions that the parties

24   submitted.

25         And I'm going to give -- Mr. Sibley, I'm going to

1    give two copies to you so you can share it with

2    Mr. Giuliani, and I think I've made multiple copies for you

3    all.

4           This is the way I do my charging conference, just

5    so you know what to expect tomorrow morning.  I usually go

6    through my charging conference just Page 1, see if there are

7    any objections.  If not, I go to 2.  I do it just page by

8    page.  We'll isolate which pages have any objections.  We'll

9    focus in on those.

10          And for the verdict form, if you wait just one

11   second you'll see how I have modified the parties' proposal

12   of a jury instruction in a way I think made more sense.  As

13   I mentioned beforehand, did you all -- when I raised the

14   issue, did you all have an opportunity to think about it?

15          MR. SIBLEY:  We did, Your Honor.  I haven't heard

16   back.

17          THE COURT:  I mean, I did get a verdict form that

18   based on the joint pretrial statement both parties agree to,

19   but it's not unusual for me to disagree with the parties

20   even if they agree, although I much appreciate it when the

21   parties confer and agree.

22          MR. GOTTLIEB:  Your Honor, Mr. Sibley has made a

23   proposal along those lines.  I think we agree with pieces of

24   it but not all of it, so I'd be eager to see what the

25   Court --

1          THE COURT:  Okay.  I'm going to submit to you what

2     I think makes sense, and then I'll hear from you about the

3     verdict form probably first thing tomorrow morning.

4          I'm trying to keep it to a limited number of

5     questions and make it, you know, fairly self-explanatory.  I

6     don't want the jury relying on the verdict form.  They've

7     got to rely on the instructions.

8          MR. GOTTLIEB:  We can confer on that when we see

9     the document.

10         THE COURT:  Perfect.

11         MR. SIBLEY:  Would we be able to get those

12    documents in Word format, Your Honor?

13         THE COURT:  I can have my law clerk send you the

14    documents in Word, the verdict form.

15         I usually don't circulate the circulation copy of

16    the draft jury instructions.  You see it right here.  If you

17    have modifications to it, it's pretty much based on what the

18    parties submitted.  So, I mean, you have plenty of it.

19         And we got it on one page.  All right.  So it's

20    not intimidating to the jury.

21         All right.  Anything else today before I see you

22    at 9:00 tomorrow morning?

23         Mr. Sibley?

24         MR. SIBLEY:  Not from the defense, Your Honor.

25         THE COURT:  And Mr. Gottlieb?

1          MR. GOTTLIEB:  No, Your Honor.

2          THE COURT:  Okay.

3          (Whereupon the hearing was

4           concluded at 4:57 p.m.)

5

6          **CERTIFICATE OF OFFICIAL COURT REPORTER**

7

8          I, LISA A. MOREIRA, RDR, CRR, do hereby

9   certify that the above and foregoing constitutes a true and

10  accurate transcript of my stenographic notes and is a full,

11  true and complete transcript of the proceedings to the best

12  of my ability.

13      Dated this 13th day of December, 2023.

14

15                              /s/Lisa A. Moreira, RDR, CRR
16                              Official Court Reporter
                                United States Courthouse
17                              Room 6718
                                333 Constitution Avenue, NW
18                              Washington, DC 20001

19

20

21

22

23

24

25

## $

**$1,198** [1] - 149:16
**$129,000** [1] - 136:15
**$129,932** [1] - 136:16
**$14** [1] - 5:6
**$17** [2] - 8:6
**$19** [1] - 5:13
**$24,946** [1] - 149:13
**$3,500** [1] - 149:19
**$350** [1] - 16:2
**$4,635** [1] - 135:24
**$41** [1] - 5:7
**$47** [1] - 8:7
**$52** [1] - 95:6
**$6,699** [1] - 134:14
**$74** [4] - 5:13, 7:3, 7:5, 7:13
**$74,061,145** [1] - 7:19

## /

**/s/Lisa** - 155:15

## 0

**003** [1] - 110:9

## 1

**1** [12] - 6:8, 6:10, 7:22, 44:12, 44:14, 88:16, 88:20, 89:4, 93:22, 96:25, 126:13, 153:6
**100** [1] - 1:14
**10:00** [4] - 151:15, 151:24, 152:12, 152:15
**11** [4] - 97:1, 105:23, 130:3, 130:4
**110263** [1] - 2:3
**1108** [1] - 2:3
**111** [1] - 130:7
**12** [2] - 97:1, 130:3
**13** [1] - 1:4
**13:53** [1] - 121:16
**13th** [1] - 155:13
**14-foot** [1] - 105:2
**142** [4] - 96:9, 121:6, 121:24, 122:2
**143** [3] - 122:3, 122:4, 122:11
**144** [2] - 122:3, 122:13
**145** [2] - 122:3, 122:15
**146** [1] - 96:9
**149** [2] - 96:9, 120:15
**14th** [1] - 1:18
**150** [3] - 96:9, 120:16
**15:58** [1] - 121:16
**16** [1] - 88:3
**165A** [7] - 97:1,

109:18, 110:8, 111:18, 114:12, 118:23, 119:16
**18** [3] - 116:6, 129:21, 129:25
**1875** [1] - 1:14
**1984** [1] - 104:15
**1987** [1] - 102:9
**1:21** [1] - 1:4
**1:49** [1] - 125:12
**1:53** [1] - 121:16
**1:55** [1] - 121:16
**1st** [1] - 8:4

## 2

**2** [8] - 17:4, 17:11, 17:25, 18:23, 44:12, 90:6, 95:3, 153:7
**20** [4] - 104:21, 127:3, 134:24
**2000** [1] - 105:8
**20001** [2] - 2:10, 155:18
**20006** [1] - 1:15
**2001** [2] - 105:15, 105:16
**2002** [1] - 78:8
**202** [2] - 1:15, 2:10
**2020** [20] - 43:16, 45:4, 84:7, 94:7, 106:1, 106:2, 106:25, 107:2, 107:5, 107:21, 107:22, 107:25, 108:17, 109:7, 109:13, 118:20, 121:14, 124:20, 125:1, 128:10
**2021** [9] - 18:23, 19:2, 90:6, 105:11, 105:14, 134:15, 134:16, 138:20, 138:23
**2022** [5] - 105:11, 135:16, 136:17, 149:14, 149:17
**2023** [11] - 1:4, 5:3, 5:9, 7:20, 7:22, 38:8, 39:14, 88:21, 136:5, 149:17, 155:13
**21-3354** [1] - 1:3
**21:12** [1] - 130:19
**21:47** [1] - 130:20
**22** [1] - 104:21
**22nd** [1] - 119:10
**23** [3] - 45:4, 89:17, 89:21
**237** [3] - 97:1, 108:24, 116:24

**23rd** [4] - 26:23, 26:25, 45:13, 89:13
**24:59** [1] - 131:19
**2526** [1] - 119:16
**25:29** [1] - 131:20
**27** [1] - 96:8
**279A** [1] - 117:2
**27th** [4] - 44:22, 45:8, 45:18, 126:22
**28** [2] - 5:3, 94:7
**287** [1] - 115:17
**288** [1] - 115:21
**28th** [1] - 8:4
**2:36** [1] - 125:12
**2:49** [1] - 109:7
**2:58** [1] - 110:2
**2nd** [3] - 18:22, 88:8, 90:12

## 3

**3** [3] - 107:22, 109:7, 109:13
**30** [1] - 86:24
**303-1016** [1] - 1:15
**30309** [1] - 111:19
**320** [1] - 111:19
**333** [2] - 2:9, 155:17
**345** [2] - 93:17, 93:25
**354-3187** [1] - 2:10
**37** [1] - 73:8
**379** [1] - 112:18
**394** [1] - 96:9
**395** [1] - 114:11
**3:14** [1] - 110:13
**3rd** [8] - 19:2, 26:25, 108:22, 110:4, 111:7, 111:10, 126:12, 127:12

## 4

**4** [1] - 3:4
**403** [3] - 10:12, 70:14, 71:3
**404** [2] - 1:19, 96:9
**416** [1] - 96:9
**420** [1] - 96:9
**423** [3] - 96:10, 125:8, 125:12
**45** [3] - 128:21, 129:6, 133:1
**499** [1] - 96:10
**4:04** [1] - 130:7
**4:22** [1] - 130:7
**4:57** [1] - 155:4
**4th** [14] - 108:22, 109:14, 110:2, 110:4, 110:13, 111:7, 111:10,

123:5, 124:3, 125:2, 126:12, 132:15, 133:7

## 5

**5** [8] - 94:12, 94:25, 95:1, 96:11, 124:20, 125:1, 134:15, 138:20
**502** [1] - 96:10
**510** [5] - 96:10, 96:11, 96:14, 96:16, 99:11
**52** [1] - 95:6
**5201** [3] - 104:19, 119:7, 119:11
**555** [1] - 1:21
**570** [5] - 96:10, 96:11, 96:15, 96:16, 118:9
**571** [4] - 96:10, 96:15, 96:16, 118:10
**575** [2] - 97:1, 130:3
**588** [1] - 150:3
**5:00** [1] - 66:8
**5th** [5] - 1:21, 124:18, 124:21, 134:6

## 6

**6** [7] - 5:9, 7:20, 88:20, 121:14, 138:23, 149:14, 149:17
**608** [4] - 80:13, 80:16, 81:3, 83:9
**619-9819** [1] - 1:22
**6718** [2] - 2:9, 155:17
**6th** [8] - 44:23, 45:8, 45:18, 45:21, 126:22, 135:16, 139:1, 139:5

## 7

**702** [1] - 73:7
**703** [1] - 73:7
**713** [1] - 2:4
**720-8111** [1] - 1:19
**75** [1] - 1:18
**78701** [1] - 2:4
**7th** [1] - 118:20

## 8

**8** [4] - 14:9, 94:12, 94:25, 95:1

## 9

**90** [1] - 117:1
**90013** [1] - 1:22
**911** [3] - 105:23, 106:5, 125:8

**919** [1] - 1:22
**966-6789** [1] - 2:4
**9:00** [4] - 151:21, 151:22, 151:25, 154:22

## A

**a.m** [2] - 110:2, 110:13
**ability** [2] - 43:24, 155:12
**able** [6] - 14:2, 25:22, 66:9, 136:9, 145:21, 154:11
**absolutely** [2] - 53:23, 65:22
**absolve** [1] - 57:7
**accept** [1] - 82:23
**accepted** [2] - 10:1
**according** [3] - 34:10, 51:23, 56:13
**account** [6] - 40:23, 73:23, 85:17, 85:22, 85:24, 86:8
**accountholder** [1] - 5:1
**accurate** [2] - 87:5, 155:10
**accused** [8] - 18:16, 19:23, 19:24, 20:2, 38:25, 40:4, 63:10, 111:15
**Action** [1] - 1:3
**action** [1] - 63:4
**actionable** [2] - 58:8, 93:3
**actual** [1] - 4:25
**ad** [1] - 79:1
**added** [1] - 89:16
**additional** [8] - 87:25, 88:7, 88:14, 89:8, 89:15, 90:5, 90:11, 149:10
**address** [8] - 93:3, 104:18, 112:21, 115:6, 115:8, 119:11, 120:9, 135:9
**addressing** [1] - 35:18
**admission** [2] - 81:2, 81:4
**admit** [1] - 96:7
**admitted** [17] - 6:15, 17:25, 73:8, 93:25, 96:22, 96:25, 99:11, 108:25, 109:18, 118:11, 118:24, 120:15, 121:7, 125:8, 126:14, 130:2, 149:21
**ads** [1] - 55:23

**advanced** [1] - 48:16
**advertise** [5] - 55:11, 104:10, 147:2, 147:12, 148:6
**advertisement** [1] - 55:20
**advertisements** [8] - 35:17, 45:13, 54:15, 55:19, 56:6, 68:9, 68:12, 79:13
**advice** [1] - 11:11
**advised** [4] - 133:20, 133:25, 139:22, 139:24
**affect** [3] - 45:21, 53:19, 141:18
**affected** [2] - 41:3, 41:10
**affirming** [1] - 42:6
**afraid** [5] - 142:17, 143:23, 145:9, 148:20
**AFTERNOON** [1] - 1:9
**afternoon** [10] - 4:12, 4:13, 74:10, 74:11, 74:12, 95:15, 97:9, 97:10, 97:15, 121:19
**age** [2] - 29:15, 144:5
**agencies** [3] - 40:18, 40:19, 78:18
**agency** [1] - 91:24
**agenda** [1] - 85:1
**ago** [4] - 12:3, 67:2, 76:2, 116:24
**agree** [10] - 18:2, 47:16, 50:25, 55:8, 55:13, 74:19, 153:18, 153:20, 153:21, 153:23
**agreed** [1] - 74:15
**agreement** [4] - 52:13, 52:18, 52:23, 96:6
**ahead** [1] - 21:12
**aiming** [1] - 45:8
**Airbnbs** [2] - 134:10, 142:13
**al** [2] - 1:3, 17:12
**alarm** [1] - 144:25
**Alex** [2] - 10:21, 11:25
**allegation** [1] - 82:10
**allegations** [7] - 18:3, 18:4, 18:7, 18:11, 18:13, 18:15, 61:10
**almost** [5] - 46:15, 65:19, 66:2, 66:6, 93:8
**alone** [1] - 145:16
**ALSO** [1] - 2:6
**amenable** [1] - 151:17
**Amendment** [1] - 64:9

**America** [7] - 51:1, 52:2, 52:4, 52:6, 52:10, 52:14, 53:19
**American** [2] - 51:7, 97:16
**AMNO** [1] - 112:9
**amount** [4] - 13:15, 13:24, 40:9, 40:11
**analyses** [1] - 84:19
**analysis** [16] - 12:4, 24:8, 24:9, 24:16, 25:18, 34:24, 35:1, 59:3, 87:9, 87:18, 88:9, 90:12, 90:17, 90:21, 90:23
**analyze** [1] - 30:25
**analyzed** [5] - 26:21, 87:13, 87:15, 88:3, 90:11
**Angeles** [1] - 1:22
**ANNIE** [1] - 1:13
**annotation** [1] - 46:15
**answer** [7] - 7:8, 12:11, 18:8, 22:9, 41:17, 41:19, 41:23, 43:24, 70:25, 71:18
**answered** [4] - 25:24, 59:17, 72:13, 73:17
**answering** [3] - 87:1, 122:22, 123:18
**anti** [1] - 50:8
**anti-Semitic** [1] - 50:8
**antiabortion** [1] - 21:25
**anticipated** [1] - 75:5
**anyway** [1] - 151:9
**apart** [1] - 140:24
**apologize** [1] - 110:25
**apology** [3] - 56:20, 57:15, 58:13
**appeal** [1] - 54:9
**appear** [2] - 7:19, 45:18
**APPEARANCES** [2] - 1:11, 2:1
**applied** [1] - 74:4
**apply** [2] - 6:13, 84:15
**appreciate** [2] - 53:16, 153:20
**approach** [3] - 5:16, 16:25, 118:11
**approaching** [1] - 5:18
**appropriate** [1] - 151:8
**area** [3] - 101:11, 104:17, 104:25
**Arena** [6] - 107:17, 107:25, 108:4, 114:4, 114:6, 116:19
**arena** [1] - 108:6
**Arizona** [2] - 46:21

**arrest** [2] - 128:4, 128:5
**arrested** [6] - 128:9, 128:12, 131:16, 131:18, 141:7, 141:8
**articles** [2] - 88:7, 88:14
**ASHLEE** [1] - 3:3
**aspect** [1] - 41:21
**aspects** [1] - 70:6
**asserted** [1] - 96:8
**assess** [1] - 64:17
**assessment** [4] - 71:25, 90:24, 91:4
**assigned** [1] - 38:17
**assignment** [9] - 14:19, 40:5, 40:7, 40:25, 59:14, 59:15, 59:24, 60:2, 101:16
**assist** [1] - 14:2
**assistance** [1] - 78:12
**assisting** [1] - 78:13
**associate** [1] - 101:8
**associated** [5] - 20:16, 20:20, 21:19, 142:17, 143:24
**assume** [2] - 67:12, 78:22
**assumed** [2] - 69:13, 110:21
**assumes** [1] - 76:6
**assumptions** [1] - 43:21
**ate** [1] - 99:2
**athletes** [1] - 38:6
**Atlanta** [9] - 1:18, 101:11, 101:12, 102:10, 102:11, 104:17, 123:9, 129:19
**attempting** [1] - 76:24
**attention** [4] - 8:20, 114:13, 115:20, 116:10
**attorney** [2] - 79:6, 79:7
**attorneys** [7] - 11:17, 12:10, 27:9, 27:15, 59:22, 64:3, 64:4
**audacity** [1] - 101:7
**audience** [10] - 51:13, 58:21, 58:22, 59:3, 59:5, 61:24, 62:3, 86:12, 86:15, 92:1
**audio** [8] - 120:20, 122:12, 122:14, 122:16, 125:13, 130:8, 130:21, 131:21
**Austin** [1] - 2:4

**Avenue** [2] - 2:9, 155:17
**average** [3] - 51:1, 51:20, 70:12
**award** [8] - 14:9, 61:1, 68:15, 70:12, 89:24, 91:3, 92:12, 92:19
**Award** [1] - 60:25
**awarded** [2] - 13:15, 14:6
**awards** [1] - 92:16
**aware** [48] - 34:5, 34:8, 34:10, 38:4, 39:19, 39:20, 45:11, 48:10, 48:15, 48:20, 49:13, 49:19, 49:22, 52:6, 52:9, 52:18, 52:19, 52:21, 54:2, 56:23, 57:1, 57:9, 57:10, 57:25, 58:1, 60:13, 60:16, 60:23, 61:1, 63:4, 63:7, 67:23, 68:2, 69:16, 69:18, 70:3, 70:21, 71:1, 75:20, 75:25, 76:1, 76:11, 77:9, 77:24, 78:2, 78:19, 84:6, 91:20
**awareness** [1] - 52:12

# B

**back-to-back** [1] - 121:13
**background** [1] - 22:10
**bad** [10] - 99:24, 114:22, 131:11, 139:8, 139:10, 144:6, 144:12, 144:16, 145:12
**badgering** [1] - 59:17
**bag** [1] - 100:2
**bags** [3] - 117:24, 118:2, 118:4
**balloon** [1] - 119:25
**Ballot** [1] - 127:5
**ballot** [2] - 127:8, 130:24
**Ballots** [1] - 47:25
**ballots** [10] - 106:13, 107:6, 107:11, 107:13, 108:1, 116:1, 129:23, 131:1, 131:3, 131:5
**bandied** [1] - 93:20
**banging** [1] - 125:15
**banned** [2] - 9:24, 10:9
**baseball** [1] - 102:19
**based** [37] - 4:21,

10:25, 11:25, 12:6, 13:3, 13:19, 18:11, 18:13, 18:15, 20:21, 30:10, 30:14, 30:20, 36:3, 47:16, 48:18, 52:9, 56:24, 57:4, 59:2, 61:12, 70:16, 70:23, 71:21, 72:4, 72:20, 72:22, 73:6, 73:24, 84:22, 86:6, 89:9, 91:3, 93:5, 94:22, 153:18, 154:17
**bases** [1] - 74:1
**basis** [2] - 81:5, 144:21
**batch** [1] - 95:23
**Bates** [2] - 110:8
**batting** [1] - 102:19
**became** [3] - 52:20, 63:7, 100:8
**become** [1] - 52:19
**beeping** [3] - 145:1, 145:3
**BEFORE** [1] - 1:9
**beforehand** [1] - 153:13
**beg** [1] - 21:13
**begin** [1] - 95:22
**beginning** [3] - 128:20, 134:5, 141:18
**behind** [1] - 117:22
**belief** [2] - 40:19, 43:11
**beliefs** [2] - 62:11, 84:23
**believes** [1] - 36:19
**bench** [10] - 17:16, 17:23, 53:3, 53:25, 73:3, 74:7, 81:7, 83:8, 150:10, 152:1
**benefit** [1] - 35:22
**Bernard** [1] - 94:5
**BERYL** [1] - 1:9
**best** [4] - 32:1, 43:24, 126:3, 155:11
**better** [3] - 58:14, 116:11, 127:17
**between** [9] - 5:6, 8:6, 52:13, 62:22, 87:18, 87:22, 90:9, 94:12, 134:15
**beyond** [1] - 66:8
**bias** [1] - 22:7
**biased** [1] - 82:10
**Biden** [3] - 10:6, 45:22, 60:15
**big** [8] - 21:24, 60:17, 105:2, 106:12,

