# EXHIBIT A

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
RUBY FREEMAN, et al.,              )  Civil Action
               Plaintiffs,         )  No. 21-3354
vs.                                )
                                   )
RUDOLPH GIULIANI,                  )  December 14, 2023
                                   )  8:59 a.m.
               Defendant.          )  Washington, D.C.
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                       TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE BERYL A. HOWELL,
               UNITED STATES DISTRICT COURT JUDGE
```

**APPEARANCES**:


FOR PLAINTIFFS:    MICHAEL J. GOTTLIEB
                   MERYL CONANT GOVERNSKI
                   ANNIE HOUGHTON-LARSEN
                   Willkie Farr & Gallagher LLP
                   1875 K Street, Suite 100
                   Washington, DC 20006
                   (202) 303-1016
                   Email: mgottlieb@willkie.com
                   Email: mgovernski@willkie.com


                   VON A. DuBOSE
                   DuBose Miller
                   75 14th Street NE
                   Atlanta, GA 30309
                   (404) 720-8111
                   Email:  miller@dubosemiller.com


                   JOHN LANGFORD
                   Protect Democracy
                   555 W. 5th Street
                   Los Angeles, CA 90013
                   (919) 619-9819
                   Email: john.langford@protectdemocracy.org


                   *(Appearances Continued)*

<u>APPEARANCES</u>:   (Continued)


FOR DEFENDANT:   JOSEPH D. SIBLEY, IV
                 Camara & Sibley LLP
                 1108 Lavaca Street
                 Suite 110263
                 Austin, TX 78701
                 (713) 966-6789
                 Email: sibley@camarasibley.com




Court Reporter:  ELIZABETH-SAINT-LOTH, RPR, FCRR
                 Official Court Reporter
                 Washington, D.C.  20001


          Proceedings reported by machine shorthand.
        Transcript produced by computer-aided transcription.

# Excerpted

```
 1              THE COURT:  And you can step forward to the
 2     microphone.
 3              MR. SIBLEY:  May I proceed, Your Honor?
 4              THE COURT:  Of course.
 5              MR. SIBLEY:  Defendant moves for a directed
 6     verdict that the relief pleaded by plaintiffs in the amended
 7     complaint fails to state claims on which relief can be
 8     granted.
 9              THE COURT:  That's it?
10              MR. SIBLEY:  I have got more, but I assume the
11     Court would rule one by one, but I can go through them all
12     if you would like.
13              THE COURT:  I'm sorry.  Please, let me just hear
14     your entire motion and all the reasons for it.
15              MR. SIBLEY:  Okay.  We move for a directed verdict
16     on the fact that the unpleaded statements that the Court
17     allowed in state -- are protected opinion, protected under
18     the First Amendment, and failed to adequately plead actual
19     malice as to those statements for which the First Amendment
20     would apply, whether or not the tort is defamation or actual
21     malice.
22              THE COURT:  So you are just repeating all of the
23     arguments that you made in your motion to dismiss.
24              MR. SIBLEY:  There were some -- some new ones, but
25     I just want to make sure we preserve.  He isn't waiving any
```

1      of this stuff.

2              For example, Your Honor, one of the issues was if

3      you allow statements to become actionable that were not in

4      the complaint, how would one ever challenge that by

5      responsive pleading?  And so that's why the argument is if

6      they are unpleaded statements and the Court is allowing them

7      in, they need to be probed for whether the party -- are they

8      actionable pending?  Are they actual statements of fact?

9      Those kind of things.  So...

10             We would also move for a directed verdict that the

11     pre-20 -- December 23, 2020 --

12             THE COURT:  And by the ones that you say were not

13     in the amended complaint, you are basically talking about

14     the four -- two tweets by Team Trump and two posts or

15     tweets -- I think they were tweets by Mr. Giuliani himself.

16             MR. SIBLEY:  Well --

17             THE COURT:  Those are the four actionable

18     statements that you're contesting as being --

19             MR. SIBLEY:  No.

20             THE COURT:  -- beyond the amended complaint?

21             MR. SIBLEY:  No.  I would say those four are

22     included, but also all of the, quote/unquote,

23     pre-December -- December 23, 2020, publications that they

24     now claim:  Well, we're going to sue on those for IIED.

25             Those would also be subject to the same

```
 1    constitutional scrutiny:  Opinion, actual malice, protected

 2    by the First Amendment.  We didn't have a chance to

 3    challenge that by responsive pleading; and I believe it's

 4    the Court's job to look at those statements and do an

 5    independent assessment of whether they are actionable --

 6              THE COURT:  Did I hear you correctly say that you

 7    did not have an opportunity to challenge those by a

 8    responsive pleading?

