```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3    Ruby Freeman,                    ) Civil Action
      Wandrea Moss,                    ) No. 21-cv-3354
 4                                     )
                        Plaintiffs,    ) JURY TRIAL
 5                                     ) PUBLIC
      vs.                              )
 6                                     ) DAY 2 - Afternoon
      Rudolph Giuliani,                ) Washington, DC
 7                                     ) December 12, 2023
                        Defendant.     ) Time:  1:30 p.m.
 8    _____

 9                    TRANSCRIPT OF JURY TRIAL
                          HELD BEFORE
10            THE HONORABLE JUDGE BERYL A. HOWELL
                    UNITED STATES DISTRICT JUDGE
11    _____

12                     A P P E A R A N C E S

13    For Plaintiffs:    John Langford
                         Protect Democracy
14                       555 W. 5th Street
                         Los Angeles, CA  90013
15                       (919) 619-9819
                         Email:  John.langford@protectdemocracy.org
16
                         Michael J. Gottlieb
17                       Meryl Conant Governski
                         Marie Annie Houghton-Larsen
18                       Willkie Farr & Gallagher, LLP
                         1875 K Street, NW
19                       Washington, DC  20006
                         (202) 303-1442
20                       Email:  Mgottlieb@willkie.com
                         Email:  Mgovernski@willkie.com
21                       Email:  Mhoughton-larsen@willkie.com

22                       Von DuBose
                         DuBose Miller
23                       75 14th Street NE, Suite 2110
                         Atlanta, GA  30309
24                       (404) 720-8111
                         Email:  Dubose@dubosemiller.com

25
```

1    For Defendant:          **Joseph D. Sibley, IV**
                             Camara & Sibley, LLP
2                            1108 Lavaca Street, Suite 110263
                             Austin, TX  78701
3                            (713) 966-6789

4    _____

5    Court Reporter:         Janice E. Dickman, RMR, CRR, CRC
                             Official Court Reporter
6                            United States Courthouse, Room 6523
                             333 Constitution Avenue, NW
7                            Washington, DC  20001
                             (202) 354-3267
8                                  *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      * * * * * * *P R O C E E D I N G S* * * * * * *

2              THE COURT:  All right.  So turning to the plaintiffs'

3      motion in limine that was filed last night.  I just want to

4      take each of the separate parts of the request in order.

5              Mr. Gottlieb, are you arguing this?

6              MR. GOTTLIEB:  Yes, Your Honor.

7              THE COURT:  Perfect.  So let me just make sure I have

8      an understanding exactly what you're asking for.  So you want

9      me to preclude the further violations of the Court's orders and

10     preclude defense counsel and Mr. Giuliani from making arguments

11     contrary to my prior evidentiary rulings, and you mentioned

12     three specific areas:

13             First, you want me to preclude Mr. Giuliani from

14     making statements or arguing that he did not proximately cause

15     any or all of the injuries alleged in the amended complaint and

16     established as true by the default judgment.

17             Two, that he will be pushed to financial ruin if the

18     plaintiffs get the substantial damages award.

19             And, three, that when he testifies, he should not be

20     allowed to testify as to what he told a reporter -- and

21     admitted in court this morning that he told a reporter

22     yesterday after court -- that his defamatory statements were,

23     in fact, true, and that he didn't cause the plaintiffs harm.

24             So that's basically the three different things?

25             MR. GOTTLIEB:  That's correct, Your Honor.

1      THE COURT:  Okay.  So I'm going to start in reverse

2  order, starting with his statements after court yesterday.

3      Why -- I mean, first of all, Mr. Sibley has a hard

4  job, and he may have confidence that if he -- or, if the Court

5  instructs Mr. Giuliani not to say anything in testimony under

6  oath in this court or outside the courtroom, that Mr. Giuliani

7  will comply with my instructions.  But, you know, I don't have

8  the confidence that Mr. Sibley has in his own influence over

9  his client.

10      But, why would you really want to stop Mr. Giuliani

11  from either testifying in court under oath that his statements

12  were true, not defamatory, or outside the courtroom?  Because

13  that can be brought in to help bolster additional punitive

14  damages.  So, why would you actually want to do that?

15      MR. GOTTLIEB:  Because the Court has decided that

16  issue in its default judgment; and not just that, but the Court

17  has entered a -- an order already, it is docket No. 108, that

18  precludes any party from introducing any evidence, including in

19  the form of testimony, that contradicts any of this Court's

20  previous orders in this case, including but not limited to the

21  factual findings, legal holdings, and entered adverse

22  inferences.

23      And it just cannot be that testifying on the subject

24  matter of the truth or falsity of the statements is

25  consistent -- testifying to the truth of the statements is

1    flatly inconsistent with the factual findings that this Court

2    has made.  It is a different thing to testify about whether

3    statements were, in fact, made.  Just testifying that

4    statements were made does not contradict any of this Court's

5    prior findings or orders.  So testimony about:  Did you, in

6    fact, make a statement on this date with this content is fully

7    consistent with what this Court has already decided.  Taking

8    the next step to say:  And that statement is true, because

9    everything I've previously said is true, is the step that

10   violates this Court's prior order.

11            THE COURT:  Okay.  Well, let's see if we're just

12   talking about something that we don't have to rule on.  I'm

13   taking these one request at a time.

14            Mr. Sibley, you've made it clear that Mr. Giuliani

15   intends to take the stand and testify.  He -- according to the

16   reports that he admitted he made, he plans to take the stand

17   and testify that his statements were true and not defamatory.

18   Is that correct?  I mean, if he takes the stand is he going to

19   admit, as he must because we see him on camera, that he made

20   all those statements?  But is his intention to take the stand

21   and say that those were not -- those were true?

22            MR. SIBLEY:  I can tell you that my intention is

23   certainly not to attempt to elicit such testimony.  But here is

24   kind of what I discussed with Her Honor earlier, which is I

25   understand as a matter of law and as a factual finding, malice

1   is established, falsity, et cetera; but if we are going to have

2   the exhibition of how false it was, how malicious it was, how

3   can he defend himself against extent of punitive damages unless

4   he's able to say or somehow point out -- not necessarily him,

5   but maybe through other evidence -- that, well, at least there

6   was -- you can see why someone might have thought that.  Maybe

7   they were wrong and maybe it was reckless, but it's not like it

8   was not something just made up out of thin air, right?

9   Clearly, there's a difference --

10          THE COURT:  So you are intending to have him testify

11   about that?

12          MR. SIBLEY:  No.  That's not --

13          THE COURT:  Because how -- I mean, it would be one

14   thing if that was what he said on December 3, you know, maybe

15   December 4, before all the Georgia officials had completed

16   their investigations, but, last night?

17          MR. SIBLEY:  Well, what I was going to -- thought I

18   said this, but I think I can actually elicit that evidence from

19   non-Giuliani sources to -- but if the issue is putting

20   Mr. Giuliani on the stand and having him say the kind of things

21   that he apparently said last night to the press --

22          THE COURT:  You say "apparently."  He admitted it --

23          MR. SIBLEY:  I don't know exactly -- something along

24   those lines.  That's a far cry --

25          THE COURT:  -- specifically.  And he said:  Yes, I

1      made those statements.  But, whatever.

2              MR. SIBLEY:  It's a far cry from trying to mitigate.

3      In other words, you know, this wasn't -- he's not the -- he

4      didn't invent the story out of thin air, it wasn't like he was

5      the only one.  It seems that there should be factors that

6      factor into a jury's determination of punitive damages.  I

7      mean, the extent of culpability, et cetera.  Otherwise, I don't

8      know why each -- there's really nothing we can say about it.

9      If we have to just roll over and get kicked with it, I mean --

10             THE COURT:  That was a decision made after multiple

11     opportunities to respond to discovery before default was

12     entered.  So that's water under the bridge for you all.

13             MR. SIBLEY:  I understand that.  I'm not -- that part

14     of it, I agree.  But I'm saying the presentation at trial, if

15     they're allowed to talk about just how bad it was, why are we

16     not able to in some way rebut that?  I'm not saying we're going

17     to introduce evidence that says:  Hey, it actually -- these

18     statements actually were, in fact, true, or, you know,

19     something that would sort of absolve liability.  But something

20     that's mitigating to the evidence that they're presenting that

21     apparently, according to why they're able to even present it at

22     all is in support of punitive damages.  I don't understand

23     what's my latitude to rebut that or at least mitigate that.

24             THE COURT:  Sort of unchartered territory.

25             MR. SIBLEY:  Right.

1          THE COURT:  As I said, you've got a difficult job.

2          MR. SIBLEY:  Maybe I can write a treatise, *Sibley on*

3  *Default*.

4          THE COURT:  You know, you're not the only one that

5  felt they wrote such a treatise.  Pull together all the

6  decisions I've had to make involving default and what happens

7  next.  So, I'll be interested in reading whatever treatise you

8  may write about it.

9          So, should he take the stand and testify about how

10  the statements he made about the plaintiffs back in December

11  2020, all the way through to December 11, 2023, were statements

12  that he made and were true, certainly it would be fair game to

13  establish the recklessness of those statements, given all the

14  Georgia elections.  And why should I -- why should I open that

15  whole issue up more than it already is, given the fact that,

16  you know, he's going to say what he believed?  Who knows what

17  he believed when?  Because we have no discovery about that for

18  any cross-examination of him to be complete on that issue.

19          So, I appreciate -- I appreciate the conundrum here,

20  Mr. Sibley, in terms of how much leeway do I have here.  At the

21  same time, I have plaintiffs who didn't get discovery to be

22  able to do a good cross-examination.  So, how -- you know,

23  you're pushing --

24          MR. SIBLEY:  To be fair --

25          THE COURT:  -- you're pushing the borders of what you

1   feel like you need to do, but we're in the situation we're in

2   because of your client.

3           MR. SIBLEY:  I understand, Your Honor.  But to be

4   fair, he did give his deposition, and it was -- I believe it

5   was in February, and he did not take the Fifth.

6           THE COURT:  Okay.  He gave a deposition where the

7   plaintiffs -- unlike in most deposition context, plaintiffs are

8   fully armed with all the documents they're going to review;

9   they had not.

10          MR. SIBLEY:  I understand that.

11          THE COURT:  So it was a deposition to, you know --

12  under the best of circumstances for Mr. Giuliani.  He'd given

13  them no discovery that was useful at all, and he said:  But

14  give me credit because I'm going to sit for a deposition,

15  unlike every other party in a civil suit who sits for a

16  deposition after full discovery has been given.  You know, he

17  really -- he put the plaintiffs in a difficult position.

18          MR. SIBLEY:  I understand, Your Honor.  And I don't

19  know the answer.  Although, I do think we -- I do think they

20  received a substantial amount of discovery before that

21  deposition; however, I do understand the Court's concerns about

22  the plaintiffs' prejudice.  And I just think we're just going

23  to have to steer these straits carefully so as not to -- so as

24  not to create a situation.  And I don't know -- I'm going to

25  have to work on Mr. Giuliani as far as testifying and make

1     clear what the Court's directives are.

2            THE COURT:  Well, because of the lack of discovery so

3     that we could test what he knew when, whether it was merely

4     reckless or whether it was just a flat-out lie because he was

5     making money from pandering to a particular audience that

6     wanted to hear what he was spouting, the evidentiary ruling and

7     the adverse rulings are:  Those statements that he made were

8     false and they were defamatory.  And that ruling stands.

9            And to the extent that he gets on the stand and says:

10    Nope.  They weren't.  They were true, they were not defamatory,

11    in some ways I feel like I'm saving him from himself because

12    this jury, having seen the witnesses from Georgia talking about

13    the thorough investigation they did -- I mean, you know, I

14    think the jury may have made up its own mind about the falsity

15    of the statements that he made.  So -- but that would cross the

16    line of the evidentiary rulings that have been made by default.

17           And plaintiffs, instead of exploiting that

18    opportunity that Mr. Giuliani's testimony would present, of

19    continuing to claim that his defamatory statements were in fact

20    true, and giving up that great opportunity for what I would

21    think would be very interesting cross-examination, I think to

22    that extent I'm going to grant their motion in limine.

23           So, now, I understand that you're going to do your

24    best with your client, but that's my ruling on that statement.

25           MR. SIBLEY:  There's a third point, Your Honor, about

1    Mr. Giuliani's making -- the statements along the lines of what

2    he makes in the press.

3              THE COURT:  Right.  Okay.  So -- okay.  So that's

4    one, and we'll go to the second statement about the financial

5    ruin.

6              I think Mr. Sibley had used that fairly hyperbolic

7    description of it being a death penalty kind of situation.

8              Why isn't it, Mr. Gottlieb?  Statements about the

9    damage to his financial situation, even financial ruin, why

10   aren't arguments like that allowable, since he is fully able to

11   contest the extent of the damages requested by the plaintiffs?

12             MR. GOTTLIEB:  Because, Your Honor, in this Court's

13   ruling at docket No. 102, page 5, this Court granted our

14   request that Defendant Giuliani's counsel would be precluded

15   from making any argument or introducing any evidence stating or

16   suggesting that he is insolvent, bankrupt, judgment proof, or

17   otherwise unable to defend himself, comply with this Court's

18   orders, or satisfy an eventual judgment.

19             And the combination of Mr. Sibley's statement that

20   this would end him, juxtaposed with his discussion of the

21   Johnny Depp case and the award in the Johnny Depp case and

22   calling what he requested as a death penalty --

23             THE COURT:  That was a pretty controversial case to

24   bring up in front of the jury, in any event.  I know that was a

25   strategy choice made by Mr. Sibley.

1          MR. GOTTLIEB:  The combination of those three

2     statements is clearly intended to suggest that if the jury were

3     to award the damages that Mr. Sibley knows we are requesting in

4     this case, that Mr. Giuliani would go bankrupt, that he would

5     be insolvent.  And --

6          THE COURT:  I mean, to the extent that he's allowed

7     to contest the amount of damages, contest punitive and

8     compensatory, why can't he -- you know, to the extent that he

9     talks about this financial ruin, why can't this be addressed --

10    allow him to do that, at the same time just tell the jury he

11    failed to turn over and respond to document requests for his

12    financial condition, about his financial condition, and how

13    much money he's making from his various endeavors, so that it's

14    difficult -- so it's impossible to either demonstrate, confirm,

15    or even test the veracity of any of those statements or

16    assertions?

17          So why can't the jury just be reminded of that, as a

18    cure to let -- give him a little bit of leeway and also, you

19    know, fight -- you know, remind the jury of why the adverse

20    instructions on his finances, you know, were driven home?

21          MR. GOTTLIEB:  So, Your Honor, I think, as the Court

22    correctly observes, the reason that we have this instruction is

23    because we requested the kind of evidence that would have

24    allowed us to put on a case about Mr. Giuliani's net worth, and

25    we weren't provided that information.  So we have nothing --

1    not that we have nothing --

2              THE COURT:  You have his 2018 taxes.

3              MR. GOTTLIEB:  We have very little to go on.

4         So I don't have an objection to Mr. Sibley being able

5    to make the argument that it's too much, damages are too high,

6    it's unfair, it's disproportionate to the wrong, that's all

7    fair game.

8              The question is:  Does he need to be able to say as a

9    part of that, and it will lead him to ruin?  In other words,

10   this will be the end, it will lead him to ruin, he will have --

11             THE COURT:  But is that such -- $47 million, I think,

12   is the maximum amount your expert is going to be testifying to.

13             MR. GOTTLIEB:  One part of the damages, yes.

14             THE COURT:  One part of the damages is 47 million.

15   So why isn't that just obvious that would lead to financial

16   ruin for somebody who is not Elon Musk or Bezos or one of the

17   other billionaires floating around?

18             MR. GOTTLIEB:  I think there's a point in time, for

19   example, where Mr. Giuliani made his public disclosures when he

20   was running for president.  He disclosed a quite substantial

21   net worth.  There was a point in time where he was making

22   $100,000 per speech he's making.  So I don't think --

23             THE COURT:  He may still be making that, we don't

24   know.

25             MR. GOTTLIEB:  I don't know what he's making now.  I

1    don't think it's at all obvious that that kind of damage would

2    lead to financial ruin.  It may be factually true that it would

3    lead to financial ruin, but we have no ability to probe or test

4    that, so we have virtually nothing we can say about that.

5         Certainly, the jury can be given an instruction, we

6    may ask for a curative instruction depending on how Mr. Sibley

7    chooses to argue this.  I would like to have it on the record

8    that Mr. Sibley and Mr. Giuliani accept that juries follow

9    their instructions, and when they're given instructions they do

10   their job to follow them such that on appeal he won't claim

11   there's prejudice this happens, but --

12        THE COURT:  I think the law is very well settled that

13   juries are assumed and presumed to follow the judge's

14   instructions.  I don't need to hear from Mr. Giuliani or

15   Mr. Sibley about that.

16        MR. GOTTLIEB:  In any event, Your Honor, the point is

17   that I don't see why Mr. Giuliani needs to be given the leeway

18   to make the argument that a large damages award would lead him

19   into ruin, given that we don't have the necessary documents to

20   say no, it wouldn't.

21        THE COURT:  All right.  Mr. Sibley?  And was the

22   basis for your saying that the damages requested by the

23   plaintiffs would lead Mr. Giuliani to ruin simply because it

24   was $47 million?

25        MR. SIBLEY:  Yes.  That's --

1          THE COURT:  And, I mean, that would be hard for most

2     individuals to stomach, unless they were sort of a well-known

3     billionaire.

4          MR. SIBLEY:  Well, I'm not a mathematician, but I

5     think that's 470 speeches at $100,000 a pop.  So there's a lot

6     of speeches to be given to even cover that.  So, yes, Your

7     Honor, I think the common sense of the jury -- that was the

8     point of the argument -- or, what the evidence will show.

9          But, Your Honor, the other thing is --

10          THE COURT:  Is Mr. Giuliani planning on testifying

11     about his current financial condition in his anticipated

12     testimony?

13          MR. SIBLEY:  I'm certainly not planning on that

14     testimony coming out.

15          THE COURT:  Well, this is the second time you said

16     that:  I'm not planning on eliciting that testimony.

17          Mr. Giuliani is only going to answer your questions,

18     right?  This is not -- this is a witness box to answer

19     questions, this is not a platform for pontificating or

20     spreading lies.  So he understands that he will just be

21     responding to the questions.  And if you're saying that you're

22     not going to be eliciting testimony about his current or even

23     his past financial condition, given the total amount of that,

24     his current financial condition produced in discovery, and that

25     amount is zero, then is this just a hypothetical debate?

1          MR. SIBLEY:  I don't -- well, Your Honor, the answer

2     to Her Honor's question is:  I have also instructed or advised

3     Mr. Giuliani of the -- the Court has ordered not to, you know,

4     talk about these things, and there's possibility of contempt.

5     And that's not something we would want.

6          But secondly, Your Honor, my understanding of the

7     financial --

8          THE COURT:  I know contempt has been a running theme

9     through this case.  I think the plaintiffs would have preferred

10    contempt to default, and maybe they were right on that.

11         MR. SIBLEY:  I understand, Your Honor, but my

12    understanding of punitive -- the discovery relating to punitive

13    damages, is that's -- that's for the punitive damages, right?

14    Because that's the only time your net worth is relevant.  And

15    so my statement to the jury was with regard to their expert

16    disclosure.  So that would be compensatory damages anyways.  So

17    I'm not sure how they don't talk about, you know, whether he

18    can satisfy a judgment, et cetera, would apply to -- and I'm

19    not planning on doing that, but I just don't think that's

20    even -- I mean, that's just obvious, that that's a lot of

21    money, comparing it to other cases and common sense --

22         THE COURT:  So your statement in your opening about

23    the preference to death, the death penalty, that was just

24    because of the $47 million?

25         MR. SIBLEY:  Correct.  Just the compensatory award is

```
 1      enormous, that's all.

 2              THE COURT:  Okay.  So if you're not planning on

 3      eliciting testimony from him about his current financial

 4      condition, or his ability to pay damages, other than making a

 5      comment about the size of the requested award being very

 6      significant, then is this -- so why do I have to make -- so is

 7      plaintiffs' request sort of beside the point?  Like you already

 8      know what the adverse instructions are, you already know what

 9      the evidentiary rulings are.  So is there any reason for me to

10      emphasize with yet another ruling that given the total lack of

11      production of financial records about his current financial

12      condition, the adverse rulings stand, and he's not allowed to

13      make an argument about his ability to afford anything because

14      it can't be tested?

15              MR. SIBLEY:  I agree, Your Honor.  Based on the

16      Court's orders, that is correct.  And I don't intend to --

17              THE COURT:  All right.  So to the extent that the

18      plaintiffs have made that portion of their motion in limine,

19      then I think we're all in agreement, that portion is granted.

20              Okay.  So now we're at 2 o'clock and we're at the

21      last part of the requested motion in limine.  And I'm a little

22      reluctant to get into that because I would like to get the jury

23      in the box at 2 o'clock.  And that one is going to take a

24      little bit longer discussion, so we'll take that up later.

25              MR. GOTTLIEB:  Okay.
```

```
 1                    THE COURT:  Okay.  Let's bring the jury in.
 2                    Ms. Moss, could you resume the stand for
 3        cross-examination?
 4                    Make yourself comfortable.
 5                    THE WITNESS:  Yes, ma'am.
 6                    (Whereupon, the jurors enter the courtroom.)
 7                    THE COURT:  Mr. Sibley, are you prepared to proceed
 8        with your cross-examination?
 9                    MR. SIBLEY:  Yes, Your Honor.
10                              CROSS-EXAMINATION
11        BY MR. SIBLEY:
12        Q.  Good afternoon, Ms. Moss.
13        A.  Good afternoon, Mr. Sibley.
14        Q.  Nice to finally meet you.
15        A.  You as well.
16        Q.  My client, as you saw last night, likes to talk a lot,
17        unfortunately.  And have you -- you've been -- I mean, this
18        case is very important to you, isn't it?
19        A.  Yes.
20        Q.  Okay.  Have you been kind of following what's happened with
21        the case, like when there's, I don't know, depositions taken,
22        things like that?
23        A.  No, not the depositions and stuff like that.
24        Q.  Okay.  And I'm not saying attend the depositions, but like,
25        for example, did you look at Mr. Giuliani's deposition?
```

1    A.   No.

2    Q.   Okay.   There was some suggestion, and I believe it was in

3    opening statements by DuBose, I believe he talked about how

4    some of the witnesses that we may hear from, I believe during

5    this trial by deposition, took the Fifth Amendment.   Do you

6    recall that?

7    A.   Yes.

8    Q.   Do you have an understanding of what that means, "the Fifth

9    Amendment"?

10   A.   Yes.

11   Q.   And what's your understanding of that?

12   A.   Basically they don't want to answer the question because

13   they will probably incriminate themselves, something like that.

14   Q.   Right.   And my question for you is:   Are you aware of any

15   time that Rudy Giuliani has taken the Fifth Amendment in this

16   case?

17          MR. LANGFORD:   Objection.

18          THE COURT:   He's just asking if she's aware.

19   Overruled.

20          MR. LANGFORD:   Okay.

21          THE WITNESS:   I'm sorry.   I thought Mr. Giuliani

22   didn't participate in anything dealing with the case.

23   BY MR. SIBLEY:

24   Q.   Okay.   I'm just asking if you're aware of him saying:   I'm

25   taking the Fifth?

1    A.  I'm not aware of him doing anything with this case.  I

2    thought he wasn't cooperating.  I don't know much about it;

3    that's it.

4    Q.  Okay.  Well, would it surprise you to learn that

5    Mr. Giuliani didn't take the Fifth during his deposition?

6    A.  It would surprise me to learn that he took a deposition,

7    yes.

8    Q.  That he didn't take the Fifth Amendment?

9    A.  Yes.  That would surprise me as well.

10   Q.  Okay.  I want to go back and talk about the night of the

11   election in 2020, okay?

12   A.  Yes, sir.

13   Q.  I wasn't sure if I caught everything you said, but I

14   believe what I heard you say -- and correct me if I'm wrong --

15   was that it was kind of a stressful night; is that fair?

16   A.  No, sir.  I didn't say that.

17   Q.  Okay.  I thought you said maybe you were frustrated, there

18   was some frustrations about trying to get all the votes

19   counted, or something like that?

20         MR. LANGFORD:  Your Honor, mischaracterizes the

21   testimony.  Objection.

22         THE COURT:  Sustained.

23   BY MR. SIBLEY:

24   Q.  Well, were there any frustrations by the crew at the State

25   Farm center about counting those votes that night?

```
 1    A.  Not on my part, no.  I -- I know how it goes, I wasn't
 2    frustrated.
 3    Q.  Were there frustrations there on anyone else's part, I
 4    guess?
 5              MR. LANGFORD:  Your Honor, objection.  I mean,
 6    personal knowledge.
 7              THE COURT:  Sustained.
 8    BY MR. SIBLEY:
 9    Q.  Okay.  And the reason I'm asking is that it seems to me,
10    you have to understand as a layperson who has never counted
11    votes, you know how you sit up at night, you watch the election
12    results and you're waiting on all the precincts to report and
13    everyone wants to get the votes in and figure out who won.  But
14    you know what I'm talking about, right?
15    A.  I'm familiar with people who -- you mean -- I don't
16    understand -- was that a question?
17    Q.  Yeah.
18    A.  Can you ask it again?
19    Q.  Sure.
20         I mean, you understand people sitting at home, they're
21    relying on people, on people like you, who are counting votes
22    to get the results in so that we can figure out who won the
23    election?
24    A.  No.  I wasn't aware of that, but I -- I work in absentee.
25    I'm not a poll worker, I do not work at polls.  And usually
```

1    those is what you are waiting to watch.  I do the elderly,

2    disabled, military.  And once you all are celebrating who won,

3    I'm still counting until that Friday.  I do provisional, I do

4    paper ballots.  So it's usually not me that -- you know,

5    they're waiting on the polls, but because no one went to the

6    polls, all eyes were on me.  Does that make sense?

7    Q.  I understand.  So now I understand.

8         So what you're saying is the ballots you were counting

9    were the absentee votes that were not done at the poll, they

10   were paper ballots, right?

11   A.  All the paper ballots -- correct.  For people who are

12   unable to make it to the polls, and they get a mail-in ballot,

13   and that's called an absentee ballot.

14   Q.  Understand.

15        And all those votes have to be counted?  You have to

16   count those?

17   A.  Every vote.  But usually it's already decided who won, and

18   we are still counting by hand.

19   Q.  Got it.

20        The video -- we've seen a lot of videos with the State

21   Farm Arena, with the vote counting and things like that going

22   on.  Just -- do you know how many videos there are that

23   circulated?

24   A.  No.  I'm not sure how many there were.

25   Q.  Well, how many videos have you seen of the State Farm Arena

1    with you and your mom and some of the other ladies on there?

2    A.  I saw the same video that Mr. Giuliani and Team Trump

3    Tweeted; that's what I saw.

4    Q.  Okay.  You didn't see any other videos?

5    A.  Not that I know of, just that same one showing us working.

6    It was, like -- we were there from 5:30 a.m. to, like,

7    midnight.  So I saw that same couple of seconds that was going

8    around with us taking the ballots.  I saw that video.  I saw a

9    video where I'm in a lot of pain and my mom gives me the ginger

10   mint and I put it in my back pocket.  I saw that video.  But I

11   don't know which other.

12   Q.  So you all were there from 5:30 a.m. on Election Day until

13   midnight?

14   A.  Probably around -- um-hum, around midnight.

15   Q.  Okay.  So if someone was to watch the entire video, that's

16   like 18 hours of video, right?

17   A.  We were there for two weeks before Election Day, so if they

18   watched from the first day we came to the end, they would see

19   us doing the repeating the same thing every day, all day.

20   Q.  Understand.

21       I think one of the suggestions that have been made here

22   is that the video that was portrayed -- I think to the Georgia

23   Senate, or maybe the one you're talking about that was

24   published by Mr. Giuliani or someone else -- was a shortened

25   version of the video.  Am I right about that?

1    A.  Yes.  It was an edited version, yes, sir.

2    Q.  Okay.  Do you know how long the unedited version was?

3    A.  No, sir.

4    Q.  It would have been a lot longer, right?

5    A.  You mean the edited clip?

6    Q.  The unedited version, like --

7    A.  Oh, right.  It would have been all day.  It would have been

8    all day.

9    Q.  So to get the whole context, you would have had to

10   literally sit and watch an 18-hour video to understand the

11   whole context of what happened on that day?

12              MR. LANGFORD:  Your Honor, objection.  This issue has

13   been decided already.

14              THE COURT:  Overruled.

15   BY MR. SIBLEY:

16   Q.  Right?  To get the whole context, you would have to watch

17   the whole video?

18   A.  The full context of what?

19   Q.  Of what happened on Election Day at the State Farm center.

20   A.  If you want to know what happened that day, yes, sir, you

21   would have to watch the video from that day.

