UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
RUBY FREEMAN, et al.,            )  Civil Action
              Plaintiffs,        )  No. 21-3354
vs.                              )
                                 )
RUDOLPH GIULIANI,                )  December 13, 2023
                                 )  9:02 a.m.
              Defendant.         )  Washington, D.C.
  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**\* <u>Morning Session</u> \***
**TRANSCRIPT OF TRIAL**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT JUDGE**

<u>**APPEARANCES**</u>:


FOR PLAINTIFFS:    MICHAEL GOTTLIEB
                   MERYL CONANT GOVERNSKI
                   ANNIE HOUGHTON-LARSEN
                   AARON NATHAN
                   Willkie Farr & Gallagher LLP
                   1875 K Street, Suite 100
                   Washington, DC 20006
                   (202) 303-1016
                   Email: mgovernski@willkie.com


                   VON A. DuBOSE
                   DuBose Miller
                   75 14th Street NE
                   Atlanta, GA 30309
                   (404) 720-8111
                   Email:  miller@dubosemiller.com


                   JOHN LANGFORD
                   Protect Democracy
                   555 W. 5th Street
                   Los Angeles, CA 90013
                   (919) 619-9819
                   Email: john.langford@protectdemocracy.org


***(Appearances Continued)***

<u>APPEARANCES</u>:   (Continued)


FOR DEFENSE:    JOSEPH D. SIBLEY, IV
                Camara & Sibley LLP
                1108 Lavaca Street
                Suite 110263
                Austin, TX 78701
                (713) 966-6789
                Email: sibley@camarasibley.com




Court Reporter:  ELIZABETH SAINT-LOTH
                 Official Court Reporter
                 Washington, D.C.  20001


         Proceedings reported by machine shorthand.
      Transcript produced by computer-aided transcription.

1                       **P R O C E E D I N G**

2              THE COURTROOM DEPUTY:  Your Honor, this is Civil

3     Action 21-3354, Ruby Freeman, et al. versus Rudolph

4     Giuliani.

5              Would the parties please come forward to the

6     lectern and identify yourselves for the record.  We'll start

7     with plaintiff counsel first this morning.

8              MR. GOTTLIEB:  Good morning, Your Honor.

9              Mike Gottlieb from Willkie Farr & Gallagher on

10    behalf of the plaintiffs.  With me at counsel's table is

11    Meryl Governski, Annie Houghton-Larsen, Von DuBose from

12    DuBose Miller, John Langford from Protect Democracy, and our

13    clients, Ruby Freeman and Shaye Moss.

14             THE COURT:  Thank you.  Good morning.

15             MR. SIBLEY:  Good morning, Your Honor.

16             Joe Sibley for the defendant.

17             THE COURT:  Good morning.

18             All right.  So the one last part of the three

19    parts of the plaintiffs' motion in limine that I think was

20    filed, I think, the day before yesterday at this point, in

21    the evening, has to do with the issue that plaintiffs have

22    requested that defendant and his counsel be barred or

23    precluded from arguing about proximate cause as a way to

24    limit damages, which has been sort of a running issue

25    throughout the trial.  And to my mind, it's a little bit

1    complicated in the context of a default judgment.

2            I don't fault the parties for either having this

3    dispute or trying to figure it out, as we're all sort of

4    working our way through how complicated this is.  When there

5    is a jury deciding liability, it all sort of naturally flows

6    from those standards of proof that guide the liability

7    decision so none of the templates, shall we say, in the

8    standard jury instructions set out in any of the model

9    rules, either for D.C. or model federal jury instructions

10   provide an answer in the context we have here.

11           Let me hear first from Mr. Gottlieb about this.

12           MR. GOTTLIEB:  Your Honor, we have laid out our

13   positions in the papers.  We think that the distinction

14   between proximate cause as to liability and proximate cause

15   in the context of a default judgment as to damages is pretty

16   clearly laid out in the Second Circuit cases.  And the

17   problem is --

18           THE COURT:  You're talking about *Greyhound*?

19           MR. GOTTLIEB:  Yes.  *Greyhound* following the

20   *TWA* --

21           THE COURT:  I mean, this is the issue with

22   *Greyhound*.  *Greyhound* didn't involve IIED.  It involved

23   damages that were a little bit more precise to calculate.

24           You know, in *Greyhound* they set out the issue we

25   have here; stating:  If we were to allow a defaulting party

1    to contest liability and interpose general set-offs at the

2    damages inquest, we would eviscerate the rule governing

3    defaults, and for all practical purposes deprive the

4    district courts of this important case management tool.

5    Precise issue we have here.  Okay.  They've got it.

6           They go on to say:  On the other hand, a

7    defaulting party must be permitted to contest the actual

8    compensatory amount claimed with respect to any particular

9    item of damages including through proof of mitigation of

10   damages.  That's exactly the situation we have here.

11          We have a defaulting party.  We can't allow

12   Mr. Giuliani to eviscerate the sanction of the default

13   judgment but at the same time he has the right to contest

14   damages as he is doing here.  And Mr. Sibley is contesting

15   damages to the extent that he's saying, you know, in terms

16   of what naturally flows from any of the defamatory

17   statements or what is reasonably foreseeable to flow from

18   those defamatory statements; it's got to stop somewhere.

19          It can't just be everything the plaintiff says is

20   covered is covered.  What's the context?  What's the factual

21   dispute the plaintiff has to resolve?

22          He has a good point, don't you think?

23          MR. GOTTLIEB:  I understand the point, Your Honor.

24   And I understand that the context makes it particularly

25   difficult here.  I think that where that line is drawn is

1        it's drawn after the injuries that are described and alleged

2        in the complaint.  In other words, the link that he is not

3        allowed to challenge is the link between Mr. Giuliani and

4        the injuries in the alleged complaint because this Court has

5        already held that Mr. Giuliani caused the injuries alleged

6        in the complaint.  It's where you are quantifying the

7        injuries that he is allowed to challenge the link.  So from

8        Mr. Giuliani --

9                    THE COURT:  What does that mean?

10                   MR. GOTTLIEB:  What it means is, I actually think

11       this case actually provides a -- some amount of detail,

12       right?

13                   So what he can't say is:  I am not responsible for

14       the fact that Ms. Freeman and Ms. Moss received threats.

15       Because we alleged in our complaint that his actions

16       directly led to them receiving threats.

17                   What he is allowed to challenge is the threats

18       that you are bringing out in evidence are not the kinds of

19       threats that are the injuries in the complaint.  That is the

20       precise type of mitigation or damages arguments that the

21       court is talking about in *Greyhound* and *TWA*.

22                   So in other words, saying that the damages that

23       our expert is measuring, the impressions, for example, that

24       Dr. Humphries measures from the defamatory statements, that

25       those impressions don't actually follow.

```
 1            THE COURT:  So I think -- I don't want to put
 2      words in Mr. Sibley's mouth.  But I think this has been
 3      where he's going, that you are bound by the four corners of
 4      the complaint because all of the emails we've seen from
 5      third-party -- I am going to call them "strangers," not Team
 6      Trump, but the strangers with the really vile emails, the
 7      whole pizza delivery threats, those are not in the amended
 8      complaint.
 9            And so Mr. Sibley is basically arguing:  "That
10      wasn't in the complaint.  I defaulted, my client defaulted.
11      So, okay, we're -- we have to eat everything that is in the
12      amended complaint."
13            But those particular email threats aren't listed
14      in the complaint, so why shouldn't he have a right to debate
15      whether those threats were reasonably foreseeable or
16      naturally flowed from his defamatory statements?  That's why
17      we have a jury, to make that factual argument.
18            And I don't think that Greyhound helps you on
19      this.  Greyhound noticed that that was -- that's the tension
20      in a defaulting situation.  You are asking me basically to
21      say anything the plaintiff says naturally flowed, whether
22      it's in the complaint or not, from any third parties decides
23      the issue.  So then what are we contesting here?
24            MR. GOTTLIEB:  Your Honor, I take the Court's
25      point on that.
```

1          But with respect -- there is a second argument

2     he's making with respect to causation, which is that other

3     people are responsible.  That is a separate proximate cause

4     argument, and I do think it is barred by the complaint; and

5     I think it's barred by the Court's prior ruling with respect

6     to conspiracy.

7          So when Mr. Sibley is eliciting testimony that

8     actually Mr. Giuliani is not the one who's responsible for

9     disseminating all of these statements because there's a

10    Gateway Pundit and there's all these other people, that is

11    exactly the type of proximate cause argument as to liability

12    that should be barred even under the reading of *Greyhound*

13    that Your Honor has noted.

14         THE COURT:  Let me just say, I think that this is

15    one where the model instructions fall flat, aren't helpful.

16    That to give guidance to the jury, an additional instruction

17    about -- in quantifying -- doing your job of quantifying the

18    compensatory damages owed, they have to apply their common

19    sense to their judgment.  It's what is reasonable, and it's

20    what's reasonably foreseeable.

21         So I do think that there needs to be an

22    instruction on that.  I don't want to turn this into a

23    charging conference, but I have added that to the

24    instructions that I will circulate for review because I

25    think that that is appropriate.

```
 1              Anything else?  We're on the clock here.
 2              MR. GOTTLIEB:  The only other thing I'd say,
 3    Your Honor, is that the problem with that is that, of
 4    course, this is a presumed damages case with respect to
 5    reputational damage.  And with respect to reputational
 6    damage, that's not our burden.  Our burden is not to
 7    demonstrate that type of causation.  So I would agree --
 8              THE COURT:  Presumed, presumed damages.  Now we're
 9    at the quantification of that issue.  The jury is going to
10    need some guidance about:  Is it just anything the
11    plaintiffs say?  The jury may decide that's reasonable; but
12    that's for them to decide, not for me.
13              All right.  Mr. Sibley, anything to add?
14              MR. SIBLEY:  No, Your Honor --
15              THE COURT:  I have already articulate -- for time
16    purposes, I think I have tried to articulate your position.
17              MR. SIBLEY:  Your Honor has made the argument
18    better than I can make it.
19              The only thing I would say is I do not have an
20    intention of telling the jury that he is not responsible for
21    anything, which is why I told the jury that.  So that's...
22              THE COURT:  Okay.  Got it.
23              So let me just lay out my ruling because we're in
24    somewhat uncharted territory here in the particular posture
25    of this case, so I want to lay out my reasoning.  I know
```

1     Mr. Giuliani is going to appeal this.  And for the benefit

2     of any Circuit panel that has to review this, you know,

3     maybe my thinking on this will be helpful or they'll reject

4     it.  Who knows what they'll do?  I just want to lay out my

5     reasoning here.

6              Okay.  So late Monday evening, plaintiffs filed a

7     motion in limine to preclude further violations of the

8     Court's prior orders, including a request to preclude any

9     further argument or attempts to introduce evidence or elicit

10    testimony that Mr. Giuliani is not fully responsible as a

11    proximate cause of plaintiffs' injuries alleged in the

12    amended complaint.  See ECF No. 126 at 3.

13             As plaintiffs correctly state in their motion, the

14    Court has now affirmed and reaffirmed that Mr. Giuliani and

15    his co-conspirators' conduct proximately caused plaintiffs'

16    injuries.  The only question remaining for trial is

17    quantifying that harm in monetary terms.

18             For that purpose, the only role of proximate cause

19    is ensuring that the compensation sought relates to damages

20    that naturally flow from the injuries pleaded.  See ECF 126

21    at 3, quoting my memorandum and order, I think from

22    December 7th, at page 6, docketed at ECF, 119.

23             So far so good.

24             To the extent that Mr. Sibley contends that

25    Mr. Giuliani cannot be held liable for republications of his

1    defamatory statements by numerous third-party publishers as

2    contemplated by this strategic plan authored by

3    Mr. Giuliani's legal team for Trump, which is cited in the

4    amended complaint at paragraph 12, ECF No. 22, that argument

5    is foreclosed by well-settled law that the maker -- and this

6    is a quote:  "The maker of a defamatory statement may be

7    held accountable for its republication if such republication

8    was reasonably foreseeable."  This is *Chandler v. Berlin*,

9    998 F.3d 965, jump cite 976, D.C. Circuit from 2021, quoting

10   from *Tavoulareas*, 759 F.2d 90, jump cite 136, footnote 56,

11   D.C. Circuit 1985.

12          In *Caudle v. Thomason*, 942 F. Supp. 635, a

13   district court case from 1996, another judge on this court

14   concluded that allegations that defendant, quote:  "Knew, or

15   in the exercise of reasonable care should have known, that

16   such republication would occur" ... "unquestionably

17   satisfies the requirement that the republication be

18   reasonably foreseeable."

19          This is wholly consistent with the well-settled

20   law regarding the tort of defamation in the District of

21   Columbia.  See *Oparaugo v Watts,* 884 A. 2d 63, a D.C. case

22   from D.C. Court of Appeals from 2005, stating:  "The

23   original publisher of a defamatory statement may be liable

24   for republication if the republication is reasonably

25   foreseeable."

1          In *Tavoulareas*, for example, the D.C. Circuit held

2     that a jury could find defendant responsible for defamatory

3     statements made to *Washington Post* reporters in the paper's

4     subsequent publication of those statements because:  "It was

5     reasonably foreseeable that as reporters they might

6     republish the statements in a news story," and accordingly,

7     "There was no need to require proof that defendant knowingly

8     participated in the *Post's* republication."  See *Tavoulareas*,

9     759 F.2d, at 136, note 56.

10          The D.C. Circuit later explained in *Chandler* that

11    "in such a context, while the precise date and story in

12    which a source's statements are published might not be

13    foreseeable to the source, the general type of

14    republication -- publication within days, weeks, or months

15    of the source's statements in newspapers or other media

16    outlets -- is reasonably foreseeable."

17          Discussing another case reflecting this principle,

18    *Green v Cosby*, a District of Massachusetts case from 2015,

19    the D.C. Circuit further explained that:  "Depending on the

20    context of the publication, nature of the statements at

21    issue, or other showing that defendant would have

22    anticipated relatively remote future publication, passage of

23    time alone will not necessarily render republication

24    unforeseeable."

25          Here, plaintiffs repeatedly alleged in their

1   amended complaint, which upon defendant's default are

2   assumed to be true, that Mr. Giuliani reasonably foresought

3   that his defamatory statements would be republished.  See

4   the amended complaint, at paragraph 4, stating that

5   defendant Giuliani published, caused to be published and

6   foreseeably led others to publish false accusations that

7   Ms. Freeman and Ms. Moss had committed election fraud;

8   paragraph 12 in the amended complaint stating:  Defendant

9   Giuliani launched the strategic plan, a significant part of

10  which consisted of Giuliani publishing widely lies about

11  Ms. Freeman and Ms. Moss by name.

12       He amplified his defamatory statements by

13  publishing them on a variety of channels, including on

14  television and on social media.  He encouraged those

15  listening to watch and spread the defamatory clips

16  repeatedly.  As intended, numerous third-party publishers

17  republished Giuliani's false accusations to millions of

18  viewers and readers.

19       Amended complaint at paragraph 165, Giuliani

20  published, caused to be published, or reasonably could have

21  foreseen the publication of a series of false and defamatory

22  statement of fact about Ms. Freeman and Ms. Moss, including

23  by and through his agents making the statements themselves;

24  and by republishing the statements on his website and social

25  media accounts.

1          As a reasonably foreseeable -- and intended --

2     result of defendant's statements and actions, others

3     repeated and amplified these false and defamatory

4     statements.

5          There is clear notice in the amended complaint as

6     the plaintiff said -- persistently pointed out that the

7     republication was broad.  It was intended by Mr. Giuliani

8     for broad republication, and the spread of the defamatory

9     statements unnaturally flowed.

10         The Court's December 7, 2023, memorandum opinion

11    and order addressing pretrial issues raised by Mr. Giuliani

12    rejected his challenges to the sufficiency of plaintiffs'

13    pleading of proximate cause and held that proximate

14    causation with respect to his liability on plaintiffs'

15    claims has been established.  It's no longer an issue in the

16    case, and cited the default judgment decision and order

17    directing an entry of default judgment against Giuliani

18    stating that it establishes liability for every well-pleaded

19    allegation in plaintiffs' amended complaint, including

20    plaintiffs' allegations regarding the publications and

21    republications by third parties that Mr. Giuliani could have

22    reasonably foreseen.

23         As plaintiffs correctly state in their motion

24    pending before the Court now, the Court has now affirmed and

25    reaffirmed that Mr. Giuliani and his co-conspirators'

1    conduct proximately caused plaintiffs' injuries.  The only

2    question remaining for trial is quantifying that harm in

3    monetary terms.  And for that purpose, the only role for

4    proximate cause is ensuring that the compensation sought

5    relate to the damages that naturally flow from the injuries

6    pleaded.

7         So the point of contention between the parties

8    boils down to what standard should guide the jury's

9    quantification of damages that, to quote the plaintiffs,

10   naturally flow from the injuries pleaded.  The answer cannot

11   be whatever plaintiffs say is a covered injury makes it so.

12        Insofar as Mr. Sibley argues that Mr. Giuliani

13   cannot be held responsible for the "onslaught of violent and

14   racist threats and harassment" by third parties, which

15   followed his defamatory campaign, that argument is at odds

16   with case law in this district.

17        In *Secord v Schlachter*, 568 F. Supp.  56, a D.D.C.

18   case from 1983, for example, the District Court for D.C.

19   held that, following the entry of default judgment,

20   plaintiff was entitled to compensatory and punitive damages

21   for harm caused by statements made by the nonappearing

22   defendant, which harm included reporters calling him

23   constantly through the summer of 1982; the FBI investigating

24   him; he and his family being questioned and ridiculed by

25   strangers, acquaintances, and friends.  These are all

1   reasonably foreseeable harms that flowed from the

2   nonappearing defendant's misconduct.

3        In another case in this district, in which the

4   court entered default judgment on plaintiff's defamation

5   claim, the Court awarded special and general damages for

6   defendant's defamatory statements, and the resulting

7   backlash against plaintiff isolated plaintiff from the

8   professional community in which he had devoted himself,

9   including that dissident organizations stopped inviting the

10  plaintiff to conferences, stopped accepting his articles,

11  and generally blocked him from their communities.  See *U.S.*

12  *ex rel. Guo v. National Endowment for Democracy*,

13  18-cv-02986, 2022 Westlaw 503765, from 2022.

14       In *LaRue v. Johnson*, the court ordered the

15  nonappearing defaulting defendant to pay damages where

16  defendant "falsely accused plaintiff of unsavory and

17  criminal conduct, and disseminated those defamatory

18  statements widely enough to isolate plaintiff from family,

19  friends, and business contacts" and defendant's "statements

20  also lowered plaintiff's personal and professional standing

21  in the community."  See *LaRue v. Johnson*, a D.D.C. case from

22  2018.

23       The court also awarded special damages, where

24  plaintiff had submitted personal financial information about

25  her business before and after defamation, demonstrating that

1    most of plaintiff's lost revenues reasonably could be

2    attributed to defendant's defamatory statements, even though

3    plaintiff had not established that defendant's defamatory

4    statements caused all of the lost revenue during the 2014 to

5    2015 time period, given the nature of defendant's conduct

6    and the effect it had on plaintiff's clients and

7    professional partners.

8            Finally, in yet another case in this district

9    asserting a defamation claim against Mr. Giuliani, arising

10   from statements he made about corporate entities involved in

11   the sale of voting machines, another judge on this court

12   denied Mr. Giuliani's motion to dismiss the complaint

13   against him, holding, as relevant here, plaintiffs had

14   sufficiently alleged injuries exceeding $75,000, in the form

15   of stalked and harassed employees, death threats, expenses

16   to remedy the defamation and to protect the lives of its

17   employees, lost profits, and damage to reputation, resulting

18   from Mr. Giuliani's defamatory statements about plaintiffs'

19   role in the 2020 election, i.e., the sort of harm on which

20   plaintiffs here intend to prove damages resulting from the

21   publication and reasonably foreseeable republication of

22   Mr. Giuliani's defamatory statements.  See *U.S. Dominion,*

23   *Inc. v. Powell*, 554 F. Supp 3d 42, a D.D.C. case from 2021.

24           So all that taken into account, defendant to my

25   mind may make inquiry and argument about how Mr. Giuliani

1    should not be held responsible for what strangers did or

2    said.  But this warrants a clear instruction to the jury

3    about his responsibility for all foreseeable harm from the

4    publication and reasonably foreseeable republication of

5    defamatory statements made by defendant and his

6    co-conspirators as part of the compensatory damages.  It is

7    for the jury to determine what is reasonably foreseeable or

8    what naturally flows from these defamatory statements as a

9    contested fact question affecting the quantity of damages

10   owed.

11          Now, if the parties want to confer about how this

12   should be condensed in an instruction, I will be happy to

13   look at it.  Otherwise you are going to be left with what I

14   come up with.  I am here to fill every vacuum in the law,

15   but I always welcome input.

16          MR. GOTTLIEB:  We will confer with Mr. Sibley,

17   Your Honor.

18          THE COURT:  Excellent.

19          All right.  Are we ready to bring the jury in?

20          MR. GOTTLIEB:  Two quick issues and then returning

21   it to the jury.

22          THE COURT:  Yes.

23          MR. GOTTLIEB:  The first is to give you a preview

24   of the timing for the presentation today.  We've got a

25   deposition video that takes about five minutes, then we'll

1    call Dr. Ashlee Humphreys, then we'll call Ms. Freeman.

2         If the parties stick to the time estimated in the

3    estimates in the pretrial, we will be able to close our case

4    today; we very much would like to do that.  We'll do

5    everything possible to stick to our allotted time, and I

6    hope Mr. Sibley will do everything to stick to his.

7         Before Mr. Giuliani testifies, there is one issue

8    relating to a series of statements that Mr. Giuliani made

9    again last night outside the courthouse and on his show that

10   reflects that he does not understand the Court's order with

11   respect to evidence or argument that references the personal

12   background of any counsel, motivation or intent of counsel

13   or law firm in litigating this case, the scope of resources

14   of any counsel or counsel's workplace, or any counsel's

15   compensation and/or fee arrangement shall be excluded from

16   trial.  That both Mr. Giuliani and his spokesperson, who I

17   believe is sitting in the court today, Mr. Goodman, violated

18   the terms of -- not expressly because they were outside of

19   the court.  But before Mr. Giuliani testifies, we would like

20   to have a conversation to make sure he understands that this

21   is, in fact, barred.

22         THE COURT:  Mr. Sibley?  I know, as I've said

23   before, you have a difficult job, and I know you acknowledge

24   that you have difficulty controlling what your client says

25   outside of the courtroom.

```
 1                    Would you like to respond?

 2                    MR. SIBLEY:  I have apprised him of the Court's

 3       order.  And I will make sure that he goes to limine

 4       reeducation --

 5                    THE COURT:  It's not just the Court's order.  This

 6       was a stipulation that was entered into by both sides.

 7                    MR. SIBLEY:  Correct.  Although --

 8                    THE COURT:  This is not -- so --

 9                    MR. SIBLEY:  I think it would be -- I mean, I

10       don't think the Court would allow it in any way which is why

11       we agreed to it.

12                    THE COURT:  True.

13                    MR. SIBLEY:  These kind of things are standard

14       limine points in almost every trial I have ever been in.  I

15       understand, and I will address it.

16                    THE COURT:  How are you going to address it?

17                    I mean, I think the plaintiffs may ask for me to

18       do something.  How are you going to address it?

19                    MR. SIBLEY:  Well, I am going to reiterate to him

20       the potential consequences of --

21                    THE COURT:  I don't know what these statements

22       were.

23                    Mr. Giuliani, did you make these statements

24       yesterday after court?

25                    THE DEFENDANT:  I did, but I didn't think it
```

```
 1    violated the order, Your Honor.  And it did not implicate
 2    the stipulation.
 3              THE COURT:  You think that is so?  Well, you will
 4    have a conversation with Mr. Sibley about that.
 5              THE DEFENDANT:  If I did, I did it accidentally.
 6              THE COURT:  That's a lot of accidents going on
 7    here, Mr. Giuliani.
 8              THE DEFENDANT:  Your Honor, I would admit it if I
 9    did.  I admitted it yesterday.  I don't not admit things.
10              I thought that I could make comments about
11    counsel.  I didn't realize that was in the order.  I will
12    not do it in the future.
13              THE COURT:  All right.
14              All right.  Are we ready to bring the jury?
15              MR. GOTTLIEB:  Yes, Your Honor.
16              THE COURT:  Okay, let's do that.
17              I want to thank plaintiffs for providing an
18    up-to-date exhibit list with what's been introduced.
19              (Whereupon, the jury returns to the courtroom.)
20              THE COURT:  Good morning, ladies and gentlemen.
21    Sorry we had another legal matter that we had to take up.
22    It's a lot more pleasant for you to be in the jury room
23    having your coffee than sitting with the husher on, as we
24    call it.
25              All right.  Are the plaintiffs ready to call their
```

```
 1    next witness?

 2              MS. GOVERNSKI:  We are, Your Honor.  Good morning.

 3              Good morning, members of the jury.

 4              Your Honor, plaintiffs call Ms. Pamela Michelle

 5    Branton whose testimony will be shown via deposition

 6    designation.  It's only four and a half minutes long.

 7              I would like to admit the documents that will be

 8    referenced during Ms. Branton's testimony, only one

 9    document, PTX 246 which we understand Mr. Giuliani has no

10    objections to; and PTX 589 will be the designated

11    transcript.

12              THE COURT:  Okay.  Any objections to admission of

13    246 and 589?

14              MR. SIBLEY:  No, Your Honor.

15              THE COURT:  Those two will be admitted, and you

16    may play the video deposition.

17              (Plaintiffs' 246 and 589 admitted.)

18              (Whereupon, the videotape deposition of

19    PAMELA M. BRANTON was published for the jury.)

20              MR. GOTTLIEB:  Your Honor, that concludes

21    Ms. Branton's testimony.

22              THE COURT:  Okay.  And your next witness.

23              MR. GOTTLIEB:  Plaintiffs call Dr. Ashlee

24    Humphreys.

25              THE COURT:  Good morning.  If you could just
```

1    remain standing, face the jury, and raise your right hand.

2                    (DR. ASHLEE HUMPHREYS, plaintiff's witness, sworn.)

3                    THE COURT:  Good morning.

4                    THE WITNESS:  Good morning.

5                    THE COURT:  If you could just use the flexibility

6    of this microphone, pull it as close to you as possible.

7                    THE WITNESS:  Sure.

8                    THE COURT:  Great.  Thank you.

9                    Please proceed.

10                   MR. GOTTLIEB:  Your Honor, before we begin with

11   the exam, I would move to batch admit -- move to batch admit

12   eight documents which we intend to reference during

13   Dr. Humphreys' exam and which were not previously entered

14   into evidence.  Pursuant to the parties' stipulation and

15   agreement, and with the Court's permission, we'd move to

16   admit Plaintiffs' Exhibit 289, 332, 339, 340, 350, 358, 367,

17   and 374.

18                   We understand there is no objection from the

19   defendant on these exhibits.

20                   THE COURT:  Mr. Sibley, is that correct?

21                   MR. SIBLEY:  Give me one second, Your Honor.

22                   THE COURT:  Of course.

23                   MR. SIBLEY:  That's correct, Your Honor.  No

24   objection.

25                   THE COURT:  Hearing no objection, 289, 332, 339,

 1    340, 350, 358, 367, and 374 will be admitted.

 2                (Plaintiffs' 289, 332, 339, 340, 350, 358, 367,

 3    and 374 admitted.)

 4                MR. GOTTLIEB:  Thank you, Your Honor.

 5                All other documents that are referenced in

 6    Dr. Humphreys' demonstrative, which was previously produced

 7    to Mr. Sibley, have been admitted into evidence already.

 8                THE COURT:  Good.  Thank you.

 9                         DIRECT EXAMINATION

10    BY MR. GOTTLIEB:

11    Q.  Good morning.

12    A.  Good morning.

13    Q.  Could you please introduce yourself to the Court and

14    jury.

15    A.  Sure.  I am Professor Ashlee Humphreys.

16    Q.  Do you prefer "Professor" or "Doctor"?

17    A.  You can choose.  Let's go with Doctor.

18    Q.  All right.  Dr. Humphreys, did you prepare a slide deck

19    summarizing the work that you performed in this case?

20    A.  I did.

21    Q.  Do you believe that slide deck would assist the jury in

22    understanding your testimony today?

23    A.  Yes, it would.

24                MR. SIBLEY:  Your Honor, we've prepared a display,

25    a demonstrative slide deck, that summarizes Dr. Humphreys'

 1    work.  It has been previously disclosed to Mr. Sibley.

 2    Unless Mr. Sibley has an objection, we'd like to show it to

 3    the jury.

 4            THE COURT:  All right.  Well, why don't we

 5    describe her background before we get into paperwork.

 6            MR. GOTTLIEB:  Okay.  We can do that.

 7            THE COURT:  For a formality -- could I just talk

 8    to all of you for a second.  Thank you.

 9            (Whereupon, a bench conference was held.)

10            THE COURT:  Normally, with an expert witness we

11    hear about what her expertise is, her background, her --

12    everything, and what her expertise is.  You make a formal

13    motion to have her -- under 702 to offer her as an expert.

14    I give my standard cautionary instruction about expert

15    testimony.  So are you planning on doing that?

16            MR. GOTTLIEB:  Yes, Your Honor.

17            There is literally one slide that displays her

18    qualifications.  There is a series of questions designed to

19    establish her qualifications and a formal motion that I will

20    make.

21            THE COURT:  Okay.

22            MR. GOTTLIEB:  We can --

23            THE COURT:  I didn't realize that.  I wanted to

24    make sure we weren't like just bumbling over all the

25    formalities.

```
 1                    MR. GOTTLIEB:  No, Your Honor.

 2                    THE COURT:  Fine.  I will let you proceed that

 3       way.

 4                    Mr. Sibley, do you have any objection to having a

 5       slide that shows all of her qualifications, and so on?

 6                    MR. SIBLEY:  Your Honor, I don't have an objection

 7       to that.  However, based on the Jensen Hughes objections,

 8       undisclosed expert testimony -- Dr. Humphreys does rely on

 9       that.  I would move to exclude it to the extent it relies on

10       Jensen Hughes.  I understand the Court has already ruled on

11       that.  I just wanted to make that for the record.

12                    THE COURT:  The objection is overruled for all of

13       the reasons I have already stated.  In the event an expert

14       can rely on a whole variety of things, other experts, fact

15       experts, other facts -- I don't even understand the basis of

16       that objection since whatever ruling there was about Jensen

17       Hughes has little to do with what this expert can rely on.

18       Your objection is overruled.

19                    (Whereupon, the bench conference concludes.)

20                    THE COURT:  Thank you.  You may proceed.

21                    MR. GOTTLIEB:  Thank you, Your Honor.

22       BY MR. GOTTLIEB:

23       Q.  Dr. Humphreys, is this the slide deck that you prepared

24       that's up on the screen?

25       A.  Yes, it is.
```

1    Q.  Dr. Humphreys, what's your current profession?

2    A.  I am a professor of integrated marketing communications

3    at the journalism school at Northwestern and a professor of

4    marketing at the management school.

5    Q.  Where is Northwestern?

6    A.  Northwestern is just west of Chicago in Evanston,

7    Illinois.

8    Q.  How long have you been teaching?

9    A.  Since 2008; so about 15 years.

10   Q.  What's your area of expertise?

11   A.  So my primary area of expertise is marketing

12   communications and specifically social media marketing.

13   Q.  What is marketing communications?

14   A.  So marketing communications is just a fancy word for

15   advertising, basically.  But rather than just like TV

16   advertising, we look at all kinds of communication with

17   people such as social media, direct mail, catalogues, things

18   like that.

19   Q.  What's your educational background?

20   A.  I have my Ph.D. from Northwestern University in

21   marketing.  And I have undergraduate degrees from

22   Northwestern as well.

23   Q.  And what are the -- what are the courses that you

24   currently teach or have taught recently?

25   A.  I currently teach social media marketing, marketing

```
1    research, consumer behavior.

2    Q.  Do you engage in research?

3    A.  Yes, I do.

4    Q.  What do you focus on in your research?

5    A.  So I have a book on social media and consider myself an

6    expert in social media.  I also study, as a marketing

7    academic, a range of topics ranging from casino gambling to

8    wine consumption to many different topics.

9    Q.  What is your social media book about?

10   A.  So for my book on social media -- I actually wrote the

11   book in 2016.  And I reviewed all social science research on

12   social media and provided a book that gives kind of an

13   objective overview of the topic; and I am currently revising

14   that book.

15   Q.  By the way, what is social media?

16   A.  So social media is a way that people communicate with

17   each other, but that communication can also be overseen by

18   very broad public.

19   Q.  Anything else you are currently researching or studying?

20   A.  I research all kinds of things.  I'd say, broadly, I am

21   an expert as well in how industry has become accepted in

22   daily life.

23   Q.  Have you published any peer-reviewed articles?

24   A.  Yes.  I have published over 20 peer-reviewed articles.

25   Q.  How about book chapters?
```

```
 1    A.  Yes.  I have published many book chapters.

 2    Q.  Academic presentations?

 3    A.  Yes.  I regularly am invited to give academic

 4    presentations throughout the world.

 5    Q.  Have you received any recognitions or awards for your

 6    work?

 7    A.  Yes.  In 2020, I was nominated a Marketing Science

 8    Institute Scholar, which is a set of 40 marketing professors

 9    that are deemed, I guess, the best in the world.

10    Q.  Have you served as an expert witness before this case?

11    A.  Yes, I have.

12    Q.  Do you know in about how many cases?

13    A.  I would say about eight cases.

14    Q.  Have you conducted analyses in other cases similar to

15    the one that you have performed in this case?

16    A.  Yes, I have.

17    Q.  Has there ever been an award from a court that relied

18    upon your -- the kind of methodology or opinion that you are

19    using in this case?

20    A.  Yes.

21    Q.  What case was that?

22    A.  That was a case where a writer named E. Jean Carroll was

23    suing Donald Trump for defamation.

24    Q.  And there was -- you analyzed the damages in that case?

25    A.  Yes.
```

1    Q.  And there was a jury award in that case?

2    A.  That's right.

3    Q.  It relied on your opinion?

4    A.  Yes.

5    Q.  Dr. Humphreys, did you prepare any written summaries of

6    your opinions in this case?

7    A.  Yes.  I prepared an initial expert report, and I

8    provided, in addition to that, two supplemental reports.

9    Q.  Did those reports go into the methodology that you used

10   and disclose the bases for your opinions?

11   A.  Yes, they did.

12   Q.  Did they list out the evidence on which you relied in

13   order to form those opinions?

14   A.  Yes.

15   Q.  Is the evidence that you looked at in this case and

16   relied on for the basis of your opinion the kind of evidence

17   that experts in your field typically rely upon to form an

18   opinion?

19   A.  Yes.

20   Q.  At a high level -- we'll get into the details if

21   permitted.  But at a high level, could you describe the

22   methods or the methodology that you applied in your reports?

23   A.  Sure.  In this case my task was to estimate the reach of

24   a certain number of statements made by the defendant against

25   the plaintiffs, Ms. Freeman and Ms. Moss.

1    Q.  Did you rely upon research in your field for those

2    methods?

3    A.  Yes, I did.

4    Q.  Did you apply that research to the methodology that you

5    used in this case?

6    A.  Yes.  So for this task we need -- social media is an

7    interdisciplinary field, so I drew from research in computer

8    science, information science, sociology and anthropology.

9    Q.  Thank you, Dr. Humphreys.

10        MR. GOTTLIEB:  Your Honor, plaintiffs would move

11   the admission of Dr. Humphreys' testimony under Federal Rule

12   of Evidence 702.

13        MR. SIBLEY:  Request permission to voir dire the

14   witness, Your Honor, to inquire as to her methodology.

15        THE COURT:  Let me talk to you all.

16        (Whereupon, a bench conference was held.)

17        THE COURT:  How long is that going to take?  I

18   don't want this to turn into the cross-examination for an

19   hour.

20        MR. SIBLEY:  Probably 15 minutes, Your Honor.

21        MR. GOTTLIEB:  Your Honor, Mr. Sibley previously

22   told this Court, and I quote:  I don't dispute that she is

23   an expert in the field that she's proffered.

24        And the methods that she is applying or the weight

25   is something he can do on cross-examination.  I don't

1   understand why this would be a 702 objection.

2            THE COURT:  Can you explain why this would be?

3            Is this another little surprise backpedaling,

4   Mr. Sibley, on what we thought was going to move sort of

5   smoothly?  I could have done some of this outside the

6   presence of the jury.

7            MR. SIBLEY:  Yes, Your Honor.  Some of this

8   applies to Jensen Hughes.  I just want to preserve the

9   issue.  And we'll get to the substance and weight in

10  examination before she gets to talk to the jury and ask an

11  instruction to disregard testimony.  I would just like to

12  spend 15 minutes on a brief voir dire.

13           THE COURT:  So 15 minutes is not brief.  One to

14  two minutes is brief --

15           MR. SIBLEY:  Can I get five?

16           THE COURT:  -- not 15 minutes.  And also, in terms

17  of the methodology, you just want to focus on how much she

18  relied on Jensen Hughes' material?

19           MR. SIBLEY:  That will be foundation.

20           THE COURT:  This is all to go to your objection

21  that I have already overruled.  Now that it's overruled, you

22  can object to her being certified as an expert.  I will

23  overrule you and certify her.

24           Is that how you want this to go, Mr. Sibley?

25           MR. SIBLEY:  No, Your Honor.

```
 1              THE COURT:  Okay.  Well, then -- yes?  What else?

 2              MR. SIBLEY:  I have a question about

 3      methodologies.  She issued three reports in the last six

 4      months; they have very different numbers.  I want to ask her

 5      how she -- why there is a vast fluctuation in the numbers in

 6      a brief amount of time.

 7              MR. GOTTLIEB:  Your Honor, Mr. Sibley never

 8      deposed this witness.  If he had, he could have asked her

 9      many of these questions.  More to the point, the methodology

10      if he read the opinion -- if he read her supplemental

11      opinions, he would know that the methodology hasn't changed.

12      It's the input or numbers she's updated.  There is no change

13      in the methodology in any of the three reports.  He can get

14      into that on cross-examination.

15              MR. SIBLEY:  Your Honor, before she's allowed to

16      testify as an expert -- by the way, the two supplements came

17      after the discovery deadline.  One was last week.  I

18      wouldn't have had a chance to depose her.  I would just like

19      five minutes, Your Honor.

20              THE COURT:  And that is to ask her about the

21      differences between the original report and each of the two

22      supplementals?

23              MR. SIBLEY:  Yes, Your Honor.  What facts or

24      foundation, I guess, have changed that have caused these

25      differences in such a brief amount of time?
```

```
 1              THE COURT:  Well, either Mr. Sibley can do it or,
 2      Mr. Gottlieb -- do you want to do that?
 3              MR. GOTTLIEB:  I am happy to ask her those
 4      questions, Your Honor.
 5              THE COURT:  I was wondering what the difference
 6      was between the two supplementals.  Why don't we do that
 7      through Mr. Gottlieb.  And then, Mr. Sibley, we can figure
 8      out whether you will -- that is sufficient for you as an
 9      explanation, and whether you want to object to her being
10      certified as an expert, with me overruling that objection in
11      front of the jury, or whether that will be sufficient for
12      you.  Okay.
13              (Whereupon, a bench conference concludes.)
14              THE COURT:  Mr. Gottlieb.
15      BY MR. GOTTLIEB:
16      Q.  Dr. Humphreys, you prepared three reports in this case;
17      is that correct?
18      A.  That's correct.
19      Q.  Your first one was July 28th, 2023?
20      A.  Yes.
21      Q.  That report -- at a very high level, without going into
22      the details, can you describe what that report does?
23      A.  Sure.  So that report takes a set of statements made by
24      the defendant and estimates the reach of those statements.
25      I then do a descriptive analysis where I understand the
```

1    nature of the reputational harm and then I provide an

2    estimate for reputational repair campaign.

3    Q.  Dr. Humphreys, you prepared a supplemental report in

4    October, October 6, 2023; is that correct?

5    A.  That's correct.

6    Q.  What is different about that supplemental report than

7    from your opening report?

8    A.  So in that report, I basically just categorized the

9    statements, the impressions according to, like, a certain

10   categorization of statements as asked by counsel.

11   Q.  Did you look at any different statements in that October

12   report from the initial report?

13   A.  No.

14   Q.  Dr. Humphreys, do you have -- we can come back to that.

15   Let me ask it this way.

16           Did you apply any kind of different methodology in

17   the analysis that you were performing in the supplemental

18   report versus the original report?

19   A.  No.

20   Q.  So in other words, what the October report does is it

21   looks at the same kind of methodology and applies it in

22   different sort of categories?

23   A.  Correct.

24   Q.  Anything change about the way that your model makes

25   assumptions or the way that your model gives weight to

1    certain considerations?

2    A.   No.

3    Q.   Dr. Humphreys, you prepared a second supplement to your

4    report on December 1st, 2023; is that correct?

5    A.   Yes.

6    Q.   Why did you prepare that second supplement?

7    A.   So I was presented with an additional set of instances,

8    publications of the same statements, and I provided an

9    updated analysis -- updated analysis of the impressions.

10   Q.   I suppose we need to get into this so the Court can

11   understand.

12   A.   Sure.

13   Q.   When you say "statements" and when you say "instances,"

14   what do you mean?

15   A.   Yeah.  So they're kind of a core set of statements,

16   things that were initially said by the defendant.  And then,

17   an instance is like a news article that might have covered

18   it or repeated it or a Twitter post that might have repeated

19   it, et cetera.

20   Q.   For the statements, were you asked to assume a set of

21   statements that you were supposed to analyze?

22   A.   Yes.  So plaintiffs' counsel provided me with those

23   statements.

24   Q.   Were those 16 statements that the Court had made a

25   ruling on with respect to liability in this case?

1    A.  Correct.

2    Q.  And the instances are essentially republications or

3    redisseminations of those statements?

4    A.  Yes.

5         MR. GOTTLIEB:  Your Honor, I would again move the

6    admission of Dr. Humphreys' testimony under Federal Rule of

7    Evidence 702.

8         MR. SIBLEY:  Your Honor, I have the same

9    objection -- same objections, Your Honor.  It doesn't

10   address what we discussed at the bench conference.

11        THE COURT:  All right.  The objection is

12   overruled.  Dr. Humphreys may testify as an expert in this

13   case.

14        Let me just advise the jury that ordinarily a

15   witness may not testify as to his or her opinions or

16   conclusions.  There is an exception for expert witnesses who

17   are allowed to give opinions, and the reasons for them is

18   because they have become an expert in some art, science,

19   profession or calling.

20        In this case, Dr. Ashlee Humphreys is being called

21   to testify as an expert concerning the reach of

22   Mr. Giuliani's and his co-conspirator's statements regarding

23   plaintiffs and the reputational impact.  You are not bound

24   by an expert's opinion.

25        If you find that the opinion is not based on

1   sufficient education or experience, that the reasons

2   supporting the opinion are not sound, or that the opinion is

3   outweighed by other evidence, you may completely or

4   partially disregard the expert's opinion.  But you should

5   consider this evidence with all of the other evidence in the

6   case and give it as much weight as you think it fairly

7   deserves.

8              All right.  Now you may proceed with

9   Dr. Humphreys' testimony.

10             MR. GOTTLIEB:  Thank you, Your Honor.

11  BY MR. GOTTLIEB:

12  Q.  Dr. Humphreys, have you ever been retained in any other

13  matter in which plaintiffs' counsel is involved?

14  A.  This counsel?  Yes.

15  Q.  When we say "this counsel," any of the counsel that are

16  sitting here at the table or in the courtroom today?

17  A.  Yes.  Yes, I have.

18  Q.  Did you disclose all of those matters in the reports

19  that you submitted in this case?

20  A.  Yes.

21  Q.  And in the appendix to your July -- original July expert

22  report, did you list out every matter in which you have been

23  retained, along with cases and docket numbers?

24  A.  Yes.

25  Q.  Are you being paid for your work in this case?

1    A.  Yes.

2    Q.  How much are you being paid?

3    A.  I am paid $350 an hour for research and writing the

4    report.

5    Q.  Is your compensation contingent or conditioned on the

6    nature or the substance of your opinions?

7    A.  No, it's not.

8    Q.  Is that -- the rate that you quoted, is that your

9    standard rate?

10   A.  Yes, it is.

11   Q.  Did anyone else assist you in your work in this case?

12   A.  Yes.  I was assisted by two research assistants.

13   Q.  How did they assist you?

14   A.  They were very helpful for collecting the data and,

15   then, working at my direction to glean the data and apply

16   the models, the mathematical models in this case.

17   Q.  Okay.  You have been asked to perform work on behalf of

18   the plaintiffs, Ms. Freeman and Ms. Moss, in this case; is

19   that right?

20   A.  Yes.

21   Q.  At a high level -- I can't get this to work -- at a high

22   level what were you asked to do?

23   A.  Sure.  So as I testified previously, the first task was

24   to measure the reach of the statements that were at issue in

25   the case, and I am going to call this the impressions model.

1        The next step was to provide an impact assessment.

2  So this is where I looked at quantitative and qualitative

3  data to assess the reputational harm caused by the

4  statements.  And the third step was the damages model, and

5  for that I based a model to repair the reputational damage

6  purely on the statements of the impressions model.

7  Q.  So starting at a high level, because we'll get into each

8  of these different models, could you explain to the jury

9  what essentially you were doing in the impressions model?

10 A.  Sure.  So in the impressions model, there were a set of

11 statements, and those were published and republished widely

12 on social media and podcasts and online news articles.  And

13 so I, basically, counted up the impressions that those

14 statements received.

15 Q.  And how about the impact assessment?

16 A.  In the impact assessment, I did quantitative analysis

17 just to understand the attention -- public attention to the

18 plaintiffs' names and, then, I read through many comments

19 that were attached to those statements at issue and did a

20 qualitative analysis to kind of describe the reputational

21 harm and to better understand it.

22        And then lastly with the damages model, I

23 calculated, well, okay, for this number of impressions, how

24 much would it cost to repair the reputation of the

25 defendants?

1    Q.  And you used the words "damages model."  Are you

2    offering any opinion to the jury on what emotional distress

3    or emotional harm damages should be -- how they should be

4    thought of in this case?

5    A.  No.

6    Q.  Are you offering any opinion to the jury on what

7    punitive damages would be in this case?

8    A.  No.

9    Q.  So your opinion with respect to damages is an estimate

10   of reputational damages only?

11   A.  That's correct.

12   Q.  At a very high level, what were your findings?

13   A.  So at a high level, I found that the statements in this

14   case reached a very broad audience that the associations

15   they introduced into the public sphere were pretty negative.

16   They contributed to a severe reputational harm and that a

17   damages model consequently would be needed to repair that

18   reputational damage.

19   Q.  All right.  So let's step back for a minute,

20   Dr. Humphreys.

21          What is reputation?  How do you define it?

22   A.  So we all have a reputation.  It's something we build

23   throughout our lifetime, through our work, through our

24   friendships.  It basically allows us to function in society.

25   It allows people to trust us and really to fit in within a

1   society.

2   Q.  And I think you have written that reputation has both a

3   moral and economic value.  Can you explain that?

4   A.  Sure.  So reputation has a moral value.  It's our social

5   standing.  It gives us dignity and respect in society.  It

6   allows people to trust us, for us to fit in within a

7   society, and then it also has an economic value.  So it can

8   impact employment, earnings, career advancement, and so

9   forth.

10  Q.  Is reputation a concept that economists study?

11  A.  Yes.  Economists can measure reputation.

12  Q.  And how do they think about reputation?

13          When I say "they," how do economists or people in

14  your field think about reputation in dollars and cents

15  terms?

16  A.  So particularly in management and business schools, we

17  think of reputation management.  And so if and when

18  reputations are harmed, there can be corrective campaigns to

19  repair that harm.

20  Q.  Can someone's reputation be changed?

21  A.  Yes.

22  Q.  How so?

23  A.  In a few ways.  I mean, someone's reputation can be

24  harmed or changed by what they do.  It can also be changed

25  by something that happens to them, that maybe somebody says

1    about them or some other thing that happens in society.

2    Q.  Can a person's reputation be changed by becoming more

3    known or more visible?

4    A.  So someone can become more prominent, but it also

5    matters the way in which they become prominent.  So someone

6    can become more known, but their reputation is kind of that

7    set of associations with their name.

8    Q.  Can a person's reputation be damaged?

9    A.  Yes.

10   Q.  How?

11   A.  So a person's reputation can be damaged by something

12   they do or by something that is said about them in the

13   broader public sphere.

14   Q.  I think you said before a person's reputation can be

15   damaged by others.  Are there different ways that can

16   happen?

17   A.  Yeah.  I mean, it can be something that someone does to

18   us, something someone says about us that becomes circulated

19   more broadly.

20   Q.  For someone's reputation to change, do you need like

21   50.1 percent or more than half of people to believe that

22   what is being said about them is true?

23   A.  No.  So we think of reputation as kind of a generalized

24   perception.  So what even a sizeable minority of people

25   think about you can make a difference.  So, you know, for

1    example, imagine that you go to work one day and, like, 30

2    percent of your coworkers think that you stole money.   A

3    minority of people think that about you, but they're

4    probably talking about it.  They're sharing that information

5    with people who don't believe it.  They're maybe trying to

6    convince others.  It can still impact your reputation and

7    your social standing at work even if 30 percent of people

8    actually believe that statement.

9    Q.  So even when there is a minority of people who may

10   believe something, it can incur a cost on someone?

11   A.  Yes, that's right.

12   Q.  Can a person who develops a well-known public reputation

13   become an anonymous figure again?

14   A.  No.

15   Q.  Is it possible to -- well, let me ask this.  Why not?

16   A.  You know, once your, kind of, name is out there, the

17   public, it's in a lot of people's minds.  It's kind of

18   impossible to erase that information.  Of course you can

19   conduct some reputational repair to try to change the nature

20   of those associations, but it's hard to go back to being

21   anonymous.

22   Q.  So are you saying that you can't erase damage that's

23   been done, but you can counteract or repair it?

24   A.  Yes.

25   Q.  How do people go about doing that?

1    A.  In my field, in the field of public relations and

2    marketing, they go about that through a reputation repair

3    campaign.

4    Q.  So has social media changed anything about how

5    reputations can change?

6    A.  Yes.

7    Q.  How so?

8    A.  So with traditional media, old media was very slow.  The

9    newspaper was printed once a day, and so information was

10   shared with a broad audience once a day in a newspaper, the

11   nightly news or whatnot.

12         In social media things just happen much more

13   quickly and much more broadly.  So, for example, in social

14   media, someone can share a piece of information with, let's

15   say, ten of their followers within a minute or even seconds.

16   Those ten followers can almost instantly share it with ten

17   other followers.

18         So you have 100 followers very quickly, a few more

19   minutes, a thousand followers, 10,000 followers.  You can

20   reach up to a million people within hours -- minutes, hours

21   or days.

22   Q.  So if I'm understanding you, there is a speed difference

23   between social media and traditional media; is that right?

24   A.  That's right.

25   Q.  Is there sort of a difference in the quantity of

1    speakers as well?

2    A.  Yes.  So anybody can share a piece of information.  And

3    so the information becomes kind of widely shared very

4    quickly.

5    Q.  Does your field have any term for that kind of spread of

6    information?

7    A.  Yeah, we would call that an information cascade.

8    Q.  And is it -- is there a role for -- is it also referred

9    to as viral, the word "viral"?

10    A.  Yes.  When people talk about video or some other piece

11    of information going viral, that's kind of what they mean.

12    Q.  Does the research in your field, does it show anything

13    about how information -- different kinds of information

14    travels across social media?

15    A.  Yes.  So there have been studies done of true

16    information versus false information being shared through

17    social media, and that research finds that for politically

18    false information, it spreads three times faster than true

19    information.

20    Q.  Three times faster?

21    A.  Yes, that's right.

22    Q.  Why is that?

23    A.  Well, the study finds that false information is more

24    novel, more surprising, more interesting, and so people --

25    they want to share it more quickly.

1    Q.  Dr. Humphreys, are you familiar with the concept of

2    filter bubbles or information silos?

3    A.  Yes.

4    Q.  Do you have a preferred term as between those two?

5    A.  Let's go filter bubbles.

6    Q.  What are filter bubbles?

7    A.  So a filter bubble -- when we're on social media, unlike

8    traditional media, we choose where we're going to get our

9    information from pretty specifically.  So the person we

10   choose to follow is the person who is going to give that

11   information to us.  We tend to follow or want to get

12   information from people who are like us.  So we, on social

13   media, tend to get information from a lot of other people

14   who we have chosen to give us information who are like us.

15            THE COURT:  Can I stop you for a second.

16            You said that studies done of true information

17   versus false information being shared through social media,

18   research found that for politically false information, it

19   traveled, I guess, three times faster than true information.

20            THE WITNESS:  Um-hum.

21            THE COURT:  So if you take the political --

22   politically false information out of that equation, it was

23   just false information, is there something about the

24   "politically"?  And how are you defining "politically"?

25            THE WITNESS:  Yes.  Of course.  This was an

```
1    article in the Journal of Science.  It's true that false

2    information travels faster than true --

3              THE COURT:  Generally.

4              THE WITNESS:  Generally.

5              THE COURT:  Of any kind?

6              THE WITNESS:  Of any kind, yes.

7              And politically false information travels even

8    faster than regular false information.

9              THE COURT:  And what falls within the definition

10   of "politically" --

11             THE WITNESS:  Yeah, that's a good question.  You

12   have to go to their methodology.  I believe they coded it by

13   source, so like what publication was the information coming

14   from?  So if it was from like a political blog by some

15   classification, they coded it as political, yes.

16             THE COURT:  Okay.

17   BY MR. GOTTLIEB:

18   Q.  Dr. Humphreys, you talked a little bit before about

19   following someone.  And just in case we don't have any avid

20   users of social media here, what do you mean by -- when you

21   say "follow someone"?

22   A.  Sure.  When I say "follow someone," I mean that you have

23   chosen to get information from them.  Usually it's by

24   clicking a button -- searching for someone and clicking a

25   button.
```

1   Q.  Do people's preexisting beliefs or prior beliefs have an

2   impact on the kind of information that they're willing to

3   believe when they see it for the first time?

4   A.  Yeah.  So people are more persuaded by -- when they

5   encounter a new piece of information, they are more likely

6   to believe a piece of information if it aligns with what

7   they already believe.

8   Q.  Does that interact with this concept of filter bubbles

9   that you just testified about?

10  A.  That's right.  So people are more likely to kind of

11  believe the information they get from a source that is like

12  them.

13  Q.  Is the concept of -- you talk about people -- I think

14  you just said people are more likely to believe someone who

15  is like them.  Are there individuals out on social media who

16  try to capitalize on that principle?

17  A.  Yeah.  We might call those people influencers.

18  Q.  What is an influencer?

19  A.  An influencer is someone who has influence.  Typically,

20  on social media, it means that they're trusted by their

21  followers and they have influence.  Typically, they'll have

22  large followings, so they will have a lot of people

23  connected to them.

24  Q.  For influencers, are there -- are there some people who

25  are influencers just because they're famous?

1    A.   Yes.

2    Q.   Are there other people for whom influencing is a

3    business?

4    A.   Yes.   People make money off of being an influencer.

5    Q.   How do people make money off of being an influencer?

6    A.   Right.   So as I said, we trust information that comes

7    from a source that's like us, and so an influencer will

8    accept money to share particular messages.

9    Q.   Do some influencers make a lot of money?

10   A.   Yes, they do.

11   Q.   And what is the general transaction that an influencer

12   is engaging in?

13   A.   So typically a company or person who wants an influencer

14   to share a message will create, like, a brief that tells the

15   influencer this is the message, this is what I would like

16   you to share, this is the platform, the way I want you to

17   share it, and this is how many times I want you to share the

18   information.

19   Q.   Are there different kinds of influencers for different

20   kinds of subject matter areas?

21   A.   Yes.   There are influencers for almost any category you

22   can think of.

23   Q.   Do companies take these influencers into account when

24   they are thinking about branding and marketing for

25   reputation?

1    A.  Yes.  So they become more important in how companies

2    share information.

3    Q.  Now, Dr. Humphreys, you testified earlier that you

4    analyzed the cost to repair Ms. Freeman and Ms. Moss's

5    reputations in this case.  What is reputational repair?

6    A.  Reputational repair is an -- sorry, my voice -- give me

7    just a minute.

8              Reputational repair is an intentional effort to

9    create positive, truthful, accurate perceptions about a

10   person, and it happens through strategic communication.  So

11   this is the purposeful use of communication for a particular

12   goal.

13   Q.  Do you want to have a littler water?

14   A.  I'm okay.  The cough drop helps.

15   Q.  Is the concept of reputational repair something you have

16   taught in your classes?

17   A.  Yes.  We typically cover reputational repair.

18   Q.  Is there academic research on how these campaigns are

19   designed and run?

20   A.  Yes.

21   Q.  Is that something on which you based your opinions in

22   this case?

23   A.  Yes.

24   Q.  You mentioned that reputational repair can be

25   accomplished through strategic communication.  How do you

1    define strategic communications?

2    A.  So strategic communication is this purposeful use of

3    communication to fulfill a certain goal or mission.

4    Q.  How do strategic communications plans typically work?

5    A.  So typically a strategic communications plan will define

6    a target audience.  Who do you want to share the information

7    with; the message?  So what do you want to tell them; the

8    source, so who do you want to share that message; and then a

9    channel, so how do you want them to share that message.

10   Q.  And do the strategic communications plans you've studied

11   and taught use different types of messaging or different

12   channels for spreading information?

13   A.  Yes.  So typically a communications plan would identify

14   several different channels to share information.

15   Q.  Does the extent of damage that you are trying to repair

16   influence how strategic communications or a repair campaign

17   is put together?

18   A.  Yes.  I would say the extent of damage, meaning if it's

19   a large target audience, or if it is a message that maybe

20   they don't -- they're not inclined to believe, then that

21   would increase the cost of your communications plan.

22   Q.  And does the extent of damage influence the length of a

23   campaign or the amount of time that you have to put in to

24   repair?

25   A.  Yes.  So to change people's attitudes, you may need to

1   show them the message multiple times which means the

2   campaign would run longer.

3   Q.  Are strategic communications plans or efforts free?

4   A.  No.

5   Q.  Are there companies that engage in strategic

6   communications plans as their main line of business?

7   A.  Yes.  It's a very common professional activity.

8   Q.  What are some of the decisions that companies or

9   individuals make when they're figuring out how much money --

10  how many resources they should devote into a strategic

11  communications plan?

12  A.  So in addition to figuring out the target, they also

13  have to figure out who are the best sources to place the

14  information with and also what percentages of channels to

15  use.  So you may want to use mostly television and a little

16  bit of social media; a little bit of social media, mostly

17  television, and divide up your budget.

18  Q.  Recognizing that there is a wide range for all of these

19  things, of course, based on your experience and expertise,

20  do you have a sense of how much strategic communications

21  plans tend to cost?

22  A.  I do, although it can vary widely for a target audience.

23  Q.  What do some of those look like?  Are we talking about

24  thousands of dollars?  Hundreds of thousands of dollars?

25  A.  I mean tens of -- it can be a million dollars.

1    Q.  All right.  Let's start -- I think you testified before

2    that you did an impressions model and impact assessment and

3    a damages model.  Let's start with the impressions model.

4          Looking at the slide that's displayed up on the

5    screen, can you walk through what your impression model

6    entails?

7    A.  Sure.  So in this case there were a number of

8    statements.  And when a statement is made by someone,

9    especially a prominent person, it enters what I would call

10   the media system.  So it's republished and shared through

11   different information channels.  I am going to call those

12   the instances.

13         There might be an online video that has the

14   statement.  There might be a tweet on Twitter that has the

15   statement.  There might be an online news article that has

16   the statement, a print newspaper.  It might be repeated on

17   television or aired on television, and it might have a

18   podcast.

19   Q.  Okay.  So you have an initial statement, and then it can

20   get published or republished in a different -- different

21   channels of media?

22   A.  That's right.

23   Q.  And then what happens in between those different

24   channels and all the dots we see at the bottom of the screen

25   labelled "Impressions"?

1    A.  Yeah.  So if you want to measure how many people saw the

2    information or the number of times they saw the information,

3    the impressions, you would then for each channel add up.

4         So if it is an online video, it might receive a

5    certain number of views.  If it's on social media, it might

6    be Tweeted to a certain number of people.  So for each

7    different channel you have a different way of just adding up

8    the number of impressions that it received.

9    Q.  Dr. Humphreys, we'll get in in a moment your

10   methodologies for these, but is it fair to say that you

11   applied the same methodology for all of the statements that

12   you analyzed in this case?

13   A.  For all of the statements, yes, and each channel has a

14   slightly different way of counting.

15        MR. GOTTLIEB:  Your Honor, the next slide has a

16   screenshot from Plaintiffs' Exhibit 350 which has previously

17   been admitted into evidence.

18   BY MR. GOTTLIEB:

19   Q.  So, Dr. Humphreys, what is an "impression"?

20   A.  So an impression is a single exposure to a statement.

21   It's one person seeing the statement one time.

22   Q.  And using this slide that's up on the screen as an

23   example, what is the image that you see depicted there?

24   A.  So if you have a video, for example, on -- this one's

25   from YouTube, you would get the number of impressions by

1    what is below here, the number of views.  So this has 1.2

2    million views.

3    Q.  Does the number of impressions that you calculate for a

4    particular statement equate to exactly a number of unique

5    individuals or people?

6    A.  No.  So one person could see something more than one

7    time.

8    Q.  So it's not your testimony that whatever the impressions

9    number is is the exact number of individual people?

10   A.  That's correct.  I did do some analysis to get a sense

11   of how many times a typical person might have seen this

12   content, and I feel pretty confident that a large number of

13   views means a large number of people.

14   Q.  Okay.  And is it relevant -- when we come later to your

15   damages model, is it relevant whether the number of

16   impressions is an exact linear relationship to a number of

17   people?

18   A.  No.  So I based the damages model on impressions as

19   well, and so it's kind of apples to apples.

20   Q.  What statements did you review as part of your

21   impressions model?

22   A.  So I have two sets of statements.  The first set of

23   statements, I will just call them the defamation statements;

24   they occurred after December 23rd, 2020.  And then there is

25   the emotional harm statements which occurred between, I

1    believe, December 3rd and December 23rd, 2020.

2    Q.  To be clear, Dr. Humphreys, are you offering any opinion

3    on whether these statements were defamatory?

4    A.  No, I'm not.

5    Q.  Are you offering any opinion at all on causation or

6    whether these statements caused any harm?

7    A.  No, I am not.

8    Q.  You are not offering any legal opinion in this case?

9    A.  Correct.  Not a lawyer.

10   Q.  So looking at the slide that's up on the screen now, it

11   says The Defamation Statements on the top.  What were the

12   statements you analyzed that relate to the defamation claim

13   in this case?

14   A.  So this was a set of statements provided to me by

15   plaintiffs' counsel.  And as you can see, they range here

16   from December 23rd, 2020 to January 12, 2022.

17   Q.  Who published these statements?

18   A.  They were published by Mr. Giuliani or, in some cases,

19   Mr. Trump or the Trump campaign.

20   Q.  Were the statements all published in the same way?

21   A.  No.  They had many different ways of being published.

22   Q.  Looking at the next slide, did you find that the

23   statements that we just examined on the previous screen were

24   republished or sent to different media forms?

25   A.  Yeah.  So as I mentioned before, one statement can be

1    republished on different websites or on different social

2    media.  So here you see the number of instances for the 16

3    statements; it was 91 instances overall.  That's some of the

4    instances.

5    Q.  Why is it important to look at the number of instances?

6    Why not just stop at the first statement?

7    A.  You know, as I mentioned before, in a media system when

8    somebody prominent says something, it can be circulated

9    pretty widely.  And so it's important, if you want the

10   number of impressions, to count the different instances.

11   Q.  Did you find every instance that's out there in the

12   world of these defamatory statements?

13   A.  No.  I didn't.

14   Q.  Do you think that would even be possible?

15   A.  Maybe not.

16   Q.  So to be clear, the list of statements that were on the

17   prior slide, the 16 statements, and then reposted in various

18   media types, what was the total number of instances that you

19   found and analyzed?

20   A.  So here we have a total of 91 instances.

21   Q.  So looking at the next slide, Dr. Humphreys, what were

22   the statements that you analyzed with respect to the

23   emotional harm statements?

24   A.  So the emotional harm statements occurred between

25   December 3rd, 2020, to December 22nd.  Here you can see it's

1    the same set of speakers.  Here I only counted almost just

2    one instance per statement.  I didn't go -- I didn't measure

3    them in the broader media system.

4    Q.  So for the emotional harm statements, you were not

5    trying to trace each individual statement out into the

6    different media forms where they were being republished?

7    A.  That's right.

8    Q.  Is that because you are not offering the jury a

9    cost-to-repair damages model on emotional harm statements in

10   this case?

11   A.  Correct.

12   Q.  On what platforms were the instances of emotional harm

13   statements posted?

14   A.  So as you can see here, those occurred -- a lot of them

15   were on Twitter.  There were some on Facebook.  There were a

16   few on YouTube podcasts and radio.

17   Q.  All right.  So looking at the slide that's up on the

18   screen for the jury now, can you explain how --

19            THE COURT:  Can I just stop you, because maybe I

20   am not the only person who is confused about this.

21            Is there a difference between the defamation

22   statements and emotional harm statements?  And if so, what

23   is the difference?  Are they the same statements or not?

24            THE WITNESS:  They're different statements, yeah.

25            THE COURT:  Did we see -- we saw the defamation

1    statements.  Did we see a list of the emotional statements

2    that are being measured?

3                MR. GOTTLIEB:  I can ask the witness --

4                THE COURT:  Okay.

5                MR. GOTTLIEB:  -- if I could.

6                THE COURT:  Yes.

7                MR. GOTTLIEB:  -- so I am not testifying.

8    BY MR. GOTTLIEB:

9    Q.  Dr. Humphreys, are the emotional harm statements -- what

10   is the starting date range for the defamatory statements

11   that you analyzed in this case?

12   A.  So the starting point for the defamation statements is

13   December 23rd, 2020.

14   Q.  Okay.  And do you see the slide up on the screen now?

15   A.  That's right.

16   Q.  Are these all of the defamation statements that you

17   analyzed?

18   A.  That's right.  That's all the statements I analyzed as

19   the defamation statements.

20   Q.  Am I correct that the emotional distress statements you

21   looked at all occurred prior to December 23rd, 2020?

22   A.  That's right.

23   Q.  And so in your analysis of the defamation statements,

24   did you consider any statement or any republication of a

25   statement prior to December 23rd, 2020?

1    A.  No.

2    Q.  In your written opinions, did you provide a list of all

3    of the emotional harm statements that you analyzed in this

4    case?

5    A.  I believe I did at some point provide a list, yes.

6    Q.  So now looking at the slide that's up on the screen --

7            THE COURT:  And the emotional harm statements are

8    different from the slide we just saw listing the defamation

9    statements?

10           THE WITNESS:  That's right.  As you can see on the

11   former slide, there are a lot of them, and so we didn't list

12   them all out on the table.  I think there are 27, plus 12,

13   plus 12.

14           MR. SIBLEY:  Your Honor, I would renew -- I don't

15   believe I need to do this.  But the 402, 403 objections that

16   the Court's previously ruled on, I would renew those for --

17           THE COURT:  I can't hear you.  Why don't we get on

18   the phones.  I don't know what you are going to say.

19           (Whereupon, a bench conference was held.)

20           THE COURT:  Mr. Sibley.

21           MR. SIBLEY:  Yes, Your Honor.

22           Just with respect to the emotional harm

23   statements, it's just our prior objection that those

24   statements are not actionable.  They were not identified

25   early in the complaint.  The Court already ruled.  I just

 1    want to make that objection to the extent --

 2              THE COURT:  Remind me what the emotional harm

 3    statements are.

 4              MR. SIBLEY:  These are the statements that they

 5    pointed out because they know they have limitation problems

 6    for everything past December 23rd.  So, basically, they're

 7    going to point to every statement -- select statements of

 8    Mr. Giuliani between December 3rd and December 22 to support

 9    the IIED claim.

10              THE COURT:  Okay.  As they're entitled to.  Okay.

11    Your objection is overruled.

12              (Whereupon, the bench conference concludes.)

13    BY MR. GOTTLIEB:

14    Q.  All right.  Dr. Humphreys, back to the impressions

15    model.  Can you explain at a high level -- and we'll dig

16    into some examples -- how you went about tracing statements

17    across the various instances in which you found them?

18    A.  Sure.  So for each statement, it was repeated amongst

19    these different instances, on online video, on social media,

20    on web, print, TV or podcast, and so I counted the

21    impressions for each of those channels.

22    Q.  All right.  Thank you, Dr. Humphreys.

23              MR. GOTTLIEB:  Your Honor, the next three slides

24    show reproductions or portions of Plaintiffs' Exhibit 1

25    which has been admitted into evidence.

```
 1    BY MR. GOTTLIEB:

 2    Q.  Dr. Humphreys, let's start with walking through an

 3    example of one of the defamation statements that you

 4    analyzed in this case.

 5            Do you recognize the document that's up on the

 6    screen on this slide that references Plaintiffs' Exhibit 1?

 7    A.  Yes.  So this is one of the statements reviewed in my

 8    analysis.

 9    Q.  And what is this statement?

10    A.  So as it says at the top there, it's a Strategic

11    Communications Plan.  It says Giuliani, Presidential Legal

12    Defense Team.

13    Q.  How did you look at this document in your analysis?

14    A.  So, you know, I guess it's an example of a defamation

15    statement that I was given, but it's also a strategic

16    communications plan.  So it outlines some of the elements of

17    strategic communications that I mentioned previously.

18    Q.  What are some examples of the sort of principles or

19    components of a strategic communications plan that you

20    notice in Plaintiffs' Exhibit 1?

21    A.  So as you see at the top, there is a goal:  Nationwide

22    communications outreach to educate the public on the fraud

23    numbers, inspire citizens to call upon legislators and

24    members of Congress to discard the fraudulent vote.  So

25    there is a goal of the campaign.  There is a target of the
```

1    campaign, as you see, the swing-state Republican senators

2    and so on; and then there is a set of messages to share.

3    Q.  And does the strategic communications plan include media

4    types or messaging channels?

5    A.  Yes.  So in addition to a target and a message, there is

6    also an identification of sources.  So who should share the

7    message and how should they share the message.  So as you

8    see here, the channels might be presidential tweets,

9    Giuliani team tweets, talk radio, and so forth.

10   Q.  Did you see any examples of presidential tweets or

11   Giuliani team tweets that you considered in your analysis in

12   this case?

13   A.  Yes, I did.

14   Q.  And how about the reference to SM Conservative

15   Influencers?  What does that mean to you?

16   A.  So I believe that means social media conservative

17   influencers.  As I mentioned, there are influencers in a

18   wide range of areas.  There are political influencers on the

19   left and the right, and these are some of the influencers

20   who have been identified for this campaign, I believe.

21   Q.  And what's with the references to YouTube and then

22   numbers, and Instagram and then numbers, and then Twitter

23   and numbers?  What's the significance of that information?

24   A.  Right.  So as I mentioned before, influencers are

25   usually defined by the size of their following.  So you can

1    have mega influencers, you can have micro influencers.

2    They're all determined by how many people follow them.

3          So the first one on the list is Candace Owens,

4    YouTube.  She has 747,000 followers.

5    Q.  Does the size of an influencer's audience change how

6    much it cost to hire that influencer to spread your message?

7    A.  Yes.  Typically, it's more expensive to hire influencers

8    with larger audiences.

9    Q.  Did you see examples of the sort of content of messaging

10   that the strategic communications plan contemplated

11   disseminating?

12   A.  Yes.  In the strategic communications plan document,

13   there are messages like this.  This one says "Suitcase

14   gate"; "Video ballot stuffing"; "When suitcases are filled

15   with ballots."

16         For Georgia, you see below it says, "A video of

17   Ruby and Shaye at Midnight"; "No Water Main Break."  It has

18   bullet points.

19   Q.  Did you see any of these messages that you saw in the

20   strategic communications plan put into action in any of the

21   statements or instances you looked at in this case?

22   A.  Yes.  In some of the statements and instances, I did see

23   messages such as this, ballot stuffing, suitcases, and so

24   forth.

25   Q.  Did you see any documents or evidence in the course of

1    preparing for your opinions that indicated the cost -- the

2    estimated cost of executing the strategic communications

3    plan?

4    A.  Yes, I did.

5    Q.  Do you remember what that was?

6    A.  I believe it was 5- to $8 million for a pretty short

7    period of something like ten days.

8    Q.  Thank you, Dr. Humphreys.

9            Let's take a look at another example of one of the

10   instances --

11           MR. GOTTLIEB:  Your Honor, this slide has video

12   that's previously been admitted into evidence as Plaintiffs'

13   Exhibit 4, the transcript of which was previously admitted

14   into evidence as Plaintiffs' Exhibit 3.

15           Let's play this video, please.

16           (Whereupon, an exhibit was published.)

17   BY MR. GOTTLIEB:

18   Q.  Dr. Humphreys, is this one of the defamation statements

19   you analyzed in this case?

20   A.  Yes.

21   Q.  Where does this statement come from?  Where was it

22   posted?

23   A.  So this was initially from a podcast called "Rudy

24   Giuliani's Common Sense."

25   Q.  What is a podcast?

1    A.   A podcast is -- typically, it's on audio and you would

2    download and listen to it, but they can also be shared on

3    video or other forms.

4    Q.   Are podcasts disseminated on multiple channels for

5    podcasts or audio?

6    A.   Yes.

7    Q.   So there are multiple channels that a podcast can be

8    disseminated in just for the audio component, and there's

9    also sometimes a video component on an online platform?

10   A.   That's right.  You have a video component.  You can also

11   have an Apple Podcast or a Spotify podcast for just the

12   audience.

13   Q.   Are the metrics or the download totals for podcasts

14   something that content producers pay attention to?

15   A.   Yes.

16   Q.   Why is that?

17   A.   They indicate the broad reach or the reach of the

18   podcast.

19   Q.   And are they relevant for advertisers?

20   A.   Yes.

21   Q.   When was this particular episode published?

22   A.   So this was published on December 23, 2020.

23   Q.   How did you go about measuring impressions for this

24   December 23rd, 2020, podcast?

25   A.   So as I mentioned, it existed on web through just a web

1    browser, in an online video, on a podcast through some of

2    those channels I mentioned, like Apple Podcast and on social

3    media.

4    Q.  How did you go about finding the instances where this

5    podcast got published or reappeared?

6    A.  So it varied according to the channel.  I had a list of

7    kind of links that would kind of take you to each one.

8    Q.  And then at a high level -- again, we'll talk about

9    methodology in each of these categories.  But at a high

10   level, how do you go about measuring impressions once you've

11   got the instances?

12   A.  Right.  So it varies depending on the channels.  For

13   online videos, it's pretty straightforward; you would use

14   views.  For podcasts, ideally you would have a number of

15   downloads if you are the accountholder.  For web, you would

16   look at the web traffic or how many people visited the

17   website, et cetera.

18   Q.  Were you forced to rely on certain estimates as you were

19   doing your analysis of this podcast?

20   A.  Yes.  So I didn't have access to the data that an

21   accountholder would have from their own social media,

22   Twitter or from the podcast.  If they're the producer, you

23   can get the exact number of downloads.

24   Q.  Who is the relevant accountholder for purposes of this

25   podcast?

1    A.  I believe in this case it would be Mr. Giuliani.

2    Q.  To be clear, an accountholder on social media, they

3    regularly have access to information that's not publicly

4    available?

5    A.  Yes.

6    Q.  Does that include things like metrics or the performance

7    of their posts?

8    A.  Typically, yes.

9    Q.  Does it include things like advertising revenue and the

10   amount they're getting in compensation?

11   A.  I know it would include the number of downloads, for

12   instance, on a podcast.

13   Q.  Let's start with your impressions analysis for this

14   statement focusing on web.

15          THE COURT:  Could I just -- when you were doing

16   this research, was this video still posted and available?

17          THE WITNESS:  Yes.  I believe it remains up.  It's

18   still accessible.

19   BY MR. GOTTLIEB:

20   Q.  To be clear, the fact that it's still accessible then

21   allows you to see a view number on the online video; is that

22   right?

23   A.  That's right.

24   Q.  But -- we'll talk as we go through the different

25   instances how that might be more challenging.  But let's

1    start with web because I think that's a good example of

2    that.

3              So did you estimate the number of impressions that

4    were caused by this podcast across publications on

5    Internet -- various Internet websites?

6    A.   Yes.

7    Q.   So how did you do that?

8    A.   So the podcast was hosted on two websites, on

9    Mr. Giuliani's website and on a website for the news network

10   called OAN, the One America News Network.

11   Q.   How did you estimate the number of impressions for this

12   podcast on these two websites?

13   A.   So for these two websites, if you are not the

14   accountholder, there is publicly available information on

15   how many people go to the website provided by third parties

16   because advertisers do want to know how many people go to

17   different websites; so I used one of those third-party

18   services.

19   Q.   Okay.  So you used a third-party service to examine

20   daily web traffic?

21   A.   Correct.

22   Q.   And then what did you do with that daily web traffic to

23   come up with your estimate?

24   A.   Right.  So the numbers you are given is for one month,

25   how many visits that particular site had for one month.  So

1    what I did is I divided by 30 to just count one day of that

2    month, and then I subtracted the bounce rate.

3    Q.  We'll come back to the bounce rate.

4            Well, actually, let's do the bounce rate now.

5            So what is a bounce rate?

6    A.  Sure.  So a bounce rate is the percent of people who go

7    to the website, but they don't actually click anything.

8    They don't perform any action; and so I didn't count those

9    people.

10   Q.  The bounce rate is an estimate?

11   A.  Correct.  That's also provided by these third-party

12   services.

13   Q.  So walk through very precisely the math here.  You start

14   with how many visitors typically go to a website in a month?

15   A.  Yes.

16   Q.  And then you divide by 30 --

17   A.  Correct.

18   Q.  -- to estimate how many typically go in a day?

19   A.  Correct.

20   Q.  And then you apply a bounce rate or a discount to that

21   number of people?

22   A.  Correct.

23   Q.  And that leaves you with an estimated number of

24   people --

25            MR. SIBLEY:  Your Honor, I would just object to

1      the leading of the witness.

2                  THE COURT:  Objection overruled to break down the

3      math that she said in one to two sentences, and I think it's

4      helpful for all of us who are hearing this for the first

5      time to have it broken down.  He is not -- he's just

6      breaking down what she's already testified to, Mr. Sibley.

7      Your objection is overruled.

8      BY MR. GOTTLIEB:

9      Q.  So those steps are how you get to the 9,640 impressions

10     you see on the screen here?

11     A.  That's right.  That is for the one day that I counted.

12     Q.  To be clear, Dr. Humphreys, I think, as the Court just

13     observed, this particular podcast was still up on the

14     Internet when you did your analysis; is that right?

15     A.  That's right.  I believe somebody can go today and watch

16     the podcast.

17     Q.  And your analysis is only meant to provide an estimate

18     of the number of people that would have listened to or

19     experienced this podcast on the day it was released; is that

20     right?

21     A.  That's right.  So I am not counting people who might

22     have gone that week or next month or next year.

23     Q.  So in your opinion, is it likely that there were the

24     same, less, or more listeners who actually listened to the

25     podcast on, for example, Mr. Giuliani's website?

1    A.   I would say more people have listened to this website

2    than my estimate here.

3    Q.   So apart from Mr. Giuliani's website, I think you said

4    you analyzed another website as well?

5    A.   Correct.  I did the same process for the website OAN.

6    Q.   Did your analysis differ in any material respect as

7    between the two?

8    A.   No.

9    Q.   What was your conclusion as to the number of impressions

10   generated on the day of publication for this particular

11   podcast for the OAN website?

12   A.   So here for Mr. Giuliani's website of 9600 impressions;

13   for OAN, you have also about 9600.

14   Q.   Okay.  Dr. Humphreys, so moving on, did you consider

15   online video platforms, republication of the December 23rd,

16   2020, podcast?

17   A.   Yes.

18   Q.   What did you consider?

19   A.   So there were two video-sharing platforms.  One was

20   YouTube where the video was hosted, and then at some point I

21   believe a video was taken down from YouTube.  It was

22   reposted to a platform called Rumble.

23   Q.   And how did you measure impressions for the

24   December 23rd, 2020, podcast on YouTube and Rumble?

25   A.   So here I took simply the number of views and defined

1    one view as one impression.

2    Q.  So there is no complicated math you need to use for

3    YouTube and Rumble because those platforms just provide a

4    running count of the number of views of that video?

5    A.  That's correct.

6    Q.  And that's publicly available?

7    A.  Yes.

8    Q.  What were your conclusions about the number of

9    impressions of the December 23rd, 2020, podcast for YouTube

10   and Rumble?

11   A.  So for YouTube, there were 448,000 impressions

12   approximately.  For Rumble, there were about 8400

13   impressions.

14          THE COURT:  I am curious.  You said that the video

15   was taken down from YouTube.  So if it was taken down, where

16   did you get the view number?

17          THE WITNESS:  Right.  So there is something called

18   the Internet archive that records all websites, and so I

19   used the latest screen grab.

20   BY MR. GOTTLIEB:

21   Q.  Does that service have a name, Dr. Humphreys?

22   A.  I think it's called the Wayback Machine or Internet

23   archive.

24   Q.  That is how you estimated the YouTube views for this

25   podcast?

1   A.  That's right.  It's commonly used in my type of

2   research.

3   Q.  How about podcasts, how did you go about analyzing the

4   number of podcast impressions for this podcast episode?

5   A.  So for this podcast episode, I didn't have access to

6   Apple Podcast which is one of the most popular services, or

7   Spotify.  They don't make their data public, so I didn't

8   include that.  I did include a service called Podbean that

9   does share their data.

10  Q.  Who would have the metrics or information on the numbers

11  for this podcast for Apple and Spotify?

12  A.  Mr. Giuliani I believe would have access to the data.

13  Q.  And you didn't have access to that?

14  A.  No, I didn't.

15  Q.  Did you review any evidence in this case that showed

16  about how many followers Mr. Giuliani had on social media

17  platforms in December of 2020?

18  A.  Right.  I believe on this date, he would have over a

19  million followers.

20  Q.  Now, does that mean that your estimate of 34,5 -- let me

21  reword.

22          What does that lead you to conclude with respect

23  to your estimate that there were 34,500 impressions

24  generated by this podcast?

25  A.  Sure.  I would say this is an undercount.

```
1    Q.  So looking at the last category, social media, is social

2    media -- estimating the number of impressions on social

3    media, is that as easy as the previous three exercises we

4    have done?

5    A.  So it's a little trickier.  I will walk you through it.

6    Q.  All right.  Let's talk about why it's trickier.

7            Can you explain the analysis that you went through

8    to estimate, for example, impressions on Facebook?

9    A.  Sure.  So one thing people may not realize is that not

10   all of your followers see what you post.  People follow lots

11   of accounts.  They may not sign on that day.  There is a lot

12   of information there that is all competing for attention.

13   And so what we do is:  To estimate the number of

14   impressions, you kind of take the number of followers and

15   then apply a series of discounts; and we call that the

16   impression rate.

17   Q.  And so it's not as simple as saying a person has 100

18   followers and they make a post and so, therefore, 100 people

19   saw it?

20   A.  Correct.

21   Q.  And so how does your sort of -- how do you go about

22   estimating that in the work that you did in this case?

23   A.  Sure.  So imagine you have 100 followers and you put

24   something on Facebook.  If you are an influential account,

25   it has a lot of engagement.  If you are pretty prominent,
```

1     your impression rate would be 20 percent.  So 20 of your 100

2     followers would see what you post.  If you are more a

3     typical person, that could be as low as about 5 percent.

4     Q.  So I think your testimony is that a less prominent user

5     of social media, their users may only see about 5 percent of

6     their posts?

7     A.  Correct.

8     Q.  But somebody who has many followers or is an influencer

9     is 20 percent?

10    A.  Correct.

11    Q.  Can it be higher than 20 percent for certain kinds of

12    people?

13    A.  Yes.

14    Q.  What would influence whether it would be higher than 20

15    percent?

16    A.  So it can vary per post.  Some posts become very widely

17    circulated; some posts aren't.  I calculate just kind of the

18    average impression rate.  For some prominent people and some

19    prominent pieces of information, the impression rate can be

20    quite a bit higher than 20 percent.

21    Q.  In your opinions in this case, did you provide a

22    low-range estimate and a high-range estimate for

23    impressions?

24    A.  Right.  So I would call the low range 5 percent, and I

25    would call the high estimate 20 percent.

1    Q.  And based on your knowledge of the defendant's followers

2    in this case and the materials you reviewed, do you have any

3    view as to which of those two provides the more accurate

4    estimate for the number of impressions that his post would

5    have generated?

6    A.  Yes.  So given the prominence of the poster, as well as

7    a few other analyses that I did in the case, I would say 20

8    percent is the more likely number.

9    Q.  Did you ever find any data that allowed you to -- that

10   guided you in your determination with respect to

11   Mr. Giuliani's prominence and how that affected the number

12   of impressions his post generated?

13   A.  Right.  So when this post was initially made, public

14   data wasn't available.  On Twitter, however, they released

15   the number of views at some point.  And so I was able to

16   collect Mr. Giuliani's Twitter data after this date and

17   perform an analysis that gave me the impression rate for

18   Twitter.

19   Q.  Okay.  And just so we have a clear record, when you say

20   "this post," so in December of 2020, there was no publicly

21   available information that reflected the level of engagement

22   with Mr. Giuliani's social media posts?

23   A.  There wasn't a measure of how many impressions that he

24   got.

25   Q.  How many impressions, okay.

1    A.  Yes.

2    Q.  But that information -- at least some information

3    relevant to that did become available later?

4    A.  Yes, on Twitter.

5    Q.  What did that information tell you?

6    A.  So when I used that information, I calculated the

7    impression rate for his specific account for Twitter, and it

8    was an average of 27 percent.

9    Q.  So the engagement rate for his Twitter account based on

10   publicly available Twitter data, you were able to calculate

11   at 27 percent impressions rate?

12   A.  The impression rate, yes.

13   Q.  All right.  Thank you, Dr. Humphreys.

14          Looking at this slide that's up on the screen, can

15   you explain how your sort of models lead to the different

16   impressions shown here?

17   A.  Sure.  So if you assume just the impression rate of

18   5 percent, that's the low impression rate, then this one

19   Facebook post would have gotten 73,000, roughly,

20   impressions.  If you assume a higher impression rate of 20

21   percent, it would have received just below 300,000

22   impressions.

23   Q.  Again, do you have a view in your expert opinion which

24   of these is a more accurate estimate?

25   A.  I think the high estimate is likely more accurate.

1   Q.  Is there any evidence that the accountholder would have

2   that would have allowed you to arrive at a more precise

3   estimate of impressions and posts?

4   A.  Yes.  I believe the accountholders have the information

5   on impressions.

6   Q.  So in this case, we're talking about Mr. Giuliani.

7   Mr. Giuliani is the accountholder?

8   A.  That's correct.

9   Q.  And so the accountholder typically has access to the

10  performance of their posts on Facebook?

11  A.  Correct.

12  Q.  Again, is that something that is important data for

13  companies and advertisers that they typically look at?

14  A.  Yes.

15  Q.  So stepping back, we have walked through these different

16  categories of online video websites, podcasts and social

17  media.  How many impressions, as you added all of these up,

18  did this one December 23rd, 2020, podcast generate that you

19  were able to estimate?

20  A.  Right.  So you just add the impressions for each channel

21  and you come up with an estimate of about 500,000

22  impressions on the low estimate or 800,000 impressions on

23  the high estimate.

24  Q.  What is driving the difference in the two -- in the low

25  number and the high number that is on this slide in the red?

```
1    A.  Right.  So as you can see here, the difference is solely

2    because of the social media, because of Facebook.

3    Q.  So the delta between those two ranges is driven by the

4    assumptions that one makes with respect to social media?

5    A.  Correct.

6    Q.  In your expert opinion based on what you looked at in

7    this case, as between the 584,000 and 806,000 impressions,

8    which do you believe is the more accurate?

9    A.  I believe the high estimate is the more accurate.

10            MR. GOTTLIEB:  Your Honor, looking at the time and

11   where we are, this could be a good place for the morning

12   break.

13            THE COURT:  All right.  We'll do that.

14            THE WITNESS:  Okay.

15            THE COURT:  We'll take a ten minute break.

16            (Whereupon, a recess was taken at 10:40 a.m.)

17            THE COURT:  Bring the jury in.

18            (Whereupon, the jury returns to the courtroom.)

19            THE COURT:  Please proceed.

20            MR. GOTTLIEB:  Thank you, Your Honor.

21   BY MR. GOTTLIEB:

22   Q.  Dr. Humphreys, before the break, we looked through

23   the -- at your analysis in the impressions model for the

24   December 23rd, 2020, episode "Common Sense."  Did you

25   perform a similar kind of analysis for all of the 16
```

1    statements that you looked at in this case --

2    A.  Yes.

3    Q.  -- the 16 defamatory statements you looked at in this

4    case?

5    A.  Correct.

6    Q.  We're going to look at another example.

7         MR. GOTTLIEB:  Your Honor, the next slide contains

8    a video and screenshot of a tweet which have both been

9    admitted into evidence as Plaintiffs' Exhibit 337 and

10   Plaintiffs' Exhibit 338, respectively.

11   BY MR. GOTTLIEB:

12   Q.  Before we play the video, I want to ask you:  Did you

13   examine any statements in this case that were disseminated

14   on Twitter?

15   A.  Yes.

16   Q.  And I think you testified earlier about the Giuliani

17   Strategic Communications Plan.  I think you testified that

18   in the channels to disseminate messaging, that plan talked

19   about presidential tweets?

20   A.  Yes.

21   Q.  Did you analyze any content for purposes of your

22   impression models that were disseminated via presidential

23   tweets?

24   A.  Right.  So as you can see here, there were presidential

25   tweets.  There were also Trump campaign tweets which is what

1    you see on the screen here.

2    Q.  Okay.  So the Team Trump Twitter message that's on the

3    right-hand side of the screen is an example of the campaign

4    tweets that you examined in this case?

5    A.  Correct.

6              MR. GOTTLIEB:  Okay.  Let's now play the video,

7    please.

8              (Whereupon, an exhibit was published.)

9    BY MR. GOTTLIEB:

10   Q.  Dr. Humphreys, is this video one of the defamatory

11   statements you analyzed as part of your impressions model in

12   this case?

13   A.  Yes.

14   Q.  How did you go about looking at the instances of this

15   particular campaign advertisement?

16   A.  So for this particular instance, it was shared on social

17   media.

18   Q.  And how many instances of this statement on social media

19   did you analyze?

20   A.  So I believe there were two tweets, one from the Trump

21   campaign and one from Mr. Trump's account on December 23rd

22   and December 24th, 2020; and there was one Facebook post on

23   December 24th, 2020.

24   Q.  Okay.  So the same video that we just played, that

25   appeared in the three tweets that are listed up on the

```
1    screen here?

2    A.  Correct.

3    Q.  Or -- sorry, the two tweets and the one Facebook post

4    that's on the screen here?

5    A.  Correct.

6    Q.  You analyzed the impressions that were generated by each

7    of the two tweets and the Facebook post?

8    A.  Right.

9    Q.  What impact did Donald Trump's posting this

10   advertisement on his Twitter account have?

11   A.  So Mr. Trump had at the time 88 million followers.  I

12   believe he was one of the top ten on Twitter for number of

13   followers, and so this reached a broad audience.

14   Q.  Do you draw any conclusions based on the number of

15   followers that President Trump had at this time with respect

16   to your estimate of impressions?

17   A.  Yes.  So this received a great number of impressions,

18   although certainly not all of those followers.  As I said,

19   it would have reached at the high estimate 20 percent of

20   those followers according to my calculations and a low of

21   5 percent.

22   Q.  For President Trump in December of 2020, could the

23   impression rate be higher than 20 percent?

24   A.  Yes.

25   Q.  But your model hasn't assumed that -- or built in a
```

1    higher number than 20 percent, has it?

2    A.  Correct.  Judging by the engagement to this tweet, the

3    number of people who liked it, and the number of comments, I

4    would say the impression rate in my opinion is likely

5    greater than 20 percent.

6    Q.  All right.  Were there any instances that you did not

7    consider or did not look at when you were analyzing the sort

8    of reach or spread of this campaign advertisement?

9    A.  Yes.  So for this advertisement, I didn't consider

10   traditional television.  I didn't consider YouTube

11   advertisements or anything on YouTube.  I didn't consider

12   other tweets or Facebook posts.

13   Q.  Okay.  So sometimes we're watching TV, particularly

14   during election season, and we're inundated with political

15   ads.  That's not something that you tried to quantify with

16   respect to this advertisement?

17   A.  Correct.

18   Q.  All right.  So getting back to the campaign

19   advertisement, what did you estimate were the total number

20   of impressions for the single Trump campaign advertisement

21   across the three instances?

22   A.  Right.  So here you see the three instances.  The low

23   estimate ranged -- was 8 million impressions, and the high

24   estimate was 18 million impressions.

25   Q.  Again, the low and the high, is that based on the 5 and

1    20 percent estimates that you've talked about previously?

2    A.  Correct.

3    Q.  So even though Donald Trump at the time had 88 million

4    Twitter followers, you are not estimating that 88 million

5    people saw this video?

6    A.  Correct.  From this, I estimate only between 8 million

7    and 18 million.

8    Q.  In your opinion, based on your experience and expertise,

9    what side of that range do you believe to be more accurate?

10   A.  I believe the 18 million would be more accurate.

11            MR. GOTTLIEB:  All right.  Your Honor, we're going

12   to look at another example of the defamatory statements.

13            The next slide contains content from Plaintiffs'

14   Exhibit 11, Plaintiffs' Exhibit 12, and Plaintiffs'

15   Exhibit 575 which have been previously admitted.

16   BY MR. GOTTLIEB:

17   Q.  So, Dr. Humphreys, did you analyze, as one of your

18   defamatory statements a phone call between Donald Trump and

19   Georgia Secretary of State Brad Raffensperger?

20   A.  Yes.

21   Q.  What was the date of that call?

22   A.  The date of that call was January 2nd, 2021.

23   Q.  You see on the screen we have a transcript of the call

24   between former President Trump and Secretary of State Brad

25   Raffensperger.  Do you see that in the bottom paragraph,

1   there is some language about Ms. Freeman's reputation?

2   A.  Yes.

3   Q.  Do you see that Mr. Trump said:  She's known all over

4   the Internet, Brad.  She's known all over.  I'm telling you,

5   "Where is Ruby" was one of the hot items.  They knew her?

6   A.  Yes.  I see that.

7   Q.  In your opinion how do you assess Mr. Trump's claim here

8   that Ms. Freeman was known all over the Internet and that

9   the phrase "Where is Ruby" was spreading or trending?

10  A.  So that squares with some of my analysis in the impact

11  analysis.

12  Q.  Okay.  Let's talk about how you measured the number of

13  impressions for this call.  So this was a phone call.  How

14  do you go about measuring the impressions that are generated

15  by a recording of a phone call?

16  A.  Right.  So this was initially a phone call, but it

17  became widely shared in news outlets, in online video.  The

18  full transcript was published in online news websites.  So

19  this call was widely shared over media.

20  Q.  Was this called "big news" when it became public?

21  A.  Yes.  From what I saw, it was covered in the news very

22  prominently on most news websites.

23  Q.  Was it covered on national network broadcasts on TV?

24  A.  That's correct.

25  Q.  Is it fair to say this was the leading or one of the

1    leading stories when it came out?

2    A.  From what I have seen, yes.

3    Q.  How did you go about finding the various instances that

4    you then calculated the impressions from?

5    A.  So here it's pretty much the same.  You have each of the

6    different channels.  I would say the only difference that I

7    will discuss is some of these channels have a very broad

8    audience.  So CNN has a very broad audience, and I only

9    counted a small -- a portion of that audience.

10   Q.  And we'll come back to that.

11             Were there instances that you found of news

12   reports covering this phone call or portions of the phone

13   call that appeared online that you found but that you did

14   not include in your impressions analysis?

15   A.  Correct.  So I included any -- I included the instances

16   that had the full transcript of the call, the full audio of

17   the call or particular portions that were related to

18   Ms. Freeman and Ms. Moss.

19   Q.  Did you consider news websites in your analysis of

20   impressions for the call?

21   A.  Yes, I did.

22   Q.  How did you do that?

23   A.  So what I did here is I worked from a set of articles

24   that were provided to me by plaintiffs' counsel and that we

25   identified that contained the full transcript or significant

1    portions.

2    Q.  And are all of those instances listed out in your expert

3    report disclosed in this case?

4    A.  Yes.

5    Q.  How many websites in total did you look at?

6    A.  So as you can see here, it appeared on 26 websites that

7    I gathered.

8    Q.  And how did you go about estimating the impression rates

9    for the call transcripts or audio-video you found on the

10   websites?

11   A.  So this is online news, so this would be

12   newyorktimes.com or cnn.com.  I again used just their number

13   of visitors, the web traffic that I had access -- I have

14   access to that data through this third-party site, and I

15   followed the same methodology.  So I subtracted the bounce

16   rate, and in this case I considered -- as I said, *The New*

17   *York Times* is a very broad audience, and so I considered

18   only the audience that would be receptive to this particular

19   message.

20   Q.  What does that mean?  What does "the audience that would

21   be receptive to the message" mean?

22   A.  So not all *The New York Times* audience is going to be

23   receptive to believing a claim by Mr. Trump, and so I

24   counted -- there is a nonprofit research institute that will

25   give you for any publication, *The New York Times* or

1    *Washington Post*, the percent of audience who are Trump

2    supporters, and I felt that was a fair measure of a

3    receptive audience to this claim.  So, for example, for *The*

4    *New York Times*, 13.7 percent of their audience are Trump

5    supporters; so I included only that audience.

6    Q.  And we may come back to that previous line.

7           The slide that is depicted up on the screen right

8    now, do these contain the percentages that you used to

9    estimate receptive audiences for the websites that you

10   examined?

11   A.  That's correct.  So for an outlet like *The Washington*

12   *Post*, it would be 14 percent of the total audience of

13   supporters for Mr. Trump; for Fox News, it would be

14   68 percent.

15   Q.  So why do that?  Why not just estimate the number of

16   people who likely saw the call or listened to the call?

17   A.  Right.  As I mentioned previously, we're likely to

18   believe something if it is sort of -- if it comes from a

19   trusted source, if it is aligned with things we already

20   believe.  So with that percent of the audience that says

21   they're Trump supporters, I consider them to be receptive to

22   the claim.

23   Q.  All right.  Am I right that when we look at examples on

24   the screen -- let's stay with *The New York Times* as you

25   mentioned before -- what percentage of *The New York Times*

1    audience are you not including in your estimate of

2    impressions for this particular call?

3    A.  It would be 100 minus 13 percent, 14 percent.

4    Q.  Which is about what?

5    A.  You want me to do math?  80-some percent.

6    Q.  So you are excluding 80-some percent of the individuals

7    on *The New York Times* who likely saw and were exposed to

8    this information but you don't include any of those people

9    in your impressions analysis?

10   A.  That is correct.

11   Q.  And that applies -- same type of math applies for all

12   these sources?

13   A.  That's right.

14   Q.  Where is this data from, by the way, from which you

15   calculated the impression -- receptive impression rate?

16   A.  Right.  This comes from a survey done by Pew Research

17   Center.  They basically conduct a survey for a nationally

18   representative audience and asked people:  What publications

19   do you read?  And they also later in the survey asked people

20   about their support for Mr. Trump.

21   Q.  Do you use this concept of receptive audiences in the

22   damages opinion that you have offered for the purposes of

23   this case?

24   A.  Yes.  So my campaign addresses only that receptive

25   audience.

1    Q.  What do you mean by that?

2    A.  Right.  So I based only -- the repair campaign only on

3    what I call the receptive impressions, that number of

4    impressions that were from people likely to believe the

5    claim.

6    Q.  We'll come back to this.

7            But the cost to repair campaign that you are

8    estimating is designed only to reach the audience that you

9    believe would have been potentially receptive to hearing the

10   negative information in the first instance?

11   A.  That is correct.

12   Q.  So in applying this analysis with the bounce rate and

13   the receptive audience impressions, how many impressions did

14   you estimate for the instances of the Trump phone call

15   across the news websites by themselves?

16   A.  So for the web that would be 1.9 million approximately.

17   Q.  Did you also consider instances of the phone calls that

18   appeared on television?

19   A.  Yes.

20   Q.  What did you look at?

21   A.  So here there is an archive of TV news where you can

22   search anything that is said on television news.  So I

23   conducted a search for the key excerpts from the call that

24   related to the plaintiffs.  And I found this call aired the

25   key portions on news outlets like CBS, CNN, Fox, and MSNBC.

1   Q.  How did you determine the number of people who may have

2   seen these broadcasts on those network stations?

3   A.  So here I, again -- well, so there are very standard

4   ways in my field for measuring television audiences from a

5   company called Nielsen because, as I've mentioned,

6   advertising is based on how many people are watching the

7   show.  So I took the television audience for each of these

8   shows and I counted only that receptive percentage.

9   Q.  Okay.  So you took a Nielsen estimate as the third party

10  that estimates audiences for television networks?

11  A.  Correct.

12  Q.  And then once you had that estimate for the number of

13  people who were likely watching at that time, what did you

14  do to calculate impressions?

15  A.  So I basically took that audience and I multiplied it by

16  30 percent; so I took only 30 percent of that total audience

17  for CBS, for example.

18  Q.  Why did you do that?

19  A.  Again, I considered only the people who were -- who were

20  open to believing the claims of Mr. Trump.

21  Q.  That's the receptive audiences?  That's the term you've

22  used before?

23  A.  Correct.  Yes.

24  Q.  So in looking at the total, what did you estimate the

25  total number of impressions for the television broadcasts of

1    former President Trump's January 2nd, 2021, call?

2    A.  So for this call on January 2nd, I estimated from

3    television 3.8 million receptive impressions.

4    Q.  All right.  So next category, how about online video?

5    A.  So online video is again very straightforward.  I took

6    the number of views of these video -- of the video from

7    YouTube and from Rumble.

8    Q.  How many online videos did you analyze in connection

9    with this call?

10   A.  So there were a total of nine online videos; but again,

11   sometimes the online video was from NBC, their YouTube

12   account, so I only took that percentage of the audience for

13   NBC that would be receptive.

14   Q.  So you applied your receptive audience discount to

15   online videos as well?

16   A.  That's right.

17   Q.  Let's use the NBC example.  Did you look at a video that

18   was posted to YouTube by NBC News?

19   A.  Right.  So this video had 11.3 million views, and NBC

20   has a receptive audience of 29.5 percent, almost 30 percent,

21   which gives you 3.3 million receptive impressions.

22   Q.  So you have got the full video and audio of President

23   Trump's January 2nd phone call.  NBC News has posted it to

24   YouTube, and that had 11.3 million views approximately?

25   A.  Correct.

1    Q.  And so your estimate of the number of impressions that

2    you are calculating for your impressions model is the

3    3.3 million number; is that right?

4    A.  Yes.

5    Q.  How many impressions did you estimate for the nine

6    online video estimates for the January 2nd, 2021, phone

7    call?

8    A.  So for online video, it's 4.8 million receptive

9    impressions.

10   Q.  So even though the one NBC video alone on YouTube we

11   know had 11.3 million views, the estimate for the nine total

12   is only 4.8 million?

13   A.  That's correct.  I took a conservative approach here.

14   Q.  We're not going to go through every single category

15   again because we have done that, but how many instances did

16   you analyze for this specific phone call?

17   A.  So if you add up all the instances, there were 46

18   instances and they produced a total of 11.7 million

19   receptive impressions.

20   Q.  Dr. Humphreys, if you remember earlier in your

21   testimony, we were talking about your three different

22   reports?

23   A.  Yes.

24   Q.  Do you remember we talked about one supplemental report

25   that you submitted in December?

1    A.  Yes.

2    Q.  Was that report about this phone call?

3    A.  Yes.  So that report, there were additional instances

4    that I discovered so additional publications of the

5    statement that were nearly identical in substance, and so I

6    included those here.

7    Q.  And so the only thing that you added in that

8    supplemental report were additional places where the

9    transcript or audio of this phone call appeared online that

10   you had not included in your original report?

11   A.  That's correct.

12   Q.  And across the 46 instances, what did you estimate were

13   the total number of impressions for this January 2nd, 2021,

14   phone call with the Georgia Secretary of State?

15   A.  So in total, that was 11.7 million receptive

16   impressions.

17   Q.  And that's receptive impressions not total impressions?

18   A.  Correct.

19   Q.  Do you know what the total would look like if

20   you -- rather than discounting for receptive impressions, if

21   you just estimated the total number of impressions of people

22   that you believe saw this information?

23   A.  Right.  So the average receptive rate is 30 percent, so

24   you can multiply that by 3; it would be approximately 33

25   million.

1    Q.  Okay.  Thank you, Dr. Humphreys.

2              THE COURT:  Can I just be clear.  For all of this

3    content that is still available, all of these impression

4    numbers would go up if you did it -- if you did the same

5    analysis today, next month and so on.

6              THE WITNESS:  Correct.  I had stopped counting

7    when I did my report.

8    BY MR. GOTTLIEB:

9    Q.  Dr. Humphreys, just as an example, to be clear, that

10   NBC News video that you just testified about, is that still

11   up on YouTube?

12   A.  I believe it is, yes.

13   Q.  And that 11.3 million views is a recent count?

14   A.  Yes, it is.

15   Q.  Okay.  As you mentioned, there were a number of

16   instances that you didn't consider.  Can you describe some

17   of what you didn't consider in this analysis of the

18   January 2nd phone call?

19   A.  Sure.  So certainly there are some instances that I may

20   not have considered.  Articles that didn't have a full

21   transcript or direct quotes of the defamatory language, I

22   didn't include.  I didn't include TV broadcasts that weren't

23   archived in the system.  I didn't include local television

24   news.

25              I only included one social media post about this

1    call.  And there are social media platforms that I didn't

2    count.  So I didn't count a platform called Reddit or TikTok

3    or Instagram.  And then there are other media, such as radio

4    and word of mouth, one person telling another that I didn't

5    count.

6    Q.  Why not?

7    A.  You have to stop somewhere.  These are the instances

8    that I had available to me.

9    Q.  Are you confident in the accuracy of the instances that

10   you did rely on?

11   A.  Yes.

12   Q.  So in summary of your impressions model, Dr. Humphreys,

13   how many total instances did you examine of the defamatory

14   statements that you examined?

15   A.  So here you have a low estimate and a high estimate

16   because there is a range based on social media impression

17   rates, and that can range -- so the low estimate is 35.5

18   million receptive impressions; the high estimate is 56.7

19   million receptive impressions.

20   Q.  Okay.  And that's based on how many instances?

21   A.  That's based on 91 instances.

22   Q.  So you have got 16 statements that you analyzed that

23   resulted in 91 instances, and those instances result in the

24   impression estimates that are on the bottom of the screen in

25   red here?

1    A.  That's correct.  So you basically add up all the

2    channels and get your number.

3    Q.  And is the low and high estimate range based on the same

4    methodology that you testified about previously differing

5    between 5 and 20 percent?

6    A.  Yes.

7    Q.  And do you have an opinion based on your experience and

8    all of the information you examined in this case as to which

9    of those estimates is more likely to be accurate?

10   A.  Based on the prominence of the speakers in this case, I

11   would think that the impressions estimate, the high

12   impressions estimate is more likely.

13   Q.  Thank you, Dr. Humphreys.

14            Did you also do a similar analysis for the

15   statements prior to December 23rd, 2020?

16   A.  Yes.

17   Q.  And how many instances did you examine for those

18   emotional harm statements that -- as we call them -- between

19   December 3rd and December 22nd of 2020?

20   A.  So there were more of these statements, and I included

21   roughly one instance per each statement; and so here, you

22   see there were 52 instances.

23   Q.  Were some of these instances tweets by Mr. Giuliani?

24   A.  Yes.

25   Q.  Any other Twitter users that you looked at in these

1    statements?

2    A.  Yes.  I believe there was some Twitter activity by

3    Mr. Trump and the Trump campaign.

4    Q.  Okay.  To be clear, how did you go about identifying the

5    statements -- not the impressions, but how did you go about

6    identifying what statements to include?

7    A.  So these statements were given to me by plaintiffs'

8    counsel.

9    Q.  So we asked you to make assumptions that those

10   statements should be included?

11   A.  Yes.  That's right.

12            MR. GOTTLIEB:  All right.  Your Honor, the next

13   slide contains several exhibits which have already been

14   admitted into evidence.  These are Plaintiffs' Exhibit 234,

15   237, 239, 269, 301, and 312.

16   BY MR. GOTTLIEB:

17   Q.  Looking at the slide that's up on the screen now with

18   the plaintiffs' exhibits that I just read into the record,

19   Dr. Humphreys, do you recognize the social media posts that

20   you see up on the screen?

21   A.  Yes, I do.

22   Q.  What are they?

23   A.  So these social media posts were instances of the

24   emotional harm statements in this case.

25   Q.  And who are the posters that are included on this

```
 1   screen?

 2   A.  So, as you can see here, these are from Twitter.  They

 3   are Mr. Giuliani, the Trump team or Mr. Trump.

 4   Q.  And how did you go about estimating the number of

 5   impressions for these particular statements?

 6   A.  So here, I used the same methodology as I have discussed

 7   previously.

 8   Q.  Okay.  Same methodology for each category of statement

 9   you looked at?

10   A.  Yes.

11   Q.  So to save time for everyone, we are not going to walk

12   through all 50 of these.  But stepping back, did you use the

13   same low- and high-range estimates for social media that you

14   previously testified to?

15   A.  Yes, I did.

16   Q.  How many impressions did you estimate for all of the 52

17   instances of the emotional harm statements that you

18   examined?

19   A.  Right.  So here you would just add up the impressions

20   across the different media.  And I produced an estimate --

21   this is for receptive impressions of 111 million on the low

22   end to 249 million, almost 250 million --

23   Q.  These are receptive impressions?

24   A.  Receptive impressions.

25   Q.  How do you explain the large number of receptive
```

1    impressions?

2    A.   These statements were shared very, very widely across

3    many media channels.

4    Q.   And I think you previously testified that former

5    President Trump had a very large number of followers at this

6    time, in December of 2020; is that right?

7    A.   Correct.

8    Q.   Was this kind of information being widely consumed on

9    social media?  In other words, information about the 2020

10   election, was it being widely consumed in early December

11   2020?

12   A.   Yes.  From what I have seen.

13   Q.   Dr. Humphreys, how do you square the high impressions

14   estimate with the total population of the United States?

15   A.   Right.  So keep in mind there are about 300 million,

16   maybe 333 million people in the United States.  Impressions

17   does not equal people.  So it is possible that one person

18   received multiple impressions here, but that gives you a

19   sense of the scale of spread for this information.

20   Q.   Okay.  So 250 million is obviously a large number, but

21   you are not testifying that every single person in the

22   United States viewed these tweets?

23   A.   That's correct.

24   Q.   Is there a term that your field uses to describe the

25   sort of mass spread of information at this kind of scale?

1   A.  So previously we talked about that as viral information.

2   Q.  Are these kind of tweets and this kind of campaign an

3   example of what you would call a viral campaign?

4   A.  Yeah.  This information is typical of information that

5   goes viral.

6   Q.  Thank you, Dr. Humphreys.

7            Let's move on to the second category or second

8   model that you used, and that's your impact assessment.

9            What did you do in your impact assessment in this

10  case?

11  A.  For the impact assessment, I wanted to understand and

12  describe just what's the nature of the reputational harm.

13  You can look at the numbers, but I wanted to see how were

14  people actually responding to the tweets made that I had

15  studied and to understand the associations and the public

16  sphere with Ms. Moss and Ms. Freeman.

17  Q.  How did you perform that analysis?

18  A.  So that had two components.  The first component was a

19  quantitative component where I looked at search trends on

20  Google and the related search terms to the plaintiffs'

21  names, and then I performed a qualitative analysis.  So I

22  read through a sample of the social media commentary of what

23  people said.

24  Q.  So what does "quantitative" mean for those of us who

25  didn't go to our appropriate statistics classes in college?

1    A.   Quantitative simply means that I looked at the search

2    volume, how many people were searching for their names.

3    Q.   What were your high-level findings for your impact

4    assessment in your case -- in this case?

5    A.   So what I found was that after December 3rd -- prior to

6    December 3rd, there was virtually no search traffic for the

7    name "Ruby Freeman."  After December 3rd, there was a

8    dramatic increase over a period of two months.

9    Q.   Let's take a look at the impact assessment.

10             You mentioned Google search data.  Is that called

11   Google Trends analysis?

12   A.   Right.  So Google provides a tool called Google Trends

13   to help you look at and estimate how many people are

14   searching for any particular term.  Google has a lot of

15   information about how many people are searching that day,

16   that time of day, what else they're searching for.  So they

17   provide you with just a score from zero to 100.

18   Q.   So what -- as we look at the example on the slide, you

19   see three boxes and dates with Ms. Freeman's name.  What do

20   those boxes indicate and what do the numbers indicate?

21   A.   Right.  So what you see here is that before

22   December 4th, there was virtually no search traffic for the

23   term "Ruby Freeman."  After December 4th, there was an

24   increase to 31 out of 100 which indicates that there was

25   some attention to this name or this term.  That continued

1    through December, and then there was another spike on

2    January 4th.

3    Q.  Did you use this tool to analyze the public attention

4    for both Ms. Freeman and Ms. Moss?

5    A.  I used it primarily for Ms. Freeman.

6    Q.  Why is that?

7    A.  When I entered the term "Shaye Moss," there was just a

8    lot of noise in the data I think because of the last name,

9    perhaps; and so these trends were clear for Ruby Freeman,

10   not for Shaye Moss.

11   Q.  Do you believe that what you found for Shaye Moss would

12   be accurate or an accurate representation of the search

13   terms?

14   A.  That's right.

15          THE COURT:  Can I just interrupt you for a second?

16          Is this Google Trend data available for free to

17   anybody?

18          THE WITNESS:  Yes.  It's public, so you can do

19   this on your computer right now, yes.

20   BY MR. GOTTLIEB:

21   Q.  Dr. Humphreys, as you look at the figure depicting the

22   Google Trends prior to December 4th, 2020, what does that

23   lead you to conclude?

24   A.  So before December 4th, there was very little interest

25   in the name "Ruby Freeman."

1    Q.  People aren't searching for it?

2    A.  Correct.

3    Q.  We'll come back to the other dates.

4         MR. GOTTLIEB:  So, Your Honor, the next slide

5    contains language that is from Plaintiffs' Exhibit 12, which

6    is already admitted into evidence.

7    BY MR. GOTTLIEB:

8    Q.  So, Dr. Humphreys, looking at the same Google Trends

9    chart, what is significant about the January 4th, 2021, date

10   that you see on the right-hand side of the chart?

11   A.  So as we mentioned before, there was a telephone call

12   that happened on January 2nd, and on January 4th, it was

13   more widely published in the media and circulated.

14   Q.  So January 4th is a date when -- I will withdraw that.

15        Was this call sort of front-page news?

16   A.  Yes.  From what I saw in my impact analysis, yes.

17   Q.  Was the date it got released to the public January 4th,

18   2021?

19   A.  Yes, I believe so.

20   Q.  So what was your takeaway or conclusions from this

21   Google Trends analysis?

22   A.  So what you can conclude here is that there were

23   statements made in this case, and directly after the

24   statements there was an increase in attention or interest in

25   the name "Ruby Freeman."

```
1    Q.  And based on the Google Trends data, when did that peak?

2    A.  The peak was December 18, 2020, for this particular time

3    period.

4    Q.  And then there was a sort of second highest level.  When

5    was the second highest level?

6    A.  On January 4th.

7    Q.  Dr. Humphreys, you also said that you analyze search

8    term associations, I think?

9    A.  Correct.

10   Q.  What are search term associations?

11   A.  Another thing this tool gives you is the context of the

12   searches.  So when people enter "Ruby Freeman," what else

13   are they looking for?  What's the actual term that they

14   enter?  You can see here under Top Related Queries the

15   context of Ruby Freeman.  For instance, a popular search

16   term was "Ruby Freeman arrested."

17   Q.  So as you are imagining a user on Google going to search

18   for something, are the top related queries the actual sort

19   of text that the person is typing into Google to search for?

20   A.  That's right.

21   Q.  Does this rank -- what is the ranking?

22   A.  These are the top, the most popular search queries.

23   Q.  What do you -- how do you read this table as an expert

24   in your field that studies this kind of information?  What

25   do you take away from it?
```

1    A.   Right.   So this gives you some sense of the associations

2    with this particular name or search term.   So "Ruby Freeman

3    arrested" or "Ruby Freeman election," "Ruby Freeman fraud,"

4    "Ruby Freeman FBI" give you a sense of the nature of the

5    associations with the name.

6    Q.   And what are the top related entities that you see on

7    the chart?

8    A.   Right.   That's a tool that Google uses.   They're not

9    actually related to the queries.   Google -- it's helpful for

10   Google to classify things as "Georgia" or "Fulton County" or

11   "election."

12   Q.   Okay.   So just so everyone understands the chart, if we

13   take an example -- let's take an example of line 9 where the

14   related query is "Who is Freeman?" and the top -- "Who is

15   Ruby Freeman?" and the top related entity is "Morgan

16   Freeman."   Those two entries are not actually related to

17   each other?

18   A.   Correct.   There's no relation across the rows.

19   Q.   Those just happen to both be ranked No. 9 on the list in

20   their respective category?

21   A.   That's correct, yeah.

22   Q.   Any conclusion that you draw from the related entities

23   here?

24   A.   Yes.   It again gives you a sense of the associations.

25   If you look at "Federal Bureau of Investigation" or "fraud,"

1    these are larger categories that the name was associated

2    with.

3    Q.  In summary, as you sort of look at this Trends analysis,

4    what are your takeaways?  Not the "Trends analysis," the

5    related search terminologies.

6    A.  Sure.  I mean, this gives you a little bit of a peek

7    into the associations with the name and people's interest.

8    Q.  All right.  Dr. Humphreys, you also said that you

9    conducted a qualitative analysis as part of your impact

10   assessment.  What we were just talking about, would that

11   constitute the quantitative analysis?

12   A.  Yes.

13   Q.  What was the qualitative analysis you performed?

14   A.  So the qualitative analysis had a couple of parts.  The

15   first material that I analyzed for the qualitative analysis

16   were the comments that were posted directly under the

17   material that I had counted the impressions for.  So these

18   were comments under Mr. Giuliani's tweets, Facebook

19   comments, comments under the YouTube videos that you saw

20   previously.

21   Q.  Okay.  So you did an actual -- there was a qualitative

22   piece of this to measure the number of likes or comments

23   that were attached to Mr. Giuliani's online statements?

24   A.  Sure.

25   Q.  And then did you -- what you have done here, you have

1     tallied them up?

2     A.  Yes.  So you can see the instances that I counted

3     previously received a lot of engagement of 340,000 likes,

4     63,000 comments.

5     Q.  As you looked at -- what did you do with those 340,000

6     likes and 63,000 comments?

7     A.  So I did not read every comment.  I sampled the comments

8     to read a selection of them.

9     Q.  All right.  So you read through to try to understand the

10    nature of the comments that you were finding on these videos

11    and tweets and posts?

12    A.  Correct.  The goal of the impact assessment was to see

13    what are the associations with Ruby Freeman in the content.

14    Q.  Okay.  So let's take a look at an example of what you

15    did here.

16            MR. GOTTLIEB:  Your Honor, the next slide displays

17    language from Plaintiffs' Exhibit 5, which has been admitted

18    into evidence.

19    BY MR. GOTTLIEB:

20    Q.  Turning to the next slide, do you recognize the

21    statement that's up on the screen here?

22    A.  Yes.  That's a defamatory statement in this case.

23    Q.  What's the date of this statement?

24    A.  It's December 25th, 2020.

25    Q.  Where was that published?

1    A.  It was initially published on Mr. Giuliani's podcast

2    called "Common Sense."

3    Q.  Was it also posted to YouTube?

4    A.  Yes.

5    Q.  Did you analyze comments that appeared on the YouTube

6    posting of this particular podcast?

7    A.  Yes.

8            MR. GOTTLIEB:  Your Honor, the next slides contain

9    the same language from this exhibit as well as a screenshot

10   from Plaintiff's Exhibit 350, which was previously received

11   into evidence.

12   BY MR. GOTTLIEB:

13   Q.  Looking at this slide, what does this image show about

14   that December 25th, 2020 episode of Mr. Giuliani's "Common

15   Sense" podcast?

16   A.  So here you can see the impressions information that we

17   discussed previously, so it received 1.2 million views.  But

18   you can also see the engagement with the information, so it

19   received 24,000 comments and 95,000 likes or thumbs-up.

20   Q.  Is that the sort of -- total of comments and likes; does

21   that form your understanding of engagement?

22   A.  That's right.  So as you can see, it gives you a sense

23   of engagement and also a sense of endorsement or not

24   endorsement given thumbs-up or thumbs-down.

25   Q.  Is that a high level of engagement, the 95,000 likes and

1    24,210 comments?

2    A.  Yes.  I'd consider this a high level of engagement.

3    Q.  What kinds of things did the comments say that you

4    reviewed?

5    A.  So underneath the comments, underneath the video were

6    endorsements of the statements of Mr. Giuliani.

7              MR. GOTTLIEB:  And, Your Honor, the next slide

8    shows other portions of Plaintiff's Exhibit 350 previously

9    received into evidence.

10   BY MR. GOTTLIEB:

11   Q.  Are these comments that you see on the screen from

12   Plaintiff's Exhibit 350 the kinds of comments that you saw

13   attached to this December 25th, 2020, "Common Sense"

14   podcast?

15   A.  Yes.  These are some of the comments.

16   Q.  Can you walk through essentially what you found here?

17   A.  Sure.  So you have other people like Laura Little

18   saying, Start arresting these flippin' transparent

19   criminals.  Do something to save humanity.

20             Remember when treason was a hanging offense?  Get

21   America cleaned up.  And All these people involved with the

22   fraud need to be executed for treason.

23   Q.  These comments were attached directly to Mr. Giuliani's

24   statement; is that right?

25   A.  That's right.

 1    Q.  Would these comments have existed but for the statement?

 2    A.  No.  These comments would not have existed but for the

 3    video being posted.

 4    Q.  Did you see examples of commenters implying violence

 5    against Ms. Freeman and Ms. Moss?

 6    A.  Yes.

 7    Q.  Is there an example of that on the screen?

 8    A.  Yeah.  I mean, you see the one at the bottom, for

 9    example, about being executed for treason.

10    Q.  What does this level of engagement of comments on a

11    YouTube video tell you about the reaction to the video?

12    A.  So I think you can say a few things.  One is that these

13    comments could endorse the content of the video; and then

14    those comments themselves are endorsed by others.  So Laura

15    Little, for instance, you see got 165 likes, 436 likes and

16    82 likes.

17    Q.  How did these examples factor into your reputational

18    harm assessment for the impact assessment?

19    A.  So these help me understand just the nature of the harm,

20    what were the associations tied to the names of the

21    plaintiffs.

22    Q.  What is the nature of that harm?

23    A.  It's that their reputation was severely damaged, and

24    this did reflect negative associations after the sharing of

25    the content in this case.

1    Q.  Thank you, Dr. Humphreys.

2          So what was the next step of your impact

3    assessment?

4    A.  So the next set of data that I looked at for my

5    qualitative analysis was provided by a security firm named

6    Jensen Hughes.

7    Q.  Who is Jensen Hughes?

8    A.  So Jensen Hughes is a firm that, as I understand it,

9    polled social media content and monitored social media

10   content attached to the names Ruby Freeman, Wandrea Shaye

11   Moss and variants of that.

12   Q.  What did you find when you looked at the Jensen Hughes

13   data?

14   A.  When I looked at the Jensen Hughes data -- this is from

15   November 1st, 2020 to June 20, 2021 -- there was a high

16   level of engagement as indicated by this 11,000 social media

17   comments and the 400 or more platforms.

18   Q.  Is that a large variety of platforms?

19   A.  Yes.

20          MR. GOTTLIEB:  Your Honor, the next slide contains

21   screenshots from plaintiffs' exhibits previously received

22   into evidence as 289, 332, 339, 340, 358, 367, and 374.

23   BY MR. GOTTLIEB:

24   Q.  Dr. Humphreys, looking at the slide that's on the screen

25   that depicts tweets from the plaintiffs' exhibits that I

1    just read -- numbers I just read into the record, what do

2    you see here?

3    A.  So these are some comments that are in the Jensen Hughes

4    data set.

5    Q.  Are these comments that you reviewed as part of your

6    impact assessment?

7    A.  That's right.

8    Q.  How do these posts relate to, as you understand it, the

9    defamatory statements in this case?

10   A.  So this gives you a sense of the broader conversation on

11   social media and the broader set of association circulating

12   about the plaintiffs.

13   Q.  To be clear, Dr. Humphreys, are you offering an opinion

14   about whether Mr. Giuliani was the direct cause of these

15   statements in this case?

16   A.  No.  I am not.

17   Q.  Are these comments similar, though, to other comments

18   you saw throughout the Jensen Hughes data?

19   A.  Yes.

20   Q.  What was your finding regarding Ms. Freeman's and

21   Ms. Moss's reputation based on your review of the comments

22   that you reviewed from Jensen Hughes' data set?

23   A.  So as you can see here in the broader public sphere, the

24   names of Ruby Freeman and Ms. Moss were used in very

25   negative ways, that there were lots of threats, as you can

1   see here; and this did indicate reputational harm.

2   Q.  What was the next step in your impact assessment?

3   A.  So the next step, I wanted to understand the long-term

4   nature of the harm, if any, so I evaluated reports from

5   Jensen Hughes from May -- sorry, November 2021 to May 2023

6   and then another report made in August of 2023.

7   Q.  Why does it matter if statements or comments like this

8   continue to appear over time?

9   A.  So, you know, if reputational harm isn't corrected, it

10   can live on for years, even decades.  So I wanted to see do

11   these kinds of associations persist.

12   Q.  Does the length of time that derogatory or false

13   information stays sort of out and publicly accessible affect

14   the difficulty of repairing reputation?

15   A.  Yes, it can further strengthen people's attitudes about

16   the information.

17   Q.  So what did you find as you looked at the Jensen Hughes

18   data with respect to the length or the lasting nature of the

19   reputational harm?

20   A.  So I found that comments such as the ones we just saw,

21   they persisted through 2021, 2022, up until August of 2023.

22   Q.  How many posts were tracked in each of these reports

23   that you took a look at?

24   A.  As you can see here, the first report which was for a

25   longer time period tracked 700,000 mentions of Ms. Moss or

1    Ms. Freeman.  The more recent report had 317,000.

2    Q.  Is that a lot?

3    A.  Yes.  I consider that to be a lot.

4    Q.  Are you aware, Dr. Humphreys, whether Mr. Giuliani is

5    still making statements, the kind of statements that he made

6    in his defamatory statements about Ms. Freeman and Ms. Moss?

7    A.  Yes.

8    Q.  Does that have an effect on Ms. Freeman's and Ms. Moss's

9    reputations?

10   A.  So what I have seen previously in the impact analysis

11   was that any time a statement is made in the public sphere,

12   it kind of raises these associations yet again in social

13   media.

14   Q.  Based on your understanding of influencers in the social

15   media environment, is Mr. Giuliani a trusted source among

16   the audience that consumes his content?

17   A.  Yes.

18   Q.  So if Mr. Giuliani were to have apologized or made a

19   corrective message, would that have an effect on that

20   audience?

21   A.  Yes.  I think so.

22   Q.  Looking at the slide on the screen, having walked

23   through --

24            THE COURT:  Excuse me.  But if this is a receptive

25   audience, if Mr. Giuliani made a statement apologizing or

1    retracting the defamatory statements, would -- what effect

2    would that have on the receptive audience, if you know?

3              THE WITNESS:  I mean, I could speculate.

4              So I think one message, even from a trusted

5    source --

6              MR. SIBLEY:  Your Honor, I would object to the

7    speculation.

8              THE COURT:  Without speculating, do you know what

9    happens when an influencer with a receptive audience changes

10   the tune?

11             THE WITNESS:  Right.  Yeah, I have seen cases of

12   this, yes.

13             THE COURT:  What happens to the influencers'

14   followers?

15             MR. SIBLEY:  I would request a voir dire of the

16   witness because that's not -- I would request voir dire as

17   to the foundation of that.

18             THE COURT:  Overruled.

19             If you know.

20             THE WITNESS:  Right.  In previous cases, an

21   influencer can kind of retract, apologize.  In my

22   experience, that alone, maybe that one statement isn't quite

23   enough because these are pretty entrenched beliefs.  But if

24   the audience receives a message from, like, multiple trusted

25   sources or a number of times, then that can correct some

```
1     harm.
2               THE COURT:  Okay.
3               MR. GOTTLIEB:  I could actually skip ahead a
4     minute to --
5               THE COURT:  You are going to get to this.  You
6     don't have to skip ahead.
7               MR. GOTTLIEB:  Okay.  Then we will come back to
8     this topic in a moment.
9     BY MR. GOTTLIEB:
10    Q.  I don't think we covered, though, Dr. Humphreys, a
11    summary of your overall findings.  In summary, what were
12    your overall findings in your impact assessment?
13    A.  Sure.  So for that side of defamatory claims that were
14    after December 23rd, those claims had a significant negative
15    and long-lasting impact on the reputations of Ms. Freeman
16    and Ms. Moss.  They became widely associated with claims of
17    election fraud.  There were racist statements, malicious
18    threats of physical violence and incarceration, being
19    arrested, beginning in 2020 -- December of 2020, and those
20    continue up until I concluded my analysis.
21    Q.  Thank you, Dr. Humphreys.
22              You have also offered an opinion with respect to a
23    damages model in this case; is that correct?
24    A.  That's correct.
25    Q.  As you testified to previously, your damages model is
```

1    confined to reputational harm in this case; is that right?

2    A.  Yes.

3    Q.  So you have not calculated a cost repair for the

4    emotional -- the 52 emotional harm statements that we looked

5    at; is that right?

6    A.  Correct.

7    Q.  So you are only calculating a cost to repair

8    reputational campaign for the 16 defamatory statements that

9    you have analyzed after December 23rd, 2020?

10   A.  Yes.

11   Q.  All right.  So, Dr. Humphreys, we have gone through the

12   impressions model.  How did you go about conducting your

13   damages model?

14   A.  So the damages model is based on the impressions model.

15   I count only the statements that I analyzed in the

16   impressions model and calculate a campaign to repair

17   reputation based on just those instances of the impressions

18   in that model.

19   Q.  Okay.  So just to make sure we're all on the same page

20   here, we start with the 16 defamatory statements that you

21   were asked to analyze.

22   A.  Yes.

23   Q.  And then you have already explained to the jury how you

24   calculated the total number of impressions from those 16

25   statements?

1    A.   Yes.

2    Q.   And you have also previously testified and explained

3    that you have only assessed receptive impressions?

4    A.   Correct.

5    Q.   So using those receptive impressions for the 16

6    defamatory statements at a high level, how did you go about

7    calculating how much it would cost to repair those

8    impressions?

9    A.   Right.  So to repair reputational harm, it's not easy.

10   I think one estimate one could make is to think about well,

11   how much would it cost to actually repair that reputational

12   harm?  And for this particular receptive audience, if you

13   were to try to change their attitudes about Ms. Moss and

14   Ms. Freeman, how would you go about that through strategic

15   communications and then how much would that kind of campaign

16   cost?

17   Q.   And is the damages model or the estimate you have

18   provided linked to or decided, you know, defined by

19   essentially the number of impressions that you have

20   estimated?

21   A.   Yes.  It's based on the number of impressions from the

22   defamation statements.

23   Q.   Have you used both your low and high estimates that you

24   previously testified about in providing damages ranges in

25   this case?

1    A.   Yes.  So as you might remember, when we talked about

2    strategic communications, you first define the audience.

3    And here, the audience is those receptive impressions; so

4    35.5 million receptive impressions on the low end and 56.7

5    million receptive impressions on the high end.

6    Q.   And, Dr. Humphreys, I know you testified about this

7    earlier, but can you explain again what a reputational

8    repair campaign is?

9    A.   Right.  So a reputational repair campaign chooses an

10   audience whose attitudes do you want to change, whose minds

11   do you want to change a particular message; so what do you

12   want to tell that audience and then where do you place that

13   information.  So for any audience but maybe particularly

14   this one, their minds are not going to be changed.  They

15   need a trusted source.  So you would need information coming

16   from multiple trusted sources through different channels.

17   Q.   Does this amount of harm done to someone's reputation

18   influence how much it costs to do a repair campaign?

19   A.   Yes.  So the larger the audience and the more entrenched

20   the beliefs or the attitudes, the more expensive.

21   Q.   In your opinion, based on your expertise and

22   experiences, is estimating the cost of a repair campaign a

23   useful way to quantify how much harm has been done to

24   someone's reputation?

25   A.   Yes, I think that's one way to quantify harm.

1    Q.  And also to make sure we're on the same page, in

2    creating your damages model, are you assuming that the

3    plaintiffs would spend all of this money on a reputational

4    repair campaign?

5    A.  No.  I am not.

6    Q.  You still find it to be a useful metric?

7    A.  Yes.  I think it's one way to get a sense of the scope

8    of the damage that's been done to one's reputation.

9    Q.  All right.  Did you put together an emotional

10   reputational repair campaign for Ms. Freeman and Ms. Moss in

11   this case?

12   A.  Yes, I did.  So this kind of campaign would involve

13   multiple channels, so it could involve mass media

14   advertising.  You kind of want to base it on how the

15   information was initially disseminating.  It could be hiring

16   influencers, circulating statements on multiple media and

17   conducting a long-running campaign.

18   Q.  I believe you previously testified it's common to use

19   influencers to try to spread a message on social media?

20   A.  Yes.

21   Q.  Do they play an important role in repair campaigns?

22   A.  Yes, particularly because they're trusted sources.

23   Q.  Can you think of any examples from the evidence you saw

24   in this case of that use of trusted sources and messages in

25   a strategic communications campaign?

1    A.  I would say Mr. Giuliani's strategic communications plan

2    is a strategic communications example that identified

3    certain influencers and so forth.

4    Q.  All right.  Dr. Humphreys, you mentioned that the

5    reputational repair campaign targets messaging through

6    multiple channels.  Did you account for that when you were

7    putting together a reputational repair campaign for

8    Ms. Freeman and Ms. Moss?

9    A.  Right.  So as I mentioned, with these campaigns you have

10   to figure out where to share the message, what platforms to

11   use.  Here I based it on the percentages that the initial

12   information was shared.

13   Q.  Okay.  And how did you do that?

14   A.  Right.  So, for example, if 13 percent of the

15   impressions that I calculated came through cable television,

16   in this repair campaign, I said well, 13 percent of our

17   corrective messages should be shared on cable television.

18   Q.  And so those impressions where they fell into different

19   channels drove the percent allocations that are depicted

20   here on this slide?

21   A.  That's right.

22   Q.  In other words, you have allocated 13.5 percent of the

23   estimated cost to cable TV.  Why is that?

24   A.  That's right.  So when I did my impressions analysis, 13

25   percent of the impressions came from cable television

```
1    initially, and so the corrective messaging would go out on

2    the same channels.

3    Q.  Now, Dr. Humphreys, these allocations were the

4    percentages that you estimated in which of your reports?

5    A.  Yeah.  In the initial report.

6    Q.  In the report that you submitted in July?

7    A.  Correct.

8    Q.  And from July to December, you analyzed and found some

9    additional instances or numbers of impressions; is that

10   right?

11   A.  That's correct.

12   Q.  Did you change this allocation based on those

13   impressions that you later found?

14   A.  So I didn't change the allocations.  The additional

15   instances came -- they were largely from television and

16   other kind of mainstream outlets.

17   Q.  So what would have happened if you had changed the

18   allocation based on those later impressions that you wound

19   up analyzing?

20   A.  So if I had changed the allocation, advertising is more

21   expensive on television than in social media, so then the

22   cost would have gone up if I had redone the allocations.

23   Q.  So you stayed with the more conservative estimate based

24   on your original estimated allocation?

25   A.  That's correct.
```

1    Q.  Dr. Humphreys, you had an exchange with the Court a

2    little bit ago about the amount of times a corrective

3    message needs to reach someone.  Is there data or studies

4    that have been done on this question?

5    A.  Sure.  Once people have an existing attitude, it can be

6    very hard to change it, particularly if it's connected to

7    yourself or your identity.  But one bedrock marketing

8    finding is that multiple exposures to a message can change

9    people's attitudes over time.  So many studies have shown

10   that if you show someone a message three to five times, it

11   can change their attitude.

12   Q.  So, for example, even if you had -- if you had something

13   like an apology or some other form of a corrective

14   statement, is it enough -- for someone who has received

15   prior impressions, is it enough to give that to that person

16   one time?

17   A.  Likely no, particularly on social media.

18   Q.  Why is that?

19   A.  There is a lot of information on social media, and one

20   time doesn't really cut through.

21   Q.  Is this principle what you call an "attitude change

22   multiplier"?

23   A.  That's right.

24   Q.  What does the data show you as to what the number of

25   times someone needs to receive a corrective message for it

1    to be effective?

2    A.  So the typical number from advertising that we've seen

3    in studies is three to five to seven times.  When people

4    have seen something three times, it will start to change

5    their attitudes.  If the attitude is more entrenched or

6    close to a, like closely held belief, then you might need

7    five or even seven times to change it.

8    Q.  What's the kind of message that comes to your mind when

9    you think about the three-times multiplier?  What are we

10   talking about?

11   A.  A three-time multiplier might be a typical marketing

12   message, like "You should go to Burger King for lunch today"

13   or something that people may not have a very strong attitude

14   about.

15   Q.  What types of attitudes are you thinking about in the

16   higher range?

17   A.  For five to seven, it would be attitudes -- it could be

18   something that's marketing related like Coke versus Pepsi.

19   It might take a lot of exposures to convince you.  Some

20   people may never be convinced to drink Pepsi; they're a Coke

21   drinker.  But also ideas that are associated with closely

22   held values.  So I would say political beliefs could require

23   a five- or even seven-times multiplier.

24   Q.  And so to arrive at the right estimate for a multiplier,

25   is the total number of impressions important?

1    A.  No, I'm sorry, how do you mean?

2    Q.  If not, is it the nature of the content?

3    A.  Yeah, it's more the nature of the content.  It's how

4    firmly do people hold this existing attitude.  You would

5    need to show people with strong attitudes the message more

6    times in order to convince them.  Frankly, there are some

7    people who it doesn't matter how many times you show the

8    information.  They may not be persuaded.

9    Q.  So do you have an opinion based on your expertise and

10   work you have done in this case as to what the appropriate

11   attitude change multiplier is?

12   A.  Um-hum.  For this case, because they are political

13   beliefs and they have been kind of integrated with people's

14   other beliefs, I would lean toward five times.

15   Q.  Okay, Dr. Humphreys.  So turning now to your ultimate

16   conclusions with respect to the damages model, can you

17   discuss your overall cost estimates for reputational repair

18   campaign in this case?

19   A.  Sure.  So I provide a range of --

20           MR. SIBLEY:  Your Honor, I object under -- object

21   under 702, 703.

22           THE COURT:  I will listen to you.

23           (Whereupon, a bench conference was held.)

24           MR. SIBLEY:  So I am with her so far.  I get the

25   impressions.  I get the reason why you would want the

1    alternative information going out through the same channels,

2    but how are we getting from the impressions to --

3                    THE COURT:  The number?

4                    MR. SIBLEY:  There is a larger leap that we need

5    to explain how we get there.

6                    THE COURT:  I think Mr. Gottlieb is starting with

7    the final conclusion.  And he is going to explain how he

8    gets there; is that right, Mr. Gottlieb?

9                    MR. GOTTLIEB:  That is correct, Your Honor.

10                    THE COURT:  All right.  So I think we can do that.

11                    Your objection is overruled to this point, but you

12    can resume it afterwards.  But I think we're going to get to

13    how she does this methodology underneath this.

14                    (Whereupon, a bench conference concludes.)

15                    THE COURT:  Continue, Mr. Gottlieb.

16    BY MR. GOTTLIEB:

17    Q.  Dr. Humphreys, we're going to get into the breakdown for

18    some of these numbers in a moment.  Can you explain at a

19    high level how you arrived at your sort of the ranges of

20    numbers that are depicted here for your final damages

21    estimates in this case?

22    A.  Sure.  So I provided a range of estimates.  You might

23    remember that we had a low estimate of impressions based on

24    some social media estimates and then a high-impressions

25    model.  So for low impressions, I provide an estimate based

1    on if you were to show the corrective message three and five

2    times, and then I also provide a high-impressions estimate,

3    again, if you were to show the message three or five times.

4    Q.  So the relevant variables we're considering here are

5    whether one selects the low-impression estimate of -- I

6    think you previously testified about 5 percent?

7    A.  That's right.

8    Q.  Or the high-impression estimate percentage of 20

9    percent?

10   A.  That's right.

11   Q.  And then the 3 to 5X on the columns refer to the

12   attitude change multiplier you just testified about; is that

13   right?

14   A.  That's right.

15   Q.  Now, you previously testified that that multiplier can

16   range from 3 to 7 percent.  I don't see a 7 on this slide.

17   Why not?

18   A.  Right.  For some people in this audience, you may need

19   to show the message seven times, but you also don't want to

20   show it too many times.  You can get some kind of overkill

21   effects if you show the message too many times.

22   Q.  All right.  So can you just read the ranges that you

23   have here for the low-impression estimate for your damages

24   estimate?

25   A.  Sure.  So if you assume low impressions -- that's just a

```
1    5 percent impression rate on social media -- you would get a

2    range anywhere from $17.8 million to $29.7 million.

3    Q.  How about the high impressions?

4    A.  For the high impressions, for a low multiplier, you

5    would get $28.4 million and the high 5X multiplier would be

6    $47.4 million.

7    Q.  Dr. Humphreys, did you do some math to arrive at these

8    calculations?

9    A.  That's right.  I did.

10   Q.  Why don't we walk through it.

11             On the slide that's depicted up on the screen now

12   and looking at this table, is this table one of the tables

13   showing the calculations that you performed in this case?

14   A.  Yes.

15   Q.  And which of the four estimates we just looked at does

16   this table show your calculations for?

17   A.  So this is for the high estimate for showing the message

18   five times.

19   Q.  Okay.  And if we were to reproduce this for the high

20   estimate, three times or the low impression, three or five

21   times, would it contain the same calculations just with

22   different inputs?

23   A.  Yes.  There are tables for each of those amounts that

24   you saw previously.

25   Q.  All right.  So using this table -- I know there are a
```

1    lot of numbers here -- can you explain to the Court and jury

2    how you estimated the total cost for a reputational repair

3    campaign?

4    A.  Sure.  It's pretty mechanical.  It's just based on the

5    impressions that I measured in that first analysis.

6            So the idea is that you want to get a certain

7    target number of impressions to repair or counteract the

8    impressions that I measured, and so you need a few pieces of

9    information.  You each -- just need the cost of how much it

10   costs to advertise on each channel, and then you can kind of

11   calculate the total cost.

12   Q.  All right.  So you are starting by trying to deliver

13   corrective messages in particular channels?

14   A.  Right.

15   Q.  And the weight column that starts with 29.16, what does

16   that column reflect?

17   A.  Right.  So you might remember the pie chart earlier

18   where it represented the percent of impressions that came

19   from that medium.  Here, this is where you'd want to put the

20   corrective messaging.  So imagine you have a bucket of money

21   and you need to allocate it, split it up amongst the

22   different channels.  So 29 percent of your overall budget

23   would come from in this case the Twitter-promoted tweets.

24   Q.  Does that weight correspond to the percentages that the

25   categories of impressions from the defamatory statements

1    fell into in this case?

2    A.  Yes.  So I think it was some 50-some percent almost

3    60 percent for Twitter.  What you see here is I have just

4    divided that in half between Twitter-promoted tweets and

5    Twitter influencer.

6    Q.  And then you previously mentioned that you want to

7    figure out how much it cost to advertise or reach a

8    particular channel.  Where is that reflected in this chart?

9    A.  So it costs a standard amount in the industry to

10   advertise on Twitter.  For example, so you see the column

11   that says CPM?  That stands -- it's industry jargon, but it

12   stands for cost per mille, which is the cost to buy 1,000

13   impressions.

14   Q.  Is that publicly available data that you have relied on

15   and disclosed in your analysis in your opinions?

16   A.  Yes.  Those are used widely throughout the industry.

17   Q.  So is it safe to say it's significantly cheaper or most

18   cost-effective to try to place messages on Twitter than it

19   is, for example, on network television?

20   A.  Yes.  As you can see here, the Twitter costs are $6.46

21   for a thousand impressions or if you hire a Twitter

22   influencer, it would be $2 for a thousand impressions.

23   Q.  So it's a lot -- for companies who are designing a

24   campaign, it is as much money when they want to reach a

25   Twitter audience as they do if they want to put ads on TV or

1    put ads on newyorktimes.com?

2    A.  That's correct.

3    Q.  What's the difference in this chart between target

4    impressions and adjusted impressions?

5    A.  Right.  So adjusted impressions takes into account two

6    things.  One, you might remember the impression rate, so,

7    again, if you have 100 followers, only a small fraction of

8    them are going to see the message.  So what you have to do

9    when you calculate impressions on social media is just take

10   that into account.  So if you hire an influencer who has a

11   million followers, all of those followers aren't going to

12   generate that number of impressions, and so you have to

13   account for that.

14   Q.  So you have to figure out how many times to put out a

15   message to ensure that someone actually sees it; is that

16   right?

17   A.  Right.

18   Q.  And then after you have figured out how many times you

19   have to do that, you just figure out how many times do they

20   need to see it?

21   A.  Correct.

22   Q.  So both of those factors are built into your model here?

23   A.  That's right.

24   Q.  And, again, this model is assuming a multiplier of 5; is

25   that right?

1    A.  Correct.

2    Q.  So in this particular model, you are assuming you've got

3    to reach someone and you've got to reach them five times?

4    A.  Correct, that's under adjusted impressions.

5    Q.  So just taking one example, can you sort of

6    explain -- why don't we look at web blog influencer.  Can

7    you explain how you get from 5.04 percent weight to the

8    ultimate total cost number that you see on the right-hand

9    side?

10   A.  Sure.  So for web blog influencer, you want to generate

11   14.2 million impressions, corrective impressions, and that's

12   5 percent of the total number of impressions.  You would, to

13   do that, need to serve a message five times and at a rate of

14   $10 per thousand impressions.  So you just kind of multiply

15   essentially across the row -- sorry -- yes, across the row.

16   Q.  It's basic math based on the assumptions of how many

17   times -- how many impressions you have, multiplied by the

18   number of times you need to put out a corrective message to

19   reach someone, then multiplied by how many times you want

20   them to see it?

21   A.  Yes.  Multiplied by how much it cost.

22   Q.  And the numbers would look different if there were

23   different numbers of impressions; is that right?

24   A.  That's correct.

25   Q.  And the number looks different if you have a three-times

1    multiplier versus a five-times multiplier?

2    A.  Correct.

3    Q.  What was your conclusion -- in this particular damages

4    estimate of high impressions with the five-times multiplier,

5    what was your conclusion about the total cost for

6    reputational repair campaign on the 16 defamatory statements

7    in this case?

8    A.  So to correct the impressions generated by these 16

9    statements with a five-time multiplier in this case, it

10   would be $47.4 million.

11   Q.  And on the previous slide we looked at, do the numbers

12   here reflect what the damages -- what the cost for a repair

13   campaign would be if you selected high versus low

14   impressions and three versus five-times attitude change

15   multiplier?

16   A.  That's right.

17   Q.  Do you have an opinion that you are offering based on

18   your expertise and experience as to where within the range

19   would be the most accurate reflection of how much it would

20   actually cost to repair Ms. Freeman and Ms. Moss's campaigns

21   based on the 16 defamatory statements in this case?

22   A.  So as I have discussed, I would go with the

23   high-impressions model, the rate of 20 percent.  Just given

24   the prominence of these particular accounts, I think that's

25   the most accurate estimate.  And then whether you do three

1    or five times really depends on how entrenched one feels the

2    beliefs are.  So if they are perhaps not as entrenched, it

3    would be a three-times multiplier or a five-times

4    multiplier; but it would be one of the numbers in that

5    column to the left there.

6    Q.  Dr. Humphreys, as a conclusion -- we're on our last

7    slide here -- can you summarize your overall conclusion and

8    the opinion you are offering with respect to the impressions

9    model?

10   A.  Sure.  So with the impressions model, I measured the

11   reach of defamation statements in this case, and I found

12   that they received between 35.5 million impressions and

13   56.6 -- I believe those are receptive impressions.  The

14   emotional harm statements that I studied was of those who

15   reached an audience of 111 million people on the low end and

16   on the high end, 250 million people.

17   Q.  How about for the impact assessment?

18   A.  When I looked at the impact assessment, I found that the

19   statements in this case reflected a significant negative and

20   long-lasting impact on the reputations of Ms. Freeman and

21   Ms. Moss.

22   Q.  And how about, lastly, the damages model?

23   A.  And for the damages model, when, based on the

24   impressions, you calculate how much it would cost to repair

25   this reputational harm, the campaign would cost anywhere

1    from $17.8 million to $47.4 million.  I would go on that

2    high-impressions model which I believe is more accurate, and

3    it would be a campaign costing more specifically between

4    28.4 million and $47.4 million.

5              MR. GOTTLIEB:  Thank you, Dr. Humphreys.  No

6    further questions.

7              THE COURT:  All right.  It's 12:15, so I think

8    we'll take our lunch break now, unless, Mr. Sibley, you want

9    to proceed immediately.

10             MR. SIBLEY:  I think it's best if we take a lunch

11   break.

12             THE COURT:  All right.  So, ladies and gentlemen,

13   I will excuse you until 1:20.  All right.  Enjoy your lunch.

14             (Whereupon, the jury was excused.)

15             THE COURT:  Can I just ask counsel for a minute.

16   This is getting into a little bit of a charging conference

17   territory, but with respect to the verdict form that the

18   parties have proposed, the compensatory damages are sort of

19   clumped together for both plaintiffs as opposed to

20   separated.  And I can appreciate why the punitive damages

21   might be clumped together as to both plaintiffs, but is

22   there a reason that both sides appear to agree that

23   compensatory damages should be awarded to each plaintiff

24   together as opposed to separately?

25             MR. GOTTLIEB:  First of all, Your Honor, should

```
1     the witness remain on the --

2                THE COURT:  Yes.  Sorry.

3                You are excused, thank you.

4                I forgot she was there.  Sorry.

5                MR. GOTTLIEB:  So, Your Honor, our position is

6     that -- and this case has been that -- particularly with

7     respect to reputational harm, because the plaintiffs were

8     essentially lumped together --

9                THE COURT:  Well, that's another question

10    because -- you have one question -- one set of questions for

11    compensatory damages for the reputational harm due to the

12    defamation and then another question for the emotional harm

13    with both plaintiffs clumped together; and then punitive

14    damages together.  And for the reputational harm, you know,

15    perhaps that can be clumped together based on the fact that

16    they're both mentioned together, associated together in the

17    defamatory statements.  But for the emotional distress,

18    should that be separated out between the two plaintiffs or

19    you just want to keep them all clumped together?

20               MR. GOTTLIEB:  Our thought was to keep them

21    together for simplicity.  We searched to see if there was

22    controlling case law in this before we submitted the verdict

23    form and couldn't really find any.  So our view is that this

24    was a very simple way of presenting the damages numbers to

25    the jury, especially in light of the fact that so often with
```

1    respect to these statements and how it affected them, the

2    plaintiffs have just been consistently lumped together at

3    times without regard to which one is which.  So that was our

4    view in putting the verdict form forward.  Mr. Sibley didn't

5    object to it --

6            THE COURT:  I know --

7            MR. GOTTLIEB:  But that was out --

8            THE COURT:  Intellectually it didn't quite make

9    sense to me, at least for the emotional distress

10   compensatory harm.

11           MR. SIBLEY:  I thought that was the template we

12   would use for each plaintiff.  I didn't realize -- I think

13   it has to be separated.  I think each plaintiff has distinct

14   injuries.  It should be identical for each plaintiff, but I

15   don't know why it would be lumped together like that because

16   I think that's --

17           THE COURT:  I'm sorry, Mr. Sibley.  It's as clear

18   as day on the face of this proposed verdict form that it's

19   talking about both plaintiffs together, so how can you say

20   you didn't notice?  You are not noticing some critical

21   things, Mr. Sibley.

22           MR. SIBLEY:  There is a lot going on here, but

23   yeah, I don't know what the problem is with

24   just -- Plaintiff Freeman, Plaintiff Moss.  It's the exact

25   same form, just separate plaintiffs.

1          THE COURT:  All right.  I want you-all to think

2     about that.

3          MR. GOTTLIEB:  Okay.

4          THE COURT:  All right.  Have a good lunch.

5          (Whereupon, a luncheon recess was taken at

6     12:20 p.m.)

7          (Whereupon, the afternoon session of the trial was

8     reported and transcribed by Lisa Moriera, and is bound under

9     separate cover.)

10                              **INDEX**

    **WITNESS**                            **PAGE**

11    Pamela M. Branton                 22

12    Dr. Ashlee Humphreys              24

13

14                        **E-X-H-I-B-I-T-S**

15    Plaintiffs 246                    22

16    Plaintiffs 589                    22

17    Plaintiffs 289                    24

18    Plaintiffs 332                    24

19    Plaintiffs 339                    24

20    Plaintiffs 340                    24

21    Plaintiffs 350                    24

22    Plaintiffs 358                    24

23    Plaintiffs 367                    24

24    Plaintiffs 374                    24

25

## CERTIFICATE

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.

Dated this 13th day of December, 2023.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter

## $

**$10** [1] - 135:14
**$350** [1] - 39:3
**$6.46** [1] - 133:20
**$75,000** [1] - 17:14

## /

**/s** [1] - 142:15

## 1

**1** [3] - 62:24, 63:6, 63:20
**1,000** [1] - 133:12
**1.2** [2] - 56:1, 111:17
**1.9** [1] - 92:16
**10,000** [1] - 45:19
**100** [10] - 1:14, 45:18, 76:17, 76:18, 76:23, 77:1, 91:3, 104:17, 104:24, 134:7
**10:40** [1] - 81:16
**11** [1] - 86:14
**11,000** [1] - 114:16
**11.3** [4] - 94:19, 94:24, 95:11, 97:13
**11.7** [2] - 95:18, 96:15
**110263** [1] - 2:4
**1108** [1] - 2:4
**111** [2] - 101:21, 137:15
**119** [1] - 10:22
**12** [7] - 11:4, 13:8, 57:16, 61:12, 61:13, 86:14, 106:5
**126** [2] - 10:12, 10:20
**12:15** [1] - 138:7
**12:20** [1] - 141:6
**13** [5] - 1:5, 91:3, 124:14, 124:16, 124:24
**13.5** [1] - 124:22
**13.7** [1] - 90:4
**136** [2] - 11:10, 12:9
**13th** [1] - 142:14
**14** [2] - 90:12, 91:3
**14.2** [1] - 135:11
**14th** [1] - 1:18
**15** [5] - 27:9, 31:20, 32:12, 32:13, 32:16
**16** [13] - 36:24, 58:2, 58:17, 81:25, 82:3, 98:22, 120:8, 120:20, 120:24, 121:5, 136:6, 136:8, 136:21
**165** [2] - 13:19, 113:15
**17.8** [2] - 131:2, 138:1

## 2

**2** [1] - 133:22
**20** [19] - 28:24, 77:1, 77:9, 77:11, 77:14, 77:20, 77:25, 78:7, 79:20, 84:19, 84:23, 85:1, 85:5, 86:1, 99:5, 114:15, 130:8, 136:23
**20001** [1] - 2:11
**20006** [1] - 1:14
**2005** [1] - 11:22
**2008** [1] - 27:9
**2014** [1] - 17:4
**2015** [2] - 12:18, 17:5
**2016** [1] - 28:11
**2018** [1] - 16:22
**202** [1] - 1:15
**2020** [35] - 17:19, 29:7, 56:24, 57:1, 57:16, 58:25, 60:13, 60:21, 60:25, 67:22, 67:24, 73:16, 73:24, 74:9, 75:17, 78:20, 80:18, 81:24, 83:22, 83:23, 84:22, 99:15, 99:19, 102:6, 102:9, 102:11, 105:22, 107:2, 110:24, 111:14, 112:13, 114:15, 119:19, 120:9
**2021** [11] - 11:9, 17:23, 86:22, 94:1, 95:6, 96:13, 106:9, 106:18, 114:15, 116:5, 116:21
**2022** [4] - 16:13, 57:16, 116:21
**2023** [9] - 1:5, 14:10, 34:19, 35:4, 36:4, 116:5, 116:6, 116:21, 142:14
**21-3354** [2] - 1:3, 3:3
**22** [5] - 11:4, 62:8, 141:11, 141:15, 141:16

## 3

**3** [6] - 10:12, 10:21, 66:14, 96:24, 130:11, 130:16
**3.3** [2] - 94:21, 95:3
**3.8** [1] - 94:3
**30** [8] - 44:1, 44:7, 71:1, 71:16, 93:16, 94:20, 96:23
**300** [1] - 102:15
**300,000** [1] - 79:21
**301** [1] - 100:15
**303-1016** [1] - 1:15
**30309** [1] - 1:18
**31** [1] - 104:24
**312** [1] - 100:15

## 2nd

**22nd** [2] - 58:25, 99:19
**23** [1] - 67:22
**234** [1] - 100:14
**237** [1] - 100:15
**239** [1] - 100:15
**23rd** [17] - 56:24, 57:1, 57:16, 60:13, 60:21, 60:25, 62:6, 67:24, 73:15, 73:24, 74:9, 80:18, 81:24, 83:21, 99:15, 119:14, 120:9
**24** [9] - 141:12, 141:17, 141:18, 141:19, 141:20, 141:21, 141:22, 141:23, 141:24
**24,000** [1] - 111:19
**24,210** [1] - 112:1
**246** [4] - 22:9, 22:13, 22:17, 141:15
**249** [1] - 101:22
**24th** [2] - 83:22, 83:23
**250** [3] - 101:22, 102:20, 137:16
**25th** [3] - 110:24, 111:14, 112:13
**26** [1] - 89:6
**269** [1] - 100:15
**27** [3] - 61:12, 79:8, 79:11
**28.4** [2] - 131:5, 138:4
**289** [5] - 23:16, 23:25, 24:2, 114:22, 141:17
**28th** [1] - 34:19
**29** [1] - 132:22
**29.16** [1] - 132:15
**29.5** [1] - 94:20
**29.7** [1] - 131:2
**2d** [1] - 11:21
**2nd** [8] - 86:22, 94:1, 94:2, 94:23, 95:6, 96:13, 97:18, 106:12

## 4

**317,000** [1] - 117:1
**33** [1] - 96:24
**332** [5] - 23:16, 23:25, 24:2, 114:22, 141:18
**333** [1] - 102:16
**337** [1] - 82:9
**338** [1] - 82:10
**339** [5] - 23:16, 23:25, 24:2, 114:22, 141:19
**34.5** [1] - 75:20
**34,500** [1] - 75:23
**340** [5] - 23:16, 24:1, 24:2, 114:22, 141:20
**340,000** [2] - 110:3, 110:5
**35.5** [3] - 98:17, 122:4, 137:12
**350** [8] - 23:16, 24:1, 24:2, 55:16, 111:10, 112:8, 112:12, 141:21
**358** [5] - 23:16, 24:1, 24:2, 114:22, 141:22
**367** [5] - 23:16, 24:1, 24:2, 114:22, 141:23
**374** [5] - 23:17, 24:1, 24:3, 114:22, 141:24
**3d** [1] - 17:23
**3rd** [7] - 57:1, 58:25, 62:8, 99:19, 104:5, 104:6, 104:7

## 4

**4** [2] - 13:4, 66:13
**4.8** [2] - 95:8, 95:12
**40** [1] - 29:8
**400** [1] - 114:17
**402** [1] - 61:15
**403** [1] - 61:15
**404** [1] - 1:19
**42** [1] - 17:23
**436** [1] - 113:15
**448,000** [1] - 74:11
**46** [2] - 95:17, 96:12
**47.4** [4] - 131:6, 136:10, 138:1, 138:4
**4th** [10] - 104:22, 104:23, 105:2, 105:22, 105:24, 106:9, 106:12, 106:14, 106:17, 107:6

## 5

**5** [13] - 66:6, 77:3, 77:5, 77:24, 79:18, 84:21, 85:25, 99:5, 110:17, 130:6,

## 6 (col 5)

**131:1, 134:24, 135:12**
**5.04** [1] - 135:7
**50** [1] - 101:12
**50-some** [1] - 133:2
**50.1** [1] - 43:21
**500,000** [1] - 80:21
**503765** [1] - 16:13
**52** [3] - 99:22, 101:16, 120:4
**554** [1] - 17:23
**555** [1] - 1:22
**56** [3] - 11:10, 12:9, 15:17
**56.6** [1] - 137:13
**56.7** [2] - 98:18, 122:4
**568** [1] - 15:17
**575** [1] - 86:15
**584,000** [1] - 81:7
**589** [4] - 22:10, 22:13, 22:17, 141:16
**5th** [1] - 1:22
**5X** [2] - 130:11, 131:5

## 6

**6** [2] - 10:22, 35:4
**60** [1] - 133:3
**619-9819** [1] - 1:23
**63** [1] - 11:21
**63,000** [2] - 110:4, 110:6
**635** [1] - 11:12
**68** [1] - 90:14

## 7

**7** [3] - 14:10, 130:16
**700,000** [1] - 116:25
**702** [5] - 25:13, 31:12, 32:1, 37:7, 128:21
**703** [1] - 128:21
**713** [1] - 2:5
**720-8111** [1] - 1:19
**73,000** [1] - 79:19
**747,000** [1] - 65:4
**75** [1] - 1:18
**759** [2] - 11:10, 12:9
**78701** [2] - 2:5
**7th** [1] - 10:22

## 8

**8** [3] - 66:6, 85:23, 86:6
**80-some** [2] - 91:5, 91:6
**800,000** [1] - 80:22
**806,000** [1] - 81:7
**82** [1] - 113:16

## 18 (col 2)

**18** [4] - 85:24, 86:7, 86:10, 107:2
**18-cv-02986** [1] - 16:13
**1875** [1] - 1:14
**1982** [1] - 15:23
**1983** [1] - 15:18
**1985** [1] - 11:11
**1996** [1] - 11:13
**1:20** [1] - 138:13
**1st** [2] - 36:4, 114:15

**8400** [1] - 74:12
**88** [3] - 84:11, 86:3, 86:4
**884** [1] - 11:21

# 9

**9** [2] - 108:13, 108:19
**9,640** [1] - 72:9
**90** [1] - 11:10
**90013** [1] - 1:22
**91** [4] - 58:3, 58:20, 98:21, 98:23
**919** [1] - 1:23
**942** [1] - 11:12
**95,000** [2] - 111:19, 111:25
**9600** [2] - 73:12, 73:13
**965** [1] - 11:9
**966-6789** [1] - 2:5
**976** [1] - 11:9
**998** [1] - 11:9
**9:02** [1] - 1:5

# A

**a.m** [2] - 1:5, 81:16
**AARON** [1] - 1:13
**ability** [1] - 142:7
**able** [4] - 19:3, 78:15, 79:10, 80:19
**academic** [4] - 28:7, 29:2, 29:3, 51:18
**accept** [1] - 50:8
**accepted** [1] - 28:21
**accepting** [1] - 16:10
**access** [8] - 68:20, 69:3, 75:5, 75:12, 75:13, 80:9, 89:13, 89:14
**accessible** [3] - 69:18, 69:20, 116:13
**accidentally** [1] - 21:5
**accidents** [1] - 21:6
**accomplished** [1] - 51:25
**according** [3] - 35:9, 68:6, 84:20
**accordingly** [1] - 12:6
**account** [12] - 17:24, 50:23, 76:24, 79:7, 79:9, 83:21, 84:10, 94:12, 124:6, 134:5, 134:10, 134:13
**accountable** [1] - 11:7
**accountholder** [8] - 68:15, 68:21, 68:24, 69:2, 70:14, 80:1, 80:7, 80:9
**accountholders** [1] -

80:4
**accounts** [3] - 13:25, 76:11, 136:24
**accuracy** [1] - 98:9
**accurate** [15] - 51:9, 78:3, 79:24, 79:25, 81:8, 81:9, 86:9, 86:10, 99:9, 105:12, 136:19, 136:25, 138:2, 142:4
**accusations** [2] - 13:6, 13:17
**accused** [1] - 16:16
**acknowledge** [1] - 19:23
**acquaintances** [1] - 15:25
**Action** [2] - 1:3, 3:3
**action** [2] - 65:20, 71:8
**actionable** [1] - 61:24
**actions** [2] - 6:15, 14:2
**activity** [2] - 53:7, 100:2
**actual** [4] - 5:7, 107:13, 107:18, 109:21
**add** [6] - 9:13, 55:3, 80:20, 95:17, 99:1, 101:19
**added** [3] - 8:23, 80:17, 96:7
**adding** [1] - 55:7
**addition** [3] - 30:8, 53:12, 64:5
**additional** [7] - 8:16, 36:7, 96:3, 96:4, 96:8, 125:9, 125:14
**address** [4] - 20:15, 20:16, 20:18, 37:10
**addresses** [1] - 91:24
**addressing** [1] - 14:11
**adjusted** [3] - 134:4, 134:5, 135:4
**admission** [3] - 22:12, 31:11, 37:6
**admit** [6] - 21:8, 21:9, 22:7, 23:11, 23:16
**admitted** [15] - 21:9, 22:15, 22:17, 24:1, 24:3, 24:7, 55:17, 62:25, 66:12, 66:13, 82:9, 86:15, 100:14, 106:6, 110:17
**ads** [3] - 85:15, 133:25, 134:1
**advancement** [1] - 42:8
**advertise** [3] - 132:10,

133:7, 133:10
**advertisement** [7] - 83:15, 84:10, 85:8, 85:9, 85:16, 85:19, 85:20
**advertisements** [1] - 85:11
**advertisers** [3] - 67:19, 70:16, 80:13
**advertising** [7] - 27:15, 27:16, 69:9, 93:6, 123:14, 125:20, 127:2
**advise** [1] - 37:14
**affect** [1] - 116:13
**affected** [2] - 78:11, 140:1
**affecting** [1] - 18:9
**affirmed** [2] - 10:14, 14:24
**afternoon** [1] - 141:7
**afterwards** [1] - 129:12
**agents** [1] - 13:23
**ago** [1] - 126:2
**agree** [2] - 9:7, 138:22
**agreed** [1] - 20:11
**agreement** [1] - 23:15
**ahead** [2] - 119:3, 119:6
**aided** [1] - 2:13
**aired** [2] - 54:17, 92:24
**al** [2] - 1:3, 3:3
**aligned** [1] - 90:19
**aligns** [1] - 49:6
**allegation** [1] - 14:19
**allegations** [2] - 11:14, 14:20
**alleged** [7] - 6:1, 6:4, 6:5, 6:15, 10:11, 12:25, 17:14
**allocate** [1] - 132:21
**allocated** [1] - 124:22
**allocation** [4] - 125:12, 125:18, 125:20, 125:24
**allocations** [4] - 124:19, 125:3, 125:14, 125:22
**allotted** [1] - 19:5
**allow** [3] - 4:25, 5:11, 20:10
**allowed** [7] - 6:3, 6:7, 6:17, 33:15, 37:17, 78:9, 80:2
**allows** [4] - 41:24, 41:25, 42:6, 69:21
**almost** [7] - 20:14, 45:16, 50:21, 59:1,

94:20, 101:22, 133:2
**alone** [3] - 12:23, 95:10, 118:22
**alternative** [1] - 129:1
**amended** [10] - 7:7, 7:12, 10:12, 11:4, 13:1, 13:4, 13:8, 13:19, 14:5, 14:19
**America** [2] - 70:10, 112:21
**amount** [9] - 5:8, 6:11, 33:6, 33:25, 52:23, 69:10, 122:17, 126:2, 133:9
**amounts** [1] - 131:23
**amplified** [2] - 13:12, 14:3
**analyses** [2] - 29:14, 78:7
**analysis** [47] - 34:25, 35:17, 36:9, 40:16, 40:20, 56:10, 60:23, 63:8, 63:13, 64:11, 68:19, 69:13, 72:14, 72:17, 73:6, 76:7, 78:17, 81:23, 81:25, 87:10, 87:11, 88:14, 88:19, 91:9, 92:12, 97:5, 97:17, 99:14, 103:17, 103:21, 104:11, 106:16, 106:21, 109:3, 109:4, 109:9, 109:11, 109:13, 109:14, 109:15, 114:5, 117:10, 119:20, 124:24, 132:5, 133:15
**analyze** [10] - 36:21, 82:21, 83:19, 86:17, 94:8, 95:16, 105:3, 107:7, 111:5, 120:21
**analyzed** [20] - 29:24, 51:4, 55:12, 57:12, 58:19, 58:22, 60:11, 60:17, 60:18, 61:3, 63:4, 66:19, 73:4, 83:11, 84:6, 98:22, 109:15, 120:9, 120:15, 125:8
**analyzing** [3] - 75:3, 85:7, 125:19
**Angeles** [1] - 1:22
**ANNIE** [1] - 1:12
**Annie** [1] - 3:11
**anonymous** [2] - 44:13, 44:21
**answer** [2] - 4:10, 15:10
**anthropology** [1] -

31:8
**anticipated** [1] - 12:22
**apart** [1] - 73:3
**apologize** [1] - 118:21
**apologized** [1] - 117:18
**apologizing** [1] - 117:25
**apology** [1] - 126:13
**appeal** [1] - 10:1
**Appeals** [1] - 11:22
**appear** [2] - 116:8, 138:22
**Appearances** [1] - 1:25
**APPEARANCES** [2] - 1:10, 2:1
**appeared** [6] - 83:25, 88:13, 89:6, 92:18, 96:9, 111:5
**appendix** [1] - 38:21
**Apple** [4] - 67:11, 68:2, 75:6, 75:11
**apples** [1] - 56:19
**applied** [3] - 30:22, 55:11, 94:14
**applies** [2] - 32:8, 35:21, 91:11
**apply** [6] - 8:18, 31:4, 35:16, 39:15, 71:20, 76:15
**applying** [2] - 31:24, 92:12
**appreciate** [1] - 138:20
**apprised** [1] - 20:2
**approach** [1] - 95:13
**appropriate** [3] - 8:25, 103:25, 128:10
**archive** [3] - 74:18, 74:23, 92:21
**archived** [1] - 97:23
**area** [2] - 27:10, 27:11
**areas** [2] - 50:20, 64:18
**argues** [1] - 15:12
**arguing** [2] - 3:23, 7:9
**argument** [10] - 7:17, 8:1, 8:4, 8:11, 9:17, 10:9, 11:4, 15:15, 17:25, 19:11
**arguments** [1] - 6:20
**arising** [1] - 17:9
**arrangement** [1] - 19:15
**arrested** [3] - 107:16, 108:3, 119:19
**arresting** [1] - 112:18
**arrive** [3] - 80:2, 127:24, 131:7

3

arrived [1] - 129:19
art [1] - 37:18
article [3] - 36:17, 48:1, 54:15
articles [6] - 16:10, 28:23, 28:24, 40:12, 88:23, 97:20
articulate [2] - 9:15, 9:16
Ashlee [5] - 19:1, 22:23, 24:15, 37:20, 141:12
ASHLEE [1] - 23:2
asserting [1] - 17:9
assess [2] - 40:3, 87:7
assessed [1] - 121:3
assessment [19] - 40:1, 40:15, 40:16, 54:2, 103:8, 103:9, 103:11, 104:4, 104:9, 109:10, 110:12, 113:18, 114:3, 115:6, 116:2, 119:12, 137:17, 137:18
assist [3] - 24:21, 39:11, 39:13
assistants [1] - 39:12
assisted [1] - 39:12
associated [4] - 109:1, 119:16, 127:21, 139:16
association [1] - 115:11
associations [15] - 41:14, 43:7, 44:20, 103:15, 107:8, 107:10, 108:1, 108:5, 108:24, 109:7, 110:13, 113:20, 113:24, 116:11, 117:12
assume [4] - 36:20, 79:17, 79:20, 130:25
assumed [2] - 13:2, 84:25
assuming [3] - 123:2, 134:24, 135:2
assumptions [4] - 35:25, 81:4, 100:9, 135:16
Atlanta [1] - 1:18
attached [5] - 40:19, 109:23, 112:13, 112:23, 114:10
attempts [1] - 10:9
attention [7] - 40:17, 67:14, 76:12, 104:25, 105:3, 106:24

attitude [9] - 126:5, 126:11, 126:21, 127:5, 127:13, 128:4, 128:11, 130:12, 136:14
attitudes [10] - 52:25, 116:15, 121:13, 122:10, 122:20, 126:9, 127:5, 127:15, 127:17, 128:5
attributed [1] - 17:2
audience [48] - 41:14, 45:10, 52:6, 52:19, 53:22, 65:5, 67:12, 84:13, 88:8, 88:9, 89:17, 89:18, 89:20, 89:22, 90:1, 90:3, 90:4, 90:5, 90:12, 90:20, 91:1, 91:18, 91:25, 92:8, 92:13, 93:7, 93:15, 93:16, 94:12, 94:14, 94:20, 117:16, 117:20, 117:25, 118:2, 118:9, 118:24, 121:12, 122:2, 122:3, 122:10, 122:12, 122:13, 122:19, 130:18, 133:25, 137:15
audiences [6] - 65:8, 90:9, 91:21, 93:4, 93:10, 93:21
audio [7] - 67:1, 67:5, 67:8, 88:16, 89:9, 94:22, 96:9
audio-video [1] - 89:9
August [2] - 116:6, 116:21
Austin [1] - 2:5
authored [1] - 11:2
authorization [1] - 142:10
available [12] - 69:4, 69:16, 70:14, 74:6, 78:14, 78:21, 79:3, 79:10, 97:3, 98:8, 105:16, 133:14
average [3] - 77:18, 79:8, 96:23
avid [1] - 48:19
award [2] - 29:17, 30:1
awarded [3] - 16:5, 16:23, 138:23
awards [1] - 29:5
aware [1] - 117:4

**B**

background [4] - 19:12, 25:5, 25:11, 27:19
backlash [1] - 16:7
backpedaling [1] - 32:3
ballot [2] - 65:14, 65:23
ballots [1] - 65:15
barred [5] - 3:22, 8:4, 8:5, 8:12, 19:21
base [1] - 123:14
based [40] - 26:7, 37:25, 40:5, 51:21, 53:19, 56:18, 78:1, 79:9, 81:6, 84:14, 85:25, 86:8, 92:2, 93:6, 98:16, 98:20, 98:21, 99:3, 99:7, 99:10, 107:1, 115:21, 117:14, 120:14, 120:17, 121:21, 122:21, 124:11, 125:12, 125:18, 125:23, 128:9, 129:23, 129:25, 132:4, 135:16, 136:17, 136:21, 137:23, 139:15
bases [1] - 30:10
basic [1] - 135:16
basis [2] - 26:15, 30:16
batch [2] - 23:11
became [3] - 87:17, 87:20, 119:16
become [9] - 28:21, 37:18, 43:4, 43:5, 43:6, 44:13, 51:1, 77:16, 79:3
becomes [2] - 43:18, 46:3
becoming [1] - 43:2
bedrock [1] - 126:7
BEFORE [1] - 1:8
begin [1] - 23:10
beginning [1] - 119:19
behalf [2] - 3:10, 39:17
behavior [1] - 28:1
belief [1] - 127:6
beliefs [8] - 49:1, 118:23, 122:20, 127:22, 128:13, 128:14, 137:2
below [4] - 56:1, 65:16, 79:21, 142:11

bench [9] - 25:9, 26:19, 31:16, 34:13, 37:10, 61:19, 62:12, 128:23, 129:14
benefit [1] - 10:1
Berlin [1] - 11:8
BERYL [1] - 1:8
best [4] - 29:9, 53:13, 138:10, 142:6
better [2] - 9:18, 40:21
between [5] - 4:14, 6:3, 15:7, 33:21, 34:6, 45:23, 47:4, 54:23, 56:25, 58:24, 59:21, 62:8, 73:7, 81:3, 81:7, 86:6, 86:18, 86:24, 99:5, 99:18, 133:4, 134:3, 137:12, 138:3, 139:18
big [1] - 87:20
bit [9] - 3:25, 4:23, 48:18, 53:16, 77:20, 109:6, 126:2, 138:16
blocked [1] - 16:11
blog [3] - 48:14, 135:6, 135:10
boils [1] - 15:8
book [8] - 28:5, 28:9, 28:10, 28:11, 28:12, 28:14, 28:25, 29:1
bottom [4] - 54:24, 86:25, 98:24, 113:8
bounce [9] - 71:2, 71:3, 71:4, 71:5, 71:6, 71:10, 71:20, 89:15, 92:12
bound [3] - 7:3, 37:23, 141:8
boxes [2] - 104:19, 104:20
Brad [3] - 86:19, 86:24, 87:4
branding [1] - 50:24
Branton [2] - 22:5, 141:11
BRANTON [1] - 22:19
Branton's [2] - 22:8, 22:21
Break [1] - 65:17
break [6] - 72:2, 81:12, 81:15, 81:22, 138:8, 138:11
breakdown [1] - 129:17
breaking [1] - 72:6
brief [6] - 32:12, 32:13, 32:14, 33:6, 33:25, 50:14
bring [3] - 18:19,

21:14, 81:17
bringing [1] - 6:18
broad [10] - 14:7, 14:8, 28:18, 41:14, 45:10, 67:17, 84:13, 88:7, 88:8, 89:17
broadcasts [4] - 87:23, 93:2, 93:25, 97:22
broader [5] - 43:13, 59:3, 115:10, 115:11, 115:23
broadly [3] - 28:20, 43:19, 45:13
broken [1] - 72:5
browser [1] - 68:1
bubble [1] - 47:7
bubbles [4] - 47:2, 47:5, 47:6, 49:8
bucket [1] - 132:20
budget [2] - 53:17, 132:22
build [1] - 41:22
built [2] - 84:25, 134:22
bullet [1] - 65:18
bumbling [1] - 25:24
burden [2] - 9:6
Bureau [1] - 108:25
Burger [1] - 127:12
business [5] - 16:19, 16:25, 42:16, 50:3, 53:6
button [2] - 48:24, 48:25
buy [1] - 133:12
BY [27] - 24:10, 26:22, 34:15, 38:11, 48:17, 55:18, 60:8, 62:13, 63:1, 66:17, 69:19, 72:8, 74:20, 81:21, 82:11, 83:9, 86:16, 97:8, 100:16, 105:20, 106:7, 110:19, 111:12, 112:10, 114:23, 119:9, 129:16

**C**

CA [1] - 1:22
cable [4] - 124:15, 124:17, 124:23, 124:25
calculate [9] - 4:23, 56:3, 77:17, 79:10, 93:14, 120:16, 132:11, 134:9, 137:24
calculated [7] - 40:23,

79:6, 88:4, 91:15, 120:3, 120:24, 124:15
**calculating** [3] - 95:2, 120:7, 121:7
**calculations** [5] - 84:20, 131:8, 131:13, 131:16, 131:21
**Camara** [1] - 2:3
**campaign** [45] - 15:15, 35:2, 45:3, 52:16, 52:23, 53:2, 57:19, 63:25, 64:1, 64:20, 82:25, 83:3, 83:15, 83:21, 85:8, 85:18, 85:20, 91:24, 92:2, 92:7, 100:3, 103:2, 103:3, 120:8, 120:16, 121:15, 122:8, 122:9, 122:18, 122:22, 123:4, 123:10, 123:12, 123:17, 123:25, 124:5, 124:7, 124:16, 128:18, 132:3, 133:24, 136:6, 136:13, 137:25, 138:3
**campaigns** [5] - 42:18, 51:18, 123:21, 124:9, 136:20
**Candace** [1] - 65:3
**cannot** [3] - 10:25, 15:10, 15:13
**capitalize** [1] - 49:16
**care** [1] - 11:15
**career** [1] - 42:8
**Carroll** [1] - 29:22
**cascade** [1] - 46:7
**case** [103] - 5:4, 6:11, 9:4, 9:25, 11:13, 11:21, 12:17, 12:18, 14:16, 15:16, 15:18, 16:3, 16:21, 17:8, 17:23, 19:3, 19:13, 24:19, 29:10, 29:15, 29:19, 29:21, 29:22, 29:24, 30:1, 30:6, 30:15, 30:23, 31:5, 34:16, 36:25, 37:13, 37:20, 38:6, 38:19, 38:25, 39:11, 39:16, 39:18, 39:25, 41:4, 41:7, 41:14, 48:19, 51:5, 51:22, 54:7, 55:12, 57:8, 57:13, 59:10, 60:11, 61:4,

63:4, 64:12, 65:21, 66:19, 69:1, 75:15, 76:22, 77:21, 78:2, 78:7, 80:6, 81:7, 82:1, 82:4, 82:13, 83:4, 83:12, 89:3, 89:16, 91:23, 99:8, 99:10, 100:24, 103:10, 104:4, 106:23, 110:22, 113:25, 115:9, 115:15, 119:23, 120:1, 121:25, 123:11, 123:24, 128:10, 128:12, 128:18, 129:21, 131:13, 132:23, 133:1, 136:7, 136:9, 136:21, 137:11, 137:19, 139:6, 139:22
**cases** [8] - 4:16, 29:12, 29:13, 29:14, 38:23, 57:18, 118:11, 118:20
**casino** [1] - 28:7
**catalogues** [1] - 27:17
**categories** [5] - 35:22, 68:9, 80:16, 109:1, 132:25
**categorization** [1] - 35:10
**categorized** [1] - 35:8
**category** [7] - 50:21, 76:1, 94:4, 95:14, 101:8, 103:7, 108:20
**Caudle** [1] - 11:12
**causation** [4] - 8:2, 9:7, 14:14, 57:5
**caused** [11] - 6:5, 10:15, 13:5, 13:20, 15:1, 15:21, 17:4, 33:24, 40:3, 57:6, 70:4
**cautionary** [1] - 25:14
**CBS** [2] - 92:25, 93:17
**Center** [1] - 91:17
**cents** [1] - 42:14
**certain** [10] - 30:24, 35:9, 36:1, 52:3, 55:5, 55:6, 68:18, 77:11, 124:3, 132:6
**certainly** [2] - 84:18, 97:19
**CERTIFICATE** [1] - 142:1
**certificate** [1] - 142:8
**certified** [2] - 32:22, 34:10
**certify** [2] - 32:23,

142:4
**cetera** [2] - 36:19, 68:17
**challenge** [3] - 6:3, 6:7, 6:17
**challenges** [1] - 14:12
**challenging** [1] - 69:25
**chance** [1] - 33:18
**Chandler** [2] - 11:8, 12:10
**change** [21] - 33:12, 35:24, 43:20, 44:19, 45:5, 52:25, 65:5, 121:13, 122:10, 122:11, 125:12, 125:14, 126:6, 126:8, 126:11, 126:21, 127:4, 127:7, 128:11, 130:12, 136:14
**changed** [10] - 33:11, 33:24, 42:20, 42:24, 43:2, 45:4, 122:14, 125:17, 125:20
**changes** [1] - 118:9
**channel** [8] - 52:9, 55:3, 55:7, 55:13, 68:6, 80:20, 132:10, 133:8
**channels** [27] - 13:13, 52:12, 52:14, 53:14, 54:11, 54:21, 54:24, 62:21, 64:4, 64:8, 67:4, 67:7, 68:2, 68:12, 82:18, 88:6, 88:7, 99:2, 102:3, 122:16, 123:13, 124:6, 124:19, 125:2, 129:1, 132:13, 132:22
**chapters** [2] - 28:25, 29:1
**charging** [1] - 8:23, 138:16
**chart** [7] - 106:9, 106:10, 108:7, 108:12, 132:17, 133:8, 134:3
**cheaper** [1] - 133:17
**Chicago** [1] - 27:6
**choose** [3] - 24:17, 47:8, 47:10
**chooses** [1] - 122:9
**chosen** [2] - 47:14, 48:23
**Circuit** [7] - 4:16, 10:2, 11:9, 11:11, 12:1, 12:10, 12:19
**circulate** [1] - 8:24

**circulated** [4] - 43:18, 58:8, 77:17, 106:13
**circulating** [2] - 115:11, 123:16
**cite** [2] - 11:9, 11:10
**cited** [2] - 11:3, 14:16
**citizens** [1] - 63:23
**Civil** [2] - 1:3, 3:2
**claim** [9] - 16:5, 17:9, 57:12, 62:9, 87:7, 89:23, 90:3, 90:22, 92:5
**claimed** [1] - 5:8
**claims** [4] - 14:15, 93:20, 119:13, 119:14, 119:16
**classes** [2] - 51:16, 103:25
**classification** [1] - 48:15
**classify** [1] - 108:10
**cleaned** [1] - 112:21
**clear** [14] - 14:5, 18:2, 57:2, 58:16, 69:2, 69:20, 72:12, 78:19, 97:2, 97:9, 100:4, 105:9, 115:13, 140:17
**clearly** [1] - 4:16
**click** [1] - 71:7
**clicking** [2] - 48:24
**client** [2] - 7:10, 19:24
**clients** [2] - 3:13, 17:6
**clips** [1] - 13:15
**clock** [1] - 9:1
**close** [3] - 19:3, 23:6, 127:6
**closely** [2] - 127:6, 127:21
**clumped** [5] - 138:19, 138:21, 139:13, 139:15, 139:19
**CNN** [2] - 88:8, 92:25
**cnn.com** [1] - 89:12
**co** [4] - 10:15, 14:25, 18:6, 37:22
**co-conspirator's** [1] - 37:22
**co-conspirators** [1] - 18:6
**co-conspirators'** [2] - 10:15, 14:25
**coded** [2] - 48:12, 48:15
**coffee** [1] - 21:23
**Coke** [3] - 127:18, 127:20
**collect** [1] - 78:16
**collecting** [1] - 39:14
**college** [1] - 103:25

**Columbia** [1] - 11:21
**COLUMBIA** [1] - 1:1
**column** [4] - 132:15, 132:16, 133:10, 137:5
**columns** [1] - 130:11
**coming** [1] - 48:13, 122:15
**comment** [1] - 110:7
**commentary** [1] - 103:22
**commenters** [1] - 113:4
**comments** [35] - 21:10, 40:18, 85:3, 109:16, 109:18, 109:19, 109:22, 110:4, 110:6, 110:7, 110:10, 111:5, 111:19, 111:20, 112:1, 112:3, 112:5, 112:11, 112:12, 112:15, 112:23, 113:1, 113:2, 113:10, 113:13, 113:14, 114:17, 115:3, 115:5, 115:17, 115:21, 116:7, 116:20
**committed** [1] - 13:7
**Common** [5] - 66:24, 81:24, 111:2, 111:14, 112:13
**common** [3] - 8:18, 53:7, 123:18
**commonly** [1] - 75:1
**communicate** [1] - 28:16
**communication** [7] - 27:16, 28:17, 51:10, 51:11, 51:25, 52:2, 52:3
**Communications** [2] - 63:11, 82:17
**communications** [29] - 27:2, 27:12, 27:13, 27:14, 52:1, 52:4, 52:5, 52:10, 52:13, 52:16, 52:21, 53:3, 53:6, 53:11, 53:20, 63:16, 63:17, 63:19, 63:22, 64:3, 65:10, 65:12, 65:20, 66:2, 121:15, 122:2, 123:25, 124:1, 124:2
**communities** [1] - 16:11
**community** [2] - 16:8, 16:21
**companies** [6] -

5

50:23, 51:1, 53:5, 53:8, 80:13, 133:23
**company** [2] - 50:13, 93:5
**compensation** [5] - 10:19, 15:4, 19:15, 39:5, 69:10
**compensatory** [8] - 5:8, 8:18, 15:20, 18:6, 138:18, 138:23, 139:11, 140:10
**competing** [1] - 76:12
**complaint** [22] - 6:2, 6:4, 6:6, 6:15, 6:19, 7:4, 7:8, 7:10, 7:12, 7:14, 7:22, 8:4, 10:12, 11:4, 13:1, 13:4, 13:8, 13:19, 14:5, 14:19, 17:12, 61:25
**complete** [1] - 142:6
**completely** [1] - 38:3
**complicated** [3] - 4:1, 4:4, 74:2
**component** [5] - 67:8, 67:9, 67:10, 103:18, 103:19
**components** [2] - 63:19, 103:18
**computer** [3] - 2:13, 31:7, 105:19
**computer-aided** [1] - 2:13
**CONANT** [1] - 1:12
**concept** [6] - 42:10, 47:1, 49:8, 49:13, 51:15, 91:21
**concerning** [1] - 37:21
**conclude** [3] - 75:22, 105:23, 106:22
**concluded** [2] - 11:14, 119:20
**concludes** [5] - 22:20, 26:19, 34:13, 62:12, 129:14
**conclusion** [7] - 73:9, 108:22, 129:7, 136:3, 136:5, 137:6, 137:7
**conclusions** [5] - 37:16, 74:8, 84:14, 106:20, 128:16
**condensed** [1] - 18:12
**conditioned** [1] - 39:5
**conduct** [6] - 10:15, 15:1, 16:17, 17:5, 44:19, 91:17
**conducted** [3] - 29:14, 92:23, 109:9

**conducting** [2] - 120:12, 123:17
**confer** [2] - 18:11, 18:16
**conference** [11] - 8:23, 25:9, 26:19, 31:16, 34:13, 37:10, 61:19, 62:12, 128:23, 129:14, 138:16
**conferences** [1] - 16:10
**confident** [2] - 56:12, 98:9
**confined** [1] - 120:1
**confused** [1] - 59:20
**Congress** [1] - 63:24
**connected** [2] - 49:23, 126:6
**connection** [1] - 94:8
**consequences** [1] - 20:20
**consequently** [1] - 41:17
**Conservative** [1] - 64:14
**conservative** [3] - 64:16, 95:13, 125:23
**consider** [16] - 28:5, 38:5, 60:24, 73:14, 73:18, 85:7, 85:9, 85:10, 85:11, 88:19, 90:21, 92:17, 97:16, 97:17, 112:2, 117:3
**considerations** [1] - 36:1
**considered** [6] - 64:11, 89:16, 89:17, 93:19, 97:20, 142:8
**considering** [1] - 130:4
**consisted** [1] - 13:10
**consistent** [1] - 11:19
**consistently** [1] - 140:2
**conspiracy** [1] - 8:6
**conspirator's** [1] - 37:22
**conspirators** [1] - 18:6
**conspirators'** [2] - 10:15, 14:25
**constantly** [1] - 15:23
**constitute** [1] - 109:11
**constitutes** [1] - 142:4
**consumed** [2] - 102:8, 102:10
**consumer** [1] - 28:1
**consumes** [1] - 117:16

**consumption** [1] - 28:8
**contacts** [1] - 16:19
**contain** [3] - 90:8, 111:8, 131:21
**contained** [1] - 88:25
**contains** [5] - 82:7, 86:13, 100:13, 106:5, 114:20
**contemplated** [2] - 11:2, 65:10
**contends** [1] - 10:24
**content** [14] - 56:12, 65:9, 67:14, 82:21, 86:13, 97:3, 110:13, 113:13, 113:25, 114:9, 114:10, 117:16, 128:2, 128:3
**contention** [1] - 15:7
**contest** [3] - 5:1, 5:7, 5:13
**contested** [1] - 18:9
**contesting** [2] - 5:14, 7:23
**context** [9] - 4:1, 4:10, 4:15, 5:20, 5:24, 12:11, 12:20, 107:11, 107:15
**contingent** [1] - 39:5
**Continue** [1] - 129:15
**continue** [2] - 116:8, 119:20
**Continued** [1] - 1:25
**continued** [2] - 2:1, 104:25
**contributed** [1] - 41:16
**controlling** [2] - 19:24, 139:22
**conversation** [3] - 19:20, 21:4, 115:10
**convince** [3] - 44:6, 127:19, 128:6
**convinced** [1] - 127:20
**core** [1] - 36:15
**corners** [1] - 7:3
**corporate** [1] - 17:10
**Correct** [3] - 37:1, 77:7, 108:18
**correct** [69] - 20:7, 23:20, 23:23, 34:17, 34:18, 35:4, 35:5, 35:23, 36:4, 41:11, 56:10, 57:9, 59:11, 60:20, 70:21, 71:11, 71:17, 71:19, 71:22, 73:5, 74:5, 76:20, 77:10, 80:8, 80:11, 81:5, 82:5, 83:5,

84:2, 84:5, 85:2, 85:17, 86:2, 86:6, 87:24, 88:15, 90:11, 91:10, 92:11, 93:11, 93:23, 94:25, 95:13, 96:11, 96:18, 97:6, 99:1, 102:7, 102:23, 106:2, 107:9, 108:21, 110:12, 118:25, 119:23, 119:24, 120:6, 121:4, 125:7, 125:11, 125:25, 129:9, 134:2, 134:21, 135:1, 135:4, 135:24, 136:2, 136:8
**corrected** [1] - 116:9
**corrective** [12] - 42:18, 117:19, 124:17, 125:1, 126:2, 126:13, 126:25, 130:1, 132:13, 132:20, 135:11, 135:18
**correctly** [2] - 10:13, 14:23
**correspond** [1] - 132:24
**Cosby** [1] - 12:18
**cost** [33] - 40:24, 44:10, 51:4, 52:21, 53:21, 59:9, 65:6, 66:1, 66:2, 92:7, 120:3, 120:7, 121:7, 121:11, 121:16, 122:22, 124:23, 125:22, 128:17, 132:2, 132:9, 132:11, 133:7, 133:12, 133:18, 135:8, 135:21, 136:5, 136:12, 136:20, 137:24, 137:25
**cost-effective** [1] - 133:18
**cost-to-repair** [1] - 59:9
**costing** [1] - 138:3
**costs** [4] - 122:18, 132:10, 133:9, 133:20
**cough** [1] - 51:14
**counsel** [16] - 3:7, 3:22, 19:12, 19:14, 21:11, 35:10, 36:22, 38:13, 38:14, 38:15, 57:15, 88:24, 100:8, 138:15

**counsel's** [3] - 3:10, 19:14
**count** [9] - 58:10, 71:1, 71:8, 74:4, 97:13, 98:2, 98:5, 120:15
**counted** [9] - 40:13, 59:1, 62:20, 72:11, 88:9, 89:24, 93:8, 109:17, 110:2
**counteract** [2] - 44:23, 132:7
**counting** [1] - 55:14, 72:21, 97:6
**County** [1] - 108:10
**couple** [1] - 109:14
**course** [6] - 9:4, 23:22, 44:18, 47:25, 53:19, 65:25
**courses** [1] - 27:23
**Court** [20] - 2:10, 2:10, 6:4, 10:14, 11:22, 14:24, 15:18, 16:5, 20:10, 24:13, 26:10, 31:22, 36:10, 36:24, 61:25, 72:12, 126:1, 132:1, 142:15
**court** [11] - 6:21, 11:13, 16:4, 16:14, 16:23, 17:11, 19:17, 19:19, 20:24, 29:17
**COURT** [101] - 1:1, 1:9, 3:14, 3:17, 4:18, 4:21, 6:9, 7:1, 8:14, 9:8, 9:15, 9:22, 18:18, 18:22, 19:22, 20:5, 20:8, 20:12, 20:16, 20:21, 21:3, 21:6, 21:13, 21:16, 21:20, 22:12, 22:15, 22:22, 22:25, 23:3, 23:5, 23:8, 23:20, 23:22, 23:25, 24:8, 25:4, 25:7, 25:10, 25:21, 25:23, 26:2, 26:12, 26:20, 31:15, 31:17, 32:2, 32:13, 32:16, 32:20, 33:1, 33:20, 34:1, 34:5, 34:14, 37:11, 47:15, 47:21, 48:3, 48:5, 48:9, 48:16, 59:19, 59:25, 60:4, 60:6, 61:7, 61:17, 61:20, 62:2, 62:10, 69:15, 72:2, 74:14, 81:13, 81:15, 81:17, 81:19, 97:2, 105:15, 117:24, 118:8, 118:13, 118:18,

119:2, 119:5,
128:22, 129:3,
129:6, 129:10,
129:15, 138:7,
138:12, 138:15,
139:2, 139:9, 140:6,
140:8, 140:17,
141:1, 141:4
**Court's** [9] - 7:24, 8:5,
10:8, 14:10, 19:10,
20:2, 20:5, 23:15,
61:16
**courthouse** [1] - 19:9
**COURTROOM** [1] -
3:2
**courtroom** [4] - 19:25,
21:19, 38:16, 81:18
**courts** [1] - 5:4
**cover** [2] - 51:17,
141:9
**covered** [7] - 5:20,
15:11, 36:17, 87:21,
87:23, 119:10
**covering** [1] - 88:12
**coworkers** [1] - 44:2
**CPM** [1] - 133:11
**create** [2] - 50:14, 51:9
**creating** [1] - 123:2
**criminal** [1] - 16:17
**criminals** [1] - 112:19
**critical** [1] - 140:20
**cross** [3] - 31:18,
31:25, 33:14
**cross-examination** [3]
- 31:18, 31:25, 33:14
**curious** [1] - 74:14
**current** [1] - 27:1
**cut** [1] - 126:20

### D

**D.C** [11] - 1:6, 2:11,
4:9, 11:9, 11:11,
11:21, 11:22, 12:1,
12:10, 12:19, 15:18
**D.D.C** [3] - 15:17,
16:21, 17:23
**daily** [3] - 28:22,
70:20, 70:22
**damage** [10] - 9:5, 9:6,
17:17, 40:5, 41:18,
44:22, 52:15, 52:18,
52:22, 123:8
**damaged** [4] - 43:8,
43:11, 43:15, 113:23
**damages** [57] - 3:24,
4:15, 4:23, 5:2, 5:9,
5:10, 5:14, 5:15,
6:20, 6:22, 8:18, 9:4,
9:8, 10:19, 15:5,

15:9, 15:20, 16:5,
16:15, 16:23, 17:20,
18:6, 18:9, 29:24,
40:4, 40:22, 41:1,
41:3, 41:7, 41:9,
41:10, 41:17, 54:3,
56:15, 56:18, 59:9,
91:22, 119:23,
119:25, 120:13,
120:14, 121:17,
121:24, 123:2,
128:16, 129:20,
130:23, 136:3,
136:12, 137:22,
137:23, 138:18,
138:20, 138:23,
139:11, 139:14,
139:24
**data** [28] - 39:14,
39:15, 40:3, 68:20,
75:7, 75:9, 75:12,
78:9, 78:14, 78:16,
79:10, 80:12, 89:14,
91:14, 104:10,
105:8, 105:16,
107:1, 114:4,
114:13, 114:14,
115:4, 115:18,
115:22, 116:18,
126:3, 126:24,
133:14
**date** [11] - 12:11,
21:18, 60:10, 75:18,
78:16, 86:21, 86:22,
106:9, 106:14,
106:17, 110:23
**Dated** [1] - 142:14
**dates** [2] - 104:19,
106:3
**days** [3] - 12:14,
45:21, 66:7
**DC** [1] - 1:14
**deadline** [1] - 33:17
**death** [1] - 17:15
**debate** [1] - 7:14
**decades** [1] - 116:10
**December** [52] - 1:5,
10:22, 14:10, 36:4,
56:24, 57:1, 57:16,
58:25, 60:13, 60:21,
60:25, 62:6, 62:8,
67:22, 67:24, 73:15,
73:24, 74:9, 75:17,
78:20, 80:18, 81:24,
83:21, 83:22, 83:23,
84:22, 95:25, 99:15,
99:19, 102:6,
102:10, 104:5,
104:6, 104:7,
104:22, 104:23,

105:1, 105:22,
105:24, 107:2,
110:24, 111:14,
112:13, 119:14,
119:19, 120:9,
125:8, 142:14
**decide** [2] - 9:11, 9:12
**decided** [1] - 121:18
**decides** [1] - 7:22
**deciding** [1] - 4:5
**decision** [2] - 4:7,
14:16
**decisions** [1] - 53:8
**deck** [4] - 24:18,
24:21, 24:25, 26:23
**deemed** [1] - 29:9
**Defamation** [1] -
57:11
**defamation** [21] -
11:20, 16:4, 16:25,
17:9, 17:16, 29:23,
56:23, 57:12, 59:21,
59:25, 60:12, 60:16,
60:19, 60:23, 61:8,
63:3, 63:14, 66:18,
121:22, 137:11,
139:12
**defamatory** [44] -
5:16, 5:18, 6:24,
7:16, 11:1, 11:6,
11:23, 12:2, 13:3,
13:12, 13:15, 13:21,
14:3, 14:8, 15:15,
16:6, 16:17, 17:2,
17:3, 17:18, 17:22,
18:5, 18:8, 57:3,
58:12, 60:10, 82:3,
83:10, 86:12, 86:18,
97:21, 98:13,
110:22, 115:9,
117:6, 118:1,
119:13, 120:8,
120:20, 121:6,
132:25, 136:6,
136:21, 139:17
**default** [8] - 4:1, 4:15,
5:12, 13:1, 14:16,
14:17, 15:19, 16:4
**defaulted** [2] - 7:10
**defaulting** [5] - 4:25,
5:7, 5:11, 7:20,
16:15
**defaults** [1] - 5:3
**DEFENDANT** [3] -
20:25, 21:5, 21:8
**defendant** [17] - 3:16,
3:22, 11:14, 12:2,
12:7, 12:21, 13:5,
13:8, 15:22, 16:15,
16:16, 17:24, 18:5,

23:19, 30:24, 34:24,
36:16
**Defendant** [1] - 1:6
**defendant's** [9] - 13:1,
14:2, 16:2, 16:6,
16:19, 17:2, 17:3,
17:5, 78:1
**defendants** [1] - 40:25
**DEFENSE** [1] - 2:3
**Defense** [1] - 63:12
**define** [4] - 41:21,
52:1, 52:5, 122:2
**defined** [2] - 64:25,
73:25, 121:18
**defining** [1] - 47:24
**definition** [1] - 48:9
**degrees** [1] - 27:21
**deliver** [1] - 132:12
**delivery** [1] - 7:7
**delta** [1] - 81:3
**Democracy** [3] - 1:21,
3:12, 16:12
**demonstrate** [1] - 9:7
**demonstrating** [1] -
16:25
**demonstrative** [2] -
24:6, 24:25
**denied** [1] - 17:12
**depicted** [5] - 55:23,
90:7, 124:19,
129:20, 131:11
**depicting** [1] - 105:21
**depicts** [1] - 114:25
**depose** [1] - 33:18
**deposed** [1] - 33:8
**deposition** [4] - 18:25,
22:5, 22:16, 22:18
**deprive** [1] - 5:3
**DEPUTY** [1] - 3:2
**derogatory** [1] -
116:12
**describe** [7] - 25:5,
30:21, 34:22, 40:20,
97:16, 102:24,
103:12
**described** [1] - 6:1
**descriptive** [1] - 34:25
**deserves** [1] - 38:7
**designated** [1] - 22:10
**designation** [1] - 22:6
**designed** [3] - 25:18,
51:19, 92:8
**designing** [1] - 133:23
**detail** [1] - 6:11
**details** [2] - 30:20,
34:22
**determination** [1] -
78:10
**determine** [2] - 18:7,
93:1

**determined** [1] - 65:2
**develops** [1] - 44:12
**devote** [1] - 53:10
**devoted** [1] - 16:8
**differ** [1] - 73:6
**difference** [10] - 34:5,
43:25, 45:22, 45:25,
59:21, 59:23, 80:24,
81:1, 88:6, 134:3
**differences** [2] -
33:21, 33:25
**different** [44] - 28:8,
33:4, 35:6, 35:11,
35:16, 35:22, 40:8,
43:15, 46:13, 50:19,
52:11, 52:14, 54:11,
54:20, 54:23, 55:7,
55:14, 57:21, 57:24,
58:1, 58:10, 59:6,
59:24, 61:8, 62:19,
69:24, 70:17, 79:15,
80:15, 88:6, 95:21,
101:20, 122:16,
124:18, 131:22,
132:22, 135:22,
135:23, 135:25
**differing** [1] - 99:4
**difficult** [2] - 5:25,
19:23
**difficulty** [2] - 19:24,
116:14
**dig** [1] - 62:15
**dignity** [1] - 42:5
**dire** [4] - 31:13, 32:12,
118:15, 118:16
**direct** [3] - 27:17,
97:21, 115:14
**DIRECT** [1] - 24:9
**directing** [1] - 14:17
**direction** [1] - 39:15
**directly** [4] - 6:16,
106:23, 109:16,
112:23
**disassembled** [1] -
142:9
**discard** [1] - 63:24
**disclose** [2] - 30:10,
38:18
**disclosed** [3] - 25:1,
89:3, 133:15
**discount** [2] - 71:20,
94:14
**discounting** [1] -
96:20
**discounts** [1] - 76:15
**discovered** [1] - 96:4
**discovery** [1] - 33:17
**discuss** [2] - 88:7,
128:17
**discussed** [4] - 37:10,

7

101:6, 111:17,
136:22
**discussing** [1] - 12:17
**dismiss** [1] - 17:12
**display** [1] - 24:24
**displayed** [1] - 54:4
**displays** [2] - 25:17,
110:16
**dispute** [3] - 4:3, 5:21,
31:22
**disregard** [2] - 32:11,
38:4
**disseminate** [1] -
82:18
**disseminated** [5] -
16:17, 67:4, 67:8,
82:13, 82:22
**disseminating** [3] -
8:9, 65:11, 123:15
**dissident** [1] - 16:9
**distinct** [1] - 140:13
**distinction** [1] - 4:13
**distress** [4] - 41:2,
60:20, 139:17, 140:9
**district** [5] - 5:4,
11:13, 15:16, 16:3,
17:8
**District** [3] - 11:20,
12:18, 15:18
**DISTRICT** [3] - 1:1,
1:1, 1:9
**divide** [2] - 53:17,
71:16
**divided** [2] - 71:1,
133:4
**docket** [1] - 38:23
**docketed** [1] - 10:22
**Doctor** [2] - 24:16,
24:17
**document** [4] - 22:9,
63:5, 63:13, 65:12
**documents** [4] - 22:7,
23:12, 24:5, 65:25
**dollars** [4] - 42:14,
53:24, 53:25
**Dominion** [1] - 17:22
**Donald** [4] - 29:23,
84:9, 86:3, 86:18
**done** [13] - 32:5,
44:23, 46:15, 47:16,
76:4, 91:16, 95:15,
109:25, 122:17,
122:23, 123:8,
126:4, 128:10
**dots** [1] - 54:24
**down** [8] - 15:8, 72:2,
72:5, 72:6, 73:21,
74:15, 111:24
**download** [2] - 67:2,
67:13

**downloads** [3] -
68:15, 68:23, 69:11
**DR** [1] - 23:2
**Dr** [72] - 6:24, 19:1,
22:23, 23:13, 24:6,
24:18, 24:25, 26:8,
26:23, 27:1, 30:5,
31:9, 31:11, 34:16,
35:3, 35:14, 36:3,
37:6, 37:12, 37:20,
38:9, 38:12, 41:20,
47:1, 48:18, 51:3,
55:9, 55:19, 57:2,
58:21, 60:9, 62:14,
62:22, 63:2, 66:8,
66:18, 72:12, 73:14,
74:21, 79:13, 81:22,
83:10, 86:17, 95:20,
97:1, 97:9, 98:12,
99:13, 100:19,
102:13, 103:6,
105:21, 106:8,
107:7, 109:8, 114:1,
114:24, 115:13,
117:4, 119:10,
119:21, 120:11,
122:6, 124:4, 125:3,
126:1, 128:15,
129:17, 131:7,
137:6, 138:5, 141:12
**dramatic** [1] - 104:8
**draw** [2] - 84:14,
108:22
**drawn** [2] - 5:25, 6:1
**drew** [1] - 31:7
**drink** [1] - 127:20
**drinker** [1] - 127:21
**driven** [1] - 81:3
**driving** [1] - 80:24
**drop** [1] - 51:14
**drove** [1] - 124:19
**DuBose** [4] - 1:17,
1:17, 3:11, 3:12
**due** [1] - 139:11
**during** [4] - 17:4, 22:8,
23:12, 85:14

**E**

**early** [2] - 61:25,
102:10
**earnings** [1] - 42:8
**easy** [2] - 76:3, 121:9
**eat** [1] - 7:11
**ECF** [4] - 10:12, 10:20,
10:22, 11:4
**economic** [2] - 42:3,
42:7
**economists** [3] -
42:10, 42:11, 42:13

**educate** [1] - 63:22
**education** [1] - 38:1
**educational** [1] -
27:19
**effect** [4] - 17:6,
117:8, 117:19, 118:1
**effective** [2] - 127:1,
133:18
**effects** [1] - 130:21
**effort** [1] - 51:8
**efforts** [1] - 53:3
**eight** [2] - 23:12,
29:13
**either** [3] - 4:2, 4:9,
34:1
**election** [7] - 13:7,
17:19, 85:14,
102:10, 108:3,
108:11, 119:17
**elements** [1] - 63:16
**elicit** [1] - 10:9
**eliciting** [1] - 8:7
**ELIZABETH** [2] - 2:10,
142:3
**Elizabeth** [1] - 142:15
**Email** [4] - 1:15, 1:19,
1:23, 2:6
**email** [1] - 7:13
**emails** [2] - 7:4, 7:6
**emotional** [26] - 41:2,
41:3, 56:25, 58:23,
58:24, 59:4, 59:9,
59:12, 59:22, 60:1,
60:9, 60:20, 61:3,
61:7, 61:22, 62:2,
99:18, 100:24,
101:17, 120:4,
123:9, 137:14,
139:12, 139:17,
140:9
**employees** [2] - 17:15,
17:17
**employment** [1] - 42:8
**encounter** [1] - 49:5
**encouraged** [1] -
13:14
**end** [5] - 101:22,
122:4, 122:5,
137:15, 137:16
**endorse** [1] - 113:13
**endorsed** [1] - 113:14
**endorsement** [2] -
111:23, 111:24
**endorsements** [1] -
112:6
**Endowment** [1] -
16:12
**engage** [1] - 28:2,
53:5
**engagement** [12] -

76:25, 78:21, 79:9,
85:2, 110:3, 111:18,
111:21, 111:23,
111:25, 112:2,
113:10, 114:16
**engaging** [1] - 50:12
**enjoy** [1] - 138:13
**ensure** [1] - 134:15
**ensuring** [2] - 10:19,
15:4
**entails** [1] - 54:6
**enter** [2] - 107:12,
107:14
**entered** [4] - 16:4,
20:6, 23:13, 105:7
**enters** [1] - 54:9
**entities** [3] - 17:10,
108:6, 108:22
**entitled** [2] - 15:20,
62:10
**entity** [1] - 108:15
**entrenched** [5] -
118:23, 122:19,
127:5, 137:1, 137:2
**entries** [1] - 108:16
**entry** [2] - 14:17,
15:19
**environment** [1] -
117:15
**episode** [5] - 67:21,
75:4, 75:5, 81:24,
111:14
**equal** [1] - 102:17
**equate** [1] - 56:4
**equation** [1] - 47:22
**erase** [2] - 44:18,
44:22
**especially** [2] - 54:9,
139:25
**essentially** [6] - 37:2,
40:9, 112:16,
121:19, 135:15,
139:8
**establish** [1] - 25:19
**established** [2] -
14:15, 17:3
**establishes** [1] -
14:18
**estimate** [69] - 30:23,
35:2, 41:9, 70:3,
70:11, 70:23, 71:10,
71:18, 72:17, 73:2,
75:20, 75:23, 76:8,
76:13, 77:22, 77:25,
78:4, 79:24, 79:25,
80:3, 80:19, 80:21,
80:22, 80:23, 81:9,
84:16, 84:19, 85:19,
85:23, 85:24, 86:6,
90:9, 90:15, 91:1,

92:14, 93:9, 93:12,
93:24, 95:1, 95:5,
95:11, 96:12, 98:15,
98:17, 98:18, 99:3,
99:11, 99:12,
101:16, 101:20,
102:14, 104:13,
121:10, 121:17,
125:23, 127:24,
129:23, 129:25,
130:2, 130:5, 130:8,
130:23, 130:24,
131:17, 131:20,
136:4, 136:25
**estimated** [11] - 19:2,
66:2, 71:23, 74:24,
94:2, 96:21, 121:20,
124:23, 125:4,
125:24, 132:2
**estimates** [15] - 19:3,
34:24, 68:18, 86:1,
93:10, 95:6, 98:24,
99:9, 101:13,
121:23, 128:17,
129:21, 129:22,
129:24, 131:15
**estimating** [7] - 76:2,
76:22, 86:4, 89:8,
92:8, 101:4, 122:22
**et** [4] - 1:3, 3:3, 36:19,
68:17
**evaluated** [1] - 116:4
**Evanston** [1] - 27:6
**evening** [2] - 3:21,
10:6
**event** [1] - 26:13
**Evidence** [2] - 31:12,
37:7
**evidence** [26] - 6:18,
10:9, 19:11, 23:14,
24:7, 30:12, 30:15,
30:16, 38:3, 38:5,
55:17, 62:25, 65:25,
66:12, 66:14, 75:15,
80:1, 82:9, 100:14,
106:6, 110:18,
111:11, 112:9,
114:22, 123:23
**eviscerate** [1] - 5:2,
5:12
**ex** [1] - 16:12
**exact** [4] - 56:9, 56:16,
68:23, 140:24
**exactly** [3] - 5:10,
8:11, 56:4
**exam** [2] - 23:11,
23:13
**EXAMINATION** [1] -
24:9
**examination** [4] -

31:18, 31:25, 32:10, 33:14
**examine** [4] - 70:19, 82:13, 98:13, 99:17
**examined** [6] - 57:23, 83:4, 90:10, 98:14, 99:8, 101:18
**example** [33] - 6:23, 12:1, 15:18, 44:1, 45:13, 55:23, 55:24, 63:3, 63:14, 66:9, 70:1, 72:25, 76:8, 82:6, 83:3, 86:12, 90:3, 93:17, 94:17, 97:9, 103:3, 104:18, 108:13, 110:14, 113:7, 113:9, 124:2, 124:14, 126:12, 133:10, 133:19, 135:5
**examples** [8] - 62:16, 63:18, 64:10, 65:9, 90:23, 113:4, 113:17, 123:23
**exceeding** [1] - 17:14
**excellent** [1] - 18:18
**exception** [1] - 37:16
**excerpts** [1] - 92:23
**exchange** [1] - 126:1
**exclude** [1] - 26:9
**excluded** [1] - 19:15
**excluding** [1] - 91:6
**excuse** [2] - 117:24, 138:13
**excused** [2] - 138:14, 139:3
**executed** [2] - 112:22, 113:9
**executing** [1] - 66:2
**exercise** [1] - 11:15
**exercises** [1] - 76:3
**Exhibit** [18] - 23:16, 55:16, 62:24, 63:6, 63:20, 66:13, 66:14, 82:9, 82:10, 86:14, 86:15, 100:14, 106:5, 110:17, 111:10, 112:8, 112:12
**exhibit** [4] - 21:18, 66:16, 83:8, 111:9
**EXHIBITS** [1] - 141:14
**exhibits** [5] - 23:19, 100:13, 100:18, 114:21, 114:25
**existed** [3] - 67:25, 113:1, 113:2
**existing** [2] - 126:5, 128:4
**expenses** [1] - 17:15

**expensive** [3] - 65:7, 122:20, 125:21
**experience** [6] - 38:1, 53:19, 86:8, 99:7, 118:22, 136:18
**experienced** [1] - 72:19
**experiences** [1] - 122:22
**expert** [24] - 6:23, 25:10, 25:13, 25:14, 26:8, 26:13, 26:17, 28:6, 28:21, 29:10, 30:7, 31:23, 32:22, 33:16, 34:10, 37:12, 37:16, 37:18, 37:21, 38:21, 79:23, 81:6, 89:2, 107:23
**expert's** [2] - 37:24, 38:4
**expertise** [9] - 25:11, 25:12, 27:10, 27:11, 53:19, 86:8, 122:21, 128:9, 136:18
**experts** [3] - 26:14, 26:15, 30:17
**explain** [15] - 32:2, 40:8, 42:3, 59:18, 62:15, 76:7, 79:15, 101:25, 122:7, 129:5, 129:7, 129:18, 132:1, 135:6, 135:7
**explained** [4] - 12:10, 12:19, 120:23, 121:2
**explanation** [1] - 34:9
**exposed** [1] - 91:7
**exposure** [1] - 55:20
**exposures** [2] - 126:8, 127:19
**expressly** [1] - 19:18
**extent** [7] - 5:15, 10:24, 26:9, 52:15, 52:18, 52:22, 62:1

# F

**F.2d** [2] - 11:10, 12:9
**F.3d** [1] - 11:9
**face** [2] - 23:1, 140:18
**Facebook** [11] - 59:15, 76:8, 76:24, 79:19, 80:10, 81:2, 83:22, 84:3, 84:7, 85:12, 109:18
**fact** [8] - 6:14, 13:22, 18:9, 19:21, 26:14, 69:20, 139:15, 139:25
**factor** [1] - 113:17

**factors** [1] - 134:22
**facts** [2] - 26:15, 33:23
**factual** [2] - 5:20, 7:17
**fair** [3] - 55:10, 87:25, 90:2
**fairly** [1] - 38:6
**fall** [1] - 8:15
**falls** [1] - 48:9
**false** [15] - 13:6, 13:17, 13:21, 14:3, 46:16, 46:18, 46:23, 47:17, 47:18, 47:22, 47:23, 48:1, 48:7, 48:8, 116:12
**falsely** [1] - 16:16
**familiar** [1] - 47:1
**family** [2] - 15:24, 16:18
**famous** [1] - 49:25
**fancy** [1] - 27:14
**far** [2] - 10:23, 128:24
**Farr** [2] - 1:13, 3:9
**faster** [5] - 46:18, 46:20, 47:19, 48:2, 48:8
**fault** [1] - 4:2
**FBI** [2] - 15:23, 108:4
**FCRR** [2] - 142:3, 142:15
**Federal** [3] - 31:11, 37:6, 108:25
**federal** [1] - 4:9
**fee** [1] - 19:15
**fell** [2] - 124:18, 133:1
**felt** [1] - 90:2
**few** [6] - 42:23, 45:18, 59:16, 78:7, 113:12, 132:8
**field** [12] - 30:17, 31:1, 31:7, 31:23, 42:14, 45:1, 46:5, 46:12, 93:4, 102:24, 107:24
**figure** [9] - 4:3, 34:7, 44:13, 53:13, 105:21, 124:10, 133:7, 134:14, 134:19
**figured** [1] - 134:18
**figuring** [2] - 53:9, 53:12
**filed** [2] - 3:20, 10:6
**fill** [1] - 18:14
**filled** [1] - 65:14
**filter** [5] - 47:2, 47:5, 47:6, 47:7, 49:8
**final** [2] - 129:7, 129:20
**finally** [1] - 17:8
**financial** [1] - 16:24
**findings** [4] - 41:12,

104:3, 119:11, 119:12
**fine** [1] - 26:2
**firm** [3] - 19:13, 114:5, 114:8
**firmly** [1] - 128:4
**first** [17] - 3:7, 4:11, 18:23, 34:19, 39:23, 49:3, 56:22, 58:6, 65:3, 72:4, 92:10, 103:18, 109:15, 116:24, 122:2, 132:5, 138:25
**fit** [2] - 41:25, 42:6
**five** [21] - 18:25, 32:15, 33:19, 126:10, 127:3, 127:7, 127:17, 127:23, 128:14, 130:1, 130:3, 131:18, 131:20, 135:3, 135:13, 136:1, 136:4, 136:9, 136:14, 137:1, 137:3
**five-time** [1] - 136:9
**five-times** [4] - 136:1, 136:4, 136:14, 137:3
**flat** [1] - 8:15
**flexibility** [1] - 23:5
**flippin'** [1] - 112:18
**flow** [4] - 5:17, 10:20, 15:5, 15:10
**flowed** [4] - 7:16, 7:21, 14:9, 16:1
**flows** [3] - 4:5, 5:16, 18:8
**fluctuation** [1] - 33:5
**focus** [2] - 28:4, 32:17
**focusing** [1] - 69:14
**follow** [7] - 6:25, 47:10, 47:11, 48:21, 48:22, 65:2, 76:10
**followed** [2] - 15:15, 89:15
**followers** [28] - 45:15, 45:16, 45:17, 45:18, 45:19, 49:21, 65:4, 75:16, 75:19, 76:10, 76:14, 76:18, 76:23, 77:2, 77:8, 78:1, 84:11, 84:13, 84:15, 84:18, 84:20, 86:4, 102:5, 118:14, 134:7, 134:11
**following** [4] - 4:19, 15:19, 48:19, 64:25
**followings** [1] - 49:22
**footnote** [1] - 11:10
**FOR** [3] - 1:1, 1:11, 2:3

**forced** [1] - 68:18
**foreclosed** [1] - 11:5
**foregoing** [1] - 142:4
**foreseeable** [15] - 5:17, 7:15, 8:20, 11:8, 11:18, 11:25, 12:5, 12:13, 12:16, 14:1, 16:1, 17:21, 18:3, 18:4, 18:7
**foreseeably** [1] - 13:6
**foreseen** [2] - 13:21, 14:22
**foresought** [1] - 13:2
**forgot** [1] - 139:4
**form** [10] - 17:14, 30:13, 30:17, 111:21, 126:13, 138:17, 139:23, 140:4, 140:18, 140:25
**formal** [2] - 25:12, 25:19
**formalities** [1] - 25:25
**formality** [1] - 25:7
**former** [4] - 61:11, 86:24, 94:1, 102:4
**forms** [3] - 57:24, 59:6, 67:3
**forth** [4] - 42:9, 64:9, 65:24, 124:3
**forward** [2] - 3:5, 140:4
**foundation** [3] - 32:19, 33:24, 118:17
**four** [3] - 7:3, 22:6, 131:15
**Fox** [2] - 90:13, 92:25
**fraction** [1] - 134:7
**frankly** [1] - 128:6
**fraud** [6] - 13:7, 63:22, 108:3, 108:25, 112:22, 119:17
**fraudulent** [1] - 63:24
**free** [2] - 53:3, 105:16
**FREEMAN** [1] - 1:3
**Freeman** [43] - 3:3, 3:13, 6:14, 13:7, 13:11, 13:22, 19:1, 30:25, 39:18, 51:4, 87:8, 88:18, 103:16, 104:7, 104:23, 105:4, 105:5, 105:9, 105:25, 106:25, 107:12, 107:15, 107:16, 108:2, 108:3, 108:4, 108:14, 108:15, 108:16, 110:13, 113:5, 114:10, 115:24, 117:1,

117:6, 119:15,
121:14, 123:10,
124:8, 136:20,
137:20, 140:24
**Freeman's** [4] - 87:1,
104:19, 115:20,
117:8
**friends** [2] - 15:25,
16:19
**friendships** [1] - 41:24
**front** [2] - 34:11,
106:15
**front-page** [1] -
106:15
**fulfill** [1] - 52:3
**full** [7] - 87:18, 88:16,
88:25, 94:22, 97:20,
142:5
**fully** [1] - 10:10
**Fulton** [1] - 108:10
**function** [1] - 41:24
**future** [2] - 12:22,
21:12

**G**

**GA** [1] - 1:18
**Gallagher** [2] - 1:13,
3:9
**gambling** [1] - 28:7
**gate** [1] - 65:14
**Gateway** [1] - 8:10
**gathered** [1] - 89:7
**general** [4] - 5:1,
12:13, 16:5, 50:11
**generalized** [1] -
43:23
**generally** [3] - 16:11,
48:3, 48:4
**generate** [3] - 80:18,
134:12, 135:10
**generated** [7] - 73:10,
75:24, 78:5, 78:12,
84:6, 87:14, 136:8
**gentlemen** [2] - 21:20,
138:12
**Georgia** [4] - 65:16,
86:19, 96:14, 108:10
**Giuliani** [49] - 3:4,
5:12, 6:3, 6:5, 6:8,
8:8, 10:1, 10:10,
10:14, 10:25, 13:2,
13:5, 13:9, 13:10,
13:19, 14:7, 14:11,
14:17, 14:21, 14:25,
15:12, 17:9, 17:25,
19:7, 19:8, 19:16,
19:19, 20:23, 21:7,
22:9, 57:18, 62:8,
63:11, 64:9, 64:11,

69:1, 75:12, 75:16,
80:6, 80:7, 82:16,
99:23, 101:3, 112:6,
115:14, 117:4,
117:15, 117:18,
117:25
**GIULIANI** [1] - 1:5
**Giuliani's** [20] - 11:3,
13:17, 17:12, 17:18,
17:22, 37:22, 66:24,
70:9, 72:25, 73:3,
73:12, 78:11, 78:16,
78:22, 109:18,
109:23, 111:1,
111:14, 112:23,
124:1
**given** [7] - 17:5, 63:15,
70:24, 78:6, 100:7,
111:24, 136:23
**glean** [1] - 39:15
**goal** [5] - 51:12, 52:3,
63:21, 63:25, 110:12
**goodman** [1] - 19:17
**Google** [16] - 103:20,
104:10, 104:11,
104:12, 104:14,
105:16, 105:22,
106:8, 106:21,
107:1, 107:17,
107:19, 108:8,
108:9, 108:10
**GOTTLIEB** [80] - 1:11,
3:8, 4:12, 4:19, 5:23,
6:10, 7:24, 9:2,
18:16, 18:20, 18:23,
21:15, 22:20, 22:23,
23:10, 24:4, 24:10,
25:6, 25:16, 25:22,
26:1, 26:21, 26:22,
31:10, 31:21, 33:7,
34:3, 34:15, 37:5,
38:10, 38:11, 48:17,
55:15, 55:18, 60:3,
60:5, 60:7, 60:8,
62:13, 62:23, 63:1,
66:11, 66:17, 69:19,
72:8, 74:20, 81:10,
82:10, 81:21, 82:7,
82:11, 83:6, 83:9,
86:11, 86:16, 97:8,
100:12, 100:16,
105:20, 106:4,
106:7, 110:16,
110:19, 111:8,
111:12, 112:7,
112:10, 114:20,
114:23, 119:3,
119:7, 119:9, 129:9,
129:16, 138:5,
138:25, 139:5,

139:20, 140:7, 141:3
**Gottlieb** [8] - 3:9,
4:11, 34:2, 34:7,
34:14, 129:6, 129:8,
129:15
**governing** [1] - 5:2
**Governski** [1] - 3:11
**GOVERNSKI** [2] -
1:12, 22:2
**grab** [1] - 74:19
**great** [2] - 23:8, 84:17
**greater** [1] - 85:5
**Green** [1] - 12:18
**Greyhound** [9] - 4:18,
4:19, 4:22, 4:24,
6:21, 7:18, 7:19,
8:12
**guess** [4] - 29:9,
33:24, 47:19, 63:14
**guidance** [2] - 8:16,
9:10
**guide** [2] - 4:6, 15:8
**guided** [1] - 78:10
**Guo** [1] - 16:12

**H**

**half** [3] - 22:6, 43:21,
133:4
**hand** [5] - 5:6, 23:1,
83:3, 106:10, 135:8
**hanging** [1] - 112:20
**happy** [2] - 18:12, 34:3
**harassed** [1] - 17:15
**harassment** [1] -
15:14
**hard** [2] - 44:20, 126:6
**harm** [51] - 10:17,
15:2, 15:21, 15:22,
17:19, 18:3, 35:1,
40:3, 40:21, 41:3,
41:16, 42:19, 56:25,
57:6, 58:23, 58:24,
59:4, 59:9, 59:12,
59:22, 60:9, 61:3,
61:7, 61:22, 62:2,
99:18, 100:24,
101:17, 103:12,
113:18, 113:19,
113:22, 116:1,
116:4, 116:9,
116:19, 119:1,
120:1, 120:4, 121:9,
121:12, 122:17,
122:23, 122:25,
137:14, 137:25,
139:7, 139:11,
139:12, 139:14,
140:10
**harmed** [2] - 42:18,

42:24
**harms** [1] - 16:1
**hear** [3] - 4:11, 25:11,
61:17
**hearing** [3] - 23:25,
72:4, 92:9
**held** [14] - 6:5, 10:25,
11:7, 12:1, 14:13,
15:13, 15:19, 18:1,
25:9, 31:16, 61:19,
127:6, 127:22,
128:23
**help** [2] - 104:13,
113:19
**helpful** [5] - 8:15,
10:3, 39:14, 72:4,
108:9
**helps** [2] - 7:18, 51:14
**hereby** [1] - 142:3
**high** [47] - 30:20,
30:21, 34:21, 39:21,
40:7, 41:12, 41:13,
62:15, 68:8, 68:9,
77:22, 77:25, 79:25,
80:23, 80:25, 81:9,
84:19, 85:23, 85:25,
98:15, 98:18, 99:3,
99:11, 101:13,
102:13, 104:3,
111:25, 112:2,
114:15, 121:6,
121:23, 122:5,
129:19, 129:24,
130:2, 130:8, 131:3,
131:4, 131:5,
131:17, 131:19,
136:4, 136:13,
136:23, 137:16,
138:2
**high-impression** [1] -
130:8
**high-impressions** [4]
- 129:24, 130:2,
136:23, 138:2
**high-level** [1] - 104:3
**high-range** [2] -
77:22, 101:13
**higher** [7] - 77:11,
77:14, 77:20, 79:20,
84:23, 85:1, 127:16
**highest** [2] - 107:4,
107:5
**himself** [1] - 16:8
**hire** [4] - 65:6, 65:7,
133:21, 134:10
**hiring** [1] - 123:15
**hold** [1] - 128:4
**holding** [1] - 17:13
**Honor** [63] - 3:2, 3:8,
3:15, 4:12, 5:23,

7:24, 8:13, 9:3, 9:14,
9:17, 18:17, 21:1,
21:8, 21:15, 22:2,
22:4, 22:14, 22:20,
23:10, 23:21, 23:23,
24:4, 24:24, 25:16,
26:1, 26:6, 26:21,
31:10, 31:14, 31:20,
31:21, 32:7, 32:25,
33:7, 33:15, 33:19,
33:23, 34:4, 37:5,
37:8, 37:9, 38:10,
55:15, 61:14, 61:21,
62:23, 66:11, 71:25,
81:10, 81:20, 82:7,
86:11, 100:12,
106:4, 110:16,
111:8, 112:7,
114:20, 118:6,
128:20, 129:9,
138:25, 139:5
**HONORABLE** [1] - 1:8
**hope** [1] - 19:6
**hosted** [2] - 70:8,
73:20
**hot** [1] - 87:5
**HOUGHTON** [1] - 1:12
**Houghton** [1] - 3:11
**HOUGHTON-
LARSEN** [1] - 1:12
**Houghton-Larsen** [1]
- 3:11
**hour** [2] - 31:19, 39:3
**hours** [2] - 45:20
**HOWELL** [1] - 1:8
**Hughes** [13] - 26:7,
26:10, 26:17, 32:8,
114:6, 114:7, 114:8,
114:12, 114:14,
115:3, 115:18,
116:5, 116:17
**Hughes'** [2] - 32:18,
115:22
**hum** [2] - 47:20,
128:12
**humanity** [1] - 112:19
**HUMPHREYS** [1] -
23:2
**Humphreys** [66] -
19:1, 22:24, 24:15,
24:18, 26:8, 26:23,
27:1, 30:5, 31:9,
34:16, 35:3, 35:14,
36:3, 37:12, 37:20,
38:12, 41:20, 47:1,
48:18, 51:3, 55:9,
55:19, 57:2, 58:21,
60:9, 62:14, 62:22,
63:2, 66:8, 66:18,
72:12, 73:14, 74:21,

79:13, 81:22, 83:10, 86:17, 95:20, 97:1, 97:9, 98:12, 99:13, 100:19, 102:13, 103:6, 105:21, 106:8, 107:7, 109:8, 114:1, 114:24, 115:13, 117:4, 119:10, 119:21, 120:11, 122:6, 124:4, 125:3, 126:1, 128:15, 129:17, 131:7, 137:6, 138:5, 141:12

**Humphreys'** [6] - 23:13, 24:6, 24:25, 31:11, 37:6, 38:9

**Humphries** [1] - 6:24

**hundreds** [1] - 53:24

**husher** [1] - 21:23

**I**

**i.e** [1] - 17:19

**idea** [1] - 132:6

**ideally** [1] - 68:14

**ideas** [1] - 127:21

**identical** [2] - 96:5, 140:14

**identification** [1] - 64:6

**identified** [4] - 61:24, 64:20, 88:25, 124:2

**identify** [2] - 3:6, 52:13

**identifying** [2] - 100:4, 100:6

**identity** [1] - 126:7

**IIED** [2] - 4:22, 62:9

**Illinois** [1] - 27:7

**image** [2] - 55:23, 111:13

**imagine** [3] - 44:1, 76:23, 132:20

**imagining** [1] - 107:17

**immediately** [1] - 138:9

**impact** [28] - 37:23, 40:1, 40:15, 40:16, 42:8, 44:6, 49:2, 54:2, 84:9, 87:10, 103:8, 103:9, 103:11, 104:3, 104:9, 106:16, 109:9, 110:12, 113:18, 114:2, 115:6, 116:2, 117:10, 119:12, 119:15, 137:17, 137:18, 137:20

**implicate** [1] - 21:1

**implying** [1] - 113:4

**important** [7] - 5:4, 51:1, 58:5, 58:9, 80:12, 123:21, 127:25

**impossible** [1] - 44:18

**impression** [29] - 54:5, 55:19, 55:20, 74:1, 76:16, 77:1, 77:18, 77:19, 78:17, 79:7, 79:12, 79:17, 79:18, 79:20, 82:22, 84:23, 85:4, 89:8, 91:15, 97:3, 98:16, 98:24, 130:5, 130:8, 130:23, 131:1, 131:20, 134:6

**impressions** [169] - 6:23, 6:25, 35:9, 36:9, 39:25, 40:6, 40:9, 40:10, 40:13, 40:23, 54:2, 54:3, 55:3, 55:8, 55:25, 56:3, 56:8, 56:16, 56:18, 56:21, 58:10, 62:14, 62:21, 67:23, 68:10, 69:13, 70:3, 70:11, 72:9, 73:9, 73:12, 73:23, 74:9, 74:11, 74:13, 75:4, 75:23, 76:2, 76:8, 76:14, 77:23, 78:4, 78:12, 78:23, 78:25, 79:11, 79:16, 79:20, 79:22, 80:3, 80:5, 80:17, 80:20, 80:22, 81:7, 81:23, 83:11, 84:6, 84:16, 84:17, 85:20, 85:23, 85:24, 87:13, 87:14, 88:4, 88:14, 88:20, 91:2, 91:9, 92:3, 92:4, 92:13, 93:14, 93:25, 94:3, 94:21, 95:1, 95:2, 95:5, 95:9, 95:19, 96:13, 96:16, 96:17, 96:20, 96:21, 98:12, 98:18, 98:19, 99:11, 99:12, 100:5, 101:5, 101:16, 101:19, 101:21, 101:23, 101:24, 102:1, 102:13, 102:16, 102:18, 109:17, 111:16, 120:12, 120:14, 120:16, 120:17, 120:24, 121:3, 121:5, 121:8,

121:19, 121:21, 122:3, 122:4, 122:5, 124:15, 124:18, 124:24, 124:25, 125:9, 125:13, 125:18, 126:15, 127:25, 128:25, 129:2, 129:23, 129:24, 129:25, 130:2, 130:25, 131:3, 131:4, 132:5, 132:7, 132:8, 132:18, 132:25, 133:13, 133:21, 133:22, 134:4, 134:5, 134:9, 134:12, 135:4, 135:11, 135:12, 135:14, 135:17, 135:23, 136:4, 136:8, 136:14, 136:23, 137:8, 137:10, 137:12, 137:13, 137:24, 138:2

**Impressions** [1] - 54:25

**Inc** [1] - 17:23

**incarceration** [1] - 119:18

**inclined** [1] - 52:20

**include** [12] - 64:3, 69:6, 69:9, 69:11, 75:8, 88:14, 91:8, 97:22, 97:23, 100:6

**included** [10] - 15:22, 88:15, 90:5, 96:6, 96:10, 97:25, 99:20, 100:10, 100:25

**including** [7] - 5:9, 10:8, 13:13, 13:22, 14:19, 16:9, 91:1

**increase** [4] - 52:21, 104:8, 104:24, 106:24

**incur** [1] - 44:10

**INDEX** [1] - 141:10

**indicate** [4] - 67:17, 104:20, 116:1

**indicated** [2] - 66:1, 114:16

**indicates** [1] - 104:24

**individual** [2] - 56:9, 59:5

**individuals** [4] - 49:15, 53:9, 56:5, 91:6

**industry** [4] - 28:21, 133:9, 133:11, 133:16

**influence** [6] - 49:19, 49:21, 52:16, 52:22, 77:14, 122:18

**influencer** [17] - 49:18, 49:19, 50:4, 50:5, 50:7, 50:11, 50:13, 50:15, 65:6, 77:8, 118:9, 118:21, 133:5, 133:22, 134:10, 135:6, 135:10

**influencer's** [1] - 65:5

**influencers** [19] - 49:17, 49:24, 49:25, 50:9, 50:19, 50:21, 50:23, 64:17, 64:18, 64:19, 64:24, 65:1, 65:7, 117:14, 123:16, 123:19, 124:3

**Influencers** [1] - 64:15

**influencers'** [1] - 118:13

**influencing** [1] - 50:2

**influential** [1] - 76:24

**information** [86] - 16:24, 31:8, 44:4, 44:18, 45:9, 45:14, 46:2, 46:3, 46:6, 46:7, 46:11, 46:13, 46:16, 46:18, 46:19, 46:23, 47:2, 47:9, 47:11, 47:12, 47:13, 47:14, 47:16, 47:17, 47:18, 47:19, 47:22, 47:23, 48:2, 48:7, 48:8, 48:13, 48:23, 49:2, 49:5, 49:6, 49:11, 50:6, 50:18, 51:2, 52:6, 52:12, 52:14, 53:14, 54:11, 55:2, 64:23, 69:3, 70:14, 75:10, 76:12, 77:19, 78:21, 79:2, 79:5, 79:6, 80:4, 91:8, 92:10, 96:22, 99:8, 102:8, 102:9, 102:19, 102:25, 103:1, 103:4, 104:15, 107:24, 111:16, 111:18, 116:13, 116:16, 122:13, 122:15, 123:15, 124:12, 126:19, 128:8, 129:1, 132:9

**initial** [5] - 30:7, 35:12, 54:19, 124:11, 125:5

**injuries** [13] - 6:1, 6:4, 6:5, 6:7, 6:19, 10:11,

10:16, 10:20, 15:1, 15:5, 15:10, 17:14, 140:14

**injury** [1] - 15:11

**input** [2] - 18:15, 33:12

**inputs** [1] - 131:22

**inquest** [1] - 5:2

**inquire** [1] - 31:14

**inquiry** [1] - 17:25

**insofar** [1] - 15:12

**inspire** [1] - 63:23

**Instagram** [2] - 64:22, 98:3

**instance** [9] - 36:17, 58:11, 59:2, 69:12, 83:16, 92:10, 99:21, 107:15, 113:15

**instances** [54] - 36:7, 36:13, 37:2, 54:12, 58:2, 58:3, 58:4, 58:5, 58:10, 58:18, 58:20, 59:12, 62:17, 62:19, 65:21, 65:22, 66:10, 68:4, 68:11, 69:25, 83:14, 83:18, 85:6, 85:21, 85:22, 88:3, 88:11, 88:15, 89:2, 92:14, 92:17, 95:15, 95:17, 95:18, 96:3, 96:12, 97:16, 97:19, 98:7, 98:9, 98:13, 98:20, 98:21, 98:23, 99:17, 99:22, 99:23, 100:23, 101:17, 110:2, 120:17, 125:9, 125:15

**instantly** [1] - 45:16

**institute** [1] - 89:24

**Institute** [1] - 29:8

**instruction** [6] - 8:16, 8:22, 18:2, 18:12, 25:14, 32:11

**instructions** [4] - 4:8, 4:9, 8:15, 8:24

**integrated** [2] - 27:2, 128:13

**intellectually** [1] - 140:8

**intend** [2] - 17:20, 23:12

**intended** [3] - 13:16, 14:1, 14:7

**intent** [1] - 19:12

**intention** [1] - 9:20

**intentional** [1] - 51:8

**interact** [1] - 49:8

**interdisciplinary** [1] - 31:7

**interest** [3] - 105:24, 106:24, 109:7
**interesting** [1] - 46:24
**Internet** [7] - 70:5, 72:14, 74:18, 74:22, 87:4, 87:8
**interpose** [1] - 5:1
**interrupt** [1] - 105:15
**introduce** [2] - 10:9, 24:13
**introduced** [2] - 21:18, 41:15
**inundated** [1] - 85:14
**investigating** [1] - 15:23
**Investigation** [1] - 108:25
**invited** [1] - 29:3
**inviting** [1] - 16:9
**involve** [3] - 4:22, 123:12, 123:13
**involved** [4] - 4:22, 17:10, 38:13, 112:21
**isolate** [1] - 16:18
**isolated** [1] - 16:7
**issue** [13] - 3:21, 3:24, 4:21, 4:24, 5:5, 7:23, 9:9, 12:21, 14:15, 19:7, 32:9, 39:24, 40:19
**issued** [1] - 33:3
**issues** [2] - 14:11, 18:20
**item** [1] - 5:9
**items** [1] - 87:5
**IV** [1] - 2:3

## J

**January** [15] - 57:16, 86:22, 94:1, 94:2, 94:23, 95:6, 96:13, 97:18, 105:2, 106:9, 106:12, 106:14, 106:17, 107:6
**jargon** [1] - 133:11
**Jean** [1] - 29:22
**Jensen** [15] - 26:7, 26:10, 26:16, 32:8, 32:18, 114:6, 114:7, 114:8, 114:12, 114:14, 115:3, 115:18, 115:22, 116:5, 116:17
**job** [2] - 8:17, 19:23
**Joe** [1] - 3:16
**JOHN** [1] - 1:21
**John** [1] - 3:12
**john.langford@ protectdemocracy.**

**org** [1] - 1:23
**Johnson** [2] - 16:14, 16:21
**JOSEPH** [1] - 2:3
**Journal** [1] - 48:1
**journalism** [1] - 27:3
**judge** [2] - 11:13, 17:11
**JUDGE** [1] - 1:9
**judging** [1] - 85:2
**judgment** [8] - 4:1, 4:15, 5:13, 8:19, 14:16, 14:17, 15:19, 16:4
**July** [5] - 34:19, 38:21, 125:6, 125:8
**jump** [2] - 11:9, 11:10
**June** [1] - 114:15
**jury** [39] - 4:5, 4:8, 4:9, 7:17, 8:16, 9:9, 9:11, 9:20, 9:21, 12:2, 18:2, 18:7, 18:19, 18:21, 21:14, 21:19, 21:22, 22:3, 22:19, 23:1, 24:14, 24:21, 25:3, 30:1, 32:6, 32:10, 34:11, 37:14, 40:8, 41:2, 41:6, 59:8, 59:18, 81:17, 81:18, 120:23, 132:1, 138:14, 139:25
**jury's** [1] - 15:8

## K

**keep** [3] - 102:15, 139:19, 139:20
**key** [2] - 92:23, 92:25
**kind** [42] - 20:13, 28:12, 29:18, 30:16, 35:16, 35:21, 36:15, 40:20, 43:6, 43:23, 44:16, 44:17, 46:3, 46:5, 46:11, 48:5, 48:6, 49:2, 49:10, 56:19, 68:7, 76:14, 77:17, 81:25, 102:8, 102:25, 103:2, 107:24, 117:5, 117:12, 118:21, 121:15, 123:12, 123:14, 125:16, 127:8, 128:13, 130:20, 132:10, 135:14
**kinds** [10] - 6:18, 27:16, 28:20, 46:13, 50:19, 50:20, 77:11, 112:3, 112:12,

116:11
**King** [1] - 127:12
**knowingly** [1] - 12:7
**knowledge** [1] - 78:1
**known** [7] - 11:15, 43:3, 43:6, 44:12, 87:3, 87:4, 87:8
**knows** [1] - 10:4

## L

**labelled** [1] - 54:25
**ladies** [2] - 21:20, 138:12
**laid** [2] - 4:12, 4:16
**Langford** [1] - 3:12
**LANGFORD** [1] - 1:21
**language** [5] - 87:1, 97:21, 106:5, 110:17, 111:9
**large** [8] - 49:22, 52:19, 56:12, 56:13, 101:25, 102:5, 102:20, 114:18
**largely** [1] - 125:15
**larger** [4] - 65:8, 109:1, 122:19, 129:4
**LARSEN** [1] - 1:12
**Larsen** [3] - 3:11
**LaRue** [2] - 16:14, 16:21
**last** [7] - 3:18, 19:9, 33:3, 33:17, 76:1, 105:8, 137:6
**lasting** [3] - 116:18, 119:15, 137:20
**lastly** [2] - 40:22, 137:22
**late** [1] - 10:6
**latest** [1] - 74:19
**launched** [1] - 13:9
**Laura** [2] - 112:17, 113:14
**Lavaca** [1] - 2:4
**law** [6] - 11:5, 11:20, 15:16, 18:14, 19:13, 139:22
**lawyer** [1] - 57:9
**lay** [3] - 9:23, 9:25, 10:4
**lead** [3] - 75:22, 79:15, 105:23
**leading** [3] - 72:1, 87:25, 88:1
**lean** [1] - 128:14
**leap** [1] - 129:4
**least** [2] - 79:2, 140:9
**leaves** [1] - 71:23
**lectern** [1] - 3:6
**led** [2] - 6:16, 13:6

**left** [3] - 18:13, 64:19, 137:5
**Legal** [1] - 63:11
**legal** [3] - 11:3, 21:21, 57:8
**legislators** [1] - 63:23
**length** [3] - 52:22, 116:12, 116:18
**less** [2] - 72:24, 77:4
**level** [21] - 30:20, 30:21, 34:21, 39:21, 39:22, 40:7, 41:12, 41:13, 62:15, 68:8, 68:10, 78:21, 104:3, 107:4, 107:5, 111:25, 112:2, 113:10, 114:16, 121:6, 129:19
**liability** [8] - 4:5, 4:6, 4:14, 5:1, 8:11, 14:14, 14:18, 36:25
**liable** [2] - 10:25, 11:23
**lies** [1] - 13:10
**life** [1] - 28:22
**lifetime** [1] - 41:23
**light** [1] - 139:25
**likely** [15] - 49:5, 49:10, 49:14, 72:23, 78:8, 79:25, 85:4, 90:16, 90:17, 91:7, 92:4, 93:13, 99:9, 99:12, 126:17
**limine** [4] - 3:19, 10:7, 20:3, 20:14
**limit** [1] - 3:24
**limitation** [1] - 62:5
**line** [4] - 5:25, 53:6, 90:6, 108:13
**linear** [1] - 56:16
**link** [3] - 6:2, 6:3, 6:7
**linked** [1] - 121:18
**links** [1] - 68:7
**Lisa** [1] - 141:8
**list** [11] - 21:18, 30:12, 38:22, 58:16, 60:1, 61:2, 61:5, 61:11, 65:3, 68:6, 108:19
**listed** [3] - 7:13, 83:25, 89:2
**listen** [2] - 67:2, 128:22
**listened** [4] - 72:18, 72:24, 73:1, 90:16
**listeners** [1] - 72:24
**listening** [1] - 13:15
**listing** [1] - 61:8
**literally** [1] - 25:17
**litigating** [1] - 19:13
**littler** [1] - 51:13

**live** [1] - 116:10
**lives** [1] - 17:16
**LLP** [2] - 1:13, 2:3
**local** [1] - 97:23
**long-lasting** [2] - 119:15, 137:20
**long-running** [1] - 123:17
**long-term** [1] - 116:3
**look** [28] - 18:13, 27:16, 35:11, 53:23, 58:5, 63:13, 66:9, 68:16, 80:13, 82:6, 85:7, 86:12, 89:5, 90:23, 92:20, 94:17, 96:19, 103:13, 104:9, 104:13, 104:18, 105:21, 108:25, 109:3, 110:14, 116:23, 135:6, 135:22
**looked** [21] - 30:15, 40:2, 60:21, 65:21, 81:6, 81:22, 82:1, 82:3, 99:25, 101:9, 103:19, 104:1, 110:5, 114:4, 114:12, 114:14, 116:17, 120:4, 131:15, 136:11, 137:18
**looking** [18] - 54:4, 57:10, 57:22, 58:21, 59:17, 61:6, 76:1, 79:14, 81:10, 83:14, 93:24, 100:17, 106:8, 107:13, 111:13, 114:24, 117:22, 131:12
**looks** [2] - 35:21, 135:25
**Los** [1] - 1:22
**lost** [3] - 17:1, 17:4, 17:17
**Loth** [1] - 142:15
**LOTH** [2] - 2:10, 142:3
**low** [25] - 77:3, 77:22, 77:24, 79:18, 80:22, 80:24, 84:20, 85:22, 85:25, 98:15, 98:17, 99:3, 101:13, 101:21, 121:23, 122:4, 129:23, 129:25, 130:5, 130:23, 130:25, 131:4, 131:20, 136:13, 137:15
**low-impression** [2] - 130:5, 130:23
**low-range** [1] - 77:22

**lowered** [1] - 16:20
**lumped** [3] - 139:8,
  140:2, 140:15
**lunch** [5] - 127:12,
  138:8, 138:10,
  138:13, 141:4
**luncheon** [1] - 141:5

## M

**machine** [1] - 2:13
**Machine** [1] - 74:22
**machines** [1] - 17:11
**mail** [1] - 27:17
**Main** [1] - 65:17
**main** [1] - 53:6
**mainstream** [1] -
  125:16
**maker** [2] - 11:5, 11:6
**malicious** [1] - 119:17
**management** [4] - 5:4,
  27:4, 42:16, 42:17
**manner** [1] - 142:10
**marketing** [16] - 27:2,
  27:4, 27:11, 27:12,
  27:13, 27:14, 27:21,
  27:25, 28:6, 29:8,
  45:2, 50:24, 126:7,
  127:11, 127:18
**Marketing** [1] - 29:7
**mass** [2] - 102:25,
  123:13
**Massachusetts** [1] -
  12:18
**material** [4] - 32:18,
  73:6, 109:15, 109:17
**materials** [1] - 78:2
**math** [7] - 71:13, 72:3,
  74:2, 91:5, 91:11,
  131:7, 135:16
**mathematical** [1] -
  39:16
**matter** [6] - 21:21,
  38:13, 38:22, 50:20,
  116:7, 128:7
**matters** [2] - 38:18,
  43:5
**mean** [21] - 4:21, 6:9,
  20:9, 20:17, 36:14,
  42:23, 43:17, 46:11,
  48:20, 48:22, 53:25,
  64:15, 75:20, 89:20,
  89:21, 92:1, 103:24,
  109:6, 113:8, 118:3,
  128:1
**meaning** [1] - 52:18
**means** [6] - 6:10,
  49:20, 53:1, 56:13,
  64:16, 104:1
**meant** [1] - 72:17

**measure** [8] - 39:24,
  42:11, 55:1, 59:2,
  73:23, 78:23, 90:2,
  109:22
**measured** [5] - 60:2,
  87:12, 132:5, 132:8,
  137:10
**measures** [1] - 6:24
**measuring** [5] - 6:23,
  67:23, 68:10, 87:14,
  93:4
**mechanical** [1] -
  132:4
**media** [87] - 12:15,
  13:14, 13:25, 27:12,
  27:17, 27:25, 28:5,
  28:6, 28:9, 28:10,
  28:12, 28:15, 28:16,
  31:6, 40:12, 45:4,
  45:8, 45:12, 45:14,
  45:23, 46:14, 46:17,
  47:7, 47:8, 47:13,
  47:17, 48:20, 49:15,
  49:20, 53:16, 54:10,
  54:21, 55:5, 57:24,
  58:2, 58:7, 58:18,
  59:3, 59:6, 62:19,
  64:3, 64:16, 68:3,
  68:21, 69:2, 75:16,
  76:1, 76:2, 76:3,
  77:5, 78:22, 80:17,
  81:2, 81:4, 83:17,
  83:18, 87:19, 97:25,
  98:1, 98:3, 98:16,
  100:19, 100:23,
  101:13, 101:20,
  102:3, 102:9,
  103:22, 106:13,
  114:9, 114:16,
  115:11, 117:13,
  117:15, 123:13,
  123:16, 123:19,
  125:21, 126:17,
  126:19, 129:24,
  131:1, 134:9
**medium** [1] - 132:19
**mega** [1] - 65:1
**members** [2] - 22:3,
  63:24
**memorandum** [2] -
  10:21, 14:10
**mentioned** [18] -
  51:24, 57:25, 58:7,
  63:17, 64:17, 64:24,
  67:25, 68:2, 90:17,
  90:25, 93:5, 97:15,
  104:10, 106:11,
  124:4, 124:9, 133:6,
  139:16
**mentions** [1] - 116:25

**MERYL** [1] - 1:12
**Meryl** [1] - 3:11
**message** [36] - 50:14,
  50:15, 52:7, 52:8,
  52:9, 52:19, 53:1,
  64:5, 64:7, 65:6,
  83:2, 89:19, 89:21,
  117:19, 118:4,
  118:24, 122:11,
  123:19, 124:10,
  126:3, 126:8,
  126:10, 126:25,
  127:8, 127:12,
  128:5, 130:1, 130:3,
  130:19, 130:21,
  131:17, 134:8,
  134:15, 135:13,
  135:18
**messages** [9] - 50:8,
  64:2, 65:13, 65:19,
  65:23, 123:24,
  124:17, 132:13,
  133:18
**messaging** [7] -
  52:11, 64:4, 65:9,
  82:18, 124:5, 125:1,
  130:20
**methodologies** [2] -
  33:3, 55:10
**methodology** [19] -
  29:18, 30:9, 30:22,
  31:4, 31:14, 32:17,
  33:9, 33:11, 33:13,
  35:16, 35:21, 48:12,
  55:11, 68:9, 89:15,
  99:4, 101:6, 101:8,
  129:13
**methods** [3] - 30:22,
  31:2, 31:24
**metric** [1] - 123:6
**metrics** [3] - 67:13,
  69:6, 75:10
**mgovernski@willkie
  .com** [1] - 1:15
**MICHAEL** [1] - 1:11
**Michelle** [1] - 22:4
**micro** [1] - 65:1
**microphone** [1] - 23:6
**Midnight** [1] - 65:17
**might** [24] - 12:5,
  12:12, 36:17, 36:18,
  49:17, 54:13, 54:14,
  54:15, 54:16, 54:17,
  55:4, 55:5, 56:11,
  64:8, 69:25, 72:21,
  122:1, 127:6,
  127:11, 127:19,
  129:22, 132:17,
  134:6, 138:21
**Mike** [1] - 3:9

**mille** [1] - 133:12
**Miller** [2] - 1:17, 3:12
**miller@
  dubosemiller.com**
  [1] - 1:19
**million** [51] - 45:20,
  53:25, 56:2, 66:6,
  75:19, 84:11, 85:23,
  85:24, 86:3, 86:4,
  86:6, 86:7, 86:10,
  92:16, 94:3, 94:19,
  94:21, 94:24, 95:3,
  95:8, 95:11, 95:12,
  95:18, 96:15, 96:25,
  97:13, 98:18, 98:19,
  101:21, 101:22,
  102:15, 102:16,
  102:20, 111:17,
  122:4, 122:5, 131:2,
  131:5, 131:6,
  134:11, 135:11,
  136:10, 137:12,
  137:15, 137:16,
  138:1, 138:4
**millions** [1] - 13:17
**mind** [4] - 3:25, 17:25,
  102:15, 127:8
**minds** [3] - 44:17,
  122:10, 122:14
**minority** [3] - 43:24,
  44:3, 44:9
**minus** [1] - 91:3
**minute** [6] - 41:19,
  45:15, 51:7, 81:15,
  119:4, 138:15
**minutes** [10] - 18:25,
  22:6, 31:20, 32:12,
  32:13, 32:14, 32:16,
  33:19, 45:19, 45:20
**misconduct** [1] - 16:2
**mission** [1] - 52:3
**mitigation** [2] - 5:9,
  6:20
**model** [50] - 4:8, 4:9,
  8:15, 35:24, 35:25,
  39:25, 40:4, 40:5,
  40:6, 40:9, 40:10,
  40:22, 41:1, 41:17,
  54:2, 54:3, 54:5,
  56:15, 56:18, 56:21,
  59:9, 62:15, 81:23,
  83:11, 84:25, 95:2,
  98:12, 103:8,
  119:23, 119:25,
  120:12, 120:13,
  120:14, 120:16,
  120:18, 121:17,
  123:2, 128:16,
  129:25, 134:22,
  134:24, 135:2,

**136:23, 137:9,
  137:10, 137:22,
  137:23, 138:2
**models** [5] - 39:16,
  40:8, 79:15, 82:22
**moment** [3] - 55:9,
  119:8, 129:18
**Monday** [1] - 10:6
**monetary** [2] - 10:17,
  15:3
**money** [9] - 44:2, 50:4,
  50:5, 50:8, 50:9,
  53:9, 123:3, 132:20,
  133:24
**monitored** [1] - 114:9
**month** [6] - 70:24,
  70:25, 71:2, 71:14,
  72:22, 97:5
**months** [3] - 12:14,
  33:4, 104:8
**moral** [2] - 42:3, 42:4
**Morgan** [1] - 108:15
**Moriera** [1] - 141:8
**morning** [14] - 3:7,
  3:8, 3:14, 3:15, 3:17,
  21:20, 22:2, 22:3,
  22:25, 23:3, 23:4,
  24:11, 24:12, 81:11
**Morning** [1] - 1:7
**Moss** [24] - 3:13, 6:14,
  13:7, 13:11, 13:22,
  30:25, 39:18, 88:18,
  103:16, 105:4,
  105:7, 105:10,
  105:11, 113:5,
  114:11, 115:24,
  116:25, 117:6,
  119:16, 121:13,
  123:10, 124:8,
  137:21, 140:24
**Moss's** [4] - 51:4,
  115:21, 117:8,
  136:20
**most** [7] - 17:1, 75:6,
  87:22, 107:22,
  133:17, 136:19,
  136:25
**mostly** [2] - 53:15,
  53:16
**motion** [7] - 3:19,
  10:7, 10:13, 14:23,
  17:12, 25:13, 25:19
**motivation** [1] - 19:12
**mouth** [2] - 7:2, 98:4
**move** [8] - 23:11,
  23:15, 26:9, 31:10,
  32:4, 37:5, 103:7
**moving** [1] - 73:14
**MR** [114] - 3:8, 3:15,
  4:12, 4:19, 5:23,

13

6:10, 7:24, 9:2, 9:14, 9:17, 18:16, 18:20, 18:23, 20:2, 20:7, 20:9, 20:13, 20:19, 21:15, 22:14, 22:20, 22:23, 23:10, 23:21, 23:23, 24:4, 24:10, 24:24, 25:6, 25:16, 25:22, 26:1, 26:6, 26:21, 26:22, 31:10, 31:13, 31:20, 31:21, 32:7, 32:15, 32:19, 32:25, 33:2, 33:7, 33:15, 33:23, 34:3, 34:15, 37:5, 37:8, 38:10, 38:11, 48:17, 55:15, 55:18, 60:3, 60:5, 60:7, 60:8, 61:14, 61:21, 62:4, 62:13, 62:23, 63:1, 66:11, 66:17, 69:19, 71:25, 72:8, 74:20, 81:10, 81:20, 81:21, 82:7, 82:11, 83:6, 83:9, 86:11, 86:16, 97:8, 100:12, 100:16, 105:20, 106:4, 106:7, 110:16, 110:19, 111:8, 111:12, 112:7, 112:10, 114:20, 114:23, 118:6, 118:15, 119:3, 119:7, 119:9, 128:20, 128:24, 129:4, 129:9, 129:16, 138:5, 138:10, 138:25, 139:5, 139:20, 140:7, 140:11, 140:22, 141:3
**MS** [1] - 22:2
**MSNBC** [1] - 92:25
**multiple** [10] - 53:1, 67:4, 67:7, 102:18, 118:24, 122:16, 123:13, 123:16, 124:6, 126:8
**multiplied** [4] - 93:15, 135:17, 135:19, 135:21
**multiplier** [18] - 126:22, 127:9, 127:11, 127:23, 127:24, 128:11, 130:12, 130:15, 131:4, 131:5, 134:24, 136:1, 136:4, 136:9, 136:15, 137:3, 137:4

**multiply** [2] - 96:24, 135:14
**must** [1] - 5:7

## N

**name** [14] - 13:11, 43:7, 44:16, 74:21, 104:7, 104:19, 104:25, 105:8, 105:25, 106:25, 108:2, 108:5, 109:1, 109:7
**named** [2] - 29:22, 114:5
**names** [6] - 40:18, 103:21, 104:2, 113:20, 114:10, 115:24
**NATHAN** [1] - 1:13
**National** [1] - 16:12
**national** [1] - 87:23
**nationally** [1] - 91:17
**nationwide** [1] - 63:21
**naturally** [8] - 4:5, 5:16, 7:16, 7:21, 10:20, 15:5, 15:10, 18:8
**nature** [14] - 12:20, 17:5, 35:1, 39:6, 44:19, 103:12, 108:4, 110:10, 113:19, 113:22, 116:4, 116:18, 128:2, 128:3
**NBC** [8] - 94:11, 94:13, 94:17, 94:18, 94:19, 94:23, 95:10, 97:10
**NE** [1] - 1:18
**nearly** [1] - 96:5
**necessarily** [1] - 12:23
**need** [21] - 9:10, 12:7, 31:6, 36:10, 43:20, 52:25, 61:15, 74:2, 112:22, 122:15, 127:6, 128:5, 129:4, 130:18, 132:8, 132:9, 132:21, 134:20, 135:13, 135:18
**needed** [1] - 41:17
**needs** [3] - 8:21, 126:3, 126:25
**negative** [6] - 41:15, 92:10, 113:24, 115:25, 119:14, 137:19
**network** [4] - 70:9, 87:23, 93:2, 133:19

**Network** [1] - 70:10
**networks** [1] - 93:10
**never** [2] - 33:7, 127:20
**new** [1] - 49:5
**New** [7] - 89:16, 89:22, 89:25, 90:4, 90:24, 90:25, 91:7
**News** [5] - 70:10, 90:13, 94:18, 94:23, 97:10
**news** [20] - 12:6, 36:17, 40:12, 45:11, 54:15, 70:9, 87:17, 87:18, 87:20, 87:21, 87:22, 88:11, 88:19, 89:11, 92:15, 92:21, 92:22, 92:25, 97:24, 106:15
**newspaper** [3] - 45:9, 45:10, 54:16
**newspapers** [1] - 12:15
**newyorktimes.com** [2] - 89:12, 134:1
**next** [24] - 22:1, 22:22, 40:1, 55:15, 57:22, 58:21, 62:23, 72:22, 82:7, 86:13, 94:4, 97:5, 100:12, 106:4, 110:16, 110:20, 111:8, 112:7, 114:2, 114:4, 114:20, 116:2, 116:3
**Nielsen** [2] - 93:5, 93:9
**night** [1] - 19:9
**nightly** [1] - 45:11
**nine** [3] - 94:10, 95:5, 95:11
**noise** [1] - 105:8
**nominated** [1] - 29:7
**nonappearing** [3] - 15:21, 16:2, 16:15
**none** [1] - 4:7
**nonprofit** [1] - 89:24
**normally** [1] - 25:10
**Northwestern** [5] - 27:3, 27:5, 27:6, 27:20, 27:22
**note** [1] - 12:9
**noted** [1] - 8:13
**notes** [1] - 142:5
**notice** [3] - 14:5, 63:20, 140:20
**noticed** [1] - 7:19
**noticing** [1] - 140:20
**novel** [1] - 46:24
**November** [2] - 114:15, 116:5

**null** [1] - 142:8
**number** [85] - 30:24, 40:23, 54:7, 55:2, 55:5, 55:6, 55:8, 55:25, 56:1, 56:3, 56:4, 56:9, 56:12, 56:13, 56:15, 56:16, 58:2, 58:5, 58:10, 58:18, 68:14, 68:23, 69:11, 69:21, 70:3, 70:11, 71:21, 71:23, 72:18, 73:9, 73:25, 74:4, 74:8, 74:16, 75:4, 76:2, 76:13, 76:14, 78:4, 78:8, 78:11, 78:15, 80:25, 84:12, 84:14, 84:17, 85:1, 85:3, 85:19, 87:12, 89:12, 90:15, 92:3, 93:1, 93:12, 93:25, 94:6, 95:1, 95:3, 96:13, 96:21, 97:15, 99:2, 101:4, 101:25, 102:5, 102:20, 109:22, 118:25, 120:24, 121:19, 121:21, 126:24, 127:2, 127:25, 129:3, 132:7, 134:12, 135:8, 135:12, 135:18, 135:25
**numbers** [23] - 33:4, 33:5, 33:12, 38:23, 63:23, 64:22, 64:23, 70:24, 75:10, 97:4, 103:13, 104:20, 115:1, 125:9, 129:18, 129:20, 132:1, 135:22, 135:23, 136:11, 137:4, 139:24
**numerous** [2] - 11:1, 13:16

## O

**OAN** [4] - 70:10, 73:5, 73:11, 73:13
**object** [7] - 32:22, 34:9, 71:25, 118:6, 128:20, 140:5
**objection** [20] - 23:18, 23:24, 23:25, 25:2, 26:4, 26:6, 26:12, 26:16, 26:18, 32:1, 32:20, 34:10, 37:9, 37:11, 61:23, 62:1, 62:11, 72:2, 72:7, 129:11
**objections** [5] - 22:10,

22:12, 26:7, 37:9, 61:15
**objective** [1] - 28:13
**observed** [1] - 72:13
**obviously** [1] - 102:20
**occur** [1] - 11:16
**occurred** [5] - 56:24, 56:25, 58:24, 59:14, 60:21
**October** [4] - 35:4, 35:11, 35:20
**odds** [1] - 15:15
**OF** [2] - 1:1, 1:8
**offense** [1] - 112:20
**offer** [1] - 25:13
**offered** [2] - 91:22, 119:22
**offering** [9] - 41:2, 41:6, 57:2, 57:5, 57:8, 59:8, 115:13, 136:17, 137:8
**Official** [1] - 2:10
**official** [1] - 142:15
**offs** [1] - 5:1
**often** [1] - 139:25
**old** [1] - 45:8
**once** [6] - 44:16, 45:9, 45:10, 68:10, 93:12, 126:5
**one** [75] - 3:18, 8:8, 8:15, 19:7, 22:8, 23:21, 25:17, 29:15, 32:13, 33:17, 34:19, 44:1, 55:21, 56:6, 57:25, 59:2, 63:3, 63:7, 65:3, 65:13, 66:9, 66:18, 68:7, 70:17, 70:24, 70:25, 71:1, 72:3, 72:11, 73:19, 74:1, 75:6, 76:9, 79:18, 80:18, 81:4, 83:10, 83:20, 83:21, 83:22, 84:3, 84:12, 86:17, 87:5, 87:25, 95:10, 95:24, 97:25, 98:4, 99:21, 102:17, 113:8, 113:12, 118:4, 118:22, 121:10, 122:14, 122:25, 123:7, 126:7, 126:16, 126:19, 130:5, 131:12, 134:6, 135:5, 137:1, 137:4, 139:10, 140:3
**One** [1] - 70:10
**one's** [2] - 55:24, 123:8
**ones** [1] - 116:20
**online** [25] - 40:12,

54:13, 54:15, 55:4, 62:19, 67:9, 68:1, 68:13, 69:21, 73:15, 80:16, 87:17, 87:18, 88:13, 89:11, 94:4, 94:5, 94:8, 94:10, 94:11, 94:15, 95:6, 95:8, 96:9, 109:23
**onslaught** [1] - 15:13
**Oparaugo** [1] - 11:21
**open** [1] - 93:20
**opening** [1] - 35:7
**opinion** [31] - 14:10, 29:18, 30:3, 30:16, 30:18, 33:10, 37:24, 37:25, 38:2, 38:4, 41:2, 41:6, 41:9, 57:2, 57:5, 57:8, 72:23, 79:23, 81:6, 85:4, 86:8, 87:7, 91:22, 99:7, 115:13, 119:22, 122:21, 128:9, 136:17, 137:8
**opinions** [12] - 30:6, 30:10, 30:13, 33:11, 37:15, 37:17, 39:6, 51:21, 61:2, 66:1, 77:21, 133:15
**opposed** [2] - 138:19, 138:24
**order** [10] - 10:21, 14:11, 14:16, 19:10, 20:3, 20:5, 21:1, 21:11, 30:13, 128:6
**ordered** [1] - 16:14
**orders** [1] - 10:8
**ordinarily** [1] - 37:14
**organizations** [1] - 16:9
**original** [6] - 11:23, 33:21, 35:18, 38:21, 96:10, 125:24
**otherwise** [1] - 18:13
**outlet** [1] - 90:11
**outlets** [4] - 12:16, 87:17, 92:25, 125:16
**outlines** [1] - 63:16
**outreach** [1] - 63:22
**outside** [4] - 19:9, 19:18, 19:25, 32:5
**outweighed** [1] - 38:3
**overall** [6] - 58:3, 119:11, 119:12, 128:17, 132:22, 137:7
**overkill** [1] - 130:20
**overrule** [1] - 32:23
**overruled** [10] - 26:12, 26:18, 32:21, 37:12, 62:11, 72:2, 72:7,

118:18, 129:11
**overruling** [1] - 34:10
**overseen** [1] - 28:17
**overview** [1] - 28:13
**owed** [2] - 8:18, 18:10
**Owens** [1] - 65:3
**own** [1] - 68:21

**P**

**p.m** [1] - 141:6
**page** [4] - 10:22, 106:15, 120:19, 123:1
**PAGE** [1] - 141:10
**paid** [3] - 38:25, 39:2, 39:3
**Pamela** [2] - 22:4, 141:11
**PAMELA** [1] - 22:19
**panel** [1] - 10:2
**paper's** [1] - 12:3
**papers** [1] - 4:13
**paperwork** [1] - 25:5
**paragraph** [5] - 11:4, 13:4, 13:8, 13:19, 86:25
**part** [7] - 3:18, 13:9, 18:6, 56:20, 83:11, 109:9, 115:5
**partially** [1] - 38:4
**participated** [1] - 12:8
**particular** [27] - 5:8, 7:13, 9:24, 50:8, 51:11, 56:4, 67:21, 70:25, 72:13, 73:10, 83:15, 83:16, 88:17, 89:18, 91:2, 101:5, 104:14, 107:2, 108:2, 111:6, 121:12, 122:11, 132:13, 133:8, 135:2, 136:3, 136:24
**particularly** [8] - 5:24, 42:16, 85:13, 122:13, 123:22, 126:6, 126:17, 139:6
**parties** [10] - 3:5, 4:2, 7:22, 14:21, 15:7, 15:14, 18:11, 19:2, 70:15, 138:18
**parties'** [1] - 23:14
**partners** [1] - 17:7
**parts** [2] - 3:19, 109:14
**party** [12] - 4:25, 5:7, 5:11, 7:5, 11:1, 13:16, 70:17, 70:19, 71:11, 89:14, 93:9, 142:10

**passage** [1] - 12:22
**past** [1] - 62:6
**pay** [2] - 16:15, 67:14
**peak** [2] - 107:1, 107:2
**peek** [1] - 109:6
**peer** [2] - 28:23, 28:24
**peer-reviewed** [2] - 28:23, 28:24
**pending** [1] - 14:24
**people** [84] - 8:3, 8:10, 27:17, 28:16, 41:25, 42:6, 42:13, 43:21, 43:24, 44:3, 44:5, 44:7, 44:9, 44:25, 45:20, 46:10, 46:24, 47:12, 47:13, 49:4, 49:10, 49:13, 49:14, 49:17, 49:22, 49:24, 50:2, 50:4, 50:5, 55:1, 55:6, 56:5, 56:9, 56:13, 56:17, 65:2, 68:16, 70:15, 70:16, 71:6, 71:9, 71:21, 71:24, 72:18, 72:21, 73:1, 76:9, 76:10, 76:18, 77:12, 77:18, 85:3, 86:5, 90:16, 91:8, 91:18, 91:19, 92:4, 93:1, 93:6, 93:13, 93:19, 96:21, 102:16, 102:17, 103:14, 103:23, 104:2, 104:13, 104:15, 106:1, 107:12, 112:17, 112:21, 126:5, 127:3, 127:13, 127:20, 128:4, 128:5, 128:7, 130:18, 137:15, 137:16
**people's** [7] - 44:17, 49:1, 52:25, 109:7, 116:15, 126:9, 128:13
**Pepsi** [2] - 127:18, 127:20
**per** [5] - 59:2, 77:16, 99:21, 133:12, 135:14
**percent** [55] - 43:21, 44:2, 44:7, 71:6, 77:1, 77:3, 77:5, 77:9, 77:11, 77:15, 77:20, 77:24, 77:25, 78:8, 79:8, 79:11, 79:18, 79:21, 84:19, 84:21, 84:23, 85:1, 85:5, 86:1, 90:1, 90:4, 90:12, 90:14,

90:20, 91:3, 91:5, 91:6, 93:16, 94:20, 96:23, 99:5, 124:14, 124:16, 124:19, 124:22, 124:25, 130:6, 130:9, 130:16, 131:1, 132:18, 132:22, 133:2, 133:3, 135:7, 135:12, 136:23
**percentage** [4] - 90:25, 93:8, 94:12, 130:8
**percentages** [5] - 53:14, 90:8, 124:11, 125:4, 132:24
**perception** [1] - 43:24
**perceptions** [1] - 51:9
**perform** [5] - 39:17, 71:8, 78:17, 81:25, 103:17
**performance** [2] - 69:6, 80:10
**performed** [5] - 24:19, 29:15, 103:21, 109:13, 131:13
**performing** [1] - 35:17
**perhaps** [3] - 105:9, 137:2, 139:15
**period** [5] - 17:5, 66:7, 104:8, 107:3, 116:25
**permission** [2] - 23:15, 31:13
**permitted** [2] - 5:7, 30:21
**persist** [1] - 116:11
**persisted** [1] - 116:21
**persistently** [1] - 14:6
**person** [17] - 44:12, 47:9, 47:10, 50:13, 51:10, 54:9, 55:21, 56:6, 56:11, 59:20, 76:17, 77:3, 98:4, 102:17, 102:21, 107:19, 126:15
**person's** [4] - 43:2, 43:8, 43:11, 43:14
**personal** [2] - 16:20, 16:24, 19:11
**persuaded** [2] - 49:4, 128:8
**Pew** [1] - 91:16
**Ph.D** [1] - 27:20
**phone** [15] - 86:18, 87:13, 87:15, 87:16, 88:12, 92:14, 92:17, 94:23, 95:6, 95:16, 96:2, 96:9, 96:14, 97:18
**phones** [1] - 61:18

**photocopied** [1] - 142:9
**phrase** [1] - 87:9
**physical** [1] - 119:18
**pie** [1] - 132:17
**piece** [6] - 45:14, 46:2, 46:10, 49:5, 49:6, 109:22
**pieces** [2] - 77:19, 132:8
**pizza** [1] - 7:7
**place** [4] - 53:13, 81:11, 122:12, 133:18
**places** [1] - 96:8
**Plaintiff** [2] - 140:24
**plaintiff** [17] - 3:7, 5:19, 5:21, 7:21, 14:6, 15:20, 16:7, 16:10, 16:16, 16:18, 16:24, 17:3, 138:23, 140:12, 140:13, 140:14
**plaintiff's** [5] - 16:4, 16:20, 17:1, 17:6, 23:2
**Plaintiff's** [3] - 111:10, 112:8, 112:12
**plaintiffs** [32] - 3:10, 3:21, 9:11, 10:6, 10:13, 12:25, 14:23, 15:9, 15:11, 17:13, 17:20, 20:17, 21:17, 21:25, 22:4, 22:23, 30:25, 31:10, 37:23, 39:18, 92:24, 113:21, 115:12, 123:3, 138:19, 138:21, 139:7, 139:13, 139:18, 140:2, 140:19, 140:25
**Plaintiffs** [11] - 1:3, 141:15, 141:16, 141:17, 141:18, 141:19, 141:20, 141:21, 141:22, 141:23, 141:24
**PLAINTIFFS** [1] - 1:11
**Plaintiffs'** [17] - 22:17, 23:16, 24:2, 55:16, 62:24, 63:6, 63:20, 66:12, 66:14, 82:9, 82:10, 86:13, 86:14, 100:14, 106:5, 110:17
**plaintiffs'** [19] - 3:19, 10:11, 10:15, 14:12, 14:14, 14:19, 14:20, 15:1, 17:18, 36:22,

38:13, 40:18, 57:15,
88:24, 100:7,
100:18, 103:20,
114:21, 114:25
**Plan** [2] - 63:11, 82:17
**plan** [15] - 11:2, 13:9,
52:5, 52:13, 52:21,
53:11, 63:16, 63:19,
64:3, 65:10, 65:12,
65:20, 66:3, 82:18,
124:1
**planning** [1] - 25:15
**plans** [5] - 52:4, 52:10,
53:3, 53:6, 53:21
**platform** [4] - 50:16,
67:9, 73:22, 98:2
**platforms** [9] - 59:12,
73:15, 73:19, 74:3,
75:17, 98:1, 114:17,
114:18, 124:10
**play** [5] - 22:16, 66:15,
82:12, 83:6, 123:21
**played** [1] - 83:24
**pleaded** [4] - 10:20,
14:18, 15:6, 15:10
**pleading** [1] - 14:13
**pleasant** [1] - 21:22
**plus** [2] - 61:12, 61:13
**Podbean** [1] - 75:8
**podcast** [37] - 54:18,
62:20, 66:23, 66:25,
67:1, 67:7, 67:11,
67:18, 67:24, 68:1,
68:5, 68:19, 68:22,
68:25, 69:12, 70:4,
70:8, 70:12, 72:13,
72:16, 72:19, 72:25,
73:11, 73:16, 73:24,
74:9, 74:25, 75:4,
75:5, 75:11, 75:24,
80:18, 111:1, 111:6,
111:15, 112:14
**Podcast** [2] - 67:11,
68:2, 75:6
**podcasts** [8] - 40:12,
59:16, 67:4, 67:5,
67:13, 68:14, 75:3,
80:16
**point** [12] - 3:20, 5:22,
5:23, 7:25, 15:7,
33:9, 60:12, 61:5,
62:7, 73:20, 78:15,
129:11
**pointed** [2] - 14:6,
62:5
**points** [2] - 20:14,
65:18
**political** [7] - 47:21,
48:14, 48:15, 64:18,
85:14, 127:22,

128:12
**politically** [7] - 46:17,
47:18, 47:22, 47:24,
48:7, 48:10
**polled** [1] - 114:9
**popular** [3] - 75:6,
107:15, 107:22
**population** [1] -
102:14
**portion** [1] - 88:9
**portions** [6] - 62:24,
88:12, 88:17, 89:1,
92:25, 112:8
**position** [2] - 9:16,
139:5
**positions** [1] - 4:13
**positive** [1] - 51:9
**possible** [5] - 19:5,
23:6, 44:15, 58:14,
102:17
**Post** [3] - 12:3, 90:1,
90:12
**post** [14] - 36:18,
76:10, 76:18, 77:2,
77:16, 78:4, 78:12,
78:13, 78:20, 79:19,
83:22, 84:3, 84:7,
97:25
**Post's** [1] - 12:8
**posted** [8] - 59:13,
66:22, 69:16, 94:18,
94:23, 109:16,
111:3, 113:3
**poster** [1] - 78:6
**posters** [1] - 100:25
**posting** [2] - 84:9,
111:6
**posts** [13] - 69:7, 77:6,
77:16, 77:17, 78:22,
80:3, 80:10, 85:12,
100:19, 100:23,
103:11, 115:8,
116:22
**posture** [1] - 9:24
**potential** [1] - 20:20
**potentially** [1] - 92:9
**Powell** [1] - 17:23
**practical** [1] - 5:3
**precise** [5] - 4:23, 5:5,
6:20, 12:11, 80:2
**precisely** [1] - 71:13
**preclude** [2] - 10:7,
10:8
**precluded** [1] - 3:23
**preexisting** [1] - 49:1
**prefer** [1] - 24:16
**preferred** [1] - 47:4
**prepare** [3] - 24:18,
30:5, 36:6
**prepared** [6] - 24:24,

26:23, 30:7, 34:16,
35:3, 36:3
**preparing** [1] - 66:1
**presence** [1] - 32:6
**presentation** [1] -
18:24
**presentations** [2] -
29:2, 29:4
**presented** [1] - 36:7
**presenting** [1] -
139:24
**preserve** [1] - 32:8
**President** [6] - 84:15,
84:22, 86:24, 94:1,
94:22, 102:5
**presidential** [5] - 64:8,
64:10, 82:19, 82:22,
82:24
**Presidential** [1] -
63:11
**presumed** [3] - 9:4,
9:8
**pretrial** [2] - 14:11,
19:3
**pretty** [11] - 4:15,
41:15, 47:9, 56:12,
58:9, 66:6, 68:13,
76:25, 88:5, 118:23,
132:4
**preview** [1] - 18:23
**previous** [5] - 57:23,
76:3, 90:6, 118:20,
136:11
**previously** [33] -
23:13, 24:6, 25:1,
31:21, 39:23, 55:16,
61:16, 63:17, 66:12,
66:13, 86:1, 86:15,
90:17, 99:4, 101:7,
101:14, 102:4,
103:1, 109:20,
110:3, 111:10,
111:17, 112:8,
114:21, 117:10,
119:25, 121:2,
121:24, 123:18,
130:6, 130:15,
131:24, 133:6
**primarily** [1] - 105:5
**primary** [1] - 27:11
**principle** [2] - 12:17,
49:16, 126:21
**principles** [1] - 63:18
**print** [2] - 54:16, 62:20
**printed** [1] - 45:9
**problem** [3] - 4:17,
9:3, 140:23
**problems** [1] - 62:5
**proceed** [6] - 23:9,
26:2, 26:20, 38:8,

81:19, 138:9
**proceedings** [1] -
142:6
**Proceedings** [1] -
2:13
**process** [1] - 73:5
**produced** [4] - 2:13,
24:6, 95:18, 101:20
**producer** [1] - 68:22
**producers** [1] - 67:14
**profession** [2] - 27:1,
37:19
**professional** [4] -
16:8, 16:20, 17:7,
53:7
**Professor** [2] - 24:15,
24:16
**professor** [2] - 27:2,
27:3
**professors** [1] - 29:8
**proffered** [1] - 31:23
**profits** [1] - 17:17
**prominence** [4] - 78:6,
78:11, 99:10, 136:24
**prominent** [8] - 43:4,
43:5, 54:9, 58:8,
76:25, 77:4, 77:18,
77:19
**prominently** [1] -
87:22
**promoted** [2] -
132:23, 133:4
**proof** [3] - 4:6, 5:9,
12:7
**proposed** [2] - 138:18,
140:18
**Protect** [2] - 1:21, 3:12
**protect** [1] - 17:16
**prove** [1] - 17:20
**provide** [12] - 4:10,
35:1, 40:1, 61:2,
61:5, 72:17, 74:3,
77:21, 104:17,
128:19, 129:25,
130:2
**provided** [11] - 28:12,
30:8, 36:8, 36:22,
57:14, 70:15, 71:11,
88:24, 114:5,
121:18, 129:22
**provides** [3] - 6:11,
78:3, 104:12
**providing** [2] - 21:17,
121:24
**proximate** [10] - 3:23,
4:14, 8:3, 8:11,
10:11, 10:18, 14:13,
15:4
**proximately** [2] -
10:15, 15:1

**PTX** [2] - 22:9, 22:10
**public** [17] - 28:18,
40:17, 41:15, 43:13,
44:12, 44:17, 45:1,
63:22, 75:7, 78:13,
87:20, 103:15,
105:3, 105:18,
106:17, 115:23,
117:11
**publication** [10] -
12:4, 12:14, 12:20,
12:22, 13:21, 17:21,
18:4, 48:13, 73:10,
89:25
**publications** [5] -
14:20, 36:8, 70:4,
91:18, 96:4
**publicly** [7] - 69:3,
70:14, 74:6, 78:20,
79:10, 116:13,
133:14
**publish** [1] - 13:6
**published** [24] -
12:12, 13:5, 13:20,
22:19, 28:23, 28:24,
29:1, 40:11, 54:20,
57:17, 57:18, 57:20,
57:21, 66:16, 67:21,
67:22, 68:5, 83:8,
87:18, 106:13,
110:25, 111:1
**publisher** [1] - 11:23
**publishers** [2] - 11:1,
13:16
**publishing** [2] - 13:10,
13:13
**pull** [1] - 23:6
**Pundit** [1] - 8:10
**punitive** [4] - 15:20,
41:7, 138:20, 139:13
**purely** [1] - 40:6
**purpose** [2] - 10:18,
15:3
**purposeful** [2] -
51:11, 52:2
**purposes** [5] - 5:3,
9:16, 68:24, 82:21,
91:22
**pursuant** [1] - 23:14
**put** [11] - 7:1, 52:17,
52:23, 65:20, 76:23,
123:9, 132:19,
133:25, 134:1,
134:14, 135:18
**putting** [2] - 124:7,
140:4

**Q**

**qualifications** [3] -

25:18, 25:19, 26:5
**qualitative** [9] - 40:2, 40:20, 103:21, 109:9, 109:13, 109:14, 109:15, 109:21, 114:5
**quantification** [2] - 9:9, 15:9
**quantify** [3] - 85:15, 122:23, 122:25
**quantifying** [5] - 6:6, 8:17, 10:17, 15:2
**quantitative** [6] - 40:2, 40:16, 103:19, 103:24, 104:1, 109:11
**quantity** [2] - 18:9, 45:25
**Queries** [1] - 107:14
**queries** [3] - 107:18, 107:22, 108:9
**query** [1] - 108:14
**questioned** [1] - 15:24
**questions** [5] - 25:18, 33:9, 34:4, 138:6, 139:10
**quick** [1] - 18:20
**quickly** [4] - 45:13, 45:18, 46:4, 46:25
**quite** [3] - 77:20, 118:22, 140:8
**quote** [4] - 11:6, 11:14, 15:9, 31:22
**quoted** [1] - 39:8
**quotes** [1] - 97:21
**quoting** [2] - 10:21, 11:9

# R

**racist** [2] - 15:14, 119:17
**radio** [3] - 59:16, 64:9, 98:3
**Raffensperger** [2] - 86:19, 86:25
**raise** [1] - 23:1
**raised** [1] - 14:11
**raises** [1] - 117:12
**range** [19] - 28:7, 53:18, 57:15, 60:10, 64:18, 77:22, 77:24, 86:9, 98:16, 98:17, 99:3, 101:13, 127:16, 128:19, 129:22, 130:16, 131:2, 136:18
**ranged** [1] - 85:23
**ranges** [4] - 81:3, 121:24, 129:19,

130:22
**ranging** [1] - 28:7
**rank** [1] - 107:21
**ranked** [1] - 108:19
**ranking** [1] - 107:21
**rate** [31] - 39:8, 39:9, 71:2, 71:3, 71:4, 71:5, 71:6, 71:10, 71:20, 76:16, 77:1, 77:18, 77:19, 78:17, 79:7, 79:9, 79:11, 79:12, 79:17, 79:18, 79:20, 84:23, 85:4, 89:16, 91:15, 92:12, 96:23, 131:1, 134:6, 135:13, 136:23
**rates** [2] - 89:8, 98:17
**rather** [2] - 27:15, 96:20
**reach** [16] - 30:23, 34:24, 37:21, 39:24, 45:20, 67:17, 85:8, 92:8, 126:3, 133:7, 133:24, 135:3, 135:19, 137:11
**reached** [4] - 41:14, 84:13, 84:19, 137:15
**reaction** [1] - 113:11
**read** [13] - 33:10, 40:18, 91:19, 100:18, 103:22, 107:23, 110:7, 110:8, 110:9, 115:1, 130:22
**readers** [1] - 13:18
**reading** [1] - 8:12
**ready** [3] - 18:19, 21:14, 21:25
**reaffirmed** [2] - 10:14, 14:25
**realize** [4] - 21:11, 25:23, 76:9, 140:12
**really** [5] - 7:6, 41:25, 126:20, 137:1, 139:23
**reappeared** [1] - 68:5
**reason** [2] - 128:25, 138:22
**reasonable** [3] - 8:19, 9:11, 11:15
**reasonably** [17] - 5:17, 7:15, 8:20, 11:8, 11:18, 11:24, 12:5, 12:16, 13:2, 13:20, 14:1, 14:22, 16:1, 17:1, 17:21, 18:4, 18:7
**reasoning** [2] - 9:25, 10:5
**reasons** [3] - 26:13,

37:17, 38:1
**receive** [2] - 55:4, 126:25
**received** [15] - 6:14, 29:5, 40:14, 55:8, 79:21, 84:17, 102:18, 110:3, 111:10, 111:17, 111:19, 112:9, 114:21, 126:14, 137:12
**receives** [1] - 118:24
**receiving** [1] - 6:16
**recent** [2] - 97:13, 117:1
**recently** [1] - 27:24
**receptive** [41] - 89:18, 89:21, 89:23, 90:3, 90:9, 90:21, 91:15, 91:21, 91:24, 92:3, 92:9, 92:13, 93:8, 93:21, 94:3, 94:13, 94:14, 94:20, 94:21, 95:8, 95:19, 96:15, 96:17, 96:20, 96:23, 98:18, 98:19, 101:21, 101:23, 101:24, 101:25, 117:24, 118:2, 118:9, 121:3, 121:5, 121:12, 122:3, 122:4, 122:5, 137:13
**recess** [2] - 81:16, 141:5
**recognitions** [1] - 29:5
**recognize** [2] - 63:5, 100:19, 110:20
**recognizing** [1] - 53:18
**record** [5] - 3:6, 26:11, 78:19, 100:18, 115:1
**recording** [1] - 87:15
**records** [1] - 74:18
**red** [2] - 80:25, 98:25
**Reddit** [1] - 98:2
**redisseminations** [1] - 37:3
**redone** [1] - 125:22
**reeducation** [1] - 20:4
**refer** [1] - 130:11
**reference** [2] - 23:12, 64:14
**referenced** [2] - 22:8, 24:5
**references** [3] - 19:11, 63:6, 64:21
**referred** [1] - 46:8
**reflect** [3] - 113:24, 132:16, 136:12

**reflected** [3] - 78:21, 133:8, 137:19
**reflecting** [1] - 12:17
**reflection** [1] - 136:19
**reflects** [1] - 19:10
**regard** [1] - 140:3
**regarding** [4] - 11:20, 14:20, 37:22, 115:20
**regular** [1] - 48:8
**regularly** [2] - 29:3, 69:3
**reiterate** [1] - 20:19
**reject** [1] - 10:3
**rejected** [1] - 14:12
**rel** [1] - 16:12
**relate** [3] - 15:5, 57:12, 115:8
**Related** [1] - 107:14
**related** [12] - 88:17, 92:24, 103:20, 107:18, 108:6, 108:9, 108:14, 108:15, 108:16, 108:22, 109:5, 127:18
**relates** [1] - 10:19
**relating** [1] - 19:8
**relation** [1] - 108:18
**relations** [1] - 45:1
**relationship** [1] - 56:16
**relatively** [1] - 12:22
**released** [3] - 72:19, 78:14, 106:17
**relevant** [7] - 17:13, 56:14, 56:15, 67:19, 68:24, 79:3, 130:4
**relied** [6] - 29:17, 30:3, 30:12, 30:16, 32:18, 133:14
**relies** [1] - 26:9
**rely** [7] - 26:8, 26:14, 26:17, 30:17, 31:1, 68:18, 98:10
**remain** [2] - 23:1, 139:1
**remaining** [2] - 10:16, 15:2
**remains** [1] - 69:17
**remedy** [1] - 17:16
**remember** [8] - 66:5, 95:20, 95:24, 112:20, 122:1, 129:23, 132:17, 134:6
**remind** [1] - 62:2
**remote** [1] - 12:22
**render** [1] - 12:23
**renew** [2] - 61:14, 61:16

**repair** [44] - 35:2, 40:5, 40:24, 41:17, 42:19, 44:19, 44:23, 45:2, 51:4, 51:5, 51:6, 51:8, 51:15, 51:17, 51:24, 52:15, 52:16, 52:24, 59:9, 92:2, 92:7, 120:3, 120:7, 120:16, 121:7, 121:9, 121:11, 122:8, 122:9, 122:18, 122:22, 123:4, 123:10, 123:21, 124:5, 124:7, 124:16, 128:17, 132:2, 132:7, 136:6, 136:12, 136:20, 137:24
**repairing** [1] - 116:14
**repeated** [5] - 14:3, 36:18, 54:16, 62:18
**repeatedly** [2] - 12:25, 13:16
**report** [29] - 30:7, 33:21, 34:21, 34:22, 34:23, 35:3, 35:6, 35:7, 35:8, 35:12, 35:18, 35:20, 36:4, 38:22, 39:4, 89:3, 95:24, 96:2, 96:3, 96:8, 96:10, 97:7, 116:6, 116:24, 117:1, 125:5, 125:6
**reported** [2] - 2:13, 141:8
**Reporter** [3] - 2:10, 2:10, 142:15
**reporters** [2] - 12:3, 12:5, 15:22
**reports** [12] - 30:8, 30:9, 30:22, 33:3, 33:13, 34:16, 38:18, 88:12, 95:22, 116:4, 116:22, 125:4
**reposted** [2] - 58:17, 73:22
**representation** [1] - 105:12
**representative** [1] - 91:18
**represented** [1] - 132:18
**reproduce** [1] - 131:19
**reproductions** [1] - 62:24
**Republican** [1] - 64:1
**republication** [15] - 11:7, 11:16, 11:17, 11:24, 12:8, 12:14,

12:23, 14:7, 14:8, 17:21, 18:4, 60:24, 73:15

**republications** [3] - 10:25, 14:21, 37:2

**republish** [1] - 12:6

**republished** [8] - 13:3, 13:17, 40:11, 54:10, 54:20, 57:24, 58:1, 59:6

**republishing** [1] - 13:24

**reputation** [32] - 17:17, 40:24, 41:21, 41:22, 42:2, 42:4, 42:10, 42:11, 42:12, 42:14, 42:17, 42:20, 42:23, 43:2, 43:6, 43:8, 43:11, 43:14, 43:20, 43:23, 44:6, 44:12, 45:2, 50:25, 87:1, 113:23, 115:21, 116:14, 120:17, 122:17, 122:24, 123:8

**reputational** [39] - 9:5, 35:1, 35:2, 37:23, 40:3, 40:5, 40:20, 41:10, 41:16, 41:18, 44:19, 51:5, 51:6, 51:15, 51:17, 51:24, 103:12, 113:17, 116:1, 116:9, 116:19, 120:1, 120:8, 121:9, 121:11, 122:7, 122:9, 123:3, 123:10, 124:5, 124:7, 128:17, 132:2, 136:6, 137:25, 139:7, 139:11, 139:14

**Reputational** [1] - 51:8

**reputations** [6] - 42:18, 45:5, 51:5, 117:9, 119:15, 137:20

**request** [4] - 10:8, 31:13, 118:15, 118:16

**requested** [1] - 3:22

**require** [2] - 12:7, 127:22

**requirement** [1] - 11:17

**research** [17] - 28:1, 28:2, 28:4, 28:11, 28:20, 31:1, 31:4, 31:7, 39:3, 39:12,

46:12, 46:17, 47:18, 51:18, 69:16, 75:2, 89:24

**Research** [1] - 91:16

**researching** [1] - 28:19

**resolve** [1] - 5:21

**resources** [2] - 19:13, 53:10

**respect** [26] - 5:8, 8:1, 8:2, 8:5, 9:4, 9:5, 14:14, 19:11, 36:25, 41:9, 42:5, 58:22, 61:22, 73:6, 75:22, 78:10, 81:4, 84:15, 85:16, 116:18, 119:22, 128:16, 137:8, 138:17, 139:7, 140:1

**respective** [1] - 108:20

**respectively** [1] - 82:10

**respond** [1] - 20:1

**responding** [1] - 103:14

**responsibility** [1] - 18:3

**responsible** [8] - 6:13, 8:3, 8:8, 9:20, 10:10, 12:2, 15:13, 18:1

**result** [2] - 14:2, 98:23

**resulted** [1] - 98:23

**resulting** [3] - 16:6, 17:17, 17:20

**resume** [1] - 129:12

**retained** [2] - 38:12, 38:23

**retract** [1] - 118:21

**retracting** [1] - 118:1

**returning** [1] - 18:20

**returns** [2] - 21:19, 81:18

**revenue** [2] - 17:4, 69:9

**revenues** [1] - 17:1

**review** [5] - 8:24, 10:2, 56:20, 75:15, 115:21

**reviewed** [8] - 28:11, 28:23, 28:24, 63:7, 78:2, 112:4, 115:5, 115:22

**revising** [1] - 28:13

**reword** [1] - 75:21

**ridiculed** [1] - 15:24

**right-hand** [3] - 83:3, 106:10, 135:8

**role** [5] - 10:18, 15:3, 17:19, 46:8, 123:21

**room** [1] - 21:22

**roughly** [2] - 79:19, 99:21

**row** [1] - 135:15

**rows** [1] - 108:18

**RPR** [2] - 142:3, 142:15

**RUBY** [1] - 1:3

**Ruby** [21] - 3:3, 3:13, 65:17, 87:5, 87:9, 104:7, 104:23, 105:9, 105:25, 106:25, 107:12, 107:15, 107:16, 108:2, 108:3, 108:4, 108:15, 110:13, 114:10, 115:24

**Rudolph** [1] - 3:3

**RUDOLPH** [1] - 1:5

**Rudy** [1] - 66:23

**rule** [1] - 5:2

**Rule** [2] - 31:11, 37:6

**ruled** [3] - 26:10, 61:16, 61:25

**rules** [1] - 4:9

**ruling** [4] - 8:5, 9:23, 26:16, 36:25

**Rumble** [6] - 73:22, 73:24, 74:3, 74:10, 74:12, 94:7

**run** [2] - 51:19, 53:2

**running** [3] - 3:24, 74:4, 123:17

## S

**safe** [1] - 133:17

**Saint** [1] - 142:15

**SAINT** [2] - 2:10, 142:3

**Saint-Loth** [1] - 142:15

**SAINT-LOTH** [2] - 2:10, 142:3

**sale** [1] - 17:11

**sample** [1] - 103:22

**sampled** [1] - 110:7

**sanction** [1] - 5:12

**satisfies** [1] - 11:17

**save** [2] - 101:11, 112:19

**saw** [18] - 55:1, 55:2, 59:25, 61:8, 65:19, 76:19, 86:5, 87:21, 90:16, 91:7, 96:22, 106:16, 109:19, 112:12, 115:18, 116:20, 123:23, 131:24

**scale** [2] - 102:19, 102:25

**Schlachter** [1] - 15:17

**Scholar** [1] - 29:8

**school** [2] - 27:3, 27:4

**schools** [1] - 42:16

**Science** [2] - 29:7, 48:1

**science** [4] - 28:11, 31:8, 37:18

**scope** [2] - 19:13, 123:7

**score** [1] - 104:17

**score** [1] - 94:5

**screen** [30] - 26:24, 54:5, 54:24, 55:22, 57:10, 57:23, 59:18, 60:14, 61:6, 63:6, 72:10, 74:19, 79:14, 83:1, 83:3, 84:1, 84:4, 86:23, 90:7, 90:24, 98:24, 100:17, 100:20, 101:1, 110:21, 112:11, 113:7, 114:24, 117:22, 131:11

**screenshot** [3] - 55:16, 82:8, 111:9

**screenshots** [1] - 114:21

**search** [17] - 92:22, 92:23, 103:19, 103:20, 104:1, 104:6, 104:10, 104:22, 105:12, 107:7, 107:10, 107:15, 107:17, 107:19, 107:22, 108:2, 109:5

**searched** [1] - 139:21

**searches** [1] - 107:12

**searching** [6] - 48:24, 104:2, 104:14, 104:15, 104:16, 106:1

**season** [1] - 85:14

**Second** [1] - 4:16

**second** [6] - 8:1, 23:21, 25:8, 36:3, 36:6, 47:15, 103:7, 105:15, 107:4, 107:5

**seconds** [1] - 45:15

**Secord** [1] - 15:17

**Secretary** [3] - 86:19, 86:24, 96:14

**security** [1] - 114:5

**see** [75] - 10:12, 10:20, 11:21, 12:8, 13:3, 16:11, 16:21, 17:22, 49:3, 54:24, 55:23, 56:6, 57:15, 58:2, 58:25, 59:14, 59:25,

60:1, 60:14, 61:10, 63:21, 64:1, 64:8, 64:10, 65:9, 65:16, 65:19, 65:22, 65:25, 69:21, 72:10, 76:10, 77:2, 77:5, 81:1, 82:24, 83:1, 85:22, 86:23, 86:25, 87:3, 87:6, 89:6, 99:22, 100:20, 101:2, 103:13, 104:19, 104:21, 106:10, 107:14, 108:6, 110:2, 110:12, 111:16, 111:18, 111:22, 112:11, 113:4, 113:8, 113:15, 115:2, 115:23, 116:1, 116:10, 116:24, 130:16, 133:3, 133:10, 133:20, 134:8, 134:20, 135:8, 135:20, 139:21

**seeing** [1] - 55:21

**sees** [1] - 134:15

**select** [1] - 62:7

**selected** [1] - 136:13

**selection** [1] - 110:8

**selects** [1] - 130:5

**senators** [1] - 64:1

**sense** [12] - 8:19, 53:20, 56:10, 102:19, 108:1, 108:4, 108:24, 111:22, 111:23, 115:10, 123:7, 140:9

**Sense** [5] - 66:24, 81:24, 111:2, 111:15, 112:13

**sent** [1] - 57:24

**sentences** [1] - 72:3

**separate** [3] - 8:3, 140:25, 141:9

**separated** [3] - 138:20, 139:18, 140:13

**separately** [1] - 138:24

**series** [4] - 13:21, 19:8, 25:18, 76:15

**serve** [1] - 135:13

**served** [1] - 29:10

**service** [3] - 70:19, 74:21, 75:8

**services** [3] - 70:18, 71:12, 75:6

**session** [1] - 141:7

**Session** [1] - 1:7

**set** [20] - 4:8, 4:24, 5:1, 29:8, 34:23, 36:7, 36:15, 36:20, 40:10, 43:7, 56:22, 57:14, 59:1, 64:2, 88:23, 114:4, 115:4, 115:11, 115:22, 139:10
**set-offs** [1] - 5:1
**sets** [1] - 56:22
**settled** [2] - 11:5, 11:19
**seven** [5] - 127:3, 127:7, 127:17, 127:23, 130:19
**seven-times** [1] - 127:23
**several** [2] - 52:14, 100:13
**severe** [1] - 41:16
**severely** [1] - 113:23
**shall** [3] - 4:7, 19:15, 142:8
**share** [19] - 45:14, 45:16, 46:2, 46:25, 50:8, 50:14, 50:16, 50:17, 51:2, 52:6, 52:8, 52:9, 52:14, 64:2, 64:6, 64:7, 75:9, 124:10
**shared** [12] - 45:10, 46:3, 46:16, 47:17, 54:10, 67:2, 83:16, 87:17, 87:19, 102:2, 124:12, 124:17
**sharing** [3] - 44:4, 73:19, 113:24
**Shaye** [6] - 3:13, 65:17, 105:7, 105:10, 105:11, 114:10
**short** [1] - 66:6
**shorthand** [1] - 2:13
**show** [17] - 19:9, 25:2, 46:12, 53:1, 62:24, 93:7, 111:13, 126:10, 126:24, 128:5, 128:7, 130:1, 130:3, 130:19, 130:20, 130:21, 131:16
**showed** [1] - 75:15
**showing** [3] - 12:21, 131:13, 131:17
**shown** [3] - 22:5, 79:16, 126:9
**shows** [3] - 26:5, 93:8, 112:8
**SIBLEY** [36] - 2:3, 3:15, 9:14, 9:17,

20:2, 20:7, 20:9, 20:13, 20:19, 22:14, 23:21, 23:23, 24:24, 26:6, 31:13, 31:20, 32:7, 32:15, 32:19, 32:25, 33:2, 33:15, 33:23, 37:8, 61:14, 61:21, 62:4, 71:25, 118:6, 118:15, 128:20, 128:24, 129:4, 138:10, 140:11, 140:22
**Sibley** [29] - 2:3, 3:16, 5:14, 7:9, 8:7, 9:13, 10:24, 15:12, 18:16, 19:6, 19:22, 21:4, 23:20, 24:7, 25:1, 25:2, 26:4, 31:21, 32:4, 32:24, 33:7, 34:1, 34:7, 61:20, 72:6, 138:8, 140:4, 140:17, 140:21
**Sibley's** [1] - 7:2
**sibley@ camarasibley.com** [1] - 2:6
**side** [5] - 83:3, 86:9, 106:10, 119:13, 135:9
**sides** [2] - 20:6, 138:22
**sign** [1] - 76:11
**signatory** [1] - 142:10
**significance** [1] - 64:23
**significant** [5] - 13:9, 88:25, 106:9, 119:14, 137:19
**significantly** [1] - 133:17
**silos** [1] - 47:2
**similar** [4] - 29:14, 81:25, 99:14, 115:17
**simple** [2] - 76:17, 139:24
**simplicity** [1] - 139:21
**simply** [2] - 73:25, 102:10
**single** [4] - 55:20, 85:20, 95:14, 102:21
**site** [2] - 70:25, 89:14
**sitting** [3] - 19:17, 21:23, 38:16
**situation** [2] - 5:10, 7:20
**six** [1] - 33:3
**size** [2] - 64:25, 65:5
**sizeable** [1] - 43:24
**skip** [2] - 119:3, 119:6
**slide** [41] - 24:18,

24:21, 24:25, 25:17, 26:5, 26:23, 54:4, 55:15, 55:22, 57:10, 57:22, 58:17, 58:21, 59:17, 60:14, 61:6, 61:8, 61:11, 63:6, 66:11, 79:14, 80:25, 82:7, 86:13, 90:7, 100:13, 100:17, 104:18, 106:4, 110:16, 110:20, 111:13, 112:7, 114:20, 114:24, 117:22, 124:20, 130:16, 131:11, 136:11, 137:7
**slides** [2] - 62:23, 111:8
**slightly** [1] - 55:14
**slow** [1] - 45:8
**SM** [1] - 64:14
**small** [2] - 88:9, 134:7
**smoothly** [1] - 32:5
**social** [70] - 13:14, 13:24, 27:12, 27:17, 27:25, 28:5, 28:6, 28:9, 28:10, 28:11, 28:12, 28:15, 28:16, 31:6, 40:12, 42:4, 44:7, 45:4, 45:12, 45:13, 45:23, 46:14, 46:17, 47:7, 47:12, 47:17, 48:20, 49:15, 49:20, 53:16, 55:5, 58:1, 62:19, 64:16, 68:2, 68:21, 69:2, 75:16, 76:1, 76:2, 77:5, 78:22, 80:16, 81:2, 81:4, 83:16, 83:18, 97:25, 98:1, 98:16, 100:19, 100:23, 101:13, 102:9, 103:22, 114:9, 114:16, 115:11, 117:12, 117:14, 123:19, 125:21, 126:17, 126:19, 129:24, 131:1, 134:9
**society** [5] - 41:24, 42:1, 42:5, 42:7, 43:1
**sociology** [1] - 31:8
**solely** [1] - 81:1
**someone** [20] - 43:4, 43:5, 43:17, 43:18, 44:10, 45:14, 48:19, 48:21, 48:22, 48:24, 49:14, 49:19, 54:8, 126:3, 126:10,

126:14, 126:25, 134:15, 135:3, 135:19
**sometimes** [3] - 67:9, 85:13, 94:11
**somewhat** [1] - 9:24
**somewhere** [2] - 5:18, 98:7
**sorry** [9] - 21:21, 51:6, 84:3, 116:5, 128:1, 135:15, 139:2, 139:4, 140:17
**sort** [23] - 3:24, 4:3, 4:5, 17:19, 32:4, 35:22, 45:25, 63:18, 65:9, 76:21, 79:15, 85:7, 90:18, 102:25, 106:15, 107:4, 107:18, 109:3, 111:20, 116:13, 129:19, 135:5, 138:18
**sought** [2] - 10:19, 15:4
**sound** [1] - 38:2
**source** [9] - 12:13, 48:13, 49:11, 50:7, 52:8, 90:19, 117:15, 118:5, 122:15
**source's** [2] - 12:12, 12:15
**sources** [7] - 53:13, 64:6, 91:12, 118:25, 122:16, 123:22, 123:24
**speakers** [3] - 46:1, 59:1, 99:10
**special** [2] - 16:5, 16:23
**specific** [2] - 79:7, 95:16
**specifically** [3] - 27:12, 47:9, 138:3
**speculate** [1] - 118:3
**speculating** [1] - 118:8
**speculation** [1] - 118:7
**speed** [1] - 45:22
**spend** [2] - 32:12, 123:3
**sphere** [5] - 41:15, 43:13, 103:16, 115:23, 117:11
**spike** [1] - 105:1
**split** [1] - 132:21
**spokesperson** [1] - 19:16
**Spotify** [3] - 67:11, 75:7, 75:11

**spread** [8] - 13:15, 14:8, 46:5, 65:6, 85:8, 102:19, 102:25, 123:19
**spreading** [2] - 52:12, 87:9
**spreads** [1] - 46:18
**square** [1] - 102:13
**squares** [1] - 87:10
**stalked** [1] - 17:15
**standard** [7] - 4:8, 15:8, 20:13, 25:14, 39:9, 93:3, 133:9
**standards** [1] - 4:6
**standing** [4] - 16:20, 23:1, 42:5, 44:7
**stands** [2] - 133:11, 133:12
**start** [9] - 3:6, 54:1, 54:3, 63:2, 69:13, 70:1, 71:13, 120:20, 127:4
**Start** [1] - 71:12
**starting** [5] - 40:7, 60:10, 60:12, 129:6, 132:12
**starts** [1] - 132:15
**state** [3] - 10:13, 14:23, 64:1
**State** [3] - 86:19, 86:24, 96:14
**statement** [37] - 11:6, 11:23, 13:22, 44:8, 54:8, 54:14, 54:15, 54:16, 54:19, 55:20, 55:21, 56:4, 57:25, 58:6, 59:2, 59:5, 60:24, 60:25, 62:7, 62:18, 63:9, 63:15, 66:21, 69:14, 83:18, 96:5, 99:21, 101:8, 110:21, 110:22, 110:23, 112:24, 113:1, 117:11, 117:25, 118:22, 126:14
**Statements** [1] - 57:11
**statements** [157] - 5:17, 5:18, 6:24, 7:16, 8:9, 11:1, 12:3, 12:4, 12:6, 12:12, 12:15, 12:20, 13:3, 13:12, 13:23, 13:24, 14:2, 14:4, 14:9, 15:21, 16:6, 16:18, 16:19, 17:2, 17:4, 17:10, 17:18, 17:22, 18:5, 18:8, 19:8, 20:21, 20:23, 30:24, 34:23, 34:24, 35:9,

35:10, 35:11, 36:8, 36:13, 36:15, 36:20, 36:21, 36:23, 36:24, 37:3, 37:22, 39:24, 40:4, 40:6, 40:11, 40:14, 40:19, 41:13, 54:8, 55:11, 55:13, 56:20, 56:22, 56:23, 56:25, 57:3, 57:6, 57:12, 57:14, 57:17, 57:20, 57:23, 58:3, 58:12, 58:16, 58:17, 58:22, 58:23, 58:24, 59:4, 59:9, 59:13, 59:22, 59:23, 59:24, 60:1, 60:9, 60:10, 60:12, 60:16, 60:18, 60:19, 60:20, 60:23, 61:3, 61:7, 61:9, 61:23, 61:24, 62:3, 62:4, 62:7, 62:16, 63:3, 63:7, 65:21, 65:22, 66:18, 82:1, 82:3, 82:13, 83:11, 86:12, 86:18, 98:14, 98:22, 99:15, 99:18, 99:20, 100:1, 100:5, 100:6, 100:7, 100:10, 100:24, 101:5, 101:17, 102:2, 106:23, 106:24, 109:23, 112:6, 115:9, 115:15, 116:7, 117:5, 117:6, 118:1, 119:17, 120:4, 120:8, 120:15, 120:20, 120:25, 121:6, 121:22, 123:16, 132:25, 136:6, 136:9, 136:21, 137:11, 137:14, 137:19, 139:17, 140:1

**STATES** [2] - 1:1, 1:9
**States** [3] - 102:14, 102:16, 102:22
**stating** [5] - 4:25, 11:22, 13:4, 13:8, 14:18
**stations** [1] - 93:2
**statistics** [1] - 103:25
**stay** [1] - 90:24
**stayed** [1] - 125:23
**stays** [1] - 116:13
**stenographic** [1] - 142:5
**step** [6] - 40:1, 40:4, 41:19, 114:2, 116:2, 116:3

**stepping** [2] - 80:15, 101:12
**steps** [1] - 72:9
**stick** [3] - 19:2, 19:5, 19:6
**still** [9] - 44:6, 69:16, 69:18, 69:20, 72:13, 97:3, 97:10, 117:5, 123:6
**stipulation** [3] - 20:6, 21:2, 23:14
**stole** [1] - 44:2
**stop** [5] - 5:18, 47:15, 58:6, 59:19, 98:7
**stopped** [3] - 16:9, 16:10, 97:6
**stories** [1] - 88:1
**story** [2] - 12:6, 12:11
**straightforward** [2] - 68:13, 94:5
**strangers** [4] - 7:5, 7:6, 15:25, 18:1
**Strategic** [2] - 63:10, 82:17
**strategic** [27] - 11:2, 13:9, 51:10, 51:25, 52:1, 52:2, 52:4, 52:5, 52:10, 52:16, 53:3, 53:5, 53:10, 53:20, 63:15, 63:17, 63:19, 64:3, 65:10, 65:12, 65:20, 66:2, 121:14, 122:2, 123:25, 124:1, 124:2
**Street** [4] - 1:14, 1:18, 1:22, 2:4
**strengthen** [1] - 116:15
**strong** [2] - 127:13, 128:5
**studied** [3] - 52:10, 103:15, 137:14
**studies** [6] - 46:15, 47:16, 107:24, 126:3, 126:9, 127:3
**study** [3] - 28:6, 42:10, 46:23
**studying** [1] - 28:19
**stuffing** [2] - 65:14, 65:23
**subject** [1] - 50:20
**submitted** [5] - 16:24, 38:19, 95:25, 125:6, 139:22
**subsequent** [1] - 12:4
**substance** [3] - 32:9, 39:6, 96:5
**subtracted** [2] - 71:2, 89:15
**sufficiency** [1] - 14:12

**sufficient** [3] - 34:8, 34:11, 38:1
**sufficiently** [1] - 17:14
**suing** [1] - 29:23
**Suitcase** [1] - 65:13
**suitcases** [2] - 65:14, 65:23
**Suite** [2] - 1:14, 2:4
**summaries** [1] - 30:5
**summarize** [1] - 137:7
**summarizes** [1] - 24:25
**summarizing** [1] - 24:19
**summary** [4] - 98:12, 109:3, 119:11
**summer** [1] - 15:23
**Supp** [3] - 11:12, 15:17, 17:23
**supplement** [2] - 36:3, 36:6
**supplemental** [7] - 30:8, 33:10, 35:3, 35:6, 35:17, 95:24, 96:8
**supplementals** [2] - 33:22, 34:6
**supplements** [1] - 33:16
**support** [2] - 62:8, 91:20
**supporters** [4] - 90:2, 90:5, 90:13, 90:21
**supporting** [1] - 38:2
**suppose** [1] - 36:10
**supposed** [1] - 36:21
**surprise** [1] - 32:3
**surprising** [1] - 46:24
**survey** [3] - 91:16, 91:17, 91:19
**swing** [1] - 64:1
**swing-state** [1] - 64:1
**sworn** [1] - 23:2
**system** [4] - 54:10, 58:7, 59:3, 97:23

**T**

**table** [8] - 3:10, 38:16, 61:12, 107:23, 131:12, 131:16, 131:25
**tables** [2] - 131:12, 131:23
**takeaway** [1] - 106:20
**takeaways** [1] - 109:4
**tallied** [1] - 110:1
**target** [8] - 52:6, 52:19, 53:12, 53:22, 63:25, 64:5, 132:7,

134:3
**targets** [1] - 124:5
**task** [3] - 30:23, 31:6, 39:23
**taught** [3] - 27:24, 51:16, 52:11
**Tavoulareas** [3] - 11:10, 12:1, 12:8
**teach** [2] - 27:24, 27:25
**teaching** [1] - 27:8
**Team** [3] - 7:5, 63:12, 83:2
**team** [4] - 11:3, 64:9, 64:11, 101:3
**telephone** [1] - 106:11
**television** [20] - 13:14, 53:15, 53:17, 54:17, 85:10, 92:18, 92:22, 93:4, 93:7, 93:10, 93:25, 94:3, 97:23, 124:15, 124:17, 124:25, 125:15, 125:21, 133:19
**template** [1] - 140:11
**templates** [1] - 4:7
**ten** [6] - 45:15, 45:16, 66:7, 81:15, 84:12
**tend** [3] - 47:11, 47:13, 53:21
**tens** [1] - 53:25
**tension** [1] - 7:19
**term** [14] - 46:5, 47:4, 93:21, 102:24, 104:14, 104:23, 104:25, 105:7, 107:8, 107:10, 107:13, 107:16, 108:2, 116:3
**terminologies** [1] - 109:5
**terms** [8] - 5:15, 10:17, 15:3, 19:18, 32:16, 42:15, 103:20, 105:13
**territory** [2] - 9:24, 138:17
**testified** [19] - 39:23, 49:9, 51:3, 54:1, 72:6, 82:16, 82:17, 97:10, 99:4, 101:14, 102:4, 119:25, 121:2, 121:24, 122:6, 123:18, 130:6, 130:12, 130:15
**testifies** [2] - 19:7, 19:19
**testify** [4] - 33:16, 37:12, 37:15, 37:21

**testifying** [2] - 60:7, 102:21
**testimony** [15] - 8:7, 10:10, 22:5, 22:8, 22:21, 24:22, 25:15, 26:8, 31:11, 32:11, 37:6, 38:9, 56:8, 77:4, 95:21
**text** [1] - 107:19
**that's..** [1] - 9:21
**THE** [122] - 1:1, 1:8, 3:2, 3:14, 3:17, 4:18, 4:21, 6:9, 7:1, 8:14, 9:8, 9:15, 9:22, 18:18, 18:22, 19:22, 20:5, 20:8, 20:12, 20:16, 20:21, 20:25, 21:3, 21:5, 21:6, 21:8, 21:13, 21:16, 21:20, 22:12, 22:15, 22:22, 22:25, 23:3, 23:4, 23:5, 23:7, 23:8, 23:20, 23:22, 23:25, 24:8, 25:4, 25:7, 25:10, 25:21, 25:23, 26:2, 26:12, 26:20, 31:15, 31:17, 32:2, 32:13, 32:16, 32:20, 33:1, 33:20, 34:1, 34:5, 34:14, 37:11, 47:15, 47:20, 47:21, 47:25, 48:3, 48:4, 48:5, 48:6, 48:9, 48:11, 48:16, 59:19, 59:24, 59:25, 60:4, 60:6, 61:7, 61:10, 61:17, 61:20, 62:2, 62:10, 69:15, 69:17, 72:2, 74:14, 74:17, 81:13, 81:14, 81:15, 81:17, 81:19, 97:2, 97:6, 105:15, 105:18, 117:24, 118:3, 118:8, 118:11, 118:13, 118:18, 118:20, 119:2, 119:5, 128:22, 129:3, 129:6, 129:10, 129:15, 138:7, 138:12, 138:15, 139:2, 139:9, 140:6, 140:8, 140:17, 141:1, 141:4
**themselves** [3] - 13:23, 92:15, 113:14
**therefore** [1] - 76:18
**they've** [1] - 5:5
**thinking** [3] - 10:3, 50:24, 127:15

**third** [13] - 7:5, 7:22, 11:1, 13:16, 14:21, 15:14, 40:4, 70:15, 70:17, 70:19, 71:11, 89:14, 93:9

**third-party** [7] - 7:5, 11:1, 13:16, 70:17, 70:19, 71:11, 89:14

**Thomason** [1] - 11:12

**thousand** [4] - 45:19, 133:21, 133:22, 135:14

**thousands** [2] - 53:24

**threats** [11] - 6:14, 6:16, 6:17, 6:19, 7:7, 7:13, 7:15, 15:14, 17:15, 115:25, 119:18

**three** [27] - 3:18, 33:3, 33:13, 34:16, 46:18, 46:20, 47:19, 62:23, 76:3, 83:25, 85:21, 85:22, 95:21, 104:19, 126:10, 127:3, 127:4, 127:9, 127:11, 130:1, 130:3, 131:20, 135:25, 136:14, 136:25, 137:3

**three-time** [1] - 127:11

**three-times** [3] - 127:9, 135:25, 137:3

**throughout** [5] - 3:25, 29:4, 41:23, 115:18, 133:16

**thumbs** [3] - 111:19, 111:24

**thumbs-down** [1] - 111:24

**thumbs-up** [2] - 111:19, 111:24

**tied** [1] - 113:20

**TikTok** [1] - 98:2

**timing** [1] - 18:24

**today** [8] - 18:24, 19:4, 19:17, 24:22, 38:16, 72:15, 97:5, 127:12

**together** [17] - 52:17, 123:9, 124:7, 138:19, 138:21, 138:24, 139:8, 139:13, 139:14, 139:15, 139:16, 139:19, 139:21, 140:2, 140:15, 140:19

**took** [9] - 73:25, 93:7, 93:9, 93:15, 93:16, 94:5, 94:12, 95:13, 116:23

**tool** [5] - 5:4, 104:12, 105:3, 107:11, 108:8

**Top** [1] - 107:14

**top** [9] - 57:11, 63:10, 63:21, 84:12, 107:18, 107:22, 108:6, 108:14, 108:15

**topic** [2] - 28:13, 119:8

**topics** [2] - 28:7, 28:8

**tort** [1] - 11:20

**total** [26] - 58:18, 58:20, 85:19, 89:5, 90:12, 93:16, 93:24, 93:25, 94:10, 95:11, 95:18, 96:13, 96:15, 96:17, 96:19, 96:21, 98:13, 102:14, 111:20, 120:24, 127:25, 132:2, 132:11, 135:8, 135:12, 136:5

**totals** [1] - 67:13

**toward** [1] - 128:14

**trace** [1] - 59:5

**tracing** [1] - 62:16

**tracked** [2] - 116:22, 116:25

**traditional** [4] - 45:8, 45:23, 47:8, 85:10

**traffic** [6] - 68:16, 70:20, 70:22, 89:13, 104:6, 104:22

**transaction** [1] - 50:11

**transcribed** [1] - 141:8

**Transcript** [1] - 2:13

**TRANSCRIPT** [1] - 1:8

**transcript** [12] - 22:11, 66:13, 86:23, 87:18, 88:16, 88:25, 96:9, 97:21, 142:5, 142:6, 142:9

**transcription** [1] - 2:13

**transcripts** [1] - 89:9

**transparent** [1] - 112:18

**traveled** [1] - 47:19

**travels** [3] - 46:14, 48:2, 48:7

**treason** [3] - 112:20, 112:22, 113:9

**Trend** [1] - 105:16

**trending** [1] - 87:9

**trends** [2] - 103:19, 105:9

**Trends** [8] - 104:11, 104:12, 105:22, 106:8, 106:21,

107:1, 109:3, 109:4

**trial** [6] - 3:25, 10:16, 15:2, 19:16, 20:14, 141:7

**TRIAL** [1] - 1:8

**trickier** [2] - 76:5, 76:6

**tried** [2] - 9:16, 85:15

**true** [11] - 13:2, 20:12, 43:22, 46:15, 46:18, 47:16, 47:19, 48:1, 48:2, 142:4, 142:5

**Trump** [29] - 7:6, 11:3, 29:23, 57:19, 82:25, 83:2, 83:20, 84:11, 84:15, 84:22, 85:20, 86:3, 86:18, 86:24, 87:3, 89:23, 90:1, 90:4, 90:13, 90:21, 91:20, 92:14, 93:20, 100:3, 101:3, 102:5

**Trump's** [5] - 83:21, 84:9, 87:7, 94:1, 94:23

**trust** [3] - 41:25, 42:6, 50:6

**trusted** [9] - 49:20, 90:19, 117:15, 118:4, 118:24, 122:15, 122:16, 123:22, 123:24

**truthful** [1] - 51:9

**try** [6] - 44:19, 49:16, 110:9, 121:13, 123:19, 133:18

**trying** [5] - 4:3, 44:5, 52:15, 59:5, 132:12

**tune** [1] - 118:10

**turn** [2] - 8:22, 31:18

**turning** [2] - 110:20, 128:15

**TV** [8] - 27:15, 62:20, 85:13, 87:23, 92:21, 97:22, 124:23, 133:25

**TWA** [2] - 4:20, 6:21

**tweet** [3] - 54:14, 82:8, 85:2

**Tweeted** [1] - 55:6

**tweets** [23] - 64:8, 64:9, 64:10, 64:11, 82:19, 82:23, 82:25, 83:4, 83:20, 83:25, 84:3, 84:7, 85:12, 99:23, 102:22, 103:2, 103:14, 109:18, 110:11, 114:25, 132:23, 133:4

**Twitter** [29] - 36:18, 54:14, 59:15, 64:22,

68:22, 78:14, 78:16, 78:18, 79:4, 79:7, 79:9, 79:10, 82:14, 83:2, 84:10, 84:12, 86:4, 99:25, 100:2, 101:2, 132:23, 133:3, 133:4, 133:5, 133:10, 133:18, 133:20, 133:21, 133:25

**Twitter-promoted** [2] - 132:23, 133:4

**two** [27] - 18:20, 22:15, 30:8, 32:14, 33:16, 33:21, 34:6, 39:12, 47:4, 56:22, 70:8, 70:12, 70:13, 72:3, 73:7, 73:19, 78:3, 80:24, 81:3, 83:20, 84:3, 84:7, 103:18, 104:8, 108:16, 134:5, 137:24

**TX** [1] - 2:5

**type** [6] - 6:20, 8:11, 9:7, 12:13, 75:1, 91:11

**types** [4] - 52:11, 58:18, 64:4, 127:15

**typical** [5] - 56:11, 77:3, 103:4, 127:2, 127:11

**typically** [15] - 30:17, 49:19, 49:21, 50:13, 51:17, 52:4, 52:5, 52:13, 65:7, 67:1, 69:8, 71:14, 71:18, 80:9, 80:13

**typing** [1] - 107:19

## U

**U.S** [2] - 16:11, 17:22

**ultimate** [2] - 128:15, 135:8

**um-hum** [1] - 47:20, 128:12

**uncharted** [1] - 9:24

**under** [12] - 8:12, 25:13, 31:11, 37:6, 107:14, 109:16, 109:18, 109:19, 128:20, 128:21, 135:4, 141:8

**undercount** [1] - 75:25

**undergraduate** [1] - 27:21

**underneath** [3] - 112:5, 129:13

**undisclosed** [1] - 26:8

**unforeseeable** [1] - 12:24

**unique** [1] - 56:4

**United** [3] - 102:14, 102:16, 102:22

**UNITED** [2] - 1:1, 1:9

**University** [1] - 27:20

**unless** [1] - 138:8

**Unless** [1] - 25:2

**unlike** [1] - 47:7

**unnaturally** [1] - 14:9

**unquestionably** [1] - 11:16

**unsavory** [1] - 16:16

**up** [42] - 18:14, 21:18, 21:21, 26:24, 40:13, 45:20, 53:17, 54:4, 55:3, 55:7, 55:22, 57:10, 59:17, 60:14, 61:6, 63:5, 69:17, 70:23, 72:13, 79:14, 80:17, 80:21, 83:25, 90:7, 95:17, 97:4, 97:11, 99:1, 100:17, 100:20, 101:19, 110:1, 110:21, 111:19, 111:24, 112:21, 116:21, 119:20, 125:19, 125:22, 131:11, 132:21

**up-to-date** [1] - 21:18

**updated** [3] - 33:12, 36:9

**useful** [2] - 122:23, 123:6

**user** [2] - 77:4, 107:17

**users** [3] - 48:20, 77:5, 99:25

**uses** [2] - 102:24, 108:8

## V

**vacuum** [1] - 18:14

**value** [3] - 42:3, 42:4, 42:7

**values** [1] - 127:22

**variables** [1] - 130:4

**variants** [1] - 114:11

**varied** [1] - 68:6

**varies** [1] - 68:12

**variety** [3] - 13:13, 26:14, 114:18

**various** [4] - 58:17, 62:17, 70:5, 88:3

**vary** [2] - 53:22, 77:16

**vast** [1] - 33:5

**verdict** [4] - 138:17,

139:22, 140:4,
140:18
**versus** [8] - 3:3, 35:18,
46:16, 47:17,
127:18, 136:1,
136:13, 136:14
**via** [2] - 22:5, 82:22
**Video** [1] - 65:14
**video** [48] - 18:25,
22:16, 46:10, 54:13,
55:4, 55:24, 62:19,
65:16, 66:11, 66:15,
67:3, 67:9, 67:10,
68:1, 69:16, 69:21,
73:15, 73:19, 73:20,
73:21, 74:4, 74:14,
80:16, 82:8, 82:12,
83:6, 83:10, 83:24,
86:5, 87:17, 89:9,
94:4, 94:5, 94:6,
94:11, 94:17, 94:19,
94:22, 95:6, 95:8,
95:10, 97:10, 112:5,
113:3, 113:11,
113:13
**video-sharing** [1] -
73:19
**videos** [6] - 68:13,
94:8, 94:10, 94:15,
109:19, 110:10
**videotape** [1] - 22:18
**view** [7] - 69:21, 74:1,
74:16, 78:3, 79:23,
139:23, 140:4
**viewed** [1] - 102:22
**viewers** [1] - 13:18
**views** [15] - 55:5, 56:1,
56:2, 56:13, 68:14,
73:25, 74:4, 74:24,
78:15, 94:6, 94:19,
94:24, 95:11, 97:13,
111:17
**vile** [1] - 7:6
**violated** [2] - 19:17,
21:1
**violations** [1] - 10:7
**violence** [2] - 113:4,
119:18
**violent** [1] - 15:13
**viral** [6] - 46:9, 46:11,
103:1, 103:3, 103:5
**virtually** [2] - 104:6,
104:22
**visible** [1] - 43:3
**visited** [1] - 68:16
**visitors** [2] - 71:14,
89:13
**visits** [1] - 70:25
**voice** [1] - 51:6
**void** [1] - 142:8

**voir** [4] - 31:13, 32:12,
118:15, 118:16
**volume** [1] - 104:2
**VON** [1] - 1:17
**Von** [1] - 3:11
**vote** [1] - 63:24
**voting** [1] - 17:11
**vs** [1] - 1:4

## W

**walk** [6] - 54:5, 71:13,
76:5, 101:11,
112:16, 131:10
**walked** [2] - 80:15,
117:22
**walking** [1] - 63:2
**Wandrea** [1] - 114:10
**wants** [1] - 50:13
**warrants** [1] - 18:2
**Washington** [6] - 1:6,
1:14, 2:11, 12:3,
90:1, 90:11
**watch** [2] - 13:15,
72:15
**watching** [3] - 85:13,
93:6, 93:13
**Water** [1] - 65:17
**water** [1] - 51:13
**Watts** [1] - 11:21
**Wayback** [1] - 74:22
**ways** [5] - 42:23,
43:15, 57:21, 93:4,
115:25
**web** [13] - 62:20,
67:25, 68:15, 68:16,
69:14, 70:1, 70:20,
70:22, 89:13, 92:16,
135:6, 135:10
**website** [14] - 13:24,
68:17, 70:9, 70:15,
71:7, 71:14, 72:25,
73:1, 73:3, 73:4,
73:5, 73:11, 73:12
**websites** [16] - 58:1,
70:5, 70:8, 70:12,
70:13, 70:17, 74:18,
80:16, 87:18, 87:22,
88:19, 89:5, 89:6,
89:10, 90:9, 92:15
**week** [2] - 33:17,
72:22
**weeks** [1] - 12:14
**weight** [7] - 31:24,
32:9, 35:25, 38:6,
132:15, 132:24,
135:7
**welcome** [1] - 18:15
**well-known** [1] - 44:12
**well-pleaded** [1] -

14:18
**well-settled** [2] - 11:5,
11:19
**west** [1] - 27:6
**Westlaw** [1] - 16:13
**whatnot** [1] - 45:11
**whole** [2] - 7:7, 26:14
**wholly** [1] - 11:19
**wide** [2] - 53:18, 64:18
**widely** [15] - 13:10,
16:18, 40:11, 46:3,
53:22, 58:9, 77:16,
87:17, 87:19, 102:2,
102:8, 102:10,
106:13, 119:16,
133:16
**willing** [1] - 49:2
**Willkie** [2] - 1:13, 3:9
**wine** [1] - 28:8
**withdraw** [1] - 106:14
**witness** [12] - 22:1,
22:22, 23:2, 25:10,
29:10, 31:14, 33:8,
37:15, 60:3, 72:1,
118:16, 139:1
**WITNESS** [18] - 23:4,
23:7, 47:20, 47:25,
48:4, 48:6, 48:11,
59:24, 61:10, 69:17,
74:17, 81:14, 97:6,
105:18, 118:3,
118:11, 118:20,
141:10
**witnesses** [1] - 37:16
**wondering** [1] - 34:5
**word** [3] - 27:14, 46:9,
98:4
**words** [7] - 6:2, 6:22,
7:2, 35:20, 41:1,
102:9, 124:22
**workplace** [1] - 19:14
**world** [3] - 29:4, 29:9,
58:12
**wound** [1] - 125:18
**writer** [1] - 29:22
**writing** [1] - 39:3
**written** [3] - 30:5,
42:2, 61:2
**wrote** [1] - 28:10

## Y

**year** [1] - 72:22
**years** [2] - 27:9,
116:10
**yesterday** [3] - 3:20,
20:24, 21:9
**York** [7] - 89:17,
89:22, 89:25, 90:4,
90:24, 90:25, 91:7

**you-all** [1] - 141:1
**yourself** [2] - 24:13,
126:7
**yourselves** [1] - 3:6
**YouTube** [24] - 55:25,
59:16, 64:21, 65:4,
73:20, 73:21, 73:24,
74:3, 74:9, 74:11,
74:15, 74:24, 85:10,
85:11, 94:7, 94:11,
94:18, 94:24, 95:10,
97:11, 109:19,
111:3, 111:5, 113:11

## Z

**zero** [1] - 104:17