```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
RUBY FREEMAN, et al.,              )  Civil Action
              Plaintiffs,         )  No. 21-3354
vs.                               )
                                  )
RUDOLPH GIULIANI,                 )  December 14, 2023
                                  )  8:59 a.m.
              Defendant.          )  Washington, D.C.
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                       TRANSCRIPT OF TRIAL
              BEFORE THE HONORABLE BERYL A. HOWELL,
               UNITED STATES DISTRICT COURT JUDGE
```

**APPEARANCES**:


FOR PLAINTIFFS:     MICHAEL J. GOTTLIEB
                    MERYL CONANT GOVERNSKI
                    ANNIE HOUGHTON-LARSEN
                    Willkie Farr & Gallagher LLP
                    1875 K Street, Suite 100
                    Washington, DC 20006
                    (202) 303-1016
                    Email: mgottlieb@willkie.com
                    Email: mgovernski@willkie.com


                    VON A. DuBOSE
                    DuBose Miller
                    75 14th Street NE
                    Atlanta, GA 30309
                    (404) 720-8111
                    Email:  miller@dubosemiller.com


                    JOHN LANGFORD
                    Protect Democracy
                    555 W. 5th Street
                    Los Angeles, CA 90013
                    (919) 619-9819
                    Email: john.langford@protectdemocracy.org


                    *(Appearances Continued)*

<u>APPEARANCES</u>:   (Continued)


FOR DEFENDANT:   JOSEPH D. SIBLEY, IV
                 Camara & Sibley LLP
                 1108 Lavaca Street
                 Suite 110263
                 Austin, TX 78701
                 (713) 966-6789
                 Email: sibley@camarasibley.com




Court Reporter:  ELIZABETH-SAINT-LOTH, RPR, FCRR
                 Official Court Reporter
                 Washington, D.C.  20001


        Proceedings reported by machine shorthand.
      Transcript produced by computer-aided transcription.

1                        **P R O C E E D I N G**

2                 THE COURTROOM DEPUTY:  Your Honor, this is Civil

3       Action 21-3354, Ruby Freeman, et al., versus Rudy Giuliani.

4                 Would parties please come forward to the lectern

5       and identify yourselves for the record.  We'll start at

6       plaintiffs' counsel for us this morning.

7                 MR. GOTTLIEB:  Good morning, Your Honor.

8                 THE COURT:  Yes.

9                 MR. GOTTLIEB:  Mike Gottlieb from Willkie, Farr &

10      Gallagher, on behalf of the plaintiffs.  With me at

11      counsel's table at this moment are Von DuBose from DuBose

12      Miller, John Langford from Protect Democracy, and

13      Ms. Freeman and Ms. Moss.

14                THE COURT:  Good morning.

15                MR. SIBLEY:  Good morning, Your Honor.

16      Joe Sibley on behalf of the defendant.

17                THE COURT:  Yes.  Good morning.

18                All right.  So I did receive your email last

19      night, Mr. Sibley, that the parties have reached an

20      agreement on some final exhibits to introduce when the jury

21      comes in, and also that Mr. Giuliani has decided not to

22      testify this morning; is that correct?  Or did something

23      change between 6:00 p.m. last night and today?

24                MR. SIBLEY:  Her Honor is correct, we have reached

25      agreement on that.  So I think the last thing to do is, you

1    know, basically directed verdict, any directed verdicts,

2    final exhibits and --

3              THE COURT:  Okay.  Well, why don't we do the

4    charging conference first, and then we'll move towards your

5    Rule 50 motion.

6              MR. SIBLEY:  Okay.

7              THE COURT:  Okay.  So let's just start with the

8    verdict form fairly quickly.

9              I think you-all have seen the verdict form.

10             I just made some little changes this morning.  My

11   law clerk will pass out the new changes.  The only change is

12   just to put date and time for the verdict as opposed to

13   2023, and removing the page number.

14             Okay.  Did the plaintiffs have any comments about

15   the verdict form?

16             MR. LANGFORD:  No, Your Honor.  We're happy with

17   it.

18             THE COURT:  Mr. Sibley?

19             MR. SIBLEY:  Yes, Your Honor.

20             The only issue we have with it is we believe that

21   the defamation claim should be separated out by plaintiff,

22   just like the IIED claim, because I think each human being

23   has their own distinct reputation, and since this is

24   reputational injury, it should be separated out.

25             THE COURT:  Is there a legal requirement for that

1    of any kind?

2              MR. SIBLEY:  Well, I think that I would say yes.

3              I think a person cannot sue for someone else's

4    reputational repair.  It's kind of a standing issue, right?

5    You can only recover for your own injuries and not someone

6    else's.  Perhaps if you're a partnership and you are a legal

7    entity where you have a unique, you know, business

8    reputation or something you can sue for a single enterprise.

9              I am not aware of any -- I am not aware of any

10   authority that would allow one person to recover for

11   injuries to another person's reputation.  I think -- I am

12   just trying to avoid any issues that we may have down the

13   road on this.  So...

14             THE COURT:  Plaintiffs want to respond?

15             MR. LANGFORD:  Yes, Your Honor.

16             So I think, as we previously explained, our goal

17   was to make the verdict form as simple as possible, which is

18   why we proposed the initial form which was just three lines,

19   which defendant's counsel, Mr. Sibley, agreed to.

20             We would like to keep it the way that Your Honor

21   has proposed, understanding your concerns about the

22   intentional infliction of emotional distress, in part

23   because we structured our case around presenting the

24   evidence towards the verdict form that the parties agreed

25   on.  And had we thought that there was going to be two lines

1      for compensatory damages for reputational harm, we probably

2      and certainly would have made more efforts to sort of lay

3      that out for the jury in the testimony by all of our

4      witnesses.  And we did not do that given that we thought we

5      had an agreement on the verdict form that was proposed.

6              And last, as we mentioned, we are aware of no case

7      law that would require us to split the lines on the verdict

8      form.

9              MR. SIBLEY:  Your Honor, after this issue was

10     identified and before Ms. Humphreys left the stand, I did

11     offer to ameliorate any potential issue by simply agreeing

12     that she could say on redirect that if you wanted to

13     allocate the amount of damages she -- in her opinion, you

14     could just divide it in half, and one plaintiff gets one

15     half, and one plaintiff gets the other.  That way we

16     wouldn't have this problem.  And for whatever reason they

17     are insistent on having this as a single reputational

18     injury.

19              I'm not sure -- I mean, if this was a no-answer

20     default situation, they would have to present their evidence

21     in a way that is in accordance with the law.  I just don't

22     understand why -- I am not really sure what the reason is

23     why they would want one question on two people's

24     reputations, but...

25              THE COURT:  All right.  So I am going to allow the

1    compensatory damages for defamation to be sought by both

2    plaintiffs together with one amount dictated.

3          This whole verdict form, you know, was something

4    that -- I opened up this can of worms after different

5    expenses on the IIED compensatory damages represented by one

6    plaintiff versus the other and thought, for the jury's

7    consideration of the evidence that was presented differently

8    for each plaintiff, that that made sense.

9          So it is a little bit late in the game after

10   evidence has already been prepared to be presented in a

11   certain way and presented, for the defendant to raise a

12   belated objection to this.  But that's par for the course.

13         I am going to keep the questions as they are.  I

14   just noticed that the counting of the questions on the

15   verdict form needs to be corrected so that there are four

16   separate questions for the jury to respond to.

17         MR. LANGFORD:  Yes, Your Honor.  And I just want

18   to clarify one point.

19         We understood the concern about intentional

20   infliction of emotional distress to be not related to the

21   pecuniary actual damages so much as that Ms. Freeman and

22   Ms. Moss had their own sort of emotional and mental distress

23   as a result of everything that happened to them.

24         We were intending to present the actual financial

25   damages that both of our clients suffered as part of the

 1   reputational harm.  And so if that changes, Your Honor, then
 2   we would --
 3             THE COURT:  Well, then, you know, that makes it
 4   easy for me to deal with the objection, so that -- instead
 5   of having four questions, we'll have five.  We'll just
 6   separate out under the defamation claim the amount of
 7   compensatory damages, if any, would fairly and reasonably
 8   compensate Ms. Freeman, and then we'll do a separate one for
 9   Ms. Moss.  And then that will actually make sense for the
10   reputational harm.
11             Mr. Sibley can prevail.  I mean, I was looking
12   mostly at the expert testimony.
13             MR. LANGFORD:  We understand, Your Honor.  I --
14             THE COURT:  So we'll make that change in the
15   verdict form.
16             Okay.  Now let's turn to the circulation draft of
17   the final jury instructions.
18             All right.  Starting at page 1, any objections
19   from plaintiffs to page 1?
20             MR. LANGFORD:  No, Your Honor.
21             THE COURT:  You can stay at the desk.  Use your
22   microphone, please.
23             MR. LANGFORD:  No, Your Honor.
24             THE COURT:  Mr. Sibley?
25             MR. SIBLEY:  No, Your Honor.

```
1                 THE COURT:  Page 2, plaintiffs?

2                 MR. LANGFORD:  No, Your Honor.

3                 THE COURT:  Mr. Sibley?

4                 MR. SIBLEY:  No, Your Honor.

5                 THE COURT:  On page 3, you see I have highlighted

6      "some evidence is admitted for a limited purpose only."  I

7      don't think any such thing occurred here, so I would suggest

8      we take out that line that the parties had proposed.

9                 Plaintiffs?

10                MR. LANGFORD:  Yeah.  No problems with that, Your

11     Honor.

12                THE COURT:  No objection with removing that

13     highlighted line?  And any other objections on page 3?

14                MR. LANGFORD:  That's correct, Your Honor.

15                THE COURT:  Mr. Sibley?

16                MR. SIBLEY:  That's correct, Your Honor.

17                THE COURT:  And no objection to removing that

18     line, Mr. Sibley?

19                MR. SIBLEY:  That's correct, Your Honor.

20                THE COURT:  Any objections to page 4 from

21     plaintiffs?

22                MR. LANGFORD:  No, Your Honor.

23                THE COURT:  Mr. Sibley?

24                MR. SIBLEY:  No, Your Honor.

25                THE COURT:  Page 5, under "Depositions of
```

1    Evidence," I am going to change the line that says:  "During

2    the trial you heard deposition testimony that was read from

3    a deposition transcript," to say:  You heard deposition

4    testimony that was shown by video.

5              Okay.  Any objection to that from plaintiffs?

6              MR. LANGFORD:  No objection, Your Honor.

7              THE COURT:  Mr. Sibley?

8              MR. SIBLEY:  No objection, Your Honor.

9              THE COURT:  And then you will see the section:

10   "Impeachment by prior inconsistent statement."  I have

11   highlighted that to remove the whole thing because I don't

12   think any of that occurred here, so I don't know the reason

13   that we have to present the jury with instructions on that.

14             So, Mr. Langford, for plaintiffs?

15             MR. LANGFORD:  We were trying to think about that.

16   We did ask Ms. Bobb about her J6 testimony, but I think it

17   is okay to remove that in these instructions.

18             THE COURT:  All right.  Mr. Sibley?

19             MR. SIBLEY:  I have no problem with that, Your

20   Honor.

21             THE COURT:  All right.  Any other comments on

22   page 5?

23             MR. LANGFORD:  No, Your Honor.

24             THE COURT:  Mr. Sibley?

25             MR. SIBLEY:  No, Your Honor.

 1          THE COURT:  Page 6?  Of course, the rest of the
 2     "inconsistent statement" is coming out.
 3          Any objections, modifications to page 6 from
 4     plaintiffs?
 5          MR. LANGFORD:  No, Your Honor.
 6          THE COURT:  From the defense?
 7          MR. SIBLEY:  No, Your Honor.
 8          THE COURT:  Page 7, plaintiffs?
 9          MR. LANGFORD:  We have a couple --
10          THE COURT:  Any objection to anything on page 7?
11          MR. LANGFORD:  Yes, Your Honor.
12          So in the third paragraph there is one small
13     thing, which is the final sentence of that paragraph, the
14     "claims established" paragraph has an extra "also."
15          THE COURT:  Let's see.  Oh, thank you.
16          MR. LANGFORD:  And then separately, in
17     paragraph 7, which is the second paragraph under Claim 1 for
18     defamation, it says:  "Those defamatory statements are what
19     you will hear referred to as the actionable statements."
20          We think the clearest way to change the jury
21     instructions would be to say:  "The 16 defamatory
22     statements" throughout.
23          But that would require us to change a lot of the
24     jury instructions because the "actionable statements" phrase
25     is used throughout the jury instructions.  And so unless --

1   if we replace all -- an option -- we think what might make

2   sense to say instead -- we'd just add a sentence to that

3   paragraph that says -- so the paragraph reads:  "Those

4   defamatory statements are what you will hear referred to as

5   the actionable statements.  These are the 16 defamatory

6   statements made after December 23, 2020, by Mr. Giuliani and

7   his co-conspirators."

8              THE COURT:  Any objection to that, Mr. Sibley?

9              Do you want Mr. Langford to repeat that?

10             MR. SIBLEY:  I think so, Your Honor.

11             THE COURT:  All right.  Could you repeat what you

12   want to add after "actionable statements"?

13             MR. LANGFORD:  So the additional --

14             THE COURT:  "These are the 16 defamatory

15   statements made" --

16             MR. LANGFORD:  -- "after December 23, 2020, by

17   Mr. Giuliani and his co-conspirators."

18             MR. SIBLEY:  I don't object to that instruction,

19   Your Honor, provided the Court's prior rulings, which -- I

20   don't think I need to renew my objection.  I don't believe

21   the claim should be expanded that far; but to the extent the

22   Court has ruled that way, I believe that's a proper

23   instruction.

24             THE COURT:  All right.  I will add that

25   instruction.

```
1                 All right.  Any other changes, Mr. Sibley, to

2       page 7?

3                 MR. SIBLEY:  No, Your Honor.

4                 THE COURT:  Page 8, plaintiffs?

5                 MR. LANGFORD:  Yes, Your Honor.

6                 So in the paragraph under Claim 3 for civil

7       conspiracy, it currently reads:  "The Court has already

8       found that Mr. Giuliani engaged" -- I could just read -- it

9       defines the conspiracy as including:  Donald J. Trump; the

10      Trump 2020 presidential campaign's legal team, headed by Mr.

11      Giuliani; the One America News Network, OAN; OAN reporters;

12      and others.

13                And we would propose changing that to match Your

14      Honor's ruling at Docket No. 119.  And we have run this by

15      defendant's counsel, who has made clear he will preserve his

16      objection to your ruling but not to this language.

17                So the paragraph would now read in full:  "The

18      Court has already found that Mr. Giuliani engaged in a civil

19      conspiracy to commit the torts of defamation and intentional

20      infliction of emotional distress on or before December 3,

21      2020," comma, "with Donald J. Trump," comma, "members of the

22      Trump 2020 presidential campaign," comma, "including members

23      of the Trump legal team headed by Mr. Giuliani," comma, "who

24      caused statements to be published about plaintiffs or

25      participated in such publication," comma, "One America News
```

```
 1    network, OAN," comma, "OAN's owners," comma, "and certain
 2    OAN reporters."
 3              THE COURT:  Yes.  I did try and shorten that up --
 4              MR. LANGFORD:  Yes.
 5              THE COURT:  -- for the statement of the case.
 6              MR. LANGFORD:  Yes.
 7              THE COURT:  All right.  Just a second.
 8              (Whereupon, the Court and staff confer.)
 9              MR. LANGFORD:  And to be clear, we shortened -- we
10    shortened or left one of your shortenings, which is:  We did
11    not reference a specific reporter or the names of the OAN
12    owners, but otherwise --
13              THE COURT:  All right.  Mr. Sibley?
14              MR. SIBLEY:  Your Honor, without waiving our prior
15    objections to the scope of the conspiracy, assuming -- with
16    Her Honor's orders on that, I agree that's an appropriate
17    instruction.
18              THE COURT:  Okay.  Good.  Thank you.
19              Anything else on page 8?
20              MR. LANGFORD:  No, Your Honor.
21              THE COURT:  Mr. Sibley, anything else on page 8?
22              MR. SIBLEY:  No, Your Honor.
23              THE COURT:  Okay.  Page 9.
24              MR. LANGFORD:  No objections from plaintiffs, Your
25    Honor.
```

```
1                   THE COURT:  And, Mr. Sibley?

2                   MR. SIBLEY:  Your Honor, there is one thing I have

3       caught in reviewing this.  In compensatory damages for

4       defamation on page 9, in the second sentence, I suppose, it

5       says:  "Your job is to quantify that harm."

6                   THE COURT:  Um-hum.

7                   MR. SIBLEY:  I believe it should read:  Your job

8       is to quantify the harm caused by the defendant and his

9       co-conspirators committed in furtherance of the conspiracy.

10                  THE COURT:  Plaintiffs, any objection to that?

11                  MR. LANGFORD:  The only objection relates to our

12      ongoing objections about proximate cause and not seeking to

13      reintroduce that issue as the jury believes it needs to

14      establish proximate cause.  So I think we would object on

15      those grounds.  It's just ambiguous if you say -- it

16      suggests that that is an open issue for the jury to again

17      reconsider.

18                      And if I may add one -- I misspoke, Your Honor.

19                      We did have one thing to flag; although,

20      ultimately are comfortable with the Court's instructions.

21                      So the next paragraph reads:  "Compensatory

22      damages for defamation should reflect the amount of money

23      that you decide will fairly and reasonably compensate each

24      plaintiff for the reasonably foreseeable harm resulting from

25      the publication and republication of the actionable
```

1     statements made by Mr. Giuliani and his co-conspirators."

2            And the only thing we would like to note for the

3     record is that we continue to believe that although this is

4     a murky situation and the law is not particularly clear, we

5     believe that the standard is that -- what is required is

6     that we demonstrate that the injuries naturally -- that the

7     damages naturally flow from the injuries alleged in the

8     complaint pursuant to *Greyhound*.  but I understand --

9            THE COURT:  And the case law sometimes uses

10    "naturally flow"; sometimes it uses "reasonably

11    foreseeable."  What's the difference?

12           MR. LANGFORD:  I was asking myself on the way over

13    here.  I am not sure there is much of a difference.

14           I guess one is putting yourself in as the

15    objective observer, whereas the other is asking --

16           THE COURT:  Truthfully, it's a debate I am having

17    with my law clerk --

18           MR. LANGFORD:  Okay.

19           THE COURT:  -- about should we use "naturally

20    flow" or "reasonably foreseeable"?

21           I personally have no idea what the difference is

22    between the two of those things.

23           MR. LANGFORD:  And so that's why we're also

24    comfortable with Your Honor's instruction.

25           I would just note we believe there is a world in

1  which "reasonably foreseeable" is slightly higher than

2  injuries that "naturally flow" from -- in that injuries that

3  naturally flow from does not ask someone to anticipate what

4  an objective person would believe would flow from the

5  injuries.

6           THE COURT:  Yes.  What I have taken from the case

7  law with judges sometimes opting to use one and sometimes

8  opting to use the other is that they pretty much duck the

9  issue.

10          MR. LANGFORD:  Agreed.

11          THE COURT:  With no explanation of what

12 differences and why they have opted for one versus the

13 other.

14          So, Mr. Sibley, do you have a view on this?  Would

15 you prefer "naturally flow"?

16          MR. SIBLEY:  I would prefer "naturally flow."  I

17 think that's -- sounds like a *Hadley versus Baxendale*

18 question about reasonable --

19          THE COURT:  A what?

20          MR. SIBLEY:  Sounds like *Hadley versus Baxendale*,

21 the contract case where you can only be accountable for

22 certain damages if you knew, for example, that -- if you

23 didn't form the contract.  So...

24          THE COURT:  Sounds like "reasonably foreseeable"

25 to me.

```
1              MR. SIBLEY:  That seems like a higher standard
2       than --
3              THE COURT:  You think "naturally flow" sounds like
4       a higher standard --
5              MR. SIBLEY:  No.
6              THE COURT:  -- than "reasonably foreseeable."
7              MR. SIBLEY:  No, no.  I think "reasonably
8       foreseeable" sounds higher than "naturally flows."  Because
9       "naturally flows" is something, I think, anyone can look
10      at and see.
11             THE COURT:  But you would agree to change, in the
12      "compensatory damages":  "Should reflect the amount of money
13      that you decide will fairly and reasonably compensate each
14      plaintiff for the harm that reasonably flows from the
15      publication"?
16             You'd prefer to have what the plaintiffs want also?
17             Rather than using "reasonably foreseeable" you
18      would rather have the "naturally flows" language?
19             MR. SIBLEY:  Yes, I would, actually.
20             THE COURT:  Okay.  So how would you suggest that
21      read, Mr. Langford?
22             MR. LANGFORD:  Compensatory damages for defamation
23      should reflect the amount of money that you decide will
24      fairly and reasonably compensate each plaintiff for the
25      damages that naturally flow from the publication of the
```

```
 1    actionable statements made by Mr. Giuliani --
 2              THE COURT:  Okay.  From the damages that naturally
 3    flow from --
 4              MR. LANGFORD:  -- the publication of the
 5    actionable statements --
 6              THE COURT:  You want to leave out "republication"?
 7              MR. LANGFORD:  I was going to add it at the end.
 8              -- made by Mr. Giuliani and his co-conspirators,
 9    and the harm caused by reasonably foreseeable republications
10    of the actionable statements.
11              THE COURT:  So we're going to have the jury
12    struggle with what's the difference between "naturally flow"
13    and what's "reasonably foreseeable" all in one sentence?
14              MR. LANGFORD:  I guess the issue is that --
15              THE COURT:  And if they come back with a note
16    saying:  What's the difference?
17              How are you going to suggest that's responded to?
18              MR. LANGFORD:  We can say that -- this is the way
19    to shorten it, I think.  We can say:  The damages that
20    naturally flow from the publication and republications of
21    the actionable statements made by Mr. Giuliani and his
22    co-conspirators.
23              And we could leave it at that as you, I believe,
24    are suggesting.
25              MR. SIBLEY:  I think it all has to be -- it has to
```

1    be all "naturally flows."  It can't be the hyper, naturally

2    flows and reasonably foreseeable.  So...

3              THE COURT:  Okay.  Did you get that?

4              THE LAW CLERK:  Would you repeat that one more

5    time?

6              MR. LANGFORD:  So I believe now we have said:

7    Compensatory damages for defamation should reflect the

8    amount of money that you decide will fairly and reasonably

9    compensate each plaintiff for the damages that naturally

10   flow from the publication and republication of the

11   actionable statements made by Mr. Giuliani and his

12   co-conspirators.

13             THE COURT:  All right.  We'll go with that.

14             I am not going to change the line "your job is to

15   quantify that harm."  I have just tried to stay away from

16   the causation issue and go with the compensatory damages for

17   defamation and IIED.  I have used the same language in both.

18             Okay.  So any other objections to page 9 from the

19   plaintiffs, or comments on page 9?

20             MR. LANGFORD:  No, Your Honor.

21             THE COURT:  And, Mr. Sibley?

22             MR. SIBLEY:  No, Your Honor.

23             THE COURT:  Page 10, plaintiffs?

24             MR. LANGFORD:  Yes, Your Honor.

25             We have one small proposed change to the fourth

1    paragraph, and it is the penultimate sentence in that

2    paragraph.

3                THE COURT:  I am not surprised.

4                MR. LANGFORD:  Which reads -- and we have run this

5    by defendant's counsel, who does not object to this change.

6                THE COURT:  Okay.

7                MR. LANGFORD:  So we would propose to strike the:

8    "If you decide that there was no injury."  And replace it

9    with:  If you decide the injury was nominal.

10               THE COURT:  All right.  Mr. Sibley, you agree with

11   that?

12               MR. SIBLEY:  Yes, Your Honor.

13               THE COURT:  Okay.  I like that change.

14               Any other changes to page 10?

15               MR. LANGFORD:  No, Your Honor.

16               THE COURT:  And, Mr. Sibley?

17               MR. SIBLEY:  No, Your Honor.

18               THE COURT:  Okay.  Now we're at page 11.

19               This is a little bit different from what I gave in

20   my preliminary instructions.  And let me just share my

21   thinking before you all react, unless you-all have no

22   objection to page 11.

23               MR. LANGFORD:  We only have two small objections,

24   I believe, so it may not --

25               THE COURT:  Okay.  Well, maybe I should just --

```
 1                    MR. LANGFORD:  Okay.

 2                    THE COURT:  -- keep my -- say nothing and let you

 3         all -- but I wanted to highlight this is a little bit

 4         different from my preliminary instructions.  And it's a

 5         little bit different from the parties' joint proposed

 6         instructions in 117 or 118, the last flurry of jury

 7         instructions that the parties filed.

 8                    I will hear your objections first, Mr. Langford.

 9                    MR. LANGFORD:  In the first full paragraph in the

10         first sentence, at the very end of the sentence it says:

11         "You are entitled to consider any such evidence if it is

12         presented."  And we would just change that to:  That was

13         presented.

14                    We have run both of these by defendant's counsel.

15                    The other is in the third paragraph.  We would

16         change --

17                    THE COURT:  Starting with?

18                    MR. LANGFORD:  "After you have determined the

19         amount that will adequately compensate," we suggested

20         changing this to:  The plaintiffs for the harm caused by

21         actionable statements.  I actually think with Your Honor's

22         change it made more sense this way now.

23                    THE COURT:  And it's the same first line in the --

24         I like this line, you should enter -- so I think it should

25         read:  After you have determined the amount that will
```

1     adequately compensate each plaintiff for the harm caused by

2     the actionable statements, you should enter that amount for

3     each plaintiff --

4               MR. LANGFORD:  Right.

5               THE COURT:  -- on the verdict form.

6               All right.  Any other changes to page 11?

7               MR. LANGFORD:  No, Your Honor.

8               THE COURT:  And, Mr. Sibley?

9               MR. SIBLEY:  No, Your Honor.

10              THE COURT:  Okay.  And I just want to make sure

11    you-all understand that I have left out the line that

12    you-all had suggested, which I incorporated into the

13    preliminary instructions, that:  "If you conclude that

14    plaintiffs have shown" -- I think in your -- in 117, the

15    parties both proposed:  "Once you conclude that it is more

16    likely than not" -- which is basically the preponderance

17    standard -- "that plaintiffs suffered damages in the form of

18    emotional distress, the plaintiffs' burden is only to

19    provide a reasonable basis from which you can estimate their

20    damages."

21              Which, based on that, I put -- in the preliminary

22    instructions I changed that to requiring them to establish

23    by a preponderance, that there was some emotional damage

24    proven before they could get to the amount.

25              But on reading it, it made very little sense in

1    the context of everything else.

2           But I did want to highlight for the parties that I

3    have changed that.  And it is different from what the

4    parties jointly proposed in 117 and 118.

5           All right.  So still no further objection on

6    page 11 from the plaintiffs?

7           MR. LANGFORD:  No further objection.

8           I think on page 12 we have a couple of -- or one

9    suggested change that goes to the same issue.

10          THE COURT:  Okay.  Mr. Sibley, may I turn to

11   page 12?

12          MR. SIBLEY:  I'm sorry, Your Honor?

13          THE COURT:  Any further objections on page 11, or

14   are you ready to move to page 12?

15          MR. SIBLEY:  We can move to page 12, Your Honor.

16          THE COURT:  Okay.  Page 12.

17          And plaintiffs?

18          MR. LANGFORD:  In the fourth paragraph -- this is

19   a small change.  But the last clause of the sentence should

20   be updated so that it's not the second line of the verdict

21   form.  It should now be either emotional -- intentional

22   infliction of emotional distress claim section or --

23          THE COURT:  It should just say:  You should enter

24   that amount on the verdict form, period.

25          MR. LANGFORD:  Sure.

```
 1              THE COURT:  I will just take out on the second

 2      line.  Okay.

 3              MR. LANGFORD:  And then I think the same issue.

 4              We would propose adding just one sentence to the

 5      burden of proof -- the next paragraph before "to establish";

 6      and that sentence would read:  As I just instructed you, for

 7      the subset of damages plaintiffs seek for future losses,

 8      comma, plaintiffs must establish those losses by a

 9      preponderance of the evidence.

10              THE COURT:  Could you repeat that?

11              MR. LANGFORD:  As I instructed you, comma, for the

12      subset of damages plaintiffs seek for future losses, comma,

13      plaintiffs must establish those losses by a preponderance of

14      the evidence.

15              THE COURT:  Losses or damages?

16              MR. LANGFORD:  Damages.  We should put "damages"

17      there.  Sorry.

18              THE COURT:  All right.  Mr. Sibley?

19              MR. SIBLEY:  That's fine, Your Honor.

20              THE COURT:  Okay.  Any other changes on page 12?

21              MR. LANGFORD:  Yes.  Just one.  It's actually

22      page 12 running into page 13.  It's the same change to the

23      language of who is in the conspiracy.

24              THE COURT:  Okay.  Any objection to that,

25      Mr. Sibley?
```

```
 1                MR. SIBLEY:  Subject to the prior issues we

 2      raised --

 3                THE COURT:  Of course.

 4                MR. SIBLEY:  -- I believe that would be

 5      appropriate wording, Your Honor.

 6                THE COURT:  All right.  I think we're on page 13

 7      now.

 8                Any changes to page 13, other than the top,

 9      "members of the conspiracy," to go back to the longer form,

10      shall we say, rather than the shorter form of the

11      co-conspirators?

12                MR. LANGFORD:  Yes, Your Honor.

13                And the parties have agreed to this as well.  We

14      would add a paragraph above the "no duplicative damages"

15      section, which would consist of effectively a curative

16      instruction related to the testimony that came out about a

17      settlement.  And so the paragraph should --

18                MR. SIBLEY:  I don't mean to interrupt.

19                I don't agree that we should have this instruction

20      in.  But to the extent the Court grants the request for the

21      instruction, I think we agreed on what the appropriate

22      wording would be should the Court grant it.  But I just want

23      to clarify --

24                MR. LANGFORD:  That's my mistake.

25                MR. SIBLEY:  Okay.
```

```
1            THE COURT:  Okay.  What are you suggesting?

2            MR. LANGFORD:  Finally, comma, you heard testimony

3      that there was a settlement with some of Mr. Giuliani's

4      co-conspirators, comma, One America News Network, comma, its

5      owners, comma, and certain of its reporters, period.  Do not

6      speculate as to whether there was a monetary recovery,

7      comma, because even if there was a monetary recovery, comma,

8      such amount is irrelevant in your determination of an

9      appropriate amount of damages against Mr. Giuliani, period.

10           THE COURT:  I am going to have you send this in an

11     email to -- chambers to email.  Does it continue?

12           MR. LANGFORD:  One more sentence.

13           As I just instructed you, comma, he is fully

14     liable for the harm caused by his co-conspirators.

15           THE COURT:  All right.  And, Mr. Sibley, I mean,

16     are you going to be arguing about setoffs from other -- are

17     you going to be mentioning or arguing about a settlement

18     with OAN?  Are you going to be arguing about whatever amount

19     of money that was?  How they used it?  Are you going to be

20     arguing about that at all?  I mean, that will trigger a need

21     for this curative instruction.  Because I can do it in the

22     middle of your closing, or we could put it here and then

23     repeat it here.

24           But if you are not even going to be making mention

25     of it in your closing, I would have more sympathy for your
```

```
 1    objection to including it.
 2              MR. SIBLEY:  Well, my concern --
 3              THE COURT:  Because it would highlight it,
 4    actually.
 5              MR. SIBLEY:  My concern is that -- whether or not
 6    there was a monetary payment under the settlement that might
 7    create some kind of setoff, which would be only appropriate
 8    for the bench to do --
 9              THE COURT:  Which is why it would be totally
10    inappropriate for you to make any argument about it.
11              MR. SIBLEY:  Well, if I may, Your Honor.
12              There was another part --
13              THE COURT:  Could you answer my question?
14              Are you planning on referencing the OAN settlement
15    in any way in your closing argument?
16              MR. SIBLEY:  Yes.  I am trying to explain why it's
17    relevant.
18              THE COURT:  Okay.  Well, then I think we'll need
19    the curative instruction.
20              MR. SIBLEY:  I mean, if I can't be heard on why I
21    think it's relevant, then I --
22              THE COURT:  Go ahead.
23              MR. SIBLEY:  So part of their damages model is:
24    We need this money to fix the reputation.
25              Apparently part of the agreement with OAN was
```

1    that:  We're going to take the stuff down and we're going to

2    issue retractions.  And their expert didn't look at the

3    effect of that.  I mean, there are other parts of this

4    resolution that I think are relevant to the jury's damages

5    determination besides, oh, they got paid X amount, so I am

6    going to reduce it.

7           I would agree that that is not something that

8    should be considered.  And I do not intend, obviously, to

9    state a fact that is not in evidence about hypothetical

10   facts about a settlement in hopes that -- hoping the jury

11   reduces the amount.

12          THE COURT:  But you understand that having one

13   entity among the multiple channels that were listed in the

14   expert report that issued a retraction without -- is very

15   different from a repair -- a communications repair campaign?

16          MR. SIBLEY:  I don't know what that is because

17   apparently it's never really been done for an individual

18   under these circumstances.  So I am not really sure if

19   that's even possible.  I have never heard of a person

20   advertising on behalf of their own reputation.

21          But in any event, Your Honor, my concern is that

22   if you put that instruction in, they're going to think they

23   can't consider the settlement and the fact that there was a

24   campaign by OAN to remove the stories and to disseminate

25   positive information, that's what the testimony is here.  I

1    don't want that to prejudice me because I think that's

2    certainly relevant to causation and damages.

3            THE COURT:  I am going to include the curative

4    instruction.  Please send it to Howell chambers so we can

5    make sure we have it in there.

6            Do you want the curative instruction repeated,

7    Mr. Sibley?

8            MR. SIBLEY:  No.  The last part, for sure, I think

9    is a problem, because it says:  Committed by

10   co-conspirators.

11           It has to be committed by co-conspirators in

12   furtherance of the conspiracy because that's the predicate

13   question.  If one of the co-conspirators rear-ended Ms. Moss

14   in Atlanta, that wouldn't be compensatory.

15           THE COURT:  What does the last sentence say again?

16           MR. LANGFORD:  "As I just instructed you, he is

17   fully liable for the harm caused by his co-conspirators."

18           We can say:  "In furtherance of the conspiracy," I

19   think.  We don't need to.  And I don't think that's, in

20   fact --

21           THE COURT:  Yes.  I think that's just too wordy.

22           MR. LANGFORD:  Yes.

23           THE COURT:  I think it's clear.

24           All right.  Anything else on page 13?

25           MR. LANGFORD:  Nothing further on page 13 from

```
1    plaintiffs.

2              THE COURT:  And, Mr. Sibley, anything further on

3    page 13?

4              MR. SIBLEY:  No, Your Honor.

5              THE COURT:  Page 14, plaintiffs?

6              MR. LANGFORD:  This is our last issue with the

7    jury instructions.  And it's a very small one.  It is in the

8    paragraph just above "Logistical Matters."  Again, we just

9    need to change the line on the verdict form to reflect that

10   you could either --

11             THE COURT:  You want to take out the third line?

12             MR. LANGFORD:  Yes.

13             THE COURT:  Okay.  Mr. Sibley, anything on

14   page 14?

15             MR. SIBLEY:  No, Your Honor.

16             THE COURT:  Anything on pages 15 and 16 from

17   plaintiffs?

18             MR. LANGFORD:  Not from the plaintiffs.

19             THE COURT:  And, Mr. Sibley, anything on pages 15

20   and 16?

21             MR. SIBLEY:  I don't -- Your Honor, I am not sure

22   what the -- looks like there is some highlighted language

23   there.  I am not sure if the Court is proposing to delete

24   that or -- under "Admitted Exhibits."

25             THE COURT:  Oh, yes.  And I think that has to stay
```

```
 1      in because there were things just marked for identification.

 2      So that was a question, but I think it stays in at this

 3      point.

 4               MR. SIBLEY:  Yes, Your Honor.

 5               THE COURT:  Okay.  So with that, I think we're

 6      ready to turn to the Rule 50 motion.

 7               MR. LANGFORD:  May I request that we address one

 8      very small issue but on the phone.

 9               THE COURT:  Sure.

10               (Whereupon, a bench conference was held:)

11               THE COURT:  Yes.  We're ready to go.

12               MR. LANGFORD:  Mr. Sibley, can you make sure your

13      microphone is off.

14               When we had a bench conference on Tuesday in the

15      middle of Mr. Sibley's cross-examination of Ms. Moss, we

16      were discussing the propriety of cross-examining her on

17      the -- when we had a bench conference in the middle of

18      Mr. Sibley's cross-examination of Ms. Moss, discussing the

19      propriety of eliciting testimony on the OAN settlement,

20      Mr. Sibley mentioned the dollar amount of the OAN

21      settlement, which is now reflected in the transcript.  It

22      was not in front of the jury, it was in a bench conference,

23      and --

24               THE COURT:  I don't remember him mentioning it.

25               MR. LANGFORD:  He said the number in the
```

1      transcript.  I just reviewed the transcript yesterday.

2                  THE COURT:  Okay.

3                  MR. LANGFORD:  And then Your Honor later asked, in

4      probing:  Why is this appropriate if she has a million bucks

5      in her bank account?

6                  So the only thing we would ask is that we be

7      permitted to redact or strike that portion from the record,

8      those two references, as well as in the definition section,

9      references to -- to get rid of the million -- to the number.

10                 THE COURT:  All right.  Mr. Sibley?

11                 MR. SIBLEY:  I certainly don't have a problem with

12     redacting her saying -- the bench conference portion where

13     it speaks -- where there was any number mentioned.  However,

14     I'm not sure I understand right.  I think he mentioned a

15     hypothetical that I might have given the witness.  If that's

16     the case, I am not sure why that's --

17                 MR. LANGFORD:  No.  I can pull it up, if you want.

18     It's really just striking --

19                 THE COURT:  Okay.  I am just going to seal the

20     bench conference part.

21                 MR. LANGFORD:  Okay.

22                 (Whereupon, the bench conference concludes.)

23                 THE COURT:  Okay.  So, Mr. Sibley, I will hear you

24     on your Rule 50 motion.

25                 MR. SIBLEY:  Okay.  Your Honor, just very quickly.

```
 1                    THE COURT:  And you can step forward to the
 2       microphone.
 3                    MR. SIBLEY:  May I proceed, Your Honor?
 4                    THE COURT:  Of course.
 5                    MR. SIBLEY:  Defendant moves for a directed
 6       verdict that the relief pleaded by plaintiffs in the amended
 7       complaint fails to state claims on which relief can be
 8       granted.
 9                    THE COURT:  That's it?
10                    MR. SIBLEY:  I have got more, but I assume the
11       Court would rule one by one, but I can go through them all
12       if you would like.
13                    THE COURT:  I'm sorry.  Please, let me just hear
14       your entire motion and all the reasons for it.
15                    MR. SIBLEY:  Okay.  We move for a directed verdict
16       on the fact that the unpleaded statements that the Court
17       allowed in state -- are protected opinion, protected under
18       the First Amendment, and failed to adequately plead actual
19       malice as to those statements for which the First Amendment
20       would apply, whether or not the tort is defamation or actual
21       malice.
22                    THE COURT:  So you are just repeating all of the
23       arguments that you made in your motion to dismiss.
24                    MR. SIBLEY:  There were some -- some new ones, but
25       I just want to make sure we preserve.  He isn't waiving any
```

1    of this stuff.

2              For example, Your Honor, one of the issues was if

3    you allow statements to become actionable that were not in

4    the complaint, how would one ever challenge that by

5    responsive pleading?  And so that's why the argument is if

6    they are unpleaded statements and the Court is allowing them

7    in, they need to be probed for whether the party -- are they

8    actionable pending?  Are they actual statements of fact?

9    Those kind of things.  So...

10             We would also move for a directed verdict that the

11   pre-20 -- December 23, 2020 --

12             THE COURT:  And by the ones that you say were not

13   in the amended complaint, you are basically talking about

14   the four -- two tweets by Team Trump and two posts or

15   tweets -- I think they were tweets by Mr. Giuliani himself.

16             MR. SIBLEY:  Well --

17             THE COURT:  Those are the four actionable

18   statements that you're contesting as being --

19             MR. SIBLEY:  No.

20             THE COURT:  -- beyond the amended complaint?

21             MR. SIBLEY:  No.  I would say those four are

22   included, but also all of the, quote/unquote,

23   pre-December -- December 23, 2020, publications that they

24   now claim:  Well, we're going to sue on those for IIED.

25             Those would also be subject to the same

1    constitutional scrutiny:  Opinion, actual malice, protected

2    by the First Amendment.  We didn't have a chance to

3    challenge that by responsive pleading; and I believe it's

4    the Court's job to look at those statements and do an

5    independent assessment of whether they are actionable --

6              THE COURT:  Did I hear you correctly say that you

7    did not have an opportunity to challenge those by a

8    responsive pleading?

9              MR. SIBLEY:  Yes, Your Honor.  Because they were

10   not specifically identified in the amended complaint as

11   something that they were basing their complaint on.  So we

12   couldn't have challenged those statements; it was just a

13   general statement about "he made these statements, see all

14   paragraphs incorporated herein," which were just the 12

15   actionable statements in the amended complaint.  So

16   that's --

17             THE COURT:  And would your objections to those

18   counting as actionable statements be the exact same defenses

19   you offered to the actionable statements set out in the

20   amended complaint?

21             MR. SIBLEY:  Yes.  Opinion, failure to actually

22   plead actual malice --

23             THE COURT:  Which were all rejected in the motion

24   to dismiss.  All right.

25             MR. SIBLEY:  They were.

 1              THE COURT:  Go on.  I hear you.

 2              MR. SIBLEY:  I think it has to be a

 3     statement-by-statement analysis.

 4              Also, that there can't be civil conspiracy claims

 5     because they were not identified as overt act in furtherance

 6     of the conspiracy.  So for all of the claims.

 7              Also, we believe that any statements that are

 8     pre-December 23, 2020, even though IIED does have a two-year

 9     statute of limitations, there is case law that I am familiar

10     with that says you can't repackage what is really a

11     defamation claim in the form of an IIED claim and then try

12     to avoid limitations.  So we would move for those claims

13     being barred by statute of limitations on directed verdict.

14     I understand the Court has stricken our answer in that

15     defense, but for purposes of appeal, I would make that

16     argument now.

17              I would also move for a directed verdict on any

18     future emotional harm or mental anguish damages for the

19     plaintiffs based on lack of competent evidence.  There was

20     no expert testimony testifying as to future emotional harm

21     or mental anguish damages.  I believe -- my understanding of

22     the law is that for past mental anguish damages, there is no

23     need for an expert to testify on that; but I believe there

24     needs to be a higher level of proof for future mental

25     anguish damages.  So we'd move for directed verdict on those

1    damages.

2              We'd also move for a directed verdict to the

3    extent the plaintiffs seek damages on the, quote/unquote,

4    impressions model, as we believe that's unreliable and

5    cannot support -- does not provide a reasonable estimate of

6    any compensatory damages for damage to reputation.

7              I believe that's it, Your Honor.

8              THE COURT:  All right.  Do plaintiffs want to

9    respond?

10             MR. GOTTLIEB:  Thank you, Your Honor.

11             Just to have a complete record, I will take them

12   one by one.

13             With respect to the sufficiency of the pleadings,

14   that's barred by the law of the case doctrine, this Court

15   has already decided it.  You should reaffirm those rulings

16   on the merits for the same reasons in the motion to dismiss

17   opinions.

18             The same goes with respect to the opinion doctrine

19   argument.  This Court has already decided that question,

20   barred by the law of the case doctrine.

21             More to the point, Mr. Sibley hasn't even made the

22   requisite showings to show that the four statements about

23   which he is complaining would even constitute opinion under

24   opinion doctrine because they state facts rather than

25   opinions and because of a host of other reasons that are

1     covered by the Supreme Court decision in *Gertz* and other

2     cases following and extrapolating on the opinion doctrine.

3          With respect to the statements not in the

4     complaint, with the four noncomplaint defamation statements,

5     I have just addressed why Mr. Sibley has not raised

6     threshold arguments that would be required to show that

7     these are covered by the opinion doctrine.  This is also

8     covered by the law of the case in the Court's pretrial

9     rulings.  Mr. Sibley hasn't cited anything that came out

10    during the testimony that changes in any way the record with

11    respect to those arguments.

12          With respect to the 50 IIED statements, Mr. Sibley

13    is making arguments that he would need a

14    statement-by-statement showing about this.  This conflates

15    the torts of defamation and intentional infliction of

16    emotional distress.  There is no legal requirement that says

17    you cannot rely on statements as a course of conduct in an

18    intentional infliction of emotional distress claim.  And

19    those defenses are not applicable, given that we are not

20    seeking defamation damages for a single one of those

21    statements.

22          Mr. Sibley's next argument is civil conspiracy

23    claims do not include overt acts.  We're not seeking

24    liability independently based on any civil conspiracy claim.

25    We are following the law of the District of Columbia.  And

1    as the Court has instructed, that this is a form of
2    vicarious liability.

3            With respect to the fifth argument, Mr. Sibley
4    says that the pre-December 23rd statements are barred by the
5    statute of limitations because they're effectively
6    defamation.  This argument is waived.  It was not made in
7    the motion to dismiss briefing; it was not made in
8    pretrial -- in pretrial motions.  This is not properly
9    preserved; it is not properly the subject of a Rule 50
10   motion.  And he said he is familiar with case law.  I don't
11   know what that case law is, I don't know how to apply it or
12   how to distinguish it, so it's an improper argument on which
13   this Court could even rely on a Rule 50 motion.

14           Sixth argument, Mr. Sibley says there is a lack of
15   competent evidence with respect to future emotional harm;
16   you need an expert for that.  He cites no law to support
17   that contention.  The standard for future harm, as we
18   understand it -- and that is in this Court's instructions --
19   is preponderance of the evidence.  We're prepared to meet
20   that standard.  And we believe the uncontradicted testimony
21   of Ms. Moss on the stand who testified as to her income and
22   her intent with respect to staying at her job more than
23   satisfies the preponderance burden.

24           The last one is:  The impressions model is
25   unreliable and unreasonable.  For all of the reasons stated

1    in Dr. Humphreys' testimony on direct, cross, and redirect,

2    her impressions model is reliable based on scientific

3    methods and opinions that were fully disclosed, including

4    publicly available data that more than sufficiently

5    satisfies the requirements of a Rule 702.

6              THE COURT:  Do you want to respond at all,

7    Mr. Sibley?

8              MR. SIBLEY:  Just a couple of things, Your Honor.

9              First, we didn't -- we weren't put on notice of

10   the scope of the claims based on the pleadings; and

11   therefore, there had to be a ruling of the Court very

12   recently, which did not give us the opportunity to challenge

13   these on pure legal questions, as we would normally have if

14   they filed them in a pleading and we got to file a

15   responsive pleading.

16             Secondly, Your Honor, I think that's a threshold

17   issue.  When you have a default situation, the Court has to

18   look at the quality of the allegations giving rise to

19   liability to determine whether they state a claim.  And I

20   don't believe that's waivable anyway, so I would -- that's

21   how I would respond to his arguments, Your Honor.

22             THE COURT:  Well, I would agree with your last

23   comment, Mr. Sibley, that the Court can only grant default

24   judgment on sufficiently pleaded claims; that was decided in

25   my motion to dismiss, that they were sufficiently pleaded.

1          All right.  So let me just set out the standard

2     that I have to apply in a Rule 50(a) motion under the

3     Federal Rules of Civil Procedure.  That rule provides that a

4     court may grant a defendant's motion for judgment as a

5     matter of law at any time before the case is submitted to

6     the jury if the court finds that a reasonable jury would not

7     have a legally sufficient evidentiary basis to find for the

8     plaintiff on the claims presented.

9          The legal question posed by a defendant's Rule 50

10    motion for a directed verdict is whether there is evidence

11    upon which the jury might reasonably find a verdict for the

12    plaintiff.

13         In making that evaluation, the court must view the

14    evidence most favorably to the plaintiff with all reasonable

15    inferences drawn in that party's favor.  The court is not

16    supposed to usurp the jury's function and assess the

17    credibility of the witnesses.

18         Given the particular posture of this case, where

19    this Court has already found that plaintiffs' claims are

20    legally sufficient in a ruling denying Mr. Giuliani's motion

21    to dismiss the complaint, and in this Court's ruling that

22    Mr. Giuliani is liable by default for his discovery

23    misconduct on plaintiffs' three claims for defamation,

24    intentional infliction of emotional distress and civil

25    conspiracy, the testing of plaintiffs' claims again on the

1    Rule 50 motion, to my mind, may very well be foreclosed by

2    law of the case.

3            But to the extent that Mr. Sibley has revived all

4    of his motion-to-dismiss claims as part of his Rule 50

5    motion, the Court will rest on both its motion-to-dismiss

6    decision as well as its default judgment decision in

7    resolving those -- and the law of the case doctrine, not to

8    go into all of the details of all of that yet again.

9            So with respect to those -- on the merits to

10   address those decisions, the Court incorporates all of the

11   reasoning set forth in its prior decisions denying the

12   defendant's motion to dismiss, finding him in default as a

13   discovery misconduct sanction, and on all of the rulings

14   that I have made to date in this case.

15           In any event, the evidence presented at trial has

16   only further established a legally sufficient evidentiary

17   basis for a jury to find for plaintiffs on the three claims

18   they present due to the default judgment.  Plaintiffs did

19   not have to present evidence of the blatant falsity of

20   Mr. Giuliani's statements about these two plaintiffs and the

21   falsity of his co-conspirators' statements about these two

22   plaintiffs, that they had engaged in election fraud.  But

23   the plaintiffs did present that evidence with powerful

24   testimony from Georgia officials who thoroughly investigated

25   and debunked those false claims again and again.  They had

1    no highfalutin campaign strategy, like the one Mr. Giuliani

2    designed for the former President.  These Georgia officials

3    did what government officials do; they issued their reports,

4    they held a press conference.  That's very different from

5    the kind of affirmative proactive campaign that the expert

6    Dr. Humphreys described that would be necessary to repair

7    and push out information about the falsities of these

8    claims.

9            But the powerful testimony of these Georgia

10   officials demonstrated that these statements made by

11   Mr. Giuliani and his co-conspirators, again and again and

12   again -- up to the first day of trial in this case -- was

13   totally false.

14           Even a Republican poll watcher -- whose video

15   deposition was shown -- a Republican poll watcher at the

16   State Farm Arena on election night debunked the false

17   allegation that poll watchers were blocked from the

18   location, a claim that Mr. Giuliani has repeated again and

19   again, totally falsely.

20           This evidence was certainly relevant to

21   establishing plaintiffs' entitlement to damages, but I also

22   view all of that evidence being presented here as a public

23   service.

24           Defense counsel, in questioning plaintiffs' expert

25   yesterday, raised the example of people who believe the

1    flat-Earth theory despite clear evidence to the contrary,

2    that the Earth is not flat.  He suggested that efforts to

3    change the thinking of flat-Earth believers would fail.  I

4    understood this line of questioning as likening flat-Earth

5    believers to those who still believe that these plaintiffs

6    engaged in the election fraud claim by Mr. Giuliani and his

7    co-conspirators with the suggestion that no amount of money

8    would help change the thinking of these flat-Earth stolen

9    election believers.  So trying a reputation repair campaign

10   was doomed from the outset.

11          The expert disagreed, and her optimism is based on

12   scientific research showing that minds can be changed even

13   if they do believe that the Earth is flat.

14          Based on all of the evidence presented by

15   plaintiffs, including their own testimony describing what

16   they have been through since Mr. Giuliani and his

17   co-conspirators seized on and spread lies about their

18   conduct on election night in 2020, the expert testimony, the

19   testimony of the Georgia officials and the Republican poll

20   watcher, a reasonable jury would have a legally sufficient

21   evidentiary basis to find for the plaintiffs and award at

22   least some damages as compensation for the harm caused by

23   Mr. Giuliani and his co-conspirators, and as punitive

24   damages against Mr. Giuliani for his continued promotion of

25   these same lies up to the very first day of this trial.

```
 1              The defendant's motion for judgment as a matter of
 2    law under Federal Rule of Civil Procedure 50 is denied.
 3              All right.  So when I bring the jury in at 10:00,
 4    or shortly thereafter, the plan, as I understand it, is that
 5    the plaintiffs will introduce some final exhibits, and then
 6    we will turn to closing arguments; is that correct?
 7              MR. GOTTLIEB:  Your Honor, if we could have 15
 8    extra minutes to incorporate the changes to the verdict form
 9    into our slide, that would be very helpful.
10              THE COURT:  All right.  That's fine.
11              MR. GOTTLIEB:  I am not sure if we have the
12    revised verdict form yet.  Would it be possible to get
13    that --
14              THE COURT:  No.  We'll get that to you shortly.
15              MR. GOTTLIEB:  Okay.
16              MR. SIBLEY:  My understanding is that -- maybe I
17    misread it, but I thought we were going to introduce the
18    exhibits before the jury comes in so we don't have to waste
19    their time with it.  I thought that's what --
20              THE COURT:  Oh.  It doesn't matter to me.
21              MR. GOTTLIEB:  We can do that, Your Honor.  We
22    just need a minute to assemble all of the paper.
23              THE COURT:  Okay.  Why don't you do that.  Do you
24    want to take your 15 minutes now, and do that and then...
25              MR. GOTTLIEB:  If that would facilitate -- I mean,
```

1    for us the most important thing and the need for time is to

2    get the verdict forms incorporated into our --

3            THE COURT:   Okay.  Let's say we'll take a

4    20-minute break, that will give everybody plenty of time.

5    We'll get you the revised verdict form.  And as quickly as

6    my law clerk's little fingers can work, we'll get you the

7    revised jury instructions.  And then we'll proceed.

8            MR. LANGFORD:   Thank you, your Honor.

9            THE COURT:   So 20 minutes.

10           (Whereupon, a recess was taken.)

11           THE COURT:   Okay.  So I think, as Mr. Sibley

12   suggested, plaintiffs want to introduce a bunch of exhibits

13   before we bring the jury in.  So why don't we do that now.

14           MS. HOUGHTON-LARSEN:   Good morning, Your Honor.

15           Last night the parties agreed to amend the

16   following exhibits:  27, 296, 509, 586, 600, which may not

17   be on the filed exhibit list; I am not sure.  If it's not,

18   it's an October 4, 2023, press conference by Mr. Giuliani

19   related to his defamation suit against President Biden.

20           THE COURT:   "Transcript of breaking news."

21           MS. HOUGHTON-LARSEN:   Yep.  Sorry.  What's the

22   last number?  I apologize.

23           THE COURT:   The last number on mine that we wrote

24   in was 608.

25           MS. HOUGHTON-LARSEN:   Okay.

```
1              THE COURT:  Which was a withdrawn exhibit, but
2      it's been marked for identification purposes.
3              MS. HOUGHTON-LARSEN:  And then two more exhibits,
4      Your Honor, 605 and 609, which is Monday, December 11, 2023,
5      episode of America's Mayor Live.
6              THE COURT:  What day?
7              MS. HOUGHTON-LARSEN:  Monday, December 11, 2023.
8              THE COURT:  Okay.  I wanted to make sure I heard
9      that correctly.
10             MS. HOUGHTON-LARSEN:  So we would move those be
11     admitted, Your Honor.
12             THE COURT:  Okay.
13             MS. HOUGHTON-LARSEN:  Thank you.
14             THE COURT:  Mr. Sibley, no objection?
15             MR. SIBLEY:  Can we just repeat those numbers so I
16     can include it, Your Honor?
17             MS. HOUGHTON-LARSEN:  Want me to repeat them, Your
18     Honor, or will you --
19             THE COURT:  I have -- and you can double-check me
20     on this:  27 -- also so that Mr. Coates can keep up:  27,
21     296, 509, 586, 600, 605, 609.
22             MR. SIBLEY:  No objection, Your Honor.
23             THE COURT:  All right.  They will all be admitted.
24             MS. HOUGHTON-LARSEN:  Thank you.
25             (Plaintiffs' Exhibits 27, 296, 509, 586, 600, 605,
```

```
 1    and 609 admitted.)

 2              THE COURT:  All right.  With that, are the

 3    plaintiffs ready for summations?

 4              MR. GOTTLIEB:  We are, Your Honor.

 5              THE COURT:  And ready to bring the jury in?

 6              MR. GOTTLIEB:  Yes, Your Honor.

 7              THE COURT:  Mr. Sibley?

 8              MR. SIBLEY:  Yes, Your Honor.

 9              THE COURT:  All right.  Let's bring the jury in.

10              Mr. Sibley, do you want to formally rest in front

11    of the jury?

12              MR. SIBLEY:  I mean, I am not sure if it -- I

13    don't know if it matters, but I am happy to do that if

14    that's the Court's preference.

15              THE COURT:  Yes.  I mean, just so -- I have told

16    them the parts of the trial, this is your opportunity.

17              Just so you all know, after I give my final

18    instructions, I will send a copy of my final instructions

19    back to the jury.  At that point, a copy of the final

20    instructions that will be sent back to the jury will be

21    given to both of you, both sides to check.  And once you

22    have confirmed that it is as given, it will be sent back to

23    the jury.

24              (Whereupon, the jury returns to the courtroom.)

25              THE COURT:  Good morning, ladies and gentlemen.  I
```

1    hope you had a pleasant evening.  I'm sorry we were tied up

2    with some legal matters a little bit longer than we expected

3    this morning.

4              All right.  So as you know, the plaintiffs rested

5    their case yesterday; it's now the defense opportunity.

6              Mr. Sibley?

7              MR. SIBLEY:  Your Honor, defendant rests.

8              THE COURT:  All right.  And let me just talk to

9    the parties for one second.

10             (Whereupon, a bench conference was held:)

11             THE COURT:  Mr. Giuliani is not here.

12             MR. SIBLEY:  Your Honor, he took a bathroom break.

13   I didn't notice he wasn't back when you brought the jury in.

14             THE COURT:  Okay.  That makes two of us.  Do you

15   want to wait a few minutes, or do you want to just proceed?

16             MR. SIBLEY:  I think we can just proceed, Your

17   Honor.

18             THE COURT:  All right.  Got it.

19             (Whereupon, the bench conference concludes.)

20             THE COURT:  All right.  So we're now at the point

21   of the trial where we will have summations by the parties,

22   and we'll start with plaintiffs.

23             MR. GOTTLIEB:  Good morning, ladies and gentlemen.

24             ALL JURORS:  Good morning.

25             MR. GOTTLIEB:  When we started this trial a few

1    days ago, you may remember, Mr. Sibley told you that there

2    is really no question that these plaintiffs were harmed.

3    They're good people, no question about that.  They didn't

4    deserve what happened to them.  He told you that.

5          On that much we agree.  But there is one person in

6    this courtroom who doesn't, and that is Mr. Sibley's client,

7    the defendant, Rudolph Giuliani.  He does not think that

8    Ruby Freeman and Shaye' Moss are good people, never has, and

9    if this week is any indication, he never will.

10          Take yourself back to Monday of this week.  You

11   all sat through the first day of the trial.  You experienced

12   a sliver of the unspeakable terror our clients suffered.

13   You saw it, you heard it, you felt it.  Mr. Giuliani sat

14   through the same thing.  And what did he do?  He left this

15   courthouse and gave a press conference, standing with his

16   spokesman at his side.  He told everyone to tune into his

17   live stream show later that night, and then he said this:

18          (Whereupon, an exhibit was published.)

19          MR. GOTTLIEB:  "I don't regret it."  "Stay tuned."

20          About 20 years ago Mr. Giuliani wrote a No. 1

21   *New York Times* best-selling book.  It's called *Leadership*.

22   It's in evidence, Plaintiffs' Exhibit 509.  And if you turn

23   to chapter 12 of this book, you will see the title of the

24   chapter is "Stand Up to Bullies."  He writes on page 269

25   that his father always told him:  Never pick on someone

1    smaller than you, never be a bully.

2              Those are wise words.  If only Mr. Giuliani had

3    listened.

4              Defendant's strategy in this case is no secret.

5    Mr. Sibley would like you to believe that the amount of

6    damages that the plaintiffs are seeking in this case is way

7    too high because Ms. Freeman and Ms. Moss were not rich or

8    famous before Mr. Giuliani and his co-conspirators destroyed

9    their lives.  The theory of their case seems to be that

10   rich, famous people have valuable reputations and ordinary

11   people are irrelevant, replaceable, worthless.

     Mr. Giuliani's defense is that his reputation, his comfort

12

13   and his goals are more important than those of Ruby

14   Freeman's and Shaye' Moss.  That is a fiction, and it ends

15   today.

16             Before we go too much farther I want to thank you.

17   Jury duty is a vital civic duty.  As the Court has already

18   said, our justice system cannot function without you.  We

19   know each of you took time away from your work and from your

20   homes to be here, and for that we thank you for your

21   service.

22             We also asked a lot of you this week.  We asked

23   you to listen as Georgia State election official s testified

24   in detail about how our clients complied with the minutiae

25   of law and procedure and performed their civic duties

1   honorably in the 2020 election, and how Mr. Giuliani refused

2   to listen.

3          We asked you to listen to Ruby Freeman and Shaye'

4   Moss telling you the heart-wrenching stories about their

5   lives before and after December 3, 2020.  We asked you to

6   sit here and listen to vile, racist, awful, profane language

7   and to look at some truly horrifying images, like that

8   letter you remember Ruby Freeman pulled out of that red

9   envelope that was sent to her home.  We know that was not

10  easy.  But now imagine living with that every day for three

11  years.  And then imagine having to relive those nightmares

12  to talk about them to strangers and to subject yourself to

13  cross-examination about them by Mr. Giuliani's lawyer.  That

14  is what Ruby Freeman and Shaye' Moss have done.

15         You now know how important names are to Ruby

16  Freeman and to Shaye' Moss, but you also know that they each

17  amount to much more than their names.  Ruby Freeman and

18  Shaye' Moss are more than just two women in a gray video of

19  State Farm Arena; although, they did indeed work hard from

20  the crack of dawn until the middle of the night counting

21  votes to serve the public during the 2020 presidential

22  election.

23         Ruby Freeman and Shaye' Moss are more than

24  internet memes; although, they became those through no fault

25  of their own.  And they are more than the two Georgia

1    election workers who found themselves unwillingly in the

2    center of a conspiracy.

3          Ruby Freeman and Shaye' Moss, as it turns out, are

4    miles, miles away from ordinary; they are heros.  After

5    everything they went through, they stood up and they said:

6    No more.

7          They filed this lawsuit.  They opened themselves

8    up to you and the public.  And unlike some other people,

9    they testified here under oath.  They have explained what

10   it's like to become the targets of some of the most powerful

11   men on the planet, knowing full well that those men are

12   still out there, saying the same things and inspiring the

13   same people to the same calls of action.  That, ladies and

14   gentlemen, is courage, that is bravery, and that is

15   extraordinary.

16         Your time for listening is almost over.  And it is

17   about time when you will decide how much you believe

18   Ms. Freeman and Ms. Moss's reputation and emotional

19   wellbeing are worth, and what Mr. Giuliani must pay for his

20   outsized role in eviscerating them.

21         As you have heard, and the Court has explained to

22   you in the preliminary instructions, to address the

23   unfairness to the plaintiffs caused by Mr. Giuliani's

24   misconduct in complying with the rules for fair discovery in

25   a federal civil action, Mr. Giuliani refused to play by

1    those rules in this litigation, and the Court has,

2    therefore, issued certain orders that Mr. Giuliani is liable

3    to plaintiffs for their claims of defamation, intentional

4    infliction of emotional distress, and civil conspiracy.

5    That means, as the Court has instructed and as you will hear

6    more about, you are at your starting point, you must accept

7    for purposes of this trial and this exercise that

8    Mr. Giuliani defamed Ms. Freeman and Ms. Moss by publishing

9    certain false and defamatory statements about them; that

10   Mr. Giuliani published these statements with actual malice;

11   that Mr. Giuliani had no legal right to do so; and that

12   these statements caused harm to Ms. Freeman and Ms. Moss.

13          As you have heard, the Court has found that by

14   engaging in extreme and outrageous conduct that

15   intentionally -- or the Court has found that the defendant

16   engaged in extreme and outrageous conduct that intentionally

17   or recklessly caused Ms. Freeman and Ms. Moss to suffer

18   severe emotional distress.  What all those words mean is

19   that the Court has found Mr. Giuliani liable for the tort of

20   intentional infliction of emotional distress.

21          And the Court has determined that what

22   Mr. Giuliani did to Ms. Freeman and Ms. Moss was part of a

23   conspiracy with the former President Trump; the campaign

24   legal team that Mr. Giuliani led; and One America News, or

25   OAN.

 1          As you will see in your jury instructions, the law

 2     makes clear that Mr. Giuliani is responsible for the acts of

 3     those co-conspirators, meaning he can't point the finger at

 4     any of them to get out of damages in this case.  And we'll

 5     talk more about that a little bit later.

 6          So where does that leave us?  It leaves us with

 7     the task that I first told you in opening was simple and

 8     complicated.  It's your job now to frame in dollars and

 9     cents these most profound of harms:  Emotional distress, and

10     indignity, and reputation, place in community and worth.  To

11     determine, as the Court has explained, the amount of money

12     that Mr. Giuliani owes to plaintiffs in the form of

13     compensatory and punitive damages.

14          Now, with the rest of my time I am going to walk

15     through some of those categories and the evidence that you

16     saw in this case that can help guide your decision.

17          You will be receiving a verdict form that looks

18     like the form you see on the screen.  It's going to ask you

19     to assign five numbers.  There will be two numbers for

20     reputational damages or defamation damages, two numbers for

21     intentional infliction of emotional distress, one for

22     punitives.  The two numbers will be one number for each

23     plaintiff; we'll talk a little bit more about that.

24          Your jury instructions will provide your guide to

25     deciding how to award damages in each category, and I will

1    walk you through some of the evidence that fits into each.

2            So let's start with the first.  Let's start with

3    defamation damages.  Defamation damages seek to compensate

4    Ms. Freeman and Ms. Moss for the harms they suffered to

5    their reputations.  In this case, those damages are limited

6    to the harms that naturally flow from those 16 defamatory

7    statements that we have been talking about in this case, the

8    16 defamatory statements you saw on the chart during

9    Dr. Humphreys' testimony.  Those are statements that began

10   on December 23, 2020, and continued thereafter.  Your award

11   of reputational damage is to quantify the harm to those

12   statements.

13           We will ask you to write in the first two lines

14   that you see, in 1 and 2 on your verdict form, an amount of

15   at least $24 million for each plaintiff in this action.

16           Now, I know Mr. Sibley will say that that is an

17   outrageous and unfair amount, but it isn't.

18           As the evidence has shown, that amount is not even

19   close to the amount of reputational damage our clients have

20   suffered in this case.  As I will explain later, this number

21   also includes certain monetary costs that you have heard

22   testimony about in this case that you have before you in

23   evidence, and that you can consider as part of your award.

24           The Court will instruct you, to determine the

25   amount of defamation you should exercise your good judgment

1    and common sense, to provide fair and just compensation for

2    the injury to plaintiffs' reputations that the actionable

3    statements has caused.

4           Now, remember, this isn't a mathematical exercise,

5    it's not a formula.  To do that, you are allowed to consider

6    factors like the plaintiffs' standing in the community; the

7    nature of the actionable statements, how bad they were; the

8    extent to which the actionable statements circulated, how

9    far they traveled; the seriousness of the defamatory charge,

10   what kinds of things were being said; the tendency of the

11   actionable statements to injure a person such as the

12   plaintiffs, it speaks for itself; and to the extent to which

13   the communication was actually believed.

14          You have heard and seen evidence about all of

15   these factors.  I am going to walk through each of them --

16   although not in exact order -- to help you understand how

17   the evidence you heard fits into them in this case.

18          Now, you have heard many of the 16 actionable

19   defamation statements.  We have played many of them for you

20   in video and audio and shown many to you in the transcript.

21   Some of them are excerpted up into the screen on here.  They

22   are all in evidence.  So if you want to review any of them

23   in the jury room, you have them all.

24          Those statements accuse Ms. Freeman and Ms. Moss

25   of illegally excluding election observers and the media

1    under false pretenses, of counting illegal ballots multiple

2    times, of hiding illegal ballots in suitcases, passing

3    around a USB drive to change voting machines.  Even though

4    we know now that that was ginger mint that was what was

5    passed.

6           The Court has found all of these statements to be

7    defamatory.  And as I will return to, these are the only

8    statements that Dr. Humphreys quantified in her damages

9    model, these are the only ones.  She traced these 16

10   statements to the impressions and made a recommendation to

11   you on a cost repair campaign limited to the impressions

12   caused by the 16 statements you see on the screen.

13          So when Mr. Sibley gets up and starts talking

14   about *The Gateway Pundit* and tries to blame that

15   Missouri-based internet gossip site for all the harm that

16   Mr. Giuliani and his co-conspirator caused, remember that

17   Dr. Humphreys' campaign that she designed is not designed to

18   reach the viewers of those articles.  It is designed to

19   reach the impressions caused by these 16 statements.

20          Rudy Giuliani falsely and repeatedly accused our

21   clients of being fraudsters, criminals, drug dealers, and

22   traitors.  He did so with actual malice, meaning he

23   deliberately lied, or at minimum did so recklessly.

24          As you have heard, this is the worst kind of

25   defamation.  It's called defamation per se.  And we submit

1        to you that it warrants a substantial damages award.

2               You know who understands that the defamation

3        per se warrants a substantial damages award?  Rudy Giuliani.

4               You know how?  Earlier this year he filed a

5        defamation lawsuit against President Biden, he gave a news

6        conference about it.  It's in evidence.  If you want to read

7        it, it's Plaintiffs' Exhibit 600.  He sued Joe Biden for

8        calling him a Russian operative during one presidential

9        debate in 2020.  One.  He called that defamation per se, and

10       based on that single act of defamation he said he is owed,

11       quote:  Millions and millions of dollars in compensation.

12       Millions and millions for one statement.

13              Let's talk about the three highlighted factors in

14       the Court's instructions:  The nature and seriousness of the

15       actionable statements and their tendency to harm.  You can

16       think of these three factors, I submit to you, together

17       because they bleed into the same idea.  Seriousness,

18       content, how bad were the statements?

19              Now, remember, the law presumes that statements

20       accusing someone of a crime caused harm.  That's the

21       defamation per se presumption.  But I submit to you, you

22       don't need to rely on presumptions in this case.  You know

23       about the harm, you have seen it.  You understand the

24       nature, the seriousness of the injury.

25              You heard Ms. Moss testify about how strangers

1     showed up at her grandmother's house to conduct a citizen's

2     arrest and how people sent emails to her work and picketed

3     outside her office.

4          You heard Ms. Freeman testify about how people

5     came to her house, too, on January 5th, with flags and

6     bullhorns.  You heard her testify about how she was made to

7     feel homeless, without a place to go.

8          The only expert in this case that has been offered

9     to you is Dr. Ashlee Humphreys.  She explained that a

10    reputation has both moral and economic value.  It is our

11    social standing.  Reputation gives us dignity and respect in

12    society.  It allows people to trust us.  It allows for a

13    place for us in our communities in society.

14         Ms. Freeman and Ms. Moss testified about having

15    lost the trust of others and having lost their dignity in

16    the process of what happened.

17         Dr. Humphreys testified about the economic value

18    of reputation as well, how it impacts employment earnings

19    and career enhancement.  You heard that Ms. Moss was passed

20    over for a promotion and had no choice but to leave her job

21    when she became a pariah in her office and learned, for

22    someone whose career aspiration was to work in elections,

23    she was told:  You will never touch a ballot again.

24         You heard that Ms. Freeman had to change the name

25    of her business that she has poured her heart and soul and

1     passion into and spent years building, and how she can't

2     even go to a show anymore to sell her goods because she

3     can't market and she can't advertise, and she doesn't want

4     her name or her business name up on a screen with all of the

5     other businesses that are there at that show.

6          You should also consider the extent to which the

7     actionable statements were circulated.  How far did they

8     travel?  And it is in this respect that I submit to you,

9     this case is unprecedented because the lies in this case

10    became a sustained, deliberate, viral campaign, the purpose

11    of which was to overturn an election that had the collateral

12    effect of having these statements rocketed around the world,

13    millions upon millions of times.

14          And you don't even guess or rely on legal

15    presumptions for this point because in this case you have

16    confessions.  In testimony before the Georgia legislature on

17    December 10, 2020 -- this is also in evidence at Plaintiffs'

18    Exhibit 306 -- Mr. Giuliani bragged that the State Farm

19    video had, quote:  Gone viral.  And that he was getting

20    letters and texts about it from all over the world.  Gee, I

21    wonder how.

22          He was not surprised or dismayed.  You can watch

23    the video for yourself.  And, of course, surely you remember

24    former President Trump's January 2, 2021, phone call to

25    Georgia Secretary of State Brad Raffensperger.  In it the

1      President of the United States bragged that the statements

2      about Ruby Freeman were all over the internet; that Ruby

3      Freeman had gone viral; that her reputation had been

4      devastated; and that "where's Ruby?" had become a trending

5      meme.   The President of the United States.

6              Dr. Humphreys has provided you with conservative

7      estimates of the reach of these 16 actionable statements.

8      Remember, though, the Court has instructed you that you must

9      assume, as you deliberate, that Mr. Giuliani intentionally

10     tried to hide evidence about his viewership and reach of his

11     podcast and social media to artificially deflate the reach

12     of his defamatory statements.

13              Remember during Dr. Humphreys' testimony, at each

14     step of her analysis, as we walked through the impressions

15     model and we talked about web views and social media views

16     and online video views, each time I asked her:  Was there

17     information that you didn't have that would have helped make

18     your analysis more precise?

19              And what did she say each time?

20              Yes, if I had the information of the accountholder

21     I would have been able to provide a precise calculation.

22              Mr. Giuliani is the accountholder.  He refused to

23     provide that information in this case.  So when Mr. Sibley

24     stands up here and tells you about the things that

25     Dr. Humphreys didn't consider and didn't think about in her

1    analysis, remember that his client is the principal reason

2    for the factors that she was unable to consider.  If

3    Mr. Giuliani had played by the rules in this case, which he

4    has said is something that is very important to do -- but if

5    he had played by the rules in this case, it is a certainty

6    that we would have more precise numbers because we would

7    have had them directly from the defendant.

8         Because we didn't, you are left with this

9    instruction, which the Court has said you must follow.

10        Now, Mr. Giuliani objected to your hearing

11   Dr. Humphreys' testimony, but the Court qualified

12   Dr. Humphreys as an expert in this case, and you are

13   entitled to consider her opinions and give them due weight

14   in your considerations.

15        Mr. Giuliani has not offered an expert of his own.

16   No expert testimony.  And Dr. Humphreys was open and honest

17   with you about the challenges she faced in performing her

18   tasks.  She testified, including on cross-examination, that

19   while she is confident in her models, she would have been

20   able to arrive at more precise numbers if Mr. Giuliani had

21   simply turned over access to the data from his social media

22   accounts.

23        Dr. Humphreys told you that based on her

24   impressions model, the 16 actionable statements, and those

25   statements alone, resulted in between 35.5 million and

1    56.7 million receptive impressions.  And I expect you'll

2    remember that Dr. Humphreys testified unequivocally that

3    56.7 impressions was the more accurate number because it

4    represents the appropriate assumption to make about the

5    interaction with the social media accounts of a prominent

6    user like Rudy Giuliani.

7          Now, Mr. Sibley didn't ask Dr. Humphreys any

8    questions about the difference between her low impression

9    and high impression model, didn't challenge any of the

10   assumptions about any of those models.  We'll talk a little

11   bit more about that cross-examination.

12         But remember that the low impressions estimate

13   that Dr. Humphreys offered assumes that only 5 percent of an

14   individual's followers would interact with their posts or

15   tweets, and the high estimate assumed the 20 percent of

16   users saw those tweets.

17         And remember, Dr. Humphreys also testified -- and

18   this is uncontradicted in this case -- that public data

19   released by Twitter that she analyzed shows that

20   Mr. Giuliani's Twitter account had to close a 27 percent

21   engagement rate.  So even the high impression rate that

22   results in the 56 million impression estimate is too low,

23   that's based on a 20 percent assumption.

24         Mr. Sibley cross-examined Dr. Humphreys at length.

25   At no point did he challenge a single estimate or

1    calculation that Dr. Humphreys actually made.  There is no

2    other expert testimony in this case or any other kind of

3    evidence to show that these 16 statements actually resulted

4    in a lower number of impressions, not even a theory.

5          Also remember that Dr. Humphreys' number is almost

6    certainly an undercount.  Think about all of the impressions

7    that Dr. Humphreys knows exist but that she did not include

8    and she is not asking you or did not recommend that you

9    award damages based on.  That includes things like

10   nonreceptive impressions; in other words, people who would

11   not be inclined to believe these kind of statements.  It

12   includes other platforms that she didn't consider.  It

13   includes massively popular podcast distribution platforms

14   like Apple and Spotify that she didn't have access to.

15         At each step when I asked her these questions, she

16   told you that these are likely undercounts and conservative

17   estimates about the number of people -- the number of

18   impressions caused by the 16 actionable statements.

19         Also remember that false political information,

20   like Mr. Giuliani's defamatory statements about Ms. Freeman

21   and Ms. Moss, spread three times faster than truthful

22   information.  So each false statement moves and reproduces

23   faster than truthful statements do.

24         And Mr. Giuliani and his codefendants in this case

25   used the equivalent of kerosene or rocket fuel loaded with

1    hazardous materials to make our clients' reputations toxic

2    with a particular audience; and it worked.

3            On the first day of trial you heard from Regina

4    Scott, who testified that the vulgarity and volume of the

5    public statements about Ms. Freeman and Ms. Moss was

6    unprecedented.  And this was all well after December 23,

7    2020, the date that the defamatory statements began.

8            Dr. Humphreys explained that determining how

9    widely the actionable statements spread is a very helpful

10   step to figuring out the severity of the harm; in other

11   words, measuring the reputational harm that our clients

12   suffered.  That's because the more times a statement is

13   seen, the harder it is and the more it costs to try to undo

14   the harm.  It's a pretty simple logic.

15           At the start of the trial I asked you to think

16   about what would happen if someone burned your house down?

17   How would you understand the damage in dollars-and-cents

18   terms.  And one way to figure out that harm is to ask how

19   much would it cost to fix it.

20           Remember, I told you that reputation is similar.

21   But this isn't a case where the arsonist just burned down

22   the house.  They used, as I said, the equivalent of rocket

23   fuel or kerosene to burn it down, so the very foundations of

24   our clients' reputations were destroyed, corrupted, and made

25   hazardous.  The kind of home that would be dangerous to live

 1   in even if you made repairs.  That's what's happened to Ruby

 2   Freeman and Shaye' Moss.  It's dangerous for them to be Ruby

 3   Freeman and Shaye' Moss because of Defendant Giuliani and

 4   his co-conspirators.

 5          You don't have to guess or presume about the

 6   extent to which the defamation was actually believed; you

 7   know it, you heard it.  Mr. Giuliani and his co-conspirators

 8   pointed the finger at Ms. Freeman and Ms. Moss, and because

 9   Mr. Giuliani is powerful and famous and has a platform that

10   reaches millions of people, people believed him.

11          You saw the letters Ms. Freeman received at her

12   home.  You listened to the voicemail Ms. Moss heard with her

13   14-year-old son.  You saw the hateful words that strangers

14   spewed on every platform available.

15          You also heard that Dr. Humphreys explained to you

16   that even when less than 50 percent of people believe

17   something, when they come to believe it strongly, it can

18   have a devastating effect on reputation.  Remember that

19   example that Dr. Humphreys gave, if you went into work one

20   day and even a small number of people had come to believe

21   that you had stole money from the office, there would be a

22   bunch of people talking about it.  And even if a small

23   number of people believed it, that notoriety and chatter and

24   distraction that caused has an effect on you.  And you need

25   to try to change the views of that minority or small number

1    of people in order to restore your reputation.

2          And Mr. Giuliani agrees with that point because in

3    that same lawsuit where he sued President Biden for

4    defamation, in his press conference -- again, Plaintiffs'

5    Exhibit 600 -- this is what he said:  Being called a Russian

6    pawn and being called by the leading candidate of the

7    Democratic party a facilitator of Russian disinformation is

8    an extraordinarily damaging thing.  It may be that a lot of

9    people don't believe him, but a lot of people do believe

10   him.  Go look at public opinion polls.

11         He gets it.  Last, let's talk about plaintiffs'

12   standing in the community.  You have heard about the

13   plaintiffs' standing in the community.  You have heard they

14   were born and raised in Georgia, with deep roots in their

15   community and no intention of ever leaving.  You heard that

16   Ms. Moss dreamt of spending the rest of her career in

17   registrations, but after the defamation she felt like a

18   pariah in her own office, how her friends were no longer

19   around.  She cut everybody off.  She secluded herself.  How

20   during an interview -- a job interview the interviewer

21   pulled up an article accusing her of fraud.

22         You heard about Ms. Freeman no longer being able

23   to use her name, and you know from her testimony how

24   important her name is to her, given its history and

25   significance.

1          You heard how she's afraid to introduce herself.

2   You heard how she had to leave the only community she ever

3   knew and only one she ever wanted to live in, a community

4   that she had been in for more than 20 years.  You heard how

5   she felt alone, how no one wanted to associate with her.

6          All of that could have been avoided without what

7   happened on December 3rd and the days that followed.

8          All of this is why the cost to repair the

9   plaintiffs' reputation is so steep and so expensive.  Of

10  course it is.  The magnitude of the harm is massive.

11         The evidence in this case shows that the

12  Giuliani's Strategic Communications Plan was estimated to

13  cost 5 to $8 million.  That's unrebutted testimony.  It's a

14  fact in evidence.  That campaign, you will recall, was

15  supposed to last ten days.  A ten-day-long Strategic

16  Communications Plan to benefit an individual, Donald Trump,

17  that was scheduled to last ten days.  And that campaign that

18  was designed to help President Trump have the benefit of

19  free Twitter and free Facebook audiences to the tune of

20  hundreds of millions of people.  Donald Trump's Twitter

21  account is 88 million followers along.

22         That campaign wasn't fighting against three years

23  of viral disinformation that had targeted two individuals

24  and made their reputations and name toxic, had branded them

25  as fraudsters and criminals.

1          What did Dr. Humphreys explain?  In her testimony

2     she explained that using the logic of the Giuliani Strategic

3     Communications Plan, a campaign of the scale that would be

4     required to repair the impressions that she found for

5     Ms. Freeman and Ms. Moss would be at least $52 million by

6     the economics of the Trump Strategic Communications Plan.

7          You may remember this chart, Dr. Humphreys

8     testified about it and discussed it in some detail.  It's

9     complex, but Dr. Humphreys walked through the steps and the

10    math that she used to arrive at her calculations to arrive

11    at this estimate of the cost of the repair campaign.

12         You remember Dr. Humphreys talked about where the

13    CPM or cost-per-mille data information comes from.  How it's

14    publicly available.  You remember how she talked about how

15    she arrived at the weight that was assigned to each category

16    based on the impressions and how the impressions had been

17    divided into different kinds of platforms.  She talked about

18    this in some amount of detail.

19         Mr. Sibley didn't ask her questions about any of

20    these calculations.  He didn't suggest that any of these

21    calculations were inaccurate or slanted or biased or

22    improper or likely to lead to incorrect results at the end.

23         There's been no serious challenge to

24    Dr. Humphreys' testimony, none.  You didn't hear any serious

25    challenge to any of this.  Instead, what did we hear?  We

1    heard about flat-Earthers, origin stories for COVID, and of

2    course the Hunter Biden laptop.

3           Mr. Sibley did not challenge a single calculation

4    that Dr. Humphreys made.  He didn't ask her about low versus

5    high impression assumptions, didn't ask her about the data

6    that shows Mr. Giuliani's Twitter account has a 27 percent

7    engagement rate on it, didn't ask her about the length

8    between where the impressions appeared and how the repair

9    costs were calculated, said nothing about the attitude

10   change multiplier that Dr. Humphreys stated -- testified was

11   based on significant data showing the number of times that

12   is required to change people's belief.

13          You may remember the discussion of whether it's

14   three times or five times or seven times based on the number

15   of exposures individuals had and how closely aligned with an

16   individual's belief system a view is.  And those views,

17   based on data, led Dr. Humphreys to recommend a five times

18   multiplier is how she arrived at her number and

19   recommendation of a damages award in this case.

20          Now, the only thing Mr. Sibley, I think, really

21   could muster was an argument about how Dr. Humphreys didn't

22   consider a retraction that was apparently published by OAN.

23   He says this affects Dr. Humphreys' assumptions about repair

24   campaigns.  But remember, when Mr. Sibley is talking to you,

25   Mr. Sibley's questions that he asks are not evidence.  Where

1   is this OAN retraction?  Is it in evidence?  Do we have any

2   idea what it is?  Do we have any idea of how many times it

3   was published or when or where or what it said?  Not in

4   evidence in this case.

5          Mr. Sibley's argument is conjecture, theory, and

6   hypothesis.  Even though he could have introduced evidence

7   on cross-examination if he had chosen to do so.

8          So in sum, for reputational damages we're asking

9   you to award at least $24 million in reputational damages

10  for each plaintiff.  That number includes expenses that --

11  and costs that our clients incurred because of the

12  defamation, which I told you in the opening that you can

13  include in your reputational damage award.

14          I mentioned before that the parties have

15  stipulated to many of those costs.  You have heard us at

16  times throughout the case reading some of those stipulations

17  into the record.

18          The exhibit number for those stipulations is

19  Plaintiffs' Exhibit 588.

20          Some of those costs include things like

21  Ms. Freeman's costs for having to move to a new home and

22  taking a home equity line out on her prior home, security

23  systems, mortgage payments, all of those facts and dollar

24  figures are in stipulations.

25          You also heard Ms. Moss testify when she left her

1     job in Fulton County she was making about $36,000 a year

2     before taxes and that she was 38 years old.  She didn't want

3     to leave.  She testified she wanted to retire as a county

4     worker, like her grandmother, even if she never got a

5     promotion or raise or salary increase for inflation.  You

6     can either -- just assume that she made $36,000, stayed in

7     the same position for the rest of her career until she

8     retired.  That would work out to between 792,000 and 972,000

9     over her career, depending on whether she retired at age 60

10    or age 65.

11         So this is what we'll ask you to write on the

12    first line of the verdict form, which includes reputational

13    harm calculated by Dr. Humphreys and the monetary harm -- or

14    monetary costs for our clients that I just discussed.

15         We're asking you to separately assign a damages

16    award for the emotional damage Mr. Giuliani caused

17    Ms. Freeman and Ms. Moss to suffer.  You heard about the

18    emotional harm that Mr. Giuliani and his co-conspirators

19    started to inflict beginning on December 3, 2020, as soon as

20    Mr. Giuliani tweeted the clipped video from State Farm

21    Arena.

22         The Court has already instructed, and will again

23    instruct you, that when considering how to compensate

24    plaintiffs for emotional distress you may consider any

25    mental pain and suffering, fear, inconvenience, nervousness,

1    indignity, insult, humiliation, or embarrassment the

2    plaintiffs suffered because of Defendant Giuliani and his

3    co-conspirators' conduct.  You have heard a lot of that

4    evidence in this trial.  I know it's been difficult to

5    listen to a lot of that evidence.

6            But remember, this claim -- before we talk about

7    some of that evidence, remember this particular claim, this

8    emotional distress claim goes back to December 3, 2020, or

9    even before that.  Remember, the defamation claim you are to

10   consider, the 16 statements starting on December 23rd.  But

11   for emotional harm, you can consider all of Mr. Giuliani's

12   conduct starting on December 3rd to launch the campaign that

13   was launched against Ruby and Shaye' and the consequences of

14   that campaign.

15           As you heard Dr. Humphreys' testimony on this

16   pre-December 3, 2020, statements, like Mr. Giuliani's tweets

17   that you saw from December 3rd and December 4th, tweeting

18   out the State Farm video to the internet, and his video

19   statements about our clients over the next several weeks.

20   Dr. Humphreys estimated that those statements generated

21   between 111 million and 249 million impressions.  You

22   remember, that's what led us to a discussion about whether

23   that really meant 249 million people, and she testified

24   impressions are not people.  That's a huge number.

25           Dr. Humphreys is not calculating a cost to repair

1    based on that, but that estimate gives you a sense of how

2    far Mr. Giuliani's, Donald Trump's, and the Trump's campaign

3    statements, just between December 3, 2020, and December 23,

4    2020, how far that spread around the world and the effect it

5    had on making our clients' names synonymous with crime and

6    fraud and treason.

7         You heard how Ms. Moss won't go out with her

8    family and won't go out alone.

9         You heard her testimony about suffering

10   debilitating panic attacks.  You heard how her 14-year-old

11   son was targeted.  He was kicked off school Zoom classes in

12   the middle of the pandemic by vile, disgusting racists who

13   were threatening Ms. Moss based on the lie that Rudy

14   Giuliani and his co-conspirators intended to spread.

15        You heard how her son failed out of school as a

16   result of those threats.  You heard how Ms. Moss is haunted

17   in every waking hour and in her nightmares about her son

18   finding her and her mother hanging from a tree.

19        You heard how Ms. Moss suffers from panic attacks,

20   anxiety, and depression; how she feels embarrassed and

21   humiliated; like it's her fault, like she brought this on

22   her family; how she lost her coworkers who felt like her

23   family; lost her long-term relationship; and for the rest of

24   her friends, due to her isolating in that cycle of shame.

25   And most tragically, you heard that on her darkest days,

1    Ms. Moss thinks it would be easier for everyone if she just

2    went to sleep and never woke up.

3            You have heard about the toll this has taken on

4    Ms. Freeman; that she was inundated with racist and violent

5    threats on email, Facebook, text, LinkedIn, voicemail; that

6    she reported those threats to the police and law enforcement

7    on December 4, 2020, and then again on December 5th when

8    strangers showed up pounding on her door.  She told you how

9    she felt terrorized.  She told you that in the immediate

10   days after President Trump's January 2nd call, strangers

11   showed up to her house with flags and bullhorns.  The FBI

12   recommended that she leave her home because she wasn't safe

13   there.

14           Now, we're not providing you with a number to

15   assign to intentional infliction of emotional distress.

16   That is left to your judgment.  The law permits you to use

17   your common sense, your good judgment and discretion.  We

18   would ask that you assign a damages figure that you think

19   adequately compensates Ms. Freeman and Ms. Moss for the

20   mental pain and suffering, fear, inconvenience, nervousness,

21   indignity, insult, humiliation, and embarrassment that they

22   have suffered because of Defendant Giuliani and his

23   co-conspirators' conduct.

24           Now, after I sit down, Mr. Sibley is probably

25   going to stand up here and tell you that Mr. Giuliani isn't

1    the one who left these threatening voice mails.  He isn't

2    the one that used all of these bad words.  He isn't the one

3    that said all of these racist things.  So how could he be

4    the cause of Ms. Freeman and Ms. Moss's harm?  And the

5    answer is in the evidence.

6           Causation in this case is easy because the

7    evidence shows that Defendant Giuliani was patient zero of

8    the lies that destroyed our clients' lies.  The harm that

9    they suffered was not an accident, it was not random, it was

10   entirely foreseeable, and it was all part of the plan.

11          You remember Gabriel Sterling.  He was the

12   gentleman who was the head of Georgia elections, and we

13   played some video from him in the opening and some during

14   testimony as well.  In that video, he was debunking the lies

15   that Mr. Giuliani and the Trump legal team were putting out

16   about the State Farm video, in excruciating detail.  That

17   exhibit is Plaintiffs' Exhibit 249.  In that same exhibit,

18   Mr. Sterling made the following statements a few days before

19   December 3rd happened.  This is from December 1, 2020.

20          (Whereupon, an exhibit was published.)

21          MR. GOTTLIEB:  The head of Georgia's elections

22   worked for the Republican Secretary of State in Georgia,

23   told President Trump and his team that if they continued to

24   spread lies about what happened in the 2020 election in

25   Georgia someone is going to get hurt, someone was going to

1    shot, someone was going to get killed -- on December 1,

2    2020.

3          So what did he do?  Two days after Mr. Sterling

4    publicly stated that words could get someone killed,

5    Mr. Giuliani and his co-conspirators launched their

6    conspiracy against Ms. Freeman and Ms. Moss, they instigated

7    their followers to find Ms. Freeman and Ms. Moss and demand

8    their arrest.

9          Look at page 5 of Plaintiffs' Exhibit 1.  It's the

10   Giuliani Strategic Communications Plan.  You have heard a

11   lot about it in this case.  It says:  Everyone, you cannot

12   let America itself be stolen by criminals.  You must take a

13   stand, and you must take it today.

14         You heard Ms. Freeman and Ms. Moss testify about

15   Mr. Giuliani and former President Trump spreading the lies

16   everywhere online and how they experienced those tweets in

17   real time.  They told you they remembered when he sent them.

18         You also heard testimony that Mr. Giuliani was the

19   boss.  He ran the Trump legal team, he was in charge of its

20   strategy.  Decisions did not get made without him.

21         You heard Christina Bobb's testimony.  If people

22   wanted to do something or file something, they would reach

23   out to the mayor.

24         You heard Bernie Kerik, one of Mr. Giuliani's

25   friends for decades who worked for him directly as part of

1    these efforts, saying Mr. Giuliani was in charge of what was

2    done and what was not done.

3            If -- on December 3, 2020, the morning of

4    December 3, 2020, before he walked into that hearing room in

5    Georgia, when Ray Smith, the local counsel from Georgia,

6    which you heard testimony about, had come up to him and

7    said:  "I got this video we should play."

8            If Mr. Giuliani had said:  "You know what, Ray, I

9    am not sure what that video says, I haven't watched any of

10   it."  "I am not an expert on Georgia's election code."  "I

11   haven't visited the scene."  "I haven't talked to the

12   witnesses."  "I haven't even viewed the whole tape."  "Maybe

13   I should talk to the Republican poll watchers who are

14   present at State Farm Arena that night to see what

15   happened."

16           Like Michelle Branton, whom you heard from in this

17   case, who had said if she had been asked she would have even

18   told Mr. Giuliani she wasn't asked to leave or told to leave

19   State Farm Arena that night.  The cornerstone theory of

20   their lies about our clients.

21           Or if he said:  "Maybe I should figure out if

22   there actually was a water main break or if anybody actually

23   said anything about that, before allegedly kicking people

24   out."  "Maybe I should ask whether the Secretary State's

25   Office ordered these people to start recounting the ballots,

1    instead of them just hatching the plan on their own."

2    "Maybe I should know the difference between putting ballots

3    through a scanner and hitting 'accept' to turn those scans

4    into votes."  "Maybe I should know something, anything

5    concrete, before my team, the Giuliani legal team, goes and

6    tells the world that these honorable civil servants engaged

7    in treason and the theft of an election."

8            Mr. Giuliani did none of those things.  Not one.

9    This is the former United States Attorney for the Southern

10   District of New York.  None.  He said:  "It's convenient for

11   me to accuse these two ordinary people of fraud, so fire

12   away."

13           And he and Team Trump and all of the

14   co-conspirators at the ready, they aimed and they fired.

15   The defendant, Rudy Giuliani, was patient zero.

16           You heard Dr. Humphreys testify that Ms. Freeman

17   was unknown to the world prior to December 3rd.  No one ever

18   was searching for Ruby Freeman's name on Google prior to

19   December 3rd.  Her name became infamous after that.  It's

20   not in dispute that that's the same day that the Giuliani

21   legal team presented the State Farm Arena video and sent it

22   out.  They just presented in the hearing -- they sent it out

23   on social media, on Twitter, on Facebook, everywhere they

24   could.

25           After that date, Ms. Freeman lost her name and

1   became a caricature, a meme:  "Where's Ruby?"

2          Mr. Giuliani called for Ms. Freeman and Ms. Moss

3   to be arrested, to be questioned, and to be searched.

4          (Whereupon, an exhibit was published.)

5          MR. GOTTLIEB:  December 10, 2020, nine days after

6   Gabriel Sterling said to the President and his team:  "You

7   are going to get someone killed."

8          You don't need any kind of expertise or Ph.D. or

9   advanced degree to know the likely result of the statements

10  Mr. Giuliani was making and the context in which he was

11  making them.

12         The people who followed Mr. Giuliani and Mr. Trump

13  and his campaign heard those statements loud and clear.

14  Look at the words Mr. Giuliani and his team used.  Look at

15  the words their followers used.  And some of those followers

16  turned to threats, racism, and harassment.  It wasn't just

17  reasonably foreseeable; it was inevitable.  They

18  internalized what Mr. Giuliani and Mr. Trump and his

19  campaign said.  They parroted the statements, as intended.

20  They were designed to be viral.  They were designed to

21  spread.

22         And as you heard, strangers acted.  They emailed,

23  they texted, they called, they showed up to Ms. Freeman's

24  house, they showed up to Ms. Freeman's mother's house, they

25  pounded on the door, they yelled, they said they were making

1   a citizen's arrest, just like they were told to do.

2            Let's talk about punitive damages.

3            As the Court will instruct you, you are to award

4   punitive damages above and beyond the amount of compensatory

5   damages to punish Mr. Giuliani for his outrageous conduct

6   and to deter others from doing the same thing in the future.

7            Determining the appropriate amount of punitive

8   damages is one that is left in your good judgment and

9   discretion, subject to the Court's instructions.

10           Now, they say when someone shows you who they are,

11  believe them.  Mr. Giuliani has shown over and over and over

12  again that he will not take our clients' names out of his

13  mouth; that facts have not, do not, and will not stop him.

14  Day after day Mr. Giuliani reminds you who he is.  He says

15  he isn't sorry.  He is telegraphing that he will do this

16  again.  Believe him.

17           Since August 2023 you heard testimony in this case

18  that -- so this is from August of this year, 2023.

19           Mr. Giuliani has repeated his false claims about

20  Ms. Freeman and Ms. Moss 20 times.  Twenty times since

21  August.  Even after the Court determined that his statements

22  were false and defamatory, 20 times.  More than that,

23  Mr. Giuliani has told you he is not sorry.  You saw, a few

24  hours after opening statements he walked out that door, rode

25  down that elevator, and walked straight to the waiting

1     cameras to tell the world that he regrets nothing.  There is

2     not much more I need to say.

3               Mr. Giuliani will not stop.  And the others who

4     might engage in conduct following him will not be stopped,

5     he knows, to be harmful.

6               Mr. Giuliani's conduct is outrageous.  For

7     starters, you can't commit a tort of intentional infliction

8     of emotional distress without engaging in outrageous

9     conduct, but this goes well beyond your base level of

10    outrage.  It's the volume and consistency of the accusations

11    with no evidence to support them.  It's the refusal to

12    acknowledge the truth no matter who speaks it.  It's the

13    insistence that he gets to have his own version of the facts

14    about our clients, his own reality, and he can run over

15    anyone he wants along the way because he is above the law.

16              Remember, Mr. Giuliani's crew didn't start making

17    up these lies until a bunch of other tactics had already

18    failed.  That's what Gabriel Sterling was talking about on

19    December 1st when he went on national TV to warn President

20    Trump that someone was going to get killed.  And he also

21    heard that investigator s looked into Mr. Giuliani's claims,

22    and they found there to be absolutely no evidence of any

23    kind to support any of them, and that that happened early in

24    December of 2020.

25              You heard Ms. Moss say she was interviewed by the

1    Secretary of State's Office, the Georgia Bureau of

2    Investigations, the Federal Bureau of Investigation, and the

3    Fulton County Attorney's Office.  Everything Mr. Giuliani

4    said about our client is a lie.  And Georgia officials

5    announced that publicly starting on December 4, 2020.

6         Officials had continued, as we have gone on, to

7    keep disproving these lies, providing witnesses and

8    affidavits, doing studies and recounts, investigations.

9    They did that into 2021 and 2022.  And you saw even into

10   this year, 2023.  And he still won't stop.

11        After Judge Howell found Mr. Giuliani's statements

12   were defamatory in the order on August 30, 2023, plaintiffs

13   hoped Mr. Giuliani would stop, but he didn't.  So we sent

14   him a letter asking him to do so, reminding him that what he

15   said was false, but he kept going.

16        So why?  Why does he keep doing it?  I am not sure

17   I really know.

18        Scapegoating Ms. Freeman and Ms. Moss, we do know,

19   was a key part of their plan to overturn the election

20   results in Georgia.  That narrative was the core of the

21   conspiracy's claim that the Georgia election was fraudulent.

22   They started spreading that lie on December 3rd and

23   immediately began sending it everywhere.  So because of

24   that, Mr. Giuliani and his co-conspirators didn't really

25   care about the bodies or the actual real human lives that

1    they left in their wake.  That plan was written out; you can

2    review it yourself.  Targeting Ms. Freeman and Ms. Moss,

3    Ruby and Shaye' at midnight was a core component of the

4    Georgia plan.

5           Now, the undisputed, uncontradicted evidence in

6    this case is that Mr. Giuliani assembled his team to

7    challenge the results of the election and claim fraud in

8    Georgia by the middle of November of 2020; and they started

9    to work on aspects of that strategic plan, the bullet points

10   that you see that say -- the things that say:  Ruby and

11   Shaye' at midnight.  And the content about each state, start

12   doing and working on those things in November, even though

13   the plan itself was not sent to the White House, as you saw

14   with Mr. Kerik's testimony, until December 27th.

15          It was then that they sent that plan to the White

16   House, according to Mr. Kerik, at the mayor's direction,

17   asking them to pull the trigger immediately.

18          Mr. Giuliani also profited from his lies.  Again,

19   we don't know how much because he didn't comply with the

20   Court's discovery orders in this case.  But the Court has

21   instructed you to assume that Mr. Giuliani made a

22   substantial financial benefit from his defamation of

23   Ms. Freeman and Ms. Moss.  Not least because Mr. Giuliani --

24   sorry.

25          The next punitive damages factor, that

1    Mr. Giuliani acted with a high degree of awareness that the

2    statements were probably false.

3          We know that Mr. Giuliani knows better than this.

4    He knows that words are power.  He knows that it's important

5    to mean what you say and to communication honestly.  He

6    knows that it's his responsibility to know the facts and

7    avoid relying on others for information.  And ironically, he

8    knows that it's important to stand up to bullies.  He wrote

9    all of that in his *New York Times* best-selling book.  And he

10   knows what defamation is.  He has been a lawyer for

11   50 years.  He has got his own defamation suit against

12   President Biden.  And he understands what it means when you

13   falsely accuse somebody of being a criminal or a traitor.

14         You are also entitled to consider in your punitive

15   damages analysis the relative wealth of Mr. Giuliani at the

16   time of trial.

17         As you know, although you can consider those

18   factors in making your damages decision, it's very difficult

19   to do here.  You do know that Mr. Giuliani is still on the

20   air, still doing his shows.  And you will see in the

21   parties' stipulations, as I mentioned, which you will have

22   in the jury room, Mr. Giuliani recently got a new deal for a

23   show on *Newsmax* that he will be on.

24         Mr. Giuliani opted out of discovery, though.  And

25   because of that, you will be instructed that you must

1    presume that he intentionally tried to hide evidence about

2    his financial assets to deflate his net worth to make it

3    harder and possible to know.

4         You will also have to consider other things that

5    Mr. Giuliani hid, like information that would have confirmed

6    the reach of his podcast or radio shows or other platforms.

7    And please keep these inferences in mind as you think

8    through the evidence in this case.

9         You can also consider in the punitive damages

10   factors the cost of duration of the litigation.  We hope you

11   have seen how much effort it took to put this presentation

12   together, how much work it takes to hold someone like

13   Mr. Giuliani accountable.  You have seen the team and

14   binders of evidence, and you know that Mr. Giuliani's

15   conduct, from the stipulations in this case that you will

16   have before you in the jury room, causes legal work costing

17   hundreds of thousands of dollars for just three motions

18   alone.

19        So in sum, Mr. Giuliani abused his notoriety and

20   his platform and his access to power to scapegoat Ruby

21   Freeman and Shaye' Moss, two election workers from Georgia

22   who showed up for duty on Election Day 2000 in the midst of

23   a global pandemic.  They should have been hero s.  Ms. Moss

24   should have been given a promotion, even though she would

25   have settled for a plaque and a potluck dinner.

1           Mr. Giuliani thought he could get away with making

2    Ruby and Shaye' the face of election fraud because he

3    thought they were ordinary and expendable; he didn't see

4    them as human beings.

5           I know there was a time in Mr. Giuliani's life

6    when he was a U.S. attorney and a mayor and when he wrote

7    that *New York Times* best-selling book, when Mr. Giuliani

8    understood and appreciated that civil servants are by and

9    large descent people who work hard to make our country

10   better.  Perhaps he disagrees with that now.  So be it.

11   That's his right.  But he has no right to offer defenseless

12   civil servants up to a virtual mob in order to overturn an

13   election.  The cost that has imposed on Ms. Freeman and

14   Ms. Moss, on all those he has deceived, and to the public's

15   confidence in our democracy are incalculable.

16          So we ask with your punitive damages award in this

17   case, send a message; send it to Mr. Giuliani, but send it

18   to any other powerful figure with a platform and an audience

19   who is considering whether they will take this chance to

20   seek profit and fame by assassinating the name and character

21   of ordinary people.  The message is:  Don't do it.  Those

22   ordinary people will stand up, they will fight back.  Facts

23   matter.  Truth is truth.  And you will be held accountable.

24          THE COURT:  Thank you, Mr. Gottlieb.

25          Mr. Sibley.

 1            While Mr. Sibley is getting settled, why don't we

 2    all stand up to stretch a little bit.

 3            Mr. Sibley, I think you sent an email to chambers

 4    with an objection, so we need to take that up first.  I

 5    don't know if the plaintiffs have seen it or not.  So why

 6    don't you go to the phone, please.

 7            (Whereupon, a bench conference was held:)

 8            THE COURT:  All right.  My law clerk has just

 9    brought to my attention that you sent an email to chambers,

10    which you didn't bring to my attention orally, that says you

11    object to the instruction in its entirety and you propose

12    some other instruction.

13            So do you want to explain that?

14            MR. SIBLEY:  Your Honor, I did discuss that during

15    our conference.  I believe that the instruction --

16            THE COURT:  So this email is just a repetition of

17    what you said at the charging conference?

18            MR. SIBLEY:  Yes, Your Honor.  I just didn't know

19    if I needed to put that in writing in response -- when you

20    asked Mr. Langford to email it, I presumed it was so we have

21    a record of that.

22            THE COURT:  No.  So I could get the words

23    correctly since he was speaking quietly and quickly.

24            MR. SIBLEY:  I understand.

25            THE COURT:  Okay.  All right.  Good.  I wanted to

1     make sure it wasn't something new.

2                    (Whereupon, the bench conference concludes.)

3                    THE COURT:  All right.

4                    MR. SIBLEY:  Your Honor, I believe Mr. Giuliani

5     had to take a bathroom break.  I think we -- counsel and I

6     can agree, can we take a brief bathroom break before I get

7     started?

8                    THE COURT:  Yes.  I didn't realize that.  Thanks

9     for bringing that to my attention.  I didn't see him slip

10    out.  Why don't we just take ten minutes.

11                   (Whereupon, the jury was excused and a recess

12    taken.)

13                   (Whereupon, the jury returns to the courtroom.)

14                   THE COURT:  All right.  Mr. Sibley, you may

15    proceed.

16                   MR. SIBLEY:  Thank you, Your Honor.  And may it

17    please the Court.

18                   Good morning.

19                   ALL JURORS:  Good morning.

20                   MR. SIBLEY:  We're almost done here, and it's been

21    hard to watch the victims in this case.  And everything that

22    you saw was 100 percent genuine; that wasn't acting.  You

23    could kind of see yesterday, Ms. Freeman was especially hard

24    to handle, and that's why we made the decision not to ask

25    her any questions.  We think enough was out.

1              We ultimately made the decision not to have my

2        client even testify because we feel like these women have

3        been through enough and, you know, this was -- no question,

4        as I told you in opening statement, that these women have

5        been harmed, that they're victims.  And that as the Court

6        has ruled, my client has committed wrongful conduct against

7        them.

8              So I am going to ask you to look at damages from

9        the standpoint of the victims.  The people are genuine, you

10       know, told you the truth.  But there is a separate part of

11       the case that I would call the lawyer part of the case.  And

12       the lawyer part of the case had witnesses that sat in that

13       box, and I didn't say anything to Dr. Humphreys, but if you

14       watched them testify, when they talked to the plaintiffs'

15       lawyers -- and by the way, these aren't parties that were

16       sitting here, these were paid people, they were paid

17       witnesses.  They don't remember how much they were paid, but

18       they were paid to come here and testify.

19             And when they talked to the plaintiffs' lawyers,

20       it was smooth as silk.  But whenever I asked them any

21       difficult question, they stopped they looked at the lawyers.

22       And I almost wanted to look at the ceiling to see if one of

23       the lawyers was puppeteering the witness.  That's how

24       rehearsed it was.  That's how robot-like it was.  It wasn't

25       genuine testimony.  And that's the kind of testimony they're

1   asking you to base your damages award on, and as we're going

2   to discuss, it is inappropriate.

3        As I mentioned, my client did not testify.  But if

4   you want to see some of the things he said about the case,

5   because I know it's -- you are probably thinking, like,

6   what -- what did he say about it?  Like, what happened?  And

7   there are some exhibits admitted that you can look at, and

8   they mention sworn testimony.  He made sworn statements

9   under oath about some of the issues in this case, and

10   they're called "interrogatories."  They are things that

11   happen in litigation where you send a question and someone

12   has to sort of answer it under oath.

13        And if you look at Plaintiffs' Exhibits -- I

14   believe they are all in evidence -- Plaintiffs' Exhibits 29,

15   36, 40, and 41, you are going to see sort of what my client

16   said about the conduct that happened here.  And what I think

17   you are going to see is that that video, that now infamous

18   video.  He didn't make that video.  It wasn't made by him;

19   it was made by somebody else; it was given to him.  In those

20   exhibits you will see it.  He relied on others, okay?  I am

21   not excusing the conduct; it's not excused, but he did rely

22   on others.  And some of those others are the people that you

23   have seen in this courtroom on video take the Fifth.

24        And that's why I kept bringing it up, whether

25   Mr. Giuliani had taken the Fifth because he hasn't.  And I

1     want you to ask yourself that question.  Like, someone who

2     is not taking the Fifth Amendment when they're testifying or

3     when they're citing interrogatory answers under oath.

4     Rightly or wrongly, that goes to what he thinks about

5     whether he has done something wrong.  Maybe -- that doesn't

6     excuse the conduct; I am not saying it excuses the conduct.

7     But they're asking you to award a catastrophic amount of

8     damages against my client.  And I think when you see what he

9     had to say about it, and sort of what his state of mind was,

10    you are going to say:  You should have done better, but you

11    are not as bad as the plaintiffs are making you out to be.

12            You know, when I talked to Ms. Moss for a little

13    bit about this issue -- because, you know, really, I mean,

14    we understand that now because we have been involved in the

15    case, but if someone has never, you know, counted ballots

16    before, you know, that video might on the surface make you

17    think something happened.  Of course nothing did, but you

18    might think something happened.

19            And the reason why I came up with the instant

20    replay example is that, you know, this wasn't an

21    open-and-shut thing.  This was something -- I am going to

22    show you Plaintiffs' Exhibit 426, which I understand is in

23    evidence.

24            And this is a report from the investigations

25    division of Georgia about this issue.  And if you look at

1    the date of the report, it's March 7, 2023.

2              THE COURT:  You need to turn that around.

3              There we go.

4              MR. SIBLEY:  All right.  It's March 7, 2023.  If

5    it's so cut and dry that -- you know, how can anyone think

6    it, why did it take so long for the defendant -- for the

7    report to come out?

8              And you can view that report and you are going to

9    see some of the things along the lines of what you see in

10   Mr. Giuliani's interrogatory answers.  Again, it was

11   irresponsible to jump to the conclusion that these women had

12   done the things that they were accused of without conducting

13   an investigation, no question about it.  These are serious

14   things.  But it's not like someone just completely made up a

15   story.

16             That's Plaintiffs' Exhibit 426.

17             And there was also a mention of how much work that

18   it took.  Mr. Gottlieb mentioned how much work it took and

19   the attorneys' fees to get to this point.  But the reality

20   is, if you look at Plaintiffs' Exhibit 513, which I

21   understand is also in evidence, this is -- and this is what

22   I talked to Dr. Humphreys about, it's the nolo contendere

23   stipulation.  And if you look at it, I just highlighted

24   there he desires to avoid unnecessary expenses in litigating

25   what he believes are unnecessary disputes.

1            And if you go and read that document, Plaintiffs'

2     Exhibit 513 -- you will see it in your exhibits -- he

3     basically says:  Look, I am not going to contest liability;

4     I am not going to contest it.

5            So I think you need to take that into

6     consideration when you're awarding damages, certainly

7     punitive damages, because he tried -- he tried to make this

8     simpler.  He showed up, okay.  It's not like he completely

9     didn't participate in the litigation.  And he did -- you

10    know, certainly did what he could to try to minimize the

11    effort that the plaintiffs needed to go through to get to

12    this point.

13           All right.  So the lawyers in this case are going

14    to ask you -- or have asked you -- for what I would consider

15    a Hollywood-type damage model.  And when we get done

16    talking, I think -- I hope that you will agree with me that

17    justice requires actual reasonable estimate of damages and

18    not what their expert witness, who has only ever done this

19    one time to Donald Trump, testified that they should get.

20           All right.  And here is the real case:  Most of

21    what we heard -- the horrible things that we heard, the

22    racism, the violence, that happened pretty soon after the

23    video started surfacing.  And if you remember, there was an

24    outlet called *The Gateway Pundit*.  We talked about that.

25    And there was a document that we had to kind of fight to get

1    it; it was our only exhibit, actually.  It's Defendant's

2    Exhibit 2.  And Mr. Gottlieb talked about patient zero,

3    meaning the spreader of the virus; and he blamed that on

4    Mr. Giuliani.

5          But as you will see -- and this is not a document

6    Ms. Freeman and Ms. Moss drafted, obviously, it's lawyers.

7    I'm not accusing anyone of anything.  But their lawyers

8    figured out sort of where their patient zero was and filed

9    this lawsuit, this *Gateway Pundit* lawsuit.  And I am going

10   to show you some of the things they said.

11         So Defendant's Exhibit 2, it's in evidence.  So

12   that is the document, okay.

13         Let me show you this page.  And by the way, this

14   lawsuit -- let me just -- well, it's actually on the last

15   page, I will show you.  But the lawsuit was filed

16   December 2nd of 2021, before this lawsuit.  And I actually

17   talked about that with Dr. Humphreys, if you recall.

18         But in paragraph 6 here, they say:  Defendant's

19   reports -- and they're talking about *The Gateway Pundit* --

20   were both false and consequential.  They caused Ms. Freeman

21   and Ms. Moss to be vilified on social media and subjected to

22   an onslaught of violent, racist threats and harassment of

23   all kinds.

24         That's a long complaint, so I am going to sift

25   through it here and get to the parts that matter.  And then

1    if you look at paragraph 49, it says -- let me move this

2    sticky note so you can see it all.

3           It says:  On December 3rd -- December 3rd,

4    remember, that's the day that the video came out -- *The*

5    *Gateway Pundit* published another article with the false

6    report.

7           Okay.  And this, if you look at paragraph 50, that

8    article was the first to identify by name Ms. Freeman.  And

9    it also named her business, okay?  It talks about the purple

10   top.  It says her name again.  I mean, it's very, very

11   identifying.  It talks about her company name, and it even

12   talks about her LinkedIn page.

13          Now, the question I had when I first looked at

14   this was:  How do these people so quickly -- have been able

15   to find the number and contact information for people that

16   are just ordinary folks?  And here was the answer.

17          So I want you to ask yourself, one of the

18   questions that you have is -- it's a more-likely-than-not

19   question, like, more likely than not what caused what.  And

20   by the way, *The Gateway Pundit* is not a co-conspirator in

21   this case; they're a separate entity.

22          More likely than not, if these ladies are getting

23   these horrible messages right after the video comes out, is

24   it more likely due to the story that identifies them by name

25   and gives identifying information to contact them through

1     LinkedIn or whatever, or is it someone that says the video

2     looks like voter fraud?

3            Well, clearly more likely than not this is the

4     party that sort of dox these women, okay?  That's how the

5     name got out, that's how everyone knew who they were, and so

6     that's why they were sued first.

7            Let me finish up here.  I want to show you a few

8     more things.

9            Paragraph 56, I am not going through every

10    sentence here, but I want to show you that *The Gateway*

11    *Pundit* was apparently also the first to identify Ms. Moss.

12    It talks about, right here, (indicating), that her name is

13    Wandrea Moss.

14           And then, in paragraph 121, again this is

15    Defendant's Exhibit 2.  Until this day, Ms. Freeman -- this

16    is, to be fair, 2021 -- "to this day, Ms. Freeman continues

17    to receive threatening communication," referencing

18    defendant's defamation.  That's *The Gateway Pundit*.

19           And then, again, we see some of the allegations

20    that were made in this case that Mr. Giuliani is responsible

21    for actually was *The Gateway Pundit*.  In paragraph 122, the

22    phone calls to Ms. -- Ms. Moss's phone that her son

23    answered.

24           And, again, Ms. Moss and Ms. Freeman didn't say

25    that Mr. Giuliani caused this; this was the argument made by

1   their lawyers, and their experts tried to make it, although

2   they couldn't really do that.  Their lawyers have already

3   identified and admitted who is responsible for this.  Okay?

4   I am not saying Giuliani wasn't responsible for some harm.

5   I am not saying that some people may not have looked at that

6   video that he posted, got ahold of this information that *The*

7   *Gateway Pundit* put out and then sent messages to them.  I

8   have no doubt that it happened, because there is one message

9   I will show you later that has Rudy's name on it.  But this

10  is the proximate cause of the identification of the

11  witnesses to where the public directed these horrible

12  comments out there.

13          And in this lawsuit, I am just going to show you

14  paragraphs 151 and 152, you are going to see -- and this is

15  the same kind of -- exact same allegations that you see in

16  this case:  Reputational damage, humiliation, et cetera.

17  You see the same thing later on for Ms. Moss, in

18  paragraph 170.

19          And, in fact, in paragraph 174, you see that they

20  specifically encouraged people to retaliate and harass the

21  plaintiffs.  And that's what we saw in those horrible

22  messages and audio transcripts.

23          And think about this:  The kind of people that are

24  looking at these sort of fringe media sites like *The Gateway*

25  *Pundit*, those are the kind of people who are more likely to

1     do the kind of things -- all of the kind of things that we

2     saw here.

3               I want to show you -- well, I will show you -- you

4     saw it earlier, I think, in Ms. Freeman's examination, but

5     there is one message from someone who references

6     Mr. Giuliani, and it's probably the tenuous one that we saw

7     of all of them.  And so, again, I have no doubt that

8     Mr. Giuliani's statements -- I mean, he is a public

9     figure -- caused harm; no question about it.  But I am

10    trying to show you that just because these things happened,

11    and they certainly did happen, it doesn't make my client

12    responsible for them, especially when they have already

13    identified patient zero.

14              And as you can see in paragraphs 178 through 80,

15    they're also claiming the emotional distress and anxiety

16    here in this lawsuit.

17              Okay.  So what happened next?  Well, after they

18    filed that lawsuit, they then filed a lawsuit against my

19    client, and Mr. Gottlieb mentioned codefendants that are no

20    longer here, that that was the *One America News Network* and

21    reporters, and that ultimately there's a settlement and are

22    no longer in the case.

23              But if you look at the complaint that's in

24    evidence, you can compare it with -- it's Plaintiffs'

25    Exhibit 27, and I am not going to go through it because it's

1    very long.  But if you look at the harm complained of and

2    the types of things that happened, it is identical, looks

3    like a cut and paste almost of *The Gateway Pundit* complaint.

4           So what they did was -- they said:  Well, look, we

5    have identified patient zero, but let's identify patient

6    deep pockets and try to go after them.  And so that's why

7    they filed a suit against us and they're trying to blame all

8    of this conduct on Mr. Giuliani and these supposed

9    co-conspirators.

10          So I showed you Defendant's Exhibit 2, and that is

11   going to show you who patient zero really is.  Now I want to

12   show you -- one of the arguments I think they made was:

13   Well, sure, *The Gateway Pundit* did this, but this was really

14   part of the conspiracy.

15          Well, let's look at Plaintiffs' Exhibit 1, which

16   is in evidence.

17          And I talked about this, I believe, with

18   Dr. Humphreys.  But the timing of that plan was supposed to

19   take action, this is the conspiracy plan.  And, yes, I know

20   plaintiffs are going to argue to you that the Court will

21   instruct you that the conspiracy formed on or about

22   December 3rd, but what's at issue here is what acts did the

23   co-conspirators take in furtherance of the conspiracy?

24   That's language you will see in the jury instructions.

25          And the only evidence of when the actions in

1    furtherance of the conspiracy are going to take place are in

2    this document.  And that's December 27th through

3    January 6th.

4            Almost all of those messages, the horrible ones

5    that you saw, are way before that.  Not only that, the two

6    of the highest number of impression tweets -- not tweets,

7    but social media impressions that Dr. Humphreys talked

8    about, those are from the Trump -- Team Trump, or whatever

9    that is, on December 23rd of that year.  So a lot -- any

10   conduct they're complaining of from the so-called conspiracy

11   that occurred prior to this date range can't have taken

12   place in furtherance of the conspiracy because the only

13   evidence of anyone doing anything in furtherance of the

14   conspiracy is in Exhibit 1, and you see the date range

15   there.

16           And remember, this document also points out that

17   they, the co-conspirators, were relying on *The Gateway*

18   *Pundit* for their information.  Should they have?  Of course

19   not.  But, again, patient zero is listed in Exhibit 1.

20           Okay.  And by the way, there was some discussion

21   about this Giuliani Strategic Communications Plan that we

22   saw in Exhibit 1.  And they mentioned there was an email

23   that talked about between 5 and $8 million.  First of all,

24   there is no evidence that that money was ever spent.  We

25   don't know what the money was being spent for.

1          What we do know, however, is that political

2     advertisements are usually on TV, sometimes they're on other

3     forms of media.  But as you saw Dr. Humphreys sort of break

4     down, there was a pie graph, and it showed, like, how much

5     it cost to do this and that.  TV is very expensive.  And

6     even if you could accept what I am going to argue to you

7     shortly is a patently ridiculous notion that an individual

8     seeks to repair the reputation by taking out ads on TV or in

9     the newspaper, even if you accepted that, you can't compare

10    whatever these political advertisements were going to be on

11    network TV with what Dr. Humphreys was talking about with

12    respect to Twitter and -- you know, other sort of

13    alternative media sites.

14          All right.  Of course, we heard about the

15    President Biden lawsuit.  Mr. Gottlieb talked about where

16    you can find that in evidence and tried to make the argument

17    that:  Well, since Giuliani is seeking millions of dollars

18    in damages, you know, what is he complaining about here?

19          I believe if you look at that lawsuit, what you

20    are going to see is that's a lost-profits lawsuit because as

21    that lawsuit alleges, when Mr. Giuliani wrote the story

22    about the Hunter Biden laptop, there were a flurry of people

23    that accused him of being a Russian spy.  And that turned

24    out to be false because it actually turned out to be true --

25    it was a laptop -- as you will see in the petition.  But

1      that's one of the reasons why he is having such a hard time

2      accepting the things about this case.

3              And that's kind of the conversation I had with

4      Dr. Humphreys.  And, you know, Mr. Gottlieb kind of poked

5      fun about the flat-Earth and COVID.  But the problem is,

6      when you tell people one day that this is absolute truth and

7      it's misinformation, people lose their jobs over it because

8      they believe it.  And then months later it turns out they

9      were right, it makes people distrusting, it makes people

10     distrusting of authority figures.  That's what happened with

11     COVID.  When the whole lab thing came out, people panned

12     through social media because of this Chinese theory.  And

13     now it's generally accepted as true.

14              And so, I mean, this is something that I want you

15     to take into consideration with respect to Mr. Giuliani

16     because there is a reason why this case was brought in

17     Washington, D.C.  He is from New York; they're from Georgia.

18              You have to send a message to the country with

19     this verdict that we don't have blue state and red state

20     America when it comes to justice.  Justice isn't red or

21     blue.  We shouldn't be trying to disparage people with

22     politics when it comes to justice.  I am not saying that my

23     client wasn't in some way guilty of that with the statements

24     he made, with the Democrats stealing, things like that, but

25     two injustices don't make justice, they just don't.

1          And one of the things -- also, I want you to keep

2     in mind is that when Mr. Giuliani's -- when the truth came

3     out about Mr. Giuliani's -- about the laptop allegations, he

4     was essentially -- he wasn't rehabilitated the same way the

5     plaintiffs were, right?  I mean, the story broke that, well,

6     it really was his laptop.  He didn't get the same treatment

7     that they got.  And so does it excuse his conduct?  No.  But

8     I am trying to understand why he's better; why maybe he's

9     made some of these statements that you have seen, even

10    during this trial.  And I am going to ask you -- at the end

11    of my presentation, I am going to ask you to take into

12    consideration some other things.

13          All right.  All right.  Dr. Humphreys.  As I

14    stated, I think it's just patently absurd to claim that the

15    measure of damages for repairing someone's representation is

16    trying to convince the people who will never be convinced

17    that they're wrong.  And it's very strange that the only

18    time that was ever used was with President Trump.

19          And by the way, President Trump only got

20    $8 million, according to Dr. Humphreys.  Now, she said she

21    couldn't remember how much she asked for, but I would argue

22    to you that the reason why she did that was because she

23    likely knows that what happened in that case was that her

24    theories of damages were either rejected by the Court or the

25    jury, and President Trump was actually penalized much less

```
1    than what she actually asked for.

2           And as we discussed with her when she was on the

3    stand, her damages calculations fluctuated over a period of

4    just a few months.  It was 14 to 41 million, and then it was

5    19 to 74 million, and a couple months later 17 to 47.  And I

6    could never really understand how this is supposed to work.

7           But ultimately what you are being asked to do

8    under Dr. Humphreys' scenario is to essentially try to

9    reeducate the public that, as we saw from that Georgia

10   report, people had been spreading -- trying to spread the

11   truth about the election for years.  And it's just done no

12   good.  And so to try and quantify reputational harm by

13   trying to convince the people that obviously will never be

14   convinced is just not an appropriate damages model.

15          And one of the things she could have done that she

16   didn't do is she could have seen how, for example, when OAN

17   took the stories down and issued -- Mr. Gottlieb said there

18   was no evidence of the retractions or the apologies from

19   OAN, but Ms. Moss said they published accurate information

20   on the stand.  We can only assume and should infer from that

21   that they told -- they said that the election claims were

22   lies.  What effect did that have on the reputation?  How did

23   it help with the repair?  Because as we saw, it apparently

24   had no effect because people who believe this stuff are

25   still going to believe it no matter what.
```

1          All right.  Oh, one other issue about

2     Dr. Humphreys that I wanted to bring up.  These documents --

3     this was from the Jensen Hughes people.  Part of -- part of

4     your job as jurors is to assess credibility of witnesses.

5     There was a lot of evasive testimony from Dr. Humphreys, but

6     she knew there was potentially a problem with the Jensen

7     Hughes document.  This is from them.  And what she said was,

8     is that this had nothing to do with her report, even though

9     she reviewed these documents that look like two *Encyclopedia*

10    *Britannicas*, right?  It's patently ridiculous.  And instead

11    of just admitting that:  "Sure, I relied on it."  "I looked

12    at thousands of pages of documents and wouldn't use it for

13    my report," she just denied it because she realized because

14    of some issues that we were having that perhaps those

15    documents were not reliable.

16          All right.  Let's talk about one of the standards

17    that you are going to be asked to look at in the jury

18    instructions.  We talked about harm.  Mr. Gottlieb talked

19    about harm that naturally flows from the conduct of

20    plaintiff here.

21          Racism, violence, you know, those are not --

22    that's not conduct that one can expect can naturally flow

23    from believing that someone committed an act of stuffing the

24    ballot box.  Maybe causing an investigation, which is what

25    happened.  They had to go through a lot of hassle.  Maybe

1    causing an investigation, maybe causing the public disdain,

2    things like that, sure, but not the kind of stuff that we

3    saw.

4          If Mr. Giuliani did that, if he had actually been

5    encouraging violence against these women, one would hope he

6    would be in jail.  But that's not what he did.

7          And I am going to show you the one message that we

8    can tie definitively to Mr. Giuliani, and that's Plaintiffs'

9    Exhibit 81.  It's from Jeremy Hughes, whoever that is.

10          What he says is:  "Why did you give up your

11    freedom for Joe Biden?"  And then he goes on to talk about

12    Uncle Rudy.

13          Okay.  Is this bad?  Is it harassing?  I am sure

14    it caused anxiety for the plaintiffs, but it's a completely

15    different category than the kind of vitriolic racist

16    messages that you saw that were around the time that *The*

17    *Gateway Pundit* identified the plaintiffs.

18          All right.  So if we're not going to look at

19    Dr. Humphreys' numbers, what should we look at?

20          I am going to show you what is Plaintiffs'

21    Exhibit 588.  This is a stipulation that we agreed to as far

22    as some of the numbers because, again, like I told you in

23    opening, you have to award some damages.  I mean, there are

24    damages here.

25          So I want you to look at the numbers in

```
1    Exhibit 588.  There are some numbers about people taking the

2    Fifth.  Rudy's is zero.  But look at the numbers here as far

3    as what the plaintiffs' expenses, damages they have

4    incurred; $237,000 in line 1.

5           On the second page it's close to $7,000, almost

6    $5,000, $130,000.

7           I mean, you can see -- of course, the income.  You

8    can see real numbers there.  That's not something that we

9    have to rely on someone who is getting paid to make up.

10   Okay?

11          So I am going to ask you -- when you award

12   damages, you need to base it on these numbers.

13          For example, if you were to give the plaintiffs,

14   for example, income loss over, say, a ten-year period, that

15   would be reasonable because we can tie it to what they have

16   actually lost, or what the -- some kind of number that we

17   can definitively tie it to.  And so you are going to have a

18   verdict form, and I am going to ask you to award numbers

19   that are consistent with actual numbers that the parties

20   have agreed to and that can be supported by facts as opposed

21   to some person that was paid to come in and testify.

22          And there was also a "Punitive Damages" section.

23   And I think when you look at the jury instructions, it's

24   going to tell you to keep the punitive damages within a

25   reasonable range and it has to be tied to the actual
```

1      damages.  So when you award punitive damages, it needs to be

2      in some way tied to whatever the actual damages are.  In

3      other words, there shouldn't be a punitive damages award of,

4      I don't know, say, 5 million if you were to decide to award

5      a million dollars in actual damages.  It should be something

6      more closely related to the actual damage number.

7             All right.  Rudy Giuliani is a good man.  I know

8      that some of you may not think that, and he hasn't

9      exactly -- he hasn't exactly helped himself with some of the

10     things that happened over the last few days, but I don't

11     think that it was appropriate for this picture to be used

12     for my client (indicating).  He is almost 80 years old.

13     This is something that's common in the media, where they

14     make fun of him and laugh at him and try to humiliate him.

15     Rudy Giuliani shouldn't be defined by what's happened in

16     recent times because, as Mr. Gottlieb said, this is the Rudy

17     Giuliani that most of us remember.  And he is the guy who

18     became mayor of New York City, one of the most, if not the

19     most diverse city in the country.  And he was loved by the

20     people there.  So the idea of him being a racist or

21     encouraging racist activity, it's really -- you know, it's

22     really a low blow.  That's not who he is.

23             He overcame, as you will see -- and the book is in

24     evidence, I am not asking you to read it, that would be a

25     long jury deliberation -- but he overcame negative

1    stereotypes.  When I was growing up everyone associated the

2    mob with Italians, and that was something very difficult for

3    him because he knew that it's not right; it's not fair for

4    people to stereotype.  Italian Americans are great people,

5    and that's why he fought to take down the mob.

6            When I was in law school -- I started in 2001, and

7    I was from Texas -- I had never really been to the Northeast

8    very much.  And I remember the first week of law school,

9    sitting in class before we even had smartphones.  People

10   would come in, and they were talking about these horrible

11   things that were happening in New York.

12           I just remember how -- you know, it was a very

13   traumatizing period for our country, and it was a time that

14   we all came together.  And I remember seeing Rudy at the

15   Yankees' game, wearing his fire department or NYPD hat.  And

16   I really felt proud to be an American at that point because,

17   you know, it was New York.  I wasn't a Yankees fan, but it

18   was -- you know, it was a unifying time.  And we are not

19   very unified right now.  We are probably as divided as we

20   have ever been.  A lot of the stuff that is going back and

21   forth is just political vitriol, and it's hard to see it.

22           But there was another time that happened in our

23   country, it was a lot worse than it is now, and there was a

24   man who probably single-handedly almost saved the Union.

25   And, of course, we know that was Abraham Lincoln.  And one

1     of the famous quotes from President Lincoln was when he knew

2     this had to be the case to reconcile the country was:   To

3     have malice toward none and justice for all.

4              I know it's kind of a cliche' thing, but you've

5     got to do that here.  I know he's done things that are

6     wrong, and I know these women have been harmed, but I am not

7     asking for a hall pass for that.  But I am asking you to

8     remember that this is a man who did great things.  And if

9     you haven't been so great lately, I want you to judge him by

10    the entire character of who he is, not by some of the things

11    that happened.  I want you to compensate these women for

12    what you rightly believe that, you know, is due and owing to

13    them.  But I want you to -- I want you to remember, this is

14    a good man.

15             And you need to send a message to America, send a

16    message to America that we can -- we can come together in

17    compassion and, you know, sympathy.  And, you know, I think

18    we need that for the healing for what we have gone through,

19    especially with January 6th.  And I don't want this to be

20    used as some kind of harbinger of look what they did to

21    Rudy -- and this needs to be -- I am asking you to be

22    reasonable and just.  Okay?  That's all I am asking.

23             Thank you.

24             THE COURT:  And we're on redirect.

25             MR. GOTTLIEB:  Ladies and gentlemen, this case is

1    not about who Rudy Giuliani is or what he did in his past;

2    it's about what he did.  It's about what he did to Ruby

3    Freeman and Shaye' Moss.  And a lot of what you just heard

4    from Mr. Sibley about what Mr. Giuliani thinks or his views

5    on different issues in the case, we'd know if he had

6    testified in the case.  He didn't testify in this case.  I

7    will come back to that.

8         So those Mr. Sibley's sort of musings about what

9    he might have said.  And, of course, you are free to look at

10   all of the exhibits that are in the record; and I am sure

11   you will do that as you deliberate and make up your own mind

12   about the facts in this case.  But this case is not about

13   sending a message based on past actions and past conducts,

14   that is not your charge in punitive damages, it's not about

15   the Yankees or 9-11 or the U.S. Attorney's Office or taking

16   on the mob; it's about the conduct in which the defendant

17   engaged, directed at Ruby Freeman and Shaye' Moss.  And

18   based on that conduct, sending a message to both

19   Mr. Giuliani and others who might follow his actions.

20        I will try to be brief, I know we have gone on a

21   long time, and I am sure you are eager to get on with

22   deliberations.  Let me address a few of Mr. Sibley's points.

23        You heard a lot about *The Gateway Pundit*, so let

24   me talk about *The Gateway Pundit*.  You know, you heard

25   Mr. Sibley sort of walk through Defense Exhibit 2, the

1    complaint in *The Gateway Pundit* action.  This is a losing

2    argument for Mr. Giuliani for more reasons than I can count.

3              The first is that, as you heard from Ms. Moss's

4    testimony -- sorry.

5              Thank you, Mr. Spalding.

6              As you heard from Ms. Moss's testimony, everyone

7    who helped spread lies about Ms. Moss and Ms. Freeman should

8    be held accountable.  The fact that there might be some

9    other publications out there that participate in this viral

10   campaign does not mean that Mr. Giuliani should not be held

11   accountable for his statements and the things that he said.

12             And second, Mr. Sibley is talking about this case

13   as though there is some guarantee that it will end and,

14   therefore, result in some kind of a financial award or

15   windfall to our plaintiffs.  As we have established, there

16   is no evidence of that.  There is no guarantee that

17   Ms. Freeman and Ms. Moss will receive any kind of

18   compensation.

19             Third, remember what I said in my opening

20   statement to you about December 3rd.  So before this *Gateway*

21   *Pundit* article was ever published, remember on that morning

22   Rudy Giuliani could have stopped all of this.  None of this

23   had to happen if he had just asked those basic questions:

24   What does the video show?  What did the eyewitnesses say?

25   What do the Republican poll watchers who were paid to be

1    there in State Farm Arena to see what happened, what did

2    they say?  You know what they would say.  And if he would

3    have asked the question, he would know too.

4         So anything after that -- he was the head of the

5    Trump campaign legal team.  He was responsible for the video

6    being played the first time.  He was responsible for it

7    being spread out into the world in all of the ways that you

8    saw.

9         Even if you didn't believe me on any of those

10   things I just said, let's look at what *The Gateway Pundit*

11   complaint actually says.  And if you look at it, you will

12   see the only reason Ms. Freeman and Ms. Moss ended up on *The*

13   *Gateway Pundit's* radar is because of Mr. Giuliani and his

14   conspiracy.  So if you look at paragraph 4 here in the

15   complaint, which Mr. Sibley showed you in Defense Exhibit 2,

16   it shows that *The Gateway Pundit* piggybacked off of Rudy

17   Giuliani and Trump campaign's conspiracy.

18        If you look at headings B, C, and D from the same

19   complaint, it was Rudy Giuliani's conspiracy that first

20   published the lies about Ms. Freeman and Ms. Moss, and that

21   is what put them on *The Gateway Pundit's* radar in the first

22   place.  And you saw this, as Ms. Moss testified, the

23   headline of the first *Gateway Pundit* article was basically a

24   cut-and-paste of the Team Trump tweet from December 3rd.

25   That's how it wound up in the St. Louis newspaper, because

1    Mr. Giuliani and Team Trump wanted it in that media

2    environment.  That's why it wound up there.  That's how this

3    happened.  That's how it spread, and that's why he is

4    responsible.

5              Mr. Sibley made some comments at the start I found

6    interesting about puppeteering witnesses, and let me tell

7    you, if I had the capacity to puppeteer the testimony of

8    women like Regina Scott and Ashlee Humphreys, I would be

9    some kind of a magician.  I am just a lawyer.

10             You saw Mr. Sibley questioning Dr. Humphreys about

11   other cases, and not this one, asking her a bunch of

12   questions about:  What did you do in this other case?  What

13   did you do in this other case?  What was your work in that

14   other case?

15             Is there any wonder or any doubt why she might be

16   confused about why she's being asked questions like that?

17   She is a professor, a Ph.D. at the finest journalism and

18   finest business school -- one of them, in the United States.

19   I am a little biased as a Northwestern grad, I will admit.

20   But she -- her credentials are impeccable and unimpeachable.

21             And when he was actually asking her questions

22   about her models, not about other cases or flat-Earthers or

23   Hunter Biden, but when he was asking her questions about her

24   calculations -- he didn't really ask her questions about her

25   calculations -- but when he was asking her questions about

1    what data is this based on, she had a cite.  "That's a

2    Science magazine article."

3         "What data is your receptive audiences

4    calculations based on?"

5         "That's from Pew."

6         At every point she had publicly available data and

7    information to recite to you about where she got her data,

8    how she did her calculations, and then explained how it was

9    nearly identical in construction and form to the strategic

10   communications plan that was good enough for Donald Trump

11   and the Trump campaign.

12        The cost estimates even lined up.

13        Mr. Sibley mentioned again, as he had before, that

14   Mr. Giuliani didn't take the Fifth, and he deserves credit

15   for that because he showed up for a deposition and didn't

16   invoke his Fifth Amendment rights.

17        This leaves out that he showed up to his

18   deposition without producing any documents to us.  I should

19   revise "not any documents"; there were some.  But not --

20   nearly all of the documents that he was required to produce

21   for the Court, he hadn't produced, so we could him questions

22   and test what he knew and find those 10,000 emails a day

23   that you heard Ms. Bobb in her testimony say he was getting;

24   didn't have an opportunity to look at those.

25        We asked for metrics on his Twitter and Facebook

1    account to see precisely how many people saw his messages;

2    didn't get that.  We asked for information on his -- the

3    agreements that he had for his podcasts and his radio shows

4    so we can see how much do you get from advertising revenue,

5    how many people listen to your show every day; he wouldn't

6    give us that.  We asked for his tax returns to see what his

7    net worth is; I think we got one from years ago.

8            And you have heard that the Court has asked you to

9    make certain inferences based on that.

10           So Mr. Sibley asking you to give Mr. Giuliani

11   credit because he showed up and sat for a deposition is a

12   little bit like asking to give a kid who showed up to take

13   his midterm exam credit even though he plagiarized and

14   copied the whole thing.

15           Mr. Sibley mentioned -- he put up Plaintiffs'

16   Exhibit 246 in talking about the investigations.  He put it

17   up here on the screen and said:  How can this be so cut and

18   dry if there is an investigation that didn't get concluded

19   until 2023?

20           You heard Frank Braun's testimony, the author of

21   that investigation.  He testified in this case; he gave a

22   deposition under oath.  You know who didn't show up to that

23   deposition to ask him any questions, like the one he was

24   implying?  Mr. Giuliani didn't show up, didn't ask him any

25   questions.  If he had, maybe he would have learned about all

1    of the investigative work and reporting that came from the

2    Georgia Secretary of State's Office in the first week of

3    December 2020.  We showed you videos; we showed you evidence

4    of that.

5            Mr. Sibley mentioned a stipulation that

6    Mr. Giuliani entered into, and that shows that he desired to

7    keep costs down and proceed efficiently here.  Whose costs?

8    His costs.  Those are the costs that he's trying to keep

9    down by stipulating to liability in this case.  It's

10   certainly not ours.

11           And even after that stipulation, remember

12   Ms. Scott's testimony that after August of 2023, he defamed

13   our clients 20 times.  After he made that stipulation saying

14   he wasn't going to challenge liability in this case, and

15   then did it again on Monday on the courthouse steps.

16           Mr. Sibley referred to Dr. Humphreys' model as a

17   Hollywood damages model, which, again, suggests that our

18   clients' reputations and worth doesn't belong on the same

19   plane as an actor or a celebrity.  Maybe Dr. Humphreys'

20   model is fine for them, but not for these civil servants.

21   It's a ridiculous argument, and it's a ridiculous

22   conception.

23           He's further caricatured Dr. Humphreys as saying

24   she has got a made-up theory that's only ever been applied

25   to Donald Trump.  You know that's not true.  You saw that

1    one of the current cases that Dr. Humphreys has as an expert

2    is representing a single individual Trump voter, registered

3    Republican, who was defamed by Project Veritas.  And all of

4    her active cases are in that same vein of representing

5    individuals who have become the victims of viral conspiracy

6    theories and disinformation online.  And you know why?

7    Because she is an expert at understanding how information

8    spreads on social media, and her training in economics

9    allows her to explain that in a way that is understandable

10   and can be translated into dollars.  And the only times it

11   has ever gone to court, it was accepted and relied -- and

12   the jury award relied on it.

13          And Mr. Sibley stood up here and engaged in some

14   kind of speculation that based on his questions to

15   Dr. Humphreys, that must mean that the jury in the *E. Jean*

16   *Carroll* case didn't give the award that she was asking for.

17   Remember, attorney arguments are not evidence.  You see no

18   evidence of any of that in this case, it has nothing to do

19   with this case.  It has nothing to do with Dr. Humphreys'

20   credibility.

21          Mr. Spalding, can we put up slide 65, please?

22          Mr. Sibley has raised an issue that he has raised

23   before, which is that the strategic communications plan has

24   a date of December -- is this 65?

25          One moment.  One more.  No.  We're going in the

 1    wrong direction, Mr. Spalding.  Yes.  No.  That one.

 2    Thank you.

 3           Mr. Sibley mentioned about the strategic

 4    communications plan, this argument again that has the dates

 5    December 27th through January 6th.  I don't know if you

 6    remember.  He is making that argument, and therefore, all of

 7    the stuff that happened before December 27th couldn't have

 8    been part of the strategic communications plan.  But you had

 9    witness testimony on this question from Bernard Kerik, under

10    oath, uncontradicted, that said they were working on the

11    contents of the plan for six weeks before December 27th.  In

12    other words, all of the bullet points in the plan was about

13    Georgia and Arizona, Ruby and Shaye' at midnight, suitcases

14    full of ballots.  All of that was in the works six weeks

15    before December 27th.  And it was on December 27th they sent

16    it to the White House and said:  We need to do this now,

17    we're running out of time.

18           So the plan was in the works long before they sent

19    it, it's just that by December 27th they hadn't yet executed

20    the engagement of the strategic communications professionals

21    to send out and disseminate the very messages that were

22    necessary in order to achieve the public messaging and

23    strategic communications objectives that they had laid out.

24           Also, what did Ms. Freeman tell you about this?

25    She testified about her recollection and her experiences

1    with respect to the plan.  She said:  "I felt this was a

2    plan.  This was a plan from the beginning that if No. 45

3    didn't win, then they already set this plan up, and now my

4    name is on a shirt, and they can fill me in the spaces."

5    (As read).  "They filled in the blanks with my name and my

6    business."

7            That's how she perceived it in real time, and

8    that's what the evidence shows, what happened in this case.

9            I think one last point about Dr. Humphreys.

10   Mr. Sibley brought up, again, that Dr. Humphreys' damages

11   model fluctuated from report to report.  And I am sure you

12   will remember during redirect of Dr. Humphreys, I brought

13   out those reports and asked her to explain why the damages

14   numbers had changed from one report to another.

15           Mr. Sibley says he can't understand how any of it

16   is supposed to work, but if he'd read Dr. Humphreys' reports

17   he would understand how it's supposed to work.  And the way

18   it's supposed to work is that she offered a damages model in

19   the second report that, remember, she told you on the stand

20   she wasn't recommending as a basis for damages in this case,

21   which is why her damages model in her testimony is lower,

22   more beneficial to the defendant than it was in that second

23   or interim report.

24           With respect to *One America News*, Mr. Sibley,

25   again, is speculating about a retraction from *One America*

1    *News* and what that said and what happened to it.  Again, we

2    have zero evidence on what this is.  For all we know --

3    Mr. Sibley is saying:  "Well, there was no OAN retraction,

4    so why is it that viewers of OAN still believe these lies?"

5           We don't know that.  We don't know how successful

6    the OAN retraction was.  There is no evidence of it in this

7    case.

8           Mr. Sibley hasn't shown you when that retraction

9    was and whether that may have factored into why

10   Dr. Humphreys didn't consider it in her analysis, given that

11   her initial report in this case was served in July of 2023.

12   There is just no evidence one way or the other.

13          We're almost done.

14          Mr. Sibley, towards the end, said:  Essentially,

15   it's unfair to hold Mr. Giuliani accountable for the racist

16   and violent language and threats that people saw because all

17   he was doing was -- is sort of expressing his view of what

18   happened on the video.

19          So first of all, the Court has already held and

20   determined that Mr. Giuliani acted with actual malice, and

21   you can -- understanding that the statements that he made

22   were false.

23          But second of all, he made statements like:

24   "They're drug dealers and criminals passing around vials of

25   cocaine and heroin."  In a super charged context of the

1    post-2020 presidential election environment with a warning

2    from Gabriel Sterling, on December 1st, that that kind of

3    rhetoric blaming government officials and government workers

4    for Donald Trump's loss in the State of Georgia was going to

5    get somebody killed.  He knew.  He had been warned.  They

6    knew it was happening.  It was foreseeable.  It was

7    inevitable.

8            Mr. Sibley made one point towards the end that

9    your punitive damages award needed to be tied to actual

10   damages and said that that means you should -- you know, you

11   should be making your damages award based on the costs that

12   our client incurred.

13           Your instructions will show you why that's an

14   incorrect understanding of both compensatory damages and

15   punitive damages.  Compensatory damages are not -- are not

16   limited to the receipts or actual costs that our clients

17   have, and you may presume damages.  We walked through in my

18   opening all of the different factors for presumed damages

19   that you can consider.

20           But punitive damages don't need to be tied to

21   actual costs, they need to be tied to the compensatory

22   damages award that you arrive at in this case.  That is what

23   your instruction will say.

24           So, again, I will return to your verdict form and

25   remind you what we would ask you to do in this case.

1          We ask you in the first two lines for the

2     defamation claim to award Ruby Freeman and Shaye' Moss an

3     amount of at least $24 million each.  We ask you to use your

4     discretion in rendering an award for Ruby Freeman and Shaye'

5     Moss for emotional distress, to use your common sense and

6     your judgment.  And then based on that, we ask you to render

7     an award of punitive damages that is sufficient to send a

8     message that this conduct in which Defendant Giuliani is

9     engaged is unacceptable and will not be tolerated.

10          Thank you, ladies and gentlemen.

11          THE COURT:  All right.  Ladies and gentlemen, I

12    know that it is a little bit past the lunch hour, but if you

13    can just hold fast and listen to my final instructions, when

14    I send you back, you can start your deliberations.  If you

15    will be patient with me, I am going to give you your final

16    instructions now.

17          We have ordered lunch for you, so lunch is waiting

18    for you when you return to the jury room.

19          So, Members of the Jury, at this time it is now my

20    duty and responsibility, as the trial judge, to give you

21    final instructions as to the law that applies in this case

22    and to the evidence that has been presented.  It is your

23    sworn duty to base your verdict upon the law given in these

24    instructions and upon the evidence that has been admitted in

25    this trial.

1          My instructions will be roughly divided into four

2     parts.  First, I will instruct you on the general principles

3     of law that apply here; second, I will instruct you on

4     evaluating the evidence; third, I will instruct you on the

5     law that applies in determining the amount of damages owed

6     to Plaintiffs Ruby Freeman and Wandrea ArShaye', or Shaye',

7     Moss by Defendant Rudolph W. Giuliani.

8          As I have explained, your duty in this case is

9     limited to determining the amount of any money damages to

10    award plaintiffs.

11         Finally, I will provide you with some instructions

12    about logistics and how you are to conduct your

13    deliberations.

14         I will provide you with written copies of these

15    instructions for your use during deliberations with enough

16    copies for each of you to have one.  So there is no need for

17    you to take notes now.  Just listen carefully.

18         I have allowed you to take notes during the trial,

19    if you wish to do so.  Recall that those notes are only for

20    your personal use and are only to be used as an aid to your

21    memory.

22         Your notes are not evidence in the case and they

23    should not replace your memory of the evidence.  Those of

24    you who have chosen not to take notes should rely on your

25    own memory of the evidence.  During your deliberations you

1    may, if you want, refer to these instructions.  While you

2    may refer to any particular portion of the instructions, you

3    are to consider the instructions as a whole, and you may not

4    follow some and ignore others.

5            If you have any questions about the instructions,

6    you should feel free to send me a note.  And I will give you

7    instructions later about how to send me a note.  These

8    instructions will be returned to me when your verdict is

9    rendered.

10           Now, I am going to talk about general instructions

11   now.

12           As I told you at the beginning of the trial, the

13   function of the judge is to conduct the trial of this case

14   in an orderly, fair, and efficient manner.  The judge also

15   must rule upon questions of law arising during the trial and

16   must tell you the law that applies to this case.

17           It is your duty to accept the law as I state it to

18   you without questioning the wisdom of these instructions.

19   In other words, even if you disagree or do not understand

20   the reasons for any of the instructions, you are bound to

21   follow them.

22           If an attorney has stated the legal principle

23   different from any that I state to you in my instructions,

24   it is my instructions that you follow.

25           Your function, as jurors, is to decide the facts.

1   You are the exclusive judges of the facts.  You alone

2   determine the weight, the effect, and the value of the

3   evidence and the believability of the witnesses.  You should

4   decide the facts only from a fair evaluation of all the

5   evidence without prejudice, sympathy, fear, or favor.

6          During the course of the trial you have heard

7   references to the terms "plaintiffs" and "defendant."

8   Simply put, the plaintiffs -- the plaintiff is the person

9   who starts a lawsuit, and the defendant is the person who is

10  sued by the plaintiff.  During your deliberations, however,

11  you must not attach any significance in weighing the

12  evidence to the terms "plaintiff" and "defendant."

13         In other words, the fact that the plaintiffs have

14  filed a lawsuit against the defendant does not mean that the

15  plaintiffs are entitled to your verdict or that their

16  evidence is entitled to greater weight than the defendant's

17  evidence.

18         As I mentioned, you must treat and consider all of

19  these instructions as a whole.  All of the instructions are

20  important.  You must not disregard, ignore, or give special

21  attention to any single instruction or part of an

22  instruction differently than the other instructions, nor may

23  you question the correctness of any rule I may state to you.

24  That is, you must not substitute or follow your own notion

25  or opinion as to what the law is or what it ought to be.  It

1    is your duty to apply the law as I give it to you regardless

2    of the consequences.

3            Remember that you are not advocates in this

4    matter, you are neutral judges of the facts.  The final test

5    of the quality of your service rely on the verdict that you

6    return to this courtroom.

7            You will make an important contribution to the

8    cause of justice if you arrive at a just and proper verdict

9    in this case.  Therefore, during your deliberations in the

10   jury room your purpose should not be to support your own

11   opinion but to determine the facts.

12           Now, during the course of the trial I may have

13   asked questions of the witness to obtain information or

14   bring out or clarify facts.  You should not take my

15   questions to witnesses as an indication of my opinion about

16   how you should determine the facts.  Similarly, you should

17   not take any rulings I have made during the trial or

18   anything I have said or done during this case, including

19   giving these instructions, as indicating what facts you

20   should -- or what your verdict should be based on those

21   facts.  You are the sole and exclusive judges of the facts.

22           The lawyers in this case sometimes objected when

23   the other side asked a question, made an argument, or

24   offered evidence that the objecting lawyer believed was not

25   proper.  Objections are not evidence.  You must not hold

1   such objections against the lawyer who made them or the

2   party he or she represents.  It is the lawyer's

3   responsibility to object to evidence that she or he believes

4   is not admissible.

5           Our system of justice requires that you decide the

6   facts of this case in an impartial manner.  You must not be

7   influenced by bias, sympathy, prejudice, or public opinion.

8   It is a violation of your sworn duty to base your verdict

9   upon anything other than the evidence in this case.

10          In reaching a just verdict, you must consider and

11  decide this case as an action between persons of equal

12  standing in the community and of equal worth.  All persons

13  stand equal before the law and must be treated as equals in

14  this Court.

15          Now I am going to talk about evaluating the

16  evidence.

17          You may consider only the evidence admitted in the

18  case.  The evidence consists of the sworn testimony of

19  witnesses, exhibits admitted into evidence, and facts

20  undisputed by the parties.  You may consider any facts to

21  which the parties have agreed to be undisputed.

22          If during the course of the trial I sustained an

23  objection to a lawyer's question or any evidence, then you

24  should ignore the question and you must not guess about what

25  the answer would have been.  Similarly, if I sustained an

 1    objection to an exhibit then you should ignore the exhibit

 2    and it should play no part in your deliberations.

 3         Statements and arguments of the lawyers are not

 4    evidence in the case unless made as an admission or

 5    undisputed fact.  They are entitled only -- they are

 6    intended only to help you to understand the evidence.

 7    Similarly, the questions of the lawyers are not evidence.

 8         If anyone describes the evidence that you heard

 9    differently from the way you remember it, it is your memory

10    that should control your deliberations.  You must rely on

11    your own recollection of the testimony and not on any notes

12    you may have taken during the trial.

13         In a videotaped deposition presented to you, a

14    witness asserted her right under the Fifth Amendment of the

15    U.S. Constitution and refused to answer a series of

16    questions on the ground that doing so may tend to

17    incriminate her.  You may infer from such a refusal that the

18    witness's answers would have been adverse to her interest,

19    but you are not required to make such inference and may

20    choose, instead, to disregard the evidence of the assertion

21    of the Fifth Amendment.  You should consider any inference

22    you may or may not choose to draw from any such refusal to

23    testify together with all of the other evidence in the case.

24         You should consider all of the evidence bearing on

25    each claim regardless of who produced it.  A party is

1    entitled to benefit from all evidence that favors that party

2    whether that party or the adversary produced it.  You should

3    not give more or less weight to evidence just because it

4    happened to be produced by one side or the other.

5         There are two types of evidence from which you may

6    determine what the facts are in this case:  Direct evidence

7    and circumstantial evidence.  When a witness, such as an

8    eyewitness, asserts actual knowledge of a fact, that

9    witness's testimony is direct evidence.  On the other hand,

10   evidence of facts from which reasonable conclusions may be

11   drawn is circumstantial evidence.

12        I am going to give you an example.  Assume a

13   person looked out a window and saw that snow was falling.

14   If he later testified in court about what he had seen, his

15   testimony would be direct evidence that snow was falling at

16   the time he saw it happen.

17        Assume, however, that he looked out a window and

18   saw no snow on the ground and then went to sleep and saw

19   snow on the ground after he woke up.  His testimony about

20   what he had seen would be circumstantial evidence that it

21   had snowed while he was asleep.

22        The law says that both circumstantial and direct

23   evidence are acceptable as a means of proving a fact.  The

24   law does not favor one form of evidence over another.  It is

25   for you to decide how much weight to give to any particular

1    evidence, whether it is direct or circumstantial.  You are

2    permitted to give equal weight to both.

3            In reaching a verdict in this case, you should

4    consider all of the evidence presented, both direct and

5    circumstantial.  You are to consider only the evidence in

6    the case, but in your consideration of the evidence you are

7    not limited to the statements of the witnesses.  In other

8    words, you are not limited solely to what you see and hear

9    as the witnesses testified.  You may draw from the facts

10   that you find have been proved such reasonable inferences or

11   conclusions as you feel are justified in light of your

12   experience.

13           Inferences are deductions or conclusions that

14   reason and common sense lead you to draw from facts

15   established by the evidence in this case.

16           The process of drawing inferences from facts in

17   evidence is not a matter of guesswork or speculation.  An

18   inference is not a suspicion or a guess.  An inference is a

19   reasoned, logical deduction or conclusion which you, the

20   jury, are permitted to draw but not required to draw from

21   the facts which have been established by either

22   circumstantial or direct evidence based on your common

23   sense.  In other words, you may make deductions and reach

24   conclusions which reason and common sense lead you to draw

25   from the facts which have been established by the testimony

1     and evidence in the case.

2            There are times when different inferences may be

3     drawn from facts, whether proved by direct or circumstantial

4     evidence.  The plaintiff asks you to draw one set of

5     inferences, while the defendant asks you to draw another.

6     It is for you, and you alone, to decide what inferences you

7     will draw.

8            I have said that you must consider all of the

9     evidence.  This does not mean, however, that you must accept

10    all of the evidence as true or accurate.  In deciding what

11    the facts are, you must weigh the testimony of all the

12    witnesses who have appeared before you.  You are the sole

13    judges of the credibility or believability of the witnesses

14    and the weight to be given to his or her testimony.  In

15    other words, you alone determine whether to believe any

16    witness and to what extent any witness should be believed.

17           Judging a witness's credibility means evaluating

18    whether the witness has testified truthfully and whether the

19    witness accurately observed, recalled, and described the

20    matters about which the witness testified.

21           You may consider anything that in your judgment

22    affects the credibility of any witness.  For example, you

23    may consider the witness's age, demeanor, capacity to

24    observe and recollect facts, the opportunity and ability to

25    see or hear or know the things the witness testified about,

1     the quality of the witness's memory, the witness's

2     appearance and manner while testifying, the witness's

3     interest in the outcome of the case, any bias or prejudice

4     the witness may have, other evidence that may have

5     contradicted the witness's testimony, the reasonableness of

6     the witness's testimony in light of all of the evidence, and

7     any other facts and circumstances bearing on credibility.

8            You may consider whether the witness has any

9     motive for not telling the truth; any interest in the

10    outcome of the case; or any friendship, animosity, or

11    cooperation toward other persons involved in the case; or

12    summarily evidence of hostility or affection which the

13    witness may have towards one of the parties.

14           You may consider the plausibility or

15    implausibility of the testimony of a witness.  You may also

16    consider whether the witness's testimony has been

17    contradicted or supported by other evidence.

18           It is your duty to consider whether the witness

19    has permitted any such bias or interest to color his or her

20    testimony.

21           In sum, you may believe everything a witness says,

22    part of it, or none of it.  After making your own judgment

23    or assessment concerning the believability of a witness, you

24    can then give that testimony the importance or weight that

25    you feel it deserves.

1          The weight of the evidence does not necessarily

2    depend upon the number of witnesses who testify.  The

3    relative weight of the evidence on a particular issue is not

4    determined by the number of witnesses testifying for either

5    side or the number of exhibits on either side.  It depends

6    on the quality and not the quantity of the evidence.

7          It is up to you to decide whether to credit the

8    testimony of a smaller number of witnesses or a small number

9    of exhibits on one side or the testimony of a greater number

10   of witnesses or a greater number of exhibits on the other

11   side.

12         A deposition is the testimony of a person taken

13   before trial.  The witness is placed under oath, swears to

14   tell the truth, and lawyers for each side may ask questions.

15   A court reporter is present and records the questions and

16   answers.  During the trial you have heard deposition

17   testimony that was shown by video.  Deposition testimony may

18   be accepted by you, subject to the same instructions that

19   apply to witnesses testifying in person in open court.

20         You should give deposition testimony the same fair

21   and impartial consideration you give any other testimony.

22   You should not give more weight or less weight to deposition

23   testimony just because the witness did not testify in court.

24         The parties may agree to certain facts.  When the

25   lawyers on both sides agree to the existence of a fact, you

1    must, unless otherwise instructed, accept the fact as

2    evidence and regard that fact as proved and to be undisputed

3    evidence.

4          The parties may also agree with the testimony a

5    particular witness would have given if he or she had

6    testified in this case.

7          If a party failed to produce relevant evidence or

8    failed to call a witness that could have given relevant

9    testimony at trial, and that evidence or witness was

10   particularly available to that party, and that party did not

11   sufficiently explain why the evidence or witness was not

12   produced, then you are permitted to infer that the evidence

13   or witness would have been unfavorable to the party who

14   failed to produce the evidence or witness.

15         Now, as I explained at the beginning of the trial,

16   in the preliminary instructions certain matters have already

17   been decided in this case.  I am going to explain what has

18   already been decided in this case and what you, the jury,

19   will have to decide.  You are not being asked to and you

20   must not reconsider any of the issues that have already been

21   decided in this case.  Before I give you instructions about

22   what has been decided, I will tell you the reason.

23         In a federal civil action like this case, parties

24   are entitled to the disclosure of all relevant,

25   nonprivileged evidence in the other party's possession or

 1    control during a process called "discovery."  That evidence

 2    can include relevant documents and electronically stored

 3    information, such as the defendant's computer files, emails,

 4    text messages, online chats, social media accounts, and call

 5    logs.  Since each party is entitled to obtain the other

 6    side's records, all parties to a lawsuit must preserve their

 7    records.

 8            The federal rules require parties to preserve and

 9    produce their records so that there will be a level playing

10    field when plaintiffs try to prove their claims and

11    defendants try to prove any defenses to those claims.

12            In this case, the Court found that Mr. Giuliani

13    willfully refused to comply with his discovery obligations,

14    including by failing to preserve all relevant records and

15    failing to provide plaintiffs with all relevant records.

16    Those records include relevant communications and documents,

17    whether stored in a filing cabinet or on a computer or

18    phone.

19            The Court also found that Mr. Giuliani's willful

20    refusal to comply with his discovery obligations caused the

21    plaintiffs prejudice, which means that it harmed their

22    ability to prove their claims.

23            To address the unfairness to the plaintiffs caused

24    by Mr. Giuliani's misconduct in complying with the rules of

25    fair discovery in a federal civil action, the Court has

1   issued certain orders that Mr. Giuliani is liable to

2   plaintiffs on their three claims against him without the

3   plaintiffs having to produce any more evidence than they

4   already have, given his failure to produce relevant records.

5   Also, under these orders certain facts must be assumed in

6   this case.

7          As I will explain again shortly, that means that

8   you will be required to assume certain facts in calculating

9   the amount, if any, awards of compensatory and punitive

10  damages.

11         I will explain plaintiffs' three claims for which

12  Mr. Giuliani is liable and then instruct you on the facts

13  that must be assumed in this case, as you make your

14  determination of any damages owed by Mr. Giuliani to

15  plaintiffs.

16         The Court already decided that Mr. Giuliani is

17  liable to plaintiffs for defamation, intentional infliction

18  of emotional distress, and civil conspiracy.

19         That means plaintiffs have met their burden of

20  demonstrating all of the factual elements of each of their

21  claims.

22         The Court has also determined that plaintiffs are

23  entitled to seek punitive damages.

24         You are not being asked to, and are not permitted,

25  to reconsider these matters.  Your only role is to determine

1    the amount of money Mr. Giuliani owes to plaintiffs as

2    compensatory damages and an additional amount as punitive

3    damages.

4         You are to decide this issue as to the amount of

5    any money damages based on the evidence that you have heard

6    and the instructions you have received.

7         I will begin by reviewing each of plaintiffs'

8    three claims and then instruct you in more detail on the

9    legal standards for how to determine the amount of any

10   damages owed.

11        Claim 1 for defamation.  As explained in the

12   preliminary instructions, it already has been decided that

13   Mr. Giuliani is liable to plaintiffs for defamation.  That

14   means you must accept for purposes of this trial that

15   Mr. Giuliani defamed Ms. Freeman and Ms. Moss by publishing

16   certain false and defamatory statements about them; that

17   Mr. Giuliani published these statements with actual malice

18   and without privilege to a third party; and that those

19   defamatory statements caused harm to Ms. Freeman and

20   Ms. Moss.

21        Those defamatory statements are what you will hear

22   referred to as the "actionable statements."  These are the

23   16 defamatory statements made after December 23, 2020, by

24   Mr. Giuliani and his co-conspirators.

25        The conclusion that Mr. Giuliani published his

1    statements about Ms. Freeman and Ms. Moss means that he

2    personally communicated statements about Ms. Freeman and

3    Ms. Moss to third parties or that he caused other people to

4    communicate the actionable statements to third parties.

5          The conclusion that the actionable statements were

6    false means that they were not true.  In this case, the

7    Court has already decided that the actionable statements

8    were defamatory.  A defamatory statement is one that would

9    tend to injure plaintiffs in their trade, profession, or

10   community standing, or lower them in the estimation of the

11   community.  In particular, the Court has concluded that the

12   actionable statements falsely accused Ms. Freeman and

13   Ms. Moss of committing crimes.  This is a serious type of

14   defamation known as defamation per se.

15         When a defendant commits defamation per se, the

16   plaintiffs need not prove that they were actually injured by

17   the statements.  Instead, the law presumes that plaintiffs

18   were injured.

19         In this case, you may presume that the actionable

20   statements injured Ms. Freeman and Ms. Moss in their trade,

21   profession, or community standing, and lowered them in the

22   estimation of the community.

23         The conclusion that Mr. Giuliani made the

24   actionable statements without privilege to a third party

25   means that he did not have a separate legal right to make

1    them.  The conclusion that Mr. Giuliani published the

2    actionable statements with actual malice means that

3    Mr. Giuliani knew his statements about Ms. Freeman and

4    Ms. Moss were false or recklessly disregarded whether they

5    were true at the time that he published those statements.

6            In other words, the Court has found that

7    Mr. Giuliani acted at least with a high degree of awareness

8    that the statements were probably false.  The Court's

9    finding that Mr. Giuliani caused harm to Ms. Freeman and

10   Ms. Moss means that they are presumed to have suffered harm

11   as a result of the defamation.

12           Claim 2 for intentional infliction of emotional

13   distress, which is sometimes referred to in shorthand as

14   "IIED."

15           The Court has already found Mr. Giuliani liable to

16   plaintiffs for intentional infliction of emotional distress.

17   That means you are to accept for purposes of this trial that

18   Mr. Giuliani intentionally inflicted emotional distress on

19   plaintiffs by engaging in extreme and outrageous conduct

20   that intentionally or recklessly caused Ms. Freeman and

21   Ms. Moss to suffer severe emotional distress.

22           Claim 3 for civil conspiracy.  The Court has

23   already found that Mr. Giuliani engaged in a civil

24   conspiracy to commit the torts of defamation and intentional

25   infliction of emotional distress on or before December 3,

1    2020, with Donald Trump; members of the Trump 2020

2    presidential campaign, including members of the Trump legal

3    team headed by Mr. Giuliani, who caused statements to be

4    published about plaintiffs or participated in such

5    publications; *One America News Network*, or OAN; OAN's

6    owners; and certain OAN reporters.

7         That means that Mr. Giuliani agreed with his

8    co-conspirators to commit defamation and intentional

9    infliction of emotional distress and took certain acts in

10   furtherance of that agreement.

11        As a result of this finding, Mr. Giuliani is

12   liable in this case, not just for the harm caused by his own

13   actions but also for all of the harm caused by the actions

14   that his co-conspirators took in furtherance of the same

15   conspiracy.

16        Now I'm going to talk about damages.  The amount

17   of money awarded to a party in a civil suit is called

18   "damages."

19        The Court has already determined that plaintiffs

20   are entitled to an award of two forms of damages:

21   Compensatory and punitive.  You should not consider the fact

22   that I am giving you this instruction as to suggest any view

23   of mine as to whether I think you should award any

24   particular amount of any damages.  That decision is entirely

25   for you to make.

1      As I have explained, your duty in this case is

2  limited to determining any amount of money in damages -- any

3  amount of money damages to award plaintiffs on their claims

4  against Mr. Giuliani.

5      Compensatory damages are the amount of money that

6  will fairly and reasonably compensate plaintiffs for the

7  harm they have suffered.

8      As I will explain in greater detail, in this case

9  "harm" is not limited to physical or economic harm but also

10  may include things like reputational harm, emotional harm,

11  and mental harm.

12      Punitive damages are awarded to a plaintiff above

13  and beyond the amount of compensatory damages.  Punitive

14  damages are not intended to compensate a plaintiff for the

15  harm that the plaintiff has suffered.  Rather, the law

16  permits a jury in a civil case to award a plaintiff punitive

17  damages against a defendant as a punishment for outrageous

18  conduct and to deter others from engaging in similar conduct

19  in the future.

20      By finding Mr. Giuliani liable for plaintiffs'

21  claim for defamation, the Court already has determined that

22  his statements harmed plaintiffs.  Your job is to quantify

23  that harm.

24      Compensatory damages for defamation should reflect

25  the amount of money that you decide will fairly and

1    reasonably compensate each plaintiff for the damages that

2    naturally flow from the publication and republication of the

3    actionable statements made by Mr. Giuliani and his

4    co-conspirators.  Such harm may include harassment and

5    threats to plaintiffs or their relatives, pain and mental

6    suffering, lowered professional and personal standing,

7    expenses to remedy the defamation, and lost profits.

8           You should not award compensatory damages for

9    defamation for any conduct of Mr. Giuliani or his

10   co-conspirators that occurred prior to December 23, 2020.

11   In other words, you should not award any compensatory

12   damages for defamation in connection with any statements

13   made prior to December 23, 2020.

14          In this case, as I mentioned, it has already been

15   decided that the actionable statements were defamatory

16   per se.  These kinds of statements that Mr. Giuliani made

17   are so likely to injure someone that the law presumes those

18   statements harmed plaintiffs in their trade, profession, or

19   community standing.  Because of this, plaintiffs were not

20   required to prove that they suffered any particular amount

21   of economic harm in order for you to award compensatory

22   damages for Mr. Giuliani's defamatory statements.  Instead,

23   you may presume that plaintiffs suffered harm as a result of

24   the actionable statements, and you have substantial latitude

25   to award an amount that you decide, using your good judgment

1   and common sense, fairly compensates the plaintiffs for the

2   harm caused by the actionable statements.

3          Damages to reputation cannot be proved with

4   mathematical accuracy, and you are not required to attempt

5   to do so.  You should award an amount that you decide in the

6   exercise of your good judgment and common sense is fair and

7   just compensation for the injury to plaintiffs' reputations

8   that the actionable statements caused.  You should consider

9   the plaintiffs' standing in the community, the nature of the

10  actionable statements, the extent to which the actionable

11  statements were circulated, the seriousness of the

12  defamatory charge, the tendency of the actionable statements

13  to injure a person such as the plaintiffs, the extent to

14  which the communication was actually believed, and all of

15  the other facts and circumstances in the case.

16         Fair compensation may vary ranging from $1, if you

17  decide the injury was nominal, to a substantial sum, if you

18  decide that the injury was substantial.

19         In making this determination, you must assume the

20  following five adverse assumptions:

21         One, Mr. Giuliani was intentionally trying to hide

22  relevant discovery about the finances of his businesses --

23  Giuliani Communications, LLC, and Giuliani Partners, LLC --

24  for the purpose of shielding his assets from discovery and

25  artificially deflating his net worth.

1    Two, Mr. Giuliani was intentionally trying to hide

2 relevant discovery about the viewership of *Common Sense* and

3 his social media reach for the purpose of artificially

4 deflating the reach of his defamatory statements.

5    Three, Mr. Giuliani received substantial financial

6 benefits from his defamation of Ms. Freeman and Ms. Moss.

7    Four, Mr. Giuliani's businesses -- Giuliani

8 Communications, LLC, and Giuliani Partners, LLC -- continue

9 to generate advertising revenue and other income from their

10 operations.

11    And adverse assumption No. 5, Mr. Giuliani was

12 intentionally trying to hide evidence about his financial

13 assets for the purpose of artificially deflating his net

14 worth.

15    Although plaintiffs are not required to present

16 evidence of the harm they have suffered as a result of the

17 actionable statements for you to award damages to compensate

18 for that harm, you are entitled to consider any such

19 evidence that was presented.  Plaintiffs' burden in

20 presenting such evidence is only to provide a reasonable

21 basis from which you can estimate the harm to their

22 reputation.  While you may not engage in speculation or

23 guesswork, you are entitled to approximate plaintiffs'

24 damages based upon the evidence they have presented.

25    Furthermore, if you decide that the evidence does

1    not fully capture the harm that plaintiffs suffered as a

2    result of the damage to their reputations, you may award an

3    additional amount that, using your good judgment and common

4    sense, you decide is necessary to fully compensate the

5    plaintiffs for the harm caused to their reputations by the

6    actionable statements.

7         The plaintiffs do not have to show that there is

8    an absolute certainty that the injury or loss will continue

9    into the future.  You may, however, award damages to

10   compensate Ms. Freeman and Ms. Moss for injury and losses

11   that you determine by a preponderance of the evidence will

12   continue.

13        After you have determined the amount that will

14   adequately compensate each plaintiff for the harm caused by

15   the actionable statements, you should enter that amount for

16   each plaintiff on the verdict form.

17        Now I'm going to turn to compensatory damages for

18   intentional infliction of emotional distress.

19        By finding Mr. Giuliani liable for plaintiffs'

20   claim for intentional infliction of emotional distress, the

21   Court already has determined that his actions caused each

22   plaintiff to suffer emotional distress.  Your job is to

23   quantify that harm.  Plaintiffs' burden is to provide a

24   reasonable basis from which you can estimate their

25   compensatory damages.  While you may not engage in

1    speculation or guesswork, you are entitled to approximate

2    plaintiffs damages based upon the evidence they have

3    presented.

4           There is no exact standard or mathematical formula

5    for deciding the compensation to be awarded for this type of

6    harm, nor is the testimony of any witness required about the

7    amount of compensation.

8           To decide the amount that would fairly and

9    reasonably compensate plaintiffs for emotional distress, you

10   should consider the facts of this case in the light of your

11   own experience and common sense.  To compensate plaintiffs

12   for intentional infliction of emotional distress, you may

13   consider any mental pain and suffering, fear, inconvenience,

14   nervousness, indignity, insult, humiliation, or

15   embarrassment that each plaintiff suffered because of

16   Mr. Giuliani and his co-conspirators' conduct.

17          When determining the amount of damages to award

18   for this claim of intentional emotional distress, you must

19   not consider any of the reputational harm for which you have

20   already awarded compensatory damages for defamation.

21          In considering damages for intentional infliction

22   of emotional distress, you may consider harm caused by

23   Mr. Giuliani and his co-conspirators that occurred anytime

24   after December 3, 2020.

25          Plaintiffs do not need to show that there is an

1     absolute certainty that the injury or loss will continue

2     into the future, but you may award damages to compensate

3     Ms. Freeman and Ms. Moss for injury and losses that you

4     determine by a preponderance of the evidence will continue.

5            In making this determination, you must assume the

6     same five adverse assumptions I have already summarized for

7     you.

8            After you have determined the amount that will

9     adequately compensate each plaintiff for the harm caused by

10    Mr. Giuliani and his co-conspirators' intentional infliction

11    of emotional distress, you should enter that amount on the

12    verdict form.

13           As I instructed you, for the subset of damages

14    plaintiffs seek for future losses, plaintiff must establish

15    those damages by a preponderance of the evidence.

16           To establish a fact by a preponderance of the

17    evidence is to prove that it is more likely so than not so.

18    In other words, a preponderance of the evidence means that

19    the evidence produces, in your mind, the belief that the

20    thing in question is more likely true than not true.

21           The fact that plaintiffs have filed a lawsuit

22    against Mr. Giuliani does not mean that plaintiffs' evidence

23    is entitled to greater weight than any evidence that the

24    defendant may have put before you.

25           If after considering all of the evidence, the

1    evidence favoring the plaintiffs' side of this issue is more

2    convincing to you and causes you to believe that the

3    probability of truth favors the plaintiffs on that issue,

4    then the plaintiffs will have succeeded in carrying the

5    burden of proof on that issue.

6         The term "preponderance of the evidence" does not

7    mean that the proof must produce absolute or mathematical

8    certainty.  For example, it does not mean proof beyond a

9    reasonable doubt, as is required in criminal cases.  Those

10   of you who may have sat as a juror on a criminal case who

11   have heard of proof beyond a reasonable doubt, that

12   requirement does not apply in a civil case.  Therefore, you

13   should put it out of your mind.

14        Whether there is a preponderance of evidence

15   depends on the quality and not the quantity of evidence.  In

16   other words, merely having a greater number of witnesses or

17   documents bearing on a certain version of the facts does not

18   necessarily constitute a preponderance of the evidence.

19        If you believe that the evidence is evenly

20   balanced on an issue that the plaintiffs had to prove, then

21   the plaintiffs have not carried the burden of proof, and

22   your finding on that issue must be for the defendant.

23        Now I'm going to turn to compensatory damages for

24   a civil conspiracy.

25        As I have explained, the Court has already

1     determined that Mr. Giuliani acted as part of a civil

2     conspiracy to commit the torts of defamation and intentional

3     infliction of emotional distress on or before December 3,

4     2020, with Donald Trump; members of the Trump 2020

5     presidential campaign, including members of the Trump legal

6     team headed by Mr. Giuliani, who caused statements to be

7     published about plaintiffs or participated in such

8     publications; *One America News Network*, OAN; OAN's owners;

9     and certain OAN reporters.

10              That means, for purposes of this case, that it has

11     already been decided that Mr. Giuliani is liable for the

12     harm caused not just by his own actions but also for the

13     harm caused by actions of his co-conspirators taken in

14     furtherance of the conspiracy.

15              Accordingly, in quantifying compensatory damages

16     for defamation and intentional infliction of emotional

17     distress, you must consider evidence of harm caused not just

18     by Mr. Giuliani himself but also harm caused by the actions

19     of Mr. Giuliani's co-conspirators during the relevant period

20     of time for each cause of action.

21              In sum, you should award an amount of compensatory

22     damages against Mr. Giuliani that you determine is necessary

23     and sufficient to compensate plaintiffs for all of the harm

24     inflicted on them for the entire conspiracy, not just by

25     Mr. Giuliani's individual actions.

1          In making this determination you must assume the

2     same five adverse assumptions that I have already summarized

3     for you.

4          Finally, you heard testimony that there was a

5     settlement with some of Mr. Giuliani's co-conspirators,

6     including *One America News Network*, or OAN, its owners, and

7     certain of its reporters.  Do not speculate as to whether

8     there was a monetary recovery through that settlement

9     because even if there was such a recovery, it would be

10    irrelevant to your determination of an appropriate amount of

11    damages.

12         As I just instructed you, Mr. Giuliani is fully

13    liable for the harm caused by his co-conspirators.

14         Any compensatory damages you award for the harms

15    the plaintiffs suffered as a result of Mr. Giuliani's

16    liability for defamation or intentional infliction of

17    emotional distress must not be duplicative.  In other words,

18    the amount of compensatory damages you award for defamation

19    should only consider the amount to compensate plaintiffs for

20    harm to their reputation and must not include any harm

21    relating to the emotional distress plaintiffs suffered.

22         The amount of compensatory damages for intentional

23    infliction of emotional distress must compensate solely for

24    emotional damages and should not attempt to compensate

25    plaintiffs for any harm for which you have already awarded

1    compensation on plaintiffs' defamation claim.

2         Now as to punitive damages.  It has already been

3    decided that plaintiffs are legally entitled to seek

4    punitive damages in addition to compensatory damages because

5    it has already been determined that Mr. Giuliani is liable

6    for defamation per se and acted with actual malice.  Your

7    job is to decide the amount of any punitive damages award.

8         Punitive damages are damages above and beyond the

9    amount of compensatory damages.  Punitive damages are

10   awarded to the plaintiffs to punish Mr. Giuliani for his

11   conduct and to serve as an example to prevent others from

12   acting in a similar way.  You should not award punitive

13   damages in an amount larger than necessary to achieve these

14   goals.

15        Unlike for compensatory damages, you should award

16   punitive damages only for Mr. Giuliani's own conduct, not

17   the conduct of his co-conspirators.

18        The amount of punitive damages is left to your

19   good judgment.  In determining the appropriate amount of

20   punitive damages, you may consider the nature and

21   reprehensibility of the wrong committed.  That would include

22   the character of the wrongdoing and Mr. Giuliani's awareness

23   of what harm the conduct caused or was likely to cause.

24        In considering the amount of punitive damages to

25   award, you should weigh this factor heavily:  The actual

1    potential harm created by Mr. Giuliani's conduct,

2    Mr. Giuliani's financial condition at the time of trial and

3    the impact your punitive damages award will have on the

4    defendant, and any attorney's fees that plaintiffs have

5    incurred in this case.

6              In making this determination you must assume the

7    same five adverse assumptions summarized above.

8              Although you should use your discretion to chose

9    the appropriate amount of punitive damages, the law still

10   requires that the amount be reasonable in proportion to the

11   amount of compensatory damages that a plaintiff has

12   suffered.  Punitive damages that are more than ten times

13   compensatory damages are almost never permissible.  Usually

14   a permissible punitive damages award would be not more than

15   four times compensatory damages.

16             You should also take care not to award punitive

17   damages that duplicate compensation that you have already

18   awarded as compensatory damages.

19             After you have determined the amount of punitive

20   damages that you find is appropriate in this case, you

21   should enter that amount on the verdict form.

22             We're almost done.

23             Now I'm going to talk about logistical matters for

24   when you begin your deliberations.

25             When you return to the jury room, you should first

1    select a foreperson to preside over your deliberations and

2    to be your spokesperson here in court.  Consider selecting a

3    foreperson who will encourage civility and mutual respect,

4    who will invite each juror to speak up regarding his or her

5    views about the evidence, and you will promote full and fair

6    consideration of the evidence.

7         The verdict must represent the considered judgment

8    of each juror.  In order to return a verdict, your verdict

9    must be unanimous; that is, each juror must agree to the

10   verdict.  Each of you has a duty to consult with other

11   jurors in an attempt to reach a unanimous verdict.  You must

12   decide the case for yourself, and you should not surrender

13   your honest beliefs about the effect or weight of the

14   evidence merely to return a verdict or solely because of

15   other jurors' opinions.  However, you should seriously

16   consider the views of your fellow jurors, just as you expect

17   them seriously to consider your own views, and you should

18   not hesitate to change an opinion if you are convinced by

19   other jurors.

20        If it becomes necessary to communicate with me,

21   you may send a note by giving it to a court security officer

22   who will be sitting outside your jury room.  The note must

23   be signed by the foreperson or one or more members of the

24   jury.  No member of the jury should ever attempt to

25   communicate with me by any means other than a signed

 1     writing.  I will not communicate with any member of the jury

 2     on any subject touching on the merits of the case, other

 3     than in writing or orally here in open court.

 4          Likewise, the court security officer or all other

 5     persons are forbidden to communicate in any way or manner

 6     with any member of the jury on any subject touching on the

 7     merits of the case.

 8          Now, bear in mind that you are never to reveal to

 9     any person, not even to me, how the jury stands on the

10     questions before you numerically or otherwise until after

11     you have reached a unanimous verdict.

12          I will be sending into the jury room with you the

13     exhibits that have been admitted into evidence.  You may

14     examine any or all of them as you consider your verdict.

15     Please keep in mind that any exhibit that was only used as a

16     demonstrative or marked for identification but was not

17     admitted into evidence will not be given to you to examine

18     or to consider in reaching your verdict.

19          Throughout your deliberations, you may discuss

20     with each other the evidence and the law that has been

21     presented in this case, but you must not communicate with

22     anyone else by any means about the case.  You also cannot

23     learn from outside sources about the case, the matters in

24     the case, the legal issues in the case, or individuals or

25     other entities involved in the case.  This means you may not

1    use any electronic device or media, such as a phone,

2    computer, or tablet, the internet, or any text or instant

3    messaging service, or any social media apps such as

4    Twitter/X, Facebook, Instagram, LinkedIn, YouTube, WhatsApp,

5    Snapchat, TikTok to research or communicate about what you

6    have seen or heard in this courtroom.  These restrictions

7    continue during deliberations because it is essential that

8    you decide this case based solely on the evidence and law

9    presented in this courtroom.  Information you find on the

10   internet or through social media might be incomplete,

11   misleading, or inaccurate.

12          And as I noted in my instructions at the very

13   start of the trial, even using your smartphones, tablets, or

14   computers, or including the news and social media apps on

15   those devices may inadvertently expose you to certain

16   notices, pop-ups or advertisements that could influence your

17   consideration of matters you have heard about in this

18   courtroom.

19          You are permitted to discuss the case only with

20   your fellow jurors during deliberations because they have

21   seen and heard the same evidence and instructions on the law

22   that you have.  And it is important that you decide this

23   case solely on the evidence presented during the trial

24   without undue influence by anything or anyone outside of the

25   courtroom.

1          For this reason I expect you to inform me at the

2     earliest opportunity should you learn or share any

3     information about this case outside of this courtroom or the

4     jury room or learn that another juror has done so.

5          A verdict form has been prepared for your

6     convenience.  You will take this form to the jury room.  The

7     verdict form contains several questions.  The answer to each

8     question must be the unanimous answer of the jury.  Your

9     foreperson will write the unanimous answer of the jury in

10    the space provided at the end of each question as the

11    instructions on the verdict form reflect, depending on how

12    you -- as the instructions on the verdict form reflect.

13    Your answer to each should be unanimous.

14          Please follow the instructions provided on the

15    form.

16          The foreperson will, then, date and sign the

17    verdict form when it's completed after you have completed

18    your deliberations.

19          You will then notify the court security officer

20    sitting outside the jury room with a note stating that you

21    have reached a unanimous verdict.  Do not show the court

22    security officer the form or say anything about your

23    verdict.  The form will be given to me and read aloud by

24    your foreperson in open court when you return to the

25    courtroom.

1          So thank you very much for your attention during

2     the lunch hour as I have given you these instructions.  You

3     may now retire to the jury room and begin your

4     deliberations.  As I said, your lunch is there.  You will

5     have to give us just a few minutes to collect all of the

6     exhibits and to make copies of the final instructions and

7     the verdict form, and those will be delivered to you by

8     Mr. Coates shortly.

9          You are now excused to begin your deliberations.

10         (Whereupon, the jury was excused.)

11         THE COURT:  All right.  While the jury is

12    deliberating, make sure you leave contact information with

13    Mr. Coates so he could reach you in case there is a note

14    from the jury.  And I'd like for all of the parties to sign

15    off on exhibit -- list of the exhibits that are being sent

16    back to the jury room.

17         If you can just stay put for a little bit, when

18    Mr. Coates gets back he will present that form for you.

19         How long do you think it will take for you to pull

20    all of the exhibits together, or are they already done?

21         MS. HOUGHTON-LARSEN:  We have a hard drive with

22    them.  We don't have Defendant's Exhibit 2 that was

23    admitted.  Once we get that --

24         THE COURT:  I have an extra copy of it, if you

25    need that, that's not marked up.

1          MR. SIBLEY:  I have an extra copy as well, Your

2     Honor.  I thought I gave it to them.  I have an extra copy.

3          THE COURT:  Okay.  All right.  So good.

4          If you need an extra copy of something that is

5     hard copies, just let me know.

6          All right.  With that, once we put the jury

7     instructions that I gave in a format that's 12-point type

8     and single spaced, we'll give it to you to look at so the

9     jury instructions can be sent back to the jury as well.

10          (Whereupon, court recessed during deliberations.)

11          (Whereupon, the afternoon session was reported and

12     transcribed by Janice Dickman, and is bound under separate

13     cover.)

14                         *  *  *  *  *

15                         **CERTIFICATE**

16          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
       certify that the foregoing constitutes a true and accurate
17     transcript of my stenographic notes, and is a full, true,
       and complete transcript of the proceedings to the best of my
18     ability.

19          This certificate shall be considered null and void
       if the transcript is disassembled and/or photocopied in any
20     manner by any party without authorization of the signatory
       below.

21

22     Dated this 14th day of December, 2023.

23     /s/ Elizabeth Saint-Loth, RPR, FCRR
       Official Court Reporter

24

25

## $

**$130,000** [1] - 110:6
**$237,000** [1] - 110:4
**$24** [3] - 57:15, 73:9, 126:3
**$36,000** [2] - 74:1, 74:6
**$5,000** [1] - 110:6
**$52** [1] - 71:5
**$7,000** [1] - 110:5

## '

**'accept'** [1] - 81:3

## /

**/s** [1] - 162:23

## 1

**1** [15] - 8:18, 8:19, 11:17, 51:20, 57:14, 78:19, 79:1, 79:9, 102:15, 103:14, 103:19, 103:22, 110:4, 141:11, 147:16
**10** [4] - 20:23, 21:14, 62:17, 82:5
**10,000** [1] - 118:22
**100** [2] - 1:13, 94:22
**10:00** [1] - 46:3
**11** [7] - 21:18, 21:22, 23:6, 24:6, 24:13, 48:4, 48:7
**110263** [1] - 2:4
**1108** [1] - 2:3
**111** [1] - 75:21
**117** [3] - 22:6, 23:14, 24:4
**118** [2] - 22:6, 24:4
**119** [1] - 13:14
**12** [9] - 24:8, 24:11, 24:14, 24:15, 24:16, 25:20, 25:22, 36:14, 51:23
**12-point** [1] - 162:7
**121** [1] - 99:14
**122** [1] - 99:21
**13** [6] - 25:22, 26:6, 26:8, 30:24, 30:25, 31:3
**14** [4] - 1:5, 31:5, 31:14, 107:4
**14-year-old** [2] - 68:13, 76:10
**14th** [2] - 1:17, 162:22
**15** [4] - 31:16, 31:19,

46:7, 46:24
**151** [1] - 100:14
**152** [1] - 100:14
**16** [17] - 11:21, 12:5, 12:14, 31:16, 31:20, 57:6, 57:8, 58:18, 59:9, 59:12, 59:19, 63:7, 64:24, 66:3, 66:18, 75:10, 141:23
**17** [1] - 107:5
**170** [1] - 100:18
**174** [1] - 100:19
**178** [1] - 101:14
**1875** [1] - 1:13
**19** [1] - 107:5
**1st** [2] - 84:19, 125:2

## 2

**2** [11] - 9:1, 57:14, 62:24, 97:2, 97:11, 99:15, 102:10, 114:25, 116:15, 143:12, 161:22
**20** [8] - 47:9, 51:20, 65:15, 65:23, 70:4, 83:20, 83:22, 120:13
**20-minute** [1] - 47:4
**2000** [1] - 88:22
**20001** [1] - 2:10
**20006** [1] - 1:13
**2001** [1] - 112:6
**202** [1] - 1:14
**2020** [40] - 12:6, 12:16, 13:10, 13:21, 13:22, 35:11, 35:23, 37:8, 45:18, 53:1, 53:5, 53:21, 57:10, 60:9, 62:17, 67:7, 74:19, 75:8, 75:16, 76:3, 76:4, 77:7, 78:19, 78:24, 79:2, 80:3, 80:4, 82:5, 84:24, 85:5, 86:8, 120:3, 141:23, 144:1, 146:10, 146:13, 150:24, 153:4
**2021** [4] - 62:24, 85:9, 97:16, 99:16
**2022** [1] - 85:9
**2023** [15] - 1:5, 4:13, 47:18, 48:4, 48:7, 83:17, 83:18, 85:10, 85:12, 95:1, 95:4, 119:19, 120:12, 124:11, 162:22
**21-3354** [2] - 1:3, 3:3
**23** [11] - 12:6, 12:16, 35:11, 35:23, 37:8, 57:10, 67:6, 76:3,

141:23, 146:10, 146:13
**23rd** [3] - 40:4, 75:10, 103:9
**246** [1] - 119:16
**249** [3] - 75:21, 75:23, 78:17
**269** [1] - 51:24
**27** [7] - 47:16, 48:20, 48:25, 65:20, 72:6, 101:25
**27th** [8] - 86:14, 103:2, 122:5, 122:7, 122:11, 122:15, 122:19
**29** [1] - 93:14
**296** [3] - 47:16, 48:21, 48:25
**2nd** [2] - 77:10, 97:16

## 3

**3** [15] - 9:5, 9:13, 13:6, 13:20, 53:5, 74:19, 75:8, 75:16, 76:3, 80:3, 80:4, 143:22, 143:25, 150:24, 153:3
**30** [1] - 85:12
**303-1016** [1] - 1:14
**30309** [1] - 1:18
**306** [1] - 62:18
**35.5** [1] - 64:25
**36** [1] - 93:15
**38** [1] - 74:2
**3rd** [12] - 70:7, 75:12, 75:17, 78:19, 81:17, 81:19, 85:22, 98:3, 102:22, 115:20, 116:24

## 4

**4** [5] - 9:20, 47:18, 77:7, 85:5, 116:14
**40** [1] - 93:15
**404** [1] - 1:18
**41** [2] - 93:15, 107:4
**426** [2] - 94:22, 95:16
**45** [1] - 123:2
**47** [1] - 107:5
**49** [1] - 98:1
**4th** [1] - 75:17

## 5

**5** [8] - 9:25, 10:22, 65:13, 70:13, 79:9, 103:23, 111:4, 148:11

**50** [13] - 4:5, 32:6, 33:24, 39:12, 40:9, 40:13, 42:9, 43:1, 43:4, 46:2, 68:16, 87:11, 98:7
**50(a** [1] - 42:2
**509** [4] - 47:16, 48:21, 48:25, 51:22
**513** [2] - 95:20, 96:2
**555** [1] - 1:21
**56** [2] - 65:22, 99:9
**56.7** [2] - 65:1, 65:3
**586** [3] - 47:16, 48:21, 48:25
**588** [2] - 73:19, 109:21, 110:1
**5th** [3] - 1:21, 61:5, 77:7

## 6

**6** [3] - 11:1, 11:3, 97:18
**60** [1] - 74:9
**600** [5] - 47:16, 48:21, 48:25, 60:7, 69:5
**605** [3] - 48:4, 48:21, 48:25
**608** [1] - 47:24
**609** [3] - 48:4, 48:21, 49:1
**619-9819** [1] - 1:22
**65** [3] - 74:10, 121:21, 121:24
**6:00** [1] - 3:23
**6th** [3] - 103:3, 113:19, 122:5

## 7

**7** [6] - 11:8, 11:10, 11:17, 13:2, 95:1, 95:4
**702** [1] - 41:5
**713** [1] - 2:5
**720-8111** [1] - 1:18
**74** [1] - 107:5
**75** [1] - 1:17
**78701** [1] - 2:4
**792,000** [1] - 74:8

## 8

**8** [6] - 13:4, 14:19, 14:21, 70:13, 103:23, 106:20
**80** [2] - 101:14, 111:12
**81** [1] - 109:9
**88** [1] - 70:21
**8:59** [1] - 1:5

## 9

**9** [4] - 14:23, 15:4, 20:18, 20:19
**9-11** [1] - 114:15
**90013** [1] - 1:22
**919** [1] - 1:22
**966-6789** [1] - 2:5
**972,000** [1] - 74:8

## A

**a.m** [1] - 1:5
**ability** [3] - 135:24, 139:22, 162:18
**able** [4] - 63:21, 64:20, 69:22, 98:14
**Abraham** [1] - 112:25
**absolute** [4] - 105:6, 149:8, 151:1, 152:7
**absolutely** [1] - 84:22
**absurd** [1] - 106:14
**abused** [1] - 88:19
**accept** [7] - 55:6, 104:6, 128:17, 135:9, 138:1, 141:14, 143:17
**acceptable** [1] - 133:23
**accepted** [4] - 104:9, 105:13, 121:11, 137:18
**accepting** [1] - 105:2
**access** [3] - 64:21, 66:14, 88:20
**accident** [1] - 78:9
**accordance** [1] - 6:21
**according** [2] - 86:16, 106:20
**accordingly** [1] - 153:15
**account** [5] - 33:5, 65:20, 70:21, 72:6, 119:1
**accountable** [6] - 17:21, 88:13, 89:23, 115:8, 115:11, 124:15
**accountholder** [2] - 63:20, 63:22
**accounts** [3] - 64:22, 65:5, 139:4
**accuracy** [1] - 147:4
**accurate** [4] - 65:3, 107:19, 135:10, 162:16
**accurately** [1] - 135:19
**accusations** [1] - 84:10

**accuse** [3] - 58:24,
81:11, 87:13
**accused** [4] - 59:20,
95:12, 104:23,
142:12
**accusing** [3] - 60:20,
69:21, 97:7
**achieve** [2] - 122:22,
155:13
**acknowledge** [1] -
84:12
**act** [3] - 37:5, 60:10,
108:23
**acted** [6] - 82:22, 87:1,
124:20, 143:7,
153:1, 155:6
**acting** [2] - 91:22,
155:12
**Action** [2] - 1:3, 3:3
**action** [9] - 54:13,
54:25, 57:15,
102:19, 115:1,
131:11, 138:23,
139:25, 153:20
**actionable** [49] -
11:19, 11:24, 12:5,
12:12, 15:25, 19:1,
19:5, 19:10, 19:21,
20:11, 22:21, 23:2,
35:3, 35:8, 35:17,
36:5, 36:15, 36:18,
36:19, 58:2, 58:7,
58:8, 58:11, 58:18,
60:15, 62:7, 63:7,
64:24, 66:18, 67:9,
141:22, 142:4,
142:5, 142:7,
142:12, 142:19,
142:24, 143:2,
146:3, 146:15,
146:24, 147:2,
147:8, 147:10,
147:12, 148:17,
149:6, 149:15
**actions** [10] - 102:25,
114:13, 114:19,
144:13, 149:21,
153:12, 153:13,
153:18, 153:25
**active** [1] - 121:4
**activity** [1] - 111:21
**actor** [1] - 120:19
**acts** [4] - 39:23, 56:2,
102:22, 144:9
**actual** [25] - 7:21,
7:24, 34:18, 34:20,
35:8, 36:1, 36:22,
55:10, 59:22, 85:25,
96:17, 110:19,
110:25, 111:2,

111:5, 111:6,
124:20, 125:9,
125:16, 125:21,
133:8, 141:17,
143:2, 155:6, 155:25
**add** [6] - 12:2, 12:12,
12:24, 15:18, 19:7,
26:14
**adding** [1] - 25:4
**addition** [1] - 155:4
**additional** [3] - 12:13,
141:2, 149:3
**address** [5] - 32:7,
43:10, 54:22,
114:22, 139:23
**addressed** [1] - 39:5
**adequately** [6] -
22:19, 23:1, 34:18,
77:19, 149:14, 151:9
**admissible** [1] - 131:4
**admission** [1] - 132:4
**admit** [1] - 117:19
**Admitted** [1] - 31:24
**admitted** [12] - 9:6,
48:11, 48:23, 49:1,
93:7, 100:3, 126:24,
131:17, 131:19,
158:13, 158:17,
161:23
**admitting** [1] - 108:11
**ads** [1] - 104:8
**advanced** [1] - 82:9
**adversary** [1] - 133:2
**adverse** [6] - 132:18,
147:20, 148:11,
151:6, 154:2, 156:7
**advertise** [1] - 62:3
**advertisements** [3] -
104:2, 104:10,
159:16
**advertising** [3] -
29:20, 119:4, 148:9
**advocates** [1] - 130:3
**affection** [1] - 136:12
**affects** [2] - 72:23,
135:22
**affidavits** [1] - 85:8
**afraid** [1] - 70:1
**afternoon** [1] - 162:11
**age** [3] - 74:9, 74:10,
135:23
**ago** [3] - 51:1, 51:20,
119:7
**agree** [13] - 14:16,
18:11, 21:10, 26:19,
29:7, 41:22, 51:5,
91:6, 96:16, 137:24,
137:25, 138:4, 157:9
**agreed** [10] - 5:19,
5:24, 17:10, 26:13,

26:21, 47:15,
109:21, 110:20,
131:21, 144:7
**agreeing** [1] - 6:11
**agreement** [5] - 3:20,
3:25, 6:5, 28:25,
144:10
**agreements** [1] -
119:3
**agrees** [1] - 69:2
**ahead** [1] - 28:22
**ahold** [1] - 100:6
**aid** [1] - 127:20
**aided** [1] - 2:12
**aimed** [1] - 81:14
**air** [1] - 87:20
**al** [2] - 1:3, 3:3
**aligned** [1] - 72:15
**ALL** [2] - 50:24, 91:19
**allegation** [1] - 44:17
**allegations** [4] -
41:18, 99:19,
100:15, 106:3
**alleged** [1] - 16:7
**allegedly** [1] - 80:23
**alleges** [1] - 104:21
**allocate** [1] - 6:13
**allow** [3] - 5:10, 6:25,
35:3
**allowed** [3] - 34:17,
58:5, 127:18
**allowing** [1] - 35:6
**allows** [3] - 61:12,
121:9
**almost** [12] - 54:16,
66:5, 91:20, 92:22,
102:3, 103:4, 110:5,
111:12, 112:24,
124:13, 156:13,
156:22
**alone** [7] - 64:25, 70:5,
76:8, 88:18, 129:1,
135:6, 135:15
**aloud** [1] - 160:23
**alternative** [1] -
104:13
**ambiguous** [1] - 15:15
**ameliorate** [1] - 6:11
**amend** [1] - 47:15
**amended** [6] - 34:6,
35:13, 35:20, 36:10,
36:15, 36:20
**Amendment** [7] -
34:18, 34:19, 36:2,
94:2, 118:16,
132:14, 132:21
**America** [14] - 13:11,
13:25, 27:4, 55:24,
79:12, 101:20,
105:20, 113:15,

113:16, 123:24,
123:25, 144:5,
153:8, 154:6
**America's** [1] - 48:5
**American** [1] - 112:16
**Americans** [1] - 112:4
**amount** [73] - 6:13,
7:2, 8:6, 15:22,
18:12, 18:23, 20:8,
22:19, 22:25, 23:2,
23:24, 24:24, 27:8,
27:9, 27:18, 29:5,
29:11, 32:20, 45:7,
52:5, 53:17, 56:11,
57:14, 57:17, 57:18,
57:19, 57:25, 71:18,
83:4, 83:7, 94:7,
126:3, 127:5, 127:9,
140:9, 141:1, 141:2,
141:4, 141:9,
144:16, 144:24,
145:2, 145:3, 145:5,
145:13, 145:25,
146:20, 146:25,
147:5, 149:3,
149:13, 149:15,
150:7, 150:8,
150:17, 151:8,
151:11, 153:21,
154:10, 154:18,
154:19, 154:22,
155:7, 155:9,
155:13, 155:18,
155:19, 155:24,
156:9, 156:10,
156:11, 156:19,
156:21
**analysis** [6] - 37:3,
63:14, 63:18, 64:1,
87:15, 124:10
**analyzed** [1] - 65:19
**Angeles** [1] - 1:22
**anguish** [4] - 37:18,
37:21, 37:22, 37:25
**animosity** [1] - 136:10
**ANNIE** [1] - 1:12
**announced** [1] - 85:5
**answer** [12] - 6:19,
28:13, 37:14, 78:5,
93:12, 98:16,
131:25, 132:15,
160:7, 160:8, 160:9,
160:13
**answered** [1] - 99:23
**answers** [4] - 94:3,
95:10, 132:18,
137:16
**anticipate** [1] - 17:3
**anxiety** [3] - 76:20,
101:15, 109:14

**anytime** [1] - 150:23
**anyway** [1] - 41:20
**apologies** [1] - 107:18
**apologize** [1] - 47:22
**appeal** [1] - 37:15
**appearance** [1] -
136:2
**Appearances** [1] -
1:24
**APPEARANCES** [2] -
1:9, 2:1
**appeared** [2] - 72:8,
135:12
**Apple** [1] - 66:14
**applicable** [1] - 39:19
**applied** [1] - 120:24
**applies** [1] - 126:21,
127:5, 128:16
**apply** [7] - 34:20,
40:11, 42:2, 127:3,
130:1, 137:19,
152:12
**appreciated** [1] - 89:8
**appropriate** [14] -
14:16, 26:5, 26:21,
27:9, 28:7, 33:4,
65:4, 83:7, 107:14,
111:11, 154:10,
155:19, 156:9,
156:20
**approximate** [2] -
148:23, 150:1
**apps** [2] - 159:3,
159:14
**Arena** [7] - 44:16,
53:19, 74:21, 80:14,
80:19, 81:21, 116:1
**argue** [1] - 102:20,
104:6, 106:21
**arguing** [4] - 27:16,
27:17, 27:18, 27:20
**argument** [19] - 28:10,
28:15, 35:5, 37:16,
38:19, 39:22, 40:3,
40:6, 40:12, 40:14,
72:21, 73:5, 99:25,
104:16, 115:2,
120:21, 122:4,
122:6, 130:23
**arguments** [9] - 34:23,
39:6, 39:11, 39:13,
41:21, 46:6, 102:12,
121:17, 132:3
**arising** [1] - 128:15
**Arizona** [1] - 122:13
**arrest** [3] - 61:2, 79:8,
83:1
**arrested** [1] - 82:3
**arrive** [5] - 64:20,
71:10, 125:22, 130:8

**arrived** [2] - 71:15, 72:18
**ArShaye'** [1] - 127:6
**arsonist** [1] - 67:21
**article** [6] - 69:21, 98:5, 98:8, 115:21, 116:23, 118:2
**articles** [1] - 59:18
**artificially** [4] - 63:11, 147:25, 148:3, 148:13
**Ashlee** [2] - 61:9, 117:8
**asleep** [1] - 133:21
**aspects** [1] - 86:9
**aspiration** [1] - 61:22
**assassinating** [1] - 89:20
**assemble** [1] - 46:22
**assembled** [1] - 86:6
**asserted** [1] - 132:14
**assertion** [1] - 132:20
**asserts** [1] - 133:8
**assess** [2] - 42:16, 108:4
**assessment** [2] - 36:5, 136:23
**assets** [3] - 88:2, 147:24, 148:13
**assign** [4] - 56:19, 74:15, 77:15, 77:18
**assigned** [1] - 71:15
**associate** [1] - 70:5
**associated** [1] - 112:1
**assume** [12] - 34:10, 63:9, 74:6, 86:21, 107:20, 133:12, 133:17, 140:8, 147:19, 151:5, 154:1, 156:6
**assumed** [3] - 65:15, 140:5, 140:13
**assumes** [1] - 65:13
**assuming** [1] - 14:15
**assumption** [3] - 65:4, 65:23, 148:11
**assumptions** [7] - 65:10, 72:5, 72:23, 147:20, 151:6, 154:2, 156:7
**Atlanta** [2] - 1:18, 30:14
**attach** [1] - 129:11
**attacks** [2] - 76:10, 76:19
**attempt** [4] - 147:4, 154:24, 157:11, 157:24
**attention** [5] - 90:9, 90:10, 91:9, 129:21,

161:1
**attitude** [1] - 72:9
**Attorney** [1] - 81:9
**attorney** [3] - 89:6, 121:17, 128:22
**Attorney's** [2] - 85:3, 114:15
**attorney's** [1] - 156:4
**attorneys'** [1] - 95:19
**audience** [2] - 67:2, 89:18
**audiences** [2] - 70:19, 118:3
**audio** [2] - 58:20, 100:22
**August** [5] - 83:17, 83:18, 83:21, 85:12, 120:12
**Austin** [1] - 2:4
**author** [1] - 119:20
**authority** [2] - 5:10, 105:10
**authorization** [1] - 162:20
**available** [5] - 41:4, 68:14, 71:14, 118:6, 138:10
**avoid** [4] - 5:12, 37:12, 87:7, 95:24
**avoided** [1] - 70:6
**award** [55] - 45:21, 56:25, 57:10, 57:23, 60:1, 60:3, 66:9, 72:19, 73:9, 73:13, 74:16, 83:3, 89:16, 93:1, 94:7, 109:23, 110:11, 110:18, 111:1, 111:3, 111:4, 115:14, 121:12, 121:16, 125:9, 125:11, 125:22, 126:2, 126:4, 126:7, 127:10, 144:20, 144:23, 145:3, 145:16, 146:8, 146:11, 146:21, 146:25, 147:5, 148:17, 149:2, 149:9, 150:17, 151:2, 153:21, 154:14, 154:18, 155:7, 155:12, 155:15, 155:25, 156:3, 156:14, 156:16
**awarded** [7] - 144:17, 145:12, 150:5, 150:20, 154:25, 155:10, 156:18
**awarding** [1] - 96:6

**awards** [1] - 140:9
**aware** [3] - 5:9, 6:6
**awareness** [3] - 87:1, 143:7, 155:22
**awful** [1] - 53:6

## B

**bad** [5] - 58:7, 60:18, 78:2, 94:11, 109:13
**balanced** [1] - 152:20
**ballot** [1] - 61:23, 108:24
**ballots** [6] - 59:1, 59:2, 80:25, 81:2, 94:15, 122:14
**bank** [1] - 33:5
**barred** [4] - 37:13, 38:14, 38:20, 40:4
**base** [5] - 84:9, 93:1, 110:12, 126:23, 131:8
**based** [32] - 23:21, 37:19, 39:24, 41:2, 41:10, 45:11, 45:14, 59:15, 60:10, 64:23, 65:23, 66:9, 71:16, 72:11, 72:14, 72:17, 76:1, 76:13, 114:13, 114:18, 118:1, 118:4, 119:9, 121:14, 125:11, 126:6, 130:20, 134:22, 141:5, 148:24, 150:2, 159:8
**basic** [1] - 115:23
**basing** [1] - 36:11
**basis** [7] - 23:19, 42:7, 43:17, 45:21, 123:20, 148:21, 149:24
**bathroom** [3] - 50:12, 91:5, 91:6
**Baxendale** [2] - 17:17, 17:20
**bear** [1] - 158:8
**bearing** [3] - 132:24, 136:7, 152:17
**became** [6] - 53:24, 61:21, 62:10, 81:19, 82:1, 111:18
**become** [4] - 35:3, 54:10, 63:4, 121:5
**becomes** [1] - 157:20
**BEFORE** [1] - 1:8
**began** [3] - 57:9, 67:7, 85:23
**begin** [4] - 141:7, 156:24, 161:3, 161:9
**beginning** [4] - 74:19,

123:2, 128:12, 138:15
**behalf** [3] - 3:10, 3:16, 29:20
**beings** [1] - 89:4
**belated** [1] - 7:12
**belief** [3] - 72:12, 72:16, 151:19
**beliefs** [1] - 157:13
**believability** [3] - 129:3, 135:13, 136:23
**believers** [3] - 45:3, 45:5, 45:9
**believes** [3] - 15:13, 95:25, 131:3
**belong** [1] - 120:18
**below** [1] - 162:20
**bench** [12] - 28:8, 32:10, 32:14, 32:17, 32:22, 33:12, 33:20, 33:22, 50:10, 50:19, 90:7, 91:2
**beneficial** [1] - 123:22
**benefit** [4] - 70:16, 70:18, 86:22, 133:1
**benefits** [1] - 148:6
**Bernard** [1] - 112:8
**Bernie** [1] - 79:24
**BERYL** [1] - 1:8
**best** [4] - 51:21, 87:9, 89:7, 162:17
**best-selling** [3] - 51:21, 87:9, 89:7
**better** [4] - 87:3, 89:10, 94:10, 106:8
**between** [12] - 3:23, 16:22, 19:12, 64:25, 65:8, 72:8, 74:8, 75:21, 76:3, 81:2, 103:23, 131:11
**beyond** [7] - 35:20, 83:4, 84:9, 145:13, 152:8, 152:11, 155:8
**bias** [3] - 131:7, 136:3, 136:19
**biased** [2] - 71:21, 117:19
**Biden** [10] - 47:19, 60:5, 60:7, 69:3, 72:2, 87:12, 104:15, 104:22, 109:11, 117:23
**binders** [1] - 88:14
**bit** [13] - 7:9, 21:19, 22:3, 22:5, 50:2, 56:5, 56:23, 65:11, 90:2, 94:13, 119:12, 126:12, 161:17
**blame** [2] - 59:14,

102:7
**blamed** [1] - 97:3
**blaming** [1] - 125:3
**blanks** [1] - 123:5
**blatant** [1] - 43:19
**bleed** [1] - 60:17
**blocked** [1] - 44:17
**blow** [1] - 111:22
**blue** [2] - 105:19, 105:21
**Bobb** [2] - 10:16, 118:23
**Bobb's** [1] - 79:21
**bodies** [1] - 85:25
**book** [5] - 51:21, 51:23, 87:9, 89:7, 111:23
**born** [1] - 69:14
**boss** [1] - 79:19
**bound** [2] - 128:20, 162:12
**box** [2] - 92:13, 108:24
**Brad** [1] - 62:25
**bragged** [2] - 62:18, 63:1
**branded** [1] - 70:24
**Branton** [1] - 80:16
**Braun's** [1] - 119:20
**bravery** [1] - 54:14
**break** [6] - 47:4, 50:12, 80:22, 91:5, 91:6, 104:3
**breaking** [1] - 47:20
**brief** [2] - 91:6, 114:20
**briefing** [1] - 40:7
**bring** [7] - 46:3, 47:13, 49:5, 49:9, 90:10, 108:2, 130:14
**bringing** [2] - 91:9, 93:24
**Britannicas** [1] - 108:10
**broke** [1] - 106:5
**brought** [6] - 50:13, 76:21, 90:9, 105:16, 123:10, 123:12
**bucks** [1] - 33:4
**building** [1] - 62:1
**bullet** [2] - 86:9, 122:12
**bullhorns** [2] - 61:6, 77:11
**bullies** [1] - 87:8
**Bullies** [1] - 51:24
**bully** [1] - 52:1
**bunch** [4] - 47:12, 68:22, 84:17, 117:11
**burden** [8] - 23:18, 25:5, 40:23, 140:19, 148:19, 149:23,

152:5, 152:21
**Bureau** [2] - 85:1, 85:2
**burn** [1] - 67:23
**burned** [2] - 67:16,
67:21
**business** [6] - 5:7,
61:25, 62:4, 98:9,
117:18, 123:6
**businesses** [3] - 62:5,
147:22, 148:7
**but..** [1] - 6:24

### C

**CA** [1] - 1:22
**cabinet** [1] - 139:17
**calculated** [2] - 72:9,
74:13
**calculating** [2] -
75:25, 140:8
**calculation** [3] -
63:21, 66:1, 72:3
**calculations** [8] -
71:10, 71:20, 71:21,
107:3, 117:24,
117:25, 118:4, 118:8
**Camara** [1] - 2:3
**cameras** [1] - 84:1
**campaign** [25] - 13:22,
29:15, 29:24, 44:1,
44:5, 45:9, 55:23,
59:11, 59:17, 62:10,
70:14, 70:17, 70:22,
71:3, 71:11, 75:12,
75:14, 76:2, 82:13,
82:19, 115:10,
116:5, 118:11,
144:2, 153:5
**campaign's** [2] -
13:10, 116:17
**campaigns** [1] - 72:24
**candidate** [1] - 69:6
**cannot** [7] - 5:3, 38:5,
39:17, 52:18, 79:11,
147:3, 158:22
**capacity** [2] - 117:7,
135:23
**capture** [1] - 149:1
**care** [2] - 85:25,
156:16
**career** [5] - 61:19,
61:22, 69:16, 74:7,
74:9
**carefully** [1] - 127:17
**caricature** [1] - 82:1
**caricatured** [1] -
120:23
**carried** [1] - 152:21
**Carroll** [1] - 121:16
**carrying** [1] - 152:4

**case** [153] - 5:23, 6:6,
14:5, 16:9, 17:6,
17:21, 33:16, 37:9,
38:14, 38:20, 39:8,
40:10, 40:11, 42:5,
42:18, 43:2, 43:7,
43:14, 44:12, 50:5,
52:4, 52:6, 52:9,
56:4, 56:16, 57:5,
57:7, 57:20, 57:22,
58:17, 60:22, 61:8,
62:9, 62:15, 63:23,
64:3, 64:5, 64:12,
65:18, 66:2, 66:24,
67:21, 70:11, 72:19,
73:4, 73:16, 78:6,
79:11, 80:17, 83:17,
86:6, 86:20, 88:8,
88:15, 89:17, 91:21,
92:11, 92:12, 93:4,
93:9, 94:15, 96:13,
96:20, 98:21, 99:20,
100:16, 101:22,
105:2, 105:16,
106:23, 113:2,
113:25, 114:5,
114:6, 114:12,
115:12, 117:12,
117:13, 117:14,
119:21, 120:9,
120:14, 121:16,
121:18, 121:19,
123:8, 123:20,
124:7, 124:11,
125:22, 125:25,
126:21, 127:8,
127:22, 128:13,
128:16, 130:9,
130:18, 130:22,
131:6, 131:9,
131:11, 131:18,
132:4, 132:23,
133:6, 134:3, 134:6,
134:15, 135:1,
136:3, 136:10,
136:11, 138:6,
138:17, 138:18,
138:21, 138:23,
139:12, 140:6,
140:13, 142:6,
142:19, 144:12,
145:1, 145:8,
145:16, 146:14,
147:15, 150:10,
152:10, 152:12,
153:10, 156:5,
156:20, 157:12,
158:2, 158:7,
158:21, 158:22,
158:23, 158:24,
158:25, 159:8,

159:19, 159:23,
160:3, 161:13
**cases** [6] - 39:2,
117:11, 117:22,
121:1, 121:4, 152:9
**catastrophic** [1] - 94:7
**categories** [1] - 56:15
**category** [3] - 56:25,
71:15, 109:15
**caught** [1] - 15:3
**causation** [3] - 20:16,
30:2, 78:6
**caused** [47] - 13:24,
15:8, 19:9, 22:20,
23:1, 27:14, 30:17,
45:22, 54:23, 55:12,
55:17, 58:3, 59:12,
59:16, 59:19, 60:20,
66:18, 68:24, 74:16,
97:20, 98:19, 99:25,
101:9, 109:14,
139:20, 139:23,
141:19, 142:3,
143:9, 143:20,
144:3, 144:12,
144:13, 147:2,
147:8, 149:5,
149:14, 149:21,
150:22, 151:9,
153:6, 153:12,
153:13, 153:17,
153:18, 154:13,
155:23
**causes** [2] - 88:16,
152:2
**causing** [3] - 108:24,
109:1
**ceiling** [1] - 92:22
**celebrity** [1] - 120:19
**center** [1] - 54:2
**cents** [2] - 56:9, 67:17
**certain** [20] - 7:11,
14:1, 17:22, 27:5,
55:2, 55:9, 57:21,
119:9, 137:24,
138:16, 140:1,
140:5, 140:8,
141:16, 144:6,
144:9, 152:17,
153:9, 154:7, 159:15
**certainly** [9] - 6:2,
30:2, 33:11, 44:20,
66:6, 96:6, 96:10,
101:11, 120:10
**certainty** [4] - 64:5,
149:8, 151:1, 152:8
**CERTIFICATE** [1] -
162:15
**certificate** [1] - 162:19
**certify** [1] - 162:16

**cetera** [1] - 100:16
**challenge** [11] - 35:4,
36:3, 36:7, 41:12,
65:9, 65:25, 71:23,
71:25, 72:3, 86:7,
120:14
**challenged** [1] - 36:12
**challenges** [1] - 64:17
**chambers** [4] - 27:11,
30:4, 90:3, 90:9
**chance** [2] - 36:2,
89:19
**change** [26] - 3:23,
4:11, 8:14, 10:1,
11:20, 11:23, 18:11,
20:14, 20:25, 21:5,
21:13, 22:12, 22:16,
22:22, 24:9, 24:19,
25:22, 31:9, 45:3,
45:8, 59:3, 61:24,
68:25, 72:10, 72:12,
157:18
**changed** [4] - 23:22,
24:3, 45:12, 123:14
**changes** [10] - 4:10,
4:11, 8:1, 13:1,
21:14, 23:6, 25:20,
26:8, 39:10, 46:8
**changing** [2] - 13:13,
22:20
**channels** [1] - 29:13
**chapter** [2] - 51:23,
51:24
**character** [3] - 89:20,
113:10, 155:22
**charge** [5] - 58:9,
79:19, 80:1, 114:14,
147:12
**charged** [1] - 124:25
**charging** [2] - 4:4,
90:17
**chart** [2] - 57:8, 71:7
**chats** [1] - 139:4
**chatter** [1] - 68:23
**check** [2] - 48:19,
49:21
**Chinese** [1] - 105:12
**choice** [1] - 61:20
**choose** [2] - 132:20,
132:22
**chose** [1] - 156:8
**chosen** [2] - 73:7,
127:24
**Christina** [1] - 79:21
**circulated** [3] - 58:8,
62:7, 147:11
**circulation** [1] - 8:16
**circumstances** [3] -
29:18, 136:7, 147:15
**circumstantial** [8] -

133:7, 133:11,
133:20, 133:22,
134:1, 134:5,
134:22, 135:3
**cite** [1] - 118:1
**cited** [1] - 39:9
**cites** [1] - 40:16
**citing** [1] - 94:3
**citizen's** [2] - 61:1,
83:1
**City** [1] - 111:18
**city** [1] - 111:19
**civic** [2] - 52:17, 52:25
**Civil** [4] - 1:3, 3:2,
42:3, 46:2
**civil** [22] - 13:6, 13:18,
37:4, 39:22, 39:24,
42:24, 54:25, 55:4,
81:6, 89:8, 89:12,
120:20, 138:23,
139:25, 140:18,
143:22, 143:23,
144:17, 145:16,
152:12, 152:24,
153:1
**civility** [1] - 157:3
**Claim** [2] - 11:17, 13:6
**claim** [29] - 4:21, 4:22,
8:6, 12:21, 24:22,
35:24, 37:11, 39:18,
39:24, 41:19, 44:18,
45:6, 75:6, 75:7,
75:8, 75:9, 85:21,
86:7, 106:14, 126:2,
132:25, 141:11,
143:12, 143:22,
145:21, 149:20,
150:18, 155:1
**claiming** [1] - 101:15
**claims** [28] - 11:14,
34:7, 37:4, 37:6,
37:12, 39:23, 41:10,
41:24, 42:8, 42:19,
42:23, 42:25, 43:4,
43:17, 43:25, 44:8,
55:3, 83:19, 84:21,
107:21, 139:10,
139:11, 139:22,
140:2, 140:11,
140:21, 141:8, 145:3
**clarify** [3] - 7:18,
26:23, 130:14
**class** [1] - 112:9
**classes** [1] - 76:11
**clause** [1] - 24:19
**clear** [7] - 13:15, 14:9,
16:4, 30:23, 45:1,
56:2, 82:13
**clearest** [1] - 11:20
**clearly** [1] - 99:3

**clerk** [3] - 4:11, 16:17, 90:8
**CLERK** [1] - 20:4
**clerk's** [1] - 47:6
**cliche'** [1] - 113:4
**client** [13] - 51:6, 64:1, 85:4, 92:2, 92:6, 93:3, 93:15, 94:8, 101:11, 101:19, 105:23, 111:12, 125:12
**clients** [13] - 7:25, 51:12, 52:24, 57:19, 59:21, 67:11, 73:11, 74:14, 75:19, 80:20, 84:14, 120:13, 125:16
**clients'** [6] - 67:1, 67:24, 76:5, 78:8, 83:12, 120:18
**clipped** [1] - 74:20
**close** [3] - 57:19, 65:20, 110:5
**closely** [2] - 72:15, 111:6
**closing** [4] - 27:22, 27:25, 28:15, 46:6
**co** [48] - 12:7, 12:17, 15:9, 16:1, 19:8, 19:22, 20:12, 26:11, 27:4, 27:14, 30:10, 30:11, 30:13, 30:17, 43:21, 44:11, 45:7, 45:17, 45:23, 52:8, 56:3, 59:16, 68:4, 68:7, 74:18, 75:3, 76:14, 77:23, 79:5, 81:14, 85:24, 98:20, 102:9, 102:23, 103:17, 141:24, 144:8, 144:14, 146:4, 146:10, 150:16, 150:23, 151:10, 153:13, 153:19, 154:5, 154:13, 155:17
**co-conspirator** [2] - 59:16, 98:20
**co-conspirators** [41] - 12:7, 12:17, 15:9, 16:1, 19:8, 19:22, 20:12, 26:11, 27:4, 27:14, 30:10, 30:11, 30:13, 30:17, 44:11, 45:7, 45:17, 45:23, 52:8, 56:3, 68:4, 68:7, 74:18, 76:14, 79:5, 81:14, 85:24, 102:9, 102:23, 103:17, 141:24,

144:8, 144:14, 146:4, 146:10, 150:23, 153:13, 153:19, 154:5, 154:13, 155:17
**co-conspirators'** [5] - 43:21, 75:3, 77:23, 150:16, 151:10
**coates** [3] - 48:20, 161:8, 161:13
**Coates** [1] - 161:18
**cocaine** [1] - 124:25
**code** [1] - 80:10
**codefendants** [2] - 66:24, 101:19
**collateral** [1] - 62:11
**collect** [1] - 161:5
**color** [1] - 136:19
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 39:25
**comfort** [1] - 52:12
**comfortable** [2] - 15:20, 16:24
**coming** [1] - 11:2
**comma** [17] - 13:21, 13:22, 13:23, 13:25, 14:1, 25:8, 25:11, 25:12, 27:2, 27:4, 27:5, 27:7, 27:13
**comment** [1] - 41:23
**comments** [5] - 4:14, 10:21, 20:19, 100:12, 117:5
**commit** [5] - 13:19, 84:7, 143:24, 144:8, 153:2
**commits** [1] - 142:15
**committed** [6] - 15:9, 30:9, 30:11, 92:6, 108:23, 155:21
**committing** [1] - 142:13
**common** [1] - 58:1, 77:17, 111:13, 126:5, 134:14, 134:22, 134:24, 147:1, 147:6, 149:3, 150:11
**Common** [1] - 148:2
**communicate** [7] - 142:4, 157:20, 157:25, 158:1, 158:5, 158:21, 159:5
**communicated** [1] - 142:2
**communication** [4] - 58:13, 87:5, 99:17, 147:14
**communications** [8] - 29:15, 118:10,

121:23, 122:4, 122:8, 122:20, 122:23, 139:16
**Communications** [8] - 70:12, 70:16, 71:3, 71:6, 79:10, 103:21, 147:23, 148:8
**communities** [1] - 61:13
**community** [14] - 56:10, 58:6, 69:12, 69:13, 69:15, 70:2, 70:3, 131:12, 142:10, 142:11, 142:21, 142:22, 146:19, 147:9
**company** [1] - 98:11
**compare** [2] - 101:24, 104:9
**compassion** [1] - 113:17
**compensate** [25] - 8:8, 15:23, 18:13, 18:24, 20:9, 22:19, 23:1, 57:3, 74:23, 113:11, 145:6, 145:14, 146:1, 148:17, 149:4, 149:10, 149:14, 150:9, 150:11, 151:2, 151:9, 153:23, 154:19, 154:23, 154:24
**compensates** [2] - 77:19, 147:1
**compensation** [10] - 45:22, 58:1, 60:11, 115:18, 147:7, 147:16, 150:5, 150:7, 155:1, 156:17
**compensatory** [42] - 6:1, 7:1, 7:5, 8:7, 15:3, 15:21, 18:12, 18:22, 20:7, 20:16, 30:14, 38:6, 56:13, 83:4, 125:14, 125:15, 125:21, 140:9, 141:2, 144:21, 145:5, 145:13, 145:24, 146:8, 146:11, 146:21, 149:17, 149:25, 150:20, 152:23, 153:15, 153:21, 154:14, 154:18, 154:22, 155:4, 155:9, 155:15, 156:11, 156:13, 156:15, 156:18

**competent** [2] - 37:19, 40:15
**complained** [1] - 102:1
**complaining** [3] - 38:23, 103:10, 104:18
**complaint** [18] - 16:8, 34:7, 35:4, 35:13, 35:20, 36:10, 36:11, 36:15, 36:20, 39:4, 42:21, 97:24, 101:23, 102:3, 115:1, 116:11, 116:15, 116:19
**complete** [2] - 38:11, 162:17
**completed** [2] - 160:17
**completely** [3] - 95:14, 96:8, 109:14
**complex** [1] - 71:9
**complicated** [1] - 56:8
**complied** [1] - 52:24
**comply** [3] - 86:19, 139:13, 139:20
**complying** [1] - 54:24, 139:24
**component** [1] - 86:3
**computer** [4] - 2:12, 139:3, 139:17, 159:2
**computer-aided** [1] - 2:12
**computers** [1] - 159:14
**CONANT** [1] - 1:11
**conception** [1] - 120:22
**concern** [4] - 7:19, 28:2, 28:5, 29:21
**concerning** [1] - 136:23
**concerns** [1] - 5:21
**conclude** [2] - 23:13, 23:15
**concluded** [2] - 119:18, 142:11
**concludes** [3] - 33:22, 50:19, 91:2
**conclusion** [6] - 95:11, 134:19, 141:25, 142:5, 142:23, 143:1
**conclusions** [4] - 133:10, 134:11, 134:13, 134:24
**concrete** [1] - 81:5
**condition** [1] - 156:2
**conduct** [38] - 39:17, 45:18, 55:14, 55:16,

61:1, 75:3, 75:12, 77:23, 83:5, 84:4, 84:6, 84:9, 88:15, 92:6, 93:16, 93:21, 94:6, 102:8, 103:10, 106:7, 108:19, 108:22, 114:16, 114:18, 126:8, 127:12, 128:13, 143:19, 145:18, 146:9, 150:16, 155:11, 155:16, 155:17, 155:23, 156:1
**conducting** [1] - 95:12
**conducts** [1] - 114:13
**confer** [1] - 14:8
**conference** [19] - 4:4, 32:10, 32:14, 32:17, 32:22, 33:12, 33:20, 33:22, 44:4, 47:18, 50:10, 50:19, 51:15, 60:6, 69:4, 90:7, 90:15, 90:17, 91:2
**confessions** [1] - 62:16
**confidence** [1] - 89:15
**confident** [1] - 64:19
**confirmed** [2] - 49:22, 88:5
**conflates** [1] - 39:14
**confused** [1] - 117:16
**conjecture** [1] - 73:5
**connection** [1] - 146:12
**consequences** [2] - 75:13, 130:2
**consequential** [1] - 97:20
**conservative** [2] - 63:6, 66:16
**consider** [51] - 22:11, 29:23, 57:23, 58:5, 62:6, 63:25, 64:2, 64:13, 66:12, 72:22, 74:24, 75:10, 75:11, 87:14, 87:17, 88:4, 88:9, 96:14, 124:10, 125:19, 128:3, 129:18, 131:10, 131:17, 131:20, 132:21, 132:24, 134:4, 134:5, 135:8, 135:21, 135:23, 136:8, 136:14, 136:16, 136:18, 144:21, 147:8, 148:18, 150:10, 150:13, 150:19, 150:22, 153:17,

154:19, 155:20, 157:2, 157:16, 157:17, 158:14, 158:18
**consideration** [8] - 7:7, 96:6, 105:15, 106:12, 134:6, 137:21, 157:6, 159:17
**considerations** [1] - 64:14
**considered** [3] - 29:8, 157:7, 162:19
**considering** [5] - 74:23, 89:19, 150:21, 151:25, 155:24
**consist** [1] - 26:15
**consistency** [1] - 84:10
**consistent** [1] - 110:19
**consists** [1] - 131:18
**conspiracy** [38] - 13:7, 13:9, 13:19, 14:15, 15:9, 25:23, 26:9, 30:12, 30:18, 37:4, 37:6, 39:22, 39:24, 42:25, 54:2, 55:4, 55:23, 79:6, 102:14, 102:19, 102:21, 102:23, 103:1, 103:10, 103:12, 103:14, 116:14, 116:17, 116:19, 121:5, 140:18, 143:22, 143:24, 144:15, 152:24, 153:2, 153:14, 153:24
**conspiracy's** [1] - 85:21
**conspirator** [2] - 59:16, 98:20
**conspirators** [41] - 12:7, 12:17, 15:9, 16:1, 19:8, 19:22, 20:12, 26:11, 27:4, 27:14, 30:10, 30:11, 30:13, 30:17, 44:11, 45:7, 45:17, 45:23, 52:8, 56:3, 68:4, 68:7, 74:18, 76:14, 79:5, 81:14, 85:24, 102:9, 102:23, 103:17, 141:24, 144:8, 144:14, 146:4, 146:10, 150:23, 153:13, 153:19, 154:5,

154:13, 155:17
**conspirators'** [5] - 43:21, 75:3, 77:23, 150:16, 151:10
**constitute** [2] - 38:23, 152:18
**constitutes** [1] - 162:16
**Constitution** [1] - 132:15
**constitutional** [1] - 36:1
**construction** [1] - 118:9
**consult** [1] - 157:10
**contact** [3] - 98:15, 98:25, 161:12
**contains** [1] - 160:7
**contendere** [1] - 95:22
**content** [2] - 60:18, 86:11
**contention** [1] - 40:17
**contents** [1] - 122:11
**contest** [2] - 96:3, 96:4
**contesting** [1] - 35:18
**context** [3] - 24:1, 82:10, 124:25
**continue** [8] - 16:3, 27:11, 148:8, 149:8, 149:12, 151:1, 151:4, 159:7
**Continued** [1] - 1:24
**continued** [5] - 2:1, 45:24, 57:10, 78:23, 85:6
**continues** [1] - 99:16
**contract** [2] - 17:21, 17:23
**contradicted** [2] - 136:5, 136:17
**contrary** [1] - 45:1
**contribution** [1] - 130:7
**control** [2] - 132:10, 139:1
**convenience** [1] - 160:6
**convenient** [1] - 81:10
**conversation** [1] - 105:3
**convince** [2] - 106:16, 107:13
**convinced** [3] - 106:16, 107:14, 157:18
**convincing** [1] - 152:2
**cooperation** [1] - 136:11
**copied** [1] - 119:14

**copies** [4] - 127:14, 127:16, 161:6, 162:5
**copy** [6] - 49:18, 49:19, 161:24, 162:1, 162:2, 162:4
**core** [2] - 85:20, 86:3
**cornerstone** [1] - 80:19
**correct** [6] - 3:22, 3:24, 9:14, 9:16, 9:19, 46:6
**corrected** [1] - 7:15
**correctly** [3] - 36:6, 48:9, 90:23
**correctness** [1] - 129:23
**corrupted** [1] - 67:24
**cost** [11] - 59:11, 67:19, 70:8, 70:13, 71:11, 71:13, 75:25, 88:10, 89:13, 104:5, 118:12
**cost-per-mille** [1] - 71:13
**costing** [1] - 88:16
**costs** [15] - 57:21, 67:13, 72:9, 73:11, 73:15, 73:20, 73:21, 74:14, 120:7, 120:8, 125:11, 125:16, 125:21
**counsel** [8] - 3:6, 5:19, 13:15, 21:5, 22:14, 44:24, 80:5, 91:5
**counsel's** [1] - 3:11
**count** [1] - 115:2
**counted** [1] - 94:15
**counting** [4] - 7:14, 36:18, 53:20, 59:1
**country** [6] - 89:9, 105:18, 111:19, 112:13, 112:23, 113:2
**County** [2] - 74:1, 85:3
**county** [1] - 74:3
**couple** [4] - 11:9, 24:8, 41:8, 107:5
**courage** [1] - 54:14
**course** [17] - 7:12, 11:1, 26:3, 34:4, 39:17, 62:23, 70:10, 72:2, 94:17, 103:18, 104:14, 110:7, 112:25, 114:9, 129:6, 130:12, 131:22
**Court** [65] - 2:9, 2:9, 12:22, 13:7, 13:18, 14:8, 26:20, 26:22,

31:23, 34:11, 34:16, 35:6, 37:14, 38:14, 38:19, 39:1, 40:1, 40:13, 41:11, 41:17, 41:23, 42:19, 43:5, 43:10, 52:17, 54:21, 55:1, 55:5, 55:13, 55:15, 55:19, 55:21, 56:11, 57:24, 59:6, 63:8, 64:9, 64:11, 74:22, 83:3, 83:21, 86:20, 91:17, 92:5, 102:20, 106:24, 118:21, 119:8, 124:19, 131:14, 139:12, 139:19, 139:25, 140:16, 140:22, 142:7, 142:11, 143:6, 143:15, 143:22, 144:19, 145:21, 149:21, 152:25, 162:23
**court** [17] - 42:4, 42:6, 42:13, 42:15, 121:11, 133:14, 137:15, 137:19, 137:23, 157:2, 157:21, 158:3, 158:4, 160:19, 160:21, 160:24, 162:10
**COURT** [177] - 1:1, 1:8, 3:8, 3:14, 3:17, 4:3, 4:7, 4:18, 4:25, 5:14, 6:25, 8:3, 8:14, 8:21, 8:24, 9:1, 9:3, 9:5, 9:12, 9:15, 9:17, 9:20, 9:23, 9:25, 10:7, 10:9, 10:18, 10:21, 10:24, 11:1, 11:6, 11:8, 11:10, 11:15, 12:8, 12:11, 12:14, 12:24, 13:4, 14:3, 14:5, 14:7, 14:13, 14:18, 14:21, 14:23, 15:1, 15:6, 15:10, 16:9, 16:16, 16:19, 17:6, 17:11, 17:19, 17:24, 18:3, 18:6, 18:11, 18:20, 19:2, 19:6, 19:11, 19:15, 20:3, 20:13, 20:21, 20:23, 21:3, 21:6, 21:10, 21:13, 21:16, 21:18, 21:25, 22:2, 22:17, 22:23, 23:5, 23:8, 23:10, 24:10, 24:13, 24:16, 24:23, 25:1, 25:10, 25:15, 25:18, 25:20,

25:24, 26:3, 26:6, 27:1, 27:10, 27:15, 28:3, 28:9, 28:13, 28:18, 28:22, 29:12, 30:3, 30:15, 30:21, 30:23, 31:2, 31:5, 31:11, 31:13, 31:16, 31:19, 31:25, 32:5, 32:9, 32:11, 32:24, 33:2, 33:10, 33:19, 33:23, 34:1, 34:4, 34:9, 34:13, 34:22, 35:12, 35:17, 35:20, 36:6, 36:17, 36:23, 37:1, 38:8, 41:6, 41:22, 46:10, 46:14, 46:20, 46:23, 47:3, 47:9, 47:11, 47:20, 47:23, 48:1, 48:6, 48:8, 48:12, 48:14, 48:19, 48:23, 49:2, 49:5, 49:7, 49:9, 49:15, 49:25, 50:8, 50:11, 50:14, 50:18, 50:20, 89:24, 90:8, 90:16, 90:22, 90:25, 91:3, 91:8, 91:14, 95:2, 113:24, 126:11, 161:11, 161:24, 162:3
**Court's** [11] - 12:19, 15:20, 36:4, 39:8, 40:18, 42:21, 49:14, 60:14, 83:9, 86:20, 143:8
**courthouse** [2] - 51:15, 120:15
**COURTROOM** [1] - 3:2
**courtroom** [11] - 49:24, 51:6, 91:13, 93:23, 130:6, 159:6, 159:9, 159:18, 159:25, 160:3, 160:25
**cover** [1] - 162:13
**covered** [3] - 39:1, 39:7, 39:8
**COVID** [3] - 72:1, 105:5, 105:11
**coworkers** [1] - 76:22
**CPM** [1] - 71:13
**crack** [1] - 53:20
**create** [1] - 28:7
**created** [1] - 156:1
**credentials** [1] - 117:20
**credibility** [7] - 42:17, 108:4, 121:20, 135:13, 135:17,

135:22, 136:7
**credit** [4] - 118:14,
119:11, 119:13,
137:7
**crew** [1] - 84:16
**crime** [2] - 60:20, 76:5
**crimes** [1] - 142:13
**criminal** [3] - 87:13,
152:9, 152:10
**criminals** [4] - 59:21,
70:25, 79:12, 124:24
**cross** [9] - 32:15,
32:16, 32:18, 41:1,
53:13, 64:18, 65:11,
65:24, 73:7
**cross-examination** [6]
- 32:15, 32:18,
53:13, 64:18, 65:11,
73:7
**cross-examined** [1] -
65:24
**cross-examining** [1] -
32:16
**curative** [5] - 26:15,
27:21, 28:19, 30:3,
30:6
**current** [1] - 121:1
**cut** [5] - 69:19, 95:5,
102:3, 116:24,
119:17
**cut-and-paste** [1] -
116:24
**cycle** [1] - 76:24

# D

**D.C** [3] - 1:6, 2:10,
105:17
**damage** [11] - 23:23,
38:6, 57:11, 57:19,
67:17, 73:13, 74:16,
96:15, 100:16,
111:6, 149:2
**Damages** [1] - 110:22
**damages** [178] - 6:1,
6:13, 7:1, 7:5, 7:21,
7:25, 8:7, 15:3,
15:22, 16:7, 17:22,
18:12, 18:22, 18:25,
19:2, 19:19, 20:7,
20:9, 20:16, 23:17,
23:20, 25:7, 25:12,
25:15, 25:16, 26:14,
27:9, 28:23, 29:4,
30:2, 37:18, 37:21,
37:22, 37:25, 38:1,
38:3, 38:6, 39:20,
44:21, 45:22, 45:24,
52:6, 56:4, 56:13,
56:20, 56:25, 57:3,

57:5, 59:8, 60:1,
60:3, 66:9, 72:19,
73:8, 73:9, 74:15,
77:18, 83:2, 83:4,
83:5, 83:8, 86:25,
87:15, 87:18, 88:9,
89:16, 92:8, 93:1,
94:8, 96:6, 96:7,
96:17, 104:18,
106:15, 106:24,
107:3, 107:14,
109:23, 109:24,
110:3, 110:12,
110:24, 111:1,
111:2, 111:3, 111:5,
114:14, 120:17,
123:10, 123:13,
123:18, 123:20,
123:21, 125:9,
125:10, 125:11,
125:14, 125:15,
125:17, 125:18,
125:20, 125:22,
126:7, 127:5, 127:9,
140:10, 140:14,
140:23, 141:2,
141:3, 141:5,
141:10, 144:16,
144:18, 144:20,
144:24, 145:2,
145:3, 145:5,
145:12, 145:13,
145:14, 145:17,
145:24, 146:1,
146:8, 146:12,
146:22, 147:3,
148:17, 148:24,
149:9, 149:17,
149:25, 150:2,
150:17, 150:20,
150:21, 151:2,
151:13, 151:15,
152:23, 153:15,
153:22, 154:11,
154:14, 154:18,
154:22, 154:24,
155:2, 155:4, 155:7,
155:8, 155:9,
155:13, 155:15,
155:16, 155:18,
155:20, 155:24,
156:3, 156:9,
156:11, 156:12,
156:13, 156:14,
156:15, 156:17,
156:18, 156:20
**damaging** [1] - 69:8
**dangerous** [2] - 67:25,
68:2
**darkest** [1] - 76:25
**data** [11] - 41:4, 64:21,

65:18, 71:13, 72:5,
72:11, 72:17, 118:1,
118:3, 118:6, 118:7
**date** [9] - 4:12, 43:14,
67:7, 81:25, 95:1,
103:11, 103:14,
121:24, 160:16
**Dated** [1] - 162:22
**dates** [1] - 122:4
**dawn** [1] - 53:20
**days** [10] - 51:1, 70:7,
70:15, 70:17, 76:25,
77:10, 78:18, 79:3,
82:5, 111:10
**DC** [1] - 1:13
**deal** [2] - 8:4, 87:22
**dealers** [2] - 59:21,
124:24
**debate** [2] - 16:16,
60:9
**debilitating** [1] - 76:10
**debunked** [2] - 43:25,
44:16
**debunking** [1] - 78:14
**decades** [1] - 79:25
**deceived** [1] - 89:14
**December** [64] - 1:5,
12:6, 12:16, 13:20,
35:11, 35:23, 37:8,
40:4, 48:4, 48:7,
53:5, 57:10, 62:17,
67:6, 70:7, 74:19,
75:8, 75:10, 75:12,
75:16, 75:17, 76:3,
77:7, 78:19, 79:1,
80:3, 80:4, 81:17,
81:19, 82:5, 84:19,
84:24, 85:5, 85:22,
86:14, 97:16, 98:3,
102:22, 103:2,
103:9, 115:20,
116:24, 120:3,
121:24, 122:5,
122:7, 122:11,
122:15, 122:19,
125:2, 141:23,
143:25, 146:10,
146:13, 150:24,
153:3, 162:22
**decide** [29] - 15:23,
18:13, 18:23, 20:8,
21:8, 21:9, 54:17,
111:4, 128:25,
129:4, 131:5,
131:11, 133:25,
135:6, 137:7,
138:19, 141:4,
145:25, 146:25,
147:5, 147:17,
147:18, 148:25,

149:4, 150:8, 155:7,
157:12, 159:8,
159:22
**decided** [14] - 3:21,
38:15, 38:19, 41:24,
138:17, 138:18,
138:21, 138:22,
140:16, 141:12,
142:7, 146:15,
153:11, 155:3
**deciding** [3] - 56:25,
135:10, 150:5
**decision** [8] - 39:1,
43:6, 56:16, 87:18,
91:24, 92:1, 144:24
**decisions** [3] - 43:10,
43:11, 79:20
**deduction** [1] - 134:19
**deductions** [2] -
134:13, 134:23
**deep** [2] - 69:14, 102:6
**defamation** [63] -
4:21, 7:1, 8:6, 11:18,
13:19, 15:4, 15:22,
18:22, 20:7, 20:17,
34:20, 37:11, 39:4,
39:15, 39:20, 40:6,
42:23, 47:19, 55:3,
56:20, 57:3, 57:25,
58:19, 59:25, 60:2,
60:5, 60:9, 60:10,
60:21, 68:6, 69:4,
69:17, 73:12, 75:9,
86:22, 87:10, 87:11,
99:18, 126:2,
140:17, 141:11,
141:13, 142:14,
142:15, 143:11,
143:24, 144:8,
145:21, 145:24,
146:7, 146:9,
146:12, 148:6,
150:20, 153:2,
153:16, 154:16,
154:18, 155:1, 155:6
**defamatory** [25] -
11:18, 11:21, 12:4,
12:5, 12:14, 55:9,
57:6, 57:8, 58:9,
59:7, 63:12, 66:20,
67:7, 83:22, 85:12,
141:16, 141:19,
141:21, 141:23,
142:8, 146:15,
146:22, 147:12,
148:4
**defamed** [4] - 55:8,
120:12, 121:3,
141:15
**default** [7] - 6:20,

149:4, 150:8, 155:7,
157:12, 159:8,
159:22
**decided** [14] - 3:21,
38:15, 38:19, 41:24,
138:17, 138:18,
138:21, 138:22,
140:16, 141:12,
142:7, 146:15,
153:11, 155:3
**defendant** [22] - 3:16,
7:11, 15:8, 34:5,
50:7, 51:7, 55:15,
64:7, 81:15, 95:6,
114:16, 123:22,
129:7, 129:9,
129:12, 129:14,
135:5, 142:15,
145:17, 151:24,
152:22, 156:4
**Defendant** [7] - 1:6,
68:3, 75:2, 77:22,
78:7, 126:8, 127:7
**DEFENDANT** [1] - 2:2
**Defendant's** [5] - 97:1,
97:11, 99:15,
102:10, 161:22
**defendant's** [13] -
5:19, 13:15, 21:5,
22:14, 42:4, 42:9,
43:12, 46:1, 52:4,
97:18, 99:18,
129:16, 139:3
**defendants** [1] -
139:11
**defense** [5] - 11:6,
37:15, 44:24, 50:5,
52:12
**Defense** [2] - 114:25,
116:15
**defenseless** [1] -
89:11
**defenses** [3] - 36:18,
39:19, 139:11
**defined** [1] - 111:15
**defines** [1] - 13:9
**definition** [1] - 33:8
**definitively** [2] -
109:8, 110:17
**deflate** [2] - 63:11,
88:2
**deflating** [3] - 147:25,
148:4, 148:13
**degree** [3] - 82:9,
87:1, 143:7
**delete** [1] - 31:23
**deliberate** [3] - 62:10,
63:9, 114:11
**deliberately** [1] -
59:23
**deliberating** [1] -
161:12
**deliberation** [1] -
111:25
**deliberations** [18] -
114:22, 126:14,
127:13, 127:15,
127:25, 129:10,

130:9, 132:2,
132:10, 156:24,
157:1, 158:19,
159:7, 159:20,
160:18, 161:4,
161:9, 162:10
**delivered** [1] - 161:7
**demand** [1] - 79:7
**demeanor** [1] - 135:23
**Democracy** [2] - 1:21,
3:12
**democracy** [1] - 89:15
**Democratic** [1] - 69:7
**Democrats** [1] -
105:24
**demonstrate** [1] - 16:6
**demonstrated** [1] -
44:10
**demonstrating** [1] -
140:20
**demonstrative** [1] -
158:16
**denied** [2] - 46:2,
108:13
**denying** [2] - 42:20,
43:11
**department** [1] -
112:15
**deposition** [15] - 10:2,
10:3, 44:15, 118:15,
118:18, 119:11,
119:22, 119:23,
132:13, 137:12,
137:16, 137:17,
137:20, 137:22
**Depositions** [1] - 9:25
**depression** [1] - 76:20
**DEPUTY** [1] - 3:2
**descent** [1] - 89:9
**described** [2] - 44:6,
135:19
**describes** [1] - 132:8
**describing** [1] - 45:15
**deserve** [1] - 51:4
**deserves** [2] - 118:14,
136:25
**designed** [7] - 44:2,
59:17, 59:18, 70:18,
82:20
**desired** [1] - 120:6
**desires** [1] - 95:24
**desk** [1] - 8:21
**despite** [1] - 45:1
**destroyed** [3] - 52:8,
67:24, 78:8
**detail** [6] - 52:24, 71:8,
71:18, 78:16, 141:8,
145:8
**details** [1] - 43:8
**deter** [2] - 83:6,

145:18
**determination** [8] -
27:8, 29:5, 140:14,
147:19, 151:5,
154:1, 154:10, 156:6
**determine** [13] -
41:19, 56:11, 57:24,
129:2, 130:11,
130:16, 133:6,
135:15, 140:25,
141:9, 149:11,
151:4, 153:22
**determined** [15] -
22:18, 22:25, 55:21,
83:21, 124:20,
137:4, 140:22,
144:19, 145:21,
149:13, 149:21,
151:8, 153:1, 155:5,
156:19
**determining** [7] -
67:8, 83:7, 127:5,
127:9, 145:2,
150:17, 155:19
**devastated** [1] - 63:4
**devastating** [1] -
68:18
**device** [1] - 159:1
**devices** [1] - 159:15
**Dickman** [1] - 162:12
**dictated** [1] - 7:2
**difference** [7] - 16:11,
16:13, 16:21, 19:12,
19:16, 65:8, 81:2
**differences** [1] - 17:12
**different** [13] - 7:4,
21:19, 22:4, 22:5,
24:3, 29:15, 44:4,
71:17, 109:15,
114:5, 125:18,
128:23, 135:2
**differently** [3] - 7:7,
129:22, 132:9
**difficult** [4] - 75:4,
87:18, 92:21, 112:2
**dignity** [2] - 61:11,
61:15
**dinner** [1] - 88:25
**direct** [9] - 41:1,
133:6, 133:9,
133:15, 133:22,
134:1, 134:4,
134:22, 135:3
**directed** [12] - 4:1,
34:5, 34:15, 35:10,
37:13, 37:17, 37:25,
38:2, 42:10, 100:11,
114:17
**direction** [2] - 86:16,
122:1

**directly** [2] - 64:7,
79:25
**disagree** [1] - 128:19
**disagreed** [1] - 45:11
**disagrees** [1] - 89:10
**disassembled** [1] -
162:19
**disclosed** [1] - 41:3
**disclosure** [1] -
138:24
**discovery** [12] - 42:22,
43:13, 54:24, 86:20,
87:24, 139:1,
139:13, 139:20,
139:25, 147:22,
147:24, 148:2
**discretion** [4] - 77:17,
83:9, 126:4, 156:8
**discuss** [4] - 90:14,
93:2, 158:19, 159:19
**discussed** [3] - 71:8,
74:14, 107:2
**discussing** [2] -
32:16, 32:18
**discussion** [3] -
72:13, 75:22, 103:20
**disdain** [1] - 109:1
**disgusting** [1] - 76:12
**disinformation** [3] -
69:7, 70:23, 121:6
**dismayed** [1] - 62:22
**dismiss** [9] - 34:23,
36:24, 38:16, 40:7,
41:25, 42:21, 43:4,
43:5, 43:12
**disparage** [1] - 105:21
**disproving** [1] - 85:7
**dispute** [1] - 81:20
**disputes** [1] - 95:25
**disregard** [2] - 129:20,
132:20
**disregarded** [1] -
143:4
**disseminate** [2] -
29:24, 122:21
**distinct** [1] - 4:23
**distinguish** [1] - 40:12
**distraction** [1] - 68:24
**distress** [40] - 5:22,
7:20, 7:22, 13:20,
23:18, 24:22, 39:16,
39:18, 42:24, 55:4,
55:18, 55:20, 56:9,
56:21, 74:24, 75:8,
77:15, 84:8, 101:15,
126:5, 140:18,
143:13, 143:16,
143:18, 143:21,
143:25, 144:9,
149:18, 149:20,

149:22, 150:9,
150:12, 150:18,
150:22, 151:11,
153:3, 153:17,
154:17, 154:21,
154:23
**distribution** [1] -
66:13
**District** [2] - 39:25,
81:10
**DISTRICT** [3] - 1:1,
1:1, 1:8
**distrusting** [2] -
105:9, 105:10
**diverse** [1] - 111:19
**divide** [1] - 6:14
**divided** [3] - 71:17,
112:19, 127:1
**division** [1] - 94:25
**Docket** [1] - 13:14
**doctrine** [7] - 38:14,
38:18, 38:20, 38:24,
39:2, 39:7, 43:7
**document** [7] - 96:1,
96:25, 97:5, 97:12,
103:2, 103:16, 108:7
**documents** [10] -
108:2, 108:9,
108:12, 108:15,
118:18, 118:19,
118:20, 139:2,
139:16, 152:17
**dollar** [2] - 32:20,
73:23
**dollars** [7] - 56:8,
60:11, 67:17, 88:17,
104:17, 111:5,
121:10
**dollars-and-cents** [1]
- 67:17
**Donald** [11] - 13:9,
13:21, 70:16, 70:20,
76:2, 96:19, 118:10,
120:25, 125:4,
144:1, 153:4
**done** [18] - 29:17,
53:14, 80:2, 91:20,
94:5, 94:10, 95:12,
96:15, 96:18,
107:11, 107:15,
113:5, 124:13,
130:18, 156:22,
160:4, 161:20
**doomed** [1] - 45:10
**door** [3] - 77:8, 82:25,
83:24
**double** [1] - 48:19
**double-check** [1] -
48:19
**doubt** [5] - 100:8,

101:7, 117:15,
152:9, 152:11
**down** [12] - 5:12, 29:1,
67:16, 67:21, 67:23,
77:24, 83:25, 104:4,
107:17, 112:5,
120:7, 120:9
**dox** [1] - 99:4
**Dr** [66] - 41:1, 44:6,
57:9, 59:8, 59:17,
61:9, 61:17, 63:6,
63:13, 63:25, 64:11,
64:12, 64:16, 64:23,
65:2, 65:7, 65:13,
65:17, 65:24, 66:1,
66:5, 66:7, 67:8,
68:15, 68:19, 71:1,
71:7, 71:9, 71:12,
71:24, 72:4, 72:10,
72:17, 72:21, 72:23,
74:13, 75:15, 75:20,
75:25, 81:16, 92:13,
95:22, 97:17,
102:18, 103:7,
104:3, 104:11,
105:4, 106:13,
106:20, 107:8,
108:2, 108:5,
109:19, 117:10,
120:16, 120:19,
120:23, 121:1,
121:15, 121:19,
123:9, 123:10,
123:12, 123:16,
124:10
**draft** [1] - 8:16
**drafted** [1] - 97:6
**draw** [9] - 132:22,
134:9, 134:14,
134:20, 134:24,
135:4, 135:5, 135:7
**drawing** [1] - 134:16
**drawn** [3] - 42:15,
133:11, 135:3
**dreamt** [1] - 69:16
**drive** [2] - 59:3, 161:21
**drug** [1] - 59:21,
124:24
**dry** [2] - 95:5, 119:18
**DuBose** [4] - 1:16,
1:17, 3:11
**duck** [1] - 17:8
**due** [5] - 43:18, 64:13,
76:24, 98:24, 113:12
**duplicate** [1] - 156:17
**duplicative** [2] -
26:14, 154:17
**duration** [1] - 88:10
**during** [31] - 10:1,
39:10, 53:21, 57:8,

60:8, 63:13, 69:20, 78:13, 90:14, 106:10, 123:12, 127:15, 127:18, 127:25, 128:15, 129:6, 129:10, 130:9, 130:12, 130:17, 130:18, 131:22, 132:12, 137:16, 139:1, 153:19, 159:7, 159:20, 159:23, 161:1, 162:10

**duties** [1] - 52:25

**duty** [12] - 52:17, 88:22, 126:20, 126:23, 127:8, 128:17, 130:1, 131:8, 136:18, 145:1, 157:10

## E

**eager** [1] - 114:21

**earliest** [1] - 160:2

**early** [1] - 84:23

**earnings** [1] - 61:18

**Earth** [7] - 45:1, 45:2, 45:3, 45:4, 45:8, 45:13, 105:5

**Earthers** [2] - 72:1, 117:22

**easier** [1] - 77:1

**easy** [3] - 8:4, 53:10, 78:6

**economic** [4] - 61:10, 61:17, 145:9, 146:21

**economics** [2] - 71:6, 121:8

**effect** [9] - 29:3, 62:12, 68:18, 68:24, 76:4, 107:22, 107:24, 129:2, 157:13

**effectively** [2] - 26:15, 40:5

**efficient** [1] - 128:14

**efficiently** [1] - 120:7

**effort** [2] - 88:11, 96:11

**efforts** [3] - 6:2, 45:2, 80:1

**either** [7] - 24:21, 31:10, 74:6, 106:24, 134:21, 137:4, 137:5

**Election** [1] - 88:22

**election** [23] - 43:22, 44:16, 45:6, 45:9, 45:18, 52:23, 53:1, 53:22, 54:1, 58:25,

62:11, 78:24, 80:10, 81:7, 85:19, 85:21, 86:7, 88:21, 89:2, 89:13, 107:11, 107:21, 125:1

**elections** [3] - 61:22, 78:12, 78:21

**electronic** [1] - 159:1

**electronically** [1] - 139:2

**elements** [1] - 140:20

**elevator** [1] - 83:25

**eliciting** [1] - 32:19

**ELIZABETH** [2] - 2:9, 162:16

**Elizabeth** [1] - 162:23

**ELIZABETH-SAINT-LOTH** [1] - 2:9

**email** [9] - 3:18, 27:11, 77:5, 90:3, 90:9, 90:16, 90:20, 103:22

**Email** [5] - 1:14, 1:15, 1:19, 1:23, 2:5

**emailed** [1] - 82:22

**emails** [3] - 61:2, 118:22, 139:3

**embarrassed** [1] - 76:20

**embarrassment** [3] - 75:1, 77:21, 150:15

**emotional** [51] - 5:22, 7:20, 7:22, 13:20, 23:18, 23:23, 24:21, 24:22, 37:18, 37:20, 39:16, 39:18, 40:15, 42:24, 54:18, 55:4, 55:18, 55:20, 56:9, 56:21, 74:16, 74:18, 74:24, 75:8, 75:11, 77:15, 84:8, 101:15, 126:5, 140:18, 143:12, 143:16, 143:18, 143:21, 143:25, 144:9, 145:10, 149:18, 149:20, 149:22, 150:9, 150:12, 150:18, 150:22, 151:11, 153:3, 153:16, 154:17, 154:21, 154:23, 154:24

**employment** [1] - 61:18

**encourage** [1] - 157:3

**encouraged** [1] - 100:20

**encouraging** [2] - 109:5, 111:21

**Encyclopedia** [1] -

108:9

**end** [8] - 19:7, 22:10, 71:22, 106:10, 115:13, 124:14, 125:8, 160:10

**ended** [2] - 30:13, 116:12

**ends** [1] - 52:14

**enforcement** [1] - 77:6

**engage** [3] - 84:4, 148:22, 149:25

**engaged** [10] - 13:8, 13:18, 43:22, 45:6, 55:16, 81:6, 114:17, 121:13, 126:9, 143:23

**engagement** [3] - 65:21, 72:7, 122:20

**engaging** [4] - 55:14, 84:8, 143:19, 145:18

**enhancement** [1] - 61:19

**enter** [6] - 22:24, 23:2, 24:23, 149:15, 151:11, 156:21

**entered** [1] - 120:6

**enterprise** [1] - 5:8

**entire** [3] - 34:14, 113:10, 153:24

**entirely** [2] - 78:10, 144:24

**entirety** [1] - 90:11

**entities** [1] - 158:25

**entitled** [16] - 22:11, 64:13, 87:14, 129:15, 129:16, 132:5, 133:1, 138:24, 139:5, 140:23, 144:20, 148:18, 148:23, 150:1, 151:23, 155:3

**entitlement** [1] - 44:21

**entity** [3] - 5:7, 29:13, 98:21

**envelope** [1] - 53:9

**environment** [2] - 117:2, 125:1

**episode** [1] - 48:5

**equal** [4] - 131:11, 131:12, 131:13, 134:2

**equals** [1] - 131:13

**equity** [1] - 73:22

**equivalent** [2] - 66:25, 67:22

**especially** [3] - 91:23, 101:12, 113:19

**essential** [1] - 159:7

**essentially** [3] - 106:4, 107:8, 124:14

**establish** [7] - 15:14, 23:22, 25:5, 25:8, 25:13, 151:14, 151:16

**established** [6] - 11:14, 43:16, 115:15, 134:15, 134:21, 134:25

**establishing** [1] - 44:21

**estimate** [11] - 23:19, 38:5, 65:12, 65:15, 65:22, 65:25, 71:11, 76:1, 96:17, 148:21, 149:24

**estimated** [2] - 70:12, 75:20

**estimates** [3] - 63:7, 66:17, 118:12

**estimation** [2] - 142:10, 142:22

**et** [3] - 1:3, 3:3, 100:16

**evaluating** [2] - 127:4, 131:15, 135:17

**evaluation** [2] - 42:13, 129:4

**evasive** [1] - 108:5

**evening** [1] - 50:1

**evenly** [1] - 152:19

**event** [2] - 29:21, 43:15

**everywhere** [3] - 79:16, 81:23, 85:23

**evidence** [170] - 5:24, 6:20, 7:7, 7:10, 9:6, 22:11, 25:9, 25:14, 29:9, 37:19, 40:15, 40:19, 42:10, 42:14, 43:15, 43:19, 43:23, 44:20, 44:22, 45:1, 45:14, 51:22, 56:15, 57:1, 57:18, 57:23, 58:14, 58:17, 58:22, 60:6, 62:17, 63:10, 66:3, 70:11, 70:14, 72:25, 73:1, 73:4, 73:6, 75:4, 75:5, 75:7, 78:5, 78:7, 84:11, 84:22, 86:5, 88:1, 88:8, 88:14, 93:14, 94:23, 95:21, 97:11, 101:24, 102:16, 102:25, 103:13, 103:24, 104:16, 107:18, 111:24, 115:16, 120:3, 121:17, 121:18, 123:8, 124:2, 124:6, 124:12, 126:22,

126:24, 127:4, 127:22, 127:23, 127:25, 129:3, 129:5, 129:12, 129:16, 129:17, 130:24, 130:25, 131:3, 131:9, 131:16, 131:17, 131:18, 131:19, 131:23, 132:4, 132:6, 132:7, 132:8, 132:20, 132:23, 132:24, 133:1, 133:3, 133:5, 133:6, 133:7, 133:9, 133:10, 133:11, 133:15, 133:20, 133:23, 133:24, 134:1, 134:4, 134:5, 134:6, 134:15, 134:17, 134:22, 135:1, 135:4, 135:9, 135:10, 136:4, 136:6, 136:12, 136:17, 137:1, 137:3, 137:6, 138:2, 138:3, 138:7, 138:9, 138:11, 138:12, 138:14, 138:25, 139:1, 140:3, 141:5, 148:12, 148:16, 148:19, 148:20, 148:24, 148:25, 149:11, 150:2, 151:4, 151:15, 151:17, 151:18, 151:19, 151:22, 151:23, 151:25, 152:1, 152:6, 152:14, 152:15, 152:18, 152:19, 153:17, 157:5, 157:6, 157:14, 158:13, 158:17, 158:20, 159:8, 159:21, 159:23

**Evidence** [1] - 10:1

**evidentiary** [3] - 42:7, 43:16, 45:21

**eviscerating** [1] - 54:20

**exact** [4] - 36:18, 58:16, 100:15, 150:4

**exactly** [2] - 111:9

**exam** [1] - 119:13

**examination** [7] - 32:15, 32:18, 53:13, 64:18, 65:11, 73:7, 101:4

**examine** [2] - 158:14,

10

158:17
**examined** [1] - 65:24
**examining** [1] - 32:16
**example** [12] - 17:22,
35:2, 44:25, 68:19,
94:20, 107:16,
110:13, 110:14,
133:12, 135:22,
152:8, 155:11
**excerpted** [1] - 58:21
**excluding** [1] - 58:25
**exclusive** [2] - 129:1,
130:21
**excruciating** [1] -
78:16
**excuse** [2] - 94:6,
106:7
**excused** [4] - 91:11,
93:21, 161:9, 161:10
**excuses** [1] - 94:6
**excusing** [1] - 93:21
**executed** [1] - 122:19
**exercise** [4] - 55:7,
57:25, 58:4, 147:6
**Exhibit** [27] - 51:22,
60:7, 62:18, 69:5,
73:19, 78:17, 79:9,
94:22, 95:16, 95:20,
96:2, 97:2, 97:11,
99:15, 101:25,
102:10, 102:15,
103:14, 103:19,
103:22, 109:9,
109:21, 110:1,
114:25, 116:15,
119:16, 161:22
**exhibit** [13] - 47:17,
48:1, 51:18, 73:18,
78:17, 78:20, 82:4,
97:1, 132:1, 158:15,
161:15
**Exhibits** [4] - 31:24,
48:25, 93:13, 93:14
**exhibits** [19] - 3:20,
4:2, 46:5, 46:18,
47:12, 47:16, 48:3,
93:7, 93:20, 96:2,
114:10, 131:19,
137:5, 137:9,
137:10, 158:13,
161:6, 161:15,
161:20
**exist** [1] - 66:7
**existence** [1] - 137:25
**expanded** [1] - 12:21
**expect** [4] - 65:1,
108:22, 157:16,
160:1
**expected** [1] - 50:2
**expendable** [1] - 89:3

**expenses** [5] - 7:5,
73:10, 95:24, 110:3,
146:7
**expensive** [2] - 70:9,
104:5
**experience** [2] -
134:12, 150:11
**experienced** [2] -
51:11, 79:16
**experiences** [1] -
122:25
**expert** [19] - 8:12,
29:2, 29:14, 37:20,
37:23, 40:16, 44:5,
44:24, 45:11, 45:18,
61:8, 64:12, 64:15,
64:16, 66:2, 80:10,
96:18, 121:1, 121:7
**expertise** [1] - 82:8
**experts** [1] - 100:1
**explain** [21] - 28:16,
54:9, 54:21, 56:11,
61:9, 67:8, 68:15,
71:2, 118:8, 127:8,
138:15, 141:11,
145:1, 152:25
**explained** [14] - 5:16,
54:9, 54:21, 56:11,
61:9, 67:8, 68:15,
71:2, 118:8, 127:8,
138:15, 141:11,
145:1, 152:25
**explanation** [1] -
17:11
**expose** [1] - 159:15
**exposures** [1] - 72:15
**expressing** [1] -
124:17
**extent** [11] - 12:21,
26:20, 38:3, 43:3,
58:8, 58:12, 62:6,
68:6, 135:16,
147:10, 147:13
**extra** [6] - 11:14, 46:8,
161:24, 162:1,
162:2, 162:4
**extraordinarily** [1] -
69:8
**extraordinary** [1] -
54:15
**extrapolating** [1] -
39:2
**extreme** [3] - 55:14,
55:16, 143:19
**eyewitness** [1] - 133:8
**eyewitnesses** [1] -
115:24

**F**

**face** [1] - 89:2

**Facebook** [5] - 70:19,
77:5, 81:23, 118:25,
159:4
**faced** [1] - 64:17
**facilitate** [1] - 46:25
**facilitator** [1] - 69:7
**fact** [18] - 29:9, 29:23,
30:20, 34:16, 35:8,
70:14, 100:19,
115:8, 129:13,
132:5, 133:8,
133:23, 137:25,
138:1, 138:2,
144:21, 151:16,
151:21
**factor** [2] - 86:25,
155:25
**factored** [1] - 124:9
**factors** [8] - 58:6,
58:15, 60:13, 60:16,
64:2, 87:18, 88:10,
125:18
**facts** [40] - 29:10,
38:24, 73:23, 83:13,
84:13, 87:6, 89:22,
110:20, 114:12,
128:25, 129:1,
129:4, 130:4,
130:11, 130:14,
130:16, 130:19,
130:21, 131:6,
131:19, 131:20,
133:6, 133:10,
134:9, 134:14,
134:16, 134:21,
134:25, 135:3,
135:11, 135:24,
136:7, 137:24,
140:5, 140:8,
140:12, 147:15,
150:10, 152:17
**factual** [1] - 140:20
**fail** [1] - 45:3
**failed** [6] - 34:18,
76:15, 84:18, 138:7,
138:8, 138:14
**failing** [2] - 139:14,
139:15
**fails** [1] - 34:7
**failure** [2] - 36:21,
140:4
**fair** [11] - 54:24, 58:1,
99:16, 112:3,
128:14, 129:4,
137:20, 139:25,
147:6, 147:16, 157:5
**fairly** [10] - 4:8, 8:7,
15:23, 18:13, 18:24,
20:8, 145:6, 145:25,
147:1, 150:8

**falling** [2] - 133:13,
133:15
**false** [19] - 43:25,
44:13, 44:16, 55:9,
59:1, 66:19, 66:22,
83:19, 83:22, 85:15,
87:2, 97:20, 98:5,
104:24, 124:22,
141:16, 142:6,
143:4, 143:8
**falsely** [4] - 44:19,
59:20, 87:13, 142:12
**falsities** [1] - 44:7
**falsity** [2] - 43:19,
43:21
**fame** [1] - 89:20
**familiar** [2] - 37:9,
40:10
**family** [3] - 76:8,
76:22, 76:23
**famous** [4] - 52:8,
52:10, 68:9, 113:1
**fan** [1] - 112:17
**far** [7] - 12:21, 58:9,
62:7, 76:2, 76:4,
109:21, 110:2
**Farm** [10] - 44:16,
53:19, 62:18, 74:20,
75:18, 78:16, 80:14,
80:19, 81:21, 116:1
**Farr** [2] - 1:12, 3:9
**fast** [1] - 126:13
**faster** [2] - 66:21,
66:23
**father** [1] - 51:25
**fault** [2] - 53:24, 76:21
**favor** [3] - 42:15,
129:5, 133:24
**favorably** [1] - 42:14
**favoring** [1] - 152:1
**favors** [2] - 133:1,
152:3
**FBI** [1] - 77:11
**FCRR** [3] - 2:9,
162:16, 162:23
**fear** [4] - 74:25, 77:20,
129:5, 150:13
**federal** [4] - 54:25,
138:23, 139:8,
139:25
**Federal** [3] - 42:3,
46:2, 85:2
**fees** [2] - 95:19, 156:4
**fellow** [2] - 157:16,
159:20
**felt** [7] - 51:13, 69:17,
70:5, 76:22, 77:9,
112:16, 123:1
**few** [9] - 50:15, 50:25,
78:18, 83:23, 99:7,

107:4, 111:10,
114:22, 161:5
**fiction** [1] - 52:14
**field** [1] - 139:10
**fifth** [1] - 40:3
**Fifth** [8] - 93:23,
93:25, 94:2, 110:2,
118:14, 118:16,
132:14, 132:21
**fight** [2] - 89:22, 96:25
**fighting** [1] - 70:22
**figure** [5] - 67:18,
77:18, 80:21, 89:18,
101:9
**figured** [1] - 97:8
**figures** [2] - 73:24,
105:10
**figuring** [1] - 67:10
**file** [2] - 41:14, 79:22
**filed** [12] - 22:7, 41:14,
47:17, 54:7, 60:4,
97:8, 97:15, 101:18,
102:7, 129:14,
151:21
**files** [1] - 139:3
**filing** [1] - 139:17
**fill** [1] - 123:4
**filled** [1] - 123:5
**final** [13] - 3:20, 4:2,
8:17, 11:13, 46:5,
49:17, 49:18, 49:19,
126:13, 126:15,
126:21, 130:4, 161:6
**finally** [3] - 27:2,
127:11, 154:4
**finances** [1] - 147:22
**financial** [7] - 7:24,
86:22, 88:2, 115:14,
148:5, 148:12, 156:2
**fine** [3] - 25:19, 46:10,
120:20
**finest** [2] - 117:17,
117:18
**finger** [2] - 56:3, 68:8
**fingers** [1] - 47:6
**finish** [1] - 99:7
**fire** [2] - 81:11, 112:15
**fired** [1] - 81:14
**first** [31] - 4:4, 22:8,
22:9, 22:10, 22:23,
41:9, 44:12, 45:25,
51:11, 56:7, 57:2,
57:13, 67:3, 74:12,
90:4, 98:8, 98:13,
99:6, 99:11, 103:23,
112:8, 115:3, 116:6,
116:19, 116:21,
116:23, 120:2,
124:19, 126:1,
127:2, 156:25

11

**First** [3] - 34:18, 34:19, 36:2
**fits** [2] - 57:1, 58:17
**five** [8] - 8:5, 56:19, 72:14, 72:17, 147:20, 151:6, 154:2, 156:7
**fix** [2] - 28:24, 67:19
**flag** [1] - 15:19
**flags** [2] - 61:5, 77:11
**flat** [9] - 45:1, 45:2, 45:3, 45:4, 45:8, 45:13, 72:1, 105:5, 117:22
**flat-Earth** [5] - 45:1, 45:3, 45:4, 45:8, 105:5
**flat-Earthers** [2] - 72:1, 117:22
**flow** [17] - 16:7, 16:10, 16:20, 17:2, 17:3, 17:4, 17:15, 17:16, 18:3, 18:25, 19:3, 19:12, 19:20, 20:10, 57:6, 108:22, 146:2
**flows** [7] - 18:8, 18:9, 18:14, 18:18, 20:1, 20:2, 108:19
**fluctuated** [2] - 107:3, 123:11
**flurry** [2] - 22:6, 104:22
**folks** [1] - 98:16
**follow** [7] - 64:9, 114:19, 128:4, 128:21, 128:24, 129:24, 160:14
**followed** [2] - 70:7, 82:12
**followers** [5] - 65:14, 70:21, 79:7, 82:15
**following** [6] - 39:2, 39:25, 47:16, 78:18, 84:4, 147:20
**FOR** [3] - 1:1, 1:11, 2:2
**forbidden** [1] - 158:5
**foreclosed** [1] - 43:1
**foregoing** [1] - 162:16
**foreperson** [6] - 157:1, 157:3, 157:23, 160:9, 160:16, 160:24
**foreseeable** [14] - 15:24, 16:11, 16:20, 17:1, 17:24, 18:6, 18:8, 18:17, 19:9, 19:13, 20:2, 78:10, 82:17, 125:6
**form** [47] - 4:8, 4:9,

4:15, 5:17, 5:18, 5:24, 6:5, 6:8, 7:3, 7:15, 8:15, 17:23, 23:5, 23:17, 24:21, 24:24, 26:9, 26:10, 31:9, 37:11, 40:1, 46:8, 46:12, 47:5, 56:12, 56:17, 56:18, 57:14, 74:12, 110:18, 118:9, 125:24, 133:24, 149:16, 151:12, 156:21, 160:5, 160:6, 160:7, 160:11, 160:12, 160:15, 160:17, 160:22, 160:23, 161:7, 161:18
**formally** [1] - 49:10
**format** [1] - 162:7
**formed** [1] - 102:21
**former** [5] - 44:2, 55:23, 62:24, 79:15, 81:9
**forms** [3] - 47:2, 104:3, 144:20
**formula** [2] - 58:5, 150:4
**forth** [2] - 43:11, 112:21
**forward** [2] - 3:4, 34:1
**fought** [1] - 112:5
**foundations** [1] - 67:23
**four** [10] - 7:15, 8:5, 35:14, 35:17, 35:21, 38:22, 39:4, 127:1, 148:7, 156:15
**fourth** [2] - 20:25, 24:18
**frame** [1] - 56:8
**Frank** [1] - 119:20
**fraud** [8] - 43:22, 45:6, 69:21, 76:6, 81:11, 86:7, 89:2, 99:2
**fraudsters** [2] - 59:21, 70:25
**fraudulent** [1] - 85:21
**free** [4] - 70:19, 114:9, 128:6
**freedom** [1] - 109:11
**Freeman** [78] - 3:3, 3:13, 7:21, 8:8, 51:8, 52:7, 53:3, 53:8, 53:14, 53:16, 53:17, 53:23, 54:3, 54:18, 55:8, 55:12, 55:17, 55:22, 57:4, 58:24, 61:4, 61:14, 61:24, 63:2, 63:3, 66:20,

67:5, 68:2, 68:3, 68:8, 68:11, 69:22, 71:5, 74:17, 77:4, 77:19, 78:4, 79:6, 79:7, 79:14, 81:16, 81:25, 82:2, 83:20, 85:18, 86:2, 86:23, 88:21, 89:13, 91:23, 97:6, 97:20, 98:8, 99:15, 99:16, 99:24, 114:3, 114:17, 115:7, 115:17, 116:12, 116:20, 122:24, 126:2, 126:4, 127:6, 141:15, 141:19, 142:1, 142:2, 142:12, 142:20, 143:3, 143:9, 143:20, 148:6, 149:10, 151:3
**FREEMAN** [1] - 1:3
**Freeman's** [6] - 52:14, 73:21, 81:18, 82:23, 82:24, 101:4
**friends** [3] - 69:18, 76:24, 79:25
**friendship** [1] - 136:10
**fringe** [1] - 100:24
**front** [2] - 32:22, 49:10
**fuel** [2] - 66:25, 67:23
**full** [6] - 13:17, 22:9, 54:11, 122:14, 157:5, 162:17
**fully** [6] - 27:13, 30:17, 41:3, 149:1, 149:4, 154:12
**Fulton** [2] - 74:1, 85:3
**fun** [2] - 105:5, 111:14
**function** [4] - 42:16, 52:18, 128:13, 128:25
**furtherance** [11] - 15:9, 30:12, 30:18, 37:5, 102:23, 103:1, 103:12, 103:13, 144:10, 144:14, 153:14
**furthermore** [1] - 148:25
**future** [12] - 25:7, 25:12, 37:18, 37:20, 37:24, 40:15, 40:17, 83:6, 145:19, 149:9, 151:2, 151:14

# G

**GA** [1] - 1:18
**Gabriel** [4] - 78:11,

82:6, 84:18, 125:2
**Gallagher** [2] - 1:12, 3:10
**game** [2] - 7:9, 112:15
**Gateway** [24] - 59:14, 96:24, 97:9, 97:19, 98:5, 98:20, 99:10, 99:18, 99:21, 100:7, 100:24, 102:3, 102:13, 103:17, 109:17, 114:23, 114:24, 115:1, 115:20, 116:10, 116:13, 116:16, 116:21, 116:23
**gee** [1] - 62:20
**general** [3] - 36:13, 127:2, 128:10
**generally** [1] - 105:13
**generate** [1] - 148:9
**generated** [1] - 75:20
**gentleman** [1] - 78:12
**gentlemen** [6] - 49:25, 50:23, 54:14, 113:25, 126:10, 126:11
**genuine** [3] - 91:22, 92:9, 92:25
**Georgia** [27] - 43:24, 44:2, 44:9, 45:19, 52:23, 53:25, 62:16, 62:25, 69:14, 78:12, 78:22, 78:25, 80:5, 85:1, 85:4, 85:20, 85:21, 86:4, 86:8, 88:21, 94:25, 105:17, 107:9, 120:2, 122:13, 125:4
**Georgia's** [2] - 78:21, 80:10
**Gertz** [1] - 39:1
**ginger** [1] - 59:4
**Giuliani** [191] - 3:3, 3:21, 12:6, 12:17, 13:8, 13:11, 13:18, 13:23, 16:1, 19:1, 19:8, 19:21, 20:11, 27:9, 35:15, 42:22, 44:1, 44:11, 44:18, 45:6, 45:16, 45:23, 45:24, 47:18, 50:11, 51:7, 51:13, 51:20, 52:2, 52:8, 53:1, 54:19, 54:25, 55:2, 55:8, 55:10, 55:11, 55:19, 55:22, 55:24, 56:2, 56:12, 59:16, 59:20, 60:3, 62:18, 63:9, 63:22, 64:3, 64:10, 64:15, 64:20,

65:6, 66:24, 68:3, 68:7, 68:9, 69:2, 71:2, 74:16, 74:18, 74:20, 75:2, 76:14, 77:22, 77:25, 78:7, 78:15, 79:5, 79:10, 79:15, 79:18, 80:1, 80:8, 80:18, 81:5, 81:8, 81:15, 81:20, 82:2, 82:10, 82:12, 82:14, 82:18, 83:5, 83:11, 83:14, 83:19, 83:23, 84:3, 85:3, 85:13, 85:24, 86:6, 86:18, 86:21, 86:23, 87:1, 87:3, 87:15, 87:19, 87:22, 87:24, 88:5, 88:13, 88:19, 89:1, 89:7, 89:17, 91:4, 93:25, 97:4, 99:20, 99:25, 100:4, 101:6, 102:8, 103:21, 104:17, 104:21, 105:15, 109:4, 109:8, 111:7, 111:15, 111:17, 114:1, 114:4, 114:19, 115:2, 115:10, 115:22, 116:13, 116:17, 117:1, 118:14, 119:10, 119:24, 120:6, 124:15, 124:20, 126:8, 127:7, 139:12, 140:1, 140:12, 140:14, 140:16, 141:1, 141:13, 141:15, 141:17, 141:24, 141:25, 142:23, 143:1, 143:3, 143:7, 143:9, 143:15, 143:18, 143:23, 144:3, 144:7, 144:11, 145:4, 145:20, 146:3, 146:9, 146:16, 147:21, 147:23, 148:1, 148:5, 148:7, 148:8, 148:11, 149:19, 150:16, 150:23, 151:10, 151:22, 153:1, 153:6, 153:11, 153:18, 153:22, 154:12, 155:5, 155:10
**GIULIANI** [1] - 1:5
**Giuliani's** [37] - 27:3, 42:20, 43:20, 52:12, 53:13, 54:23, 65:20,

66:20, 70:12, 72:6, 75:11, 75:16, 76:2, 79:24, 84:6, 84:16, 84:21, 85:11, 88:14, 89:5, 95:10, 101:8, 106:2, 106:3, 116:19, 139:19, 139:24, 146:22, 148:7, 153:19, 153:25, 154:5, 154:15, 155:16, 155:22, 156:1, 156:2
**given** [18] - 6:4, 33:15, 39:19, 42:18, 49:21, 49:22, 69:24, 88:24, 93:19, 124:10, 126:23, 135:14, 138:5, 138:8, 140:4, 158:17, 160:23, 161:2
**global** [1] - 88:23
**goal** [1] - 5:16
**goals** [2] - 52:13, 155:14
**goods** [1] - 62:2
**Google** [1] - 81:18
**gossip** [1] - 59:15
**Gottlieb** [10] - 3:9, 89:24, 95:18, 97:2, 101:19, 104:15, 105:4, 107:17, 108:18, 111:16
**GOTTLIEB** [17] - 1:11, 3:7, 3:9, 38:10, 46:7, 46:11, 46:15, 46:21, 46:25, 49:4, 49:6, 50:23, 50:25, 51:19, 78:21, 82:5, 113:25
**government** [3] - 44:3, 125:3
**GOVERNSKI** [1] - 1:11
**grad** [1] - 117:19
**grandmother** [1] - 74:4
**grandmother's** [1] - 61:1
**grant** [3] - 26:22, 41:23, 42:4
**granted** [1] - 34:8
**grants** [1] - 26:20
**graph** [1] - 104:4
**gray** [1] - 53:18
**great** [3] - 112:4, 113:8, 113:9
**greater** [6] - 129:16, 137:9, 137:10, 145:8, 151:23, 152:16
**Greyhound** [1] - 16:8

**ground** [3] - 132:16, 133:18, 133:19
**grounds** [1] - 15:15
**growing** [1] - 112:1
**guarantee** [2] - 115:13, 115:16
**guess** [6] - 16:14, 19:14, 62:14, 68:5, 131:24, 134:18
**guesswork** [3] - 134:17, 148:23, 150:1
**guide** [2] - 56:16, 56:24
**guilty** [1] - 105:23
**guy** [1] - 111:17

## H

**Hadley** [2] - 17:17, 17:20
**half** [2] - 6:14, 6:15
**hall** [1] - 113:7
**hand** [1] - 133:9
**handedly** [1] - 112:24
**handle** [1] - 91:24
**hanging** [1] - 76:18
**happy** [2] - 4:16, 49:13
**harass** [1] - 100:20
**harassing** [1] - 109:13
**harassment** [3] - 82:16, 97:22, 146:4
**harbinger** [1] - 113:20
**hard** [8] - 53:19, 89:9, 91:21, 91:23, 105:1, 112:21, 161:21, 162:5
**harder** [2] - 67:13, 88:3
**harm** [80] - 6:1, 8:1, 8:10, 15:5, 15:8, 15:24, 18:14, 19:9, 20:15, 22:20, 23:1, 27:14, 30:17, 37:18, 37:20, 40:15, 40:17, 45:22, 55:12, 57:11, 59:15, 60:15, 60:20, 60:23, 67:10, 67:11, 67:14, 67:18, 70:10, 74:13, 74:18, 75:11, 78:4, 78:8, 100:4, 101:9, 102:1, 107:12, 108:18, 108:19, 141:19, 143:9, 143:10, 144:12, 144:13, 145:7, 145:9, 145:10, 145:11, 145:15, 145:23, 146:4, 146:21,

146:23, 147:2, 148:16, 148:18, 148:21, 149:1, 149:5, 149:14, 149:23, 150:6, 150:19, 150:22, 151:9, 153:12, 153:13, 153:17, 153:18, 153:23, 154:13, 154:20, 154:25, 155:23, 156:1
**harmed** [6] - 51:2, 92:5, 113:6, 139:21, 145:22, 146:18
**harmful** [1] - 84:5
**harms** [4] - 56:9, 57:4, 57:6, 154:14
**hassle** [1] - 108:25
**hat** [1] - 112:15
**hatching** [1] - 81:1
**hateful** [1] - 68:13
**haunted** [1] - 76:16
**hazardous** [2] - 67:1, 67:25
**head** [3] - 78:12, 78:21, 116:4
**headed** [4] - 13:10, 13:23, 144:3, 153:6
**headings** [1] - 116:18
**headline** [1] - 116:23
**healing** [1] - 113:18
**hear** [13] - 11:19, 12:4, 22:8, 33:23, 34:13, 36:6, 37:1, 55:5, 71:24, 71:25, 134:8, 135:25, 141:21
**heard** [77] - 10:2, 10:3, 27:2, 28:20, 29:19, 48:8, 51:13, 54:21, 55:13, 57:21, 58:14, 58:17, 58:18, 59:24, 60:25, 61:4, 61:6, 61:19, 61:24, 67:3, 68:7, 68:12, 68:15, 69:12, 69:13, 69:15, 69:22, 70:1, 70:2, 70:4, 72:1, 73:15, 73:25, 74:17, 75:3, 75:15, 76:7, 76:9, 76:10, 76:15, 76:16, 76:19, 76:25, 77:3, 79:10, 79:14, 79:18, 79:21, 79:24, 80:6, 80:16, 81:16, 82:13, 82:22, 83:17, 84:21, 84:25, 96:21, 104:14, 114:3, 114:23, 114:24, 115:3, 115:6,

118:23, 119:8, 119:20, 129:6, 132:8, 137:16, 141:5, 152:11, 154:4, 159:6, 159:17, 159:21
**hearing** [3] - 64:10, 80:4, 81:22
**heart** [2] - 53:4, 61:25
**heart-wrenching** [1] - 53:4
**heavily** [1] - 155:25
**held** [8] - 32:10, 44:4, 50:10, 89:23, 90:7, 115:8, 115:10, 124:19
**help** [6] - 45:8, 56:16, 58:16, 70:18, 107:23, 132:6
**helped** [3] - 63:17, 111:9, 115:7
**helpful** [2] - 46:9, 67:9
**hereby** [1] - 162:16
**herein** [1] - 36:14
**hero** [1] - 88:23
**heroin** [1] - 124:25
**heros** [1] - 54:4
**herself** [2] - 69:19, 70:1
**hesitate** [1] - 157:18
**hid** [1] - 88:5
**hide** [5] - 63:10, 88:1, 147:21, 148:1, 148:12
**hiding** [1] - 59:2
**high** [7] - 52:7, 65:9, 65:15, 65:21, 72:5, 87:1, 143:7
**higher** [5] - 17:1, 18:1, 18:4, 18:8, 37:24
**highest** [1] - 103:6
**highfalutin** [1] - 44:1
**highlight** [3] - 22:3, 24:2, 28:3
**highlighted** [6] - 9:5, 9:13, 10:11, 31:22, 60:13, 95:23
**himself** [3] - 35:15, 111:9, 153:18
**history** [1] - 69:24
**hitting** [1] - 81:3
**hold** [4] - 88:12, 124:15, 126:13, 130:25
**Hollywood** [2] - 96:15, 120:17
**Hollywood-type** [1] - 96:15
**home** [7] - 53:9, 67:25, 68:12, 73:21,

73:22, 77:12
**homeless** [1] - 61:7
**homes** [1] - 52:20
**honest** [2] - 64:16, 157:13
**honestly** [1] - 87:5
**Honor** [90] - 3:2, 3:7, 3:15, 3:24, 4:16, 4:19, 5:15, 5:20, 6:9, 7:17, 8:1, 8:13, 8:20, 8:23, 8:25, 9:2, 9:4, 9:11, 9:14, 9:16, 9:19, 9:22, 9:24, 10:6, 10:8, 10:20, 10:23, 10:25, 11:5, 11:7, 11:11, 12:10, 12:19, 13:3, 13:5, 14:14, 14:20, 14:22, 14:25, 15:2, 15:18, 20:20, 20:22, 20:24, 21:12, 21:15, 21:17, 23:7, 23:9, 24:12, 24:15, 25:19, 26:5, 26:12, 28:11, 29:21, 31:4, 31:15, 31:21, 32:4, 33:3, 33:25, 34:3, 35:2, 36:9, 38:7, 38:10, 41:8, 41:16, 41:21, 46:7, 46:21, 47:8, 47:14, 48:4, 48:11, 48:16, 48:18, 48:22, 49:4, 49:6, 49:8, 50:7, 50:12, 50:17, 90:14, 90:18, 91:4, 91:16, 162:2
**Honor's** [4] - 13:14, 14:16, 16:24, 22:21
**honorable** [1] - 81:6
**HONORABLE** [1] - 1:8
**honorably** [1] - 53:1
**hope** [4] - 50:1, 88:10, 96:16, 109:5
**hoped** [1] - 85:13
**hopes** [1] - 29:10
**hoping** [1] - 29:10
**horrible** [6] - 96:21, 98:23, 100:11, 100:21, 103:4, 112:10
**horrifying** [1] - 53:7
**host** [1] - 38:25
**hostility** [1] - 136:12
**HOUGHTON** [11] - 1:12, 47:14, 47:21, 47:25, 48:3, 48:7, 48:10, 48:13, 48:17, 48:24, 161:21
**HOUGHTON-LARSEN** [11] - 1:12,

13

47:14, 47:21, 47:25, 48:3, 48:7, 48:10, 48:13, 48:17, 48:24, 161:21
**hour** [3] - 76:17, 126:12, 161:2
**hours** [1] - 83:24
**House** [3] - 86:13, 86:16, 122:16
**house** [7] - 61:1, 61:5, 67:16, 67:22, 77:11, 82:24
**HOWELL** [1] - 1:8
**Howell** [2] - 30:4, 85:11
**huge** [1] - 75:24
**Hughes** [3] - 108:3, 108:7, 109:9
**hum** [1] - 15:6
**human** [3] - 4:22, 85:25, 89:4
**humiliate** [1] - 111:14
**humiliated** [1] - 76:21
**humiliation** [4] - 75:1, 77:21, 100:16, 150:14
**Humphreys** [52] - 6:10, 44:6, 59:8, 61:9, 61:17, 63:6, 63:25, 64:12, 64:16, 64:23, 65:2, 65:7, 65:13, 65:17, 65:24, 66:1, 66:7, 67:8, 68:15, 68:19, 71:1, 71:7, 71:9, 71:12, 72:4, 72:10, 72:17, 72:21, 74:13, 75:20, 75:25, 81:16, 92:13, 95:22, 97:17, 102:18, 103:7, 104:3, 104:11, 105:4, 106:13, 106:20, 108:2, 108:5, 117:8, 117:10, 120:23, 121:1, 121:15, 123:9, 123:12, 124:10
**Humphreys'** [16] - 41:1, 57:9, 59:17, 63:13, 64:11, 66:5, 71:24, 72:23, 75:15, 107:8, 109:19, 120:16, 120:19, 121:19, 123:10, 123:16
**hundreds** [2] - 70:20, 88:17
**Hunter** [3] - 72:2, 104:22, 117:23

**hurt** [1] - 78:25
**hyper** [1] - 20:1
**hypothesis** [1] - 73:6
**hypothetical** [2] - 29:9, 33:15

**I**

**idea** [5] - 16:21, 60:17, 73:2, 111:20
**identical** [2] - 102:2, 118:9
**identification** [4] - 32:1, 48:2, 100:10, 158:16
**identified** [7] - 6:10, 36:10, 37:5, 100:3, 101:13, 102:5, 109:17
**identifies** [1] - 98:24
**identify** [4] - 3:5, 98:8, 99:11, 102:5
**identifying** [2] - 98:11, 98:25
**ignore** [4] - 128:4, 129:20, 131:24, 132:1
**IIED** [8] - 4:22, 7:5, 20:17, 35:24, 37:8, 37:11, 39:12, 143:14
**illegal** [2] - 59:1, 59:2
**illegally** [1] - 58:25
**images** [1] - 53:7
**imagine** [2] - 53:10, 53:11
**immediate** [1] - 77:9
**immediately** [2] - 85:23, 86:17
**impact** [1] - 156:3
**impacts** [1] - 61:18
**impartial** [2] - 131:6, 137:21
**impeachment** [1] - 10:10
**impeccable** [1] - 117:20
**implausibility** [1] - 136:15
**implying** [1] - 119:24
**importance** [1] - 136:24
**important** [10] - 47:1, 52:13, 53:15, 64:4, 69:24, 87:4, 87:8, 129:20, 130:7, 159:22
**imposed** [1] - 89:13
**impression** [6] - 65:8, 65:9, 65:21, 65:22, 72:5, 103:6

**impressions** [22] - 38:4, 40:24, 41:2, 59:10, 59:11, 59:19, 63:14, 64:24, 65:1, 65:3, 65:12, 66:4, 66:6, 66:10, 66:18, 71:4, 71:16, 72:8, 75:21, 75:24, 103:7
**improper** [2] - 40:12, 71:22
**inaccurate** [2] - 71:21, 159:11
**inadvertently** [1] - 159:15
**inappropriate** [2] - 28:10, 93:2
**incalculable** [1] - 89:15
**inclined** [1] - 66:11
**include** [12] - 30:3, 39:23, 48:16, 66:7, 73:13, 73:20, 139:2, 139:16, 145:10, 146:4, 154:20, 155:21
**included** [1] - 35:22
**includes** [6] - 57:21, 66:9, 66:12, 66:13, 73:10, 74:12
**including** [12] - 13:9, 13:22, 28:1, 41:3, 45:15, 64:18, 130:18, 139:14, 144:2, 153:5, 154:6, 159:14
**income** [4] - 40:21, 110:7, 110:14, 148:9
**incomplete** [1] - 159:10
**inconsistent** [2] - 10:10, 11:2
**inconvenience** [3] - 74:25, 77:20, 150:13
**incorporate** [1] - 46:8
**incorporated** [3] - 23:12, 36:14, 47:2
**incorporates** [1] - 43:10
**incorrect** [2] - 71:22, 125:14
**increase** [1] - 74:5
**incriminate** [1] - 132:17
**incurred** [4] - 73:11, 110:4, 125:12, 156:5
**indeed** [1] - 53:19
**independent** [1] - 36:5
**independently** [1] - 39:24
**indicating** [2] - 99:12,

130:19
**indicating)** [1] - 111:12
**indication** [2] - 51:9, 130:15
**indignity** [4] - 56:10, 75:1, 77:21, 150:14
**individual** [5] - 29:17, 70:16, 104:7, 121:2, 153:25
**individual's** [2] - 65:14, 72:16
**individuals** [4] - 70:23, 72:15, 121:5, 158:24
**inevitable** [2] - 82:17, 125:7
**infamous** [2] - 81:19, 93:17
**infer** [3] - 107:20, 132:17, 138:12
**inference** [4] - 132:19, 132:21, 134:18
**inferences** [9] - 42:15, 88:7, 119:9, 134:10, 134:13, 134:16, 135:2, 135:5, 135:6
**inflation** [1] - 74:5
**inflict** [1] - 74:19
**inflicted** [2] - 143:18, 153:24
**infliction** [26] - 5:22, 7:20, 13:20, 24:22, 39:15, 39:18, 42:24, 55:4, 55:20, 56:21, 77:15, 84:7, 140:17, 143:12, 143:16, 143:25, 144:9, 149:18, 149:20, 150:12, 150:21, 151:10, 153:3, 153:16, 154:16, 154:23
**influence** [2] - 159:16, 159:24
**influenced** [1] - 131:7
**inform** [1] - 160:1
**information** [23] - 29:25, 44:7, 63:17, 63:20, 63:23, 66:19, 66:22, 71:13, 87:7, 88:5, 98:15, 98:25, 100:6, 103:18, 107:19, 118:7, 119:2, 121:7, 130:13, 139:3, 159:9, 160:3, 161:12
**initial** [2] - 5:18, 124:11
**injure** [4] - 58:11,

142:9, 146:17, 147:13
**injured** [3] - 142:16, 142:18, 142:20
**injuries** [7] - 5:5, 5:11, 16:6, 16:7, 17:2, 17:5
**injury** [13] - 4:24, 6:18, 21:8, 21:9, 58:2, 60:24, 147:7, 147:17, 147:18, 149:8, 149:10, 151:1, 151:3
**injustices** [1] - 105:25
**insistence** [1] - 84:13
**insistent** [1] - 6:17
**inspiring** [1] - 54:12
**Instagram** [1] - 159:4
**instant** [2] - 94:19, 159:2
**instead** [8] - 8:4, 12:2, 71:25, 81:1, 108:10, 132:20, 142:17, 146:22
**instigated** [1] - 79:6
**instruct** [9] - 57:24, 74:23, 83:3, 102:21, 127:2, 127:3, 127:4, 140:12, 141:8
**instructed** [13] - 25:6, 25:11, 27:13, 30:16, 40:1, 55:5, 63:8, 74:22, 86:21, 87:25, 138:1, 151:13, 154:12
**instruction** [21] - 12:18, 12:23, 12:25, 14:17, 16:24, 26:16, 26:19, 26:21, 27:21, 28:19, 29:22, 30:4, 30:6, 64:9, 90:11, 90:12, 90:15, 125:23, 129:21, 129:22, 144:22
**instructions** [64] - 8:17, 10:13, 10:17, 11:21, 11:24, 11:25, 15:20, 21:20, 22:4, 22:6, 22:7, 23:13, 23:22, 31:7, 40:18, 47:7, 49:18, 49:20, 54:22, 56:1, 56:24, 60:14, 83:9, 102:24, 108:18, 110:23, 125:13, 126:13, 126:16, 126:21, 126:24, 127:1, 127:11, 127:15, 128:1, 128:2, 128:3, 128:5, 128:7, 128:8,

128:10, 128:18, 128:20, 128:23, 128:24, 129:19, 129:22, 130:19, 137:18, 138:16, 138:21, 141:6, 141:12, 159:12, 159:21, 160:11, 160:12, 160:14, 161:2, 161:6, 162:7, 162:9

**insult** [3] - 75:1, 77:21, 150:14
**intend** [1] - 29:8
**intended** [4] - 76:14, 82:19, 132:6, 145:14
**intending** [1] - 7:24
**intent** [1] - 40:22
**intention** [1] - 69:15
**intentional** [27] - 5:22, 7:19, 13:19, 24:21, 39:15, 39:18, 42:24, 55:3, 55:20, 56:21, 77:15, 84:7, 140:17, 143:12, 143:16, 143:24, 144:8, 149:18, 149:20, 150:12, 150:18, 150:21, 151:10, 153:2, 153:16, 154:16, 154:22
**intentionally** [9] - 55:15, 55:16, 63:9, 88:1, 143:18, 143:20, 147:21, 148:1, 148:12
**interact** [1] - 65:14
**interaction** [1] - 65:5
**interest** [4] - 132:18, 136:3, 136:9, 136:19
**interesting** [1] - 117:6
**interim** [1] - 123:23
**internalized** [1] - 82:18
**internet** [6] - 53:24, 59:15, 63:2, 75:18, 159:2, 159:10
**interrogatories** [1] - 93:10
**interrogatory** [2] - 94:3, 95:10
**interrupt** [1] - 26:18
**interview** [2] - 69:20
**interviewed** [1] - 84:25
**interviewer** [1] - 69:20
**introduce** [5] - 3:20, 46:5, 46:17, 47:12, 70:1
**introduced** [1] - 73:6

**inundated** [1] - 77:4
**investigated** [1] - 43:24
**investigation** [5] - 95:13, 108:24, 109:1, 119:18, 119:21
**Investigation** [1] - 85:2
**Investigations** [1] - 85:2
**investigations** [3] - 85:8, 94:24, 119:16
**investigative** [1] - 120:1
**investigator** [1] - 84:21
**invite** [1] - 157:4
**invoke** [1] - 118:16
**involved** [3] - 94:14, 136:11, 158:25
**ironically** [1] - 87:7
**irrelevant** [3] - 27:8, 52:11, 154:10
**irresponsible** [1] - 95:11
**isolating** [1] - 76:24
**issue** [27] - 4:20, 5:4, 6:9, 6:11, 15:13, 15:16, 17:9, 19:14, 20:16, 24:9, 25:3, 29:2, 31:6, 32:8, 41:17, 94:13, 94:25, 102:22, 108:1, 121:22, 137:3, 141:4, 152:1, 152:3, 152:5, 152:20, 152:22
**issued** [5] - 29:14, 44:3, 55:2, 107:17, 140:1
**issues** [8] - 5:12, 26:1, 35:2, 93:9, 108:14, 114:5, 138:20, 158:24
**Italian** [1] - 112:4
**Italians** [1] - 112:2
**itself** [3] - 58:12, 79:12, 86:13
**IV** [1] - 2:2

**J**

**J6** [1] - 10:16
**jail** [1] - 109:6
**Janice** [1] - 162:12
**January** [6] - 61:5, 62:24, 77:10, 103:3, 113:19, 122:5
**Jean** [1] - 121:15

**Jensen** [2] - 108:3, 108:6
**Jeremy** [1] - 109:9
**job** [13] - 15:5, 15:7, 20:14, 36:4, 40:22, 56:8, 61:20, 69:20, 74:1, 108:4, 145:22, 149:22, 155:7
**jobs** [1] - 105:7
**Joe** [3] - 3:16, 60:7, 109:11
**JOHN** [1] - 1:20
**John** [1] - 3:12
**john.langford@ protectdemocracy. org** [1] - 1:23
**joint** [1] - 22:5
**jointly** [1] - 24:4
**JOSEPH** [1] - 2:2
**journalism** [1] - 117:17
**Judge** [1] - 85:11
**judge** [4] - 113:9, 126:20, 128:13, 128:14
**JUDGE** [1] - 1:8
**judges** [5] - 17:7, 129:1, 130:4, 130:21, 135:13
**judging** [1] - 135:17
**judgment** [17] - 41:24, 42:4, 43:6, 43:18, 46:1, 57:25, 77:16, 77:17, 83:8, 126:6, 135:21, 136:22, 146:25, 147:6, 149:3, 155:19, 157:7
**July** [1] - 124:11
**jump** [1] - 95:11
**juror** [5] - 152:10, 157:4, 157:8, 157:9, 160:4
**JURORS** [2] - 50:24, 91:19
**jurors** [6] - 108:4, 128:25, 157:11, 157:16, 157:19, 159:20
**jurors'** [1] - 157:15
**jury** [73] - 3:20, 6:3, 7:16, 8:17, 10:13, 11:20, 11:24, 11:25, 15:13, 15:16, 19:11, 22:6, 29:10, 31:7, 32:22, 42:6, 42:11, 43:17, 45:20, 46:3, 46:18, 47:7, 47:13, 49:5, 49:9, 49:11, 49:19, 49:20, 49:23, 49:24, 50:13, 52:17,

56:1, 56:24, 58:23, 87:22, 88:16, 91:11, 91:13, 102:24, 106:25, 108:17, 110:23, 111:25, 121:12, 121:15, 126:18, 130:10, 134:20, 138:18, 145:16, 156:25, 157:22, 157:24, 158:1, 158:6, 158:9, 158:12, 160:4, 160:6, 160:8, 160:9, 160:20, 161:3, 161:10, 161:11, 161:14, 161:16, 162:6, 162:9
**Jury** [1] - 126:19
**jury's** [3] - 7:6, 29:4, 42:16
**justice** [9] - 52:18, 96:17, 105:20, 105:22, 105:25, 113:3, 130:8, 131:5
**justified** [1] - 134:11

**K**

**keep** [12] - 5:20, 7:13, 22:2, 48:20, 85:7, 85:16, 88:7, 106:1, 110:24, 120:7, 120:8, 158:15
**kept** [2] - 85:15, 93:24
**Kerik** [3] - 79:24, 86:16, 122:9
**Kerik's** [1] - 86:14
**kerosene** [2] - 66:25, 67:23
**key** [1] - 85:19
**kicked** [1] - 76:11
**kicking** [1] - 80:23
**kid** [1] - 119:12
**killed** [5] - 79:1, 79:4, 82:7, 84:20, 125:5
**kind** [31] - 5:1, 5:4, 28:7, 35:9, 44:5, 59:24, 66:2, 66:11, 67:25, 82:8, 84:23, 91:23, 92:25, 96:25, 100:15, 100:23, 100:25, 101:1, 105:3, 105:4, 109:2, 109:15, 110:16, 113:4, 113:20, 115:14, 115:17, 117:9, 121:14, 125:2
**kinds** [4] - 58:10, 71:17, 97:23, 146:16
**knowing** [1] - 54:11

**knowledge** [1] - 133:8
**known** [1] - 142:14
**knows** [9] - 66:7, 84:5, 87:3, 87:4, 87:6, 87:8, 87:10, 106:23

**L**

**lab** [1] - 105:11
**lack** [2] - 37:19, 40:14
**ladies** [7] - 49:25, 50:23, 54:13, 98:22, 113:25, 126:10, 126:11
**laid** [1] - 122:23
**Langford** [6] - 3:12, 10:14, 12:9, 18:21, 22:8, 90:20
**LANGFORD** [72] - 1:20, 4:16, 5:15, 7:17, 8:13, 8:20, 8:23, 9:2, 9:10, 9:14, 9:22, 10:6, 10:15, 10:23, 11:5, 11:9, 11:11, 11:16, 12:13, 12:16, 13:5, 14:4, 14:6, 14:9, 14:20, 14:24, 15:11, 16:12, 16:18, 16:23, 17:10, 18:22, 19:4, 19:7, 19:14, 19:18, 20:6, 20:20, 20:24, 21:4, 21:7, 21:15, 21:23, 22:1, 22:9, 22:18, 23:4, 23:7, 24:7, 24:18, 24:25, 25:3, 25:11, 25:16, 25:21, 26:12, 26:24, 27:2, 27:12, 30:16, 30:22, 30:25, 31:6, 31:12, 31:18, 32:7, 32:12, 32:25, 33:3, 33:17, 33:21, 47:8
**language** [8] - 13:16, 18:18, 20:17, 25:23, 31:22, 53:6, 102:24, 124:16
**laptop** [5] - 72:2, 104:22, 104:25, 106:3, 106:6
**large** [1] - 89:9
**larger** [1] - 155:13
**LARSEN** [11] - 1:12, 47:14, 47:21, 47:25, 48:3, 48:7, 48:10, 48:13, 48:17, 48:24, 161:21
**last** [20] - 3:18, 3:23, 3:25, 6:6, 22:6, 24:19, 30:8, 30:15,

31:6, 40:24, 41:22, 47:15, 47:22, 47:23, 69:11, 70:15, 70:17, 97:14, 111:10, 123:9
**late** [1] - 7:9
**lately** [1] - 113:9
**latitude** [1] - 146:24
**laugh** [1] - 111:14
**launch** [1] - 75:12
**launched** [2] - 75:13, 79:5
**Lavaca** [1] - 2:3
**law** [49] - 4:11, 6:7, 6:21, 16:4, 16:9, 16:17, 17:7, 37:9, 37:22, 38:14, 38:20, 39:8, 39:25, 40:10, 40:11, 40:16, 42:5, 43:2, 43:7, 46:2, 47:6, 52:25, 56:1, 60:19, 77:6, 77:16, 84:15, 90:8, 112:6, 112:8, 126:21, 126:23, 127:3, 127:5, 128:15, 128:16, 128:17, 129:25, 130:1, 131:13, 133:22, 133:24, 142:17, 145:15, 146:17, 156:9, 158:20, 159:8, 159:21
**LAW** [1] - 20:4
**lawsuit** [20] - 54:7, 60:5, 69:3, 97:9, 97:14, 97:15, 97:16, 100:13, 101:16, 101:18, 104:15, 104:19, 104:20, 104:21, 129:9, 129:14, 139:6, 151:21
**lawyer** [7] - 53:13, 87:10, 92:11, 92:12, 117:9, 130:24, 131:1
**lawyer's** [2] - 131:2, 131:23
**lawyers** [14] - 92:15, 92:19, 92:21, 92:23, 96:13, 97:6, 97:7, 100:1, 100:2, 130:22, 132:3, 132:7, 137:14, 137:25
**lay** [1] - 6:2
**lead** [3] - 71:22, 134:14, 134:24
**Leadership** [1] - 51:21
**leading** [1] - 69:6
**learn** [3] - 158:23,

160:2, 160:4
**learned** [2] - 61:21, 119:25
**least** [7] - 45:22, 57:15, 71:5, 73:9, 86:23, 126:3, 143:7
**leave** [10] - 19:6, 19:23, 56:6, 61:20, 70:2, 74:3, 77:12, 80:18, 161:12
**leaves** [2] - 56:6, 118:17
**leaving** [1] - 69:15
**lectern** [1] - 3:4
**led** [3] - 55:24, 72:17, 75:22
**left** [11] - 6:10, 14:10, 23:11, 51:14, 64:8, 73:25, 77:16, 78:1, 83:8, 86:1, 155:18
**legal** [23] - 4:25, 5:6, 13:10, 13:23, 39:16, 41:13, 42:9, 50:2, 55:11, 55:24, 62:14, 78:15, 79:19, 81:5, 81:21, 88:16, 116:5, 128:22, 141:9, 142:25, 144:2, 153:5, 158:24
**legally** [5] - 42:7, 42:20, 43:16, 45:20, 155:3
**legislature** [1] - 62:16
**length** [2] - 65:24, 72:7
**less** [4] - 68:16, 106:25, 133:3, 137:22
**letter** [2] - 53:8, 85:14
**letters** [2] - 62:20, 68:11
**level** [3] - 37:24, 84:9, 139:9
**liability** [7] - 39:24, 40:2, 41:19, 96:3, 120:9, 120:14, 154:16
**liable** [1] - 27:14, 30:17, 42:22, 55:2, 55:19, 140:1, 140:12, 140:17, 141:13, 143:15, 144:12, 145:20, 149:19, 153:11, 154:13, 155:5
**lie** [3] - 76:13, 85:4, 85:22
**lied** [1] - 59:23
**lies** [16] - 45:17, 45:25, 62:9, 78:8, 78:14,

78:24, 79:15, 80:20, 84:17, 85:7, 86:18, 107:22, 115:7, 116:20, 124:4
**life** [1] - 89:5
**light** [3] - 134:11, 136:6, 150:10
**likely** [15] - 23:16, 66:16, 71:22, 82:9, 98:18, 98:19, 98:22, 98:24, 99:3, 100:25, 106:23, 146:17, 151:17, 151:20, 155:23
**likening** [1] - 45:4
**likewise** [1] - 158:4
**limitations** [4] - 37:9, 37:12, 37:13, 40:5
**limited** [9] - 9:6, 57:5, 59:11, 125:16, 127:9, 134:7, 134:8, 145:2, 145:9
**Lincoln** [2] - 112:25, 113:1
**line** [16] - 9:8, 9:13, 9:18, 10:1, 20:14, 22:23, 22:24, 23:11, 24:20, 25:2, 31:9, 31:11, 45:4, 73:22, 74:12, 110:4
**lined** [1] - 118:12
**lines** [6] - 5:18, 5:25, 6:7, 57:13, 95:9, 126:1
**LinkedIn** [4] - 77:5, 98:12, 99:1, 159:4
**list** [2] - 47:17, 161:15
**listed** [2] - 29:13, 103:19
**listen** [8] - 52:23, 53:2, 53:3, 53:6, 75:5, 119:5, 126:13, 127:17
**listened** [2] - 52:3, 68:12
**listening** [1] - 54:16
**litigating** [1] - 95:24
**litigation** [4] - 55:1, 88:10, 93:11, 96:9
**live** [3] - 51:17, 67:25, 70:3
**Live** [1] - 48:5
**lives** [3] - 52:9, 53:5, 85:25
**living** [1] - 53:10
**LLC** [4] - 147:23, 148:8
**LLP** [2] - 1:12, 2:3
**loaded** [1] - 66:25
**local** [1] - 80:5

**location** [1] - 44:18
**logic** [2] - 67:14, 71:2
**logical** [1] - 134:19
**logistical** [1] - 156:23
**Logistical** [1] - 31:8
**logistics** [1] - 127:12
**logs** [1] - 139:5
**long-term** [1] - 76:23
**look** [39] - 18:9, 29:2, 36:4, 41:18, 53:7, 69:10, 79:9, 82:14, 92:8, 92:22, 93:7, 93:13, 94:25, 95:20, 95:23, 96:3, 98:1, 98:7, 101:23, 102:1, 102:4, 102:15, 104:19, 108:9, 108:17, 109:18, 109:19, 109:25, 110:2, 110:23, 113:20, 114:9, 116:10, 116:11, 116:14, 116:18, 118:24, 162:8
**looked** [7] - 84:21, 92:21, 98:13, 100:5, 108:11, 133:13, 133:17
**looking** [2] - 8:11, 100:24
**looks** [4] - 31:22, 56:17, 99:2, 102:2
**Los** [1] - 1:22
**lose** [1] - 105:7
**losing** [1] - 115:1
**loss** [4] - 110:14, 125:4, 149:8, 151:1
**losses** [8] - 25:7, 25:8, 25:12, 25:13, 25:15, 149:10, 151:3, 151:14
**lost** [8] - 61:15, 76:22, 76:23, 81:25, 104:20, 110:16, 146:7
**lost-profits** [1] - 104:20
**LOTH** [2] - 2:9, 162:16
**Loth** [1] - 162:23
**loud** [1] - 82:13
**Louis** [1] - 116:25
**loved** [1] - 111:19
**low** [7] - 65:8, 65:12, 65:22, 72:4, 111:22
**lower** [1] - 66:4, 123:21, 142:10
**lowered** [2] - 142:21, 146:6
**lunch** [1] - 126:12, 126:17, 161:2, 161:4

## M

**machine** [1] - 2:12
**machines** [1] - 59:3
**made-up** [1] - 120:24
**magazine** [1] - 118:2
**magician** [1] - 117:9
**magnitude** [1] - 70:10
**mails** [1] - 78:1
**main** [1] - 80:22
**malice** [11] - 34:19, 34:21, 36:1, 36:22, 55:10, 59:22, 113:3, 124:20, 141:17, 143:2, 155:6
**man** [4] - 111:7, 112:24, 113:8, 113:14
**manner** [5] - 128:14, 131:6, 136:2, 158:5, 162:20
**March** [2] - 95:1, 95:4
**marked** [4] - 32:1, 48:2, 158:16, 161:25
**market** [1] - 62:3
**massive** [1] - 70:10
**massively** [1] - 66:13
**match** [1] - 13:13
**materials** [1] - 67:1
**math** [1] - 71:10
**mathematical** [4] - 58:4, 147:4, 150:4, 152:7
**matter** [9] - 42:5, 46:1, 46:20, 84:12, 89:23, 97:25, 107:25, 130:4, 134:17
**Matters** [1] - 31:8
**matters** [8] - 49:13, 50:2, 135:20, 138:16, 140:25, 156:23, 158:23, 159:17
**mayor** [3] - 79:23, 89:6, 111:18
**Mayor** [1] - 48:5
**mayor's** [1] - 86:16
**mean** [26] - 6:19, 8:11, 26:18, 27:15, 27:20, 28:20, 29:3, 46:25, 49:12, 49:15, 55:18, 87:5, 94:13, 98:10, 101:8, 105:14, 106:5, 109:23, 110:7, 115:10, 121:15, 129:14, 135:9, 151:22, 152:7, 152:8
**meaning** [1] - 56:3, 59:22, 97:3

**means** [21] - 55:5, 87:12, 125:10, 133:23, 135:17, 139:21, 140:7, 140:19, 141:14, 142:1, 142:6, 142:25, 143:2, 143:10, 143:17, 144:7, 151:18, 153:10, 157:25, 158:22, 158:25
**meant** [1] - 75:23
**measure** [1] - 106:15
**measuring** [1] - 67:11
**media** [21] - 58:25, 63:11, 63:15, 64:21, 65:5, 81:23, 97:21, 100:24, 103:7, 104:3, 104:13, 105:12, 111:13, 117:1, 121:8, 139:4, 148:3, 159:1, 159:3, 159:10, 159:14
**meet** [1] - 40:19
**member** [3] - 157:24, 158:1, 158:6
**Members** [1] - 126:19
**members** [8] - 13:21, 13:22, 26:9, 144:1, 144:2, 153:4, 153:5, 157:23
**meme** [2] - 63:5, 82:1
**memes** [1] - 53:24
**memory** [5] - 127:21, 127:23, 127:25, 132:9, 136:1
**men** [2] - 54:11
**mental** [10] - 7:22, 37:18, 37:21, 37:22, 37:24, 74:25, 77:20, 145:11, 146:5, 150:13
**mention** [3] - 27:24, 93:8, 95:17
**mentioned** [16] - 6:6, 32:20, 33:13, 33:14, 73:14, 87:21, 93:3, 95:18, 101:19, 103:22, 118:13, 119:15, 120:5, 122:3, 129:18, 146:14
**mentioning** [2] - 27:17, 32:24
**merely** [2] - 152:16, 157:14
**merits** [4] - 38:16, 43:9, 158:2, 158:7
**MERYL** [1] - 1:11
**message** [11] - 89:17,

89:21, 100:8, 101:5, 105:18, 109:7, 113:15, 113:16, 114:13, 114:18, 126:8
**messages** [8] - 98:23, 100:7, 100:22, 103:4, 109:16, 119:1, 122:21, 139:4
**messaging** [2] - 122:22, 159:3
**met** [1] - 140:19
**methods** [1] - 41:3
**metrics** [1] - 118:25
**mgottlieb@willkie. com** [1] - 1:14
**mgovernski@willkie .com** [1] - 1:15
**MICHAEL** [1] - 1:11
**Michelle** [1] - 80:16
**microphone** [3] - 8:22, 32:13, 34:2
**middle** [6] - 27:22, 32:15, 32:17, 53:20, 76:12, 86:8
**midnight** [3] - 86:3, 86:11, 122:13
**midst** [1] - 88:22
**midterm** [1] - 119:13
**might** [12] - 12:1, 28:6, 33:15, 42:11, 84:4, 94:16, 94:18, 114:9, 114:19, 115:8, 117:15, 159:10
**Mike** [1] - 3:9
**miles** [2] - 54:4
**mille** [1] - 71:13
**Miller** [2] - 1:17, 3:12
**miller@ dubosemiller.com** [1] - 1:19
**million** [20] - 33:4, 33:9, 57:15, 64:25, 65:1, 65:22, 70:13, 70:21, 71:5, 73:9, 75:21, 75:23, 103:23, 106:20, 107:4, 107:5, 111:4, 111:5, 126:3
**millions** [9] - 60:11, 60:12, 62:13, 68:10, 70:20, 104:17
**mind** [9] - 43:1, 88:7, 94:9, 106:2, 114:11, 151:19, 152:13, 158:8, 158:15
**minds** [1] - 45:12
**mine** [2] - 47:23, 144:23
**minimize** [1] - 96:10

**minimum** [1] - 59:23
**minority** [1] - 68:25
**mint** [1] - 59:4
**minute** [1] - 46:22
**minutes** [6] - 46:8, 46:24, 47:9, 50:15, 91:10, 161:5
**minutiae** [1] - 52:24
**misconduct** [4] - 42:23, 43:13, 54:24, 139:24
**misinformation** [1] - 105:7
**misleading** [1] - 159:11
**misread** [1] - 46:17
**Missouri** [1] - 59:15
**Missouri-based** [1] - 59:15
**misspoke** [1] - 15:18
**mistake** [1] - 26:24
**mob** [4] - 89:12, 112:2, 112:5, 114:16
**model** [16] - 28:23, 38:4, 40:24, 41:2, 59:9, 63:15, 64:24, 65:9, 96:15, 107:14, 120:16, 120:17, 120:20, 123:11, 123:18, 123:21
**models** [3] - 64:19, 65:10, 117:22
**modifications** [1] - 11:3
**moment** [2] - 3:11, 121:25
**Monday** [4] - 48:4, 48:7, 51:10, 120:15
**monetary** [7] - 27:6, 27:7, 28:6, 57:21, 74:13, 74:14, 154:8
**money** [19] - 15:22, 18:12, 18:23, 20:8, 27:19, 28:24, 45:7, 56:11, 68:21, 103:24, 103:25, 127:9, 141:1, 141:5, 144:17, 145:2, 145:3, 145:5, 145:25
**months** [3] - 105:8, 107:4, 107:5
**moral** [1] - 61:10
**more-likely-than-not** [1] - 98:18
**morning** [16] - 3:6, 3:7, 3:14, 3:15, 3:17, 3:22, 4:10, 47:14, 49:25, 50:3, 50:23, 50:24, 80:3, 91:18, 91:19, 115:21

**mortgage** [1] - 73:23
**Moss** [83] - 3:13, 7:22, 8:9, 30:13, 32:15, 32:18, 40:21, 51:8, 52:7, 52:14, 53:4, 53:14, 53:16, 53:18, 53:23, 54:3, 55:8, 55:12, 55:17, 55:22, 57:4, 58:24, 60:25, 61:14, 61:19, 66:21, 67:5, 68:2, 68:3, 68:8, 68:12, 69:16, 71:5, 73:25, 74:17, 76:7, 76:13, 76:16, 76:19, 77:1, 77:19, 79:6, 79:7, 79:14, 82:2, 83:20, 84:25, 85:18, 86:2, 86:23, 88:21, 88:23, 89:14, 94:12, 97:6, 97:21, 99:11, 99:13, 99:24, 100:17, 107:19, 114:3, 114:17, 115:7, 115:17, 116:12, 116:20, 116:22, 126:2, 126:5, 127:7, 141:15, 141:20, 142:1, 142:3, 142:13, 142:20, 143:4, 143:10, 143:21, 148:6, 149:10, 151:3
**Moss's** [5] - 54:18, 78:4, 99:22, 115:3, 115:6
**most** [9] - 42:14, 47:1, 54:10, 56:9, 76:25, 96:20, 111:17, 111:18, 111:19
**mostly** [1] - 8:12
**mother** [1] - 76:18
**mother's** [1] - 82:24
**motion** [21] - 4:5, 32:6, 33:24, 34:14, 34:23, 36:23, 38:16, 40:7, 40:10, 40:13, 41:25, 42:2, 42:4, 42:10, 42:20, 43:1, 43:4, 43:5, 43:12, 46:1
**motion-to-dismiss** [2] - 43:4, 43:5
**motions** [2] - 40:8, 88:17
**motive** [1] - 136:9
**mouth** [1] - 83:13
**move** [12] - 4:4, 24:14, 24:15, 34:15, 35:10, 37:12, 37:17, 37:25,

38:2, 48:10, 73:21, 98:1
**moves** [2] - 34:5, 66:22
**MR** [170] - 3:7, 3:9, 3:15, 3:24, 4:6, 4:16, 4:19, 5:2, 5:15, 6:9, 7:17, 8:13, 8:20, 8:23, 8:25, 9:2, 9:4, 9:10, 9:14, 9:16, 9:19, 9:22, 9:24, 10:6, 10:8, 10:15, 10:19, 10:23, 10:25, 11:5, 11:7, 11:9, 11:11, 11:16, 12:10, 12:13, 12:16, 12:18, 13:3, 13:5, 14:4, 14:6, 14:9, 14:14, 14:20, 14:22, 14:24, 15:2, 15:7, 15:11, 16:12, 16:18, 16:23, 17:10, 17:16, 17:20, 18:1, 18:5, 18:7, 18:19, 18:22, 19:4, 19:7, 19:14, 19:18, 19:25, 20:6, 20:20, 20:22, 20:24, 21:4, 21:7, 21:12, 21:15, 21:17, 21:23, 22:1, 22:9, 22:18, 23:4, 23:7, 23:9, 24:7, 24:12, 24:15, 24:18, 24:25, 25:3, 25:11, 25:16, 25:19, 25:21, 26:1, 26:4, 26:12, 26:18, 26:24, 26:25, 27:2, 27:12, 28:2, 28:5, 28:11, 28:16, 28:20, 28:23, 29:16, 30:8, 30:16, 30:22, 30:25, 31:4, 31:6, 31:12, 31:15, 31:18, 31:21, 32:4, 32:7, 32:12, 32:25, 33:3, 33:11, 33:17, 33:21, 33:25, 34:3, 34:5, 34:10, 34:15, 34:24, 35:16, 35:19, 35:21, 36:9, 36:21, 36:25, 37:2, 38:10, 41:8, 46:7, 46:11, 46:15, 46:16, 46:21, 46:25, 47:8, 48:15, 48:22, 49:4, 49:6, 49:8, 49:12, 50:7, 50:12, 50:16, 50:23, 50:25, 51:19, 78:21, 82:5, 90:14, 90:18, 90:24, 91:4, 91:16, 91:20, 95:4, 113:25, 162:1
**MS** [10] - 47:14, 47:21,

47:25, 48:3, 48:7,
48:10, 48:13, 48:17,
48:24, 161:21
**multiple** [2] - 29:13,
59:1
**multiplier** [2] - 72:10,
72:18
**murky** [1] - 16:4
**musings** [1] - 114:8
**must** [51] - 25:8,
25:13, 42:13, 54:19,
55:6, 63:8, 64:9,
79:12, 79:13, 87:25,
121:15, 128:15,
128:16, 129:11,
129:18, 129:20,
129:24, 130:25,
131:6, 131:10,
131:13, 131:24,
132:10, 135:8,
135:9, 135:11,
138:1, 138:20,
139:6, 140:5,
140:13, 141:14,
147:19, 150:18,
151:5, 151:14,
152:7, 152:22,
153:17, 154:1,
154:17, 154:20,
154:23, 156:6,
157:7, 157:9,
157:11, 157:22,
158:21, 160:8
**muster** [1] - 72:21
**mutual** [1] - 157:3

# N

**name** [19] - 61:24,
62:4, 69:23, 69:24,
70:24, 81:18, 81:19,
81:25, 89:20, 98:8,
98:10, 98:11, 98:24,
99:5, 99:12, 100:9,
123:4, 123:5
**named** [1] - 98:9
**names** [5] - 14:11,
53:15, 53:17, 76:5,
83:12
**narrative** [1] - 85:20
**national** [1] - 84:19
**naturally** [23] - 16:6,
16:7, 16:10, 16:19,
17:2, 17:3, 17:15,
17:16, 18:3, 18:8,
18:9, 18:18, 18:25,
19:2, 19:12, 19:20,
20:1, 20:9, 57:6,
108:19, 108:22,
146:2

**nature** [5] - 58:7,
60:14, 60:24, 147:9,
155:20
**NE** [1] - 1:17
**nearly** [2] - 118:9,
118:20
**necessarily** [2] -
137:1, 152:18
**necessary** [6] - 44:6,
122:22, 149:4,
153:22, 155:13,
157:20
**need** [30] - 12:20,
27:20, 28:18, 28:24,
30:19, 31:9, 35:7,
37:23, 39:13, 40:16,
46:22, 47:1, 60:22,
68:24, 82:8, 84:2,
90:4, 95:2, 96:5,
110:12, 113:15,
113:18, 122:16,
125:20, 125:21,
127:16, 142:16,
150:25, 161:25,
162:4
**needed** [3] - 90:19,
96:11, 125:9
**needs** [5] - 7:15,
15:13, 37:24, 111:1,
113:21
**negative** [1] - 111:25
**nervousness** [3] -
74:25, 77:20, 150:14
**net** [4] - 88:2, 119:7,
147:25, 148:13
**Network** [6] - 13:11,
27:4, 101:20, 144:5,
153:8, 154:6
**network** [2] - 14:1,
104:11
**neutral** [1] - 130:4
**never** [16] - 29:17,
29:19, 51:8, 51:9,
51:25, 52:1, 61:23,
74:4, 77:2, 94:15,
106:16, 107:6,
107:13, 112:7,
156:13, 158:8
**new** [5] - 4:11, 34:24,
73:21, 87:22, 91:1
**New** [8] - 51:21, 81:10,
87:9, 89:7, 105:17,
111:18, 112:11,
112:17
**news** [3] - 47:20, 60:5,
159:14
**News** [10] - 13:11,
13:25, 27:4, 55:24,
101:20, 123:24,
124:1, 144:5, 153:8,

154:6
**Newsmax** [1] - 87:23
**newspaper** [2] -
104:9, 116:25
**next** [6] - 15:21, 25:5,
39:22, 75:19, 86:25,
101:17
**night** [9] - 3:19, 3:23,
44:16, 45:18, 47:15,
51:17, 53:20, 80:14,
80:19
**nightmares** [2] -
53:11, 76:17
**nine** [1] - 82:5
**no-answer** [1] - 6:19
**nolo** [1] - 95:22
**nominal** [2] - 21:9,
147:17
**noncomplaint** [1] -
39:4
**none** [6] - 71:24, 81:8,
81:10, 113:3,
115:22, 136:22
**nonprivileged** [1] -
138:25
**nonreceptive** [1] -
66:10
**normally** [1] - 41:13
**Northeast** [1] - 112:7
**Northwestern** [1] -
117:19
**note** [10] - 16:2, 16:25,
19:15, 98:2, 128:6,
128:7, 157:21,
157:22, 160:20,
161:13
**noted** [1] - 159:12
**notes** [7] - 127:17,
127:18, 127:19,
127:22, 127:24,
132:11, 162:17
**nothing** [8] - 22:2,
30:25, 72:9, 84:1,
94:17, 108:8,
121:18, 121:19
**notice** [2] - 41:9,
50:13
**noticed** [1] - 7:14
**notices** [1] - 159:16
**notify** [1] - 160:19
**notion** [2] - 104:7,
129:24
**notoriety** [2] - 68:23,
88:19
**November** [2] - 86:8,
86:12
**null** [1] - 162:19
**number** [35] - 4:13,
32:25, 33:9, 33:13,
47:22, 47:23, 56:22,

57:20, 65:3, 66:4,
66:5, 66:17, 68:20,
68:23, 68:25, 72:11,
72:14, 72:18, 73:10,
73:18, 75:24, 77:14,
98:15, 103:6,
110:16, 111:6,
137:2, 137:4, 137:5,
137:8, 137:9,
137:10, 152:16
**numbers** [17] - 48:15,
56:19, 56:20, 56:22,
64:6, 64:20, 109:19,
109:22, 109:25,
110:1, 110:2, 110:8,
110:12, 110:18,
110:19, 123:14
**numerically** [1] -
158:10
**NYPD** [1] - 112:15

# O

**OAN** [24] - 13:11, 14:1,
14:2, 14:11, 27:18,
28:14, 28:25, 29:24,
32:19, 32:20, 55:25,
72:22, 73:1, 107:16,
107:19, 124:3,
124:4, 124:6, 144:5,
144:6, 153:8, 153:9,
154:6
**OAN's** [3] - 14:1,
144:5, 153:8
**oath** [7] - 54:9, 93:9,
93:12, 94:3, 119:22,
122:10, 137:13
**object** [5] - 12:18,
15:14, 21:5, 90:11,
131:3
**objected** [2] - 64:10,
130:22
**objecting** [1] - 130:24
**objection** [23] - 7:12,
8:4, 9:12, 9:17, 10:5,
10:6, 10:8, 11:10,
12:8, 12:20, 13:16,
15:10, 15:11, 21:22,
24:5, 24:7, 25:24,
28:1, 48:14, 48:22,
90:4, 131:23, 132:1
**objections** [14] - 8:18,
9:13, 9:20, 11:3,
14:15, 14:24, 15:12,
20:18, 21:23, 22:8,
24:13, 36:17,
130:25, 131:1
**objective** [2] - 16:15,
17:4
**objectives** [1] - 122:23

**obligations** [2] -
139:13, 139:20
**observe** [1] - 135:24
**observed** [1] - 135:19
**observer** [1] - 16:15
**observers** [1] - 58:25
**obtain** [2] - 130:13,
139:5
**obviously** [3] - 29:8,
97:6, 107:13
**occurred** [5] - 9:7,
10:12, 103:11,
146:10, 150:23
**October** [1] - 47:18
**OF** [2] - 1:1, 1:7
**offer** [2] - 6:11, 89:11
**offered** [6] - 36:19,
61:8, 64:15, 65:13,
123:18, 130:24
**Office** [5] - 80:25,
85:1, 85:3, 114:15,
120:2
**office** [4] - 61:3,
61:21, 68:21, 69:18
**officer** [4] - 157:21,
158:4, 160:19,
160:22
**Official** [1] - 2:9
**official** [2] - 52:23,
162:23
**officials** [8] - 43:24,
44:2, 44:3, 44:10,
45:19, 85:4, 85:6,
125:3
**old** [2] - 74:2, 111:12
**once** [4] - 23:15,
49:21, 161:23, 162:6
**One** [10] - 13:11,
13:25, 27:4, 55:24,
101:20, 123:24,
123:25, 144:5,
153:8, 154:6
**one** [94] - 5:10, 6:14,
6:15, 6:23, 7:2, 7:5,
7:18, 8:8, 11:12,
14:10, 15:2, 15:18,
15:19, 16:14, 17:7,
17:12, 19:13, 20:4,
20:25, 24:8, 25:4,
25:21, 27:12, 29:12,
30:13, 31:7, 32:7,
34:11, 35:2, 35:4,
38:12, 39:20, 40:24,
44:1, 50:9, 51:5,
56:21, 56:22, 60:8,
60:9, 60:12, 67:18,
68:19, 70:3, 70:5,
78:1, 78:2, 79:24,
81:8, 81:17, 83:8,
92:22, 96:19, 98:17,

100:8, 101:5, 101:6, 102:12, 105:1, 105:6, 106:1, 107:15, 108:1, 108:16, 108:22, 109:5, 109:7, 111:18, 112:25, 117:11, 117:18, 119:7, 119:23, 121:1, 121:25, 122:1, 123:9, 123:14, 124:12, 125:8, 127:16, 133:4, 133:24, 135:4, 136:13, 137:9, 142:8, 147:21, 157:23

**ones** [4] - 34:24, 35:12, 59:9, 103:4

**ongoing** [1] - 15:12

**online** [4] - 63:16, 79:16, 121:6, 139:4

**onslaught** [1] - 97:22

**open** [6] - 15:16, 64:16, 94:21, 137:19, 158:3, 160:24

**open-and-shut** [1] - 94:21

**opened** [2] - 7:4, 54:7

**opening** [8] - 56:7, 73:12, 78:13, 83:24, 92:4, 109:23, 115:19, 125:18

**operations** [1] - 148:10

**operative** [1] - 60:8

**opinion** [15] - 6:13, 34:17, 36:1, 36:21, 38:18, 38:23, 38:24, 39:2, 39:7, 69:10, 129:25, 130:11, 130:15, 131:7, 157:18

**opinions** [5] - 38:17, 38:25, 41:3, 64:13, 157:15

**opportunity** [7] - 36:7, 41:12, 49:16, 50:5, 118:24, 135:24, 160:2

**opposed** [2] - 4:12, 110:20

**opted** [2] - 17:12, 87:24

**optimism** [1] - 45:11

**opting** [2] - 17:7, 17:8

**option** [1] - 12:1

**orally** [2] - 90:10, 158:3

**order** [7] - 58:16, 69:1, 85:12, 89:12, 122:22, 146:21, 157:8

**ordered** [2] - 80:25, 126:17

**orderly** [1] - 128:14

**orders** [5] - 14:16, 55:2, 86:20, 140:1, 140:5

**ordinary** [7] - 52:10, 54:4, 81:11, 89:3, 89:21, 89:22, 98:16

**origin** [1] - 72:1

**otherwise** [3] - 14:12, 138:1, 158:10

**ought** [1] - 129:25

**outcome** [2] - 136:3, 136:10

**outlet** [1] - 96:24

**outrage** [1] - 84:10

**outrageous** [8] - 55:14, 55:16, 57:17, 83:5, 84:6, 84:8, 143:19, 145:17

**outset** [1] - 45:10

**outside** [6] - 61:3, 157:22, 158:23, 159:24, 160:3, 160:20

**outsized** [1] - 54:20

**overcame** [2] - 111:23, 111:25

**overt** [2] - 37:5, 39:23

**overturn** [3] - 62:11, 85:19, 89:12

**owed** [2] - 60:10, 127:5, 140:14, 141:10

**owes** [2] - 56:12, 141:1

**owing** [1] - 113:12

**own** [23] - 4:23, 5:5, 7:22, 29:20, 45:15, 53:25, 64:15, 69:18, 81:1, 84:13, 84:14, 87:11, 114:11, 127:25, 129:24, 130:10, 132:11, 136:22, 144:12, 150:11, 153:12, 155:16, 157:17

**owners** [6] - 14:1, 14:12, 27:5, 144:6, 153:8, 154:6

---

## P

**p.m** [1] - 3:23

**page** [49] - 4:13, 8:18,

8:19, 9:1, 9:5, 9:13, 9:20, 9:25, 10:22, 11:1, 11:3, 11:8, 11:10, 13:2, 13:4, 14:19, 14:21, 14:23, 15:4, 20:18, 20:19, 20:23, 21:14, 21:18, 21:22, 23:6, 24:6, 24:8, 24:11, 24:13, 24:14, 24:15, 24:16, 25:20, 25:22, 26:6, 26:8, 30:24, 30:25, 31:3, 31:5, 31:14, 51:24, 79:9, 97:13, 97:15, 98:12, 110:5

**pages** [3] - 31:16, 31:19, 108:12

**paid** [8] - 29:5, 92:16, 92:17, 92:18, 110:9, 110:21, 115:25

**pain** [4] - 74:25, 77:20, 146:5, 150:13

**pandemic** [2] - 76:12, 88:23

**panic** [2] - 76:10, 76:19

**panned** [1] - 105:11

**paper** [1] - 46:22

**par** [1] - 7:12

**paragraph** [28] - 11:12, 11:13, 11:14, 11:17, 12:3, 13:6, 13:17, 15:21, 21:1, 21:2, 22:9, 22:15, 24:18, 25:5, 26:14, 26:17, 31:8, 97:18, 98:1, 98:7, 99:9, 99:14, 99:21, 100:18, 100:19, 116:14

**paragraphs** [3] - 36:14, 100:14, 101:14

**pariah** [2] - 61:21, 69:18

**parroted** [1] - 82:19

**part** [24] - 5:22, 7:25, 28:12, 28:23, 28:25, 30:8, 33:20, 43:4, 55:22, 57:23, 78:10, 79:25, 85:19, 92:10, 92:11, 92:12, 102:14, 108:3, 122:8, 129:21, 132:2, 136:22, 153:1

**participate** [2] - 96:9, 115:9

**participated** [3] - 13:25, 144:4, 153:7

**particular** [10] - 42:18,

67:2, 75:7, 128:2, 133:25, 137:3, 138:5, 142:11, 144:24, 146:20

**particularly** [2] - 16:4, 138:10

**parties** [26] - 3:4, 3:19, 5:24, 9:8, 22:7, 23:15, 24:2, 24:4, 26:13, 47:15, 50:9, 50:21, 73:14, 92:15, 110:19, 131:20, 131:21, 136:13, 137:24, 138:4, 138:23, 139:6, 139:8, 142:3, 142:4, 161:14

**parties'** [2] - 22:5, 87:21

**Partners** [2] - 147:23, 148:8

**partnership** [1] - 5:6

**parts** [4] - 29:3, 49:16, 97:25, 127:2

**party** [16] - 35:7, 69:7, 99:4, 131:2, 132:25, 133:1, 133:2, 138:7, 138:10, 138:13, 139:5, 141:18, 142:24, 144:17, 162:20

**party's** [2] - 42:15, 138:25

**pass** [2] - 4:11, 113:7

**passed** [2] - 59:5, 61:19

**passing** [2] - 59:2, 124:24

**passion** [1] - 62:1

**past** [5] - 37:22, 114:1, 114:13, 126:12

**paste** [2] - 102:3, 116:24

**patently** [1] - 104:7, 106:14, 108:10

**patient** [10] - 78:7, 81:15, 97:2, 97:8, 101:13, 102:5, 102:11, 103:19, 126:15

**pawn** [1] - 69:6

**pay** [1] - 54:19

**payment** [1] - 28:6

**payments** [1] - 73:23

**pecuniary** [1] - 7:21

**penalized** [1] - 106:25

**pending** [1] - 35:8

**penultimate** [1] - 21:1

**people** [62] - 44:25, 51:3, 51:8, 52:10,

52:11, 54:8, 54:13, 61:2, 61:4, 61:12, 66:10, 66:17, 68:10, 68:16, 68:20, 68:22, 68:23, 69:1, 69:9, 70:20, 75:23, 75:24, 79:21, 80:23, 80:25, 81:11, 82:12, 89:9, 89:21, 89:22, 92:9, 92:16, 93:22, 98:14, 98:15, 100:5, 100:20, 100:23, 100:25, 104:22, 105:6, 105:7, 105:9, 105:11, 105:21, 106:16, 107:10, 107:13, 107:24, 108:3, 110:1, 111:20, 112:4, 112:9, 119:1, 119:5, 124:16, 142:3

**people's** [2] - 6:23, 72:12

**per** [9] - 59:25, 60:3, 60:9, 60:21, 71:13, 142:14, 142:15, 146:16, 155:6

**perceived** [1] - 123:7

**percent** [7] - 65:13, 65:15, 65:20, 65:23, 68:16, 72:6, 91:22

**performed** [1] - 52:25

**performing** [1] - 64:17

**perhaps** [3] - 5:6, 89:10, 108:14

**period** [7] - 24:24, 27:5, 27:9, 107:3, 110:14, 112:13, 153:19

**permissible** [2] - 156:13, 156:14

**permits** [2] - 77:16, 145:16

**permitted** [7] - 33:7, 134:2, 134:20, 136:19, 138:12, 140:24, 159:19

**person** [14] - 5:3, 5:10, 17:4, 29:19, 51:5, 58:11, 110:21, 129:8, 129:9, 133:13, 137:12, 137:19, 147:13, 158:9

**person's** [1] - 5:11

**personal** [2] - 127:20, 146:6

**personally** [2] - 16:21, 142:2

**persons** [4] - 131:11,

131:12, 136:11, 158:5
**petition** [1] - 104:25
**Pew** [1] - 118:5
**Ph.D** [2] - 82:8, 117:17
**phone** [7] - 32:8, 62:24, 90:6, 99:22, 139:18, 159:1
**photocopied** [1] - 162:19
**phrase** [1] - 11:24
**physical** [1] - 145:9
**pick** [1] - 51:25
**picketed** [1] - 61:2
**picture** [1] - 111:11
**pie** [1] - 104:4
**piggybacked** [1] - 116:16
**place** [6] - 56:10, 61:7, 61:13, 103:1, 103:12, 116:22
**placed** [1] - 137:13
**plagiarized** [1] - 119:13
**plaintiff** [34] - 4:21, 6:14, 6:15, 7:6, 7:8, 15:24, 18:14, 18:24, 20:9, 23:1, 23:3, 42:8, 42:12, 42:14, 56:23, 57:15, 73:10, 108:20, 129:8, 129:10, 129:12, 135:4, 145:12, 145:14, 145:15, 145:16, 146:1, 149:14, 149:16, 149:22, 150:15, 151:9, 151:14, 156:11
**Plaintiffs** [2] - 1:3, 127:6
**plaintiffs** [124] - 3:10, 4:14, 5:14, 7:2, 8:19, 9:1, 9:9, 9:21, 10:5, 10:14, 11:4, 11:8, 13:4, 13:24, 14:24, 15:10, 18:16, 20:19, 20:23, 22:20, 23:14, 23:17, 24:6, 24:17, 25:7, 25:8, 25:12, 25:13, 31:1, 31:5, 31:17, 31:18, 34:6, 37:19, 38:3, 38:8, 43:17, 43:18, 43:20, 43:22, 43:23, 45:5, 45:15, 45:21, 46:5, 47:12, 49:3, 50:4, 50:22, 51:2, 52:6, 54:23, 55:3, 56:12, 58:12, 74:24, 75:2,

85:12, 90:5, 94:11, 96:11, 100:21, 102:20, 106:5, 109:14, 109:17, 110:13, 115:15, 127:10, 129:7, 129:8, 129:13, 129:15, 139:10, 139:15, 139:21, 139:23, 140:2, 140:3, 140:15, 140:17, 140:19, 140:22, 141:1, 141:13, 142:9, 142:16, 142:17, 143:16, 143:19, 144:4, 144:19, 145:3, 145:6, 145:22, 146:5, 146:18, 146:19, 146:23, 147:1, 147:13, 148:15, 149:1, 149:5, 149:7, 150:2, 150:9, 150:11, 150:25, 151:14, 151:21, 152:3, 152:4, 152:20, 152:21, 153:7, 153:23, 154:15, 154:19, 154:21, 154:25, 155:3, 155:10, 156:4
**PLAINTIFFS** [1] - 1:11
**Plaintiffs'** [19] - 48:25, 51:22, 60:7, 62:17, 69:4, 73:19, 78:17, 79:9, 93:13, 93:14, 94:22, 95:16, 95:20, 96:1, 101:24, 102:15, 109:8, 109:20, 119:15
**plaintiffs'** [27] - 3:6, 23:18, 42:19, 42:23, 42:25, 44:21, 44:24, 58:2, 58:6, 69:11, 69:13, 70:9, 92:14, 92:19, 110:3, 140:11, 141:7, 145:20, 147:7, 147:9, 148:19, 148:23, 149:19, 149:23, 151:22, 152:1, 155:1
**Plan** [6] - 70:12, 70:16, 71:3, 71:6, 79:10, 103:21
**plan** [22] - 46:4, 78:10, 81:1, 85:19, 86:1, 86:4, 86:9, 86:13, 86:15, 102:18,

102:19, 118:10, 121:23, 122:4, 122:8, 122:11, 122:12, 122:18, 123:1, 123:2, 123:3
**plane** [1] - 120:19
**planet** [1] - 54:11
**planning** [1] - 28:14
**plaque** [1] - 88:25
**platform** [4] - 68:9, 68:14, 88:20, 89:18
**platforms** [4] - 66:12, 66:13, 71:17, 88:6
**plausibility** [1] - 136:14
**play** [3] - 54:25, 80:7, 132:2
**played** [5] - 58:19, 64:3, 64:5, 78:13, 116:6
**playing** [1] - 139:9
**plead** [2] - 34:18, 36:22
**pleaded** [3] - 34:6, 41:24, 41:25
**pleading** [5] - 35:5, 36:3, 36:8, 41:14, 41:15
**pleadings** [2] - 38:13, 41:10
**pleasant** [1] - 50:1
**plenty** [1] - 47:4
**pockets** [1] - 102:6
**podcast** [3] - 63:11, 66:13, 88:6
**podcasts** [1] - 119:3
**point** [16] - 7:18, 32:3, 38:21, 49:19, 50:20, 55:6, 56:3, 62:15, 65:25, 69:2, 95:19, 96:12, 112:16, 118:6, 123:9, 125:8
**pointed** [1] - 68:8
**points** [4] - 86:9, 103:16, 114:22, 122:12
**poked** [1] - 105:4
**police** [1] - 77:6
**political** [4] - 66:19, 104:1, 104:10, 112:21
**politics** [1] - 105:22
**poll** [6] - 44:14, 44:15, 44:17, 45:19, 80:13, 115:25
**polls** [1] - 69:10
**pop** [1] - 159:16
**pop-ups** [1] - 159:16
**popular** [1] - 66:13
**portion** [3] - 33:7,

33:12, 128:2
**posed** [1] - 42:9
**position** [1] - 74:7
**positive** [1] - 29:25
**possession** [1] - 138:25
**possible** [4] - 5:17, 29:19, 46:12, 88:3
**post-2020** [1] - 125:1
**posted** [1] - 100:6
**posts** [2] - 35:14, 65:14
**posture** [1] - 42:18
**potential** [2] - 6:11, 156:1
**potentially** [1] - 108:6
**potluck** [1] - 88:25
**pounded** [1] - 82:25
**pounding** [1] - 77:8
**poured** [1] - 61:25
**power** [2] - 87:4, 88:20
**powerful** [5] - 43:23, 44:9, 54:10, 68:9, 89:18
**pre** [4] - 35:23, 37:8, 40:4, 75:16
**pre-20** [1] - 35:11
**pre-December** [4] - 35:23, 37:8, 40:4, 75:16
**precise** [4] - 63:18, 63:21, 64:6, 64:20
**precisely** [1] - 119:1
**predicate** [1] - 30:12
**prefer** [3] - 17:15, 17:16, 18:16
**preference** [1] - 49:14
**prejudice** [5] - 30:1, 129:5, 131:7, 136:3, 139:21
**preliminary** [7] - 21:20, 22:4, 23:13, 23:21, 54:22, 138:16, 141:12
**prepared** [3] - 7:10, 40:19, 160:5
**preponderance** [14] - 23:16, 23:23, 25:9, 25:13, 40:19, 40:23, 149:11, 151:4, 151:15, 151:16, 151:18, 152:6, 152:14, 152:18
**present** [10] - 6:20, 7:24, 10:13, 43:18, 43:19, 43:23, 80:14, 137:15, 148:15, 161:18
**presentation** [2] -

88:11, 106:11
**presented** [20] - 7:7, 7:10, 7:11, 22:12, 22:13, 42:8, 43:15, 44:22, 45:14, 81:21, 81:22, 126:22, 132:13, 134:4, 148:19, 148:24, 150:3, 158:21, 159:9, 159:23
**presenting** [2] - 5:23, 148:20
**preserve** [5] - 13:15, 34:25, 139:6, 139:8, 139:14
**preserved** [1] - 40:9
**preside** [1] - 157:1
**President** [20] - 44:2, 47:19, 55:23, 60:5, 62:24, 63:1, 63:5, 69:3, 70:18, 77:10, 78:23, 79:15, 82:6, 84:19, 87:12, 104:15, 106:18, 106:19, 106:25, 113:1
**presidential** [7] - 13:10, 13:22, 53:21, 60:8, 125:1, 144:2, 153:5
**press** [4] - 44:4, 47:18, 51:15, 69:4
**presume** [5] - 68:5, 88:1, 125:17, 142:19, 146:23
**presumed** [3] - 90:20, 125:18, 143:10
**presumes** [3] - 60:19, 142:17, 146:17
**presumption** [1] - 60:21
**presumptions** [2] - 60:22, 62:15
**pretenses** [1] - 59:1
**pretrial** [3] - 39:8, 40:8
**pretty** [3] - 17:8, 67:14, 96:22
**prevail** [1] - 8:11
**prevent** [1] - 155:11
**previously** [1] - 5:16
**principal** [1] - 64:1
**principle** [1] - 128:22
**principles** [1] - 127:2
**privilege** [2] - 141:18, 142:24
**proactive** [1] - 44:5
**probability** [1] - 152:3
**probed** [1] - 35:7
**probing** [1] - 33:4
**problem** [6] - 6:16,

10:19, 30:9, 33:11, 105:5, 108:6
**problems** [1] - 9:10
**procedure** [1] - 52:25
**Procedure** [2] - 42:3, 46:2
**proceed** [6] - 34:3, 47:7, 50:15, 50:16, 91:15, 120:7
**proceedings** [1] - 162:17
**Proceedings** [1] - 2:12
**process** [3] - 61:16, 134:16, 139:1
**produce** [7] - 118:20, 138:7, 138:14, 139:9, 140:3, 140:4, 152:7
**produced** [6] - 2:12, 118:21, 132:25, 133:2, 133:4, 138:12
**produces** [1] - 151:19
**producing** [1] - 118:18
**profane** [1] - 53:6
**profession** [3] - 142:9, 142:21, 146:18
**professional** [1] - 146:6
**professionals** [1] - 122:20
**professor** [1] - 117:17
**profit** [1] - 89:20
**profited** [1] - 86:18
**profits** [2] - 104:20, 146:7
**profound** [1] - 56:9
**Project** [1] - 121:3
**prominent** [1] - 65:5
**promote** [1] - 157:5
**promotion** [4] - 45:24, 61:20, 74:5, 88:24
**proof** [7] - 25:5, 37:24, 152:5, 152:7, 152:8, 152:11, 152:21
**proper** [3] - 12:22, 130:8, 130:25
**properly** [2] - 40:8, 40:9
**proportion** [1] - 156:10
**propose** [4] - 13:13, 21:7, 25:4, 90:11
**proposed** [8] - 5:18, 5:21, 6:5, 9:8, 20:25, 22:5, 23:15, 24:4
**proposing** [1] - 31:23
**propriety** [2] - 32:16, 32:19

**Protect** [2] - 1:21, 3:12
**protected** [3] - 34:17, 36:1
**proud** [1] - 112:16
**prove** [7] - 139:10, 139:11, 139:22, 142:16, 146:20, 151:17, 152:20
**proved** [4] - 134:10, 135:3, 138:2, 147:3
**proven** [1] - 23:24
**provide** [11] - 23:19, 38:5, 56:24, 58:1, 63:21, 63:23, 127:11, 127:14, 139:15, 148:20, 149:23
**provided** [4] - 12:19, 63:6, 160:10, 160:14
**provides** [1] - 42:3
**providing** [2] - 77:14, 85:7
**proving** [1] - 133:23
**proximate** [5] - 15:12, 15:14, 100:10
**public** [12] - 44:22, 53:21, 54:8, 65:18, 67:5, 69:10, 100:11, 101:8, 107:9, 109:1, 122:22, 131:7
**public's** [1] - 89:14
**publication** [8] - 13:25, 15:25, 18:15, 18:25, 19:4, 19:20, 20:10, 146:2
**publications** [4] - 35:23, 115:9, 144:5, 153:8
**publicly** [5] - 41:4, 71:14, 79:4, 85:5, 118:6
**published** [17] - 13:24, 51:18, 55:10, 72:22, 73:3, 78:20, 82:4, 98:5, 107:19, 115:21, 116:20, 141:17, 141:25, 143:1, 143:5, 144:4, 153:7
**publishing** [2] - 55:8, 141:15
**pull** [3] - 33:17, 86:17, 161:19
**pulled** [2] - 53:8, 69:21
**Pundit** [22] - 59:14, 96:24, 97:9, 97:19, 98:5, 98:20, 99:11, 99:18, 99:21, 100:7, 100:25, 102:3,

102:13, 103:18, 109:17, 114:23, 114:24, 115:1, 115:21, 116:10, 116:16, 116:23
**Pundit's** [2] - 116:13, 116:21
**punish** [2] - 83:5, 155:10
**punishment** [1] - 145:17
**punitive** [41] - 45:23, 56:13, 83:2, 83:4, 83:7, 86:25, 87:14, 88:9, 89:16, 96:7, 110:24, 111:1, 111:3, 114:14, 125:9, 125:15, 125:20, 126:7, 140:9, 140:23, 141:2, 144:21, 145:12, 145:13, 145:16, 155:2, 155:4, 155:7, 155:8, 155:9, 155:12, 155:16, 155:18, 155:20, 155:24, 156:3, 156:9, 156:12, 156:14, 156:16, 156:19
**Punitive** [1] - 110:22
**punitives** [1] - 56:22
**puppeteer** [1] - 117:7
**puppeteering** [2] - 92:23, 117:6
**pure** [1] - 41:13
**purple** [1] - 98:9
**purpose** [6] - 9:6, 62:10, 130:10, 147:24, 148:3, 148:13
**purposes** [6] - 37:15, 48:2, 55:7, 141:14, 143:17, 153:10
**pursuant** [1] - 16:8
**push** [1] - 44:7
**put** [18] - 4:12, 23:21, 25:16, 27:22, 29:22, 41:9, 88:11, 90:19, 100:7, 116:21, 119:15, 119:16, 121:21, 129:8, 151:24, 152:13, 161:17, 162:6
**putting** [3] - 16:14, 78:15, 81:2

## Q

**qualified** [1] - 64:11

**quality** [5] - 41:18, 130:5, 136:1, 137:6, 152:15
**quantified** [1] - 59:8
**quantify** [7] - 15:5, 15:8, 20:15, 57:11, 107:12, 145:22, 149:23
**quantifying** [1] - 153:15
**quantity** [2] - 137:6, 152:15
**questioned** [1] - 82:3
**questioning** [4] - 44:24, 45:4, 117:10, 128:18
**questions** [32] - 7:13, 7:14, 7:16, 8:5, 41:13, 65:8, 66:15, 71:19, 72:25, 91:25, 98:18, 115:23, 117:12, 117:16, 117:21, 117:23, 117:24, 117:25, 118:21, 119:23, 119:25, 121:14, 128:5, 128:15, 130:13, 130:15, 132:7, 132:16, 137:14, 137:15, 158:10, 160:7
**quickly** [5] - 4:8, 33:25, 47:5, 90:23, 98:14
**quietly** [1] - 90:23
**quote** [2] - 60:11, 62:19
**quote/unquote** [2] - 35:22, 38:3
**quotes** [1] - 113:1

## R

**racism** [3] - 82:16, 96:22, 108:21
**racist** [8] - 53:6, 77:4, 78:3, 97:22, 109:15, 111:20, 111:21, 124:15
**racists** [1] - 76:12
**radar** [2] - 116:13, 116:21
**radio** [2] - 88:6, 119:3
**Raffensperger** [1] - 62:25
**raise** [2] - 7:11, 74:5
**raised** [6] - 26:2, 39:5, 44:25, 69:14, 121:22
**ran** [1] - 79:19
**random** [1] - 78:9

**range** [3] - 103:11, 103:14, 110:25
**ranging** [1] - 147:16
**rate** [3] - 65:21, 72:7
**rather** [5] - 18:17, 18:18, 26:10, 38:24, 145:15
**Ray** [2] - 80:5, 80:8
**reach** [12] - 59:18, 59:19, 63:7, 63:10, 63:11, 79:22, 88:6, 134:23, 148:3, 148:4, 157:11, 161:13
**reached** [4] - 3:19, 3:24, 158:11, 160:21
**reaches** [1] - 68:10
**reaching** [3] - 131:10, 134:3, 158:18
**react** [1] - 21:21
**read** [12] - 10:2, 13:8, 13:17, 15:7, 18:21, 22:25, 25:6, 60:6, 96:1, 111:24, 123:16, 160:23
**read]** [1] - 123:5
**reading** [2] - 23:25, 73:16
**reads** [4] - 12:3, 13:7, 15:21, 21:4
**ready** [6] - 24:14, 32:6, 32:11, 49:3, 49:5, 81:14
**reaffirm** [1] - 38:15
**real** [5] - 79:17, 85:25, 96:20, 110:8, 123:7
**reality** [2] - 84:14, 95:19
**realize** [1] - 91:8
**realized** [1] - 108:13
**really** [21] - 6:22, 29:17, 29:18, 33:18, 37:10, 51:2, 72:20, 75:23, 85:17, 85:24, 94:13, 100:2, 102:11, 102:13, 106:6, 107:6, 111:21, 111:22, 112:7, 112:16, 117:24
**rear** [1] - 30:13
**rear-ended** [1] - 30:13
**reason** [12] - 6:16, 6:22, 10:12, 64:1, 94:19, 105:16, 106:22, 116:12, 134:14, 134:24, 138:22, 160:1
**reasonable** [17] - 17:18, 23:19, 38:5,

42:6, 42:14, 45:20, 96:17, 110:15, 110:25, 113:22, 133:10, 134:10, 148:20, 149:24, 152:9, 152:11, 156:10
**reasonableness** [1] - 136:5
**reasonably** [22] - 8:7, 15:23, 15:24, 16:10, 16:20, 17:1, 17:24, 18:6, 18:7, 18:13, 18:14, 18:17, 18:24, 19:9, 19:13, 20:2, 20:8, 42:11, 82:17, 145:6, 146:1, 150:9
**reasoned** [1] - 134:19
**reasoning** [1] - 43:11
**reasons** [7] - 34:14, 38:16, 38:25, 40:25, 105:1, 115:2, 128:20
**recalled** [1] - 135:19
**receipts** [1] - 125:16
**receive** [3] - 3:18, 99:17, 115:17
**received** [3] - 68:11, 141:6, 148:5
**receiving** [1] - 56:17
**recent** [1] - 111:16
**recently** [2] - 41:12, 87:22
**receptive** [2] - 65:1, 118:3
**recess** [2] - 47:10, 91:11
**recessed** [1] - 162:10
**recite** [1] - 118:7
**recklessly** [4] - 55:17, 59:23, 143:4, 143:20
**recollect** [1] - 135:24
**recollection** [2] - 122:25, 132:11
**recommend** [2] - 66:8, 72:17
**recommendation** [2] - 59:10, 72:19
**recommended** [1] - 77:12
**recommending** [1] - 123:20
**reconcile** [1] - 113:2
**reconsider** [3] - 15:17, 138:20, 140:25
**record** [8] - 3:5, 16:3, 33:7, 38:11, 39:10, 73:17, 90:21, 114:10
**records** [8] - 137:15, 139:6, 139:7, 139:9, 139:14, 139:15,

139:16, 140:4
**recounting** [1] - 80:25
**recounts** [1] - 85:8
**recover** [2] - 5:5, 5:10
**recovery** [4] - 27:6, 27:7, 154:8, 154:9
**red** [3] - 53:8, 105:19, 105:20
**redact** [1] - 33:7
**redacting** [1] - 33:12
**redirect** [4] - 6:12, 41:1, 113:24, 123:12
**reduce** [1] - 29:6
**reduces** [1] - 29:11
**reeducate** [1] - 107:9
**refer** [2] - 128:1, 128:2
**reference** [1] - 14:11
**references** [4] - 33:8, 33:9, 101:5, 129:7
**referencing** [2] - 28:14, 99:17
**referred** [5] - 11:19, 12:4, 120:16, 141:22, 143:13
**reflect** [8] - 15:22, 18:12, 18:23, 20:7, 31:9, 145:24, 160:11, 160:12
**reflected** [1] - 32:21
**refusal** [4] - 84:11, 132:17, 132:22, 139:20
**refused** [5] - 53:1, 54:25, 63:22, 132:15, 139:13
**regard** [1] - 138:2
**regarding** [1] - 157:4
**regardless** [2] - 130:1, 132:25
**Regina** [2] - 67:3, 117:8
**registered** [1] - 121:2
**registrations** [1] - 69:17
**regret** [1] - 51:19
**regrets** [1] - 84:1
**rehabilitated** [1] - 106:4
**rehearsed** [1] - 92:24
**reintroduce** [1] - 15:13
**rejected** [2] - 36:23, 106:24
**related** [4] - 7:20, 26:16, 47:19, 111:6
**relates** [1] - 15:11
**relating** [1] - 154:21
**relationship** [1] - 76:23
**relative** [2] - 87:15,

137:3
**relatives** [1] - 146:5
**released** [1] - 65:19
**relevant** [16] - 28:17, 28:21, 29:4, 30:2, 44:20, 138:7, 138:8, 138:24, 139:2, 139:14, 139:15, 139:16, 140:4, 147:22, 148:2, 153:19
**reliable** [2] - 41:2, 108:15
**relied** [4] - 93:20, 108:11, 121:11, 121:12
**relief** [2] - 34:6, 34:7
**relive** [1] - 53:11
**rely** [9] - 39:17, 40:13, 60:22, 62:14, 93:21, 110:9, 127:24, 130:5, 132:10
**relying** [2] - 87:7, 103:17
**remedy** [1] - 146:7
**remember** [48] - 32:24, 51:1, 53:8, 58:4, 59:16, 60:19, 62:23, 63:8, 63:13, 64:1, 65:2, 65:12, 65:17, 66:5, 66:19, 67:20, 68:18, 71:7, 71:12, 71:14, 72:13, 72:24, 75:6, 75:7, 75:9, 75:22, 78:11, 84:16, 92:17, 96:23, 98:4, 103:16, 106:21, 111:17, 112:8, 112:12, 112:14, 113:8, 113:13, 115:19, 115:21, 120:11, 121:17, 122:6, 123:12, 123:19, 130:3, 132:9
**remembered** [1] - 79:17
**remind** [1] - 125:25
**reminding** [1] - 85:14
**reminds** [1] - 83:14
**remove** [3] - 10:11, 10:17, 29:24
**removing** [3] - 4:13, 9:12, 9:17
**render** [1] - 126:6
**rendered** [1] - 128:9
**rendering** [1] - 126:4
**renew** [1] - 12:20
**repackage** [1] - 37:10
**repair** [14] - 5:4, 29:15,

44:6, 45:9, 59:11, 70:8, 71:4, 71:11, 72:8, 72:23, 75:25, 104:8, 107:23
**repairing** [1] - 106:15
**repairs** [1] - 68:1
**repeat** [7] - 12:9, 12:11, 20:4, 25:10, 27:23, 48:15, 48:17
**repeated** [3] - 30:6, 44:18, 83:19
**repeatedly** [1] - 59:20
**repeating** [1] - 34:22
**repetition** [1] - 90:16
**replace** [3] - 12:1, 21:8, 127:23
**replaceable** [1] - 52:11
**replay** [1] - 94:20
**report** [15] - 29:14, 94:24, 95:1, 95:7, 95:8, 98:6, 107:10, 108:8, 108:13, 123:11, 123:14, 123:19, 123:23, 124:11
**reported** [3] - 2:12, 77:6, 162:11
**reporter** [2] - 14:11, 137:15
**Reporter** [3] - 2:9, 2:9, 162:23
**reporters** [7] - 13:11, 14:2, 27:5, 101:21, 144:6, 153:9, 154:7
**reporting** [1] - 120:1
**reports** [4] - 44:3, 97:19, 123:13, 123:16
**reprehensibility** [1] - 155:21
**represent** [1] - 157:7
**representation** [1] - 106:15
**represented** [1] - 7:5
**representing** [2] - 121:2, 121:4
**represents** [2] - 65:4, 131:2
**reproduces** [1] - 66:22
**Republican** [7] - 44:14, 44:15, 45:19, 78:22, 80:13, 115:25, 121:3
**republication** [4] - 15:25, 19:6, 20:10, 146:2
**republications** [2] - 19:9, 19:20
**reputation** [23] - 4:23,

5:8, 5:11, 28:24, 29:20, 38:6, 45:9, 52:12, 54:18, 56:10, 61:10, 61:11, 61:18, 63:3, 67:20, 68:18, 69:1, 70:9, 104:8, 107:22, 147:3, 148:22, 154:20
**reputational** [18] - 4:24, 5:4, 6:1, 6:17, 8:1, 8:10, 56:20, 57:11, 57:19, 67:11, 73:8, 73:9, 73:13, 74:12, 100:16, 107:12, 145:10, 150:19
**reputations** [11] - 6:24, 52:10, 57:5, 58:2, 67:1, 67:24, 70:24, 120:18, 147:7, 149:2, 149:5
**request** [2] - 26:20, 32:7
**require** [3] - 6:7, 11:23, 139:8
**required** [13] - 16:5, 39:6, 71:4, 72:12, 118:20, 132:19, 134:20, 140:8, 146:20, 147:4, 148:15, 150:6, 152:9
**requirement** [3] - 4:25, 39:16, 152:12
**requirements** [1] - 41:5
**requires** [3] - 96:17, 131:5, 156:10
**requiring** [1] - 23:22
**requisite** [1] - 38:22
**research** [2] - 45:12, 159:5
**resolution** [1] - 29:4
**resolving** [1] - 43:7
**respect** [16] - 38:13, 38:18, 39:3, 39:11, 39:12, 40:3, 40:15, 40:22, 43:9, 61:11, 62:8, 104:12, 105:15, 123:1, 123:24, 157:3
**respond** [5] - 5:14, 7:16, 38:9, 41:6, 41:21
**responded** [1] - 19:17
**response** [1] - 90:19
**responsibility** [3] - 87:6, 126:20, 131:3
**responsible** [8] - 56:2, 99:20, 100:3, 100:4, 101:12, 116:5,

116:6, 117:4
**responsive** [4] - 35:5, 36:3, 36:8, 41:15
**rest** [7] - 11:1, 43:5, 49:10, 56:14, 69:16, 74:7, 76:23
**rested** [1] - 50:4
**restore** [1] - 69:1
**restrictions** [1] - 159:6
**rests** [1] - 50:7
**result** [10] - 7:23, 76:16, 82:9, 115:14, 143:11, 144:11, 146:23, 148:16, 149:2, 154:15
**resulted** [2] - 64:25, 66:3
**resulting** [1] - 15:24
**results** [4] - 65:22, 71:22, 85:20, 86:7
**retaliate** [1] - 100:20
**retire** [2] - 74:3, 161:3
**retired** [2] - 74:8, 74:9
**retraction** [7] - 29:14, 72:22, 73:1, 123:25, 124:3, 124:6, 124:8
**retractions** [2] - 29:2, 107:18
**return** [8] - 59:7, 125:24, 126:18, 130:6, 156:25, 157:8, 157:14, 160:24
**returned** [1] - 128:8
**returns** [3] - 49:24, 91:13, 119:6
**reveal** [1] - 158:8
**revenue** [2] - 119:4, 148:9
**review** [2] - 58:22, 86:2
**reviewed** [2] - 33:1, 108:9
**reviewing** [2] - 15:3, 141:7
**revise** [1] - 118:19
**revised** [3] - 46:12, 47:5, 47:7
**revived** [1] - 43:3
**rhetoric** [1] - 125:3
**rich** [2] - 52:7, 52:10
**rid** [1] - 33:9
**ridiculous** [4] - 104:7, 108:10, 120:21
**rightly** [2] - 94:4, 113:12
**rights** [1] - 118:16
**rise** [1] - 41:18
**road** [1] - 5:13
**robot** [1] - 92:24

**robot-like** [1] - 92:24
**rocket** [2] - 66:25, 67:22
**rocketed** [1] - 62:12
**rode** [1] - 83:24
**role** [2] - 54:20, 140:25
**room** [14] - 58:23, 80:4, 87:22, 88:16, 126:18, 130:10, 156:25, 157:22, 158:12, 160:4, 160:6, 160:20, 161:3, 161:16
**roots** [1] - 69:14
**roughly** [1] - 127:1
**RPR** [3] - 2:9, 162:16, 162:23
**RUBY** [1] - 1:3
**Ruby** [28] - 3:3, 51:8, 52:13, 53:3, 53:8, 53:14, 53:15, 53:17, 53:23, 54:3, 63:2, 63:4, 68:1, 68:2, 75:13, 81:18, 82:1, 86:3, 86:10, 88:20, 89:2, 114:2, 114:17, 122:13, 126:2, 126:4, 127:6
**RUDOLPH** [1] - 1:5
**Rudolph** [2] - 51:7, 127:7
**Rudy** [16] - 3:3, 59:20, 60:3, 65:6, 76:13, 81:15, 109:12, 111:7, 111:15, 111:16, 112:14, 113:21, 114:1, 115:22, 116:16, 116:19
**Rudy's** [2] - 100:9, 110:2
**rule** [4] - 34:11, 42:3, 128:15, 129:23
**Rule** [11] - 4:5, 32:6, 33:24, 40:9, 40:13, 41:5, 42:2, 42:9, 43:1, 43:4, 46:2
**ruled** [2] - 12:22, 92:6
**rules** [6] - 54:24, 55:1, 64:3, 64:5, 139:8, 139:24
**Rules** [1] - 42:3
**ruling** [5] - 13:14, 13:16, 41:11, 42:20, 42:21
**rulings** [5] - 12:19, 38:15, 39:9, 43:13, 130:17
**run** [4] - 13:14, 21:4,

22:14, 84:14
**running** [2] - 25:22, 122:17
**Russian** [4] - 60:8, 69:5, 69:7, 104:23

### S

**safe** [1] - 77:12
**SAINT** [2] - 2:9, 162:16
**Saint** [1] - 162:23
**SAINT-LOTH** [1] - 162:16
**Saint-Loth** [1] - 162:23
**salary** [1] - 74:5
**sanction** [1] - 43:13
**sat** [5] - 51:11, 51:13, 92:12, 119:11, 152:10
**satisfies** [2] - 40:23, 41:5
**saved** [1] - 112:24
**saw** [32] - 51:13, 56:16, 57:8, 65:16, 68:11, 68:13, 75:17, 83:23, 85:9, 86:13, 91:22, 100:21, 101:2, 101:4, 101:6, 103:5, 103:22, 104:3, 107:9, 107:23, 109:3, 109:16, 116:8, 116:22, 117:10, 119:1, 120:25, 124:16, 133:13, 133:16, 133:18
**scale** [1] - 71:3
**scanner** [1] - 81:3
**scans** [1] - 81:3
**scapegoat** [1] - 88:20
**scapegoating** [1] - 85:18
**scenario** [1] - 107:8
**scene** [1] - 80:11
**scheduled** [1] - 70:17
**school** [5] - 76:11, 76:15, 112:6, 112:8, 117:18
**Science** [1] - 118:2
**scientific** [2] - 41:2, 45:12
**scope** [2] - 14:15, 41:10
**Scott** [2] - 67:4, 117:8
**Scott's** [1] - 120:12
**screen** [5] - 56:18, 58:21, 59:12, 62:4, 119:17

**scrutiny** [1] - 36:1
**se** [8] - 59:25, 60:3, 60:9, 60:21, 142:14, 142:15, 146:16, 155:6
**seal** [1] - 33:19
**searched** [1] - 82:3
**searching** [1] - 81:18
**secluded** [1] - 69:19
**second** [12] - 11:17, 14:7, 15:4, 24:20, 25:1, 50:9, 110:5, 115:12, 123:19, 123:22, 124:23, 127:3
**secondly** [1] - 41:16
**secret** [1] - 52:4
**Secretary** [5] - 62:25, 78:22, 80:24, 85:1, 120:2
**section** [5] - 10:9, 24:22, 26:15, 33:8, 110:22
**security** [5] - 73:22, 157:21, 158:4, 160:19, 160:22
**see** [49] - 9:5, 10:9, 11:15, 18:10, 36:13, 51:23, 56:1, 56:18, 57:14, 59:12, 80:14, 86:10, 87:20, 89:3, 91:9, 91:23, 92:22, 93:4, 93:15, 93:17, 93:20, 94:8, 95:9, 96:2, 97:5, 98:2, 99:19, 100:14, 100:15, 100:17, 100:19, 101:14, 102:24, 103:14, 104:20, 104:25, 110:7, 110:8, 111:23, 112:21, 116:1, 116:12, 119:1, 119:4, 119:6, 121:17, 134:8, 135:25
**seeing** [1] - 112:14
**seek** [8] - 25:7, 25:12, 38:3, 57:3, 89:20, 140:23, 151:14, 155:3
**seeking** [5] - 15:12, 39:20, 39:23, 52:6, 104:17
**seeks** [1] - 104:8
**seized** [1] - 45:17
**select** [1] - 157:1
**selecting** [1] - 157:2
**sell** [1] - 62:2
**selling** [3] - 51:21,

87:9, 89:7
**send** [16] - 27:10, 30:4, 49:18, 89:17, 93:11, 105:18, 113:15, 122:21, 126:7, 126:14, 128:6, 128:7, 157:21
**sending** [4] - 85:23, 114:13, 114:18, 158:12
**sense** [16] - 7:8, 8:9, 12:2, 22:22, 23:25, 58:1, 76:1, 77:17, 126:5, 134:14, 134:23, 134:24, 147:1, 147:6, 149:4, 150:11
**Sense** [1] - 148:2
**sent** [17] - 49:20, 49:22, 53:9, 61:2, 79:17, 81:21, 81:22, 85:13, 86:13, 86:15, 90:3, 90:9, 100:7, 122:15, 122:18, 161:15, 162:9
**sentence** [13] - 11:13, 12:2, 15:4, 19:13, 21:1, 22:10, 24:19, 25:4, 25:6, 27:12, 30:15, 99:10
**separate** [7] - 7:16, 8:6, 8:8, 92:10, 98:21, 142:25, 162:12
**separated** [2] - 4:21, 4:24
**separately** [2] - 11:16, 74:15
**series** [1] - 132:15
**serious** [4] - 71:23, 71:24, 95:13, 142:13
**seriously** [2] - 157:15, 157:17
**seriousness** [5] - 58:9, 60:14, 60:17, 60:24, 147:11
**servants** [4] - 81:6, 89:8, 89:12, 120:20
**serve** [2] - 53:21, 155:11
**served** [1] - 124:11
**service** [4] - 44:23, 52:21, 130:5, 159:3
**session** [1] - 162:11
**set** [5] - 36:19, 42:1, 43:11, 123:3, 135:4
**setoff** [1] - 28:7
**setoffs** [1] - 27:16
**settled** [2] - 88:25, 90:1

**settlement** [12] - 26:17, 27:3, 27:17, 28:6, 28:14, 29:10, 29:23, 32:19, 32:21, 101:21, 154:5, 154:8
**seven** [1] - 72:14
**several** [2] - 75:19, 160:7
**severe** [2] - 55:18, 143:21
**severity** [1] - 67:10
**shall** [2] - 26:10, 162:19
**shame** [1] - 76:24
**share** [2] - 21:20, 160:2
**Shaye'** [21] - 51:8, 52:14, 53:3, 53:14, 53:16, 53:18, 53:23, 54:3, 68:2, 68:3, 75:13, 86:3, 86:11, 88:21, 89:2, 114:3, 114:17, 122:13, 126:2, 126:4, 127:6
**shielding** [1] - 147:24
**shirt** [1] - 123:4
**shorten** [2] - 14:3, 19:19
**shortened** [2] - 14:9, 14:10
**shortenings** [1] - 14:10
**shorter** [1] - 26:10
**shorthand** [2] - 2:12, 143:13
**shortly** [5] - 46:4, 46:14, 104:7, 140:7, 161:8
**shot** [1] - 79:1
**show** [30] - 38:22, 39:6, 51:17, 62:2, 62:5, 66:3, 87:23, 94:22, 97:10, 97:13, 97:15, 99:7, 99:10, 100:9, 100:13, 101:3, 101:10, 102:11, 102:12, 109:7, 109:20, 115:24, 119:5, 119:22, 119:24, 125:13, 149:7, 150:25, 160:21
**showed** [16] - 61:1, 77:8, 77:11, 82:23, 82:24, 88:22, 96:8, 102:10, 104:4, 116:15, 118:15, 118:17, 119:11, 119:12, 120:3
**showing** [3] - 39:14,

45:12, 72:11
**showings** [1] - 38:22
**shown** [8] - 10:4, 23:14, 44:15, 57:18, 58:20, 83:11, 124:8, 137:17
**shows** [11] - 65:19, 70:11, 72:6, 78:7, 83:10, 87:20, 88:6, 116:16, 119:3, 120:6, 123:8
**shut** [1] - 94:21
**SIBLEY** [84] - 2:2, 3:15, 3:24, 4:6, 4:19, 5:2, 6:9, 8:25, 9:4, 9:16, 9:19, 9:24, 10:8, 10:19, 10:25, 11:7, 12:10, 12:18, 13:3, 14:14, 14:22, 15:2, 15:7, 17:16, 17:20, 18:1, 18:5, 18:7, 18:19, 19:25, 20:22, 21:12, 21:17, 23:9, 24:12, 24:15, 25:19, 26:1, 26:4, 26:18, 26:25, 28:2, 28:5, 28:11, 28:16, 28:20, 28:23, 29:16, 30:8, 31:4, 31:15, 31:21, 32:4, 33:11, 33:25, 34:3, 34:5, 34:10, 34:15, 34:24, 35:16, 35:19, 35:21, 36:9, 36:21, 36:25, 37:2, 41:8, 46:16, 48:15, 48:22, 49:8, 49:12, 50:7, 50:12, 50:16, 90:14, 90:18, 90:24, 91:4, 91:16, 91:20, 95:4, 162:1
**Sibley** [87] - 2:3, 3:16, 3:19, 4:18, 5:19, 8:11, 8:24, 9:3, 9:15, 9:18, 9:23, 10:7, 10:18, 10:24, 12:8, 13:1, 14:13, 14:21, 15:1, 17:14, 20:21, 21:10, 21:16, 23:8, 24:10, 25:18, 25:25, 27:15, 30:7, 31:2, 31:13, 31:19, 32:12, 32:20, 33:10, 33:23, 38:21, 39:5, 39:9, 39:12, 40:3, 40:14, 41:7, 41:23, 43:3, 47:11, 48:14, 49:7, 49:10, 50:6, 51:1, 52:5, 57:16, 59:13, 63:23, 65:7, 65:24, 71:19, 72:3, 72:20,

72:24, 77:24, 89:25, 90:1, 90:3, 91:14, 114:4, 114:25, 115:12, 116:15, 117:5, 117:10, 118:13, 119:10, 119:15, 120:5, 120:16, 121:13, 121:22, 122:3, 123:10, 123:15, 123:24, 124:3, 124:8, 124:14, 125:8
**Sibley's** [8] - 32:15, 32:18, 39:22, 51:6, 72:25, 73:5, 114:8, 114:22
**sibley@ camarasibley.com** [1] - 2:5
**side** [9] - 51:16, 130:23, 133:4, 137:5, 137:9, 137:11, 137:14, 152:1
**side's** [1] - 139:6
**sides** [2] - 49:21, 137:25
**sift** [1] - 97:24
**sign** [2] - 160:16, 161:14
**signatory** [1] - 162:20
**signed** [2] - 157:23, 157:25
**significance** [2] - 69:25, 129:11
**significant** [1] - 72:11
**silk** [1] - 92:20
**similar** [3] - 67:20, 145:18, 155:12
**similarly** [3] - 130:16, 131:25, 132:7
**simple** [3] - 5:17, 56:7, 67:14
**simpler** [1] - 96:8
**simply** [5] - 6:11, 64:21, 129:8
**single** [10] - 5:8, 6:17, 39:20, 60:10, 65:25, 72:3, 112:24, 121:2, 129:21, 162:8
**single-handedly** [1] - 112:24
**sit** [2] - 53:6, 77:24
**site** [1] - 59:15
**sites** [2] - 100:24, 104:13
**sitting** [4] - 92:16, 112:9, 157:22, 160:20
**situation** [3] - 6:20,

16:4, 41:17
**six** [2] - 122:11, 122:14
**sixth** [1] - 40:14
**slanted** [1] - 71:21
**sleep** [2] - 77:2, 133:18
**slide** [2] - 46:9, 121:21
**slightly** [1] - 17:1
**slip** [1] - 91:9
**sliver** [1] - 51:12
**small** [10] - 11:12, 20:25, 21:23, 24:19, 31:7, 32:8, 68:20, 68:22, 68:25, 137:8
**smaller** [2] - 52:1, 137:8
**smartphones** [2] - 112:9, 159:13
**Smith** [1] - 80:5
**smooth** [1] - 92:20
**Snapchat** [1] - 159:5
**snow** [4] - 133:13, 133:15, 133:18, 133:19
**snowed** [1] - 133:21
**so-called** [1] - 103:10
**so..** [4] - 5:13, 17:23, 20:2, 35:9
**social** [15] - 61:11, 63:11, 63:15, 64:21, 65:5, 81:23, 97:21, 103:7, 105:12, 121:8, 139:4, 148:3, 159:3, 159:10, 159:14
**society** [2] - 61:12, 61:13
**sole** [2] - 130:21, 135:12
**solely** [5] - 134:8, 154:23, 157:14, 159:8, 159:23
**someone** [24] - 5:3, 5:5, 17:3, 51:25, 60:20, 61:22, 67:16, 78:25, 79:1, 79:4, 82:7, 83:10, 84:20, 88:12, 93:11, 94:1, 94:15, 95:14, 99:1, 101:5, 108:23, 110:9, 146:17
**sometimes** [7] - 16:9, 16:10, 17:7, 104:2, 130:22, 143:13
**son** [5] - 68:13, 76:11, 76:15, 76:17, 99:22
**soon** [2] - 74:19, 96:22
**sorry** [9] - 24:12,

25:17, 34:13, 47:21, 50:1, 83:15, 83:23, 86:24, 115:4
**sort** [13] - 6:2, 7:22, 93:12, 93:15, 94:9, 97:8, 99:4, 100:24, 104:3, 104:12, 114:8, 114:25, 124:17
**sought** [1] - 7:1
**soul** [1] - 61:25
**sounds** [5] - 17:17, 17:20, 17:24, 18:3, 18:8
**sources** [1] - 158:23
**Southern** [1] - 81:9
**space** [1] - 160:10
**spaced** [1] - 162:8
**spaces** [1] - 123:4
**Spalding** [3] - 115:5, 121:21, 122:1
**speaking** [1] - 90:23
**speaks** [3] - 33:13, 58:12, 84:12
**special** [1] - 129:20
**specific** [1] - 14:11
**specifically** [2] - 36:10, 100:20
**speculate** [2] - 27:6, 154:7
**speculating** [1] - 123:25
**speculation** [4] - 121:14, 134:17, 148:22, 150:1
**spending** [1] - 69:16
**spent** [3] - 62:1, 103:24, 103:25
**spewed** [1] - 68:14
**split** [1] - 6:7
**spokesman** [1] - 51:16
**spokesperson** [1] - 157:2
**Spotify** [1] - 66:14
**spread** [11] - 45:17, 66:21, 67:9, 76:4, 76:14, 78:24, 82:21, 107:10, 115:7, 116:7, 117:3
**spreader** [1] - 97:3
**spreading** [3] - 79:15, 85:22, 107:10
**spreads** [1] - 121:8
**spy** [1] - 104:23
**St** [1] - 116:25
**staff** [1] - 14:8
**stand** [11] - 6:10, 40:21, 77:25, 79:13, 87:8, 89:22, 90:2,

24

107:3, 107:20,
123:19, 131:13
**Stand** [1] - 51:24
**standard** [8] - 16:5,
18:1, 18:4, 23:17,
40:17, 40:20, 42:1,
150:4
**standards** [2] -
108:16, 141:9
**standing** [12] - 5:4,
51:15, 58:6, 61:11,
69:12, 69:13,
131:12, 142:10,
142:21, 146:6,
146:19, 147:9
**standpoint** [1] - 92:9
**stands** [2] - 63:24,
158:9
**start** [12] - 3:5, 4:7,
50:22, 57:2, 67:15,
80:25, 84:16, 86:11,
117:5, 126:14,
159:13
**started** [7] - 50:25,
74:19, 85:22, 86:8,
91:7, 96:23, 112:6
**starters** [1] - 84:7
**starting** [6] - 8:18,
22:17, 55:6, 75:10,
75:12, 85:5
**starts** [2] - 59:13,
129:9
**State** [14] - 44:16,
52:23, 53:19, 62:18,
62:25, 74:20, 75:18,
78:16, 78:22, 80:14,
80:19, 81:21, 116:1,
125:4
**state** [12] - 29:9, 34:7,
34:17, 38:24, 41:19,
86:11, 94:9, 105:19,
128:17, 128:23,
129:23
**State's** [3] - 80:24,
85:1, 120:2
**statement** [14] - 10:10,
11:2, 14:5, 36:13,
37:3, 39:14, 60:12,
66:22, 67:12, 92:4,
115:20, 142:8
**statement-by-
statement** [2] - 37:3,
39:14
**statements** [137] -
11:18, 11:19, 11:22,
11:24, 12:4, 12:5,
12:6, 12:12, 12:15,
13:24, 16:1, 19:1,
19:5, 19:10, 19:21,
20:11, 22:21, 23:2,

162:17
**step** [4] - 34:1, 63:14,
66:15, 67:10
**steps** [2] - 71:9,
120:15
**stereotype** [1] - 112:4
**stereotypes** [1] -
112:1
**Sterling** [6] - 78:11,
78:18, 79:3, 82:6,
84:18, 125:2
**sticky** [1] - 98:2
**still** [9] - 24:5, 45:5,
54:12, 85:10, 87:19,
87:20, 107:25,
124:4, 156:9
**stipulated** [1] - 73:15
**stipulating** [1] - 120:9
**stipulation** [5] - 95:23,
109:21, 120:5,
120:11, 120:13
**stipulations** [5] -
73:16, 73:18, 73:24,
87:21, 88:15
**stole** [1] - 68:21
**stolen** [2] - 45:8,
79:12
**stood** [2] - 54:5,
121:13
**stop** [4] - 83:13, 84:3,
85:10, 85:13
**stopped** [3] - 84:4,
92:21, 115:22
**stored** [2] - 139:2,
139:17
**stories** [4] - 29:24,
53:4, 72:1, 107:17
**story** [4] - 95:15,
98:24, 104:21, 106:5
**straight** [1] - 83:25
**strange** [1] - 106:17
**strangers** [6] - 53:12,
60:25, 68:13, 77:8,
77:10, 82:22
**strategic** [7] - 86:9,
118:9, 121:23,
122:3, 122:8,
122:20, 122:23
**Strategic** [6] - 70:12,
70:15, 71:2, 71:6,
79:10, 103:21
**strategy** [3] - 44:1,
52:4, 79:20
**stream** [1] - 51:17
**Street** [4] - 1:13, 1:17,
1:21, 2:3
**stretch** [1] - 90:2
**stricken** [1] - 37:14
**strike** [2] - 21:7, 33:7
**striking** [1] - 33:18

**strongly** [1] - 68:17
**structured** [1] - 5:23
**struggle** [1] - 19:12
**studies** [1] - 85:8
**stuff** [6] - 29:1, 35:1,
107:24, 109:2,
112:20, 122:7
**stuffing** [1] - 108:23
**subject** [8] - 26:1,
35:25, 40:9, 53:12,
83:9, 137:18, 158:2,
158:6
**subjected** [1] - 97:21
**submit** [4] - 59:25,
60:16, 60:21, 62:8
**submitted** [1] - 42:5
**subset** [3] - 25:7,
25:12, 151:13
**substantial** [7] - 60:1,
60:3, 86:22, 146:24,
147:17, 147:18,
148:5
**substitute** [1] - 129:24
**succeeded** [1] - 152:4
**successful** [1] - 124:5
**sue** [3] - 5:3, 5:8,
35:24
**sued** [4] - 60:7, 69:3,
99:6, 129:10
**suffer** [4] - 55:17,
74:17, 143:21,
149:22
**suffered** [20] - 7:25,
23:17, 51:12, 57:4,
57:20, 67:12, 75:2,
77:22, 78:9, 143:10,
145:7, 145:15,
146:20, 146:23,
148:16, 149:1,
150:15, 154:15,
154:21, 156:12
**suffering** [5] - 74:25,
76:9, 77:20, 146:6,
150:13
**suffers** [1] - 76:19
**sufficiency** [1] - 38:13
**sufficient** [6] - 42:7,
42:20, 43:16, 45:20,
126:7, 153:23
**sufficiently** [4] - 41:4,
41:24, 41:25, 138:11
**suggest** [5] - 9:7,
18:20, 19:17, 71:20,
144:22
**suggested** [5] - 22:19,
23:12, 24:9, 45:2,
47:12
**suggesting** [2] -
19:24, 27:1
**suggestion** [1] - 45:7

**suggests** [2] - 15:16,
120:17
**suit** [4] - 47:19, 87:11,
102:7, 144:17
**suitcases** [2] - 59:2,
122:13
**Suite** [2] - 1:13, 2:4
**sum** [5] - 73:8, 88:19,
136:21, 147:17,
153:21
**summarily** [1] -
136:12
**summarized** [3] -
151:6, 154:2, 156:7
**summations** [2] -
49:3, 50:21
**super** [1] - 124:25
**support** [5] - 38:5,
40:16, 84:11, 84:23,
130:10
**supported** [2] -
110:20, 136:17
**suppose** [1] - 15:4
**supposed** [8] - 42:16,
70:15, 102:8,
102:18, 107:6,
123:16, 123:17,
123:18
**Supreme** [1] - 39:1
**surely** [1] - 62:23
**surface** [1] - 94:16
**surfacing** [1] - 96:23
**surprised** [2] - 21:3,
62:22
**surrender** [1] - 157:12
**suspicion** [1] - 134:18
**sustained** [3] - 62:10,
131:22, 131:25
**swears** [1] - 137:13
**sworn** [5] - 93:8,
126:23, 131:8,
131:18
**sympathy** [4] - 27:25,
113:17, 129:5, 131:7
**synonymous** [1] -
76:5
**system** [3] - 52:18,
72:16, 131:5
**systems** [1] - 73:23

**T**

**table** [1] - 3:11
**tablet** [1] - 159:2
**tablets** [1] - 159:13
**tactics** [1] - 84:17
**talks** [4] - 98:9, 98:11,
98:12, 99:12
**tape** [1] - 80:12
**targeted** [2] - 70:23,

34:16, 34:19, 35:3,
35:6, 35:8, 35:18,
36:4, 36:12, 36:13,
36:15, 36:18, 36:19,
37:7, 38:22, 39:3,
39:4, 39:12, 39:17,
39:21, 40:4, 43:20,
43:21, 44:10, 55:9,
55:10, 55:12, 57:7,
57:8, 57:9, 57:12,
58:3, 58:7, 58:8,
58:11, 58:19, 58:24,
59:6, 59:8, 59:10,
59:12, 59:19, 60:15,
60:18, 60:19, 62:7,
62:12, 63:1, 63:7,
63:12, 64:24, 64:25,
66:3, 66:11, 66:18,
66:20, 66:23, 67:5,
67:7, 67:9, 75:10,
75:16, 75:19, 75:20,
76:3, 78:18, 82:9,
82:13, 82:19, 83:21,
83:24, 85:11, 87:2,
93:8, 101:8, 105:23,
106:9, 115:11,
124:21, 124:23,
132:3, 134:7,
141:16, 141:17,
141:19, 141:21,
141:22, 141:23,
142:1, 142:2, 142:4,
142:5, 142:7,
142:12, 142:17,
142:20, 142:24,
143:2, 143:3, 143:5,
143:8, 144:3,
145:22, 146:3,
146:12, 146:15,
146:16, 146:18,
146:22, 146:24,
147:2, 147:8,
147:10, 147:11,
147:12, 148:4,
148:17, 149:6,
149:15, 153:6
**States** [4] - 63:1, 63:5,
81:9, 117:18
**STATES** [2] - 1:1, 1:8
**stating** [1] - 160:20
**statute** [3] - 37:9,
37:13, 40:5
**stay** [5] - 8:21, 20:15,
31:25, 51:19, 161:17
**stayed** [1] - 74:6
**staying** [1] - 40:22
**stays** [1] - 32:2
**stealing** [1] - 105:24
**steep** [1] - 70:9
**stenographic** [1] -

76:11
**targeting** [1] - 86:2
**targets** [1] - 54:10
**task** [1] - 56:7
**tasks** [1] - 64:18
**tax** [1] - 119:6
**taxes** [1] - 74:2
**team** [16] - 13:10,
13:23, 55:24, 78:15,
78:23, 79:19, 81:5,
81:21, 82:6, 82:14,
86:6, 88:13, 116:5,
144:3, 153:6
**Team** [5] - 35:14,
81:13, 103:8,
116:24, 117:1
**telegraphing** [1] -
83:15
**ten** [6] - 70:15, 70:17,
91:10, 110:14,
156:12
**ten-day-long** [1] -
70:15
**ten-year** [1] - 110:14
**tend** [2] - 132:16,
142:9
**tendency** [3] - 58:10,
60:15, 147:12
**tenuous** [1] - 101:6
**term** [2] - 76:23, 152:6
**terms** [3] - 67:18,
129:7, 129:12
**terror** [1] - 51:12
**terrorized** [1] - 77:9
**test** [2] - 118:22, 130:4
**testified** [24] - 40:21,
52:23, 54:9, 61:14,
61:17, 64:18, 65:2,
65:17, 67:4, 71:8,
72:10, 74:3, 75:23,
96:19, 114:6,
116:22, 119:21,
122:25, 133:14,
134:9, 135:18,
135:20, 135:25,
138:6
**testify** [17] - 3:22,
37:23, 60:25, 61:4,
61:6, 73:25, 79:14,
81:16, 92:2, 92:14,
92:18, 93:3, 110:21,
114:6, 132:23,
137:2, 137:23
**testifying** [5] - 37:20,
94:2, 136:2, 137:4,
137:19
**testimony** [75] - 6:3,
8:12, 10:2, 10:4,
10:16, 26:16, 27:2,
29:25, 32:19, 37:20,

39:10, 40:20, 41:1,
43:24, 44:9, 45:15,
45:18, 45:19, 57:9,
57:22, 62:16, 63:13,
64:11, 64:16, 66:2,
69:23, 70:13, 71:1,
71:24, 75:15, 76:9,
78:14, 79:18, 79:21,
80:6, 83:17, 86:14,
92:25, 93:8, 108:5,
115:4, 115:6, 117:7,
118:23, 119:20,
120:12, 122:9,
123:21, 131:18,
132:11, 133:9,
133:15, 133:19,
134:25, 135:11,
135:14, 136:5,
136:6, 136:15,
136:16, 136:20,
136:24, 137:8,
137:9, 137:12,
137:17, 137:20,
137:21, 137:23,
138:4, 138:9, 150:6,
154:4
**testing** [1] - 42:25
**Texas** [1] - 112:7
**text** [3] - 77:5, 139:4,
159:2
**texted** [1] - 82:23
**texts** [1] - 62:20
**THE** [179] - 1:1, 1:8,
3:2, 3:8, 3:14, 3:17,
4:3, 4:7, 4:18, 4:25,
5:14, 6:25, 8:3, 8:14,
8:21, 8:24, 9:1, 9:3,
9:5, 9:12, 9:15, 9:17,
9:20, 9:23, 9:25,
10:7, 10:9, 10:18,
10:21, 10:24, 11:1,
11:6, 11:8, 11:10,
11:15, 12:8, 12:11,
12:14, 12:24, 13:4,
14:3, 14:5, 14:7,
14:13, 14:18, 14:21,
14:23, 15:1, 15:6,
15:10, 16:9, 16:16,
16:19, 17:6, 17:11,
17:19, 17:24, 18:3,
18:6, 18:11, 18:20,
19:2, 19:6, 19:11,
19:15, 20:3, 20:4,
20:13, 20:21, 20:23,
21:3, 21:6, 21:10,
21:13, 21:16, 21:18,
21:25, 22:2, 22:17,
22:23, 23:5, 23:8,
23:10, 24:10, 24:13,
24:16, 24:23, 25:1,

25:10, 25:15, 25:18,
25:20, 25:24, 26:3,
26:6, 27:1, 27:10,
27:15, 28:3, 28:9,
28:13, 28:18, 28:22,
29:12, 30:3, 30:15,
30:21, 30:23, 31:2,
31:5, 31:11, 31:13,
31:16, 31:19, 31:25,
32:5, 32:9, 32:11,
32:24, 33:2, 33:10,
33:19, 33:23, 34:1,
34:4, 34:9, 34:13,
34:22, 35:12, 35:17,
35:20, 36:6, 36:17,
36:23, 37:1, 38:8,
41:6, 41:22, 46:10,
46:14, 46:20, 46:23,
47:3, 47:9, 47:11,
47:20, 47:23, 48:1,
48:6, 48:8, 48:12,
48:14, 48:19, 48:23,
49:2, 49:5, 49:7,
49:9, 49:15, 49:25,
50:8, 50:11, 50:14,
50:18, 50:20, 89:24,
90:8, 90:16, 90:22,
90:25, 91:3, 91:8,
91:14, 95:2, 113:24,
126:11, 161:11,
161:24, 162:3
**theft** [1] - 81:7
**themselves** [2] - 54:1,
54:7
**then..** [1] - 46:24
**theories** [2] - 106:24,
121:6
**theory** [7] - 45:1, 52:9,
66:4, 73:5, 80:19,
105:12, 120:24
**thereafter** [2] - 46:4,
57:10
**therefore** [6] - 41:11,
55:2, 115:14, 122:6,
130:9, 152:12
**thinking** [4] - 21:21,
45:3, 45:8, 93:5
**thinks** [3] - 77:1, 94:4,
114:4
**third** [9] - 11:12,
22:15, 31:11,
115:19, 127:4,
141:18, 142:3,
142:4, 142:24
**thoroughly** [1] - 43:24
**thousands** [2] - 88:17,
108:12
**threatening** [3] -
76:13, 78:1, 99:17
**threats** [7] - 76:16,

77:5, 77:6, 82:16,
97:22, 124:16, 146:5
**three** [14] - 5:18,
42:23, 43:17, 53:10,
60:13, 60:16, 66:21,
70:22, 72:14, 88:17,
140:2, 140:11,
141:8, 148:5
**threshold** [2] - 39:6,
41:16
**throughout** [4] -
11:22, 11:25, 73:16,
158:19
**tie** [3] - 109:8, 110:15,
110:17
**tied** [6] - 50:1, 110:25,
111:2, 125:9,
125:20, 125:21
**TikTok** [1] - 159:5
**timing** [1] - 102:18
**title** [1] - 51:23
**today** [3] - 3:23, 52:15,
79:13
**together** [7] - 7:2,
60:16, 88:12,
112:14, 113:16,
132:23, 161:20
**tolerated** [1] - 126:9
**toll** [1] - 77:3
**took** [8] - 50:12,
52:19, 88:11, 95:18,
107:17, 144:9,
144:14
**top** [2] - 26:8, 98:10
**tort** [3] - 34:20, 55:19,
84:7
**torts** [4] - 13:19,
39:15, 143:24, 153:2
**totally** [3] - 28:9,
44:13, 44:19
**touch** [1] - 61:23
**touching** [2] - 158:2,
158:6
**toward** [2] - 113:3,
136:11
**towards** [5] - 4:4,
5:24, 124:14, 125:8,
136:13
**toxic** [2] - 67:1, 70:24
**traced** [1] - 59:9
**trade** [3] - 142:9,
142:20, 146:18
**tragically** [1] - 76:25
**training** [1] - 121:8
**traitor** [1] - 87:13
**traitors** [1] - 59:22
**transcribed** [1] -
162:12
**Transcript** [1] - 2:12
**TRANSCRIPT** [1] - 1:7

**transcript** [9] - 10:3,
32:21, 33:1, 47:20,
58:20, 162:17,
162:17, 162:19
**transcription** [1] -
2:12
**transcripts** [1] -
100:22
**translated** [1] - 121:10
**traumatizing** [1] -
112:13
**travel** [1] - 62:8
**traveled** [1] - 58:9
**treason** [2] - 76:6,
81:7
**treat** [1] - 129:18
**treated** [1] - 131:13
**treatment** [1] - 106:6
**tree** [1] - 76:18
**trending** [1] - 63:4
**trial** [34] - 10:2, 43:15,
44:12, 45:25, 49:16,
50:21, 50:25, 51:11,
55:7, 67:3, 67:15,
75:4, 87:16, 106:10,
126:20, 126:25,
127:18, 128:12,
128:13, 128:15,
129:6, 130:12,
130:17, 131:22,
132:12, 137:13,
137:16, 138:9,
138:15, 141:14,
143:17, 156:2,
159:13, 159:23
**TRIAL** [1] - 1:7
**tried** [7] - 20:15,
63:10, 88:1, 96:7,
100:1, 104:16
**tries** [1] - 59:14
**trigger** [2] - 27:20,
86:17
**true** [10] - 104:24,
105:13, 120:25,
135:10, 142:6,
143:5, 151:20,
162:16, 162:17
**truly** [1] - 53:7
**Trump** [38] - 13:9,
13:10, 13:21, 13:22,
13:23, 35:14, 55:23,
70:16, 70:18, 71:6,
78:15, 78:23, 79:15,
79:19, 81:13, 82:12,
82:18, 84:20, 96:19,
103:8, 106:18,
106:19, 106:25,
116:5, 116:17,
116:24, 117:1,
118:10, 118:11,

120:25, 121:2,
144:1, 144:2, 153:4,
153:5
**Trump's** [6] - 62:24,
70:20, 76:2, 77:10,
125:4
**trust** [2] - 61:12, 61:15
**truth** [10] - 84:12,
89:23, 92:10, 105:6,
106:2, 107:11,
136:9, 137:14, 152:3
**truthful** [2] - 66:21,
66:23
**truthfully** [2] - 16:16,
135:18
**try** [12] - 14:3, 37:11,
67:13, 68:25, 96:10,
102:6, 107:8,
107:12, 111:14,
114:20, 139:10,
139:11
**trying** [15] - 5:12,
10:15, 28:16, 45:9,
101:10, 102:7,
105:21, 106:8,
106:16, 107:10,
107:13, 120:8,
147:21, 148:1,
148:12
**Tuesday** [1] - 32:14
**tune** [2] - 51:16, 70:19
**tuned** [1] - 51:19
**turn** [9] - 8:16, 24:10,
32:6, 46:6, 51:22,
81:3, 95:2, 149:17,
152:23
**turned** [4] - 64:21,
82:16, 104:23,
104:24
**turns** [2] - 54:3, 105:8
**TV** [5] - 84:19, 104:2,
104:5, 104:8, 104:11
**tweet** [1] - 116:24
**tweeted** [1] - 74:20
**tweeting** [1] - 75:17
**tweets** [9] - 35:14,
35:15, 65:15, 65:16,
75:16, 79:16, 103:6
**twenty** [1] - 83:20
**Twitter** [8] - 65:19,
65:20, 70:19, 70:20,
72:6, 81:23, 104:12,
118:25
**Twitter/X** [1] - 159:4
**two** [29] - 5:25, 6:23,
16:22, 21:23, 33:8,
35:14, 37:8, 43:20,
43:21, 48:3, 50:14,
53:18, 53:25, 56:19,
56:20, 56:22, 57:13,

70:23, 79:3, 81:11,
88:21, 103:5,
105:25, 108:9,
126:1, 133:5,
144:20, 148:1
**two-year** [1] - 37:8
**TX** [1] - 2:4
**type** [4] - 96:15,
142:13, 150:5, 162:7
**types** [2] - 102:2,
133:5

## U

**U.S** [3] - 89:6, 114:15,
132:15
**ultimately** [4] - 15:20,
92:1, 101:21, 107:7
**um-hum** [1] - 15:6
**unable** [1] - 64:2
**unacceptable** [1] -
126:9
**unanimous** [7] -
157:9, 157:11,
158:11, 160:8,
160:9, 160:13,
160:21
**Uncle** [1] - 109:12
**uncontradicted** [4] -
40:20, 65:18, 86:5,
122:10
**under** [23] - 8:6, 9:25,
11:17, 13:6, 28:6,
29:18, 31:24, 34:17,
38:23, 42:2, 46:2,
54:9, 59:1, 93:9,
93:12, 94:3, 107:8,
119:22, 122:9,
132:14, 137:13,
140:5, 162:12
**undercount** [1] - 66:6
**undercounts** [1] -
66:16
**understandable** [1] -
121:9
**understood** [3] - 7:19,
45:4, 89:8
**undisputed** [5] - 86:5,
131:20, 131:21,
132:5, 138:2
**undo** [1] - 67:13
**undue** [1] - 159:24
**unequivocally** [1] -
65:2
**unfair** [2] - 57:17,
124:15
**unfairness** [2] - 54:23,
139:23
**unfavorable** [1] -
138:13

unified [1] - 112:19
**unifying** [1] - 112:18
**unimpeachable** [1] -
117:20
**Union** [1] - 112:24
**unique** [1] - 5:7
**UNITED** [2] - 1:1, 1:8
**United** [4] - 63:1, 63:5,
81:9, 117:18
**unknown** [1] - 81:17
**unless** [4] - 11:25,
21:21, 132:4, 138:1
**unlike** [2] - 54:8,
155:15
**unnecessary** [2] -
95:24, 95:25
**unpleaded** [2] - 34:16,
35:6
**unprecedented** [2] -
62:9, 67:6
**unreasonable** [1] -
40:25
**unrebutted** [1] - 70:13
**unreliable** [2] - 38:4,
40:25
**unspeakable** [1] -
51:12
**unwillingly** [1] - 54:1
**up** [60] - 7:4, 14:3,
33:17, 44:12, 45:25,
48:20, 50:1, 54:5,
54:8, 58:21, 59:13,
61:1, 62:4, 63:24,
69:21, 77:2, 77:8,
77:11, 77:25, 80:6,
82:23, 82:24, 84:17,
87:8, 88:22, 89:12,
89:22, 90:2, 90:4,
93:24, 94:19, 95:14,
96:8, 99:7, 108:2,
109:10, 110:9,
112:1, 114:11,
116:12, 116:25,
117:2, 118:12,
118:15, 118:17,
119:11, 119:12,
119:15, 119:17,
119:22, 119:24,
120:24, 121:13,
121:21, 123:3,
123:10, 133:19,
137:7, 157:4, 161:25
**Up** [1] - 51:24
**updated** [1] - 24:20
**ups** [1] - 159:16
**USB** [1] - 59:3
**user** [1] - 65:6
**users** [1] - 65:16
**uses** [2] - 16:9, 16:10
**usurp** [1] - 42:16

## V

**valuable** [1] - 52:10
**value** [3] - 61:10,
61:17, 129:2
**vary** [1] - 147:16
**vein** [1] - 121:4
**verdict** [64] - 4:1, 4:8,
4:9, 4:12, 4:15, 5:17,
5:24, 6:5, 6:7, 7:3,
7:15, 8:15, 23:5,
24:20, 24:24, 31:9,
34:6, 34:15, 35:10,
37:13, 37:17, 37:25,
38:2, 42:10, 42:11,
46:8, 46:12, 47:2,
47:5, 56:17, 57:14,
74:12, 105:19,
110:18, 125:24,
126:23, 128:8,
129:15, 130:5,
130:8, 130:20,
131:8, 131:10,
134:3, 149:16,
151:12, 156:21,
157:7, 157:8,
157:10, 157:11,
157:14, 158:11,
158:14, 158:18,
160:5, 160:7,
160:11, 160:12,
160:17, 160:21,
160:23, 161:7
**verdicts** [1] - 4:1
**Veritas** [1] - 121:3
**version** [2] - 84:13,
152:17
**versus** [6] - 3:3, 7:6,
17:12, 17:17, 17:20,
72:4
**vials** [1] - 124:24
**vicarious** [1] - 40:2
**victims** [4] - 91:21,
92:5, 92:9, 121:5
**video** [30] - 10:4,
44:14, 53:18, 58:20,
62:19, 62:23, 63:16,
74:20, 75:18, 78:13,
78:14, 78:16, 80:7,
80:9, 81:21, 93:17,
93:18, 93:23, 94:16,
96:23, 98:4, 98:23,
99:1, 100:6, 115:24,
116:5, 124:18,
137:17
**videos** [1] - 120:3
**videotaped** [1] -
132:13
**view** [7] - 17:14,
42:13, 44:22, 72:16,

95:8, 124:17, 144:22
**viewed** [1] - 80:12
**viewers** [2] - 59:18,
124:4
**viewership** [2] -
63:10, 148:2
**views** [9] - 63:15,
63:16, 68:25, 72:16,
114:4, 157:5,
157:16, 157:17
**vile** [2] - 53:6, 76:12
**vilified** [1] - 97:21
**violation** [1] - 131:8
**violence** [3] - 96:22,
108:21, 109:5
**violent** [3] - 77:4,
97:22, 124:16
**viral** [7] - 62:10, 62:19,
63:3, 70:23, 82:20,
115:9, 121:5
**virtual** [1] - 89:12
**virus** [1] - 97:3
**visited** [1] - 80:11
**vital** [1] - 52:17
**vitriol** [1] - 112:21
**vitriolic** [1] - 109:15
**voice** [1] - 78:1
**voicemail** [2] - 68:12,
77:5
**void** [1] - 162:19
**volume** [2] - 67:4,
84:10
**VON** [1] - 1:16
**Von** [1] - 3:11
**voter** [2] - 99:2, 121:2
**votes** [2] - 53:21, 81:4
**voting** [1] - 59:3
**vs** [1] - 1:4
**vulgarity** [1] - 67:4

## W

**wait** [1] - 50:15
**waiting** [2] - 83:25,
126:17
**waivable** [1] - 41:20
**waived** [1] - 40:6
**waiving** [2] - 14:14,
34:25
**wake** [1] - 86:1
**waking** [1] - 76:17
**walk** [4] - 56:14, 57:1,
58:15, 114:25
**walked** [6] - 63:14,
71:9, 80:4, 83:24,
83:25, 125:17
**Wandrea** [2] - 99:13,
127:6
**wants** [1] - 84:15
**warn** [1] - 84:19

**warned** [1] - 125:5
**warning** [1] - 125:1
**warrants** [2] - 60:1, 60:3
**Washington** [4] - 1:6, 1:13, 2:10, 105:17
**waste** [1] - 46:18
**watch** [2] - 62:22, 91:21
**watched** [2] - 80:9, 92:14
**watcher** [3] - 44:14, 44:15, 45:20
**watchers** [3] - 44:17, 80:13, 115:25
**water** [1] - 80:22
**ways** [1] - 116:7
**wealth** [1] - 87:15
**wearing** [1] - 112:15
**web** [1] - 63:15
**week** [5] - 51:9, 51:10, 52:22, 112:8, 120:2
**weeks** [3] - 75:19, 122:11, 122:14
**weigh** [2] - 135:11, 155:25
**weighing** [1] - 129:11
**weight** [15] - 64:13, 71:15, 129:2, 129:16, 133:3, 133:25, 134:2, 135:14, 136:24, 137:1, 137:3, 137:22, 151:23, 157:13
**wellbeing** [1] - 54:19
**WhatsApp** [1] - 159:4
**whereas** [1] - 16:15
**White** [3] - 86:13, 86:15, 122:16
**whole** [7] - 7:3, 10:11, 80:12, 105:11, 119:14, 128:3, 129:19
**widely** [1] - 67:9
**willful** [1] - 139:19
**willfully** [1] - 139:13
**Willkie** [2] - 1:12, 3:9
**win** [1] - 123:3
**windfall** [1] - 115:15
**window** [2] - 133:13, 133:17
**wisdom** [1] - 128:18
**wise** [1] - 52:2
**wish** [1] - 127:19
**withdrawn** [1] - 48:1
**witness** [30] - 33:15, 92:23, 96:18, 122:9, 130:13, 132:14, 133:7, 135:16,

135:18, 135:19, 135:20, 135:22, 135:25, 136:4, 136:8, 136:13, 136:15, 136:18, 136:21, 136:23, 137:13, 137:23, 138:5, 138:8, 138:9, 138:11, 138:13, 138:14, 150:6
**witness's** [10] - 132:18, 133:9, 135:17, 135:23, 136:1, 136:2, 136:5, 136:6, 136:16
**witnesses** [22] - 6:4, 42:17, 80:12, 85:7, 92:12, 92:17, 100:11, 108:4, 117:6, 129:3, 130:15, 131:19, 134:7, 134:9, 135:12, 135:13, 137:2, 137:4, 137:8, 137:10, 137:19, 152:16
**woke** [2] - 77:2, 133:19
**women** [9] - 53:18, 92:2, 92:4, 95:11, 99:4, 109:5, 113:6, 113:11, 117:8
**wonder** [2] - 62:21, 117:15
**wording** [2] - 26:5, 26:22
**words** [23] - 52:2, 55:18, 66:10, 67:11, 68:13, 78:2, 79:4, 82:14, 82:15, 87:4, 90:22, 111:3, 122:12, 128:19, 129:13, 134:8, 134:23, 135:15, 143:6, 146:11, 151:18, 152:16, 154:17
**wordy** [1] - 30:21
**worker** [1] - 74:4
**workers** [3] - 54:1, 88:21, 125:3
**works** [2] - 122:14, 122:18
**world** [8] - 16:25, 62:12, 62:20, 76:4, 81:6, 81:17, 84:1, 116:7
**worms** [1] - 7:4
**worse** [1] - 112:23
**worst** [1] - 59:24

**worth** [8] - 54:19, 56:10, 88:2, 119:7, 120:18, 131:12, 147:25, 148:14
**worthless** [1] - 52:11
**wound** [2] - 116:25, 117:2
**wrenching** [1] - 53:4
**write** [3] - 57:13, 74:11, 160:9
**writes** [1] - 51:24
**writing** [3] - 90:19, 158:1, 158:3
**written** [2] - 86:1, 127:14
**wrongdoing** [1] - 155:22
**wrongful** [1] - 92:6
**wrongly** [1] - 94:4
**wrote** [5] - 47:23, 51:20, 87:8, 89:6, 104:21

### Y

**Yankees** [2] - 112:17, 114:15
**Yankees'** [1] - 112:15
**year** [7] - 37:8, 60:4, 74:1, 83:18, 85:10, 103:9, 110:14
**years** [10] - 51:20, 53:11, 62:1, 70:4, 70:22, 74:2, 87:11, 107:11, 111:12, 119:7
**yelled** [1] - 82:25
**yesterday** [4] - 33:1, 44:25, 50:5, 91:23
**York** [8] - 51:21, 81:10, 87:9, 89:7, 105:17, 111:18, 112:11, 112:17
**you-all** [4] - 4:9, 21:21, 23:11, 23:12
**yourself** [8] - 16:14, 51:10, 53:12, 62:23, 86:2, 94:1, 98:17, 157:12
**yourselves** [1] - 3:5
**YouTube** [1] - 159:4

### Z

**zero** [10] - 78:7, 81:15, 97:2, 97:8, 101:13, 102:5, 102:11, 103:19, 110:2, 124:2
**Zoom** [1] - 76:11