## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RUBY FREEMAN, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 21-3354 (BAH) |
| | Judge Beryl A. Howell |
| RUDOLPH W. GIULIANI, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

A unanimous jury awarded plaintiffs Ruby Freeman and Wandrea' ArShaye "Shaye" Moss, on December 15, 2023, a total of $148,169,000.00, in compensatory and punitive damages for defamation and intentional infliction of emotional distress, against defendant Rudolph W. Giuliani. Verdict Form, ECF No. 135. This jury award was followed, in rapid succession, three days later, by entry of the final judgment against Giuliani, *see Freeman v. Giuliani*, No. 21-cv-3354 (BAH), 2023 WL 9783148 (D.D.C. Dec. 18, 2023) ("Final Judgment"), and two days after that, by this Court's order dissolving the 30-day automatic stay for enforcement of judgment to permit plaintiffs to register their judgment immediately in any district, *see* Mem. and Order at 12–13, ECF No. 144 ("Enforcement of Judgment Decision").[1] The very next day, on December 21, 2023, Giuliani filed a Chapter 11 bankruptcy petition in the Southern District of New York, which

---

[1]       The Final Judgment adopted the parties' Joint Stipulation Regarding Final Judgment, ECF No. 138; *id.*, Proposed Order at 1, 138-1 (agreeing, *inter alia*, to reduce the damages award to $145,969,000, plus post-judgment interest and costs), and ordered Giuliani to reimburse plaintiffs, in addition to the damages award, a total of $237,113 in accumulated attorney's fees, which had been ordered by this Court in July, August, and September 2023, in connection with plaintiffs' three successful discovery motions, and had remained unpaid as Giuliani failed to comply with the orders, *see* Final Judgment, 2023 WL 9783148, at *1, for a total judgment against Giuliani in the amount of $146,206,113, plus post-judgment interest, *id.*

filing automatically halted all proceedings in this case, including plaintiffs' right to exercise the authority granted by this Court to seek prompt enforcement of the judgment against Giuliani.  *See* Chapter 11 Pet., *In re Rudolph W. Giuliani*, No. 23-12055 (SHL), ECF No. 1 (Bankr. S.D.N.Y. Dec. 21, 2023).

Despite the utter failure of Giuliani to comply with his discovery obligations and related orders in this lawsuit or to pay a dime in the attorney's fees imposed for his discovery abuses— after multiple opportunities were extended for him to do so, over the course of months, leading, ultimately, to entry of default judgment against him on liability on plaintiff's well-pleaded claims, *see Freeman v. Giuliani*, No. 21-cv-3354 (BAH), 2023 WL 5600316, at *26 (D.D.C. Aug. 30, 2023) ("Default Judgment Decision"); Default Judgment Order, ECF No. 93—the Bankruptcy Court granted Giuliani's request to lift the bankruptcy stay to permit him to "file and litigate . . . a post-trial motion (or motions)" and "file a notice of appeal from the Freeman Judgment," so long as that court is assured, somehow, that the funds expended on continued litigation in this case "shall not be paid by . . . the Debtor or his estate," Order ¶¶ 2, 6, *In re Rudolph W. Giuliani*, No. 23-12055 (SHL), ECF No. 124 (Bankr. S.D.N.Y. Feb. 20, 2024) ("Bankruptcy Modifying Stay Order").  With the automatic bankruptcy stay lifted for Giuliani's benefit to continue litigating in this case, he now renews his motion made at trial for judgment as a matter of law ("JMOL"), pursuant to Federal Rule of Civil Procedure 50(b), or alternatively, for "a new trial and/or to alter or amend the Final Judgment," pursuant to Federal Rule 59.  Def.'s Renewed Mot. JMOL at 1 & n.1 ("Def.'s Mot."), ECF No. 147.

Giuliani urges this Court to reverse prior findings and rulings and override the jury's considered verdict based on five cursory arguments made in a brief eight pages: (1) that plaintiffs have failed to state a claim, "incorporat[ing] by reference his arguments in his Motion to Dismiss

[] and reargu[ing] them as to the statements specifically identified in the Complaint," Def.'s Mot. at 4 (citation omitted); (2) that the "unpleaded conduct" on which plaintiffs were permitted to prove damages "suffers from the same defects as the pleaded conduct" and "fails to adequately plead the claims for relief and/or were improperly presented to the jury despite being outside the pleadings," *id.*; (3) that the "'emotional harm' statements that Plaintiffs based their [intentional infliction of emotional distress ('IIED')] claims on at trial were . . . made more than one year before suit was filed," *id.* at 5, and consequently, "Defendant is entitled to judgment as a matter of law on the IIED claims on limitations grounds," *id.*; (4) that any IIED damages were based on a lack of "competent evidence" because there was no expert testimony "as to how much of their emotional harm was caused by Giuliani as opposed to other sources that pre-dated Giuliani's alleged conduct," *id.* at 5–6 (capitalization omitted) (citing *Halcomb v. Woods*, 610 F. Supp. 2d 77, 86 (D.D.C. 2009)), and (5) that the "testimony and documents" of two plaintiffs' witnesses, Regina Scott and Dr. Ashlee Humphreys, "should have been stricken" with an instruction to "the jury to disregard it," *id.* at 7.

These arguments are foreclosed by the law of the case doctrine based on this Court's Default Judgment Decision imposing liability on Giuliani for plaintiffs' claims as a discovery sanction—and Giuliani provides no basis to exempt him from application of that doctrine here—and otherwise fail on the merits.  *See Guedes v. BATFE,* 45 F.4th 306, 312 (D.C. Cir. 2022) ("[T]he law of the case doctrine . . . instructs that 'the *same* issue presented a second time in the *same  case* in the *same  court* should lead to the *same  result*.'" (emphasis in original) (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996)).  Giuliani's motion is accordingly denied for the reasons explained more fully below.

## I.   BACKGROUND

The factual background of this case has been detailed previously in prior decisions.  *See,*
*e.g.*, Enforcement of Judgment Decision at 2–4, 12–13 (ordering dissolution of automatic stay of
execution of final judgment entered on December 18, 2023, and of proceedings to enforce it, and
authorizing plaintiffs to register the judgment in any district of the United States to enforce this
judgment); Default Judgment Decision, 2023 WL 5600316, at *3–12, *26 (directing the entry of
default judgment against Giuliani on liability); *Freeman v. Giuliani*, No. 21-cv-3354 (BAH), 2022
WL 16551323, at *1–5, 11 (D.D.C. Oct. 31, 2022) ("Dismissal Denial Decision") (denying
Giuliani's motion to dismiss plaintiffs' Amended Complaint).  Only the factual and procedural
history pertinent to resolving Giuliani's pending motion is set forth below.

### A.  Pretrial Disputes

During the lifecycle of this case, Giuliani disputed his liability for plaintiffs' three claims
of defamation/defamation *per se*, IIED, and civil conspiracy to commit those torts, in only two
written filings—his motion to dismiss plaintiffs' Amended Complaint, for which "Giuliani chose
not to file any reply, thereby forfeiting his opportunity to address plaintiffs' vigorous opposition
to dismissal," *Freeman v. Giuliani*, No. 21-3354 (BAH), 2023 WL 8472723, at *2 (D.D.C. Dec.
7, 2023) ("Pretrial Disputes Decision") (citing Dismissal Denial Decision, 2022 WL 16551323, at
*5), and in the form of his asserted affirmative defenses set out in his responsive pleading to
plaintiffs' Amended Complaint, *see* Def.'s Answer ¶¶ 193, 197, and 194, ECF No. 33 (asserting,
*inter alia*, that "[p]laintiffs' claims [were] barred in whole or in part by the First Amendment,"
"because some and/or all of Giuliani's statements complained of are substantially true," and "by
the applicable statute of limitations (the single publication rule)," respectively).

4

As the case proceeded to discovery, Giuliani repeatedly "fail[ed] to comply with his basic preservation and production discovery obligations for both himself and his two businesses," Default Judgment Decision, 2023 WL 5600316, at *3, frustrating plaintiffs' procedural rights to obtain any meaningful discovery to support their claims, *see id.* at *3–12, including evidence relating to their IIED claim, *id.* at *16 ("[P]laintiffs will be severely hampered in proving that Giuliani acted intentionally or recklessly without access to circumstantial evidence of his state of mind when he made allegedly false statements about them.").  Giuliani's persistent discovery violations "necessitat[ed] the entry of default judgment against [him] on liability as a discovery sanction, pursuant to Federal Rule of Civil Procedure 37(b) and (e)," *Freeman v. Giuliani*, No. 21-3354 (BAH), 2023 WL 8360664, at *2 (D.D.C. Dec. 3, 2023) ("Jury Trial Decision") (citing Default Judgment Decision, 2023 WL 5600316, at *26 (citing FED. R. CIV. P. 37(b)(2)(A)(vi) and (e)(2)(C))).  Default judgment "established Giuliani's liability for every well-pleaded allegation in [plaintiffs' amended] complaint," Pretrial Disputes Decision, 2023 WL 8472723, at *2 (alterations in original) (quotation marks and citations omitted), with "the well-pled allegations . . . and all inferences that may reasonably be drawn from those allegations [] deemed to be true," *id.* (citations omitted).

In the order directing the entry of default judgment against Giuliani on liability, Giuliani was provided yet another opportunity to comply with plaintiffs' reasonable discovery requests for financial information, with which requests Giuliani had failed to comply notwithstanding a prior court order directing production.  *See* Default Judgment Decision, 2023 WL 5600316, at *7–9 & n.4 ("Giuliani failed to produce full and complete responses to plaintiffs' requests for financial information in RFP Nos. 40 and 41[,]" which included requests for "[d]ocuments sufficient to show [Giuliani's] yearly income since 2018 and [] current net worth" (quotation marks and

citations omitted)); Default Judgment Order at 3.  To incentivize Giuliani's compliance, the otherwise mandatory adverse instruction to the jury that was ordered as a sanction for Giuliani's non-compliance "may be converted to a permissive one" should he produce the requested financial discovery, albeit belatedly, Default Judgment Order at 3, but this incentive was to no avail.  Giuliani again failed to produce discovery responsive to plaintiffs' requests for financial information or to otherwise "comply with any part of the [Default Judgment] Order," *Freeman v. Giuliani*, No. 21-cv-3354 (BAH), 2023 WL 8360653, at *2 (D.D.C. Oct. 13, 2023) ("Additional Sanctions Order"), and as a consequence, additional sanctions were imposed, pursuant to Federal Rule of Civil Procedure 37(b)(2)(A), *see id.* (ordering four additional adverse inferences on which the "jury [would] be instructed," and precluding Giuliani from "introducing any evidence . . . that has not been disclosed or produced during discovery," and from "making any argument, or introducing any evidence . . . that he received no financial benefits . . . from the statements he made about Plaintiffs" or "that he is . . . unable to defend himself, comply with this Court's orders, or satisfy an eventual judgment").

Before final judgment could be entered reflecting the amount of compensatory and punitive damages, if any, to be awarded to plaintiffs, this Court ordered "a trial on such damages."  Default Judgment Decision, 2023 WL 5600316, at *26 (citing FED. R. CIV. P. 55(b)(2)(B) (providing that, following entry of default judgment, "[t]he court may conduct hearings or make referrals— preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to . . . determine the amount of damages")).  Consistent with the parties' jointly proposed schedule for pretrial proceedings, including the filing of pretrial motions, and trial, the scheduling order set trial to begin on December 11, 2023, *see* Scheduling Order (Sept. 20, 2023); Parties' Jt. Proposed Pretrial and Trial Schedule at 2, ECF No. 99.  The only timely pretrial motion filed was plaintiffs'

Consent Motion *in Limine* to preclude Giuliani from making certain arguments or introducing

certain evidence, *see* Pls.' Consent Mot. *In Limine*, at 1, ECF No. 103 (Giuliani's counsel

"confirmed that [Giuliani] consent[ed] to the requested relief"), which motion was granted, *see*

Order Granting Consent Mot. *In Limine* at 3–4, ECF No. 108.[2]

With the deadline for filing pretrial motions long past and trial scheduled to begin within

the month, Giuliani raised, in the parties' joint pretrial statement, on November 14, 2023, a host

of objections to jury instructions, arguments, and evidence that plaintiffs sought to introduce to

prove damages, the only issue at trial.  *See* Jt. Pretrial Submission ("JPTS"), ECF No. 105; First

Am. JPTS, ECF No. 115.[3]  Though finding that Giuliani had "opted to forfeit th[e] opportunity"

to raise his objections in timely filed pretrial motions, his objections were nonetheless resolved "to

ensure the fair and expeditious presentation of evidence at the trial and to minimize interruptions

for legal arguments," Pretrial Disputes Decision, 2023 WL 8472723, at *1, 8 (overruling in part

and sustaining in part Giuliani's objections).  Three of Giuliani's various objections raised and

resolved before trial are pertinent here.