116:13, 140:18,
143:13, 148:9
**bill** [2] - 137:8, 137:9
**billboard** [3] - 55:14,
79:1, 79:5
**binder** [1] - 44:11
**biscuits** [1] - 98:23
**bit** [10] - 26:5, 53:8,
56:20, 100:5, 100:6,
103:17, 104:22,
119:21, 126:7,
144:17
**black** [1] - 118:21
**blacks** [1] - 106:21
**blanks** [1] - 129:1
**blast** [2] - 132:3, 148:2
**blessed** [1] - 105:13
**bling** [1] - 146:3
**blinged** [1] - 113:25
**BLM** [1] - 112:1
**book** [6] - 77:7, 77:11,
101:21, 101:23,
102:6
**books** [1] - 77:11
**born** [1] - 104:15
**borrow** [1] - 136:8
**bottle** [1] - 98:24
**bottles** [1] - 98:25
**bottom** [3] - 42:4,
70:9, 127:4
**bought** [2] - 102:16,
147:24
**bound** [1] - 7:16
**boutique** [4] - 97:17,
100:2, 103:16,
110:21
**brackets** [1] - 128:5
**brand** [4] - 50:6,
50:14, 79:15, 147:1
**Brandon** [1] - 51:22
**Braves** [2] - 102:11,
103:20
**break** [5] - 65:19,
65:23, 81:11, 82:5,
140:24
**breakfast** [1] - 140:18
**breast** [1] - 12:23
**brick** [3] - 104:5,
104:6, 104:9
**brief** [1] - 150:8
**briefly** [1] - 33:8
**bring** [3] - 4:3, 147:10,
152:15
**broad** [1] - 40:22
**broadly** [1] - 50:4
**brought** [4] - 16:10,
99:21, 99:22, 100:23
**bullhorns** [4] - 124:22,
132:19, 133:12,
133:15

**bunch** [2] - 82:17,
139:15
**buried** [4] - 29:17,
41:20, 43:10, 43:21
**business** [6] - 13:5,
104:24, 113:21,
113:23, 129:1, 133:3
**busy** [1] - 108:13
**Butowsky** [2] - 67:1,
67:10
**buy** [2] - 135:17,
135:18
**buying** [1] - 110:22
**BY** [40] - 4:11, 6:24,
17:5, 18:1, 29:21,
39:15, 42:3, 47:8,
54:1, 57:24, 59:19,
66:18, 71:5, 71:13,
72:8, 74:9, 76:10,
77:5, 80:14, 83:11,
84:5, 94:3, 97:8,
109:3, 111:3,
115:12, 117:4,
118:13, 119:2,
120:21, 122:17,
125:14, 126:16,
127:19, 130:9,
130:22, 131:22,
134:18, 136:2,
136:18

## C

**CA** [1] - 1:22
**calculate** [1] - 37:5
**calculating** [1] - 92:25
**calculation** [1] - 73:24
**calculations** [1] -
30:21, 73:25, 93:1
**calm** [1] - 137:14
**CAMARA** [1] - 2:2
**cameras** [1] - 21:23,
108:12, 134:22,
134:25, 135:1,
135:19, 135:20,
137:3, 137:6, 145:1
**campaign** [38] - 35:16,
36:5, 37:18, 38:22,
39:1, 45:1, 45:12,
49:16, 50:9, 50:12,
54:24, 55:25, 56:9,
56:15, 57:12, 58:15,
62:7, 62:10, 65:16,
67:25, 68:5, 68:12,
68:17, 68:20, 69:1,
69:20, 75:19, 78:4,
78:9, 78:13, 86:4,
89:12, 90:4, 91:7,
94:11, 94:16, 95:4,
133:1

**campaigns** [12] -
40:18, 43:5, 49:14,
49:24, 54:13, 77:17,
77:22, 77:24, 78:20,
78:23, 91:17, 91:20
**candidates** [1] - 107:6
**candy** [9] - 98:18,
99:3, 99:4, 99:5,
99:6, 99:7, 99:8,
99:9
**canned** [1] - 98:23
**Capitol** [4] - 114:16,
114:22, 139:2, 139:7
**car** [5] - 140:22,
141:24, 142:3,
142:5, 145:7
**care** [2] - 130:15,
130:17
**career** [1] - 54:22
**Carroll** [2] - 13:8, 54:8
**Carroll/Trump** [1] -
49:8
**carrying** [1] - 133:14
**case** [139] - 5:4, 9:1,
9:9, 10:23, 10:24,
11:1, 11:2, 11:3,
11:14, 12:1, 12:2,
12:6, 12:15, 12:16,
12:25, 13:14, 13:16,
13:25, 14:15, 14:16,
14:19, 14:22, 15:8,
15:11, 15:13, 15:16,
15:19, 15:24, 16:4,
16:7, 16:10, 16:15,
16:16, 16:18, 16:20,
16:23, 17:19, 18:4,
18:19, 19:8, 19:16,
19:18, 19:21, 19:22,
20:10, 20:19, 22:13,
27:3, 27:5, 30:18,
30:20, 34:5, 34:11,
34:19, 34:25, 35:8,
36:25, 37:1, 37:17,
37:19, 40:5, 40:13,
41:11, 49:5, 49:8,
49:18, 50:18, 52:13,
54:6, 54:7, 55:2,
57:18, 59:7, 59:24,
62:2, 62:3, 66:9,
66:24, 66:25, 67:1,
67:3, 67:4, 67:5,
67:11, 67:12, 67:17,
68:14, 69:17, 70:13,
70:17, 70:19, 70:21,
71:1, 71:2, 71:19,
72:1, 72:17, 77:21,
80:8, 80:21, 80:22,
80:25, 81:15, 81:20,
81:22, 83:17, 83:23,
84:7, 84:15, 84:20,

85:7, 85:10, 85:11,
87:24, 88:22, 90:25,
91:4, 91:8, 91:21,
92:9, 92:10, 92:13,
92:16, 92:19, 93:4,
93:6, 94:5, 94:22,
95:5, 104:14,
116:16, 149:22,
150:19, 152:7,
152:8, 152:10
**case-in-chief** [1] -
152:7
**caseload** [1] - 85:11
**cases** [27] - 10:18,
10:19, 13:8, 13:11,
13:13, 13:17, 21:1,
22:11, 22:25, 30:24,
48:15, 49:20, 49:21,
66:21, 70:8, 70:18,
71:7, 71:17, 79:21,
79:23, 80:1, 80:8,
82:11, 82:18, 82:19,
84:13, 84:14
**catch** [1] - 137:5
**caught** [1] - 8:20
**caused** [1] - 142:9
**caution** [1] - 152:9
**cell** [1] - 124:1
**Center** [4] - 107:3,
107:5, 107:12, 123:8
**center** [2] - 107:16,
148:12
**cents** [1] - 98:22
**certain** [10] - 10:9,
13:15, 38:13, 40:9,
40:11, 59:25, 61:18,
95:23, 105:5, 136:25
**certainly** [2] - 50:21,
84:14
**certainty** [2] - 4:17,
4:21
**CERTIFICATE** [1] -
155:6
**certification** [1] -
45:22
**certify** [1] - 155:9
**chair** [1] - 95:25
**challenging** [1] -
100:13
**change** [17] - 24:22,
36:20, 37:15, 40:9,
41:2, 41:6, 41:9,
42:20, 42:21, 42:24,
43:2, 58:15, 88:10,
89:20, 90:9, 146:24
**changed** [15] - 24:18,
24:24, 25:2, 25:5,
25:7, 26:3, 26:4,
26:5, 41:13, 42:15,
88:13, 88:25, 90:2,

108:19, 146:25
**changing** [3] - 36:20,
43:15, 87:9
**channels** [1] - 10:10
**character** [1] - 112:15
**characterization** [2] -
21:11, 26:6
**charging** [5] - 151:11,
151:16, 151:23,
153:4, 153:6
**cheaten** [1] - 118:21
**check** [3] - 19:14,
96:18, 107:5
**checker** [1] - 9:16
**checking** [1] - 8:25
**Chicago** [2] - 79:2,
79:4
**Chicken** [1] - 103:9
**chief** [1] - 152:7
**child** [1] - 98:17
**childhood** [2] - 100:4,
104:16
**chose** [1] - 98:4
**Christian** [2] - 97:17,
144:8
**Christians** [1] - 101:2
**Christmas** [2] - 126:9,
143:9
**church** [2] - 104:2,
143:1
**circulate** [1] - 154:15
**circulated** [1] - 85:18
**circulation** [2] -
151:12, 152:21,
154:15
**cited** [1] - 9:10
**citizen** [1] - 97:16
**Citizens** [2] - 60:15,
60:21
**city** [1] - 123:9
**City** [1] - 129:19
**Civil** [1] - 1:3
**claim** [3] - 37:23,
86:25, 150:24
**claiming** [1] - 42:5
**claims** [9] - 10:7,
35:20, 36:8, 36:14,
38:9, 39:18, 42:7,
81:21, 84:10
**clarity** [1] - 119:15
**class** [1] - 54:21
**classifies** [1] - 9:18
**classy** [1] - 97:20
**cleaners** [2] - 105:5
**cleanly** [1] - 41:22
**clear** [8] - 13:3,
69:21, 74:4, 88:20,
93:19, 95:16,
105:16, 124:25,
140:25

**clerk** [1] - 154:13
**clients** [1] - 86:9
**clients'** [1] - 86:17
**close** [4] - 114:16, 123:11, 140:5, 141:18
**closer** [1] - 115:10
**clothes** [2] - 98:14, 103:23
**clothing** [6] - 102:8, 102:9, 102:14, 102:15, 102:24, 104:1
**clue** [1] - 131:2
**CNN** [1] - 51:22
**co** [1] - 65:12
**coached** [2] - 81:11, 82:4
**coaches** [1] - 102:20
**coaster** [1] - 144:23
**Cobb** [3] - 104:18, 123:23, 141:3
**coded** [1] - 9:7
**coffee** [1] - 152:14
**collected** [1] - 24:19
**college** [5] - 105:10, 105:11, 105:12, 105:17
**color** [2] - 98:19, 113:22
**colors** [2] - 98:19, 113:24
**COLUMBIA** [1] - 1:1
**coming** [17] - 113:6, 117:21, 117:22, 117:23, 120:9, 123:21, 124:22, 124:23, 125:5, 125:22, 125:24, 131:13, 132:19, 132:23, 133:16, 148:11, 148:12
**comment** [2] - 115:20, 115:22
**commentary** [1] - 26:6
**commit** [1] - 36:13
**common** [3] - 49:15, 71:16, 79:18
**communicated** [1] - 28:22
**communication** [5] - 33:7, 45:17, 76:20, 110:20, 112:21
**Communications** [18] - 40:23, 44:19, 45:7, 45:15, 47:17, 48:3, 62:17, 63:19, 63:25, 64:2, 93:10, 93:20, 94:7, 94:19, 94:23, 94:24, 126:20,

128:17
**communications** [9] - 11:16, 11:24, 75:24, 78:23, 91:25, 92:2, 93:13, 110:4, 115:13
**community** [1] - 60:11
**companies** [5] - 50:4, 55:8, 55:11, 77:21, 78:12
**company** [2] - 12:23, 12:24
**compared** [1] - 70:7
**complaint** [22] - 16:22, 16:24, 17:19, 18:7, 18:13, 18:15, 19:4, 52:20, 80:20, 81:12, 81:14, 81:17, 81:25, 82:1, 82:2, 82:9, 82:21, 83:13, 83:14, 83:20, 84:8
**complaints** [1] - 82:24
**complete** [2] - 12:3, 155:11
**completed** [2] - 12:7, 152:6
**complications** [1] - 136:19
**compound** [2] - 25:25, 43:10
**CONANT** [1] - 1:13
**concept** [1] - 85:21
**concerned** [1] - 132:5
**concluded** [1] - 155:4
**conclusion** [7] - 18:6, 21:14, 26:18, 35:10, 42:21, 86:14, 91:10
**conclusions** [10] - 4:20, 4:23, 21:16, 24:15, 26:4, 41:3, 41:10, 41:13, 84:20, 94:22
**conduct** [1] - 65:10
**conducted** [1] - 40:23
**confer** [2] - 153:21, 154:8
**conference** [17] - 17:16, 17:23, 53:3, 53:25, 73:3, 74:7, 76:1, 81:7, 83:8, 148:12, 150:10, 151:11, 151:16, 151:23, 152:1, 153:4, 153:6
**conferred** [1] - 66:5
**confirmation** [1] - 128:5
**congregation** [1] - 143:13
**connection** [7] - 25:11, 31:5, 31:13,

33:12, 107:25, 128:9, 135:24
**Conservative** [1] - 46:1
**conservative** [1] - 83:3
**consider** [8] - 4:14, 33:18, 33:24, 51:11, 69:9, 90:18, 91:17, 106:23
**consideration** [2] - 7:25, 8:3
**considered** [3] - 52:1, 85:14, 134:25
**consistent** [2] - 71:9, 74:5
**conspiracy** [4] - 33:20, 44:25, 45:1, 65:13
**conspirators** [1] - 65:13
**constitutes** [1] - 155:9
**Constitution** [2] - 2:9, 155:17
**consult** [4] - 15:20, 15:25, 16:5, 27:4
**consulted** [1] - 24:19
**consulting** [3] - 10:24, 11:7, 11:15
**contact** [3] - 29:5, 29:23, 34:14
**contacted** [4] - 27:2, 27:5, 27:7, 27:8
**contained** [1] - 118:25
**contendere** [2] - 69:9, 69:11
**content** [1] - 110:24
**contents** [1] - 89:3
**contest** [2] - 69:17, 69:20
**context** [1] - 110:20
**continued** [2] - 1:24, 76:17
**CONTINUED** [1] - 2:1
**continues** [2] - 75:20, 76:12
**contributed** [1] - 26:17
**controversy** [2] - 21:24, 77:7
**conventions** [1] - 104:2
**conversation** [4] - 28:12, 129:17, 129:22, 150:8
**conversations** [1] - 33:9
**convert** [2] - 62:6, 62:11
**convincing** [1] - 62:13
**Coomer** [1] - 54:3
**coordinated** [1] - 30:5

**copies** [2] - 153:1, 153:2
**cops** [1] - 112:1
**copy** [4] - 96:16, 151:12, 154:15
**coronavirus** [1] - 10:3
**correct** [81] - 5:5, 5:8, 7:24, 8:2, 8:7, 8:18, 8:22, 9:14, 10:22, 13:4, 13:6, 13:10, 13:23, 14:21, 15:10, 16:8, 16:17, 16:21, 18:17, 18:18, 19:5, 19:17, 22:14, 22:17, 24:7, 24:10, 24:12, 24:13, 24:20, 24:21, 25:16, 27:1, 27:24, 30:7, 30:16, 31:1, 31:17, 32:15, 33:1, 33:2, 33:21, 34:3, 34:4, 35:6, 35:13, 36:23, 38:16, 38:21, 40:16, 50:1, 58:11, 59:14, 59:24, 63:20, 64:5, 67:7, 67:13, 77:23, 78:21, 78:24, 81:1, 83:15, 83:16, 86:2, 86:7, 86:19, 88:5, 88:14, 89:14, 89:15, 89:19, 90:1, 90:8, 90:20, 91:19, 92:21, 93:22, 93:23, 94:21, 121:24
**corrective** [2] - 37:18, 50:9
**correspond** [1] - 23:14
**correspondence** [7] - 28:15, 28:18, 29:1, 29:23, 31:4, 31:11, 31:14
**cost** [18] - 35:11, 37:5, 63:18, 73:24, 89:12, 89:24, 90:3, 91:7, 93:14, 94:15, 94:23, 94:25, 95:2, 95:5, 134:11, 135:2, 135:3, 135:21
**cost-to-repair** [2] - 89:12, 90:3
**costs** [3] - 74:21, 75:4, 75:14
**coughing** [1] - 99:23
**coughs** [1] - 99:17
**counsel** [19] - 4:24, 11:5, 23:17, 28:16, 29:2, 29:6, 29:24, 30:2, 30:11, 30:14, 30:18, 30:22, 31:15, 66:21, 66:23, 67:7, 67:13, 99:20, 150:9

**Counsel** [1] - 152:20
**counter** [5] - 37:5, 39:22, 42:5, 43:15, 67:25
**counting** [1] - 107:16
**County** [22] - 102:10, 104:18, 105:18, 105:21, 105:22, 105:23, 106:1, 106:5, 106:11, 106:16, 106:18, 107:3, 107:4, 107:12, 108:6, 123:8, 123:9, 123:11, 123:23, 125:3, 129:18, 141:3
**county** [1] - 106:12
**couple** [6] - 5:12, 13:8, 28:24, 76:2, 107:19, 149:10
**Courage** [1] - 60:25
**courage** [1] - 61:9
**course** [6] - 12:13, 67:12, 100:20, 100:25, 104:8, 152:13
**COURT** [137] - 1:1, 4:2, 4:5, 4:7, 5:18, 5:22, 6:1, 6:6, 6:11, 6:13, 6:20, 7:8, 10:13, 11:14, 11:22, 16:14, 17:1, 17:14, 17:18, 17:22, 17:24, 18:8, 20:11, 21:6, 21:10, 22:5, 22:9, 26:1, 28:9, 28:12, 29:17, 29:20, 31:9, 31:22, 39:4, 41:16, 42:1, 43:10, 43:20, 44:6, 46:24, 47:5, 52:17, 53:2, 53:5, 53:12, 53:16, 53:23, 57:22, 59:18, 65:22, 66:1, 66:11, 66:15, 68:22, 70:15, 70:22, 71:4, 71:12, 71:23, 72:7, 72:14, 72:24, 73:5, 73:15, 74:6, 76:7, 77:4, 78:16, 79:11, 81:6, 81:9, 81:14, 81:24, 82:6, 82:15, 82:25, 83:7, 83:9, 84:2, 84:4, 84:18, 91:11, 93:19, 93:24, 94:2, 95:10, 95:12, 95:15, 95:18, 95:25, 96:12, 96:14, 96:17, 96:21, 97:2, 97:4, 99:25, 109:2, 109:20, 115:9,

118:12, 120:17,
121:9, 121:24,
122:1, 122:4, 122:9,
125:10, 126:15,
127:14, 127:16,
130:5, 149:3, 149:8,
149:20, 149:25,
150:4, 150:6,
150:12, 150:15,
150:18, 150:23,
151:4, 151:7,
151:20, 151:22,
152:2, 152:6,
152:20, 153:17,
154:1, 154:10,
154:13, 154:25,
155:2, 155:6
**Court** [9] - 2:8, 2:8,
22:4, 32:2, 53:22,
111:1, 112:10,
153:25, 155:16
**court** [2] - 6:18, 76:2
**Court's** [3] - 21:14,
82:22, 96:6
**Courthouse** [2] - 2:9,
155:16
**courtroom** [4] - 4:6,
65:24, 66:14, 152:19
**COURTROOM** [3] -
47:4, 95:17, 122:5
**courts** [1] - 71:9
**COVID** [3] - 9:22, 10:1,
29:15
**crashed** [1] - 115:16
**crazy** [3] - 109:16,
126:11, 126:25
**create** [1] - 25:22
**criminal** [1] - 111:13
**criminals** [1] - 111:25
**crisis** [1] - 50:7
**cross** [4] - 4:9, 66:7,
80:23, 87:9
**CROSS** [1] - 4:10
**cross-examination**
- 4:9, 80:23
**CROSS-**
**EXAMINATION** [1] -
4:10
**crowded** [1] - 95:18
**CRR** [2] - 2:8, 155:8,
155:15
**cue** [1] - 132:6
**culprit** [2] - 129:3,
129:5
**curb** [1] - 119:25
**current** [1] - 136:1
**cut** [3] - 116:12, 118:3,
143:10