 9              MR. SIBLEY:  Yes, Your Honor.  Because they were

10    not specifically identified in the amended complaint as

11    something that they were basing their complaint on.  So we

12    couldn't have challenged those statements; it was just a

13    general statement about "he made these statements, see all

14    paragraphs incorporated herein," which were just the 12

15    actionable statements in the amended complaint.  So

16    that's --

17              THE COURT:  And would your objections to those

18    counting as actionable statements be the exact same defenses

19    you offered to the actionable statements set out in the

20    amended complaint?

21              MR. SIBLEY:  Yes.  Opinion, failure to actually

22    plead actual malice --

23              THE COURT:  Which were all rejected in the motion

24    to dismiss.  All right.

25              MR. SIBLEY:  They were.
```

```
 1                    THE COURT:  Go on.  I hear you.
 2                    MR. SIBLEY:  I think it has to be a
 3       statement-by-statement analysis.
 4                    Also, that there can't be civil conspiracy claims
 5       because they were not identified as overt act in furtherance
 6       of the conspiracy.  So for all of the claims.
 7                    Also, we believe that any statements that are
 8       pre-December 23, 2020, even though IIED does have a two-year
 9       statute of limitations, there is case law that I am familiar
10       with that says you can't repackage what is really a
11       defamation claim in the form of an IIED claim and then try
12       to avoid limitations.  So we would move for those claims
13       being barred by statute of limitations on directed verdict.
14       I understand the Court has stricken our answer in that
15       defense, but for purposes of appeal, I would make that
16       argument now.
17                    I would also move for a directed verdict on any
18       future emotional harm or mental anguish damages for the
19       plaintiffs based on lack of competent evidence.  There was
20       no expert testimony testifying as to future emotional harm
21       or mental anguish damages.  I believe -- my understanding of
22       the law is that for past mental anguish damages, there is no
23       need for an expert to testify on that; but I believe there
24       needs to be a higher level of proof for future mental
25       anguish damages.  So we'd move for directed verdict on those
```

1    damages.

2            We'd also move for a directed verdict to the

3    extent the plaintiffs seek damages on the, quote/unquote,

4    impressions model, as we believe that's unreliable and

5    cannot support -- does not provide a reasonable estimate of

6    any compensatory damages for damage to reputation.

7            I believe that's it, Your Honor.

8            THE COURT:  All right.  Do plaintiffs want to

9    respond?

10           MR. GOTTLIEB:  Thank you, Your Honor.

11           Just to have a complete record, I will take them

12   one by one.

13           With respect to the sufficiency of the pleadings,

14   that's barred by the law of the case doctrine, this Court

15   has already decided it.  You should reaffirm those rulings

16   on the merits for the same reasons in the motion to dismiss

17   opinions.

18           The same goes with respect to the opinion doctrine

19   argument.  This Court has already decided that question,

20   barred by the law of the case doctrine.

21           More to the point, Mr. Sibley hasn't even made the

22   requisite showings to show that the four statements about

23   which he is complaining would even constitute opinion under

24   opinion doctrine because they state facts rather than

25   opinions and because of a host of other reasons that are

1     covered by the Supreme Court decision in *Gertz* and other

2     cases following and extrapolating on the opinion doctrine.

3           With respect to the statements not in the

4     complaint, with the four noncomplaint defamation statements,

5     I have just addressed why Mr. Sibley has not raised