22   Q.  Okay.  And let me just ask you, because you're -- I mean,

23   you worked for a long time in vote counting with Fulton County,

24   right?

25   A.  I worked in registration, yes, sir.

1    Q.   How many years was it?

2    A.   Five years temporary; five years permanent.

3    Q.   And there's training and manuals and things like that you

4    had to go through and read in order to get -- I guess, to have

5    that job; am I right?

6    A.   There are standard operating procedures for each task, and

7    there is an election code book that's given by the Secretary of

8    State that lists all of the election laws that we must follow

9    in order to complete those tasks.

10   Q.   And that's what I'm getting at.  Thank you.

11   A.   Yes, sir.

12   Q.   I think you mentioned that earlier, I just wanted to

13   clarify.

14        So you, as opposed to somebody off the street who is not

15   familiar with the process of counting, say, absentee ballots,

16   you're going to know more about that process than the average

17   person; would you agree with me?

18   A.   Incorrect.  No, I would not.

19   Q.   Okay.  So you think --

20   A.   We have monitors, there -- you can go and watch the

21   process.  You can ask.  There's so many people.  Usually it's

22   the same people.  I don't know their parties.  There are a lot

23   of people at every election.  There are monitors.  There are

24   observers.  There are watchers.  And I have to administer them

25   the oath.  They know whoever is in charge, they go up to them

1    and they say:  Well, what are you doing over here?  Why is this

2    like this?  Why is that like this?

3            So the people who actually are actually interested in

4    the process, they come and educate themselves.

5    Q.  I understand that.

6            I guess my question is more if I'm someone who doesn't

7    know the first thing about how absentee votes are counted and I

8    see a video of, you know, pulling out some containers having

9    ballots and having the ballots go through the machine multiple

10   times, can you see how someone who is not familiar with the

11   process -- like you, who is a professional at that, can you see

12   how they might think, Hey, it looks like the votes are being

13   counted multiple times?  Can you see that?

14           MR. LANGFORD:  Objection, Your Honor.  I mean, calls

15   for speculation, and this is just --

16           THE COURT:  This is getting a little bit into areas

17   that have already been resolved.  So why don't we see where

18   you're going with this, Mr. Sibley.

19           (Whereupon, a bench conference was held:)

20           THE COURT:  So, Mr. Sibley, I take it that plaintiffs

21   counsel's concern is you're sort of doing a cross-examination

22   about liability and whether what he did and what his beliefs

23   were were true.  That's already been resolved.  So where are

24   you going with this?

25           MR. SIBLEY:  I guess I'm going where I mentioned

1     earlier, that, yes, it's absolutely the case that the

2     statements that there was election misconduct were false, but

3     I'm just trying to get to the point that at least for her it's

4     easy to look at it and say it's easy to happen.  But for those

5     who understood the law, that's perfectly normal.  But for

6     someone off the street who doesn't understand how these votes

7     are counted, you can see how, hey, maybe there's something

8     there.

9          THE COURT:  Maybe you think that on December 3,

10    December 4, but after all the Georgia elections defamatory

11    statements, after that, where is -- isn't that going towards

12    liability?  I mean, so why isn't this just a waste of time?

13         MR. SIBLEY:  Because I think it's different to look

14    at the video and draw the conclusion that something is fishy.

15    And maybe it takes time -- if it was so blatantly obvious, why

16    did there need to be an investigation that lasted so long?

17         THE COURT:  Because there were powerful people making

18    accusations.

19         MR. LANGFORD:  This goes to the issue of actual

20    malice, which has already been decided as alleged in the

21    complaint.  Actual malice is knowledge or reckless disregard of

22    the falsity.  Not only that we pled that to the defamation

23    claim and IIED claim, which goes back to the December 3rd, I

24    mean the falsity intent; it was willful, it was done with

25    actual malice.  This is completely -- this is resolved.

```
1            MR. SIBLEY:  But it was malice on steroids.
2            THE COURT:  You're entitled to have malice on
3     steroids.
4            I am going to sustain the objection.  I don't know
5     where you're going on this liability business.  Okay?  And
6     where you're going has already been resolved.  Okay.
7            (Open court:)
8            THE COURT:  Objection is sustained.
9     BY MR. SIBLEY:
10    Q.  Okay.  Ms. Moss, let me ask you, you mentioned something
11    earlier about the fact that you are a member of the public, you
12    can actually come in and observe, if you want to, the absentee
13    votes being counted; is that correct?
14    A.  Correct.
15    Q.  Is that "yes"?
16    A.  Yes.
17    Q.  Okay.  You mentioned that you had to learn about the law
18    with respect to counting absentee ballots.  Do you have an
19    understanding of whether, under Georgia law, you were required
20    to have observers there when you counted votes, or not?
21    A.  You are not required.
22    Q.  So it's not a requirement that anyone observe, I guess, the
23    persons counting the votes in the State Farm center?
24    A.  No.  This is the only time where absentee is just, like,
25    the entire county voted absentee.  We have plenty of elections.
```

1    For example, if someone passes away and we have to vote someone

2    else in their seat.  It's a small election, we've had --

3    there's like 20 absentee ballots and we go and we scan those

4    ballots.

5    Q.  Okay.  So, I mean, you probably know -- I'm sure you do

6    know more about this law than I do, I'm not an election lawyer,

7    but it sounds to me what you're saying is if someone wants to

8    observe, they can, but it's not a requirement that when you're

9    counting you have to have someone necessarily observing; am I

10   right?

11   A.  Correct.

12   Q.  Okay.  Now, you know there's been some suggestion -- or,

13   there was some suggestion that people who wanted to observe

14   were excluded from observing.  Do you recall that?

15   A.  I recall those lies.

16   Q.  And that's not true, is it?

17   A.  No.  It's a lie.

18   Q.  Okay.  Are you aware of some people that signed affidavits

19   that suggested that maybe they were excluded from the State

20   Farm center?

21        MR. LANGFORD:  Objection, Your Honor.  Same grounds.

22        THE COURT:  Sustained.

23   BY MR. SIBLEY:

24   Q.  There was an investigation into whether these allegations

25   of fraudulent activity actually occurred, was there not?

```
1    A.  Yes, sir.

2    Q.  Were you involved in questions, I guess, in that

3    investigation?

4    A.  Yes, sir.

5    Q.  Who did you interact with?  Who questioned you?

6            MR. LANGFORD:  Objection.  I guess the question I

7    have is:  How is this relevant?

8            THE COURT:  Overruled.

9    BY MR. SIBLEY:

10   Q.  Who questioned you?

11   A.  The Secretary of State office, the Georgia Bureau of

12   Investigations, the Federal Bureau of Investigations, the

13   Fulton County Attorney's Office.  Yep, those are the people.

14   Q.  Understood.

15       Okay.  That's a lot of law enforcement or administrative

16   agencies, I guess, that looked into this, right?

17   A.  Yes.

18   Q.  Do you remember the timeframe that that went on, where they

19   were kind of looking into it?

20   A.  As soon as the -- as soon as the lies were spread.  In

21   December they were looking into it.  It depends on what you

22   mean by "they" because it -- it -- it was, like, a snowball

23   effect.  So after your client went on TV, it prompted a lot of

24   other people to also try to file cases with the county that I,

25   then had to, like, stop working and resolve.
```

1    Q.  Okay.  You said you're an Atlanta sports fan; did I get

2    that right?

3    A.  Kind of, sort of.

4    Q.  Who is your teams?

5    A.  Atlanta Braves, Atlanta Falcons, Georgia Bull Dogs, and the

6    Atlanta Hawks.

7    Q.  Okay.  Well, your Braves took on my Astros in 2021, and I'm

8    in the city that also beat us in 2019, so this isn't a great

9    baseball moment for me.

10   A.  Oh, sorry.

11   Q.  Have you watched games where they have, like, the instant

12   replay where somebody tries to steal second, and they may get

13   caught out and they go and look at it?

14   A.  Yes, sir.

15   Q.  And that's something you can just look at the video and

16   you'd say:  Oh, runner's foot was on the base before he was

17   tagged, right?

18   A.  Right.

19   Q.  Okay.  This clearly wasn't the kind of thing you could look

20   at the video and say:  Well, clearly, you know, there wasn't

21   any election fraud --

22           MR. LANGFORD:  Objection, Your Honor.

23   BY MR. SIBLEY:

24   Q.  -- because as you just mentioned there was a large

25   investigation with multiple law enforcement agencies that

1    looked into this for quite some time.  So you would agree with

2    me, this wasn't an instant replay kind of thing where you could

3    just throw the coach a challenge and look at the video and

4    figure out what happened?

5              MR. LANGFORD:  Objection, Your Honor.  Same grounds.

6              THE COURT:  Sustained.  Liability has been

7    established because of the default.

8    BY MR. SIBLEY:

9    Q.  Do you know who Jacki Pick is?

10   A.  I heard my lawyers mention to the judge that person will be

11   speaking; that's about it.

12   Q.  Okay.  By the way, what was the deal with the water leak?

13   Apparently there was a water leak, but --

14   A.  So, the room that we were in, when you look up in the

15   ceiling, it didn't look nice like this.  You would actually see

16   pipes and things like that, and one of those pipes burst

17   because there were -- there was a urinal above us, and that's

18   what leaked.

19   Q.  Understand.  Okay.

20           Is this the only lawsuit that you're involved in over

21   statements that persons made, false statements that persons

22   made about you and your mother engaging in election fraud?

23             MR. LANGFORD:  Objection, Your Honor.

24             THE COURT:  Overruled.

25             THE WITNESS:  No, sir.

```
 1    BY MR. SIBLEY:

 2    Q.  How many other lawsuits have you filed on the grounds that

 3    statements about you and your mother making -- or, engaging in

 4    election fraud were false?

 5    A.  One other lawsuit.

 6    Q.  Okay.  And who did you sue?

 7    A.  The Gateway Pundit.

 8    Q.  Okay.  What is The Gateway Pundit?

 9    A.  They are a media-based group that re-Tweets everything

10    Mr. Giuliani and Mr. Trump likes to say negatively about us.

11    Q.  Okay.  Would it surprise you to learn that The Gateway

12    Pundit may actually have been the first media outlet to publish

13    the video that Mr. Giuliani later re-Tweeted?

14              MR. LANGFORD:  Objection, Your Honor.  This goes to

15    proximate cause, which has been decided here.

16              THE COURT:  Overruled.

17              THE WITNESS:  Can you ask it again?

18    BY MR. SIBLEY:

19    Q.  Yeah.

20              Would it surprise you to learn that The Gateway Pundit

21    was actually the first media outlet to publish the video of you

22    and your mother at the State Farm Arena and accuse you and your

23    mother of election fraud falsely?

24    A.  They were the first to mention our names, I believe.

25    Q.  Are you suing The Gateway Pundit for reputational injury?
```

1  A.  I would have to look at the -- that -- you know, I would

2  have to look at it to say what is the exact words.  I'm not --

3  Q.  Okay.  But you would agree that *The Gateway Pundit*, by

4  making false claims about you engaging in election fraud,

5  damaged your reputation; is that correct?

6  A.  Correct.

7  Q.  And they did that on December -- November 3rd -- got my

8  dates wrong.  Sorry.  Strike that -- December 3rd of 2020,

9  correct?

10  A.  Correct.  The same day Giuliani told those lies, yes, sir.

11  Q.  I'm sorry.  Is it the case that you're alleging

12  Mr. Giuliani made his first statements about you and your

13  mother on December 3rd or December 4th?

14  A.  No.  He said it on December 3rd.  I found out about it on

15  December 4th, at work.

16  Q.  Okay.  And I think what you said earlier, though, is that

17  since your son had your phone, you didn't realize that he was

18  getting messages on December 3rd, correct?

19  A.  Correct.

20  Q.  Okay.

21  A.  It happened on December 3rd, they started calling on

22  December 3rd.  When I went to work on the 4th, that's when I

23  found out.  On the 4th is when I found out that I had

24  message -- messages.  On the 4th, that evening after work, is

25  when I found out about my son telling me that he's been

1    receiving these all through the night and all through that day.

2    Q.  Okay.  And did *The Gateway Pundit*, by publishing those

3    false claims about you and your mother being involved in

4    election fraud, did that cause you mental anguish?

5    A.  Yes.  Everyone who -- yes, it did.

6    Q.  Did it cause you emotional distress?

7    A.  Yes, sir.

8    Q.  Okay.  They actually named you and your mother, correct?

9    A.  Correct.

10   Q.  Okay.  By the way, just out of curiosity, how did anyone

11   get, you know, like -- if you were just someone reading that

12   *Gateway Pundit* article, how would you know what your cell phone

13   number was or the cell phone number that was tied to you that,

14   I guess, your son used?  How would someone know that?

15          MR. LANGFORD:  Objection, Your Honor.  Calls for

16   speculation.

17          THE COURT:  If she knows.  Overruled.

18          THE WITNESS:  I believe it's called doxxing.  I was

19   doxxed, I believe.

20   BY MR. SIBLEY:

21   Q.  Sure.

22          But was your number listed somewhere, like on a -- I

23   don't know, is it the Yellow Pages or something?  I mean, how

24   would you someone get your number?  Or did you know?

25   A.  I'm not in that career.  I don't know how they did things

1    that they did.  I don't know.  Sorry.

2    Q.  Okay.  How are the damages that *The Gateway Pundit* caused

3    you different from the damages that Mr. Giuliani and the

4    co-conspirators in this case caused you?

5    A.  They're no different.  They were all on the same hate train

6    together.  Mr. Giuliani was just driving the bus, picking up

7    these people, and they were helping spread his lies.

8    Q.  Okay.  Was there anyone else that posted false claims about

9    you and your mother committing election fraud, other than *The*

10   *Gateway Pundit* and Mr. Giuliani?

11           MR. LANGFORD:  Objection, Your Honor.  Goes to

12   proximate cause, which has already been decided.

13           MR. SIBLEY:  Your Honor, the --

14           THE COURT:  I think -- overruled.  You presented

15   exhibits of the same thing, so overruled.

16           THE WITNESS:  Team Trump as well.

17   BY MR. SIBLEY:

18   Q.  Okay.  Who else?

19   A.  Another media outlet that I will not name.

20   Q.  Well, who is it?

21   A.  The other media outlet that we settled with, the one that

22   was on the same lawsuit with you guys before you decided to

23   separate yourselves from them.

24   Q.  I see.

25           *One America News Network*, is that who it is?

```
1    A.  Yes.

2    Q.  Okay.  And you originally filed -- because some of the

3    statements that you're complaining about Mr. Giuliani made were

4    actually on One America News, correct?

5    A.  His statements were everywhere, sir.  I was not -- that's

6    my --

7    Q.  Okay.  All right.  So you originally sued One America News,

8    I believe it was Chanel Rion, a reporter; Charles Herring; and

9    Rudy Giuliani all in this case; is that right?

10   A.  No, sir.  Those are different lawsuits.

11   Q.  Well --

12   A.  Herring is Gateway --

13   Q.  Okay.

14   A.  -- I'm not sure, I would have to see it and then let you

15   know, since you don't know.

16   Q.  But you settled with One America News, right?

17   A.  Yes, sir.

18         MR. LANGFORD:  Objection, Your Honor.  May we use the

19   telephones?

20         (Whereupon, a bench conference was held:)

21         THE COURT:  Yes?

22         MR. LANGFORD:  I apologize for objecting so much, but

23   the consent motion in limine, ECF No. 108, specifically

24   provided -- okay, Your Honor understands that he may not

25   reference an OAN settlement.  He's not referencing
```

1    co-conspirators that the jury may have forgotten are

2    co-conspirators.  I'm not sure what to do about this right now.

3              THE COURT:  I think he's picking up on the fact that

4    the witness mentioned that there was a settlement, so that was

5    just a gift to Mr. Sibley.

6              But, Mr. Sibley, where are you going with this?

7              MR. SIBLEY:  Well, Your Honor, if we're talking about

8    injuries that they're claiming, she's already said the ones

9    she's claiming from Giuliani are the ones that are parties that

10   are not even in this case, not even listed as co-conspirators.

11   So I'm entitled to probe whether there's been a segregation or

12   bifurcation of the harm that was caused by these other parties

13   or -- I mean, if she's claiming harm from multiple parties and

14   it's the same injury, essentially, I'm entitled to probe what

15   the differences are and whether there's any differences.  And,

16   I mean, she's just brought it out.  We have to --

17             THE COURT:  You're not going to be probing into the

18   nature of the settlement with OAN or anything like that.  And I

19   think on redirect you can clarify that this reporter and

20   Herring are connected to OAN and who they are.

21             MR. LANGFORD:  Yes.

22             THE COURT:  Okay.  So just be prepared on redirect.

23   So it's based on that you're objecting.  I'm going to overrule

24   it.

25             (Open court:)

1    BY MR. SIBLEY:

2    Q.  Okay.  Let me ask you this, Ms. Moss:  How much are you

3    asking the jury to award you to compensate you for the harm

4    that Mr. Giuliani caused you in this case?

5    A.  I'm relying on the experts.

6    Q.  Okay.  And that's -- I believe her name is Ms. Humphreys,

7    correct?

8    A.  I believe so.

9    Q.  Have you spoken with her, been interviewed by her, anything

10   like that?

11   A.  No, sir.

12   Q.  Okay.  You never met with her?

13   A.  Not that I know of, no.

14   Q.  Any kind of email correspondence with her?

15   A.  No.

16   Q.  Text messages?

17   A.  I've not spoken with her, sir.

18   Q.  Okay.  Well, sometimes people can take "spoken" to mean,

19   like, orally speaking --

20   A.  I know what speaking means.  You text, means you're

21   speaking to me.

22   Q.  All right.  Well, that's what I think, too.

23        All right.  So you're relying on your expert.

24        And, from what I understand, Ms. Humphreys -- or,

25   Dr. Humphreys is going to testify that it's going to cause an

1    extensive amount of money to repair your reputation; is that

2    right?

3    A.  Yes, sir.

4    Q.  Okay.  And then we heard Mr. DuBose in opening talk about

5    value of a name.  Do you recall that?

6    A.  Yes.

7    Q.  Okay.  And that's really what this case is about for you;

8    it's about restoring you and your mother's good name, not about

9    making money, right?

10   A.  I want to vindicate myself, yes.  I want to receive some

11   type of justice for everything that me and my family has been

12   through.

13   Q.  Okay.  How much -- what steps have you taken as of now to

14   try to repair your reputation?  Like, I don't know, paying

15   someone to, you know, do something on the internet to make your

16   search results go down, things like that?  Have you done

17   anything like that?

18   A.  Yes, I have.

19   Q.  What have you done?

20   A.  I have subscribed to DeleteMe, so they can constantly

21   monitor where my information is online and have it removed so I

22   can't be found.

23   Q.  Okay.  How much does that cost you?

24   A.  I think it's about $140 a year for that service.

25   Q.  Okay.  Anything else you've done?

1    A.  As far as what, again?

2    Q.  Is there anything else you've done to try to, I don't know,

3    repair your reputation?  Any money that you've expended to do

4    that?

5    A.  It's kind of difficult for me to do that when there are

6    extremely powerful people still spewing lies about me.

7    Q.  Okay.  Do you know how much money that's going to cost you

8    to -- I mean, to get that done?  Anyone given you an estimate

9    of, kind of, what the -- you know, what the repair would be on

10   your reputation?

11   A.  No, sir.  I don't -- I have no idea.  That's why we have

12   expert witnesses, that's their job to quantify that.  I don't

13   know.

14   Q.  Okay.  But if your expert testifies that the jury needs to

15   pay you money so that you can use that money to repair your

16   reputation, that's what you're going to do with the money,

17   right?

18   A.  Well, what I'm going to do with the money is something

19   totally different.  What I remember hearing, that we need to

20   make a statement.  We need to ensure that the election workers

21   that are still there don't have to go through this.  There are

22   election workers that are now wearing bulletproof vests.  And

23   I'm sure by hitting someone in the pockets, especially someone

24   whose whole career is about their pockets, that will definitely

25   leave an impression for the next person that tries to spew lies

```
1    about the next election worker.  We matter.  So, that's what

2    stood out to me in the opening --

3    Q.  Okay.

4    A.  -- about -- concerning the money.

5    Q.  Well, one other thing -- and that did stand out.  I

6    appreciate you reminding me of that.

7         But another thing that stood out to me, I think

8    Mr. DuBose said if somebody commits arson and burns down your

9    house, they need to pay to rebuild the house, right?

10         MR. LANGFORD:  Objection, Your Honor.  That

11   mischaracterizes the opening.  I believe that what Mr. Gottlieb

12   said was if someone burns down your house, one way he would

13   measure the damages is by figuring out much the house --

14   further, it's not evidence.  But that just mischaracterizes

15   what Mr. Gottlieb said.

16         THE COURT:  We now have it corrected.

17   BY MR. SIBLEY:

18   Q.  Okay.  Let me ask you the question:  You know how, like,

19   sometimes you make an insurance claim and, you know, they give

20   you a certain amount of money for the damage that maybe was

21   done to your property?  Do you know what I'm talking about?

22   A.  Correct.  I know that.

23   Q.  So if the jury gives you a check for the damage done to

24   your reputation, are you going to repair your reputation or are

25   you just going to use the money to -- I don't know, do
```

```
 1    something else, get a real nice --
 2              MR. LANGFORD:  Objection, Your Honor.  This is an
 3    improper hypothetical.
 4              THE COURT:  Sustained.
 5              MR. SIBLEY:  May I --
 6              THE COURT:  Confer with your client?  Yes.
 7              MR. SIBLEY:  No, Your Honor.  May I use the --
 8              THE COURT:  Oh.
 9              MR. SIBLEY:  -- walkie-talkie.
10              THE COURT:  No, you may not.
11              MR. SIBLEY:  Okay.
12    BY MR. SIBLEY:
13    Q.  Well, is one of the reasons why you haven't been able to
14    repair your reputation, sitting here today, is you haven't --
15    you don't have enough money to do that?  Is that fair?
16    A.  I disagree.
17    Q.  You do have enough money?
18    A.  I disagree.
19    Q.  Do you have enough money, or do you not have enough money,
20    sitting here this day, to repair your reputation?
21    A.  Like I stated before, I personally cannot repair my
22    reputation at the moment because your client is still lying on
23    me and ruining my reputation further.  How -- how could I do
24    that?  Like, how could you work in law if everybody was saying
25    that you're, like, a horrible lawyer and stuff like that?
```

1    Like --

2    Q.  Well, you would be surprised actually, but --

3    A.  I'm sure.

4    Q.  Well, I guess my question is, is:  What you're telling me

5    is that your reputation really can't be repaired as long as

6    Mr. Giuliani is allowed to say things about you, right?

7    A.  No.  What I'm saying, it's not just black and white, it's

8    not one thing that's going to happen and my reputation is -- is

9    repaired.  I might have to spend money, people might have to

10   change, people might have to tell the truth.  Maybe the truth

11   needs to be screamed just as loud and just as many times as the

12   law -- I mean as the lies, like -- I'm not sure because I'm not

13   there yet.

14   Q.  What if the statements, the false statements about you are

15   just taken down from wherever they are, off the internet?

16   Wouldn't that be -- would that be sufficient?

17   A.  Will they be replaced with the truth by the same people who

18   spew the lies?

19   Q.  Well, it's -- I'll let you -- we'll talk about that, but

20   can you answer my question?  Would it not be good enough for --

21            MR. LANGFORD:  Objection, Your Honor.  Asked and

22   answered.  I mean, she's answered the question.

23            THE COURT:  I don't know what the next question is

24   going to be.

25            THE WITNESS:  Same one he just asked.

```
 1    BY MR. SIBLEY:

 2    Q.  Well, is that what happened with OAN?  I mean, I'm

 3    asking --

 4              MR. LANGFORD:  Objection, Your Honor.  We've just

 5    gone over this.

 6              THE COURT:  Sustained.

 7    BY MR. SIBLEY:

 8    Q.  Did One America News Network take off the stories, false

 9    stories they posted about you?

10              MR. LANGFORD:  Objection.  Same grounds.

11              THE COURT:  Overruled.  That objection is overruled.

12    If she knows.

13    BY MR. SIBLEY:

14    Q.  Do you know?

15    A.  I'm sorry.  What did you say?

16    Q.  Do you know whether One America News Network took down the

17    postings, the news stories it made about you and your mother

18    that were false?

19    A.  Yes.  And as many times as they said the lie, they had to

20    say the truth, leave it up for the same amount of time, like --

21    yes.  It was a lot that they had to do.

22    Q.  They took it down, right?

23    A.  (Nods head.)

24    Q.  Did they -- and did they replace it with, as you say, the

25    truth after they took it down?
```

```
1    A.  I think I just -- yes, sir.  That's what I just said,
2    um-hum.
3    Q.  They did replace it with the truth?
4    A.  I believe so, yes.
5    Q.  What did they say?
6    A.  I do not know verbatim what they said, but I know that they
7    basically, like, recanted their story.  And just the same
8    amount of times as they spread their lies, that was the same
9    amount of times that they spread -- that they said that
10   basically -- they recanted it.
11   Q.  Okay.  Did you review any documents in preparation for your
12   testimony today?
13   A.  Any documents?  Um, I'm not sure what you mean.
14   Q.  Do you know what a document is?
15   A.  Yes.
16   Q.  Okay.  Like, the binders --
17   A.  A piece of paper?  Did I -- are you just saying a piece of
18   paper?  Or what -- what are you -- what are you talking about?
19   What do you mean?
20   Q.  Well, anything in writing, like, any materials?  Did you
21   review anything in preparation for your testimony today?  I
22   don't want to know what your lawyers might have told you, but I
23   just want to know if you looked at any materials?
24   A.  Any materials that would prepare me for today?
25   Q.  In preparing to come here and testify to the jury today,
```

```
 1   did you review any materials to prepare and come testify?
 2   A.  No, sir.  I'm -- I'm answering my truth.  There is no
 3   materials that's going to give you my -- my truth and what
 4   happened to me and what I did on my job, I don't believe so.
 5   Q.  Okay.  It's just -- I'm just wondering, like, for example,
 6   if you reviewed the documents that are in front of you in that
 7   binder before you testified to that?
 8   A.  Yes.  I went over the -- yes.  The pictures that were in
 9   here -- like, a lot of these documents, it's blank.  And they
10   show -- they show the video.  Of course I reviewed the horrible
11   calls because, you know, they came to me and I gave it to them.
12   So, I'm kind of -- I'm kind of -- does that answer your
13   question?
14   Q.  Yeah.
15         Other than that stuff, did you review any other
16   documents?
17   A.  Not that I can think of, sir.
18   Q.  Okay.  There were other -- it wasn't just you and your mom
19   that were in the State Farm Arena that night that were kind of
20   the subject of this -- these false claims, there were other
21   women there, too, correct?
22   A.  It was me and my mom that they claim pulled the suitcase
23   from under the table.  It was me and my mom that they claim
24   passed a USB drive.  It was me that they claimed kicked
25   everyone out and lied about a water main break.  So, yeah, that
```

1    was us.

2    Q.  I'm just wondering if the other persons that were at the

3    State Farm Arena that night, other than you and your mother,

4    received any kind of death threats or any negative treatment

5    for being kind of associated with that vote counting, I guess?

6    A.  Every employee that worked there -- like, they were

7    actively there, you know, as we were working, they were on a

8    bridge, they had their picket signs, the confederate flags,

9    they threw things over the bridge at us at night as we left.

10   Yes.  We were asked many times, Do we need security to be able

11   to come in here?  Because as I said, you are able to walk in

12   and view tabulations.  So my entire staff was tormented for the

13   two weeks we were there leading up until Election Day.

14   Q.  Okay.  I'm going to move now onto something that's

15   uncomfortable to talk about.  But, we saw in opening

16   presentation and during your testimony with Mr. Langford, we

17   saw a lot of very unfortunate racist messages that were sent to

18   your phone, correct?

19   A.  Correct.

20   Q.  And actually, I think what you said is you let your son use

21   the phone, and unfortunately he may have seen -- or did see, I

22   guess, those messages, correct?

23   A.  Correct.

24   Q.  Okay.  Now, we've seen a lot of things that Mr. Giuliani

25   has said about you and your mother and about what happened at

1  State Farm Arena, but there's nothing that he said that

2  mentioned you or your mother's race; am I correct?

3  A.  Mr. Giuliani assumed that everyone was a dem, and

4  basically --

5          MR. SIBLEY:  Objection.  Not responsive.

6          THE COURT:  Overruled.  Continue.

7          THE WITNESS:  Basically, he's saying everyone is dem

8  because we were all Black.  Like, he has no idea how many Trump

9  voters that are Black that are in Atlanta, probably until when

10  he had to turn himself in and saw the Black guys out -- Black

11  folks out there with just the "Blacks For Trump" or something

12  like that.