---

[2]    Specifically, this order excluded at trial the following evidence or argument (1) "that contradicts any of this Court's previous orders in th[e] case . . . or [was] otherwise foreclosed by the Court at any stage of the instant case," Order Granting Consent Mot. *In Limine* at 3; (2) that references the "2022 confidential settlement agreement between plaintiffs and former defendants . . . including the fact, terms (including financial terms), and/or circumstances (including related communications) of the agreement" and/or "any potential setoff as a result of the confidential settlement agreement," *id.*; (3) that concerns "any comparative fault or responsibility that defendant Giuliani's co-conspirators may bear for the damages inflicted by Giuliani's civil conspiracy to defame and inflict emotional distress on plaintiffs as a whole," *id.*; and (4) that "references the personal background of any counsel, motivation or intent of any counsel or law firm in litigating this case, the scope of resources of any counsel or any counsel's workplace, or any counsel's compensation and/or fee arrangement," *id.* at 3–4.

[3]    On November 20, 2023, more than a month past the Scheduling Order's deadline to "file any pretrial motions," Scheduling Order (Sept. 20, 2023), Giuliani also submitted a cursory one-and-a-half page "Trial Brief" contesting "a jury trial on the remaining issues of damages," in favor of a bench trial, Def.'s Trial Brief on Propriety of Jury Trial and Obj. to Jury Trial at 2, ECF No. 107, which objection was denied, *see* Jury Trial Decision, 2023 WL 8360664, at *8.

First, Giuliani objected that plaintiffs had "not established all elements of any of their claims" because the "allegations [were] not well pleaded, particularly the conspiracy claim, and therefore cannot support a default judgment," *id.* at *1–2 (citations omitted), but this objection was denied, for the same reasons given for denial of his motion to dismiss, *id.* at *4; *see* Dismissal Denial Decision, 2022 WL 16551323, at *5–11.   Moreover, the Default Judgment Decision "established Giuliani's 'liability for every well-pleaded allegation in [plaintiffs' amended] complaint,'" Pretrial Disputes Decision, 2023 WL 8472723, at *2 (alterations in original) (citations omitted), including "proximate cause as to Giuliani's liability, leaving only the issue of causation to the extent it limits the scope of damages," *id.* at *3 (quotation marks and citations omitted). Both decisions constituted "law of the case," given Giuliani's failure to "identif[y] an intervening change of law or any other basis for concluding that these prior decisions were clearly erroneous . . . to merit departing from this doctrine."  *Id.* (quotation marks and citations omitted).

Second, Giuliani objected "that plaintiffs have not precisely defined the members comprising the civil conspiracy," *id.* at *4, a critique delivered with obvious crocodile tears given Giuliani's obstruction of discovery that would have enabled plaintiffs to support and expand (or not) their allegations regarding the identities of the members of the civil conspiracy.  Nevertheless, based on Giuliani's own stipulation, plaintiffs' Amended Complaint, deposition testimony, and expert reports disclosed to Giuliani prior to the entry of default judgment on August 30, 2023, the Court found that members of the civil conspiracy included: "persons whom the parties [] stipulated are conspiracy members, namely, Donald J. Trump, Christina Bobb, and Herring Networks, Inc., d/b/a OAN, Robert Herring, Charles Herring, and Chanel Rion," as well as "members of the Trump 2020 Presidential Campaign, including members of the Trump Legal team headed by Giuliani." *Id.* at *5 (citations omitted); *see* JPTS at 29–30; First Am. JPTS at 28 (stipulating that "the parties

are in agreement that the following individuals or entities were members of the conspiracy: Donald J. Trump, Christina Bobb, and Herring Networks, Inc., d/b/a One America News Network ('OAN'); Robert Herring; Charles Herring; and Chanel Rion").

Finally, Giuliani posited that "plaintiffs are limited to proving damages on all claims based only on twelve defamatory statements identified in plaintiffs' Amended Complaint," and objected to use of any other defamatory statements. *Id.* at *6 (citation omitted). The Court ruled that Giuliani had been "put on notice of plaintiffs' allegations regarding Giuliani's ongoing defamatory statements through plaintiffs' Amended Complaint and expert reports" and had "himself admitted to the course of conduct continuing past the filing of plaintiffs' Amended Complaint." *Id.* at *7. Further, "[p]laintiffs pleaded their IIED claim based on the course of conduct causing Plaintiffs extreme mental distress . . . which alleged conduct constitutes a separate tort from the defamation claim and rests on broader allegations than only the twelve defamatory statements Giuliani identifie[d]." *Id.* (quotation marks, citations, and brackets omitted). Thus, plaintiffs were permitted to "prove damages on their IIED claim based on statements pleaded or incorporated by reference in [their] Amended Complaint that were addressed and thereby disclosed to Giuliani in [Dr. Humphreys'] reports." *Id.*

### B. Trial, Rule 50(a) Motion, and Final Judgment

Trial began on December 11, 2023, and by the close of the first day, plaintiffs filed a second motion *in limine* to preclude Giuliani and his counsel from making arguments or eliciting testimony "contrary to the Court's prior orders in this case," including arguing or eliciting testimony that Giuliani "did not proximately cause any or all of the injuries alleged in the Amended Complaint." Pls.' Mot. *In Limine* to Preclude Further Violations of the Court's Prior Orders at 2–3, ECF No. 126 ("Pls.' 2nd MIL"). As relevant here, this motion was granted in part and denied

9

in part, allowing Giuliani to "make inquiry and argument about how [] Giuliani should not be held responsible for what strangers did or said," but at the same time that he was subject to "a clear instruction to the jury about his responsibility for all foreseeable harm from the publication and reasonably foreseeable republication of defamatory statements made by [him] and his co-conspirators as part of the compensatory damages."  Trial Tr. at 17:24–18:6 (Dec. 13, 2023, AM), ECF No. 155.[4]

On December 14, 2023, following the presentation of evidence and argument on the amount of compensatory and punitive damages owed to plaintiffs, but before the case was submitted to the jury, Giuliani orally moved for a directed verdict, pursuant to Federal Rule of Civil Procedure 50(a).  *See* Trial Tr. at 34:5–38:7 (Dec. 14, 2023, AM), ECF No. 156; FED. R. CIV. P. 50(a)(1) (authorizing grant of a motion for judgment as a matter of law upon finding "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue").  Giuliani raised six arguments: (1) "that the relief pleaded by plaintiffs in the amended complaint fails to state claims on which relief can be granted," *id.* at 34:5–8; (2) that "the unpleaded statements that the Court allowed in," *id.* at 34:15–17, including "pre-[] December 23, 2020, publications" that required "an independent assessment of whether they are actionable," *id.* at 35:21–36:5," are "protected opinion, protected under the First Amendment," and lack adequate proof of "actual malice," *id.* at 34:15–21; (3) "that there can't be civil conspiracy claims because they were not identified as overt act[s] in furtherance of the conspiracy," *id.* at 37:4–6; (4) that the

---

[4]       Plaintiffs' requests were granted to preclude (1) Giuliani from testifying regarding the veracity of his defamatory statements, *see* Pls.' 2nd MIL at 2, 4 ("Defendant Giuliani stated publicly to reporters on the courthouse steps that he intended to testify that his defamatory statements were true[.]"), and (2) Giuliani and his counsel from arguing that Giuliani "would be pushed to financial ruin—or otherwise placed in a position rendering him insolvent— by a substantial damages award in Plaintiffs' favor," *id.* at 2–4; *see* Trial Tr. at 10:17–22, 17:17–19 (Dec. 12, 2023, PM), ECF No. 152.

IIED statements made prior to December 23, 2020, are "barred by statute of limitations," because "there is case law that I am familiar with that says you can't repackage what is really a defamation claim in the form of an IIED claim and then try to avoid limitations," *id.* at 37:7–16, but without otherwise identifying such "case law"; (5) that damages could not be awarded for "any future emotional harm or mental anguish damages" because "[t]here was no expert testimony testifying as to future emotional harm or mental anguish damages," acknowledging that while "there is no need for an expert to testify on [past mental anguish damages] . . . there needs to be a higher level of proof for future mental anguish damages," *id.* at 37:17–38:1; and (6) that damages could not be awarded based on Dr. Ashlee Humphreys' "impressions model, as we believe that's unreliable and . . . does not provide a reasonable estimate of any compensatory damages for damage to reputation," *id.* at 38:2–6.

This motion was denied for reasons detailed orally on record, with the Court concluding that, "[b]ased on all of the evidence presented by plaintiffs, including their own testimony describing what they ha[d] been through since [] Giuliani and his co-conspirators seized on and spread lies about their conduct on election night in 2020, the expert testimony, the testimony of the Georgia officials and the Republican poll watcher, a reasonable jury would have a legally sufficient evidentiary basis to find for the plaintiffs and award at least some damages as compensation for the harm caused by [] Giuliani and his co-conspirators, and as punitive damages against [] Giuliani for his continued promotion of these same lies up to the very first day of this trial." *Id.* at 45:14–25.

The next day, an eight-member jury returned a verdict awarding plaintiffs $148,169,000 in compensatory and punitive damages. *See* Verdict Form (awarding (1) $16,171,000 to Freeman and $16,998,000 to Moss as compensatory damages for defamation; (2) $20,000,000 to each

plaintiff as compensatory damages for emotional distress; and (3) $75,000,000 total to both plaintiffs, as punitive damages).[5]  This Court later observed, without "pre-judging any remittitur arguments that may be made by Giuliani, the obvious fact that the jury's unanimous awards were conservative as to the plaintiffs' requested compensation for reputational harm due to Giuliani's defamation *per se*, based on the expert's calculation of the cost of repairing their reputations, and the jury's punitive damages award was nearly equivalent to compensatory damages, rather than multiplied by up to four times compensatory damages, reduction of the award on remittitur faces some challenges."  Enforcement of Judgment Decision at 11.[6]

### C.  Giuliani's Bankruptcy Petition and the Pending Motion

On December 21, 2023, the day after plaintiffs were authorized by this Court to execute immediately on their judgment, Giuliani filed for Chapter 11 bankruptcy, triggering the automatic bankruptcy stay applicable to this case pursuant to 11 U.S.C. § 362(a).  *See* Chapter 11 Pet., *In re Rudolph W. Giuliani*, No. 23-12055 (SHL), ECF No. 1 (Bankr. S.D.N.Y. Dec. 21, 2023); *see also* Debtor's Mot. for Order Modifying Stay ¶ 15 ("Debtor's Mot."), *id.*, ECF No. 25 (Bankr. S.D.N.Y. Jan. 5, 2024) (Giuliani asserting that "the $148,000,000.00 [sic] judgment was the immediate precipitating cause of the Debtor's Chapter 11 filing.").  On January 5, 2024, Giuliani moved for "an order modifying the automatic stay for the limited purpose of allowing" Giuliani to file "post

---

[5]    As noted, *supra* n.1, the parties agreed to reduce the compensatory damages award by more than $2,000,000 as "resolution of any setoff claim [] Giuliani may have arising from Plaintiffs' May 31, 2022 settlement agreement with the other defendants in this litigation."  Jt. Stip. Regarding Final Judgment at 1; *id.*, Proposed Order at 1 (reducing the award to $145,969,000, plus post-judgment interest and costs).

[6]    On December 18, 2023, the same day Final Judgment was entered, *see* Final Judgment, 2023 WL 9783148, plaintiffs filed a second complaint against Giuliani seeking to "enjoin[] [him] from making or publishing . . . further statements repeating any and all false claims that" plaintiffs, among other things, "engaged in election fraud, illegal activity, or misconduct . . . related to the 2020 presidential election,"  which false statements Giuliani continued to make throughout trial in this matter, even though such statements had "been found and held, conclusively, to be defamatory."  Compl. ¶¶ 3–4, 6, 14–16, *Freeman et al. v. Giuliani*, No. 23-cv-3754 (BAH), ECF No. 1 (D.D.C. Dec. 18, 2023).  This suit seeks no monetary damages but injunctive relief, yet remains subject to the automatic stay triggered by Giuliani's Chapter 11 filing.  *See* 11 U.S.C. § 362(a).

judgment motions to modify the judgment and/or for a new trial and for Plaintiffs to participate in

such motion if . . . it is deemed necessary to file a notice or notices of appeal . . . and for Plaintiffs

to participate in such appeal." Debtor's Mot. ¶ 9. As part of this motion, Giuliani emphasized that

the stay would "not be to authorize the Plaintiffs to take any steps to perfect any additional liens

or otherwise with further collection of the judgment except to participate in the post-judgment

litigation." *Id.* ¶ 10. After initially opposing the motion, on grounds that this would let Giuliani

"have his cake and eat it too: he wants to appeal the Freeman Litigation, not post a bond, and use

the automatic stay to bar Ms. Freeman and Ms. Moss from enforcing their judgment," Pls.' Opp'n

¶ 4, *id.*, ECF No. 50 (Bankr. S.D.N.Y. Jan. 18, 2024), plaintiffs "ultimately consented to a limited

modification of the stay for the sole purpose of preserving Mr. Giuliani's rights to seek review of

the judgment below," Pls.' Opp'n Def.'s Renewed JMOL at 6 ("Pls.' Opp'n), ECF No. 151

(emphasis omitted).