**D**

**daily** [1] - 144:20
**damage** [3] - 11:8,
36:6, 37:18
**damaged** [1] - 77:7
**damages** [31] - 5:6,
5:12, 7:2, 7:13, 7:15,
7:16, 10:25, 21:2,
22:16, 26:7, 36:17,
36:21, 36:24, 37:1,
53:20, 57:18, 62:5,
67:25, 73:13, 73:19,
73:24, 86:6, 88:25,
89:5, 89:8, 89:24,
91:3, 92:13, 92:22,
93:5, 150:25
**damaging** [1] - 75:2
**dare** [2] - 143:21
**dark** [2] - 135:13,
140:16
**data** [8] - 5:1, 9:11,
9:12, 24:19, 51:23,
73:21, 90:22, 91:6
**date** [4] - 18:20,
124:25, 134:5,
138:25
**dated** [5] - 7:20, 18:21,
94:7, 110:2, 126:21
**Dated** [1] - 155:13
**dates** [1] - 45:17
**daughter** [7] - 97:16,
104:13, 105:9,
114:15, 114:21,
121:1, 133:4
**days** [9] - 76:2, 94:19,
95:1, 107:19, 108:6,
108:9, 144:24,
145:11
**DC** [3] - 1:15, 2:10,
155:18
**dead** [1] - 111:24
**Dead** [1] - 47:22
**deal** [4] - 60:17, 75:13,
116:12, 143:22
**dealt** [1] - 107:13
**death** [4] - 131:12,
139:25, 141:6, 141:9
**December** [44] - 1:4,
5:23, 7:22, 8:4,
18:22, 19:1, 26:23,
26:25, 44:22, 45:4,
45:8, 45:13, 45:18,
87:14, 88:2, 89:13,
89:17, 89:21, 94:7,
108:22, 109:7,
109:13, 110:2,
110:4, 110:13,
111:7, 111:10,
118:20, 119:10,

121:13, 123:5,
124:19, 124:20,
124:21, 125:1,
125:2, 126:8,
126:21, 126:22,
127:12, 155:13
**decide** [2] - 60:4,
106:3
**decided** [2] - 30:13,
105:25
**decision** [1] - 106:18
**declined** [1] - 74:3
**deemed** [1] - 9:24
**defamation** [24] -
10:19, 12:16, 18:16,
18:18, 19:22, 20:4,
20:25, 22:11, 26:22,
48:11, 49:21, 50:18,
67:5, 70:4, 70:8,
70:12, 70:18, 71:8,
72:17, 84:10, 85:10,
93:5, 93:7
**defamatory** [3] - 34:1,
44:16, 58:8
**defamed** [3] - 12:23,
48:11, 55:1
**defamer** [1] - 56:21
**default** [1] - 150:24
**defaulted** [1] - 150:25
**defend** [1] - 76:25
**Defendant** [4] - 1:6,
76:11, 96:8, 109:6
**defendant** [5] - 20:3,
67:8, 67:10, 85:7,
116:16
**Defendant's** [6] - 6:9,
17:3, 17:11, 88:16,
88:20, 89:4
**defendants** [3] - 21:2,
31:7, 85:4
**defense** [3] - 150:19,
152:8, 154:24
**Defense** [3] - 6:8,
17:24, 126:21
**DEFENSE** [1] - 2:2
**define** [2] - 18:9, 60:1
**definitely** [1] - 106:20
**definitionally** [1] -
53:22
**degree** [1] - 4:17
**degrees** [1] - 4:21
**deliberations** [2] -
6:16, 150:2
**delve** [1] - 11:24
**delving** [1] - 11:15
**Democracy** [2] - 80:5,
80:9
**DEMOCRACY** [1] -
1:21
**demonic** [1] - 119:13

**denied** [1] - 74:6
**deniers** [1] - 62:6
**deny** [1] - 81:15
**denying** [1] - 43:11
**Department** [3] -
105:22, 123:10,
141:4
**department** [3] -
106:4, 123:6, 125:3
**depose** [1] - 74:3
**deposition** [4] - 63:13,
63:21, 64:7, 64:10
**Depp** [2] - 70:19,
70:21
**DEPUTY** [3] - 47:4,
95:17, 122:5
**describe** [2] - 119:12,
119:22
**described** [1] - 128:1
**describing** [1] - 119:8
**description** [1] - 126:4
**descriptively** [1] -
24:17
**designed** [3] - 79:15,
86:11, 94:25
**designers** [1] - 50:7
**desk** [1] - 95:16
**detail** [3] - 25:6, 28:7,
34:16
**detail-oriented** [1] -
28:7
**details** [3] - 28:8,
49:21, 63:7
**determination** [1] -
9:16
**determine** [3] - 71:14,
72:11, 72:19
**determined** [3] -
42:19, 59:20, 69:24
**determines** [1] - 8:23
**determining** [1] -
24:11
**Detroit** [1] - 47:23
**devastated** [2] -
130:14, 131:25
**developed** [1] - 49:5
**died** [1] - 115:16
**differ** [1] - 21:13
**difference** [4] - 87:18,
87:21, 88:6, 108:11
**different** [36] - 8:4,
8:12, 8:13, 8:14,
8:16, 27:17, 37:24,
40:14, 46:15, 46:16,
51:14, 55:9, 58:17,
61:19, 81:15, 81:21,
86:22, 87:10, 89:5,
90:17, 92:1, 92:5,
98:19, 100:19,
102:3, 108:10,

108:14, 132:14,
134:10, 137:16,
138:5, 138:6,
142:13, 146:21,
147:3
**difficult** [3] - 119:21,
120:19, 121:22
**Dior** [2] - 50:6
**DIRECT** [1] - 97:7
**direct** [6] - 73:17,
79:24, 86:21,
114:13, 115:20,
116:10
**directed** [4] - 65:5,
65:9, 150:20, 150:21
**directly** [4] - 36:24,
57:1, 57:19, 82:9
**disagree** [1] - 153:19
**disappointed** [1] -
139:14
**disclose** [1] - 73:9
**disclosed** [2] - 73:25,
80:1
**disclosure** [2] - 11:13,
11:15
**disclosures** [1] - 31:5
**disconnected** [1] -
115:4
**discuss** [1] - 152:10
**discussed** [4] - 30:9,
56:22, 63:24, 144:20
**discussing** [2] - 32:1,
64:2
**discussion** [1] - 32:14
**dispel** [2] - 40:19,
43:16
**disproven** [1] - 38:10
**disseminated** [2] -
62:18, 62:20
**disseminating** [1] -
63:5
**DISTRICT** [3] - 1:1,
1:1, 1:10
**document** [24] - 6:5,
6:19, 6:22, 17:6,
17:8, 17:9, 26:13,
32:6, 34:17, 46:9,
47:2, 47:13, 48:5,
48:7, 80:15, 80:17,
110:8, 118:14,
118:25, 119:3,
119:19, 126:17,
149:20, 154:9
**documentary** [1] -
29:12
**documented** [1] - 43:4
**documents** [15] -
24:23, 25:1, 25:17,
26:15, 32:3, 32:5,
32:6, 32:8, 32:10,

32:16, 32:18, 32:21,
95:23, 154:12,
154:14
**Doe** [2] - 56:4, 56:5
**dollars** [1] - 95:2
**dome** [2] - 114:16,
114:22
**Donald** [10] - 13:8,
14:4, 14:15, 20:23,
22:13, 22:24, 45:12,
49:18, 82:19, 86:4
**done** [24] - 14:16,
15:11, 15:12, 36:6,
37:18, 40:6, 40:12,
42:18, 45:14, 54:18,
61:11, 64:17, 65:19,
66:1, 66:6, 68:3,
68:9, 71:10, 71:19,
77:19, 93:8, 102:3,
142:8, 142:9
**door** [1] - 125:15
**double** [1] - 19:14
**double-check** [1] -
19:14
**doughnuts** [2] - 98:23,
99:1
**Douglas** [1] - 98:8
**down** [10] - 56:24,
57:5, 57:14, 58:12,
84:22, 85:6, 96:12,
118:18, 126:6,
149:22
**Dr** [17] - 4:12, 66:19,
73:17, 74:10, 74:14,
75:20, 79:12, 80:15,
83:12, 84:20, 88:16,
90:3, 90:14, 93:8,
94:4, 95:8, 95:10
**draft** [2] - 152:21,
154:16
**draw** [3] - 21:15,
30:10, 75:14
**drawn** [2] - 35:10,
94:22
**driving** [1] - 79:4
**DuBOSE** [1] - 1:17
**DUBOSE** [1] - 1:17
**Duhaney** [2] - 12:15,
12:20
**during** [8] - 6:16, 9:22,
32:14, 53:6, 95:24,
134:15, 134:20,
150:1

## E

**eager** [1] - 153:24
**early** [2] - 108:22,
124:6
**earned** [1] - 106:20

**earth** [9] - 38:1, 38:4,
38:7, 62:10, 62:11,
62:13, 91:14, 130:11
**East** [1] - 101:12
**Ed** [1] - 67:10
**educate** [3] - 36:18,
38:13, 42:24
**effect** [6] - 26:12,
26:16, 34:2, 36:14,
59:12, 60:19
**effective** [3] - 42:12,
43:5, 43:6
**effectiveness** [1] -
12:24
**effects** [1] - 43:14
**effort** [3] - 38:12, 66:6,
66:7
**efforts** [1] - 67:24
**eight** [1] - 105:24
**either** [2] - 21:11,
147:24
**election** [30] - 10:7,
18:11, 18:17, 34:8,
36:13, 36:19, 37:21,
38:25, 39:13, 40:20,
43:17, 51:16, 51:21,
57:8, 58:16, 62:6,
63:11, 84:7, 105:19,
106:1, 106:9,
106:18, 107:19,
107:20, 107:21,
107:25, 108:9,
113:25, 114:3,
128:10
**Election** [5] - 108:4,
108:7, 108:9,
108:11, 108:17
**elections** [1] - 123:16
**element** [1] - 55:25
**elements** [1] - 61:19
**elevate** [1] - 61:8
**elevator** [1] - 147:6
**elicit** [1] - 11:23
**ELMO** [1] - 46:25
**Email** [4] - 1:16, 1:19,
1:23, 2:5
**email** [21] - 28:15,
28:18, 28:20, 29:2,
29:22, 31:1, 31:2,
31:4, 31:10, 31:11,
31:14, 94:5, 110:2,
110:12, 110:16,
111:11, 112:21,
112:25, 113:4,
115:2, 116:16
**emails** [2] - 109:15,
125:21
**emotional** [6] - 26:23,
75:11, 89:9, 89:25,
142:10, 144:22

**emotions** [1] - 139:15
**employ** [1] - 10:25
**employed** [2] - 48:12,
71:19
**employing** [1] - 73:20
**encountered** [1] - 77:6
**end** [8] - 17:23, 46:1,
53:25, 74:7, 83:8,
116:11, 128:4, 152:1
**ended** [1] - 104:18
**ends** [2] - 110:9,
111:18
**engage** [1] - 55:17
**engaged** [3] - 50:9,
67:24, 68:12
**engagement** [2] -
84:22, 85:6
**engagements** [2] -
84:25, 85:3
**enjoy** [1] - 102:14
**enjoyed** [4] - 102:15,
104:4, 105:6, 106:6
**entered** [2] - 69:16,
134:16
**enters** [2] - 4:6, 66:14
**entirely** [1] - 81:21
**enumerated** [1] -
22:25
**envelope** [2] - 107:11,
119:8
**equity** [3] - 136:8,
136:11, 136:16
**Eric** [1] - 54:3
**errand** [2] - 41:7,
41:11
**escaped** [1] - 9:23
**especially** [1] - 99:16
**ESQ** [6] - 1:12, 1:13,
1:13, 1:17, 1:20, 2:2
**essentially** [1] - 82:13
**established** [1] - 9:2
**estimate** [8] - 13:2,
16:1, 57:18, 89:12,
89:15, 89:16, 89:17,
89:20
**estimated** [5] - 16:3,
16:6, 59:2, 59:7,
90:4
**estimating** [2] - 89:6,
94:11
**et** [2] - 1:3, 17:12
**evaluated** [1] - 65:15
**evening** [1] - 104:4
**event** [3] - 77:7, 146:6,
146:7
**events** [4] - 38:20,
83:18, 136:19,
144:20
**everywhere** [2] -
108:12, 115:5

**evidence** [20] - 5:15,
6:15, 17:10, 17:19,
22:2, 29:12, 39:3,
39:6, 39:12, 48:13,
51:3, 73:12, 76:6,
92:12, 93:17, 94:5,
125:9, 128:6,
134:17, 149:21
**evil** [1] - 130:13
**exact** [5] - 4:18, 28:21,
34:24, 35:1, 88:3
**exactly** [4] - 15:21,
26:8, 27:6, 27:14
**exam** [2] - 79:24,
95:24
**examination** [3] - 4:9,
44:9, 80:23
**EXAMINATION** [3] -
4:10, 74:8, 97:7
**examined** [1] - 44:16
**example** [9] - 9:22,
10:5, 24:23, 48:14,
50:6, 53:18, 56:14,
60:13, 63:5, 77:10,
78:7
**examples** [5] - 49:13,
50:2, 50:18, 55:2,
78:7
**exchange** [1] - 78:2
**exchanges** [1] - 28:20
**excited** [2] - 146:7,
146:8
**exclude** [2] - 73:6,
86:11
**excuse** [3] - 151:10,
151:24, 152:9
**Excuse** [1] - 101:20
**excused** [2] - 95:10,
150:6, 152:18
**execute** [1] - 130:16
**executed** [1] - 50:12
**Exhibit** [16] - 6:10,
17:4, 17:11, 17:25,
44:14, 80:12, 80:16,
81:3, 88:16, 88:20,
89:4, 93:17, 93:22,
109:18, 121:24
**exhibit** [8] - 6:12,
80:12, 81:5, 94:4,
111:18, 112:19,
114:12, 134:17
**exhibits** [6] - 96:4,
96:7, 96:16, 96:25,
118:10, 122:3
**existing** [1] - 43:15
**exits** [2] - 65:24,
152:19
**expect** [1] - 153:5
**expected** [1] - 68:25
**expenses** [1] - 149:19

**expensive** [1] - 102:22
**experience** [1] - 49:23
**expert** [21] - 5:21,
10:24, 16:12, 16:16,
16:18, 31:5, 31:21,
32:22, 34:6, 48:20,
70:18, 73:6, 76:8,
79:21, 80:1, 80:25,
81:18, 83:15, 84:22,
85:9, 88:21
**expert's** [1] - 11:16
**expertise** [1] - 24:3
**experts** [3] - 24:3,
48:23, 49:1, 71:9,
73:22
**explain** [9] - 24:15,
87:21, 118:15,
120:4, 120:24,
122:18, 137:14,
141:15, 144:19
**explanatory** [1] -
154:5
**extensive** [2] - 50:9,
78:9
**extensively** [1] - 70:10
**extent** [1] - 48:4

## F

**face** [2] - 61:9, 75:14
**Facebook** [2] - 116:9,
147:13
**fact** [13] - 8:25, 9:15,
37:23, 51:25, 69:23,
72:23, 73:11, 79:18,
85:17, 86:11, 89:23,
93:2, 94:23
**fact-checking** [1] -
8:25
**factor** [1] - 24:14
**facts** [5] - 22:1, 29:14,
39:3, 76:6
**fair** [1] - 37:6
**fairly** [2] - 20:14, 154:5
**false** [16] - 8:20, 8:23,
9:3, 9:4, 9:6, 9:7,
9:10, 11:8, 34:7,
35:19, 35:20, 36:8,
36:14, 39:1, 61:10,
69:25
**familiar** [9] - 10:2,
10:3, 10:4, 15:16,
15:17, 15:18, 22:10,
34:16, 54:11
**familiarity** [2] - 70:3,
70:5
**family** [3] - 98:14,
111:25, 113:7
**far** [6] - 22:15, 40:19,
44:16, 49:23, 96:1,

117:22
**Farm** [6] - 107:17, 107:24, 108:3, 114:3, 114:6, 116:19
**FARR** [1] - 1:14
**fashion** [2] - 50:6, 104:3
**fashions** [1] - 146:13
**faster** [4] - 8:21, 9:5, 9:7, 9:11
**fat** [1] - 118:21
**father** [1] - 119:14
**FBI** [3] - 134:2, 139:11, 141:3
**fed** [1] - 140:21
**Federal** [1] - 114:15
**federal** [1] - 114:21
**feed** [1] - 140:19
**Feehan** [1] - 12:14
**feign** [1] - 81:24
**feigned** [1] - 81:22
**fellow** [1] - 104:14
**felon** [1] - 111:13
**felt** [23] - 99:18, 120:4, 120:6, 122:18, 123:11, 125:18, 126:4, 128:19, 130:12, 131:11, 132:24, 137:25, 139:8, 139:10, 140:18, 141:19, 144:5, 144:6, 144:12, 144:16
**few** [8] - 22:25, 61:21, 66:2, 66:19, 111:2, 112:17, 116:24, 139:19
**fiasco** [1] - 61:21
**field** [5] - 28:5, 42:11, 43:4, 73:22, 98:15
**Fifth** [1] - 64:9
**figure** [1] - 43:21
**figures** [1] - 21:1
**file** [1] - 101:18
**filed** [1] - 19:1
**files** [1] - 101:16
**filings** [2] - 152:22, 152:23
**fill** [1] - 128:22
**filled** [1] - 129:1
**final** [1] - 25:22
**finalized** [2] - 11:2, 12:2
**finally** [3] - 106:20, 143:2, 149:4
**findings** [1] - 32:2
**finish** [3] - 66:9, 101:9, 101:10
**finished** [1] - 101:12
**firm** [2] - 101:16, 102:1

**first** [26] - 5:3, 5:24, 13:21, 14:19, 32:22, 34:11, 37:13, 44:15, 49:10, 49:15, 49:18, 59:3, 82:3, 88:21, 89:3, 89:7, 100:7, 102:12, 109:11, 111:24, 114:13, 125:2, 127:10, 127:11, 128:18, 154:3
**five** [1] - 104:25
**fix** [5] - 35:11, 40:10, 54:14, 69:4, 144:9
**Fix** [1] - 144:8
**fixed** [1] - 69:4
**fixing** [1] - 140:17
**flags** [1] - 133:15
**flat** [7] - 38:1, 38:4, 38:7, 62:10, 62:11, 62:13, 91:14
**flat-earth** [6] - 38:1, 38:7, 62:10, 62:11, 62:13, 91:14
**fluctuate** [2] - 8:10, 8:11
**focus** [2] - 10:19, 153:9
**focused** [1] - 50:14
**folks** [1] - 50:19
**follow** [2] - 66:19, 70:19
**follow-up** [1] - 66:19
**followers** [3] - 116:19, 127:10, 148:3
**following** [8] - 17:16, 53:3, 73:3, 74:15, 81:7, 96:7, 96:25, 150:10
**food** [1] - 98:19
**fool's** [2] - 41:7, 41:11
**footnotes** [1] - 46:15
**FOR** [3] - 1:1, 1:12, 2:2
**force** [1] - 62:10
**forcibly** [1] - 62:6
**foregoing** [1] - 155:9
**forget** [2] - 9:1, 22:24
**forgot** [2] - 48:9, 69:7
**form** [7] - 43:18, 151:13, 153:10, 153:17, 154:3, 154:6, 154:14
**format** [1] - 154:12
**former** [12] - 62:22, 129:8, 129:11, 129:14, 129:24, 130:12, 130:23, 131:8, 131:23, 136:1, 149:13, 149:16

**forms** [1] - 115:1
**formula** [1] - 64:21
**forward** [1] - 96:1
**foundation** [3] - 76:5, 77:3, 78:14
**foundations** [1] - 73:7
**Fox** [2] - 51:22, 51:24
**frankly** [1] - 21:21
**fraud** [11] - 18:11, 18:14, 18:17, 19:23, 19:24, 20:2, 34:8, 36:13, 36:20, 37:21, 63:11
**Fraud** [1] - 46:18
**fraudulent** [1] - 39:13
**free** [2] - 98:5, 98:6
**Freedom** [2] - 86:9, 86:16
**FREEMAN** [3] - 1:3, 3:5, 97:6
**Freeman** [101] - 2:6, 17:12, 19:9, 23:24, 24:18, 33:5, 37:22, 38:20, 38:24, 39:18, 39:23, 40:3, 40:6, 50:15, 51:2, 52:7, 52:14, 54:16, 58:16, 60:14, 61:20, 85:15, 85:19, 95:14, 95:15, 95:19, 95:25, 97:12, 97:13, 97:19, 98:1, 98:3, 98:6, 98:7, 99:12, 99:20, 100:4, 102:7, 104:13, 105:25, 107:24, 108:3, 108:16, 109:4, 109:12, 109:21, 110:11, 110:15, 111:4, 111:7, 111:20, 112:11, 112:20, 113:10, 114:13, 114:14, 115:9, 115:13, 115:18, 115:24, 116:7, 117:5, 117:17, 118:14, 119:3, 119:18, 120:12, 120:22, 121:10, 122:18, 124:24, 126:17, 127:20, 127:23, 128:3, 128:9, 129:6, 129:25, 130:10, 130:23, 131:23, 133:6, 134:14, 134:19, 135:2, 135:24, 136:3, 136:11, 136:15, 136:19, 137:21,