6     threshold arguments that would be required to show that

7     these are covered by the opinion doctrine.  This is also

8     covered by the law of the case in the Court's pretrial

9     rulings.  Mr. Sibley hasn't cited anything that came out

10    during the testimony that changes in any way the record with

11    respect to those arguments.

12          With respect to the 50 IIED statements, Mr. Sibley

13    is making arguments that he would need a

14    statement-by-statement showing about this.  This conflates

15    the torts of defamation and intentional infliction of

16    emotional distress.  There is no legal requirement that says

17    you cannot rely on statements as a course of conduct in an

18    intentional infliction of emotional distress claim.  And

19    those defenses are not applicable, given that we are not

20    seeking defamation damages for a single one of those

21    statements.

22          Mr. Sibley's next argument is civil conspiracy

23    claims do not include overt acts.  We're not seeking

24    liability independently based on any civil conspiracy claim.

25    We are following the law of the District of Columbia.  And

1    as the Court has instructed, that this is a form of

2    vicarious liability.

3            With respect to the fifth argument, Mr. Sibley

4    says that the pre-December 23rd statements are barred by the

5    statute of limitations because they're effectively

6    defamation.  This argument is waived.  It was not made in

7    the motion to dismiss briefing; it was not made in

8    pretrial -- in pretrial motions.  This is not properly

9    preserved; it is not properly the subject of a Rule 50

10   motion.  And he said he is familiar with case law.  I don't

11   know what that case law is, I don't know how to apply it or

12   how to distinguish it, so it's an improper argument on which

13   this Court could even rely on a Rule 50 motion.

14           Sixth argument, Mr. Sibley says there is a lack of

15   competent evidence with respect to future emotional harm;

16   you need an expert for that.  He cites no law to support

17   that contention.  The standard for future harm, as we

18   understand it -- and that is in this Court's instructions --

19   is preponderance of the evidence.  We're prepared to meet

20   that standard.  And we believe the uncontradicted testimony

21   of Ms. Moss on the stand who testified as to her income and

22   her intent with respect to staying at her job more than

23   satisfies the preponderance burden.

24           The last one is:  The impressions model is

25   unreliable and unreasonable.  For all of the reasons stated

1    in Dr. Humphreys' testimony on direct, cross, and redirect,

2    her impressions model is reliable based on scientific

3    methods and opinions that were fully disclosed, including

4    publicly available data that more than sufficiently

5    satisfies the requirements of a Rule 702.

6           THE COURT:  Do you want to respond at all,

7    Mr. Sibley?

8           MR. SIBLEY:  Just a couple of things, Your Honor.

9           First, we didn't -- we weren't put on notice of

10   the scope of the claims based on the pleadings; and

11   therefore, there had to be a ruling of the Court very

12   recently, which did not give us the opportunity to challenge

13   these on pure legal questions, as we would normally have if

14   they filed them in a pleading and we got to file a

15   responsive pleading.

16          Secondly, Your Honor, I think that's a threshold

17   issue.  When you have a default situation, the Court has to

18   look at the quality of the allegations giving rise to

19   liability to determine whether they state a claim.  And I

20   don't believe that's waivable anyway, so I would -- that's

21   how I would respond to his arguments, Your Honor.

22          THE COURT:  Well, I would agree with your last

23   comment, Mr. Sibley, that the Court can only grant default

24   judgment on sufficiently pleaded claims; that was decided in

25   my motion to dismiss, that they were sufficiently pleaded.