13          But, yes, he made it very clear that we were

14  segregated, that no one in there was a Republican, like him.

15  And because he saw we were all Black -- I have some white

16  workers, but they were already gone -- he assumed because we

17  are Black, we are Dems.  So I felt like that is the beginning

18  of the race issue.  They wouldn't have known -- I mean, like --

19  BY MR. SIBLEY:

20  Q.  How would he have -- how do you know that he assumed that?

21  A.  Because he called us "Dems," and he didn't know me from a

22  hole in the wall.  He doesn't know who I vote for.  And in

23  Georgia, we do not identify you by party.  I couldn't look at

24  someone's record and it will say one election Republican,

25  Democrat, Democrat, Republican, Republican.  Like, we don't

1    identify you by party here in Georgia.  So it was obvious that

2    he assumed we were all Democrats because we were all Black.

3    Q.  There were no non-Black persons --

4    A.  Not in the video that he watched and scrutinized and lied

5    about.

6    Q.  What about outside the video?  Is it a diverse group of

7    people --

8    A.  He was talking about the videos.  He listened to it, he

9    said:  The Dems kicked everybody out.  The Dems went (witness

10   makes sound).  Like, that's his words.

11   Q.  Wouldn't you just presume that if you believed someone was

12   stealing an election for the Democratic candidate, that they

13   were probably a Democrat, as opposed to their race?

14   A.  (Shakes head.)

15   Q.  That's a "no"?  You have to use words.

16   A.  I would not assume that.  There are -- wasn't it just a

17   Black guy running for the Republican party?  I wouldn't assume

18   that.  Someone ignorant would assume that, but I would not.

19   Q.  Okay.  Do you think those horrible racist messages you

20   received, do you think Mr. Giuliani intended for persons to

21   react to his statements and send those messages to you?

22          MR. LANGFORD:  Objection, Your Honor.  Calls for

23   speculation.

24          THE COURT:  True.  Sustained.

25   BY MR. SIBLEY:

```
1    Q.  Do you have any --

2              THE COURT:  It does call for speculation.  What does

3    she know about his intent?  I mean, I don't know -- you can

4    rephrase the question.

5    BY MR. SIBLEY:

6    Q.  Do you have any reasons to believe that Mr. Giuliani

7    intended for persons to act on his statements about you and

8    your mother and then make racist comments to you?

9    A.  Yes, I do.  He did not go to BET Nightly News to spew his

10   lies.  He was not on the Rickey Smiley Morning Show spewing his

11   lies.  He went to places where he knew his people would believe

12   the lies and have his back, and call into action.

13   Q.  So do you think he wanted you to receive racist messages?

14   A.  No, sir.  I can't say what he wanted, but I can say that he

15   was not spewing the lies where there are majority Black people

16   as viewers.

17   Q.  Okay.  Well, that's a good -- that's kind of a good point.

18             Do most of the people that are kind of in your community

19   and you associate with, do they -- are they subscribers to

20   Mr. Giuliani's podcast, that you know of?

21   A.  I don't know.  We don't talk.

22             MR. LANGFORD:  Objection.

23             THE WITNESS:  I'm sorry.

24             MR. LANGFORD:  I was going to say:  Objection.  Calls

25   for speculation and beyond the witness's personal knowledge.
```

```
 1              THE COURT:  She's already answered it.  I think,
 2   Counsel, we'll move on.
 3   BY MR. SIBLEY:
 4   Q.  Okay.  Well, part of what you're claiming to the jury is
 5   how you've been damaged in the community, right?
 6   A.  No.  All over.
 7   Q.  Okay.  Do you -- I mean, do you think that the average
 8   person sitting here today believes that you and your mother
 9   committed election fraud?
10   A.  Not ever since we have been standing up for ourselves and
11   speaking our truth and calling these liars to the front, no.
12   We have a lot of people on our side now.
13   Q.  Okay.  How many people do you know who listen to Rudy
14   Giuliani's podcast?
15              MR. LANGFORD:  Objection, Your Honor.  Calls for
16   speculation.  But --
17              MR. SIBLEY:  How many people does she know?
18              THE COURT:  How would she know that?  Sustained.
19   BY MR. SIBLEY:
20   Q.  Has anyone told you, that you know, that they listen to
21   Rudy Giuliani's podcast?
22   A.  No, sir.  Not his podcast.
23   Q.  Okay.  Has anyone you know told you that they follow
24   Mr. Giuliani on social media?
25   A.  No.  Not on social media.
```

1    Q.  Okay.  So is it fair to say that your group of friends are

2    probably not fans of Mr. Giuliani and his social media and

3    publishing activities?  Is that fair?

4    A.  No, that's not fair.  Because you don't have to be a fan of

5    Mr. Giuliani to just so happen to hear his lies.

6    Q.  Okay.  But you would have to go -- I mean, he's not on CNN,

7    right?

8    A.  Yes, he is.  He's -- he's on TV.

9    Q.  Okay.  Did he make statements about you on CNN?

10   A.  I don't know if it was CNN.  Like, I'm not sure which

11   station it was.

12   Q.  Okay.  I mean, Alex Jones, for example, you know who that

13   is?

14          MR. LANGFORD:  Objection, Your Honor.  I mean, where

15   is this going?

16          MR. SIBLEY:  Well, it's --

17          THE COURT:  I'm not sure.  Does she know Alex Jones

18   or who he is?  Overruled.

19   BY MR. SIBLEY:

20   Q.  Do you know who Alex Jones is?

21   A.  No, sir.

22   Q.  Okay.  Well, let me ask you this:  Do you think

23   Mr. Giuliani intended for there to be violence against you and

24   your mother as a result of this --

25          MR. LANGFORD:  Again, calls for speculation.  He's

1    asking her what Mr. Giuliani intended.

2              THE COURT:  Sustained.  And it's irrelevant to

3    damages, what she thought he thought.  Come on, Mr. Sibley.

4    BY MR. SIBLEY:

5    Q.  Okay.  Do you have any evidence that Mr. Giuliani intended

6    violence to result against you and your mother as a result of

7    his statements?

8    A.  I don't have any evidence that he intended violence, just

9    that he wanted people to search our homes and lock us up.  He

10   didn't say who should do that, so the world felt like they

11   should do that for him.

12   Q.  Okay.  How do you know, for example, the racist comments

13   that were directed at you were not the result of *The Gateway*

14   *Pundit* and their stories about you and your mother?

15   A.  They were sharing the same video with the same caption, the

16   same -- same re-Tweet and publishing it that he re-Tweeted,

17   that Team Trump re-Tweeted.  It was -- wasn't anything

18   different; it was the same.  It was like a torch for the

19   Olympics when someone lights it and they pass it from person to

20   person and person until they get to the Olympic torch.  They're

21   all on the bus together.

22   Q.  So those racist messages we've looked at throughout the

23   trial, those could have easily been spawned by someone reading

24   *The Gateway Pundit*?

25   A.  I'm sorry?

1    Q.  The racist messages we saw earlier and throughout the

2    trial, those could have just as easily been caused by

3    statements made by *The Gateway Pundit*, right?

4              MR. LANGFORD:  Objection.  Calls for speculation.

5              THE COURT:  Overruled.

6              THE WITNESS:  I don't really understand.

7    BY MR. SIBLEY:

8    Q.  Okay.  How do you know that the people who contacted you

9    and made racist comments, how could you know whether that was

10   because they read something Mr. Giuliani published?

11   A.  Because they were parroting his exact words.  They were

12   speaking of the exact video he was speaking of.  They were

13   saying the same things that made no sense, that he repeatedly

14   was saying.  They -- they were parroting each other.

15   Q.  And they were also parroting *The Gateway Pundit,* right?

16   A.  All of them were.  And Team Trump as well.

17   Q.  Okay.  Do you know who Jensen Hughes is?  Do you know

18   Jensen Hughes?

19   A.  I'm learning about them through this trial, yes.

20   Q.  You remember Ms. Scott from yesterday, correct?

21   A.  Yes, sir.

22   Q.  Okay.  I believe there was some suggestion that she had

23   provided security to you and your mother.  Do you recall that?

24   A.  Yes, sir.

25   Q.  Okay.  What kind of security did she provide?

1    A.  Well, protection.

2    Q.  Like, as, like, a police security person?  Or how did they

3    do it?

4    A.  Yes.

5    Q.  Okay.  Are they involved with -- Jensen Hughes, are they

6    involved with any other cases besides this one?

7    A.  I'm not sure.

8    Q.  Are they involved in *The Gateway Pundit* case?

9    A.  That is my other case, so I'm not sure, sir.

10   Q.  Okay.  All right.  How much money a year did you make --

11   how much were you making a year in 2020?

12   A.  I'm not sure how much I made in 2020.  We had a major

13   pandemic, so there was a lot of overtime, and we had a lot of

14   elections that year.  And as I stated, during election we work

15   7:00 to 7:00, seven times a week.  So during the election year

16   we make a little bit more than our normal range of 34- to

17   36,000 before taxes.

18   Q.  Okay.  Was the -- you may have discussed this with

19   Mr. Langford and I missed it, but were you working any other

20   jobs in 2020 besides the Fulton County job?

21   A.  That was all.

22   Q.  Okay.  But you stayed -- I guess you stayed working there

23   until 2023?

24   A.  Yes.

25   Q.  And I think you mentioned something about a promotion that

1   you were passed over for?

2   A.  Yes.

3   Q.  Okay.  What would you have made -- how much more money, I

4   guess, would you have made if you had gotten that promotion?

5   A.  I'm not sure because I didn't get it.  I didn't go back to

6   see what they were paying the person that got it.

7   Q.  What was the job title, again?

8   A.  It was an absentee supervisor.

9   Q.  Okay.  And there was another job you mentioned that you

10  said you felt like you got passed over for because of all the

11  statements about the election fraud.  Do you recall that?

12  A.  Incorrect.  I said there was another job that I walked out

13  of the interview because they started to ask me about the lies.

14  Q.  I see.  I thought they were two separate occasions.  You're

15  talking about the Chick-fil-A position, right?

16  A.  Correct.

17  Q.  Okay.  Do you still live in Fulton County?

18  A.  I've never lived in Fulton County.

19  Q.  Oh, okay.  Well, do you still live in the same place that

20  all of these horrible events took place, where people were

21  showing up and terrorizing the home and things like that?

22  A.  Of course not.

23  Q.  Okay.  What was the -- I'm interested to know, when the

24  Chick-fil-A person turned the computer around and showed your

25  face, what -- was that a -- what was that?  Do you remember

```
 1   whether it was, like, a news story or just like an internet
 2   image search?
 3   A.  No.  It was -- it was a news article, I believe.  I'm not
 4   quite sure.  I'm just assuming it was -- he turned it around
 5   and it was a picture, a side-by-side of my mom, and it had
 6   "fraud" written across.  And I just bailed out of there.  I
 7   didn't ask him where did he find his research or anything.  I
 8   don't know for sure.
 9   Q.  But that wasn't a Giuliani Twitter feed or something, was
10   it?
11   A.  I'm not sure.  I didn't see the URL or anything.  I told
12   you exactly what I saw.
13   Q.  What date was that?
14   A.  I'm not sure.  It was in 2021.
15   Q.  Okay.  So you were trying to get the Chick-fil-A job while
16   you were still working for Fulton County?
17   A.  Yes.
18   Q.  Okay.  I see.
19       What do you do -- are you working now?
20   A.  No, sir.
21   Q.  What do you do for money?  How do you support yourself?
22   A.  I have my savings that I am depleting.
23   Q.  Are they depleted?
24   A.  They are.
25   Q.  So you're pretty much -- I mean, one of the reasons it's
```

1   difficult to repair your reputation right now is you're pretty

2   much -- this has caused you to be financially -- you don't have

3   any money, I guess, right?

4   A.  That's mostly correct.



60



1

2

3

4                    (Open court:)

5     BY MR. SIBLEY:

6     Q.   Okay.  Ms. Moss, I think what you told me is that you had a

7     savings that had been depleted.  Is that fair?

8     A.   Incorrect.  That's not what I said.

9     Q.   Okay.

10    A.   I said that I am using some savings that are depleting

11    because I have a set amount of savings.  But I don't have a

12    job, so that's what I'm living off of.

13    Q.   Okay.  Do you have an annuity as well?

14    A.   I put -- I took a lump for my savings.

15    Q.   And put it in an annuity.  Okay.  Right?  Yes?

16    A.   Yes.  So I could get a little at a time instead of just --

17    Q.   So there's no threat that you're about to be out on the

18    street because your savings are depleted, right?

19    A.   No.  I didn't say they were depleted, they are depleting.

20    They're getting smaller and smaller.

21    Q.   Okay.  Have you looked for other work recently?

22    A.   No.  I have not looked for other work because,

23    unfortunately, I am suffering major depressive disorder and

24    anxiety.  I am not going to go to a job where I cannot do -- be

25    my best self.  I'm on a lot of medication and I'm trying to get

```
 1    my mental health together before I try to be someone's
 2    employee.
 3    Q.  Do you have any kind of prognosis on returning to work?
 4    A.  You mean, like, from my therapist?
 5    Q.  Sure.
 6    A.  No.  She didn't give me a day where I'm going to -- a
 7    prognosis, no, sir.
 8    Q.  It's a she, I suppose?
 9    A.  Yes, it's a she.
10    Q.  Did she say that you can't work right now?
11    A.  She suggested that I take time and work on my -- myself.
12    Q.  It's not stressful to be in litigation?  You don't think
13    that adds stress to you?
14    A.  Only talking to you.  I love my lawyer.
15    Q.  Okay.  All right.  Outside of talking to me, litigation is
16    not that big of a deal for you, I guess, with your --
17    A.  It's not stressful.  I'm telling them what I'm going
18    through.  I'm telling them what has happened to me.  Basically
19    everything that I've said until today, I've been telling them
20    little by little over almost three years.
21    Q.  Okay.  When was the last time you received, I don't know,
22    threatening -- a threatening message?
23    A.  The last time I received, like, that came directly to me?
24    Is that what you're speaking of?
25    Q.  Yeah.  Let's start with that.
```

1    A.   No, I -- I don't want that in my life.  I blocked that.  No

2    one has access to send me anything.  But, you know, I wouldn't

3    say "threatening."  People try to intimidate me.  They, of

4    course, found where I -- they have found my new home.  I have

5    had people sending me in the mail clippings, like a cut-up

6    clipping of my face; things, yeah.

7    Q.   Okay.  Have you contacted -- well, how long ago was that

8    that happened?

9    A.   It was a couple months ago.

10   Q.   Okay.  Do you ever contact the authorities when you receive

11   things like that and report these incidents?

12   A.   To tell them I received a clipped-up newspaper clipping of

13   my face?

14   Q.   No, ma'am.  The threatening messages.

15   A.   I've -- I've made it so that people cannot send me

16   threatening messages any longer.

17   Q.   What did you do to do that?

18   A.   Blocked everything.  I have it all blocked.  You can't send

19   me a message or anything like that on where -- where they were

20   sending me before -- I mean, going into detail, I have cut it

21   off on Facebook, you cannot message me.  Unfortunately, I love

22   Pinterest, they were on there.  I shut that down.  The

23   LinkedIn, they were coming through there.  I deleted that.  And

24   I just -- I -- I blocked it.

25            I told you, I did the DeleteMe to just remove me from

 1    the places that I didn't even know that I was there.  I'm

 2    working to prevent me or my son to have to keep reliving that

 3    because it's still being spewed, you know, as lies.  Like, I

 4    received a picture of a cell phone hanging from a noose and I

 5    had to, like, contact Facebook and -- and really just get it

 6    blocked because once I blocked them, then they were sending --

 7    going to my SPAM messages.  And I spoke with the people in

 8    social media to assist me into just blocking -- blocking it

 9    all.

10    Q.  I think Mr. Langford talked to you a little bit about the

11    effects of all this on your family.  Do you recall that?

12    A.  Yes, sir.

13    Q.  And, obviously, your mother is going to testify.  We're

14    going to hear from her eventually.

15         But based on your observations of your mother, do you

16    feel like this was harder on her than you, or easier?  I mean,

17    maybe she didn't have as much social media?  I don't know.  Can

18    you -- can you tell us how it affected her and how that

19    compared with what you dealt with?

20    A.  No, sir.  I can't do it.

21    Q.  You can't you us how this affected your mom?

22    A.  I mean, it affect her in a negative way.  It affected her

23    the same way it affected me.

24    Q.  Okay.  Can't say whether it was worse or not for her than

25    it was for you?

 1   A.   No.   I can't.   It's like two people getting jumped and

 2   deciding which one got jumped worse.   I don't know.

 3   Q.   I see.

 4        Well, does she have any kind of -- she getting treatment

 5   for any of these issues that you're having that you went to

 6   therapy for?

 7             MR. LANGFORD:   Objection, Your Honor.

 8             THE COURT:   If she knows.   Overruled.

 9             THE WITNESS:   I'm not sure.   This -- this experience

10   has been very embarrassing because I just let my mom know that

11   I am taking medicine.   I tried to, you know, be as strong as I

12   can.   You know, when I'm around people, I don't want to be a

13   Debbie Downer.   So a lot of people are going to know all of my

14   business now, and that's not something I just go screaming out,

15   that I'm on meds.   And I'm not going to ask my mom if she is as

16   well.

17   BY MR. SIBLEY:

18   Q.   Okay.   She hasn't told you that "I'm on medication" or "I'm

19   suffering from posttraumatic stress disorder," anything like

20   that?

21   A.   No, sir.

22   Q.   Okay.   Is she still working?

23   A.   She had to shut her business down.

24   Q.   Okay.   I remember seeing something in the documents about a

25   business.   What kind of business did she have?

```
1    A.  She -- she had a travelling boutique.  Like, she -- she --
2    she had to change all of that.  She doesn't -- she doesn't go
3    about her business the way she used to.  She had her business,
4    but she had to change things so they couldn't find her, and she
5    has to work differently.
6    Q.  Okay.  And how long ago did she shut that business down?
7    A.  Well, she made -- she had to just make changes, and she has
8    to work differently.  We're not just as free as we used to be.
9    So, when everything happened.
10   Q.  Is she still working as an election -- in elections in
11   Fulton County?
12   A.  No.  She was a temporary worker, but she -- she left before
13   the holidays even came.
14   Q.  Oh, you mean like in 2020?
15   A.  Correct.
16   Q.  I see.
17       You mentioned you started going to therapy, I think, in
18   June of 2021?
19   A.  Yes.
20   Q.  Okay.  And I think what you said is well-spoken, a lot of
21   people don't appreciate the significance of mental health.  And
22   it sounds like you did that in June of 2021, correct?
23   A.  I'm sorry.  I didn't understand the question.
24   Q.  I thought what you said is the reason you didn't go to
25   therapy sooner is that it just wasn't something you were used
```

1   to doing or didn't really know much about.  Maybe I

2   misunderstood that, but --

3   A.  Right.  It was something that I've never done, I've never

4   had the reason to do.  It's something that I've seen people --

5   I've seen it on TV, but I've -- I was a very happy person.  I

6   never -- I never thought I would be in that situation, so I --

7   I didn't know anything about it.

8   Q.  Okay.  And you claim that you have some diagnosis of --

9   that you mentioned earlier with Mr. Langford from going to

10  therapy, right?

11  A.  Yes, sir.

12  Q.  Okay.  And what are those?

13  A.  Major depressive disorder.  Acute stress disorder.

14  Q.  Is that it?

15  A.  Those are the ones that I spoke about today.

16  Q.  Okay.  Are there any other ones that you didn't speak

17  about?

18  A.  Yes.

19  Q.  What are those?

20      Well, let me ask you this:  What other ones are you

21  contending to the jury that were caused by Mr. Giuliani's

22  conduct?

23  A.  I -- I believe that all of my medical records are

24  submitted.

25  Q.  All of your medical -- issues?  Did I understand that

1    correctly?

2    A.  All of my medical records.  So it's everything from my

3    doctor, they have it.

4    Q.  Okay.  What are -- what other issues do you have besides

5    maybe the major depressive disorder and --

6            MR. LANGFORD:  Objection, Your Honor.  What other

7    issues does she have?

8            THE COURT:  Let's talk.

9            (Whereupon, a bench conference was held:)

10           THE COURT:  Have all of the plaintiff's medical

11   records been turned over to the defense?

12           So, Mr. Sibley, are you fishing for something you

13   found in the medical records that you want to make public?

14           MR. SIBLEY:  I don't, Your Honor.  I'm just

15   wondering -- I mean, I don't know --

16           THE COURT:  Let me ask plaintiff's counsel.

17   Plaintiff's counsel turn over medical records for this

18   plaintiff?

19           MR. LANGFORD:  We have turned over redacted medical

20   records that detail the specific things that we are seeking as

21   damages for the intentional inflection of emotional distress.

22   It's a very narrow universe.

23           THE COURT:  And that is what she's testified about?

24           MR. LANGFORD:  Exactly.

25           THE COURT:  Mr. Sibley, what are you fishing for?

```
 1              MR. SIBLEY:  I'm not fishing necessarily, it came up.

 2              THE COURT:  You've asked her:  What else are you

 3     seeking damages for?

 4              And she's seeking damages for what she's testified

 5     about.  So other things that are in the medical records that

 6     have been redacted, she is clearly not seeking damages for

 7     those.  So what more are you trying to get out of this witness?

 8              MR. SIBLEY:  I wasn't until she said that she felt

 9     like he was responsible for all of her medical problems, and I

10     wanted to make sure -- since I don't get a recross, I want to

11     make sure --

12              THE COURT:  So, plaintiff's counsel, you weren't

13     planning on bringing up anything else from her medical records

14     that has not already been discussed?

15              MR. LANGFORD:  No, Your Honor.

16              THE COURT:  Okay.  So there you have it, Mr. Sibley.

17              (Open court:)

18              THE COURT:  Objection is sustained.

19     BY MR. SIBLEY:

20     Q.  Who was the therapist that made those diagnoses that you

21     just mentioned, Ms. Moss?

22     A.  Dr. Shin, Dr. Womack.  And I cannot remember the lady that

23     I went to that one time in June of 2021.

24     Q.  Okay.  Do you know what kind of doctors they were?

25     A.  Well, Dr. Shin is my primary care physician.  She's the
```

1    first one that diagnosed me, gave me medication.

2              And, well, the first lady, I don't remember her name,

3    that I went to in June, I never went back.  But according to my

4    records, she diagnosed me with acute stress disorder.  And then

5    fast forward over a year later, September 2022, I went to

6    Dr. Shin and she diagnosed me with things.  But -- it was major

7    depressive disorder.

8              And then I went to Dr. Womack, that's my therapist.

9    She also diagnosed me with major depressive disorder and acute

10   anxiety -- with acute anxiety.

11   Q.  Do you know whether there's anything in your medical

12   records that attributed the cause of these conditions to

13   Mr. Giuliani?

14   A.  Say that again.  Sorry.

15   Q.  Is there anything in your medical records that attribute

16   the cause of these conditions that you mentioned to

17   Mr. Giuliani?

18   A.  Do you mean, like, did my doctor say:  Mr. Giuliani is why

19   you have major depressive disorder?

20   Q.  There might be something in the records where you told the

21   therapist that, I don't know, I'm suffering from, you know,

22   nightmares, et cetera, because of the things that Mr. Giuliani

23   said about me.

24             I'm just asking you whether there are.

25   A.  Correct.  I said the former president and his -- his

1    allies.

2    Q.  Okay.  But that wouldn't be necessarily reflected in the

3    medical records, right?

4    A.  I'm not sure how they would write in my medical records or

5    if they're like the court reporter and writing every single

6    word I say and put it in there.  I know that I told them my

7    story, and it started with Trump and his allies, meaning Rudy

8    Giuliani and his crew were the start of it all.  They lit the

9    torch.

10   Q.  You didn't talk about *The Gateway Pundit*?

11   A.  When I started to -- so, yes, I said Trump and his allies

12   spread the rumors at their rallies and their -- their

13   appearances.  And a lot of media outlets grabbed it and helped

14   spread their lies; the one that, you know, I've settled with

15   and the one that I am currently still in process of, you know,

16   have my suit with.

17   Q.  Okay.  I want to show you, these are exhibits Mr. DuBose

18   already talk to you about.  It's in the binder, it's

19   Exhibit 270 -- it's not in the binder, but let me get the --

20             MR. LANGFORD:  It's an audio file?  Is that what

21   you're looking for?

22             THE COURT:  We have a blank page in our notebooks

23   here, Mr. Sibley.  Plaintiffs' Exhibit 270.  So what is it that

24   you want to --

25             MR. SIBLEY:  I thought there was a -- trying to

1    demonstrate -- I thought it had a message.

2              THE COURT:  Instead of speaking out loud on the

3    record, why don't you just confer with plaintiffs' counsel and

4    see if they can help you.

5              (Off-the-record discussion between counsel.)

6    BY MR. SIBLEY:

7    Q.  Okay.  Let me look.  It's -- all right.  Let me ask you

8    this, ma'am:  Do you have any messages from -- that have been

9    been -- that we've seen so far in this case, do you have any

10   messages -- voice messages, text messages, whatever -- from

11   December 3rd that are -- that you believe were generated as a

12   result of Mr. Giuliani's conduct?

13   A.  Yes, sir.

14   Q.  Okay.  Okay.  Can you tell us which ones those were?  Do

15   you recall?

16   A.  I can't recall -- it was a lot of them that I've seen

17   throughout the --

18   Q.  Okay.  Well, some of the exhibits we looked at -- or, you

19   looked at with Mr. Langford were Plaintiffs' Exhibit 270, 275,

20   and 278.  Do you see them in that binder in front of you?

21   There's not actually a document, but it has a blank page that's

22   a placeholder.  Do you see that?

23   A.  Yes.

24   Q.  Okay.  Would it surprise you that those messages are

25   actually from December 4th and not December 3rd?

1    A.  No, it wouldn't.

2    Q.  Okay.  Other than those, can you think of any messages that

3    could be from December 3rd that we've looked at or we will look

4    at in this case?

5    A.  I'm not sure which all -- the ones that we will look at or

6    have looked at.  I think I've had my fill of looking at them.

7    But I know that my son's cell phone was riddled with a lot of

8    things from the 3rd, as well as my Facebook.

9    Q.  Understand.  Okay.

10          I'm almost done, Ms. Moss.  Give me one second.

11          MR. SIBLEY:  All right.  I'll pass the witness, Your

12   Honor.

13          THE COURT:  All right.  I don't know how long your

14   redirect is going to be, but would it make sense, given the

15   length of what it might be, for us to take a break now?

16          MR. LANGFORD:  Yes, Your Honor.

17          THE COURT:  All right.  We'll take a ten-minute

18   break.

19          (Whereupon, the jurors leave the courtroom.)

20          THE COURT:  All right.

21          (Recess from 3:23 to 3:39.)

22          THE COURT:  All right.  Are you ready to proceed with

23   redirect?

24          MR. LANGFORD:  Yes, Your Honor.

25          THE COURT:  Okay.  Let's bring the jury in.

```
 1              (Whereupon, the jurors enter the courtroom.)
 2              MR. LANGFORD:  Thank you.
 3                    REDIRECT EXAMINATION
 4    BY MR. LANGFORD:
 5    Q.  Ms. Moss, Mr. Giuliani's attorney asked you about working.
 6    If you could right now, would you like to be working?
 7    A.  Yes.
 8    Q.  Tell us more about that.
 9    A.  Um, I mean, if it was a perfect world, I would love to work
10    at the only job I've known.  Anywhere that I work now cannot be
11    in a registration or elections department, not even at a
12    secretary of state's office because of all the things that are
13    being said about me.
14              But I would definitely have to start off again at the
15    bottom and work my way up.  I am wanting to do that, but I am
16    not mentally able to do that with things the way they are now.
17    It's a little difficult.  I -- I have to work on my mental
18    health, unfortunately.
19    Q.  Do you enjoy being without a job?
20    A.  No, I do not.  Before I had purpose, I had a reason.  No, I
21    do not enjoy this.  Most days I pray that God does not wake me
22    up and I just disappear.
23    Q.  Ms. Moss, Mr. Sibley also asked you about whether -- about
24    Jensen Hughes.  Why do you have security?
25    A.  Because my safety is at risk.
```

1   Q.  Do you feel safe going out in public without security?

2   A.  No, I do not.

3   Q.  In fact, how many times have you been out to dinner in the

4   last year?

5   A.  I've been out -- I can't count.  Like, a few times.  Not

6   alone, no.

7   Q.  Do you ever go out alone?

8   A.  No, I do not.  And actually, that was my homework from one

9   of my -- from my therapist, was to try to go out alone, and I

10  did.  I did once.  And -- and I made sure it was a restaurant

11  that when you walk in, the bar is right there.  So I just said:

12  I'm going to sit at the end of the bar and I'm going to try to

13  do this.