On February 20, 2024, the Bankruptcy Court granted Giuliani's request, ordering that the

stay be "modified, pursuant to Bankruptcy Code [11 U.S.C.] § 362(d)(1) and Bankruptcy Rule

4001 . . . solely to the extent necessary to permit" (1) Giuliani to "file and litigate in the District

Court a post-trial motion (or motions) . . . under Federal Rule of Civil Procedure 50 and/or Federal

Rule of Civil Procedure 59," and the parties "to litigate and otherwise oppose such Post-Trial

Filings," and (2) Giuliani to "file a notice of appeal from the Freeman Judgment entered on

December 18, 2023." Bankruptcy Modifying Stay Order ¶ 2. The Bankruptcy Court set the

condition that "[a]ny fees and expenses incurred by [Giuliani] and his advisors in the Freeman

Litigation in connection with any Post-Trial Filings and the Notice of Appeal shall not be paid by,

and shall not result in a claim against, [Giuliani] or his estate," and that "that no party shall pay

any such fees and expenses . . . until such time as this Court enters an order approving the payment

of such fees and expenses." *Id.* ¶ 6. This Bankruptcy Court Order provides no discernible detail on how the assurances required to satisfy the fee payment approval condition will be met by Giuliani, if at all.

The fee payment approval condition set by the Bankruptcy Court was not a precondition for Giuliani's filings in this case, and thus, the same day, on February 20, 2024, Giuliani filed the instant motion for renewed judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), or in the alternative, "a new trial and/or to alter or amend the Final Judgment" pursuant to Rule 59, Def.'s Mot. at 1 & n.1, with a notice of appeal filed shortly thereafter, *see* Notice of Appeal, ECF No. 148; Notice of Appeal, *Freeman v. Giuliani*, No. 24-7021 (D.C. Cir. Feb. 22, 2024).[7] The D.C. Circuit, on its own motion, ordered Giuliani's appeal held in abeyance and directed this Court to "notify [it] promptly upon the conclusion of its proceedings." Order, *Freeman v. Giuliani*, No. 24-7021 (D.C. Cir. Feb. 22, 2024).[8] With the filing of plaintiffs' opposition on March 5, 2024, *see* Pls.' Opp'n, and no reply from Giuliani—timely or otherwise—the pending motion is ripe for resolution.

---

[7]     Giuliani states that he filed his Notice of Appeal "out of abundance of caution in the event the tolling doctrine. . . applying 11 U.S.C. § 108 to the deadline to file a notice of appeal . . . is not held to apply to a post-judgment motion such as a Rule 50(b) motion." Notice of Appeal at 1 n.1. Plaintiffs do not contest the applicability of the tolling doctrine to Giuliani's instant motion, *see generally* Pls.' Opp'n, and thus the timeliness of Giuliani's pending motion and his appeal is not addressed here, other than noting that defendant's pending Rule 50(b) motion does not meet the 28-day filing deadline provided in that Rule, which deadline "must not [be] extend[ed]" by the Court, FED. R. CIV. P. 6(b)(2); *see* FED. R. CIV. P. 50(b).

[8]     Plaintiffs explained to the D.C. Circuit that, although the Bankruptcy Court authorized Giuliani to "file a notice of appeal from the Freeman Judgment," this does not mean the appeal may proceed since "any appeal of the Freeman Litigation shall remain subject to the automatic stay." Pls.' Letter Reg. Case Status, *Freeman v. Giuliani*, No. 24-7021 (D.C. Cir. Feb. 23, 2024) (quoting Bankruptcy Modifying Stay Order ¶¶ 2–3). The D.C. Circuit's notice holds Giuliani's appeal in this case in abeyance "pending decision in" this case, but makes no mention that, regardless of this Court's ruling, due to the terms of the Bankruptcy Modifying Stay Order, Giuliani's appeal apparently remains subject to the bankruptcy stay. *See* Order, *Freeman v. Giuliani*, No. 24-7021 (D.C. Cir. Feb. 22, 2024).

## II.   LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 50(b)

Federal Rule of Civil Procedure 50 authorizes a court, once "a party has been fully heard on an issue," FED. R. CIV. P. 50(a), to "grant judgment as a matter of law if it finds that 'a reasonable jury would not have a legally *sufficient* evidentiary basis to find for the party on that issue.'" *Dupree v. Younger*, 598 U.S. 729, 737 (2023) (emphasis in original) (quoting FED. R. CIV. P. 50(a), (b)).  If a Rule 50(a) motion is denied, "Rule 50(b) permits a disappointed party to file a renewed motion for judgment as a matter of law[.]" *Id.* at 732; *see* FED. R. CIV. P. 50(b).

A defendant seeking relief from a jury verdict through Rule 50 must satisfy an exceedingly demanding standard, with courts instructed not to "substitute our view for that of the jury, nor . . . assess the credibility or weight of the evidence." *Xereas v. Heiss*, 987 F.3d 1124, 1135 (D.C. Cir. 2021) (citing *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 163 (D.C. Cir. 2015)).  "Judgment as a matter of law is appropriate only if the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in plaintiff's favor." *Id.* (quoting *Muldrow ex rel. Estate of Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007)).  "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 151 (2000) (citation omitted).  "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (quotation marks and citation omitted).

**B.  Federal Rule of Civil Procedure 59**

After a jury trial, a court may, upon the motion of a party, grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  FED. R. CIV. P. 59(a)(1)(A).  Rather than define the precise circumstances justifying a new trial, Rule 59(a) turns to case law and permits a new trial in those circumstances traditionally viewed as permitting a new trial.  *See ABM Marking, Inc. v. Zanasi Fratelli, S.R.L.*, 353 F.3d 541, 543 (7th Cir. 2003) ("Rule 59(a), in a bit of a circular way, allows new trials in cases where new trials have been traditionally allowed at law." (citing FED. R. CIV. P. 59(a)).  The D.C. Circuit has explained that a "jury verdict stands 'unless the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not disagree on the verdict.'"  *Lane v. Dist. of Columbia*, 887 F.3d 480, 486 (D.C. Cir. 2018) (quoting *Czekalski v. LaHood*, 589 F.3d 449, 456 (D.C. Cir. 2009)).

Other circuits have given further meaning to this standard, ruling that "a new trial is warranted when a jury has reached a 'seriously erroneous' result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias."  *E.E.O.C. v. New Breed Logistics*, 783 F.3d 1057, 1066 (6th Cir. 2015) (citation omitted); *see also Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014) ("A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." (citation omitted)); *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417–18 (2d Cir. 2012) ("A court may grant a new trial 'for any reason for which a new trial has heretofore been granted in an action at law in federal court' . . . including if the verdict is against the weight of the evidence.  '[A] decision is against the weight of the evidence . . . if and only if

16

the verdict is [(1)] seriously erroneous or [(2)] a miscarriage of justice." (citations omitted) (alterations in original)); 12 MOORE'S FED. PRAC.—CIVIL § 59.13 (2024) ("The general grounds for a new trial are that the verdict is against the clear weight of the evidence, that the damages are excessive, that the trial was not fair, [] that substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions," or "when necessary to prevent injustice.").

"The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (per curiam). "Ordinarily Rule 59 motions for a new trial . . . are not granted by the District Court where they are used by a losing party to request the trial judge to reopen proceedings in order to consider a new defensive theory which could have been raised during the original proceedings." *Ciralsky v. CIA*, 355 F.3d 661, 673 (D.C. Cir. 2004) (brackets omitted) (quoting *Kattan by Thomas v. Dist. of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993), *as amended* (June 30, 1993)); *see also* Charles A. Wright et al., 11 FED. PRAC. & PROC. CIV. § 2805 (3d ed. 2023 Update) ("[A] party may not seek a second trial on the basis of a theory not urged at the first trial.").

The high threshold for a new trial reflects the "well-settled" principle that "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple[.]'" *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998) (citations omitted); *see also Aero Int'l, Inc. v. U.S. Fire Ins. Co.*, 713 F.2d 1106, 1113 (5th Cir. 1983).

## III.   DISCUSSION

Giuliani raises five arguments in support of his motion seeking renewed judgment as a matter of law, or in the alternative, a new trial. *See* Def.'s Mot. at 4–7. Plaintiffs respond that Giuliani's arguments "are foreclosed by the effect of the default judgment . . . [and] by the law of

the case because the Court has already considered and rejected them," and are otherwise waived or fail on the merits.  Pls.' Opp'n at 1.  For the reasons that follow, Giuliani has failed to satisfy the requirements for relief under Rule 50(b) or Rule 59(a), and his motion seeking to "disturb a jury verdict," *Xereas*, 987 F.3d at 1135 (citation omitted), is accordingly denied.[9]

### A.   Plaintiffs' Amended Complaint States a Claim.

Giuliani's first challenge to the Final Judgment "incorporates by reference his arguments in his Motion to Dismiss [] and reargues them," contending that plaintiffs' Amended Complaint fails to state a claim.  Def.'s Mot. at 4 (citation omitted).  This argument fails at the starting gate under the law of the case doctrine.

The "[l]aw-of-the-case doctrine refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided . . . by that court or a higher one in earlier phases."  *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 697 (D.C. Cir. 2022) (alteration in original) (quoting *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995)).  The doctrine reflects that "courts are . . . loathe to reconsider issues already decided, except in the case of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice."  *Sherley v. Sebelius*, 689 F.3d 776, 781 (D.C. Cir. 2012) (quotation marks and citation omitted).  That said, the "doctrine applies only where a prior ruling in the case resolved the same question that a party asks the court to revisit."  *Simon v. Republic of Hungary*, 77 F.4th 1077, 1120 (D.C. Cir. 2023) (citing *Wye Oak Tech., Inc.*, 24 F.4th at 698, and *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999)).

---

[9]   Giuliani states that he also seeks alternative relief, under Federal Rule of Civil Procedure 59(e), "to alter or amend the Final Judgment dated December 18, 2023" "in accordance with the arguments advanced," Def.'s Mot. at 1–2, 8 & n.1, but says nothing more about precisely how he seeks to have the Final Judgment "alter[ed] or amend[ed]," *id.* at 1 n.1, nor even provides a proposed order to clarify any alteration he seeks, as required by the local rules of this Court, *see* D.D.C. LCvR  7(c) ("Each motion . . . shall be accompanied by a proposed order."), leaving no substantive basis for this Court to address such a single-line fragment of a request.

Ordinarily, a prior ruling assessing "the legal sufficiency of [the] complaint" does not control a post-pleading stage assessment that is based on "a developed factual record following a full adversarial hearing." *Id.* (quoting *Wye Oak Tech., Inc.*, 24 F.4th at 697–98) (alteration in original) (quotation marks omitted). This is because the "prior ruling [would have] occurred at a 'distinct procedural' stage of the case," *id.* (quoting *Wye Oak Tech., Inc.*, 24 F.4th at 698)—that is, at the "threshold inquiry into whether the complaint's allegations provide a sufficient basis for the parties to proceed to litigate," *Wye Oak Tech., Inc.*, 24 F.4th at 700—and accordingly would not "resolve[] the same question that a party asks the court to revisit" at the later stage, *Simon*, 77 F.4th at 1120 (citations omitted); *see Wye Oak Tech., Inc.*, 24 F.4th at 700 (rejecting "argument that the Fourth Circuit's ruling qualifies as law of the case" where the "Fourth Circuit's de novo review . . . was a targeted assessment of the legal sufficiency of [plaintiff's] complaint for the purpose of proceeding to discovery," whereas "our consideration of the sovereign immunity question, which stems from our review of the DDC's post-trial judgment" that was based on "a full adversarial hearing of the issues and a developed factual record," "plainly transcends the Fourth Circuit's threshold conclusions").

Applying these principles in the specific context of default judgment on liability presented here, the pleading-stage assessment *does* "resolve[] the same question" this Court is asked "to revisit" post-trial. *Simon*, 77 F.4th at 1120 (citations omitted). The Dismissal Denial Decision held that plaintiffs had plausibly pleaded each element of their three claims. *See* Dismissal Denial Decision, 2022 WL 16551323, at *5. Giuliani's egregious discovery violations, which "significantly prejudiced plaintiffs' abilities to prove their claims," Default Judgment Decision, 2023 WL 5600316, at *18, warranted imposition of the severe sanction of entry of default judgment on liability, establishing his "liability for every well-pleaded allegation in [plaintiffs'

amended] complaint," Pretrial Disputes Decision, 2023 WL 8472723, at *2 (citations omitted), obviating the normal course of litigation requiring that further development of the factual record be undertaken and a full adversarial hearing held on liability.