138:19, 140:24, 144:17, 149:4, 149:11, 149:12, 149:15, 149:18, 150:5, 150:6
**Freeman's** [1] - 95:24
**Fried** [1] - 103:9
**friend's** [3] - 139:16, 141:13, 141:16
**friends** [1] - 142:16
**fringe** [1] - 52:1
**front** [4] - 44:11, 88:17, 119:19, 150:15
**full** [4] - 111:23, 114:14, 114:20, 155:10
**Fulton** [19] - 102:10, 105:18, 105:21, 105:22, 105:23, 106:1, 106:5, 106:11, 106:16, 106:18, 107:3, 107:4, 107:12, 108:6, 123:8, 123:9, 123:11, 125:3, 129:18
**fun** [2] - 98:17, 103:14
**fund** [1] - 68:19
**furtherance** [1] - 45:14

**G**

**GA** [1] - 1:18
**GALLAGHER** [1] - 1:14
**gallery** [1] - 15:3
**game** [2] - 103:2, 103:13
**games** [1] - 102:17
**Gate** [1] - 127:5
**Gateway** [34] - 15:9, 16:9, 16:23, 17:11, 17:12, 18:3, 18:16, 34:5, 34:11, 34:19, 34:21, 35:11, 35:15, 36:1, 36:12, 37:11, 37:14, 37:17, 37:19, 37:22, 46:8, 47:9, 47:14, 47:17, 47:21, 48:4, 48:6, 48:7, 67:12, 81:16, 92:9, 92:13, 92:16
**Gatsby** [1] - 25:11
**general** [10] - 9:3, 9:4, 11:21, 61:25, 62:1, 70:5, 77:9, 87:2, 87:3, 92:22
**generally** [3] - 4:20, 9:25, 70:4

**gentlemen** [2] - 6:14, 152:2
**Georgia** [7] - 39:17, 98:8, 104:19, 113:3, 127:4
**ginger** [12] - 99:8, 99:10, 99:13, 99:14, 99:15, 99:18, 99:19, 99:20, 99:22, 100:1, 100:3
**Girl** [1] - 142:20
**girlfriend** [1] - 134:7
**girlfriend's** [1] - 140:4
**GIULIANI** [1] - 1:5
**Giuliani** [45] - 10:9, 19:9, 20:20, 33:20, 35:19, 36:7, 36:15, 37:16, 37:21, 40:13, 44:18, 45:14, 48:3, 52:10, 57:13, 57:19, 58:3, 58:23, 59:5, 59:6, 61:7, 62:17, 63:5, 63:10, 65:15, 69:17, 69:24, 75:20, 76:1, 76:11, 76:14, 76:17, 76:24, 86:4, 94:6, 96:8, 109:7, 116:12, 116:16, 116:18, 126:20, 127:9, 128:17, 133:2, 153:2
**Giuliani's** [7] - 63:13, 63:21, 64:6, 65:10, 69:9, 69:19, 109:9
**given** [3] - 7:17, 60:14, 110:25
**Glad** [1] - 137:24
**glad** [2] - 28:5, 145:16
**goal** [3] - 62:5, 104:6
**God** [1] - 144:11
**good-quality** [1] - 103:25
**GOTTLIEB** [59] - 1:12, 4:4, 5:14, 7:4, 7:6, 10:12, 11:10, 16:11, 17:13, 17:21, 18:5, 20:7, 22:1, 25:24, 28:10, 29:14, 31:6, 31:19, 39:2, 43:18, 52:15, 52:24, 53:21, 57:21, 59:16, 66:4, 68:21, 70:14, 70:20, 71:3, 71:11, 72:13, 73:16, 74:9, 76:9, 76:10, 77:5, 80:11, 80:14, 81:2, 82:3, 82:7, 82:22, 83:5, 83:10, 83:11, 84:5, 93:16, 93:23, 94:1, 94:3, 95:8, 150:14,

150:17, 151:18,
152:4, 153:22,
154:8, 155:1
**Gottlieb** [10] - 4:7,
23:5, 26:21, 30:9,
32:14, 33:17, 45:25,
64:23, 66:20, 154:25
**Gottlieb)**......................
.................**74** [1] - 3:4
**GOVERNKSI** [1] -
118:13
**Government** [5] -
107:3, 107:5,
107:12, 114:15,
123:8
**government** [10] -
38:23, 40:18, 42:14,
91:17, 91:20, 91:23,
91:24, 92:3, 107:16,
114:21
**government-issued**
[1] - 42:14
**GOVERNSKI** [66] -
1:13, 95:13, 95:22,
96:5, 96:13, 96:15,
96:23, 97:5, 97:8,
108:24, 109:3,
110:23, 111:3,
111:17, 112:7,
112:18, 114:11,
115:12, 115:17,
116:6, 117:1, 117:4,
117:15, 118:9,
118:17, 118:23,
119:2, 119:15,
120:15, 120:18,
120:21, 121:6,
121:21, 121:25,
122:2, 122:7,
122:10, 122:13,
122:15, 122:17,
125:7, 125:11,
125:14, 126:13,
126:16, 127:2,
127:18, 127:19,
130:2, 130:6, 130:9,
130:19, 130:22,
131:19, 131:22,
134:13, 134:18,
135:23, 136:2,
136:14, 136:18,
149:2, 149:9,
149:24, 150:3, 150:5
**Governski**................
.................**97** [1] - 3:6
**GOVERSKI** [1] -
109:17
**grade** [3] - 100:8,
100:12
**graduated** [3] -

101:13, 101:15,
105:12
**Grand** [3] - 112:22,
112:24, 113:1
**grandmamma** [1] -
98:10
**grandmother** [1] -
97:16
**grandson** [2] - 105:13,
144:15
**great** [2] - 20:5, 75:13
**Great** [1] - 25:11
**grew** [2] - 98:8, 99:6
**grocery** [1] - 105:5
**group** [2] - 21:25,
81:16
**grow** [1] - 98:7
**guess** [17] - 6:9,
13:21, 13:22, 23:25,
24:15, 28:7, 46:16,
48:16, 50:14, 54:9,
54:12, 54:16, 57:7,
64:22, 65:2, 65:13,
123:10
**guy** [1] - 21:22
**guys** [1] - 103:1

## H

**half** [1] - 123:1
**handed** [2] - 80:15,
118:15
**hang** [2] - 112:5,
114:21
**hangs** [1] - 114:15
**happy** [1] - 141:22
**hard** [4] - 96:16,
100:19, 136:23,
137:2
**hard-copy** [1] - 96:16
**hardworking** [1] -
61:23
**harm** [20] - 26:24,
40:6, 40:12, 48:17,
48:21, 49:17, 61:15,
64:17, 64:18, 74:21,
75:1, 75:4, 86:22,
86:24, 87:3, 87:5,
89:9, 89:25, 91:2,
147:19
**harmed** [1] - 74:22,
74:24, 86:17
**harms** [2] - 75:9, 75:11
**hate** [2] - 114:22,
148:3
**health** [1] - 75:9
**healthy** [1] - 99:18
**hear** [9] - 96:3, 114:17,
114:23, 130:10,
137:5, 144:3, 144:7,

144:10, 154:2
**heard** [12] - 24:1, 38:1,
38:6, 57:4, 77:6,
100:24, 101:1,
129:17, 140:4,
142:20, 144:25,
153:15
**hearing** [11] - 17:17,
17:24, 53:4, 73:4,
81:8, 96:21, 130:23,
131:8, 131:23,
150:11, 155:3
**HELD** [1] - 1:9
**held** [5] - 17:17, 53:4,
73:4, 81:8, 150:11
**help** [13] - 36:6, 37:14,
56:21, 56:22, 58:13,
61:16, 67:16, 106:1,
106:15, 106:16,
106:18, 124:13,
137:1
**helped** [1] - 32:12
**helpful** [8] - 7:18,
57:11, 57:13, 57:16,
58:20, 69:20, 69:25,
109:22
**helping** [1] - 139:9
**helps** [1] - 75:23
**hereby** [1] - 155:8
**hi** [1] - 55:15
**hidden** [1] - 21:23
**high** [7] - 100:11,
101:9, 101:10,
101:12, 101:14,
101:15
**higher** [1] - 70:12
**highlighted** [3] -
47:12, 47:13, 94:18
**highway** [1] - 79:4
**himself** [1] - 76:14
**hire** [1] - 85:9
**hired** [2] - 50:10, 78:18
**history** [4] - 49:10,
49:18, 49:20, 105:20
**Hmm** [1] - 132:17
**holding** [1] - 99:10
**hole** [1] - 98:25
**home** [48] - 98:20,
101:3, 105:13,
118:7, 119:11,
120:5, 123:23,
124:14, 125:3,
132:11, 132:12,
132:14, 132:15,
132:19, 133:6,
133:11, 133:17,
133:20, 133:22,
133:24, 134:3,
134:6, 134:19,
135:10, 135:13,

135:17, 135:18,
135:19, 136:1,
136:3, 136:5,
136:11, 136:16,
136:20, 136:23,
138:10, 138:12,
138:15, 138:21,
139:17, 140:5,
140:22, 141:13,
141:16, 143:6,
144:15, 149:14,
149:16
**homeless** [3] - 140:18,
141:25, 142:4
**honest** [2] - 22:10,
61:23
**Honor** [79] - 4:4, 5:14,
5:17, 5:24, 6:10, 7:4,
7:6, 10:12, 11:10,
16:11, 16:25, 17:4,
17:11, 17:21, 18:5,
20:7, 22:1, 31:6,
31:19, 39:2, 52:15,
52:24, 53:10, 53:21,
59:16, 65:18, 66:2,
66:5, 66:17, 68:21,
69:23, 73:1, 73:2,
76:5, 77:2, 78:14,
79:8, 80:11, 81:2,
81:5, 82:3, 82:23,
83:5, 83:10, 84:1,
84:16, 91:9, 93:16,
93:23, 95:13, 95:17,
95:22, 96:5, 96:11,
96:20, 96:23, 99:23,
118:9, 121:25,
122:7, 125:7,
126:13, 127:18,
130:2, 134:13,
135:23, 136:14,
149:9, 149:24,
150:14, 150:20,
151:2, 151:18,
152:4, 153:15,
153:22, 154:12,
154:24, 155:1
**HONORABLE** [1] - 1:9
**hope** [1] - 114:15
**hopefully** [1] - 151:22
**horrible** [12] - 60:9,
113:5, 120:6,
120:25, 121:2,
122:20, 126:5,
131:11, 133:5,
137:13
**host** [1] - 35:20
**hotel** [1] - 148:12
**HOUGHTON** [1] - 1:13
**HOUGHTON-
LARSEN** [1] - 1:13

**hour** [2] - 16:2, 129:22
**hours** [2] - 15:21, 16:3
**house** [14] - 105:1,
116:13, 124:22,
125:6, 125:22,
134:8, 137:4, 137:6,
139:3, 139:12,
140:3, 142:4,
145:17, 145:19
**housing** [1] - 134:15
**HOWELL** [1] - 1:9
**Hughes** [22] - 23:4,
23:5, 23:8, 23:12,
23:14, 23:16, 23:18,
23:20, 24:2, 24:6,
24:23, 24:25, 25:1,
25:3, 25:17, 25:21,
65:3, 73:10, 90:15,
90:18, 90:22, 91:6
**HUMPHREYS** [1] - 3:3
**Humphreys** [16] -
4:12, 66:19, 74:10,
74:14, 75:20, 79:12,
80:15, 83:12, 84:20,
88:16, 90:3, 90:14,
93:8, 94:4, 95:8,
95:10
**Humphreys's** [1] -
73:17
**hundreds** [2] - 115:15
**Hunter** [1] - 10:6
**hurt** [2] - 139:14,
143:16
**husband** [3] - 134:7,
140:4, 140:11
**hypothetical** [1] -
92:15
**hypothetically** [1] -
68:24
**hypotheticals** [1] -
92:17

## I

**ID** [2] - 137:10, 137:11
**identification** [3] - 6:2,
6:15, 6:17
**identified** [3] - 31:12,
33:19, 47:18
**identify** [4] - 20:5,
34:1, 34:2, 34:12
**ignorance** [2] - 81:22,
81:25
**ignorant** [1] - 118:21
**image** [2] - 79:16,
119:18
**imagine** [2] - 11:11,
36:1
**imagined** [1] - 132:21
**impact** [8] - 24:8, 24:9,

24:16, 34:20, 84:19, 90:23, 90:24, 91:4
**impacted** [1] - 34:22
**impacting** [1] - 144:18
**impacts** [2] - 24:11, 144:20
**implication** [1] - 82:4
**importance** [1] - 46:3
**important** [6] - 50:23, 69:3, 72:10, 72:18, 72:19, 74:16
**impose** [1] - 74:21
**impression** [3] - 116:15, 127:7, 141:5
**impressions** [35] - 10:25, 11:25, 12:6, 13:3, 13:19, 26:7, 35:3, 35:4, 36:3, 36:25, 37:3, 37:4, 37:6, 48:22, 59:2, 59:7, 59:25, 64:20, 70:16, 73:23, 85:17, 85:20, 85:21, 85:24, 86:2, 86:3, 86:6, 87:19, 87:24, 92:22, 92:23, 92:24, 93:3, 93:7
**impressions-based** [5] - 10:25, 11:25, 12:6, 13:3, 13:19
**improper** [2] - 16:11, 52:25
**improve** [3] - 76:24, 79:15
**IN** [1] - 1:1
**inappropriate** [1] - 81:13
**inauguration** [1] - 133:23
**incidence** [1] - 100:21
**Incidents** [1] - 46:19
**inclined** [1] - 86:8
**include** [1] - 86:19
**included** [3] - 88:8, 89:13, 90:12
**including** [4] - 73:21, 73:22, 80:1, 85:10
**incorporated** [1] - 152:22
**increase** [3] - 12:23, 60:10, 60:12
**increased** [1] - 61:12
**increasing** [1] - 61:13
**incur** [1] - 75:4
**incurred** [5] - 134:14, 135:24, 149:13, 149:16, 149:19
**incurring** [1] - 75:5
**individual** [10] - 20:25, 54:25, 56:15, 76:22,

77:6, 78:3, 78:10, 78:25, 79:13, 111:5
**individually** [1] - 64:18
**individuals** [10] - 46:10, 55:4, 55:8, 55:11, 55:14, 55:17, 77:19, 78:19, 78:22, 86:18
**industry** [1] - 73:24
**infamous** [1] - 63:9
**influencer** [1] - 47:18
**Influencers** [1] - 46:2
**influencers** [7] - 46:3, 46:7, 47:21, 50:10, 50:11, 56:11, 56:12
**inform** [1] - 36:18
**information** [29] - 14:14, 23:23, 24:6, 25:3, 25:21, 34:14, 35:6, 37:6, 39:23, 42:6, 42:10, 43:15, 45:21, 47:10, 47:19, 47:20, 51:8, 51:12, 51:17, 57:6, 60:4, 64:4, 67:25, 85:14, 85:18, 85:22, 90:18, 90:22
**initial** [2] - 89:1, 90:3
**innocence** [1] - 42:6
**innocent** [2] - 36:13, 54:16
**inputs** [2] - 73:25, 88:12
**inside** [2] - 102:21, 123:8
**insider** [1] - 78:8
**insignificant** [2] - 25:8, 25:10
**insisting** [1] - 84:13
**Instagram** [1] - 115:19
**install** [1] - 135:19
**installation** [1] - 135:4
**installed** [1] - 135:20
**installing** [1] - 135:25
**instances** [6] - 8:14, 30:25, 87:19, 87:22, 87:25, 90:6
**instead** [2] - 82:15, 98:4
**instructed** [1] - 39:5
**instruction** [1] - 153:12
**instructions** [5] - 151:12, 152:21, 152:23, 154:7, 154:16
**integrated** [2] - 100:9, 100:15
**intend** [2] - 95:23, 96:24

**Interested** [1] - 110:16
**interested** [2] - 110:22, 111:5
**Internet** [2] - 56:5, 132:2
**interrupt** [1] - 113:18
**interviewed** [1] - 33:11
**intimidating** [1] - 154:20
**introduce** [6] - 81:12, 97:13, 137:21, 138:2, 138:14, 138:16
**introduced** [1] - 17:19
**introducing** [2] - 82:8, 82:24
**invented** [1] - 48:25
**investigative** [1] - 91:23
**involve** [1] - 21:1
**involved** [2] - 15:8, 133:4
**involving** [4] - 19:8, 19:16, 50:19, 71:8
**ironic** [1] - 141:20
**ironing** [1] - 98:14
**isolate** [1] - 153:8
**issue** [9] - 12:25, 24:12, 30:13, 30:15, 59:8, 59:10, 59:11, 66:4, 153:14
**issued** [9] - 5:3, 5:9, 7:22, 10:23, 13:17, 14:20, 15:14, 39:17, 42:14
**issues** [2] - 144:20, 152:16
**italics** [1] - 128:5
**itemized** [1] - 92:23
**itself** [2] - 34:17, 98:14
**IV** [1] - 2:2

### J

**James** [2] - 20:3, 21:17
**January** [22] - 13:14, 13:16, 44:23, 45:8, 45:18, 45:21, 88:8, 90:6, 90:12, 124:18, 126:11, 126:22, 129:13, 132:15, 133:7, 134:6, 134:15, 138:19, 138:23, 139:1, 139:5
**Jean** [3] - 13:8, 49:8, 54:8
**Jensen** [22] - 23:4, 23:5, 23:8, 23:12,

23:14, 23:16, 23:18, 23:20, 24:2, 24:6, 24:23, 24:25, 25:1, 25:3, 25:17, 25:21, 65:3, 73:10, 90:15, 90:18, 90:22, 91:6
**jeopardy** [1] - 140:12
**Jesus** [5] - 143:16, 144:8, 144:9, 145:12, 145:14
**job** [1] - 106:25, 144:13
**Joe** [1] - 55:15
**JOHN** [1] - 1:20
**John** [5] - 56:4, 56:5, 60:24, 61:3, 67:18
**john.langford@ protectdemocracy. org** [1] - 1:23
**Johnny** [2] - 70:19, 70:21
**joint** [1] - 153:18
**Jones** [2] - 10:21, 11:25
**JOSEPH** [1] - 2:2
**JUDGE** [1] - 1:10
**judgment** [6] - 13:14, 13:21, 48:18, 68:14, 150:24, 150:25
**July** [7] - 5:3, 8:4, 87:15, 88:4, 89:17, 89:20, 90:4
**June** [2] - 39:14, 136:5
**jurors** [1] - 15:7
**JURY** [1] - 1:9
**jury** [54] - 4:3, 4:6, 4:24, 13:15, 13:22, 14:6, 17:17, 32:2, 37:8, 53:4, 57:12, 65:24, 66:14, 70:4, 73:4, 81:8, 87:21, 89:23, 90:10, 91:3, 91:8, 97:14, 109:1, 109:19, 110:25, 111:23, 112:20, 115:22, 117:6, 117:20, 118:15, 119:4, 119:9, 120:4, 120:16, 121:8, 128:1, 130:4, 144:19, 149:22, 149:25, 150:11, 150:16, 151:10, 151:14, 151:24, 151:25, 152:19, 152:21, 152:23, 153:12, 154:6, 154:16, 154:20
**jury's** [1] - 39:5

### K

**karaoke** [1] - 138:5
**keep** [9] - 6:18, 12:10, 27:15, 62:3, 98:4, 116:12, 116:20, 145:18, 154:4
**Kennedy** [2] - 60:25, 61:3
**Kentucky** [1] - 103:9
**kept** [4] - 123:13, 123:16, 124:1, 145:3
**Kerik** [2] - 94:6, 94:10
**key** [1] - 23:23
**kill** [3] - 120:2, 120:9, 125:24
**Kill** [1] - 112:8
**killed** [1] - 139:9
**kind** [25] - 11:6, 12:15, 12:21, 32:1, 33:15, 52:18, 54:13, 57:6, 57:15, 58:21, 58:22, 58:23, 61:7, 62:6, 62:12, 63:2, 67:3, 75:19, 84:25, 95:4, 136:25, 139:13, 143:12, 148:22, 148:23
**kinds** [1] - 32:5
**King** [2] - 100:25, 101:25
**KKK** [2] - 113:1, 113:2
**kkk@protonmail** [1] - 112:22
**Klan** [1] - 112:24
**Klux** [1] - 112:24
**knowing** [1] - 141:24
**knowledge** [5] - 40:22, 45:12, 54:23, 54:24, 68:14
**known** [5] - 20:14, 102:1, 102:3, 102:22, 104:18
**knows** [6] - 51:1, 68:22, 70:15, 82:16, 82:20, 146:25
**Krystal** [1] - 12:20
**Ku** [1] - 112:24