```
 1              All right.  So let me just set out the standard

 2     that I have to apply in a Rule 50(a) motion under the

 3     Federal Rules of Civil Procedure.  That rule provides that a

 4     court may grant a defendant's motion for judgment as a

 5     matter of law at any time before the case is submitted to

 6     the jury if the court finds that a reasonable jury would not

 7     have a legally sufficient evidentiary basis to find for the

 8     plaintiff on the claims presented.

 9              The legal question posed by a defendant's Rule 50

10     motion for a directed verdict is whether there is evidence

11     upon which the jury might reasonably find a verdict for the

12     plaintiff.

13              In making that evaluation, the court must view the

14     evidence most favorably to the plaintiff with all reasonable

15     inferences drawn in that party's favor.  The court is not

16     supposed to usurp the jury's function and assess the

17     credibility of the witnesses.

18              Given the particular posture of this case, where

19     this Court has already found that plaintiffs' claims are

20     legally sufficient in a ruling denying Mr. Giuliani's motion

21     to dismiss the complaint, and in this Court's ruling that

22     Mr. Giuliani is liable by default for his discovery

23     misconduct on plaintiffs' three claims for defamation,

24     intentional infliction of emotional distress and civil

25     conspiracy, the testing of plaintiffs' claims again on the
```

1    Rule 50 motion, to my mind, may very well be foreclosed by

2    law of the case.

3           But to the extent that Mr. Sibley has revived all

4    of his motion-to-dismiss claims as part of his Rule 50

5    motion, the Court will rest on both its motion-to-dismiss

6    decision as well as its default judgment decision in

7    resolving those -- and the law of the case doctrine, not to

8    go into all of the details of all of that yet again.

9           So with respect to those -- on the merits to

10   address those decisions, the Court incorporates all of the

11   reasoning set forth in its prior decisions denying the

12   defendant's motion to dismiss, finding him in default as a

13   discovery misconduct sanction, and on all of the rulings

14   that I have made to date in this case.

15          In any event, the evidence presented at trial has

16   only further established a legally sufficient evidentiary

17   basis for a jury to find for plaintiffs on the three claims

18   they present due to the default judgment.  Plaintiffs did

19   not have to present evidence of the blatant falsity of

20   Mr. Giuliani's statements about these two plaintiffs and the

21   falsity of his co-conspirators' statements about these two

22   plaintiffs, that they had engaged in election fraud.  But

23   the plaintiffs did present that evidence with powerful

24   testimony from Georgia officials who thoroughly investigated

25   and debunked those false claims again and again.  They had

1   no highfalutin campaign strategy, like the one Mr. Giuliani

2   designed for the former President.  These Georgia officials

3   did what government officials do; they issued their reports,

4   they held a press conference.  That's very different from

5   the kind of affirmative proactive campaign that the expert

6   Dr. Humphreys described that would be necessary to repair

7   and push out information about the falsities of these

8   claims.

9         But the powerful testimony of these Georgia

10  officials demonstrated that these statements made by

11  Mr. Giuliani and his co-conspirators, again and again and

12  again -- up to the first day of trial in this case -- was

13  totally false.

14        Even a Republican poll watcher -- whose video

15  deposition was shown -- a Republican poll watcher at the

16  State Farm Arena on election night debunked the false

17  allegation that poll watchers were blocked from the

18  location, a claim that Mr. Giuliani has repeated again and

19  again, totally falsely.

20        This evidence was certainly relevant to

21  establishing plaintiffs' entitlement to damages, but I also

22  view all of that evidence being presented here as a public

23  service.

24        Defense counsel, in questioning plaintiffs' expert

25  yesterday, raised the example of people who believe the

1    flat-Earth theory despite clear evidence to the contrary,

2    that the Earth is not flat.  He suggested that efforts to

3    change the thinking of flat-Earth believers would fail.  I

4    understood this line of questioning as likening flat-Earth

5    believers to those who still believe that these plaintiffs

6    engaged in the election fraud claim by Mr. Giuliani and his

7    co-conspirators with the suggestion that no amount of money

8    would help change the thinking of these flat-Earth stolen

9    election believers.  So trying a reputation repair campaign

10   was doomed from the outset.

11          The expert disagreed, and her optimism is based on

12   scientific research showing that minds can be changed even

13   if they do believe that the Earth is flat.

14          Based on all of the evidence presented by

15   plaintiffs, including their own testimony describing what

16   they have been through since Mr. Giuliani and his

17   co-conspirators seized on and spread lies about their

18   conduct on election night in 2020, the expert testimony, the