14          And I did it that one time.  I was so terrified.  I

15  was extremely nauseous.  But, thankfully, there was this guy at

16  the bar, and he was a Jewish guy, and he literally talked the

17  entire time about -- about this -- about this movie, about this

18  family that is in the pharmaceuticals -- I can't remember the

19  name of it.  But the guy was just talking.  And -- and I -- I

20  did it, and I was very proud of myself.  But, unfortunately, I

21  have not -- I have not been able to do that again.  But I did

22  do it, do it once.

23  Q.  Do you have security that's with you here in D.C.?

24  A.  For sure, yes.

25  Q.  They're protecting you to come to this trial?

1    A.  Correct.

2    Q.  Is that because you're unsafe?

3    A.  Correct.

4    Q.  Did you ever have a need before security -- did you ever

5    have a need for security before December 3, 2020?

6    A.  No.  No.  That was unheard of in my life.  Never.

7    Q.  You have a number of lawyers here, right?

8    A.  Yes.  A whole lot.

9    Q.  And Mr. Sibley mentioned that you have sued some other

10   defendants?

11   A.  Yes, sir.

12   Q.  Did you ever want to be in a position where you needed to

13   have these lawyers and security?

14   A.  No.  Never.  I enjoined my life before all of this.  I

15   enjoyed having a purpose to live.  I enjoyed, you know, helping

16   people.  I enjoyed educating people about their right to vote.

17   Like, I enjoyed being able to, like, ditch everyone and have my

18   day, where I am, like, shopping, going different places, don't

19   have to worry about picking up nobody from school.  You know,

20   I -- I enjoyed -- I enjoyed that.  I actually, you know, was

21   able to live my life.  This is not what I want.

22   Q.  Mr. Sibley also asked you about whether you thought that

23   Mr. Giuliani intended people to send you certain messages.  Are

24   you aware that Mr. Giuliani compared you to bank robbers?

25   A.  Yes.

1    Q.   That he accused you of being like a drug dealer?

2    A.   Yes.

3    Q.   That he accused you of passing vials of heroin and cocaine?

4    A.   Correct.

5    Q.   What do you understand that to mean?

6    A.   That's what he think about Black folks when he see them.

7    Q.   Mr. Sibley also talked about a number of other entities and

8    individuals that spread lies.  Is it true that *One America*

9    *News*, Chanel Rion were co-conspirators with this case?

10   A.   Right.  They were with this case, this one, yes.

11   Q.   Isn't it true that Team Trump, the Trump campaign members

12   thereof were co-conspirators in this case?

13   A.   Yes, sir.

14   Q.   Another entity that Mr. Sibley talked about was *The Gateway*

15   *Pundit*, and he asked you about your lawsuit against *Gateway*

16   *Pundit*.

17        Have you ever said that Mr. Giuliani was the only person

18   that spread lies about you?

19   A.   No.

20   Q.   Do you think that everyone who helped spread lies about you

21   should be held accountable?

22   A.   Yes.

23   Q.   Are you familiar with the complaint you filed in your

24   *Gateway Pundit* case?

25   A.   Yes.

1   Q.  Ms. Moss, do you know the date of the first *Gateway Pundit*

2   story that you're suing over?

3   A.  December 3, 2020.

4            MR. LANGFORD:  Your Honor, I would like to approach

5   the bench to have an exhibit marked for identification.

6            THE COURT:  Um-hum.

7            MR. LANGFORD:  That would be marked Plaintiffs'

8   Exhibit 607, I believe.

9            Your Honor, may I approach the witness to hand her --

10           THE COURT:  You may approach.

11  BY MR. LANGFORD:

12  Q.  Ms. Moss, what is this?

13  A.  This looks like an article from *The Gateway Pundit's*

14  website.

15  Q.  Is that the first article you're suing over in this case?

16  A.  Yes.

17           MR. LANGFORD:  Your Honor, I would like to offer

18  Plaintiffs' Exhibit 607 into evidence.

19           THE COURT:  Any objection?

20           MR. SIBLEY:  No objection, Your Honor.

21           THE COURT:  Okay.  It will be admitted.

22           MR. LANGFORD:  Your Honor, may we publish this to the

23  jury?

24           THE COURT:  Yes, you may.

25           (Plaintiffs' Exhibit 607, was admitted and

1      published.)

2      BY MR. LANGFORD:

3      Q.  Ms. Moss, can you read the headline of this article?

4      A.  "Huge!  Video footage from Georgia shows suitcases filled

5      with ballots pulled from under a table after supervisor told

6      GOP poll workers to leave tabulation center."

7              MR. LANGFORD:  Now, Mr. Spaulding, can you scroll

8      down to page 2, Zoom in on this second Team Trump Tweet.

9      BY MS. LANGFORD:

10     Q.  Ms. Moss, can you read the second Team Trump Tweet in this

11     article?

12     A.  "Watch:  Video footage from Georgia shows suitcases filled

13     with ballots pulled from under a table after supervisors told

14     poll workers to leave the room and four people stayed behind to

15     keep counting votes."

16     Q.  You said Team Trump is a part of this co-conspirator?

17             MR. SIBLEY:  Objection, Your Honor.  That -- number

18     one, I raised the objection that this is beyond the scope of

19     the pleadings.

20             And number two --

21             THE COURT:  Excuse me.  Do you have a speaking

22     objection which is -- I've already cautioned you about.  Let's

23     get on the bench phones.

24             (Whereupon, a bench conference was held:)

25             THE COURT:  Mr. Sibley, you didn't object to

1    introduction of this, so what are you complaining about now?

2              MR. SIBLEY:  Because he's asking the question whether

3    this is some conspiracy in this case with Team Trump.  And the

4    problem with it is the issues we've already raised, which Your

5    Honor ruled on.

6              THE COURT:  You opened the door to *Gateway Pundit*,

7    and you opened the door to December 3.  You opened the door to

8    this entire redirect, so objection overruled.

9              MR. SIBLEY:  But that's --

10             (Open court:)

11   BY MR. LANGFORD:

12   Q.  Ms. Moss, I was just asking you, you said Team Trump is a

13   co-conspirator in this case?

14             MR. SIBLEY:  Objection.  Foundation.  Objection --

15             THE COURT:  Overruled.

16   BY MR. LANGFORD:

17   Q.  Ms. Moss?

18   A.  Yes.

19   Q.  You said -- is Team Trump a co-conspirator with

20   Mr. Giuliani in this lawsuit?

21   A.  Yes, sir.

22   Q.  I'm going to ask:  How do you think you ended up on the

23   *Gateway Pundit's* radar?

24   A.  Because of the whole conspiracy from Mr. Giuliani and Team

25   Trump.

1          MR. LANGFORD:  Thank you.  No further questions, Your

2    Honor.

3          THE COURT:  All right.  Ms. Moss, you're excused.

4    Thank you.

5          And the plaintiffs' next witness.

6          MR. GOTTLIEB:  Your Honor, the plaintiffs call by

7    deposition testimony Mr. Bernard Kerik.

8          Before playing that testimony, I would like to batch

9    admit the documents that will be referenced in the deposition.

10          Counsel for Mr. Giuliani has indicated that his

11    objections to these exhibits are the 402, 403 objections.

12    Those exhibits are Plaintiffs' Exhibits 287, 342, 343.  And we

13    would also move the designation transcript of Mr. Kerik, which

14    is Exhibit No. 592.

15          THE COURT:  All right.  Mr. Sibley, do you have

16    objections to 287?

17          MR. SIBLEY:  Yes, Your Honor.

18          THE COURT:  Do you have objections to 342?

19          MR. SIBLEY:  Yes, Your Honor.

20          THE COURT:  Do you have objections to 343?

21          MR. SIBLEY:  Yes, Your Honor.

22          THE COURT:  And do you have objections to 592?

23          MR. SIBLEY:  592?

24          THE COURT:  Correct.  That's what's pending before

25    us, admission of those four exhibits.  That's the deposition

1    transcript from the designations.

2         MR. SIBLEY:  If it's the designations of the

3    transcript, I don't have an objection.

4         THE COURT:  Well, I haven't looked at it, but that's

5    what Mr. Gottlieb has represented.

6         MR. SIBLEY:  Let me look at the exhibit list.  One

7    second.

8         (Pause.)

9         MR. SIBLEY:  It's on the exhibit list, but can I see

10   Exhibit 592?

11        592 is fine, Your Honor.

12        THE COURT:  All right.  So 592 is admitted.  And

13   you'll have to excuse us.

14        (Plaintiffs' Exhibit 592, was admitted.)

15        (Whereupon, a bench conference was held:)

16        THE COURT:  What is it?

17        MR. SIBLEY:  It's the same objection.

18        THE COURT:  I need to know, what is the exhibit?

19        MR. SIBLEY:  Okay.  Exhibit is 287.

20        THE COURT:  Mr. Sibley, I know you're trying to be

21   the master of the universe here, but why don't we ask

22   Mr. Gottlieb, since it's his exhibit.

23        What is 287?

24        MR. GOTTLIEB:  Your Honor, these three exhibits were

25   admitted during Mr. Kerik's deposition, and Mr. Sibley did not

1    attend, so there was no objection.  But 287 is a Tweet by

2    Mr. Kerik.

3              THE COURT:  On what date?

4              MR. GOTTLIEB:  I believe Mr. Sibley has these in his

5    binders, but I will get the dates for each of these three.

6              It is December 6th.

7              THE COURT:  All right.  And then 342?

8              MR. GOTTLIEB:  This is another Tweet by Mr. Kerik

9    that is December 27, 2020.

10             THE COURT:  And 343?

11             MR. GOTTLIEB:  This is also a Tweet from Mr. Kerik,

12   of the -- this is a Tweet by Mr. Kerik, Tweeting out the

13   Giuliani Strategic Communication Plan state summaries, and the

14   date is December 27, 2020.

15             THE COURT:  All right.  Okay.  So, Mr. Sibley, your

16   objections to -- do you have the same objection to all three,

17   287, 342, and 343?

18             MR. SIBLEY:  Yes, Your Honor.

19             THE COURT:  Your objection is what?

20             MR. SIBLEY:  The objection is that these are not

21   actionable statements because they were not identified in the

22   complaint.  Further, there's no evidence that these were

23   actions taken in furtherance of the alleged conspiracy, even if

24   they were rightly part of the conspiracy.

25             THE COURT:  And why do you think -- if they're not

1    actionable statements, defamation statements, aren't they all

2    part of the same conspiracy?  So why should that stop them from

3    coming in?

4              MR. SIBLEY:  Because it's --

5              THE COURT:  Helps to spread whatever the conspiracy

6    theory is, and why isn't that just part of the spread?

7              MR. SIBLEY:  It's only relevant if it's actionable

8    part of the conspiracy, and that would mean that these --

9              THE COURT:  No.  That's part of what's relevant.

10   Let's go back to "not actions taken in furtherance of the

11   conspiracy."

12             What makes you think this is not actions in

13   furtherance of the conspiracy?  Mr. Kerik was part of the

14   Strategic Plan formulation and dissemination, as clearly

15   reflected by Exhibit 343.

16             MR. SIBLEY:  Well, one of these statements for sure

17   is -- looks like a cut-and-paste of the Strategic Communication

18   Plan.  However, even if that were true, we still have the

19   objection that these were not identified in the complaint as

20   overt acts.

21             THE COURT:  Okay.  I've already dealt with that.

22             Does the plaintiffs' counsel, Mr. Gottlieb, want to

23   say something about that?

24             MR. GOTTLIEB:  Obviously, 343 is one of the

25   actionable statements.  But it's completely irrelevant whether

1    they're actionable statements or not because they are relevant

2    evidence that go to Mr. Kerik's testimony, and his testimony

3    describes Mr. Giuliani's role in spreading this information

4    around this time.

5              THE COURT:  The objections are overruled.

6              (Open court:)

7              THE COURT:  Objection is overruled.

8              Over objection, Exhibits 342 is admitted, 343 is

9    admitted.  Okay.  Let's proceed.

10             (Plaintiffs' Exhibits 342, 343, were admitted.)

11             (Whereupon, the video of Bernard Kerik was played to

12   the jury.)

13             THE COURT:  Can I pause for a second?  What's this

14   exhibit that we're looking at?  Mark Meadows.  I want to make

15   sure that's already admitted.  I don't see a plaintiffs'

16   exhibit number on it.

17             It was.  There it is.  It's covered.  345.

18             And, Mark?

19             THE COURTROOM DEPUTY:  Yes.  Yes, it is.

20             (Video of Bernard Kerik continues playing.)

21             MR. GOTTLIEB:  Your Honor, that concludes Mr. Kerik's

22   testimony.

23             THE COURT:  All right.

24             MR. GOTTLIEB:  For our next witness, the plaintiffs

25   would call Ms. Christina Bobb, who will also testify by

1    videotape deposition designation pursuant to the parties'

2    agreement, with the Court's permission.

3           We move to admit the following exhibits -- and we

4    understand there are no objections to these exhibits -- the

5    exhibits are 508, 259, 272, 406.  One of those is a physical

6    exhibit, it is a book that Ms. Bobb wrote, that is Exhibit 508.

7    And the designation transcript of Ms. Bobb's testimony is

8    Exhibit 595.

9           THE COURT:  All right.  Mr. Sibley, just so the

10    record is clear, any objections to 508, 259, 272, 406, 508, and

11    595?

12           MR. SIBLEY:  No, Your Honor.

13           THE COURT:  Hearing no objection, those will all be

14    admitted.

15           (Plaintiffs' Exhibits 508, 259, 272, 406, and 595,

16    were admitted.)

17           (Whereupon, the deposition of Christina Bobb was

18    played for the jury.)

19           MR. GOTTLIEB:  Your Honor, that concludes Ms. Bobb's

20    testimony.

21           For the next witness, plaintiffs would call Ms. Jenna

22    Ellis, again deposition by designation videotaped testimony.

23           THE COURT:  And how long is that?

24           MR. GOTTLIEB:  I believe that is 18 minutes, Your

25    Honor.

1          THE COURT:  Perfect.

2          MR. GOTTLIEB:  There are three exhibits not

3     previously in evidence associated with that.  I believe there

4     are -- there's one to which there is no objection, and two to

5     which there are objections.

6          THE COURT:  Okay.

7          MR. GOTTLIEB:  The exhibit that we move to admit that

8     we understand to be without objection is Plaintiffs'

9     Exhibit 218.

10          Then the plaintiffs also move to admit Plaintiffs'

11     Exhibit 425 and 558.  And we understand Mr. Sibley has made an

12     objection to those exhibits.

13          THE COURT:  All right.  Okay.  Anything else?

14          MR. SIBLEY:  The last one is the transcript, which is

15     Plaintiffs' Exhibit 594.

16          THE COURT:  All right.  Mr. Sibley, out of those four

17     exhibits, which ones do you have objection?  Do you want me to

18     go through them one by one?

19          MR. SIBLEY:  If you would please, Your Honor.

20          THE COURT:  Sure.  218, any objection?  Plaintiffs'

21     counsel believes you have no objection to that.

22          Mr. Giuliani, let your lawyer focus on my questions,

23     please.

24          MR. SIBLEY:  I'm sorry, Your Honor.  218, no

25     objection to that one.

1          THE COURT:  Okay.  And 594, transcript, any objection

2     that that?

3          MR. SIBLEY:  No objection.

4          THE COURT:  Okay.  So 218, 594 will be admitted with

5     no objection.

6          (Plaintiffs' Exhibits 218 and 594, were admitted.)

7          THE COURT:  425?

8          MR. SIBLEY:  Okay.  That, Your Honor --

9          THE COURT:  You have an objection.

10          MR. SIBLEY:  402, 403 on that one, Your Honor.

11          THE COURT:  Okay.  And then 558?

12          MR. SIBLEY:  Same objections on that.

13          THE COURT:  Okay.  Both 402 and 403 objections?

14          MR. SIBLEY:  Yes, Your Honor.

15          THE COURT:  Okay.

16          (Whereupon, a bench conference was held:)

17          THE COURT:  Okay.  Starting with plaintiffs' counsel.

18     What is 425?

19          MR. GOTTLIEB:  These exhibits are related, Your

20     Honor.  The first one, 425, is a February 13, 2023 stipulation

21     to discipline from -- disciplinary proceeding for conspiracy

22     acts for Ms. Ellis.  And then 558 is the March 8, 2023, order

23     approving the stipulation to discipline.

24          My understanding is that Mr. Sibley did not object to

25     558 on the exhibit list; he did object on 402 grounds to 425.

1    The reason that this testimony is relevant and the testimony in

2    the deposition shows it's directly relevant to the assessments

3    of punitives, given that Mr. Giuliani continues to defame and

4    has continued to defame our clients following one of his key

5    legal associate's stipulation to essentially admitting that the

6    allegations respecting our clients are false.

7         THE COURT:  Is that what the stipulation says?  Can

8    you just read the pertinent part of the stipulation, so that I

9    can make sure?

10        MR. GOTTLIEB:  I'll have to get it out, Your Honor.

11        THE COURT:  Do so.

12        MR. GOTTLIEB:  I'm looking at pages 2 through 4 of

13   Exhibit 425.  And it's a lengthy set of bullet points, Your

14   Honor, but Ms. Ellis represents that she was a member of

15   President Trump's legal team that made efforts to challenge

16   President Biden's victory in the 2020 presidential election.

17   While she was part of the legal team, along with attorneys like

18   Rudy Giuliani, unlike Mr. Giuliani, she was not counsel of

19   record for any of the lawsuits.

20        She made a variety of public statements to the Trump

21   campaign and personal counsel to President Trump.  And

22   respondent made the following misrepresentations while serving

23   as counsel for the Trump campaign and personal counsel to

24   President Trump -- and then there is a long list of bullet

25   points, and one of which is:  We have affidavits from

1    witnesses, we have voter intimidation, we have ballots that

2    were manipulated.

3              One of those representations is -- so these are --

4    all follow the statement that these were following

5    misrepresentations.  So I'm trying to now go through the bullet

6    points of page 3 of the exhibit that are misrepresentations.

7              THE COURT:  Okay.  Is there any specific reference to

8    the plaintiffs?

9              MR. GOTTLIEB:  There are specific references to

10   Georgia, there are specific references to alleged affidavits

11   that they have supporting the allegations of fraud, and there

12   is, for example, a representation on *Spicer & Co.*, November 20,

13   2020, that says:  With all those states -- Nevada, Michigan,

14   Pennsylvania, Wisconsin, Georgia -- combined we know the

15   election was stolen from President Trump, and we can prove

16   that.

17             THE COURT:  So that's one of the misrepresentation

18   sentences, Mr. Gottlieb?

19             MR. GOTTLIEB:  Yes.

20             THE COURT:  Okay.  Let me hear from Mr. Sibley.

21             And go back to you, does this -- I don't know how

22   long this stipulation is, but does the whole stipulation have

23   to come in?

24             MR. GOTTLIEB:  This document is six pages long, and

25   it was just part of the stipulation that's six pages long.  558

1     is also six pages long, and we -- we asked her questions about

2     these documents in the deposition, so I suppose, theoretically,

3     we could cut it out.  But these are questions that she was

4     asked about.

5                  THE COURT:  All right.  And this all goes to the

6     punitive damages because this all occurred in February and

7     March of 2023?

8                  MR. GOTTLIEB:  That's correct.

9                  THE COURT:  And Mr. Giuliani has persisted in his

10    claim -- defamatory statements and the truth of those, and

11    repeated those defamatory statements after that?

12                 MR. GOTTLIEB:  Yes.  And it's significant in how

13    close of an advisor Ms. Ellis was to Mr. Giuliani, which is --

14    also that comes out in the testimony.

15                 THE COURT:  All right.  Mr. Sibley?

16                 MR. SIBLEY:  So the objection is basically that --

17    you've already ruled on this, but we don't believe she's

18    properly part of the conspiracy.

19                 Secondly, you already have her on your order listed

20    as -- I believe you have her listed as a co-conspirator.  She's

21    pleaded the Fifth almost entirely throughout the deposition.

22    My understanding of punitive damages, he has to be -- the

23    punitive damages are for his conduct, not for hers.  So I don't

24    understand how this is relevant to the punitive aspect of the

25    case that she had a bar grievance and was disciplined by the

1    state bar.  How is that not unduly prejudicial?  They have

2    everything they need, so what does this add and does not

3    prejudice my client?

4             THE COURT:  Because, unlike your client, this is

5    somebody who is his right-hand person, based on somebody who

6    was also working for them on the Giuliani legal team who has

7    admitted that it was -- that the statements she was making were

8    misrepresentations, if I understand plaintiffs' position

9    correctly.

10            MR. GOTTLIEB:  That is our position, Your Honor.

11            MR. SIBLEY:  And how does that add --

12            THE COURT:  Let me just ask:  The stipulation and

13   order, are these at all public, or this kind of a grievance

14   procedure that is private?

15            MR. GOTTLIEB:  These are not private documents.  I

16   believe they're all public.

17            THE COURT:  Okay.  The objection is overruled.  I

18   mean, because I think that this -- you know, for all the

19   reasons that the plaintiffs' counsel has stated and I've

20   already stated.  So the objection is overruled.

21            (Open court:)

22            THE COURT:  The objection is overruled.  Let's

23   proceed.

24            (Whereupon, Exhibits 425 and 558 were admitted.)

25            (Whereupon, the deposition of Jenna Ellis was played

1    for the jury.)

2            MR. GOTTLIEB:  Your Honor, that concludes Ms. Ellis's

3    testimony.

4            (Whereupon, a bench conference was held:)

5            THE COURT:  I hadn't quite realized that she was not

6    going to respond to any questions and that she was going to

7    assert the Fifth as to every single question.  That wasn't made

8    clear to me by either side.  I thought it was just going to

9    be -- she had some substantive information.

10           Given the fact that she really answered no questions

11   except to plead the Fifth, I think an instruction to the jury

12   is appropriate.  And I'll remind them questions are not

13   evidence, it's only the answer from the witness what they can

14   take to be evidence, and that when a third-party to a lawsuit

15   asserts the Fifth, that they can weigh that in connection with

16   all the other evidence presented in the case to decide what

17   weight to give that answer, if any.

18           I was surprised that there was no substantive

19   information relayed in that.

20           Any other comments about that instruction or

21   objections to it?  Mr. Sibley?

22           MR. SIBLEY:  I think that instruction is appropriate,

23   Your Honor.

24           THE COURT:  And, Mr. Gottlieb?

25           MR. GOTTLIEB:  No objection, Your Honor.

1          THE COURT:  Okay.

2          (Open court:)

3          THE COURT:  Ladies and gentlemen, before we break, I

4    just want to give you a special instruction regarding the Jenna

5    Ellis videotape deposition that you just heard.  You know that

6    I have instructed you already that questions posed by a lawyer

7    are not evidence in the case; it's what the answer is by the

8    witness.  And in this videotape deposition, you saw that

9    Ms. Ellis responded by asserting her Fifth Amendment privilege

10   against self-incrimination, and from my count almost all the

11   questions.  So you may left wondering:  Well, what do we do

12   with that?

13          When a third party -- meaning a person who is not a

14   party to this litigation, who is outside this litigation --

15   asserts the Fifth Amendment privilege against

16   self-incrimination, you can take that as an -- you can draw an

17   adverse inference that the answer would have been a yes or a

18   no.  You can give it whatever weight that you think it is

19   entitled to based on all of the other evidence in the case.

20          So, with that, I'm going to excuse you and ask that

21   you be here at 9:15 in the morning so we can resume the

22   evidentiary part of this trial.

23          Thank you.  You're excused.

24          Do not talk about the case among yourselves or with

25   anybody else.  Keep an open mind.

```
 1                (Whereupon, the jurors leave the courtroom.)

 2          THE COURT:  All right.  Well, it's 5 o'clock.  I will

 3    take up the last remaining matter from the motion in limine

 4    tomorrow morning.  So, get here by 9:00, and we can take that

 5    up before the jury comes in at 9:15.

 6          And what witness are you going to start with

 7    tomorrow?

 8          MR. GOTTLIEB:  Your Honor, we have one final

 9    deposition designation clip to play.  It is Pamela Michelle

10    Branton.

11          THE COURT:  I'm sorry.  Say that again.

12          MR. GOTTLIEB:  Let me try to speak clearly.

13          THE COURT:  Yes, please.

14          MR. GOTTLIEB:  We have one final deposition video to

15    play.  It's the testimony of Pamela Michelle Branton.

16          THE COURT:  Branton?

17          MR. GOTTLIEB:  Branton.  It's about four minutes

18    long.

19          THE COURT:  Who, technically, is Ms. Branton?

20          MR. GOTTLIEB:  Ms. Branton was a poll observer at

21    State Farm Arena, who was present on election night.

22          THE COURT:  Any Fifth Amendment assertions in that?

23          MR. GOTTLIEB:  There is no assertion, and there is

24    only one exhibit.  And there's, as I understand it, no

25    objection to the exhibit.
```

1          THE COURT:  That's about four minutes?

2          MR. GOTTLIEB:  It's about four minutes long.

3          THE COURT:  Okay.

4          MR. GOTTLIEB:  And after that, we will be calling

5    Dr. Ashley Humphreys.

6          THE COURT:  All right.  Anything further today from

7    the other side before I excuse you and see you at 9 o'clock

8    tomorrow morning?

9          (No response.)

10          Okay.  No.  You're all excused.

11                          *   *   *

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, JANICE DICKMAN, do hereby certify that the above and

4    foregoing constitutes a true and accurate transcript of my

5    stenographic notes and is a full, true and complete transcript

6    of the proceedings to the best of my ability.