In this procedural posture, Giuliani's renewed "arguments [from] his Motion to Dismiss," Def.'s Mot. at 4, present the "same question" that this Court decided in its Dismissal Denial Decision, *Simon*, 77 F.4th at 1120 (citations omitted); *accord Sherley*, 689 F.3d at 782–83 (applying law of the case doctrine where "the earlier ruling, though on preliminary-injunction review, was established in a definitive, fully considered legal decision based on a fully developed factual record and a decisionmaking process that included full briefing and argument"). Accordingly, as this Court explained in denying Giuliani's oral Rule 50(a) motion at trial, the law-of-the-case doctrine applies to preclude Giuliani's renewed motion-to-dismiss arguments here. *See* Trial Tr. at 43:3–8 (Dec. 14, 2023, AM) ("[T]o the extent that [Giuliani's counsel] has revived all of his motion-to-dismiss claims as part of his Rule 50 motion, the Court will rest on both its motion-to-dismiss decision as well as its default judgment decision . . . and the law of the case doctrine[.]").  Indeed, Giuliani has identified no "'intervening change of law' or any other basis for concluding that [the] prior decision[] [was] 'clearly erroneous' . . . to merit departing from this doctrine."  Pretrial Disputes Decision, 2023 WL 8472723, at *3 (quoting *Wye Oak Tech., Inc.*, 24 F.4th at 698) (other citations omitted).  Giuliani has offered no basis to disturb this Court's rulings, having "raise[d] nothing new with respect to these issues."  *Robertson v. Cartinhour*, No. 9-cv-1642 (ESH), 2011 WL 1134299, at *1 (D.D.C. Mar. 28, 2011), *aff'd*, 475 F. App'x 767 (D.C. Cir. 2012) (citation omitted).

Giuliani does not pretend otherwise.  Indeed, as he conceded, on the record, this argument is asserted to preserve issues "for purposes of appeal."  Trial Tr. at 37:15 (Dec. 14, 2023, AM);

*see also* Trial Tr. at 151:2–3 (Dec. 13, 2023, PM), ECF No. 146.  Plaintiffs correctly point out, however, that is not the "purpose of a Rule 50(b) motion."  Pls.' Opp'n at 8 (citation omitted). Rule 50(b) is not meant "to rehash decisions that were made pre-trial, but to determine whether the jury verdict was supported by the evidence presented at trial."  *Martin v. Howard Univ.*, No. 99-cv-1175 (TFH), 2006 WL 2850656, at *5 (D.D.C. Oct. 4, 2006), *aff'd*, 275 F. App'x 2 (D.C. Cir. 2008).  Here, as this Court explained at the Rule 50(a) stage, "the evidence presented at trial [] only further established a legally sufficient evidentiary basis for a jury to find for plaintiffs on the three claims they present due to the default judgment."  Trial Tr. at 43:15–18 (Dec. 14, 2023, AM).  Thus, Giuliani has neither raised "ground[s] to reach a different conclusion after trial" to merit judgment as a matter of law, *Novak v. Cap. Mgmt. & Dev. Corp.*, 570 F.3d 305, 312 (D.C. Cir. 2009), nor come close to establishing that the jury "reached a 'seriously erroneous' result" necessitating a new trial under Rule 59(a), *New Breed Logistics*, 783 F.3d at 1066 (citation omitted); *see also Moore v. Hartman*, 102 F. Supp. 3d 35, 65–66, 137 (D.D.C. 2015) (holding that "none of the grounds urged by the plaintiff would constitute error or otherwise warrant upsetting the jury verdict in this case," where "Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple'" (quoting *Sequa Corp.*, 156 F.3d at 144, and citing *Aero Int'l, Inc.*, 713 F.2d at 1113)).

In sum, Giuliani's first argument warrants no relief under either Rule 50(b) or Rule 59(a).

### B.   "Unpleaded" Statements Were Properly Admitted.

Giuliani's next argument—asserted in a bare half paragraph—is that "the unpleaded conduct" on which plaintiffs relied to prove damages at trial "suffers from the same defects as the pleaded conduct" by failing "to properly allege conspiracy . . . [or] actual malice" and alleging only conduct that is "protected opinion." Def.'s Mot. at 4.  This argument, again, merely

regurgitates old challenges already denied for sound reasons, as to which Giuliani offers no new basis to revisit.

At the outset, Giuliani does not identify what specific statements presented to the jury constitute "unpleaded conduct," and merely "incorporates by reference" the objections he raised prior to trial "to the statements not identified in the Complaint." Def.'s Mot. at 4 (citations omitted). At the pretrial conference and at trial, this Court tried to confirm what Giuliani vaguely and broadly described then, as here, as "unpleaded" conduct and determined this consisted of: (1) two Twitter posts by "@TeamTrump" on December 23, 2020, *see* Pretrial Conf. Tr. at 53:8–11, 54:13–20, ECF No. 123; (2) one Twitter post and one Facebook post by Giuliani on December 30, 2020, and January 4, 2021, respectively—all of which were disclosed to Giuliani "prior to the Court's entry of default judgment against [him] on liability on August 30, 2023," Pretrial Disputes Decision, 2023 WL 8472723, at *7 (citation omitted); *see also* Pretrial Conf. Tr. at 55:11–16, 59:22–23, 69:18–20—and (3) 52 pre-December 23, 2020, statements consisting of posts by Giuliani, Donald J. Trump, and the Trump presidential campaign, and a handful of rebroadcasts of Giuliani's *own* defamatory statements, *see* Pretrial Conf. Tr. at 86:7–22; *see also* Trial Tr. at 99:20–100:3, 120:3–6 (Dec. 13, 2023, AM); Trial Tr. at 76:2–6 (Dec. 14, 2023, AM). These three categories of statements were not reproduced *verbatim* in the Amended Complaint but were plainly Giuliani's own statements and statements by persons he stipulated were part of the civil conspiracy that plaintiffs alleged. *See* JPTS at 29–30; First Am. JPTS at 28 (stipulating that "the parties are in agreement that the following individuals or entities were members of the conspiracy: Donald J. Trump, Christina Bobb, and Herring Networks, Inc., d/b/a One America News Network ("OAN"); Robert Herring; Charles Herring; and Chanel Rion"); *see also* Pretrial Conf. Tr. at 83:17–21 (Giuliani's counsel agreeing with Court's observation as to the first two categories that "we're not

talking about . . . a huge volume of other people's statements").  Whether Giuliani reasserts his argument here as to some or all of these categories of statements is unclear and, ultimately, of no matter, since his argument fails.[10]

This Court previously denied Giuliani's pretrial objection that plaintiffs were "limited to proving damages on all claims based only on twelve defamatory statements identified in plaintiffs' Amended Complaint."  Pretrial Disputes Decision, 2023 WL 8472723, at *6 (citation omitted). That ruling was based on the threshold fact that Giuliani had "misrepresent[ed] the scope of allegations pleaded in plaintiffs' Amended Complaint, which . . . throughout, alleged that the defamatory statements extended 'over a period of more than 18 months and continu[ed] even after Plaintiffs initiated this action.'"  *Id.* (quoting Am. Compl. ¶ 5, ECF No. 22, and citing *id.* ¶¶ 12, 17, 137).  As to plaintiffs' defamation claim, Giuliani "ha[d] been on notice since the filing of plaintiffs' Amended Complaint in May 2022, of plaintiffs' allegations regarding Giuliani's ongoing defamatory statements, which 'continu[ed] even after Plaintiffs initiated this action.'"  *Id.* at *7 (alteration in original) (quoting Am. Compl. ¶ 5).  Giuliani "further had the opportunity to contest plaintiffs' damages evidence well before the entry of default judgment" on August 30, 2023, since he was "put on notice of plaintiffs' intent to prove damages relating to statements included in reports by plaintiffs' expert, Dr. Ashlee Humphreys, whose first report was served on Giuliani on July 28, 2023[.]"  *Id.* at *7 (citations omitted).  As to proof of damages on plaintiffs' IIED claim, this Court further held that plaintiffs were permitted to "prove damages . . . based on

---

[10]     Plaintiffs urge this Court to reject Giuliani's argument about "unpleaded" statements generally, and pre-December 23, 2020, statements in particular, which at the Rule 50(a) stage, Giuliani contended required a "statement-by-statement analysis," because Giuliani "never made the argument at any point prior to his Rule 50(a) Motion and, when he raised the argument during the Rule 50(a) Motion, he failed to provide the requisite factual and legal basis the law requires."  Pls.' Opp'n at 9–10 (citations omitted); *see* Trial Tr. at 37:2–3 (Dec. 14, 2023, AM).  Although Giuliani's objection is far from a model of clarity, he sufficiently raised a form of this objection pretrial to prompt consideration in the Pretrial Disputes Decision, 2023 WL 8472723, at *6–8.

statements pleaded or incorporated by reference in [their] Amended Complaint that were addressed and thereby disclosed to Giuliani in [Dr. Humphreys'] reports," *id.*, which included "pre-December 23rd [2020] emotional harm statements," Pretrial Conf. Tr. at 85:25–86:9; *see* Trial Tr. at 99:17–22 (Dec. 13, 2023, AM) (Dr. Humphreys testifying that she examined 52 emotional harm statements between December 3 and December 22, 2020).  Giuliani had fair and ample notice of the statements he challenged as "unpleaded," not only because he was the person making most of them, but also because plaintiffs' IIED claim was "based on the 'course of conduct causing [them] extreme mental distress,'" and "rest[ed] on broader allegations than only the twelve defamatory statements Giuliani identifies."  Pretrial Disputes Decision, 2023 WL 8472723, at *6 (cleaned up) (citation omitted); *see also* Dismissal Denial Decision, 2022 WL 16551323, at *5.

At the Rule 50(a) stage, this Court reaffirmed this pretrial ruling that plaintiffs were permitted to prove damages based on statements not expressly presented *verbatim* in their Amended Complaint, denying Giuliani's oral motion for directed verdict "on the fact that the unpleaded statements that the Court allowed in . . . are protected opinion, protected under the First Amendment, and failed to adequately plead actual malice[.]"  Trial Tr. at 34:15–21, 35:2–37:6, 43:3–8, 45:14–46:2 (Dec. 14, 2023, AM).  These  objections were the same ones Giuliani previously unsuccessfully asserted that were rejected in the Dismissal Denial Decision, *id.* at 36:17–225, which had become law of the case, *id*. at 43:3–14.  This Court further found that "the evidence presented at trial [] only further established a legally sufficient evidentiary basis for a jury to find for plaintiffs on the three claims they present due to the default judgment," *id.* at 43:15–18, including "powerful testimony of [] Georgia officials demonstrat[ing] that [the] statements made by Mr. Giuliani and his co-conspirators, again and again and again—up to the first day of trial in this case . . . [were] false," *id.* at 44:9–13.

Giuliani does not dispute the factual bases of this Court's rulings, including that the "unpleaded" statements consisted entirely of statements or rebroadcasts of statements made by Giuliani, Trump, or the Trump campaign, and thus were of a piece with the statements specifically pleaded in plaintiffs' Amended Complaint that this Court held were sufficiently pleaded. *See* Dismissal Denial Decision, 2022 WL 16551323, at *5; Trial Tr. at 35:12–24, 36:17–25 (Dec. 14, 2023, AM); *see also* Pretrial Conf. Tr. at 86:7–22. Moreover, these challenged statements, while not pleaded *verbatim* in the Amended Complaint, were certainly relevant to establishing plaintiffs' entitlement to damages for defamation and emotional distress from Giuliani and his co-conspirators' defamatory statements. *See* Trial Tr. at 43:15–44:23 (Dec. 14, 2023, AM). Simply put, Giuliani does not offer *any* reason why this Court should depart from its prior rulings and overrule the jury's considered verdict on this issue.

### C. Plaintiffs' Damages Are Not Based on Time-Barred Statements.

Giuliani next argues that "[a]ll of the so-called 'emotional harm' statements that Plaintiffs based their IIED claims on at trial were . . . made more than one year before suit was filed," Def.'s Mot. at 5, and, consequently, "[d]efendant is entitled to judgment as a matter of law on the IIED claims on limitations ground," *id.* This reasoning is predicated on well-settled law in the District of Columbia that when the facts giving rise to an IIED claim, which has "no prescribed statute of limitations," are "intertwined" with the facts of a cause of action with a specified statute of limitations, the IIED claim is also subject to the same statute of limitations. *Browning v. Clinton*, 292 F.3d 235, 244 (D.C. Cir. 2002) (applying one-year prescribed period for defamation to intertwined claim for tortious interference with business expectancy, which has "no prescribed statute of limitation," where "conduct [plaintiff] characterizes as defamatory . . . forms the sole basis for her tortious interference claim" (citing *Mittleman v. United States*, 104 F.3d 410, 415–17

(D.C. Cir. 1997))); *see also  Jovanovic v. U.S.-Algeria Bus. Council*, 561 F. Supp. 2d 103, 114 (D.D.C. 2008) (concluding that the plaintiff's IIED claim was subject to a one-year statute of limitations because it was "dependent on the same personal interests purportedly infringed by [defendant's] alleged defamation of Plaintiff" and thus was "intertwined" with plaintiff's defamation claim (quotation marks and citations omitted)); *Allen v. Nat'l All. of Postal & Fed. Emps.*, No. 93-cv-869 (LFO), 1994 WL 151213, at *2 (D.D.C. Apr. 15, 1994) ("Because this [IIED] claim appears to be based on plaintiff's defamation claim, the statute of limitation is also one year." (citation omitted)).