### L

**laboratory** [1] - 9:23
**labors** [1] - 20:5
**ladies** [3] - 6:14, 60:22, 152:2
**Lady** [15] - 97:15, 97:19, 97:20, 97:22, 97:24, 104:10, 113:23, 113:25, 142:19, 145:25,

146:9, 146:11,
147:7, 148:5, 148:6
**lady** [7] - 97:21,
115:25, 116:3,
137:10, 137:14,
138:1, 142:18
**Lafferty** [1] - 10:21
**Lane** [12] - 104:19,
104:20, 118:5,
119:7, 119:11,
134:20, 134:25,
135:6, 136:1, 136:4,
136:12, 136:16
**LANGFORD** [1] - 1:20
**Langford** [2] - 67:17,
67:18
**language** [4] - 111:1,
112:12, 117:20,
131:5
**lanyard** [1] - 146:15
**lanyards** [1] - 146:2
**laptop** [2] - 10:5, 10:6
**large** [1] - 87:6
**largely** [4] - 20:18,
42:11, 43:5, 50:12
**LARSEN** [1] - 1:13
**LaRuby** [1] - 118:20
**LaRuby's** [10] - 97:18,
103:24, 110:16,
110:19, 111:5,
111:21, 114:24,
119:14, 129:2,
146:23
**last** [16] - 18:22, 27:11,
29:25, 31:15, 31:16,
44:6, 61:21, 96:20,
98:1, 98:2, 106:12,
112:8, 118:1,
127:21, 129:4
**lasted** [1] - 129:22
**latest** [1] - 146:13
**launch** [2] - 62:10,
68:12
**Lavaca** [1] - 2:3
**law** [3] - 101:16, 102:1,
154:13
**lawsuit** [7] - 16:10,
18:20, 18:21, 18:25,
19:1, 52:7, 58:1
**lawyer** [2] - 136:25,
137:1
**lawyers** [1] - 60:1
**leading** [1] - 84:3
**Leaks** [1] - 47:23
**lean** [2] - 96:1, 127:16
**learn** [3] - 24:2, 49:3,
63:23
**learned** [1] - 129:13
**leave** [9] - 133:20,
133:24, 137:16,

139:11, 140:16,
140:20, 141:16,
144:15, 150:7
**leaving** [1] - 140:10
**left** [11] - 29:10,
100:14, 105:11,
124:8, 124:9, 134:6,
138:20, 140:21,
141:13, 142:1
**Legal** [1] - 126:21
**legal** [4] - 18:6, 53:22,
91:10, 152:15
**Legendairy** [1] - 12:14
**less** [3] - 14:11, 26:9,
102:22
**lesson** [1] - 101:5
**letter** [4] - 118:19,
119:10, 138:4, 143:9
**letters** [2] - 115:5,
118:7
**liability** [2] - 69:17,
69:20
**liable** [1] - 69:24
**lie** [1] - 131:4
**lieutenant** [1] - 123:14
**life** [13] - 99:5, 101:6,
109:13, 111:8,
111:10, 121:2,
140:12, 144:18,
146:17, 146:18,
147:23, 147:25
**likelihood** [1] - 58:14
**likely** [5] - 29:7, 31:2,
51:24, 51:25, 85:24
**limelight** [1] - 104:3
**limited** [1] - 154:4
**line** [5] - 42:4, 64:24,
70:9, 111:24
**lines** [1] - 153:23
**link** [4] - 31:2, 47:24,
48:1, 48:7
**LinkedIn** [3] - 34:15,
115:3, 115:4
**links** [1] - 46:16
**Lisa** [1] - 2:8
**LISA** [1] - 155:8
**list** [10] - 10:18, 17:3,
47:21, 136:3, 136:5,
139:25, 141:6, 141:9
**listed** [5] - 11:13, 13:8,
47:18, 47:22, 55:22
**listen** [3] - 58:23,
120:19, 121:22
**listing** [1] - 11:14
**Live** [1] - 147:13
**live** [6] - 79:2, 104:16,
115:7, 135:6, 136:9,
145:16
**lived** [3] - 104:21,
104:23, 105:7

**living** [3] - 113:3,
134:21, 134:24
**LLC** [1] - 12:20
**LLP** [2] - 1:14, 2:2
**location** [1] - 107:16
**lock** [1] - 116:2
**logical** [1] - 30:6
**logistics** [1] - 30:5
**logo** [1] - 148:9
**look** [46] - 10:17,
10:18, 11:4, 18:20,
18:21, 26:15, 30:10,
34:20, 37:4, 39:21,
39:22, 39:25, 40:1,
40:2, 40:24, 42:4,
42:19, 43:14, 44:10,
44:14, 45:24, 46:7,
46:18, 51:4, 59:8,
59:12, 60:5, 60:19,
61:8, 62:16, 65:20,
67:15, 88:19, 89:3,
89:5, 102:17, 108:1,
111:24, 112:7,
112:17, 119:23,
121:10, 143:3, 143:7
**looked** [23] - 17:9,
32:11, 35:3, 35:4,
40:17, 40:21, 42:9,
42:13, 42:14, 42:16,
44:11, 44:25, 45:24,
55:3, 58:9, 60:8,
61:11, 65:3, 65:4,
71:7, 93:1, 116:22,
119:13
**looking** [12] - 12:10,
18:2, 27:15, 46:25,
47:6, 58:12, 101:22,
121:11, 132:10,
132:20, 137:5, 143:4
**looks** [8] - 19:8, 45:7,
46:9, 46:21, 47:9,
47:13, 96:19, 109:6
**Los** [1] - 1:22
**lost** [3] - 41:25,
148:22, 148:23
**Louis** [1] - 19:9
**love** [1] - 66:9
**loved** [2] - 144:13
**luggage** [1] - 147:10
**lunch** [2] - 33:8, 33:9
**Luther** [1] - 100:25
**lying** [1] - 118:21

## M

**ma'am** [6] - 12:5, 17:6,
43:9, 55:5, 96:13,
110:6
**mad** [4] - 139:14,
140:23, 142:7

**made-for-Trump** [1] -
73:13
**mail** [1] - 115:5,
118:19, 131:13
**mailed** [1] - 120:5
**maintaining** [1] -
135:25
**major** [3] - 28:2, 28:3,
77:7
**majority** [2] - 29:4,
29:5
**Mama** [11] - 12:15,
12:20, 98:10, 98:12,
98:13, 98:16, 98:18,
98:21, 101:2, 101:3
**man** [4] - 98:6, 101:18,
142:8, 146:8
**manage** [1] - 78:18
**March** [1] - 134:16
**Mark** [3] - 94:6, 95:16,
122:4
**mark** [1] - 80:12
**marked** [6] - 6:1, 6:3,
6:7, 6:14, 6:17,
80:16, 107:6, 108:1
**market** [2] - 147:14,
148:7
**Martha** [1] - 78:7
**Martin** [1] - 100:25
**mask** [5] - 82:13,
145:7, 145:8,
148:14, 148:16
**masks** [1] - 148:15
**massive** [1] - 38:22
**master** [1] - 98:4
**matches** [1] - 70:9
**materials** [2] - 25:21,
30:22
**matter** [5] - 38:12,
41:1, 41:8, 42:19
**matters** [3] - 23:9,
80:4, 82:24
**maximum** [1] - 7:12
**Meadows** [1] - 94:6
**meadows** [1] - 94:11
**mean** [56] - 8:11, 9:9,
9:21, 10:8, 11:9,
18:9, 18:10, 19:25,
21:14, 22:4, 22:23,
24:24, 25:10, 27:15,
27:18, 28:19, 29:3,
29:25, 30:12, 32:5,
35:1, 35:7, 39:11,
40:1, 50:15, 51:11,
51:20, 55:11, 56:1,
58:22, 59:10, 60:12,
60:17, 60:20, 61:13,
62:1, 65:2, 68:8,
70:6, 75:22, 81:19,
92:19, 97:19,

106:15, 106:19,
110:19, 112:23,
113:18, 124:20,
130:13, 153:17,
154:18
**meaning** [3] - 112:3,
118:1, 138:25
**means** [2] - 5:2, 41:7
**meant** [2] - 97:20, 98:5
**measure** [4] - 40:6,
48:17, 48:21, 59:25
**measured** [1] - 91:7
**measuring** [2] - 49:17,
73:22
**Medal** [4] - 60:15,
60:21, 86:9, 86:16
**media** [13] - 9:25,
10:10, 12:16, 23:22,
26:6, 35:4, 40:14,
40:19, 50:10, 55:24,
67:5, 115:1
**meet** [2] - 55:16, 149:5
**meeting** [7] - 29:7,
29:11, 32:4, 32:8,
123:7, 124:1, 138:11
**meetings** [5] - 29:8,
29:22, 30:1, 33:4
**members** [2] - 48:2,
143:15
**memorable** [2] -
22:23, 108:16
**Memorial** [12] -
104:19, 104:20,
118:5, 119:7,
119:11, 134:20,
134:25, 135:6,
136:1, 136:3,
136:12, 136:16
**memory** [2] - 99:3,
99:4
**mentees** [1] - 147:15
**mention** [2] - 69:8,
73:9
**mentioned** [15] - 13:7,
30:8, 56:19, 99:3,
99:10, 100:14,
101:9, 103:16,
106:25, 120:12,
127:12, 132:5,
139:19, 143:25,
153:13
**merchandise** [5] -
102:16, 102:21,
103:20, 103:21,
110:22
**MERYL** [1] - 1:13
**mess** [1] - 113:2
**message** [15] - 56:10,
110:24, 111:4,
111:8, 111:20,

113:11, 114:19,
116:8, 117:6,
117:11, 117:12,
117:13, 117:18,
117:19, 121:3
**messages** [11] - 30:4,
79:13, 109:15,
114:24, 115:1,
115:2, 115:18,
120:5, 122:19,
122:21, 123:15
**messaging** [1] - 92:3
**messed** [8] - 124:25,
132:3, 133:2, 133:3,
144:25, 147:25,
148:1
**messenger** [1] - 116:9
**Messenger** [1] - 116:9
**met** [2] - 31:15, 60:21
**method** [4] - 48:22,
49:4, 49:5, 49:8
**methodologies** [4] -
71:21, 72:4, 73:19,
74:5
**methodology** [18] -
9:4, 35:8, 35:9, 37:2,
48:12, 48:18, 49:17,
71:6, 71:19, 71:25,
72:10, 72:17, 72:20,
73:7, 73:12, 73:20,
88:10, 88:13
**methods** [1] - 73:21
**Metro** [2] - 101:11,
104:17
**mgovernski@willkie.
com** [1] - 1:16
**MICHAEL** [1] - 1:12
**Michigan** [1] - 46:22
**microphone** [2] - 96:2,
115:10
**middle** [1] - 24:16
**might** [12] - 9:19,
11:23, 29:18, 42:15,
51:14, 67:10, 67:17,
68:19, 96:1, 99:25,
103:2, 116:12
**Milk** [1] - 12:14
**milk** [1] - 12:23
**Milky** [2] - 12:15,
12:20
**MILLER** [1] - 1:17
**miller@dubosemiller
.com** [1] - 1:19
**million** [21] - 5:6, 5:7,
5:13, 7:3, 7:5, 7:13,
8:6, 8:7, 14:9, 94:12,
94:25, 95:1, 95:2,
95:3, 95:6, 95:7
**millions** [3] - 116:19,
127:10, 148:2

**mind** [4] - 77:10, 78:6,
115:21, 119:8
**minded** [2] - 28:7,
104:24
**minds** [12] - 36:20,
37:15, 40:9, 40:20,
41:3, 41:6, 41:10,
42:20, 42:25, 43:2,
58:15
**mine** [1] - 134:7
**mint** [7] - 99:8, 99:10,
99:13, 99:15, 99:18,
99:19, 100:3
**mints** [5] - 99:14,
99:15, 99:20, 99:22,
100:1
**minute** [3] - 21:17,
40:8, 65:23
**minutes** [1] - 66:3
**mischaracterizes** [3] -
20:8, 57:21, 84:17
**misinformation** [3] -
9:19, 9:24, 10:8
**misleading** [1] - 43:19
**misprint** [1] - 19:8
**miss** [1] - 138:15
**missed** [1] - 149:25
**misstates** [7] - 5:14,
29:14, 39:2, 70:20,
70:23, 79:8, 79:9
**model** [16] - 11:1,
13:19, 36:3, 36:17,
36:21, 36:24, 37:1,
37:3, 68:1, 73:14,
85:17, 85:20, 86:6,
86:7, 90:25, 92:22
**models** [1] - 21:2
**modifications** [2] -
134:19, 154:17
**modified** [1] - 153:11
**mom** [3] - 98:16, 99:6,
143:21
**moment** [4] - 17:6,
47:4, 125:18, 142:2
**moments** [4] - 103:4,
111:2, 116:24, 145:6
**Monday** [2] - 1:4,
23:25
**money** [34] - 13:15,
14:3, 27:16, 36:4,
38:12, 40:9, 40:12,
40:14, 41:2, 41:5,
41:8, 42:23, 43:3,
43:7, 67:24, 68:2,
68:6, 68:16, 68:17,
68:19, 68:25, 69:4,
69:6, 75:13, 75:18,
86:7, 92:20, 134:11,
135:2, 135:3,
135:21, 136:8,

136:10
**monitoring** [1] - 135:4
**monkey** [1] - 119:13
**monthly** [2] - 28:23,
149:13
**months** [2] - 5:13,
134:4
**MOREIRA** [1] - 155:8
**Moreira** [2] - 2:8,
155:15
**morning** [13] - 108:23,
109:14, 124:5,
124:6, 140:17,
150:19, 151:15,
151:16, 152:7,
152:16, 153:5,
154:3, 154:22
**mortar** [3] - 104:5,
104:7, 104:9
**mortgage** [1] - 149:13
**Moss** [30] - 2:6, 17:12,
19:9, 23:24, 24:18,
33:5, 37:21, 38:20,
38:24, 39:18, 39:23,
40:3, 40:7, 50:15,
51:2, 52:7, 52:13,
54:15, 56:25, 57:4,
58:16, 60:14, 60:24,
61:20, 85:15, 85:19,
104:14, 105:9,
105:17, 143:25
**Moss's** [2] - 53:7,
104:16
**most** [6] - 29:1, 29:3,
31:2, 75:18, 104:1,
130:10
**mostly** [1] - 46:10
**mother** [1] - 97:15
**motion** [3] - 41:19,
73:2, 134:22
**motion's** [1] - 74:6
**motions** [2] - 150:21,
151:8
**motivations** [1] -
84:19
**move** [10] - 17:10,
44:2, 73:6, 81:2,
96:7, 115:9, 135:9,
135:14, 135:15,
136:9
**moveable** [1] - 96:2
**moved** [6] - 100:9,
101:11, 104:17,
105:8, 135:9, 135:16
**moving** [1] - 149:19
**MR** [139] - 4:4, 4:11,
5:14, 5:16, 5:20,
5:24, 6:3, 6:9, 6:12,
6:21, 6:24, 7:4, 7:6,
10:12, 10:16, 11:10,

11:13, 11:20, 16:11,
16:13, 16:25, 17:3,
17:5, 17:10, 17:13,
17:21, 18:1, 18:5,
20:7, 20:13, 21:13,
22:1, 22:3, 22:7,
25:24, 28:10, 28:11,
28:14, 29:14, 29:15,
29:19, 29:21, 31:6,
31:19, 31:21, 39:2,
39:15, 41:12, 41:15,
41:24, 42:3, 43:13,
43:18, 44:8, 47:1,
47:7, 47:8, 52:15,
52:24, 53:1, 53:10,
53:14, 53:17, 53:21,
54:1, 57:21, 57:24,
59:16, 59:19, 65:18,
66:2, 66:4, 66:13,
66:17, 66:18, 68:21,
70:14, 70:20, 71:3,
71:5, 71:11, 71:13,
71:22, 72:6, 72:8,
72:13, 72:21, 72:25,
73:6, 73:16, 74:9,
76:5, 76:9, 76:10,
77:2, 77:5, 78:14,
79:8, 80:11, 80:14,
81:2, 81:4, 81:10,
81:20, 82:3, 82:7,
82:22, 83:5, 83:10,
83:11, 84:1, 84:3,
84:5, 84:16, 91:9,
93:16, 93:23, 94:1,
94:3, 95:8, 96:19,
97:8, 109:3, 149:4,
149:7, 150:14,
150:17, 150:20,
151:2, 151:5,
151:18, 151:21,
152:4, 153:15,
153:22, 154:8,
154:11, 154:24,
155:1
**MS** [65] - 95:13, 95:22,
96:5, 96:13, 96:15,
96:23, 97:5, 108:24,
109:17, 110:23,
111:3, 111:17,
112:7, 112:18,
114:11, 115:12,
115:17, 116:6,
117:1, 117:4,
117:15, 118:9,
118:13, 118:17,
118:23, 119:2,
119:15, 120:15,
120:18, 120:21,
121:6, 121:21,
121:25, 122:2,
122:7, 122:10,

122:13, 122:15,
122:17, 125:7,
125:11, 125:14,
126:13, 126:16,
127:2, 127:18,
127:19, 130:2,
130:6, 130:9,
130:19, 130:22,
131:19, 131:22,
134:13, 134:18,
135:23, 136:2,
136:14, 136:18,
149:2, 149:9,
149:24, 150:3, 150:5
**Multiple** [1] - 47:25
**multiple** [5] - 39:5,
49:25, 56:10, 81:22,
153:2
**multiracial** [1] -
104:24

**N**

**name** [71] - 34:12,
37:13, 54:6, 67:9,
69:21, 97:11, 97:17,
97:19, 97:22, 97:23,
98:1, 98:2, 98:3,
98:4, 104:9, 110:21,
113:11, 113:12,
113:13, 113:14,
113:20, 113:21,
114:1, 114:14,
114:20, 115:7,
116:25, 120:10,
127:20, 128:16,
128:22, 128:25,
129:1, 129:10,
129:14, 129:20,
129:24, 130:11,
131:3, 133:3,
136:24, 137:1,
137:7, 137:15,
137:17, 137:18,
137:20, 137:25,
138:3, 138:7,
138:18, 139:24,
140:1, 141:9,
145:25, 146:2,
146:7, 146:14,
146:16, 146:24,
146:25, 147:2,
147:7, 147:20,
147:21, 147:22,
147:23, 148:2
**named** [2] - 20:2, 54:3
**names** [1] - 68:13
**Natalie** [1] - 50:11
**nature** [6] - 12:8,
13:13, 14:19, 15:12,
19:21, 91:2

**NE** [1] - 1:18
**nearly** [1] - 73:16
**necessarily** [1] - 37:25
**necks** [2] - 114:17,
114:23
**need** [13] - 4:18,
22:19, 42:5, 65:20,
66:8, 68:16, 68:17,
69:4, 96:17, 99:25,
128:5, 137:11, 147:9
**needed** [4] - 50:19,
95:5, 133:20, 137:10
**neighborhood** [6] -
104:22, 104:23,
105:4, 105:6,
137:25, 138:16
**neighbors** [2] -
135:11, 137:22
**never** [17] - 24:23,
25:2, 31:10, 38:14,
42:24, 60:21, 75:5,
92:20, 100:24,
101:1, 132:21,
135:1, 137:8,
137:14, 143:8, 143:9
**new** [6] - 135:17,
135:18, 135:19,
135:20, 136:20,
137:21
**news** [7] - 20:14, 21:7,
34:11, 38:23, 40:2,
83:2, 88:7
**News** [8] - 51:22,
51:24, 52:2, 52:4,
52:6, 52:10, 52:14,
53:19
**next** [17] - 13:16,
18:22, 44:9, 46:13,
66:9, 95:12, 102:13,
111:1, 117:15,
119:8, 119:17,
124:16, 124:18,
125:4, 125:5,
140:17, 144:23
**Next** [1] - 1:24
**next-to-the-last** [1] -
18:22
**nice** [2] - 104:23,
149:4
**nickel** [1] - 98:21
**night** [6] - 38:25,
96:20, 108:22,
113:22, 113:25,
114:3
**ninth** [1] - 100:12
**nobody** [1] - 103:19,
137:6, 141:20,
142:11, 142:12,
142:21, 142:22,
142:25, 143:23,