19   testimony of the Georgia officials and the Republican poll

20   watcher, a reasonable jury would have a legally sufficient

21   evidentiary basis to find for the plaintiffs and award at

22   least some damages as compensation for the harm caused by

23   Mr. Giuliani and his co-conspirators, and as punitive

24   damages against Mr. Giuliani for his continued promotion of

25   these same lies up to the very first day of this trial.

1          The defendant's motion for judgment as a matter of

2     law under Federal Rule of Civil Procedure 50 is denied.

3          All right.  So when I bring the jury in at 10:00,

4     or shortly thereafter, the plan, as I understand it, is that

5     the plaintiffs will introduce some final exhibits, and then

6     we will turn to closing arguments; is that correct?

7          MR. GOTTLIEB:  Your Honor, if we could have 15

8     extra minutes to incorporate the changes to the verdict form

9     into our slide, that would be very helpful.

10          THE COURT:  All right.  That's fine.

11          MR. GOTTLIEB:  I am not sure if we have the

12     revised verdict form yet.  Would it be possible to get

13     that --

14          THE COURT:  No.  We'll get that to you shortly.

15          MR. GOTTLIEB:  Okay.

16          MR. SIBLEY:  My understanding is that -- maybe I

17     misread it, but I thought we were going to introduce the

18     exhibits before the jury comes in so we don't have to waste

19     their time with it.  I thought that's what --

20          THE COURT:  Oh.  It doesn't matter to me.

21          MR. GOTTLIEB:  We can do that, Your Honor.  We

22     just need a minute to assemble all of the paper.

23          THE COURT:  Okay.  Why don't you do that.  Do you

24     want to take your 15 minutes now, and do that and then...

25          MR. GOTTLIEB:  If that would facilitate -- I mean,

# Excerpted

1          And if you go and read that document, Plaintiffs'

2     Exhibit 513 -- you will see it in your exhibits -- he

3     basically says:  Look, I am not going to contest liability;

4     I am not going to contest it.

5          So I think you need to take that into

6     consideration when you're awarding damages, certainly

7     punitive damages, because he tried -- he tried to make this

8     simpler.  He showed up, okay.  It's not like he completely

9     didn't participate in the litigation.  And he did -- you

10    know, certainly did what he could to try to minimize the

11    effort that the plaintiffs needed to go through to get to

12    this point.

13         All right.  So the lawyers in this case are going

14    to ask you -- or have asked you -- for what I would consider

15    a Hollywood-type damage model.  And when we get done

16    talking, I think -- I hope that you will agree with me that

17    justice requires actual reasonable estimate of damages and

18    not what their expert witness, who has only ever done this

19    one time to Donald Trump, testified that they should get.

20         All right.  And here is the real case:  Most of

21    what we heard -- the horrible things that we heard, the

22    racism, the violence, that happened pretty soon after the

23    video started surfacing.  And if you remember, there was an

24    outlet called *The Gateway Pundit*.  We talked about that.

25    And there was a document that we had to kind of fight to get

1    it; it was our only exhibit, actually.  It's Defendant's

2    Exhibit 2.  And Mr. Gottlieb talked about patient zero,

3    meaning the spreader of the virus; and he blamed that on

4    Mr. Giuliani.

5              But as you will see -- and this is not a document

6    Ms. Freeman and Ms. Moss drafted, obviously, it's lawyers.

7    I'm not accusing anyone of anything.  But their lawyers

8    figured out sort of where their patient zero was and filed

9    this lawsuit, this *Gateway Pundit* lawsuit.  And I am going

10   to show you some of the things they said.

11             So Defendant's Exhibit 2, it's in evidence.  So

12   that is the document, okay.

13             Let me show you this page.  And by the way, this

14   lawsuit -- let me just -- well, it's actually on the last

15   page, I will show you.  But the lawsuit was filed

16   December 2nd of 2021, before this lawsuit.  And I actually

17   talked about that with Dr. Humphreys, if you recall.

18             But in paragraph 6 here, they say:  Defendant's

19   reports -- and they're talking about *The Gateway Pundit* --

20   were both false and consequential.  They caused Ms. Freeman

21   and Ms. Moss to be vilified on social media and subjected to

22   an onslaught of violent, racist threats and harassment of

23   all kinds.

24             That's a long complaint, so I am going to sift

25   through it here and get to the parts that matter.  And then

1      if you look at paragraph 49, it says -- let me move this

2      sticky note so you can see it all.

3              It says:  On December 3rd -- December 3rd,

4      remember, that's the day that the video came out -- *The*

5      *Gateway Pundit* published another article with the false

6      report.

7              Okay.  And this, if you look at paragraph 50, that

8      article was the first to identify by name Ms. Freeman.  And

9      it also named her business, okay?  It talks about the purple

10     top.  It says her name again.  I mean, it's very, very

11     identifying.  It talks about her company name, and it even

12     talks about her LinkedIn page.