7                         Dated this 12th day of December, 2023

8

9

10                      /s/_____

11                      Janice E. Dickman, CRR, CMR, CCR
                        Official Court Reporter
12                      Room 6523
                        333 Constitution Avenue, N.W.
13                      Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2   WITNESSES:

 3       WANDREA MOSS
                 Cross-Examination By Mr. Sibley....................18
 4               Redirect Examination By Mr. Langford..............74

 5       BERNARD KERIK
                 By Video.........................................85
 6
         CHRISTINA BOBB
 7               By Video.........................................86

 8       JENNA ELLIS
                 By Video.........................................92
 9

10   EXHIBITS ADMITTED:

11       Plaintiffs' Exhibit 218...............................88
         Plaintiffs' Exhibit 259...............................86
12       Plaintiffs' Exhibit 272...............................86
         Plaintiffs' Exhibit 342...............................85
13
         Plaintiffs' Exhibit 343...............................85
14       Plaintiffs' Exhibit 406...............................86
         Plaintiffs' Exhibit 425...............................92
15       Plaintiffs' Exhibit 508...............................86

16       Plaintiffs' Exhibit 558...............................92
         Plaintiffs' Exhibit 592...............................82
17       Plaintiffs' Exhibit 594...............................88
         Plaintiffs' Exhibit 595...............................86
18       Plaintiffs' Exhibit 607...............................78