Here, plaintiffs dispute that their IIED claim is "intertwined" with their defamation claim and thus subject to the same one-year limitations period, contending that this "Court previously reached the opposite conclusion" when "holding that the claims require different elements of proof and that Plaintiffs sufficiently 'pleaded their IIED claim based on the course of conduct causing Plaintiffs extreme mental distress.'"  Pls.' Opp'n at 14 (quoting Pretrial Disputes Decision, 2023 WL 8472723, at *7, and citing Dismissal Denial Decision, 2022 WL 16551323, at *10).  Plaintiffs are mixing apples and oranges: findings that "IIED is a separate and distinct tort from defamation," Dismissal Denial Decision, 2022 WL 16551323, at *10, and that plaintiffs sufficiently "pleaded their IIED claim based on the course of conduct causing Plaintiffs extreme mental distress," Pretrial Disputes Decision, 2023 WL 8472723, at *7 (citation, quotation marks, and brackets omitted), are distinct and different issues from the question of what limitations period applies to such a claim.  Thus, contrary to plaintiffs' contention, this Court did not resolve the specific issue raised by Giuliani here.  Plaintiffs cannot so easily gloss over the fact that the allegations giving rise to their IIED claim—*i.e.*, Giuliani and his co-conspirators' publication and republication of false and defamatory statements about them—are the same as those underlying their defamation

claim. *Compare* Am. Compl. ¶ 165 (defamation claim alleging that "Giuliani published, caused to publish, or reasonably could have foreseen the publication of a series of false and defamatory statements of fact about Ms. Freeman and Ms. Moss"), *with id.* ¶ 179 (IIED claim alleging that "Giuliani's campaign of false and defamatory accusations directed specifically at Ms. Freeman and Ms. Moss was malicious, wanton, and intentional"). Consequently, Giuliani is correct that plaintiffs' IIED claim is subject to the same statute of limitation period as their defamation claim. *See, e.g.*, *Bond v. U.S. Dep't of Just.*, 828 F. Supp. 2d 60, 78 (D.D.C. 2011) (holding plaintiff's "IIED claim stems directly from the harm to his reputation and emotional state that the alleged defamation caused" and accordingly "is subject to the one-year limitations period"); *Jovanovic*, 561 F. Supp. 2d at 114 (IIED claim barred by one-year statute of limitations applicable to defamation claim, where plaintiff's IIED claim "alleges only that Plaintiff suffered severe emotional distress upon reading the allegedly false statements in the September 2004 Correspondence . . . and is therefore dependent on the same personal interests purportedly infringed by [defendant's] alleged defamation of Plaintiff" (quotation marks and citation omitted)).

That Giuliani is correct about the defamation and IIED claims being intertwined and subject to the same statutory limitations period does not mean he prevails on this issue to limit the damages of $20,000,000 to each plaintiff awarded by the jury on their IIED claim, *see* Verdict Form—and the reason he does not prevail is due to his own course of litigation conduct in failing to comply with his discovery obligations. Giuliani made an expensive choice when he decided not to preserve and produce any meaningful relevant and responsive information during discovery.

Plaintiffs are correct that the Default Judgment Decision precludes the affirmative limitations defense, since the entry of default judgment against Giuliani as a discovery sanction "had the effect of striking Defendant Giuliani's answer and affirmative defenses," Pls.' Opp'n at

27

13, "leaving as the only question—as far as liability is concerned—whether Plaintiffs' allegations stated a plausible claim for relief on the face of the Amended Complaint," *id.* As to plaintiffs' claims, this Court held in its Dismissal Denial Decision that plaintiffs' allegations supported plausibly pleaded claims of defamation, IIED, and civil conspiracy to proceed to discovery. *See* Dismissal Denial Decision, 2022 WL 16551323, at *11; *see also* Pretrial Disputes Decision, 2023 WL 8472723, at *2 ("The consequence of default due to Giuliani's failure to preserve and produce his communications with others . . . is that the well-pled allegations in the complaint and all inferences that may reasonably be drawn from those allegations are deemed to be true[.]" (quotation marks and citations omitted)). Giuliani's effort to dismiss the IIED claim as time-barred fails since this affirmative defense was excluded as a by-product of entry of default judgment against him. *See Wood v. Milyard*, 566 U.S. 463, 470 (2012) ("An affirmative defense, once forfeited, is 'exclu[ded] from the case.'") (alteration in original) (quoting Charles Alan Wright et al., 5 FED. PRAC. & PROC. CIV. § 1278 (3d ed. 2004)).

This conclusion is predicated on well-settled law that a defendant's conduct may result in waiver or forfeiture of an affirmative defense resting on a statute of limitations. A defendant may, for example, deliberately waive a limitations defense when, though being aware of such a defense, "intelligently chooses not to rely on it in the court of first instance," *Wood*, 566 U.S. at 466 (citing *Day v. McDonough*, 547 U.S. 198, 202, 210, n. 11 (2006)), or may forfeit this defense by not raising it "in a defendant's answer or in an amendment thereto," *id*. at 470 (quoting *Day*, 547 U.S. at 202); *see also Corley v. Dep't of Just.*, 998 F.3d 981, 988 (D.C. Cir. 2021) ("'[W]aiver is the intentional relinquishment or abandonment of a known right' and cannot be the product of 'inadvertent error.'" (quoting *Wood*, 566 U.S. at 474)). When a statutory time limitation is, as here, non-jurisdictional, the Supreme Court has cautioned courts not "to bypass, override, or

28

excuse a [] deliberate waiver of a limitations defense," *Wood*, 566 U.S. at 466 (citation omitted),

but has permitted judicial consideration, even raised *sua sponte*, of an otherwise forfeited

limitations defense only in "distinct and narrow circumstances in which the judiciary's own

interests are implicated and the forfeiting party is present in the litigation," *Maalouf v. Islamic*

*Republic of Iran*, 923 F.3d 1095, 1109–12 (D.C. Cir. 2019) (identifying, from Supreme Court

precedent, circumstances "squarely implicat[ing] the institutional interests of the judiciary,"

including "promot[ing] judicial efficiency and conservation of judicial resources" and comity

principles that "foster[] respectful, harmonious relations between the state and federal judiciaries"

(citations omitted)).

In *Maalouf*, the D.C. Circuit concluded that an absent foreign sovereign defendant, who by

failing to appear had engaged in "a purportedly willful default," had forfeited, rather than waived,

an affirmative limitations defense.  *Id*. at 1108.  Nonetheless, the Circuit found that the district

court had erred by *sua sponte* invoking the limitations defense since none of the "very narrow

exceptions that may exist when certain institutional interests of the judiciary are implicated and

both parties are present in the litigation," was present.  *Id.* at 1111–12 (concluding that "no []

authority exists for a federal court to raise the [Foreign Sovereign Immunities Act] terrorism

exception's statute of limitations on behalf of an entirely absent defendant" since "[u]nlike in the

[Antiterrorism and Effective Death Penalty Act] context or in the case of a *res judicata* defense,

no institutional interests of the judiciary are implicated when a § 1605A claim against an absent

defendant proceeds to a default judgment, regardless of who the defendant is or how much time

has passed since the terrorist act giving rise to the action took place").

Set against this legal backdrop, Giuliani arguably waived any affirmative limitations

defense as a straightforward and inevitable consequence of his decision to "repeatedly flout[] basic

preservation and production duties, frustrating plaintiffs' procedural rights to obtain any meaningful discovery in this case," Jury Trial Decision, 2023 WL 8360664, at *2 (citation omitted), and thereby "severely hamper[ing]" plaintiffs from "proving that Giuliani acted intentionally or recklessly," Default Judgment Decision, 2023 WL 5600316, at *16.  He did, however, assert a statute-of-limitations affirmative defense in his responsive pleading to plaintiffs' Amended Complaint, *see* Answer ¶ 194 ("Plaintiffs' claims are barred in whole or in part by the applicable statute of limitations"), and did allude, albeit without legal citation during his counsel's oral Rule 50(a) motion, that certain statements were time-barred and could not be used to support plaintiffs' IIED claim, *see* Trial Tr. at 37:7–12 (Dec. 14, 2023, AM) (Giuliani's counsel arguing, "there is case law that I am familiar with that says you can't repackage what is really a defamation claim in the form of an IIED claim and then try to avoid limitations").  Even if these minimal assertions were sufficient to defeat a waiver finding, the record in this case firmly supports Giuliani's forfeiture of any limitations affirmative defense.[11]

The Default Judgment Decision had the effect of striking Giuliani's affirmative defenses to liability in his Answer.  *See, e.g.*, *In re Est. of Ferdinand E. Marcos Hum. Rts. Litig.*, 978 F.2d 493, 495 n.2 (9th Cir. 1992) (refusing to consider defendant's challenge to default judgment based on affirmative statute of limitations defense because it "was waived by virtue of her default"); *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992) (for post-default assessment of damages, rejecting defendant's argument that it "should have been

---

[11]     Plaintiffs further argue that Giuliani waived his statute-of-limitations defense by raising this issue in his oral Rule 50(a) motion both "too late" in this litigation and with insufficient reasoning and citation to preserve this defense. Pls.' Opp'n at 10–13.  Certainly, after brief mention of the limitations affirmative defense in his Answer, *see* Answer ¶ 194, Giuliani seemed to drop it until making a general reference to it in an oral Rule 50(a) motion.  As the Court acknowledges, the spare attention given to this issue by Giuliani may be enough to warrant a finding of waiver, but a finding of forfeiture of the limitations affirmative defense has even firmer foundation here given the Default Judgment Decision.

permitted to introduce evidence of [plaintiff's] comparative negligence," which argument "effectively contests settled issues of liability" and, "[i]f accepted . . . would undermine . . . the general policy governing default"); *S.E.C. v. Amerindo Inv. Advisors*, 639 F. App'x 752, 754 (2d Cir. 2016) ("[T]he statute of limitations defense was abandoned by their failure to appear and assert that defense." (citation omitted)); *Rubicon Glob. Ventures, Inc. v. Chongquing Zongshen Grp. Imp./Exp. Corp.*, 630 F. App'x 655, 657–58 (9th Cir. 2015) (holding defendants could not later raise res judicata "as an affirmative defense [to reinstating prior default judgments] when they had defaulted in those cases") (citing FED. R. CIV. P. 8(c)); *Doe v. Constant*, 354 F. App'x 543, 545 (2d Cir. 2009) (summary order) (affirming entry of default judgment and noting that "timeliness . . . is an affirmative defense that may be forfeited or waived" (citing *United States v. Walsh*, 700 F.2d 846, 855–56 (2d Cir. 1983)); *McKinnon v. Kwong Wah Rest.*, 83 F.3d 498, 505–06 (1st Cir. 1996) ("The defendants in the instant case, through their default, waived their right to raise the issue that they were not named in the complaint to the [Equal Employment Opportunity] Commission."); *United States v. Barron*, No. 22-cv-1682, 2023 WL 6326785, at *2 (N.D. Tex. Sept. 27, 2023) ("[D]efendants effectively waived the affirmative defense by choosing to not participate in this case[.]"); *Lim v. Boone*, No. 20-cv-167, 2021 WL 7259038, at *2 (D. Wyo. June 8, 2021) ("Defendants waived their statute of limitations affirmative defense by defaulting.").

Giuliani's failure to participate in discovery in any meaningful way forfeited any affirmative defense presented in his Answer and now precludes him from raising his statute of limitations affirmative defense to plaintiffs' IIED claim. Concluding otherwise would run counter to common sense principles that a defendant against whom default judgment has been entered as a sanction for blatant and persistent discovery misconduct will not be rewarded with the preservation of pre-default affirmative defenses to liability. Indeed, Giuliani's counsel conceded

this consequence at the Rule 50(a) stage, acknowledging that this Court had "stricken [Giuliani's] answer," and he was nevertheless renewing the defense "for purposes of appeal."  Trial Tr. at 37:14–16 (Dec. 14, 2023, AM).  Giuliani has made absolutely no effort to show that allowing consideration of a limitations defense in this case fits within permissible "narrow exceptions," *Maalouf*, 923 F.3d at 1109–11, or would otherwise serve *any* judicial "institutional interests," *id.* To the contrary, allowing a defendant, who has engaged in flagrant discovery abuses sufficient to trigger entry of default judgment, to nonetheless preserve and assert affirmative defenses would undermine, rather than incentivize and enforce compliance with, the civil procedural rules guiding discovery.