146:25, 147:19
**nolo** [2] - 69:9, 69:11
**nonresponsive** [4] -
41:15, 71:22, 72:6,
72:21
**nonstop** [1] - 124:7
**note** [4] - 96:11, 96:15,
96:24, 139:24
**notes** [2] - 65:20,
155:10
**nothing** [13] - 25:14,
27:18, 83:3, 123:3,
130:15, 136:24,
137:1, 137:5, 138:8,
138:10, 144:9,
147:22, 148:10
**noticed** [1] - 99:20
**notified** [1] - 143:1
**notions** [1] - 43:16
**November** [6] -
107:21, 107:22,
108:17, 135:16,
149:14, 149:17
**now-infamous** [1] -
63:9
**nowhere** [2] - 142:5,
146:16
**number** [15] - 7:17,
7:19, 8:24, 28:21,
35:3, 53:19, 55:15,
59:25, 89:9, 92:9,
110:9, 120:10,
121:15, 152:15,
154:4
**numbers** [14] - 8:9,
8:13, 8:16, 26:7,
33:1, 70:8, 70:11,
70:16, 89:6, 96:18,
96:22, 149:22, 150:1
**nutshell** [1] - 36:21
**NW** [2] - 2:9, 155:17

**O**

**O'Keefe** [1] - 20:3,
21:17
**OAN** [13] - 56:23, 57:5,
57:14, 57:20, 57:25,
58:4, 58:9, 58:12,
58:24, 59:3, 59:5,
59:11
**object** [3] - 74:2,
78:14, 81:4
**objection** [47] - 5:14,
7:4, 7:6, 10:12,
10:13, 11:10, 16:11,
17:13, 17:24, 18:5,
20:7, 22:1, 25:24,
28:10, 29:14, 31:6,
31:19, 39:2, 41:12,

41:15, 43:18, 43:23,
52:15, 52:24, 57:21,
59:16, 68:21, 70:14,
70:20, 70:23, 70:24,
71:3, 71:11, 71:22,
72:6, 72:13, 72:21,
73:10, 76:5, 77:2,
79:8, 84:1, 84:16,
91:9, 96:20, 96:21
**objectionable** [1] -
29:18
**objections** [3] - 96:8,
153:7, 153:8
**observers** [1] - 108:13
**obviously** [1] - 25:17
**occur** [2] - 86:22,
86:24
**occurred** [1] - 34:5
**October** [12] - 5:9,
5:25, 7:20, 88:20,
89:6, 89:11, 106:2,
106:25, 107:2,
107:5, 136:16,
149:17
**OF** [3] - 1:1, 1:9, 155:6
**offer** [1] - 62:13
**offhand** [5] - 14:1,
14:23, 16:5, 23:2,
64:8
**official** [2] - 102:16,
155:16
**Official** [1] - 2:8
**OFFICIAL** [1] - 155:6
**officials** [1] - 38:23
**offsets** [1] - 53:21
**often** [2] - 28:22, 28:25
**old** [1] - 138:15
**Olympics** [3] - 102:13,
103:18, 103:20
**once** [5] - 17:1, 29:25,
124:9, 131:11, 144:4
**One** [6] - 52:2, 52:4,
52:6, 52:10, 52:14,
53:19
**one** [70] - 4:16, 7:17,
12:23, 13:14, 13:21,
13:22, 14:24, 15:7,
22:12, 27:8, 28:5,
33:16, 38:12, 39:12,
41:21, 47:4, 48:5,
48:6, 48:16, 48:18,
49:15, 50:6, 50:7,
50:11, 51:3, 52:11,
55:22, 55:25, 56:14,
66:4, 69:7, 72:9,
72:17, 78:7, 80:8,
82:23, 85:4, 87:25,
90:4, 96:12, 99:23,
99:25, 100:2, 100:9,
100:21, 103:8,

106:12, 112:17,
113:22, 115:16,
118:20, 121:21,
122:25, 132:24,
137:9, 138:1, 139:9,
139:22, 141:3,
141:20, 141:21,
142:18, 144:23,
145:23, 146:6,
148:10, 148:14,
153:10, 154:19
**ones** [7] - 8:21, 9:5,
33:22, 115:13,
132:14, 139:9,
148:19
**online** [3] - 23:23,
131:10, 132:6
**open** [1] - 118:15
**opening** [1] - 119:8
**operate** [2] - 45:8,
146:23
**opinion** [11] - 10:23,
11:5, 11:6, 11:7,
25:15, 28:25, 42:21,
43:15, 62:13, 65:8,
65:11
**opinions** [5] - 30:10,
30:13, 30:15, 42:15,
74:1
**opportunity** [2] - 74:2,
153:14
**opposed** [1] - 82:11
**orally** [1] - 150:22
**order** [1] - 128:23
**ordinary** [6] - 50:15,
50:19, 50:21, 74:25,
75:16, 75:18
**organization** [10] -
9:17, 20:15, 21:7,
21:21, 21:22, 24:3,
34:12, 80:5, 83:2
**organizations** [2] -
8:25, 38:23
**oriented** [1] - 28:7
**origin** [2] - 10:1, 63:9
**original** [2] - 87:15,
88:4
**originally** [1] - 90:9
**outcome** [2] - 27:17,
71:2
**outside** [10] - 17:17,
33:18, 33:25, 34:2,
53:4, 73:4, 76:2,
81:8, 145:5, 150:11
**overall** [1] - 41:18
**overlap** [2] - 58:25,
59:1
**overrule** [1] - 43:23
**overruled** [25] - 18:8,
20:12, 26:1, 31:9,

31:22, 39:9, 41:19,
52:17, 57:22, 59:18,
68:22, 70:15, 70:24,
71:23, 72:7, 72:14,
72:24, 73:10, 77:4,
78:16, 79:11, 84:2,
84:4, 84:18, 91:11
**overseen** [1] - 54:13
**own** [8] - 17:18, 21:15,
30:20, 75:21, 76:25,
103:16, 104:24
**owner** [1] - 115:24

**P**

**p.m** [3] - 1:4, 109:7,
155:4
**packing** [2] - 140:7
**page** [13] - 18:22,
26:15, 45:24, 46:13,
89:3, 110:7, 111:18,
117:15, 119:17,
153:7, 153:8, 154:19
**PAGE** [1] - 3:2
**Page** [6] - 1:24, 116:6,
117:1, 119:16,
127:3, 153:6
**pages** [2] - 26:13,
153:8
**paid** [8] - 15:22, 15:24,
16:2, 16:6, 27:17,
36:1, 36:3, 54:9
**pandemic** [1] - 99:16
**panic** [1] - 145:6
**paper** [1] - 29:10
**paragraph** [1] - 94:10
**Parenthood** [1] -
21:24
**part** [17] - 14:10,
16:18, 34:19, 35:14,
40:14, 40:25, 41:17,
42:4, 44:9, 67:25,
71:6, 90:21, 99:5,
112:15, 121:2, 130:3
**participate** [1] - 138:7
**particular** [8] - 8:24,
9:6, 9:9, 34:16,
36:25, 37:4, 61:1,
87:25
**particularly** [2] - 93:6,
108:16
**parties** [14] - 4:2,
12:22, 17:15,
134:13, 135:23,
136:14, 149:12,
149:15, 149:18,
152:23, 153:18,
153:19, 153:21,
154:18
**parties'** [2] - 96:6,

153:11
**parts** [1] - 25:6
**party** [2] - 83:19, 83:22
**pass** [2] - 72:25, 137:3
**passage** [1] - 4:18
**past** [2] - 42:10, 77:25
**Pastor** [1] - 143:7
**Pause** [2] - 46:5, 97:3
**pay** [3] - 57:13, 68:8, 68:25
**paying** [1] - 35:16
**payment** [1] - 53:18
**payments** [2] - 149:13, 149:16
**pedophile** [2] - 56:4, 56:7
**peer** [7] - 71:18, 71:21, 72:4, 72:18, 72:20, 72:23, 73:20
**peer-reviewed** [4] - 71:21, 72:4, 72:20, 73:20
**peers** [3] - 71:14, 71:16, 71:24
**penny** [1] - 98:22
**people** [84] - 9:24, 21:15, 23:12, 27:25, 28:2, 28:6, 35:18, 35:20, 36:7, 36:14, 37:15, 37:24, 38:3, 38:9, 38:14, 39:13, 40:15, 42:20, 42:24, 50:5, 50:16, 50:21, 51:7, 51:16, 56:12, 58:15, 58:23, 60:9, 60:18, 62:10, 62:11, 62:14, 74:25, 75:4, 75:13, 75:16, 75:18, 77:11, 78:13, 85:24, 86:3, 86:7, 86:12, 86:15, 86:20, 86:25, 101:7, 102:16, 102:25, 103:15, 104:1, 104:2, 105:4, 108:11, 118:21, 120:9, 120:25, 122:23, 124:2, 124:21, 125:5, 131:13, 132:6, 132:19, 133:6, 133:9, 133:11, 138:13, 139:3, 139:8, 139:25, 140:3, 141:21, 142:8, 142:15, 143:23, 145:9, 145:13, 147:3, 147:4, 147:5, 147:17, 148:15
**people's** [6] - 40:9,

40:20, 41:2, 41:6, 42:15, 144:7
**percent** [1] - 86:24
**percentage** [1] - 38:17
**perfect** [2] - 4:5, 154:10
**performed** [1] - 12:9
**perhaps** [2] - 27:13, 41:23
**period** [2] - 134:15, 134:20
**permission** [8] - 96:7, 109:1, 109:19, 118:11, 120:16, 121:8, 122:7, 130:3
**person** [19] - 9:16, 48:19, 51:1, 51:20, 52:3, 61:8, 73:11, 98:6, 103:6, 106:23, 121:15, 122:25, 130:11, 130:17, 139:6, 140:18, 141:9, 147:11
**person's** [1] - 139:25
**personal** [6] - 54:23, 85:1, 109:12, 115:2, 117:13, 119:6
**personally** [1] - 31:10
**persuaded** [1] - 86:15
**pertaining** [1] - 34:8
**petition** [2] - 16:23, 34:10
**Pew** [1] - 51:23
**Ph.D** [1] - 3:3
**PhD** [1] - 27:23
**philosophy** [2] - 28:1, 28:3
**phone** [24] - 63:1, 63:5, 90:6, 109:15, 115:15, 115:16, 116:11, 117:13, 120:10, 122:22, 123:13, 123:16, 123:18, 124:1, 124:4, 124:10, 125:21, 139:21, 141:1, 141:2, 142:23, 143:4
**phrases** [1] - 112:3
**physical** [1] - 118:10
**picked** [1] - 41:17
**picture** [3] - 82:8, 82:12, 82:14
**piece** [1] - 73:19
**pieces** [1] - 153:23
**pile** [1] - 81:17
**pill** [2] - 98:24, 98:25
**place** [4] - 43:16, 113:7, 137:17, 142:10

**plaintiff** [11] - 12:17, 13:15, 19:18, 20:1, 21:3, 67:6, 82:9, 82:12, 83:17, 84:6, 104:14
**plaintiff's** [2] - 54:6, 56:21
**plaintiffs** [37] - 15:8, 16:10, 18:16, 33:5, 34:7, 34:12, 34:15, 34:21, 35:16, 35:21, 36:2, 36:4, 36:8, 36:15, 37:12, 37:13, 42:13, 42:15, 56:24, 57:7, 59:12, 63:11, 65:6, 65:9, 67:23, 73:15, 76:18, 81:20, 85:4, 91:21, 92:20, 95:13, 150:12, 151:17, 152:3, 152:5
**Plaintiffs** [1] - 1:4
**PLAINTIFFS** [1] - 1:12
**Plaintiffs'** [5] - 44:14, 80:12, 80:16, 81:3, 93:16
**plaintiffs'** [26] - 4:24, 17:18, 27:8, 28:15, 29:1, 29:6, 29:24, 30:2, 30:11, 30:14, 30:18, 30:22, 31:15, 34:3, 34:10, 35:21, 42:6, 59:22, 60:1, 66:21, 66:23, 67:13, 69:20, 70:1, 95:12, 152:7
**plan** [12] - 42:6, 45:17, 91:25, 93:14, 95:1, 118:9, 128:20, 128:21, 128:23, 130:16, 131:6
**Planned** [1] - 21:23
**plans** [3] - 42:10, 43:16, 92:2
**platform** [1] - 60:10
**platforms** [1] - 40:15
**play** [9] - 120:16, 121:21, 122:8, 125:7, 125:12, 130:3, 130:6, 130:19, 131:19
**played** [8] - 120:20, 122:12, 122:14, 122:16, 125:13,

130:8, 130:21, 131:21
**players** [1] - 102:19
**pleadings** [1] - 16:19
**plenty** [1] - 154:18
**point** [13] - 37:3, 39:16, 44:2, 47:11, 48:13, 59:17, 79:12, 100:14, 105:9, 108:19, 118:5, 122:22, 139:16
**point's** [1] - 44:4
**pointed** [1] - 151:2
**Police** [3] - 105:22, 123:9, 141:4
**police** [15] - 106:4, 123:4, 123:5, 123:22, 123:23, 124:1, 124:12, 124:14, 124:15, 124:17, 125:1, 125:2, 125:3, 125:19, 145:4
**political** [5] - 83:19, 84:19, 84:23, 85:1, 106:23
**politics** [5] - 20:16, 20:21, 106:17, 106:19, 106:22
**pop** [1] - 147:2
**pop-up** [1] - 147:2
**population** [4] - 61:25, 62:1, 86:23, 87:2
**portion** [2] - 38:14, 64:6
**portions** [1] - 63:16
**Portman** [1] - 50:11
**pose** [1] - 28:13
**positive** [4] - 40:2, 85:14, 85:18, 85:22
**possible** [3] - 4:18, 19:11, 51:19
**post** [2] - 89:17, 89:21
**post-December** [1] - 89:17, 89:21
**potential** [1] - 92:16
**potentially** [1] - 11:16
**Powder** [2] - 104:18, 104:19
**powerful** [1] - 130:10
**practice** [1] - 77:9
**pray** [2] - 103:5, 114:16
**prejudicial** [2] - 39:3, 39:4
**preliminary** [1] - 15:12
**preparation** [1] - 32:18
**prepare** [1] - 32:12
**preparing** [1] - 31:23
**PRESENT** [1] - 2:6

**present** [2] - 32:1, 32:2
**presented** [4] - 149:21
**president** [4] - 61:3, 129:8, 129:9, 130:12
**President** [9] - 45:22, 60:15, 62:23, 129:11, 129:14, 129:24, 130:24, 131:8, 131:24
**Presidential** [5] - 60:14, 60:21, 86:9, 86:16, 126:21
**presidential** [4] - 106:1, 106:18, 107:25, 128:10
**press** [2] - 75:24, 76:1
**presumably** [1] - 45:20
**pretrial** [1] - 153:18
**pretty** [6] - 22:23, 38:9, 60:17, 61:3, 74:4, 154:17
**previous** [1] - 66:23
**previously** [3] - 56:22, 108:25, 109:18
**prime** [1] - 147:15
**printout** [1] - 32:23
**prison** [2] - 113:8, 116:21
**private** [4] - 54:25, 55:4, 56:15, 103:4
**privilege** [1] - 11:12
**privileged** [2] - 11:16, 11:24
**proceed** [3] - 4:8, 66:16, 97:4
**proceedings** [1] - 155:11
**proceeds** [1] - 112:9
**process** [1] - 78:18
**produce** [4] - 11:2, 12:2, 31:4, 31:10
**product** [5] - 11:11, 12:24, 23:21, 30:20, 31:20
**profanities** [1] - 112:10
**profanity** [1] - 110:25
**Profile** [1] - 60:25
**program** [1] - 48:12
**prohibited** [1] - 52:16
**Project** [11] - 19:16, 19:19, 20:3, 20:14, 21:6, 21:17, 80:20, 80:22, 83:1, 83:4, 83:14
**prominent** [8] - 50:22, 50:23, 55:17, 61:3, 61:17, 61:18, 74:15

prompted [1] - 141:16
proposal [2] - 153:11, 153:23
propose [1] - 151:13
PROTECT [1] - 1:21
Protect [2] - 80:5, 80:9
protective [1] - 98:15
proud [1] - 97:16
provide [2] - 11:5, 40:6
provided [9] - 13:1, 14:13, 23:17, 23:21, 30:11, 34:14, 89:8, 89:11, 134:17
provides [1] - 23:22
PTX [17] - 96:8, 96:25, 99:11, 108:24, 111:18, 116:24, 118:9, 120:15, 120:16, 121:6, 125:7, 125:12, 126:13, 130:3, 130:4, 130:7, 150:3
public [12] - 36:18, 36:19, 38:14, 43:15, 55:17, 63:2, 63:8, 73:21, 77:14, 87:3, 87:6
publication [1] - 37:13
publications [1] - 88:8
publish [2] - 93:18, 94:1, 109:1, 109:2, 109:19, 109:20, 121:8, 125:10, 130:5
published [4] - 57:5, 63:10, 121:9, 126:15
publishing [1] - 57:15
pull [5] - 96:2, 108:24, 109:17, 110:23, 121:6
Pundit [33] - 15:9, 16:10, 16:23, 17:11, 17:12, 18:3, 18:16, 34:5, 34:11, 34:19, 34:21, 35:11, 35:15, 36:1, 36:12, 37:11, 37:14, 37:17, 37:19, 37:22, 46:8, 46:9, 47:9, 47:14, 47:17, 47:21, 48:4, 48:6, 48:7, 67:12, 92:9, 92:10, 92:13, 92:16
purchasing [1] - 136:20
purely [1] - 93:5
purple [6] - 115:25, 116:3, 127:13, 127:23, 127:25, 128:3
purpose [3] - 41:5,

148:25, 149:1
purposes [1] - 65:13
pursuant [1] - 96:5
put [28] - 17:1, 47:2, 55:14, 56:4, 60:20, 61:17, 79:1, 81:14, 81:16, 82:21, 90:9, 98:24, 100:2, 111:17, 115:7, 118:3, 118:23, 120:3, 126:13, 128:23, 128:25, 131:3, 132:3, 141:25, 142:8, 142:12, 147:19, 148:9
putting [4] - 54:15, 83:1, 140:11, 148:1

**Q**

quality [1] - 103:25
quantify [1] - 87:24
quantifying [1] - 55:23
questions [24] - 12:11, 39:5, 66:19, 78:1, 79:20, 82:17, 84:12, 85:13, 87:2, 87:9, 87:16, 88:24, 90:15, 91:13, 91:16, 92:8, 92:9, 92:15, 93:10, 93:12, 95:9, 149:2, 149:7, 154:5
quickly [2] - 149:23, 151:23
quiet [4] - 104:23, 126:8, 126:9, 126:10
quieted [1] - 126:6
quite [2] - 79:18, 151:23
quote [1] - 38:13
quote-unquote [1] - 38:13

**R**

racist [3] - 65:5, 121:2, 122:23
radius [1] - 105:1
Raffensperger [3] - 62:23, 129:18, 131:24
raise [1] - 66:4
raised [4] - 84:10, 98:9, 98:11, 153:13
ran [1] - 78:8
range [8] - 5:6, 5:12, 7:2, 7:13, 7:15, 59:6, 88:25, 94:16
rather [3] - 38:7, 38:8, 141:24

RDR [3] - 2:8, 155:8, 155:15
reach [1] - 142:22
reaches [1] - 92:1
reaction [7] - 113:10, 114:18, 120:24, 128:16, 130:23, 131:8, 131:23
read [12] - 25:11, 41:24, 42:1, 63:13, 110:24, 111:4, 111:23, 117:5, 117:17, 117:20, 119:3, 149:10
reading [5] - 19:12, 48:3, 101:18, 101:19, 115:22
ready [2] - 4:2, 66:12
real [2] - 130:17
realize [1] - 143:12
realized [2] - 119:24
really [21] - 22:6, 28:21, 41:16, 44:1, 87:7, 96:1, 101:1, 103:20, 106:6, 119:23, 122:23, 130:12, 130:15, 130:25, 131:17, 137:9, 138:18, 144:12, 145:12, 147:3, 147:25
reask [1] - 7:10
reason [3] - 21:3, 82:7, 145:24
reasonable [2] - 4:17, 4:21
reasons [1] - 58:20
rebutting [1] - 82:10
recalled [1] - 94:15
receipt [1] - 86:16
receive [8] - 86:15, 114:24, 115:14, 115:18, 117:11, 120:5, 122:19, 141:2
received [20] - 13:22, 25:1, 25:3, 30:22, 30:24, 60:24, 68:18, 68:24, 86:9, 93:17, 110:12, 111:8, 111:20, 115:1, 115:15, 116:7, 120:12, 121:3, 121:5, 141:1
receiving [5] - 110:3, 114:18, 118:7, 120:22, 123:15
receptive [4] - 85:21, 85:24, 86:3, 93:6
Recess [1] - 65:25
recognize [8] - 6:21,