13             Now, the question I had when I first looked at

14     this was:  How do these people so quickly -- have been able

15     to find the number and contact information for people that

16     are just ordinary folks?  And here was the answer.

17             So I want you to ask yourself, one of the

18     questions that you have is -- it's a more-likely-than-not

19     question, like, more likely than not what caused what.  And

20     by the way, *The Gateway Pundit* is not a co-conspirator in

21     this case; they're a separate entity.

22             More likely than not, if these ladies are getting

23     these horrible messages right after the video comes out, is

24     it more likely due to the story that identifies them by name

25     and gives identifying information to contact them through

1    LinkedIn or whatever, or is it someone that says the video

2    looks like voter fraud?

3           Well, clearly more likely than not this is the

4    party that sort of dox these women, okay?  That's how the

5    name got out, that's how everyone knew who they were, and so

6    that's why they were sued first.

7           Let me finish up here.  I want to show you a few

8    more things.

9           Paragraph 56, I am not going through every

10   sentence here, but I want to show you that *The Gateway*

11   *Pundit* was apparently also the first to identify Ms. Moss.

12   It talks about, right here, (indicating), that her name is

13   Wandrea Moss.

14          And then, in paragraph 121, again this is

15   Defendant's Exhibit 2.  Until this day, Ms. Freeman -- this

16   is, to be fair, 2021 -- "to this day, Ms. Freeman continues

17   to receive threatening communication," referencing

18   defendant's defamation.  That's *The Gateway Pundit*.

19          And then, again, we see some of the allegations

20   that were made in this case that Mr. Giuliani is responsible

21   for actually was *The Gateway Pundit*.  In paragraph 122, the

22   phone calls to Ms. -- Ms. Moss's phone that her son

23   answered.

24          And, again, Ms. Moss and Ms. Freeman didn't say

25   that Mr. Giuliani caused this; this was the argument made by

1    their lawyers, and their experts tried to make it, although

2    they couldn't really do that.  Their lawyers have already

3    identified and admitted who is responsible for this.  Okay?

4    I am not saying Giuliani wasn't responsible for some harm.

5    I am not saying that some people may not have looked at that

6    video that he posted, got ahold of this information that *The*

7    *Gateway Pundit* put out and then sent messages to them.  I

8    have no doubt that it happened, because there is one message

9    I will show you later that has Rudy's name on it.  But this

10   is the proximate cause of the identification of the

11   witnesses to where the public directed these horrible

12   comments out there.

13          And in this lawsuit, I am just going to show you

14   paragraphs 151 and 152, you are going to see -- and this is

15   the same kind of -- exact same allegations that you see in

16   this case:  Reputational damage, humiliation, et cetera.

17   You see the same thing later on for Ms. Moss, in

18   paragraph 170.

19          And, in fact, in paragraph 174, you see that they

20   specifically encouraged people to retaliate and harass the

21   plaintiffs.  And that's what we saw in those horrible

22   messages and audio transcripts.

23          And think about this:  The kind of people that are

24   looking at these sort of fringe media sites like *The Gateway*

25   *Pundit*, those are the kind of people who are more likely to

1    do the kind of things -- all of the kind of things that we

2    saw here.

3            I want to show you -- well, I will show you -- you

4    saw it earlier, I think, in Ms. Freeman's examination, but

5    there is one message from someone who references

6    Mr. Giuliani, and it's probably the tenuous one that we saw

7    of all of them.  And so, again, I have no doubt that

8    Mr. Giuliani's statements -- I mean, he is a public

9    figure -- caused harm; no question about it.  But I am

10    trying to show you that just because these things happened,

11    and they certainly did happen, it doesn't make my client

12    responsible for them, especially when they have already

13    identified patient zero.

14            And as you can see in paragraphs 178 through 80,

15    they're also claiming the emotional distress and anxiety

16    here in this lawsuit.

17            Okay.  So what happened next?  Well, after they

18    filed that lawsuit, they then filed a lawsuit against my

19    client, and Mr. Gottlieb mentioned codefendants that are no

20    longer here, that that was the *One America News Network* and

21    reporters, and that ultimately there's a settlement and are

22    no longer in the case.

23            But if you look at the complaint that's in

24    evidence, you can compare it with -- it's Plaintiffs'

25    Exhibit 27, and I am not going to go through it because it's

1    very long.  But if you look at the harm complained of and

2    the types of things that happened, it is identical, looks

3    like a cut and paste almost of *The Gateway Pundit* complaint.

4         So what they did was -- they said:  Well, look, we

5    have identified patient zero, but let's identify patient

6    deep pockets and try to go after them.  And so that's why