19                              *  *  *

20

21

22

23

24

25
```

## $

**$100,000** [2] - 13:22, 15:5
**$140** [1] - 40:24
**$47** [3] - 13:11, 14:24, 16:24

## /

**/s** [1] - 97:10

## 1

**102** [1] - 11:13
**108** [2] - 4:17, 37:23
**11** [1] - 8:11
**110263** [1] - 2:2
**1108** [1] - 2:2
**12** [1] - 1:7
**12th** [1] - 97:7
**13** [1] - 88:20
**14th** [1] - 1:23
**18** [2] - 23:16, 86:24
**18-hour** [1] - 24:10
**1875** [1] - 1:18
**1:30** [1] - 1:7

## 2

**2** [5] - 1:6, 17:20, 17:23, 79:8, 89:12
**20** [2] - 29:3, 90:12
**20001** [2] - 2:7, 97:13
**20006** [1] - 1:19
**2018** [1] - 13:2
**2019** [1] - 31:8
**202** [2] - 1:19, 2:7
**2020** [13] - 8:11, 20:11, 34:8, 56:11, 56:12, 56:20, 66:14, 76:5, 78:3, 83:9, 83:14, 89:16, 90:13
**2021** [5] - 31:7, 58:14, 66:18, 66:22, 69:23
**2022** [1] - 70:5
**2023** [7] - 1:7, 8:11, 56:23, 88:20, 88:22, 91:7, 97:7
**21-cv-3354** [1] - 1:3
**2110** [1] - 1:23
**218** [5] - 87:9, 87:20, 87:24, 88:4, 88:6
**218**..........................
.....**88** [1] - 98:11
**259** [3] - 86:5, 86:10, 86:15
**259**..........................
.....**86** [1] - 98:11
**27** [2] - 83:9, 83:14

## 3

**3** [6] - 6:14, 27:9, 76:5, 78:3, 80:7, 90:6
**303-1442** [1] - 1:19
**30309** [1] - 1:23
**333** [2] - 2:6, 97:12
**34** [1] - 56:16
**342** [6] - 81:12, 81:18, 83:7, 83:17, 85:8, 85:10
**342**..........................
.....**85** [1] - 98:12
**343** [8] - 81:12, 81:20, 83:10, 83:17, 84:15, 84:24, 85:8, 85:10
**343**..........................
.....**85** [1] - 98:13
**345** [1] - 85:17
**354-3267** [1] - 2:7
**36,000** [1] - 56:17
**3:23** [1] - 73:21
**3:39** [1] - 73:21
**3rd** [12] - 27:23, 34:7, 34:8, 34:13, 34:14, 34:18, 34:21, 34:22, 72:11, 72:25, 73:3, 73:8

## 4

**4** [3] - 6:15, 27:10, 89:12
**402** [4] - 81:11, 88:10, 88:13, 88:25
**403** [3] - 81:11, 88:10, 88:13
**404** [1] - 1:24
**406** [3] - 86:5, 86:10, 86:15
**406**..........................
.....**86** [1] - 98:14
**425** [7] - 87:11, 88:7, 88:18, 88:20, 88:25, 89:13, 92:24
**425**..........................
.....**92** [1] - 98:14
**47** [1] - 13:14

## 470
**470** [1] - 15:5
**4th** [6] - 34:13, 34:15, 34:22, 34:23, 34:24, 72:25

## 5

**5** [2] - 11:13, 95:2
**508** [5] - 86:5, 86:6, 86:10, 86:15
**508**..........................
.....**86** [1] - 98:15
**555** [1] - 1:14
**558** [6] - 87:11, 88:11, 88:22, 88:25, 90:25, 92:24
**558**..........................
.....**92** [1] - 98:16
**592** [7] - 81:14, 81:22, 81:23, 82:10, 82:11, 82:12, 82:14
**592**..........................
.....**82** [1] - 98:17
**594** [4] - 87:15, 88:1, 88:4, 88:6
**594**..........................
.....**88** [1] - 98:17
**595** [3] - 86:8, 86:11, 86:15
**595**..........................
.....**86** [1] - 98:17
**5:30** [2] - 23:6, 23:12
**5th** [1] - 1:14

## 6

**607** [3] - 78:8, 78:18, 78:25
**607**..........................
.....**78** [1] - 98:18
**619-9819** [1] - 1:15
**6523** [2] - 2:6, 97:12
**6th** [1] - 83:6

## 7

**713** [1] - 2:3
**720-8111** [1] - 1:24
**75** [1] - 1:23
**78701** [1] - 2:2
**7:00** [2] - 56:15

## 8

**8** [1] - 88:22

## 9

**9** [1] - 96:7
**90013** [1] - 1:14

## 919
**919** [1] - 1:15
**966-6789** [1] - 2:3
**9:00** [1] - 95:4
**9:15** [2] - 94:21, 95:5

## A

**a.m** [2] - 23:6, 23:12
**ability** [4] - 14:3, 17:4, 17:13, 97:6
**able** [14] - 6:4, 7:16, 7:21, 8:22, 11:10, 13:4, 13:8, 43:13, 48:10, 48:11, 74:16, 75:21, 76:17, 76:21
**absentee** [11] - 21:24, 22:9, 22:13, 25:15, 26:7, 28:12, 28:18, 28:24, 28:25, 29:3, 57:8
**absolutely** [1] - 27:1
**absolve** [1] - 7:19
**accept** [1] - 14:8
**access** [1] - 63:2
**according** [3] - 5:15, 7:21, 70:3
**accountable** [1] - 77:21
**accurate** [1] - 97:4
**accusations** [1] - 27:18
**accuse** [1] - 33:22
**accused** [2] - 77:1, 77:3
**act** [1] - 51:7
**Action** [1] - 1:3
**action** [1] - 51:12
**actionable** [5] - 83:21, 84:1, 84:7, 84:25, 85:1
**actions** [3] - 83:23, 84:10, 84:12
**actively** [1] - 48:7
**activities** [1] - 53:3
**activity** [1] - 29:25
**acts** [2] - 84:20, 88:22
**actual** [3] - 27:19, 27:21, 27:25
**acute** [4] - 67:13, 70:4, 70:9, 70:10
**add** [2] - 92:2, 92:11
**additional** [1] - 4:13
**addressed** [1] - 12:9
**adds** [1] - 62:13
**administer** [1] - 25:24
**administrative** [1] - 30:15
**admission** [1] - 81:25
**admit** [5] - 5:19, 81:9, 86:3, 87:7, 87:10
**ADMITTED** [1] - 98:10

admitted [18] - 3:21,
5:16, 6:22, 78:21,
78:25, 82:12, 82:14,
82:25, 85:8, 85:9,
85:10, 85:15, 86:14,
86:16, 88:4, 88:6, 92:7,
92:24
admitting [1] - 89:5
adverse [6] - 4:21,
10:7, 12:19, 17:8,
17:12, 94:17
advised [1] - 16:2
advisor [1] - 91:13
affect [1] - 64:22
affected [4] - 64:18,
64:21, 64:22, 64:23
affidavits [3] - 29:18,
89:25, 90:10
afford [1] - 17:13
afternoon [2] - 18:12,
18:13
Afternoon [1] - 1:6
agencies [2] - 30:16,
31:25
ago [3] - 63:7, 63:9,
66:6
agree [5] - 7:14, 17:15,
25:17, 32:1, 34:3
agreement [2] - 17:19,
86:2
air [2] - 6:8, 7:4
Alex [3] - 53:12, 53:17,
53:20
allegations [3] -
29:24, 89:6, 90:11
alleged [4] - 3:15,
27:20, 83:23, 90:10
alleging [1] - 34:11
allies [3] - 71:1, 71:7,
71:11
allow [1] - 12:10
allowable [1] - 11:10
allowed [3] - 3:20,
7:15, 12:6, 12:24,
17:12, 44:6
almost [4] - 62:20,
73:10, 91:21, 94:10
alone [3] - 75:6, 75:7,
75:9
amended [1] - 3:15
Amendment [7] - 19:5,
19:9, 19:15, 20:8, 94:9,
94:15, 95:22
America [7] - 36:25,
37:4, 37:7, 37:16, 45:8,
45:16, 77:8
amount [11] - 9:20,
12:7, 13:12, 15:23,
15:25, 40:1, 42:20,
45:20, 46:8, 46:9,

61:11
Angeles [1] - 1:14
anguish [1] - 35:4
Annie [1] - 1:17
annuity [2] - 61:13,
61:15
answer [11] - 9:19,
15:17, 15:18, 16:1,
19:12, 44:20, 47:12,
93:13, 93:17, 94:7,
94:17
answered [4] - 44:22,
52:1, 93:10
answering [1] - 47:2
anticipated [1] - 15:11
anxiety [3] - 61:24,
70:10
anyways [1] - 16:16
apologize [1] - 37:22
appeal [1] - 14:10
appearances [1] -
71:13
apply [1] - 16:18
appreciate [4] - 8:19,
42:6, 66:21
approach [3] - 78:4,
78:9, 78:10
appropriate [2] -
93:12, 93:22
approving [1] - 88:23
areas [2] - 3:12, 26:16
Arena [7] - 22:21,
22:25, 33:22, 47:19,
48:3, 49:1, 95:21
argue [1] - 14:7
arguing [2] - 3:5, 3:14
argument [5] - 11:15,
13:5, 14:18, 15:8,
17:13
arguments [2] - 3:10,
11:10
armed [1] - 9:8
arson [1] - 42:8
article [6] - 35:12,
58:3, 78:13, 78:15,
79:3, 79:11
Ashley [1] - 96:5
aspect [1] - 91:24
assert [1] - 93:7
asserting [1] - 94:9
assertion [1] - 95:23
assertions [2] - 12:16,
95:22
asserts [2] - 93:15,
94:15
assessments [1] -
89:2
assist [1] - 64:8
associate [1] - 51:19
associate's [1] - 89:5

associated [2] - 48:5,
87:3
assume [3] - 50:16,
50:17, 50:18
assumed [5] - 14:13,
49:3, 49:16, 49:20,
50:2
assuming [1] - 58:4
Astros [1] - 31:7
Atlanta [6] - 1:23,
31:1, 31:5, 31:6, 49:9
attempt [1] - 5:23
attend [2] - 18:24,
83:1
attorney [1] - 74:5
Attorney's [1] - 30:13
attorneys [1] - 89:17
attribute [1] - 70:15
attributed [1] - 70:12
audience [1] - 10:5
audio [1] - 71:20
Austin [1] - 2:2
authorities [1] - 63:10
Avenue [2] - 2:6,
97:12
average [2] - 25:16,
52:7
award [7] - 3:18,
11:21, 12:3, 14:18,
16:25, 17:5, 39:3
aware [7] - 19:14,
19:18, 19:24, 20:1,
21:24, 29:18, 76:24

## B

bad [1] - 7:15
bailed [1] - 58:6
ballot [2] - 22:12,
22:13
ballots [14] - 22:4,
22:8, 22:10, 22:11,
23:8, 25:15, 26:9,
28:18, 29:3, 29:4, 79:5,
79:13, 90:1
bank [1] - 76:24
bankrupt [2] - 11:16,
12:4
bar [5] - 75:11, 75:12,
75:16, 91:25, 92:1
base [1] - 31:16
baseball [1] - 31:9
based [6] - 17:15,
33:9, 38:23, 64:15,
92:5, 94:19
basis [1] - 14:22
batch [1] - 81:8
beat [1] - 31:8
BEFORE [1] - 1:9
beginning [1] - 49:17

behind [1] - 79:14
beliefs [1] - 26:22
believes [2] - 52:8,
87:21
bench [9] - 26:19,
37:20, 68:9, 78:5,
79:23, 79:24, 82:15,
88:16, 93:4
BERNARD [1] - 98:5
Bernard [3] - 81:7,
85:11, 85:20
BERYL [1] - 1:10
beside [1] - 17:7
best [4] - 9:12, 10:24,
61:25, 97:6
BET [1] - 51:9
between [1] - 72:5
beyond [2] - 51:25,
79:18
Bezos [1] - 13:16
Biden's [1] - 89:16
bifurcation [1] - 38:12
big [1] - 62:16
billionaire [1] - 15:3
billionaires [1] - 13:17
binder [4] - 47:7,
71:18, 71:19, 72:20
binders [2] - 46:16,
83:5
bit [5] - 12:18, 17:24,
26:16, 56:16, 64:10
black [1] - 44:7
Black [11] - 49:8, 49:9,
49:10, 49:15, 49:17,
50:2, 50:3, 50:17,
51:15, 77:6
Blacks [1] - 49:11
blank [3] - 47:9, 71:22,
72:21
blatantly [1] - 27:15
blocked [1] - 63:1,
63:18, 63:24, 64:6
blocking [2] - 64:8
BOBB [1] - 98:6
Bobb [3] - 85:25, 86:6,
86:17
Bobb's [2] - 86:7,
86:19
bolster [1] - 4:13
book [2] - 25:7, 86:6
borders [1] - 8:25
bottom [1] - 74:15
boutique [1] - 66:1
box [2] - 15:18, 17:23
Branton [6] - 95:10,
95:15, 95:16, 95:17,
95:19, 95:20
Braves [2] - 31:5, 31:7
break [4] - 47:25,
73:15, 73:18, 94:3

**bridge** [3] - 7:12, 48:8, 48:9
**bring** [3] - 11:24, 18:1, 73:25
**bringing** [1] - 69:13
**brought** [2] - 4:13, 38:16
**Bull** [1] - 31:5
**bullet** [3] - 89:13, 89:24, 90:5
**bulletproof** [1] - 41:22
**Bureau** [2] - 30:11, 30:12
**burns** [2] - 42:8, 42:12
**burst** [1] - 32:16
**bus** [2] - 36:6, 54:21
**business** [8] - 28:5, 65:14, 65:23, 65:25, 66:3, 66:6
**BY** [38] - 18:11, 19:23, 20:23, 21:8, 24:15, 28:9, 29:23, 30:9, 31:23, 32:8, 33:1, 33:18, 35:20, 36:17, 39:1, 42:17, 43:12, 45:1, 45:7, 45:13, 49:19, 50:25, 51:5, 52:3, 52:19, 53:19, 54:4, 55:7, 61:5, 65:17, 69:19, 72:6, 74:4, 78:11, 79:2, 79:9, 80:11, 80:16

## C

**CA** [1] - 1:14
**Camara** [1] - 2:1
**camera** [1] - 5:19
**campaign** [3] - 77:11, 89:21, 89:23
**candidate** [1] - 50:12
**cannot** [7] - 4:23, 43:21, 61:24, 63:15, 63:21, 69:22, 74:10
**caption** [1] - 54:15
**care** [1] - 69:25
**career** [2] - 35:25, 41:24
**carefully** [1] - 9:23
**case** [35] - 4:20, 11:21, 11:23, 12:4, 12:24, 16:9, 18:18, 18:21, 19:16, 19:22, 20:1, 27:1, 34:11, 36:4, 37:9, 38:10, 39:4, 40:7, 56:8, 56:9, 72:9, 73:4, 77:9, 77:10, 77:12, 77:24, 78:15, 80:3, 80:13, 91:25, 93:16, 94:7, 94:19, 94:24

**cases** [3] - 16:21, 30:24, 56:6
**caught** [2] - 20:13, 31:13
**caused** [7] - 36:2, 36:4, 38:12, 39:4, 55:2, 59:2, 67:21
**cautioned** [1] - 79:22
**CCR** [1] - 97:11
**ceiling** [1] - 32:15
**celebrating** [1] - 22:2
**cell** [4] - 35:12, 35:13, 64:4, 73:7
**center** [5] - 20:25, 24:19, 28:23, 29:20, 79:6
**certain** [1] - 42:20, 76:23
**certainly** [4] - 5:23, 8:12, 14:5, 15:13
**CERTIFICATE** [1] - 97:1
**certify** [1] - 97:3
**cetera** [4] - 6:1, 7:7, 16:18, 70:22
**challenge** [2] - 32:3, 89:15
**Chanel** [2] - 37:8, 77:9
**change** [3] - 44:10, 66:2, 66:4
**changes** [1] - 66:7
**charge** [1] - 25:25
**Charles** [1] - 37:8
**check** [1] - 42:23
**Chick** [3] - 57:15, 57:24, 58:15
**Chick-fil-A** [3] - 57:15, 57:24, 58:15
**choice** [1] - 11:25
**chooses** [1] - 14:7
**CHRISTINA** [1] - 98:6
**Christina** [2] - 85:25, 86:17
**circulated** [1] - 22:23
**circumstances** [1] - 9:12
**city** [1] - 31:8
**Civil** [1] - 1:3
**civil** [1] - 9:15
**claim** [9] - 10:19, 14:10, 27:23, 42:19, 47:22, 47:23, 67:8, 91:10
**claimed** [1] - 47:24
**claiming** [4] - 38:8, 38:9, 38:13, 52:4
**claims** [4] - 34:4, 35:3, 36:8, 47:20
**clarify** [2] - 25:13, 38:19

**clear** [5] - 5:14, 10:1, 49:13, 86:10, 93:8
**clearly** [7] - 6:9, 12:2, 31:19, 31:20, 69:6, 84:14, 95:12
**client** [9] - 4:9, 9:2, 10:24, 18:16, 30:23, 43:6, 43:22, 92:3, 92:4
**clients** [2] - 89:4, 89:6
**clip** [2] - 24:5, 95:9
**clipped** [1] - 63:12
**clipped-up** [1] - 63:12
**clipping** [2] - 63:6, 63:12
**clippings** [1] - 63:5
**close** [1] - 91:13
**CMR** [1] - 97:11
**CNN** [3] - 53:6, 53:9, 53:10
**co** [10] - 36:4, 38:1, 38:2, 38:10, 77:9, 77:12, 79:16, 80:13, 80:19, 91:20
**Co** [1] - 90:12
**co-conspirator** [4] - 79:16, 80:13, 80:19, 91:20
**co-conspirators** [6] - 36:4, 38:1, 38:2, 38:10, 77:9, 77:12
**coach** [1] - 32:3
**cocaine** [1] - 77:3
**code** [1] - 25:7
**COLUMBIA** [1] - 1:1
**combination** [2] - 11:19, 12:1
**combined** [1] - 90:14
**comfortable** [1] - 18:4
**coming** [3] - 15:14, 63:23, 84:3
**comment** [1] - 17:5
**comments** [4] - 51:8, 54:12, 55:9, 93:20
**commits** [1] - 42:8
**committed** [1] - 52:9
**committing** [1] - 36:9
**common** [2] - 15:7, 16:21
**Communication** [2] - 83:13, 84:17
**community** [2] - 51:18, 52:5
**compared** [2] - 64:19, 76:24
**comparing** [1] - 16:21
**compensate** [1] - 39:3
**compensatory** [3] - 12:8, 16:16, 16:25
**complaining** [2] - 37:3, 80:1

**complaint** [5] - 3:15, 27:21, 77:23, 83:22, 84:19
**complete** [3] - 8:18, 25:9, 97:5
**completed** [1] - 6:15
**completely** [2] - 27:25, 84:25
**comply** [2] - 4:7, 11:17
**computer** [1] - 57:24
**Conant** [1] - 1:17
**concern** [1] - 26:21
**concerning** [1] - 42:4
**concerns** [1] - 9:21
**concludes** [3] - 85:21, 86:19, 93:2
**conclusion** [1] - 27:14
**condition** [2] - 12:12, 15:11, 15:23, 15:24, 17:4, 17:12
**conditions** [2] - 70:12, 70:16
**conduct** [2] - 67:22, 72:12, 91:23
**confederate** [1] - 48:8
**confer** [2] - 43:6, 72:3
**conference** [7] - 26:19, 37:20, 68:9, 79:24, 82:15, 88:16, 93:4
**confidence** [2] - 4:4, 4:8
**confirm** [1] - 12:14
**connected** [1] - 38:20
**connection** [1] - 93:15
**consent** [1] - 37:23
**consistent** [2] - 4:25, 5:7
**conspiracy** [11] - 80:3, 80:24, 83:23, 83:24, 84:2, 84:5, 84:8, 84:11, 84:13, 88:21, 91:18
**conspirator** [4] - 79:16, 80:13, 80:19, 91:20
**conspirators** [6] - 36:4, 38:1, 38:2, 38:10, 77:9, 77:12
**constantly** [1] - 40:20
**constitutes** [1] - 97:4
**Constitution** [2] - 2:6, 97:12
**contact** [2] - 63:10, 64:5
**contacted** [2] - 55:8, 63:7
**containers** [1] - 26:8
**contempt** [3] - 16:4, 16:8, 16:10
**contending** [1] - 67:21

**content** [1] - 5:6
**contest** [3] - 11:11, 12:7
**context** [5] - 9:7, 24:9, 24:11, 24:16, 24:18
**continue** [1] - 49:6
**continued** [1] - 89:4
**continues** [2] - 85:20, 89:3
**continuing** [1] - 10:19
**contradict** [1] - 5:4
**contradicts** [1] - 4:19
**contrary** [1] - 3:11
**controversial** [1] - 11:23
**conundrum** [1] - 8:19
**cooperating** [1] - 20:2
**correct** [37] - 3:25, 5:18, 16:25, 17:16, 20:14, 22:11, 28:13, 28:14, 29:11, 34:5, 34:6, 34:9, 34:10, 34:18, 34:19, 35:8, 35:9, 37:4, 39:7, 42:22, 47:21, 48:18, 48:19, 48:22, 48:23, 49:2, 55:20, 57:16, 59:4, 66:15, 66:22, 70:25, 76:1, 76:3, 77:4, 81:24, 91:8
**corrected** [1] - 42:16
**correctly** [3] - 12:22, 68:1, 92:9
**correspondence** [1] - 39:14
**cost** [2] - 40:23, 41:7
**Counsel** [1] - 52:2
**counsel** [16] - 3:10, 11:14, 68:16, 68:17, 69:12, 72:3, 72:5, 81:10, 84:22, 87:21, 88:17, 89:18, 89:21, 89:23, 92:19
**counsel's** [1] - 26:21
**count** [3] - 22:16, 75:5, 94:10
**counted** [8] - 20:19, 21:10, 22:15, 26:7, 26:13, 27:7, 28:13, 28:20
**counting** [13] - 20:25, 21:21, 22:3, 22:8, 22:18, 22:21, 24:23, 25:15, 28:18, 28:23, 29:9, 48:5, 79:15
**County** [7] - 24:23, 30:13, 56:20, 57:17, 57:18, 58:16, 66:11
**county** [2] - 28:25, 30:24

**couple** [2] - 23:7, 63:9
**course** [3] - 47:10, 57:22, 63:4
**court** [14] - 3:21, 3:22, 4:2, 4:6, 4:11, 28:7, 38:25, 61:4, 69:17, 71:5, 80:10, 85:6, 92:21, 94:2
**Court** [11] - 2:5, 2:5, 4:4, 4:15, 4:16, 5:1, 5:7, 11:13, 12:21, 16:3, 97:11
**COURT** [164] - 1:1, 3:2, 3:7, 4:1, 5:11, 6:10, 6:13, 6:22, 6:25, 7:10, 7:24, 8:1, 8:4, 8:25, 9:6, 9:11, 10:2, 11:3, 11:23, 12:6, 13:2, 13:11, 13:14, 13:23, 14:12, 14:21, 15:1, 15:10, 15:15, 16:8, 16:22, 17:2, 17:17, 18:1, 18:7, 19:18, 20:22, 21:7, 24:14, 26:16, 26:20, 27:9, 27:17, 28:2, 28:8, 29:22, 30:8, 32:6, 32:24, 33:16, 35:17, 36:14, 37:21, 38:3, 38:17, 38:22, 42:16, 43:4, 43:6, 43:8, 43:10, 44:23, 45:6, 45:11, 49:6, 50:24, 51:2, 52:1, 52:18, 53:17, 54:2, 55:5, 65:8, 68:8, 68:10, 68:16, 68:23, 68:25, 69:2, 69:12, 69:16, 69:18, 71:22, 72:2, 73:13, 73:17, 73:20, 73:22, 73:25, 78:6, 78:10, 78:19, 78:21, 78:24, 79:21, 79:25, 80:6, 80:15, 81:3, 81:15, 81:18, 81:20, 81:22, 81:24, 82:4, 82:12, 82:16, 82:18, 82:20, 83:3, 83:7, 83:10, 83:15, 83:19, 83:25, 84:5, 84:9, 84:21, 85:5, 85:7, 85:13, 85:23, 86:9, 86:13, 86:23, 87:1, 87:6, 87:13, 87:16, 87:20, 88:1, 88:4, 88:7, 88:9, 88:11, 88:13, 88:15, 88:17, 89:7, 89:11, 90:7, 90:17, 90:20, 91:5, 91:9, 91:15, 92:4, 92:12, 92:17, 92:22, 93:5,

93:24, 94:1, 94:3, 95:2, 95:11, 95:13, 95:16, 95:19, 95:22, 96:1, 96:3, 96:6, 97:1
**Court's** [10] - 3:9, 4:19, 5:4, 5:10, 9:21, 10:1, 11:12, 11:17, 17:16, 86:2
**Courthouse** [1] - 2:6
**courtroom** [6] - 4:6, 4:12, 18:6, 73:19, 74:1, 95:1
**COURTROOM** [1] - 85:19
**cover** [1] - 15:6
**covered** [1] - 85:17
**CRC** [1] - 2:5
**create** [1] - 9:24
**credit** [1] - 9:14
**crew** [2] - 20:24, 71:8
**Cross** [1] - 98:3
**cross** [7] - 8:18, 8:22, 10:15, 10:21, 18:3, 18:8, 26:21
**CROSS** [1] - 18:10
**Cross-Examination** [1] - 98:3
**cross-examination** [6] - 8:18, 8:22, 10:21, 18:3, 18:8, 26:21
**CROSS-EXAMINATION** [1] - 18:10
**CRR** [2] - 2:5, 97:11
**cry** [2] - 6:24, 7:2
**culpability** [1] - 7:7
**curative** [1] - 14:6
**cure** [1] - 12:18
**curiosity** [1] - 35:10
**current** [5] - 15:11, 15:22, 15:24, 17:3, 17:11
**cut** [4] - 63:5, 63:20, 84:17, 91:3
**cut-and-paste** [1] - 84:17
**cut-up** [1] - 63:5

# D

**D.C** [2] - 75:23, 97:13
**damage** [4] - 11:9, 14:1, 42:20, 42:23
**damaged** [2] - 34:5, 52:5
**damages** [28] - 3:18, 4:14, 6:3, 7:6, 7:22, 11:11, 12:3, 12:7, 13:5, 13:13, 13:14, 14:18, 14:22, 16:13, 16:16,

17:4, 36:2, 36:3, 42:13, 54:3, 68:21, 69:3, 69:4, 69:6, 91:6, 91:22, 91:23
**date** [5] - 5:6, 58:13, 78:1, 83:3, 83:14
**Dated** [1] - 97:7
**dates** [2] - 34:8, 83:5
**DAY** [1] - 1:6
**days** [1] - 74:21
**DC** [3] - 1:6, 1:19, 2:7
**deal** [2] - 32:12, 62:16
**dealer** [1] - 77:1
**dealing** [1] - 19:22
**dealt** [2] - 64:19, 84:21
**death** [5] - 11:7, 11:22, 16:23, 48:4
**debate** [1] - 15:25
**Debbie** [1] - 65:13
**December** [29] - 1:7, 6:14, 6:15, 8:10, 8:11, 27:9, 27:10, 27:23, 30:21, 34:7, 34:8, 34:13, 34:14, 34:15, 34:18, 34:21, 34:22, 72:11, 72:25, 73:3, 76:5, 78:3, 80:7, 83:6, 83:9, 83:14, 97:7
**decide** [1] - 93:16
**decided** [8] - 4:15, 5:7, 22:17, 24:13, 27:20, 33:15, 36:12, 36:22
**deciding** [1] - 65:2
**decision** [1] - 7:10
**decisions** [1] - 8:6
**defamation** [2] - 27:22, 84:1
**defamatory** [9] - 3:22, 4:12, 5:17, 10:8, 10:10, 10:19, 27:10, 91:10, 91:11
**defame** [2] - 89:3, 89:4
**Default** [1] - 8:3
**default** [7] - 3:16, 4:16, 7:11, 8:6, 10:16, 16:10, 32:7
**defend** [2] - 6:3, 11:17
**Defendant** [3] - 1:7, 2:1, 11:14
**defendants** [1] - 76:10
**defense** [2] - 3:10, 68:11
**definitely** [2] - 41:24, 74:14
**deleted** [1] - 63:23
**DeleteMe** [2] - 40:20, 63:25
**dem** [2] - 49:3, 49:7
**Democracy** [1] - 1:13
**Democrat** [3] - 49:25,

50:13
**Democratic** [1] - 50:12
**Democrats** [1] - 50:2
**demonstrate** [2] -
12:14, 72:1
**Dems** [4] - 49:17,
49:21, 50:9
**department** [1] - 74:11
**depleted** [4] - 58:23,
61:7, 61:18, 61:19
**depleting** [3] - 58:22,
61:10, 61:19
**deposition** [26] - 9:4,
9:6, 9:7, 9:11, 9:14,
9:16, 9:21, 18:25, 19:5,
20:5, 20:6, 81:7, 81:9,
81:25, 82:25, 86:1,
86:17, 86:22, 89:2,
91:2, 91:21, 92:25,
94:5, 94:8, 95:9, 95:14
**depositions** [3] -
18:21, 18:23, 18:24
**Depp** [2] - 11:21
**depressive** [6] - 61:23,
67:13, 68:5, 70:7, 70:9,
70:19
**DEPUTY** [1] - 85:19
**describes** [1] - 85:3
**description** [1] - 11:7
**designation** [5] -
81:13, 86:1, 86:7,
86:22, 95:9
**designations** [2] -
82:1, 82:2
**detail** [2] - 63:20,
68:20
**determination** [1] -
7:6
**diagnosed** [4] - 70:1,
70:4, 70:6, 70:9
**diagnoses** [1] - 69:20
**diagnosis** [1] - 67:8
**Dickman** [2] - 2:5,
97:11
**DICKMAN** [1] - 97:3
**difference** [1] - 6:9
**differences** [2] - 38:15
**different** [9] - 3:24,
5:2, 27:13, 36:3, 36:5,
37:10, 41:19, 54:18,
76:18
**differently** [2] - 66:5,
66:8
**difficult** [6] - 8:1, 9:17,
12:14, 41:5, 59:1,
74:17
**dinner** [1] - 75:3
**directed** [1] - 54:13
**directives** [1] - 10:1
**directly** [2] - 62:23,

89:2
**disabled** [1] - 22:2
**disagree** [2] - 43:16,
43:18
**disappear** [1] - 74:22
**disciplinary** [1] -
88:21
**discipline** [2] - 88:21,
88:23
**disciplined** [1] - 91:25
**disclosed** [1] - 13:20
**disclosure** [1] - 16:16
**disclosures** [1] -
13:19
**discovery** [9] - 7:11,
8:17, 8:21, 9:13, 9:16,
9:20, 10:2, 15:24,
16:12
**discussed** [3] - 5:24,
56:18, 69:14
**discussion** [3] -
11:20, 17:24, 72:5
**disorder** [9] - 61:23,
65:19, 67:13, 68:5,
70:4, 70:7, 70:9, 70:19
**disproportionate** [1] -
13:6
**disregard** [1] - 27:21
**dissemination** [1] -
84:14
**distress** [2] - 35:6,
68:21
**DISTRICT** [3] - 1:1,
1:1, 1:10
**ditch** [1] - 76:17
**diverse** [1] - 50:6
**docket** [2] - 4:17,
11:13
**doctor** [2] - 68:3,
70:18
**doctors** [1] - 69:24
**document** [4] - 12:11,
46:14, 72:21, 90:24
**documents** [11] - 9:8,
14:19, 46:11, 46:13,
47:6, 47:9, 47:16,
65:24, 81:9, 91:2,
92:15
**Dogs** [1] - 31:5
**done** [11] - 22:9,
27:24, 40:16, 40:19,
40:25, 41:2, 41:8,
42:21, 42:23, 67:3,
73:10
**door** [3] - 80:6, 80:7
**down** [11] - 40:16,
42:8, 42:12, 44:15,
45:16, 45:22, 45:25,
63:22, 65:23, 66:6,
79:8

**Downer** [1] - 65:13
**doxxed** [1] - 35:19
**doxxing** [1] - 35:18
**Dr** [7] - 39:25, 69:22,
69:25, 70:6, 70:8, 96:5
**draw** [2] - 27:14, 94:16
**drive** [1] - 47:24
**driven** [1] - 12:20
**driving** [1] - 36:6
**drug** [1] - 77:1
**DuBose** [6] - 1:22,
1:22, 19:3, 40:4, 42:8,
71:17
**dubose@
dubosemiller.com** [1] -
1:24
**during** [6] - 19:4, 20:5,
48:16, 56:14, 56:15,
82:25

## E

**easier** [1] - 64:16
**easily** [2] - 54:23, 55:2
**easy** [2] - 27:4
**ECF** [1] - 37:23
**edited** [2] - 24:1, 24:5
**educate** [1] - 26:4
**educating** [1] - 76:16
**effect** [1] - 30:23
**effects** [1] - 64:11
**efforts** [1] - 89:15
**either** [3] - 4:11,
12:14, 93:8
**elderly** [1] - 22:1
**election** [29] - 20:11,
21:11, 21:23, 25:7,
25:8, 25:23, 27:2, 29:2,
29:6, 31:21, 32:22,
33:4, 33:23, 34:4, 35:4,
36:9, 41:20, 41:22,
42:1, 49:24, 50:12,
52:9, 56:14, 56:15,
57:11, 66:10, 89:16,
90:15, 95:21
**Election** [4] - 23:12,
23:17, 24:19, 48:13
**elections** [6] - 8:14,
27:10, 28:25, 56:14,
66:10, 74:11
**elicit** [2] - 5:23, 6:18
**eliciting** [3] - 15:16,
15:22, 17:3
**ELLIS** [1] - 98:8
**Ellis** [7] - 86:22, 88:22,
89:14, 91:13, 92:25,
94:5, 94:9
**Ellis's** [1] - 93:2
**Elon** [1] - 13:16
**Email** [5] - 1:15, 1:20,

1:20, 1:21, 1:24
**email** [1] - 39:14
**embarrassing** [1] -
65:10
**emotional** [2] - 35:6,
68:21
**emphasize** [1] - 17:10
**employee** [2] - 48:6,
62:2
**end** [4] - 11:20, 13:10,
23:18, 75:12
**endeavors** [1] - 12:13
**ended** [1] - 80:22
**enforcement** [2] -
30:15, 31:25
**engaging** [3] - 32:22,
33:3, 34:4
**enjoined** [1] - 76:14
**enjoy** [2] - 74:19,
74:21
**enjoyed** [6] - 76:15,
76:16, 76:17, 76:20
**enormous** [1] - 17:1
**ensure** [1] - 41:20
**enter** [2] - 18:6, 74:1
**entered** [3] - 4:17,
4:21, 7:12
**entire** [5] - 23:15,
28:25, 48:12, 75:17,
80:8
**entirely** [1] - 91:21
**entities** [1] - 77:7
**entitled** [4] - 28:2,
38:11, 38:14, 94:19
**entity** [1] - 77:14
**especially** [1] - 41:23
**essentially** [2] - 38:14,
89:5
**establish** [1] - 8:13
**established** [3] - 3:16,
6:1, 32:7
**estimate** [1] - 41:8
**et** [4] - 6:1, 7:7, 16:18,
70:22
**evening** [1] - 34:24
**event** [2] - 11:24,
14:16
**events** [1] - 57:20
**eventual** [1] - 11:18
**eventually** [1] - 64:14
**everywhere** [1] - 37:5
**evidence** [20] - 4:18,
6:5, 6:18, 7:17, 7:20,
11:15, 12:23, 15:8,
42:14, 54:5, 54:8,
78:18, 83:22, 85:2,
87:3, 93:13, 93:14,
93:16, 94:7, 94:19
**evidentiary** [5] - 3:11,
10:6, 10:16, 17:9,

94:22
   **exact** [3] - 34:2, 55:11,
55:12
   **exactly** [4] - 3:8, 6:23,
58:12, 68:24
   **examination** [6] -
8:18, 8:22, 10:21, 18:3,
18:8, 26:21
   **EXAMINATION** [2] -
18:10, 74:3
   **Examination** [2] -
98:3, 98:4
   **example** [7] - 13:19,
18:25, 29:1, 47:5,
53:12, 54:12, 90:12
   **except** [1] - 93:11
   **excluded** [2] - 29:14,
29:19
   **excuse** [4] - 79:21,
82:13, 94:20, 96:7
   **excused** [3] - 81:3,
94:23, 96:10
   **Exhibit** [29] - 71:19,
71:23, 72:19, 78:8,
78:18, 78:25, 81:14,
82:10, 82:14, 84:15,
86:6, 86:8, 87:9, 87:11,
87:15, 89:13, 98:11,
98:11, 98:12, 98:12,
98:13, 98:14, 98:14,
98:15, 98:16, 98:16,
98:17, 98:17, 98:18
   **exhibit** [14] - 78:5,
82:6, 82:9, 82:18,
82:19, 82:22, 85:14,
85:16, 86:6, 87:7,
88:25, 90:6, 95:24,
95:25
   **exhibition** [1] - 6:2
   **exhibits** [14] - 36:15,
71:17, 72:18, 81:11,
81:12, 81:25, 82:24,
86:3, 86:4, 86:5, 87:2,
87:12, 87:17, 88:19
   **Exhibits** [6] - 81:12,
85:8, 85:10, 86:15,
88:6, 92:24
   **EXHIBITS** [1] - 98:10
   **expended** [1] - 41:3
   **experience** [1] - 65:9
   **expert** [5] - 13:12,
16:15, 39:23, 41:12,
41:14
   **experts** [1] - 39:5
   **exploiting** [1] - 10:17
   **extensive** [1] - 40:1
   **extent** [8] - 6:3, 7:7,
10:9, 10:22, 11:11,
12:6, 12:8, 17:17
   **extremely** [2] - 41:6,

75:15
   **eyes** [1] - 22:6

# F

   **face** [3] - 57:25, 63:6,
63:13
   **Facebook** [3] - 63:21,
64:5, 73:8
   **fact** [10] - 3:23, 5:3,
5:6, 7:18, 8:15, 10:19,
28:11, 38:3, 75:3,
93:10
   **factor** [1] - 7:6
   **factors** [1] - 7:5
   **factual** [3] - 4:21, 5:1,
5:25
   **factually** [1] - 14:2
   **failed** [1] - 12:11
   **fair** [10] - 8:12, 8:24,
9:4, 13:7, 20:15, 43:15,