In short, Giuliani forfeited his affirmative defenses by failing to participate in discovery, with the result that his statute of limitations challenge to plaintiffs' IIED claim, and evidence supporting that claim, is denied.

### D.  Expert Testimony Was Not Required to Prove Plaintiffs' IIED Damages.

Giuliani contends, in a short two-paragraph argument, that he is "entitled to judgment as a matter of law" because plaintiffs failed to "have an expert testify as to how much of their emotional harm was caused by Giuliani as opposed to other sources that pre-dated Giuliani's alleged conduct."  Def.'s Mot. at 6 (citation omitted).[12]  This contention falls flat, given the well-settled

---

[12]     Insofar as Giuliani attempts to renew his causation defense as to liability by arguing that plaintiffs must "prove the extent that Giuliani's conduct proximately caused them harm," Pretrial Disputes Decision, 2023 WL 8472723, at *3 (quotation marks and citation omitted), "that argument is barred by the Default Judgment Order," Pls.' Opp'n at 18 n.16.  As this Court held in denying that argument prior to trial, "proximate cause—going to liability—is completely and irrefutably established upon the defendant's default," with the result that "proximate causation with respect to Giuliani's liability on plaintiffs' claims . . . is no longer an issue in this case."  Pretrial Disputes Decision, 2023 WL 8472723, at *3 (quoting *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 159).  By operation of the Default Judgment Order, Giuliani's license to argue causation is limited to "the ministerial calculation of damages," *id.* (quoting *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 159), as this Court instructed the jury, *see* Jury Instr. at 8 ("By finding Mr. Giuliani liable for plaintiffs' claim for intentional infliction of emotional distress, the Court already has determined that his actions caused each plaintiff to suffer severe emotional distress.  Your job is to quantify that

law in this Circuit that a plaintiff's testimony, standing alone, may support a claim for damages for emotional distress, where, as here, no proof of physical harm is required. *See, e.g.*, *Arias v. DynCorp*, 752 F.3d 1011, 1017 (D.C. Cir. 2014) (opining that "we see no reason why expert testimony should be necessary to prove these claims," including for intentional infliction of emotional distress which does not "require[] proof of physical harm," and finding that "the district court erred in dismissing these claims—at least on the basis of a failure to produce expert testimony" (citations omitted)); *Daskalea v. District of Columbia*, 227 F.3d 433, 444 (D.C. Cir. 2000) (finding that "no expert testimony was required to bolster that of [plaintiff] and her witnesses, or to show the causal link between her treatment in prison and her injuries," which included "insomnia and eating disorders, and [] months [spent] emotionally and psychologically debilitated, withdrawn, and depressed" (citing approvingly *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1251 (4th Cir. 1996) ("A survey of the case law reveals that a plaintiff's testimony, standing alone, may support a claim of emotional distress precipitated by a constitutional violation.") (collecting cases))); *Hobson v. Wilson*, 737 F.2d 1, 62 (D.C. Cir. 1984), *overruled in part on other grounds by Leatherman v. Tarrant Cty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993) ("[T]he factfinder may measure plaintiff's testimony in light of the surrounding circumstances, and in proper circumstances award damages on the basis of plaintiff's testimony. In reaching its conclusion, the court or jury may consider, as elements of compensable injury for emotional distress, humiliation and personal indignity, emotional pain, embarrassment, fear, anxiety and anguish." (citations omitted)); *see also Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 546 (4th Cir. 2003) ("We have held that a plaintiff's testimony, standing alone, can

---

harm."); *see also id.* at 6 ("By finding Mr. Giuliani liable for plaintiffs' claim for defamation, the Court already has determined that his statements harmed plaintiffs. Your job is to quantify that harm.").

support an award of compensatory damages for emotional distress." (citation omitted)); *Hudson v. Am. Fed'n of Gov't Emps.*, No. 17-cv-2094 (JEB), 2021 WL 5083436, at *8 (D.D.C. Nov. 2, 2021), *aff'd*, No. 21-7133, 2022 WL 15798719 (D.C. Cir. Oct. 28, 2022) ("[A] plaintiff's own testimony is sufficient to establish emotional-distress damages." (citing *Daskalea*, 227 F.3d at 444, and *Bryant*, 333 F.3d at 546)); *Winstead v. District of Columbia*, 720 F. Supp. 2d 44, 51 (D.D.C. 2010) (concluding "there is no support for defendants' contention that the plaintiff must offer expert medical testimony or medical records to prove actual injury proximately caused by violations of [constitutional] rights," since "mental suffering and emotional anguish may be evidenced by one's conduct and observed by others" (alteration in original) (quotations and citations omitted)); *Robertson v. District of Columbia*, No. 01-cv-1405 (DAR), 2005 U.S. Dist. LEXIS 11754, at *9 (D.D.C. June 8, 2005) (describing "as entirely specious" defendant's complaint about lack of evidence with respect to damages, crediting testimony of plaintiff and her daughter, and noting that "[t]he District of Columbia Circuit has held that expert testimony is not required to prove damages for injuries such as humiliation, anguish and suffering, or to show the causal link between the conduct which was the subject of the civil action and the plaintiff's injuries" (citing *Daskalea*, 227 F.3d at 444)).[13]

---

[13]     As support for his position, Giuliani relies on case law for the proposition that "expert testimony is necessary . . . 'in cases presenting medically complicated questions due to multiple and/or preexisting causes,'" Def.'s Mot. at 5–6 (quoting *Baltimore v. B.F. Goodrich Co.*, 545 A.2d 1228, 1231 (D.C. 1988), and citing *Halcomb v. Woods*, 610 F. Supp. 2d 77 (D.D.C. 2009), and *Gray Line, Inc. v. Keaton*, 428 A.2d 360 (D.C. 1981)), but neither the proposition nor the caselaw he cites applies here. First, the record here contains no evidence of "preexisting causes" of plaintiffs' injuries that would raise "medically complicated questions" requiring expert medical testimony to isolate and properly identify the cause of plaintiffs' emotional distress. *Id.* To the contrary, the factual record here is clear that plaintiffs had no "preexisting" emotional distress prior to Giuliani and his co-conspirators' conduct at issue. Prior to December 3, 2020, when Giuliani made his first defamatory statement about plaintiffs, *see* Trial Tr. at 34:10–15 (Dec. 12, 2023, PM), Moss was not anxious "at all," had not experienced panic attacks or trouble sleeping, and had never seen a therapist or been prescribed medication for mental health, *see* Trial Tr. at 61:13–62:4, 64:10–12, 65:13–21, 67:7–13, 85:19–86:1 (Dec. 12, 2023, AM), ECF No. 154; Trial Tr. at 69:25–70:1 (Dec. 12, 2023, PM), which emotional situation "changed" on December 3, 2020, and since that date, Moss has become "this whole new messed-up person," *id.* at 61:22–62:4 (Dec. 12, 2023, AM). Freeman similarly testified that since December 3, 2020, she has been "on an

Giuliani's bold assertion that "no competent evidence of emotional distress," Def.' Mot. at 5 (capitalization omitted) was presented at trial, is belied by each plaintiff's credible and detailed testimony about the "mental pain and suffering, fear, inconvenience, nervousness, indignity, insult, humiliation, or embarrassment . . . [they] suffered because of Mr. Giuliani and his co-conspirators' conduct," Jury Instr. at 8.  Freeman testified that she "was terrorized" after she began receiving "[h]undreds" of threatening messages and "people started coming to [her] house," Trial Tr. at 115:13–16, 125:5–6, 126:3–4 (Dec. 13, 2023, PM); that she was "scared [that] people [were] coming to kill" her, *id.* at 120:8–9; and that as a result of this harassment, she was fearful "every time" she had to "use [her] name," *id.* at 137:18–20, with the result that, by the time of trial, Freeman felt she no longer "ha[d] a name really," *id.* at 138:17–18.

Moss similarly testified that "every single aspect of [her] life has changed" and she is "not even that same person" she was before the onslaught of threats and harassment precipitated by Giuliani and his co-conspirators' conduct.  Trial Tr. at 49:18–21 (Dec. 12, 2023, AM).  Moss stated that she "instantly felt like a pariah in the office" and "would often have panic attacks," *id.* at

---

emotional roller coaster from one day to the next," Trial Tr. at 144:22–23 (Dec. 13, 2023, PM), and has been unable to go anywhere with her name, to the point where "it's like [she] doesn't] have a life," *id.* at 146:16–18.

    Second, the cases cited are likewise inapposite.  In *Halcomb*, 610 F. Supp. 2d 77, for example, expert testimony was required "to ensure that the jury was not left to speculate as to [the] cause or causes" of plaintiff's emotional distress, which was "potentially traceable to at least three different sources," including an unrelated "employment discrimination suit . . . filed prior to her arrest and detention," where plaintiff testified that the "suit and the events giving rise to it inflicted upon her 'a devastating loss of enjoyment of life' and 'substantial emotional pain and anguish.'"  *Id.* at 85–86 & n.9 (citation omitted).  No such preexisting source of emotional distress is present as to plaintiffs here.  Similarly inapposite is *B.F. Goodrich Company*, 545 A.2d 1228, where expert testimony was necessary to establish that "the accident [at issue] played a substantial part in bringing about" plaintiff's premature retirement due to "depression, anxiety and related pain" where the evidence showed "multiple preexisting and concurrent possible causes" of plaintiff's disability, including his "preexisting depression anxiety," "preexisting hypertension," and "preexisting arthritis."  *Id.* at 1231–34.  Again, no such preexisting source of emotional distress is present as to plaintiffs here.  Giuliani's citation to *Gray Line, Inc.*, 428 A.2d 360, which addressed a negligence claim for a back injury, is no more helpful, since the record in that case likewise "present[ed] medically complicated questions due to multiple and/or preexisting causes" of plaintiff's injury, *B.F. Goodrich Co.*, 545 A.2d at 1231 (citations omitted); *see Gray Line, Inc.*, 428 A.2d at 362–63 (holding "medical testimony" required to establish "that the particular collision [plaintiff] had with [defendant's] bus directly caused permanent injury to her back," where plaintiff had been in another collision "less than two months" after, and "had incurred a back injury" both before and after the incident).

53:18–24; that it was "very hard for [her] to remain professional and not break down, not cry," *id.*
at 54:2–4; and that she eventually "pushed everybody away" and "just secluded" herself because
she didn't want others "to feel how I feel and go through what I go through every day," *id.* at
63:15–64:1, resulting in a "pattern of cry, eat, sleep, cry, eat, sleep," *id.* at 64:19–20.

Plaintiffs' IIED "injuries are hardly surprising or unexpected in light of the abuse [they]
suffered" as a result of Giuliani and his co-conspirators' defamatory statements, *Daskalea*, 227
F.3d at 444, and no expert was necessary "to confirm the jury's common sense with respect to both
the[] existence and cause," of the distress they described, *id* (denying motion for a new trial on
compensatory damages award and holding "no expert testimony was required to . . . show the
causal link between [plaintiff's] treatment in prison and her injuries" given "unrebutted evidence"
about plaintiff's treatment and her own testimony about the emotional distress she suffered
(citation omitted)); *see also David v. District of Columbia*, No. 02-cv-1145 (RWR), 2006 WL
1582277, at *2 & n.1 (D.D.C. June 6, 2006) (denying renewed motion for judgment as a matter of
law since plaintiff "presented sufficient evidence at trial for a reasonable jury to find that she
suffered serious and verifiable emotional distress caused by [defendant's] negligence," even
though "[n]o expert testimony was offered at trial to substantiate [plaintiff's] emotional distress").

Without citing or grappling with the strong binding Circuit precedent on this issue and the
credible testimony of both plaintiffs at trial, Giuliani insists that an expert was "necessary" to
"testify as to how much of their emotional harm was caused by Giuliani as opposed to other sources
that pre-dated Giuliani's alleged conduct," pointing, specifically, to "The Gateway Pundit." Def.'s
Mot. at 6; *id.* (describing The Gateway Pundit as "the first to identify Plaintiffs by name, first to
report the defamatory allegations, and that Plaintiffs sued that publication *prior* to suing Giuliani"

(emphasis in original)).[14]   Giuliani stops short of identifying precisely the type of expert he believes was "necessary," whether a medical or psychological expert or some other sort of expert to track the reach and spread of The Gateway Pundit's publication of defamatory statements versus Giuliani's publications, for purpose of assigning accountability for the emotional distress, perhaps because no such expert exists to perform the task Giuliani purports to demand.   In any event, no expert is required, even if multiple factors may contribute to a plaintiff's emotional distress. Identifying those various factors is the job of the adversarial system, and making the best estimate of accountability is the job of the jury.   As now Chief Judge Boasberg has eloquently explained in rejecting a defendant's demand that expert testimony was required for any emotional distress damages "because other events in [plaintiff's] life . . . could explain any distress he experienced at the time," "[e]motional distress can often be plausibly attributed to something else—trouble at work, marital strife, a relative's death.   Yet we trust the jury to untangle such causal knots." *Hawkins v. Dist. of Columbia*, No. 09-cv-1831 (JEB), 2013 WL 12338621, at *1–2 (D.D.C. June 20, 2013).