15:7, 17:7, 17:9, 44:21, 80:16, 109:24, 126:17
recognized [1] - 148:17
recognizes [1] - 6:4
recommended [5] - 56:9, 89:23, 90:5, 91:3, 91:8
record [12] - 6:18, 42:9, 74:3, 82:4, 97:11, 105:16, 110:25, 119:15, 124:24, 140:25, 149:10, 151:3
records [4] - 15:20, 15:25, 16:5, 27:4
REDIRECT [1] - 74:8
redirect [1] - 149:8
reduce [1] - 53:20
reeducation [2] - 35:15, 62:7
refer [3] - 114:2, 127:11, 129:6
reference [3] - 95:24, 116:15, 127:25
referenced [2] - 104:20, 127:20
referred [1] - 69:10
referring [9] - 7:14, 9:13, 33:22, 47:11, 75:1, 75:17, 110:5, 129:6, 134:1
refreshed [1] - 22:20
regarded [1] - 50:12
regarding [1] - 94:6
regardless [1] - 144:14
registered [2] - 83:18, 83:20
registration [1] - 105:19
regularly [2] - 54:21, 55:17, 152:10
rehabilitate [1] - 81:10
rehearsing [1] - 31:24
related [3] - 23:23, 57:18, 134:14
relating [1] - 149:11
relations [1] - 55:18
release [2] - 145:20
released [1] - 63:2
relevance [2] - 31:8, 71:3
relevancy [1] - 22:6
relevant [9] - 40:5, 40:7, 59:14, 59:15, 59:20, 90:22, 90:23, 91:6, 91:12
reliability [2] - 26:16,

72:19
reliable [4] - 26:9, 71:6, 71:15, 72:12
reliance [1] - 73:21
relied [6] - 9:17, 24:6, 24:20, 25:1, 31:12, 73:9
relocating [2] - 149:14, 149:17
rely [3] - 25:8, 92:2, 154:7
relying [3] - 9:1, 48:4, 154:6
remain [2] - 26:7, 87:23
remarks [1] - 144:7
remember [24] - 10:6, 14:3, 22:15, 22:19, 22:21, 23:2, 28:8, 32:25, 44:1, 64:6, 64:8, 64:9, 79:20, 91:13, 100:21, 100:23, 106:10, 120:22, 123:7, 125:18, 139:4, 139:5, 140:17, 145:2
remembered [1] - 103:25
repair [30] - 36:5, 37:18, 40:12, 42:11, 43:5, 48:12, 49:14, 49:16, 49:24, 50:19, 50:24, 54:25, 55:1, 56:9, 56:15, 56:21, 70:1, 74:16, 77:17, 77:21, 77:24, 78:3, 78:9, 78:20, 89:12, 89:24, 90:3, 91:7, 91:17, 91:20
repeat [1] - 112:9
rephrase [3] - 11:22, 42:2, 43:12
report [71] - 4:17, 5:3, 5:9, 5:21, 6:25, 7:3, 7:13, 7:16, 7:20, 7:23, 8:4, 11:2, 12:2, 12:7, 12:25, 13:22, 13:24, 14:1, 14:14, 14:20, 15:14, 23:16, 23:17, 23:22, 24:20, 24:22, 25:2, 25:12, 25:23, 26:12, 26:16, 26:17, 30:8, 31:12, 31:13, 32:2, 32:22, 32:24, 33:1, 33:17, 39:17, 42:14, 44:22, 51:9, 53:20, 55:23, 69:8, 69:13, 80:2, 87:14, 87:15, 88:2, 88:4, 88:21, 88:25,

89:1, 89:6, 89:7, 89:8, 89:11, 89:18, 89:21, 90:10, 91:23, 123:4, 123:22, 123:24, 124:15
**reported** [2] - 63:1, 123:6
**Reporter** [3] - 2:8, 2:8, 155:16
**REPORTER** [1] - 155:6
**reporters** [1] - 108:12
**reporting** [1] - 24:15
**reports** [8] - 8:12, 13:17, 24:7, 33:19, 74:5, 87:10, 90:21, 92:3
**represent** [4] - 12:17, 85:4, 85:10, 146:3
**representative** [2] - 24:2, 51:7
**represented** [1] - 67:6
**representing** [2] - 15:8, 19:18
**Republican** [4] - 19:23, 19:24, 83:21, 85:9
**Republicans** [2] - 83:3, 84:14
**republications** [1] - 90:11
**reputation** [27] - 34:3, 34:22, 36:5, 40:10, 40:12, 50:23, 50:24, 54:14, 54:25, 55:1, 56:21, 59:13, 60:10, 60:12, 61:12, 61:13, 61:14, 61:15, 61:16, 61:22, 74:16, 76:25, 86:17, 131:24, 132:1, 132:3
**reputational** [24] - 42:11, 43:4, 48:12, 48:17, 48:21, 49:14, 49:15, 49:17, 49:24, 50:7, 56:9, 56:15, 64:18, 70:1, 74:21, 75:1, 75:4, 78:9, 78:20, 86:21, 86:24, 87:3, 87:5, 91:2
**reputations** [4] - 24:17, 50:20, 69:3, 74:23
**request** [1] - 109:19
**requested** [1] - 31:7
**reread** [1] - 44:6
**Research** [1] - 51:23
**research** [2] - 56:13, 72:5
**resent** [1] - 82:4

**residence** [2] - 119:6, 136:1
**resolve** [1] - 52:13
**resolving** [1] - 52:23
**resources** [1] - 75:13
**respect** [6] - 30:18, 42:13, 74:25, 84:20, 87:3, 87:6
**respond** [2] - 41:18, 73:15
**responded** [1] - 41:21
**responding** [1] - 43:22
**responsibility** [1] - 57:8
**responsive** [1] - 41:12
**rest** [2] - 150:15, 152:5
**restate** [2] - 35:23, 43:25
**restaurant** [3] - 103:8, 103:10, 103:14
**restroom** [1] - 65:19
**result** [1] - 93:3
**resume** [1] - 60:20
**retained** [6] - 16:16, 16:17, 16:18, 34:6, 80:5, 80:9
**retracting** [1] - 59:11
**retraction** [2] - 56:20, 57:15
**review** [8] - 17:6, 32:8, 32:10, 32:18, 32:21, 71:16, 71:24, 72:18
**reviewed** [22] - 16:22, 16:24, 19:4, 31:13, 32:3, 32:11, 32:16, 32:22, 32:24, 52:22, 62:23, 63:16, 64:7, 71:14, 71:18, 71:21, 72:4, 72:11, 72:20, 72:23, 73:13, 73:20
**reviewing** [3] - 16:19, 52:20, 63:24
**reviews** [4] - 6:19, 17:8, 46:9
**Rich** [1] - 67:1
**riding** [1] - 27:16
**right-wing** [3] - 20:16, 21:1, 21:7
**ringing** [10] - 123:14, 123:16, 123:17, 124:1, 124:4, 124:5, 124:6, 124:7
**road** [2] - 79:5, 147:18
**roadkill** [2] - 119:24, 120:3
**role** [1] - 106:17
**roller** [1] - 144:22
**room** [1] - 33:8
**Room** [2] - 2:9, 155:17
**ropes** [3] - 112:2,

112:3, 112:6
**roughly** [4] - 14:7, 14:8, 23:19, 52:5
**round** [1] - 62:11
**round-earth** [1] - 62:11
**RUBY** [3] - 1:3, 3:5, 97:6
**Ruby** [26] - 2:6, 23:24, 95:14, 97:12, 97:15, 97:19, 97:20, 97:22, 97:24, 104:10, 113:7, 113:11, 113:25, 114:14, 115:24, 127:23, 128:3, 129:24, 131:9, 132:6, 146:1, 146:9, 146:11, 147:7, 148:5, 148:6
**Ruby's** [1] - 113:23
**Ruby_Unique** [1] - 115:25
**Rudy** [6] - 20:20, 86:3, 109:6, 116:12, 116:16, 116:18
**RUDY** [1] - 1:5
**rule** [1] - 102:5
**Rule** [1] - 73:8
**rules** [2] - 102:2, 102:5
**ruling** [1] - 82:22
**run** [11] - 37:17, 68:17, 75:19, 77:21, 77:24, 78:19, 78:23, 94:12, 94:19, 95:1, 95:4
**running** [1] - 78:3

## S

**sad** [2] - 146:20
**safest** [1] - 113:7
**sake** [1] - 42:24
**sample** [1] - 51:7
**sane** [1] - 145:18
**sanity** [1] - 145:18
**save** [1] - 112:9
**saw** [12] - 4:16, 14:1, 19:14, 32:13, 100:25, 113:1, 119:13, 120:10, 127:10, 128:18, 131:6, 139:4
**scale** [2] - 61:15, 95:5
**scandal** [1] - 78:8
**scanned** [1] - 118:24
**scared** [15] - 120:7, 120:8, 120:11, 125:20, 125:23, 125:25, 132:20, 135:11, 135:12, 135:14, 137:18,

145:21
**scary** [3] - 121:2, 137:19, 146:20
**scholarly** [1] - 71:25
**school** [13] - 98:16, 98:20, 100:6, 100:9, 100:11, 100:15, 101:9, 101:10, 101:12, 101:14, 101:15
**science** [3] - 8:17, 28:5, 39:12
**scientifically** [1] - 28:6
**scientist** [3] - 4:14, 4:15, 28:1
**scientists** [2] - 4:20, 27:25
**scope** [3] - 16:12, 59:2, 60:1
**screaming** [2] - 145:17, 145:19
**screen** [15] - 47:12, 94:8, 109:4, 109:17, 109:21, 110:10, 111:18, 115:21, 118:18, 118:23, 119:16, 119:21, 121:10, 126:14, 148:9
**sealed** [1] - 107:13
**search** [1] - 23:23
**season** [1] - 103:22
**second** [19] - 5:9, 5:20, 5:22, 14:15, 17:15, 32:23, 77:10, 82:7, 90:24, 90:25, 94:10, 96:12, 96:18, 112:8, 116:10, 119:18, 126:8, 138:19, 153:11
**second-to-last** [1] - 112:8
**Secretary** [2] - 62:23, 129:18
**secretary** [1] - 106:10
**sections** [1] - 86:22
**security** [6] - 75:7, 134:22, 134:25, 135:1, 135:19, 135:25
**see** [45] - 4:18, 6:16, 19:7, 19:16, 20:5, 31:3, 44:21, 46:6, 46:8, 46:9, 46:11, 46:14, 46:16, 46:19, 46:23, 46:25, 47:3, 47:5, 47:15, 47:24, 48:1, 61:12, 70:8, 71:8, 94:7, 94:10, 109:4, 109:21,

110:10, 110:12, 113:6, 115:21, 119:21, 127:4, 127:20, 128:3, 128:7, 137:24, 138:13, 153:6, 153:11, 153:24, 154:8, 154:16, 154:21
**seeing** [6] - 31:7, 64:9, 94:15, 111:1, 119:16, 128:16
**seek** [2] - 84:25, 85:3
**seem** [1] - 145:18
**segregated** [2] - 100:7, 100:15
**selected** [1] - 63:16
**self** [1] - 154:5
**self-explanatory** [1] - 154:5
**sell** [4] - 98:20, 98:21, 99:2, 102:8
**selling** [6] - 102:9, 102:14, 102:15, 102:24, 103:20, 103:23
**Semitic** [1] - 50:8
**Send** [1] - 148:8
**send** [2] - 55:15, 154:13
**sense** [3] - 85:25, 153:12, 154:2
**sensors** [1] - 134:23
**sent** [5] - 116:18, 119:6, 138:4, 143:9, 150:1
**sentence** [6] - 112:8, 114:14, 116:11, 118:2, 127:21, 128:14
**separate** [1] - 122:3
**Series** [1] - 102:12
**series** [1] - 87:9
**serve** [1] - 84:25
**served** [1] - 79:21
**serving** [3] - 80:25, 81:18, 83:15
**SESSION** [1] - 1:9
**set** [9] - 9:11, 9:12, 30:24, 37:4, 58:17, 87:25, 88:14, 100:22, 128:21
**sets** [1] - 26:21
**settled** [1] - 13:1
**settlement** [1] - 13:2
**several** [2] - 121:5, 129:21
**share** [2] - 103:4, 153:1
**shared** [1] - 33:8

**Shaye** [4] - 23:24, 104:15, 105:11, 143:20
**shirt** [11] - 113:22, 114:2, 114:9, 115:25, 116:3, 127:13, 127:23, 127:25, 128:1, 128:4, 128:22
**shirts** [1] - 146:4
**Shoe** [1] - 142:19
**shoot** [1] - 127:15
**shop** [3] - 100:3, 102:20, 147:10
**shopping** [1] - 138:13
**shops** [1] - 147:2
**short** [1] - 65:19
**show** [7] - 35:2, 76:11, 82:8, 82:14, 145:23, 147:12, 148:7
**showed** [2] - 32:25, 64:23
**showing** [2] - 82:12, 94:4
**shown** [2] - 4:24, 6:6
**shows** [10] - 76:14, 76:18, 104:2, 145:21, 145:22, 145:23, 147:5, 148:8, 148:18, 148:21
**Sibley** [40] - 4:9, 6:2, 6:20, 10:15, 11:19, 21:12, 28:9, 29:18, 46:24, 53:5, 66:1, 66:5, 66:12, 66:15, 73:5, 74:2, 74:14, 75:1, 75:17, 78:1, 78:25, 79:20, 80:23, 82:17, 84:12, 85:13, 87:8, 88:24, 90:14, 91:13, 92:8, 92:15, 93:9, 94:18, 96:17, 149:3, 151:20, 152:25, 153:22, 154:23
**SIBLEY** [81] - 2:2, 2:2, 4:11, 5:16, 5:20, 5:24, 6:3, 6:9, 6:12, 6:21, 6:24, 10:16, 11:13, 11:20, 16:13, 16:25, 17:3, 17:5, 17:10, 18:1, 20:13, 21:13, 22:3, 22:7, 28:11, 28:14, 29:15, 29:19, 29:21, 31:21, 39:15, 41:12, 41:15, 41:24, 42:3, 43:13, 44:8, 47:1, 47:7, 47:8, 53:1, 53:10,

53:14, 53:17, 54:1, 57:24, 59:19, 65:18, 66:2, 66:13, 66:17, 66:18, 71:5, 71:13, 71:22, 72:6, 72:8, 72:21, 72:25, 73:6, 76:5, 77:2, 78:14, 79:8, 81:4, 81:10, 81:20, 84:1, 84:3, 84:16, 91:9, 96:19, 149:4, 149:7, 150:20, 151:2, 151:5, 151:21, 153:15, 154:11, 154:24
**Sibley's** [2] - 82:10, 87:2
**Sibley)** ......................
.......... [1] - 3:4
**sibley@**
**camarasibley.com**
[1] - 2:5
**side** [5] - 79:5, 85:4, 113:3, 119:25, 120:3
**sign** [6] - 82:13, 101:20, 101:23, 102:2, 102:5, 102:6
**Signature** [1] - 47:25
**signed** [3] - 50:11, 101:17, 101:24
**significance** [1] - 109:10
**significant** [1] - 26:18
**similar** [2] - 18:4, 18:10
**similarities** [1] - 35:9
**similarity** [1] - 18:6
**similarly** [1] - 70:13
**single** [3] - 79:13, 82:8, 105:1
**sit** [1] - 103:6
**sitting** [3] - 22:21, 60:22, 114:16
**situated** [1] - 70:13
**situation** [1] - 151:7
**situations** [1] - 48:11
**sixth** [1] - 100:8
**slave** [1] - 98:4
**slaves** [1] - 98:3
**Sleep** [1] - 117:10
**slide** [1] - 35:2
**slides** [3] - 32:11, 32:13, 32:23
**slightly** [1] - 66:8
**slow** [1] - 96:12
**slowly** [1] - 101:19
**SM** [1] - 46:1
**smaller** [1] - 59:5
**smart** [1] - 43:20
**snacks** [1] - 152:14

**snap** [2] - 114:17, 114:23
**sneezes** [1] - 99:17
**sniggering** [1] - 144:10
**so-called** [1] - 75:16
**so..** [2] - 67:22, 136:10
**social** [10] - 4:15, 9:25, 12:16, 23:22, 26:6, 39:12, 50:10, 55:24, 67:5, 115:1
**solo** [1] - 79:5
**someone** [8] - 9:15, 47:18, 48:11, 49:3, 54:2, 56:4, 72:11, 110:22
**sometimes** [8] - 58:3, 60:8, 61:7, 76:15, 92:2, 97:25, 103:1, 145:16
**somewhat** [2] - 15:17, 15:18
**somewhere** [2] - 136:9, 137:19
**Soon** [1] - 120:1
**soothing** [1] - 99:19
**sorry** [32] - 4:9, 7:10, 11:14, 14:5, 15:1, 18:9, 27:14, 29:17, 30:12, 35:23, 36:16, 41:4, 41:14, 41:25, 47:1, 54:6, 59:10, 62:19, 69:10, 69:15, 72:15, 88:19, 97:4, 105:15, 107:21, 110:8, 113:16, 117:3, 117:25, 122:18, 124:20, 136:15
**sort** [11] - 7:12, 33:18, 35:5, 35:14, 42:5, 60:11, 64:21, 70:7, 85:14, 86:22, 152:22
**sought** [1] - 85:9
**sound** [2] - 5:4, 18:23
**source** [5] - 47:9, 47:19, 51:13, 51:14, 58:18
**sources** [6] - 48:5, 51:8, 51:12, 51:17, 56:10, 68:19
**South** [2] - 98:8, 98:13
**spaces** [1] - 128:23
**spalding** [1] - 127:2
**Spalding** [1] - 101:25, 102:1, 117:3, 117:16, 118:17, 119:17, 122:10, 125:11, 130:6, 130:19, 131:19

**spare** [1] - 112:10
**speaking** [2] - 77:14, 96:3
**special** [4] - 97:20, 103:12, 106:5, 106:6
**specific** [9] - 7:18, 11:9, 11:10, 14:14, 33:22, 44:10, 77:10, 92:23, 92:24
**specifically** [3] - 34:1, 59:6, 86:11
**specifics** [1] - 39:20
**speculation** [1] - 77:3
**speeches** [1] - 77:14
**spend** [8] - 40:8, 40:11, 41:8, 42:23, 43:7, 68:6, 69:6, 86:7
**spending** [3] - 40:14, 41:5, 43:3
**spends** [1] - 38:13
**spent** [5] - 15:18, 16:3, 41:2, 67:24, 68:2
**sphere** [1] - 22:6
**spoken** [1] - 21:15
**spokesman** [1] - 75:23
**spokesperson** [2] - 75:21, 75:22
**spread** [2] - 10:4, 47:19
**spreadsheet** [1] - 64:23
**Springs** [2] - 104:18, 104:19
**St** [1] - 19:9
**Stadium** [1] - 102:10
**stadium** [3] - 102:21, 103:8, 103:25
**stand** [2] - 61:9, 150:7
**standard** [1] - 73:24
**standing** [2] - 60:11, 61:14
**start** [8] - 87:8, 96:3, 109:15, 118:14, 122:10, 124:21, 132:19, 150:18
**started** [19] - 82:23, 102:7, 102:9, 103:16, 103:23, 105:18, 106:25, 107:2, 107:15, 110:3, 122:25, 123:1, 123:18, 124:6, 125:5, 132:24, 140:7
**starting** [3] - 115:22, 117:20, 151:14
**state** [6] - 35:5, 38:23, 39:17, 46:20, 97:11, 106:10