7    they filed a suit against us and they're trying to blame all

8    of this conduct on Mr. Giuliani and these supposed

9    co-conspirators.

10        So I showed you Defendant's Exhibit 2, and that is

11   going to show you who patient zero really is.  Now I want to

12   show you -- one of the arguments I think they made was:

13   Well, sure, *The Gateway Pundit* did this, but this was really

14   part of the conspiracy.

15        Well, let's look at Plaintiffs' Exhibit 1, which

16   is in evidence.

17        And I talked about this, I believe, with

18   Dr. Humphreys.  But the timing of that plan was supposed to

19   take action, this is the conspiracy plan.  And, yes, I know

20   plaintiffs are going to argue to you that the Court will

21   instruct you that the conspiracy formed on or about

22   December 3rd, but what's at issue here is what acts did the

23   co-conspirators take in furtherance of the conspiracy?

24   That's language you will see in the jury instructions.

25        And the only evidence of when the actions in

1    furtherance of the conspiracy are going to take place are in

2    this document.  And that's December 27th through

3    January 6th.

4            Almost all of those messages, the horrible ones

5    that you saw, are way before that.  Not only that, the two

6    of the highest number of impression tweets -- not tweets,

7    but social media impressions that Dr. Humphreys talked

8    about, those are from the Trump -- Team Trump, or whatever

9    that is, on December 23rd of that year.  So a lot -- any

10   conduct they're complaining of from the so-called conspiracy

11   that occurred prior to this date range can't have taken

12   place in furtherance of the conspiracy because the only

13   evidence of anyone doing anything in furtherance of the

14   conspiracy is in Exhibit 1, and you see the date range

15   there.

16           And remember, this document also points out that

17   they, the co-conspirators, were relying on *The Gateway*

18   *Pundit* for their information.  Should they have?  Of course

19   not.  But, again, patient zero is listed in Exhibit 1.

20           Okay.  And by the way, there was some discussion

21   about this Giuliani Strategic Communications Plan that we

22   saw in Exhibit 1.  And they mentioned there was an email

23   that talked about between 5 and $8 million.  First of all,

24   there is no evidence that that money was ever spent.  We

25   don't know what the money was being spent for.

1           What we do know, however, is that political

2     advertisements are usually on TV, sometimes they're on other

3     forms of media.  But as you saw Dr. Humphreys sort of break

4     down, there was a pie graph, and it showed, like, how much

5     it cost to do this and that.  TV is very expensive.  And

6     even if you could accept what I am going to argue to you

7     shortly is a patently ridiculous notion that an individual

8     seeks to repair the reputation by taking out ads on TV or in

9     the newspaper, even if you accepted that, you can't compare

10    whatever these political advertisements were going to be on

11    network TV with what Dr. Humphreys was talking about with

12    respect to Twitter and -- you know, other sort of

13    alternative media sites.

14          All right.  Of course, we heard about the

15    President Biden lawsuit.  Mr. Gottlieb talked about where

16    you can find that in evidence and tried to make the argument

17    that:  Well, since Giuliani is seeking millions of dollars

18    in damages, you know, what is he complaining about here?

19          I believe if you look at that lawsuit, what you

20    are going to see is that's a lost-profits lawsuit because as

21    that lawsuit alleges, when Mr. Giuliani wrote the story

22    about the Hunter Biden laptop, there were a flurry of people

23    that accused him of being a Russian spy.  And that turned

24    out to be false because it actually turned out to be true --

25    it was a laptop -- as you will see in the petition.  But

```
 1              MR. SIBLEY:  I have an extra copy as well, Your
 2    Honor.  I thought I gave it to them.  I have an extra copy.
 3              THE COURT:  Okay.  All right.  So good.
 4              If you need an extra copy of something that is
 5    hard copies, just let me know.
 6              All right.  With that, once we put the jury
 7    instructions that I gave in a format that's 12-point type
 8    and single spaced, we'll give it to you to look at so the
 9    jury instructions can be sent back to the jury as well.
10              (Whereupon, court recessed during deliberations.)
11              (Whereupon, the afternoon session was reported and
12    transcribed by Janice Dickman, and is bound under separate
13    cover.)
14                              *  *  *  *  *
```

**CERTIFICATE**

```
16              I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
      certify that the foregoing constitutes a true and accurate
17    transcript of my stenographic notes, and is a full, true,
      and complete transcript of the proceedings to the best of my
18    ability.

19              This certificate shall be considered null and void
      if the transcript is disassembled and/or photocopied in any
20    manner by any party without authorization of the signatory
      below.
21
22        Dated this 14th day of December, 2023.

23        /s/ Elizabeth Saint-Loth, RPR, FCRR
          Official Court Reporter
24

25
```