53:1, 53:3, 53:4, 61:7
   **fairly** [1] - 11:6
   **Falcons** [1] - 31:5
   **false** [13] - 6:2, 10:8,
27:2, 32:21, 33:4, 34:4,
35:3, 36:8, 44:14, 45:8,
45:18, 47:20, 89:6
   **falsely** [1] - 33:23
   **falsity** [5] - 4:24, 6:1,
10:14, 27:22, 27:24
   **familiar** [4] - 21:15,
25:15, 26:10, 77:23
   **family** [3] - 40:11,
64:11, 75:18
   **fan** [2] - 31:1, 53:4
   **fans** [1] - 53:2
   **far** [5] - 6:24, 7:2, 9:25,
41:1, 72:9
   **Farm** [11] - 20:25,
22:21, 22:25, 24:19,
28:23, 29:20, 33:22,
47:19, 48:3, 49:1,
95:21
   **Farr** [1] - 1:18
   **fast** [1] - 70:5
   **February** [3] - 9:5,
88:20, 91:6
   **Federal** [1] - 30:12
   **feed** [1] - 58:9
   **felt** [5] - 8:5, 49:17,
54:10, 57:10, 69:8
   **few** [1] - 75:5
   **Fifth** [14] - 9:5, 19:5,
19:8, 19:15, 19:25,
20:5, 20:8, 91:21, 93:7,
93:11, 93:15, 94:9,
94:15, 95:22
   **fight** [1] - 12:19
   **figure** [3] - 21:13,

21:22, 32:4
   **figuring** [1] - 42:13
   **fil** [3] - 57:15, 57:24,
58:15
   **file** [2] - 30:24, 71:20
   **filed** [4] - 3:3, 33:2,
37:2, 77:23
   **fill** [1] - 73:6
   **filled** [2] - 79:4, 79:12
   **final** [2] - 95:8, 95:14
   **finally** [1] - 18:14
   **finances** [1] - 12:20
   **financial** [17] - 3:17,
11:4, 11:9, 12:9, 12:12,
13:15, 14:2, 14:3,
15:11, 15:23, 15:24,
16:7, 17:3, 17:11
   **financially** [1] - 59:2
   **findings** [3] - 4:21,
5:1, 5:5
   **fine** [1] - 82:11
   **first** [13] - 3:13, 4:3,
23:18, 26:7, 33:12,
33:21, 33:24, 34:12,
70:1, 70:2, 78:1, 78:15,
88:20
   **fishing** [3] - 68:12,
68:25, 69:1
   **fishy** [1] - 27:14
   **five** [2] - 25:2
   **flags** [1] - 48:8
   **flat** [1] - 10:4
   **flat-out** [1] - 10:4
   **flatly** [1] - 5:1
   **floating** [1] - 13:17
   **focus** [1] - 87:22
   **folks** [2] - 49:11, 77:6
   **follow** [6] - 14:8,
14:10, 14:13, 25:8,
52:23, 90:4
   **following** [5] - 18:20,
86:3, 89:4, 89:22, 90:4
   **foot** [1] - 31:16
   **footage** [2] - 79:4,
79:12
   **FOR** [1] - 1:1
   **foregoing** [1] - 97:4
   **forgotten** [1] - 38:1
   **form** [1] - 4:19
   **former** [1] - 70:25
   **formulation** [1] -
84:14
   **forward** [1] - 70:5
   **foundation** [1] - 80:14
   **four** [6] - 79:14, 81:25,
87:16, 95:17, 96:1,
96:2
   **fraud** [11] - 31:21,
32:22, 33:4, 33:23,
34:4, 35:4, 36:9, 52:9,

57:11, 58:6, 90:11
   **fraudulent** [1] - 29:25
   **free** [1] - 66:8
   **Freeman** [1] - 1:3
   **Friday** [1] - 22:3
   **friends** [1] - 53:1
   **front** [4] - 11:24, 47:6,
52:11, 72:20
   **frustrated** [1] - 20:17,
21:2
   **frustrations** [3] -
20:18, 20:24, 21:3
   **full** [3] - 9:16, 24:18,
97:5
   **fully** [3] - 5:6, 9:8,
11:10
   **Fulton** [7] - 24:23,
30:13, 56:20, 57:17,
57:18, 58:16, 66:11
   **furtherance** [3] -
83:23, 84:10, 84:13

# G

   **GA** [1] - 1:23
   **Gallagher** [1] - 1:18
   **game** [2] - 8:12, 13:7
   **games** [1] - 31:11
   **Gateway** [24] - 33:7,
33:8, 33:11, 33:20,
33:25, 34:3, 35:2,
35:12, 36:2, 36:10,
37:12, 54:13, 54:24,
55:3, 55:15, 56:8,
71:10, 77:14, 77:15,
77:24, 78:1, 78:13,
80:6, 80:23
   **generated** [1] - 72:11
   **gentlemen** [1] - 94:3
   **Georgia** [14] - 6:15,
8:14, 10:12, 23:22,
27:10, 28:19, 30:11,
31:5, 49:23, 50:1, 79:4,
79:12, 90:10, 90:14
   **gift** [1] - 38:5
   **ginger** [1] - 23:9
   **Giuliani** [68] - 1:6,
3:10, 3:13, 4:5, 4:6,
4:10, 5:14, 6:19, 6:20,
9:12, 9:25, 12:4, 13:19,
14:8, 14:14, 14:17,
14:23, 15:10, 15:17,
16:3, 19:15, 19:21,
20:5, 23:2, 23:24,
33:10, 33:13, 34:10,
34:12, 36:3, 36:6,
36:10, 37:3, 37:9, 38:9,
39:4, 44:6, 48:24, 49:3,
50:20, 51:6, 52:24,
53:2, 53:5, 53:23, 54:1,

54:5, 55:10, 58:9, 70:13, 70:17, 70:18, 70:22, 71:8, 76:23, 76:24, 77:17, 80:20, 80:24, 81:10, 83:13, 87:22, 89:3, 89:18, 91:9, 91:13, 92:6

**Giuliani's** [12] - 10:18, 11:1, 11:14, 12:24, 18:25, 51:20, 52:14, 52:21, 67:21, 72:12, 74:5, 85:3

**given** [16] - 8:13, 8:15, 9:12, 9:16, 14:5, 14:9, 14:17, 14:19, 15:6, 15:23, 17:10, 25:7, 41:8, 73:14, 89:3, 93:10

**God** [1] - 74:21

**GOP** [1] - 79:6

**Gottlieb** [10] - 1:16, 3:5, 11:8, 42:11, 42:15, 82:5, 82:22, 84:22, 90:18, 93:24

**GOTTLIEB** [44] - 3:6, 3:25, 4:15, 11:12, 12:1, 12:21, 13:3, 13:13, 13:18, 13:25, 14:16, 17:25, 81:6, 82:24, 83:4, 83:8, 83:11, 84:24, 85:21, 85:24, 86:19, 86:24, 87:2, 87:7, 88:19, 89:10, 89:12, 90:9, 90:19, 90:24, 91:8, 91:12, 92:10, 92:15, 93:2, 93:25, 95:8, 95:12, 95:14, 95:17, 95:20, 95:23, 96:2, 96:4

**Governski** [1] - 1:17

**grabbed** [1] - 71:13

**grant** [1] - 10:22

**granted** [2] - 11:13, 17:19

**great** [2] - 10:20, 31:8

**grievance** [2] - 91:25, 92:13

**grounds** [5] - 29:21, 32:5, 33:2, 45:10, 88:25

**group** [3] - 33:9, 50:6, 53:1

**guess** [16] - 21:4, 25:4, 26:6, 26:25, 28:22, 30:2, 30:6, 30:16, 35:14, 44:4, 48:5, 48:22, 56:22, 57:4, 59:3, 62:16

**guy** [4] - 50:17, 75:15, 75:16, 75:19

**guys** [2] - 36:22, 49:10

## H

**hand** [3] - 22:18, 78:9, 92:5

**hanging** [1] - 64:4

**happy** [1] - 67:5

**hard** [2] - 4:3, 15:1

**harder** [1] - 64:16

**harm** [4] - 3:23, 38:12, 38:13, 39:3

**hate** [1] - 36:5

**Hawks** [1] - 31:6

**head** [2] - 45:23, 50:14

**headline** [1] - 79:3

**health** [3] - 62:1, 66:21, 74:18

**hear** [6] - 10:6, 14:14, 19:4, 53:5, 64:14, 90:20

**heard** [4] - 20:14, 32:10, 40:4, 94:5

**hearing** [2] - 41:19, 86:13

**HELD** [1] - 1:9

**held** [8] - 26:19, 37:20, 68:9, 77:21, 79:24, 82:15, 88:16, 93:4

**help** [2] - 4:13, 72:4

**helped** [2] - 71:13, 77:20

**helping** [1] - 36:7, 76:15

**helps** [1] - 84:5

**hereby** [1] - 97:3

**heroin** [1] - 77:3

**Herring** [3] - 37:8, 37:12, 38:20

**high** [1] - 13:5

**himself** [4] - 6:3, 10:11, 11:17, 49:10

**hitting** [1] - 41:23

**holdings** [1] - 4:21

**hole** [1] - 49:22

**holidays** [1] - 66:13

**home** [4] - 12:20, 21:20, 57:21, 63:4

**homes** [1] - 54:9

**homework** [1] - 75:8

**Honor** [78] - 3:6, 3:25, 5:24, 9:3, 9:18, 10:25, 11:12, 12:21, 14:16, 15:7, 15:9, 16:1, 16:6, 16:11, 17:15, 18:9, 20:20, 21:5, 24:12, 26:14, 29:21, 31:22, 32:5, 32:23, 33:14, 35:15, 36:11, 36:13, 37:18, 37:24, 38:7,

42:10, 43:2, 43:7, 44:21, 45:4, 50:22, 52:15, 53:14, 65:7, 68:6, 68:14, 69:15, 73:12, 73:16, 73:24, 78:4, 78:9, 78:17, 78:20, 78:22, 79:17, 80:5, 81:2, 81:6, 81:17, 81:19, 81:21, 82:11, 82:24, 83:18, 85:21, 86:12, 86:19, 86:25, 87:19, 87:24, 88:8, 88:10, 88:14, 88:20, 89:10, 89:14, 92:10, 93:2, 93:23, 93:25, 95:8

**Honor's** [1] - 16:2

**HONORABLE** [1] - 1:10

**horrible** [4] - 43:25, 47:10, 50:19, 57:20

**Houghton** [1] - 1:17

**Houghton-Larsen** [1] - 1:17

**hours** [1] - 23:16

**house** [4] - 42:9, 42:12, 42:13

**HOWELL** [1] - 1:10

**huge** [1] - 79:4

**Hughes** [4] - 55:17, 55:18, 56:5, 74:24

**hum** [3] - 23:14, 46:2, 78:6

**Humphreys** [4] - 39:6, 39:24, 39:25, 96:5

**hyperbolic** [1] - 11:6

**hypothetical** [2] - 15:25, 43:3

## I

**idea** [2] - 41:11, 49:8

**identification** [1] - 78:5

**identified** [2] - 83:21, 84:19

**identify** [2] - 49:23, 50:1

**ignorant** [1] - 50:18

**IIED** [1] - 27:23

**image** [1] - 58:2

**important** [1] - 18:18

**impossible** [1] - 12:14

**impression** [1] - 41:25

**improper** [1] - 43:3

**IN** [1] - 1:1

**incidents** [1] - 63:11

**including** [2] - 4:18, 4:20

**inconsistent** [1] - 5:1

**incorrect** [3] - 25:18, 57:12, 61:8

**incriminate** [1] - 19:13

**incrimination** [2] - 94:10, 94:16

**INDEX** [1] - 98:1

**indicated** [1] - 81:10

**individuals** [2] - 15:2, 77:8

**inference** [1] - 94:17

**inferences** [1] - 4:22

**inflection** [1] - 68:21

**influence** [1] - 4:8

**information** [5] - 12:25, 40:21, 85:3, 93:9, 93:19

**injuries** [2] - 3:15, 38:8

**injury** [2] - 33:25, 38:14

**insolvent** [2] - 11:16, 12:5

**instant** [2] - 31:11, 32:2

**instead** [3] - 10:17, 61:16, 72:2

**instructed** [2] - 16:2, 94:6

**instruction** [7] - 12:22, 14:5, 14:6, 93:11, 93:20, 93:22, 94:4

**instructions** [6] - 4:7, 12:20, 14:9, 14:14, 17:8

**instructs** [1] - 4:5

**insurance** [1] - 42:19

**intend** [1] - 17:16

**intended** [8] - 12:2, 50:20, 51:7, 53:23, 54:1, 54:5, 54:8, 76:23

**intending** [1] - 6:10

**intends** [1] - 5:15

**intent** [2] - 27:24, 51:3

**intention** [2] - 5:20, 5:22

**intentional** [1] - 68:21

**interact** [1] - 30:5

**interested** [3] - 8:7, 26:3, 57:23

**interesting** [1] - 10:21

**internet** [3] - 40:15, 44:15, 58:1

**interview** [1] - 57:13

**interviewed** [1] - 39:9

**intimidate** [1] - 63:3

**intimidation** [1] - 90:1

**introduce** [1] - 7:17

**introducing** [2] - 4:18, 11:15

**introduction** [1] - 80:1

**invent** [1] - 7:4
**investigation** [5] - 10:13, 27:16, 29:24, 30:3, 31:25
**Investigations** [2] - 30:12
**investigations** [1] - 6:16
**involved** [6] - 30:2, 32:20, 35:3, 56:5, 56:6, 56:8
**involving** [1] - 8:6
**irrelevant** [2] - 54:2, 84:25
**issue** [7] - 4:16, 6:19, 8:15, 8:18, 24:12, 27:19, 49:18
**issues** [10] - 65:5, 67:25, 68:4, 68:7, 80:4
**IV** [1] - 2:1

## J

**Jacki** [1] - 32:9
**Janice** [2] - 2:5, 97:11
**JANICE** [1] - 97:3
**Jenna** [3] - 86:21, 92:25, 94:4
**jENNA** [1] - 98:8
**Jensen** [4] - 55:17, 55:18, 56:5, 74:24
**Jewish** [1] - 75:16
**job** [15] - 4:4, 8:1, 14:10, 25:5, 41:12, 47:4, 56:20, 57:7, 57:9, 57:12, 58:15, 61:12, 61:24, 74:10, 74:19
**jobs** [1] - 56:20
**John** [1] - 1:13
**john.langford@ protectdemocracy.org** [1] - 1:15
**Johnny** [1] - 11:21
**Jones** [3] - 53:12, 53:17, 53:20
**Joseph** [1] - 2:1
**judge** [1] - 32:10
**JUDGE** [2] - 1:10, 1:10
**judge's** [1] - 14:13
**judgment** [5] - 3:16, 4:16, 11:16, 11:18, 16:18
**jumped** [2] - 65:1, 65:2
**June** [4] - 66:18, 66:22, 69:23, 70:3
**juries** [2] - 14:8, 14:13
**jurors** [4] - 18:6, 73:19, 74:1, 95:1
**jury** [26] - 10:12,

10:14, 11:24, 12:2, 12:10, 12:17, 12:19, 14:5, 15:7, 16:15, 17:22, 18:1, 38:1, 39:3, 41:14, 42:23, 46:25, 52:4, 67:21, 73:25, 78:23, 85:12, 86:18, 93:1, 93:11, 95:5
**JURY** [2] - 1:4, 1:9
**jury's** [1] - 7:6
**justice** [1] - 40:11
**juxtaposed** [1] - 11:20

## K

**keep** [3] - 64:2, 79:15, 94:25
**KERIK** [1] - 98:5
**Kerik** [9] - 81:7, 81:13, 83:2, 83:8, 83:11, 83:12, 84:13, 85:11, 85:20
**Kerik's** [3] - 82:25, 85:2, 85:21
**key** [1] - 89:4
**kicked** [3] - 7:9, 47:24, 50:9
**kind** [27] - 5:24, 6:20, 11:7, 12:23, 14:1, 18:20, 20:15, 30:19, 31:3, 31:19, 32:2, 39:14, 41:5, 41:9, 47:12, 47:19, 48:4, 48:5, 51:17, 51:18, 55:25, 62:3, 65:4, 65:25, 69:24, 92:13
**knowledge** [3] - 21:6, 27:21, 51:25
**known** [3] - 15:2, 49:18, 74:10
**knows** [5] - 8:16, 12:3, 35:17, 45:12, 65:8

## L

**lack** [2] - 10:2, 17:10
**ladies** [2] - 23:1, 94:3
**lady** [2] - 69:22, 70:2
**Langford** [6] - 1:13, 48:16, 56:19, 64:10, 67:9, 72:19
**LANGFORD** [51] - 19:17, 19:20, 20:20, 21:5, 24:12, 26:14, 27:19, 29:21, 30:6, 31:22, 32:5, 32:23, 33:14, 35:15, 36:11, 37:18, 37:22, 38:21, 42:10, 43:2, 44:21, 45:4, 45:10, 50:22,

51:22, 51:24, 52:15, 53:14, 53:25, 55:4, 65:7, 68:6, 68:19, 68:24, 69:15, 71:20, 73:16, 73:24, 74:2, 74:4, 78:4, 78:7, 78:11, 78:17, 78:22, 79:2, 79:7, 79:9, 80:11, 80:16, 81:1
**Langford**................**74** [1] - 98:4
**large** [2] - 14:18, 31:24
**Larsen** [1] - 1:17
**larsen@willkie.com** [1] - 1:21
**last** [10] - 3:3, 6:16, 6:21, 17:21, 18:16, 62:21, 62:23, 75:4, 87:14, 95:3
**lasted** [1] - 27:16
**latitude** [1] - 7:23
**Lavaca** [1] - 2:2
**law** [10] - 5:25, 14:12, 27:5, 28:17, 28:19, 29:6, 30:15, 31:25, 43:24, 44:12
**laws** [1] - 25:8
**lawsuit** [6] - 32:20, 33:5, 36:22, 77:15, 80:20, 93:14
**lawsuits** [3] - 33:2, 37:10, 89:19
**lawyer** [5] - 29:6, 43:25, 62:14, 87:22, 94:6
**lawyers** [4] - 32:10, 46:22, 76:7, 76:13
**layperson** [1] - 21:10
**lead** [7] - 13:9, 13:10, 13:15, 14:2, 14:3, 14:18, 14:23
**leading** [1] - 48:13
**leak** [2] - 32:12, 32:13
**leaked** [1] - 32:18
**learn** [5] - 20:4, 20:6, 28:17, 33:11, 33:20
**learning** [1] - 55:19
**least** [3] - 6:5, 7:23, 27:3
**leave** [6] - 41:25, 45:20, 73:19, 79:6, 79:14, 95:1
**leeway** [3] - 8:20, 12:18, 14:17
**left** [3] - 48:9, 66:12, 94:11
**legal** [5] - 4:21, 89:5, 89:15, 89:17, 92:6
**length** [1] - 73:15
**lengthy** [1] - 89:13

**liability** [5] - 7:19, 26:22, 27:12, 28:5, 32:6
**liars** [1] - 52:11
**lie** [3] - 10:4, 29:17, 45:19
**lied** [2] - 47:25, 50:4
**lies** [21] - 15:20, 29:15, 30:20, 34:10, 36:7, 41:6, 41:25, 44:12, 44:18, 46:8, 51:10, 51:11, 51:12, 51:15, 53:5, 57:13, 64:3, 71:14, 77:8, 77:18, 77:20
**life** [4] - 63:1, 76:6, 76:14, 76:21
**lights** [1] - 54:19
**limine** [6] - 3:3, 10:22, 17:18, 17:21, 37:23, 95:3
**limited** [1] - 4:20
**line** [1] - 10:16
**lines** [2] - 6:24, 11:1
**LinkedIn** [1] - 63:23
**list** [4] - 82:6, 82:9, 88:25, 89:24
**listed** [4] - 35:22, 38:10, 91:19, 91:20
**listen** [2] - 52:13, 52:20
**listened** [1] - 50:8
**lists** [1] - 25:8
**lit** [1] - 71:8
**literally** [2] - 24:10, 75:16
**litigation** [4] - 62:12, 62:15, 94:14
**live** [4] - 57:17, 57:19, 76:15, 76:21
**lived** [1] - 57:18
**living** [1] - 61:12
**LLP** [2] - 1:18, 2:1
**lock** [1] - 54:9
**look** [16] - 18:25, 27:4, 27:13, 31:13, 31:15, 31:19, 32:3, 32:14, 32:15, 34:1, 34:2, 49:23, 72:7, 73:3, 73:5, 82:6
**looked** [11] - 30:16, 32:1, 46:23, 54:22, 61:21, 61:22, 72:18, 72:19, 73:3, 73:6, 82:4
**looking** [6] - 30:19, 30:21, 71:21, 73:6, 85:14, 89:12
**looks** [3] - 26:12, 78:13, 84:17
**Los** [1] - 1:14

**loud** [2] - 44:11, 72:2
**love** [3] - 62:14, 63:21, 74:9
**lump** [1] - 61:14
**lying** [1] - 43:22

## M

**ma'am** [3] - 18:5, 63:14, 72:8
**machine** [1] - 26:9
**mail** [2] - 22:12, 63:5
**mail-in** [1] - 22:12
**main** [1] - 47:25
**major** [7] - 56:12, 61:23, 67:13, 68:5, 70:6, 70:9, 70:19
**majority** [1] - 51:15
**malice** [6] - 5:25, 27:20, 27:21, 27:25, 28:1, 28:2
**malicious** [1] - 6:2
**manipulated** [1] - 90:2
**manuals** [1] - 25:3
**March** [2] - 88:22, 91:7
**Marie** [1] - 1:17
**mark** [1] - 85:14
**Mark** [1] - 85:18
**marked** [2] - 78:5, 78:7
**master** [1] - 82:21
**materials** [5] - 46:20, 46:23, 46:24, 47:1, 47:3
**mathematician** [1] - 15:4
**matter** [4] - 4:24, 5:25, 42:1, 95:3
**maximum** [1] - 13:12
**Meadows** [1] - 85:14
**mean** [48] - 4:3, 5:18, 6:13, 7:7, 7:9, 10:13, 12:6, 15:1, 16:20, 18:17, 21:5, 21:15, 21:20, 24:5, 24:22, 26:14, 27:12, 27:24, 29:5, 30:22, 35:23, 38:13, 38:16, 39:18, 41:8, 44:12, 44:22, 45:2, 46:13, 46:19, 49:18, 51:3, 52:7, 53:6, 53:12, 53:14, 58:25, 62:4, 63:20, 64:16, 64:22, 66:14, 68:15, 70:18, 74:9, 77:5, 84:8, 92:18
**meaning** [2] - 71:7, 94:13
**means** [3] - 19:8, 39:20

**measure** [1] - 42:13
**media** [11] - 33:9, 33:12, 33:21, 36:19, 36:21, 52:24, 52:25, 53:2, 64:8, 64:17, 71:13
**media-based** [1] - 33:9
**medical** [14] - 67:23, 67:25, 68:2, 68:10, 68:13, 68:17, 68:19, 69:5, 69:9, 69:13, 70:11, 70:15, 71:3, 71:4
**medication** [3] - 61:25, 65:18, 70:1
**medicine** [1] - 65:11
**meds** [1] - 65:15
**meet** [1] - 18:14
**member** [2] - 28:11, 89:14
**members** [1] - 77:11
**mental** [4] - 35:4, 62:1, 66:21, 74:17
**mentally** [1] - 74:16
**mention** [2] - 32:10, 33:24
**mentioned** [15] - 3:11, 25:12, 26:25, 28:10, 28:17, 31:24, 38:4, 49:2, 56:25, 57:9, 66:17, 67:9, 69:21, 70:16, 76:9
**merely** [1] - 10:3
**Meryl** [1] - 1:17
**message** [5] - 34:24, 62:22, 63:19, 63:21, 72:1
**messages** [20] - 34:18, 34:24, 39:16, 48:17, 48:22, 50:19, 50:21, 51:13, 54:22, 55:1, 63:14, 63:16, 64:7, 72:8, 72:10, 72:24, 73:2, 76:23
**met** [1] - 39:12
**mgottlieb@willkie.com** [1] - 1:20
**Mgovernski@willkie.com** [1] - 1:20
**mhoughton** [1] - 1:21
**mhoughton-larsen@willkie.com** [1] - 1:21
**Michael** [1] - 1:16
**Michelle** [2] - 95:9, 95:15
**Michigan** [1] - 90:13
**midnight** [3] - 23:7, 23:13, 23:14
**might** [8] - 6:6, 26:12,

44:9, 44:10, 46:22, 70:20, 73:15
**military** [1] - 22:2
**Miller** [1] - 1:22
**million** [4] - 13:11, 13:14, 14:24, 16:24
**mind** [2] - 10:14, 94:25
**mint** [1] - 23:10
**minute** [1] - 73:17
**minutes** [4] - 86:24, 95:17, 96:1, 96:2
**mischaracterizes** [3] - 20:20, 42:11, 42:14
**misconduct** [1] - 27:2
**misrepresentation** [1] - 90:17
**misrepresentations** [4] - 89:22, 90:5, 90:6, 92:8
**missed** [1] - 56:19
**misunderstood** [1] - 67:2
**mitigate** [2] - 7:2, 7:23
**mitigating** [1] - 7:20
**mom** [9] - 23:1, 23:9, 47:18, 47:22, 47:23, 58:5, 64:21, 65:10, 65:15
**moment** [2] - 31:9, 43:22
**money** [23] - 10:5, 12:13, 16:21, 40:1, 40:9, 41:3, 41:7, 41:15, 41:16, 41:18, 42:4, 42:20, 42:25, 43:15, 43:17, 43:19, 44:9, 56:10, 57:3, 58:21, 59:3
**monitor** [1] - 40:21
**monitors** [2] - 25:20, 25:23
**months** [1] - 63:9
**Morning** [1] - 51:10
**morning** [4] - 3:21, 94:21, 95:4, 96:8
**Moss** [17] - 1:3, 18:2, 18:12, 28:10, 39:2, 61:6, 69:21, 73:10, 74:5, 74:23, 78:1, 78:12, 79:3, 79:10, 80:12, 80:17, 81:3
**MOSS** [1] - 98:3
**most** [4] - 9:7, 15:1, 51:18, 74:21
**mostly** [1] - 59:4
**mother** [19] - 32:22, 33:3, 33:22, 33:23, 34:13, 35:3, 35:8, 36:9, 45:17, 48:3, 48:25, 51:8, 52:8, 53:24, 54:6,

54:14, 55:23, 64:13, 64:15
**mother's** [2] - 40:8, 49:2
**motion** [6] - 3:3, 10:22, 17:18, 17:21, 37:23, 95:3
**move** [6] - 48:14, 52:2, 81:13, 86:3, 87:7, 87:10
**movie** [1] - 75:17
**MR** [195] - 3:6, 3:25, 4:15, 5:22, 6:12, 6:17, 6:23, 7:2, 7:13, 7:25, 8:2, 8:24, 9:3, 9:10, 9:18, 10:25, 11:12, 12:1, 12:21, 13:3, 13:13, 13:18, 13:25, 14:16, 14:25, 15:4, 15:13, 16:1, 16:11, 16:25, 17:15, 17:25, 18:9, 18:11, 19:17, 19:20, 19:23, 20:20, 20:23, 21:5, 21:8, 24:12, 24:15, 26:14, 26:25, 27:13, 27:19, 28:1, 28:9, 29:21, 29:23, 30:6, 30:9, 31:22, 31:23, 32:5, 32:8, 32:23, 33:1, 33:14, 33:18, 35:15, 35:20, 36:11, 36:13, 36:17, 37:18, 37:22, 38:7, 38:21, 39:1, 42:10, 42:17, 43:2, 43:5, 43:7, 43:9, 43:11, 43:12, 44:21, 45:1, 45:4, 45:7, 45:10, 45:13, 49:5, 49:19, 50:22, 50:25, 51:5, 51:22, 51:24, 52:3, 52:15, 52:17, 52:19, 53:14, 53:16, 53:19, 53:25, 54:4, 55:4, 55:7, 61:5, 65:7, 65:17, 68:6, 68:14, 68:19, 68:24, 69:1, 69:8, 69:15, 69:19, 71:20, 71:25, 72:6, 73:11, 73:16, 73:24, 74:2, 74:4, 78:4, 78:7, 78:11, 78:17, 78:20, 78:22, 79:2, 79:7, 79:17, 80:2, 80:9, 80:11, 80:14, 80:16, 81:1, 81:6, 81:17, 81:19, 81:21, 81:23, 82:2, 82:6, 82:9, 82:17, 82:19, 82:24, 83:4, 83:8, 83:11, 83:18, 83:20, 84:4, 84:7,

84:16, 84:24, 85:21, 85:24, 86:12, 86:19, 86:24, 87:2, 87:7, 87:14, 87:19, 87:24, 88:3, 88:8, 88:10, 88:12, 88:14, 88:19, 89:10, 89:12, 90:9, 90:19, 90:24, 91:8, 91:12, 91:16, 92:10, 92:11, 92:15, 93:2, 93:22, 93:25, 95:8, 95:12, 95:14, 95:17, 95:20, 95:23, 96:2, 96:4
**MS** [1] - 79:9
**multiple** [5] - 7:10, 26:9, 26:13, 31:25, 38:13
**Musk** [1] - 13:16
**must** [2] - 5:19, 25:8

## N

**N.W** [1] - 97:12
**name** [6] - 36:19, 39:6, 40:5, 40:8, 70:2, 75:19
**named** [1] - 35:8
**names** [1] - 33:24
**narrow** [1] - 38:18
**nature** [1] - 38:18
**nauseous** [1] - 75:15
**NE** [1] - 1:23
**necessarily** [4] - 6:4, 29:9, 69:1, 71:2
**necessary** [1] - 14:19
**need** [12] - 9:1, 13:8, 14:14, 27:16, 41:19, 41:20, 42:9, 48:10, 76:4, 76:5, 82:18, 92:2
**needed** [1] - 76:12
**needs** [3] - 14:17, 41:14, 44:11
**negative** [2] - 48:4, 64:22
**negatively** [1] - 33:10
**net** [3] - 12:24, 13:21, 16:14
**Network** [3] - 36:25, 45:8, 45:16
**Nevada** [1] - 90:13
**never** [10] - 21:10, 39:12, 57:18, 67:3, 67:6, 70:3, 76:6, 76:14
**new** [1] - 63:4
**news** [3] - 45:17, 58:1, 58:3
**News** [8] - 36:25, 37:4, 37:7, 37:16, 45:8, 45:16, 51:9, 77:9
**newspaper** [1] - 63:12

**next** [8] - 5:8, 8:7, 41:25, 42:1, 44:23, 81:5, 85:24, 86:21
**nice** [3] - 18:14, 32:15, 43:1
**night** [13] - 3:3, 6:16, 6:21, 18:16, 20:10, 20:15, 20:25, 21:11, 35:1, 47:19, 48:3, 48:9, 95:21
**Nightly** [1] - 51:9
**nightmares** [1] - 70:22
**nobody** [1] - 76:19
**non** [2] - 6:19, 50:3
**non-Black** [1] - 50:3
**non-Giuliani** [1] - 6:19
**noose** [1] - 64:4
**normal** [2] - 27:5, 56:16
**notebooks** [1] - 71:22
**notes** [1] - 97:5
**nothing** [5] - 7:8, 12:25, 13:1, 14:4, 49:1
**November** [2] - 34:7, 90:12
**number** [9] - 35:13, 35:22, 35:24, 76:7, 77:7, 79:17, 79:20, 85:16
**NW** [2] - 1:18, 2:6

## O

**o'clock** [4] - 17:20, 17:23, 95:2, 96:7
**OAN** [4] - 37:25, 38:18, 38:20, 45:2
**oath** [3] - 4:6, 4:11, 25:25
**object** [3] - 79:25, 88:24, 88:25
**objecting** [2] - 37:22, 38:23
**objection** [68] - 13:4, 19:17, 20:21, 21:5, 24:12, 26:14, 28:4, 28:8, 29:21, 30:6, 31:22, 32:5, 32:23, 33:14, 35:15, 36:11, 37:18, 42:10, 43:2, 44:21, 45:4, 45:10, 45:11, 49:5, 50:22, 51:22, 51:24, 52:15, 53:14, 55:4, 65:7, 68:6, 69:18, 78:19, 78:20, 79:17, 79:18, 79:22, 80:8, 80:14, 82:3, 82:17, 83:1, 83:16, 83:19, 83:20, 84:19, 85:7, 85:8, 86:13, 87:4,

87:8, 87:12, 87:17, 87:20, 87:21, 87:25, 88:1, 88:3, 88:5, 88:9, 91:16, 92:17, 92:20, 92:22, 93:25, 95:25
**objections** [14] - 81:11, 81:16, 81:18, 81:20, 81:22, 83:16, 85:5, 86:4, 86:10, 87:5, 88:12, 88:13, 93:21
**observations** [1] - 64:15
**observe** [4] - 28:12, 28:22, 29:8, 29:13
**observer** [1] - 95:20
**observers** [2] - 25:24, 28:20
**observes** [1] - 12:22
**observing** [2] - 29:9, 29:14
**obvious** [5] - 13:15, 14:1, 16:20, 27:15, 50:1
**obviously** [2] - 64:13, 84:24
**occasions** [1] - 57:14
**occurred** [2] - 29:25, 91:6
**OF** [3] - 1:1, 1:9, 97:1
**off-the-record** [1] - 72:5
**offer** [1] - 78:17
**office** [2] - 30:11, 74:12
**Office** [1] - 30:13
**OFFICIAL** [1] - 97:1
**Official** [2] - 2:5, 97:11
**officials** [1] - 6:15
**Olympic** [1] - 54:20
**Olympics** [1] - 54:19
**once** [4] - 22:2, 64:6, 75:10, 75:22
**One** [7] - 36:25, 37:4, 37:7, 37:16, 45:8, 45:16, 77:8
**one** [54] - 5:13, 6:13, 7:5, 8:4, 11:4, 13:13, 13:14, 13:16, 17:23, 22:5, 23:5, 23:21, 23:23, 32:16, 33:5, 36:21, 42:5, 42:12, 43:13, 44:8, 44:25, 49:14, 49:24, 56:6, 58:25, 63:2, 65:2, 69:23, 70:1, 71:14, 71:15, 73:10, 75:8, 75:14, 77:10, 79:18, 82:6, 84:16, 84:24, 86:5, 87:4, 87:14, 87:18, 87:25, 88:10,

88:20, 89:4, 89:25, 90:3, 90:17, 95:8, 95:14, 95:24
**ones** [8] - 38:8, 38:9, 67:15, 67:16, 67:20, 72:14, 73:5, 87:17
**online** [1] - 40:21
**open** [9] - 8:14, 28:7, 38:25, 61:4, 80:10, 85:6, 92:21, 94:2, 94:25
**Open** [1] - 69:17
**opened** [3] - 80:6, 80:7
**opening** [6] - 16:22, 19:3, 40:4, 42:2, 42:11, 48:15
**operating** [1] - 25:6
**opportunities** [1] - 7:11
**opportunity** [2] - 10:18, 10:20
**opposed** [2] - 25:14, 50:13
**orally** [1] - 39:19
**order** [9] - 3:4, 4:2, 4:17, 5:10, 25:4, 25:9, 88:22, 91:19, 92:13
**ordered** [1] - 16:3
**orders** [5] - 3:9, 4:20, 5:5, 11:18, 17:16
**originally** [1] - 37:2, 37:7
**otherwise** [2] - 7:7, 11:17
**ourselves** [1] - 52:10
**outlet** [4] - 33:12, 33:21, 36:19, 36:21
**outlets** [1] - 71:13
**outside** [5] - 4:6, 4:12, 50:6, 62:15, 94:14
**overrule** [1] - 38:23
**overruled** [21] - 19:19, 24:14, 30:8, 32:24, 33:16, 35:17, 36:14, 36:15, 45:11, 49:6, 53:18, 55:5, 65:8, 80:8, 80:15, 85:5, 85:7, 92:17, 92:20, 92:22
**overt** [1] - 84:20
**overtime** [1] - 56:13
**own** [2] - 4:8, 10:14

## P

**p.m** [1] - 1:7
**page** [5] - 11:13, 71:22, 72:21, 79:8, 90:6
**Pages** [1] - 35:23

**pages** [4] - 89:12, 90:24, 90:25, 91:1
**pain** [1] - 23:9
**Pamela** [2] - 95:9, 95:15
**pandemic** [1] - 56:13
**pandering** [1] - 10:5
**paper** [5] - 22:4, 22:10, 22:11, 46:17, 46:18
**parroting** [3] - 55:11, 55:14, 55:15
**part** [20] - 7:13, 13:9, 13:13, 13:14, 17:21, 21:1, 21:3, 52:4, 79:16, 83:24, 84:2, 84:6, 84:8, 84:9, 84:13, 89:8, 89:17, 90:25, 91:18, 94:22
**participate** [1] - 19:22
**particular** [1] - 10:5
**parties** [4] - 25:22, 38:9, 38:12, 38:13
**parties'** [1] - 86:1
**parts** [1] - 3:4
**party** [8] - 4:18, 9:15, 49:23, 50:1, 50:17, 93:14, 94:13, 94:14
**pass** [2] - 54:19, 73:11
**passed** [3] - 47:24, 57:1, 57:10
**passes** [1] - 29:1
**passing** [1] - 77:3
**past** [1] - 15:23
**paste** [1] - 84:17
**pause** [2] - 82:8, 85:13
**pay** [3] - 17:4, 41:15, 42:9
**paying** [2] - 40:14, 57:6
**penalty** [3] - 11:7, 11:22, 16:23
**pending** [1] - 81:24
**Pennsylvania** [1] - 90:14
**people** [43] - 21:15, 21:20, 21:21, 22:11, 25:21, 25:22, 25:23, 26:3, 27:17, 29:13, 29:18, 30:13, 30:24, 36:7, 39:18, 41:6, 44:9, 44:10, 44:17, 50:7, 51:11, 51:15, 51:18, 52:12, 52:13, 52:17, 54:9, 55:8, 57:20, 63:3, 63:5, 63:15, 64:7, 65:1, 65:12, 65:13, 66:21, 67:4, 76:16, 76:23, 79:14
**per** [1] - 13:22

**perfect** [3] - 3:7, 74:9, 87:1
**perfectly** [1] - 27:5
**permanent** [1] - 25:2
**permission** [1] - 86:2
**persisted** [1] - 91:9
**person** [14] - 25:17, 32:10, 41:25, 52:8, 54:19, 54:20, 56:2, 57:6, 57:24, 67:5, 77:17, 92:5, 94:13
**personal** [4] - 21:6, 51:25, 89:21, 89:23
**personally** [1] - 43:21
**persons** [7] - 28:23, 32:21, 48:2, 50:3, 50:20, 51:7
**pertinent** [1] - 89:8
**pharmaceuticals** [1] - 75:18
**phone** [7] - 34:17, 35:12, 35:13, 48:18, 48:21, 64:4, 73:7
**phones** [1] - 79:23
**physical** [1] - 86:5
**physician** [1] - 69:25
**Pick** [1] - 32:9
**picket** [1] - 48:8
**picking** [3] - 36:6, 38:3, 76:19
**picture** [2] - 58:5, 64:4
**pictures** [1] - 47:8
**piece** [2] - 46:17
**Pinterest** [1] - 63:22
**pipes** [2] - 32:16
**place** [2] - 57:19, 57:20
**placeholder** [1] - 72:22
**places** [3] - 51:11, 64:1, 76:18
**plaintiff** [1] - 68:18
**plaintiff's** [4] - 68:10, 68:16, 68:17, 69:12
**plaintiffs** [18] - 3:18, 3:23, 8:10, 8:21, 9:7, 9:17, 10:17, 11:11, 14:23, 16:9, 17:18, 26:20, 81:6, 85:24, 86:21, 87:10, 90:8
**Plaintiffs** [2] - 1:4, 1:13
**plaintiffs'** [12] - 3:2, 9:22, 17:7, 71:23, 72:3, 81:5, 84:22, 85:15, 87:20, 88:17, 92:8, 92:19
**Plaintiffs'** [25] - 72:19, 78:7, 78:18, 78:25, 81:12, 82:14, 85:10,

86:15, 87:8, 87:10, 87:15, 88:6, 98:11, 98:11, 98:12, 98:12, 98:13, 98:14, 98:14, 98:15, 98:16, 98:16, 98:17, 98:17, 98:18