Indeed, at trial, Giuliani used the opportunity, through cross examination, to elicit facts about The Gateway Pundit, *see supra* n.14, and argue to the jury his objection that not all of

---

[14]        As alleged in plaintiffs' Amended Complaint and confirmed by evidence elicited on cross-examination by Giuliani's counsel at trial, The Gateway Pundit first published an article accusing plaintiffs of engaging in election fraud on December 3, 2020, the same day that Giuliani made his first defamatory statement about plaintiffs.  *See* Am. Compl. ¶ 6 ("On December 3, 2020, the Trump campaign published an excerpted clip from State Farm Arena security camera video showing grainy images of Ms. Freeman and Ms. Moss . . . counting ballots (the 'Trump Edited Video'). Defendant Giuliani re-published the Trump Edited Video on his Twitter account that afternoon."); Trial Tr. at 78:1–3 (Dec. 12, 2023, PM) (Moss testifying that "the first *Gateway Pundit* story," for which plaintiffs brought suit, was published December 3, 2020); Trial Tr. at 109:6–11 (Dec. 13, 2023, PM) (Freeman testifying that Giuliani's "first video came out" on December 3, 2020); *see also* Second Am. Pet. ¶ 45, *Freeman et al. v. James Hoft et al.*, No. 2122-cc-9815-01 (Mo. 22nd Jud. Cir. Jan. 10, 2023) ("That same day, December 3, 2020, *The Gateway Pundit* published its first article disseminating the same Trump Edited Video.").  Giuliani than proceeded to repeat those statements, including through the launch of a "Strategic Communications Plan . . . designed to overturn the 2020 election" that "identified Ms. Freeman and Ms. Moss by name," Am. Compl. ¶¶ 9–10 (emphasis omitted), from December 3, 2020 "throughout 2021 and into 2022, including after Plaintiffs initiated this action," *id.* ¶ 12.

plaintiffs' "emotional harm was caused by [him] as opposed to other sources that pre-dated Giuliani's alleged conduct."  Def.'s Mot. at 6 (citation omitted).  This defense position was highlighted in closing argument when Giuliani's counsel stated that while he harbored "no doubt that Mr. Giuliani's statements . . . caused harm," "just because these things happened, and they certainly did happen, it doesn't make my client responsible for them[.]"  Trial Tr. at 101:7–13 (Dec. 14, 2023, AM).  Giuliani's counsel again specifically identified The Gateway Pundit as a contributing cause of plaintiffs' emotional distress, arguing, "[t]he kind of people that are looking at these sort of fringe media sites like *The Gateway Pundit*, those are the kind of people who are more likely to do the kind of things—all of the kind of things that we saw here."  *Id.* at 100:23– 101:2.  Evaluating this argument and all of the evidence introduced to inform the quantification damages on plaintiffs' IIED claim is precisely the sort of determination to be made by the jury. *See Alkire v. Marriott Int'l, Inc.*, No. 03-cv-1087, 2007 WL 1041660, at *9 (D.D.C. Apr. 5, 2007) ("[t]ranslating legal damage into money damages . . . is a matter purely within a jury's ken" (alteration in original) (quoting *Ruiz v. Gonzalez Caraballo*, 929 F.2d 31, 34 (1st Cir. 1991)).

As this Court found in rejecting Giuliani's argument at the Rule 50(a) stage, "a reasonable jury would have a legally sufficient evidentiary basis to find for the plaintiffs," Trial Tr. at 45:20– 25 (Dec. 14, 2023, AM), given "all of the evidence presented by plaintiffs, including their own testimony describing what they have been through since Mr. Giuliani and his co-conspirators seized on and spread lies about their conduct on election night in 2020," *id.* at 45:14–18.  Giuliani presents no reason for this Court to revisit its Rule 50(a) ruling, and has fallen well short of establishing that the evidence presented of plaintiffs' emotional distress damages, including each

plaintiff's testimony, was legally or factually flawed to meet the demanding standard, under Rule 59(a), for a new trial.[15]

### E.  Testimony of Two Witnesses Challenged By Giuliani Was Properly Admitted.

Finally, Giuliani contends, in another two-paragraph argument, that the testimony of two of plaintiffs' witnesses, Regina Scott and Dr. Ashlee Humphreys, should have been stricken. Def.'s Mot. at 6–7.  Regina Scott, a senior consultant and team leader with the "security risk and consulting firm" Jensen Hughes, testified about Jensen Hughes' monitoring of online statements and threats made about plaintiffs, Trial Tr. at 47:16–23, 69:6–24 (Dec. 11, 2023, PM), ECF No. 145, and Dr. Ashlee Humphreys, a professor at Northwestern University specializing in social media marketing, testified about "the reputational harm" caused by Giuliani and his co-conspirators' statements and "provid[ed] an estimate for [a] reputational repair campaign" using an "impressions" model, which involved "measur[ing] the reach of the statements that were at issue in the case," Trial Tr. at 27:2–12, 34:21–35:2, 39:23–40:6 (Dec. 13, 2023, AM).  Giuliani

---

[15]    Plaintiffs contend that "Giuliani has waived the right to argue that the Plaintiffs were required to prove IIED damages with expert testimony," first, "because he did not make that argument with respect to jury instructions on Plaintiffs' burden," Pls.' Opp'n at 16 (citing FED. R. CIV. P. 51(b), (c)), and, second, to the extent Giuliani raised an objection at the Rule 50(a) stage, he limited his argument about the necessity of expert testimony to *future* emotional distress damages, *see* Trial Tr. at 37:21–25 (Dec. 14, 2023, AM), and argues now "for the first time that Plaintiffs were obligated to proffer expert testimony for purposes of establishing past emotional harm," Pls.' Opp'n at 15. Parsing the specific word choices of what Giuliani argued, or not, in his Rule 50(a) motion has limited usefulness when the Court is also confronted with a Rule 59(a) motion.  While "Rule 50(b) permits only the 'renewing' of arguments made in prior Rule 50(a) motions," *Campbell v. Dist. of Columbia*, 894 F.3d 281, 286 (D.C. Cir. 2018) (citations omitted), this restriction does not apply to a Rule 59(a) motion, *see* 9B Charles Alan Wright et al., 11 FED. PRAC. & PROC. CIV. § 2537 (3d ed. 2023 Update) ("[I]f the verdict winner's evidence was insufficient as a matter of law but no motion for judgment as a matter of law was made under Rule 50(a), even though the district court cannot grant judgment as a matter of law under Rule 50(b) for the party against whom the verdict is rendered, it can set aside the verdict and order a new trial." (citations omitted)); *Falto De Roman v. Mun. Gov't of Mayaguez*, 46 F.4th 51, 55–56 (1st Cir. 2022) (finding motion for new trial "preserved" even when plaintiff "failed to move for judgment before her case was submitted to the jury" resulting in waiver of "her Rule 50(b) motion").  All this means is that, even if Giuliani's argument is waived for purposes of Rule 50(b), though belated and minimally developed, consideration here for purposes of Rule 59(a) is not improper.

raises three grounds for why the jury should not have been permitted to hear or rely on the testimony of these two witnesses, but none of these arguments is persuasive.

First, Giuliani argues that "the work that Jensen Hughes did that was provided to Dr. Humphreys was, essentially, an expert report and required specialized knowledge and expertise," but "Ms. Scott/Jensen Hughes were never disclosed as an expert witness." Def.'s Mot. at 6–7. Giuliani mischaracterizes Scott's testimony as saying Jensen Hughes' work "required specialized knowledge and expertise." *Id.* at 7. That is not what Scott said. Scott agreed with Giuliani's counsel's characterization that Jensen Hughes' open-source analysts and senior investigators "were specialists in what they do," Trial Tr. at 115:2–6, 118:8–10, 119:18–20 (Dec. 11, 2023, PM), and that "without the expertise of all of those people," the Jensen Hughes report discussed "would not have been possible," *id.* at 119:25–120:2. Yet, Scott also testified that Jensen Hughes analysts were assessed only "for a set of baseline skills"; that she could not "recall" the "type of education and what type of degrees the analysts that worked on" the report held; and that, instead of these particular qualifications, Scott determined that Jensen Hughes' analysts were qualified because she "supervise[d] their work." *Id.* at 115:2–6, 116:16–117:1.

Regardless of how Scott described her own work in this case, the question of whether Scott should have been qualified as an expert under the federal rules is a legal question based on the testimony offered. As this Court explained in overruling Giuliani's same objection that Scott was "an unauthorized expert" and that "documents generated by Jensen Hughes were really undisclosed expert reports" when raised at trial and in a filing made the morning after Scott testified, *see id.* at 76:6–20, 104:24–106:4, 120:19–121:10–14, 123:1–8; Def.'s Resp. Reg. Objections to Exhibits at 2, ECF No. 127; Trial Tr. at 6:3–19 (Dec. 12, 2023, AM), "[b]eing an expert in a field doesn't mean that somebody is testifying as an expert under Federal Rule of

Evidence 702," Trial Tr. at 118:18–20 (Dec. 11, 2023, PM); *see* FED. R. EVID. 701, Comm. Notes on Rules—2000 Amendment ("The amendment does not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*." (emphasis in original)).

Scott explained that Jensen Hughes analysts and investigators compiled their "threat intelligence and monitoring" reports by "pull[ing] [information] from the spreadsheet" generated by a third-party vendor, which consisted of open-source content culled from "the Internet and dark web," and "digging into each post," in order to glean from the content "direct or indirect threats or anything that [was] reputationally damaging that could potentially lead to violence" against plaintiffs. Trial Tr. at 77:13–16, 81:23–82:1, 84:11–12, 108:10–22, 114:3–8, 119:8–14 (Dec. 11, 2023, PM); *see also* Trial Tr. at 114:8–11 (Dec. 13, 2023, AM) (Dr. Humphreys testifying that Jensen Hughes "polled social media content and monitored social media content attached to the names Ruby Freeman, Wandrea Shaye Moss and variants of that"). Based on these online mentions of plaintiffs over time, trends could be discerned, as discussed in Jensen Hughes' reports. *See, e.g.*, Trial Tr. at 86:19–87:4, 88:7–24 (Dec. 11, 2023, PM) (Scott testifying, as to "key finding in the report" covering mentions of plaintiffs from November 21, 2021 to May 1, 2023, that report showed "[m]ore than 710,000 . . . express mentions of [plaintiffs'] names," with graphs prepared by third-party vendor showing "largely negative sentiment trends"). Essentially, what Jensen Hughes did was commit people, who could count and had reading comprehension skills, to count the online mentions of plaintiffs and discern whether the content was positive or negative, under Scott's supervision. This required no specialized expertise to perform or then to explain to the jury. Thus, Scott testified merely as a lay witness about the work she and Jensen Hughes performed to cull and evaluate open-source data from a spreadsheet compiled by a third-party vendor. *See* Trial Tr. at 123:7–8 (Dec. 11, 2023, PM) (Court finding that the reports prepared by

Jensen Hughes reflected "collations of data" from the Internet and that Scott "has not been opining about anything"); Trial Tr. at 6:12–19 (Dec. 12, 2023, AM) (Court repeating finding that "Scott and the Jensen Hughes reports were basically data collection efforts . . . [and] reporting on that data collection," prepared by individuals with "reading comprehension [and] some search skills," which simply does not amount to "expertise").

In short, Scott testified as a lay witness, under Federal Rule of Evidence 701, basing her testimony on her experiential perception of what her team counted and assessed in online mentions of plaintiffs. Her testimony was "rationally based on [her] perception," FED. R. EVID. 701(a), "helpful" in "determining a fact in issue," in terms of the volume over time of defamatory statements about plaintiffs as well as the cause of plaintiffs' distress, FED. R. EVID. 701(b), and was not based on such "scientific, technical, or other specialized knowledge" outside the scope of typical lay knowledge to fall "within the scope of Rule 702," FED. R. EVID. 701(c). As such, her testimony was "the product of reasoning processes familiar to the average person in everyday life," *United States v. Wilson*, 605 F.3d 985, 1025–26 (D.C. Cir. 2010) (quoting *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005)), and thus properly admitted without qualification as an expert witness, *see also United States v. Kelsey*, 917 F.3d 740, 747–48 (D.C. Cir. 2019) (concluding the "record fully supports the district court's conclusion that [witness] testified as one of multiple lay witnesses who accounted for the chain of custody and physical processing of the DNA evidence, as distinct from its expert analysis" since witness "was testifying on a factual matter within her own experience—the raw data she produced and that it was the same data as was presented to the outside laboratory"). Giuliani has offered no new arguments or insights, or at bottom, any reason whatsoever to modify the rulings made during trial that Scott was testifying a lay witness, not as an expert.