**State** [7] - 107:17, 107:24, 108:3, 114:3, 114:6, 116:19, 129:18
**statement** [9] - 44:15, 52:11, 64:21, 64:24, 74:15, 88:1, 88:15, 152:3, 153:18
**statements** [78] - 7:14, 7:25, 8:3, 8:5, 8:20, 8:23, 9:2, 9:5, 9:6, 9:8, 9:11, 9:12, 9:18, 11:4, 24:11, 26:22, 26:24, 30:24, 30:25, 33:18, 33:19, 33:20, 33:25, 34:1, 34:2, 34:7, 34:20, 35:19, 36:25, 37:4, 37:12, 37:19, 40:13, 44:10, 44:16, 45:1, 52:10, 56:24, 57:5, 57:19, 57:20, 57:25, 58:3, 58:4, 58:8, 58:9, 58:13, 58:17, 59:11, 59:25, 64:18, 65:5, 65:9, 65:14, 65:15, 69:24, 76:12, 76:17, 76:24, 85:25, 87:13, 87:15, 87:19, 87:22, 87:23, 88:2, 88:3, 89:9, 89:13, 89:17, 89:21, 89:25, 93:4, 93:6, 93:7
**STATES** [2] - 1:1, 1:10
**states** [3] - 94:11, 110:16, 114:14
**States** [3] - 146:13, 147:4, 155:16
**stating** [2] - 39:23, 126:25
**stay** [10] - 101:4, 103:3, 126:10, 134:3, 134:7, 134:9, 135:10, 141:23, 141:24, 142:11
**stayed** [2] - 134:8, 139:19
**staying** [1] - 139:16
**stealing** [4] - 38:25, 57:8, 129:23, 131:3
**stenographic** [1] - 155:10
**step** [1] - 127:14
**Stewart** [1] - 78:8
**sticker** [2] - 6:12, 17:2
**still** [18] - 36:19, 38:3, 39:13, 39:16, 41:9, 58:15, 88:16, 97:22, 124:3, 124:4, 135:6, 144:18, 144:22,

145:7, 146:23,
148:5, 148:25,
151:21
**stipulated** [7] - 96:20,
134:14, 135:24,
136:15, 149:12,
149:15, 149:18
**stipulation** [4] - 69:9,
69:16, 96:6, 134:16
**stipulations** [1] -
149:10
**stockings** [1] - 99:7
**stole** [1] - 58:16
**stolen** [4] - 40:20,
43:17, 51:17, 51:21
**stop** [1] - 146:14
**store** [2] - 105:5,
138:12
**stories** [2] - 40:2,
57:14
**stormed** [1] - 139:1
**story** [1] - 144:3
**strange** [2] - 38:7,
38:8
**strategic** [6] - 76:20,
78:23, 91:24, 92:2,
93:13, 131:6
**Strategic** [18] - 40:22,
44:18, 45:7, 45:14,
47:17, 48:3, 62:17,
63:18, 63:25, 64:2,
93:10, 93:20, 94:6,
94:18, 94:23, 94:24,
126:20, 128:17
**Street** [4] - 1:14, 1:18,
1:21, 2:3
**street** [10] - 102:10,
104:20, 104:21,
117:23, 118:2,
118:4, 118:5,
119:25, 120:3, 142:6
**strict** [1] - 98:13
**strike** [3] - 41:16,
41:19, 64:16
**strong** [1] - 61:9
**students** [2] - 54:21,
100:20
**studied** [1] - 9:7
**studies** [1] - 55:2
**study** [4] - 8:24, 9:6,
9:10, 9:13
**stuff** [18] - 30:6, 65:3,
83:1, 101:1, 102:23,
103:14, 103:25,
112:16, 121:1,
125:21, 138:5,
138:6, 138:13,
139:7, 139:10,
140:22, 142:20,
144:10

**Stuffing** [1] - 127:5
**stuffing** [4] - 127:8,
130:24, 131:1, 131:5
**submit** [1] - 154:1
**submitted** [2] -
152:24, 154:18
**subset** [2] - 14:10,
59:3
**substance** [3] - 33:15,
110:15, 117:5
**substantial** [2] - 18:6,
26:18
**substantially** [4] -
18:4, 25:4, 26:3,
70:12
**success** [5] - 42:9,
54:20, 54:24, 55:7,
58:14
**successful** [9] - 49:25,
50:3, 50:13, 56:14,
57:12, 57:14, 57:16,
68:5, 147:16
**sued** [1] - 52:7
**suing** [1] - 20:4
**suitcase** [1] - 116:1
**Suitcase** [1] - 127:4
**suitcases** [1] - 131:1
**Suite** [2] - 1:14, 2:3
**sunglasses** [1] - 145:8
**supplement** [9] - 5:20,
5:22, 5:25, 6:25,
7:19, 32:22, 32:23,
32:24, 87:24
**supplemental** [3] -
87:14, 88:21, 152:23
**supplements** [1] -
12:22
**supported** [1] - 20:9
**supporter** [3] - 20:6,
82:16, 82:20
**supporting** [1] - 83:22
**suppose** [3] - 4:22,
12:18, 42:18
**supposed** [4] - 53:6,
53:12, 94:19, 145:22
**surprise** [8] - 19:1,
19:13, 24:1, 24:4,
57:3, 57:10, 61:2,
67:16
**surprised** [1] - 28:8
**survey** [1] - 51:5
**surveyed** [1] - 71:7
**sustain** [1] - 10:13
**sustained** [5] - 16:14,
53:24, 71:4, 71:12,
76:7
**swing** [1] - 113:8
**Sworn** [1] - 97:6
**sworn** [1] - 95:21
**symbolism** [1] - 98:2

**systems** [1] - 135:25

**T**

**T-shirts** [1] - 146:4
**table** [5] - 88:19, 89:3,
93:1, 99:21, 103:10
**tailored** [1] - 92:22
**talks** [1] - 76:14
**tapped** [1] - 142:24
**taste** [1] - 99:15
**teach** [2] - 54:21,
147:15
**team** [1] - 67:22
**Team** [2] - 94:6,
126:21
**television** [1] - 139:5
**temporary** [1] - 134:15
**Ten** [1] - 46:18
**ten** [5] - 65:22, 94:19,
94:24, 95:1, 133:10
**ten-day-long** [1] -
94:24
**tennis** [1] - 138:5
**tenth** [1] - 100:12
**term** [3] - 93:20, 127:7,
131:9
**terms** [5] - 4:16, 23:23,
112:23, 127:8,
130:24
**terrible** [1] - 126:4
**territory** [1] - 52:16
**terroristic** [1] - 126:1
**terrorized** [3] - 120:6,
126:3, 126:4
**testified** [8] - 16:2,
72:16, 86:21, 94:14,
133:6, 138:20,
141:15, 144:1
**testify** [3] - 22:12,
27:21, 30:17
**testifying** [3] - 10:8,
21:2, 31:21
**testimony** [11] - 20:8,
31:24, 32:19, 53:7,
73:18, 74:4, 79:10,
81:13, 84:17, 90:3,
123:25
**text** [10] - 30:4, 55:15,
109:15, 111:23,
115:2, 117:6,
117:12, 117:13,
117:17, 117:19
**thanking** [1] - 61:7
**THE** [151] - 1:1, 1:1,
1:9, 4:2, 4:5, 4:7,
5:18, 5:22, 6:1, 6:6,
6:11, 6:13, 6:20,
6:23, 7:8, 7:10,
10:13, 11:14, 11:22,

16:14, 17:1, 17:14,
17:18, 17:22, 17:24,
18:8, 20:11, 21:6,
21:9, 21:10, 22:5,
22:9, 26:1, 28:9,
28:12, 29:17, 29:20,
31:9, 31:22, 39:4,
39:11, 41:16, 42:1,
43:10, 43:20, 44:6,
46:24, 47:4, 47:5,
52:17, 53:2, 53:5,
53:12, 53:16, 53:23,
57:22, 59:18, 65:22,
66:1, 66:11, 66:15,
68:22, 70:15, 70:22,
71:4, 71:12, 71:23,
72:7, 72:14, 72:24,
73:5, 73:15, 74:6,
76:7, 77:4, 78:16,
79:11, 81:6, 81:9,
81:14, 81:24, 82:6,
82:15, 82:25, 83:7,
83:9, 84:2, 84:4,
84:18, 91:11, 93:19,
93:24, 94:2, 95:10,
95:11, 95:12, 95:15,
95:17, 95:18, 95:20,
95:25, 96:12, 96:14,
96:17, 96:21, 97:2,
97:4, 99:25, 109:2,
109:20, 115:9,
115:11, 118:12,
120:17, 121:9,
121:24, 122:1,
122:4, 122:5, 122:9,
125:10, 126:15,
127:14, 127:15,
127:16, 127:17,
130:5, 149:3, 149:6,
149:8, 149:20,
149:25, 150:4,
150:6, 150:12,
150:15, 150:18,
150:23, 151:4,
151:7, 151:20,
151:22, 152:2,
152:6, 152:20,
153:17, 154:1,
154:10, 154:13,
154:25, 155:2
**themselves** [1] - 48:19
**theories** [1] - 10:3
**theory** [6] - 9:22, 38:1,
38:7, 48:17, 62:5,
91:14
**therefore** [1] - 91:6
**they've** [4] - 68:2,
68:18, 128:25, 154:6
**thinking** [2] - 94:14,
139:5

**thinks** [1] - 51:20
**third** [2] - 87:24,
127:21
**third-to-last** [1] -
127:21
**thousand** [2] - 26:13,
26:15
**thousand-page** [1] -
26:15
**threat** [1] - 90:18
**threatened** [1] -
140:12
**threats** [5] - 75:7,
123:4, 124:2, 126:1,
131:12
**three** [7] - 8:12, 38:19,
39:12, 74:5, 98:22,
121:12, 121:13
**throughout** [5] -
54:22, 87:23, 101:6,
104:16, 104:17
**tied** [1] - 36:24
**TikTok** [1] - 56:7
**timeframe** [1] - 27:10
**timeline** [1] - 126:22
**Timeline** [1] - 44:22
**tobacco** [1] - 98:15
**today** [18] - 4:24, 9:25,
14:25, 15:2, 22:22,
32:19, 66:8, 66:9,
90:5, 90:10, 99:21,
138:3, 144:18,
145:13, 145:14,
154:21
**today's** [2] - 9:19,
145:13
**tomorrow** [8] - 150:19,
151:11, 151:15,
152:7, 152:12,
153:5, 154:3, 154:22
**tomorrow's** [1] - 9:20
**took** [15] - 7:25, 8:3,
56:23, 82:18, 99:8,
101:17, 112:5,
116:1, 118:3, 120:2,
128:18, 132:1,
132:2, 136:11,
136:15
**top** [3] - 44:21, 110:15,
118:14
**total** [2] - 14:9, 59:4
**totally** [3] - 81:15,
131:4, 132:4
**touch** [2] - 116:20,
143:2
**tours** [1] - 77:12
**toward** [1] - 46:1
**town** [1] - 113:3
**track** [2] - 6:18, 42:9
**trade** [1] - 104:1

**trading** [1] - 78:8
**trail** [1] - 29:10
**train** [1] - 41:25
**traitors** [1] - 111:25
**transcript** [2] - 155:10, 155:11
**TRANSCRIPT** [1] - 1:9
**transition** [1] - 100:18
**trash** [3] - 117:23, 118:4, 137:23
**Trash** [1] - 118:2
**travel** [3] - 8:20, 9:5, 146:12
**traveled** [2] - 9:7, 9:11
**traveling** [1] - 97:17
**treading** [1] - 11:11
**treason** [1] - 111:15
**Treasures** [10] - 97:18, 103:24, 110:17, 110:19, 111:5, 111:21, 114:25, 115:25, 129:2, 146:23
**tree** [2] - 112:2, 112:3
**trees** [2] - 112:6, 113:8
**trending** [1] - 131:9
**TRIAL** [1] - 1:9
**trial** [8] - 11:5, 14:25, 15:2, 15:4, 22:13, 22:23, 30:5, 31:23
**trick** [1] - 67:21
**tried** [3] - 91:1, 137:13, 137:14
**triggered** [1] - 99:4
**trouble** [1] - 87:1
**truck** [1] - 105:3
**true** [18] - 7:2, 7:12, 8:21, 9:5, 9:7, 9:11, 10:11, 11:8, 19:10, 39:19, 39:25, 57:6, 66:22, 112:25, 128:14, 155:9, 155:11
**Trump** [37] - 13:9, 14:4, 14:15, 19:23, 19:24, 20:6, 20:23, 22:13, 22:24, 35:19, 36:7, 45:1, 45:12, 49:7, 49:18, 54:5, 62:23, 65:15, 65:16, 73:13, 82:11, 82:13, 82:16, 82:19, 84:9, 84:13, 85:25, 86:4, 90:6, 129:11, 129:14, 129:24, 130:24, 131:9, 131:24
**trust** [3] - 51:13, 51:17, 56:12
**trusted** [3] - 51:8,

51:11, 56:10
**trusts** [1] - 51:15
**truth** [4] - 9:20, 35:18, 40:15, 59:8
**truthfully** [1] - 27:21
**try** [6] - 40:9, 42:24, 76:9, 81:12, 119:22, 120:4
**trying** [11] - 11:18, 36:20, 37:8, 38:13, 54:25, 66:7, 67:16, 67:21, 86:2, 86:7, 93:2, 130:16, 131:3, 143:2, 145:2, 146:18, 154:4
**turn** [9] - 46:13, 110:7, 112:18, 114:11, 124:10, 142:14, 143:19, 152:8
**turned** [4] - 10:11, 84:22, 85:6, 124:11
**Tweet** [9] - 109:6, 109:9, 109:13, 116:18, 116:22, 127:11, 127:12, 132:24, 142:9
**Tweeted** [1] - 127:9
**Tweeting** [1] - 148:2
**Tweets** [1] - 45:12
**twelfth** [1] - 100:7
**twins** [1] - 100:22
**Twitter** [2] - 54:17, 56:6
**two** [10] - 13:11, 26:21, 61:19, 100:10, 118:10, 134:4, 134:8, 139:21, 141:21, 153:1
**TX** [1] - 2:4
**type** [2] - 101:13, 112:11
**types** [1] - 55:24, 71:17, 73:21
**typo** [1] - 19:11

### U

**U.S** [1] - 2:9
**ugly** [1] - 118:21
**ultimate** [1] - 25:14
**Uncle** [1] - 116:12
**under** [6] - 46:20, 47:22, 47:23, 47:25, 73:8, 128:4
**underlying** [1] - 9:4
**understood** [1] - 93:13
**underway** [2] - 91:18, 91:21
**underwent** [1] - 36:4
**undisclosed** [1] - 73:7

**unfamiliar** [1] - 20:19
**unfortunate** [2] - 38:10, 38:19
**uniform** [1] - 113:24
**union** [1] - 112:1
**Unique** [9] - 97:18, 103:24, 110:16, 110:19, 111:5, 111:21, 114:25, 129:2, 146:23
**unique** [4] - 97:20, 102:15, 103:19, 103:25
**UNITED** [2] - 1:1, 1:10
**United** [3] - 146:13, 147:4, 155:16
**universe** [1] - 33:19
**unless** [1] - 30:18
**unquote** [1] - 38:13
**unreliable** [1] - 73:7
**unsuccessful** [1] - 40:18
**unusual** [2] - 151:7, 153:19
**up** [50] - 7:5, 38:18, 47:2, 49:4, 54:15, 55:14, 64:22, 66:19, 69:6, 70:9, 79:1, 81:17, 88:17, 98:7, 98:8, 99:6, 99:10, 104:18, 108:7, 108:9, 108:24, 109:17, 110:23, 111:17, 116:2, 117:3, 118:3, 121:6, 124:25, 128:21, 132:3, 133:2, 133:3, 143:3, 143:5, 143:7, 144:7, 144:25, 145:25, 146:2, 146:7, 146:8, 147:2, 147:25, 148:1, 148:10, 150:18, 152:16
**upcoming** [1] - 13:16
**upper** [1] - 7:16
**utilities** [1] - 136:24
**utility** [1] - 149:16

### V

**vague** [1] - 7:6
**value** [2] - 36:2, 36:18
**various** [3] - 10:3, 110:3, 112:9
**vendor** [3] - 102:10, 142:19, 147:15
**vendors** [2] - 147:14, 147:16
**verdict** [9] - 54:11,

150:21, 151:13, 153:10, 153:17, 154:3, 154:6, 154:14
**verdicts** [1] - 70:4
**Veritas** [11] - 19:16, 19:19, 20:3, 20:14, 21:6, 21:17, 80:20, 80:22, 83:1, 83:4, 83:14
**version** [2] - 19:11, 118:24
**versions** [1] - 77:17
**versus** [1] - 89:6
**via** [3] - 29:2, 31:1, 111:21
**Video** [1] - 127:5
**video** [12] - 63:9, 63:10, 109:11, 114:7, 114:9, 116:1, 116:17, 127:7, 127:10, 127:25, 128:4
**video)** [1] - 127:23
**vindicating** [1] - 39:23
**violent** [1] - 65:5
**virus** [2] - 9:23, 10:1
**visited** [1] - 29:25
**vitriolic** [1] - 65:5
**voice** [1] - 121:3
**voicemail** [1] - 121:12
**voicemails** [6] - 115:2, 120:12, 120:14, 121:13, 122:2, 122:21
**Volume** [1] - 44:12
**VON** [1] - 1:17
**vote** [5] - 83:18, 106:19, 106:20, 106:21
**Voted** [1] - 47:22
**voted** [2] - 84:7, 84:8
**voter** [3] - 18:14, 19:23, 19:24
**voters** [1] - 105:18
**votes** [1] - 38:25
**vs** [1] - 1:4

### W

**wait** [10] - 21:17, 40:8, 70:22, 136:6, 143:6, 153:10
**walk** [1] - 146:12
**walked** [1] - 101:24
**walking** [2] - 101:19, 148:16
**wallet** [2] - 139:25, 141:8
**Wandrea** [1] - 2:6
**wants** [1] - 112:1

**warn** [1] - 120:18
**warning** [1] - 121:22
**was..** [1] - 132:1
**Washington** [3] - 1:15, 2:10, 155:18
**waste** [4] - 62:9, 62:12, 82:6, 152:17
**watch** [7] - 51:22, 51:24, 51:25, 58:24, 103:10, 103:13, 135:12
**watched** [2] - 105:1, 105:3
**ways** [1] - 82:25
**wear** [4] - 145:7, 145:8, 146:4, 148:15
**wearing** [3] - 82:13, 114:2, 114:9
**week** [4] - 29:25, 31:16, 95:2, 95:3, 107:19, 126:8
**weekly** [1] - 28:23
**weeks** [4] - 28:24, 95:6, 134:8, 139:20
**weight** [1] - 86:8
**Weisenbach** [8] - 20:2, 20:6, 80:8, 80:20, 81:24, 83:12, 83:14, 84:6
**welcome** [3] - 46:24, 138:4, 152:14
**well-known** [1] - 20:14
**white** [2] - 100:20, 100:22
**whole** [3] - 62:5, 139:15, 141:21
**wide** [1] - 22:6
**WILLKIE** [1] - 1:14
**win** [1] - 128:21
**wing** [4] - 20:16, 20:21, 21:1, 21:7
**withdraw** [2] - 29:19, 83:10
**withdrawing** [1] - 83:9
**withdrawn** [1] - 92:7
**WITNESS** [11] - 3:2, 6:23, 7:10, 21:9, 39:11, 95:11, 95:20, 115:11, 127:15, 127:17, 149:6
**witness** [19] - 5:16, 6:4, 6:7, 7:8, 21:15, 22:8, 39:7, 43:20, 59:17, 65:20, 66:10, 73:1, 78:15, 82:11, 95:12, 95:21, 118:11, 150:7
**Witness** [3] - 6:19, 17:8, 46:9
**witnesses** [1] - 150:13

**Wizard** [3] - 112:22, 112:24, 113:1
**woman** [6] - 103:2, 105:1, 106:21, 127:23, 127:25, 128:3
**women** [2] - 36:12, 61:23
**wondering** [5] - 33:11, 99:3, 113:10, 126:2, 144:18
**word** [6] - 100:23, 101:8, 118:21, 126:1, 129:4, 129:5
**Word** [2] - 154:12, 154:14
**words** [3] - 101:3, 111:11, 115:22
**works** [2] - 56:8, 151:18
**World** [1] - 102:12
**world** [3] - 85:23, 92:23, 123:1
**worst** [1] - 102:12
**Worst** [1] - 46:18
**Wow** [2] - 61:8, 112:24
**write** [2] - 77:11, 149:22
**wrongfully** [1] - 40:4
**wrote** [2] - 4:19, 77:7

## Y

**y'all** [2] - 132:20, 148:22
**year** [5] - 27:11, 95:6, 100:13, 102:13
**years** [7] - 38:19, 61:22, 100:10, 104:21, 105:23, 105:24, 134:24
**yesterday** [4] - 56:25, 57:4, 99:23, 143:25
**Young** [1] - 143:7
**young** [1] - 144:5
**youngest** [1] - 98:16
**yourself** [5] - 4:14, 97:13, 106:23, 112:8, 137:21
**yourselves** [1] - 152:10
**yup** [1] - 144:2

## Z

**Zoom** [5] - 29:7, 29:8, 29:16, 29:22, 30:1