**Plan** [3] - 83:13, 84:14, 84:18
**planning** [6] - 15:10, 15:13, 15:16, 16:19, 17:2, 69:13
**plans** [1] - 5:16
**platform** [1] - 15:19
**play** [2] - 95:9, 95:15
**played** [3] - 85:11, 86:18, 92:25
**playing** [2] - 81:8, 85:20
**plead** [1] - 93:11
**pleaded** [1] - 91:21
**pleadings** [1] - 79:19
**pled** [1] - 27:22
**plenty** [1] - 28:25
**pocket** [1] - 23:10
**pockets** [2] - 41:23, 41:24
**podcast** [4] - 51:20, 52:14, 52:21, 52:22
**point** [9] - 6:4, 10:25, 13:18, 13:21, 14:16, 15:8, 17:7, 27:3, 51:17
**points** [3] - 89:13, 89:25, 90:6
**police** [1] - 56:2
**poll** [5] - 21:25, 22:9, 79:6, 79:14, 95:20
**polls** [4] - 21:25, 22:5, 22:6, 22:12
**pontificating** [1] - 15:19
**pop** [1] - 15:5
**portion** [2] - 17:18, 17:19
**portrayed** [1] - 23:22
**posed** [1] - 94:6
**position** [5] - 9:17, 57:15, 76:12, 92:8, 92:10
**possibility** [1] - 16:4
**posted** [2] - 36:8, 45:9
**postings** [1] - 45:17
**posttraumatic** [1] - 65:19
**powerful** [2] - 27:17, 41:6
**pray** [1] - 74:21
**precincts** [1] - 21:12
**preclude** [3] - 3:9, 3:10, 3:13
**precluded** [1] - 11:14

**precludes** [1] - 4:18
**preference** [1] - 16:23
**preferred** [1] - 16:9
**prejudice** [3] - 9:22, 14:11, 92:3
**prejudicial** [1] - 92:1
**preparation** [2] - 46:11, 46:21
**prepare** [2] - 46:24, 47:1
**prepared** [2] - 18:7, 38:22
**preparing** [1] - 46:25
**present** [3] - 7:21, 10:18, 95:21
**presentation** [2] - 7:14, 48:16
**presented** [2] - 36:14, 93:16
**presenting** [1] - 7:20
**President** [5] - 89:15, 89:16, 89:21, 89:24, 90:15
**president** [2] - 13:20, 70:25
**presidential** [1] - 89:16
**press** [2] - 6:21, 11:2
**presume** [1] - 50:11
**presumed** [1] - 14:13
**pretty** [3] - 11:23, 58:25, 59:1
**prevent** [1] - 64:2
**previous** [1] - 4:20
**previously** [2] - 5:9, 87:3
**primary** [1] - 69:25
**private** [2] - 92:14, 92:15
**privilege** [2] - 94:9, 94:15
**probe** [3] - 14:3, 38:11, 38:14
**probing** [1] - 38:17
**problem** [1] - 80:4
**problems** [1] - 69:9
**procedure** [1] - 92:14
**procedures** [1] - 25:6
**proceed** [4] - 18:7, 73:22, 85:9, 92:23
**proceeding** [1] - 88:21
**proceedings** [1] - 97:6
**process** [6] - 25:15, 25:16, 25:21, 26:4, 26:11, 71:15
**produced** [1] - 15:24
**production** [1] - 17:11
**professional** [1] - 26:11
**prognosis** [2] - 62:3,

62:7
**promotion** [2] - 56:25, 57:4
**prompted** [1] - 30:23
**proof** [1] - 11:16
**properly** [1] - 91:18
**property** [1] - 42:21
**Protect** [1] - 1:13
**protecting** [1] - 75:25
**protection** [1] - 56:1
**proud** [1] - 75:20
**prove** [1] - 90:15
**provide** [1] - 55:25
**provided** [3] - 12:25, 37:24, 55:23
**provisional** [1] - 22:3
**proximate** [2] - 33:15, 36:12
**proximately** [1] - 3:14
**public** [7] - 13:19, 28:11, 68:13, 75:1, 89:20, 92:13, 92:16
**PUBLIC** [1] - 1:5
**publish** [3] - 33:12, 33:21, 78:22
**published** [3] - 23:24, 55:10, 79:1
**publishing** [3] - 35:2, 53:3, 54:16
**pull** [1] - 8:5
**pulled** [3] - 47:22, 79:5, 79:13
**pulling** [1] - 26:8
**Pundit** [21] - 33:7, 33:8, 33:12, 33:20, 33:25, 34:3, 35:2, 35:12, 36:2, 36:10, 54:14, 54:24, 55:3, 55:15, 56:8, 71:10, 77:15, 77:16, 77:24, 78:1, 80:6
**Pundit's** [2] - 78:13, 80:23
**punitive** [12] - 4:13, 6:3, 7:6, 7:22, 12:7, 16:12, 16:13, 91:6, 91:22, 91:23, 91:24
**punitives** [1] - 89:3
**purpose** [2] - 74:20, 76:15
**pursuant** [1] - 86:1
**pushed** [1] - 3:17
**pushing** [2] - 8:23, 8:25
**put** [6] - 9:17, 12:24, 23:10, 61:14, 61:15, 71:6
**putting** [1] - 6:19

## Q

**quantify** [1] - 41:12
**questioned** [2] - 30:5, 30:10
**questions** [13] - 15:17, 15:19, 15:21, 30:2, 81:1, 87:22, 91:1, 91:3, 93:6, 93:10, 93:12, 94:6, 94:11
**quite** [4] - 13:20, 32:1, 58:4, 93:5

## R

**race** [3] - 49:2, 49:18, 50:13
**racist** [8] - 48:17, 50:19, 51:8, 51:13, 54:12, 54:22, 55:1, 55:9
**radar** [1] - 80:23
**raised** [2] - 79:18, 80:4
**rallies** [1] - 71:12
**range** [1] - 56:16
**re** [5] - 33:9, 33:13, 54:16, 54:17
**re-Tweet** [1] - 54:16
**re-Tweeted** [3] - 33:13, 54:16, 54:17
**re-Tweets** [1] - 33:9
**react** [1] - 50:21
**read** [5] - 25:4, 55:10, 79:3, 79:10, 89:8
**reading** [3] - 8:7, 35:11, 54:23
**ready** [1] - 73:22
**real** [1] - 43:1
**realize** [1] - 34:17
**realized** [1] - 93:5
**really** [9] - 4:10, 7:8, 9:17, 40:7, 44:5, 55:6, 64:5, 67:1, 93:10
**reason** [7] - 12:22, 17:9, 21:9, 66:24, 67:4, 74:20, 89:1
**reasons** [4] - 43:13, 51:6, 58:25, 92:19
**rebuild** [1] - 42:9
**rebut** [2] - 7:16, 7:23
**recanted** [2] - 46:7, 46:10
**receive** [3] - 40:10, 51:13, 63:10
**received** [7] - 9:20, 48:4, 50:20, 62:21, 62:23, 63:12, 64:4
**receiving** [1] - 35:1
**recently** [1] - 61:21
**recess** [1] - 73:21

**reckless** [3] - 6:7, 10:4, 27:21
**recklessness** [1] - 8:13
**record** [6] - 14:7, 49:24, 72:3, 72:5, 86:10, 89:19
**records** [15] - 17:11, 67:23, 68:2, 68:11, 68:13, 68:17, 68:20, 69:5, 69:13, 70:4, 70:12, 70:15, 70:20, 71:3, 71:4
**recross** [1] - 69:10
**redacted** [2] - 68:19, 69:6
**REDIRECT** [1] - 74:3
**Redirect** [1] - 98:4
**redirect** [5] - 38:19, 38:22, 73:14, 73:23, 80:8
**reference** [2] - 37:25, 90:7
**referenced** [1] - 81:9
**references** [2] - 90:9, 90:10
**referencing** [1] - 37:25
**reflected** [2] - 71:2, 84:15
**regard** [1] - 16:15
**regarding** [1] - 94:4
**registration** [2] - 24:25, 74:11
**related** [1] - 88:19
**relating** [1] - 16:12
**relayed** [1] - 93:19
**relevant** [8] - 16:14, 30:7, 84:7, 84:9, 85:1, 89:1, 89:2, 91:24
**reliving** [1] - 64:2
**reluctant** [1] - 17:22
**relying** [3] - 21:21, 39:5, 39:23
**remaining** [1] - 95:3
**remember** [8] - 30:18, 41:19, 55:20, 57:25, 65:24, 69:22, 70:2, 75:18
**remind** [2] - 12:19, 93:12
**reminded** [1] - 12:17
**reminding** [1] - 42:6
**remove** [1] - 63:25
**removed** [1] - 40:21
**repair** [10] - 40:1, 40:14, 41:3, 41:9, 41:15, 42:24, 43:14, 43:20, 43:21, 59:1
**repaired** [2] - 44:5, 44:9

**repeated** [1] - 91:11
**repeatedly** [1] - 55:13
**repeating** [1] - 23:19
**rephrase** [1] - 51:4
**replace** [2] - 45:24, 46:3
**replaced** [1] - 44:17
**replay** [2] - 31:12, 32:2
**report** [2] - 21:12, 63:11
**REPORTER** [1] - 97:1
**reporter** [5] - 3:20, 3:21, 37:8, 38:19, 71:5
**Reporter** [3] - 2:5, 2:5, 97:11
**reports** [1] - 5:16
**representation** [1] - 90:12
**representations** [1] - 90:3
**represented** [1] - 82:5
**represents** [1] - 89:14
**Republican** [5] - 49:14, 49:24, 49:25, 50:17
**reputation** [1] - 34:5, 40:1, 40:14, 41:3, 41:10, 41:16, 42:24, 43:14, 43:20, 43:22, 43:23, 44:5, 44:8, 59:1
**reputational** [1] - 33:25
**request** [4] - 3:4, 5:13, 11:14, 17:7
**requested** [6] - 11:11, 11:22, 12:23, 14:22, 17:5, 17:21
**requesting** [1] - 12:3
**requests** [1] - 12:11
**required** [2] - 28:19, 28:21
**requirement** [2] - 28:22, 29:8
**research** [1] - 58:7
**resolve** [1] - 30:25
**resolved** [4] - 26:17, 26:23, 27:25, 28:6
**respect** [1] - 28:18
**respecting** [1] - 89:6
**respond** [3] - 7:11, 12:11, 93:6
**responded** [1] - 94:9
**respondent** [1] - 89:22
**responding** [1] - 15:21
**response** [1] - 96:9
**responsible** [1] - 69:9
**responsive** [1] - 49:5
**restaurant** [1] - 75:10
**restoring** [1] - 40:8
**result** [5] - 53:24,

54:6, 54:13, 72:12
**results** [3] - 21:12, 21:22, 40:16
**resume** [2] - 18:2, 94:21
**returning** [1] - 62:3
**reverse** [1] - 4:1
**review** [5] - 9:8, 46:11, 46:21, 47:1, 47:15
**reviewed** [2] - 47:6, 47:10
**Rickey** [1] - 51:10
**riddled** [1] - 73:7
**right-hand** [1] - 92:5
**rightly** [1] - 83:24
**Rion** [2] - 37:8, 77:9
**risk** [1] - 74:25
**RMR** [1] - 2:5
**robbers** [1] - 76:24
**role** [1] - 85:3
**roll** [1] - 7:9
**Room** [2] - 2:6, 97:12
**room** [2] - 32:14, 79:14
**Ruby** [1] - 1:3
**Rudolph** [1] - 1:6
**Rudy** [6] - 19:15, 37:9, 52:13, 52:21, 71:7, 89:18
**ruin** [11] - 3:17, 11:5, 11:9, 12:9, 13:9, 13:10, 13:16, 14:2, 14:3, 14:19, 14:23
**ruining** [1] - 43:23
**rule** [1] - 5:12
**ruled** [2] - 80:5, 91:17
**ruling** [5] - 10:6, 10:8, 10:24, 11:13, 17:10
**rulings** [5] - 3:11, 10:7, 10:16, 17:9, 17:12
**rumors** [1] - 71:12
**runner's** [1] - 31:16
**running** [3] - 13:20, 16:8, 50:17

## S

**safe** [1] - 75:1
**safety** [1] - 74:25
**satisfy** [2] - 11:18, 16:18
**saving** [1] - 10:11
**savings** [6] - 58:22, 61:7, 61:10, 61:11, 61:14, 61:18
**saw** [14] - 18:16, 23:2, 23:3, 23:7, 23:8, 23:10, 48:15, 48:17, 49:10, 49:15, 55:1, 58:12,

94:8
**scan** [1] - 29:3
**school** [1] - 76:19
**scope** [1] - 79:18
**Scott** [1] - 55:20
**screamed** [1] - 44:11
**screaming** [1] - 65:14
**scroll** [1] - 79:7
**scrutinized** [1] - 50:4
**search** [3] - 40:16, 54:9, 58:2
**seat** [1] - 29:2
**second** [8] - 11:4, 15:15, 31:12, 73:10, 79:8, 79:10, 82:7, 85:13
**secondly** [2] - 16:6, 91:19
**seconds** [1] - 23:7
**secretary** [1] - 74:12
**Secretary** [2] - 25:7, 30:11
**security** [10] - 48:10, 55:23, 55:25, 56:2, 74:24, 75:1, 75:23, 76:4, 76:5, 76:13
**see** [29] - 5:11, 5:19, 6:6, 14:17, 23:4, 23:18, 26:8, 26:10, 26:11, 26:13, 26:17, 27:7, 32:15, 36:24, 37:14, 48:21, 57:6, 57:14, 58:11, 58:18, 65:3, 66:16, 72:4, 72:20, 72:22, 77:6, 82:9, 85:15, 96:7
**seeing** [1] - 65:24
**seeking** [4] - 68:20, 69:3, 69:4, 69:6
**segregated** [1] - 49:14
**segregation** [1] - 38:11
**self** [3] - 61:25, 94:10, 94:16
**self-incrimination** [2] - 94:10, 94:16
**Senate** [1] - 23:23
**send** [5] - 50:21, 63:2, 63:15, 63:18, 76:23
**sending** [3] - 63:5, 63:20, 64:6
**sense** [5] - 15:7, 16:21, 22:6, 55:13, 73:14
**sent** [1] - 48:17
**sentences** [1] - 90:18
**separate** [3] - 3:4, 36:23, 57:14
**September** [1] - 70:5
**service** [1] - 40:24

**serving** [1] - 89:22
**set** [2] - 61:11, 89:13
**settled** [4] - 14:12, 36:21, 37:16, 71:14
**settlement** [3] - 37:25, 38:4, 38:18
**seven** [1] - 56:15
**Shakes** [1] - 50:14
**sharing** [1] - 54:15
**Shin** [3] - 69:22, 69:25, 70:6
**shopping** [1] - 76:18
**shortened** [1] - 23:24
**Show** [1] - 51:10
**show** [4] - 15:8, 47:10, 71:17
**showed** [1] - 57:24
**showing** [2] - 23:5, 57:21
**shows** [3] - 79:4, 79:12, 89:2
**shut** [3] - 63:22, 65:23, 66:6
**sibley** [1] - 2:1
**SIBLEY** [101] - 5:22, 6:12, 6:17, 6:23, 7:2, 7:13, 7:25, 8:2, 8:24, 9:3, 9:10, 9:18, 10:25, 14:25, 15:4, 15:13, 16:1, 16:11, 16:25, 17:15, 18:9, 18:11, 19:23, 20:23, 21:8, 24:15, 26:25, 27:13, 28:1, 28:9, 29:23, 30:9, 31:23, 32:8, 33:1, 33:18, 35:20, 36:13, 36:17, 38:7, 39:1, 42:17, 43:5, 43:7, 43:9, 43:11, 43:12, 45:1, 45:7, 45:13, 49:5, 49:19, 50:25, 51:5, 52:3, 52:17, 52:19, 53:16, 53:19, 54:4, 55:7, 61:5, 65:17, 68:14, 69:1, 69:8, 69:19, 71:25, 72:6, 73:11, 78:20, 79:17, 80:2, 80:9, 80:14, 81:17, 81:19, 81:21, 81:23, 82:2, 82:6, 82:9, 82:17, 82:19, 83:18, 83:20, 84:4, 84:7, 84:16, 86:12, 87:14, 87:19, 87:24, 88:3, 88:8, 88:10, 88:12, 88:14, 91:16, 92:11, 93:22
**Sibley** [43] - 2:1, 4:3, 4:8, 5:14, 8:2, 8:20, 11:6, 11:25, 12:3, 13:4,

14:6, 14:8, 14:15, 14:21, 18:7, 18:13, 26:18, 26:20, 38:5, 38:6, 54:3, 68:12, 68:25, 69:16, 71:23, 74:23, 76:9, 76:22, 77:7, 77:14, 79:25, 81:15, 82:20, 82:25, 83:4, 83:15, 86:9, 87:11, 87:16, 88:24, 90:20, 91:15, 93:21
**Sibley's** [1] - 11:19
**Sibley...................18** - 98:3
**side** [5] - 52:12, 58:5, 93:8, 96:7
**side-by-side** [1] - 58:5
**signed** [1] - 29:18
**significance** [1] - 66:21
**significant** [2] - 17:6, 91:12
**signs** [1] - 48:8
**simply** [1] - 14:23
**single** [2] - 71:5, 93:7
**sit** [4] - 9:14, 21:11, 24:10, 75:12
**sits** [1] - 9:15
**sitting** [4] - 21:20, 43:14, 43:20, 52:8
**situation** [5] - 9:1, 9:24, 11:7, 11:9, 67:6
**six** [3] - 90:24, 90:25, 91:1
**size** [1] - 17:5
**small** [1] - 29:2
**smaller** [2] - 61:20
**Smiley** [1] - 51:10
**snowball** [1] - 30:22
**social** [5] - 52:24, 52:25, 53:2, 64:8, 64:17
**someone** [21] - 6:6, 23:15, 23:24, 26:6, 26:10, 27:6, 29:1, 29:7, 29:9, 35:11, 35:14, 35:24, 40:15, 41:23, 42:12, 50:11, 50:18, 54:19, 54:23
**sometimes** [2] - 39:18, 42:19
**somewhere** [1] - 35:22
**son** [5] - 34:17, 34:25, 35:14, 48:20, 64:2
**son's** [1] - 73:7
**soon** [2] - 30:20
**sooner** [1] - 66:25
**sorry** [12] - 19:21, 31:10, 34:8, 34:11,

36:1, 45:15, 51:23, 54:25, 66:23, 70:14, 87:24, 95:11

**sort** [6] - 7:19, 7:24, 15:2, 17:7, 26:21, 31:3

**sound)** [1] - 50:10

**sounds** [2] - 29:7, 66:22

**sources** [1] - 6:19

**SPAM** [1] - 64:7

**Spaulding** [1] - 79:7

**spawned** [1] - 54:23

**speaking** [10] - 32:11, 39:19, 39:20, 39:21, 52:11, 55:12, 62:24, 72:2, 79:21

**special** [1] - 94:4

**specific** [5] - 3:12, 68:20, 90:7, 90:9, 90:10

**specifically** [2] - 6:25, 37:23

**speculation** [8] - 26:15, 35:16, 50:23, 51:2, 51:25, 52:16, 53:25, 55:4

**speech** [1] - 13:22

**speeches** [2] - 15:5, 15:6

**spend** [1] - 44:9

**spew** [3] - 41:25, 44:18, 51:9

**spewed** [1] - 64:3

**spewing** [3] - 41:6, 51:10, 51:15

**Spicer** [1] - 90:12

**spoken** [4] - 39:9, 39:17, 39:18, 66:20

**sports** [1] - 31:1

**spouting** [1] - 10:6

**spread** [11] - 30:20, 36:7, 46:8, 46:9, 71:12, 71:14, 77:8, 77:18, 77:20, 84:5, 84:6

**spreading** [2] - 15:20, 85:3

**staff** [1] - 48:12

**stand** [10] - 5:15, 5:16, 5:18, 5:20, 6:20, 8:9, 10:9, 17:12, 18:2, 42:5

**standard** [1] - 25:6

**standing** [1] - 52:10

**stands** [1] - 10:8

**start** [5] - 4:1, 62:25, 71:8, 74:14, 95:6

**started** [5] - 34:21, 57:13, 66:17, 71:7, 71:11

**starting** [2] - 4:2, 88:17

**state** [2] - 83:13, 92:1

**State** [13] - 20:24, 22:20, 22:25, 24:19, 25:8, 28:23, 29:19, 30:11, 33:22, 47:19, 48:3, 49:1, 95:21

**state's** [1] - 74:12

**statement** [9] - 5:6, 5:8, 10:24, 11:4, 11:19, 16:15, 16:22, 41:20, 90:4

**statements** [49] - 3:14, 3:22, 4:2, 4:11, 4:24, 4:25, 5:3, 5:4, 5:17, 5:20, 7:1, 7:18, 8:10, 8:11, 8:13, 10:7, 10:15, 10:19, 11:1, 11:8, 12:2, 12:15, 19:3, 27:2, 27:11, 32:21, 33:3, 34:12, 37:3, 37:5, 44:14, 50:21, 51:7, 53:9, 54:7, 55:3, 57:11, 83:21, 84:1, 84:16, 84:25, 85:1, 89:20, 91:10, 91:11, 92:7

**States** [1] - 2:6

**STATES** [2] - 1:1, 1:10

**states** [1] - 90:13

**stating** [1] - 11:15

**station** [1] - 53:11

**stayed** [3] - 56:22, 79:14

**steal** [1] - 31:12

**stealing** [1] - 50:12

**steer** [1] - 9:23

**stenographic** [1] - 97:5

**step** [2] - 5:8, 5:9

**steps** [1] - 40:13

**steroids** [2] - 28:1, 28:3

**still** [14] - 13:23, 22:3, 22:18, 41:6, 41:21, 43:22, 57:17, 57:19, 58:16, 64:3, 65:22, 66:10, 71:15, 84:18

**stipulation** [9] - 88:20, 88:23, 89:5, 89:7, 89:8, 90:22, 90:25, 92:12

**stolen** [1] - 90:15

**stomach** [1] - 15:2

**stood** [2] - 42:2, 42:7

**stop** [3] - 4:10, 30:25, 84:2

**stories** [4] - 45:8, 45:9, 45:17, 54:14

**story** [5] - 7:4, 46:7, 58:1, 71:7, 78:2

**straits** [1] - 9:23

**Strategic** [3] - 83:13,

84:14, 84:17

**strategy** [1] - 11:25

**Street** [4] - 1:14, 1:18, 1:23, 2:2

**street** [3] - 25:14, 27:6, 61:18

**stress** [4] - 62:13, 65:19, 67:13, 70:4

**stressful** [3] - 20:15, 62:12, 62:17

**strike** [1] - 34:8

**strong** [1] - 65:11

**stuff** [3] - 18:23, 43:25, 47:15

**subject** [2] - 4:23, 47:20

**submitted** [1] - 67:24

**subscribed** [1] - 40:20

**subscribers** [1] - 51:19

**substantial** [3] - 3:18, 9:20, 13:20

**substantive** [2] - 93:9, 93:18

**sue** [1] - 33:6

**sued** [2] - 37:7, 76:9

**suffering** [3] - 61:23, 65:19, 70:21

**sufficient** [1] - 44:16

**suggest** [1] - 12:2

**suggested** [2] - 29:19, 62:11

**suggesting** [1] - 11:16

**suggestion** [4] - 19:2, 29:12, 29:13, 55:22

**suggestions** [1] - 23:21

**suing** [3] - 33:25, 78:2, 78:15

**suit** [2] - 9:15, 71:16

**suitcase** [1] - 47:22

**suitcases** [2] - 79:4, 79:12

**Suite** [2] - 1:23, 2:2

**summaries** [1] - 83:13

**supervisor** [2] - 57:8, 79:5

**supervisors** [1] - 79:13

**support** [2] - 7:22, 58:21

**supporting** [1] - 90:11

**suppose** [2] - 62:8, 91:2

**surprise** [6] - 20:4, 20:6, 20:9, 33:11, 33:20, 72:24

**surprised** [2] - 44:2, 93:18

**sustain** [1] - 28:4

**sustained** [11] - 20:22, 21:7, 28:8, 29:22, 32:6, 43:4, 45:6, 50:24, 52:18, 54:2, 69:18

**T**

**table** [3] - 47:23, 79:5, 79:13

**tabulation** [1] - 79:6

**tabulations** [1] - 48:12

**tagged** [1] - 31:17

**talkie** [1] - 43:9

**talks** [1] - 12:9

**task** [1] - 25:6

**tasks** [1] - 25:9

**taxes** [2] - 13:2, 56:17

**team** [3] - 89:15, 89:17, 92:6

**Team** [12] - 23:2, 36:16, 54:17, 55:16, 77:11, 79:8, 79:10, 79:16, 80:3, 80:12, 80:19, 80:24

**teams** [1] - 31:4

**technically** [1] - 95:19

**telephones** [1] - 37:19

**temporary** [2] - 25:2, 66:12

**ten** [1] - 73:17

**ten-minute** [1] - 73:17

**terms** [1] - 8:20

**terrified** [1] - 75:14

**territory** [1] - 7:24

**terrorizing** [1] - 57:21

**test** [3] - 10:3, 12:15, 14:3

**tested** [1] - 17:14

**testified** [3] - 47:7, 68:23, 69:4

**testifies** [2] - 3:19, 41:14

**testify** [11] - 3:20, 5:2, 5:15, 5:17, 6:10, 8:9, 39:25, 46:25, 47:1, 64:13, 85:25

**testifying** [7] - 4:11, 4:23, 4:25, 5:3, 9:25, 13:12, 15:10

**testimony** [27] - 4:5, 4:19, 5:5, 5:23, 10:18, 15:12, 15:14, 15:16, 15:22, 17:3, 20:21, 46:12, 46:21, 48:16, 81:7, 81:8, 85:2, 85:22, 86:7, 86:20, 86:22, 89:1, 91:14, 93:3, 95:15

**text** [3] - 39:16, 39:20, 72:10

**thankfully** [1] - 75:15
**THE** [177] - 1:1, 1:1, 1:10, 3:2, 3:7, 4:1, 5:11, 6:10, 6:13, 6:22, 6:25, 7:10, 7:24, 8:1, 8:4, 8:25, 9:6, 9:11, 10:2, 11:3, 11:23, 12:6, 13:2, 13:11, 13:14, 13:23, 14:12, 14:21, 15:1, 15:10, 15:15, 16:8, 16:22, 17:2, 17:17, 18:1, 18:5, 18:7, 19:18, 19:21, 20:22, 21:7, 24:14, 26:16, 26:20, 27:9, 27:17, 28:2, 28:8, 29:22, 30:8, 32:6, 32:24, 32:25, 33:16, 33:17, 35:17, 35:18, 36:14, 36:16, 37:21, 38:3, 38:17, 38:22, 42:16, 43:4, 43:6, 43:8, 43:10, 44:23, 44:25, 45:6, 45:11, 49:6, 49:7, 50:24, 51:2, 51:23, 52:1, 52:18, 53:17, 54:2, 55:5, 55:6, 65:8, 65:9, 68:8, 68:10, 68:16, 68:23, 68:25, 69:2, 69:12, 69:16, 69:18, 71:22, 72:2, 73:13, 73:17, 73:20, 73:22, 73:25, 78:6, 78:10, 78:19, 78:21, 78:24, 79:21, 79:25, 80:6, 80:15, 81:3, 81:15, 81:18, 81:20, 81:22, 81:24, 82:4, 82:12, 82:16, 82:18, 82:20, 83:3, 83:7, 83:10, 83:15, 83:19, 83:25, 84:5, 84:9, 84:21, 85:5, 85:7, 85:13, 85:19, 85:23, 86:9, 86:13, 86:23, 87:1, 87:6, 87:13, 87:16, 87:20, 88:1, 88:4, 88:7, 88:9, 88:11, 88:13, 88:15, 88:17, 89:7, 89:11, 90:7, 90:17, 90:20, 91:5, 91:9, 91:15, 92:4, 92:12, 92:17, 92:22, 93:5, 93:24, 94:1, 94:3, 95:2, 95:11, 95:13, 95:16, 95:19, 95:22, 96:1, 96:3, 96:4, 96:6
**theme** [1] - 16:8
**themselves** [2] - 19:13, 26:4

**theoretically** [1] - 91:2
**theory** [1] - 84:6
**therapist** [5] - 62:4, 69:20, 70:8, 70:21, 75:9
**therapy** [4] - 65:6, 66:17, 66:25, 67:10
**thereof** [1] - 77:12
**thin** [2] - 6:8, 7:4
**third** [3] - 10:25, 93:14, 94:13
**third-party** [1] - 93:14
**thorough** [1] - 10:13
**threat** [1] - 61:17
**threatening** [5] - 62:22, 63:3, 63:14, 63:16
**threats** [1] - 48:4
**three** [9] - 3:12, 3:19, 3:24, 12:1, 62:20, 82:24, 83:5, 83:16, 87:2
**threw** [1] - 48:9
**throughout** [4] - 54:22, 55:1, 72:17, 91:21
**throw** [1] - 32:3
**tied** [1] - 35:13
**timeframe** [1] - 30:18
**title** [1] - 57:7
**today** [9] - 43:14, 46:12, 46:21, 46:24, 46:25, 52:8, 62:19, 67:15, 96:6
**together** [4] - 8:5, 36:6, 54:21, 62:1
**tomorrow** [3] - 95:4, 95:7, 96:8
**took** [8] - 19:5, 20:6, 31:7, 45:16, 45:22, 45:25, 57:20, 61:14
**torch** [3] - 54:18, 54:20, 71:9
**tormented** [1] - 48:12
**total** [2] - 15:23, 17:10
**totally** [1] - 41:19
**towards** [1] - 27:11
**train** [1] - 36:5
**training** [1] - 25:3
**transcript** [8] - 81:13, 82:1, 82:3, 86:7, 87:14, 88:1, 97:4, 97:5
**TRANSCRIPT** [1] - 1:9
**travelling** [1] - 66:1
**treatise** [3] - 8:2, 8:5, 8:7
**treatment** [2] - 48:4, 65:4
**trial** [7] - 7:14, 19:5, 54:23, 55:2, 55:19,

75:25, 94:22
**TRIAL** [2] - 1:4, 1:9
**tried** [1] - 65:11
**tries** [2] - 31:12, 41:25
**true** [20] - 3:16, 3:23, 4:12, 5:8, 5:9, 5:17, 5:21, 7:18, 8:12, 10:10, 10:20, 14:2, 26:23, 29:16, 50:24, 77:8, 77:11, 84:18, 97:4, 97:5
**Trump** [23] - 23:2, 33:10, 36:16, 49:8, 49:11, 54:17, 55:16, 71:7, 71:11, 77:11, 79:8, 79:10, 79:16, 80:3, 80:12, 80:19, 80:25, 89:20, 89:21, 89:23, 89:24, 90:15
**Trump's** [1] - 89:15
**truth** [12] - 4:24, 4:25, 44:10, 44:17, 45:20, 45:25, 46:3, 47:2, 47:3, 52:11, 91:10
**try** [8] - 30:24, 40:14, 41:2, 62:1, 63:3, 75:9, 75:12, 95:12
**trying** [9] - 7:2, 20:18, 27:3, 58:15, 61:25, 69:7, 71:25, 82:20, 90:5
**turn** [3] - 12:11, 49:10, 68:17
**turned** [4] - 57:24, 58:4, 68:11, 68:19
**turning** [1] - 3:2
**TV** [3] - 30:23, 53:8, 67:5
**Tweet** [7] - 54:16, 79:8, 79:10, 83:1, 83:8, 83:11, 83:12
**Tweeted** [4] - 23:3, 33:13, 54:16, 54:17
**Tweeting** [1] - 83:12
**Tweets** [1] - 33:9
**Twitter** [1] - 58:9
**two** [7] - 3:17, 23:17, 48:13, 57:14, 65:1, 79:20, 87:4
**TX** [1] - 2:2
**type** [1] - 40:11

**U**

**um-hum** [3] - 23:14, 46:2, 78:6
**unable** [2] - 11:17, 22:12
**unchartered** [1] - 7:24
**uncomfortable** [1] -

48:15
**under** [8] - 4:5, 4:11, 7:12, 9:12, 28:19, 47:23, 79:5, 79:13
**understood** [2] - 27:5, 30:14
**unduly** [1] - 92:1
**unedited** [2] - 24:2, 24:6
**unfair** [1] - 13:6
**unfortunate** [1] -
48:17
**unfortunately** [6] -
18:17, 48:21, 61:23, 63:21, 74:18, 75:20
**unheard** [1] - 76:6
**UNITED** [2] - 1:1, 1:10
**United** [1] - 2:6
**universe** [2] - 68:22, 82:21
**unless** [2] - 6:3, 15:2
**unlike** [4] - 9:7, 9:15, 89:18, 92:4
**unsafe** [1] - 76:2
**up** [26] - 6:8, 8:15, 10:14, 10:20, 11:24, 17:24, 21:11, 25:25, 32:14, 36:6, 38:3, 45:20, 48:13, 52:10, 54:9, 57:21, 63:5, 63:12, 69:1, 69:13, 74:15, 74:22, 76:19, 80:22, 95:3, 95:5
**urinal** [1] - 32:17
**URL** [1] - 58:11
**USB** [1] - 47:24
**useful** [1] - 9:13

**V**

**value** [1] - 40:5
**variety** [1] - 89:20
**various** [1] - 12:13
**veracity** [1] - 12:15
**verbatim** [1] - 46:6
**version** [4] - 23:25, 24:1, 24:2, 24:6
**vests** [1] - 41:22
**vials** [1] - 77:3
**victory** [1] - 89:16
**video** [29] - 22:20, 23:2, 23:8, 23:9, 23:10, 23:15, 23:16, 23:22, 23:25, 24:10, 24:17, 24:21, 26:8, 27:14, 31:15, 31:20, 32:3, 33:13, 33:21, 47:10, 50:4, 50:6, 54:15, 55:12, 79:4, 79:12, 85:11, 85:20, 95:14

Video........................
................85 [1] - 98:5
Video........................
................86 [1] - 98:7
Video........................
................92 [1] - 98:8
videos [5] - 22:20,
22:22, 22:25, 23:4,
50:8
videotape [3] - 86:1,
94:5, 94:8
videotaped [1] - 86:22
view [1] - 48:12
viewers [1] - 51:16
vindicate [1] - 40:10
violates [1] - 5:10
violations [1] - 3:9
violence [3] - 53:23,
54:6, 54:8
virtually [1] - 14:4
voice [1] - 72:10
Von [1] - 1:22
vote [7] - 22:17, 22:21,
24:23, 29:1, 48:5,
49:22, 76:16
voted [1] - 28:25
voter [1] - 90:1
voters [1] - 49:9
votes [14] - 20:18,
20:25, 21:11, 21:13,
21:21, 22:9, 22:15,
26:7, 26:12, 27:6,
28:13, 28:20, 28:23,
79:15
vs [1] - 1:5

## W

waiting [3] - 21:12,
22:1, 22:5
wake [1] - 74:21
walk [2] - 48:11, 75:11
walked [1] - 57:12
walkie [1] - 43:9
walkie-talkie [1] - 43:9
wall [1] - 49:22
wANDREA [1] - 98:3
Wandrea [1] - 1:3
wants [2] - 21:13, 29:7
Washington [4] - 1:6,
1:19, 2:7, 97:13
waste [1] - 27:12
watch [8] - 21:11,
22:1, 23:15, 24:10,
24:16, 24:21, 25:20,
79:12
watched [3] - 23:18,
31:11, 50:4
watchers [1] - 25:24
water [4] - 7:12, 32:12,

32:13, 47:25
ways [1] - 10:11
wearing [1] - 41:22
website [1] - 78:14
week [1] - 56:15
weeks [2] - 23:17,
48:13
weigh [1] - 93:15
weight [2] - 93:17,
94:18
well-known [1] - 15:2
well-spoken [1] -
66:20
white [2] - 44:7, 49:15
whole [9] - 8:15, 24:9,
24:11, 24:16, 24:17,
41:24, 76:8, 80:24,
90:22
willful [1] - 27:24
Willkie [1] - 1:18
Wisconsin [1] - 90:14
WITNESS [11] - 18:5,
19:21, 32:25, 33:17,
35:18, 36:16, 44:25,
49:7, 51:23, 55:6, 65:9
witness [12] - 15:18,
38:4, 50:9, 69:7, 73:11,
78:9, 81:5, 85:24,
86:21, 93:13, 94:8,
95:6
witness's [1] - 51:25
witnesses [4] - 10:12,
19:4, 41:12, 90:1
WITNESSES [1] - 98:2
Womack [2] - 69:22,
70:8
women [1] - 47:21
won [4] - 21:13, 21:22,
22:2, 22:17
wondering [4] - 47:5,
48:2, 68:15, 94:11
word [1] - 71:6
words [6] - 7:3, 13:9,
34:2, 50:10, 50:15,
55:11
worker [3] - 21:25,
42:1, 66:12
workers [5] - 41:20,
41:22, 49:16, 79:6,
79:14
world [2] - 54:10, 74:9
worry [1] - 76:19
worse [2] - 64:24, 65:2
worth [3] - 12:24,
13:21, 16:14
write [3] - 8:2, 8:8,
71:4
writing [2] - 46:20,
71:5
written [1] - 58:6

wrote [2] - 8:5, 86:6

## Y

year [7] - 40:24, 56:10,
56:11, 56:14, 56:15,
70:5, 75:4
years [4] - 25:1, 25:2,
62:20
Yellow [1] - 35:23
yesterday [3] - 3:22,
4:2, 55:20
yourself [2] - 18:4,
58:21
yourselves [2] - 36:23,
94:24

## Z

zero [1] - 15:25
Zoom [1] - 79:8