Second, Giuliani argues that Dr. Humphreys "impermissibly relied on the Jensen Hughes testimony and documents" in her expert testimony. Def.'s Mot. at 7. In making this argument, Giuliani ignores that, under Federal Rule of Evidence 703, experts may "rely on reports prepared by others for the specific purpose of providing a basis for the testifying expert's opinions as long as they are 'of a type reasonably relied upon by experts in the particular field.'" *Huthnance v. Dist. of Columbia*, 793 F. Supp. 2d 183, 207 (D.D.C. 2011), *aff'd*, 722 F.3d 371 (D.C. Cir. 2013) (quoting FED. R. EVID. 703 (2000)). Dr. Humphreys testified that the evidence on which she relied, including the Jensen Hughes data, was "the kind of evidence that experts in [her] field typically rely upon to form an opinion," Trial Tr. at 30:15–19 (Dec. 13, 2023, AM); *see Huthnance*, 793 F. Supp. 2d at 207 (holding that "even if allowing reliance on [] report was error, it was harmless" and does not require a new trial, since "[b]oth experts testified that [the] report is of a type reasonably relied upon by experts in the field" (citations omitted)). Indeed, as this Court found at trial when overruling Giuliani's same objection, the Jensen Hughes data considered by Dr. Humphreys, which included "social media content attached to the names Ruby Freeman, Wandrea Shaye Moss and variants of that," Trial Tr. at 114:8–11 (Dec. 13, 2023, AM), was the type of information experts are permitted to rely on without the need for additional disclosures, *see id.* at 26:12–18 (Court concluding that "an expert can rely on a whole variety of things," including "other experts, fact experts, [and] other facts"); *see, e.g.*, *United States ex rel. Landis v. Tailwind Sports Corp.*, No. 10-cv-976 (CRC), 2017 WL 5905509, at *7–8 (D.D.C. Nov. 28, 2017) (expert's "media-impression count" was "the product of a reliable methodology" where expert consulted a "database [] which archives traditional print and digital media" and "provide[s] the 'reach' of each article," and "was able to calculate the 'media impressions' by summing the number of articles multiplied by the reach of each article" (citations omitted)).

Moreover, Dr. Humphreys testified that, without the Jensen Hughes materials, her "characterization of the social media commentary" "would have changed a little bit," but "the impressions numbers and the damages numbers would remain *exactly the same*," and that omitting those materials would not have "made [her reports] less reliable," Trial Tr. at 26:5–11 (Dec. 13, 2023, PM) (emphasis supplied); *id.* at 26:17–18 (Dr. Humphreys testifying that the Jensen Hughes data "contributed to some of [her] report" but did not impact "a significant or substantial conclusion"); *see also Sedgwick v. Giant Food, Inc.*, 110 F.R.D. 175, 177 (D.D.C. 1986) (denying motion for a new trial where "it is by no means clear that the jury's verdict on the epilepsy claim was based upon the [challenged] testimony" and "[o]n the basis of the evidence other than the expert testimony challenged here, the Court cannot say that the jury verdict was seriously erroneous or a clear miscarriage of justice" (quotation marks and citations omitted)).[16]   This is because, as Dr. Humphreys explained, she consulted the Jensen Hughes data only for the second, "impact assessment," step of her three-step analysis—which middle step she performed to "assess the reputational harm caused by the statements" made about plaintiffs—and only then as a portion of this middle step.  Trial Tr. at 40:1–4, 40:16–21, 103:18–23, 114:4–6 (Dec. 13, 2023, AM).

For this "impact assessment," Dr. Humphreys "looked at quantitative and qualitative data," *id.* at 40:2–4, "to understand descriptively how the reputations of Ms. Moss and Ms. Freeman had changed over time," Trial Tr. at 24:16–19 (Dec. 13, 2023, PM).   Specifically, Dr. Humphreys "looked at search trends on Google and the related search terms to the plaintiffs' names, and then

---

[16]     Giuliani cites *Jones v. NVR Inc.*, No. 20-cv-453 (CKK), 2022 WL 951338 (D.D.C. Mar. 29, 2022), *aff'd*, No. 22-7064, 2023 WL 4678759 (D.C. Cir. July 21, 2023), as support for his argument that "[w]here a party fails to disclose expert witnesses and instead tries to sneak an expert witness into trial wearing 'lay clothing', the result is an exclusion of the testimony or any evidence that relies on the testimony," Def.'s Mot. at 7 (citing *Jones*, 2022 WL 951338, at *7), but the witness at issue in that case, unlike Scott, offered "'opinions' based on 'scientific, technical, or other specialized knowledge,'" *Jones*, 2022 WL 951338, at *7 (quoting Fed. R. Evid. 701–702), and that is simply not what occurred here.

44

[] performed a qualitative analysis," Trial. Tr. at 103:18–23 (Dec. 13, 2023, AM), which involved analyzing material including "comments under Mr. Giuliani's tweets, Facebook comments, comments under the YouTube videos" that Dr. Humphreys considered for her impressions model—as well as Jensen Hughes data, *id.* at 109:13–20, 114:2–11.  Based on this data, Dr. Humphreys found that "the statements in this case reflected a significant negative and long-lasting impact on the reputations of Ms. Freeman and Ms. Moss," *id.* at 137:18–21.

Dr. Humphreys did not consider the Jensen Hughes data at the first, "impressions model" step, or the third, "damages model" step, of her analysis on which her damages estimates were based.  *See id.* at 39:23–40:6; *see also* Trial Tr. at 91:1–12 (Dec. 13, 2023, PM) (Dr. Humphreys did not "recommen[d] a damages award to the jury based on [her] impact assessment in this case" and "the Jensen Hughes data therefore" was "not relevant" "in any way to the cost to repair campaign that . . . [Dr. Humphreys] measured and recommended to the jury in this case").  For the impressions model, Dr. Humphreys "measure[d] the reach of the statements that were at issue in the case," which consisted of "two sets of statements" provided by plaintiffs' counsel— "defamation statements . . . [that] occurred after December 23rd, 2020," and "emotional harm statements [that] occurred between December 3rd, 2020, to December 22nd[,] [2020]."  Trial Tr. at 39:23–25, 56:22–24, 57:14–15, 58:24–59:1, 100:4–8 (Dec. 13, 2023, AM).  She based her damages model, which considered the cost "to repair the reputational damage" to plaintiffs, *id.* at 40:4–5, "purely on the statements of the impressions model," *id.* at 40:6 (Dec. 13, 2023, AM); *see also id.* at 120:14–18 ("[T]he damages model is based on the impressions model.  I count only the statements that I analyzed in the impressions model and calculate a campaign to repair reputation based on just those instances of the impressions in that model.").

Notably, Giuliani's complaint about use of the Jensen Hughes data amounts to another instance of him crying crocodile tears, since this use was a direct consequence of Giuliani's failure to comply with plaintiffs' basic discovery request for "the number of online views and/or impressions of any of the Actionable Statements about Plaintiffs [Giuliani] made, as described in Amended Complaint."   Default Judgment Decision, 2023 WL 5600316, at *10 n.7 (quoting plaintiffs' document request to the Giuliani Businesses).   Reliance on data compiled by Jensen Hughes, without corroboration from Giuliani's own data and discovery, was made necessary by Giuliani's discovery abuses.

Lastly, Giuliani challenges Dr. Humphreys' methods as "unreliable, contained too large of an analytical gap, and undisclosed foundations," Def.'s Mot. at 7, and blames this allegedly flawed methodology for producing "an exorbitant damages award for reputation injury," *id.*, with a punitive damages award tied to this compensatory award that was in turn "excessive," *id.* at 7 n.10.[17]   Giuliani was well aware of the results of this model and had been provided with Dr. Humphreys' three expert reports prior to trial, with all her reports employing "the same kind of methodology." *See* Trial Tr. at 5:3–11, 7:22–23, 88:10–11 (Dec. 13, 2023, PM) (Dr. Humphreys testifying that she issued her first report on July 28, 2023, her second report on October 6, 2023, and her third report on December 1, 2023); Trial Tr. at 34:18–36:9 (Dec. 13, 2023, AM) (Dr. Humphreys testifying that nothing "about the way that [her] model makes assumptions or the way that [her] model gives weight to certain considerations" changed in the supplemental reports).

---

[17]     Plaintiffs contend that this "Court should reject any other objections to the testimony of Dr. Humphreys and Ms. Scott" except as to the reliability of Dr. Humphreys' "impressions" model, "because [the other objections] were not presented at the Rule 50(a) stage," Pls.' Opp'n at 19 (citation omitted), when Giuliani objected only to the reliability of Dr. Humphrey's "impressions" model.   As explained *supra* n.15, however, an objection that is not preserved for a Rule 50(b) motion, may properly be considered under Rule 59(a). *See* 9B Charles Alan Wright et al., 11 FED. PRAC. & PROC. CIV. § 2537 (3d ed. 2023 Update).

Giuliani had ample opportunity to contest Dr. Humphreys' three-part model well before trial and even before the entry of default judgment, through deposition testimony or the filing of *Daubert* motions or motions *in limine*, but he waited until cross examination to do so. *See* Trial Tr. at 37:1–6 (Dec. 13, 2023, PM). As this Court previously summarized in denying Giuliani's objection that plaintiffs "should be limited to proving damages based only on 'those statements and/or co-conspirators specifically alleged in the Amended Complaint,'" Pretrial Disputes Decision, 2023 WL 8472723, at *6–7 (citations omitted), Giuliani had "been put on notice of plaintiffs' intent to prove damages relating to statements included in" Dr. Humphreys' reports, where Dr. Humphreys' first report was served on Giuliani "before [he] attempted to stipulate to liability for a second time on August 8, 2023 . . . and prior to the Court's entry of default judgment against Giuliani on liability on August 30, 2023," *id.* at 7 (citations omitted).

Giuliani moved to exclude Dr. Humphreys' testimony, at the close of her cross examination, "based on [Federal Rules of Evidence] 702, 703, unreliable methodology [and] undisclosed foundations," Trial Tr. at 73:6–14 (Dec. 13, 2023, PM), to which plaintiffs responded that Dr. Humphreys had "disclosed the bases for her opinions," that "each piece of the damages methodology that she [was] employing have been peer-reviewed," and that the "record . . . [was] clear from her testimony that she applied consistent methodologies across the three reports," *id.* at 73:19–74:5 (statement of plaintiffs' counsel). The defense motion was denied. *Id.* at 74:6. Giuliani's renewed objection at the Rule 50(a) stage was also denied, with the Court persuaded that "[f]or all of the reasons stated in Dr. Humphreys' testimony on direct, cross, and redirect, her 'impressions' model was "reliable based on scientific methods and opinions that were fully disclosed, including publicly available data that more than sufficiently satisfies the requirements of a [Federal Rule of Evidence] 702." Trial Tr. at 40:25–41:5 (Dec. 14, 2023, AM) (statement of

plaintiffs' counsel).  This Court concluded that "[b]ased on all of the evidence presented by plaintiffs, including . . . the expert testimony . . . a reasonable jury would have a legally sufficient evidentiary basis to . . . award at least some damages as compensation for the harm caused by Mr. Giuliani and his co-conspirators, and as punitive damages against Mr. Giuliani for his continued promotion of these same lies up to the very first day of this trial."  Trial Tr. at 45:14–25 (Dec. 14, 2023, AM).  On this third round of reviewing Giuliani's objection to the expert testimony of Dr. Humphreys, Giuliani raises no new argument and thus his objection is no more persuasive now than before, and is rejected.

## IV.    CONCLUSION

Giuliani's renewed motion urging this Court to reverse its prior findings and rulings and to override the jury's considered verdict on the basis of five threadbare arguments falls well short of persuading that "the evidence and all reasonable inferences that can be drawn therefrom are so one-sided that reasonable men and women could not have reached a verdict in [plaintiffs'] favor." *Xereas*, 987 F.3d at 1135 (citation omitted); *see also Lane*, 887 F.3d at 486–87.  The jury's verdict awarding plaintiffs compensatory and punitive damages for defamation and intentional infliction of emotional distress caused by Giuliani and his co-conspirators, as reflected in the Final Judgment, in the amount of $145,969,000, plus post-judgment interest, *see* Final Judgment, 2023 WL 9783148, at *1, stands.

Date:  April 15, 2024

_____
**BERYL A. HOWELL**
United States District Judge

48